IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ALTA POWER LLC, | |
| *Plaintiff/ Counter-Defendant,* | |
| v. | Case No. 3:23-CV-0270-X |
| GENERAL ELECTRIC INTERNATIONAL INC., d/b/a GE POWER SERVICES, | |
| *Defendant/ Counter-Plaintiff.* | |

## INDEX

| Exhibit No. | Description | Appendix Page |
|---|---|---|
| 1 | Alta Power's Original Claims Against Defendant GE | 2 |
| 2 | May 14, 2024 Email from M. Cappocia to J. Golinkin | 30 |
| 3 | Alta Power's Amended Interrogatory Answer | 34 |
| 4 | Alta Power's Amended Rule 26 Disclosures | 53 |

# Exhibit 1

FILED
2/24/2021 5:40 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Darling Tellez DEPUTY

CAUSE NO. DC-20-08331

| | |
|---|---|
| WATTSTOCK LLC. <br> *Plaintiff* <br><br> v. <br><br> ALTA POWER LLC, <br> *Defendant, Counter-Plaintiff, and Third-Party Plaintiff,* <br><br> v. <br><br> WATTSTOCK LLC <br> *Counter-Defendant, and* <br><br> GENERAL ELECTRIC INTERNATIONAL, INC., d/b/a GE POWER SERVICES <br> *Third-Party Defendants.* | IN THE DISTRICT COURT OF <br><br><br><br> DALLAS COUNTY, TEXAS <br><br><br><br> 116th JUDICIAL DISTRICT |

## ALTA POWER LLC'S FIRST AMENDED ANSWER AND COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION

Alta Power LLC ("Alta Power") files this First Amended Answer and Counterclaim and Original Third-Party Petition against Counter-Defendant WattStock LLC ("WattStock") and Third-Party Defendant General Electric International, Inc., d/b/a GE Power Services ("GE") and would respectfully show as follows:

### I.      SUMMARY OF ACTION

1.      This case is necessitated by repeated misrepresentation made by GE and WattStock to Alta Power concerning GE/WattStock's relationship, capabilities, and program to entice Alta Power to use GE/WattStock as the source of used aeroderivative gas turbines.

2.      Alta Power was created to develop power assets that would provide additional power capacity to the Texas energy grid when the grid was overburdened. As part of

this, Alta Power intended to purchase and place into service used aeroderivative gas turbines (essentially jet engines on skids) that can quickly turn on and off to meet instances where power demand exceeds available power supply. During these periods of excess demand, power prices are highest.

3.      GE was eager to participate in the used gas turbine market, a segment in which it historically had no presence. GE, however, did not want to be involved in the work of actually acquiring and selling the used turbines. Instead, GE engaged former GE employees who started WattStock to act as its sales force and point of entry into the used gas turbine market.

4.      Starting in 2018, GE and WattStock persuaded Alta Power to purchase used GE aeroderivative gas turbines, marketing the units as both more reliable and cost competitive, similar to the "Certified Pre-Owned Mercedes Benz®" program. Critically, Alta Power relied on GE's and WattStock's representations regarding the nature of the WattStock/GE relationship, the total acquisition cost of used units, and the benefits of GE's "OEM certified program." Ultimately, Alta Power agreed to move forward with WattStock/GE.

5.      GE's and WattStock's representations were false and have caused Alta Power to miss opportunities in the marketplace. Instead of the benefits claimed by GE and WattStock, Alta Power put money into potential units that were never going to fit their budgetary requirements because the units were either (1) burdened by undisclosed liabilities related to GE's "Long Term Services Agreements," (2) were prohibitively expensive for refurbishment by GE, or (3) were not available as marketed. Simply put, the acquisition costs and the benefits lauded by GE and WattStock were false.

6.      GE and WattStock's breaches of contract and tortious conduct caused Alta Power to lose more than one hundred million dollars of essential financing, profits related to its

business, and millions in payments to GE and WattStock for undelivered equipment and phantom services. After investing millions, Alta Power has nothing to show for what it has paid to GE and WattStock.

## II.      DISCOVERY CONTROL PLAN

7.      Discovery is intended to be conducted under Level 3 of Texas Rule of Civil Procedure 190.

## III.      PARTIES

8.      Alta Power is the Defendant in this case originally filed by WattStock, the original Plaintiff and Counter-Defendant. Both Alta Power and WattStock have already appeared.

9.      Third-Party Defendant GE is a company incorporated under the laws of Delaware doing business in Texas and can be served with Citation through its registered agent in Texas, CT Corporation System, 1999 Bryan St., Ste 900, Dallas, TX 75201-3136.

## IV.      VENUE AND JURISDICTION

10.      This Court has personal jurisdiction over WattStock related to Alta Power's claims as WattStock originally filed this case. This Court has personal jurisdiction over GE because a substantial amount of the acts giving rise to Alta Power's causes of action arose in Texas.

11.      Venue is proper in Dallas County, Texas under Section 15.002 of the Texas Civil Practice & Remedies Code because all, or a substantial part of the events or omissions giving rise to the claims against WattStock and GE, occurred in Dallas County and WattStock's principal place of business is in Dallas County, Texas.

12.      As required by Rule 47(b) of the Texas Rules of Civil Procedure, Alta Power seeks monetary relief of more than $1,000,000. Alta Power also seeks pre-judgment and post judgment interest at the highest legal rate.

## V.      GENERAL DENIAL

13.     Alta Power denies all the allegations set forth in WattStock's Original Petition and any subsequent amended petition and demands strict proof thereof as required by the laws of Texas.

## VI.      AFFIRMATIVE DEFENSES

14.     Alta Power asserts the following affirmative defenses:

a.  WattStock's claims are barred because of WattStock's material breaches of the Master Agreement, the LNTP, and the Ethos Authorization; and

b.  WattStock's claim for attorneys' fees fails for lack of presentment.

## VII.      FACTUAL ALLEGATIONS

**A.      Alta Power develops a strategy for meeting peak energy demands.**

15.     Alta Power was established to provide additional capacity to an overloaded energy grid in a creative and profitable manner.

16.     The market for power in Texas has evolved from traditional gas and coal fired power plants to more renewable sources like wind and solar. In 2019, renewable energy sources accounted for about 11% of total U.S. energy consumption and about 17% of electricity generation. Texas now meets 20% of its sizeable electricity demand with wind power.

17.     As electrical providers move towards renewable power production, there are times when the energy grid has more demand than supply. Aeroderivative gas turbine "peaker plants" have become imperative to meet this imbalance since these plants turn on quickly—in less than 10 minutes.

18.     Pricing for this "peak demand" power is often at a premium and can be sold under long-term contracts with investment grade counterparties. Alta Power determined that

ALTA POWER LLC'S FIRST AMENDED ANSWER AND
COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION - PAGE 4

peaker plants could help meet this demand, profitably for Alta Power if Alta Power could acquire aeroderivative gas turbines at a competitive price and locate them appropriately.

19.    Because of the high cost of new aeroderivative gas turbines, Alta Power's strategy relied on acquiring used aeroderivative gas turbines, which was the only way to make the projects work within the required budget.

20.    Developing natural gas-fired peaker projects is a complex process, including (1) identifying areas in the grid where a peaker plant fits (considering gas supply, offtake pricing, and interconnection feasibility); (2) navigating the state and federal regulatory waters of the electrical power market; (3) sourcing used aeroderivative gas turbines that can be purchased and refurbished within budget; and (4) obtaining project financing.

21.    This complexity, along with relatively high entry costs, means that there were only a few companies competing with Alta Power. However, given the limited size of the market, being a first mover was critical.

22.    By April 2018, Alta Power had identified several potential project sites through an extensive vetting process based on prevailing market conditions. Through this work, Alta Power earned a head start on its competitors and found itself with a brief window during which it would be the first mover in this niche market.

23.    At this point Alta Power turned to identifying surplus aeroderivative gas turbines units, which, once contractually secured, would allow it to obtain project financing.

**B.    GE and WattStock's Partnership**

24.    GE is one of the limited suppliers of aeroderivative gas turbines.

25.    GE historically has not had a presence in the sale of used aeroderivative gas turbines but recognized a need to be present in this market at some point prior to 2018. As such,

GE partnered with WattStock, a group of former GE executives. WattStock marketed itself (along with GE) as a fully integrated locator, dealer, refurbisher, and servicer of used aeroderivative gas turbines. WattStock markets itself as a unique solution in the used aeroderivative gas turbines, and as the only authorized distributor of used GE aeroderivative gas turbines.

26.     In reality, GE intended for, and held out WattStock to be, the *de facto* sales force in the used aeroderivative gas turbine market for GE. GE and WattStock work "hand-in-hand" as "partners" to provide the "TRUE PACKAGE™" or Certified Turbine Power—CTP™[1] system, "[t]he only authorized OEM [original equipment manufacturer] certified preowned package offering in the industry."[2]

27.     GE and WattStock entered in a Memorandum of Understanding ("MOU") on June 26, 2018 that "outlines" their relationship. The MOU establishes that GE is in complete control, especially in the context of transactions related to aeroderivative gas turbines originally manufactured by GE.

28.     Consistent with their relationship, GE and WattStock held themselves out publicly and privately as "partners" both orally and in writing.

## C.     GE directs Alta Power to WattStock

29.     In 2018, Alta Power began to determine which used aeroderivative gas turbines would best suit its needs. Availability and total acquisition costs were key drivers in its decision on which aeroderivative gas turbines to select. Because the used aeroderivative gas turbines must be refurbished, acquisition costs necessarily include the costs associated with

---

[1]     GE/WattStock uses the TRUEpackage™ descriptor on GE's Website and CTP™ on WattStock' s website. *See*   https://www.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions   and https://www.WattStock.com/ctp.

[2]     https://www.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions.

purchasing the units, the costs of refurbishment, and the costs associated with placing the unit at the location and into service.

30.     After sharing these considerations with GE and WattStock, and after meetings with GE, WattStock and others, Alta Power determined that used GE LM6000 aeroderivative turbine packages were best suited for Alta Power's strategy of tapping into the niche peaker plant market in Texas based on assurances from GE and WattStock.

31.     GE/WattStock were not the only companies that marketed used and refurbished GE LM6000s. Indeed, Alta Power met with several GE "certified" companies that refurbished used aeroderivative gas turbines. None, however, offered a fully OEM-certified and warranted end-to-end product like the TRUEpackage$^{TM}$, which GE/WattStock marketed as their "exclusive" service offering of being the "only authorized OEM certified preowned package offering in the industry."

32.     Alta Power had several meetings with both GE and WattStock personnel mainly at GE's Jacintoport facility where WattStock is co-located. To protect Alta Power's confidential information concerning its unique strategy, the parties entered into a Confidentiality Agreement.

33.     During these meetings, Alta Power disclosed to GE/WattStock the detailed budgetary requirements of Alta Power's business model. Alta Power repeatedly emphasized the cost sensitivity of its projects; that is, the cost of the gas turbine units cannot exceed a certain price point if the project is to remain within budget and financeable. GE and WattStock repeatedly confirmed that used units could be obtained for the prices Alta Power needed.

34.     GE/WattStock also persuaded Alta Power that its exclusive TRUEpackage$^{TM}$ OEM warranty was superior to anything offered in the market because GE would

provide an end-to-end package warranty covering both the aeroderivative gas turbine and the electrical generation components. GE/WattStock further stated that other competitors could only warrant a portion of the package.

35.     During these meetings, GE and WattStock described themselves as "partners." GE made it clear that the only way Alta Power could obtain the TRUEpackage™ equipment certification and warranty was by working with the GE and WattStock partnership.

36.     Specifically, GE refused to provide equipment certifications and warranties without WattStock.

37.     In addition to the pricing and warranties, GE and WattStock knew time was of the essence for Alta Power, as competitors were also attempting to enter the market. GE made it clear that delivery could occur within the time frame required by Alta Power's plans if Alta Power used the GE/WattStock TRUEpackage™ program.

38.     GE/WattStock emphasized that (1) GE had a proprietary global database of used LM6000 units including the operational and maintenance history on each, and (2) only GE and WattStock had access to this "proprietary" database. This "proprietary" data was a key selling point for Alta Power.

39.     GE/WattStock represented that GE and WattStock could efficiently locate used units, generate a detailed refurbishment scope, and cost estimate and streamline the acquisition, refurbishment, and delivery process all within Alta Power's required budget.

**D.     WattStock and Alta Power enter into a "Master Agreement."**

40.     Based on the representations concerning the benefits of the TRUEpackage™ program, including, (1) the benefits from GE and WattStock "collaborating" as "partners;" (2) the ready availability of used units that met Alta Power's project budget; (3) the

ability to timely close purchases and refurbish units; and (4) the "benefits" of the warranty with respect to the overall economics of the project, Alta Power agreed to move forward with GE/WattStock for the acquisition of used GE aeroderivative gas turbines to effectuate Alta Power's unique strategy.

41.     Through their discussions, GE and WattStock were keenly aware of the specific unit price requirements of Alta Power, and GE and WattStock assured Alta Power on multiple occasions that sufficient suitable units were available.

42.     The parties began negotiating financial and contractual terms for the relationship in February 2019. At GE's insistence, Alta Power contracted directly with WattStock. GE/WattStock required that WattStock (with GE standing behind it) negotiate the purchase price of each used GE aeroderivative unit with the prior owner and acquire the unit in WattStock's name for an agreed not to exceed price. GE/WattStock presented Alta Power with detailed total cost estimates for each unit showing that if each unit identified could be acquired at or below the "not to exceed price," then the fully refurbished unit could be delivered within Alta Power's budgetary requirements.

43.     The parties also agreed that in the event Alta Power paid any amounts prior to the units being acquired, those interim payments would be credited towards the purchase price Alta Power ultimately agreed to pay.

44.     GE and WattStock caused Alta Power to believe that GE's involvement would insulate Alta Power from any concerns related to the financial viability of WattStock since GE is one of the largest companies in the world. GE and WattStock caused Alta Power to believe that WattStock had the financial resources to pay for the units or complete the necessary steps leading to GE's certification under the TRUEpackage$^{TM}$ OEM program.

45.     On February 27, 2019 WattStock and Alta Power entered into a "Master Agreement" confirming the negotiations concerning how WattStock would be reimbursed for out-of-pocket expenses and as part of a negotiated purchase price after WattStock purchased and refurbished the used units. At no point was WattStock to be paid any mark-up on "down payments" made by Alta Power or on any out-of-pocket expenses for which Alta Power reimbursed WattStock.

46.     While not a named party to the Master Agreement, GE is an "affiliate" or "representative" of WattStock and, therefore, a party to the Master Agreement.

47.     In the Master Agreement, Alta Power and GE and WattStock agreed to a very strict confidentiality provision. GE/WattStock agreed to hold confidential information in "strict confidence" and agreed such information would "not be disclosed in any manner whatsoever." The Master Agreement also contains an exclusivity and non-circumvention provision under which WattStock (and by extension, GE) agreed that neither WattStock nor GE would directly or indirectly cause another person to either attempt to or purchase a unit inspected on behalf of Alta Power (a service for which Alta Power paid).

48.     Additionally, the confidentiality provision required WattStock and GE not to use any information obtained for any other purpose other than the agreed "business purpose," including but not limited to, providing any product or service, or establishing a relationship that is competitive with or against the best interest of Alta Power.

49.     Under the "Master Agreement," the parties also agreed that Alta Power would reimburse WattStock for specific out-of-pocket expenses incurred in arranging inspection and evaluation of the condition of used aeroderivative gas turbines, with prior written approval needed for expenditures more than $20,000.

**E.**   **WattStock and GE's misrepresentations continue.**

50.    Fully cognizant of the pricing sensitivities of Alta Power's projects, GE/WattStock presented Alta Power with financial information for the acquisition of available units.

51.    The knowledge of the availability of units was largely driven by GE's data. The financial information related to the acquisition of units included WattStock's own estimates based on its "experience" and data from GE based on GE's own data and detailed refurbishment pricing models for each unit.

52.    In February 2019, Pete Watson, WattStock's Vice President of CTP Operations, travelled to Turkey to begin inspections and negotiations on used GE aeroderivative gas turbine units. This was done at Alta Power's expense pursuant to the Master Agreement.

53.    Several used GE aeroderivative units were available in Turkey because changes in Turkish governmental regulations made the units uneconomical in country. In March 2019, WattStock presented Alta Power price and purchase options for nine used GE units based in Turkey.

54.    What WattStock and GE did not tell Alta Power was that the presented prices of the units were not the true prices. All the units GE/WattStock persuaded Alta Power to spend money on were burdened by hidden liabilities. Many of the potential units were significantly more expensive than represented because GE had Long Term Service Agreements ("LTSA") carrying hefty termination fees with the prior owners seeking to sell the used LM6000 aeroderivative gas turbine units. Units not burdened by LTSAs had other material undisclosed liabilities – all of which were driven by internal GE policies.

55.     These LTSAs generally required the prior owner pay GE millions of dollars to terminate. GE/WattStock failed to disclose the existence of these LTSA financial burdens to Alta Power up front. In fact, the LTSA termination fees were not disclosed until after (1) the units were targeted, (2) a purchase agreement was executed between the owners and WattStock, and (3) Alta Power paid WattStock millions of dollars in down payments associated with these purchase agreements.

56.     It was not until almost nine months after Alta Power had paid the first down payment that Alta Power learned of the existence of the LTSA termination fees. In February 2020, one of the sellers of two units, a Turkish company called Nuh Cemento, began demanding reimbursement for the LTSA termination fees to be paid GE in addition to the agreed upon purchase price. GE ultimately refused to waive the LTSA termination fee unless Alta Power entered into a multi-million dollar service agreement with GE. As a result, the project was burdened by expenses materially above Alta Power's project budgets.

57.     GE/WattStock were aware of the undisclosed termination fees before suggesting the Nuh Cemento units be targeted for acquisition. GE/WattStock knew adding the undisclosed termination fees would make the prices of those units higher than Alta Power's project budget. Utilizing a classic "bait and switch move," GE/WattStock deliberately hid the existence of the termination fees in the hope Alta Power would have no choice but to pay them at the 11th hour after Alta Power's project financing had been secured and the projects were already well underway.

58.     Prior to learning of the true cost of these units due to the undisclosed associated liabilities, Alta Power, relying on GE and WattStock, moved throughout 2019 and into 2020 attempting to purchase the two Nuh Cemento units.

59.     WattStock also improperly marked up Alta Power's down payment that would have never been made had Alta Power known the true price of the Nuh Cemento units. Per the terms of the Master Agreement, WattStock entered Equipment Purchase Agreements with Nuh Cemento. When WattStock sent an invoice to Alta Power for the $250,000 down-payment, WattStock added a "mark-up" of $125,000. Alta Power refused to pay the "mark-up" since it was inconsistent with the Master Agreement. Recognizing it had no entitlement to these funds, WattStock did not reiterate its demand for payment until litigation between the parties became imminent.

60.     WattStock, GE, and Alta Power identified an additional unit in Turkey owned by a Turkish company called Acarsoy.

61.     As with the Nuh Cemento units, WattStock/GE failed to disclose that the Acarsoy unit was burdened with a multi-million-dollar LTSA termination fee, which was not included in the pricing presented to Alta Power.

62.     Like with Nuh Cemento, Alta Power paid $475,000 in down payments related to this unit, unaware of the true cost of the unit. Alta Power would never have done so had GE/WattStock disclosed the liabilities associated with the unit which rendered it uneconomical for Alta Power's projects.

63.     Once again, WattStock even attempted to mark-up this down payment (as they did with every other payment from Alta Power) despite having no contractual basis to do so. Alta Power rebuffed these attempts, and WattStock recognized it had no basis for payments, and did not request the payments again until just before the filing of its lawsuit against Alta Power.

64.     In addition to units made uneconomical by LTSAs, WattStock also marketed units that were uneconomical for other reasons.

65.     In May of 2019, WattStock informed Alta Power of the existence of a package owned by EthosEnergy. WattStock suggested Alta Power purchase the package from EthosEnergy, claiming demand for the package was high. The "package" was essentially the housing for the aeroderivative gas turbine.

66.     GE and WattStock represented that Alta Power could obtain a gas turbine engine from the GE lease pool to marry with the EthosEnergy package and claimed a similar housing was available in Panama and could also easily be married with a lease pool engine.

67.     GE/WattStock claimed these leased units with the purchased housings would lead to a significantly lower price for Alta Power.

68.     Based on these representations, Alta Power purchased the EthosEnergy package for $200,000.

69.     When WattStock sent an invoice for this purchase, it marked up the purchase price initially by $175,000 and then later by $115,000.

70.     Once again Alta Power refused to pay the mark-up, as there was no contractual basis for such a mark-up. Indeed, the contractual relationship between Alta Power and WattStock contemplated that this package would not be marked up.

71.     GE/WattStock also did not disclose that the EthosEnergy unit was in a dilapidated condition and was only suggested as a possibility so that GE/WattStock could increase their revenue stream for providing repairs. Furthermore, several months later when Alta Power inquired about the possibility of cost savings using the previously promised lease pool engines, WattStock and GE informed Alta Power that "that program was no longer being offered."

72.     Had GE/WattStock disclosed the true condition of the EthosEnergy unit or the unavailability of the lease pool, Alta Power would not have purchased the Ethos unit at any

price. Furthermore, WattStock still has possession of the EthosEnergy unit, despite having been paid for it.

73.     WattStock convinced Alta Power to make a down payment for a unit owned by a company in Turkey called Bosen. As with all other units, WattStock and GE represented that the delivered unit would be priced consistent with Alta Power's needs.

74.     Alta Power put $300,000 dollars down for the purchase of the Bosen unit. Alta Power was later informed that GE/WattStock would not service units containing non-GE components unless the non-GE components were first replaced—regardless of their condition.

75.     The Bosen unit contained non-GE components and as a result the "new" purchase price including the refurbishment work which was several million dollars higher than previously represented by GE/WattStock and the unit was uneconomical for Alta's projects.

**F.     WattStock scuttles Alta Power's efforts at financing.**

76.     Throughout 2019, Alta Power discussed potential financing options for its power project. Alta Power reached out to several sources of funding. In the summer of 2019, Alta Power identified its best source of funding for the purchase of the nine aeroderivative units: Deutsche Bank.

77.     Alta Power engaged in negotiations with Deutsche Bank concerning financing for its unique peaker plant strategy. As part of its due diligence, Deutsche Bank requested a meeting with WattStock. WattStock met with Deutsche Bank and during these meetings, WattStock confirmed that GE and WattStock were "partners."

78.     Of course, Deutsche Bank would rely not solely on WattStock's representation that GE and WattStock were "partners." Accordingly, Deutsche Bank formally asked GE to provide appropriate assurances. On July 31, 2019, GE responded to this request in a

letter confirming that if WattStock failed to meet its contractual obligations, GE would step in since GE and WattStock are partners in this venture. GE also confirmed that GE engineering will be overseeing WattStock's work and that GE has a "strong incentive" for the project to succeed.

79.    Sometime before financing was closed, WattStock disclosed to Ryan Castleman of Castleman Power Development LLC ("Castleman"), one of Alta Power's few competitors, that project financing from Deutsche Bank was imminent. Knowing the financing would decrease the available used units in the marketplace and would allow Alta Power's projects to come online first, Castleman predictably attempted to scuttle Alta Power's financing. Specifically, Castleman threatened to file a frivolous "trade secret" lawsuit against Alta Power to stop the financing.

80.    Alta Power was forced to disclose this frivolous claim to Deutsche Bank. Alta Power worked to quickly resolve the frivolous dispute, and ultimately had no choice but to pay Castleman an extortion fee to settle the frivolous claim. But the damage was already done. Castleman's strategy of causing delay to destroy financing worked.

81.    Deutsche Bank decided against providing financing to Alta Power, delaying Alta Power's ability to bring units into service.

**G.    WattStock steals $100,000 from Alta Power to finance WattStock's operations.**

82.    Despite the Deutsche Bank financing falling through, Alta Power remained committed to its unique peaker plant strategy and continued to explore other financing options in the fall of 2019.

83.    By the fall of 2019, GE and WattStock continued to lead Alta Power to believe that the targeted units could be acquired consistent with WattStock and GE's earlier pricing guidance. Because of this, Alta Power continued to fund the potential acquisition of units.

84.     In October 2019, Alta Power sent WattStock $100,000 for potential use in extending an option to purchase units from Bosen. During WattStock's negotiations with Bosen, Alta Power ultimately decided not to go through and told WattStock to cease negotiations. WattStock complied and the parties never entered into an agreement extending the option period with Bosen.

85.     WattStock never sent Alta Power's $100,000 to Bosen since the negotiations were called off before the $100,000 was used.

86.     Alta Power requested the return of the $100,000. WattStock acknowledged the funds would be returned, and repeatedly promised to do so on multiple occasions during the fall and winter of 2019-2020.

87.     WattStock broke these promises. Instead, WattStock converted Alta Power's $100,000 and used it to cover serious cash flow issues, which WattStock had previously failed to disclose to Alta Power and did not disclose until May of 2020.

**H.     WattStock continues to fail to disclose the true costs of units.**

88.     Despite the Deutsche Bank financing falling through, Alta Power was still committed to the development of its projects. Consistent with this and based on WattStock's false representations that other buyers were targeting the Turkish units, Alta Power paid WattStock over $200,000 for extensions to keep alive potential deals with Acarsoy and Nuh Cemento in the fall of 2019.

89.     At no time did WattStock inform Alta Power that the true costs of these units were inconsistent with WattStock's and GE's representations.

90.     During the fall of 2019, Alta Power considered a variety of funding structures, and decided to finance each project separately, rather than approaching potential lenders with a portfolio of three projects.

91.     Consistent with this, Alta Power and WattStock entered a Limited Notice to Proceed Proposal ("LNTP") on December 23, 2019 for two separate units to be acquired from Nuh Cemento. The total amount of the LNTP was almost $20 million. This included the "not to exceed price" of $6.5 million for WattStock to purchase the units from Nuh Cemento that GE/WattStock told Alta Power will be sufficient to purchase the units, with the balance for transportation, refurbishment, and installation of the units. This price included GE/WattStock's profit margin for the project.

92.     GE and WattStock represented to Alta Power that GE needed to be paid $1,500,000 to secure the purchase of long-lead hardware, start engineering activities and deliver preliminary drawings related to a potential TRUEpackage$^{TM}$ project. The $1,500,000 was divided into two payments of $750,000.

93.     Alta Power paid $750,000 on December 24, 2019 and paid another $750,000 on January 13, 2020.

94.     In February 2020, Alta Power was informed for the first time that the owner of the two Nuh Cemento units would only sell the two units for the agreed not to exceed price of $6.5 million **plus** the cancellation of GE's LTSA termination fee of over $1.4 million.

95.     The impact of the cancellation fee materially increased project costs above the previous budget and impacted Alta Power's ability to obtain financing for the project.

96.     For the units being considered (as with the Bosen unit), the significant liabilities were *not* disclosed until *after* Alta Power made the final payment to GE under the LNTP.

97.     By March 2020, the global economy was in the grips of the COVID-19 crisis. This delay impacted the closing of Alta Power's project financing. Regardless, Alta Power remained financially committed to the project and was ready, willing, and able to go forward with the two Nuh Cemento units under the LNTP.

98.     In the spring of 2020 WattStock informed Alta Power it was having financial issues. WattStock asked Alta Power to either provide a loan or acquire WattStock.

99.     During this time, Alta Power requested that GE step in and fulfill its commitment to Alta Power to assist in securing the units needed for Alta Power's project. GE refused.

100.     Alta Power was ready, willing, and able to go forward with the Nuh Cemento project with GE alone. GE refused to allow Alta to pay directly for the LNTP components, despite repeated requests by Alta Power due to concerns regarding WattStock's financial situation. And GE further refused to step in and take over for WattStock (despite contrary written representations) when Alta Power notified GE that WattStock was insolvent.

101.     Alta Power also continued to negotiate with other sources of funding for the Project, including Riverstone and Macquarie.

102.     Despite Alta Power's effort sand GE's prior representations, GE made it clear, once again, that it would only move forward with WattStock, thereby constructively cancelling the LNTP and the Nuh Cemento project.

103.     Consequently, Alta missed their opportunity to be a first mover in the highly competitive Texas peaking electricity market.

## VIII.    CAUSES OF ACTION

### COUNT I: DECLARATORY JUDGMENT (AGAINSTGE AND WATTSTOCK)

104.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

105.    Alta Power seeks a declaratory judgment pursuant to Tex. Civ. Prac. & Rem. Code § 37.001 *et seq.* Alta Power requests the Court to declare that:

   a. No contractual agreement exists by which WattStock is entitled to "mark-ups" on goods or services.

   b. GE and WattStock are principal/agent or partners such that GE is responsible for WattStock's torts and breaches.

   c. As of May 20, 2020, WattStock was insolvent and Alta Power was entitled to terminate the Master Agreement, which excuses Alta Power of any further performance.

   d. As of May 20, 2020, WattStock was insolvent and Alta Power was entitled to terminate the December 23, 2019 LNTP.

   e. GE's refusal to go forward with the Nuh Cemento project once WattStock became insolvent was a breach of the LNTP requiring GE to refund money paid to WattStock/GE by Alta Power.

### COUNT II: RESPONDEAT SUPERIOR (AGAINST GE)

106.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein. GE and WattStock represented to Alta Power that they were "partners" and that WattStock acted as GE's Authorized Service Provider.

107.    Alta Power justifiably relied on these representations by GE and WattStock in agreeing to the Master Agreement and the LNTP.

108.    In fact, without the representations, Alta Power would have never entered any contracts with WattStock.

109.    Accordingly, an ostensible agency existed between WattStock and GE.

110.    GE is estopped from denying liability for WattStock's breaches and torts and/or GE and WattStock engaged in a joint enterprise for which joint and several liability exists.

111.    Despite the fig leaf boiler-plate language in the MOU between GE and WattStock, the language of the MOU shows GE controlled WattStock. Accordingly, the "no partnership or agency" provision is a sham or subterfuge designed to conceal the true legal status of GE/WattStock. Extrinsic evidence also shows actual control by GE over WattStock.

112.    GE is *respondeat superior* liable for the breaches and torts of WattStock.

### COUNT III: BREACH OF CONTRACT (AGAINST WATTSTOCK)

113.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

114.    Alta Power and WattStock entered into the Master Agreement, which is and was a valid and enforceable contract. Alta has standing to sue for breach of the Master Agreement.

115.    Alta Power performed its obligations under the Master Agreement.

116.    WattStock breached the confidentiality provisions of the Master Agreement by disclosing confidential information about Alta Power and its financing to Castleman. WattStock's breach has proximately caused injury to Alta Power. Specifically, WattStock's breach caused Alta Power to lose project financing for its a unique strategy for developing power generation projects in the Texas market.

117.    Had WattStock not breached the confidentiality provisions, Alta Power would have closed financing with Deutsche Bank and been able to implement its unique strategy.

118.    As a direct result of WattStock's breaches, Alta Power has been severely damaged.

119.    Alta Power paid GE/WattStock $1.5 million related to the Nuh Cemento project for GE to acquire long-lead hardware, start engineering activities, and deliver preliminary drawings.

120.    The Master Agreement and LNTP were cancelled due to WattStock's insolvency.

121.    In addition to its liability under the theory of respondeat superior, GE is also vicariously liable for WattStock's breaches of the Master Agreement and LNTP. Consequently, GE must refund to Alta Power the $1.5 million under the contracts between the parties.

122.    To compensate it for the damages outlined above, Alta Power seeks unliquidated damages.

123.    Pursuant to Texas Civil Practice and Remedies Code section 38, Alta Power is entitled to attorney's fees, costs, and expenses, due to WattStock's breach of the agreement.

## COUNT IV: UNJUST ENRICHMENT (AGAINST GE)

124.    Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

125.    GE has been unjustly enriched in the amount of $1.5 million to the detriment of Alta Power.

126.    Alta Power demands restitution of all amounts GE has been justly enriched.

## COUNT V: CONVERSION (AGAINST WATTSTOCK)

127.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

128.    In October 2019, Alta Power sent WattStock $100,000 to extend an option to purchase units from Bosen.

129.    Alta ultimately declined to extend the option and instructed WattStock to return the $100,000.

130.    Alta repeatedly demanded that WattStock return the $100,000 during the fall and winter of 2019-2020. WattStock refused (and continues to refuse) to return this money, and thereby assumed and exercised dominion and control over Alta's money in an unlawful and unauthorized manner, to the exclusion of and inconsistent with Alta's rights.

## COUNT VI: TEXAS THEFT LIABILITY ACT (AGAINST WATTSTOCK)

131.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

132.    Alta has a possessory right to the $100,000 it paid WattStock.

133.    WattStock misappropriated and enjoyed these monies knowing full well it was not entitled to same.

134.    All of this was done without Alta's consent. WattStock intended to and did in fact deprive Alta of these monies which led Alta to suffer significant financial damages in an amount to be proven at trial, plus court costs and reasonable and necessary attorney's fees as allowed by the TLA.

## COUNT VII: FRAUD (AGAINST GE AND WATTSTOCK)

135.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

136.    GE and WattStock intentionally misrepresented the nature of their relationship to induce Alta Power to contract with GE/WattStock.

137.    GE represented it would "stand behind" WattStock. However, when the time came to do so GE did not.

138.     Simply put, the pricing provided by GE and WattStock was intentionally misrepresented and did not include the true cost of acquisition of the units. Alta Power relied on these representations to its detriment.

139.     GE had the right under its MOU with WattStock to force WattStock to sell GE any gas turbine purchased pursuant to the TRUEPACKAGE$^{TM}$ program. In effect, GE had the right to push WattStock aside and ensure that any deal was consummated.

140.     Yet, when WattStock became insolvent GE refused to "stand behind" WattStock and take the necessary steps to consummate the LNTP with Alta Power and Nuh Cemento.

141.     GE/WattStock misrepresented the benefits of the TRUEpackage$^{TM}$ program.

142.     GE/WattStock represented that the program would enhance the ability to obtain financing when it did not.

143.     GE/WattStock represented that the program would be able to move quickly to service the narrow window Alta Power had for this unique strategy when in fact the GE/WattStock relationship created a bureaucracy that only slowed down projects.

144.     GE/WattStock represented that the TRUEpackage$^{TM}$ program was of a superior quality when in fact it was not.

145.     GE/WattStock represented that units from the TRUEpackage$^{TM}$ program were competitively priced with alternative refurbished gas turbine solutions when in fact they were not.

146.     GE/WattStock hid the existence of undisclosed liabilities on virtually every unit suggested using a classic bait and switch maneuver.

147.    GE/WattStock's misrepresentations were material and false.

148.    Both GE and WattStock knew these representations were false when they made them, or at the very least, these representations were made recklessly and without knowledge of their truth.

149.    These representations were made with the intent that Alta Power act on them.

150.    Alta Power relied on GE and WattStock's representations regarding their relationship.

151.    GE and WattStock's misrepresentations caused Alta Power injury well beyond the minimum jurisdictional limits of the Court.

152.    Alta Power has wasted at least $10 million based on GE/WattStock's misrepresentations.

153.    Had GE/WattStock not misrepresented the true facts, Alta Power would have been able to successfully serve the niche market and has lost significant revenue as a result.

## COUNT VIII: NEGLIGENT MISREPRESENTATION (AGAINST GE AND WATTSTOCK)

154.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

155.    Alternatively, each fraudulent misrepresentation made by GE and WattStock were made negligently since GE/WattStock did not exercise reasonable care or competence in obtaining or communicating the information.

156.    Alta Power has wasted at least $10 million based on GE/WattStock's negligent misrepresentations.

157.    Had GE/WattStock not negligently misrepresented the true facts, Alta Power would have been able to successfully serve the niche market and has lost significant revenue as a result.

## IX.    JURY DEMAND

158.    Alta Power requests trial by jury on all contested issues of fact. The requisite jury fee has been paid.

## X.    PRAYER

ACCORDINGLY, Alta Power prays that WattStock and GE be cited to appear and answer and that upon a final trial of this matter, the Court enter a final judgment against WattStock and GE awarding Alta Power the following relief:

a)  An award of the full amount of actual damages incurred by Alta Power and caused by the acts and omissions of GE and WattStock;

b)  An award of equitable damages, as requested above;

c)  An award of exemplary damages;

d)  Reasonable and necessary attorneys' fees;

e)  Pre-judgment and post-judgment interest at the maximum rate allowed by law;

f)  Cost of court; and

g)  Such other and further relief, general or special, at law or in equity, to which Alta Power may show itself to be justly entitled.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By: /s/ Michael Cancienne
      Michael Cancienne
      State Bar No. 24055256
      Kevin Jordan
      State Bar No. 11014800
      Joseph W. ("Jeb") Golinkin II
      State Bar No. 24087596
      1980 Post Oak Blvd., Ste. 2300
      Houston, Texas 77056
      713.955.4028
      713.955.9644 Facsimile
      mcancienne@jlcfirm.com
      kjordan@jlcfirm.com
      jgolinkin@jlcfirm.com

**ATTORNEYS FOR DEFENDANT, COUNTER-PLAINTIFF AND THIRD-PARTY PLAINTIFF ALTA POWER LLC**

## CERTIFICATE OF SERVICE

I hereby certified that a true and correct copy of the above pleading was served on all parties through the Court's electronic filing service on the 24th day of February, 2021.

By:     /s/ Michael Cancienne
       Michael Cancienne

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Linda Baumgartner on behalf of Michael Cancienne
Bar No. 24055256
lbaumgartner@jlcfirm.com
Envelope ID: 50890701
Status as of 2/25/2021 10:02 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Andrew Robertson | 24090845 | drobertson@krcl.com | 2/24/2021 5:40:13 PM | SENT |
| Brian N. Hail | 8705500 | bhail@krcl.com | 2/24/2021 5:40:13 PM | SENT |
| Michael Cancienne | 24055256 | mcancienne@jlcfirm.com | 2/24/2021 5:40:13 PM | SENT |
| Kaitlyn Faucett | | kfaucett@lightfootlaw.com | 2/24/2021 5:40:13 PM | SENT |
| Jared Levinthal | | levinthal@lightfootlaw.com | 2/24/2021 5:40:13 PM | SENT |
| Natalie Sanchez | | nsanchez@lightfootlaw.com | 2/24/2021 5:40:13 PM | SENT |
| Ann Requena | | arequena@lightfootlaw.com | 2/24/2021 5:40:13 PM | SENT |
| Jeannine Peyton | | jpeyton@lightfootlaw.com | 2/24/2021 5:40:13 PM | SENT |
| Michael D.Fisse | | mfisse@daiglefisse.com | 2/24/2021 5:40:13 PM | SENT |
| Ted Lefebvre | | ted.lefebvre@ge.com | 2/24/2021 5:40:13 PM | SENT |
| Julie Frauenhofer | | Julie.frauenhofer@ge.com | 2/24/2021 5:40:13 PM | SENT |

Associated Case Party: WATTSTOCK LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| MARTI BEAUJEAN | | mbeaujean@krcl.com | 2/24/2021 5:40:13 PM | SENT |
| Vicki Sedon | | vsedon@krcl.com | 2/24/2021 5:40:13 PM | SENT |
| Connie Nims | | cnims@krcl.com | 2/24/2021 5:40:13 PM | SENT |

Associated Case Party: ALTA POWER LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Kevin Jordan | | kjordan@jlcfirm.com | 2/24/2021 5:40:13 PM | SENT |
| Joseph Golinkin | | jgolinkin@jlcfirm.com | 2/24/2021 5:40:13 PM | SENT |

# Exhibit 2

| From: | Capoccia, Matt |
|---|---|
| To: | Jeb Golinkin |
| Cc: | LeGrand, Andrew; Sohn, Bryan; Michael Cancienne |
| Subject: | Re: Alta Power: Proposed Amended Complaint and Meet and Confer |
| Date: | Tuesday, May 14, 2024 6:15:51 PM |

Jeb,

GE would be willing to not oppose Alta's amended complaint if Alta will agree to answer interrogatories and provide deposition testimony needed to remedy the prejudice of Alta substantively amending its theories four years into the life of the case.

First, Alta must agree that GE may serve 15 additional interrogatories.  These are warranted not only because Alta has changed its theories in the middle of the case, but also because a review of the interrogatories to date reflects that Alta has only given five substantive answers to interrogatories.

Second, Alta's late-stage amendment, if allowed, would require additional deposition time with two Alta deponents, Mr. Laterza and Mr. West.  As you know, a large portion of each deposition was spent exploring theories that Alta now seeks to drop from its case, regarding the Castleman dispute.  And neither deposition accounted for the new claims Alta now seeks to add, long after each deponent testified.  I would also note that we approached you in November 2022 and sought for you to amend at that time, but you refused – causing GE to continue to expend resources (and deposition time) on claims you knew to be groundless and now seek to abandon.

Best,
Matt

**Matt Capoccia**
GIBSON DUNN

Gibson, Dunn & Crutcher LLP
2001 Ross Avenue Suite 2100, Dallas, TX 75201
Tel +1 214.698.3249 • Fax +1 214.571.2987
MCapoccia@gibsondunn.com • www.gibsondunn.com

On May 10, 2024, at 1:58 PM, Jeb Golinkin <jgolinkin@jlcfirm.com> wrote:

**[WARNING: External Email]**

Dear Andrew and Matt,

As you know, the deadline for the parties to amend their pleadings is **on Tuesday**. To that end, we have prepared an amended complaint, a copy of which is attached for your review. I have also attached a redline so you can see what has changed. Please let us know if you oppose our amendment, or whether we can amend with your consent.

Also, in response to Matt's previous email, we are available to talk **next Friday afternoon** to confer. Anytime after 1:30pm. Let us know what works best for you.

Thanks,

Jeb
–
**Joseph W. Golinkin II**
Partner | Jordan, Lynch & Cancienne PLLC
(o) 713-955-4019 | (c) 832-250-6567
1980 Post Oak Blvd., Suite 2300 Houston, Texas 77056
www.jlcfirm.com  |  Attorney Biography
<image001.png>


<Alta Power_Proposed Amended Complaint (clean).pdf>
<Alta Power_Proposed Amended Complaint (Redline).pdf>


**Matt Capoccia**
GIBSON DUNN

Gibson, Dunn & Crutcher LLP
2001 Ross Avenue Suite 2100, Dallas, TX 75201
Tel +1 214.698.3249 • Fax +1 214.571.2987
MCapoccia@gibsondunn.com • www.gibsondunn.com

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

# Exhibit 3

| From: | Jeb Golinkin |
|---|---|
| To: | Cox, Trey; LeGrand, Andrew; Patel, Pooja R.; LeGrand, Andrew |
| Cc: | Michael Cancienne; "Pulliam, Jessica"; Lawrence, John; Kazlow, Jordan; "Wallace, Kirstie"; Kasey Todd |
| Subject: | AP v. GE: AP"s Amended Answers to GE"s Interrogatories |
| Date: | Wednesday, October 12, 2022 8:33:46 PM |
| Attachments: | image001.png |
| | Alta Power"s Amended Answers to GE"s Interrogatories.pdf |

Counsel,

Please find Alta Power's First Amended Answers to GE's Interrogatories.

Respectfully,

Jeb Golinkin

--
**Joseph W. Golinkin II**
Trial Attorney | Jordan, Lynch & Cancienne PLLC

(o) 713-955-4019 | (c) 832-250-6567
1980 Post Oak Blvd., Suite 2300 Houston, Texas 77056
www.jlcfirm.com |  Attorney Biography



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

WATTSTOCK LLC,

      *Plaintiff/Counter Defendant*,

v.

ALTA POWER LLC,

      *Defendant/Counter Plaintiff,*

v.

GENERAL ELECTRIC INTERNATIONAL
INC., d/b/a GE POWER SERVICES,

      *Third-Party Defendant.*

Case No. 3:21-CV-03183-X

### ALTA POWER, LLC'S OBJECTIONS AND RESPONSES TO GENERAL ELECTRIC'S FIRST INTERROGATORIES

TO:    Third-Party Defendant General Electric International, Inc ("GE"), by and through its attorneys of record, Trey Cox, Andrew Legrand, and Pooja Patel of Gibson, Dunn & Crutcher LLP

        Pursuant to the Federal Rules of Civil Procedure, Alta Power LLC ("Alta" or "Alta Power") serves this, its Amended Objections and Responses to Third-Party Defendant General Electric International, Inc.'s Interrogatories.

        Respectfully submitted,

        JORDAN, LYNCH & CANCIENNE PLLC

        By:     *Michael Cancienne*
           Michael Cancienne
           State Bar No. 24055256
           Joseph W. ("Jeb") Golinkin II
           State Bar No. 24087596
           1980 Post Oak Blvd., Suite 2300

Houston, Texas 77056
Telephone: 713.955.4025
Facsimile: 713.955.9644
mcancienne@jlcfirm.com
jgolinkin@jlcfirm.com

BAKER BOTTS L.L.P.

Jessica B. Pulliam
State Bar No. 24037309
John B. Lawrence
State Bar No. 24055825
Kirstie L. Wallace
State Bar No. 24115920
2001 Ross Avenue, Suite 900
Dallas, Texas 75201
Telephone: (214) 953-6500
Facsimile: (214) 953-6503
jessica.pulliam@bakerbotts.com
john.lawrence@bakerbotts.com
Kirstie.wallace@bakerbotts.com

ATTORNEYS FOR ALTA POWER LLC

## <u>CERTIFICATE OF SERVICE</u>

This certifies that a copy of the above and foregoing was sent to the following counsel of record by electronic mail on October 12, 2022:

Trey Cox
Andrew Legrand
Pooja Patel
Gibson Dunn & Crutcher LLP
2001 Ross Ave Suite 2100
Dallas, TX 75201
*Attorneys for Third-Party Defendant*
*General Electric International, Inc.*

And

Thomas D Berghman
Jamil Alibhai
Natalie Sears
Munsch, Hardt, Kopf & Harr, PC;

Page **2**

500 N. Akard St., Ste. 500
Dallas, TX 75201
*Attorneys for Wattstock LLC*

 /s/ *Jeb Golinkin*
Jeb Golinkin

## **GENERAL OBJECTIONS**

1.  Alta Power objects to GE's Definitions and Instructions contained in the discovery to the extent that same seek to alter or expand Alta's obligations to respond to same under the Federal Rules of Civil Procedure.

2.  To the extent the definition of "you" and "your" includes Alta's attorneys, the discovery seeks information protected from discovery by the attorney/client privilege and the attorney work product doctrine.

3.  As noted in Jeb Golinkin's 06/29/21 Letter to Mr. Fisse, GE served 34 total interrogatories on Alta Power. The Federal Rules of Civil Procedure provide that "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts FED. R. CIV. P. 33. Accordingly, Alta Power will answer only the first 25 interrogatories (numbered Rogs 1-22, since Numbered Rog 1 contains two interrogatories and Numbered Rog 2 contains 3 interrogatories.

4.  Alta Power objects to GE's definitions of "identify" because they seek to impose burdens on Alta Power that are not permitted by the Federal Rules of Civil Procedure.

Appendix038

## ALTA POWER'S OBJECTIONS AND ANSWERS TO GE's INTERROGATORIES

Interrogatory Number 1:

In Paragraph 1 of your First Amended Answer and Counterclaim and Third-Party Petition, you state that "[t]his case is necessitated by repeated misrepresentation made by GE and WattStock to Alta Power concerning GE/WattStock's relationship, capabilities, and program to entice Alta Power to use GE/WattStock as the source of used aeroderivative gas turbines." For each statement or communication made by any person which you claim to constitute a "misrepresentation," please identify the communication, including the following information:

   a.   State verbatim the statement or representation that was made, and identify whether the statement or representation was made verbally or in writing;

   b.   Identify the person who made the statement or representation;

   c.   Identify the person(s) to whom the statement or representation was made;

   d.   Identify all persons who were present when the statement or representation was made;

   e.   State the date on which the statement or representation was made;

   f.   State the location at which the statement or representation was made; and

   g.   Describe in detail how the person to whom the representation was made (or any other person who acted for Alta) acted in reliance on the representation and how Alta suffered injury thereby.

**RESPONSE:** Alta Power objects that this interrogatory is in fact two separate interrogatories: one which asks Alta Power to identify the communications (subparts a through f) and another that commands Alta Power to explain *how* the identified statements were relied upon.

With regard to subparts (A-F): Alta Power objects that this Interrogatory is unduly burdensome. Subject to that objection, Alta Power references and incorporates its live pleading, which provides detail no GE's representations. GE repeatedly held itself out as WattStock's partner. *See* e.g.: Lance Herrington's July 31, 2019 letter to Matt Laterza ("Re: GE TruePackage LM600's and WattStock Refurbishment Services") (Alta 0016167); GE's website: https://www.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions and https://www.WattStock.com/ctp; and pricing data provided by GE through WattStock (*See e.g.* Ex. 7 to the Deposition of Pete Watson). GE also made false representations about availability of and demand for its used turbines in an effort to create the impression that there was availability and demand for these products that did not actually exist.

Appendix039

GE falsely represented that it could and would enable Alta Power to purchase up to nine used GE LM6000s for at or below $10 million per used GE LM6000 unit, including the two Nuh Cemento Units, the Ataer unit, and the Acorsoy units. In so doing, GE did not disclose the fact that it needed to coordinate the resale of these used products because failure to do so would mean it would no longer be making money on service contracts with the owners of those turbines.

GE egregiously broke its promise to do everything in its power to enable Alta Power to purchase the nine required units at or below Alta Power's "not to exceed" price. On at least four occasions, GE did the exact opposite by knowingly preventing Alta Power from purchasing units that otherwise would have satisfied the pricing requirements that GE knew was required from the parties' first meeting and which GE represented it could satisfy by (a) refusing to release Nuh Cemento, Ataer unit, or Acorsoy from their obligation to pay GE termination fees upon cancellation of the GE service agreements attached to those units and (b) attempting to use the termination fees to force Alta Power into entering into Long Term Service Agreements with GE for these units.

But for GE and WattStock's unlawful conduct, Alta Power would have purchased power generation units and would have made millions of dollars in profits. Instead, GE and WattStock misappropriated millions of dollars of Alta Power's money.

Additional information about these termination fees and GE's decisions related thereto can be found in (among others) the following documents: GEALTA_0011724; GEALTA_0003482; GEALTA_0003380; GEALTA_0003496; GEALTA_0003444; GEALTA_0000253; GEALTA_0001471; GEALTA_0001520-21; GEALTA_0003380-0003432; GEALTA_0003434; GEALTA_0003532; GEALTA_0003551; GEALTA_0003553; GEALTA_0003580; GEALTA_0003642; GEALTA_0003643; GEALTA_0003647; GEALTA_0003711; GEALTA_0004121; GEALTA_0004251; GEALTA_0007501; GEALTA_0007508; GEALTA_0007653; GEALTA_0007826; GEALTA_0008029; GEALTA_0008433; GEALTA_0009561; GEALTA_0009563; GEALTA_0010344; GEALTA_0010350; GEALTA_0003382.

In addition to the above, GE falsely held itself out as the lowest cost, most financeable solution in the marketplace, which was not accurate. These representations were made primarily at meetings that took place at GE's Jacinto Port Facility that were attended by, among others, Lance Harrington, Jim Cannon, Clayton Yancey, Alex Babu, and Matthew Laterza; and Travis West. The dates and times of these meetings are reflected in the productions of both Alta Power and WattStock. *See e.g.* Alta 0008423; GEALTA_0013784; Alta 0025622.These representations caused Alta Power to forego pursuing other turbines and caused Alta Power to lose the ability to purchase this used hardware with which Alta Power would have made millions in profits.

With regard to subpart (G): GE's misrepresentations caused Alta Power to enter into a business relationship with WattStock and a business relationship with GE and pay millions of dollars to WattStock, over $1.5MM of which went to GE. The misrepresentations also caused Alta Power to lose important business opportunities, and allowed competitors to

enter the marketplace before Alta Power. Finally, and importantly, GE's misrepresentations caused Alta Power to lose the ability to purchase nine used power units for $10 million per unit or less and earn the millions and millions of pure profits that it would have made but for GE's tortious conduct.

Interrogatory Number 2:

In Paragraph 6 of your First Amended Answer and Counterclaim and Third-Party Petition, you allege that "GE and WattStock's breaches of conduct and tortious conduct caused Alta Power to lose more than one hundred million dollars of essential financing, profits related to (your) business, and millions in payments to GE and WattStock." Please state separately the precise amount of (a) "essential financing" that you claim to have lost, (2) the precise amount of "profits related to your business" that you claim to have lost, and (3) the precise amount of "payments to GE and WattStock" that you claim to have lost. In addition, please describe how you have calculated these amounts.

**RESPONSE:** This interrogatory is three separate interrogatories, as it demands Alta Power identify "the precise amount of . . . (1) essential financing you claim to have lost; (2) the precise amount of "profits related to your business" that you claim to have lost; and (3) the precise amount of payments to GE and WattStock" that you claim to have lost. Alta Power objects to each of these three interrogatories because they are overly broad and unduly burdensome. Alta Power further objects that these interrogatories are premature and violate the Federal Rules of Civil Procedure by seeking the "precise amount of profits related" to Alta Power's business Alta Power claims to have lost. Alta Power will comply with the Federal Rules of Civil Procedure which apply to the disclosure its experts and their opinions.

Subject to the foregoing, GE/WattStock caused financing to fall through. The scope and terms of that financing are reflected in numerous documents, including but not limited to Alta 0019105; Alta 0063231; Alta 0012605; Alta 0013905; Alta 0028566; Alta 0028565; and Alta 0016048.

GE caused Alta Power to lose millions in financing it would have obtained from Deutsche Bank, Starwood, or potentially others but for GE's tortious acts. Alta Power would have obtained nine units and earned hundreds of millions in profits, as reflected in documents produced in this case. Finally, Alta Power paid WattStock more than $3 million, of which roughly $1.5 million was paid to GE.

Interrogatory Number 3:

Please state the date on which Alta first obtained the "Memorandum of Understanding" described in Paragraph 27 of your First Amended Answer and Counterclaim and Third-Party Petition; and describe how Alta came into possession of said Memorandum of Understanding.

Appendix041

**RESPONSE:** Alta Power obtained the Memorandum of Understanding for the first time when it was produced by WattStock in discovery in this case, which was August 2020.

Interrogatory Number 4:

In Paragraph 31 your First Amended Answer and Counterclaim and Third-Party Petition, you allege that you met with "GE 'certified' companies that refurbished used aeroderivative gas turbines." Please identify all such "GE 'certified' companies" with whom you met; and please identify any other person or business group with whom you met or considered for the purchase of refurbished used aeroderivative gas turbines as alleged in your First Amended Answer and Counterclaim and Third-Party Petition. In addition, please state the dates and locations which said meetings took place and the persons who were present at such meetings.

**RESPONSE:** Alta Power objects to this Request because it is overly broad and unduly burdensome. Subject to the foregoing: MTU Aero Engines AG, TransCanada Turbines Ltd., Air New Zealand Gas Turbines, Uniper SE. Alta Power also met with companies that were not "GE certified" but offered turbine overhaul and refurbishment services.

Interrogatory Number 5:

In Paragraphs 21, 22, and 37 of your First Amended Answer and Counterclaim and Third-Party Petition, you allege that you had "competitors" or "companies competing with (you)" to enter the used aeroderivative gas turbines market. Please identify all of these competitors.

**RESPONSE:** Sky Global Power; ProEnergy; and Siemens.

Interrogatory Number 6:

Please identify all documents in which any of the statements or representations identified in response to Interrogatory Number 1 were contained.

RESPONSE: Alta Power objects that this Interrogatory impermissibly commands Alta Power to "marshal its available proof." Moreover, to the extent such misrepresentations were made in writing, GE already possesses those documents since it sent those documents. Subject to those objections, examples of responsive documents include: Lance Herrington's July 31, 2019 letter to Matt Laterza ("Re: GE TruePackage LM600's and WattStock Refurbishment Services") (Alta 0016167); GE's website: https://www.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions and https://www.WattStock.com/ctp; and pricing data provided by GE through

Appendix042

WattStock (*See* Ex. 7 to the Deposition of Pete Watson). Additionally, Alta Power will produce communications between GE and Alta Power. Interrogatory Number 7:

Please identify all documents containing any of the alleged misrepresentations alleged by you in Paragraph 1 of your First Amended Answer and Counterclaim.

**RESPONSE:** Alta Power objects that this Interrogatory impermissibly commands Alta Power to "marshal its available proof." To the extent such misrepresentations were made in writing, GE already possesses those documents since it sent those documents. Subject to those objections, examples of responsive documents include: Lance Herrington's July 31, 2019 letter to Matt Laterza ("Re: GE TruePackage LM600's and WattStock Refurbishment Services") (Alta 0016167); GE's website: https://www.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions and https://www.WattStock.com/ctp; and pricing data provided by GE through WattStock (*See* Ex. 7 to the Deposition of Pete Watson). Additionally, Alta Power will produce all communications between GE and Alta Power. Additionally, Alta Power will produce all information in its possession custody or control provided by GE or sent to GE, including 3,857 documents that contain the word "GE."

Interrogatory Number 8:

Please identify all documents that advertise or describe the Alta commercial enterprise or business plan and that were prepared in order to attract or inform clients, members, buyers, or investors, including without limitation prospectus documents, business plans and descriptions, proposals, profitability studies, documents that describe Alta's financial security, presentations, analyses, recommendations, models (including financial models), documents showing the budgeting for the Alta projects, and similar documents which describe Alta's "strategy for meeting peak energy demands" as alleged in Section VII A of your First Amended Answer and Counterclaim and Third-Party Petition.

**RESPONSE:** This is a request for production masquerading as an interrogatory. Alta Power objects that this Interrogatory is overly broad, vague, and unduly burdensome. Alta Power further objects that this Interrogatory fails to identify the information sought with reasonable particularity, rendering the Interrogatory impossible to answer as written. On its face, this Interrogatory commands Alta Power to identify every document that "advertises or describes the Alta commercial enterprise or business plan" that was ever prepared or shared with any third party for informational purposes. On its own terms, these include documents that fall into 13 separate document types including "analyses" and "business descriptions." Alta Power will produce documents that generally describe Alta's business model and generally lay out its strategy in response to GE's Requests for Production. *See* Alta 0021840; Alta 0043425; and Alta 0044229. Alta Power is also producing relevant communications with third parties concerning Alta Power's efforts to obtain financing, including but not limited to Ares, EIG, ECP, GIP, GIC, Angelo Gordon, Alliance Bernstein, Mass Mutual, John Hancock, DNB Nordbank, Texas Capital Bank, Cadence

Appendix043

Bank, Atlas Credit, Anchorage Capital, Blackstone, Arroyo Energy, Rockland Capital, Carlyle, Hullstreet Energy, EMG, Charlesbank, Oaktree, Rock Hill, Quantum Energy, Capital Dynamics, EIV Capital, Starwood Infrastructure, Mason Capital, Moore Capital, Avenue Capital, Mill Rock Capital, Basalt Infrastructure, Fengate, AMP Infrastructure, IFM Investors, ING, Vantage Infrastructure, Blackrock Real Assets Team, Prudential, Allstate, Cigna, Apollo, Stonepeak, Fortress, GSO, Nomura, GE Capital, Arclight, Alcentra, Angel Island, Beach Street, Benefit Street, Blue Torch, Capital Southwest, Derby Capital, Deerpath, Guggenheim, King Street, KKR, Macquarie, Marathon, MGG, Neuberger Berman, NexBank, Perot, Riverstone, Solus, Stellus, Summit Credit, TCW, WhiteOak, BBVA, MUFG, Investec, CIT, Deutsche Bank, BNP Paribas, Societe Generale, First Tennessee, Orion Energy, Perot, Renova, Santander, SMBC, RBC, UMB, TPG, TD Securities, and Western Alliance. These documents will describe the information sought by this Interrogatory.

Interrogatory Number 9:

Please identify all documents prepared in connection with the establishment or organization of Alta or that concern, describe, or analyze any financial risks that were presented by the Alta commercial enterprise or business plan, including without limitation prospectus documents, business plans and descriptions, proposals, profitability studies, documents that describe Alta's financial security, presentations, analyses, recommendations, models (including financial models), documents showing the budgeting for the Alta projects, and similar documents which describe or analyze any such financial risks, whether or not the documents are internal to Alta or not provided to clients, members, buyers, or investors.

**RESPONSE:** Alta Power objects that this Interrogatory is overly broad, vague, and unduly burdensome. Alta Power further objects that this Interrogatory fails to identify the information sought with reasonable particularity, rendering the Interrogatory impossible to answer as written. This interrogatory effectively commands Alta Power to identify every document the company has ever produced or received that discusses anything related to Alta Power's finances, prospective or otherwise. Subject to the foregoing, Alta Power is producing a variety of presentations given to third parties that lay out its mission, prospects, and goals. *See* e.g. Alta 0021840; Alta 0043425; and Alta 0044229. These documents will describe the information sought by this Interrogatory.

Interrogatory Number 10:

Please identify all documents that show or concern the "budgets" referenced in Paragraphs 19, 20, 33 and 95 of your First Amended Answer and Counterclaim and Third-Party Petition, including without limitation documents that were prepared or collected by Alta in connection with the preparation of these budgets as alleged in your First Amended Answer and Counterclaim and Third-Party Petition.

**RESPONSE:** This is a request for production masquerading as an interrogatory. The budgets in question concern the projects at the heart of this entire case, thus the documents

Appendix044

this interrogatory demands Alta Power "identify" necessarily include all documents related to the projects, which would comprise the lion's share of the 15,000 plus documents Alta Power has produced in this case. Accordingly, this Interrogatory is vague, overbroad, unduly burdensome, and fails to identify the information sought with reasonable particularity. Accordingly, it cannot be answered as written. Subject to the foregoing, Alta Power is producing all of its communications with GE and WattStock, including information responsive to this Interrogatory. *See* e.g. Alta 0005003 and Alta 0007514. GE's understanding of the pricing requirements is also reflected in GEALTA_0000642, among other documents.

Interrogatory Number 11:

Please identify all documents that that show or concern the activities or actions of Alta in developing its natural gas-fired peaker projects as alleged in Paragraph 20 of your First Amended Answer and Counterclaim and Third-Party Petition, including without limitation documents collected or prepared by Alta in connection with "(1) identifying areas in the grid where a peaker plant fits (considering gas supply, offtake pricing, and interconnection feasibility); (2) navigating the state and federal regulatory waters of the electrical power market; (3) sourcing used aeroderivative gas turbines that can be purchased and refurbished within budget; and (4) obtaining project financing" as alleged in your First Amended Answer and Counterclaim and Third-Party Petition.

**RESPONSE:** Alta Power objects that this Interrogatory is vague, overly broad, and unduly burdensome. Alta Power further objects that this Interrogatory because it fails to identify the information sought with reasonably particularity. The phrase "show or concern the activities of Alta in developing its natural gas fired peaker projects" describes every conceivable act by Alta Power related to this case. Subject to the foregoing, Alta Power is producing documents related to the subject matters described above, including presentations and analysis related to the identification and development of Alta Power's strategy *(see* e.g. Alta 0021840; Alta 0043425; Alta 0048202; and Alta 0044229), as well as documents related to its efforts to obtain financing for the projects relevant to this lawsuit (*see e.g.* Alta 0003231; Alta 0003241; Alta 0003477; and Alta 0003809).

Interrogatory Number 12:

Please identify all documents that that show or concern how you "identified several project sites through an extensive vetting process based on prevailing market conditions" as alleged m Paragraph 22 of your First Amended Answer and Counterclaim and Third-Party Petition.

**RESPONSE:** Alta Power objects that this Interrogatory impermissibly commands Alta Power to "marshal its available proof." Alta Power also objects to this Interrogatory because it is vague, ambiguous, fails to identify the documents sought with sufficient particularity, and is not reasonably limited in time, nature or scope. Alta Power is producing documents that discuss and reflect Alta Power's objectives and choices. For example, Alta 0021840

contains a detailed overview of the site locations being considered by Alta (at Alta 0021845), as well as cash flow projections for those sites (at Alta 0021847). That document also contains a section titled "Texas Power Market Opportunity" (beginning at Alta 0021855) that discusses Alta Power's view of why its business is well positioned to succeed. Alta Power will produce many other documents that provide similar information. *See e.g.* Alta 0021840; Alta 0043425; Alta 0048202; and Alta 0044229.

Interrogatory Number 13:

Please identify all documents that contain written communications between you and WattStock concerning the transactions described in your First Amended Answer and Counterclaim and Third-Party Petition.

**RESPONSE:** Alta Power objects that this Interrogatory is overly broad, vague, and unduly burdensome. Alta Power will produce all its communications with WattStock, as well as relevant, non-privileged communications about WattStock. The spreadsheet attached to these answers as Exhibit A contains a list of documents that include "*@wattstock.com."

Interrogatory Number 14:

Please identify all documents that contain Alta internal communications concerning the transactions described in your First Amended Answer and Counterclaim and Third-Party Petition involving Alta.

**RESPONSE:** This is a request for production masquerading as an interrogatory. Alta Power objects that this Interrogatory is overly broad, vague, and unduly burdensome. Alta Power further objects that this Interrogatory fails to identify the information sought with reasonable particularity. Alta Power will produce non-privileged communications between Alta Power employees discussing the transactions at issue in this case, and Alta Power refers GE to its production, including many of the 9,238 documents it is producing that reference "*altapowerdev.com."

Interrogatory Number 15:

Please identify all documents that contain written communications between you and GE concerning the transactions described in your First Amended Answer and Counterclaim and Third-Party Petition.

**RESPONSE:** Alta Power objects to this Interrogatory because GE already possesses the communications it impermissibly commands Alta Power to "identify." Alta Power further objects that this Interrogatory impermissibly commands Alta Power to "marshal its available proof." Alta Power also objects to this Interrogatory because it is vague, overly broad, unduly burdensome, and fails to identify the information sought with reasonable particularity. Though GE already possesses copies of its communications with Alta Power,

Alta Power will produce those communications, as well as at least 3,857 documents that reference "GE." A list of those documents can be found on a spreadsheet attached as Ex. A.

Interrogatory Number 16:

Please identify all documents which support, show or concern how you calculate the "more than one hundred million dollars of essential financing, profits related to (your) business, and millions in payments to GE and WattStock" as alleged in Paragraph 6 of your First Amended Answer and Counterclaim and Third-Party Petition.

**RESPONSE:** Alta Power objects that this Interrogatory impermissibly commands Alta Power to "marshal its available proof." Alta Power further objects to this Interrogatory because it is vague, overly broad, unduly burdensome, and fails to identify the information sought with reasonable particularity. Alta Power will disclose the documents used to create its damages model at the time and in the manner required by the Federal Rules of Civil Procedure. Subject to the foregoing, information related to Alta Power's damages can be found in its Amended Rule 26 Disclosures, as well as in the documents Alta Power has produced.

Interrogatory Number 17:

Please identify all documents containing written communications between you and any lender or any other person or business group that concerns financing for the transactions described in your First Amended Answer and Counterclaim and Third-Party Petition, including without limitation Deutche Bank and any other lender or financing person or business group.

**RESPONSE:** Alta Power objects that this Interrogatory is overly broad, vague, and unduly burdensome. Subject to the foregoing, Alta Power is producing all non-privileged communications with Deutsche Bank related to the transactions and/or projects at issue, including 1,941 documents that contain the word "Deutsche." A list of the Bates numbers associated with those documents can be found on the spreadsheet attached as Ex. A.

Interrogatory Number 18:

Please identify all documents that contain written communications between you and any "GE 'certified' companies that refurbished used aeroderivative gas turbines" with whom you met as described in Paragraph 31 your First Amended Answer and Counterclaim and Third-Party Petition.

**RESPONSE:** This is a request for production masquerading as an interrogatory. Alta Power therefore objects that this Interrogatory is overly broad, vague, and unduly burdensome. Alta Power further objects that this Interrogatory fails to identify the information sought with reasonable particularity. Alta Power will produce relevant, non-privileged

communications with other GE certified companies and refers GE those documents. *See e.g.* Alta 0059041 and Alta 0025261.

Interrogatory Number 19:

Please identify all documents that contain written communications and between you and any person or business group with whom you met or considered (other than those identified in Interrogatory Number 19 above) for the purchase of refurbished used aeroderivative gas turbines as alleged in your First Amended Answer and Counterclaim and Third-Party Petition.

**RESPONSE:** This is a request for production masquerading as an interrogatory. Alta Power therefore objects that this Interrogatory is overly broad, vague, and unduly burdensome. Alta Power further objects that this Interrogatory fails to identify the information sought with reasonable particularity, and therefore cannot be answered as written. Also, this is (numbered) Interrogatory 19. Alta Power will produce its written communications regarding refurbished and used aeroderivative gas turbines, thus Alta Power refers GE to those productions. *See e.g.* Alta 0059041 and Alta 0025261.

Interrogatory Number 20:

Please identify all documents that contain written communications between you and any person or business group with whom you negotiated or contracted to sell and/or operate any of the gas turbine equipment described in your First Amended Answer and Counterclaim and Third-Party Petition.

**RESPONSE:** This is a request for production masquerading as an interrogatory. Alta Power therefore objects that this Interrogatory is overly broad, vague, and unduly burdensome. Alta Power further objects that this Interrogatory fails to identify the information it seeks with reasonable particularity, and thus cannot be answered as written. To the extent such communications exist, they have or will be produced.

Interrogatory Number 21:

Please identify all documents containing all financial statements (both audited and unaudited) prepared by or for Alta over the last 10 years.

**RESPONSE:** Alta Power objects that this Interrogatory is overly broad and unduly burdensome. Alta Power further objects to this Interrogatory because it fails to identify the information it seeks with reasonable particularity; thus it cannot be answered as written. Alta Power also objects that this Interrogatory because it seeks information that is not relevant to any cause of action or issue in this case. Subject to the foregoing, *see* e.g. Alta 0003271. Alta Power will produce documents relevant communications with third parties concerning Alta Power's efforts to obtain financing, including but not limited to Ares, EIG, ECP, GIP, GIC, Angelo Gordon, Alliance Bernstein, Mass Mutual, John Hancock, DNB

Nordbank, Texas Capital Bank, Cadence Bank, Atlas Credit, Anchorage Capital, Blackstone, Arroyo Energy, Rockland Capital, Carlyle, Hullstreet Energy, EMG, Charlesbank, Oaktree, Rock Hill, Quantum Energy, Capital Dynamics, EIV Capital, Starwood Infrastructure, Mason Capital, Moore Capital, Avenue Capital, Mill Rock Capital, Basalt Infrastructure, Fengate, AMP Infrastructure, IFM Investors, ING, Vantage Infrastructure, Blackrock Real Assets Team, Prudential, Allstate, Cigna, Apollo, Stonepeak, Fortress, GSO, Nomura, GE Capital, Arclight, Alcentra, Angel Island, Beach Point, Benefit Street, Blue Torch, Capital Southwest, Derby Capital, Deerpath, Guggenheim, King Street, KKR, Macquarie, Marathon, MGG, Neuberger Berman, NexBank, Perot, Riverstone, Solus, Stellus, Summit Credit, TCW, WhiteOak, BBVA, MUFG, Investec, CIT, Deutsche Bank, BNP Paribas, Societe Generale, First Tennessee, Orion Energy, Perot, Renova, Santander, SMBC, RBC, UMB, TPG, TD Securities, and Western Alliance. These documents will contain financial statements relevant to this case.

Interrogatory Number 22:

Please identify all documents that contain all bid packages, proposals, and similar documents that you provided to any person or business group for the sale or operation of any aeroderivative gas turbines as described in your First Amended Answer and Counterclaim and Third-Party Petition.

**RESPONSE:** This is a request for production masquerading as an interrogatory. Alta Power therefore objects that this Interrogatory is overly broad, vague, and unduly burdensome. Alta Power further objects that this Interrogatory fails to identify the information it seeks with reasonable particularity, and thus cannot be answered as written. Subject to the foregoing objections, Alta Power was a buyer, not a seller in the market for an aeroderivative gas turbine. WattStock and GE acted as Alta Power's agent in the marketplace and was responsible for preparing the kind of information seemingly at issue in this interrogatory.

Interrogatory Number 23:

Please identify all documents that show or concern the "detailed cost estimates" identified in Paragraph 42 of your First Amended Answer and Counterclaim and Third-Party Petition.

**RESPONSE:** Alta Power objects to this Interrogatory because it has already responded to 25 interrogatories served by GE. Fed. R. CIV. P. 33. Alta Power further objects to this Interrogatory because it impermissibly commands Alta Power to "marshal its available proof." Fed. R. Civ. P. 197.1 ("An interrogatory . . . may ask the responding party to state the legal theories and to *describe in general* the factual bases for the party's claims or defenses, but interrogatories may not be used to require the responding party to marshal all of its available proof. . .") (emphasis added). Alta Power further objects to this Interrogatory because it is overly broad, unduly burdensome, and cannot be answered as written.

Appendix049

Interrogatory Number 24:

Please identify all documents that support your allegation in Paragraph 46 of your First Amended Answer and Counterclaim and Third-Party Petition that GE is an "affiliate" or "representative" of WattStock.

**RESPONSE:** Alta Power objects to this Interrogatory because it has already responded to 25 interrogatories served by GE. FED. R. CIV. P. 33. Alta Power further objects to this Interrogatory because it impermissibly commands Alta Power to "marshal its available proof." Alta Power further objects to this Interrogatory because it is overly broad, unduly burdensome, and cannot be answered as written.

Interrogatory Number 25:

Please identify all documents that show or concern the "financial information for the acquisition of available units" identified in Paragraph 50 of your First Amended Answer and Counterclaim and Third-Party Petition.

**RESPONSE:** Alta Power objects to this Interrogatory because it has already responded to 25 interrogatories served by GE. FED. R. CIV. P. 33. Alta Power further objects to this Interrogatory because it impermissibly commands Alta Power to "marshal its available proof." Alta Power further objects to this Interrogatory because it is overly broad, unduly burdensome, and cannot be answered as written.

Interrogatory Number 26:

Please identify all documents that contain written communications between you and Ryan Castleman and/or Castleman Power Development LLC concerning the "trade secret" claim described in Paragraphs 79 and 80 of your First Amended Answer and Counterclaim and Third- Party Petition.

**RESPONSE:** Alta Power objects to this Interrogatory because it has already responded to 25 interrogatories served by GE. Alta Power further objects to this Interrogatory because it impermissibly commands Alta Power to "marshal its available proof." Alta Power further objects to this Interrogatory because it is overly broad, unduly burdensome, and cannot be answered as written.

Interrogatory Number 27:

Please identify all documents that show or concern the "variety of funding structures" referenced in Paragraph 90 of your First Amended Answer and Counterclaim and Third-Party Petition.

**RESPONSE:** Alta Power objects to this Interrogatory because it has already responded to 25 interrogatories served by GE. Fed. R. CIV. P. 33. Alta Power further objects to this

Appendix050

Interrogatory because it is, overly broad, unduly burdensome, and cannot be answered as written.

Interrogatory Number 28:

Please identify all documents containing written communications between you and WattStock concerning WattStock's "inform(ing) Alta Power it was having "financial issues" as described in Paragraph 98 of your First Amended Answer and Counterclaim and Third-Party Petition.

**RESPONSE:** Alta Power objects to this Interrogatory because it has already responded to 25 interrogatories served by GE. FED. R. CIV. P. 33. Alta Power further objects to this Interrogatory because it impermissibly commands Alta Power to "marshal its available proof." Alta Power further objects to this Interrogatory because it is overly broad, unduly burdensome, and cannot be answered as written.

Interrogatory Number 29:

Please identify all documents containing written communications between you and Riverstone concerning your negotiations with Riverstone as described in Paragraph 101 of your First Amended Answer and Counterclaim and Third-Party Petition.

**RESPONSE:** Alta Power objects to this Interrogatory because it has already responded to 25 interrogatories served by GE. FED. R. CIV. P. 33. Alta Power further objects to this Interrogatory because it is overly broad, unduly burdensome, and cannot be answered as written.

Interrogatory Number 30:

Please identify all documents containing written communications between you and Macquarie concerning your negotiations with Macquarie as described in Paragraph 101 of your First Amended Answer and Counterclaim and Third-Party Petition.

**RESPONSE:** Alta Power objects to this Interrogatory because it has already responded to 25 interrogatories served by GE. FED. R. CIV. P. 33. Alta Power further objects to this Interrogatory because it impermissibly commands Alta Power to "marshal its available proof." Alta Power further objects to this Interrogatory because it is overly broad, unduly burdensome, and cannot be answered as written.

Interrogatory Number 31:

Please identify all documents showing or concerning the services and amounts charged and paid for the "reasonable and necessary attorneys' fees" referenced in Section X (d) of your First Amended Answer and Counterclaim and Third-Party Petition, including

Appendix051

without limitation all bills, invoices, time sheets, logs, expense records, receipts, proofs of payment, and similar records.

**RESPONSE:** Alta Power objects to this Interrogatory because it has already responded to 25 interrogatories served by GE. FED. R. CIV. P. 33. Alta Power further objects to this Interrogatory because it impermissibly commands Alta Power to "marshal its available proof." Alta Power further objects to this Interrogatory because it is vague, overly broad, unduly burdensome, and cannot be answered as written.

# Exhibit 4

| From: | Jeb Golinkin |
|---|---|
| To: | Alibhai, Jamil; Sears, Natalie; Cox, Trey; LeGrand, Andrew; Patel, Pooja R.; Capoccia, Matt |
| Cc: | Michael Cancienne; "Pulliam, Jessica"; Lawrence, John; Kasey Todd; Kazlow, Jordan; "Wallace, Kirstie" |
| Subject: | Alta Power v. GE/WS: AP"s First Amended Disclosures |
| Date: | Wednesday, October 12, 2022 8:27:28 PM |
| Attachments: | image001.png |
| | Alta Power"s First Amended Rule 26 Disclosures.pdf |

Counsel,

Attached, please find Alta Power's First Amended Rule 26 Disclosures.

Respectfully,

Jeb Golinkin

--

**Joseph W. Golinkin II**

Trial Attorney | Jordan, Lynch & Cancienne PLLC

(o) 713-955-4019 | (c) 832-250-6567

1980 Post Oak Blvd., Suite 2300 Houston, Texas 77056

www.jlcfirm.com | Attorney Biography



IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| WATTSTOCK LLC,<br><br>    *Plaintiff/Counter Defendant*,<br><br>v.<br><br>ALTA POWER LLC,<br><br>    *Defendant/Counter Plaintiff*,<br><br>v.<br><br>GENERAL ELECTRIC INTERNATIONAL INC., d/b/a GE POWER SERVICES,<br><br>    *Third-Party Defendant.* | Case No. 3:21-CV-03183-X |

## ALTA POWER'S FIRST AMENDED RULE 26 DISCLOSURES

TO:    Third-Party Defendant General Electric International, Inc ("GE"), by and through its attorneys of record, Trey Cox, Andrew Legrand, and Pooja Patel of Gibson, Dunn & Crutcher LLP AND Plaintiff/Counter-Defendant WattStock LLC ("WattStock") by and through its counsel of record, Thomas D Berghman, Jamil Alibhai, and Natalie Sears, Musnch Hardt, Kopf & Harr, PC.

        Alta Power LLC ("Alta" or "Alta Power") makes these first amended initial disclosures as required by Federal Rule of Civil Procedure 26(a)(1).

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By: *Jeb Golinkin*
      Michael Cancienne
      State Bar No. 24055256
      Joseph W. ("Jeb") Golinkin II
      State Bar No. 24087596
      1980 Post Oak Blvd., Suite 2300
      Houston, Texas 77056
      Telephone:  713.955.4025
      Facsimile:  713.955.9644
      mcancienne@jlcfirm.com
      jgolinkin@jlcfirm.com

BAKER BOTTS L.L.P.

      Jessica B. Pulliam
      State Bar No. 24037309
      John B. Lawrence
      State Bar No. 24055825
      Kirstie L. Wallace
      State Bar No. 24115920
      2001 Ross Avenue, Suite 900
      Dallas, Texas 75201
      Telephone: (214) 953-6500
      Facsimile: (214) 953-6503
      jessica.pulliam@bakerbotts.com
      john.lawrence@bakerbotts.com
      Kirstie.wallace@bakerbotts.com

ATTORNEYS FOR ALTA POWER LLC

2

## CERTIFICATE OF SERVICE

This certifies that a copy of the above and foregoing was sent to the following counsel of record by electronic mail on October 12, 2022:

Trey Cox
Andrew Legrand
Pooja Patel
Gibson Dunn & Crutcher LLP
2001 Ross Ave Suite 2100
Dallas, TX 75201
*Attorneys for Third-Party Defendant*
*General Electric International, Inc.*

And

Thomas D Berghman
Jamil Alibhai
Natalie Sears
Munsch, Hardt, Kopf & Harr, PC;
500 N. Akard St., Ste. 500
Dallas, TX 75201
*Attorneys for Wattstock LLC*

_____*/s/ Jeb Golinkin*_____
Jeb Golinkin

3

**A. INDIVIDUALS WITH DISCOVERABLE INFORMATION**

1. The names, addresses, and telephone numbers of individuals likely to have discoverable information that Alta Power may use to support its claims or defenses are:

| Name and Contact Information | Description |
|---|---|
| **Matthew Laterza**<br>c/o Jordan, Lynch & Cancienne PLLC<br>1980 Post Oak Blvd., Ste. 2300<br>Houston, Texas 77007<br>(713) 955-4019 | Mr. Laterza is the Chief Financial Officer of Alta Power. Mr. Laterza has knowledge related to Alta Power's business, as well as knowledge of the events that gave rise to this case, including the representations made by GE and Wattstock. Mr. Laterza's knowledge includes but is not limited to Alta Power's efforts to obtain the necessary supplies, equipment, permits, financing, and all other necessary items/information in order to implement Alta Power's business plan. Mr. Laterza has knowledge related to Alta Power's interactions with GE, WattStock, and other third parties related to its efforts to implement its business plan. He also has knowledge concerning the damages sustained as a result of GE and WattStock's actionable conduct. |
| **William Phelps**<br>c/o Jordan, Lynch & Cancienne PLLC<br>1980 Post Oak Blvd., Ste. 2300<br>Houston, Texas 77007<br>(713) 955-4019 | Mr. Phelps is Chief Executive Officer of Alta Power. Mr. Phelps has knowledge related to Alta Power's business, as well as of the events that gave rise to this case. This knowledge includes but is not limited to Alta Power's efforts to obtain the necessary supplies, equipment, permits, financing, and all other necessary items/information in order to implement Alta Power's business plan. Mr. Phelps has knowledge related to Alta Power's interactions with GE, WattStock, and other third parties related to its efforts to implement its business plan. He also has detailed knowledge concerning the damages sustained as a result of GE and WattStock's actionable conduct. |

Appendix058

| | |
|---|---|
| **Travis West**<br>c/o Jordan, Lynch & Cancienne PLLC<br>1980 Post Oak Blvd., Ste. 2300<br>Houston, Texas 77007<br>(713) 955-4019 | Mr. West has knowledge concerning, but not limited to, information related to Alta Power's efforts to obtain peaker power units and GE and WattStock's involvement in that process. |
| **Carlos Gaset**<br>c/o Jordan, Lynch & Cancienne PLLC<br>1980 Post Oak Blvd., Ste. 2300<br>Houston, Texas 77007<br>(713) 955-4019 | Mr. Gaset has knowledge concerning, but not limited to, information related to Alta Power's efforts to obtain peaker power units and GE and WattStock's involvement in that process. |
| **Jay Manning**<br>c/o Munsch Hardt Kopf & Harr PC<br>500 N Akard St, Suite 3800<br>Dallas, TX 75201<br>(214) 855-7554 | Mr. Manning is President and EVP Sales of WattStock. He has knowledge related to the TruePackage Program and GE/WattStock's practice of selling and servicing both new and used LM6000s. He also has knowledge of WattStock's relationship/communications/interactions with and related to GE, Alta Power, and Castleman. Manning also has knowledge related to the availability and pricing of LM6000s, and WattStock's representations and communications related to the same. Mr. Manning also has knowledge concerning the damage caused to Alta Power by WattStock and GE, and other information related to this case. Finally, Manning has knowledge regarding WattStock's financial condition during the periods at issue in this case. |
| **Patrick Jenevein**<br>c/o Munsch Hardt Kopf & Harr PC<br>500 N Akard St, Suite 3800<br>Dallas, TX 75201<br>(214) 855-7554 | Mr. Jenevein was Chairman of Wattstock. He has knowledge of all aspects of the TruePackage Program, WattStock's business, WattStock's financial condition, and all of the events that form the basis of Alta Power's claims against both WattStock and GE in this case. |

5

| | |
|---|---|
| **Pete Watson**<br>c/o Munsch Hardt Kopf & Harr PC<br>500 N Akard St, Suite 3800<br>Dallas, TX 75201<br>(214) 855-7554 | Mr. Watson is VP, CTP Operations for WattStock. Mr. Watson has knowledge related to the TruePackage Program and GE/WattStock's practice of selling and servicing both new and used LM6000s. He also has knowledge of WattStock's relationship/communications/interactions with and related to GE, Alta Power, and Castleman. Mr. Watson also has knowledge related to the availability and pricing of LM6000s. Mr. Watson also has knowledge concerning the damage caused to Alta Power by WattStock, and other information related to this case. |
| **Andrew Herr**<br>c/o Munsch Hardt Kopf & Harr PC<br>500 N Akard St, Suite 3800<br>Dallas, TX 75201<br>(214) 855-7554 | Mr. Herr is CFO of WattStock. He has knowledge of WattStock's operations, including its financial affairs, products, and services offered, and books and records. Mr. Herr also has knowledge of WattStock's relationship with GE/ communications with GE and Alta Power/ interactions with and related to GE, Alta Power, Castleman, and of the damage caused by WattStock, and other information related to this case. Mr. Herr also has knowledge related to WattStock's financial condition during the period at issue in this case. |
| **Alex Babu**<br>Address Unknown<br>(346) 269-9514<br>Alex.Babu@Siemens-Energy.com | Mr. Babu was Sales Manager for GE Power Services. Mr. Babu has detailed knowledge of all aspects of the TruePackage program. Mr. Babu has knowledge related to the availability of units at issue, including pricing and costs of those units. Mr. Babu also is aware of GE's relationship with Wattstock and Alta Power, and the representations made by Wattstock and GE to Alta Power. |

6

| | |
|---|---|
| **Lance Herrington**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Lance Herrington is the Global Sales Leader, Aero Services for GE. He has knowledge of all aspects of the TruePackage Program and GE's practice of selling and servicing both new and used LM6000s (including costs and availability). He has knowledge of all aspects of GE's TruePackage Program, as well as all of the events that form the basis of Alta Power's claims against both WattStock and GE in this case. Mr. Herrington has knowledge of the representations made by GE regarding the TruePackage Program (both to Alta Power and others). |
| **Clayton Yancy**<br>Solar Turbines<br>10203 Sam Houston Park Dr.<br>Houston, TX 77064<br>(713) 895-2300 | Mr. Yancy was a Sales Application Engineer. Mr. Yancy has detailed knowledge of all aspects of the Truepackage program. He also has detailed knowledge related to GE's relationship, interactions, and work done by GE with/for WattStock and Alta Power, and other information related to this case. |
| **Daniel D. Hill**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Mr. Hill has knowledge related to all aspects of GE's TruePackage Program and GE's practice of selling and servicing both new and used LM6000s. He also has detailed knowledge related to the events that gave rise to this case, including but not limited to the work performed by GE for WattStock and Alta Power. |
| **Cherrylyn Aranas**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Ms. Aranas is a Sales Applications Engineer at GE. Ms. Alston has knowledge about GE's dealings with Alta Power and Wattstock, and the work performed for both. She also has knowledge of all aspects of the TruePackage Program and GE's practice of selling and servicing both new and used LM6000s, and other knowledge related to this case. |

| | |
|---|---|
| **Ashley Alston (Young)**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Ms. Alston was Lead Commercial Proposal manager for GE Power Services. In that capacity, she served as "sole aeroderivative commercial manager" for Texas. Ms. Alston has knowledge about GE's dealings with Alta Power and Wattstock, and the work performed for both. She also has knowledge of all aspects of the TruePackage Program and GE's practice of selling and servicing both new and used LM6000s. She also has knowledge of the risk analysis conducted by the "PMO" office of the "Alta Opportunity." |
| **Gavin Hall**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Mr. Hall is Global Project Quality Leader at GE. Previously, Mr. Hall was Project Management Director-Aero, and Senior Project Manager for GE Power. Mr. Hall has knowledge related to GE's industrial gas turbine projects including all aspects of GE's TruePackage Program. Mr. Hall has knowledge related to GE's TruePackage Program, its dealings with Wattstock and Alta, and other information related to this case. Mr. Hall also has knowledge related to analysis conducted by GE of the risk/rewards posed by the "Alta Opportunity." |
| **Saieed Tajbakhsh**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Mr. Tajbakhsh was PMO Risk Leader and assisted GE analyze the "Alta Opportunity." He has knowledge related to the events that gave rise to this case. |

Appendix062

| | |
|---|---|
| **Heather Jubber**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Ms. Jubber is the Director of Sales Operations for GE Power. Previously, Ms. Jubber served as Senior Sales Operations Leader at GE Power. Ms. Jubber has knowledge of the various business factors considered by GE in its business interactions with Alta Power and others. She also has knowledge of all aspects of the TruePackage Program and GE's practice of selling and servicing both new and used LM6000s, and other information related to this case. |
| **Amol Mody**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Mr. Mody has knowledge related to GE's internal analysis of the "Alta Opportunity," and other facts related to this case. |
| **Patrick Georges**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Mr. Georges is a Manager IV, Commercial at General Electric. He has knowledge of all aspects of GE's TruePackage Program, and of GE's business and its interactions with Alta Power, Wattstock, and of the Alta projects generally. |
| **Nilay Basegmez**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Ms. Basegmez has knowledge related to the costs associated with LM6000 units at issue in this case. |
| **Fernando Celdran**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Mr. Celdran has knowledge related to costs associated with various LM6000 units at issue in this case. |

Appendix063

| | |
|---|---|
| **James Canon**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Mr. Canon is GE's head of Conversions, Modifications & Upgrades in North America. He has knowledge of all aspects of the TruePackage Program and GE's practice of selling and servicing both new and used LM6000s. He has knowledge of GE's relationship with Wattstock, its work related to Alta, the termination fees attached to the LM6000s WattStock and GE considered selling Alta, GE's interactions with Castleman, GE's interactions with financiers, and other information related to this case. |
| **Ozgun Gun**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Mr. Gun has knowledge related to the undisclosed termination fees and other events giving rise to the litigation. |
| **Luis Barbero**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Mr. Barbero has knowledge related to the costs associated with the units at issue and other events giving rise to this litigation. |
| **Valeiano Bernardi**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Mr. Bernardi has knowledge concerning GE's representations to Alta Power and other event giving rise to this litigation, including undisclosed termination fees. |
| **Samuel Cathey**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Mr. Cathey is GE's General Manager of Project Management Operations. He has knowledge related to the events giving rise to this litigation. |
| **Xavi Mesegeur**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Mr. Mesegeur has knowledge related to the costs associated with the units at issue and other events giving rise to this litigation. |
| **Joshua Minnix**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Mr. Minnix has knowledge related to all aspects of the TruePackage Program, as well as GE's interactions and actions with Alta Power and WattStock related to this case. |

| | |
|---|---|
| **Mohamed Nabil Talhaoui**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Talhoui has information related to the costs associated with the units at issue and other events giving rise to this case. |
| **Selma Kivran**<br>c/o Gibson, Dunn & Crutcher LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br>(214) 698-3193 | Mr. Kivran was General Manager—Aero Product Line, GE Power Services. In that capacity, she signed the June 26, 2017 Memorandum of Understanding between Wattstock and GE. She has knowledge related to GE's relationship with Wattstock, and the work performed related to Alta. |
| **Abdullah Kurt**<br>Pro-Per Energy Services<br>Esentepe M. Kasap S.<br>No:4 K:1 D:1<br>34394 Sisli/Istanbul<br><br>or<br><br>5718 Westheimer Rd. Ste. 1000<br>Houston, TX 77057<br><br>Abdullah@pro-per.net<br>+90 (212) 347-5151 | Mr. Kurt is Co-Founder and Chairman of Pro-Per Energy Services. He has knowledge related to the negotiations related to the purchases of peaker units at issue in this case. |
| **Soner Ozkan**<br>Pro-Per Energy Services<br>Esentepe M. Kasap S.<br>No:4 K:1 D:1<br>34394 Sisli/Istanbul<br><br>or<br><br>5718 Westheimer Rd. Ste. 1000<br>Houston, TX 77057<br><br>Ozkan@pro-per.net<br>+90 (212) 347-5151 | Mr. Ozkan has knowledge related to the preparation of the visual inspection reports prepared by Pro-Per related to the various Turkish units considered for purchase by Alta Power. |

11

| | |
|---|---|
| **Ibrahim Kurt**<br>Pro-Per Energy Services<br>Esentepe M. Kasap S.<br>No:4 K:1 D:1<br>34394 Sisli/Istanbul<br><br>or<br><br>5718 Westheimer Rd. Ste. 1000<br>Houston, TX 77057<br><br>kurt@pro-per.net<br>+90 (212) 347-5151 | Mr. Kurt has knowledge related to the preparation of the visual inspection reports prepared by Pro-Per related to the various Turkish units considered for purchase by Alta Power. |
| **Ryan Castleman**<br>5850 San Felipe St.<br>Houston, TX 77057<br>713-275-7999 | Mr. Castleman is the CEO of Castleman Power development. He has knowledge related to the peaker power business model, as well as his interactions with GE and/or WattStock related to Alta Power. |

## B. DISCOVERABLE DOCUMENTS, ELECTRONICALLY STORED INFORMATION & TANGIBLE THINGS

2. Alta Power has produced discoverable documents pursuant to the search terms agreed to by the parties.  *See* Alta0000001-Alta0076408

## C. INFORMATION RELATED TO CALCULATION OF DAMAGES

3. As described in Alta Power LLC's First Amended Answer and Counterclaim and Original Third Party Petition, Alta Power seeks to recover actual, consequential, and exemplary damages from both GE and WattStock. These damages include, but are note limited to:

- Roughly $1.5 million for payments made in December 2019 and January 2020 to Wattstock for GE.

- Roughly $10 million Alta Power spent based on GE/WattStock's representations.

- The profits Alta Power would have made serving the market as described in its Second Amended Counterclaim. These profits range depending on the sites and configuration.  Under a three-site, nine-unit configuration, Alta Power estimates it would have generated $140,000,000 to $320,000,000 in profits.  Under a one-site, two-unit confirmation, Alta Power estimates it

12

would have generated between $10,000,000 and $50,000,000 in profits. A one-site, three unit configuration would have been within these two ranges.

- Attorneys' fees.

The documents supporting these damages can be found in Alta's existing productions (Alta0000001-Alta0076408).

Alta Power will supplement this response consistent with its obligations under the Federal Rules of Civil Procedure.

**D. INSURANCE**

4. *N/A*.

13