IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **ALTA POWER LLC,** | |
| *Plaintiff/Counter-Defendant,* | |
| **v.** | Case No. 3:23-CV-270-X |
| **GENERAL ELECTRIC INTERNATIONAL, INC., n/k/a GE VERNOVA INTERNATIONAL LLC, d/b/a GE POWER SERVICES,** | |
| *Defendant/Counter-Plaintiff.* | |

**GE VERNOVA INTERNATIONAL LLC'S APPENDIX
IN SUPPORT OF ITS RESPONSE IN OPPOSITION TO ALTA POWER LLC'S
<u>MOTION FOR LEAVE TO FILE AMENDED COMPLAINT</u>**

GE Vernova International LLC ("GE") respectfully submits this Appendix in Support of its Response in Opposition to Alta Power LLC's ("Alta") Motion for Leave to File Amended Complaint.

| Exhibit | Description | App. Pages |
|---------|-------------|------------|
| A | Declaration of Matthew Capoccia in Support of GE's Response in Opposition to Alta's Motion for Leave to File Amended Complaint, dated June 4, 2024 | 1-7 |
| B | Alta's First Amended Answer and Counterclaim and Original Third-Party Petition, filed February 24, 2021 | 8-35 |
| C | Letter from David M. Gregory to Alta, et al., dated August 16, 2019, produced by Alta in this litigation, and bates numbered Alta 0052083 (Laterza Dep. Ex. 2038) | 36-39 |
| D | Alta's Response to GE's Rule 12(c) Motion for Judgment on the Pleadings, filed March 17, 2022 | 40-73 |
| E | Email from Travis West to April Henry, et al. (Subject Line: "RE: Site Visits"), dated August 10, 2018, produced by Alta in this litigation, and bates numbered Alta 0080630 (West Dep. Ex. 2066) | 74-76 |
| F | Email from William Phelps to Chip Lewis (Subject Line: "Alta Power Presentation 08152018 – MUFG.pdf"), dated August 17, 2018, produced by Alta in this litigation, and bates numbered Alta 0034756 (Hart Dep. Ex. 2162) | 77-88 |
| G | Excerpts from the Transcript of the Deposition of Matthew E. Laterza, taken October 15, 2022 | 89-97 |
| H | Excerpts from the Transcript of the Deposition of Travis West, taken April 20, 2023 | 98-113 |
| I | Excerpts from the Transcript of the Deposition of Roy Jeffrey Hart, taken November 3, 2023 | 114-122 |
| J | Declaration of Roy Hart, dated August 28, 2019, produced by Alta in this litigation, and bates numbered Alta 0078637 (Hart Dep. Ex. 2179) | 123-125 |
| K | Email from Travis West to Ryan Castleman, et al. (Subject Line: "Re: non compete"), dated November 21, 2018, produced by Alta in this litigation, and bates numbered Alta 0080311 (Laterza Dep. Ex. 2045) | 126-127 |
| L | Email from Robin Gibbs to Brandon Renken et al. (Subject Line: "RE: Proposed Letter to Deutsche Bank"), dated September 5, 2019, produced by Alta in this litigation, and bates numbered Alta 0080280 through Alta 0080282 (Laterza Dep. Ex. 2044) | 128-131 |
| M | Email from Jay Manning to Travis West, et al. (Subject Line: "SURPLUS UNITS UPDATE V10") with Attachment, dated May 13, 2019, produced by Alta in this litigation, and bates | 132-140 |

| Exhibit | Description | App. Pages |
|---------|-------------|-----------|
| | numbered Alta 0030223 and Alta 0030224 (Laterza Dep. Ex. 11a) | |
| N | Email from Matthew Laterza to Travis West (Subject Line: "FW: List of Packages") with Attachment, dated February 8, 2019, produced by Alta in this litigation, and bates numbered Alta 0030091 and Alta 0030092 (Laterza Dep. Ex. 2022) | 141-143 |
| O | Email from Jay Manning to Travis West (Subject Line: "Status of Negotiations") with Attachment, dated April 11, 2019, produced by Alta in this litigation, and bates numbered Alta 0006067 through Alta 0006069 (Laterza Dep. Ex. 2026) | 144-150 |
| P | Email from Jay Manning to Matthew Laterza, et al. (Subject Line "Status of Negotiations") with Attachment, dated April 16, 2019, produced by Alta in this litigation, and bates numbered Alta 0004855 and Alta 0004856 (Laterza Dep. Ex. 2027) | 151-155 |
| Q | Email from Jay Manning to Matthew Laterza, et al. (Subject Line: "FW: Update") with Attachment, dated May 9, 2019, produced by Alta in this litigation, and bates numbered Alta 0003486 and Alta 0003487 (Laterza Dep. Ex. 2030) | 156-164 |
| R | Email from Jay Manning to Matthew Laterza, et al. (Subject Line: "Alta Surplus Units Update and Payments Made/Due") with Attachment, dated June 22, 2019, produced by Alta in this litigation, and bates numbered Alta 0029639 and Alta 0029640 (Laterza Dep. Ex. 2032) | 165-175 |
| S | Email from Matthew Laterza to Prashant Mupparapu (Subject Line: "RE: Alta / Owl Rock"), dated September 3, 2019, produced by Alta in this litigation, and bates numbered Alta 0038184 and Alta 0038185 (Laterza Dep. Ex. 2040) | 176-178 |
| T | Email from Jay Manning to Matthew Laterza, et al. (Subject Line: "FW: WattStock revise teklifi") with Attachment, dated April 19, 2019, produced by Alta in this litigation, and bates numbered Alta 0028095 through Alta 0028101 (Laterza Dep. Ex. 2029) | 179-187 |
| U | Email from Jay Manning to Abdullah Kurt, et al. (Subject Line: "RE: ACARSOY signed contract") with Attachment, dated June 28, 2019, produced by Alta in this litigation, and bates numbered Alta 0028557 through Alta 0028879 (Laterza Dep. Ex. 2031) | 188-212 |
| V | Letter from Andrew LeGrand to Alta's Counsel, dated November 1, 2022 | 213-219 |
| W | GE's Motion to Amend the Scheduling Order and Temporarily Stay Discovery, filed November 23, 2022 | 220-223 |
| X | Non-Redacted Brief in Support of GE's Motion to Amend the Scheduling Order and Temporarily Stay Discovery, filed December 30, 2022 (redacted version filed November 23, 2022) | 224-246 |

| Exhibit | Description | App. Pages |
|---|---|---|
| Y | Transcript of Proceedings from the January 23, 2023 Hearing on GE's Motion to Amend the Scheduling Order and Temporarily Stay Discovery. | 247-259 |
| Z | Email from Jeb Golinkin to Andrew LeGrand, et al. (Subject Line: "Alta Power: Proposed Amended Complaint and Meet and Confer"), with Attachments, dated May 10, 2024 | 260-328 |
| AA | GE's Redline Showing Alta's May 10, 2024 Proposed Complaint (as added or stricken text) Compared Over Alta's February 24, 2021 Original Third-Party Petition | 329-368 |
| BB | Email from Matthew Capoccia to Jeb Golinkin (Subject Line: "Re: Alta Power: Proposed Amended Complaint and Meet and Confer), dated May 14, 2024 | 369-371 |
| CC | Alta's As-Filed Proposed Complaint, filed May 14, 2024 (ECF 36-1) | 372-401 |
| DD | GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint (as added or stricken text) Compared Over Alta's May 10, 2024 Proposed Complaint | 402-448 |

Dated: June 4, 2024

    /s/ *Andrew LeGrand*
Andrew LeGrand (Tex. Bar No. 24070132)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Tel: (214) 698-3100
Fax: (214) 571-2900
Email: ALegrand@gibsondunn.com

COUNSEL TO GE VERNOVA
INTERNATIONAL LLC

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on June 4, 2024, a true and correct copy of the foregoing document has been

served on counsel of record pursuant to the Federal Rules of Civil Procedure.

<u>/s/ Andrew LeGrand</u>
Andrew LeGrand

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **ALTA POWER LLC,** <br>      *Plaintiff/Counter-Defendant,* <br> **v.** <br><br> **GENERAL ELECTRIC INTERNATIONAL, INC., n/k/a GE VERNOVA INTERNATIONAL LLC, d/b/a GE POWER SERVICES,** <br>      *Defendant/Counter-Plaintiff.* | Case No. 3:23-CV-270-X |

**DECLARATION OF MATTHEW CAPOCCIA IN SUPPORT OF
GE VERNOVA INTERNATIONAL LLC'S RESPONSE IN OPPOSITION TO
ALTA POWER LLC'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT**

Matthew Capoccia submits this declaration in support of GE Vernova International LLC's Response in Opposition to Alta Power LLC's Motion for Leave to File Amended Complaint.

1.     My name is Matthew M. Capoccia. My work address is 2001 Ross Avenue, Suite 2100, Dallas, Texas 75201. I am an attorney at the law firm of Gibson, Dunn & Crutcher LLP. I am over the age of 18 years.

2.     I have personal knowledge of the facts stated in this Declaration and, if called as a witness in this case, could and would testify competently to those facts.

3.     I am an attorney for Defendant GE Vernova International LLC ("GE") in the above-styled case.

4.     I have been involved with discovery in this case since July 2021 and am familiar with the parties' written, document, and deposition discovery.

5.     Attached hereto as **Exhibit B** is a true and correct copy of Alta's First Amended Answer and Counterclaim and Original Third-Party Petition, filed February 24, 2021.

1

6.      Attached hereto as **Exhibit C** is a true and correct copy of the Letter from David M. Gregory to Alta, et al., dated August 16, 2019, produced by Alta in this litigation, and bates numbered Alta 0052083 (Laterza Dep. Ex. 2038).

7.      Attached hereto as **Exhibit D** is a true and correct copy of Alta's Response to GE's Rule 12(c) Motion for Judgment on the Pleadings, filed March 17, 2022.

8.      Attached hereto as **Exhibit E** is a true and correct copy of the Email from Travis West to April Henry, et al. (Subject Line: "RE: Site Visits"), dated August 10, 2018, produced by Alta in this litigation, and bates numbered Alta 0080630 (West Dep. Ex. 2066).

9.      Attached hereto as **Exhibit F** is a true and correct copy of the Email from William Phelps to Chip Lewis (Subject Line: "Alta Power Presentation 08152018 – MUFG.pdf"), dated August 17, 2018, produced by Alta in this litigation, and bates numbered Alta 0034756 (Hart Dep. Ex. 2162).

10.     Attached hereto as **Exhibit G** is a true and correct copy of Excerpts from the Transcript of the Deposition of Matthew E. Laterza, taken October 15, 2022.

11.     Attached hereto as **Exhibit H** is a true and correct copy of Excerpts from the Transcript of the Deposition of Travis West, taken April 20, 2023.

12.     Attached hereto as **Exhibit I** is a true and correct copy of Excerpts from the Transcript of the Deposition of Roy Jeffrey Hart, taken November 3, 2023.

13.     Attached hereto as **Exhibit J** is a true and correct copy of the Declaration of Roy Hart, dated August 28, 2019, produced by Alta in this litigation, and bates numbered Alta 0078637 (Hart Dep. Ex. 2179).

14.     Attached hereto as **Exhibit K** is a true and correct copy of the Email from Travis West to Ryan Castleman, et al. (Subject Line: "Re: non compete"), dated November 21, 2018,

APP.003

produced by Alta in this litigation, and bates numbered Alta 0080311 (Laterza Dep. Ex. 2045).

15.    Attached hereto as **Exhibit I** is a true and correct copy of Excerpts from the Transcript of the Deposition of Roy Jeffrey Hart, taken November 3, 2023.

16.    Attached hereto as **Exhibit J** is a true and correct copy of the Declaration of Roy Hart, dated August 28, 2019, produced by Alta in this litigation, and bates numbered Alta 0078637 (Hart Dep. Ex. 2179).

17.    Attached hereto as **Exhibit K** is a true and correct copy of the Email from Travis West to Ryan Castleman, et al. (Subject Line: "Re: non compete"), dated November 21, 2018, produced by Alta in this litigation, and bates numbered Alta 0080311 (Laterza Dep. Ex. 2045).

18.    Attached hereto as **Exhibit L** is a true and correct copy of the Email from Robin Gibbs to Brandon Renken et al. (Subject Line: "RE: Proposed Letter to Deutsche Bank"), dated September 5, 2019, produced by Alta in this litigation, and bates numbered Alta 0080280 through Alta 0080282 (Laterza Dep. Ex. 2044).

19.    Attached hereto as **Exhibit M** is a true and correct copy of the Email from Jay Manning to Travis West, et al. (Subject Line: "SURPLUS UNITS UPDATE V10") with Attachment, dated May 13, 2019, produced by Alta in this litigation, and bates numbered Alta 0030223 and Alta 0030224 (Laterza Dep. Ex. 11a).

20.    Attached hereto as **Exhibit N** is a true and correct copy of the Email from Matthew Laterza to Travis West (Subject Line: "FW: List of Packages") with Attachment, dated February 8, 2019, produced by Alta in this litigation, and bates numbered Alta 0030091 and Alta 0030092 (Laterza Dep. Ex. 2022).

21.    Attached hereto as **Exhibit O** is a true and correct copy of the Email from Jay Manning to Travis West (Subject Line: "Status of Negotiations") with Attachment, dated April

APP.004

11, 2019, produced by Alta in this litigation, and bates numbered Alta 0006067 through Alta 0006069 (Laterza Dep. Ex. 2026).

22.　　Attached hereto as **Exhibit P** is a true and correct copy of the Email from Jay Manning to Matthew Laterza, et al. (Subject Line "Status of Negotiations") with Attachment, dated April 16, 2019, produced by Alta in this litigation, and bates numbered Alta 0004855 and Alta 0004856 (Laterza Dep. Ex. 2027).

23.　　Attached hereto as **Exhibit Q** is a true as correct copy of the Email from Jay Manning to Matthew Laterza, et al. (Subject Line: "FW: Update") with Attachment, dated May 9, 2019, produced by Alta in this litigation, and bates numbered Alta 0003486 and Alta 0003487 (Laterza Dep. Ex. 2030).

24.　　Attached hereto as **Exhibit R** is a true and correct copy of the Email from Jay Manning to Matthew Laterza, et al. (Subject Line: "Alta Surplus Units Update and Payments Made/Due") with Attachment, dated June 22, 2019, produced by Alta in this litigation, and bates numbered Alta 0029639 and Alta 0029640 (Laterza Dep. Ex. 2032).

25.　　Attached hereto as **Exhibit S** is a true and correct copy of the Email from Matthew Laterza to Prashant Mupparapu (Subject Line: "RE: Alta / Owl Rock"), dated September 3, 2019, produced by Alta in this litigation, and bates numbered Alta 0038184 and Alta 0038185 (Laterza Dep. Ex. 2040).

26.　　Attached hereto as **Exhibit T** is a true and correct copy of the Email from Jay Manning to Matthew Laterza, et al. (Subject Line: "FW: WattStock revise teklifi") with Attachment, dated April 19, 2019, produced by Alta in this litigation, and bates numbered Alta 0028095 through Alta 0028101 (Laterza Dep. Ex. 2029).

27.　　Attached hereto as **Exhibit U** is a true and correct copy of the Email from Jay

Manning to Abdullah Kurt, et al. (Subject Line: "RE: ACARSOY signed contract") with Attachment, dated June 28, 2019, produced by Alta in this litigation, and bates numbered Alta 0028557 through Alta 0028879 (Laterza Dep. Ex. 2031).

28.    Attached hereto as **Exhibit V** is a true and correct copy of the Letter from Andrew LeGrand to Alta's Counsel, dated November 1, 2022.

29.    Attached here to as **Exhibit W** is a true and correct copy of GE's Motion to Amend the Scheduling Order and Temporarily Stay Discovery, filed November 23, 2022.

30.    Attached hereto as **Exhibit X** is a true and correct copy of the non-redacted Brief in Support of GE's Motion to Amend the Scheduling Order and Temporarily Stay Discovery, filed December 30, 2022 (redacted version filed November 23, 2022).

31.    Attached hereto as **Exhibit Y** is a true and correct copy of the Transcript of Proceedings from the January 23, 2023 Hearing on GE's Motion to Amend the Scheduling Order and Temporarily Stay Discovery.

32.    Attached hereto as **Exhibit Z** is a true and correct copy of the Email from Jeb Golinkin to Andrew LeGrand, et al. (Subject Line: "Alta Power: Proposed Amended Complaint and Meet and Confer"), with Attachments, dated May 10, 2024.

33.    Attached hereto as **Exhibit AA** is a true and correct copy of GE's Redline Showing Alta's May 10, 2024 Proposed Complaint (as added or stricken text) Compared Over Alta's February 24, 2021 Original Third-Party Petition.

34.    Attached hereto as **Exhibit BB** is a true and correct copy of the Email from Matthew Capoccia to Jeb Golinkin (Subject Line: "Re: Alta Power: Proposed Amended Complaint and Meet and Confer), dated May 14, 2024.

35.    Attached hereto as **Exhibit CC** is a true and correct copy of Alta's As-Filed

Proposed Complaint, filed May 14, 2024 (ECF 36-1).

36.    Attached hereto as **Exhibit DD** is a true and correct copy of GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint (as added or stricken text) Compared Over Alta's May 10, 2024 Proposed Complaint.

I declare under penalty of perjury, under the laws of the United States of America, 28 U.S.C. § 1746, that the foregoing is true and correct.


Dated this 4th day of June, 2024

    /s/ *Matthew Capoccia*
    Matthew Capoccia (Tex. Bar No. 24121526)
    GIBSON, DUNN & CRUTCHER LLP
    2001 Ross Avenue, Suite 2100
    Dallas, TX 75201
    Tel: (214) 698-3100
    Fax: (214) 571-2900
    Email: mcapoccia@gibsondunn.com

    COUNSEL TO GE VERNOVA
    INTERNATIONAL LLC

6

# EXHIBIT B

CAUSE NO. DC-20-08331

| | |
|---|---|
| WATTSTOCK LLC.<br>    *Plaintiff*<br><br>v.<br><br>ALTA POWER LLC,<br>    *Defendant, Counter-Plaintiff, and Third-Party Plaintiff,*<br><br>v.<br><br>WATTSTOCK LLC<br>    *Counter-Defendant, and*<br><br>GENERAL ELECTRIC INTERNATIONAL, INC., d/b/a GE POWER SERVICES<br>    *Third-Party Defendants.* | IN THE DISTRICT COURT OF<br><br><br><br>DALLAS COUNTY, TEXAS<br><br><br><br>116th JUDICIAL DISTRICT |

**ALTA POWER LLC'S FIRST AMENDED ANSWER AND
COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION**

Alta Power LLC ("Alta Power") files this First Amended Answer and Counterclaim and Original Third-Party Petition against Counter-Defendant WattStock LLC ("WattStock") and Third-Party Defendant General Electric International, Inc., d/b/a GE Power Services ("GE") and would respectfully show as follows:

## I.    SUMMARY OF ACTION

1. This case is necessitated by repeated misrepresentation made by GE and WattStock to Alta Power concerning GE/WattStock's relationship, capabilities, and program to entice Alta Power to use GE/WattStock as the source of used aeroderivative gas turbines.

2. Alta Power was created to develop power assets that would provide additional power capacity to the Texas energy grid when the grid was overburdened. As part of

this, Alta Power intended to purchase and place into service used aeroderivative gas turbines (essentially jet engines on skids) that can quickly turn on and off to meet instances where power demand exceeds available power supply. During these periods of excess demand, power prices are highest.

3.    GE was eager to participate in the used gas turbine market, a segment in which it historically had no presence. GE, however, did not want to be involved in the work of actually acquiring and selling the used turbines. Instead, GE engaged former GE employees who started WattStock to act as its sales force and point of entry into the used gas turbine market.

4.    Starting in 2018, GE and WattStock persuaded Alta Power to purchase used GE aeroderivative gas turbines, marketing the units as both more reliable and cost competitive, similar to the "Certified Pre-Owned Mercedes Benz$^{®}$" program. Critically, Alta Power relied on GE's and WattStock's representations regarding the nature of the WattStock/GE relationship, the total acquisition cost of used units, and the benefits of GE's "OEM certified program." Ultimately, Alta Power agreed to move forward with WattStock/GE.

5.    GE's and WattStock's representations were false and have caused Alta Power to miss opportunities in the marketplace. Instead of the benefits claimed by GE and WattStock, Alta Power put money into potential units that were never going to fit their budgetary requirements because the units were either (1) burdened by undisclosed liabilities related to GE's "Long Term Services Agreements," (2) were prohibitively expensive for refurbishment by GE, or (3) were not available as marketed. Simply put, the acquisition costs and the benefits lauded by GE and WattStock were false.

6.    GE and WattStock's breaches of contract and tortious conduct caused Alta Power to lose more than one hundred million dollars of essential financing, profits related to its

business, and millions in payments to GE and WattStock for undelivered equipment and phantom services. After investing millions, Alta Power has nothing to show for what it has paid to GE and WattStock.

## II.    DISCOVERY CONTROL PLAN

7.    Discovery is intended to be conducted under Level 3 of Texas Rule of Civil Procedure 190.

## III.    PARTIES

8.    Alta Power is the Defendant in this case originally filed by WattStock, the original Plaintiff and Counter-Defendant. Both Alta Power and WattStock have already appeared.

9.    Third-Party Defendant GE is a company incorporated under the laws of Delaware doing business in Texas and can be served with Citation through its registered agent in Texas, CT Corporation System, 1999 Bryan St., Ste 900, Dallas, TX 75201-3136.

## IV.    VENUE AND JURISDICTION

10.    This Court has personal jurisdiction over WattStock related to Alta Power's claims as WattStock originally filed this case. This Court has personal jurisdiction over GE because a substantial amount of the acts giving rise to Alta Power's causes of action arose in Texas.

11.    Venue is proper in Dallas County, Texas under Section 15.002 of the Texas Civil Practice & Remedies Code because all, or a substantial part of the events or omissions giving rise to the claims against WattStock and GE, occurred in Dallas County and WattStock's principal place of business is in Dallas County, Texas.

12.    As required by Rule 47(b) of the Texas Rules of Civil Procedure, Alta Power seeks monetary relief of more than $1,000,000. Alta Power also seeks pre-judgment and post judgment interest at the highest legal rate.

## V.    GENERAL DENIAL

13.    Alta Power denies all the allegations set forth in WattStock's Original Petition and any subsequent amended petition and demands strict proof thereof as required by the laws of Texas.

## VI.    AFFIRMATIVE DEFENSES

14.    Alta Power asserts the following affirmative defenses:

    a.    WattStock's claims are barred because of WattStock's material breaches of the Master Agreement, the LNTP, and the Ethos Authorization; and

    b.    WattStock's claim for attorneys' fees fails for lack of presentment.

## VII.    FACTUAL ALLEGATIONS

### A.    Alta Power develops a strategy for meeting peak energy demands.

15.    Alta Power was established to provide additional capacity to an overloaded energy grid in a creative and profitable manner.

16.    The market for power in Texas has evolved from traditional gas and coal fired power plants to more renewable sources like wind and solar. In 2019, renewable energy sources accounted for about 11% of total U.S. energy consumption and about 17% of electricity generation. Texas now meets 20% of its sizeable electricity demand with wind power.

17.    As electrical providers move towards renewable power production, there are times when the energy grid has more demand than supply. Aeroderivative gas turbine "peaker plants" have become imperative to meet this imbalance since these plants turn on quickly—in less than 10 minutes.

18.    Pricing for this "peak demand" power is often at a premium and can be sold under long-term contracts with investment grade counterparties. Alta Power determined that

peaker plants could help meet this demand, profitably for Alta Power if Alta Power could acquire aeroderivative gas turbines at a competitive price and locate them appropriately.

19.    Because of the high cost of new aeroderivative gas turbines, Alta Power's strategy relied on acquiring used aeroderivative gas turbines, which was the only way to make the projects work within the required budget.

20.    Developing natural gas-fired peaker projects is a complex process, including (1) identifying areas in the grid where a peaker plant fits (considering gas supply, offtake pricing, and interconnection feasibility); (2) navigating the state and federal regulatory waters of the electrical power market; (3) sourcing used aeroderivative gas turbines that can be purchased and refurbished within budget; and (4) obtaining project financing.

21.    This complexity, along with relatively high entry costs, means that there were only a few companies competing with Alta Power. However, given the limited size of the market, being a first mover was critical.

22.    By April 2018, Alta Power had identified several potential project sites through an extensive vetting process based on prevailing market conditions. Through this work, Alta Power earned a head start on its competitors and found itself with a brief window during which it would be the first mover in this niche market.

23.    At this point Alta Power turned to identifying surplus aeroderivative gas turbines units, which, once contractually secured, would allow it to obtain project financing.

**B.    GE and WattStock's Partnership**

24.    GE is one of the limited suppliers of aeroderivative gas turbines.

25.    GE historically has not had a presence in the sale of used aeroderivative gas turbines but recognized a need to be present in this market at some point prior to 2018. As such,

GE partnered with WattStock, a group of former GE executives. WattStock marketed itself (along with GE) as a fully integrated locator, dealer, refurbisher, and servicer of used aeroderivative gas turbines. WattStock markets itself as a unique solution in the used aeroderivative gas turbines, and as the only authorized distributor of used GE aeroderivative gas turbines.

26.     In reality, GE intended for, and held out WattStock to be, the *de facto* sales force in the used aeroderivative gas turbine market for GE. GE and WattStock work "hand-in-hand" as "partners" to provide the "TRUEPACKAGE™" or Certified Turbine Power—CTP™[1] system, "[t]he only authorized OEM [original equipment manufacturer] certified preowned package offering in the industry."[2]

27.     GE and WattStock entered in a Memorandum of Understanding ("MOU") on June 26, 2018 that "outlines" their relationship. The MOU establishes that GE is in complete control, especially in the context of transactions related to aeroderivative gas turbines originally manufactured by GE.

28.     Consistent with their relationship, GE and WattStock held themselves out publicly and privately as "partners" both orally and in writing.

## C.     GE directs Alta Power to WattStock

29.     In 2018, Alta Power began to determine which used aeroderivative gas turbines would best suit its needs. Availability and total acquisition costs were key drivers in its decision on which aeroderivative gas turbines to select. Because the used aeroderivative gas turbines must be refurbished, acquisition costs necessarily include the costs associated with

---

[1]     GE/WattStock uses the TRUEpackage™ descriptor on GE's Website and CTP™ on WattStock' s website. *See*  https://www.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions  and https://www.WattStock.com/ctp.

[2]     https://www.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions.

purchasing the units, the costs of refurbishment, and the costs associated with placing the unit at the location and into service.

30.    After sharing these considerations with GE and WattStock, and after meetings with GE, WattStock and others, Alta Power determined that used GE LM6000 aeroderivative turbine packages were best suited for Alta Power's strategy of tapping into the niche peaker plant market in Texas based on assurances from GE and WattStock.

31.    GE/WattStock were not the only companies that marketed used and refurbished GE LM6000s. Indeed, Alta Power met with several GE "certified" companies that refurbished used aeroderivative gas turbines. None, however, offered a fully OEM-certified and warranted end-to-end product like the TRUEpackage<sup>TM</sup>, which GE/WattStock marketed as their "exclusive" service offering of being the "only authorized OEM certified preowned package offering in the industry."

32.    Alta Power had several meetings with both GE and WattStock personnel mainly at GE's Jacintoport facility where WattStock is co-located. To protect Alta Power's confidential information concerning its unique strategy, the parties entered into a Confidentiality Agreement.

33.    During these meetings, Alta Power disclosed to GE/WattStock the detailed budgetary requirements of Alta Power's business model. Alta Power repeatedly emphasized the cost sensitivity of its projects; that is, the cost of the gas turbine units cannot exceed a certain price point if the project is to remain within budget and financeable. GE and WattStock repeatedly confirmed that used units could be obtained for the prices Alta Power needed.

34.    GE/WattStock also persuaded Alta Power that its exclusive TRUEpackage<sup>TM</sup> OEM warranty was superior to anything offered in the market because GE would

provide an end-to-end package warranty covering both the aeroderivative gas turbine and the electrical generation components. GE/WattStock further stated that other competitors could only warrant a portion of the package.

35.    During these meetings, GE and WattStock described themselves as "partners." GE made it clear that the only way Alta Power could obtain the TRUEpackage™ equipment certification and warranty was by working with the GE and WattStock partnership.

36.    Specifically, GE refused to provide equipment certifications and warranties without WattStock.

37.    In addition to the pricing and warranties, GE and WattStock knew time was of the essence for Alta Power, as competitors were also attempting to enter the market. GE made it clear that delivery could occur within the time frame required by Alta Power's plans if Alta Power used the GE/WattStock TRUEpackage™ program.

38.    GE/WattStock emphasized that (1) GE had a proprietary global database of used LM6000 units including the operational and maintenance history on each, and (2) only GE and WattStock had access to this "proprietary" database. This "proprietary" data was a key selling point for Alta Power.

39.    GE/WattStock represented that GE and WattStock could efficiently locate used units, generate a detailed refurbishment scope, and cost estimate and streamline the acquisition, refurbishment, and delivery process all within Alta Power's required budget.

**D.    WattStock and Alta Power enter into a "Master Agreement."**

40.    Based on the representations concerning the benefits of the TRUEpackage™ program, including, (1) the benefits from GE and WattStock "collaborating" as "partners;" (2) the ready availability of used units that met Alta Power's project budget; (3) the

ability to timely close purchases and refurbish units; and (4) the "benefits" of the warranty with respect to the overall economics of the project, Alta Power agreed to move forward with GE/WattStock for the acquisition of used GE aeroderivative gas turbines to effectuate Alta Power's unique strategy.

41.    Through their discussions, GE and WattStock were keenly aware of the specific unit price requirements of Alta Power, and GE and WattStock assured Alta Power on multiple occasions that sufficient suitable units were available.

42.    The parties began negotiating financial and contractual terms for the relationship in February 2019. At GE's insistence, Alta Power contracted directly with WattStock. GE/WattStock required that WattStock (with GE standing behind it) negotiate the purchase price of each used GE aeroderivative unit with the prior owner and acquire the unit in WattStock's name for an agreed not to exceed price. GE/WattStock presented Alta Power with detailed total cost estimates for each unit showing that if each unit identified could be acquired at or below the "not to exceed price," then the fully refurbished unit could be delivered within Alta Power's budgetary requirements.

43.    The parties also agreed that in the event Alta Power paid any amounts prior to the units being acquired, those interim payments would be credited towards the purchase price Alta Power ultimately agreed to pay.

44.    GE and WattStock caused Alta Power to believe that GE's involvement would insulate Alta Power from any concerns related to the financial viability of WattStock since GE is one of the largest companies in the world. GE and WattStock caused Alta Power to believe that WattStock had the financial resources to pay for the units or complete the necessary steps leading to GE's certification under the TRUEpackage$^{TM}$ OEM program.

45.    On February 27, 2019 WattStock and Alta Power entered into a "Master Agreement" confirming the negotiations concerning how WattStock would be reimbursed for out-of-pocket expenses and as part of a negotiated purchase price after WattStock purchased and refurbished the used units. At no point was WattStock to be paid any mark-up on "down payments" made by Alta Power or on any out-of-pocket expenses for which Alta Power reimbursed WattStock.

46.    While not a named party to the Master Agreement, GE is an "affiliate" or "representative" of WattStock and, therefore, a party to the Master Agreement.

47.    In the Master Agreement, Alta Power and GE and WattStock agreed to a very strict confidentiality provision. GE/WattStock agreed to hold confidential information in "strict confidence" and agreed such information would "not be disclosed in any manner whatsoever." The Master Agreement also contains an exclusivity and non-circumvention provision under which WattStock (and by extension, GE) agreed that neither WattStock nor GE would directly or indirectly cause another person to either attempt to or purchase a unit inspected on behalf of Alta Power (a service for which Alta Power paid).

48.    Additionally, the confidentiality provision required WattStock and GE not to use any information obtained for any other purpose other than the agreed "business purpose," including but not limited to, providing any product or service, or establishing a relationship that is competitive with or against the best interest of Alta Power.

49.    Under the "Master Agreement," the parties also agreed that Alta Power would reimburse WattStock for specific out-of-pocket expenses incurred in arranging inspection and evaluation of the condition of used aeroderivative gas turbines, with prior written approval needed for expenditures more than $20,000.

E.    **WattStock and GE's misrepresentations continue.**

50.    Fully cognizant of the pricing sensitivities of Alta Power's projects, GE/WattStock presented Alta Power with financial information for the acquisition of available units.

51.    The knowledge of the availability of units was largely driven by GE's data. The financial information related to the acquisition of units included WattStock's own estimates based on its "experience" and data from GE based on GE's own data and detailed refurbishment pricing models for each unit.

52.    In February 2019, Pete Watson, WattStock's Vice President of CTP Operations, travelled to Turkey to begin inspections and negotiations on used GE aeroderivative gas turbine units. This was done at Alta Power's expense pursuant to the Master Agreement.

53.    Several used GE aeroderivative units were available in Turkey because changes in Turkish governmental regulations made the units uneconomical in country. In March 2019, WattStock presented Alta Power price and purchase options for nine used GE units based in Turkey.

54.    What WattStock and GE did not tell Alta Power was that the presented prices of the units were not the true prices. All the units GE/WattStock persuaded Alta Power to spend money on were burdened by hidden liabilities. Many of the potential units were significantly more expensive than represented because GE had Long Term Service Agreements ("LTSA") carrying hefty termination fees with the prior owners seeking to sell the used LM6000 aeroderivative gas turbine units. Units not burdened by LTSAs had other material undisclosed liabilities – all of which were driven by internal GE policies.

55.    These LTSAs generally required the prior owner pay GE millions of dollars to terminate. GE/WattStock failed to disclose the existence of these LTSA financial burdens to Alta Power up front. In fact, the LTSA termination fees were not disclosed until after (1) the units were targeted, (2) a purchase agreement was executed between the owners and WattStock, and (3) Alta Power paid WattStock millions of dollars in down payments associated with these purchase agreements.

56.    It was not until almost nine months after Alta Power had paid the first down payment that Alta Power learned of the existence of the LTSA termination fees. In February 2020, one of the sellers of two units, a Turkish company called Nuh Cemento, began demanding reimbursement for the LTSA termination fees to be paid GE in addition to the agreed upon purchase price. GE ultimately refused to waive the LTSA termination fee unless Alta Power entered into a multi-million dollar service agreement with GE. As a result, the project was burdened by expenses materially above Alta Power's project budgets.

57.    GE/WattStock were aware of the undisclosed termination fees before suggesting the Nuh Cemento units be targeted for acquisition. GE/WattStock knew adding the undisclosed termination fees would make the prices of those units higher than Alta Power's project budget. Utilizing a classic "bait and switch move," GE/WattStock deliberately hid the existence of the termination fees in the hope Alta Power would have no choice but to pay them at the 11th hour after Alta Power's project financing had been secured and the projects were already well underway.

58.    Prior to learning of the true cost of these units due to the undisclosed associated liabilities, Alta Power, relying on GE and WattStock, moved throughout 2019 and into 2020 attempting to purchase the two Nuh Cemento units.

59.     WattStock also improperly marked up Alta Power's down payment that would have never been made had Alta Power known the true price of the Nuh Cemento units. Per the terms of the Master Agreement, WattStock entered Equipment Purchase Agreements with Nuh Cemento. When WattStock sent an invoice to Alta Power for the $250,000 down-payment, WattStock added a "mark-up" of $125,000. Alta Power refused to pay the "mark-up" since it was inconsistent with the Master Agreement. Recognizing it had no entitlement to these funds, WattStock did not reiterate its demand for payment until litigation between the parties became imminent.

60.     WattStock, GE, and Alta Power identified an additional unit in Turkey owned by a Turkish company called Acarsoy.

61.     As with the Nuh Cemento units, WattStock/GE failed to disclose that the Acarsoy unit was burdened with a multi-million-dollar LTSA termination fee, which was not included in the pricing presented to Alta Power.

62.     Like with Nuh Cemento, Alta Power paid $475,000 in down payments related to this unit, unaware of the true cost of the unit. Alta Power would never have done so had GE/WattStock disclosed the liabilities associated with the unit which rendered it uneconomical for Alta Power's projects.

63.     Once again, WattStock even attempted to mark-up this down payment (as they did with every other payment from Alta Power) despite having no contractual basis to do so. Alta Power rebuffed these attempts, and WattStock recognized it had no basis for payments, and did not request the payments again until just before the filing of its lawsuit against Alta Power.

64.     In addition to units made uneconomical by LTSAs, WattStock also marketed units that were uneconomical for other reasons.

65.    In May of 2019, WattStock informed Alta Power of the existence of a package owned by EthosEnergy. WattStock suggested Alta Power purchase the package from EthosEnergy, claiming demand for the package was high. The "package" was essentially the housing for the aeroderivative gas turbine.

66.    GE and WattStock represented that Alta Power could obtain a gas turbine engine from the GE lease pool to marry with the EthosEnergy package and claimed a similar housing was available in Panama and could also easily be married with a lease pool engine.

67.    GE/WattStock claimed these leased units with the purchased housings would lead to a significantly lower price for Alta Power.

68.    Based on these representations, Alta Power purchased the EthosEnergy package for $200,000.

69.    When WattStock sent an invoice for this purchase, it marked up the purchase price initially by $175,000 and then later by $115,000.

70.    Once again Alta Power refused to pay the mark-up, as there was no contractual basis for such a mark-up. Indeed, the contractual relationship between Alta Power and WattStock contemplated that this package would not be marked up.

71.    GE/WattStock also did not disclose that the EthosEnergy unit was in a dilapidated condition and was only suggested as a possibility so that GE/WattStock could increase their revenue stream for providing repairs. Furthermore, several months later when Alta Power inquired about the possibility of cost savings using the previously promised lease pool engines, WattStock and GE informed Alta Power that "that program was no longer being offered."

72.    Had GE/WattStock disclosed the true condition of the EthosEnergy unit or the unavailability of the lease pool, Alta Power would not have purchased the Ethos unit at any

price. Furthermore, WattStock still has possession of the EthosEnergy unit, despite having been paid for it.

73.     WattStock convinced Alta Power to make a down payment for a unit owned by a company in Turkey called Bosen. As with all other units, WattStock and GE represented that the delivered unit would be priced consistent with Alta Power's needs.

74.     Alta Power put $300,000 dollars down for the purchase of the Bosen unit. Alta Power was later informed that GE/WattStock would not service units containing non-GE components unless the non-GE components were first replaced—regardless of their condition.

75.     The Bosen unit contained non-GE components and as a result the "new" purchase price including the refurbishment work which was several million dollars higher than previously represented by GE/WattStock and the unit was uneconomical for Alta's projects.

**F.    WattStock scuttles Alta Power's efforts at financing.**

76.     Throughout 2019, Alta Power discussed potential financing options for its power project. Alta Power reached out to several sources of funding. In the summer of 2019, Alta Power identified its best source of funding for the purchase of the nine aeroderivative units: Deutsche Bank.

77.     Alta Power engaged in negotiations with Deutsche Bank concerning financing for its unique peaker plant strategy. As part of its due diligence, Deutsche Bank requested a meeting with WattStock. WattStock met with Deutsche Bank and during these meetings, WattStock confirmed that GE and WattStock were "partners."

78.     Of course, Deutsche Bank would rely not solely on WattStock's representation that GE and WattStock were "partners." Accordingly, Deutsche Bank formally asked GE to provide appropriate assurances. On July 31, 2019, GE responded to this request in a

letter confirming that if WattStock failed to meet its contractual obligations, GE would step in since GE and WattStock are partners in this venture. GE also confirmed that GE engineering will be overseeing WattStock's work and that GE has a "strong incentive" for the project to succeed.

79.    Sometime before financing was closed, WattStock disclosed to Ryan Castleman of Castleman Power Development LLC ("Castleman"), one of Alta Power's few competitors, that project financing from Deutsche Bank was imminent. Knowing the financing would decrease the available used units in the marketplace and would allow Alta Power's projects to come online first, Castleman predictably attempted to scuttle Alta Power's financing. Specifically, Castleman threatened to file a frivolous "trade secret" lawsuit against Alta Power to stop the financing.

80.    Alta Power was forced to disclose this frivolous claim to Deutsche Bank. Alta Power worked to quickly resolve the frivolous dispute, and ultimately had no choice but to pay Castleman an extortion fee to settle the frivolous claim. But the damage was already done. Castleman's strategy of causing delay to destroy financing worked.

81.    Deutsche Bank decided against providing financing to Alta Power, delaying Alta Power's ability to bring units into service.

## G.    WattStock steals $100,000 from Alta Power to finance WattStock's operations.

82.    Despite the Deutsche Bank financing falling through, Alta Power remained committed to its unique peaker plant strategy and continued to explore other financing options in the fall of 2019.

83.    By the fall of 2019, GE and WattStock continued to lead Alta Power to believe that the targeted units could be acquired consistent with WattStock and GE's earlier pricing guidance. Because of this, Alta Power continued to fund the potential acquisition of units.

84.     In October 2019, Alta Power sent WattStock $100,000 for potential use in extending an option to purchase units from Bosen. During WattStock's negotiations with Bosen, Alta Power ultimately decided not to go through and told WattStock to cease negotiations. WattStock complied and the parties never entered into an agreement extending the option period with Bosen.

85.     WattStock never sent Alta Power's $100,000 to Bosen since the negotiations were called off before the $100,000 was used.

86.     Alta Power requested the return of the $100,000. WattStock acknowledged the funds would be returned, and repeatedly promised to do so on multiple occasions during the fall and winter of 2019-2020.

87.     WattStock broke these promises. Instead, WattStock converted Alta Power's $100,000 and used it to cover serious cash flow issues, which WattStock had previously failed to disclose to Alta Power and did not disclose until May of 2020.

**H.     WattStock continues to fail to disclose the true costs of units.**

88.     Despite the Deutsche Bank financing falling through, Alta Power was still committed to the development of its projects. Consistent with this and based on WattStock's false representations that other buyers were targeting the Turkish units, Alta Power paid WattStock over $200,000 for extensions to keep alive potential deals with Acarsoy and Nuh Cemento in the fall of 2019.

89.     At no time did WattStock inform Alta Power that the true costs of these units were inconsistent with WattStock's and GE's representations.

90.    During the fall of 2019, Alta Power considered a variety of funding structures, and decided to finance each project separately, rather than approaching potential lenders with a portfolio of three projects.

91.    Consistent with this, Alta Power and WattStock entered a Limited Notice to Proceed Proposal ("LNTP") on December 23, 2019 for two separate units to be acquired from Nuh Cemento. The total amount of the LNTP was almost $20 million. This included the "not to exceed price" of $6.5 million for WattStock to purchase the units from Nuh Cemento that GE/WattStock told Alta Power will be sufficient to purchase the units, with the balance for transportation, refurbishment, and installation of the units. This price included GE/WattStock's profit margin for the project.

92.    GE and WattStock represented to Alta Power that GE needed to be paid $1,500,000 to secure the purchase of long-lead hardware, start engineering activities and deliver preliminary drawings related to a potential TRUEpackage$^{TM}$ project. The $1,500,000 was divided into two payments of $750,000.

93.    Alta Power paid $750,000 on December 24, 2019 and paid another $750,000 on January 13, 2020.

94.    In February 2020, Alta Power was informed for the first time that the owner of the two Nuh Cemento units would only sell the two units for the agreed not to exceed price of $6.5 million **plus** the cancellation of GE's LTSA termination fee of over $1.4 million.

95.    The impact of the cancellation fee materially increased project costs above the previous budget and impacted Alta Power's ability to obtain financing for the project.

96.    For the units being considered (as with the Bosen unit), the significant liabilities were *not* disclosed until *after* Alta Power made the final payment to GE under the LNTP.

97.    By March 2020, the global economy was in the grips of the COVID-19 crisis. This delay impacted the closing of Alta Power's project financing. Regardless, Alta Power remained financially committed to the project and was ready, willing, and able to go forward with the two Nuh Cemento units under the LNTP.

98.    In the spring of 2020 WattStock informed Alta Power it was having financial issues. WattStock asked Alta Power to either provide a loan or acquire WattStock.

99.    During this time, Alta Power requested that GE step in and fulfill its commitment to Alta Power to assist in securing the units needed for Alta Power's project. GE refused.

100.    Alta Power was ready, willing, and able to go forward with the Nuh Cemento project with GE alone. GE refused to allow Alta to pay directly for the LNTP components, despite repeated requests by Alta Power due to concerns regarding WattStock's financial situation. And GE further refused to step in and take over for WattStock (despite contrary written representations) when Alta Power notified GE that WattStock was insolvent.

101.    Alta Power also continued to negotiate with other sources of funding for the Project, including Riverstone and Macquarie.

102.    Despite Alta Power's effort sand GE's prior representations, GE made it clear, once again, that it would only move forward with WattStock, thereby constructively cancelling the LNTP and the Nuh Cemento project.

103.    Consequently, Alta missed their opportunity to be a first mover in the highly competitive Texas peaking electricity market.

## VIII.    CAUSES OF ACTION

### COUNT I: DECLARATORY JUDGMENT (AGAINST GE AND WATTSTOCK)

104.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

105.    Alta Power seeks a declaratory judgment pursuant to Tex. Civ. Prac. & Rem. Code § 37.001 *et seq.* Alta Power requests the Court to declare that:

  a.  No contractual agreement exists by which WattStock is entitled to "mark-ups" on goods or services.

  b.  GE and WattStock are principal/agent or partners such that GE is responsible for WattStock's torts and breaches.

  c.  As of May 20, 2020, WattStock was insolvent and Alta Power was entitled to terminate the Master Agreement, which excuses Alta Power of any further performance.

  d.  As of May 20, 2020, WattStock was insolvent and Alta Power was entitled to terminate the December 23, 2019 LNTP.

  e.  GE's refusal to go forward with the Nuh Cemento project once WattStock became insolvent was a breach of the LNTP requiring GE to refund money paid to WattStock/GE by Alta Power.

### COUNT II: RESPONDEAT SUPERIOR (AGAINST GE)

106.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein. GE and WattStock represented to Alta Power that they were "partners" and that WattStock acted as GE's Authorized Service Provider.

107.    Alta Power justifiably relied on these representations by GE and WattStock in agreeing to the Master Agreement and the LNTP.

108.    In fact, without the representations, Alta Power would have never entered any contracts with WattStock.

109.    Accordingly, an ostensible agency existed between WattStock and GE.

110.    GE is estopped from denying liability for WattStock's breaches and torts and/or GE and WattStock engaged in a joint enterprise for which joint and several liability exists.

111.    Despite the fig leaf boiler-plate language in the MOU between GE and WattStock, the language of the MOU shows GE controlled WattStock. Accordingly, the "no partnership or agency" provision is a sham or subterfuge designed to conceal the true legal status of GE/WattStock. Extrinsic evidence also shows actual control by GE over WattStock.

112.    GE is *respondeat superior* liable for the breaches and torts of WattStock.

### COUNT III: BREACH OF CONTRACT (AGAINST WATTSTOCK)

113.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

114.    Alta Power and WattStock entered into the Master Agreement, which is and was a valid and enforceable contract. Alta has standing to sue for breach of the Master Agreement.

115.    Alta Power performed its obligations under the Master Agreement.

116.    WattStock breached the confidentiality provisions of the Master Agreement by disclosing confidential information about Alta Power and its financing to Castleman. WattStock's breach has proximately caused injury to Alta Power. Specifically, WattStock's breach caused Alta Power to lose project financing for its a unique strategy for developing power generation projects in the Texas market.

117.    Had WattStock not breached the confidentiality provisions, Alta Power would have closed financing with Deutsche Bank and been able to implement its unique strategy.

118.    As a direct result of WattStock's breaches, Alta Power has been severely damaged.

119.    Alta Power paid GE/WattStock $1.5 million related to the Nuh Cemento project for GE to acquire long-lead hardware, start engineering activities, and deliver preliminary drawings.

120.    The Master Agreement and LNTP were cancelled due to WattStock's insolvency.

121.    In addition to its liability under the theory of respondeat superior, GE is also vicariously liable for WattStock's breaches of the Master Agreement and LNTP. Consequently, GE must refund to Alta Power the $1.5 million under the contracts between the parties.

122.    To compensate it for the damages outlined above, Alta Power seeks unliquidated damages.

123.    Pursuant to Texas Civil Practice and Remedies Code section 38, Alta Power is entitled to attorney's fees, costs, and expenses, due to WattStock's breach of the agreement.

## COUNT IV: UNJUST ENRICHMENT (AGAINST GE)

124.    Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

125.    GE has been unjustly enriched in the amount of $1.5 million to the detriment of Alta Power.

126.    Alta Power demands restitution of all amounts GE has been justly enriched.

## COUNT V: CONVERSION (AGAINST WATTSTOCK)

127.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

128.    In October 2019, Alta Power sent WattStock $100,000 to extend an option to purchase units from Bosen.

129.    Alta ultimately declined to extend the option and instructed WattStock to return the $100,000.

130.    Alta repeatedly demanded that WattStock return the $100,000 during the fall and winter of 2019-2020. WattStock refused (and continues to refuse) to return this money, and thereby assumed and exercised dominion and control over Alta's money in an unlawful and unauthorized manner, to the exclusion of and inconsistent with Alta's rights.

## COUNT VI: TEXAS THEFT LIABILITY ACT (AGAINST WATTSTOCK)

131.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

132.    Alta has a possessory right to the $100,000 it paid WattStock.

133.    WattStock misappropriated and enjoyed these monies knowing full well it was not entitled to same.

134.    All of this was done without Alta's consent. WattStock intended to and did in fact deprive Alta of these monies which led Alta to suffer significant financial damages in an amount to be proven at trial, plus court costs and reasonable and necessary attorney's fees as allowed by the TLA.

## COUNT VII: FRAUD (AGAINST GE AND WATTSTOCK)

135.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

136.    GE and WattStock intentionally misrepresented the nature of their relationship to induce Alta Power to contract with GE/WattStock.

137.    GE represented it would "stand behind" WattStock. However, when the time came to do so GE did not.

138.     Simply put, the pricing provided by GE and WattStock was intentionally misrepresented and did not include the true cost of acquisition of the units. Alta Power relied on these representations to its detriment.

139.     GE had the right under its MOU with WattStock to force WattStock to sell GE any gas turbine purchased pursuant to the TRUEPACKAGE™ program. In effect, GE had the right to push WattStock aside and ensure that any deal was consummated.

140.     Yet, when WattStock became insolvent GE refused to "stand behind" WattStock and take the necessary steps to consummate the LNTP with Alta Power and Nuh Cemento.

141.     GE/WattStock misrepresented the benefits of the TRUEpackage™ program.

142.     GE/WattStock represented that the program would enhance the ability to obtain financing when it did not.

143.     GE/WattStock represented that the program would be able to move quickly to service the narrow window Alta Power had for this unique strategy when in fact the GE/WattStock relationship created a bureaucracy that only slowed down projects.

144.     GE/WattStock represented that the TRUEpackage™ program was of a superior quality when in fact it was not.

145.     GE/WattStock represented that units from the TRUEpackage™ program were competitively priced with alternative refurbished gas turbine solutions when in fact they were not.

146.     GE/WattStock hid the existence of undisclosed liabilities on virtually every unit suggested using a classic bait and switch maneuver.

147.    GE/WattStock's misrepresentations were material and false.

148.    Both GE and WattStock knew these representations were false when they made them, or at the very least, these representations were made recklessly and without knowledge of their truth.

149.    These representations were made with the intent that Alta Power act on them.

150.    Alta Power relied on GE and WattStock's representations regarding their relationship.

151.    GE and WattStock's misrepresentations caused Alta Power injury well beyond the minimum jurisdictional limits of the Court.

152.    Alta Power has wasted at least $10 million based on GE/WattStock's misrepresentations.

153.    Had GE/WattStock not misrepresented the true facts, Alta Power would have been able to successfully serve the niche market and has lost significant revenue as a result.

## COUNT VIII: NEGLIGENT MISREPRESENTATION (AGAINST GE AND WATTSTOCK)

154.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

155.    Alternatively, each fraudulent misrepresentation made by GE and WattStock were made negligently since GE/WattStock did not exercise reasonable care or competence in obtaining or communicating the information.

156.    Alta Power has wasted at least $10 million based on GE/WattStock's negligent misrepresentations.

157.    Had GE/WattStock not negligently misrepresented the true facts, Alta Power would have been able to successfully serve the niche market and has lost significant revenue as a result.

## IX.    JURY DEMAND

158.    Alta Power requests trial by jury on all contested issues of fact. The requisite jury fee has been paid.

## X.    PRAYER

ACCORDINGLY, Alta Power prays that WattStock and GE be cited to appear and answer and that upon a final trial of this matter, the Court enter a final judgment against WattStock and GE awarding Alta Power the following relief:

a)  An award of the full amount of actual damages incurred by Alta Power and caused by the acts and omissions of GE and WattStock;

b)  An award of equitable damages, as requested above;

c)  An award of exemplary damages;

d)  Reasonable and necessary attorneys' fees;

e)  Pre-judgment and post-judgment interest at the maximum rate allowed by law;

f)  Cost of court; and

g)  Such other and further relief, general or special, at law or in equity, to which Alta Power may show itself to be justly entitled.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC


By: /s/ Michael Cancienne
      Michael Cancienne
      State Bar No. 24055256
      Kevin Jordan
      State Bar No. 11014800
      Joseph W. ("Jeb") Golinkin II
      State Bar No. 24087596
      1980 Post Oak Blvd., Ste. 2300
      Houston, Texas 77056
      713.955.4028
      713.955.9644 Facsimile
      mcancienne@jlcfirm.com
      kjordan@jlcfirm.com
      jgolinkin@jlcfirm.com

      **ATTORNEYS FOR DEFENDANT,
      COUNTER-PLAINTIFF AND THIRD-
      PARTY PLAINTIFF ALTA POWER
      LLC**


## CERTIFICATE OF SERVICE

      I hereby certified that a true and correct copy of the above pleading was served on all parties through the Court's electronic filing service on the 24th day of February, 2021.


      By:      /s/ Michael Cancienne
                Michael Cancienne

# EXHIBIT C



2800 JPMorgan Chase Tower, 600 Travis
Houston, Texas 77002-3095
Telephone: 713-226-1200
Fax: 713-223-3717
www.lockelord.com

David M. Gregory
Direct Telephone: 713-226-1344
Direct Fax: 713-229-2630
dgregory@lockelord.com

August 16, 2019

**BY FEDERAL EXPRESS AND**
**E-MAIL (mlaterza@alta.energy.com)**

Alta Power LLC
c/o Mr. Matthew E. Laterza
4605 Post Oak Place Dr., Suite 270
Houston, Texas 77027

**BY FEDERAL EXPRESS AND**
**E-MAIL (royhart@rocketmail.com)**

Mr. Roy J. Hart
116 Springs Edge
Montgomery, Texas 77356
royhart@rocketmail.com

**BY FEDERAL EXPRESS AND**
**E-MAIL (twest44@earthlink.net)**

Mr. Travis West
36499 Plantation Blvd
Prairieville, LA 70769

　　　　Re:　　Demand to Immediately Cease and Desist and Preserve Evidence

Gentlemen:

　　　　This firm represents Castleman Power Development LLC ("Castleman"). Please direct all communications regarding this matter to me.

　　　　As you know, both Mr. Hart and Mr. West formerly provided consulting services to Castleman related to the development of electricity generating facilities and assets in the ERCOT region. As a result of those relationships, both were privy to, developed, and received confidential information and trade secrets belonging to Castleman. To protect such information, Mr. Hart and Mr. West were, and remain, subject to certain contractual obligations of confidentiality, non-solicitation, and/or non-competition to Castleman, in addition to their common law and statutory obligations not to use or disclose Castleman's confidential information and trade secrets.

81223266v.1



EXHIBIT 2038
WIT: _____
DATE: 10-15-22
Pat E. Arredondo, CRR, RMR

APP.037
Alta 0052083

August 16, 2019
Mr. Matthew E. Laterza
Mr. Roy J. Hart
Mr. Travis West

Castleman understands that Alta Power LLC or one of its subsidiaries or affiliates (collectively "Alta"), with the assistance of Mr. Hart and Mr. West, is in the process of developing electricity generating facilities or assets in the ERCOT region, as well as contacting vendors and seeking financing related to such developments.  As Alta is no doubt aware, Mr. Hart's involvement in such activities is a blatant violation of his continuing obligations to Castleman.  Alta is facilitating those breaches and thus tortiously interfering with Castleman's contractual rights. Specifically, Mr. Hart is prohibited through, at the earliest, November 18, 2019, from becoming employed by or otherwise providing services (directly or indirectly) to any person or entity that is engaged in the business of developing, constructing, acquiring, owning, or operating electricity generating facilities or assets in the state of Texas.  Mr. Hart is also prohibited through, at the earliest, June 15, 2020, from calling on, soliciting, recruiting, or interfering with any customer, client, supplier, vendor, employee, or contractor of Castleman, and from inducing any such person or entity to cease or terminate their relationship with Castleman.

Moreover, it appears that Alta, Mr. Hart, and Mr. West are utilizing Castleman's confidential information and trade secrets in your current activities and in support of Alta's development of those facilities or assets.  In addition to violating the contractual confidentiality obligations owed to Castleman by Mr. Hart and Mr. West, this conduct violates the Defend Trade Secrets Act ("DTSA") and the Texas Uniform Trade Secrets Act.  Lastly, it appears that Mr. Hart, Mr. West, and Alta made, and may still be making, false and damaging statements regarding Castleman to third parties in an attempt to harm Castleman's business.  This conduct has damaged Castleman and constitutes actionable defamation and tortious interference.

This letter is to place all of you on notice of Castleman's claims and intent to pursue those claims through litigation.  To be clear, Castleman intends to pursue and protect its rights and use its available remedies to do so, including seeking an injunction, potential seizure under the DTSA, economic and punitive damages, and attorneys' fees.  To the extent any assets or facilities are constructed utilizing Castleman's confidential information and trade secrets, Castleman will also seek a constructive trust on such assets or facilities and seek to gain rightful ownership over the fruits of, and any benefits received from, the misappropriation of Castleman's confidential information and trade secrets.

To the extent any of you are directly or indirectly engaged in any misappropriation and/or use of Castleman's confidential information and trade secrets, unfair competition, defamation, tortious interference, or any other conduct in derogation of Castleman's contractual, common law, or statutory rights, Castleman demands immediate cessation of any such activities.  Without limitation, Mr. Hart must cease his participation with Alta in violation of his contractual obligations to Castleman.  Castleman further demands that any of Castleman's information in any of your possession, custody, or control be returned and any electronic devices containing such information be turned over to Castleman for review and analysis by a digital forensic consultant. At minimum, Castleman demands that:  (1) Mr. Hart and Mr. West turn over any devices or accounts they used to store or retain Castleman's information to this firm for review by Castleman's digital forensic consultant; (2) to the extent not already done, Mr. Hart and Mr. West return any other documents or information of Castleman, in any form, in their possession, custody, or control that they retained from their work with Castleman; (3) Alta review its systems to confirm that neither Mr. Hart nor Mr. West placed any of Castleman's information on Alta's systems or incorporated it into their work for Alta; (4) Alta inform Castleman of whether it discovers any Castleman information in its possession, custody, or control; and (5) if applicable, Alta certify in writing to Castleman that it either: (a) has not received or used, directly or indirectly, any

2

81223266v.1

APP.038
Alta 0052084

August 16, 2019
Mr. Matthew E. Laterza
Mr. Roy J. Hart
Mr. Travis West

Castleman information retained by Mr. Hart or Mr. West, or (b) has secured on its system any Castleman information from access. Given the importance of this matter, we request that you coordinate these efforts with us, so that we can ensure Castleman's confidential information and trade secrets are protected, and that appropriate remediation occurs where necessary.

Each of you is now on direct and specific notice of your evidence preservation obligations related to this matter. Do not destroy or alter any evidence (*e.g.,* e-mails, text messages, direct messages, documents in hard copy or downloaded or saved onto your systems, invoices, plans, blue prints, specifications, phone call records, voicemails, or other communications) relating to: (1) any of the matters addressed in this letter; (2) Alta's recruitment and hiring or engagement of Mr. Hart and Mr. West; (3) Mr. Hart's and Mr. West's business activities on behalf of Castleman, including, without limitation, in the months preceding their departure from Castleman; (4) Mr. Hart's and Mr. West's business activities for Alta, including any work on developing or planning to develop electricity generating facilities or assets in the ERCOT region and any solicitation of Castleman's customers, clients, employees, contractors, suppliers, vendors, or financing sources on behalf of Alta; or (5) statements made by Alta, or anyone acting on its behalf, including, without limitation, Mr. Hart or Mr. West, to any customers, clients, employees, contractors, suppliers, vendors, or financing sources regarding Castleman or any of its management team, including Ryan Castleman and GP Manalac. Any destruction of evidence may be presumed to be evidence of intent to cover up wrongdoing and result in significant adverse legal consequences.

Castleman's investigation into this matter is ongoing and this letter does not waive or relinquish any of Castleman's rights.

Very Truly Yours,

David M. Gregory

cc: Jeff McPhaul (Firm)
Rufino Gaytán III (Firm)

3

81223266v.1

CONFIDENTIAL

**APP.039**
Alta 0052085

# EXHIBIT D

**BAKER BOTTS L.L.P.**
Jessica B. Pulliam, TX SBN 24037309
*jessica.pulliam@bakerbotts.com*
2001 Ross Avenue, Suite 900
Dallas, TX  75201-2980
Telephone:    214.953.6500

David R. Eastlake, TX SBN 24074165
*david.eastlake@bakerbotts.com*
910 Louisiana Street
Houston, Texas 77002-4995
Telephone:    713.229.1234

*Co-Counsel for Alta Power LLC*

**JORDAN, LYNCH & CANCIENNE PLLC**
Michael Cancienne
State Bar No. 24055256
Kevin Jordan
State Bar No. 11014800
Joseph W. ("Jeb") Golinkin II
State Bar No. 24087596
1980 Post Oak Blvd., Ste. 2300
Houston, Texas 77056
713.955.4028
*mcancienne@jlcfirm.com*
*kjordan@jlcfirm.com*
*jgolinkin@jlcfirm.com*

**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: WATTSTOCK, LLC, | ) Chapter 11 (Subchapter V) |
| | ) Case No. 21-31488 (SGJ) |
| *Debtor*. | ) |
| | ) |
| WATTSTOCK, LLC, | ) |
| | ) |
| *Plaintiff*, | ) Adv. No. 21-03083 (SGJ) |
| | ) |
| v. | ) *Removed from the District Court of Dallas County,* |
| | ) *Texas, 116ᵗʰ Judicial District* |
| | ) Case No. DC-20-08331 |
| ALTA POWER LLC, | ) |
| | ) |
| *Defendant, Counter-Plaintiff, and* | ) |
| *Third-Party Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) |
| WATTSTOCK, LLC, | ) |
| | ) |
| *Counter-Defendant*, and | ) |
| | ) |
| GENERAL ELECTRIC INTERNATIONAL, | ) |
| INC., d/b/a GE POWER SERVICES, | ) |
| | ) |
| *Third-Party Defendant*. | ) |

**ALTA POWER'S RESPONSE TO GENERAL ELECTRIC INTERNATIONAL INC.'S
RULE 12(C) MOTION FOR JUDGMENT ON THE PLEADINGS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

PROCEDURAL AND FACTUAL BACKGROUND.......................................................... 2

LEGAL STANDARD........................................................................................................... 6

ARGUMENT ........................................................................................................................ 7

    I.    Alta pleads viable fraud and negligent misrepresentation claims against GE. ....... 7

        a.    Alta's fraud and negligent misrepresentation allegations satisfy
            Rule 9(b). ....................................................................................................... 7

        b.    The "direct contradiction" rule does not apply. ........................................ 10

        c.    The economic loss rule does not apply. ..................................................... 11

    II.    Alta plausibly pleads unjust enrichment. ............................................................. 12

    III.    Alta pleads actionable contract and tort claims against GE.................................. 13

        a.    Alta plausibly pleads partnership by estoppel. ......................................... 13

        b.    Alta plausibly pleads a joint enterprise between GE and WattStock........ 15

        c.    Alta plausibly pleads an agency theory of liability.................................... 19

    IV.    Alta plausibly pleads entitlement to consequential damages............................... 21

        a.    Alta pleads that GE proximately caused its damages. ............................. 21

        b.    No contractual damages waiver limits Alta's consequential damages. .... 22

CONCLUSION.................................................................................................................... 25

**APP.042**

## TABLE OF AUTHORITIES

<span style="font-variant: small-caps">Cases</span>

*Am. Realty Trust, Inc. v. Travelers Cas. and Sur. Co. of Am.*,
   362 F. Supp. 2d 744 (N.D. Tex. 2005) ................................................................10

*Array Techs., Inc. v. Mitchell*,
   305 F. Supp. 3d 1256 (D.N.M. 2018) .................................................................22

*Benchmark Elecs., Inc. v. J.M. Huber Corp.*,
   343 F.3d 719 (5th Cir. 2003) ............................................................................7, 9

*Blakely v. Andrade*,
   360 F. Supp. 3d 453 (N.D. Tex. 2019) ..................................................................7

*Blue Gordon, C.V. v. Quicksilver Jet Sales, Inc.*,
   444 F. App'x 1 (5th Cir. 2011) ............................................................................22

*Bowman v. CitiMortgage Inc.*,
   No. 3:14-CV-4036-B, 2015 WL 4867746 (N.D. Tex. Aug. 12, 2015)...................11

*Bransom v. Standard Hardware, Inc.*,
   874 S.W.2d 919 (Tex. App.—Fort Worth 1994, pet. denied) ...............................12

*Burlington Res. Oil & Gas Co. LP v. Texas Crude Energy, LLC*,
   573 S.W.3d 198 (Tex. 2019)...............................................................................24

*CCR, Inc. v. Chamberlain*,
   No. 13-97-312-CV, 2000 WL 35721225 (Tex. App.—Corpus Christi June 1, 2000, pet.
   denied)................................................................................................................14

*Chesapeake Operating, Inc. v. Whitehead*,
   No. C-10-301, 2011 WL 335084 (S.D. Tex. Jan. 31, 2011)..................................20

*Chevez v. Brinkerhoff*,
   No. 05-13-00572-CV, 2014 WL 7246798 (Tex. App.—Dallas Dec. 22, 2014, no pet.) ........16

*Cicalese v. Univ. of Texas Med. Branch*,
   924 F.3d 762 (5th Cir. 2019) ..............................................................................14

*Clark v. PFPP Ltd. P'ship*,
   455 S.W.3d 283 (Tex. App.—Dallas 2015, no pet.)..............................................11

*Clements v. HLF Funding*,
   No. 05-19-01295-CV, 2021 WL 3196962 (Tex. App.—Dallas July 28, 2021, pet. denied)...10

**APP.043**

*Cunningham v. Politi*,
No. 4:18-CV-00362-ALM-CAN, 2019 WL 2519568 (E.D. Tex. Apr. 30, 2019)..................19

*DaimlerChrysler Motors Co., LLC v. Manuel*,
362 S.W.3d 160 (Tex. App.—Fort Worth 2012, no pet.) .........................................................24

*Derrick Petroleum Servs. v. PLS, Inc.*,
No. H–14–1520, 2014 WL 7447229 (S.D. Tex. Dec. 31, 2014) ............................................14

*Douglass v. Beakley*,
900 F. Supp. 2d 736 (N.D. Tex. 2012) ...................................................................................12

*Duke Energy Int'l, L.L.C. v. Napoli*,
748 F. Supp. 2d 656 (S.D. Tex. 2010) ...................................................................................18

*E.S. v. Best W. Int'l, Inc.*,
510 F. Supp. 3d 420 (N.D. Tex. 2021) ...................................................................................20

*Emtel, Inc. v. Lipidlabs, Inc.*,
583 F. Supp. 2d 811 (S.D. Tex. 2008) ...................................................................................19

*Encore Int'l Inv. Funds, LLC v. 2608 Inwood, Ltd.*,
No. 05-19-00070-CV, 2020 WL 1685420 (Tex. App.—Dallas Apr. 7, 2020, no pet.)...........23

*Energy Intel. Grp., Inc. v. Bank of Am., N.A.*,
No. 4:17-CV-3767, 2018 WL 3303166 (S.D. Tex. July 5, 2018) ..........................................18

*First Nat'l Bank of Luling v. Nugent*,
384 S.W.2d 224 (Tex. App.—San Antonio 1964, writ ref'd n.r.e.) ........................................23

*Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*,
960 S.W.2d 41 (Tex. 1998).............................................................................................11, 12

*Guidry v. Am. Pub. Life Ins. Co.*,
512 F.3d 177 (5th Cir. 2007) .....................................................................................................7

*Guidry v. Bank of LaPlace*,
954 F.2d 278 (5th Cir. 1992) .....................................................................................................7

*Harrison v. Aztec Well Servicing Co.*,
No. 1:20-CV-038-H, 2021 WL 6073164 (N.D. Tex. Dec. 23, 2021)......................................17

*Higher Perpetual Energy, LLC v. Higher Power Energy, LLC*,
No. 17-cv-0414, 2018 WL 3031780 (E.D. Tex. June 18, 2018) ............................................22

*Hilco Elec. Co-op., Inc. v. Midlothian Butane Gas Co.*,
111 S.W.3d 75 (Tex. 2003)....................................................................................................23

**APP.044**

*IberiaBank Corp. v. Illinois Union Ins. Co.*,
   953 F.3d 339 (5th Cir. 2020) .......................................................................6

*In re Life Partners Holdings, Inc.*,
   926 F.3d 103 (5th Cir. 2019) .....................................................................10

*In re THEAG N. Arlington LLC*,
   No. 19-41108-ELM, 2020 WL 7330055 (Bankr. N.D. Tex. Dec. 11, 2020) .........................10

*Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*,
   892 F.3d 719 (5th Cir. 2018) .....................................................................18

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*,
   341 S.W.3d 323 (Tex. 2011)........................................................................11

*JP Morgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*,
   546 S.W.3d 648 (Tex. 2018)........................................................................10

*Marquis v. OmniGuide, Inc.*,
   No. 3:09-CV-2092-D, 2011 WL 321112 (N.D. Tex. Jan. 28, 2011).......................................21

*Oxy USA, Inc. v. Sw. Energy Prod. Co.*,
   161 S.W.3d 277 (Tex. App.—Corpus Christi 2005, pet. denied)...........................................23

*Prudential Ins. of Am. v. Jefferson Assocs., Ltd.*,
   896 S.W.2d 156 (Tex. 1995)........................................................................25

*Rainier DSC 1, L.L.C. v. Rainier Cap. Mgmt., L.P.*,
   828 F.3d 356 (5th Cir. 2016) ................................................................14, 15

*Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*,
   336 S.W.3d 764 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ...........................................20

*Remuda Ranch v. Archer Daniels Midland Co.*,
   No. 07-05-0234-CV, 2006 WL 2726234 (Tex. App.—Amarillo Sept. 22, 2006, no pet.)......21

*Rosenbrock v. Deutsche Lufthansa, A.G., Inc.*,
   No. 6:16-CV-0003, 2016 WL 2756589 (S.D. Tex. May 9, 2016)...........................................16

*Schakosky v. Client Servs., Inc.*,
   634 F. Supp. 2d 732 (E.D. Tex. 2007).................................................................19

*Shoemaker v. Whistler's Estate*,
   513 S.W.2d 10 (Tex. 1974)........................................................................16, 18

*St. Joseph Hosp. v. Wolff*,
   94 S.W.3d 513 (Tex. 2002)........................................................................16

*Strebel v. Wimberly*,
    371 S.W.3d 267 (Tex. App.—Houston [1st Dist.] 2012, pet. denied)....................................24

*Sullivan v. Leor Energy, LLC*,
    600 F.3d 542 (5th Cir. 2010) .................................................................................................12

*Sw. Bell Tele. Co. v. DeLanney*,
    809 S.W.2d 493 (Tex. 1991)..................................................................................................11

*Tex. Dep't of Transp. v. Able*,
    35 S.W.3d 608 (Tex. 2000)...............................................................................................17, 18

*Triplex Commc'ns, Inc. v. Riley*,
    900 S.W.2d 716 (Tex. 1995)..................................................................................................18

*Tryad Serv. Corp. v. Mach. Tool Ctr., Inc.*,
    512 S.W.2d 785 (Tex. App.—Houston [14th Dist.] 1974, pet. denied) ...............................20

*United States ex rel. Grubbs v. Kanneganti*,
    565 F.3d 180 (5th Cir. 2009) ...................................................................................................7

*West v. City of Santa Fe, Texas*,
    No. 16-CV-0309, 2018 WL 4047115 (S.D. Tex. Aug. 16, 2018) ..........................................16

*Williams v. Holiday Inns, Inc.*,
    No. 93-1790, 1994 WL 90396 (E.D. La. Mar. 16, 1994) .....................................................20

*Worldwide Asset Purchasing, L.L.C. v. Rent-A-Ctr. E., Inc.*,
    290 S.W.3d 554 (Tex. App.—Dallas 2009, no pet.).............................................................24

*YUM! Brands, Inc. v. Doe*,
    No. 01-19-00844-CV, 2021 WL 5113021 (Tex. App.—Houston [1st Dist.] Nov. 4, 2021) .21

*Yumilicious Franchise, L.L.C. v. Barrie*,
    No. 3:13-CV-4841-L, 2015 WL 1856729 (N.D. Tex. Apr. 23, 2015) ...................................11

*Zachry Const. Corp. v. Port of Houston Auth. of Harris Cty.*,
    449 S.W.3d 98 (Tex. 2014).....................................................................................................23

## INTRODUCTION

As all Texans have experienced, our State's power grid can struggle to keep up with electricity needs during times of peak electricity usage. This leaves Texans vulnerable to power outages. Alta sought to address this vulnerability through the use of "peaker power plants" to provide additional capacity to the electrical grid during times of peak demand. GE and its partner WattStock also saw opportunity in the market for "peaker" plants. WattStock is a small group of former GE employees officing inside of GE's secured energy facility. GE duped Alta into agreeing to rely on the GE-WattStock "partnership" to find and acquire used GE aeroderivative gas turbine engines for Alta. GE promised certain pricing and to ensure WattStock's performance in the event of a default. Alta relied on GE's representations and paid GE and WattStock millions of dollars only to have GE and WattStock pocket its money without delivering anything of value. As a result, Alta lost its ability to enter the power-peaking market at a critical time.

GE has already failed once when attempting to end this litigation at the pleading stage. Before this case was removed, the state district court heard and fully rejected GE's motion to dismiss making nearly identical arguments to those in its Motion for Judgment on the Pleadings before this Court. Rather than accept the result in state court, the Motion is yet another in a long string of delay tactics GE has employed to keep this case from moving forward. Just as the state court did, this Court should reject GE's Motion:

*Fraud and Negligent Misrepresentation*: GE disregards the detailed factual allegations set out in Alta's 158-paragraph Petition supporting each element of Alta's claims for fraud and negligent misrepresentation. GE's additional arguments based on the "direct contradiction" and "economic loss" rules disregard precedent making those doctrines inapplicable.

*Unjust Enrichment*: Just as in the state court, GE's arguments ignore that unjust

**APP.047**

enrichment is indisputably a remedy for fraud, which Alta adequately alleges against **both** GE and WattStock.  GE cannot obtain dismissal of the unjust enrichment claim by feigning ignorance of Alta's allegation that at least $1.5 million of its money landed in GE's coffers.

*Partnership by Estoppel and Joint Enterprise***:** GE again relies on the irrelevant legal tests for partnership and joint venture, rather than for partnership by *estoppel* and joint *enterprise*.  This Court should reject this sleight of hand, just as the state court did.

*Agency***:** Alta's agency theory is supported by detailed factual allegations that GE fails even to mention, much less engage.  GE's previous motion to dismiss also disregarded these well-pleaded facts, a mistake GE repeats here.

*Consequential Damages***:** The consequential damages waiver to which GE clings does not say what GE says it does.  As Alta explained during the last round of briefing, the parties did ***not*** agree to waive consequential damages incurred due to fraud or confidentiality breach (which Alta plausibly alleges).  Tellingly, GE does not bother to address this point.

GE offers no basis to dismiss any of Alta's claims, and its Motion should be denied.

## PROCEDURAL AND FACTUAL BACKGROUND

*Alta's allegations.*  This is a case about a bait-and-switch.  Alta, a start-up formed to develop so-called "peaker plants," turned to GE and a group of former GE executives to supply the used aeroderivative gas turbines Alta needed for those plants. Pet. ¶¶ 17–19, 25, 40.  GE is a leading manufacturer of aeroderivative gas turbines and one of the largest companies in the world. *Id.* ¶¶ 24, 44.  Historically, GE had no presence in the market for ***used*** aeroderivative gas turbines but recognized this as a white space opportunity sometime before 2018.  *Id.* ¶ 25.  GE had one problem: GE did not want to be involved in the work of actually acquiring and selling the used turbines.  *Id.* ¶ 3.  As a solution, some GE employees spun off to start WattStock.  *Id.*  ¶¶ 3, 25.

GE would engage WattStock, and WattStock would act as GE's *de facto* sales force and point of entry into the used gas turbine market. *Id.*

WattStock and GE's touted "partnership" created synergies for both companies. GE's status and renown in the turbine industry lent credibility to the unknown WattStock. *Id.* ¶ 44. Together, GE and WattStock said they worked "hand-in-hand" to devise the "exclusive" TRUEpackage™ turbine refurbishment program. *Id.* ¶¶ 26, 31. GE and WattStock further claimed that GE's TRUEpackage™ was unique because GE—the turbines' original manufacturer—was the only company that could provide an end-to-end warranty and performance guarantee at a fixed price. *Id.* ¶¶ 31, 34.

Intrigued by the TRUEpackage™ concept, Alta met with GE and WattStock several times at GE's Jacintoport facility, where GE and WattStock are co-located. *Id.* ¶ 32. During these meetings, GE repeatedly held itself out as WattStock's "partner" and emphasized that the only way to obtain GE's TRUEpackage™ warranty was through WattStock. *Id.* ¶ 35. Alta made clear that it would not agree to purchase anything from GE and WattStock unless they could satisfy Alta's detailed budgetary requirements. *Id.* ¶¶ 33, 41. After reviewing the information provided by Alta, GE emphatically represented that it and its partner, WattStock, could deliver the turbines at the right fixed price. *Id.* ¶ 33. Relying on these representations, Alta selected GE and WattStock rather than another provider. *Id.* ¶¶ 31, 40.

GE and WattStock "jointly determined" to structure the deal such that Alta would enter a Master Agreement directly with WattStock, with GE standing behind it. *Id.* ¶ 42; GE APP19 (*cited at* Pet. ¶ 78). GE led Alta to believe that GE's involvement would insulate Alta from risks related to the financial viability of WattStock. *Id.* ¶ 44. GE actively participated in contract negotiations between WattStock and Alta, and even agreed to "step in" and "assume responsibility" should

**APP.049**

WattStock fail to meet its contractual obligations. *Id.* ¶¶ 40–49; GE APP19. Alta agreed to the arrangement and executed the Master Agreement in February 2019.[1] *Id.* ¶ 45.

With the Master Agreement in place, Alta began negotiating financing with Deutsche Bank. *Id.* ¶¶ 76–77. During due diligence, Deutsche Bank asked GE to confirm its relationship with WattStock. *Id.* ¶¶ 77–78. In response, GE confirmed what it had been telling Alta all along. *Id.* ¶ 78. GE wrote that "[s]hould WattStock fail to meet its contractual obligations to Alta [], GE would be in a position to assume responsibility to complete any outstanding work," that "GE is willing to warranty WattStock's work on this project," and that GE "already conduct[s] oversight of all aspects of WattStock's work." GE APP19. Reassured once again, Alta continued moving forward with WattStock and GE. *Id.* ¶¶ 78, 83.

Having locked Alta into the Master Agreement, GE and WattStock began to implement their bait-and-switch scheme. *Id.* ¶¶ 57, 146. GE's playbook was simple. Time and again, GE presented pricing and purchase options to Alta knowing full well that those were not the true turbine prices. *Id.* ¶¶ 53–54. Each turbine presented to Alta was burdened by material secret liabilities, all of which were driven by internal GE policies—the existence of which GE and WattStock conspired to conceal from Alta until after Alta had already spent significant money on the projects. *Id.* For example, many of the turbines' existing owners had "Long Term Service Agreements" with GE, carrying steep penalties for their early termination. *Id.* ¶¶ 54–55. Others contained non-GE components that GE would refuse to refurbish unless replaced, regardless of

---

[1] The Master Agreement generally provides that WattStock will locate suitable gas turbines for Alta, arrange inspections to evaluate their condition and refurbishment requirements, and negotiate the purchase price with the existing owners (with GE standing behind it). Pet. ¶¶ 42, 49; GE APP73 (*cited at* Pet. ¶ 45). Despite its name, the Master Agreement is limited in scope, covering only the preliminary steps toward acquiring the turbines. *See id.* The Master Agreement contemplated that the parties would enter subsequent "definitive" agreements that would also describe the scope, terms, and price for the purchase of any given turbine. GE APP76. One such agreement was the parties' December 2019 Limited Notice to Proceed ("LNTP"). GE APP91 (*cited at* Pet. ¶ 91).

**APP.050**

their condition. *Id.* ¶ 74. These hidden costs would all be passed on to Alta, resulting in significant increases over the prices GE quoted. *Id.* ¶ 56. Other turbines GE presented as candidates for its supposed "lease pool" option. *Id.* ¶¶ 66–72. Alta could cut costs, GE claimed, by purchasing a turbine "package"—essentially the housing for the turbine—then marrying the package to one of GE's "lease pool engines." *Id.* ¶¶ 65–67. But the supposed "lease pool" did not exist. *Id.* ¶ 71.

When the dust settled, WattStock and GE had deliberately identified for Alta *only* those turbines burdened with liabilities so that GE could recover profits under the Alta/WattStock contract *and* additional profits associated with the hidden liabilities. *Id.* ¶¶ 50–51, 56, 71, 146. GE and WattStock did not reveal these undisclosed liabilities until after (1) the turbines were targeted, (2) purchase agreements were executed between the owners and WattStock, and (3) Alta paid millions of dollars in down payments. *Id.* ¶¶ 55, 62, 71, 74. GE and WattStock concealed the existence of these undisclosed liabilities on every turbine suggested to Alta, in hopes that Alta would be forced to pay the extra fees at the 11th hour once project financing had been secured and the project was well underway. *Id.* ¶ 57.

Ultimately, Alta discovered that the turbine prices were false and WattStock's "partnership" with GE was a sham. In the spring of 2020, WattStock began experiencing financial issues and Alta requested that GE "step in" as promised to fulfill WattStock's contractual commitments to Alta. *Id.* ¶¶ 98–99. GE refused, even as WattStock's financial troubles mounted and it eventually became insolvent. *Id.* ¶¶ 100–102. GE walked away, having pocketed more than a million dollars of Alta's money. *Id.* ¶¶ 6, 125. With no equity capital left and no turbine supplier, Alta missed its opportunity to be a first mover in the Texas peaking electricity market. *Id.* ¶ 103.

WattStock sued Alta in Texas state court for breach of contract. *See generally* GE APP57–70. Alta answered and later filed a third-party petition against GE, asserting counterclaims

against GE and WattStock for breach of contract, unjust enrichment, conversion, theft, fraud, and negligent misrepresentation. *See generally* GE APP28–53.

**GE's first motion to dismiss.** In April of 2021, GE filed a Rule 91a motion to dismiss which the Dallas County district court denied in its entirety.

**GE obstructs discovery.** Even prior to GE joining the case as a party, Alta served GE with a third-party document subpoena on November 4, 2020. On November 17, 2020, GE agreed to produce documents but never did so. After Alta filed its third-party petition against GE, it once again served (near identical) document requests on GE in May of 2021. GE continued to refuse to produce ***any*** documents—over six months after the original requests. As of February 2022, GE ***still*** had not produced even a single document despite repeated promises and a legal obligation to do so. Although GE recently began producing documents on February 21, 2022, serious deficiencies remain, including GE's refusal to run even basic searches on its custodians.

**GE moves to dismiss—again.** On August 17, 2021, WattStock filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas. WattStock then removed this case to the United States District Court for the Northern District of Texas, which referred the matter to this Court pursuant to the standing order of reference. Alta's subsequent motion to withdraw the reference is currently pending. While still refusing to meaningfully participate in discovery, and seeking another bite at the apple under the different federal pleading standard, GE filed its second motion to dismiss under Rule 12(c) on February 28, 2022.

## LEGAL STANDARD

Motions to dismiss are "viewed with disfavor and [are] rarely granted." *IberiaBank Corp.*

*v. Illinois Union Ins. Co.*, 953 F.3d 339, 345 (5th Cir. 2020).[2]  To defeat a motion to dismiss, the plaintiff need only allege facts that "raise a right to relief above the speculative level." *Blakely v. Andrade*, 360 F. Supp. 3d 453, 471 (N.D. Tex. 2019).

## ARGUMENT

### I.      Alta pleads viable fraud and negligent misrepresentation claims against GE.

#### a.      Alta's fraud and negligent misrepresentation allegations satisfy Rule 9(b).

Without citation to ***any*** pleaded allegation, GE concludes that Alta "falls short" of meeting Rule 9(b)'s pleading requirement to state its fraud and negligent misrepresentation claims with sufficient particularity.  Mot. 17.  Rule 9(b) requires that plaintiffs allege "the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003).  "What constitutes 'particularity' will necessarily differ with the facts of each case." *Id*. (quoting *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992)).  "Rule 9(b) does not reflect a subscription to fact pleading and requires only simple, concise, and direct allegations of the circumstances constituting fraud." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009).  And in all events, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Although Alta filed suit in Texas state court where there is no equivalent to Rule 9(b), its allegations satisfy that standard.  Extending well beyond GE's broad one-paragraph summary of the allegations, Alta's 158-paragraph Petition sets forth multiple instances of the requisite "who, what, when, where, and how" of the alleged fraud.  The Petition alleges: GE misrepresented its "partnership" with WattStock, the benefits and security it afforded, and the true price of every

---

[2]      The standard for deciding a motion for judgment on the pleadings under Rule 12(c) is identical to a motion to dismiss under Rule 12(b)(6).  *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 180 (5th Cir. 2007).

**APP.053**

turbine GE suggested for acquisition, Pet. ¶¶ 4, 26, 33, 44, 54, 57, 78; these representations were false or misleading, *id.* ¶¶ 5, 54, 57, 100; Alta relied on GE's misrepresentations by foregoing other opportunities and paying money to GE and WattStock, *id.* ¶¶ 31, 40, 55, 62, 92–94; Alta suffered injury as a result—incurring out-of-pocket expenses, wasting equity capital, and losing profits and financing (and ultimately its projects in their entirety), *id.* ¶¶ 6, 95, 103, 152.

Indeed, far from broadly alleging that "at some point . . . GE represented that it was 'partners' with WattStock," Mot. 17, the Petition identifies many instances in which GE fraudulently misrepresented the existence of a partnership and benefits therefrom. Among other things, the Petition points to statements from GE's own website where it emphasized that, together with WattStock, it provides "[t]he only authorized OEM [original equipment manufacturer] certified preowned package offering in the industry." Pet. ¶ 26; *see also id.* n.2 (providing hyperlink to where GE's statements are found). The Petition also points to GE's June 26, 2018 Memorandum of Understanding, *id.* ¶ 27, which outlines GE and WattStock's relationship, and cites GE's July 31, 2019 letter signed by its Global Sales Leader Lance Herrington representing that "GE is willing to warranty WattStock's work on this project," and that GE "already conduct[s] oversight of all aspects of WattStock's work." *Id.* ¶ 78 (citing GE APP19).

GE also ignores that the Petition describes statements made by GE during meetings at GE's Jacintoport facility (where WattStock is co-located) both before and after WattStock and Alta entered into the Master Agreement. Pet. ¶¶ 32, 35, 38, 44. For instance, the Petition alleges that GE—and only GE—specifically represented that "the only way Alta [] could obtain the TRUEpackage™ equipment certification and warranty was by working with the GE and WattStock partnership," *id.* ¶ 35, and that "delivery could occur within the time frame required by [Alta's] plans if Alta [] used the GE/WattStock TRUEpackage™ program," *id.* ¶ 37.

APP.054

Finally, GE entirely ignores Alta's well-pleaded allegations that GE fraudulently represented that it could obtain the units Alta required for the prices Alta needed to make its projects economical. *Id.* ¶¶ 32–33. Representations on price were made in meetings at the Jacintoport facility before and after the February 2019 Master Agreement, and in "detailed total cost estimates for each unit showing that if each unit identified could be acquired at or below the 'not to exceed price,' then the fully refurbished unit could be delivered within [Alta's] budgetary requirements." *Id.* ¶ 42. Alta explicitly alleges that the pricing misrepresentations were "driven by GE's data," including data from GE on "detailed refurbishment pricing models." *Id.* ¶ 51.

Alta sets forth the "who, what, when, and where" of the alleged fraud, and "explains why the various assertions are fraudulent or misleading." *Benchmark*, 343 F.3d at 724. Alta details how, contrary to its representations, GE "refused to step in and take over for WattStock" when Alta "notified GE that WattStock was insolvent" causing Alta to miss its opportunity "to be a first mover in the highly competitive Texas peaking electricity market." *Id.* ¶¶ 100–103. And how additional undisclosed costs "materially increased project costs above the previous budget and impacted [Alta's] ability to obtain financing for the project." *Id.* ¶¶ 88–95.

Alta's allegations satisfy its pleading burden. *See Benchmark*, 343 F.3d at 724 (vacating judgment and holding that allegations that identified false representations in various discussions occurring over four months sufficiently "put [the defendant] on notice as to the challenged assertions"). Further, though the law does not require any more detailed allegations than already pleaded, Alta is able to plead additional detail concerning meetings with GE and other GE representations that further support its claims. Dismissal with prejudice is thus in all events

inappropriate.[3]  *See, e.g.*, *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 125 (5th Cir. 2019)

("Even if a plaintiff's pleadings are deficient under Rule 12(b)(6), a district court should freely

give leave to amend when justice so requires.").

> **b.  The "direct contradiction" rule does not apply.**

GE misapplies the "direct contradiction" rule relating to the element of justifiable reliance,[4]

which does not bar recovery here.  Mot. 19.  GE alleges that Alta cannot have relied on assurances

that GE and WattStock were partners because the "plain language of the Alta-WattStock contracts

contradicts any claims of reliance."  *Id.*  But the "direct contradiction" rule ***only*** bars reliance on

oral representations that are "directly contradicted by the ***express, unambiguous terms*** of a written

agreement between the parties."  *JP Morgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546

S.W.3d 648, 658 (Tex. 2018) (emphasis added).  GE fails to identify ***any*** term in the Master

Agreement concerning GE's relationship with WattStock, much less a term that expressly and

unambiguously dispels GE and WattStock's representations.  *Clements v. HLF Funding*, No. 05-

19-01295-CV, 2021 WL 3196962, at *9 (Tex. App.—Dallas July 28, 2021, pet. denied)

("Clements contends there is a direct contradiction between the representations and the Agreement

because the representations are not specifically mentioned in the Agreement. . . . Put simply,

silence is not direct contradiction.").  The only evidence GE cites is the ***absence*** of a reference to

---

[3]      Although unnecessary, leave to replead would be doubly appropriate as to Alta's negligent misrepresentation claim.  In the event a negligent misrepresentation claim is held to be so intertwined with the fraud claim as to warrant dismissal under a Rule 9(b) pleading standard, courts are to provide leave to amend so that plaintiffs have the option of separating out those allegations.  *See Am. Realty Trust, Inc. v. Travelers Cas. and Sur. Co. of Am.*, 362 F. Supp. 2d 744, 752–53 (N.D. Tex. 2005) (dismissing under Rule 9(b) negligent misrepresentation claims intertwined with inadequately pleaded fraud claims without prejudice).

[4]      GE's suggestion that Alta cannot have justifiably relied on the representations due to supposed "red flags" is likewise misplaced.  Mot. 19.  At the pleading stage, the relevant inquiry is whether Alta has facially alleged plausible justifiable reliance—as detailed above, it has.  GE inappropriately asks the Court to "head[] straight to the trial stage, where the justifiability of the alleged reliance is to be tested based upon the evidence presented."  *See In re THEAG N. Arlington LLC*, No. 19-41108-ELM, 2020 WL 7330055, at *16 (Bankr. N.D. Tex. Dec. 11, 2020) (rejecting argument that a party could not have justifiably relied on the alleged misrepresentations given supposed red flags).

GE in the Master Agreement and extra-contractual documents such as the MOU. Neither suffices.[5]

And the Supreme Court of Texas has expressly rejected GE's argument that a general merger clause precludes reliance. Mot. 20. "Pure merger clauses, without an expressed clear and unequivocal intent to disclaim reliance or waive claims for fraudulent inducement, have never had the effect of precluding claims for fraudulent inducement." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 334 (Tex. 2011).

### c. The economic loss rule does not apply.

GE's invocation of the economic loss rule, Mot. 21, is also misplaced. The economic loss rule "precludes recovery in tort when the loss is the subject matter of a contract between the parties" and "[i]n deciding whether the economic loss rules applies . . . the Court must 'examine the source of the defendant's duty and the nature of the claimed injury." *Bowman v. CitiMortgage Inc.*, No. 3:14-CV-4036-B, 2015 WL 4867746, at *3 (N.D. Tex. Aug. 12, 2015) (citing *Sw. Bell Tele. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991); *Clark v. PFPP Ltd. P'ship*, 455 S.W.3d 283, 288 (Tex. App.—Dallas 2015, no pet.)).

This rule does not bar Alta's claims because GE's duty to engage honestly in negotiations with Alta is independent of the duties arising under the Master Agreement. *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998) ("[I]t is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself."). Moreover, many of GE's misrepresentations **predate** the Master Agreement and therefore do not arise from any contractual obligations. *See Yumilicious Franchise, L.L.C. v. Barrie*, No. 3:13-CV-4841-L, 2015 WL

---

[5]  The state court rejected GE's attempt to rely on the "direct contradiction" doctrine after Alta explained that the Master Agreement nowhere contradicts GE's misrepresentations about pricing issues that were already known to GE at the time of the misrepresentations. GE now pivots and proffers a new argument that is not even connected to text in the Master Agreement.

APP.057

1856729, at *7 n.8 (N.D. Tex. Apr. 23, 2015) (the economic loss rule does not apply to fraud and negligent misrepresentation claims predating the parties' contract). That GE continued the fraud after entering into the contract is of no moment. *Formosa*, 960 S.W.2d at 46 (the Supreme Court of Texas has "repeatedly recognized that a fraud claim can be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed within a contract").

## II.    Alta plausibly pleads unjust enrichment.

There is also no basis to dismiss Alta's claim for unjust enrichment, which seeks return of the $1.5 million Alta paid for hardware and drawings it never received. Pet. ¶¶ 92, 125. As GE acknowledges, a claim for unjust enrichment must be sustained on a Rule 12 challenge when a plaintiff has plausibly alleged that the defendant "obtained a benefit . . . by fraud." Mot. 15 (quoting *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 550 (5th Cir. 2010)). Though GE implies otherwise, the alleged fraud need not be the recipient's own fraud; unjust enrichment is an available remedy even where the recipient passively received the benefits of another's fraud. *Sullivan*, 600 F.3d at 550. Because the Petition alleges GE received the $1.5 million in connection with a fraud perpetrated against Alta, the Motion should be denied.

***First***, GE feigns ignorance about whether "GE, as opposed to WattStock, obtained the $1.5 million benefit." Mot. 16. But the Petition plainly alleges that GE and WattStock "represented to Alta [] that ***GE needed to be paid***" $1.5 million, and that Alta consequently provided that amount.[6] Pet. ¶¶ 92–93 (emphasis added).

***Second***, at minimum, Alta adequately pleads that GE benefited from WattStock's fraud, which is all that is required for Alta's claim to survive. *Douglass v. Beakley*, 900 F. Supp. 2d 736, 753 (N.D. Tex. 2012); *see also Bransom v. Standard Hardware, Inc.*, 874 S.W.2d 919, 922 (Tex.

---

[6]    In any event, if required to replead, Alta can provide documentary proof (obtained in discovery) that WattStock did indeed transfer that $1.5 million that Alta provided to GE, as it told Alta it would.

APP.058

App.—Fort Worth 1994, pet. denied) (affirming unjust enrichment damages where husband received the benefits of wife's fraud, despite no evidence that husband participated in or even knew about wife's fraudulent scheme). GE's argument that "Alta has not plausibly alleged that GE engaged in any wrongful conduct," Mot. 16, is beside the point.

**Third,** Alta plausibly alleges that GE committed fraud, too. The Petition alleges that Alta "paid [the $1.5 million]" after "GE and WattStock represented to Alta [] that GE needed to be paid $1,500,000 to secure the purchase of long-lead hardware, start engineering activities and deliver preliminary drawings" for the Nuh Cemento project. Pet. ¶¶ 92–93. Only later did Alta learn of the hidden termination fees GE was aware of all along. *Id.* ¶ 57. Alta would not have paid a dime toward the Nuh Cemento units (or any of the other units) had GE disclosed the true prices. *Id.* ¶ 62. Thus, Alta can recover the undue gains GE obtained by fraud.

## III. Alta pleads actionable contract and tort claims against GE.

GE tries to shield itself from liability by focusing on the wrong law and ignoring critical facts. Alta's allegations sound in estoppel and joint enterprise and do not assert that GE and WattStock were partners or engaged in a joint venture. GE tenders no valid basis to dismiss any of Alta's claims premised on theories of estoppel, joint enterprise, and agency.

### a. Alta plausibly pleads partnership by estoppel.

GE repeats the same error that it made in state court on its first motion to dismiss. GE sweeps aside Alta's ***actual*** allegation that "GE is estopped from denying liability" because "GE and WattStock represented to Alta [] that they were 'partners,'" Pet. ¶¶ 106, 110, instead making the irrelevant argument that GE and WattStock were not partners under Texas law. The issue is not whether GE and WattStock satisfied the partnership elements of the Texas Business Organizations Code, but whether Alta has adequately alleged that GE should be estopped from denying that a partnership existed.

13

Alta plausibly pleads partnership by estoppel. *Rainier DSC 1, L.L.C. v. Rainier Cap. Mgmt., L.P.*, 828 F.3d 356, 361 (5th Cir. 2016). "Partnership by estoppel consists of two elements: (1) a representation that the one sought to be bound is a partner; and (2) the one to whom the representation is made must rely on the representation." *Id.* "The representation may be made directly by the alleged partner, or by others, provided the alleged partner knowingly allows others to make the representation and fails to correct them." *CCR, Inc. v. Chamberlain*, No. 13-97-312-CV, 2000 WL 35721225, at *10 (Tex. App.—Corpus Christi June 1, 2000, pet. denied).

Alta's Petition is replete with allegations that GE *itself* represented to Alta that WattStock was its "partner." *See, e.g.*, Pet. ¶¶ 26, 28, 35, 106. What is more, the facts as pleaded confirm that GE *also* allowed WattStock to perpetuate the same falsehood. *See, e.g.*, *id.* ¶¶ 25, 77–78. And Alta alleges it relied on those representations. *See, e.g.*, ¶¶ 40, 44, 77–78, 92, 101, 107. Alta's allegations rise well above the pleading threshold. *Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762, 768 (5th Cir. 2019) ("[A] plaintiff need only plausibly allege facts going to the ultimate elements of the claim to survive a motion to dismiss.").

GE makes only passing reference to estoppel, citing a single case that is readily distinguishable. Mot. 6 (citing *Derrick Petroleum Servs. v. PLS, Inc.*, No. H–14–1520, 2014 WL 7447229, at *14 (S.D. Tex. Dec. 31, 2014)). In *Derrick*, the court held—*after a bench trial*—that estoppel did not apply when the plaintiff and the defendant took no "concrete actions" supporting an alleged intent to be legal partners. *Id.* Importantly, the court considered estoppel *as between the purported partners themselves*—not as to an innocent third party. *See id.* GE cites no authority that suggests the Court should use the five-factor test it espouses when considering whether allegations *by a third-party* of partnership by estoppel are sufficient. Application of those factors makes no sense in that context. A third-party has no means to know or assess the facts

14

underpinning those factors, nor would they necessarily bear on whether the test for estoppel is met.

GE's reliance on the language of its MOU with WattStock is also misplaced. Mot. 7–9. Each of the cases on which GE relies concerns whether two parties were partners ***as between themselves***, and do not involve a third party alleging estoppel. The distinction is significant: purported partners are best positioned to ascertain the context and reasonableness of their own statements. Third parties are not similarly situated.

More importantly, GE's argument fails to view the well-pleaded facts through Alta's eyes as the deal progressed. Alta knew that WattStock had spun off from GE when a group of former GE executives created it, Pet. ¶¶ 3, 25; that WattStock and GE were "co-located" at the same facility, *id.* ¶ 32; that WattStock and GE marketed themselves as "partners" with an exclusive service offering, *id.* ¶¶ 25, 31; and that WattStock and GE were ***both*** heavily involved in all the contract negotiations, *id.* ¶¶ 32–42. From Alta's vantage point, the context in which GE and WattStock used the term "partner" was legally significant.

Moreover, GE cannot defeat Alta's allegation of partnership by estoppel by pointing to the contents of a document—the MOU—that Alta did not see until discovery began in this litigation. *See Al-Saud v. Youtoo Media, L.P.*, 754 F. App'x 246, 253 (5th Cir. 2018) ("[P]artnership by estoppel demonstrates the point that official documents do not always control."). It is what GE and WattStock represented to Alta—not what they hid from it—that is relevant to the elements of the claim: (1) whether they represented to Alta that they were partners, and (2) whether Alta relied on that representation. *Rainier*, 828 F.3d at 361.

### b. Alta plausibly pleads a joint enterprise between GE and WattStock.

In arguing that Alta does not adequately allege a "joint venture," Mot. 1, 6–9, 11–12, GE again takes aim at a target that does not exist. Alta does not plead any claim contending any joint

*venture* between GE and WattStock; Alta alleges a joint *enterprise*, Pet. ¶ 110, which GE ignores. Joint enterprise liability is a wholly distinct concept from joint venture under Texas law. *Shoemaker v. Whistler's Estate*, 513 S.W.2d 10, 16 (Tex. 1974) (explaining that "joint enterprise" and "joint venture" are distinct doctrines); *Rosenbrock v. Deutsche Lufthansa, A.G., Inc.*, No. 6:16-CV-0003, 2016 WL 2756589, at *6 n.5 (S.D. Tex. May 9, 2016) ("[A] joint enterprise is not the same as a joint venture and is not governed by the rules applicable to joint ventures.") (citation omitted). GE's failure to address the joint enterprise theory that Alta alleges means GE has presented no valid grounds for dismissing this theory.[7]

Though GE has not contested the sufficiency of Alta's joint *enterprise* allegations, those allegations are more than sufficient. The Supreme Court of Texas has set forth the following elements of joint enterprise liability, each of which the Petition's allegations support: "(1) an agreement, express or implied, among the members of [a] group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members[,] and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002). Where parties are engaged in a joint enterprise, the acts of one may be imputed to the other. *Chevez v. Brinkerhoff*, No. 05-13-00572-CV, 2014 WL 7246798, at *8 (Tex. App.—Dallas Dec. 22, 2014, no pet.).

*Agreement and Common Purpose.* Exhibit 1-E to GE's own Motion (which Alta references in its Petition) forecloses any argument by GE that Alta does not meet the first two elements. On its face, GE's July 31, 2019 letter to Alta concedes an express agreement between GE and WattStock and also describes the common purpose of their relationship:

WattStock and GE will ***work together*** to refurbish previously owned

---

[7]    *Cf. West v. City of Santa Fe, Texas*, No. 16-CV-0309, 2018 WL 4047115, at *10 (S.D. Tex. Aug. 16, 2018) (refusing to dismiss claim where defendant "did not raise [a certain] argument in its Motion to Dismiss, and the Court [wa]s reluctant to invite the Fifth Circuit to reverse a *sua sponte* dismissal").

APP.062

aero-derivative power units, including the LM6000 series units. In general, GE is committed to overhauling engines and supplying engineering analysis and diagrams to ensure the entire unit is refurbished to GE-specifications, and WattStock is committed to acquiring used units and refurbishing the balance-of-plant. . . . WattStock and GE **have agreed** that either party might act in the role of prime contractor, depending on a variety of factors. With regard to the Alta Power project, we **jointly determined** that WattStock would take the lead, and GE will perform its engineering and engine overhaul work as a subcontractor to WattStock.

GE APP19 (emphasis added).

In addition to this smoking gun, the Petition is replete with allegations from which an agreement and shared purpose between GE and WattStock can be plausibly inferred. *See, e.g.*, Pet. ¶¶ 25–26 (WattStock and GE jointly marketed themselves as, in essence, a one-stop-shop); *id.* ¶ 3 (GE held out WattStock as its sales force); *id.* ¶ 32 (GE and WattStock were "co-located" at GE's Jacintoport facility); *id.* ¶¶ 38, 51 (GE and WattStock shared the "proprietary database" used to identify units and create refurbishment models); *id.* ¶ 27 (GE and WattStock entered into a Memorandum of Understanding); *id.* ¶¶ 31, 34 (GE and WattStock mutually devised the TRUEpackage™ program). These sorts of facts are enough even to survive the more onerous summary judgment standard. *See Harrison v. Aztec Well Servicing Co.*, No. 1:20-CV-038-H, 2021 WL 6073164, at *22 (N.D. Tex. Dec. 23, 2021) (fact issue existed in part because, despite "different bank accounts and incorporation documents," defendants "voluntarily elected to hold themselves out to the world as a family through marketing materials" and "share[d] an office").

***Community of Pecuniary Interest.*** In determining whether a community of pecuniary interest exists, the Supreme Court of Texas has focused on facts suggesting the pooling of efforts and monetary resources between entities to achieve certain goals, namely reducing costs and achieving economic gain by approaching the project as a joint undertaking. *See Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 614 (Tex. 2000). "[T]he *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are

**APP.063**

peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*, 892 F.3d 719, 730 (5th Cir. 2018) (citations omitted); *see also Energy Intel. Grp., Inc. v. Bank of Am., N.A.*, No. 4:17-CV-3767, 2018 WL 3303166, at *7 (S.D. Tex. July 5, 2018) (denying motion to dismiss where certain information was "inaccessible to [plaintiff] until discovery commences"). Here, Alta adequately pleads a joint enterprise given that the factual details of GE's and WattStock's financial relationship are within their exclusive possession. Alta alleges that GE was "eager to participate in the used gas turbine market" and engaged WattStock to "act as its sales force" because it "did not want to be involved in the work of actually acquiring and selling the used turbines." Pet. ¶ 3. GE, by its own admission, had "strong incentive" for the project to succeed. *Id.* ¶ 78 (quoting GE's July 31, 2019 letter).

***Equal Right of Control.*** As for the final element, each participant "must have an authoritative voice or ... must have some voice and right to be heard." *Shoemaker*, 513 S.W.2d at 15. This factor requires an authoritative voice, some right to do more than make suggestions that can be adopted or rejected. *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995). The control inquiry is necessarily fact intensive. *Duke Energy Int'l, L.L.C. v. Napoli*, 748 F. Supp. 2d 656, 674 (S.D. Tex. 2010). That one participant exercises day-to-day control over operations does not negate the equal right of control element so long as both participants possess a "mutual right to control the direction and management of the enterprise." *Able*, 35 S.W.3d at 616.

Alta plausibly pleads that both GE and WattStock possessed a meaningful voice in the conduct of their business affairs. GE and WattStock held themselves out as "partners" who worked "hand-in-hand" to provide the TRUEpackage™ program they created together. *See* Pet. ¶¶ 26, 31. They jointly met and negotiated contractual terms with Alta as though they were equal cohorts.

18

*See id.* ¶¶ 32–42. Together they developed and presented to Alta detailed (albeit misleading) cost estimates for the refurbishment of turbines and communicated with Alta using one voice. *See id.* ¶¶ 42, 44, 50–51, 92. Because these well-pleaded facts support a plausible inference of WattStock's right to be heard, GE's Motion should be denied.

### c. Alta plausibly pleads an agency theory of liability.

GE also fails to address Alta's allegations of an agency relationship between GE and WattStock. "Agency relationships do not require the principal to expressly appoint the agent," as "the parties' conduct under certain circumstances may imply an agency relationship." *Schakosky v. Client Servs., Inc.*, 634 F. Supp. 2d 732, 735 (E.D. Tex. 2007). As GE concedes, the key inquiry is control, meaning there "must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." Mot. 12–13 (quoting *Emtel, Inc. v. Lipidlabs, Inc.*, 583 F. Supp. 2d 811, 837 (S.D. Tex. 2008)). Agency is usually a fact question, and the plaintiff at the pleading stage need only "allege a factual basis that gives rise to an inference of an agency relationship through the use of generalized as opposed to evidentiary facts." *Cunningham v. Politi*, No. 4:18-CV-00362-ALM-CAN, 2019 WL 2519568, at *6 (E.D. Tex. Apr. 30, 2019).

GE myopically focuses on the MOU as the only source supporting Alta's actual agency theory and ignores numerous allegations in the Petition unrelated to the MOU, including its own damning admissions in the documents underlying those allegations. For example, in a July 31, 2019 letter to Alta, GE admitted that it "***track[s] project progress daily***" and "***conduct[s] oversight of all aspects of WattStock's work***." GE APP19 (emphasis added). The Petition alleges that GE treated WattStock as its "*de facto* sales force," an allegation plausibly suggesting that GE controlled WattStock in the way an employer controls an employee. Pet. ¶ 26. The Petition also alleges—consistent with the language in the MOU, and contrary to GE's assertions—that "GE had the right under its MOU with WattStock to force WattStock to sell GE any gas turbine purchased

pursuant to the TRUEpackage™ program." *Id.* ¶ 139. The MOU expressly provides that "For any [] Package purchased by WS from a third-party owner, GE, *at its sole option*, may purchase the associated gas turbine(s) from WS." GE APP22 (*cited at* Pet. ¶ 27) (emphasis added).

Alta's description of GE's extensive oversight over WattStock (its *de facto* sales agent), and its description of GE's right to push WattStock aside and take over turbines acquired in the course of the Alta project are sufficient to plausibly plead an agency relationship. *See E.S. v. Best W. Int'l, Inc.*, 510 F. Supp. 3d 420, 429 (N.D. Tex. 2021) (denying motion to dismiss where plaintiff generally alleged that defendant "exercise[d] an ongoing and systemic right of control," including by "conducting regular inspection of the facility and operation").

Alta's allegations of ostensible agency also far exceed the requirements of Rule 8(b). Liability may be imposed under the doctrine of ostensible agency "in circumstances when the principal's conduct should equitably prevent it from denying the existence of an agency." *Chesapeake Operating, Inc. v. Whitehead*, No. C-10-301, 2011 WL 335084, at *5 (S.D. Tex. Jan. 31, 2011). "Apparent authority arises either from (1) a principal knowingly permitting an agent to hold himself out as having authority, or (2) a principal's actions which lack such ordinary care as to clothe an agent with the indicia of authority, thus leading a reasonably prudent person to believe that the agent has the authority he purports to exercise." *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 784, 790 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Whether a plaintiff's belief was reasonable is usually a question of fact. *Williams v. Holiday Inns, Inc.*, No. 93-1790, 1994 WL 90396, at *4 (E.D. La. Mar. 16, 1994) (applying Texas law).

Texas courts have applied the doctrine of ostensible agency when, as here, an ostensible agent acted as a broker or middleman through which a transaction between the principal and the plaintiff was consummated. *See Tryad Serv. Corp. v. Mach. Tool Ctr., Inc.*, 512 S.W.2d 785, 789

(Tex. App.—Houston [14th Dist.] 1974, pet. denied) (contract to sell machinery could be enforced against defendant who did not sign it where evidence supported that apparent agent executed contract on defendant's behalf); *Remuda Ranch v. Archer Daniels Midland Co.*, No. 07-05-0234-CV, 2006 WL 2726234, at \*3 (Tex. App.—Amarillo Sept. 22, 2006, no pet.) (contract between ostensible agent and plaintiff could satisfy the statute of frauds as to defendant principal).

GE summarily dismisses Alta's well-pleaded facts alleging that GE not only was aware of and approved the deal structure with Alta, but it actively participated in the negotiation, execution, and performance of the deal. *See, e.g.*, Pet. ¶¶ 4, 26, 28, 32, 35, 42, 44, 51, 56, 78, 92. These allegations are far afield of the facts in *Doe v. YUM! Brands, Inc.*, which GE contends renders Alta's belief unreasonable as a matter of law. Mot. 15. There, the court merely held—on summary judgment—that a franchisee's use of Pizza Hut's trademark in national advertising could not confer apparent authority. *YUM! Brands, Inc.*, No. 01-19-00844-CV, 2021 WL 5113021, at \*14 (Tex. App.—Houston [1st Dist.] Nov. 4, 2021). Here, by contrast, Alta's belief was not only reasonable, it was **reinforced** by GE when GE, after being directly questioned about its relationship with WattStock, wrote (among other things) that it would "warranty," "oversee," and "assume responsibility" for WattStock's work. GE APP19. GE's arguments are without merit.

## IV. Alta plausibly pleads entitlement to consequential damages.

### a. Alta pleads that GE proximately caused its damages.

To plead consequential damages, a plaintiff must allege facts plausibly inferring that the defendant's actions proximately caused the plaintiff's harm. *Marquis v. OmniGuide, Inc.*, No. 3:09-CV-2092-D, 2011 WL 321112, at \*9 (N.D. Tex. Jan. 28, 2011). The nexus between Alta's allegations of its injuries and GE's actions is clear. GE (1) defrauded Alta into believing that it would stand behind WattStock, Pet. ¶ 137; (2) tied Alta up into a Master Agreement that expressly precluded Alta from pursuing the gas turbines from other sources—so that Alta would be boxed

out of the market and barred from seeking another turbine supplier, GE APP77; (3) steered Alta, under false pretenses, exclusively toward uneconomical turbines in order to maximize its own profits, Pet. ¶¶ 50–51, 56, 71; (4) terminated the parties' relationship in the middle of Alta's negotiations with funding sources, *id.* ¶¶ 100–103; and (5) all but totally depleted Alta's equity capital by swindling Alta out of millions for undelivered equipment and phantom services, *id.* ¶¶ 6, 42, 54, 102. The natural and probable consequence of GE's conduct was that Alta's business ground to a halt, causing Alta to miss its opportunity to be the first mover in the Texas peaking electricity market. *Id.* ¶ 103. Plainly, Alta's claims for lost profits and lost financing are rationally connected to these well-pleaded facts. *Array Techs., Inc. v. Mitchell*, 305 F. Supp. 3d 1256, 1271 (D.N.M. 2018) (*Twombly* does not require the plaintiff to "specifically plead each and every element of damages," so long as the alleged facts "support a reasonable inference of loss"). GE's arguments concerning the consequential damages allegations lack legal support. Mot. 23–24.[8]

**b. No contractual damages waiver limits Alta's consequential damages.**

The consequential damages waiver in Section 9.1(b) of the Master Agreement also does not save GE. ***First***, the Master Agreement's damages waiver does not encompass fraud. GE's cursory analysis of Section 9.1(b) ignores the plain language of that provision, in which the parties did ***not*** agree to waive consequential damages incurred because of fraud. Section 9.1(b) states:

> THIS MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES, **SHALL INCLUDE, BUT IS NOT LIMITED TO,** LOSS OF USE, LOSS OF PROFIT, LOSS OF BUSINESS, LOSS OF INCOME, LOSS OF REPUTATION OR ANY OTHER CONSEQUENTIAL DAMAGES THAT EITHER PARTY MAY HAVE INCURRED FROM ANY CAUSE

---

[8] In *Higher Perpetual Energy*, for example, the court merely held that the plaintiff's alleged damages were precluded by the economic loss rule. *Higher Perpetual Energy, LLC v. Higher Power Energy, LLC*, No. 17-cv-0414, 2018 WL 3031780, at *7 (E.D. Tex. June 18, 2018). The case had nothing to do with adequately pleading proximate causation for purposes of stating a claim to consequential damages. Similarly, in *Blue Gordon*, the court held (on summary judgment) that the defendant's supposed wrongful termination of a lease for non-payment (the injury) was entirely unrelated to misrepresentations concerning the defendant's legal ability to execute the lease. *Blue Gordon, C.V. v. Quicksilver Jet Sales, Inc.*, 444 F. App'x 1, 9–10 (5th Cir. 2011). Because the lease termination was caused by the plaintiff's own failure to cure payment defaults—not the defendant's lack of authority to execute the lease— there was no causal link between the misrepresentations and the injury. *Id.* Here, the causal link is manifest.

**APP.068**

OF ACTION **INCLUDING NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT AND BREACH OF STRICT OR IMPLIED WARRANTEE**.

GE APP80 (emphasis altered). Texas courts have long recognized the maxim *expressio unius est exclusio alterius*—"the expression in a contract of one or more things of a class implies the exclusion of all not expressed, even though all would have been implied had none been expressed." *First Nat'l Bank of Luling v. Nugent*, 384 S.W.2d 224, 226 (Tex. App.—San Antonio 1964, writ ref'd n.r.e.). Here, Section 9.1(b)'s enumeration of specific types of causes of action that the waiver applies to implies the exclusion of other causes of action that do not conform to those types.[9] Section 9.1(b)'s enumerated causes of action are all business claims not similar in kind or class to intentional torts like fraud. Nothing in Section 9.1(b) expresses the parties' intent to immunize any type of claim for willful misconduct.[10]

This construction is buttressed by Section 9.1(b)'s disparate use of the phrases "including" and "includ[ing], but not limited to." Section 9.1(b) contains two "lists" that serve to clarify its intended scope: (1) a list of different categories of consequential damages, and (2) a list of different causes of action. Section 9.1(b) employs the phrase "includ[ing], *but not limited to*" earlier in the provision to tee-up the (unlimited) categories of consequential damages that the provision waives. But when Section 9.1(b) enumerates the types of causes of action to which the waiver applies, it uses the more limited phrase "including." The words "including" and "includ[ing], but not limited to" must convey different meanings—otherwise "but not limited to" is mere surplusage. The

---

[9]     *See CKB & Assocs., Inc. v. Moore McCormack* Petroleum, Inc., 734 S.W.2d 653, 655–56 (Tex. 1987); *Encore Int'l Inv. Funds, LLC v. 2608 Inwood, Ltd.*, No. 05-19-00070-CV, 2020 WL 1685420, at *4 (Tex. App.—Dallas Apr. 7, 2020, no pet.); *Oxy USA, Inc. v. Sw. Energy Prod. Co.*, 161 S.W.3d 277, 285 (Tex. App.—Corpus Christi 2005, pet. denied).

[10]     *See Zachry Const. Corp. v. Port of Houston Auth. of Harris Cty.*, 449 S.W.3d 98, 115 (Tex. 2014) ("As a matter of textual interpretation, it is doubtful whether the rule of *ejusdem generis* [a cousin to *expressio unius*] would allow 'other fault', following 'negligence' and 'breach of contract', to include the kind of deliberate, wrongful conduct the [defendant] was found by the jury to have engaged in."); *cf. Hilco Elec. Co-op., Inc. v. Midlothian Butane Gas Co.*, 111 S.W.3d 75, 81 (Tex. 2003).

parties chose to use distinct phrases, and that choice should be given effect.[11]

Lastly, Section 9.1(b)'s sister provision—Section 9.1(a)—confirms that the parties did not intend for Section 9.1(b)'s consequential damages waiver to encompass claims sounding in fraud. Section 9.1(a)—a separate damages limitation—limits each parties' liability for claims arising directly "under" the Master Agreement to $100,000:

> IT IS INTENDED THAT THIS LIMITATION [OF $100,000] SHALL APPLY TO **ANY AND ALL** LIABILITY OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT **HOWEVER ALLEGED OR ARISING**[.]

GE APP80 (emphasis altered). First, that Section 9.1(a)'s $100,000 limitation applies to "any and all" causes of action "however alleged" under the Master Agreement, reaffirms that the parties knew how to draft unlimited clauses. Section 9.1(b) did not take a similar linguistic approach.

Moreover, when both provisions are construed together,[12] it makes sense why each has a different scope. Section 9.1(a) is narrower in the sense that it applies only to claims brought directly "under" the Master Agreement, but broader in the sense that it limits damages arising from "any and all" causes of action "however alleged" under the Master Agreement. By contrast, Section 9.1(b) is broader in scope in that it covers claims for consequential damages "arising out of or connected" to the Master Agreement. But Section 9.1(b) is also narrower in the sense that "any and all" causes of action are not covered—claims like fraud are excluded. The parties' own intentional calibration of the damages waivers should not be disturbed.

***Second,*** the damages waiver exempts Article 7 (Confidentiality). Section 9.1(b)'s

---

[11] *DaimlerChrysler Motors Co., LLC v. Manuel*, 362 S.W.3d 160, 185 (Tex. App.—Fort Worth 2012, no pet.) (Texas courts presume that different language conveys different meanings); *Strebel v. Wimberly*, 371 S.W.3d 267, 277 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (Texas courts strive to give each word effect so as not to render any mere surplusage); *Worldwide Asset Purchasing, L.L.C. v. Rent-A-Ctr. E., Inc.*, 290 S.W.3d 554, 560 (Tex. App.—Dallas 2009, no pet.) (same).

[12] *Burlington Res. Oil & Gas Co. LP v. Texas Crude Energy, LLC*, 573 S.W.3d 198, 203 (Tex. 2019) (courts "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract").

consequential damages waiver also expressly does not include claims for breach of the contract's confidentiality provisions. GE APP80. Alta alleges that WattStock "breached the confidentiality provisions of the Master Agreement by disclosing confidential information about Alta and its financing to Castleman," Pet. ¶ 116, that GE is responsible for that breach, *id.* ¶¶ 109−12, which caused Alta "to lose project financing," which "severely damaged" Alta, *id.* ¶¶ 116, 118. Accordingly, GE's reliance on Section 9.1(b) ignores an explicit exception to the consequential damages waiver and supplies an additional reason for its Motion to be denied.

*Third,* fraud vitiates the damages waiver. Not only does the Master Agreement make clear the parties did not agree to waive consequential damages for fraud, had the parties done so under Texas law it would have no effect. If Alta's allegations of fraud are proven, that would invalidate the waiver. *See Prudential Ins. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995) ("A buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment of information by the seller."). In *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings LLC*, the Court enforced a contractual ***punitive*** damages waiver despite the defendant's fraud. 572 S.W.3d 213, 232 (Tex. 2019). In doing so, the Court distinguished the punitive damages waiver and the "as is" clauses that it had previously explained were vitiated by fraud. *Id.* at 232−33. Because *Bombardier*'s punitive damages waiver did not "limit actual damages," the plaintiff's proffered comparisons to the "as is" clauses discussed in *Prudential* were inapt. *Id.* By contrast, a consequential damages waiver here ***would*** limit Alta's actual damages.

## CONCLUSION

For these reasons, Alta respectfully requests that the Court deny GE's Motion in its entirety. If the Court grants the Motion in any respect, Alta requests leave to amend.

Dated: March 17, 2022
Dallas, Texas

Respectfully submitted,

By: */s/ John B. Lawrence*

**BAKER BOTTS L.L.P.**
Jessica B. Pulliam, TX SBN 24037309
*jessica.pulliam@bakerbotts.com*
John B. Lawrence, TX SBN 24055825
*john.lawrence@bakerbotts.com*
Kevin Chiu, TX SBN 24109723
*kevin.chiu@bakerbotts.com*
2001 Ross Avenue, Suite 900
Dallas, TX 75201-2980
Telephone:    214.953.6500
Facsimile:    214.953.6503

–and–

David R. Eastlake, TX SBN 24074165
*david.eastlake@bakerbotts.com*
910 Louisiana Street
Houston, Texas 77002-4995
Telephone:    713.229.1234
Facsimile:    713.229.1522

**JORDAN, LYNCH & CANCIENNE PLLC**
Michael Cancienne
State Bar No. 24055256
Kevin Jordan
State Bar No. 11014800
Joseph W. ("Jeb") Golinkin II
State Bar No. 24087596
1980 Post Oak Blvd., Ste. 2300
Houston, Texas 77056
713.955.4028
713.955.9644 Facsimile
*mcancienne@jlcfirm.com*
*kjordan@jlcfirm.com*
*jgolinkin@jlcfirm.com*

*Co-Counsel for Alta Power LLC*

**APP.072**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on March 17, 2022, I caused a copy of the foregoing to be served on the Debtor and all parties eligible to receive service through the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas by electronic mail.

By: */s/ John B. Lawrence*

**APP.073**

# EXHIBIT E

APP.074

**To:** April Henry[ahenry@audleyadvisors.com]
**Cc:** Rupert Pupkin[rpupkin@audleyadvisors.com]; William Phelps[wcp@wcphelps.com]; Matthew Laterza[mlaterza@alta.energy]
**From:** Travis West[twest@audleyadvisors.com]
**Sent:** Fri 8/10/2018 7:04:38 AM Central Daylight Time
**Subject:** RE: Site visits

EPC with ProE went well. We gave them scope doc's and they will be issuing a proposal for a 3 unit site. If they are consistent with what they say, then we should have the alternative supplier to meet our proforma.

We are still waiting on the revised proposal from GE/Wattstock, but confidence is not high that they will be able to get to our numbers.

-----Original Message-----
From: April Henry
Sent: Thursday, August 9, 2018 9:52 PM
To: Travis West <twest@audleyadvisors.com>
Cc: Rupert Pupkin <rpupkin@audleyadvisors.com>; Bill Phelps (wcp@wcphelps.com) <wcp@wcphelps.com>; Matthew Laterza <mlaterza@alta.energy>
Subject: Re: Site visits

Good evening all.

Yes, we had a very good trip with site visits yesterday.

Travis, I don't think you missed anything but timing of the steps is relevant.

For Mexia, the most relevant issue at this point is whether we can get the gas. If we can get gas then we can resubmit for new INR and begin screening study. The community leaders are now very interested and cooperative. All else should go forward well there — once we determine gas availability.

For Dawson, the Paynes are continuing to be communicating and exemplifying full cooperation. I've ordered a survey that will not only include meets & bounds but topography as well. Once we get initial screening study results, assuming they are positive, and survey in hand then determining most favorable layout of access, easements, and ROWs should not be a challenge, but at that point water would be the main issue. We have initial indications of water availability and cooperation which can be firmed up after initial screening study comes back positive. In terms of access to plant from roadways, there are routes to the plant that are over Navarro county only, such that the Hill county road you refer to can be completely avoided. These things can and should be worked out once the initial screening study findings are known.

For Goodlow, the water has been initially agreed to and worked out. Once the screening study comes back positive then more details can be worked out on water. Both Goodlow & Dawson prefer onsite retention of WW for use in mitigating drought tendencies. This has been initially discussed with at least one of the potential environmental consultants being considered.

I think we need to keep timing of critical path steps in mind. How did the EPC meeting go today?

Goodnight,
April

> On Aug 9, 2018, at 9:00 PM, Travis West <twest@audleyadvisors.com> wrote:
>
> All,
>
> We had a good trip yesterday visiting the sites (Mexia, Dawson, & Goodlow). Below includes a list of items that we need to follow up on:
>
>
> *   Mexia:
>     *   Need to determine price adder for Energy Transfer to complete the booster tie-in for us to be able to utilize the 12" pipe
>     *   Need to identify the site location – preferably near the tree farm on Belknap
> *   Dawson:
>     *   Met with the Paynes – they seem to be willing to work with us on easements – we need to identify location of easements and get them to sign off
>     *   See attached sketch for potential easement locations
>     *   Need to set up meeting with water manager – discuss options for water tie-in location and options for WWD
>     *   Need to get existing easement from gas pipeline group to determine limitations on where we can place equipment
>     *   Road access will work to plant site from southwestern direction (3361), but about a quarter of a mile of the road needs to be repaired (rock added) to prevent sinking – this is apparently is in another county (needs to be discussed with city manager for options)
>     *   Need site survey – TOPO needs to be included – significant sloping of land to pond located northern property border
>
> [cid:image001.jpg@01D43023.F7E6E580]
>
>
> *   Goodlow
>     *   Need to determine ownership of land for requesting high voltage easement on SW corner of property
>     *   Need to set up meeting with water manager – discuss options for tie-in/WWD
>     *   Need to get existing easement from gas pipeline group to determine limitations on where we can place equipment



CONFIDENTIAL

**APP.075**
Alta 0080630

> * Need site survey – no need for TOPO (site is relatively flat)
>
>
> April – did I miss anything
>
> Travis West
> Audley Advisors
> Office: 225-673-4776
> Mobile: 225-936-9602
> Email: twest@audleyadvisors.com
>
>
> <Dawson Easements.pdf>
> <image001.jpg>

CONFIDENTIAL

**APP.076**
Alta 0080631

# EXHIBIT F

APP.077




To: CLewis@us.mufg.jp[CLewis@us.mufg.jp]
Cc: William Phelps[wcp@wcphelps.com]
From: Matthew Laterza['O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8006DA2AB75C43029C578C3F978BCB84-MLATERZA_27]
Sent: Fri 8/17/2018 2:32:46 PM Central Daylight Time
Subject: Alta Power Project Presentation
Attachment: Alta Power Presentation 08152018 - MUFG.pdf

Dear Chip,

I'm working with Bill Phelps on the power generation project I believe he has mentioned to you. I've attached a brief overview presentation and put a few high level bullets below. Let us know when a good time to discuss in further detail would be.

- Developing natural gas fired peaking plants within ERCOT (150 MW at each site)
- A portion (~35%) of generation capacity to be sold via a heat rate call option with an investment grade counterparty
- Cash flows from HRCO and ERCOT ancillary services revenue will support project debt
- Plants are going to be capable of participating in all ERCOT ancillaries (black start, quick start capable, etc.)

Thanks,
Matt

APP.078
Alta 0034756

CONFIDENTIAL



# Prepared for MUFG

4605 Post Oak Place Dr. Suite 270, Houston, TX 77027

Alta 0034757

# Executive Summary

Development of 6 - 8 sites with natural gas fired peaker power plants of 150 MW each in the ERCOT market

- ✓ Three sites in advanced screening study stage with ERCOT with Full Interconnect Studies expected to be filed by September 2018

- ✓ A further six sites have been identified and are in the initial stages of development

Each site will have 3 units totaling 150 MW of generation capacity

- ✓ Construction costs of $55MM (~$370 / kW vs. ~$950+ for newbuild facilities)

- ✓ Construction costs significantly reduced by utilizing refurbished equipment

- ✓ A heat rate call option (HRCO) will be sold to an investment grade counterparty providing 5-7 years of contracted revenue

Other contracted revenue generated from single-year and multi-year ancillary services agreements (Black Start/ERS, Quick Start, Non-Spin services) with ERCOT (operator of the Texas power grid)

Private and Confidential

CONFIDENTIAL

Private and Confidential

CONFIDENTIAL

# Alta Power Team

- Team has 6 successful developments in Texas totaling 1000 MW

- Experienced power professionals with 50+ years of power development experience in Texas

- Individually 20+ power generation facilities developed and operational

- Roy Hart has developed 4 similar projects using this development model, 2 of which which became commercially operational in 2017

  - Port Lavaca – 100 MW (Agilon I)

  - Channelview – 100 MW (Agilon I)

CONFIDENTIAL

Private and Confidential

# Revenues

**Alta Power**

Facilities will generate revenue from five sources:

- Heat Rate Call Option (contracted capacity payment) for 5 – 7 years with an investment grade counterparty

- Black Start (contract payment from ERCOT)

- Quick Start Capability Payment (contract payment from ERCOT)

- Non-Spinning Ancillary Services (contract payment from ERCOT)

- Excess Energy and Real Time Sales (merchant)

*Note: See Appendix for descriptions of ERCOT revenue streams*



**REVENUE BY SOURCE**

20%
4%
10%
5%
61%

- HRCO (contracted)
- Non-Spin Services (contracted)
- Black Start (contracted)
- Quick Start (contracted)
- Excess Energy + Real Time (merchant)



**PERCENTAGE OF CONTRACTED REVENUE**

5%
95%

- Contracted
- Uncontracted

# Marketing

☑ HRCO will be offered competitively via RFP to multiple investment grade counterparties

☑ 5 – 7 year HRCO with variable extension option

☑ HRCO will be day-ahead market and will be for approximately 1,200 – 1,500 hours per year

☑ Remaining generation capacity (2,500 – 2,800 hours per year) will be available to cycle up and sell into periods of high ERCOT real-time pricing

  ☑ Plants are quick start capable (<10 mins) allowing the power to be sold into the initial pricing period of a spike in ERCOT real-time pricing

☑ When market conditions are not advantageous for real-time operations, each plant will participate in the appropriate ERCOT ancillary services to generate additional revenue

  ☑ Each plant will be analyzed on a nodal pricing basis and our QSE will work with us to optimize our ancillary service offerings to maximize

CONFIDENTIAL

Private and Confidential



# Schedule for First Two 150MW Sites

**Phase I (4 months)**
Site Selection & Vetting
(Lease, Surveys, Interconnect
Screening Study)

**August 31, 2018**
Current
Progress for
1st two sites

**Phase II (5 months)**
Project Development & Financing
(Phase II Studies, Permitting, Full
Interconnect Study, Equipment Sourcing, EPC
Negotiation, Financing Negotiation)

**January 31, 2019**
Financial Close

**Phase III (9 months)**
Facility Construction & Commissioning
(Facility Construction, Substation
Construction)

**October 31, 2019**
COD



# Three Unit (Single Site) Plant Parameters

- Nominal 150 MW

- Air permit

- Daytime peak supply

- Consumes 3.2 mmcf of NG / hr

- Black Start Capable

- Quick  Start capability (hot standby compliant) 10 mins to 150 MW

- Natural Gas fuel, meets Texas Air Standard Permit requirement (6 weeks to obtain in both Compliance & Non Compliance Zones)

- Easily located due to small size, as low as 4.5 acres

- Low noise ( <85dB at 5 ft from equipment, normal road noise equivalent at site boundary with 5 acre site)

- ~$55 MM investment

- 25 year life span

Private and Confidential

CONFIDENTIAL

CONFIDENTIAL

*Private and Confidential*

# General Area of Proposed Sites



Alta 0034764

APP.086

# Appendix

CONFIDENTIAL

Alta 0034765



## Definitions

➢ ERCOT – the Electric Reliability Council of Texas, the agency responsible for managing the transmission grid for the state of Texas

➢ Heat Rate Call Option (HRCO) – a hedging product that is sold by the power plant to an offtaker specifying a fixed number of hours that the plant can be called to run by the offtaker in exchange for a fixed annual capacity payment

➢ Black Start Service – an ancillary service provided by a facility able to start without support of the ERCOT transmission grid

➢ Quick Start Resource – a facility that in its cold-temperature state can come online within ten minutes of receiving ERCOT notice

➢ Non-Spinning Reserve Service – an ancillary service provided through use of the part of offline generation resources that can be synchronized and ramped to a specified output level within 30 minutes and that can operate at a specified output level for at least one hour

➢ Excess Power Sales – revenue earned from selling power for 1-2 hours before and after a HRCO cycle

➢ Real Time Value – merchant power sales in response to favourable market pricing

*Private and Confidential*

CONFIDENTIAL

APP.088
Alta 0034766

# EXHIBIT G

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
 2                    DALLAS DIVISION
 3   IN RE WATTSTOCK, LLC,          :
        Debtor,                     :
 4                                  :
                                    :
 5   WATTSTOCK LLC,                 :
        Plaintiff,                  :
 6                                  :
     v.                             :
 7                                  :
     ALTA POWER LLC,                :
 8      Defendant,                  :   Case No. 21-31488-sgj11V
        Counter-Plaintiff and       :
 9      Third-Party Plaintiff,      :   Chapter 11
                                    :   Subchapter V
10   v.                             :
                                    :   Adv No. 21-03083-sgj
11   WATTSTOCK LLC,                 :
        Counter-Defendant, and      :
12                                  :
     GENERAL ELECTRIC               :
13   INTERNATIONAL, INC., d/b/a     :
     GE POWER SERVICES,             :
14      Third-Party Defendant.      :
15
16       ********************************************
17          VIDEOTAPED / REALTIMED DEPOSITION OF
18                  MATTHEW E. LATERZA
19                   OCTOBER 15, 2022
20                      VOLUME 1
21       ********************************************
22
23
24
25

                                              Page 1
```

**APP.090**

1    Chapman at WattStock.  Right?

2         A.    That's correct.

3         Q.    And the information provided is a spreadsheet.

4    Correct?

5         A.    It is.

6         Q.    Does this appear to be the type of spreadsheet

7    that you mentioned was shown to you by WattStock in the

8    meetings leading up to the Master Agreement?

9         A.    No.

10        Q.    Okay.  So this is a different spreadsheet?

11        A.    It is a different spreadsheet.

12        Q.    Okay.  I just want you to look at one thing,

13   and that is the third row down, it refers to Ugur Energy

14   or something like that.  Right?

15        A.    That's correct.

16              MR. CANCIENNE:  U-G-U-R.

17        Q.    (By Mr. LeGrand)  And if you look at the

18   comments box on the far end -- far-right end of the

19   spreadsheet.  Do you see that?

20        A.    I do.

21        Q.    Can you read that?

22        A.    Sorry.  It's really tiny, but --

23        Q.    I will read it for you.

24        A.    [As read]:  "In addition to the price, there

25   will be GE CSA termination fee for 1.5 million.  No

                                        Page 234

APP.091

1    power at site.  No preventive maintenance."

2         Q.   Okay.  So in February of 2019, WattStock

3    disclosed to Mr. West, who then forwarded on to you,

4    that at least one of these units had a CSA termination

5    fee for $1.5 million.  Correct?

6         A.   This is the only unit on this list that they

7    disclosed had a termination fee on this spreadsheet, and

8    we never pursued this unit.

9         Q.   That's not my question, sir.

10                MR. LeGRAND:  I object as nonresponsive.

11   Reserve my right to move to strike.

12        Q.   (By Mr. LeGrand)  In February of 2019,

13   WattStock disclosed to Mr. West, who then forwarded on

14   to you, that at least one of these units had a CSA

15   termination fee of $1.5 million.  Is that true or is

16   that not true?

17        A.   They disclosed that the Ugur unit had a

18   termination fee.  It's the only one noted as having a

19   termination fee, and we never pursued the Ugur unit.

20        Q.   And they never disclosed any other unit that

21   had a termination fee associated with it until

22   February of 2020.  Right?

23        A.   It's not on this spreadsheet.

24        Q.   Okay.  No, no.  That's not my question.

25                You testified earlier that you did not

Page 235

1    learn about any -- any units having LTSA fees

2    cancellation fees until February of 2020.  Right?

3                    MR. CANCIENNE:  Objection, form.

4    Misstates the witness' testimony.

5                    MR. LeGRAND:  I will find it and read it

6    after our break.

7                    MR. CANCIENNE:  Okay.

8        Q.   (By Mr. LeGrand)  That's what you testified

9    to.  Correct?

10       A.   I said the first time that any of the other

11   termination fees were highlighted to us.

12                   MR. CANCIENNE:  Which is consistent with

13   his prior testimony.

14                   MR. LeGRAND:  Do you want to testify?

15                   MR. CANCIENNE:  No.  I do want --

16                   MR. LeGRAND:  You will testify if you're

17   seeking fees, so it's coming.  I promise you that.

18                   MR. CANCIENNE:  I am -- we are seeking

19   fees.

20       Q.   (By Mr. LeGrand)  Section 56 of your

21   complaint, which is Exhibit 2001, I specifically pointed

22   you to this provision -- this section of your complaint,

23   and asked you to read it, and it refers to February of

24   2020 being the first time that Alta Power learned of the

25   existence of LTSA termination fees.  And you testified

Page 236

APP.093

1          Q.    And you testified earlier that MTU was one of
2    the other entities that offered service agreements even
3    if it wasn't on this long-term basis like this?
4          A.    Service contracts, yes.
5          Q.    Okay.
6                    (Marked was Exhibit 2041.)
7          Q.    (By Mr. LeGrand)   I'm going to hand you
8    Exhibit 2041.
9                    This appears to be an email to you from
10   Mr. Sutherland from May 6, 2020.  Right?
11         A.    Yes.
12         Q.    Who is Peter Sutherland?
13         A.    Peter Sutherland is a friend of Bill Phelps.
14         Q.    Okay.  And he has some affiliation with a
15   lender or investor?
16         A.    He -- yes.  He had -- well, I don't think
17   "affiliation" is the correct word.
18         Q.    Okay.
19         A.    I would say he said that he might be able to
20   make some introductions that could be helpful.
21         Q.    Okay.  So you were sending him information
22   that might potentially help you get financing, right?
23         A.    Yes.
24         Q.    And you included in May of 2020 a management
25   bio slide.  Correct?

Page 280

1        A.   Yes.

2        Q.   And on the next page, that management bio

3   slide includes Mr. Phelps, Mr. Hart, Mr. West, and you.

4   Correct?

5        A.   That's correct.

6        Q.   All right.  If you can just go back very

7   quickly to Exhibit 2001 --

8        A.   Yes.

9        Q.   -- Paragraph 79 --

10       A.   Okay.

11       Q.   -- that says [as read]:  "Sometime before

12   financing was closed, WattStock disclosed to Ryan

13   Castleman of Castleman Power Development, LLC, one of

14   Alta Power's few competitors, that project financing

15   from Deutsche Bank was imminent."  Right?

16       A.   Yes.

17       Q.   How do you know that WattStock disclosed that

18   information to Castleman?

19       A.   Because Jay Manning called me on my cell phone

20   a couple of days before I received the cease and desist

21   letter and told me that he had just spoken with Ryan

22   Castleman, and Ryan told him they were sending the cease

23   and desist letter and that the -- and logically you can

24   deduce that because there was no crossover between

25   ourselves and Castleman, and WattStock was the

Page 281

APP.095

1    only -- the only common third party that knew of the

2    Deutsche Bank financing, that it had been disclosed by

3    WattStock because they were clearly having ongoing

4    dialog with Castleman.

5        Q.   Okay.  So because Mr. Manning called you and

6    talked to you about a conversation he had with

7    Mr. Castleman around the time that Mr. Castleman sent

8    you this cease and desist letter, you deduced that

9    Mr. Manning told Mr. Castleman about the financing?

10       A.   That's the only way it could have happened.

11       Q.   All right.  Because Mr. Castleman had never

12   before threatened any litigation against Alta Power or

13   Mr. West or Mr. Hart.  Right?

14       A.   He never threatened it against Alta Power.  I

15   don't know about the other two.

16       Q.   But Mr. Hart and Mr. West were at least

17   represented in the document we just looked at as key

18   management employees of Alta Power.  Correct?

19       A.   Yes.

20       Q.   Let me hand you what I'm marking as Exhibit

21   2042.

22            (Marked was Exhibit 2042.)

23       A.   Okay.

24       Q.   (By Mr. LeGrand)  And this is a declaration

25   that you executed on August 28, 2019, in connection with

Page 282

1    the Castleman dispute.  Right?

2         A.   That's correct.

3         Q.   And you executed this under penalty of

4    perjury.  Right?

5         A.   Yes.

6         Q.   So everything in this declaration is true?

7         A.   Yes.

8         Q.   Okay.  You are aware, sir, that your lawyers,

9    or the lawyers that Alta Power retained in connection

10   with the Castleman dispute, spoke directly to the

11   lawyers that were representing Mr. Castleman.  Right?

12        A.   I'm aware, yes.

13        Q.   And some of those conversations, you weren't a

14   part of.  Correct?

15        A.   That's correct.

16        Q.   All right.  And are you aware that your

17   lawyers also spoke to the lawyers for Deutsche Bank?

18        A.   I believe they spoke to the project finance

19   lawyers.

20        Q.   Okay.  And so some of the lawyers representing

21   Deutsche Bank, did that include White & Case and Baker &

22   Botts?

23        A.   Correct.

24        Q.   And Baker & Botts is representing Alta Power

25   in this litigation.  Correct?

Page 283

APP.097

# EXHIBIT H

**APP.098**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE WATTSTOCK LLC,

Debtor.

Case No.
21-31488-sgj11V

WATTSTOCK LLC,

Plaintiff,

Chapter 11
Subchapter V

Adv. No. 21-03083-sgj

v.

ALTA POWER LLC,

Defendant, Counter-Plaintiff,
and Third-Party Plaintiff,

Removed from the
District Court of
Dallas County, Texas,
116th Judicial District

Case No. DC-20-08331

v.

WATTSTOCK LLC,

    Counter-Defendant, and

GENERAL ELECTRIC
INTERNATIONAL, INC., d/b/d
GE POWER SERVICES,

    Third-Party Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION TRANSCRIPT OF:

TRAVIS WEST

TAKEN IN CONNECTION WITH THE CAPTIONED CAUSE BEFORE

YOLANDA J. PENA, CERTIFIED COURT REPORTER, AT 5551

CORPORATE BOULEVARD, SUITE 101, BATON ROUGE, LOUISIANA

70808, COMMENCING AT 8:34 A.M., ON APRIL 20, 2023.

Case 3:23-cv-00270-X    Document 38    Filed 06/04/24    Page 105 of 453    PageID 511    04/20/2023

```
 1                    MR. GOLINKIN:  Okay, cool.  Thanks.
 2                    MR. CAPOCCIA:  Can you see that?  This
 3               is premarked as exhibit -- oh, shoot.
 4               Actually, the one before that.  Our numbers
 5               are off in here.
 6    BY MR. CAPOCCIA:
 7         Q.   So you see here that you send on a list to
 8    Mr. Laterza in February of 2019 of various units?  You
 9    may need the magnifying glass for this.
10         A.   Okay.
11         Q.   Do you see, next to the -- the Uygar Energy
12    unit, under comments it says, "In addition to the
13    price, there will be a GE CSA termination fee for
14    1.5 million"?  The comments on the right side.
15         A.   I'm trying to find Uygar.
16                    MR. GOLINKIN:  It's the second one on
17               the list.
18                    THE WITNESS:  Okay.
19    BY MR. CAPOCCIA:
20         Q.   Did you have an understanding of what that
21    meant?
22         A.   No, not at that time.
23         Q.   Did you ask anybody at WattStock, "What is
24    this CSA termination fee?"
25         A.   I don't recall seeing this document.  I may
```

```
 1    have, but I don't recall seeing it.

 2        Q.   When did you first learn of a CSA termination

 3    fee for any unit from GE?

 4        A.   I didn't hear it from GE.  I mean, I heard it

 5    from Matt.  So he was the one that brought it to us and

 6    said, "Hey, some of these units have termination fees."

 7        Q.   Okay.  Do you recall when you first learned

 8    about that?

 9        A.   I don't.

10        Q.   Would it have been before February of 2020?

11        A.   I have -- I have no recollection of the date

12    when that occurred.

13        Q.   Okay.  Do you recall if this list that you

14    received came from WattStock?

15        A.   I believe yes.

16        Q.   Okay.  So WattStock disclosed a list listing

17    one termination fee at least that they knew of,

18    correct, from Uygar?

19        A.   According to this, yes.

20        Q.   Is it your understanding that they were trying

21    to hide termination fees from you, based on having

22    disclosed one here?

23             MR. GOLINKIN:  Objection; form.  You can

24             answer that.

25        A.   No.  I don't think that WattStock was ever
```

```
 1  trying to hide termination fees from us.
 2  BY MR. CAPOCCIA:
 3      Q.   Okay, great.  You can go to the next one, next
 4  tab.
 5               MR. CAPOCCIA:  Oh, they have.  It's
 6           2023, Exhibit 2023.
 7               MR. GOLINKIN:  Okay.  Got it.
 8  BY MR. CAPOCCIA:
 9      Q.   This is a list you received.  And do you see
10  underneath -- on the page that has Pete's estimate and
11  then the list of Turkey units -- should be the third
12  page from the end.  Do you see under "Bosen" under
13  comments it says, "Chromalloy parts?
14      A.   Okay.  Which one?  You said Bosen?
15      Q.   Yeah.
16      A.   Okay.
17      Q.   All right.  Did you have an understanding of
18  whether GE would warrant units with Chromalloy parts?
19      A.   There was discussions that went back and forth
20  between the groups regarding Chromalloy.  There was
21  some kind of dispute between GE and Chromalloy at the
22  time.
23      Q.   Is it your understanding -- did you have an
24  understanding as to whether a company like GE would
25  warrant non-OEM parts?
```

```
 1              MR. GOLINKIN:  Objection; form.

 2       A.   According to what we were portrayed from Pete

 3  and Jay, I recall that they would have used these

 4  components and -- and warranted them, yes, at that

 5  time.

 6  BY MR. CAPOCCIA:

 7       Q.   Okay.  That -- Pete Watson and Jay Manning

 8  told you around --

 9       A.   I don't know which person it was.  In all

10  likelihood, it was Pete that made references to GE

11  would accept Chromalloy as an alternative for those

12  components.

13       Q.   Okay.  Did anybody from GE tell you that they

14  would accept Chromalloy parts?

15       A.   I don't recall that.

16       Q.   Okay.

17              MR. CAPOCCIA:  We can go to the next

18         document.

19              MR. GOLINKIN:  Thank you, sir.

20  BY MR. CAPOCCIA:

21       Q.   This is Exhibit 2026.  You received a document

22  titled "Status of Alta Power surplus LM6000 units,

23  version 6."  And you can see, if you go to the document

24  itself -- you may need the magnifying glass -- it lists

25  the price for the Nuh Çimento units.
```

```
 1    in the ERCOT during the term of the noncompetition
 2    agreement, which was to expire by its terms on
 3    December 5, 2018," correct?
 4         A.   Okay.
 5         Q.   Okay.  Then you go down, in the next
 6    paragraph.  You say, "A few months after leaving
 7    Castleman Power, I started talking with Alta Power
 8    regarding opportunities with that company," right?
 9         A.   Okay.
10         Q.   Okay.  So do you recall when you left
11    Castleman Power?
12         A.   I don't know the date right off the top of my
13    head, no.
14         Q.   Okay.  We'll go to that in a second.
15              You say you advised Alta of the terms of your
16    noncompetition agreement and Alta understood and
17    honored that restriction, correct?
18         A.   Correct.
19         Q.   "Thus I began consulting for Audley Advisors,
20    an entity unaffiliated with Alta but with similar
21    ownership," correct?
22         A.   Okay.
23         Q.   You say, "My work was confined to projects
24    Audley exploring outside of Texas, including in
25    Louisiana and Ohio."
```

```
 1         A.    Okay.
 2         Q.    So you affirmed that you were not working on
 3    Texas projects during the term of your noncompete,
 4    correct?
 5         A.    Okay.
 6         Q.    "I also did extensive research for Audley
 7    regarding battery storage technology, a matter not at
 8    issue for ERCOT participants," correct?
 9         A.    Okay.
10         Q.    And you said, "I did not provide any paid
11    consulting services for any party for any work or
12    ERCOT-related matters prior to December 5, 2018."  Is
13    that a true statement?
14         A.    To my recollection, yes.
15         Q.    Okay.  And then you say, "In January 2019,
16    once free of the restrictions of the Castleman Power
17    noncompetition agreement, I began consulting for Alta
18    on it's ERCOT-related projects."
19         A.    Okay.
20         Q.    Okay.  And then at the end on page 3, at the
21    very bottom, you say -- do you see it says, "I declare
22    under the penalty of perjury that the foregoing is true
23    and correct"?
24         A.    Okay.
25         Q.    Okay.  Do you understand that when you are
```

```
 1   making representations to a bank that you are required
 2   to be truthful?
 3                 MR. GOLINKIN:  Objection; form.
 4   BY MR. CAPOCCIA:
 5        Q.   Do you understand that as a general matter as
 6   a person in business?
 7        A.   Sure.
 8        Q.   Okay.
 9                 MR. CAPOCCIA:  All right.  We can go to
10                 the next one.  Yep, this is Exhibit 2130.
11      (Exhibit No. 2130 was marked for identification.)
12                 MR. GOLINKIN:  Thanks.
13   BY MR. CAPOCCIA:
14        Q.   Do you see -- so you see that this is an email
15   that goes from someone at SKV, the same lawyers working
16   for Alta, to someone with DB, which I'll represent to
17   you is Deutsche Bank's domain, correct?
18        A.   Okay.
19        Q.   And it has your noncompetition agreement as
20   one of the attachments?
21        A.   Okay.
22        Q.   Okay.  I want to go to 3B, and it says some
23   things that you are not allowed to do.  You see that it
24   says in 3B, subparagraph I, it says, "You cannot invest
25   in, carry on, engage, or have any ownership, control,
```

```
 1              MR. GOLINKIN:  Form.

 2         A.   Potentially, yes.

 3    BY MR. CAPOCCIA:

 4         Q.   And this is during the term of your

 5    noncompete?

 6         A.   Correct.

 7         Q.   Do you see that you had a meeting with

 8    ProEnergy on the 9th of August?

 9         A.   Correct.

10         Q.   Do you recall that we saw emails before in

11    which ProEnergy gave a proposal and said it was for an

12    ERCOT project?

13         A.   Correct.

14         Q.   Okay.  Do you see that on the 22nd you had a

15    meeting with ERM?

16         A.   Yes.

17         Q.   Okay.  And this is in Texas, correct?

18         A.   ERM?

19         Q.   Yes.  It says Houston, Texas, for the

20    location.

21         A.   Yes.

22         Q.   Okay.  And then for the 23rd, it says there's

23    a meeting with Triton Gas Storage correct?

24         A.   Yes.

25         Q.   Do you know of any Triton Gas Storage?
```

```
 1        A.   I don't.

 2        Q.   Do you know of a Trinity Gas Storage?

 3        A.   Yes.

 4        Q.   Okay.  Is it likely that this was Trinity Gas

 5   Storage that you met with?

 6        A.   Potentially, yes.

 7        Q.   And Trinity Gas Storage was the gas storage

 8   facility that Alta used for its ERCOT peaker plants?

 9        A.   Correct.

10        Q.   Okay.

11             MR. CAPOCCIA:  We can go to 8A.

12             MR. GOLINKIN:  Are we done with this or

13        no?

14             MR. CAPOCCIA:  We're done with that.

15             MR. GOLINKIN:  Okay, cool.

16   BY MR. CAPOCCIA:

17        Q.   You see here at the bottom email, Travis West,

18   on August 9th --

19             MR. GOLINKIN:  Hold on, hang tight.  Let

20        me make sure.  You want me to give him

21        Exhibit 2066?

22             MR. CAPOCCIA:  Yes.

23             MR. GOLINKIN:  Okay.  There you go.

24   BY MR. CAPOCCIA:

25        Q.   You say, on August 9, 2018 -- which you admit
```

```
 1    that's in the middle of your noncompete?

 2         A.   Yes.

 3         Q.   Okay.  You said, "We had a good visit

 4    yesterday visiting the sites, Mexia, Dawson, and

 5    Goodlow."

 6              Are those ERCOT peaker plants that Alta had or

 7    that it was intending to seek financing for and to

 8    bring about as peaker plants?

 9                   MR. GOLINKIN:  Form.  You can answer.

10         A.   Yes.

11    BY MR. CAPOCCIA:

12         Q.   And those are in ERCOT?

13         A.   They are.

14         Q.   Do you see that you gave recommendations for

15    each one of those plants?

16         A.   (No audible response.)

17         Q.   So, for example, on Mexia you said that -- you

18    gave recommendations on the tie-in for utilizing the

19    pipe and for -- you also said they needed to identify

20    the site location, and then you give some

21    recommendations on that?

22         A.   Yes.

23         Q.   And do you agree that you were providing

24    services that aid Alta's ERCOT peaker plant?

25                   MR. GOLINKIN:  Form.  You can go ahead.
```

```
 1        A.   No, not -- not specifically providing
 2   information for the peaker plants themselves.  No.
 3   BY MR. CAPOCCIA:
 4        Q.   Okay.  What other plants were envisioned for
 5   these --
 6             MR. GOLINKIN:  Form.
 7   BY MR. CAPOCCIA:
 8        Q.   -- for these locations?
 9        A.   At the time, we were -- we were considering
10   doing battery storage in those particular areas as
11   well.
12        Q.   Okay.  Do you see for Dawson, it says -- one
13   second.  "Need to get existing easement from gas
14   pipeline group to determine limitations on where we can
15   place equipment."
16             Is that related to a battery project?
17        A.   No.  That's part of the gas portion of that
18   project.
19        Q.   Yeah.  So you were saying -- you were giving
20   recommendations as to the gas portion of the project at
21   Dawson, correct?
22             MR. GOLINKIN:  Form.  You can answer.
23        A.   Yes.
24   BY MR. CAPOCCIA:
25        Q.   Okay.  And for Goodlow it says, "Need to get
```

```
 1   existing easement from gas pipeline group to determine

 2   limitations on where we can place equipment," correct?

 3        A.   Yes.

 4        Q.   And that, again, is giving recommendations as

 5   to an ERCOT peaker plant during the term of your

 6   noncompete, correct?

 7        A.   Yes.

 8        Q.   Okay.  And you see in April Henry's email

 9   where -- it's the their paragraph, where she says, "For

10   Mexia, the most relevant issue is where we can get the

11   gas," right?

12        A.   Yes.

13        Q.   And she talks about, in the first paragraph,

14   that "We had a very good trip with site visits

15   yesterday."  And then she says, "Travis, I don't think

16   you missed anything, but timing of the steps is

17   relevant."

18             So she's referring to the visit that you just

19   had.

20                  MR. GOLINKIN:  Objection; form.

21   BY MR. CAPOCCIA:

22        Q.   And she's referring to the gas power plants

23   there, correct?

24                  MR. GOLINKIN:  Objection; form and

25                  foundation.  You can answer if you know.
```

```
 1        A.   Correct.
 2   BY MR. CAPOCCIA:
 3        Q.   Okay.  And you see in the paragraph about
 4   Goodlow, she refers to a screening study?
 5        A.   Okay.
 6        Q.   Okay.  Were you involved with the screening
 7   study for any of Alta's ERCOT peaker plants during the
 8   term of your noncompete?
 9        A.   Depends.  If we were putting batteries on
10   there, I would have been involved with the screening
11   study piece of that as well.
12        Q.   Okay.  But based on Exhibit 2066, you were
13   providing services while you were employed as an Audley
14   Advisors employee to Alta's peaker plants?
15             MR. GOLINKIN:  Objection; form.
16             Objection; foundation.  He's not a lawyer.  He
17             can answer, though.
18        A.   As far as I'm concerned, I didn't violate the
19   noncompete.  Because the way we had it structured, I
20   was giving free advice on the thermal side of the
21   project and evaluating the sites for battery
22   capabilities.
23   BY MR. CAPOCCIA:
24        Q.   Were you paid by Audley Advisors?
25        A.   I was paid by Audley.
```

```
 1        Q.   Okay.  And while you were being paid by Audley
 2   Advisors, you provided services to Alta Power?
 3                MR. GOLINKIN:  Objection; form.  That's
 4           actually not -- misstates his testimony, but
 5           he's welcome --
 6   BY MR. CAPOCCIA:
 7        Q.   Did you provide -- while you were employed by
 8   Audley Advisors, being paid, you provided services on
 9   Alta's peaker plants in ERCOT, correct?
10                MR. GOLINKIN:  Objection; form.
11           Objection; foundation.  He's not an attorney.
12           He can answer.
13   BY MR. CAPOCCIA:
14        Q.   Okay.  You can answer.
15                MR. GOLINKIN:  Do you instruct my
16           witness before --
17   BY MR. CAPOCCIA:
18        Q.   You can answer.
19                MR. GOLINKIN:  Completely out of
20           control.
21        A.   So as far as the -- as I'm concerned, I was
22   paid based on the evaluation of the battery projects.
23   BY MR. CAPOCCIA:
24        Q.   Okay.  So this -- in your opinion, you gave
25   free advice to Alta here?
```

# EXHIBIT I

```
 1            IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 2                    DALLAS DIVISION
 3   IN RE WATTSTOCK, L.L.C.,     §Case No. 21-31488-sgj11V
                                  §Chapter 11
 4   Debtor.                      §Subchapter V
                                  §Adv. No. 21-03083-sgj
 5   WATTSTOCK, L.L.C.,           §
                                  §
 6   Plaintiff,                   §
                                  §
 7   v.                           §  Case No. DC-20-08331
                                  §
 8   ALTA POWER, L.L.C.,          §
                                  §
 9   Defendant, Counter-Plaintiff,§
     and Third-Party Plaintiff,   §
10                                §
     v.                           §
11                                §
     WATTSTOCK, L.L.C.,           §
12                                §
        Counter-Defendant, and   §
13                                §
     GENERAL ELECTRIC             §
14   INTERNATIONAL, INC., d/b/a   §
     GE POWER SERVICES,           §
15                                §
        Third-Party Defendant.   §
16
      * * * * * * * * * * * * * * * * * * * * * * * * *
17        VIDEOTAPED ORAL DEPOSITION OF ROY JEFFREY HART
                     November 3, 2023
18    * * * * * * * * * * * * * * * * * * * * * * * * *
19   VIDEOTAPED ORAL DEPOSITION OF ROY JEFFREY HART,
     produced as a witness and duly sworn, was taken in the
20   above-styled and numbered cause on November 3, 2023,
     from 9:06 a.m. until 4:53 p.m., Central Standard
21   Time, before Suzanne Kelly, Registered Diplomate
     Reporter and Certified Realtime Reporter, reported by
22   stenographic method at the law offices of Jordan,
     Lynch & Cancienne located at 1980 Post Oak Boulevard,
23   Suite 2300, Houston, Texas pursuant to the
     Federal Rules of Civil Procedure and the provisions
24   stated on the record, if any.
     Reported by:  Suzanne Kelly, CSR, RDR, CRR
25   Job:  6295014
```

Page 1

 1          A.   Yes.

 2          Q.   Okay.  And one of those tasks was

 3     filling out interconnection studies.  Correct?

 4          A.   Yes.

 5          Q.   And you testified earlier that those

 6     were complicated roughly 40-page long

 7     documents --

 8          A.   Yes.

 9          Q.   -- for ERCOT.  Correct?

10          A.   Yes.

11          Q.   Okay.  So when you say "the small front

12     piece," you're talking about a variety of things.

13     Correct?  And -- and the development of a peaker

14     power plant?

15          A.   Yes.

16          Q.   Okay.

17          A.   They're all cut and paste situations.

18          Q.   So is it your position that for the

19     development work you were doing for Alta --

20          A.   Uh-huh.

21          Q.   -- you didn't need all of your

22     experience and expertise in the power industry to

23     do it, anybody could have done it?

24                    MR. GOLINKIN:  Form.

25                    THE WITNESS:  I didn't say the last

                                        Page 315

```
1    piece.  I just said yes.  You don't need all of
2    my experiences to do that front little section.
3    BY MS. TALLEY:
4        Q.  But April does say that she's certain
5    with your continued mentoring and coaching she
6    would be able to do your development role.
7    Right?
8        A.  Yes.
9        Q.  Okay.  So she was -- per this e-mail,
10   she is saying that she is going to rely on your
11   continued mentoring and coaching of her to do
12   your job.  Is that fair?
13       A.  Yes.  It is fair.
14       Q.  Okay.  Was that your understanding with
15   April?
16       A.  Yes.
17       Q.  Okay.  And then, at the bottom, her last
18   sentence says that, "With Roy at my back, I
19   promise I can help Alta go forward well if you
20   take the chance on me."  Correct?
21       A.  Yes.
22       Q.  Okay.  So, is it fair to say that the
23   only way April was going to be able to fulfill a
24   role as the primary development officer for
25   Alta's peaker power plants was with you
```

Page 316

1    mentoring --

2         A.   I --

3         Q.   -- and coaching her at her back?

4         A.   I would think that's a fair statement,

5    yes.

6         Q.   Okay.  And to your knowledge, did she

7    ultimately do development work on Alta's three

8    peaker --

9         A.   She certainly --

10        Q.   -- projects we have been discussing?

11        A.   She certainly did step up and fill in

12   forms and run around, doing -- driving around,

13   meeting people, doing the right things, yes.

14                  Was I with her during that time?

15   Yes.

16        Q.   Okay.  And that was part of the

17   development work for these three peaker plants

18   we've been talking about.  Correct?

19        A.   For the three -- for the nine sites that

20   we were looking at, yeah.

21        Q.   Including the three that we talked about

22   earlier?

23        A.   Including the --

24        Q.   Lufkin, Jacksonville, Goodlow?

25        A.   These three that have all the things

Page 317

1   done in them that you're going to do, this is the

2   next group.

3                   Can you do those things for that

4   group?  Yeah.

5       Q.  Okay.  Let me just ask it again to be

6   clear.

7                   To your knowledge, was Ms. Hart

8   specifically involved in assisting with the

9   development of Alta's peaker plants at Goodlow,

10  Jacksonville and Lufkin, the original three that

11  we talked about?

12      A.  She was with me when I talked to those

13  landowners, yes.

14      Q.  So she did work on those sites?

15      A.  She did -- she did some of the filling

16  in of ERCOT requirements, which was cut and

17  paste, as I say.  Once you've done one, you're in

18  the rest?

19      Q.  My question is just:  Did she do work --

20      A.  Yes.  Yes.

21      Q.  -- developing those sites?

22      A.  Yes, she did.

23      Q.  Okay.  Are you aware of whether she

24  provided updates to Oncor regarding those sites?

25                   MR. GOLINKIN:  Objection.  Form.

Page 318

1    right?"

2                    (Conversation held off the record.)

3                    MR. GOLINKIN:  Sorry.  The RealTime

4    froze.

5                    Do you want to go off the record

6    real quick?

7                    MS. TALLEY:  Sure.  Let's go off

8    the record for just a second.

9                    THE VIDEOGRAPHER:  Off the record

10    at 3:52.

11                    (Recess taken.)

12                    THE VIDEOGRAPHER:  We are going

13    back on the record at 3:54.  This is the start of

14    Media 8.

15    BY MS. TALLEY:

16        Q.  All right.  Mr. Hart, as -- as we were

17    saying before we left off, you testified a few

18    moments ago on this deposition that you were the

19    one in August 2018, who was working on and

20    filling out the interconnect studies for Alta.

21                    And now you were saying it was

22    actually your wife.  Is that correct?

23        A.  Correct.

24                    MR. GOLINKIN:  Misstates testimony.

25    BY MS. TALLEY:

                                        Page 349

1          Q.   Okay.  And earlier, you told us that

2     when April was working on development projects

3     for Alta, she was doing that through your

4     guidance and mentorship.  Correct?

5                    That was how she was able to do

6     that work for Alta?

7          A.   Certainly.

8          Q.   And you advised her on how to fill out

9     the interconnection studies.  Correct?

10         A.   Originally, yes.

11         Q.   Okay.  And so, even if it was April --

12         A.   Yes.

13         Q.   -- filling out the interconnection

14    studies in August 2018 --

15         A.   Yes.

16         Q.   -- she was doing that through mentorship

17    and advice from you.  Correct?

18         A.   That mentorship and advice could have

19    been a year earlier or six months earlier.  I

20    don't know.

21         Q.   Is it your testimony that you were

22    not -- you were -- you stopped having any -- any

23    input or advice or oversight of April as of

24    August 2018?

25                    MR. GOLINKIN:  Form.

                                        Page 350

```
 1                    THE WITNESS:  The answer to that
 2    is, yes, she was self-sufficient.
 3    BY MS. TALLEY:
 4         Q.  As of August 2018?
 5         A.  Yeah.
 6         Q.  Okay.  So between her offering to work
 7    for Alta in May 2018 --
 8         A.  Yes.
 9         Q.  -- and a handful of months later, three
10    months later in August 2018 --
11         A.  Yes.
12         Q.  -- you're saying somebody with a
13    background in higher education administration
14    became sufficiently expert in power plant
15    development such that she was able to do power
16    plant development tasks without your input,
17    advice or guidance?
18         A.  Yes.
19                    MR. GOLINKIN:  Form.
20    BY MS. TALLEY:
21         Q.  Okay.
22         A.  Yes.  I am.
23         Q.  Do you recall that Castleman sent Alta a
24    cease and desist letter in August of 2019
25    threatening a lawsuit?
```

Page 351

# EXHIBIT J

**EXHIBIT**

tabbies®

2179

## DECLARATION OF ROY HART

My name is Roy Hart. I am over 18 years of age and I am competent to make this declaration.

I have more than 40 years of experience in the field of power generation. My specific expertise is with power plants, including site location and development.

Between 2005 and 2009, I worked for Nu Coastal Power, an affiliate of Coastal Corporation. There I met William Phelps, Coastal Corporation's Chief Financial Officer, and Matthew Laterza, who worked under Mr. Phelps at Coastal. During my time at Nu Coastal Power, in 2006 we developed and built a 300-megawatt natural gas-fired power plant in Victoria, Texas with used equipment that was proven technology.

From 2009 to the present, I have worked as an independent consultant through the entity Roy J. Hart LLC. Between 2009 and 2015, I worked on various projects, including development of natural gas combined cycle power plants in Texas and Louisiana.

In 2015, I approached Mr. Phelps and Mr. Laterza with the idea of developing peaking power plants fired by natural gas using proven refurbished equipment. This was not a secret or a new idea, as it had been done by others before. There are hundreds of power plants around the world that are fired by natural gas using refurbished equipment. Mr. Phelps and Mr. Laterza were not interested at the time due to the potential rates of return, given market conditions.

I continued to work on the idea independently, and located a potential site for such a power plant in Point Comfort, Texas. Based on my knowledge and experience, I believed that a peaking power plant fired by natural gas could be developed at this site using three refurbished GE LM6000 turbines.

Around that same time, Matthew Whitaker, an industry acquaintance, contacted me on behalf of Ryan Castleman and asked about my activities. I shared my idea with him and in response he asked me to work for Castleman as a consultant to develop such a project. Based on those conversations, and my subsequent work for Castleman, it does not appear to me that Castleman had any previous experience with peaking power plants fired by natural gas using refurbished equipment. In fact, I introduced Castleman to GE's LM6000 turbines.

I subsequently reached an oral agreement with Mr. Castleman that I would work as a non-exclusive consultant for the proposed project, preparing a development plan and cost estimates, etc., and would be paid a flat fee for my work. We did not sign a written agreement. In that role, in 2015 and 2016 I helped Castleman Power Development LLC ("Castleman Power") develop two, 100 megawatt peaking power plants fired by natural gas, one in Point Comfort and another in Channelview, Texas. Both plants used refurbished GE LM6000 turbines.

I relied upon my industry experience and expertise to identify the site, prepare the development plan, and perform my work. Castleman Power did not teach me, train me, or provide me any trade secrets about how to accomplish my work.

In 2017, Castleman Power moved on to developing two similar power plants in Victoria, Texas. As with the others, I identified for Castleman Power suitable locations in Victoria where the electricity grid meets up with natural gas lines sufficiently nearby to make the location viable.

However, by the fall of 2017, I was no longer interested in consulting for Castleman Power. Once again I approached Mr. Phelps and Mr. Laterza to gauge their interest in building their own peaking power plants fired by natural gas using refurbished equipment. This time, Mr. Phelps and Mr. Laterza were interested, citing changes in market conditions.

As a result, I began consulting for Alta Power in early 2018. When Mr. Castleman learned that I was consulting for Alta Power, he said he did not want me working for anyone else. However, since my agreement with Castleman Power was verbal and non-exclusive, Mr.

**APP.124**

Alta 0078637

Castleman did not have the right to stop me from working for others. In response, in May 2018 Mr. Castleman offered to "put me in retirement" and to pay me $250,000 not to consult or work for any competitor of Castleman Power. I agreed, and signed a "Consulting, Non-Disclosure and Non-Competition Agreement" that says I would not work for a Competing Business for a period of 18 months. The $250,000 payment was to be made in two equal installments, the first $125,000 in May 2018 and the second $125,000 no later than January 15, 2019.

Castleman Power made the first payment of $125,000 in May 2018. However, Castleman Power did not make the second payment of $125,000 in January 2019. From the time I signed the agreement through the end of January 2019, other than one email and one phone call with Ryan Castleman, I did not do any work for Castleman Power. During that same time period, I also did not do any work or consulting for any Competing Business, including Alta Power.

To date, Castleman Power has not paid me the $125,000 it promised to pay by January 15, 2019 in exchange for my agreement not to work for a Competing Business for 18 months. As a result, in February 2019 I began consulting for Alta Power again.

I did not obtain any confidential information belonging to Castleman Power during my association with Castleman Power. Nothing about the construction and operation of peaking power plants is novel or new. I did not learn from Castleman Power any aspect of the development and construction of peaking power plants—site selection, financing, development, permitting, construction, building, contracting, vendors, etc.—that I did not already know or that was not commonly known in the industry. I am not aware of any technology, processes, or designs developed by or on behalf of Castleman Power that distinguish Castleman Power from any other participant in the peaking power plant market. Nor am I aware of any terms of any of Castleman Power's customer or vendor contracts that would give any party an advantage over Castleman Power if disclosed. Nor have I misappropriated any information—confidential or otherwise—related to Castleman Power that I worked on for my personal benefit or the benefit of any other party.

Notably, technical information regarding power plants in Texas, including the Castleman Power plants, is publicly available through the Texas Commission on Environmental Quality and ERCOT. The publicly-available technical specifications include the type (by model number) and number of turbines in use, megawatts per turbine, emissions control method is use, and whether the plant is simple cycle or combined cycle. Thus, anyone can learn that the two Castleman Power facilities in Victoria, Texas, utilize two LM6000 refurbished turbines, each capable of 50 MW output, for total plant output of 100 MW, using SCR emissions control method.

Today there are hundreds of peaking power plants around the world, many of which use new and refurbished LM6000 turbines. The availability of such turbines is well known, and it is not unusual for such turbines to be bought for refurbishment and used elsewhere in the world.

Although Castleman Power Development provided me with a Castleman Power email address—roy@castlemanpower.com—for work performed on behalf of Castleman Power, the company did not provide me with a computer, cell phone, or other electronics for my use. Thus, I performed all of my work for Castleman Power on a personal computer that I still have in my possession and continue to use for personal and work matters. Castleman Power was aware of the fact that I used my personal computer to generate and store Castleman Power documents. Prior to Castleman Power's cease and desist letter dated August 16, 2019, Castleman Power had never requested that I delete or return any Castleman Power records stored on my computer. Although I do not agree that any information on my personal computer constitutes "Confidential Information" of Castleman Power, as explained above, I have agreed to have a computer forensics expert image and preserve my personal computers and cell phone.

My name is Roy Hart, my birth date is October 14th, 1950, and my address is 116 Springs Edge, Montgomery, Texas 77356. I declare under penalty of perjury that the facts contained in this declaration are within my personal knowledge and are true and correct.

Executed in Montgomery County, State of Texas, on the 28th day of August, 2019.

CONFIDENTIAL

# EXHIBIT K

Cc: GP Manalac[gmanalac@castlemanpower.com]
To: Ryan Castleman[ryan@castlemanpower.com]
From: Travis West[twest44@earthlink.net]
Sent: Wed 11/21/2018 6:39:46 PM Central Standard Time
Subject: Re: non compete

I don't work for them.

Travis West

On Nov 21, 2018, at 4:49 PM, Ryan Castleman <ryan@castlemanpower.com> wrote:

> Alta Energy ring any bells ?
>
> iPhone 281 732 8235
>
> On Nov 21, 2018, at 2:43 PM, Travis West <twest44@earthlink.net> wrote:
>
>> Received your voice mail – not sure what you are talking about.
>>
>> Travis
>>
>> _____
>>
>> From: Ryan Castleman <ryan@castlemanpower.com>
>> Sent: Tuesday, November 20, 2018 5:00 PM
>> To: twest44@earthlink.net
>> Cc: GP Manalac <gmanalac@castlemanpower.com>
>> Subject: non compete
>>
>> Travis – I left you a voice mail earlier.  We have information that indicates you have been in violation of the ndisclosure and non compete agreement.  This is an issue we will be taking action to enforce, as disappointing as that is.
>>
>> Regards,
>> Ryan
>>
>> Ryan Castleman - CEO
>> Castleman Power Development, LLC
>> 5850 San Felipe, Suite 601
>> Houston, TX 77057
>> T: 281.732.8235



EXHIBIT: 2045
WIT:
DATE: 10/5/22
Pat E. Arredondo, CRR, RMR
APP.127

# EXHIBIT L

**APP.128**



**From:** Robin C. Gibbs
**Sent:** Thursday, September 5, 2019 2:54 PM
**To:** Renken, Brandon <brenken@lockelord.com>
**Cc:** Militello, Janet <JMilitello@lockelord.com>
**Subject:** RE: Proposed Letter to Deutsche Bank

Brandon, respectfully, revisionist history, though sometimes viewed as strategically necessary, is by definition neither accurate nor persuasive. The sequence of these events is a matter of record in the prior exchanges.

We look forward to receiving your proposal regarding the language of the letter in order to restore the loan closing.

**From:** Renken, Brandon <brenken@lockelord.com>
**Sent:** Thursday, September 5, 2019 2:24 PM
**To:** Robin C. Gibbs <RGibbs@gibbsbruns.com>
**Cc:** Militello, Janet <JMilitello@lockelord.com>
**Subject:** RE: Proposed Letter to Deutsche Bank

Robin,

In the interest of continuing our efforts at resolution, I need to correct a few factual inaccuracies you have made throughout our correspondence:

(1) Lee Kaplan's response to our cease and desist said nothing of the issue you now claim is paramount, i.e., Alta's financing issues, and also did not suggest anything about Alta demanding that Castleman affirmatively represent that Alta had not violated its proprietary, confidential, and trade secret rights. To the contrary, Lee's letter was the standard response in virtually every trade secrets/confidential information case; that is, to deny wrongdoing. Lee's letter also foresaw the likelihood of litigation and did not suggest anything other than Castleman provide Alta with sufficient notice to appear at any TRO proceedings.

(2) The first hint of urgency on Alta's behalf came on Thursday of last week, via your calls to David Gregory, to which we promptly replied. Part of our replies were to request information regarding the sudden urgency—especially after Lee had indicated that Alta was interested in reaching an amicable resolution of Castleman's claims, but Alta had done nothing to move the ball forward on that front. At that time, you refused to disclose anything, but we scheduled a meeting, at your request, for the first possible date, which was Tuesday, September 3.

(3) Then on Friday you insisted on a phone call, which you and I, and others, conducted at your request. During that phone call, Alta, for the first time, raised its financing issues. Your position was that Castleman's assertion of its rights was something that Alta decided must be disclosed to its financier, Deutsche Bank. Castleman had no prior knowledge of the status of Alta's financing, the identity of its financier, or Alta's disclosure obligations, but Castleman had done its due diligence and was confident that Alta has violated its rights. At that time, I suggested that you and Alta put pen to paper on a proposal for resolution of Castleman's claims, as Lee had suggested in his letter.

I also committed to explaining the facts, as you had described them to me, without any third party verification, to Castleman, which I did. Throughout my call with you, I was clear that Castleman had real, enforceable rights, and that Castleman had done sufficient due diligence to be confident that those rights had been violated by Alta.

(4) On Saturday, you contacted me seeking an update. I responded that I had communicated the issues to my client, but that I was expecting you to provide a proposal for resolution. Ultimately, you proposed affidavits of the believed wrongdoers stating that they had done nothing wrong, similar to what had been set forth in Lee's letter. I agreed to your demands—that any such affidavits be restricted to this matter and destroyed—but indicated that I did not think such affidavits would be satisfactory. You did not provide any affidavits.

Instead, you suggested, for the first time, that Castleman resolve this matter by stating that it had conducted a thorough investigation and had determined that there was no breach of its confidential information or trade secret rights. That was despite the fact that I had told you the opposite during our call Friday.

(5) On Monday, you sent a letter setting forth the "facts" of the matter, again attempting to paper up your potential claim.

(6) After further communications, including Castleman's offer to consent to participate in a quick mediation, we spoke again on Wednesday. During that conversation, I again explained the basis for Castleman's assertion of its rights and again explained Castleman's willingness to meet with Alta or otherwise attempt resolution. You explained to me that Alta had drafted a letter for Deutsche Bank that it wanted to use as a structure for a resolution of Castleman's claims. During that conversation, you again insisted the letter include a statement that Castleman had conducted a thorough investigation and had determined that its rights had not been violated. I agreed to review the draft letter, but again reminded you that our investigation had resulted in the opposite conclusion.

(7) In an attempt to move things forward, we requested information that would be necessary to validate Alta's representations that it does not possess Castleman's confidential or trade secret information. It has been Alta's position that they have done nothing wrong, and if that is true, then disclosing this information, subject to non-disclosure and confidentiality restrictions, would bear that out. Alta refused to provide that information.

Despite not being able to agree to your letter as written, we are working on revising it as a basis for continuing settlement communications on Friday.

We are cognizant of your insistence on urgency and will continue to be prompt in our communications with you.

Regards,

b

Brandon Renken
Partner
Locke Lord LLP
713.226.1131

**From:** Robin C. Gibbs <RGibbs@gibbsbruns.com>
**Sent:** Thursday, September 5, 2019 8:05 AM
**To:** Renken, Brandon <brenken@lockelord.com>
**Cc:** Militello, Janet <JMilitello@lockelord.com>
**Subject:** Re: Proposed Letter to Deutsche Bank

Brandon,

We agree it is necessary that Castleman review the draft letter and determine responsive language that will satisfy the Bank and fix the damage from its in terrorem communications. We obviously do not agree that 19 days past the initial Aug 16th letter, followed by the Aug 21st emails, it is proper or constructive

EXHIBIT: **2044**
WIT:
DATE: 10-15-22
Pat E. Arredondo, CRR, RMR

**APP.129**

Alta 0080280

to initiate, as Castleman proposes, an "investigation" by now seeking a wholesale foray into Alta's documents in the face of what remain deliberately undefined, unspecified trade secrets, confidential information or contractual claims. Nor has LockeLord disclosed the results of any "investigation" it has purportedly conducted specifying or defining any of the matters to which it demanded that Alta respond.

We look forward to receiving the language regarding the Bank letter which you reference with the hope that Castleman can repair the damage and permit the loan and transaction to close.
We do reiterate that time remains of the essence to the possible resolution of this urgent matter.

Robin C Gibbs
713-751-5217
On Sep 4, 2019, at 5:43 PM, Renken, Brandon <brenken@lockelord.com> wrote:

> Robin,
> My client is reviewing the draft letter you have submitted and determining if it can work as a framework for resolution of the dispute, as well as what other terms might be necessary.
> As written, your draft letter states:
> "Following completion of our review, and now having conducted an investigation of our potential claims and consulted our legal counsel, we have concluded that Alta has not used any trade secrets or confidential information of Castleman's in developing Alta's ERCOT assets and projects."
> For this statement to be true, Castleman must have the opportunity to conduct the investigation to which you refer. At a minimum, that requires the review of the following documents and information for each of Alta's three projects currently under development:
>> 1. All versions submitted to ERCOT of the resource asset registration form (RARF in excel form or equivalent) including all embedded files and related documents and studies.
>>
>> 2. All submissions and versions of the electric interconnect agreement related to the three projects including exhibits, related documents, and studies requested by the Transmission and Distribution Service Provider.
>>
>> 3. All submission and versions of the TCEQ air permit application including all supporting documentation, studies and reports related to such applications.
>>
>> 4. Any reports, screen shots, documents, or data produced from the time stamped Envision software related to your three projects.
>
> Please produce the foregoing documents and information. We will agree to confidentiality/non-disclosure requirements with respect to this information. If you will not produce these items, then Castleman cannot swear to having "conducted an investigation," other than the diligence that has been done to date, all of which indicates that Alta has, in fact, improperly used Castleman's trade secrets and confidential information.
> You have repeatedly indicated that time is of the essence on these issues, so please confirm that you will be providing this information and when it will be provided. Alternatively, if you are refusing to provide this information, please let us know that as soon as possible, so that we can propose other terms for resolution of our dispute that provides appropriate protection of Castleman's rights.
> Regards,
> b
> Brandon Renken
> Partner
> Locke Lord LLP
> 713.226.1131

From: Robin C. Gibbs <RGibbs@gibbsbruns.com>
Sent: Wednesday, September 4, 2019 12:30 PM
To: Renken, Brandon <brenken@lockelord.com>
Cc: Robin C. Gibbs <RGibbs@gibbsbruns.com>
Subject: Proposed Letter to Deutsche Bank
Brandon, I have attached the draft proposed letter we discussed earlier today. This was prepared by my client based on some discussion they had with a bank representative. I reiterate that while this represents Alta's best understanding of the type of writing the bank might find acceptable and agree to close the loan, obviously any such final version must necessarily be approved by them as Alta has no ability to dictate its contents to DB. Please let me know whether this provides a constructive basis for resolving the matter. As we also discussed, due to the acute time constraints attending the underlying transaction, it is imperative any pursuit of a resolution must occur now. I will be available to discuss today.
Robin Gibbs

Atlanta | Austin | Boston | Chicago | Cincinnati | Dallas | Hartford | Hong Kong | Houston | London | Los Angeles | Miami | New Orleans | New York | Princeton | Providence | San Francisco | Stamford | Washington DC | West Palm Beach

For more information visit www.lockelord.com

CONFIDENTIALITY NOTICE
This e-mail and any attached files from Locke Lord LLP may contain information that is privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you received this e-mail by accident, please notify the sender immediately and destroy this e-mail and all copies of it. We may scan and or monitor emails sent to and from our servers to ensure regulatory compliance to protect our clients and business.

**APP.130**

Alta 0080281

CONFIDENTIAL

**APP.131**

Alta 0080282

# EXHIBIT M

**To:** Travis West[twest@altapowerdev.com]; Matthew Laterza[mlaterza@altapowerdev.com]
**Cc:** Pete Watson[p.watson@wattstock.com]; Donald Brunswick[d.brunswick@wattstock.com]; Dave H[dave@sterlingintegrity.com]
**From:** j.manning@wattstock.com[j.manning@wattstock.com]
**Sent:** Mon 5/13/2019 6:34:06 PM Central Standard Time
**Subject:** SURPLUS UNITS STATUS UPDATE V10
**Attachment:** STATUS OF ALTA POWER SURPLUS LM6000 UNITS v10.xlsx

Added orientation Row 5.
Added current site in Row 6.
Added Ethos and Panama in Col I and J.
Jay



EXHIBIT

11 A

APP.133

Alta 0030223

# DOCUMENT PRODUCED IN NATIVE FORMAT

**APP.134**

CONFIDENTIAL

Alta 0030224

This spreadsheet is the property of WattStock LLC. It may not be distributed or copied anyone outside of Alta Power LLC and is confidential information per the executed ND/ 8 May 2018 between WattStock LLC and Alta Power LLC.

to
A dated



**ALTA POWER SURPLUS PACKAGES**          **TURKEY UNITS**

| PLANT NAME | ACARSOY | ATAER GT2 (NEW) | NUH GT2 | BOSEN GT1 (PC) | NUH GT1 | ATAER GT1 (OLD) | ZORLU | | ETHOS | PANAMA |
|---|---|---|---|---|---|---|---|---|---|---|
| ORIENTATION | RIGHT | LEFT | RIGHT | LEFT | RIGHT | RIGHT | RIGHT | | ? | ? |
| SITE | JCKSVL | JCKSNVL | JCKSNVL | GDLW | GDLW | GDLW | LFK | | LFK | LFK |
| GT TYPE | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PA | | LM6000PC |
| PACKAGE OP HOUR | 8,774 | 26,333 | 21,255 | 52,612 | 50,281 | 101,410 | 120,000 | | | |
| ESN | 191-716 | 191-648 | 191-625 | 191-530 | 191-524 | 191-539 | 191-124 | NONE | | NONE |
| PACKAGE S/N | 821305 | 820458 | 820208 | 812537 | 812523 | 808466 | 809393 | | | |
| GT OP HOUR | 8,774 | 26,333 | 21,255 | 52,612 | 50,281 | 59,886 | 82,200 | | | |
| GENERATOR TYPE | MEDINSHA | MEDINSHA | BRUSH | BRUSH | BRUSH | BRUSH | BRUSH | BRUSH | | NONE |
| GEAR-BOX TYPE | FLENDER | FLENDER | FLENDER | LUFKIN | BRUSH | LUFKIN | LUFKIN | NONE | | NONE |
| CONTROL SYSTEM | WW MICRONET | WW MICRONET | WW MICRONET | WW MICRONET | MARK VI | WW MICRONET | NETCON 5000 | | | |
| PACKAGE INSPECTION/COMM ENTS | IN VERY GOOD CONDITION-ALMOST NEW | IN GOOD CONDITION | IN GOOD CONDITION | AVERAGE PACKAGE | AVERAGE PACKAGE | OLD S65 PACKAGE | S&S PACKAGE IN BAD CONDITION | | | |
| SPRINT | YES | YES | YES | YES (LP SPRINT ONLY) | YES | YES | YES | | | |
| CHILLER | EVAP | | CHILLER | EVAP | EVAP | CHILLER | CHILLER | | | EVAP |
| LUBE OIL COOLER | FIN-FAN | | FIN FAN | SHELL & TUBE | SHELL & TUBE | FIN FAN | FIN FAN | FIN FAN | | |
| BSI | Performed by Pro-Per | | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | | | |
| COMMENTS | N/A | HSE BY TCT CRACK ON LPT SHROUD | NEEDING HSE | ZORLU-HSE CHROMALLOY PARTS | AROUND 7K HOURS AFTER GE MOH | N/A | MOHBY CROMALLOY, HSE @75K HOURS, ISSUES WITH B,D,E SUMP | | | |
| OFFER PRICE | $ 7,000,000.00 | $ 3,600,000.00 | $ 3,300,000.00 | $ 2,500,000.00 | $ 2,800,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | | | |
| Offer Letter Price | $ 6,700,000.00 | $ 3,400,000.00 | $ 3,000,000.00 | $ 2,300,000.00 | $ 2,500,000.00 | $ 900,000.00 | $ 850,000.00 | | | |
| Offer Price Max | $ 7,700,000.00 | $ 3,960,000.00 | $ 3,630,000.00 | $ 2,750,000.00 | $ 3,080,000.00 | $ 1,100,000.00 | $ 1,100,000.00 | | | |
| MNDA SIGNED | YES | YES | YES | YES | YES | YES | NO | | | |
| OL sent to AP | YES | YES | YES | YES | YES | YES | YES | | | |
| Offer letter Approved | YES | YES | YES | YES | YES | YES | Yes | | | |
| Offer letter received | | YES | YES | YES | YES | YES | Yes | | | |
| Offer accepted | no | | no | no | no | | no | | | |
| Owner Counter Offer | $9mm | | $11mm for both units | $3mm | $11mm for both units | | $3mm | | | |
| WS/AP Counter Offer | $6.8mm | | 6.1mm | $2.3mm | 6.1mm | | $850k | | | |
| Agreed upon price per unit based on LOI | $7mm plus $500k for canc fee | $3,760,000 and 1% DP | $2,625,000 WITH 4% DP | $2.6mm w/10% DP | $3,625,000 WITH 4% DP | $940,000 and 1% DP | 950000 | $ 200,000 | | |
| | | | | | | | | $ 175,000 | | |

Jay Manning:
PPE raised their price for BOP from $150k to $250k.
Includes eliminating the GE $1.4mm LTSA debt.

| Delta from Max | $700,000 | | $ 460,000 | $150,000 | $ 460,000 | | $ 150,000 | |
|---|---|---|---|---|---|---|---|---|
| LOI SIGNED | NO | NO | NO | NO | NO | NO | NO | PO ISSUED 5/13/19  PURCHASED 10/15/18 |
| NEGOT PSA | WAITING ON FINAL PSA VERSION FROM WS | DECISION MAY 10, SUBJECT TO BD MTG JUNE 18. | SIGNED | SIGN MAY 10 | SIGNED | DECISION MAY 10, SUBJECT TO BD MTG JUNE 18. | ASKING $1.3MM, 50% MAY, 50% JUNE | NET 100% 5/31/19 |
| | | | | | | | | 100 % PAID |

ATAER CALCS/UNIT

| | | | PERCENTAGE OF TOTAL | USED FOR CALC |
|---|---|---|---|---|
| NEW | $ | 3,400,000.00 | 79.07% | 80.00% |
| OLD | $ | 900,000.00 | 20.93% | 20.00% |
| | $ | 4,300,000.00 | | |
| LOI BOTH | $ | 4,700,000.00 | | |
| NEW LOI | $ | 3,760,000.00 | | |
| OLD LOI | $ | 940,000 | | |

NUH CALC/UNIT

| | | | PERCENTAGE OF TOTAL | USED FOR CALC |
|---|---|---|---|---|
| NUH 2 | $ | 2,300,000 | 42.75% | 42.00% |
| NUH 1 | $ | 3,080,000 | 57.25% | 58.00% |
| TOTAL | $ | 5,380,000 | | |
| LOI BOTH | $ | 6,250,000 | | |
| LOI NUH 2 | $ | 2,625,000 | | |
| LOI NUH 1 | $ | 3,625,000 | | |

**APP.138**

UNITS NOT PURCHASED FROM TURKEY

| | AS CEMENT | REASON PRICE TOO HIGH | | CERKEZKOY |
|---|---|---|---|---|
| | LM6000PC | | | LM6000PC |
| | NEW | | | 44,050 |
| | 191-610 | | | 191-540 |
| | 820207 | | | 812659 |
| | NEW | | | 44,050 |
| | BRUSH | | | BRUSH |
| | LUFKIN | | | FLENDER |
| | WW MICRONET | | | WW MICRONET |
| | NEW PACKAGE-NEVER INSTALLED | | | AVERAGE PACKAGE |
| | YES | | | YES |
| | NONE | | | EVAP |
| | FIN FAN | | | FIN FAN |
| | N/A | | | PERFORMED BY PRO-PER |
| | NEVER INSTALLED | | | NEEDING MOH |
| | $ 5,000,000.00 | | | $ 2,000,000.00 |
| | $ 4,750,000.00 | | | $ 2,000,000.00 |
| | $ 5,500,000.00 | | | $ 2,200,000.00 |
| | YES | | | NO |
| | YES | | | YES |
| | Yes | | | YES |
| | yes | | | YES |
| | No | | | no |
| | $9mm | | | $2.65mm/10% |
| | None | | | $2.35mm/1% |
| | **None** | | | **$2.5mm/1% subject to board approval** |
| | | | | |
| | | | | $ (300,000) |
| | NO | | | YES |

REASON
PE bought the unit

# EXHIBIT N

APP.141

**To:** Matthew Laterza[mlaterza@altapowerdev.com]
**From:** Travis West['/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=ea86f21b4dd84b83812645c4a778c8d8-twest_525a1']
**Sent:** Fri 2/8/2019 11:56:06 AM Central Standard Time
**Subject:** FW: List of Packages
**Attachment:** Aero Power Plants for sale_2019 V2.xlsx

CTG list

**From:** Christy Chapman <c.chapman@wattstock.com>
**Sent:** Friday, February 8, 2019 11:47 AM
**To:** Travis West <twest@altapowerdev.com>
**Subject:** List of Packages
Travis,
Please see attachment.
Thank you,
*Christy Chapman*
*Office Manager*
*Cell #281-235-7415*
*16415 Jacintoport Blvd*
*Houston, Texas 77015*
*c.chapman@wattstock.com*





CONFIDENTIAL

Alta 0030091

**LM6000 PACKAGES FOR SALE IN TURKEY**

| NOT FOR SALE | MAY BE FOR SALE | OWNED BY W/USE | | | | | | | | 43118 REVISED |
|---|---|---|---|---|---|---|---|---|---|---|

| Owner | COUNTRY | Technology | Configuration | QTY | Serial No. | Op.Hr Total | Op.Hr Since Last Major Maint. | Hours since HSE | Simple Cycle Price($) | COD | Last Op.Date | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cerkezkoy Energy | TURKEY | A6000 PC Sprint | Cogeneration | 1 | 191-540 | 43,000 | 18000 hours since HSE | 18,000 | 1,250,000 | 1-Oct-06 | 2014 | Preventive maintenance is performed regularly |
| Ugur Energy | TURKEY | A6000 PC Sprint | Combined Cycle | 1 | 191-647 | 23,000 | 0 | | 4,500,000 | 1-Jun-10 | 2014 | In addition to the price,there will be GE CSA termination fee for $1.5M.No Power at the site, no preventive maintenance |
| Nuh Energy | TURKEY | A6000 PC Sprint | Combined Cycle | 1 | 191-524 | 22,000 | 0 | | 6,000,000 | 1-May-05 | | |
| Nuh Energy | TURKEY | A6000 PC Sprint | Combined Cycle | 1 | 191-425 | 50,000 | 7000 hours after MOH at 43K hours | | 6,000,000 | 1-Jun-09 | 2014 | GE Overhauled the engine at 43K Op hour |
| Bosen Energy | TURKEY | A6000 PD Sprint | Combined Cycle | 1 | 191-530 | 56,000 | Unplanned HSE @38K hours | 18,000 | 3,000,000 | 1-Apr-05 | In Op | Decommissioned in mid Dec,201 |
| Bosen Energy | TURKEY | A6000 PD Sprint | Combined Cycle | 1 | 192-283 | 17,000 | Since new | | 9,000,000 | 1-Sep-11 | In Op | Decommissioned in mid Dec,201 |
| Bosen Energy | TURKEY | A6000 PC Sprint | Combined Cycle | 1 | 192-292 | | | | 9,000,000 | 1-Sep-11 | | |
| ATAER | TURKEY | LM6000PC | Simple cycle | 1 | 191-648 | 17,066 | Since new | | ?? | 1-Jun-05 | | |
| ATAER | TURKEY | LM6000PC | Simple cycle | 1 | 191-539 | | | | ?? | 1-Oct-98 | | |
| AS CEMENT | TURKEY | A6000PC | Simple cycle | 1 | 191-610 | - 0 | - 0 | never installed | 9,000,000 | 1-Jun-08 | In storage | Never been installed |
| ZORLU | TURKEY | A6000 PC Sprint | | 1 | 191-519 | 68,852 | 42,897 | 25955 | 8,000,000/4,000,000 | 1-May-05 | | |
| ZORLU | TURKEY | A6000 PC Sprint | | 1 | 191-519 | 68,852 | 42,897 | 25955 | 8,000,000/4,000,000 | 1-May-05 | | |
| AKSA | TURKEY | A6000 PC Sprint | Combined Cycle | 0 | | | | | | | | |
| AKSA | TURKEY | A6000 PC Sprint | Combined Cycle | 0 | | | | | | | | |
| AKSA | TURKEY | A6000 PD Sprint | Combined Cycle | 0 | | | | | | | | |
| AKSA | TURKEY | A6000 PC Sprint | Combined Cycle | 0 | | | | | | | | |
| ENTEK | TURKEY | A6000 PC Sprint | Combined Cycle | 0 | | | | | | | | |
| ENTEK | TURKEY | A6000 PC Sprint | Combined Cycle | 0 | | | | | | | | |
| ACARSOY | TURKEY | A6000 PC Sprint | | 1 | 191-716 | | HSE@25K | 18-Dec | 7,500,000 | | | |
| ORAZUL | ECUADOR | PA to PC | SC | 0 | 185-205 | 45,552 | 37,816 | 1,991 | 3,000,000 | 1-May-97 | | |
| ORAZUL | ECUADOR | PA to PC | SC | 0 | 185-122 | 56,301 | 45,110 | 3,814 | 3,000,000 | 1-Apr-96 | | |
| ORAZUL | ECUADOR | PA to PC | SC | 0 | 185-207 | 36,193 | 36,193 | 4,426 | 3,000,000 | 1-Jul-96 | | |
| ORAZUL | ECUADOR | PC | SC | 0 | 191-758 | 5,018 | | | 3,000,000 | | | |
| CERRO AZUL | PANAMA | NO ENGINE | No generator | 1 | | | | | | | | |
| BACONTON | USA | PC | SC | 0 | 185-224 | | | | | 1-Oct-96 | | |
| BACONTON | USA | PC | SC | 0 | 185-119 | | | | | 1-Jun-96 | | |
| BACONTON | USA | PC | SC | 0 | 191-199 | | | | | 1-Jul-00 | | |
| BACONTON | USA | PC | SC | 0 | 191-203 | | | | | 1-Aug-00 | | |
| ROCKLAND CAP | USA | PC | SC | 1 | 191-172 | | | | | 1-Mar-93 | | |
| ROCKLAND CAP | USA | PC | SC | 1 | 185-102 | | | | | 1-May-93 | | |
| EMPOWER | USA | PC | | 0 | 191-140 | | 56,022 | 33502 | | | | |
| EUROPE | EUROPE | PD | | 1 | ? | 45,388 | | | | 2001 | 2013 | |
| UNKNOWN | 50 HZ | PC | | 1 | ? | 13,417 | | | | 2010 | 2015 | |
| UNKNOWN | 50 HZ | PC | | 1 | ? | 22,000 | | | | | | |
| THERMO COGEN | USA | NO ENGINE | | 1 | 185-136 | | | | | 1-Mar-94 | | |
| Mighty River | New Zealand | NO ENGINE | | 0 | | | | | | | | |
| Mighty River | New Zealand | NO ENGINE | | 0 | | | | | | | | |
| Mighty River | New Zealand | NO ENGINE | | 0 | | | | | | | | |
| | | | W/O RED/YELLOW | 19 | | | | | | | | |
| | | | W/YELLOW | 35 | | | | | | | | |

# EXHIBIT O

To: Travis West[twest@altapowerdev.com]; Matthew Laterza[mlaterza@altapowerdev.com]
Cc: Pete Watson[p.watson@wattstock.com]; Andrew F. Herr[a.herr@wattstock.com]; Billy Tate[b.tate@wattstock.com]; Carsey Manning[c.manning@wattstock.com]; p.jenevein@wattstock.com[p.jenevein@wattstock.com]
From: j.manning@wattstock.com[j.manning@wattstock.com]
Sent: Thur 4/11/2019 1:13:27 PM Central Daylight Time
Subject: Status of Negotiations
Attachment: STATUS OF ALTA POWER SURPLUS LM6000 UNITS v6.xlsx

Pete's doing a great job: 3 down, 6 to go. All under Max offering.
For the AS Cemento new unit, if we are under the Max offering, we would like to increase our offer >$5mm. Thoughts?
Jay

From: j.manning@wattstock.com
Sent: Thursday, April 11, 2019 6:48 AM
To: Travis West (twest@altapowerdev.com) <twest@altapowerdev.com>; Matt Laterza (mlaterza@altapowerdev.com) <mlaterza@altapowerdev.com>
Cc: Pete Watson <p.watson@wattstock.com>; Andy Herr (a.herr@wattstock.com) <a.herr@wattstock.com>; Billy Tate (b.tate@wattstock.com) <b.tate@wattstock.com>; Carsey Manning <c.manning@wattstock.com>
Subject: RE: Alta Power Proposal for the Lufkin Site: 3 x LM6000 PC SPRINT GE TRUEpackages from WattStock
Travis, this is the proposal for the Lufkin site. Changes made to Paragraphs 4.1 and 4.5 and I removed the delivery schedule.
Everything else remains the same as the Jacksonville proposal.
Jay

From: j.manning@wattstock.com
Sent: Thursday, April 11, 2019 6:40 AM
To: Travis West (twest@altapowerdev.com) <twest@altapowerdev.com>; Matt Laterza (mlaterza@altapowerdev.com) <mlaterza@altapowerdev.com>
Cc: Pete Watson <p.watson@wattstock.com>; Andy Herr (a.herr@wattstock.com) <a.herr@wattstock.com>; Billy Tate (b.tate@wattstock.com) <b.tate@wattstock.com>; Carsey Manning <c.manning@wattstock.com>
Subject: RE: Alta Power Proposal for the Goodlow Site: 3 x LM6000 PC SPRINT GE TRUEpackages from WattStock
Travis, this is the proposal for the Goodlow site. Changes made to Paragraphs 4.1 and 4.5. Everything else remains the same as the Jacksonville proposal.
Jay

From: j.manning@wattstock.com
Sent: Wednesday, April 10, 2019 6:15 PM
To: Travis West (twest@altapowerdev.com) <twest@altapowerdev.com>; Matt Laterza (mlaterza@altapowerdev.com) <mlaterza@altapowerdev.com>
Cc: Pete Watson <p.watson@wattstock.com>; Andy Herr (a.herr@wattstock.com) <a.herr@wattstock.com>; Billy Tate (b.tate@wattstock.com) <b.tate@wattstock.com>; Carsey Manning <c.manning@wattstock.com>
Subject: Alta Power Proposal for the Jacksonville Site: 3 x LM6000 PC SPRINT GE TRUEpackages from WattStock
Travis, please see attached draft proposal for your review. Changes made defined below.
Goodlow and Lufkin to follow shortly.
Jay

From: j.manning@wattstock.com
Sent: Wednesday, March 27, 2019 2:19 PM
To: Travis West (twest@altapowerdev.com) <twest@altapowerdev.com>; Matt Laterza (mlaterza@altapowerdev.com) <mlaterza@altapowerdev.com>
Cc: Pete Watson <p.watson@wattstock.com>; Andy Herr (a.herr@wattstock.com) <a.herr@wattstock.com>
Subject: Proposal Review with Alta Power
Here are my notes. Please review and comment:

1. WS to make it clear that the proposal is the precedence over the t's and c's. Payment terms were pointed out: 6.1 vs 3.2. See Article 9 wording in the proposal. If this is not clear, please let me know what changes you would like to make.
2. Section 2.2: same control system at each site, but doesn't need to be all the same at all of the sites. JM changed wording.
3. 2.2.2: AP understands that there may be different generators, but don't want it stated. DH added additional wording.
4. 2.2.12: Don't know the difference in LPC only Sprint, so I will delete it because we have to install the system that gets them the output they desire. JM deleted sentence.
5. 2.2.13: Question on the amount of water supply. I will ask GE. Will be stated in the performance guarantee in Appendix B.
6. 2.2.17: Question on the supply pressure stated here: GE only needs 675psig. Will ask GE. Waiting for answer.
7. 2.3.2: No DCS so delete as to not confuse the lender's engineer. Done.
8. 2.3.4: Make it clear that we are providing engineering and interconnect drawing for our equipment including the PCM, but not the engineering for the actual interconnect of the equipment. JM changed wording.

1. Section 4: Agreed to the claw back. Need to come up with the claw back pricing for the second site if the third site is not built. Will be in Goodlow proposal.

2. Section 5: Jacksonville and Goodlow have the same COD of May 1, 2020. Lufkin delivery is to be days from effective date of contract. AP wants to make sure that the site delivery date of Feb 15, 2020 was from Craig and Pete. Confirmed that Pete and Craig discussed the delivery to site. DH made revisions in 5.3 regarding delays in Effective Date past June 1 for Jacksonville only. There should be no mention of the 2nd and third sites in this Jacksonville Proposal.
3. Section 6: Need that payments 1 and 2 are due upon submittal. The payment approval process will prevent immediate payment, but will be within 10 to 15 days. How do we handle the schedule if the purchase of the surplus units is delayed? DH has made revisions to Article 6 (Payment Terms). With respect to Jay's question about delays in purchasing the surplus units due to delays in Alta payment, the Proposal already covers that in Section 5.2 wherein it states "The delivery date for the first package is contingent upon the purchase of the surplus units and right to commence immediate removal by WattStock on or before May 1, 2019. Delivery may change if the date of purchase or right to remove is later than May 1, 2019."
4. Section 7: Want 5% hold back on performance test, but can't say how long after mech completion that may be due to waiting on ONCOR for the interconnect. Suggestions on how to handle this? JM inserted clause 7.1.
5. Appendix B: Confirming that it is a plant guaranteed performance not an individual GTG guarantee. Waiting on GE.
6. Appendix C: Need language that says proposal takes precedence. JM inserted suggested language.
7. Need proposals for all three sites. Said they will be identical except that Lufkin will have different delivery and pricing.

EXHIBIT
2026

CONFIDENTIAL

Alta 0006067

Jay C. Manning
WattStock LLC
16415 Jacintoport Blvd.
Houston, TX 77015
C: 713.248.4148
j.manning@wattstock.com www.wattstock.com



*******************************************************************************

This e-mail is the property of WattStock LLC and/or its relevant affiliate and contains confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender or reply to WattStock LLC at Webmaster@wattstock.com and delete all copies of the message. This e-mail (and any attachments hereto) are not intended to be an offer (or an acceptance) and do not create or evidence a binding and enforceable contract between WattStock LLC (or any of its affiliates) and the intended recipient or any other party, and may not be relied on by anyone as the basis of a contract by estoppel or otherwise. Thank you.

# DOCUMENT PRODUCED IN NATIVE FORMAT

**APP.147**

CONFIDENTIAL

Alta 0006069

This spreadsheet is the property of WattStock LLC. It may not be distributed or copied to anyone outside of Alta Power LLC and is confidential information per the executed NDA dated 8 May 2018 between WattStock LLC and Alta Power LLC.



**ALTA POWER SURPLUS PACKAGES**                         **TURKEY UNITS**

| PLANT NAME | AS CEMENT | ACARSOY | ATAER GT2 (NEW) | NUH GT2 | BOSEN GT1 (PC) | NUH GT1 | CERKEZKOY | ATAER GT1 (OLD) | ZORLU | |
|---|---|---|---|---|---|---|---|---|---|---|
| GT TYPE | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | |
| PACKAGE OP HOUR | NEW | 8,774 | 26,333 | 21,255 | 52,612 | 50,281 | 44,050 | 101,410 | 120,000 | |
| ESN | 191-610 | 191-716 | 191-648 | 191-625 | 191-530 | 191-524 | 191-540 | 191-539 | 191-124 | |
| PACKAGE S/N | 820007 | 821305 | 820458 | 820208 | 812537 | 812523 | 812659 | 808466 | 809393 | |
| GT OP HOUR | NEW | 8,774 | 26,333 | 21,255 | 52,612 | 50,281 | 44,050 | 59,836 | 82,200 | |
| GENERATOR TYPE | BRUSH | MEDINSHA | MEDINSHA | BRUSH | BRUSH | BRUSH | BRUSH | BRUSH | BRUSH | |
| GEAR-BOX TYPE | LUFKIN | FLENDER | FLENDER | FLENDER | LUFKIN | LUFKIN | FLENDER | LUFKIN | LUFKIN | |
| CONTROL SYSTEM | WW MICRONET | WW MICRONET | WW MICRONET | WW MICRONET | WW MICRONET | MARK VI | WW MICRONET | WW MICRONET | NETCON 5000 | |
| PACKAGE INSPECTION/COMM ENTS | NEW PACKAGE-NEVER INSTALLED | IN VERY GOOD CONDITION-ALMOST NEW | IN GOOD CONDITION | IN GOOD CONDITION | AVERAGE PACKAGE | AVERAGE PACKAGE | AVERAGE PACKAGE | OLD 565 PACKAGE | S&S PACKAGE IN BAD CONDITION | |
| CHILLER | NONE | EVAP | CHILLER | EVAP | EVAP | CHILLER | EVAP | CHILLER | EVAP | |
| LUBE OIL COOLER | FIN FAN | FIN-FAN | FIN FAN | SHELL & TUBE | SHELL & TUBE | FIN FAN | FIN FAN | FIN FAN | FIN FAN | |
| BSI | N/A | Performed by Pro-Per | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | |
| COMMENTS | NEVER INSTALLED | N/A | HSE BY TCT CRACK ON LPT SHROUD | NEEDING HSE | ZORLU-HSE CHROMALLOY PARTS | AROUND 7K HOURS AFTER GE MOH | NEEDING MOH | N/A | MOHBY CROMALLOY, HSE @75K HOURS, ISSUES WITH B.SE SUMP | |
| OFFER PRICE | $ 5,000,000.00 | $ 7,000,000.00 | $ 3,600,000.00 | $ 3,300,000.00 | $ 2,500,000.00 | $ 2,800,000.00 | $ 2,000,000.00 | $ 1,000,000.00 | | $ 28,200,000.00 |
| Offer Letter Price | $ 4,750,000.00 | $ 6,700,000.00 | $ 3,400,000.00 | $ 3,000,000.00 | $ 2,300,000.00 | $ 2,500,000.00 | $ 2,000,000.00 | $ 900,000.00 | $ 850,000.00 | $ 26,400,000.00 |
| Offer Price Max | $ 5,500,000.00 | $ 7,700,000.00 | $ 3,960,000.00 | $ 3,630,000.00 | $ 2,750,000.00 | $ 3,080,000.00 | $ 2,200,000.00 | $ 1,100,000.00 | $ 1,100,000.00 | $ 31,020,000.00 |
| MNDA SIGNED | YES | YES | YES | YES | YES | YES | NO | Jay Manning: Declined to sign NDA, but wants to receive the offer letter. | NO | |
| OL sent to AP | YES | YES | YES | YES | YES | YES | YES | | YES | |
| Offer letter Approval | Yes | YES | YES | YES | YES | YES | YES | | | |
| Offer letter received | yes | YES | YES | YES | YES | YES | YES | YES | | |
| Offer accepted | | no | | no | | | | | | |
| Owner Counter Offer | | $9mm | | $11mm for both units | | $11mm for both units | | Jay Manning: PPE raised their price for BOP from $150k to $250k. Includes eliminating the GE $1.4mm LTSA debt. | | |
| WS/AP Counter Offer | | $6.8mm | | 6.1mm | | 6.1mm | | | | |
| Agreed upon price | | $7mm plus $500k for canc fee | | $6.250 for both units | | $6.250 for both units | | | | |
| Delta from Max | | $700k or $200k | | $ 460,000 | | $ 460,000 | | | | |
| MEETING ACCEPTED | NO | YES | YES | YES | YES | YES | YES | YES | YES | |

# EXHIBIT P

APP.151

**To:** Matthew Laterza[mlaterza@altapowerdev.com]; Pete Watson[p.watson@wattstock.com]; Andrew F. Herr[a.herr@wattstock.com]
**Cc:** p.jenevein@wattstock.com[p.jenevein@wattstock.com]; Travis West[twest@altapowerdev.com]
**From:** j.manning@wattstock.com[j.manning@wattstock.com]
**Sent:** Tue 4/16/2019 8:32:01 AM Central Daylight Time
**Subject:** Status of Negotiations
**Attachment:** STATUS OF ALTA POWER SURPLUS LM6000 UNITS v7.xlsx

Pete successfully negotiated the purchase of 5 of the 9 units. We actually only tried for 7 because AS CEMENTO would not come off of $9mm asking price, and Zorlu wants $3mm for their package which is way too high as it is not in good shape.
ACARSOY, NUH and 1 and 2, Bosen, Cerkezkoy are done. We will begin negotiating the purchase agreement for these units. **Matt, have you reviewed the doc?**
We will negotiate with Ataer on Tuesday, April 23 for their two units.
Leaves us two short if we can purchase the Ataer units, and the indication is that we will be successful.
We have Ethos and Panama plus the two IHI packages if we need them. We are actively looking for more units.
Regards,
Jay C. Manning
WattStock LLC
16415 Jacintoport Blvd.
Houston, TX 77015
C: 713.248.4148
j.manning@wattstock.com www.wattstock.com



\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail is the property of WattStock LLC and/or its relevant affiliate and contains confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender or reply to WattStock LLC at Webmaster@wattstock.com and delete all copies of the message. This e-mail (and any attachments hereto) are not intended to be an offer (or an acceptance) and do not create or evidence a binding and enforceable contract between WattStock LLC (or any of its affiliates) and the intended recipient or any other party, and may not be relied on by anyone as the basis of a contract by estoppel or otherwise. Thank you.

EXHIBIT

2017
10-15-22  PSA
**APP.152**

Alta 0004855

# DOCUMENT PRODUCED IN NATIVE FORMAT

**APP.153**

CONFIDENTIAL

Alta 0004856

This spreadsheet is the property of WattStock LLC.  It may not be distributed or copied to anyone outside of Alta Power LLC and is confidential information per the executed NDA dated 8 May 2018 between WattStock LLC and Alta Power LLC.



## WattStock
KNOWLEDGE. POWER. SECURITY.

**ALTA POWER SURPLUS PACKAGES**          **TURKEY UNITS**

Conf Call April 23

| PLANT NAME | AS CEMENT | ACARSOY | ATAER GT2 (NEW) | NUH GT2 | BOSEN GT1 (PC) | NUH GT1 | CERKEZKOY | ATAER GT1 (OLD) | ZORLU |
|---|---|---|---|---|---|---|---|---|---|
| GT TYPE | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC |
| PACKAGE OP HOUR | NEW | 8,774 | 26,333 | 21,255 | 52,612 | 50,281 | 44,050 | 101,410 | 120,000 |
| ESN | 191-610 | 191-716 | 191-648 | 191-625 | 191-530 | 191-524 | 191-540 | 191-539 | 191-124 |
| PACKAGE S/N | 820207 | 821305 | 820458 | 820208 | 812537 | 812523 | 812659 | 808466 | 809393 |
| GT OP HOUR | NEW | 8,774 | 26,333 | 21,255 | 52,612 | 50,281 | 44,050 | 59,836 | 82,200 |
| GENERATOR TYPE | BRUSH | MEDINGHA | MEDINGHA | BRUSH | BRUSH | BRUSH | BRUSH | BRUSH | BRUSH |
| GEAR-BOX TYPE | LUFKIN | FLENDER | FLENDER | FLENDER | LUFKIN | LUFKIN | FLENDER | LUFKIN | LUFKIN |
| CONTROL SYSTEM | WW MICRONET | WW MICRONET | WW MICRONET | WW MICRONET | WW MICRONET | MARK VI | WW MICRONET | WW MICRONET | NETCON 5000 |
| PACKAGE INSPECTION/COMM ENTS | NEW PACKAGE-NEVER INSTALLED | IN VERY GOOD CONDITION-ALMOST NEW | IN GOOD CONDITION | IN GOOD CONDITION | AVERAGE PACKAGE | AVERAGE PACKAGE | AVERAGE PACKAGE | OLD S&S PACKAGE | S&S PACKAGE IN BAD CONDITION |
| SPRINT | YES | YES | YES | YES | YES (LP SPRINT ONLY) | YES | YES | YES | YES |
| CHILLER | NONE | EVAP | CHILLER | EVAP | EVAP | CHILLER | EVAP | CHILLER | EVAP |
| LUBE OIL COOLER | FIN FAN | FIN FAN | FIN FAN | SHELL & TUBE | SHELL & TUBE | FIN FAN | FIN FAN | FIN FAN | FIN FAN |
| BSI | N/A | Performed by Pro-Per | PERFORMED BY PRO-PER | NEEDING HSE | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER |
| COMMENTS | NEVER INSTALLED | N/A | HSE BY TCT CRACK ON LPT SHROUD | NEEDING  HSE | ZORLU-HSE CHROMALLOY PARTS | AROUND 7K HOURS AFTER CE MOH | NEEDING MOH | N/A | VOHBY CROMALLOY, HSE @754 HOURS, ISSUES WITH BLDE SUMP |
| OFFER PRICE | $ 5,000,000.00 | $ 7,000,000.00 | $ 3,300,000.00 | $ 3,300,000.00 | $ 2,500,000.00 | $ 2,800,000.00 | $ 2,000,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | 28,200,000.00 |
| Offer Letter Price | $ 4,750,000.00 | $ 6,700,000.00 | $ 3,400,000.00 | $ 3,000,000.00 | $ 2,300,000.00 | $ 2,500,000.00 | $ 2,000,000.00 | $ 900,000.00 | $ 850,000.00 | 26,400,000.00 |
| Offer Price Max | $ 5,500,000.00 | $ 7,700,000.00 | $ 3,960,000.00 | $ 3,630,000.00 | $ 2,750,000.00 | $ 3,080,000.00 | $ 2,200,000.00 | | $ 1,100,000.00 | 31,020,000.00 |
| MNDA SIGNED | YES | YES | YES | YES | YES | YES | NO | YES | NO |
| OL sent to AP | YES | YES | YES | YES | YES | YES | YES | YES | YES |
| Offer letter Approved | Yes | YES | YES | YES | YES | YES | YES | | Yes |
| Offer letter received | yes | YES | YES | YES | YES | YES | YES | YES | Yes |
| Offer accepted | No | no | | no | no | no | no | | no |
| Owner Counter Offer | $9mm | $9mm | | $11mm for both units | $3mm | $11mm for both units | $2.65mm/10% | | $3mm |
| WS/AP Counter Offer | None | $6.8mm | | 6.1mm | $2.3mm | 6.1mm | $2.35mm/1% | | $1mm |
| Agreed upon price | None | $7mm plus $500k for canc fee | | $6.250 for both units | $2.6mm w/10% DP | $6.250 for both units | $2.5mm/1% subject to board approval | | None |
| Delta from Max | | $700k or $200k | | $ 460,000 | $150,000 | $ 460,000 | over by $300k | | |
| MEETING ACCEPTED | NO | YES | YES | YES | YES | YES | YES | YES | YES |

*Jay Manning: Declined to sign NDA, but wants to receive the offer letter.*

*Jay Manning: PPE raised their price for BOP from $150k to $250k. Includes eliminating the GE $1.4mm LTSA debt.*

# EXHIBIT Q

**To:** Matthew Laterza[mlaterza@altapowerdev.com]; Travis West[twest@altapowerdev.com]
**Cc:** Pete Watson[p.watson@wattstock.com]; Andrew F. Herr[a.herr@wattstock.com]; Donald Brunswick[d.brunswick@wattstock.com]
**From:** j.manning@wattstock.com[j.manning@wattstock.com]
**Sent:** Thur 5/9/2019 3:24:44 PM Central Standard Time
**Subject:** FW: Update
**Attachment:** STATUS OF ALTA POWER SURPLUS LM6000 UNITS v9.xlsx

See note below and updated spreadsheet. Almost there.
Zorlu wants us to make an offer on their second unit.
Jay

**From:** Abdullah Kurt [mailto:abdullah@pro-per.net]
**Sent:** Thursday, May 9, 2019 3:19 PM
**To:** Pete Watson <p.watson@wattstock.com>; j.manning@wattstock.com
**Subject:** Update

Pete, Jay,
Update of today.

- NUH CEMENT: They just called me and informed that they signed the contract. I will get the signed copy tomorrow afternoon.
- BOSEN: I sent the revised PSA from Dave yesterday. They called me today. They have two comments they said. No major stuff. We will get the track changed version tomorrow.
- ACARSOY: Waiting revised PSA from Jay and Dave.
- ATAER: Tomorrow, they will tell me their min price to sell. But, they also told me even if they agree on the price, their(Organized Zone) general assembly has to approve the sale which is scheduled to hold on June 18th.
- ZORLU: They ask for $1.3M and asks us to pay before July (%50 in May, %50 in June). They also asked to inspect their other unit and offer a price. My team will inspect it on Monday. After the inspection, we can talk about possible options to purchase both.

Regards,
Apo

EXHIBIT
20 30
APP 159  22  PE4

Alta 0003486

**DOCUMENT PRODUCED IN NATIVE FORMAT**

APP.158

Alta 0003487

This spreadsheet is the property of WattStock LLC.  It may not be distributed or copied anyone outside of Alta Power LLC and is confidential information per the executed ND/ 8 May 2018 between WattStock LLC and Alta Power LLC.

**to**

**dated**



**ALTA POWER SURPLUS PACKAGES**          **TURKEY UNITS**

| PLANT NAME | ACARSOY | ATAER GT2 (NEW) | NUH GT2 | BOSEN GT1 (PC) | NUH GT1 | ATAER GT1 (OLD) | ZORLU | |
|---|---|---|---|---|---|---|---|---|
| GT TYPE | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | |
| PACKAGE OP HOUR | 8,774 | 26,333 | 21,255 | 52,612 | 50,281 | 101,410 | 120,000 | |
| ESN | 191-716 | 191-648 | 191-625 | 191-530 | 191-524 | 191-539 | 191-124 | |
| PACKAGE S/N | 821305 | 820458 | 820208 | 812537 | 812523 | 808466 | 809393 | |
| GT OP HOUR | 8,774 | 26,333 | 21,255 | 52,612 | 50,281 | 59,836 | 82,200 | |
| GENERATOR TYPE | MEDINSHA | MEDINSHA | BRUSH | BRUSH | BRUSH | BRUSH | BRUSH | |
| GEAR-BOX TYPE | FLENDER | FLENDER | FLENDER | LUFKIN | LUFKIN | LUFKIN | LUFKIN | |
| CONTROL SYSTEM | WW MICRONET | WW MICRONET | WW MICRONET | WW MICRONET | MARK VI | WW MICRONET | NETCON 5000 | |
| PACKAGE INSPECTION/COMMENTS | IN VERY GOOD CONDITION-ALMOST NEW | IN GOOD CONDITION | IN GOOD CONDITION | AVERAGE PACKAGE | AVERAGE PACKAGE | OLD 565 PACKAGE | S&S PACKAGE IN BAD CONDITION | |
| SPRINT | YES | YES | YES | YES (LP SPRINT ONLY) | YES | YES | YES | |
| CHILLER | EVAP | CHILLER | EVAP | EVAP | CHILLER | CHILLER | EVAP | |
| LUBE OIL COOLER | FIN-FAN | FIN FAN | SHELL & TUBE | SHELL & TUBE | FIN FAN | FIN FAN | FIN FAN | |
| BSI | Performed by Pro-Per | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | |
| COMMENTS | N/A | HSE BY TCT CRACK ON LPT SHROUD | NEEDING  HSE | ZORLU-HSE CHROMALLOY PARTS | AROUND 7K HOURS AFTER GE MOH | N/A | MOHBY CROMALLOY, HSE @75K HOURS, ISSUES WITH B,DE SUMP | |
| OFFER PRICE | $ 7,000,000.00 | $ 3,600,000.00 | $ 3,300,000.00 | $ 2,500,000.00 | $ 2,800,000.00 | $ 1,000,000.00 | $ 1,000,000.00 | $ 21,200,000.00 |
| Offer Letter Price | $ 6,700,000.00 | $ 3,400,000.00 | $ 3,000,000.00 | $ 2,300,000.00 | $ 2,500,000.00 | $ 900,000.00 | $ 850,000.00 | $ 19,650,000.00 |
| Offer Price Max | $ 7,700,000.00 | $ 3,960,000.00 | $ 3,630,000.00 | $ 2,750,000.00 | $ 3,080,000.00 | $ 1,100,000.00 | $ 1,100,000.00 | $ 23,320,000.00 |
| MNDA SIGNED | YES | YES | YES | YES | YES | YES | NO | |
| OL sent to AP | YES | YES | YES | YES | YES | YES | YES | |
| Offer letter Approved | YES | YES | YES | YES | YES | YES | Yes | |
| Offer letter received | YES | YES | YES | YES | YES | YES | Yes | |
| Offer accepted | no | | no | no | no | | no | |
| Owner Counter Offer | $9mm | | $11mm for both units | $3mm | $11mm for both units | | $3mm | |
| WS/AP Counter Offer | $6.8mm | | 6.1mm | $2.3mm | 6.1mm | | $850k | |

| Agreed upon price per unit based on LOI | $7mm plus $500k for canc fee | $3,760,000 and 1% DP | $2,625,000 WITH 4% DP | $2.6mm w/10% DP | $3,625,000 WITH 4% DP | $940,000 and 1% DP | 950000 | $ | 19,300,000 |
|---|---|---|---|---|---|---|---|---|---|
| Delta from Max | $700,000 | | $ 460,000 | $150,000 | $ 460,000 | | $ 150,000 | $ | 1,770,000 |
| LOI SIGNED | NO | NO | NO | NO | NO | NO | NO | | |
| NEGOT PSA | WAITING ON FINAL PSA VERSION FROM WS | DECISION MAY 10, SUBJECT TO BD MTG JUNE 18. | SIGNED | SIGN MAY 10 | SIGNED | DECISION MAY 10, SUBJECT TO BD MTG JUNE 18. | ASKING $1.3MM, 50% MAY, 50% JUNE | | |

**ATAER CALCS/UNIT**

|  |  | | PERCENTAGE OF TOTAL | USED FOR CALC | |
|---|---|---|---|---|---|
| NEW | $ | 3,400,000.00 | 79.07% | 80.00% | |
| OLD | $ | 900,000.00 | 20.93% | 20.00% | |
| | $ | 4,300,000.00 | | | |
| LOI BOTH | $ | 4,700,000.00 | | | |
| NEW LOI | $ | 3,760,000.00 | | | |
| OLD LOI | $ | 940,000 | | | |

Jay Manning:
PPE raised their price for BOP from $150k to $250k.
Includes eliminating the GE $1.4mm LTSA debt.

**NUH CALC/UNIT**

|  |  | | PERCENTAGE OF TOTAL | USED FOR CALC |
|---|---|---|---|---|
| NUH 2 | $ | 2,300,000 | 42.75% | 42.00% |
| NUH 1 | $ | 3,080,000 | 57.25% | 58.00% |
| TOTAL | $ | 5,380,000 | | |
| LOI BOTH | $ | 6,250,000 | | |
| LOI NUH 2 | $ | 2,625,000 | | |
| LOI NUH 1 | $ | 3,625,000 | | |

**APP.162**

UNITS NOT PURCHASED FROM TURKEY

| | REASON<br>PRICE TOO HIGH | |
| --- | --- | --- |
| AS CEMENT | | CERKEZKOY |

| AS CEMENT | CERKEZKOY |
| --- | --- |
| LM6000PC | LM6000PC |
| NEW | 44,050 |
| 191-610 | 191-540 |
| 820207 | 812659 |
| NEW | 44,050 |
| BRUSH | BRUSH |
| LUFKIN | FLENDER |
| WW MICRONET | WW MICRONET |
| NEW PACKAGE-NEVER INSTALLED | AVERAGE PACKAGE |
| YES | YES |
| NONE | EVAP |
| FIN FAN | FIN FAN |
| N/A | PERFORMED BY PRO-PER |
| NEVER INSTALLED | NEEDING MOH |
| $   5,000,000.00 | $   2,000,000.00 |
| $   4,750,000.00 | $   2,000,000.00 |
| $   5,500,000.00 | $   2,200,000.00 |
| YES | NO |
| YES | YES |
| Yes | YES |
| yes | YES |
| No | no |
| $9mm | $2.65mm/10% |
| None | $2.35mm/1% |
| **None** | **$2.5mm/1% subject to board approval** |
| | **$        (300,000)** |
| NO | YES |

REASON
PE bought the unit

# EXHIBIT R

**To:** Matthew Laterza[mlaterza@altapowerdev.com]: Travis West[twest@altapowerdev.com]
**Cc:** Andrew F. Herr[a.herr@wattstock.com]; Pete Watson[p.watson@wattstock.com]
**From:** j.manning@wattstock.com[j.manning@wattstock.com]
**Sent:** Sat 6/22/2019 9:23:44 AM Central Standard Time
**Subject:** Alta Surplus Units Update and Payments Made/Due
**Attachment:** STATUS OF ALTA POWER SURPLUS LM6000 UNITS v18.xlsx

| ALTA POWER INVOICE NUMBERS BY SITE | | | | |
|---|---|---|---|---|
| INVOICE PAID | INVOICE NOT SENT | | INVOICE SENT | |
| | INVOICE NO. | INVOICE DATE | DESCRIPTION | |
| JACKSONVILLE (JKSV) | | | | |
| | AP-030519-JKSV-001, Rev 0 | 17-May-19 | DP for Nuh two units | |
| | AP-030519-JKSV-001, Rev 1 | 10-Jun-19 | Balance due on DP for Nuh two units | |
| | AP-030519-JKSV-002, Rev 0 | 10-Jun-19 | Attorney's fees for the escrow for Acarsoy | |
| | AP-030519-JKSV-003, Rev 0 | 10-Jun-19 | DP for Acarsoy one unit | |
| | AP-030519-JKSV-005, Rev 0 | | Balance due on DP for Acarsoy | |
| | AP-030519-JKSV-004, Rev 0 | 14-Jun-19 | DP for ATAER two units | |
| | | | | |
| GOODLOW (GDLW) | AP-030519-GDLW-001, Rev 0 | 6/10/2019 | DP for the Bosen unit | |
| | AP-030519-GDLW-002, Rev 0 | 6/10/2019 | Attorney's fees for the escrow for Bosen | |
| | AP-030519-GDLW-003, Rev 0 | | Balance due on Bosen | |
| | | | | |
| LUFKIN (LFKN) | AP-030519-LFKN-001, Rev 0 | 29-May-19 | DP for Ethos one unit | |
| | AP-030519-LFKN-001, Rev 1 | 10-Jun-19 | Corrected invoice amount and invoiced the balance due. | |
| | AP-030519-LFKN-002, Rev 0 | 14-Jun-19 | Total Amount for the Panama unit | |

**EXHIBIT**
2032
APP.166   _JBSO_  _REA-_

Alta 0029639

# DOCUMENT PRODUCED IN NATIVE FORMAT

**APP.167**

CONFIDENTIAL

Alta 0029640

This spreadsheet is the property of WattStock LLC.  It may not be distributed or copied to anyone outside of Alta Power LLC and is confidential information per the executed NDA dated 8 May 2018 between WattStock LLC and Alta Power LLC.

| ALTA POWER SURPLUS PACKAGES | | | | TURKEY UNITS | | | | |
|---|---|---|---|---|---|---|---|---|
| PLANT NAME | ACARSOY | NUH GT2 | NUH GT1 | ATAER GT2 (NEW) | BOSEN GT1 (PC) | Zorlu No. 2 | ATAER GT1 (OLD) | ETHOS | PANAMA |
| ORIENTATION | RIGHT | RIGHT | RIGHT | LEFT | LEFT | LEFT | RIGHT | LEFT | LEFT |
| SITE | JCKSVL | JCKSVL | JCKSVL | GDLW | GDLW | GDLW | LFK | LFK | LFK |
| GT TYPE | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PC | LM6000PA | LM6000PC |
| PACKAGE OP HOUR | 8,774 | 21,255 | 50,281 | 26,333 | 52,612 | 28700 | 101,410 | | |
| ESN | 191-716 | 191-625 | 191-524 | 191-648 | 191-530 | 191-519 | 191-539 | NONE | NONE |
| PACKAGE S/N | 821305 | 820208 | 812523 | 820458 | 812537 | | 808466 | | |
| GT OP HOUR | 8,774 | 21,255 | 50,281 | 26,333 | 52,612 | 28700 | 59,836 | | |
| GENERATOR TYPE | MEDINSHA | BRUSH | BRUSH | MEDINSHA | BRUSH | BRUSH 914331.010 | BRUSH | BRUSH | NONE |
| GEAR-BOX TYPE | FLENDER | FLENDER | FLENDER | LUFKIN | FLENDER | LUFKIN | LUFKIN | NONE | NONE |
| CONTROL SYSTEM | WW MICRONET | WW MICRONET | MARK VI | WW MICRONET | WW MICRONET | LUFKIN 120055 | WW MICRONET | NONE | NONE |
| PACKAGE INSPECTION/COMM ENTS | IN VERY GOOD CONDITION ALMOST NEW | IN GOOD CONDITION | AVERAGE PACKAGE | IN GOOD CONDITION | AVERAGE PACKAGE | GOOD | OLD 565 PACKAGE | | |
| SPRINT | YES | YES | YES | YES | YES (LP SPRINT ONLY) | YES | YES | | |
| CHILLER | EVAP | EVAP | CHILLER | CHILLER | EVAP | NO | CHILLER | | |
| LUBE OIL COOLER | FIN FAN | FIN FAN | SHELL & TUBE | FIN FAN | SHELL & TUBE | | FIN FAN | | |
| BSI | Performed by Pro-Per | PERFORMED BY PRO-PER | FIN FAN | PERFORMED BY PRO-PER | PERFORMED BY PRO-PER | PRO-PER | PERFORMED BY PRO-PER | N/A | |
| COMMENTS | N/A | NEEDING  HSE | AROUND 7K HOURS AFTER GE MOH | HSE BY TCT CRACK ON LPT SHROUD | ZORLU-HSE CHROMALLOY PARTS | SEE REPORT | N/A | | |
| OFFER PRICE | $ 7,000,000.00 | $ 3,300,000.00 | $ 2,800,000.00 | $ 3,600,000.00 | $ 2,500,000.00 | $ 2,500,000 | $ 1,000,000.00 | | |
| Offer Letter Price | $ 6,700,000.00 | $ 3,000,000.00 | $ 2,500,000.00 | $ 3,400,000.00 | $ 2,300,000.00 | $ 2,500,000 | $ 900,000.00 | | |
| Offer Price Max | $ 7,700,000.00 | $ 3,630,000.00 | $ 3,080,000.00 | $ 3,960,000.00 | $ 2,750,000.00 | $ 2,800,000 | $ 1,100,000.00 | Jay Manning: PFE raised their price for BOP from $150k to $250k. Includes eliminating the GE $1.4mm LTSA debt. | |
| MNDA SIGNED | YES | YES | YES | YES | YES | NO | YES | | |
| OL sent to AP | YES | YES | YES | YES | YES | VERBAL | YES | | |
| Offer letter Approval | YES | YES | YES | YES | YES | YES | YES | | |
| Offer letter received | YES | YES | YES | YES | YES | NO | YES | | |
| Offer accepted | no | no | | no | | | | | |
| Owner Counter Offer | $9mm | $11mm for both units | $11mm for both units | | | | | | |
| WS/AP Counter Offer | $6.8mm | 6.1mm | 6.1mm | | $2.3mm | | | | |
| Agreed upon price per unit based on LOI | $7mm plus $500k for canc fee | $2,625,000 WITH 4% DP | $3,625,000 WITH 4% DP | $3,760,000 and 1% DP | $2.6mm w/10% DP | $940,000 and 1% DP | $ 200,000 | $ 175,000 | |
| Delta from Max | $700,000 | $ 460,000 | $ 460,000 | | $150,000 | | | | |
| LOI SIGNED | NO | NO | NO | NO | NO | NO | PO ISSUED 5/13/19 | PURCHASED 10/15/18 | |
| NEGOT PSA | WAITING ON FINAL PSA VERSION FROM WS | SIGNED | SIGNED | DECISION MAY 17, SUBJECT TO BD MTG JUNE 18. | SIGN MAY 10 | | DECISION MAY 17, SUBJECT TO BD MTG JUNE 18. | NET 100% 5/31/19 | 100 % PAID |

**APP.169**

| ATAER CALCS/UNIT | | | USED FOR CALC | | PERCENTAGE OF TOTAL | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NEW | $ | 3,400,000.00 | | | 79.07% | 80.00% | | | | | | |
| OLD | $ | 900,000.00 | | | 20.93% | 20.00% | | | | | | |
| | $ | 4,300,000.00 | | | | | | | | | | |
| LOI BOTH | $ | 4,700,000.00 | | | | | | | | | | |
| NEW LOI | $ | 3,760,000.00 | | | | | | | | | | |
| OLD LOI | $ | 940,000 | | | | | | | | | | |
| | | | | | | | | | | | | |
| NUH CALC/UNIT | | | | | PERCENTAGE OF TOTAL | USED FOR CALC | | | | | | |
| NUH 2 | $ | 2,300,000 | | | 42.75% | 42.00% | | | | | | |
| NUH 1 | $ | 3,080,000 | | | 57.25% | 58.00% | | | | | | |
| TOTAL | $ | 5,380,000 | | | | | | | | | | |
| LOI BOTH | $ | 6,250,000 | | | | | | | | | | |
| LOI NUH 2 | $ | 2,625,000 | | | | | | | | | | |
| LOI NUH 1 | $ | 3,625,000 | | | | | | | | | | |
| | | | | | | | | | | | | |

**APP.170**

**ALTA POWER**

## TURKEY PACKAGE NEGOTIATIONS/PAYMENTS — TURKEY UNITS

| PLANT NAME | ACARSOY | NUH GT2 | NUH GT1 | ATAER GT2 (NEW) | BOSEN GT1 (PC) | ETHOS | ATAER GT1 (OLD) | PANAMA | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ORIENTATION | RIGHT | RIGHT | RIGHT | LEFT | LEFT | LEFT | RIGHT | LEFT | | |
| SITE | JCKSVL | JCKSNVL | JCKSNVL | GDLW | GDLW | LFK | LFK | LFK | | |
| PRICE + DCS | $ 9,528,000 | $ 5,309,000 | $ 4,059,000 | $ 5,478,000 | $ 3,250,000 | $ 315,000 | $ 1,953,000 | $ 742,000 | $ 30,634,000 | |
| DOWN PAYMENT | $ 476,400 | $ 212,000 | $ 162,000 | $ 55,000 | $ 315,000 | $ - | $ 20,000 | NA | | |
| FINAL PAYMENT | $ 9,051,600 | $ 5,097,000 | $ 3,897,000 | $ 5,423,000 | $ 2,925,000 | $ 315,000 | $ 1,933,000 | $ - | | |
| PSA SIGNED | no est June 28 | Yes | Yes | No | Y | NA | No | NA | | |
| PSA DATE | | 17-May-19 | 17-May-19 | EST July 5 | 28-May-19 | NA | EST July 5 | NA | | |
| PSA DP PMT DATE | | 4-Jun-19 | 4-Jun-19 | 15-Jul-19 | 11-Jun-19 | NA | 15-Jul-19 | NA | | |
| PSA FINAL PMT DATE | | 1-Jul-19 | 1-Jul-19 | 1-Aug-19 | NA | NA | 1-Aug-19 | NA | | |
| LNTP SIGNED | | Y | Y | No | N | NA | No | NA | | |
| LNTP DATE | | 17-May-19 | 17-May-19 | | 29-May-19 | NA | | NA | | |
| ALTA PMT DUE DATE | 5-Jul | 30-May-19 | 30-May-19 | 9-Jul-19 | 7-Jun-19 | NA | 9-Jul-19 | 8/1/2019 | | |
| ALTA PMT COMPLETE | 1-Aug | | | 1-Aug-19 | | 7-Jun-19 | 1-Aug-19 | NA | | |
| DP TO OWNER COMPLETE | NO | YES | YES | NO | NO | NA | NO | NA | | |
| FINAL PAYMENT | NO | NO | NO | NO | NO | COMPLETE | NO | NO | | |

**APP.171**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

## GENERATOR CONFIGURATION COMPARISON

|  | OPTION I: | OPTION II | OPTION III |
|---|---|---|---|
|  | RE-GEAR | UNENCLOSED | REMOVE GB SKID/ENCLOSURE |
| SCHEDULE RISK H/M/L | M | H | L |
| COST/PACKAGE | $0 |  |  |
| COST INCREASE/DECREASE | IN QUOTE |  |  |

UNITS NOT PURCHASED FROM TURKEY

|  | REASON | |
|---|---|---|
| AS CEMENT | PRICE TOO HIGH | CERKEZKOY |

| AS CEMENT | CERKEZKOY |
|---|---|
| LM6000PC | LM6000PC |
| NEW | 44,050 |
| 191-610 | 191-540 |
| 820207 | 812659 |
| NEW | 44,050 |
| BRUSH | BRUSH |
| LUFKIN | FLENDER |
| WW MICRONET | WW MICRONET |
| NEW PACKAGE-NEVER INSTALLED | AVERAGE PACKAGE |
| YES | YES |
| NONE | EVAP |
| FIN FAN | FIN FAN |
| N/A | PERFORMED BY PRO-PER |
| NEVER INSTALLED | NEEDING MOH |
| $    5,000,000.00 | $    2,000,000.00 |
| $    4,750,000.00 | $    2,000,000.00 |
| $    5,500,000.00 | $    2,200,000.00 |
| YES | NO |
| YES | YES |
| Yes | YES |
| yes | YES |
| No | no |
| $9mm | $2.65mm/10% |
| None | $2.35mm/1% |
| **None** | **$2.5mm/1% subject to board approval** |
| | **$         (300,000)** |
| NO | YES |

REASON
PE bought the unit

# EXHIBIT S

**To:** 'Prashant Mupparapu'[prashant@owlrock.com]
**From:** Matthew Laterza[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8F6EED0B000C4F419C7E8DBD7C543FB2-MLATERZA_86]
**Sent:** Tue 9/3/2019 4:47:21 PM Central Daylight Time
**Subject:** RE: Alta / Owl Rock

Prashant,

We have about $10MM of equity invested by the principals (we don't have any outside LPs at this point) and our lead lender was contemplating an approximate ~$200MM debt facility.

Our projects are similar to Agilon in that they are LM6000 peakers in ERCOT, but we have a very different approach to execution. I'm happy to have a chat and run you through the differences if that would be helpful.

Biggest difference on the LT operational risk is that we are using GE to do the LM6000 rebuild and the rebuilt engines will have the same warranty, output and performance guarantees from GE as a new LM6000 would have. We're using Casey Industrial as our balance of plant EPC contractor (they've done 18 LM6000 installations in the US and have a strong balance sheet). And we will have a long term service agreement/engine lease pool arrangement with either GE or MTU.

Let me know if this helps or if additional color would be helpful.

Matt

**From:** Prashant Mupparapu <prashant@owlrock.com>
**Sent:** Tuesday, September 3, 2019 4:28 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Subject:** RE: Alta / Owl Rock

Thank you for the information and good to meet you.
What is the debt quantum you are contemplating?
Are these projects similar to Agilon/ Castleman?
How does one get comfortable with the LT operational risk on the equipment?

Regards,
Prashant.

## OWL ROCK

Managing Director, Infrastructure and Real Assets
Owl Rock Capital Partners
399 Park Avenue, 38th Floor,
New York, NY 10022
prashant@owlrock.com
212.419.3086

**From:** Matthew Laterza <mlaterza@altapowerdev.com>
**Sent:** Tuesday, September 3, 2019 5:03 PM
**To:** Prashant Mupparapu <prashant@owlrock.com>
**Subject:** RE: Alta / Owl Rock

Matt,

Thanks for the intro and moving you to BCC.

Prashant,

Nice to meet you over email.

We are developing three natural gas fired peaking power plants in ERCOT (150 MW each for a total of 450 MW). We were all set to close on a unitranche financing, but our lead bank had some internal institutional issues arise a couple of days ago and they are now on hold pending some kind of resolution. This has created an opportunity for someone to step into a fully baked deal that is ready to close in only a couple of weeks. Matt mentioned you might have interest in taking a look at the deal. Below is a brief summary of the project highlights:

• Plants will use grey market equipment refurbished by the OEM (GE) with warranty, output and performance guarantees from the OEM
• Turnkey EPC costs of ~$400 / kW vs. ~$950 / kW for newbuilds
• Contracted cash flows from a 5 year offtake contract with an investment grade counterparty plus ancillary services revenue from ERCOT covering a majority of project costs
• Plants will be capable of <10 min start and black start capable enabling participation in full range of ancillary services markets
• Total project costs of ~$200MM

We need to move quickly if we are going to make the summer 2020 run in ERCOT. We're fairly ready to close on our side as we have an independent engineering report being delivered tomorrow, fully baked White & Case credit docs, W&C fully reviewed all major contracts and is finalizing their legal diligence report, etc. Let me know if this is something you have interest in discussing further. I'm available just about any time to have a chat.

Thanks,
Matt Laterza
Matthew E. Laterza
Chief Financial Officer
Alta Power Ltd.
4605 Post Oak Place Dr. Suite 270
Houston, TX 77027
(o) 832.397.6939
(f) 832.356.5202
(m) 713.859.9770
(e) mlaterza@altapowerdev.com

**From:** Matt DeNichilo <mdenichilo@ecpartners.com>
**Sent:** Tuesday, September 3, 2019 3:59 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>; Prashant Mupparapu <prashant@owlrock.com>
**Subject:** Alta / Owl Rock

Matt, Prashant,
I wanted to connect you guys per my separate conversations with each of you. Feel free to drop me from the emails and connect directly.

Best,



EXHIBIT 2040
WIT:
DATE: 10-15-22
Pat E. Arredondo, CRR, RMR

CONFIDENTIAL

APP.177

Alta 0038184

Matt DeNichilo
Energy Capital Partners
40 Beechwood Road
Summit, NJ 07901
Work: 973-671-6119
Mobile: 908-358-3160
Email: mdenichilo@ecpartners.com

**CONFIDENTIALITY NOTICE:** This message originates from Energy Capital Partners. This message and any attachments are solely for the use of the intended recipients. They may contain privileged and/or confidential information or other information protected from disclosure. If you are not an intended recipient, you are hereby notified that you received this email in error and that any review, dissemination, distribution or copying of this email and any attachment is strictly prohibited. If you have received this email in error, please contact the sender and delete the message and any attachment from your system.

# EXHIBIT T

To: Matthew Laterza[mlaterza@altapowerdev.com]; Travis West[twest@altapowerdev.com]
Cc: Pete Watson[p.watson@wattstock.com]; Andrew F. Herr[a.herr@wattstock.com]; dave@sterlingintegrity.com[dave@sterlingintegrity.com]
From: j.manning@wattstock.com[j.manning@wattstock.com]
Sent: Fri 4/19/2019 11:38:22 AM Central Standard Time
Subject: FW: WattStock revize teklifi
Attachment: Letter of Intent for Acarsoy Enerji LM6000 PC Plant Equipment April 18 2019 Rev 1.docx

Matt, see message below. I am sure this will happen with all of them, but we only included in the LOI those that asked for it up front. I have revised the LOI accordingly. See the attachment.
Please approve.
Regards,
Jay

**From:** Abdullah Kurt [mailto:abdullah@pro-per.net]
**Sent:** Friday, April 19, 2019 11:23 AM
**To:** j.manning@wattstock.com; Pete Watson <p.watson@wattstock.com>
**Subject:** FW: WattStock revize teklifi

Jay, Pete,

I sent the LOI and the draft contract

Acarsoy has an objection to the LOI. Because we will start to remove their equipment pretty soon (May 15th) and the %99 of the payment will be in July 1st. they want a payment guarantee, LOC. He also says that it's important for them to get an LOC before they allow us to start the site work.
That's what Mr. Cem Cokrak says below.
Please advise.
Regards,
Apo

**From:** Cem Çokrak <cemcokrak@acarsoyenerji.com.tr>
**Date:** Friday, April 19, 2019 at 6:46 PM
**To:** Abdullah Kurt <abdullah@pro-per.net>
**Cc:** Hakan Kubilay <hakan.kubilay@pro-per.net>, Emrah Turan <emrahturan@acarsoyenerji.com.tr>
**Subject:** RE: WattStock revize teklifi

*Abdullah Bey,*

*Yaptığımız görüşme esnasında 1% ön ödeme ile beraber kontrat imzalanması ile sahaya giriş ve ekipmanı sökme işlemlerine bizim tarafımızdan izin verilebilmesi için sözleşme kapsamında kalan bedele ait Şirketimize bir LC veya banka teminat mektubu verilmesi gerektiği konusunda uzlaşmıştık. Fakat WattStock firmasının hem teklifinde hem de taslak sözleşmesinde bu konudan hiç bahsedilmemektedir. Öncelikle bu durumun düzeltilmesi gerekmektedir. Teklifte bahsi geçen Exclusivity Period içerisinde ekipmanın başka birine satılmaması, kiralanmaması vb şartların sağlanması için öncesinde ödeme garantisinin alınmış olması arttır. Arka planda diğer incelemelerimizi yapıyor olacağız ama bu konuyla ilgili düzeltmenin ivedi şekilde yapılmasını ve revize belgelerin gönderilmesini rica ederim.*
*İyi çalışmalar.*
*Cem ÇOKRAK*
*Genel Müdür*
*Acarsoy Enerji Elektrik*
*Üretim Sanayi ve Ticaret A.Ş.*

*Mobil : +90 530 581 39 86 & +90 532 283 67 99*
*E-mail : cemcokrak@acarsoy.com.tr*
*cemcokrak@acarsoyenerji.com.tr*
*Merkez : Mustafa Karaer Caddesi No:14*
*Demirtaş OSB 16245 Osmangazi / BURSA*
*Tel : +90 224 2610290 Fax: +90 224 2610292*
*www.acarsoyenerji.com.tr*

**From:** Abdullah Kurt [mailto:abdullah@pro-per.net]
**Sent:** Friday, April 19, 2019 5:10 PM
**To:** Cem Çokrak
**Cc:** Hakan Kubilay; Abdullah Kurt
**Subject:** WattStock revize teklifi

Cem bey merhaba,

Toplantıda konuşulan konuları kapsayacak şekilde revize edilen WattStock kontratı ve de imzalanmak istenen kontrat taslağı ektedir.
Ayrıca Hakan bey ile konuşmanız üzerine hazırladığımız Pro-Per teklifi de ekte sunulmuştur.
Pro-Per ve WattStock tekliflerini imzalayıp geri göndermenizi, kontratı ise inceleyip değiştirmek istediğiniz yerler varsa track change'li olarak yapmanızı ve geri göndermenizi rica ederim.
Saygılarımla,
Abdullah Kurt



EXHIBIT
2029
tabbies
APP.180  22  PEA



April 18, 2019
Acarsoy A.S.
Mustafa Karaer Caddesi No 14 DOSAB Osmangazi
Bursa, Turkey
Attention: Mr. Cem Cokrak
Subject: Letter of Intent to Purchase Power Plant Equipment

Dear Mr. Cokrak,
Thank you for meeting with me. This letter confirms the terms we discussed in our recent meeting and documents the intent of Acarsoy Enerji A.S. (Owner) to sell and WattStock LLC to purchase the below Equipment.

**I.  Equipment**
The following is not a full list of the equipment and all of the accessories but indicative only. A comprehensive list would be included as an exhibit to any final definitive purchase agreement.

1. LM6000 PC Gas Turbine Package serial number 821305
2. LM6000 PC Gas Turbine Engine serial number 191-716
3. Gas turbine and generator control & protection systems
4. Turbine control panel
5. Ship loose hardware
6. Air filter
7. Hydraulic and/or TLO skid
8. Auxiliary skid
9. Fire system
10. Main generator skid and all associated systems and hardware (i.e. lube oil systems, protection systems, excitation systems, etc),
11. Generator
12. Gearbox

**APP.181**



13. Generator and gearbox lube oil skid
14. Turbine gauge panel
15. Battery system
16. Lift equipment
17. MGTB
18. MTTB
19. Roof skid
20. Main turbine skid and all associated systems and hardware (i.e. fuel, water, lube oil systems, etc)
21. Water injection skid
22. SPRINT skid
23. Lube oil heat exchangers
24. Spare parts

**II.    Price:**

1. One LM6000 PC Gas Turbine Generator Sets:  $ 7,000,000 USD, EX-WORKS Acarsoy power plant. Price assumes no liens, duties or taxes are pending against the equipment.
2. In the event that Acarsoy is required to pay to the General Electric Company termination fees for the early termination of the contractual services agreement, WattStock will increase the purchase price of the equipment by the amount of such termination fees up to an amount not to exceed $500,000 USD. For the avoidance of doubt, the decision by Acarsoy whether to terminate its agreement with GE early is solely the decision of Acarsoy and is not based upon any recommendation by WattStock.

CONFIDENTIAL

**APP.182**

Alta 0028097



III.    **Payment Terms:**

1.  One percent (1%) non-refundable Down Payment due within 10 business days of the execution of an Equipment Purchase and Sale Agreement ("PSA").

2.  Ninety-nine percent (99%) at closing which will be no later than July 1, 2019, upon which title to the Equipment will transfer from Owner to WattStock.

3.  To secure the payment of the balance of the purchase price WattStock shall deliver to Owner within 10 business days of the execution of the PSA an irrevocable, standby letter of credit in the amount of 96% of the purchase price ("LOC"). The LOC shall be issued by a US bank and issued on terms to be mutually agreed by Owner and WattStock. The LOC shall an expiration date of no earlier than August 1, 2019. An agreed form of LOC will be attached as an exhibit to the PSA. The Owner will return the original of the LOC to WattStock upon receipt of the final payment of the purchase price.

2.

> **Formatted:** Indent: Before: 0.25", No bullets or numbering

IV.    **Schedule:**

1.  Subject to the Parties reaching a definitive PSA as further described in Article VI and Article VII below, Closing, and final payment of the purchase price, would be scheduled to occur no later than July 1, 2019.

2.  Promptly following execution of the PSA and payment of the 1% Down Payment, which is anticipated to be by May 15, 2019, Acarsoy shall grant WattStock access to the Equipment to commence disassembly

CONFIDENTIAL

**APP.183**

Alta 0028098



activities. WattStock shall use its best efforts to have the Equipment disassembled, crated and stored at the Acarsoy site by July 1, 2019.

V.  **No Warranty** – Equipment would be purchased "as-is, where-is" with no warranty being offered by Owner other than warranty of clear and marketable title.

VI.  **Purchase and Sale Agreement:** Attached is a draft form of PSA that would serve as the basis of the parties' good faith negotiations over the next 30 days. In the event of an inconsistency between any term of this Letter of Intent and the form of PSA, the term set forth in this Letter of Intent will control.

VII.  **Exclusivity Period**. In consideration of (i) WattStock's investment of resources in traveling and inspecting the Equipment (ii) WattStock's execution of this Letter of Intent, and (iii) WattStock's commercially reasonable efforts to negotiate with Owner during the period of 30 days following the date of this Letter of Intent, or such longer period as the Parties may agree in writing ("Exclusivity Period") the terms and conditions of a definitive PSA, Owner hereby grants to WattStock the exclusive right to purchase the Equipment during the Exclusivity Period for the Price stated above. Owner agrees not to sell, lease, pledge or otherwise encumber or transfer tile to the Equipment to any third-party during the Exclusivity Period.

**APP.184**

CONFIDENTIAL

Alta 0028099



If this Letter of Intent accurately reflects the terms our agreement, please confirm by signing below.

We look forward to a successful conclusion to finalize the terms of the PSA in the coming days.

Sincerely yours,


Martin "Pete" Watson
VP Operations
WattStock LLC
p.watson@wattstock.com


Confirmed:
**Acarsoy Enerji A.S**

Acarsoy Enerji LM6000 Letter of Intent
CONFIDENTIAL INFORMATION: NOT FOR DISTRIBUTION
Page 5 | 6

**APP.185**

Alta 0028100



By: _____

Printed Name: _____

Title: _____

Date: _____

**APP.186**

CONFIDENTIAL

Alta 0028101

# EXHIBIT U

To: Abdullah Kurt[abdullah@pro-per.net]

Cc: Dave Herberger[dave@sterlingintegrity.com]; Pete Watson[p.watson@wattstock.com]; Matthew Laterza[mlaterza@altapowerdev.com]; Travis West[twest@altapowerdev.com]

From: j.manning@wattstock.com[j.manning@wattstock.com]

Sent: Fri 6/28/2019 10:55:29 AM Central Standard Time

Subject: RE: ACARSOY signed contract

Attachment: Acarsor Enerji-WattStock Executed GT Signed PSA 28 JUNE 2019 Contract 270619.pdf

Apo, please find attached executed PSA for the Acarsoy unit.

Thanks for your hard work in getting this closed.

Regards,

**WATTSTOCK**

Jay C. Manning

16415 Jacintoport Blvd.

Houston, TX 77015

C: 713.248.4148

j.manning@wattstock.com www.wattstock.com

************************************************************

This e-mail is the property of WattStock LLC and/or its relevant affiliate and contains confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender or reply to WattStock LLC at Webmaster@wattstock.com and delete all copies of the message. This e-mail (and any attachments hereto) are not intended to be an offer (or an acceptance) and do not create or evidence a binding and enforceable contract between WattStock LLC (or any of its affiliates) and the intended recipient or any other party and may not be relied on by anyone as the basis of a contract by estoppel or otherwise. Thank you.

From: Abdullah Kurt [mailto:abdullah@pro-per.net]

Sent: Thursday, June 27, 2019 1:17 PM

To: j.manning@wattstock.com; Pete Watson <p.watson@wattstock.com>

Cc: Dave Herberger <dave@sterlingintegrity.com>; Abdullah Kurt <abdullah@pro-per.net>

Subject: ACARSOY signed contract

Here are the signed copies of ACARSOY.

They sent the originals to Omer Kesikli. Please expedite the down Payment.

Regards,

Apo



CONFIDENTIAL

EXECUTION COPY R1

## EQUIPMENT PURCHASE AND SALE AGREEMENT

This EQUIPMENT PURCHASE AND SALE AGREEMENT, dated as of the 27 day of June 2019 ("Agreement"), is made and entered into by and between Acarsoy Enerji Elektrik Üretim San. Ve Tic. A.S. ("Seller") and WattStock LLC ("Buyer"). Buyer and Seller are referred to herein individually as a "Party" and collectively as the "Parties".

### WITNESSETH:

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Assets (as defined herein) pursuant to the terms and conditions of this Agreement; and

NOW, THEREFORE, in consideration of the premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

### ARTICLE I
### DEFINITIONS

1.1    Certain Definitions. For purposes of this Agreement, the following terms have the meanings specified in this Section 1.1:

"Affiliate" means, with respect to any Person, any other Person that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such first Person. As used in this definition, "control" (including with correlative meanings, "controlled by" and "under common control with") means possession, directly or indirectly, of power (i) to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise), (ii) to vote fifty percent (50%) or more of the total combined voting power of such Person, or (iii) to direct the voting of sufficient securities to elect at least 50% of the board of directors or similar governing body of such Person.

"Agreement" shall have the meaning provided in the preamble.

"Applicable Law(s)" means, with respect to any Person, any Law applicable to such Person or its business, properties or assets.

"Assets" means the Equipment and the Records.

"Bill of Sale" means that bill of sale to be executed by the Seller on the same date Seller executes this Agreement, substantially in the form attached hereto as Exhibit B.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, NY are authorized or required by Law to close. Any event the scheduled occurrence of which would fall on a day that is not a Business Day shall be deferred until the next succeeding Business Day.

"Buyer" shall have the meaning provided in the preamble.

-1-

ACARSOY ENERJ
ELEKTRİK ÜRETİM SAN. VE TİC A.Ş
DOGAS Mustafa Karaer Cad No 14
Tel 0 224 261 02 90 Faks 0 224 261 02 92
Mersis No 0004048924300011
Uludağ VD 004 048 9243    BURSA

**APP.190**

"Claim" means any demand, obligation, liability, action, claim (including, but not limited to, any claim for damage to property or injury to or death of any persons), cause of action, chose in action, right of recovery or right of set-off of whatever kind, arbitration, inquiry, proceeding or investigation by or before any Governmental Authority of any nature whether civil, criminal, regulatory or otherwise and whether at law or in equity.

"Closing" means the closing of the purchase and sale of the Assets as contemplated by this Agreement.

"Closing Date" means July 26, 2019, provided that the conditions described in Articles XI and XII shall have been satisfied or waived on or before such date (other than those conditions that, by their terms, are to be satisfied at the Closing, but subject to their satisfaction at Closing), otherwise on the third Business Day following the satisfaction or waiver of such conditions (other than those conditions that, by their terms, are to be satisfied at the Closing, but subject to their satisfaction at Closing), or on such other date as the Parties may mutually agree in writing.

"Closing Payment" shall have the meaning provided in Section 3.2.

"Down Payment" shall have the meaning provided in Section 3.1.

"Early Services Termination Fee" shall mean the amount, if any, charged to the Seller by General Electric for the early termination of the contractual services agreement between Seller and General Electric.

"Environmental Law(s)" means all Applicable Laws in effect on the date hereof, relating to the protection of human health and safety, the environment, or natural resources, including but not limited to any Laws relating to releases of regulated substances or Hazardous Materials.

"Environmental Liabilities and Obligations" means all Liabilities arising from any impairment or damage to the environment or failure to comply with Environmental Laws in connection with the ownership or operation of the Assets including, without limitation, Liabilities related to:

(a)    the transportation, storage, use or disposal of Hazardous Materials, waste or other regulated substances;

(b)    the release of Hazardous Materials, waste or other regulated substances;

(c)    any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments;

(d)    any other obligations imposed under Environmental Laws with respect to the Assets; and

(e)    all obligations with respect to personal injury, property damages, wrongful death and other damages and losses arising under Applicable Law as a result of any of the matters identified in subparagraphs (a) – (d) of this paragraph.

"Equipment" means those items listed on Exhibit A attached hereto.

2.

ACARSOY ENERJİ
ELEKTRİK ÜRETİM SAN. VE TİC. A.Ş.
DOSAB  Musimta  Karaer  Cad  No  4
Tel 0 224 261 02 90 Faks 0 224 261 02 92
Marsa  No  0004048924000011
Uludag  VD  001 048 9249    BURSA

**APP.191**

"Escrow Agent" means Omer Kesikli.

"Escrow Instruction Letter" shall mean the letter to the Escrow Agent to be executed by Seller and Buyer in the form attached as Exhibit C.

"Governmental Authority" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including any governmental authority, agency, department, board, commission or instrumentality of a governmental entity or any political subdivision thereof, and any tribunal, court or arbitrator(s) of competent jurisdiction.

"Hazardous Materials" means all substances defined or regulated as "hazardous substances," "hazardous wastes," "hazardous materials," "pollutants," "toxic wastes," "toxic substances" or "contaminants" or regulated under Environmental Laws.

"Law" means any federal, state or local law (including common law), statute, code, ordinance, rule, regulation, order, injunction, writ, decree or other requirement enacted, promulgated, issued or entered by a Governmental Authority.

"Liabilities" means any and all debts, losses, liabilities, damages, expenses, awards, judgments, settlement payments, fines, penalties, costs, royalties, proceedings, deficiencies or obligations (including, without limitation, those arising out of any Claim, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, absolute, accrued, contingent or otherwise and whether due or to become due, and whether or not resulting from Third Party Claims, and any reasonable out-of-pocket costs and expenses (including reasonable legal counsels', accountants', or other fees and expenses incurred in defending any Claim or in investigating any of the same or in asserting any rights hereunder), but not including damages based on any theory of liability for any special, indirect, incidental, consequential (including lost profits), exemplary, or punitive damages.

"Lender" means Yapı ve Kredi Bankası Anonim Şirketi.

"Lien" means any lien, mortgage, pledge, security interest, lease, charge, option, conditional and installment sales agreements, right of first refusal, any transfer restriction under any shareholder or similar agreement or any encumbrance of any kind.

"OEM" means the for each piece Equipment the original equipment manufacturer.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award.

"Party" or "Parties" shall have the meaning provided in the preamble.

"Permitted Liens" means Liens securing payment to materialmen, warehouse, storage, mechanics, repairmen, employees, contractors, operators, royalty owners and taxing authorities and other similar Liens or charges relating to any of the Assets to the extent any of the foregoing arise as a result of any inspection, work, survey or services performed at the request of Buyer, or any of its Affiliates, contractors or agents.

"Person" means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint venture,

3

AGARSOY ENERJİ
ELEKTRİK ÜRETİM SAN VE TİC A Ş
DOSAB Mustafa Karaer Cad No 14
Tel 0 224 261 05 90 Faks 0 224 261 05 92
Mersis No 0004040592490 0 11
Uludağ V.D 004 048 9249    BURSA

**APP.192**

EXECUTION COPY R1

associations, companies, trusts, banks, trust companies, business trusts or other organizations, whether or not legal entities, and all Governmental Authorities.

"Personal Property Taxes" means any ad valorem Taxes or personal property Taxes due or payable as a result of the ownership of the Assets.

"Purchase Price" means the sum of (i) Seven Million and Five Hundred Thousand US Dollars ($7,500,000.00) minus (ii) an amount equal to the amount General Electric reduces Seller's payment of the Early Services Termination Fee, if any.

"Records" means the original (to extent available, or then otherwise copies) of any documentation (i) originally provided by the OEM for use in connection with the Equipment and in the possession or control of Seller, including drawings, manuals, lists of recommended spare parts, technical information letters, inspection reports or data, as-built drawings, isometrics, specifications, studies, system descriptions, diagrams, procedures, instructions, reports, test results, calculations, control system source code and programming, including all electronically originated and stored information and other data and information originated by the OEM or any subcontractor in connection with the manufacture and delivery of the Equipment, and (ii) any operation or maintenance information listed on Exhibit A.

"Seller" shall have the meaning provided in the preamble.

"Seller Non-Repair Notice" shall have the meaning provided in Section 4.2.

"Seller's knowledge" or "to the knowledge of Seller" means the actual knowledge of the current employees of Seller or its Affiliates directly and actively engaged in the operation, maintenance or storage of the Assets.

"Storage Facility" means the facility located at Denizli OSB 2. Kısım 602 Sok. No:4 20330 Honaz / Denizli, at which the Equipment is currently installed or is being stored by Seller.

"Tax" means all federal, state, provincial, territorial, municipal, local or foreign income, profits, franchise, gross receipts, environmental, customs, duties, net worth, sales, use, goods and services, withholding, value added, ad valorem, employment, social security, disability, occupation, pension, real property, personal property (tangible and intangible), stamp, transfer, conveyance, severance, production, excise and other taxes, withholdings, duties, levies, imposts and other similar charges and assessments (including any and all fines, penalties and additions attributable to or otherwise imposed on or with respect to any such taxes, charges, fees, levies or other assessments, and interest thereon) imposed by or on behalf of any Governmental Authority, in each case whether such Tax arises by law, contract or otherwise.

"Third Party Claim" means a Claim by a Person (including a Governmental Authority) other than Buyer, Seller or their respective Affiliates, successors, assigns, officers, directors, agents, shareholders, partners, employees, consultants, representatives and attorneys.

"Transaction Documents" means this Agreement and the Bill of Sale.

## ARTİCLE II
## PURCHASE AND SALE OF ASSETS

2.1    Purchase and Sale of Assets.    Concurrently with its execution of this Agreement:

4



**APP.193**

EXECUTION COPY R1

(a)     Buyer and Seller shall execute and deliver to the Escrow Agent the Escrow Instruction Letter; and

(b)     Seller shall execute the undated Bill of Sale and deliver to the Escrow Agent the signed but undated Bill of Sale and such other instruments of conveyance, if any, reasonably necessary for the transfer of the Assets, duly executed and effective as of the Closing Date.

Subject to the terms and conditions contained herein, at the Closing Seller shall sell, assign, transfer and convey to Buyer, and Buyer shall purchase, accept and receive from Seller, all of Seller's right, title and interest in and to the Assets.

2.2     Closing.  The Closing shall take place at the office of the Seller as described in Section 14.10 at 10:00 a.m. local time on the Closing Date or as otherwise agreed by Seller and Buyer. At the Closing:

(a)     Seller shall deliver to Buyer reasonable documentary evidence that all Liens have been satisfied and released effective no later than the Closing Date

(b)     Seller shall deliver to Buyer reasonable documentary evidence that all Taxes due and payable have been made as of the Closing Date.

(c)     Seller shall deliver to Buyer in writing confirmation of the amount of the Early Services Termination Fee; and

(d)     Buyer shall deliver to Seller via the account described in Section 3.3 the Closing Payment as provided in Article III.

### ARTICLE III
### PAYMENTS

Upon the terms and subject to the conditions contained in this Agreement, in consideration of the sale and delivery of the Assets, Buyer shall cause to be paid to Seller the Purchase Price, payable as follows:

3.1     Down Payment.  Within five (5) Business Days following the execution and delivery of this Agreement by both Seller and Buyer, and as an express condition to the effectiveness of this Agreement, Buyer shall wire transfer to the Seller the sum of THREE HUNDRED AND SEVENTY FIVE THOUSAND US DOLLARS ($375,000.00) ("Down Payment"). The Down Payment shall only be refundable to Buyer in accordance with Section 4.2 and Section 13.2.

3.2     Closing Payment.  At the Closing, Buyer shall wire transfer to the Seller an amount equal to the Purchase Price minus the Down Payment (the "Closing Payment").

Buyer or the subcontractor of the Buyer cannot enter the Site for disassembly before transfer the Closing Payment.

5

ACARSOY ENERJİ
ELEKTRİK ÜRETİM SAN. VE TİC. A.Ş.
DOSAB   Mustafa   Karaer   Cad.   No:1
Tel:0 224 261 02 00 Faks 0 224 261 02 92
Mersis   No   0004048924900011
Uludağ V.D. 043 9249   BURSA

**APP.194**

3.3    Account Information.    Buyer shall pay the Down Payment and the Closing Payment into the following Seller account:

> Acct Name: Yapi Kredi Bankasi
> Acct #: TR30 0006 7010 0000 0084 9194 69

3.4    Lien Release.    Immediately following Buyer's delivery of the Down Payment to Seller's account, and in any event prior to July 1, 2019, Seller shall take all steps necessary to (i) cause the release of all Liens, including all Permitted Liens and (ii) provide Buyer with reasonable evidence that all such Liens have been released.

## ARTICLE IV
## TITLE, RISK OF LOSS AND DELIVERY

4.1    Title; Risk of Loss.    Title to and risk of loss of the Assets shall remain with Seller until, and shall pass to Buyer only upon, the consummation of the Closing.

4.2    Condition of Equipment.    Except as set forth in this Section 4.2 and Article VI, Seller makes no representation or warranty regarding the quality, character or, the quantity of the Assets.   Notwithstanding anything in this Agreement to the contrary, the Seller shall deliver to Buyer the Equipment listed on Exhibit A attached hereto. In the event of damage or destruction to the Assets between the date this Agreement is executed and the Closing Date, Seller shall promptly notify Buyer in writing with detailed information about the damage or destruction to the Assets. If Seller is unable to repair the damage or replace the Equipment within thirty (30) days after the event that caused the damage or destruction, to Buyer's reasonable satisfaction, Seller shall notify Buyer (such notice a "Seller Non-Repair Notice") and Buyer shall have ten (10) Business Days from receipt of a Seller Non-Repair Notice to provide notice in writing to Seller that Buyer has elected not to purchase the Assets. Should Buyer elect not to purchase the Assets, the Seller shall return the Down Payment to Buyer within three (3) Business Days from the date of Buyer's notice to Seller that Buyer will not purchase the damaged or destroyed Assets. For the avoidance of doubt, any damage caused by the Buyer or the subcontractor of the Buyer during the disassembly of the Equipment cannot be assessed and is the responsibility of the Buyer.

4.3    Storage.    Seller agrees that, from the date of execution of this Agreement until the Closing, Seller will maintain and store the Equipment in accordance with OEM recommendations, and will take reasonable steps to secure the Equipment. On and after the Closing Date, Seller shall only be responsible for damage to the Equipment to the extent caused by the acts or omissions of Seller. Subject to the foregoing sentence, from and after the Closing Date, Buyer assumes all liability associated with the same, damage to the Equipment caused by Buyer during  the removal of the Equipment from the Storage Facility.

4.4    Delivery.    On the Closing Date, Seller shall deliver the Equipment to Buyer in accordance with Section 6.9. Buyer shall not be liable for any rent or lease costs, Taxes or duties assessed or related to the Equipment or Storage Facility prior to the Closing.

6

ACARSOY ENERJI
ELEKTRİK ÜRETİM SAN VE TİC. A.Ş
DOSAB  Mustafa  Karaer  Cad.  No 14
Tel 0 224 251 02 90 Faks 0 224 261 02 92
M e r a k a  N o  0 0 0 4 0 4 6 9 2 4 9 0 0 0  1
Uludağ  V.D  004  048  9249    BURSA

**APP.195**

EXECUTION COPY R1

Date, or thereafter, and Seller agrees to indemnify Buyer for any such costs associated with rent, leases, Taxes or duties. Seller shall use its commercially reasonable efforts to deliver the Records to Buyer as soon as practicable following the Closing Date, but in no event later than ten (10) days after the Closing Date. If Seller discovers (on its own initiative or upon the request of Buyer or Buyer's representatives) additional Records after Closing, Seller shall deliver such additional Records to Buyer as soon as practicable following such discovery.

4.5 Disassembly and Removal.    Buyer shall not commence disassembly or removal of the Equipment prior to Seller's receipt of the Closing Payment without the prior written consent of Seller. Unless otherwise provided in the description of the Equipment, Buyer shall have no obligation to perform any repairs to Seller's Storage Facility (other than those repairs caused by the negligence of Buyer), removal of pipe, conduit, or wires or other remediation or improvements to the Storage Facility as a part of removing the Equipment. Seller agrees to assist Buyer in having uninterrupted access to the Equipment for disassembly and removal until Buyer has removed the last of the Equipment from the Storage Facility. Buyer shall be responsible for providing all labor, tools and equipment necessary to disassemble and remove the Equipment from the Storage Location. For the avoidance of doubt, the Buyer or any sub-contractor of the Buyer shall be responsible for any physical injury to persons or damage to the Equipment during disassembly of the Equipment.

## ARTICLE V
## INDEMNIFICATION AND LIMIT OF LIABILITY

5.1    Indemnification by Buyer.    Buyer agrees to defend, indemnify and hold harmless Seller, its Affiliates, successors, assigns, and its and their respective officers, directors, agents, shareholders, partners, employees, consultants, representatives and attorneys from all Claims and Liabilities (i) for any damage or destruction to the Equipment or any Third Party Claim imposed upon, incurred by, or asserted against Seller for bodily injuries, death and/or property loss or damage, in each such case of damage, destruction or Third Party Claim to the extent caused by, or attributable to, Buyer and/or Buyer's agents', representatives' or contractors' actions, omissions or negligence or presence at the Storage Facility, (ii) arising out of, relating to, resulting from or in connection with any equipment survey or any other inspection or testing of the Equipment conducted by Buyer and/or Buyer's agents, representatives or contractors, (iii) arising from any broker, sales agent, financial advisor or other third party claiming any fee, commission or like payment by, through, on account of or on behalf of Buyer or any of its Affiliates, resulting from the sale of the Assets, (iv) arising out of, relating to, resulting from or in connection with any material misrepresentation or breach of any material warranty or representation given by Buyer in this Agreement or any Transaction Document to which Buyer is a party or material breach of any material covenant or agreement made by Buyer in this Agreement or any Transaction Document to which Buyer is a party, including, without limitation, those obligations in respect of Taxes set forth in Article IX hereof and (v) from and after the Closing, arising out of, relating to, resulting from or in connection with (1) any Third Party Claim based upon events occurring after Closing and relating to the Equipment, or (2) the storage, transportation or use of any of the Equipment after the Closing.

7

ACARSOY ENERJI
ELEKTRIK ÜRETİM SAN. VE TİC. A.Ş.
DOSAB Mustafa Karaer Cad No 14
Tel 0 224 261 02 90 Faks 0 224 261 02 92
Mersis No 000 404 892 4 000011
Uludağ VD 004 041 9249    BURSA

**APP.196**

    Alta 0028864

EXECUTION COPY R1

5.2   Indemnification by Seller.   From and after the Closing, Seller agrees to defend, indemnify and hold harmless Buyer, its Affiliates, successors, assigns, and its and their respective officers, directors, agents, shareholders, partners, employees, consultants, representatives and attorneys from all Claims and Liabilities (i) arising out of, relating to, or resulting from or in connection with any material misrepresentation or breach of any material warranty or representation given by Seller in this Agreement or any Transaction Document to which Seller is a party or material breach of any material covenant or agreement made by Seller in this Agreement or any Transaction Document to which Seller is a party; (ii) for any Third Party Claim imposed upon, incurred by, or asserted against Buyer for bodily injuries, death and/or property loss or damage, in each such case to the extent caused by, or attributable to, Seller and/or Seller's agents', representatives' or contractors' actions, omissions or negligence or presence at the Storage Facility; (iii) arising out of, relating to, resulting from or in connection with the storage, transportation or use of any of the Equipment prior to the Closing; and (iv) arising from any broker, sales agent, financial advisor or other third party claiming a⁻ ⋅ fee, commission or like payment by, through, on account of or on behalf of Seller or any of its Affiliates, resulting from the sale of the Assets.

5.3   Environmental Indemnity.   From and after the Closing:

(a)   Buyer shall indemnify, defend and hold harmless Seller and its Affiliates, and their respective agents, directors, shareholders, partners, employees, officers, consultants, representatives, attorneys, successors and assigns, from and against any and all Environmental Liabilities and Obligations and Claims for the same, in each case arising from, resulting from, incident to, or otherwise relating to or concerning the Equipment that arise from events that occur after the Closing.

(b)   Seller shall indemnify, defend and hold harmless Buyer and its Affiliates, and their respective agents, directors, shareholders, partners, employees, officers, consultants, representatives, attorneys, successors and assigns, from and against any and all Environmental Liabilities and Obligations and Claims for the same, in each case arising from, resulting from, incident to, or otherwise relating or concerning the Equipment that arise from events that occur prior to the Closing.

5.4   Limitation of Liability.   Each Party's liability hereunder is limited at all times by the provisions of Section 10.3.

5.5   Indemnification Notice.   If any Party (or its Affiliates, successors or assigns or its or their respective officers, directors, agents, shareholders, partners, employees, consultants, representatives and attorneys) (each, an "Indemnified Party") entitled to or seeking indemnification hereunder (a) determines that any event, occurrence, fact, condition or claim has given or could reasonably be expected to give rise to Liabilities which such Indemnified Party is or may be entitled to, or may seek, indemnification under this Agreement, or (b) otherwise identifies an event, occurrence, fact, condition or Claim giving rise (or which may give rise) to a right of indemnification hereunder in favor of such Indemnified Party (any of the foregoing, an "Indemnity Claim"), such Indemnified Party shall promptly notify the Party obligated to provide indemnification or from whom indemnification is being or will be sought (the "Indemnifying Party") in writing of such

8

ACARSO ENERJI
ELEKTRİK ÜRETİM SAN. TİC. A.Ş.
DOSAB Muşula Karaer Cad.  No 14
Tel 0 224 261 62 90 Faks 0 224 261 02 92
Mersis No 0004045924900011
Uludağ VD 004 041 9249  BURSA

**APP.197**

EXECUTION COPY R1

Indemnity Claim (a "Claim Notice") describing in reasonable detail the facts giving rise to the claim for indemnification hereunder and shall include in such Claim Notice (if then known) the amount or the method of computation of the amount of such Liability; provided, however, the failure of any Indemnified Party to give timely notice thereof shall not affect any of its rights to indemnification hereunder nor relieve the Indemnifying Party from any of its indemnification obligations hereunder, except to the extent the Indemnifying Party is materially prejudiced by such failure.

5.6   Indemnification Procedure.   Any obligation to provide indemnification hereunder with respect to any Third Party Claim, shall be subject to the following terms and conditions:

(a)   Upon receipt of a Claim Notice in respect of any such Third Party Claim, the Indemnifying Party shall, at its cost and expense and upon notice to the Indemnified Party within thirty (30) days of its receipt of such Claim Notice, assume and control the defense, compromise, settlement and investigation of such Indemnity Claim, including the management of any proceeding relating thereto, and shall employ and engage counsel reasonably acceptable to the Indemnified Party; provided, however. that if there exists a material conflict of interest (other than one of a monetary nature) or if the Indemnified Party has been advised by counsel that there may be one or more legal or equitable defenses available to it that are different from or additional to those available to the Indemnifying Party, which, in either case, would make it inappropriate for the same counsel to represent both the Indemnifying Party and the Indemnified Party, then the Indemnified Party shall be entitled to retain its own counsel at the cost and expense of the Indemnifying Party (except that the Indemnifying Party shall not be obligated to pay the fees and expenses of more than one separate counsel for all Indemnified Parties, taken together).

(b)   The Indemnified Party may, at its own cost and expense, participate in the defense of such Indemnity Claim and agrees to cooperate with the Indemnifying Party in such efforts and make available to the Indemnifying Party all witnesses, records, materials and information in the Indemnified Party's possession, under its control or to which it may have access as may be reasonably required by the Indemnifying Party.   The Indemnifying Party will keep the Indemnified Party reasonably informed of the progress of the defense of any such Indemnity Claim.   If the Indemnifying Party fails to so assume the defense and investigation of any such Indemnity Claim as provided in this Section 5.6, (i) the Indemnified Party shall have the right to undertake the defense, compromise, settlement and investigation of such Indemnity Claim on behalf of, and at the cost and expense of and for the account and risk of the Indemnifying Party, (ii) the Indemnifying Party agrees to cooperate with the Indemnified Party in such efforts, and (iii) the Indemnified Party will keep the Indemnifying Party reasonably informed of the progress of the defense of any such Indemnity Claim.

(c)   If a Third Party Claim is made by any Governmental Authority, the Indemnifying Party agrees to consult with the Indemnified Party prior to communicating with such Governmental Authority (but, for avoidance of doubt, the Indemnifying Party shall be under no obligation to take account of the views of the Indemnified Party).

9

ACARSOY ENERJI
ELEKTRİK ÜRETİM SAN VE TİC A.S.
DOSAB Mustafa Karaer Cad No:14
Tel 0 224 261 08 90 Faks 0 224 261 22 92
Mersis No. 0004048924900011
Uludağ VD. 004 048 9243   BURSA

**APP.198**

5.7  Settlement of Indemnity Claims.  The Indemnifying Party shall not, without the written consent of the Indemnified Party, (a) settle or compromise any Indemnity Claim or consent to the entry of any final judgment which does not include as an unconditional term thereof the delivery by the claimant or plaintiff, as applicable, of a written release or releases from all liability in respect of such Indemnity Claim of all Indemnified Parties affected by such Indemnity Claim, or (b) settle or compromise any Indemnity Claim if the settlement or compromise imposes equitable remedies or material obligations on the Indemnified Party other than financial obligations for which such Indemnified Party will be indemnified hereunder.  No Indemnity claim that is being defended in good faith by the Indemnifying Party shall be settled or compromised by the Indemnified Party without the written consent of the Indemnifying Party.

5.8  Exclusive Remedy.  THE PARTIES ACKNOWLEDGE AND AGREE THAT THE REMEDIES SET FORTH IN THIS ARTICLE V, TOGETHER WITH AND SUBJECT TO THE LIMITATIONS ON LIABILITY, SURVIVAL PERIODS, DISCLAIMERS AND LIMITATIONS ON REMEDIES SET FORTH ANYWHERE IN THIS AGREEMENT ARE INTENDED TO BE, AND SHALL BE, THE EXCLUSIVE REMEDIES WITH RESPECT TO ANY ASPECT OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer that:

6.1  Organization and Good Standing.  Seller is a corporation duly organized and validly existing under the laws of the jurisdiction in which it was formed, and Seller has the requisite power and authority to own, lease and operate its material assets and properties and to carry on its business as now conducted.  Seller is duly qualified to transact business and is in good standing in each jurisdiction in which its business as now conducted or its ownership of the Assets makes such qualification necessary.

6.2  Authorization of Agreement.  Seller has the requisite power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated by this Agreement and the other Transaction Documents to which it is a party.  The execution and delivery of this Agreement and the other Transaction Documents to which Seller is a party by Seller and the consummation by Seller of the transactions contemplated by this Agreement and such other Transaction Documents have been duly and validly authorized by all necessary action on the part of Seller.  This Agreement has been, and the other Transaction Documents to which Seller is a party will be, duly executed and delivered by Seller and, assuming due execution and delivery by Buyer, constitute (or in the case of the other Transaction Documents will constitute upon the execution and delivery thereof) valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except to the extent that enforceability hereof may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws generally affecting or relating to the enforcement of creditors' rights and by general equitable principles regardless of whether enforcement is sought in equity or at law.

10

AGARSOY ENERJI
ELEKTRIK ÜRETİM SAN. VE TİC. A.Ş.
DOSAB  Mustafa  Karaer  Cad  No. 14
Tel 0 224 261 02 00 Faks 0 224 261 02 02
Mersis  No  000404652490000 11
Uludağ  V.D.  004  048  9248    BURSA

**APP.199**

EXECUTION COPY R1

### 6.3   No Violation; Consents.

(a)   The execution and delivery by Seller of this Agreement and the other Transaction Documents to which Seller is a party and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the organizational or constituent documents of Seller, (ii) violate any Order of any Governmental Authority to which Seller is bound or subject, (iii) violate any Applicable Law, (iv) infringe upon or violate any intellectual property rights necessary to operate and maintain the Equipment after the Closing as contemplated by this Agreement and in accordance with Applicable Laws, or (v) breach or result in a default (or give rise to any right of termination, cancellation or acceleration) under any note, bond, mortgage, indenture, material agreement or other instrument by which Seller is bound or by which its assets are subject, other than, in the case of clauses (ii), (iii) and (iv), any conflict, violation, breach, default, requirement for consents, rights of acceleration, cancellation, or termination that would not materially and adversely affect the ability of Seller to perform its obligations under this Agreement or would not result in any Lien (other than Permitted Liens) on the Equipment.

(b)   To Seller's knowledge, no Order or permit issued by, or declaration or filing with, or notification to, or waiver or consent from any Governmental Authority is required on the part of Seller in connection with the execution and delivery of this Agreement or any Transaction Documents to which Seller is a party, the consummation of the transactions contemplated hereby or thereby, or the compliance with or performance by Seller of any provision contained in this Agreement or any of the Transaction Documents to which Seller is party, other than any such Order, permit, declaration, filing, notification, waiver or consent the failure of which to obtain would not materially and adversely affect the ability of Seller to perform its obligations under this Agreement or any of the Transaction Documents to which it is party.

6.4   No Other Equipment Commitments.   Except for a Permitted Lien currently held by Lender and which will be released prior to Closing, Seller has not assigned, pledged, sold, leased, granted any option to purchase or entered into any other agreement that would grant any other party any interest or rights to the Equipment

6.5   Litigation.   There is no action, proceeding or Order pending or, to Seller's knowledge, threatened against Seller or any of its Affiliates that seeks to restrain or prohibit the consummation, legality or validity of the transactions contemplated hereby.

6.6   Title to the Assets.   Seller has good and marketable title to the Equipment and Records free and clear of any Liens, other than the Permitted Liens. At Closing, Seller shall deliver to Buyer good and marketable title to the Equipment and Records free and clear of any Liens or restrictions, including all Permitted Liens.

6.7   Preferential Rights.   No rights of first offer or refusal or other preferential rights to purchase any of the Equipment are held by any Person.

6.8   Financial Advisors.   Neither Seller nor any of its Affiliates has entered into a contract with any broker, finder or financial advisor that would obligate Buyer to pay

11

**APP.200**

CONFIDENTIAL

Alta 0028868

EXECUTION COPY R1

any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated by this Agreement.

6.9    Equipment Delivery. All of the Equipment listed on Exhibit A shall be delivered to Buyer *in situ* at the Storage Facility at Closing. Seller shall grant to Buyer, or shall otherwise cause Buyer to have, unrestricted access to the Storage Facility following the Closing Date until the Equipment is removed by Buyer. Buyer, or its representatives, shall also have the right to perform periodic inspections of the Equipment from the date of this Agreement prior to the removal of the Equipment from the Storage Facility.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

7.1    Organization and Good Standing.    Buyer is a limited liability company duly organized and validly existing under the laws of the jurisdiction in which it was formed, and Buyer has the requisite power and authority to own, lease and operate its material assets and properties and to carry on its business as now conducted.    Buyer is duly qualified to transact business and is in good standing in each jurisdiction in which its business as now conducted makes such qualification necessary.

7.2    Authorization of Agreement.    Buyer has the requisite power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated by this Agreement and the other Transaction Documents to which it is a party.    The execution and delivery of this Agreement and the other Transaction Documents to which it is a party by Buyer and the consummation by Buyer of the transactions contemplated by this Agreement and such other Transaction Documents have been duly and validly authorized by all necessary action on the part of Buyer.    This Agreement has been, and the other Transaction Documents to which it is a party will be, duly executed and delivered by Buyer and constitute (or in the case of the other Transaction Documents will constitute upon the execution and delivery thereof) valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except to the extent that enforceability hereof may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws generally affecting or relating to the enforcement of creditors' rights and by general equitable principles regardless of whether enforcement is sought in equity or at law.

7.3    No Violation; Consents.

(a)    The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the organizational or constituent documents of Buyer, (ii) violate any Order of any Governmental Authority to which Buyer is bound or subject, (iii) violate any Applicable Law, or (iv) breach or result in a default (or give rise to any right of termination, cancellation or acceleration) under any note, bond, mortgage, indenture, material agreement or other instrument by which Buyer is bound or by which its assets are subject, other than, in the case of clauses (ii), (iii) and (iv), any

12

**APP.201**

CONFIDENTIAL

Alta 0028869

EXECUTION COPY R1

conflict, violation, breach, default, requirement for consents, rights of acceleration, cancellation or termination that would not materially and adversely affect the ability of Buyer to perform its obligations under this Agreement.

(b)    To the knowledge of Buyer, no Order or permit issued by, or declaration or filing with, or notification to, or waiver or consent from, any Governmental Authority is required on the part of Buyer in connection with the execution and delivery of this Agreement or any of the Transaction Documents to which Buyer is a party, the consummation of the transactions contemplated hereby or thereby, or the compliance or performance by Buyer with any of the provisions contained in this Agreement or any of the Transaction Documents to which Buyer is a party, other than any such Order, permit, declaration, filing, notification, waiver or consent the failure of which to obtain would not materially and adversely affect the ability of Buyer to perform its obligations under this Agreement or any of the Transaction Documents to which it is party.

7.4    Litigation.    There is no action, proceeding or Order pending or, to the knowledge of Buyer, threatened against Buyer or any of its Affiliates that seeks to restrain or prohibit the consummation, legality or validity of the transactions contemplated hereby.

7.5    Financial Advisors.    Neither Buyer nor any of its Affiliates has entered into a contract with any broker, finder or financial advisor that would obligate Seller pay any fee or commission or like payment to any broker, finder or financial advisor as a result of the consummation of the transactions contemplated by this Agreement.

## ARTICLE VIII
## OTHER COVENANTS

8.1    Public Announcements.    Buyer and Seller agree that this Agreement and all communications between Buyer and Seller related to this Agreement are deemed confidential information and protected from disclosure. None of Seller, Buyer nor any of their respective Affiliates, nor any of their agents or representatives, shall issue any press release or public statement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written consent of the other Party; provided that either Party may make such disclosure as it may determine in good faith, after consultation with counsel, is required by any Applicable Law, Order or obligations pursuant to any listing agreement with, or any rules or regulations of, any national securities exchange so long as the Party intending to make such disclosure gives the other Party prior notice of such disclosure and uses its commercially reasonable efforts, consistent with such Applicable Law, Order or obligation, to consult with the other Party with respect to the text thereof.

8.2    Further Assurances.    Each of the Parties will execute and deliver such additional instruments and other documents and will take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement and the other Transaction Documents.

13

**APP.202**

EXECUTION COPY R1

## ARTICLE IX
## TAXES

9.1  Personal Property Taxes.  All Personal Property Taxes relating to the Assets for the taxable year in which the Closing occurs shall be apportioned as of the Closing Date between Seller and Buyer.  Seller shall be liable for the portion of such Personal Property Taxes based upon the number of days in the taxable year occurring prior to the Closing Date, and Buyer shall be liable for the portion of such Personal Property Taxes based upon the number of days in the year occurring on and after the Closing Date.  For any taxable year in which an apportionment is required, Buyer shall file all required reports and returns incident to these Taxes assessed for the taxable year in which the Closing Date occurs that are not filed by Seller as of the Closing Date.  If Seller has paid any portion of Personal Property Taxes apportioned to Buyer under this Section 9.1, Buyer shall pay to Seller, promptly upon notice from Seller, to which shall be annexed copies of the relevant tax filing and demand of the portion of such Taxes apportioned to Buyer, Buyer's share of such Taxes.

9.2  Sales and Other Transfer Taxes.  The Purchase Price is inclusive of any sales, use, excise, gain or other transfer Taxes imposed in connection with the sale of the Assets.  Seller shall pay any such Taxes, as well as any applicable conveyance, transfer and recording fee, and real estate transfer stamps, documentation or other Taxes imposed on the transfer of the Assets pursuant to the Agreement.

## ARTICLE X
## LIMITATIONS

10.1  Buyer's Review.

(a)  No Reliance.  Buyer has had the opportunity to investigate the Assets, has reviewed and has had access to all documents, records and information which it has desired to review, and has had the opportunity to ask questions, and has received sufficient answers, in connection with its decision to enter into this Agreement, and subject to further inspection prior to the Closing Date, to consummate the transactions contemplated hereby.

(b)  Limited Duties.  Any and all duties and obligations that any Party may have to the other Party with respect to or in connection with the Assets, this Agreement, the Transaction Documents or the transactions contemplated hereby or thereby are limited to those specifically set forth in this Agreement and the Transaction Documents.  Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement or the Transaction Documents on the basis of any legal or equitable principle or on any other basis whatsoever.  Neither any equitable or legal principle nor any implied obligation of good faith or fair dealing nor any other matter requires any Party to incur, suffer or perform any act, condition or obligation contrary to the terms of this Agreement or any Transaction Document, whether or not existing and whether foreseeable or unforeseeable.  Each of the Parties acknowledges that it would be unfair, and that it does not intend, to increase any of the obligations of any other Party under this Agreement or any Transaction Document on the basis of any implied obligation or otherwise.

14

**APP.203**

EXECUTION COPY R1

10.2 LIMITATION OF REPRESENTATIONS AND WARRANTIES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE VI, SELLER IS NOT MAKING ANY REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, CONCERNING THE ASSETS OR SELLER OR THE BUSINESS, ASSETS OR LIABILITIES OF SELLER AND IT IS UNDERSTOOD THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE VI, BUYER TAKES THE ASSETS "AS IS" AND "WHERE IS"; SPECIFICALLY, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN ARTICLE VI, SELLER MAKES NO REPRESENTATION AS TO THE CONDITION, VALUE OR QUALITY OF THE ASSETS (FINANCIAL OR OTHERWISE), RISKS AND OTHER INCIDENTS OF THE ASSETS AND SELLER DISCLAIMS ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE WITH RESPECT TO THE ASSETS, OR ANY PORTION THEREOF, OR AS TO THE WORKMANSHIP THEREOF, OR THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT.

10.3 NO CONSEQUENTIAL OR PUNITIVE DAMAGES. NO PARTY (OR ITS AFFILIATES OR ANY OTHER PERSON) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO ANY OTHER PARTY (OR ITS AFFILIATES OR ANY OTHER PERSON) FOR ANY CONSEQUENTIAL, EXEMPLARY, SPECIAL, INDIRECT, INCIDENTAL OR PUNITIVE DAMAGES CLAIMED BY SUCH PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT, BILL OF SALE, AGREEMENT, INSTRUMENT OR CERTIFICATE DELIVERED HEREUNDER OR IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT INCLUDING, BUT NOT LIMITED TO, LOSS OF REVENUE OR INCOME, COST OF CAPITAL, OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY.

## ARTİCLE XI
## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligation of Buyer to consummate the transactions contemplated to occur at the Closing is subject to satisfaction (or waiver in writing by Buyer) of the following conditions precedent at or prior to the Closing.

11.1 Representations and Warranties; Covenants. Each of the representations and warranties of Seller contained in Article VI shall be true and correct in all material respects at and as of the Closing Date with the same force and effect as though made at and as of the Closing Date. Seller shall have performed and complied, in all material respects, with the obligations and covenants required by this Agreement to be performed or complied with by Seller prior to the Closing.

11.2 Litigation. No Order shall have been issued by any Governmental Authority restricting, prohibiting or staying the transactions contemplated by this Agreement

15

AÇARSOY ENERJİ
ELEKTRİK ÜRETİM SAN. VE TİC. A.Ş.
DOSAB Mustafa Karaer Cad. No 14
Tel 0 224 261 02 90 Faks 0 224 261 02 92
Merkez No 0004046624300011
Uludağ VD 001 048 9249   BURSA

**APP.204**

Alta 0028872

11.3  Closing Deliveries.  Seller shall have delivered to the Buyer the Seller's closing deliverables described in Section 2.2(a), 2.2(b) and 2.2(c).

### ARTICLE XII
### CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER

The obligation of Seller to consummate the transactions contemplated to occur at the Closing is subject to the satisfaction (or waiver in writing by Seller) of the following conditions precedent at or before the Closing.

12.1  Representations and Warranties; Covenants.  The representations and warranties of Buyer contained in Article VII shall be true and correct in all material respects at and as of the Closing Date with the same force and effect as though made at and as of the Closing Date.  Buyer shall have performed and complied, in all material respects, with the obligations and covenants required by this Agreement to be performed or complied with by Buyer prior to the Closing.

12.2  Litigation.  No Order shall have been issued by any Governmental Authority restricting, prohibiting or staying the transactions contemplated by this Agreement.

12.3  Closing Deliveries.  Buyer shall have delivered to Seller the Buyer's closing deliverables described in Section 2.1(a).

12.4  Payment.  Buyer shall have paid the Closing Payment in accordance with Section 3.2 hereof.

### ARTICLE XIII
### TERMINATION

13.1  Termination.  This Agreement may be terminated, and the Transaction abandoned, at any time prior to the Closing as follows:

(a)     by written agreement of Buyer and Seller;

(b)     by Buyer:

(i)     at any time after July 26, 2019, if the Closing shall not have occurred; provided, that Buyer is not in material breach of any of its representations and warranties contained in this Agreement and has not failed in any material respect to perform any of its obligations hereunder;

(ii)     if any Order permanently restraining, prohibiting or enjoining Buyer or Seller from consummating the transactions contemplated by this Agreement is entered by any Governmental Authority;

(iii)     in accordance with Section 4.2 as a result of Seller being unable or unwilling to repair or replace damaged or destroyed Equipment;

16

ACARSOY ENERJİ
ELEKTRİK ÜRETİM SAN. VE TİC. A.Ş.
DOSAB  Mustafa  Karaer  Cad  No 14
Tel 0 224 261 02 90 Faks 0 224 261 02 92
Mersis  No  0004048924800001
Ulud ... V.D.  Sicil  048  9249    BURSA

**APP.205**

Alta 0028873

EXECUTION COPY R1

(iv)     if there shall have been a breach by Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 11.1, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within 10 days after written notice thereof shall have been received by Seller;

(c)     by Seller:

(i)     at any time after July 26, 2019, if the Closing shall not have occurred; provided, that Seller is not in breach of any of its representations and warranties contained in this Agreement and has not failed in any material respect to perform any of its obligations hereunder;

(ii)     if any Order permanently restraining, prohibiting or enjoining Buyer or Seller from consummating the transactions contemplated by this Agreement is entered by any Governmental Authority;

(iii)     if there shall have been a breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 12.1, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within 10 days after written notice thereof shall have been received by Buyer.

13.2  Effect of Termination; Default.  If this Agreement is terminated under Section 13.1, written notice thereof shall forthwith be given to the other Party and this Agreement will thereafter become void and have no further force and effect and all further obligations of Seller and Buyer to each other under this Agreement will terminate without further obligation or Liability of Seller or Buyer to the other Party (other than with respect to breaches, if any, of this Agreement occurring prior to such termination), except that:

(a)     If this Agreement is terminated by Buyer pursuant to Sections 13.1(b)(i), 13.1(b)(ii), 13.1(b)(iii), or 13.1(b)(iv), or by Seller pursuant to Section 13.1(c)(ii), Buyer shall be entitled to receive, and Seller shall return to Buyer, all funds paid to Seller by Buyer within three (3) Business Days after the termination of this Agreement;

(b)     If this Agreement is terminated by Seller pursuant to Section 13.1(c)(i) or 13.1(c)(iii), Seller shall be entitled to retain $75,000 of the Down Payment, and shall refund to Buyer the balance of the Down Payment within five (5) Business Days of the effective date of termination; and

(c)     Notwithstanding  the  foregoing,  Section  8.2  (Public Announcements), Article X (Limitations), Section 14.4 (Dispute Resolution), Section 14.8 (Governing Law), Section 14.10 (Notices) shall survive any such termination of this Agreement.

13.3  Effect of Termination; Buyer's Convenience.  Buyer shall have the unilateral right to terminate this Agreement for its convenience for any or no reason prior to the

17

**APP.206**

Alta 0028874

EXECUTION COPY R1

Closing Date. If Buyer terminates this Agreement for its convenience (as opposed to a termination in accordance with Section 13.1), then Seller's sole and exclusive recourse against Buyer, and Buyer's sole liability to Seller is that Seller shall be entitled to retain $75,000 of the Down Payment, and Seller shall refund to Buyer the balance of the Down Payment within five (5) Business Days of the effective date of termination. In such event, all further obligations of Seller and Buyer to each other under this Agreement will terminate without further obligation or Liability of Seller or Buyer to the other Party.

## ARTICLE XIV
## MISCELLANEOUS

14.1    Limitation on Survival of Representations, Warranties and Covenants. All representations and warranties of the Parties made herein or in any other agreement delivered pursuant to this Agreement shall not survive beyond one (1) year from the Closing Date and there shall be no liability in respect thereof after such date; provided that the representations and warranties of Seller in Sections 6.6 and 6.7 shall survive indefinitely. All covenants and agreements, which, by their terms, contemplate performance after the Closing Date, shall survive the Closing Date in accordance with their terms.

14.2    Expenses.    Except as otherwise set forth in this Agreement, each of Seller and Buyer shall bear its own expenses (including, without limitation, attorneys' fees) incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

14.3    Incorporation of Exhibits.    The exhibits identified in this Agreement are incorporated herein by reference and made a part hereof.

14.4    Dispute Resolution.

(a)    In the event of a dispute between the Parties arising under or relating to this Agreement, prior to seeking relief from any court of competent jurisdiction, such dispute shall be referred to a representative of senior management of each of the Parties for resolution for a period of no less than thirty (30) days.    Pending resolution of any claim or dispute, the Parties shall continue to perform their obligations under this Agreement.

(b)    Any dispute arising out of or in connection with this Agreement that has not been resolved in accordance with Section 14.4(a) shall be exclusively and finally settled by arbitration in accordance with the Rules of Arbitration of the International Chamber of Commerce ("ICC Rules"), by three arbitrators appointed in accordance with the ICC Rules where the arbitrators appointed by each of the Parties shall appoint the third arbitrator and failing such agreement within 14 days, the third arbitrator shall be appointed in accordance with the ICC Rules.    The arbitrators shall not be nationals of the jurisdiction of either Party.    The seat of the arbitration shall be London, England, the language of the arbitration shall be English, and the arbitrators shall apply the substantive Law of England and Wales.    Any decision of the arbitration shall be final and binding on the Parties.

18

AÇARSOY ENERJİ
ELEKTRİK ÜRETİM SAN VE TİC. A.Ş.
DOSAB Mustafa Karaer Cad. No 14
Tel 0 224 261 02 90 Faks 0 224 261 02 92
Mersis No 0040486924600011
Uludağ VD 004 048 9241    BURSA

**APP.207**

CONFIDENTIAL

Alta 0028875

EXECUTION COPY R1

14.5   No Right of Set-Off.  Buyer, for itself and for its Affiliates, successors and assigns hereby unconditionally and, irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Buyer or any of its Affiliates, successors and assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Buyer pursuant to this Agreement or any other document or instrument delivered by Buyer in connection herewith.

14.6   Timely Performance.  With regard to all dates and time periods set forth or referred to in this Agreement, timely performance is of critical importance.

14.7   Entire Agreement; Amendments and Waivers.   This Agreement (including the Exhibits attached hereto), and the Transaction Documents represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersede any other agreements, written or oral, among Seller and Buyer concerning such subject matter.   This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.   No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.   The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.   No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

14.8   Governing Law.   THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, SHALL IN ALL RESPECTS BE GOVERNED BY AND INTERPRETED, CONSTRUED, AND DETERMINED IN ACCORDANCE WITH, THE INTERNAL LAWS OF ENGLAND AND WALES (WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISION THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION).

14.9   Headings.   The section headings of this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.

14.10   Notices.   Any notice, demand, offer or other written instrument required or permitted to be given pursuant to this Agreement shall be in writing signed by the Party giving such notice and shall be sent by facsimile, hand delivery, overnight courier,

19

ACARSOY ENERJİ
ELEKTRİK ÜRETİM SAN VE TİC A.Ş.
DOSAB  Mustafa  Karaer  Cad  No 14
Tel 0 224 261 02 30 Faks 0 224 261 02 92
Merkez  No 0  041 - 0 52 4 5 00011
Uludağ VD  No 045 9249   BURSA

**APP.208**

CONFIDENTIAL

Alta 0028876

registered mail, to the other Party at the address set forth below. The Parties agree that email shall also be deemed an effective means of notification for purposes of this Agreement, provided that delivery of an email notice shall be deemed to have occurred on the earlier of (i) when the sender receives an automated message confirming delivery or (ii) one (1) hour after the time sent (as recorded on the device from which the sender sent the email) unless the sender receives an automated message that the email has not been delivered, but if the delivery or receipt is on a day which is not a Business Day or is after 5:00 pm (addressee's time) it is deemed to be received at 9:00 am recipient's time on the following Business Day.:

If to Seller:  Acarsoy Enerji Elektrik Üretim San. Ve Tic. A.S.
Attention:   Cem Cokrak
Address:    Mustafa Karaer caddesi No 14 Demirtas OSB Osmangazi
City:        Bursa
Country:     Turkey
ZIP:         16110
Email:       cemcokrak@acarsoyenerji.com.tr
Copy to:     emrahturan@acarsoyenerji.com.tr and
ozcansahin@acarsoyenerji.com.tr

If to Buyer:   WattStock LLC
Attention:   Jay Manning
Address:     Suite 850, 4040 North Central Expressway
City:        Dallas
State:       Texas
ZIP:         75204
Email:       j.manning@wattstock.com
Copy to:     p.jenevein@wattstock.com

Or to such other individual or address as a Party hereto may designate for itself by notice given as herein provided.

14.11  Severability.  If any provision of this Agreement is held or determined to be invalid or unenforceable, the balance of this Agreement shall remain in effect.  In such event, the parties shall negotiate in good faith replacement provisions that will be valid and enforceable and that provide the same or substantially similar economic effect as provided by the invalid or unenforceable provisions.

14.12  Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Unless specifically set forth herein, nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person not a party to this Agreement.  No further assignment of this Agreement or of any rights or obligations hereunder may be made by Seller or Buyer (by operation of law or otherwise) without the prior written consent of the other Party, and any attempted or purported assignment without the required consents shall be void.

20

**APP.209**

14.13   U.S. Dollars.  All dollar amounts set forth herein are United States (U.S.) dollars.

14.14   Bulk Sales.  Seller shall comply with the provision of any bulk sales laws of any jurisdiction that may apply in connection with the transactions contemplated by this Agreement.  Nothing in this section shall relieve Seller of its obligation to deliver to Buyer good and marketable title to the Equipment free and clear of all liens and encumbrances.

14.15   Joint Drafting.   The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

14.16   Counterparts.   This Agreement may be executed and delivered by facsimile signature, which shall be binding upon the Parties, upon the transmission of such facsimile and in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

14.17   All transactions hereunder shall at all times be subject to and conditioned upon compliance with all applicable export control laws and regulations of the United States. Buyer hereby agrees that it shall not transship, re-export, divert or otherwise make or allow any disposition of US origin goods, software or other material or technical data, or the direct product thereof, supplied by Seller under this Agreement, to any country other than the country in which the Equipment is located, except as may be permitted by such United States export laws and regulations. Buyer hereby certifies that the equipment, materials, technical data, software or other information or assistance furnished by Seller under this Agreement will not be used in the design, development, production, stockpiling or use of chemical, biological, nuclear or other similar such weapons either by the Buyer or by any entity acting on Buyer's behalf or with owner's knowledge.

21



**APP.210**

Alta 0028878

EXECUTION COPY R1

**IN WITNESS WHEREOF**, the Parties have caused this EQUIPMENT PURCHASE AND SALE AGREEMENT to be executed by their respective duly authorized officers, effective as of the date first written above.

**ACARSOY ENERJI ELEKTRIK ÜRETIM SAN. VE TIC. A.S.**

By      :

Name  :   Cem ÇOKRAK

Title   :   General Manager

**WATTSTOCK LLC**

By

Name :   JAY C. MANNING

Title :   PRESIDENT

28 June 2019

**APP.211**

CONFIDENTIAL

Alta 0028879

APP.212

# EXHIBIT V

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

2001 Ross Avenue
Dallas, TX 75201-2911
Tel 214.698.3100
www.gibsondunn.com

Andrew LeGrand
Direct: +1 214.698.3405
Fax: +1 214.571.2960
ALeGrand@gibsondunn.com

November 1, 2022

<u>VIA ELECTRONIC MAIL</u>

Michael Cancienne
Joseph W. Golinkin, II
Jordan, Lynch & Cancienne PLLC
1980 Post Oak Blvd., Suite 2300
Houston, TX 77056

John B. Lawrence
Baker Botts L.L.P.
2001 Ross Avenue, Suite 900
Dallas, TX 75001-2980

Re:    *Wattstock LLC et al. v. Alta Power LLC, Ch. 11 Case No. 21-31488-sgj, Adv, No. 21-03183-sgj (N.D. Tex.)*

Counsel:

As you know, we represent Third-Party Defendant General Electric International Inc. ("GE") in the above-referenced action.  I write to provide formal notice to you, your firms, and your client that we believe that neither your February 24, 2021 First Amended Answer and Counterclaim and Original Third-Party Petition ("TPP") nor your March 17, 2022 Opposition to GE's Motion for Judgment on the Pleadings (ECF No. 39) were signed and filed in compliance with Rule 11 of the Federal Rules of Civil Procedure and the Texas Disciplinary Rules of Professional Conduct.[1]

Rule 11 imposes a duty on attorneys and their clients to present to the federal courts only factual allegations that "have evidentiary support."  Fed. R. Civ. P. 11(b)(3); *see also Bynum v. Am. Airlines, Inc.*, 166 F. App'x 730, 734 (5th Cir. 2006) (Rule 11 sanctions may be appropriate if "the allegations and other factual contentions lack evidentiary support or are unlikely to do so after a reasonable opportunity for investigation").  Rule 11 also imposes a duty on attorneys and their clients to conduct "an inquiry reasonable under the circumstances" before filing a complaint.  Fed. R. Civ. P. 11(b)(3).  Violations of Rule 11 may result in "an

---

[1] "[D]istrict courts in Texas are to consider the Texas Disciplinary Rules of Professional Conduct . . . because they govern attorneys practicing in Texas generally."  *Nat'l Rifle Ass'n of Am. v. Ackerman McQueen, Inc.*, 2020 WL 5526553, *3 (N.D. Tex. Sep. 14, 2020) (citing *Fed. Deposit Ins. Corp. v. United States Fire Ins. Co.*, 50 F.3d 1304, 1312 (5th Cir. 1995)).

Beijing · Brussels · Century City · Dallas · Denver · Dubai · Frankfurt · Hong Kong · Houston · London · Los Angeles · Munich
New York · Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

**APP.214**

GIBSON DUNN

John B. Lawrence
Joseph W. Golinkin, II
November 1, 2022
Page 2

appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation," including attorneys' fees. *Id.* 11(c)(1); *see Turnbow v. White*, 2021 WL 3195920, at *1–2 (N.D. Tex. July 13, 2021) (awarding attorneys' fees as a Rule 11 sanction for unsupported factual contentions in complaint). Similarly, the Texas Disciplinary Rules provide that "[a] lawyer shall not bring . . . a proceeding, or assert or controvert an issue therein, unless the lawyer reasonably believes that there is a basis for doing so that is not frivolous." Tex. Disc. R. Prof'l Conduct 3.01. Violating the Texas Disciplinary Rules by knowingly filing unsubstantiated claims in federal court can subject an attorney to disciplinary proceedings. *See* N.D. Tex. L.R. 83.8(b), (e).

Where, as here, attorneys assert claims or factual allegations that a reasonable investigation would have revealed lack merit, the attorneys and their law firms may be subject to sanctions under Rule 11. *See, e.g.*, *Boone v. Galveston Indep. Sch. Dist.*, 126 F. App'x 660 (5th Cir. 2005). As explained below, you and your client have failed to comply with these standards. Your pleadings and other court filings violate Rule 11 because many of the claims and allegations asserted therein are patently false. The Fifth Circuit has upheld the imposition of Rule 11 sanctions against attorneys who file documents that include false allegations. *See, e.g.*, *Worrell v. Houston CanA Acad.*, 287 F. App'x 320, 325–26 (5th Cir. 2008); *Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255, 262–66 (5th Cir. 2007). This is especially true where the attorney knows the allegations are false. *See, e.g.*, *Barrett-Bowie v. Select Portfolio Servicing, Inc.*, 631 F. App'x 219, 219 (5th Cir. 2015); *Mercury Air Group, Inc. v. Mansour*, 237 F.3d 542, 549 (5th Cir. 2001).

As explained below, discovery to date has made clear that Alta lacks any evidentiary or legal basis for its allegations and representations to the Court regarding the disclosure of termination fees and the Castleman dispute. These claims, and others in Alta's Third-Party Petition and court filings to date, are demonstrably false.

**A.      Your Allegations Regarding GE's Alleged Concealment of the Termination Fees Associated with Its Long Term Service Agreements Are Demonstrably False.**

The Third-Party Petition is overwrought with misrepresentations about GE's supposed concealment of the termination fees associated with its Long Term Service Agreements with potential resellers of used aeroderivative gas turbines. You allege that the termination "fees were not disclosed until after (1) the units were targeted, (2) a purchase agreement was executed between the owners and WattStock, and (3) Alta Power paid WattStock millions of dollars in down payments associated with these purchase agreements." *See* TPP ¶ 55.

You also allege that "[i]t was not until almost nine months after Alta Power had paid the first down payment that Alta Power learned of the *existence* of the LTSA termination fees,"

**GIBSON DUNN**

John B. Lawrence
Joseph W. Golinkin, II
November 1, 2022
Page 3

suggesting that the first time Alta heard about "termination fees" associated with LTSAs
generally was from Nuh Cemento in February 2020. *Id.* ¶ 56 (emphasis added). Alta further
alleges that GE "was aware of the undisclosed termination fees before suggesting the Nuh
Cemento units be targeted for acquisition" and "*deliberately hid the existence* of the
termination fees in the hope Alta Power would have no choice but to pay them at the 11th
hour[.]" *Id.* ¶ 57 (emphasis added). Finally, you allege that "WattStock/GE failed to disclose
that the Acarsoy unit was burdened with a multi-million-dollar LTSA termination fee, which
was not included in the pricing presented to Alta Power." *Id.* ¶ 61. These misstatements have
been repeated and overstated in your briefings and written discovery responses, as well as at
hearings and depositions.[2]

To the contrary, Alta's own documents, many of which were produced in this case before Alta
filed its Third-Party petition, confirm that Alta was told about the termination fees as early as
2019—*before* signing purchase and sale agreements for the units at issue. *See* Laterza Dep.
Ex. 11a.[3] In fact, almost two years ago, you used one of these documents as an exhibit during

---

[2] *See* Alta's Opp. to GE Mot. for Judgment on the Pleadings at 4 ("Each turbine presented to Alta was
burdened by material secret liabilities, all of which were driven by internal GE policies—the existence
of which GE and WattStock conspired to conceal from Alta until after Alta had already spent significant
money on the projects."); *id.* at 5 ("GE and WattStock concealed the existence the existence of these
undisclosed liabilities on *every turbine suggested to Alta*, in hopes that Alta would be forced to pay
the extra fees at the 11th hour once project financing had been secured and the project was well
underway." (emphasis added)); Rule 91A Mot. Hr'g at 30:25-31-8 (Jessica Pulliam of Baker Botts on
behalf of Alta Power) ("[W]hen there were representations made by both GE and WattStock with
respect to the pricing, there was a failure to . . . tell Alta Power the whole truth. And the . . .
representations about the pricing were . . . knowingly false because GE was aware that . . . these
termination fees existed."); Mot. for Judgment on the Pleadings Hr'g at 60:15-17 (Jessica Pulliam of
Baker Botts on behalf of Alta Power) ("The problem here is that there's no disclosure of this known fee
that I mentioned earlier."); Alta's Am. Objections and Resps. at 5 ("GE egregiously broke its promise
to do everything in its power to enable Alta Power to purchase the nine required units at or below Alta
Power's 'not to exceed' price. . . . GE did the exact opposite . . . by (a) refusing to release Nuh Cemento,
Ataer unit, or Ac[a]rsoy from their obligation to pay GE termination fees upon cancellation of the GE
service agreements attached to those units and (b) attempting to use the termination fees to force Alta
Power into entering into Long Term Service Agreements with GE for these units.").

[3] *See also* Laterza Depo. Ex. 2022 (email from T. West to M. Laterza from February 2019 attaching
spreadsheet called "Aero Power Plants for sale_2019 V2" that lists a $1.5 million termination fee for
the UGER unit); Laterza Depo. Ex. 2026 (email from J. Manning to T. West and M. Laterza from April
2019 attaching spreadsheet which specifies "[a]greed upon price" entry for the Acarsoy unit, "$500k

*(Cont'd on next page)*

GIBSON DUNN

John B. Lawrence
Joseph W. Golinkin, II
November 1, 2022
Page 4

your deposition of Pete Watson and sought testimony from him regarding this claim. *See* Watson Dep. 142:3-148:16. But the document that you used in that deposition had been manipulated. *See id.* Ex. 11. The version of the document that you used omitted all of the comments on the document, including a *highlighted* comment that showed that WattStock did not hide the existence of termination fees generally or specifically for the units at issue in this litigation and also communicated the exact dollar amounts of those fees in early 2019. *See* Laterza Dep. Ex. 11a. When asking Mr. Watson questions about that document during his January 12, 2021 deposition, you admitted that "we [presumably Alta and its counsel] knew the – we looked at the Acarsoy unit, and we were aware that there was a 500,000 cap on the termination fee for that one … based on the LOI." Watson Dep. 143:4-10. It is unacceptable— and frankly sanctionable—that you would sign and file the Third-Party Petition one month later and represent to two separate courts, on multiple occasions, that Alta was unaware of the existence of any termination fees until Nuh Cemento began demanding payment for those fees in February 2020.

To make matters worse, your filings and arguments in court have deliberately created the misimpression that GE engaged in a "bait and switch" scheme to try to *impose* LTSA termination fees on Alta at the "11th hour" when Alta would have no choice but to pay them. TPP ¶¶ 57, 146.[4] It is unsurprising that you have failed to produce a single document or

---

for canc fee" and "[a]greed upon price" entry for Nuh GT2 that "includes elimin[a]ting the GE $1.4mm LTSA debt"); Laterza Depo. Ex. 2027 (same); Laterza Depo. Ex. 2030 (same); Laterza Depo. Ex. 11A (same); Laterza Depo. Ex. 2032 (same); Laterza Depo. Ex. 2028 (email from J. Manning to M. Laterza dated May 2019 with signed Nuh Cemento offer letter and PSA attached); Laterza Depo. Ex. 2040 (query from Owl Rock Capital to Laterza from September 2019 stating that Alta "will have a long term service agreement/engine lease pool arrangement with either GE or MTU"); Laterza Depo. Ex. 2029 (email from J. Manning to M. Laterza from April 2019 attaching Letter of Intent, which states that "in the event that Acarsoy is required to pay to the General Electric company termination fees for the early termination of the contractual services agreement, WattStock will increase the purchase price of the equipment by the amount of such termination fees up to an amount not to exceed $500,000"); Laterza Depo. Ex. 2031 (email from J. Manning and copying M. Laterza from June 2019 attaching executed Acarsoy PSA with a definition of "Early Services Termination Fee" and subsequently defines "purchase price" as $7.5 million "minus . . . an amount equal to the amount General Electric reduces Seller's payment of the Early Services Termination Fee, if any").

[4] *See* Rule 91A Mot. Hr'g at 34:20-35:2 (Jessica Pulliam of Baker Botts on behalf of Alta Power) ("What Alta found out later was that in order to -- for -- for Alta to ultimately obtain those turbines, the third party was insisting on a $1.4 million LTSA termination fee from GE and that GE tried to impose that fee on Alta. That was – was something that was never told to Alta as part of the not to exceed price, but was -- but GE tried to force it on Alta later."); *see id.* at 30:16-19 ("Alta only later found out for the

*(Cont'd on next page)*

**GIBSON DUNN**

John B. Lawrence
Joseph W. Golinkin, II
November 1, 2022
Page 5

communication to support these statements. They are simply not true. GE was not imposing on or passing through to Alta any sort of termination fees; rather, the fees were being requested by certain third-party sellers, and the fees were capped at $500,000 on the Acarsoy unit (as you acknowledged during Mr. Watson's deposition).

Mr. Laterza's deposition testimony further confirms that you have continuously made false representations regarding Alta's awareness of LTSA termination fees. Mr. Laterza not only conceded that he was aware of the existence of termination fees for LTSAs at least as early as February 2019, but he also testified that the existence of termination fees for the five units "might have been disclosed" *before* Alta spent any money on those units. *See* Laterza Dep. 235:12-19 (testifying that WattStock disclosed the termination fee for UGUR unit in February of 2019); *see also id.* 149:13-16 (the "existence [of termination fees for the five units] might have been disclosed" before Alta spent any money on those units).

**B.    Alta's Allegation That WattStock Is Responsible for Alta's Dispute with Castleman Lacks Factual and Legal Support.**

Alta attempts to hold GE vicariously liable for WattStock's alleged disclosure of information to Castleman regarding Alta's purported financing transaction from Deutsche Bank. *See* TPP ¶¶ 113-23. You allege that "[s]ometime before financing was closed, WattStock disclosed to Ryan Castleman . . . that project financing from Deutsche Bank was imminent[,]" and Castleman "attempted to scuttle Alta Power's financing . . . [and] threatened to file a frivolous 'trade secret' lawsuit against Alta Power to stop the financing." *Id.* ¶ 79. Unsurprisingly, Alta has not produced a shred of evidence to support this baseless allegation; instead, Alta's own documents show that Alta's allegations about the timing of Castleman's threat of litigation and Alta's "imminent" financing are legally and factually frivolous.

Mr. Laterza testified during his deposition that his only evidence to support the claim that WattStock told Castleman about Alta's imminent financing was his own supposedly "logical[]

---

first time that the 6.5 million not to exceed price did not include the cancellation of GE's own termination fees."); *see also* Mot. for Judgment on the Pleadings Hr'g at 50:9-13 (Jessica Pulliam of Baker Botts on behalf of Alta Power) ("So what was missing from the pricing representations was peculiar with -- peculiarly in the knowledge of GE. It knew that it had these requirements to be paid these fees. That was in GE's knowledge. It wasn't in Alta's knowledge."); Laterza Dep. 133:23-1 ("GE attempted to pass through to" Alta "all of the undisclosed cost increases and liabilities that were burdening these units"); Alta's Opp. to GE Mot. for Judgment on the Pleadings at 5 ("WattStock and GE had deliberately identified for Alta *only* those turbines burdened with liabilities so that GE could recover profits under the Alta/WattStock contract *and* additional profits associated with the hidden liabilities." (emphasis in original)).

John B. Lawrence
Joseph W. Golinkin, II
November 1, 2022
Page 6

. . . deduc[tion] that because there was no crossover between [Alta] and Castleman, and WattStock was the only – the only common third party that knew of the Deutsche Bank financing." *Id.* 281:17-282:4; *see id.* 282:5-10 (testifying that the "only way [the disclosure to Castleman] could have happened" was because "Mr. Manning called [Mr. Laterza] and talked to [Mr. Laterza] about a conversation [Mr. Manning] had with Mr. Castleman around the time that Mr. Castleman sent [Laterza] this cease and desist letter."). But it is clear from an email exchange between Ryan Castleman and Travis West that Castleman had threatened action against West in November of 2018—a fact that Mr. Laterza did not and could not dispute. *See* Laterza Dep. Ex. 2045 ("We have information that indicates you have been in violation of the nondisclosure and noncompete agreement. This is an issue we will be taking action to enforce."); *see also* Laterza Dep. 289:12-18 (agreeing that according to Ex. 2045, Castleman threatened litigation or some action to enforce the nondisclosure and noncompete agreements well in advance of Alta Power ever even having its first conversation with Deutsche Bank about financing). This predates any attempts by Alta to seek financing from Deutsche Bank for its peaker plant project by several months. Relatedly, and more notably, you have also produced email correspondence between Alta's prior counsel and Castleman's attorneys in which Castleman's counsel represents that the first time Castleman learned of Alta's financing efforts with Deutsche Bank was during a phone call with Alta's own attorneys. *See* Laterza Dep. Ex. 2044.

***

For the reasons explained above, Alta's claims regarding termination fees and the Castleman dispute are devoid of any factual or legal support. The specific allegations discussed in this letter are intended to be illustrative, not exhaustive, and this letter represents a good-faith effort to confer about a path forward without intervention from the Court. We reserve our right to seek all appropriate relief from the Court if you and your client refuse to resolve these issues to GE's satisfaction.

Please let us know when you are available to discuss these issues by phone. We expect to receive a prompt response.

Andrew LeGrand
APL/prp

# EXHIBIT W

**APP.220**

**GIBSON, DUNN & CRUTCHER LLP**
John T. Cox III (Tex. Bar No. 24003722)
Andrew LeGrand (Tex. Bar No. 24070132)
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201-2911
Tel: 214.698.3100
TCox@gibsondunn.com
ALegrand@gibsondunn.com
*Counsel to General Electric International, Inc.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **IN RE WATTSTOCK, LLC,** | **Case No. 21-31488-sgj11V** |
| *Debtor.* | **Chapter 11** |
| | **Subchapter V** |
| **WATTSTOCK LLC,** | **Adv. No. 21-03083-sgj** |
| *Plaintiff,* | |
| **v.** | *Removed from the District Court of Dallas County, Texas, 116th Judicial District* |
| **ALTA POWER LLC,** | |
| *Defendant, Counter-Plaintiff, and Third-Party Plaintiff,* | **Case No. DC-20-08331** |
| **v.** | |
| **WATTSTOCK LLC,** | |
| *Counter-Defendant,* **and** | |
| **GENERAL ELECTRIC INTERNATIONAL, INC., d/b/a GE POWER SERVICES,** | |
| *Third-Party Defendant.* | |

**GENERAL ELECTRIC INTERNATIONAL, INC.'S MOTION
TO AMEND THE SCHEDULING ORDER AND TEMPORARILY STAY DISCOVERY**

APP.221

Third-Party Defendant General Electric International, Inc. ("GE") hereby respectfully moves the Court to amend the scheduling order, consistent with Federal Rule of Civil Procedure 16(b), to set a deadline for the pleadings to close.  Specifically, GE requests that the Court order:

(1)     Any motion for leave by WattStock to amend its complaint against Alta to be filed no later than 30 days from the date of the Court's order;

(2)     Any amended answer and counterclaims by Alta against WattStock, and any motion for leave by Alta to amend its third-party complaint against GE, to be filed within 21 days of the later of WattStock's deadline to file a motion for leave or the docketing of any amended complaint by WattStock;

(3)     Any amended answer by WattStock, and any amended answer and counterclaims by GE, to be filed within 21 days of the later of Alta's deadline to file a motion for leave or the docketing of any counterclaims and/or amended third-party complaint by Alta;

(4)     Any answer by Alta to any GE counterclaim to be filed within 14 days of GE's amended answer; and

(5)     The pleading to close 14 days after WattStock's deadline to file its amended answer and GE's deadline to file its amended answer and counterclaims.

GE further requests that the Court stay all proceedings and discovery in this case until the pleadings are closed and a new scheduling order is entered by the Court.  The grounds for this motion are fully set forth in the accompanying brief, filed concurrently.

 Dated:  November 23, 2022

                                        Respectfully submitted,

                                        /s/   Andrew LeGrand
                                        John T. Cox III  (Tex. Bar No. 24003722)
                                        Andrew LeGrand (Tex. Bar No. 24070132)
                                        GIBSON, DUNN & CRUTCHER LLP
                                        2001 Ross Avenue, Suite 2100,
                                        Dallas, TX 75201
                                        Tel:    214.698.3100
                                        Email: TCox@gibsondunn.com
                                                ALegrand@gibsondunn.com

                                                                    **APP.222**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document has been served on counsel of record pursuant to the Federal Rules of Civil Procedure.

*/s/ Andrew LeGrand*
Andrew LeGrand

*Attorney for General Electric
International, Inc.*


## CERTIFICATE OF CONFERENCE

Pursuant to Local Bankruptcy Rule 7007-1, I certify that on November 18, 2022, counsel for GE met and conferred with counsel for Alta Power LLC.  Alta and GE were unable to reach agreement and have reached an impasse, leaving the open issues for the court to resolve.  The motion is opposed by Alta Power LLC.  I certify that on November 21, 2022, counsel for GE met and conferred with counsel for WattStock LLC.  WattStock LLC does not oppose this motion.

*/s/ Andrew LeGrand*
Andrew LeGrand

*Attorney for General Electric
International, Inc.*

**APP.223**

# EXHIBIT X

**GIBSON, DUNN & CRUTCHER LLP**
John T. Cox III (Tex. Bar No. 24003722)
Andrew LeGrand (Tex. Bar No. 24070132)
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201-2911
Tel:  214.698.3100
TCox@gibsondunn.com
ALegrand@gibsondunn.com
*Counsel to General Electric International, Inc.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| **IN RE WATTSTOCK, LLC,** | **Case No. 21-31488-sgj11V** |
| *Debtor.* | **Chapter 11**<br>**Subchapter V** |
| | **Adv. No. 21-03083-sgj** |
| **WATTSTOCK LLC,** | |
| *Plaintiff,* | *Removed from the District Court of*<br>*Dallas County, Texas, 116th Judicial*<br>*District* |
| **v.** | |
| **ALTA POWER LLC,** | **Case No. DC-20-08331** |
| *Defendant, Counter-Plaintiff, and Third-Party Plaintiff,* | |
| **v.** | |
| **WATTSTOCK LLC,** | |
| *Counter-Defendant,* **and** | |
| **GENERAL ELECTRIC INTERNATIONAL, INC., d/b/a GE POWER SERVICES,** | |
| *Third-Party Defendant.* | |

**BRIEF IN SUPPORT OF GENERAL ELECTRIC INTERNATIONAL, INC.'S MOTION TO AMEND THE SCHEDULING ORDER AND <u>TEMPORARILY STAY DISCOVERY</u>**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL AND PROCEDURAL BACKGROUND.......................................... 3

    A.    Alta's Pleadings, Filings, and Representations to the Court............................ 3

    B.    Alta's Allegations and Arguments Are Demonstrably False............................ 5

    C.    GE Informed Alta of Its False Allegations ................................................... 10

    D.    WattStock and Alta Have Entered Into Settlement Negotiations ................... 11

III.  ARGUMENT ...................................................................................................... 11

    A.    The Court Has the Authority to Amend the Scheduling Order and Close the
        Pleadings, and It Should Do So .................................................................... 11

    B.    The Court Has the Authority to Stay This Action, and It Should Do So....................... 12

IV.   CONCLUSION.................................................................................................... 16

## TABLE OF AUTHORITIES

CASES                                                                                          PAGE(S)

*Augustyniak Ins. Grp., Inc. v. Astonish Results, L.P.*,
  No. CV 11-464S, 2012 WL 13041528 (D.R.I. Dec. 12, 2012) ...............................15

*Bassknight v. Deutsche Bank Nat'l Tr. Co.*,
  No. 3:12-CV-1412-M BF, 2014 WL 6769085 (N.D. Tex. Dec. 1, 2014) .............................13

*Clinton v. Jones*,
  520 U.S. 681 (1997)............................................................................12

*E.C. v. Beacon Hill Asset Mgmt. LLC*,
  No. 02 CIV. 8855 (LAK), 2004 WL 367673 (S.D.N.Y. Feb. 25, 2004) ...............................14

*Exclusive Fishing Tex., LLC v. Markel Am. Ins. Co.*,
  No. 2:16-CV-125, 2016 WL 10703624 (S.D. Tex. May 3, 2016)...........................13

*Hennessey v. ICE Floe, LLC*,
  No. C20-0835RSL, 2021 WL 322685 (W.D. Wash. Feb. 1, 2021)........................15

*Himebaugh v. Smith*,
  476 F. Supp. 502 (C.D. Cal. 1978) ...........................................................14

*Holmes v. Gates*,
  No. 1:08-CV-2152, 2009 WL 3366471 (M.D. Pa. Oct. 19, 2009) ..........................13

*Interpreter Services, Inc. v. BRB Techs., Inc.*,
  No. CIV. 10-4007, 2011 WL 2601740 (D.S.D. June 30, 2011) ..........................13

*Landis v. N. Am. Co.*,
  299 U.S. 248 (1936)........................................................................12, 16

*McKnight v. Blanchard*,
  667 F.2d 477 (5th Cir. 1982) ...............................................................12

*Melvin v. Astrue*,
  No. 5:10-CV-347-D, 2011 WL 6299219 (E.D.N.C. Oct. 14, 2011).......................13

*Poppel v. Rockefeller Univ. Hosp.*,
  No. 19-CV-1403 (ALC), 2019 WL 3334476 (S.D.N.Y. July 25, 2019) ...............................13

*Primesource Building Prods., Inc. v. Lee Grp. Int'l, Inc.*,
  3:19-CV-02878-X, 2020 WL 6140462 (N.D. Tex. Aug. 12, 2020) ..........................12

*Rakhshandeh v. Tex. Tech Univ.*,
  No. 5:20-CV-110-BQ, 2022 WL 1608637 (N.D. Tex. May 20, 2022) ...............................13

*In re Ramu Corp.*,
  903 F.2d 312 (5th Cir. 1990) ...............................................................12

*Royal Consumer Prods. v. Martin Indus., LLC*,
  No. 3:15-CV-00830-CRS, 2016 WL 3080841 (W.D. Ky. May 27, 2016)............................12

*Umsted v. Andersen LLP*,
    No. CIV.A.3:02CV496M, 2003 WL 222621 (N.D. Tex. Jan. 28, 2003) ...............................13

**RULES**

Fed. R. Civ. P. 16(b)(1), (b)(3)(A).................................................................................................11

## I.    INTRODUCTION

Discovery to date has revealed that Alta and its counsel have made a series of misrepresentations in their pleadings, filings, and arguments in this Court.  As detailed below, Alta and its counsel have repeatedly claimed that (1) GE and WattStock failed to disclose the existence of the Long Term Service Agreement ("LTSA") cancellation fees until after Alta had spent millions of dollars pursuing the used nine aeroderivative gas turbines at issue in this case; and (2) Alta "learned of the existence of the LTSA cancellation fees" in February 2020, when the Turkish owner of two of these units began demanding payment of those fees.  Alta's Third-Party Petition ("TPP") ¶ 56, APP20.  But Alta's own documents and the testimony from its principal witness, CFO Matthew Laterza, confirm that those statements were neither true nor reasonably supported by any evidence.  The same can be said of one of Alta's additional claims, that "WattStock disclosed to Ryan Castleman . . . that project financing from Deutsche Bank was imminent" and Castleman "predictably attempted to scuttle Alta Power's financing" by "threaten[ing] to file a frivolous 'trade secret' lawsuit against Alta Power to stop the financing."  APP24 ¶ 79.  The truth is that Castleman first threatened a lawsuit related to Alta's engagement of its former employees and consultants, Travis West and Roy Hart, in November 2018—months before Alta even approached Deutsche Bank about financing.  And, in fact, Alta's own documents show that the Deutsche Bank financing request was disclosed to Castleman by Alta's own outside counsel in August 2019.

After Laterza's deposition, GE notified Alta and its counsel of their duty to correct and refrain from continuing to advance their false statements about disclosure of the existence of the LTSA cancellation fees and the Castleman dispute.  GE proposed a path forward that would not have required any intervention by this Court.  First, GE offered to allow Alta to amend its TPP to remove these and any other misstatements.  And second, GE proposed a stipulation regarding the

**APP.229**

non-use of any testimony by Pete Watson—a deponent with whom Alta's counsel used an apparently altered document to suggest (incorrectly) that these fees were not disclosed.  During a November 1, 2022 call between GE and Alta's counsel, Alta's counsel initially indicated that it had "always intended to amend" its complaint.  LeGrand Decl. ¶ 7, APP3.  At the parties' meet and confer on November 8, 2022, however, Alta's counsel backtracked, taking the position that it does not intend to "materially" alter the operative complaint.  APP3–4 ¶ 8.

GE files this motion to put an end to this gamesmanship.  If Alta intends to amend its complaint, it should seek leave to do so by a date certain so the parties and the Court have clarity regarding the true nature of this dispute.  If Alta elects not to amend, GE should be allowed to pursue appropriate relief for the false statements in Alta's pleadings, filings, and arguments with this Court.  And, at a minimum, the pleadings should be set to close so that GE can assert any counterclaims it intends to pursue, and Alta will be required to live with its decision to double down on its misrepresentations.

GE also seeks a short stay so the parties can avoid discovery that may turn out to be irrelevant, and to confer on a new case schedule as appropriate after the pleadings have closed.  A short stay is also warranted for a separate and equally compelling reason: GE's counsel recently became aware of ongoing settlement negotiations between Alta and WattStock.  LeGrand Decl. ¶ 9, APP4.  While GE has not participated in these negotiations, GE believes a stay would be beneficial if a settlement between Alta and WattStock is imminent or likely to occur in the near future.  Alta will have to amend its Third-Party Petition if it resolves its dispute with WattStock, and WattStock's claims against Alta (and WattStock as a party) presumably will be dismissed from the case.  Any such dismissal would have implications for discovery directed at WattStock (who

APP.230

would become a third party) and the viability of Alta's vicarious liability claims against GE—all of which are predicated on *WattStock's* alleged misconduct.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Alta's Pleadings, Filings, and Representations to the Court

Alta filed its Third-Party Petition on February 24, 2021. In it, Alta advanced two sets of extremely serious but entirely baseless allegations. First, Alta asserted that "[u]tilizing a classic 'bait and switch move,' GE/WattStock deliberately hid the existence of the [Long Term Service Agreement ('LTSA')] termination fees in the hope Alta Power would have no choice but to pay them at the 11th hour after Alta Power's project financing had been secured and the projects were already well underway." TPP ¶ 57, APP20. More specifically, Alta claimed that "the LTSA termination fees were not disclosed until after (1) the units were targeted, (2) a purchase agreement was executed between the owners and WattStock, and (3) Alta Power paid WattStock millions of dollars in down payments associated with these purchase agreements." *Id.* ¶ 55. The Third-Party Petition alleges that "Alta Power learned of the existence of the LTSA termination fees" "almost nine months after Alta had paid the first down payment." *Id.* ¶ 56.

Second, Alta claimed that WattStock "caused Alta Power to lose project financing [from Deutsche Bank] for its . . . unique strategy for developing power generation projects in the Texas market." APP29 ¶ 116. According to the Third-Party Petition, "[s]ometime before financing was closed, WattStock disclosed to Ryan Castleman . . . that project financing from Deutsche Bank was imminent," and Castleman, as "one of Alta Power's few competitors," "predictably attempted to scuttle Alta Power's financing" by "threaten[ing] to file a frivolous 'trade secret' lawsuit against Alta Power to stop the financing." APP24 ¶ 79.

Importantly, Alta continued to reiterate and expand on these assertions in its subsequent filings and arguments. In its Opposition to GE's Motion for Judgment on the Pleadings, Alta

claimed that GE and WattStock *conspired to conceal* the termination fees from Alta. *See* Alta's Opp. to GE Mot. for Judgment on the Pleadings at 4, APP46 ("Each turbine presented to Alta was burdened by material secret liabilities, all of which were driven by internal GE policies—the existence of which GE and WattStock *conspired to conceal* from Alta until after Alta had already spent significant money on the projects." (emphasis added)); APP47 at 5 ("GE and WattStock *concealed* the existence of these undisclosed liabilities on *every turbine suggested to Alta*, in hopes that Alta would be forced to pay the extra fees at the 11th hour once project financing had been secured and the project was well underway." (emphasis added)); *id.* ("WattStock and GE had deliberately identified for Alta *only* those turbines burdened with liabilities so that GE could recover profits under the Alta/WattStock contract *and* additional profits associated with the hidden liabilities." (emphasis in original)).

Alta's counsel made similar representations to the Court during the hearing on GE's dispositive motion.[1] *See, e.g.*, Mot. for Judgment on the Pleadings Hr'g at 60:15–17, APP79 ("The problem here is that there's no disclosure of this known fee that I mentioned earlier."); APP78 at 50:9–13 ("So what was missing from the pricing representations was peculiar with -- peculiarly in the knowledge of GE. It knew that it had these requirements to be paid these fees. That was in GE's knowledge. It wasn't in Alta's knowledge.").

---

[1] This was consistent with Alta's earlier oral representations to the state court. *See* Rule 91A Mot. Hr'g at 30:25–31:8, APP72–73 (Jessica Pulliam of Baker Botts on behalf of Alta Power) ("[W]hen there were representations made by both GE and WattStock with respect to the pricing, there was a failure to . . . tell Alta Power the whole truth. And the . . . representations about the pricing were . . . knowingly false because GE was aware that . . . these termination fees existed."); APP74–75 at 34:20–35:2 (Jessica Pulliam of Baker Botts on behalf of Alta Power) ("What Alta found out later was that in order to -- for -- for Alta to ultimately obtain those turbines, the third party was insisting on a $1.4 million LTSA termination fee from GE and that GE tried to impose that fee on Alta. That was -- was something that was never told to Alta as part of the not to exceed price, but was -- but GE tried to force it on Alta later."); APP72 at 30:16–19 ("[A]lta only later found out for the first time that the 6.5 million not to exceed price did not include the cancellation of GE's own termination fees.").

Alta CFO Matt Laterza claimed in his deposition that each of the nine units Alta sought to purchase from WattStock "had something that was undisclosed to" Alta. Laterza Dep. at 147:11–15, APP85. He testified that the "Nuh Cemento 1 and Nuh Cemento 2, Acarsoy, Ataer 1, [and] Ataer 2" units each had LTSA termination fees that were not disclosed at any time to Alta before Alta spent money on those units. APP86–87 at 148:10–149:1. When asked whether it was his "testimony sitting here today that Alta Power learned of the existence of the LTSA termination fees in February of 2020 when someone from Nuh Cemento began demanding reimbursement for those fees," Laterza answered: "That's correct. That was the first time it was ever highlighted to us." APP90 at 158:13–19. Laterza maintained that "GE attempted to pass through to" Alta "all of the undisclosed cost increases and liabilities that were burdening these units." APP83–84 at 133:23–134:1.

## B.    Alta's Allegations and Arguments Are Demonstrably False

Discovery in this case has confirmed that Alta's factual allegations and representations to the Court are patently false. Indeed, even the most cursory pre-suit investigation would have exposed Alta's allegations as legally and factually frivolous. GE never "conspired to conceal" the termination fees. Quite the contrary, Alta's own documents establish beyond any doubt that Alta was made aware of the existence of termination fees generally as early as February 2019, and the $1.4 million in termination fees for the Nuh Cemento units specifically no later than April 2019. *See* Laterza Dep. Ex. 11a, APP105–12.[2] Alta's documents show that throughout this time, Alta

---

[2] *See also* Laterza Dep. Ex. 2022, APP114–15 (email from T. West to M. Laterza from February 8, 2019, attaching spreadsheet called "Aero Power Plants for sale_2019 V2" that lists a $1.5 million termination fee for the UGER unit); Laterza Dep. Ex. 2026, APP121 (email from J. Manning to T. West and M. Laterza from April 11, 2019, attaching spreadsheet which specifies "[a]greed upon price" entry for the Acarsoy unit, "$500k for canc fee," and "[a]greed upon price" entry for Nuh GT2 that "includes elimin[a]ting the GE $1.4mm LTSA debt"); Laterza Dep. Ex. 2027, APP127 (same); Laterza Dep. Ex. 2030, APP133–34 (same); Laterza Dep. Ex. 11A, APP109–10 (same); Laterza Dep. Ex. 2032, APP141–47 (same); Laterza

and WattStock communicated regularly about the used aeroderivative units WattStock targeted for Alta's potential purchase.  No later than February 8, 2019, WattStock shared an Excel file with Alta that provided detailed information about each of the targeted units and the status of WattStock's attempts to acquire those units for Alta's use.  The February 8, 2019 version of that Excel file shows beyond any doubt that Alta was made aware of the existence of termination fees nearly three weeks before Alta and WattStock executed the Master Agreement on February 27, 2019—and well before February 2020, when Alta alleges in its Third-Party Petition that it first learned about the existence of any such fees.  Laterza Dep. Ex. 2022, APP114–15.  Crucially, the April 11, 2019 version of this file shows that Alta was specifically informed about the $1.4 million in termination fees for the two Nuh Cemento units months before Alta executed purchase and sale agreements for those units.  Laterza Dep. Ex. 2026, APP117–21.  The Excel files also conclusively prove that Alta learned about the termination fees directly from WattStock, and not (as Alta alleges in its TPP) the Turkish owner of the two Nuh Cemento units.

Alta's accusation that GE and WattStock engaged in a "bait and switch" scheme to ambush Alta at the "11th hour" collapses in the face of Alta's own documents.  TPP ¶ 57, APP20.  Alta and its counsel had a duty to conduct some reasonable investigation into these facts—one easily

---

Dep. Ex. 2028 APP149–78 (email from J. Manning to M. Laterza dated May 2019 with signed Nuh Cemento offer letter and PSA attached); Laterza Dep. Ex. 2040, APP180–81 (query from Owl Rock Capital to Laterza from September 2019 stating that Alta "will have a long term service agreement/engine lease pool arrangement with either GE or MTU"); Laterza Dep. Ex. 2029, APP185 (email from J. Manning to M. Laterza from April 2019 attaching Letter of Intent, which states that "in the event that Acarsoy is required to pay to the General Electric company termination fees for the early termination of the contractual services agreement, WattStock will increase the purchase price of the equipment by the amount of such termination fees up to an amount not to exceed $500,000"); Laterza Dep. Ex. 2031, APP193, APP195 (email from J. Manning and copying M. Laterza from June 2019 attaching executed Acarsoy PSA with a definition of "Early Services Termination Fee" and subsequently defines "Purchase Price" as $7.5 million "minus . . . an amount equal to the amount General Electric reduces Seller's payment of the Early Services Termination Fee, if any").

made on documents already produced by Alta itself in this very case—before making patently false statements in its pleadings, filings, and arguments to the Court.

Worse still, it appears that Alta not only *ignored* this evidence, but in fact *manipulated* it. When deposing Pete Watson almost two years ago, Alta's counsel used a spreadsheet that—in its unmodified form—contains a comment from WattStock expressly flagging for Alta the termination fees associated with the Nuh Cemento units. But in Watson's deposition, Alta used a version of the document that omitted the comment. *Compare* Watson Dep. Ex. 11, APP218–21 (Alta's version of the document), *with* Laterza Dep. Ex. 11a, APP109–12 (unmodified version of the document). Below is the relevant segment of the unmodified version of the document, which was marked as Exhibit 11A during Matthew Laterza's deposition and shows the comment from WattStock noting that the agreed price for the Nuh Cemento units "includes elimin[a]ting the GE $1.4mm LTSA debt":

| $ | 3,960,000.00 | $ | 3,630,000.00 | $ | 2,750,000.00 | $ | 3,080,000.00 | $ | 1,100,000.00 | $ | 1,100,000.00 | Jay Manning: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | YES | | YES | | YES | | YES | | YES | | NO | PPE raised their price for BOP from $190k to $250k. |
| | YES | | YES | | YES | | YES | | YES | | YES | Includes eliminating the GE $1.4mm LTSA debt. |
| | YES | | YES | | YES | | YES | | YES | | Yes | |
| | YES | | YES | | YES | | YES | | YES | | Yes | |
| | | | no | | no | | no | | | | no | |
| | | | $11mm for both units | | $3mm | | $11mm for both units | | | | $3mm | |
| | | | 6.1mm | | $2.3mm | | 6.1mm | | | | $850k | |
| | $3,760,000 and 1% DP | | $2,625,000 WITH 4% DP | | $2.6mm w/10% DP | | $3,625,000 WITH 4% DP | | $940,000 and 1% DP | | 950000 | $ 200,000 |

APP109. In contrast, WattStock's comment was nowhere to be found in the version of the document that Alta's counsel marked as Exhibit 11 and used during Pete Watson's deposition:

| 0 | $ | 3,960,000.00 | $ | 3,630,000.00 | $ | 2,750,000.00 | $ | 3,080,000.00 | $ | 1,100,000.00 | $ | 1,100,000.00 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | YES | | YES | | YES | | YES | | YES | | NO | |
| | | YES | | YES | | YES | | YES | | YES | | YES | |
| | | YES | | YES | | YES | | YES | | YES | | Yes | |
| | | YES | | YES | | YES | | YES | | YES | | Yes | |
| | | | | no | | no | | no | | | | no | |
| | | | | $11mm for both units | | $3mm | | $11mm for both units | | | | $3mm | |
| | | | | 6.1mm | | $2.3mm | | 6.1mm | | | | $850k | |
| | | $3,760,000 and 1% DP | | $2,625,000 WITH 4% DP | | $2.6mm w/10% DP | | $3,625,000 WITH 4% DP | | $940,000 and 1% DP | | 950000 | $ 200,000 |

**APP.235**

APP218.

Alta and its counsel never alerted the parties or the Court to this error. Instead, having reviewed this document (and apparently even having altered it), Alta filed the TPP claiming that GE and WattStock never disclosed the existence of the LTSA fees, and later resisted GE's motion for judgment on the pleadings by representing to the Court that "there's no disclosure of this known fee" by GE and WattStock. Mot. for Judgment on the Pleadings Hr'g at 60:15–17, APP79. To make matters worse, Alta and its counsel made these false representations *after* Alta's counsel seemingly acknowledged during the deposition that Alta was made aware of the termination fees on one of the units (Acarsoy). Watson Dep. at 171:18–172:2, APP224–25 (statement by counsel during the deposition: "Earlier we talked about the Acarsoy – Acarsoy LTSA; and, obviously, people were aware of that, at least on some level. And there was a concession in there about or language . . . in there about a half a million dollars we discussed.").

Were this not enough, Laterza's deposition likewise belies Alta's long-repeated claims that it was never told of the LTSA fees' existence until February 2020.[3] When confronted on this point, Laterza unsurprisingly attempted to pivot away from the claim—and his prior testimony—that GE and WattStock failed to disclose the fees' existence. Instead, Laterza sought to focus on—for the first time in this case—WattStock's alleged failure to "highlight[] to Alta" that the termination fees would "impact [Alta's] final pricing." *See* Laterza Dep. at 236:20–237:4, APP93–94 (when asked whether Alta's allegation that February 2020 was the first time Alta Power learned of the existence of LTSA termination fees was true, Laterza replied: "It's consistent that this is the first time [LTSA termination fees were] highlighted as something that would impact the pricing."); APP94–95 at 237:25–238:4 ("[T]he first time that the existence of the LTSA termination fees and

---

[3] *See, e.g.*, Laterza Dep. at 149:13–16, APP87 (the "existence [of termination fees for the five units] might have been disclosed" before Alta spent any money on those units).

**APP.236**

their impact to the final price of the unit was highlighted to us or disclosed to us was in February of 2020."); APP88–89 at 150:19–21, 151:21 (Laterza admits that Paragraph 55 of the TPP "could be written better" and "should say, to be more specific, that GE/WattStock failed to disclose that any of the LTSA termination fees would impact our final pricing"); APP96 at 249:9–11 ("[T]he first time it was ever highlighted to us as something that would impact price was February of 2020.").

Like its claim that GE and WattStock failed to disclose the existence of the LTSA fees, Alta's allegations regarding the Castleman dispute are also frivolous. Alta's allegation is clear: that WattStock disclosed confidential information prompting Castleman to threaten a lawsuit meant to scuttle Alta's "imminent" financing deal with Deutsche Bank. TPP ¶ 79, APP24. But Alta has failed to produce *any* evidence in support of this tale—and in fact, Alta's own documents squarely disprove it. First, in his deposition, Laterza admitted that Alta's only support for this claim is his own baseless speculation. *See* Laterza Dep. at 281:17–282:4, APP102–03 (testifying that Alta's allegation turns on the allegedly "logical[] . . . deduc[tion] that [] there was no crossover between [Alta] and Castleman, and WattStock was the only . . . common third party that knew of the Deutsche Bank financing"); APP103 at 282:5–10 (testifying that the "only way [the disclosure to Castleman] could have happened" was because "Mr. Manning called [Laterza] and talked to [Laterza] about a conversation [Manning] had with Mr. Castleman around the time that Mr. Castleman sent [Laterza] this cease and desist letter"). Second, documents produced by Alta in discovery confirm that Castleman first threatened the litigation of which Alta complains in November 2018, months before Alta even began pursuing financing from Deutsche Bank. *See* Laterza Dep. Ex. 2045, APP227 (Ryan Castleman Email) ("We have information that indicates you have been in violation of the nondisclosure and noncompete agreement. This is an issue we

will be taking action to enforce.").  Third, and even more fatal to Alta's claim, is a September 5, 2019 email relaying that Castleman first learned about Alta's plans for Deutsche Bank financing in August 2019—from Alta's own outside counsel.  *See* Laterza Dep. Ex. 2044, APP229–30.  That email references a phone call in which "Alta, for the first time, raised its financing issues." APP230.  Castleman's counsel goes on to make clear that "Castleman had no prior knowledge of the status of Alta's financing, the identity of its financiers, or Alta's disclosure obligations."  *Id.*

Troublingly, Alta and its counsel relied on these false representations about the Castleman dispute to survive a critical element of GE's motion for judgment on the pleadings: dismissal of Alta's claims for consequential damages.  Though the Master Agreement between Alta and WattStock broadly waives claims for consequential damages, Alta argued that this waiver does not apply to breaches of the Master Agreement's confidentiality provision, and in support, it pointed to its claim that WattStock and GE (vicariously) were responsible for the Castleman Dispute.  TPP ¶¶ 114–21, APP29–30; Alta's Opp. to GE Mot. for Judgment on the Pleadings at 24–25, APP66–67.

This Court denied GE's motion, ballooning the value of the dispute between Alta and GE from about $1.5 million to an amount up to $331.5 million.

### C.     GE Informed Alta of Its False Allegations

GE has engaged in repeated—but thus far unsuccessful—efforts to persuade Alta to correct these misrepresentations without court intervention.  After Laterza's deposition on October 15, 2022, GE advised Alta of those false allegations in writing and asked that they be withdrawn.  On November 1, 2022, GE sent Alta's counsel a letter detailing the factual inaccuracies contained in Alta's pleadings, filings, and arguments in this Court.  *See* LeGrand Decl. ¶ 7, APP3; Nov. 1, 2022 A. LeGrand Letter, APP233–38.  In that letter, GE urged Alta's counsel to correct the factual errors and reserved the right to seek appropriate relief from the Court if necessary.  *See* APP238.

On November 1 2022, Mr. LeGrand, counsel for GE, spoke with Mr. Cancienne, counsel for Alta.  Mr. Cancienne represented that Alta had "always intended to amend" its complaint and agreed to schedule a meet and confer with Alta's other counsel and GE's counsel.  LeGrand Decl. ¶ 7, APP3.  On November, 8, 2022, counsel for GE and Alta participated in a meet and confer to discuss GE's letter.  During that meet and confer, Alta's counsel stated that Alta did not plan to "materially change" its claims.  APP3–4 ¶ 8.

### D.    WattStock and Alta Have Entered Into Settlement Negotiations

Around the same time, another significant development came to light: On November 4, 2022, counsel for GE spoke with WattStock's counsel, who indicated that Alta and WattStock were discussing a settlement that could potentially lead to Alta's dismissal of its claims against WattStock.  LeGrand Decl. ¶ 9, APP4.

## III.    ARGUMENT

### A.    The Court Has the Authority to Amend the Scheduling Order and Close the Pleadings, and It Should Do So

The Federal Rules of Civil Procedure provide that a trial court "must issue a scheduling order that . . . limit[s] the time to . . . amend the pleadings[.]"  Fed. R. Civ. P. 16(b)(1), (b)(3)(A).  As the Advisory Committee Notes to Rule 16(b) explain, "the fixing of time limits serves to stimulate litigants to narrow the areas of inquiry and advocacy to those they believe are truly relevant and material. . . . Litigants are forced to establish discovery priorities and thus do the most important work first."  With Alta now caught in its own misstatements—but professedly unwilling to correct them—GE respectfully asks this Court to set a deadline for the pleadings to close.

Indeed, if the only issue at stake here were whether Alta could correct some minor factual error in its pleadings at some later time, GE might not have brought this motion.  But, as detailed above, Alta has refused to state definitively whether it plans to amend its claims in light of repeated

misrepresentations regarding two central tenets of its case—disclosure of the LTSA termination fees and the Castleman dispute—and advanced settlement negotiations that would change the pleading and discovery landscape. From Alta's refusals, one thing is clear: that in the absence of a hard deadline by which Alta must amend or live with its claims, Alta will continue to approach this litigation with its fingers crossed behind its back, pressing discovery on a concoction of claims either controverted by its own documents, yet to be defined, or yet to be released, thwarting the fundamental purposes of Rule 26(b)(1) in the process.

**B.    The Court Has the Authority to Stay This Action, and It Should Do So**

This Court has "broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 683 (1997); *see also McKnight v. Blanchard*, 667 F.2d 477, 479 (5th Cir. 1982); *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."); *In re Ramu Corp.*, 903 F.2d 312, 318 (5th Cir. 1990) ("The stay of a pending matter is ordinarily within the trial court's wide discretion to control the course of litigation, which includes authority to control the scope and pace of discovery.").

Indeed, "a district court can make any order which justice requires to protect a person from . . . undue burden or expense, including a stay of discovery[.]" *Primesource Building Prods., Inc. v. Lee Grp. Int'l, Inc.*, 3:19-CV-02878-X, 2020 WL 6140462, at *1 (N.D. Tex. Aug. 12, 2020) (internal quotation marks and citation omitted); *see also Royal Consumer Prods. v. Martin Indus., LLC*, No. 3:15-CV-00830-CRS, 2016 WL 3080841, at *2 (W.D. Ky. May 27, 2016) ("[S]taying discovery . . . promotes the interest of judicial economy by ensuring that the Court does not exert resources on a claim that may never arise.").

**APP.240**

More specifically, courts routinely stay proceedings to permit parties to amend their complaints. *See, e.g.*, *Rakhshandeh v. Tex. Tech Univ.*, No. 5:20-CV-110-BQ, 2022 WL 1608637, at *10 (N.D. Tex. May 20, 2022) (staying all deadlines "[i]n light of the Court's determination that Plaintiff should be given a final opportunity to amend"); *Umsted v. Andersen LLP*, No. CIV.A.3:02CV496M, 2003 WL 222621, at *5 (N.D. Tex. Jan. 28, 2003) (staying all proceedings to give plaintiffs 30 days to amend their complaint); *Poppel v. Rockefeller Univ. Hosp.*, No. 19-CV-1403 (ALC), 2019 WL 3334476, at *3 (S.D.N.Y. July 25, 2019) (temporarily staying proceedings "to allow Plaintiff to amend his Complaint"); *Holmes v. Gates*, No. 1:08-CV-2152, 2009 WL 3366471, at *1 (M.D. Pa. Oct. 19, 2009) (noting that "[t]he case was stayed by the Court in order to allow Plaintiff to file an amended complaint").

Courts also stay cases while settlement negotiations are pending as a matter of course. *See, e.g.*, *Bassknight v. Deutsche Bank Nat'l Tr. Co.*, No. 3:12-CV-1412-M BF, 2014 WL 6769085, at *2 (N.D. Tex. Dec. 1, 2014) (noting that "the parties sought, and were granted, various extensions of time and a stay of proceedings because they were actively exploring settlement"); *Exclusive Fishing Tex., LLC v. Markel Am. Ins. Co.*, No. 2:16-CV-125, 2016 WL 10703624, at *1 (S.D. Tex. May 3, 2016) (agreeing with the parties that "a stay will allow them to focus on their settlement efforts").

And courts have stayed proceedings when appropriate to provide more time for parties to address potential unethical conduct, *see, e.g.*, *Interpreter Services, Inc. v. BRB Techs., Inc.*, No. CIV. 10-4007, 2011 WL 2601740, at *1–2 (D.S.D. June 30, 2011) (granting a temporary stay to give parties more time to address allegations that a party used fake emails as evidence), or to otherwise allow for the orderly preparation of additional motions, *see, e.g.*, *Melvin v. Astrue*, No. 5:10-CV-347-D, 2011 WL 6299219, at *8 (E.D.N.C. Oct. 14, 2011) (recommending granting a

temporary stay because "while [defendant] does not have a pending dispositive motion, it will likely re-file [a new motion to dismiss] and discovery will likely be irrelevant to the issues presented in the renewed motion to dismiss"); *E.C. v. Beacon Hill Asset Mgmt. LLC*, No. 02 CIV. 8855 (LAK), 2004 WL 367673, at *1 (S.D.N.Y. Feb. 25, 2004) (noting that "[t]he Court initially entered a temporary stay to permit briefing of the motion [to continue a stay of certain discovery]"); *Himebaugh v. Smith*, 476 F. Supp. 502, 511 (C.D. Cal. 1978) ("In order to allow the parties . . . to more orderly prepare . . . a motion [for permanent stay pending appeal], this Court grants [defendant's] request for a temporary stay.").

GE respectfully submits that a brief stay of discovery in this case is necessary and appropriate for three purposes.

*First*, Alta's pleadings, filings, and arguments in this case rely on significant factual misrepresentations, none of which would have survived even a cursory pre-suit investigation. These misrepresentations raise significant questions about Alta's and its counsel's candor to the tribunal. They also go directly to Alta's principal claims in this litigation against GE. Alta's false statements that GE and WattStock failed to disclose the existence of termination fees underlie Alta's fraud and negligent misrepresentation claims. *See* TPP ¶¶ 135–58, APP31–34. And Alta's breach of contract claim cannot survive without its allegations about the nature and timing of the Castleman dispute. *See* APP29 ¶ 116 ("WattStock breached the confidentiality provisions of the Master Agreement by disclosing confidential information about Alta Power and its financing to Castleman. . . . WattStock's breach caused Alta Power to lose project financing for its . . . unique strategy for developing power generation projects in the Texas market."). Nor, again, can Alta's immense claim for $320 million in lost profits. In other words, the resolution of Alta's factual

**APP.242**

misrepresentations, either through an amendment by Alta or on a motion by GE, could dramatically narrow the scope of the claims in this case.

*Second*, and relatedly, a temporary stay will provide Alta one final opportunity to amend the Third-Party Petition to rectify the offending misrepresentations. On November 1, 2022, GE sent Alta's counsel a letter detailing the false factual allegations in its pleadings and filings. LeGrand Decl. ¶ 6, APP3; *see also* APP233–38. Since then, Alta's counsel has dithered and demurred about its plans to amend the Third-Party Petition to correct the errors. Alta's counsel has suggested both that Alta has always intended to amend its complaint and that Alta has no plans to "materially change" its complaint. LeGrand Decl. ¶¶ 7–8, APP3–4. Alta should be forced to decide—and live with its choice—before the parties expend more time and energy on discovery that might turn out to be irrelevant. During the brief stay, Alta can reexamine the record and make its choice: it can either amend the Third-Party Petition and potentially resolve this issue, or it can definitively confirm to the Court and GE that no amendments to the Third-Party Petition will be forthcoming.[4] Either option will substantially clarify and reshape the future direction of this litigation.

*Third*, the Court has good cause to enter a brief stay in light of Alta's and WattStock's ongoing settlement negotiations. In its Third-Party Petition, Alta sought to hold GE vicariously liable for *WattStock's* alleged contract breach. *See* TPP ¶ 121, APP30 ("GE is [] vicariously liable for WattStock's breach of the Master Agreement and LNTP."). Alta also sought to hold GE liable for WattStock's alleged torts under the doctrine of respondeat superior. *See* APP29 ¶ 112 ("GE is

---

[4] If Alta ends up amending its complaint, additional interrogatories may be warranted. *See e.g.*, *Augustyniak Ins. Grp., Inc. v. Astonish Results, L.P.*, No. CV 11-464S, 2012 WL 13041528, at *2 (D.R.I. Dec. 12, 2012) (permitting defendant to "propound up to ten new Interrogatories in each case focused on the new issues raised by the Amended Complaints"); *Hennessey v. ICE Floe, LLC*, No. C20-0835RSL, 2021 WL 322685, at *2 (W.D. Wash. Feb. 1, 2021) (permitting defendant to "serve up to a total of 28 interrogatories . . . regarding the new aspects of the amended complaint"). GE reserves its rights to request additional interrogatories and any other relief it believes is appropriate.

**APP.243**

*respondeat superior* liable for the breaches and torts of WattStock." (emphasis in original)).  A temporary stay will allow Alta and WattStock's recent settlement discussions to play out, and will inform whether Alta must amend or drop claims rooted in the conduct of a party it may soon release.  After all, many of Alta's claims are predicated upon *WattStock*'s alleged conduct—not GE's.  A short stay is therefore warranted to preserve the Court's and the parties' "economy of time and effort." *Landis*, 299 U.S. at 254.

Finally, a temporary stay would not cause injustice nor otherwise prejudice Alta.  On the contrary, a brief stay will provide Alta the opportunity to avoid expending resources on litigation and discovery that are likely to be mooted by any amended complaint or requests for appropriate relief by GE.  The same principle applies to the outcome of WattStock's and Alta's settlement negotiations.

## IV.    CONCLUSION

For the foregoing reasons, GE respectfully requests that this Court amend the scheduling order to set a deadline for the pleadings to close and temporarily stay these proceedings until that date.  To conserve the resources of the parties and the Court, GE respectfully requests that the Court order:

(1)    Any motion for leave by WattStock to amend its complaint against Alta to be filed no later than 30 days from the date of the Court's order;

(2)    Any amended answer and counterclaims by Alta against WattStock, and any motion for leave by Alta to amend its third-party complaint against GE, to be filed within 21 days of the later of WattStock's deadline to file a motion for leave or the docketing of any amended complaint by WattStock;

(3)    Any amended answer by WattStock, and any amended answer and counterclaims by GE, to be filed within 21 days of the later of Alta's deadline to file a motion for leave or the docketing of any counterclaims and/or amended third-party complaint by Alta;

(4)    Any answer by Alta to any GE counterclaim to be filed within 14 days of GE's amended answer; and

(5)    The pleading to close 14 days after WattStock's deadline to file its amended answer and GE's deadline to file its amended answer and counterclaims.

GE further requests that the Court stay all proceedings and discovery in this case until the

pleadings are closed and a new scheduling order is entered by the Court.


Dated:  November 23, 2022

Respectfully submitted,

/s/  *Andrew LeGrand*
John T. Cox III (Tex. Bar No. 24003722)
Andrew LeGrand (Tex. Bar No. 24070132)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Tel:    214.698.3100
Email: TCox@gibsondunn.com
       ALegrand@gibsondunn.com

**APP.245**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document has been served on counsel of record pursuant to the Federal Rules of Civil Procedure.

/s/  *Andrew LeGrand*
Andrew LeGrand

*Attorney for General Electric*
*International, Inc.*


## CERTIFICATE OF CONFERENCE

Pursuant to Local Bankruptcy Rule 7007-1, I certify that on November 18, 2022, counsel for GE met and conferred with counsel for Alta Power LLC.  Alta and GE were unable to reach agreement and have reached an impasse, leaving the open issues for the court to resolve.  The motion is opposed by Alta Power LLC.  I certify that on November 21, 2022, counsel for GE met and conferred with counsel for WattStock LLC.  WattStock LLC does not oppose this motion.

*/s/ Andrew LeGrand*
Andrew LeGrand

*Attorney for General Electric*
*International, Inc.*

# EXHIBIT Y

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
 2                        DALLAS DIVISION

 3

 4    IN RE:                  )   BK. NO:  21-31488-SGJ

 5                            )

 6    WATTSTOCK, LLC          )

 7        D E B T O R.        )

 8    _____

 9    WATTSTOCK v ALTA POWER )   ADV. NO:  21-3083

10

11              *   *   *   *   *   *   *   *   *   *

12                  TRANSCRIPT OF PROCEEDINGS

13              *   *   *   *   *   *   *   *   *   *

14

15

16

17

18

19

20       BE IT REMEMBERED, that on the 23rd day of January, 2023,

21    before the HONORABLE STACEY G. JERNIGAN, United States

22    Bankruptcy Judge at Dallas, Texas, the above styled and

23    numbered cause came on for hearing, and the following

24    constitutes the transcript of such proceedings as hereinafter

25    set forth:
```

```
 1                    P R O C E E D I N G S

 2              THE COURT:  All right.  We are going back on

 3   the record now.  We have WattStock versus Alta.  Adversary

 4   21-3083.  Let's go ahead and get formal appearances here.  I

 5   think we may have some people on the line, but we'll hear

 6   appearances in the courtroom, please.

 7              MR. LeGRAND:  Yes, Your Honor.  This is Andrew

 8   LeGrand of Gibson Dunn & Crutcher on behalf of General

 9   Electric International.  Also with me is my colleague Pooja

10   Patel and my colleague Bryan Sohn.  Although he has not

11   appeared in this case, he's helping with the tech today.

12              THE COURT:  Okay.  Good morning to all.

13        Other appearances?

14              MR. CANCIENNE:  Good morning, Your Honor.

15   Michael Cancienne, Jessica Pulliam, John Lawrence, and Jeb

16   Golinkin for Alta Power, LLC.

17              THE COURT:  Thank you.

18              MR. CANCIENNE:  Thank you.

19              MS. SEARS:  Good morning, Your Honor.  Natalie

20   Sears and Thomas Berghman of Munsch Hardt on behalf of

21   WattStock, LLC.

22              THE COURT:  Okay.  Thank you.

23        All right.  Any other appearances on the Webex, by

24   chance?

25        All right.  Well, before we get started, I'm going to
```

1   tell you all that I usually -- I was going to say, pride

2   myself, but show respect to the lawyers by reading all of

3   their submissions before court.  I mean, that's just

4   fundamental, right?  But I was at a conference Friday and

5   Saturday.  Got home Saturday evening.  And when I was

6   preparing for my docket yesterday afternoon, you know, I had,

7   as you heard, a few other things set this morning, and so

8   what I did is I thought, okay, the GE motion to amend

9   scheduling order and temporarily stay discovery, I can come

10  in Monday morning and read that one.  It's you, it's a motion

11  to amend scheduling order.  How much paper could there be?

12        Well, guess what, there were hundreds of pages.  You

13  know, the GE motion to amend was only like three pages, but

14  there was a brief with an appendix, and then the response

15  with its appendix was over 300 pages, in case you didn't zero

16  in on that.  So I'm just letting you know, I don't feel as

17  prepared for this hearing as I like to be.  I didn't think

18  there would be more than, you know, 15 or so pages of paper

19  to read when I got in.  And obviously there's a lot more.  So

20  keep that in mind when you're making your argument.  I

21  haven't as carefully reviewed your submissions as I would

22  normally have done.

23        With that, Mr. LeGrand, are you going to be making the

24  argument?

25                MR. LeGRAND:  Yes, Your Honor.

1              THE COURT:  Okay.  I will hear you.

2              MR. LeGRAND:  Thank you, Your Honor.

3         May it please the Court.

4              THE COURT:  Uh-huh.

5              MR. LeGRAND:  Your Honor, our motion requests

6    a deadline for the parties to amend their pleadings.  Rule

7    16(b) requires it.  Both GE and WattStock agreed that one

8    should be added to the scheduling order.  And, frankly, in

9    light of how this litigation has unfolded so far, GE believes

10   it is necessary to avoid trial or summary judgment briefing

11   by ambush.  Now, Alta disagrees, but they have not identified

12   any reasonable basis for their opposition.

13        On December 16th the parties filed a stipulation,

14   that's at docket 81, to confer on a proposed schedule after

15   this motion is resolved.  So the only outstanding issue at

16   the moment is whether the parties must include a deadline to

17   amend the pleadings in their proposed schedule.  We

18   respectfully request that the Court order the parties to do

19   so and that the deadline be set for 14 days from the date of

20   the Court's order.

21        Now, our briefing explains why a deadline to amend the

22   pleadings is both required and necessary -- I see I have a

23   little technical glitch here -- and necessary in this case.

24   I'll address very quickly Rule 16(b).  And unless the Court

25   has any questions -- and I know Your Honor didn't have an

1   petition.  That is what the motion's about, not Rule 16.

2       August 2009 (sic), GE is still looking for a solution,

3   but hasn't disclosed the New Simento (phonetic) fee that it

4   won't be eliminated and the Arcisol fee is four and a half

5   times more than they're representing.  February 26, 2020, the

6   solution is finally sprung on Alta Power.  And why does this

7   matter?  As detailed in our amended petition, this is right

8   when we're on the cusp of closing financially for three

9   units.  And what do they do?  They say to us, hey, come in

10  for a meeting so we can chat about service agreements.  What

11  they were going to do was try to replace the termination fee

12  revenue with service agreements so it can withstand scrutiny

13  internally at GE.  Now that was GE's plan all along from

14  July, at least July 2019.  And in February of 2020, they

15  finally sprang it on Alta.

16      What's the response internally between WattStock and GE

17  when Alta learns about the fee?  Man, what a day.  Bombs

18  everywhere.  Now you can see the importance of the

19  termination fee.  But they could kill the deal.

20      A day later internally at GE Lance Harrington, who is

21  probably the most important witness in this case, discussing

22  the termination fees internally and how it's getting very

23  close to financial close for the customer.  And they're still

24  trying to understand how the termination fee is going to

25  impact the price.  A month later after the parties are unable

1   to come to any resolution, Jay Manning at WattStock emails
2   Lance Harrington and Alex Baboo at GE, the primary contacts
3   at GE and says, game over, unless the term fee is negotiable,
4   any amount more than 500k kills the deal.  Internally GE's
5   representing that the fees remain a real challenge to
6   financial close.

7        This document is interesting to us, Your Honor, because
8   it says in stark terms, it identifies that Cap X for Alta is
9   a real challenge for the project.  And the problem they have
10  in the final ending documents is that the price continues to
11  move.  That's what they're saying in the document.  This
12  document is not part of the Court's record because it was
13  produced, unfortunately, last Wednesday, I believe, Wednesday
14  evening at around 11:00.

15       So how did we get to this point today?  And I'll run
16  through this briefly before I turn it over to Ms. Pulliam.
17  WattStock sued Alta Power in June of 2020.  The Court's
18  familiar with that.  We filed a counterclaim.  We believe
19  WattStock's preemptive suit over some payments, frankly, were
20  to establish itself as plaintiff.  But WattStock and Alta
21  Power after that lawsuit in June 2020, Alta Power reached out
22  to GE to try to figure out what we needed to be doing to
23  better understand the GE relationship.  Our internal counsel
24  reaches out to Alex Baboo, who responds -- or Alex Baboo and
25  asks for an opportunity to talk to legal.  This is on July

 1  23rd, 2020.  In response to this, Mr. Baboo leaves the

 2  company and General Electric deletes his emails.  This is

 3  right after Mr. Baboo says, hey, we're going to have this

 4  reviewed internally by legal counsel.  And I think that's

 5  important because I'm trying to let the Court know why we're

 6  here today, based on GE's conduct and why it's taking so

 7  long.  Alex 5th -- August 5th is when Mr. Baboo leaves.

 8       At that point, Alta Power has no options but to

 9  subpoena GE.  They do in October of 2020.  That stonewalling

10  continues until -- throughout the Fall of 2020.  Pete Watson

11  is deposed in January of 2021.  And Mr. Watson's deposition

12  confirmed precisely what Alta Power at that point believed,

13  which is that Alta Power -- that Alta Power was not made

14  aware of the significance of the -- of the termination fees.

15  It was not brought up to us as something we needed to be

16  worried about.  He confirmed that GE was aware that those

17  units were burdened.

18       And as a result of Mr. Watson's testimony -- now, when

19  this began, one of the things they wanted was us to never be

20  able to use Mr. Watson's testimony because of that exhibit.

21  The questioning of that exhibit of 160 something pages, 180

22  pages was about 32 lines.  They said, we want you to not be

23  able to use Watson's deposition.  Of course we said, that's

24  ridiculous.  If you have a question with the exhibit, we can

25  address it with the Court at the appropriate time.  They

 1   didn't want Watson's deposition used for obvious reasons.  It

 2   went (inaudible word) for GE in retrospect.  GE didn't

 3   participate it in, to be clear.  And my response to them was,

 4   let's go take Pete Watson's deposition again.  You guys

 5   should have an opportunity to question him.  He lives in

 6   Houston.  Subpoena him.  Instead their response was, we don't

 7   want you to ever use it and we're going to file a motion with

 8   the Court.  And their motion now has transitioned to this

 9   Rule 16 motion.

10       GE didn't produce documents in the Fall.  Eventually

11   Alta Power had to sue GE.  GE moved to dismiss in state

12   court.  That motion was denied.  The stonewalling continued,

13   of course until -- until Gibson Dunn was involved, frankly.

14   And then WattStock filed for bankruptcy in August of 2021.

15   The case was removed to bankruptcy court in November where

16   the Court said that after GE moved on the pleadings again,

17   which the Court may remember, GE finally made its first

18   production in February of 2022.  The Court denied GE's motion

19   and the original scheduling order was put in place.  That

20   original scheduling order was very aggressive.  It

21   contemplated discovery ending in October of 2022.

22   Unfortunately because of document production issues and

23   getting a lot more witnesses to be deposed than I think the

24   parties originally anticipated, that became unworkable.  The

25   schedule was amended to extend it to December.  And as we

1  issue down the road, maybe conceivably we could need the

2  Court.  But just otherwise, it's just a straight up

3  contractual obligation, like a confirmation order and a plan

4  is between the creditors and the debtor to perform an

5  obligation.  So I don't think there's any special bankruptcy

6  (inaudible word) to that, just for clarification.

7              THE COURT:  But, again, I asked this before

8  and I think I was clear on the answer.  There is no scenario

9  where creditors' recovery is changed one way or another by

10 the result of the Alta --

11             MR. BERGHMAN:  No, Your Honor.

12             THE COURT:  -- and GE claims against each

13 other?

14             MR. BERGHMAN:  There is no scenario where that

15 would happen.

16             THE COURT:  Okay.  All right.  Thank you.

17             MR. BERGHMAN:  Thank you.

18             THE COURT:  All right.  Well, just to kind of

19 drive home the point I made at the very beginning of this

20 hearing.  I was flabbergasted when I got in this morning.  I

21 think that's the right word to use.  Because, again, I take

22 my own obligation very seriously to read all the pleadings

23 and read all the briefs.  And, you know, if your clients paid

24 for this, if you all thought it was important to say certain

25 things to the Court, I owe you all the respect of thoroughly

1  reading your submissions.  So thought it would be no problem.

2  Thought, okay, Rule 16 motion to extend and for stay, you

3  know, how long could that be?  Never contemplated briefing,

4  because, you know, it's a Rule 16 issue.

5       And so not only did I have this long brief in support

6  of the Rule 16 motion with a long appendix, I think it was

7  over 100 pages collectively, then I had the response of Alta

8  that altogether with appendix was over a 300 page thing to

9  read.  And then I forgot to mention there was even a reply

10  from GE that was collectively over 100 pages.  So I just,

11  again, drive this home because I'm partly upset with myself

12  for just assuming I would have less than 20 pages to read in

13  connection with a Rule 16 motion and then having all of this

14  paper.  But I'm also, I guess expressing my dismay that we

15  have this huge, huge brouhaha.  You know, you each have made

16  very passionate arguments.  But as far as GE, there's a heck

17  of a lot more in this Rule 16 motion and briefing, I should

18  say, then just, you know, we think Rule 16 should be applied

19  here so that a good cause standard will apply, if anyone

20  wants to amend.  And, by the way, we think we should get a

21  stay for X reason.  You know, there are quite highly charged

22  accusations put out there in the briefing.  And then, you

23  know, we've got Alta trying to defend its honor with it's own

24  extensive arguments.

25       I'm very dismayed.  I'm very dismayed.  I am going to

 1    deny the motion.  I think it's premature.  Although I might
 2    not have imagined, given the timetable here it would be
 3    premature, given that we have a lawsuit that first started
 4    June of 2020 in state court and has been in the bankruptcy
 5    court for about 14 months now.  You know, it doesn't sound
 6    like a heck of a lot of discovery has actually been concluded
 7    here.  So I think it's fair to allow a little more discovery
 8    to happen here before we can set in stone no more amendments
 9    after X date without good cause.  I just -- you know, I want
10    this to move along.  I'm dismayed it isn't closer to trial
11    ready.  But I'm going to deny the motion.
12         I am also, you know, Alta has asked, we want attorney's
13    fees.  We think this was so over the top.  You know, they
14    feel Dondi is implicated.  What I'm going to do is strike all
15    of these pleadings; the motion with brief and appendix; the
16    response with, you know, arguments and appendix; the reply
17    with appendix.  I'm just going to strike it all.  And, you
18    know, the irony here is because it is, I should say that I
19    haven't really read all of this.  Okay?  I've just scanned it
20    to see, oh, my goodness, why do we have so much in the way of
21    paper submissions?  So I've not been influenced.  I've not
22    been tainted or biased in favor of one side or the other, or
23    offended by, you know, accusations.  None of it stuck.  None
24    of it has stuck on me, essentially the Magistrate Judge, just
25    because I didn't have time to read it.  Never expected I was

1  going to have so much paper.  So I feel like we -- the

2  fairest thing to do is just to strike it all, so that I don't

3  ever consider this.  So that a District Judge upstairs

4  doesn't ever consider it.  So a State Court Judge doesn't

5  ever consider it.  Everybody is going to have to be left to

6  their proof.  If someone thinks a Rule 11 motion is

7  appropriate, God forbid then, you know, it's going to have to

8  happen in the context of a Rule 11 motion.  If someone wants

9  to file a motion for summary judgment, you know, I don't want

10  anyone to have already some evidence in their brain or

11  argument in their brain from this Rule 16 motion.  So I'm

12  going to deny any request for attorney's fees.  But I'm going

13  to strike every darn piece of paper as part of my ruling

14  today.

15      I will further say that we need a scheduling order in

16  place.  And it sounds like the one we have is expired.  I

17  think discovery should continue on.  And the parties should

18  please negotiate in good faith regarding an amended

19  scheduling order.  Maybe it will have a Rule 16 deadline.  In

20  fact, I think probably it should, now that I've looked at the

21  Rule.  But I'm not going to grant the relief that, you know,

22  30 days after today, the Court's ruling, you know, amendments

23  shall close.

24      Let me ask you, was your previous scheduling order, did

25  it have a trial docket date on it?

# EXHIBIT Z

**APP.260**

| | |
|---|---|
| **From:** | Jeb Golinkin <jgolinkin@jlcfirm.com> |
| **Sent:** | Friday, May 10, 2024 1:56 PM |
| **To:** | LeGrand, Andrew; Capoccia, Matt; Sohn, Bryan |
| **Cc:** | Michael Cancienne |
| **Subject:** | Alta Power: Proposed Amended Complaint and Meet and Confer |
| **Attachments:** | Alta Power_Proposed Amended Complaint (clean).pdf; Alta Power_Proposed Amended Complaint (Redline).pdf |

**[WARNING: External Email]**

Dear Andrew and Matt,

As you know, the deadline for the parties to amend their pleadings is **on Tuesday**. To that end, we have prepared an amended complaint, a copy of which is attached for your review. I have also attached a redline so you can see what has changed. Please let us know if you oppose our amendment, or whether we can amend with your consent.

Also, in response to Matt's previous email, we are available to talk **next Friday afternoon** to confer. Anytime after 1:30pm. Let us know what works best for you.

Thanks,

Jeb

–
**Joseph W. Golinkin II**
Partner| Jordan, Lynch & Cancienne PLLC
(o) 713-955-4019 | (c) 832-250-6567
1980 Post Oak Blvd., Suite 2300 Houston, Texas 77056
www.jlcfirm.com  |  Attorney Biography



**APP.261**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

WATTSTOCK LLC,

      *Plaintiff/Counter Defendant,*

v.

ALTA POWER LLC,                                         Case No. 3:21-CV-03183-X

      *Defendant/Counter Plaintiff,*

v.

GENERAL ELECTRIC INTERNATIONAL
INC., d/b/a GE POWER SERVICES,

      *Third-Party Defendant.*

## ALTA POWER LLC'S FIRST AMENDED COMPLAINT AGAINST GENERAL ELECTRIC INTERNATIONAL, INC.

      Alta Power LLC ("Alta Power") files this First Amended Complaint against General Electric International, Inc., d/b/a GE Power Services ("GE") and would respectfully show as follows:

### I.     SUMMARY OF ACTION

      1.    Alta Power was created to develop natural gas-fired power assets that would provide critical additional power capacity to the Texas energy grid when the grid is experiencing periods of high demand. As part of this, Alta Power intended to purchase and place into service used aeroderivative gas turbines (essentially jet engines on skids powering a generator) that can quickly turn on and off to meet instances where power

**APP.262**

demand exceeds available power supply. During these periods of excess demand, power prices are highest.

2.     GE was eager to participate in the used gas turbine market, a segment in which it historically had no presence. GE, however, did not want to be involved in the work of actually acquiring and selling the used turbines. Instead, GE engaged former GE employees who started a new company named WattStock to act as its exclusive sales force and point of entry into the used gas turbine market.

3.     Starting in 2018, GE and WattStock persuaded Alta Power to purchase used refurbished GE aeroderivative gas turbines, marketing the units as both more reliable and cost competitive, similar to the "Certified Pre-Owned Mercedes Benz®" program. Critically, Alta Power relied on GE's and WattStock's representations regarding the nature of the GE's relationship with WattStock, the total acquisition cost of used units, and the benefits of GE's Aero TRUEPackage™ program. Ultimately, Alta Power agreed to use GE TRUEPackages™ instead of a similar refurbished GE gas turbine product offered by one of GE's competitors.

4.     GE's and WattStock's representations were false and have caused Alta Power to miss opportunities in the marketplace. Instead of the benefits claimed by GE and WattStock, Alta Power put money into potential units that were never going to fit their budgetary requirements because the units were either (1) burdened by undisclosed liabilities related to GE's "Long Term Services Agreements," (2) were prohibitively expensive for refurbishment by GE, or (3) were not available as marketed. Simply put, the acquisition costs and the benefits lauded by GE and WattStock were false. Worse still,

GE ultimately prevented Alta Power from acquiring the promised units by refusing to waive termination fees attached to the prospective units that they never disclosed in the first place.

5.     But for GE and WattStock's unlawful conduct, Alta Power would have obtained three or more  LM6000s and would have made millions in profits. Instead, GE and WattStock misappropriated millions of dollars of Alta Power's money.

## II.    PARTIES

6.     Alta Power is the Defendant in this case originally filed by WattStock, the original Plaintiff and Counter-Defendant. Both Alta Power and WattStock have already appeared.

7.     Third-Party Defendant GE is a company incorporated under the laws of Delaware doing business in Texas and can be served with Citation through its registered agent in Texas, CT Corporation System, 1999 Bryan St., Ste 900, Dallas, TX 75201-3136.

## III.    VENUE AND JURISDICTION

8.     Jurisdiction in this Court is proper under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000. This Court also has core jurisdiction under 28 U.S.C. §§ 157 and 1334.

9.     This Court has personal jurisdiction over GE because a substantial amount of the acts giving rise to Alta Power's causes of action arose in Texas.

10.     Venue in this Court is proper under 28 U.S.C. §§ 1408, 1409, and 1452.

## IV.    FACTUAL ALLEGATIONS

### A.    Alta Power's business.

11.    Alta Power was established to provide additional capacity to an overloaded energy grid in a creative and profitable manner.

12.    The market for power in Texas has evolved from traditional gas and coal fired power plants to more renewable sources like wind and solar. In 2019, renewable energy sources accounted for about 11% of total U.S. energy consumption and about 17% of electricity generation. Texas now meets approximately 30% of its sizeable electricity demand with wind power and approximately another 15% with solar.

13.    As electrical providers move towards renewable power production, there are times when the energy grid has more demand than supply. Aeroderivative gas turbine "peaker plants" have become imperative to meet this imbalance since these plants turn on quickly—in less than 10 minutes.

14.    Pricing for this "peak demand" power is often at a premium and can be sold under long-term contracts with investment grade counterparties. Alta Power determined that peaker plants could help meet this demand, profitably for Alta Power if Alta Power could acquire aeroderivative gas turbines at a competitive price and locate them appropriately.

15.    Because of the high cost of new aeroderivative gas turbines, Alta Power's strategy relied on acquiring used aeroderivative gas turbines, which was the only way to make the projects work within the required budget.

16.     To successfully develop a peaker plant, Alta Power needed to (1) identify areas in the grid where a peaker plant fits (considering gas supply, offtake pricing, and interconnection feasibility); (2) navigate the state and federal regulatory waters of the electrical power market; and (3) obtain used aeroderivative gas turbines that can be purchased and refurbished within budget.

17.     This complexity, along with relatively high entry costs, means that there were only a few companies competing with Alta Power. However, given the limited size of the market, being a first mover was critical.

18.     By April 2018, Alta Power had identified several potential project sites through an extensive vetting process based on prevailing market conditions. Through this work, Alta Power earned a head start on its competitors and found itself with a brief window during which it would be the first mover in this niche market.

19.     At this point Alta Power turned to identifying and purchasing surplus aeroderivative gas turbines units.

**B.      GE Aero TRUEPackage™.**

20.     GE is one of the limited suppliers of aeroderivative gas turbines.

21.     GE historically has not had a presence in the sale of used aeroderivative gas turbines but recognized a need to be present in this market at some point prior to 2018. As such, GE partnered with WattStock, a group of former GE executives, agreed to work together to gain entry into this market. As part of this agreement, GE authorized and allowed WattStock to use its trademarks and other intellectual property to apparently create the impression that WattStock and GE were partners selling a GE product. s.

22.     By early 2018, sales of GE's new gas-powered turbines had fallen off a cliff because "decentralized renewable resources increase cost-competitive pressures." However, the increased reliance on renewables and wind energy had created a gap in the energy markets that companies like Alta Power could use refurbished LM6000s to very profitably exploit. GE's competitors, like ProEnergy, had recognized the potential market for refurbished LM6000 assets and had begun buying up and refurbishing previously owned LM6000 units in earnest. In so doing, ProEnergy and others were also increasingly winning contracts to service the GE units they were refurbishing and reselling.

23.     Fearing it was being left behind, GE launched its Aero TRUEPackage™ product line, which GE described as the "only authorized OEM certified pre-owned package offering in the industry." According to GE's marketing materials, GE's TRUEPackage™ promised (1) OEM warranty and performance guarantees; (2) delivery in six months or less; (3) equipment selection and refurbishment plan driver by installed cost; and (4) OEM brand certification can improve financing options and insurance premiums.

24.     GE intended for, and held out WattStock to be, its ***exclusive partner*** and representative in the sale of TRUEPackages™which both companies jointly marketed as "[t]he only authorized OEM [original equipment manufacturer] certified preowned package offering in the industry."[1]

---

[1]     https://www.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions.

25.     GE and WattStock entered in a Memorandum of Understanding ("MOU") on June 26, 2018 that "outlines" their relationship. The MOU establishes that GE is in complete control, especially in the context of transactions related to aeroderivative gas turbines originally manufactured by GE.

26.     Consistent with their relationship, GE and WattStock held themselves out publicly and privately as "partners" both orally and in writing. GE described the TRUEPackage™ "process" as follows:



27.     GE applied for and owns a trademark for the word "TRUEPackage™" in the Construction and Repair Services  category. In its trademark application, GE informed the United States Patent and Trademark Office that "TRUEPackage™" refers to GE's practice of "refurbishing and upgrading of gas turbines power plants." GE attached a draft of the LNTP that it would eventually execute related to the sale of TRUEPackages™ to Alta Power with its trademark application.

28.     Since at least October of 2018, GE strictly required WattStock to refer only to "GE Aero TRUEPackage in marketing materials" related to the refurbishment and

resale of used LM6000s because "TRUEpackage is the GE brand….not Certified Turbine Power:" and GE does not want to "confuse the market with different names."

**C.    GE directs Alta Power to WattStock**

29.    In 2018, Alta Power began to determine which used aeroderivative gas turbines would best suit its needs. Availability and total acquisition costs were key drivers in its decision on which aeroderivative gas turbines to select. Because the used aeroderivative gas turbines must be refurbished, acquisition costs necessarily include the costs associated with purchasing the units, the costs of refurbishment, and the costs associated with placing the unit at the location and into service.

30.    After sharing these considerations with GE and WattStock, and after meetings with GE, WattStock and others, Alta Power determined that used GE LM6000 aeroderivative turbine packages were best suited for Alta Power's strategy of tapping into the niche peaker plant market in Texas based on assurances from GE and WattStock.

31.    GE/WattStock were not the only companies that marketed used and refurbished GE LM6000s. Indeed, Alta Power met with several GE "certified" companies that refurbished used aeroderivative gas turbines. None, however, offered a fully OEM-certified and warranted end-to-end product like the TRUEpackage™, which GE/WattStock marketed as their "exclusive" service offering of being the "only authorized OEM certified preowned package offering in the industry."

32.    Alta Power had several joint meetings with both GE and WattStock personnel mainly at GE's Jacintoport facility where WattStock is co-located. During these meetings, Alta Power disclosed to GE/WattStock the detailed budgetary requirements of

Alta Power's business model. Alta Power repeatedly emphasized the cost sensitivity of its projects; that is, the cost of the gas turbine units cannot exceed a certain price point if the project is to remain within budget and financeable. GE and WattStock repeatedly promised and reassured Alta that GE could provide obtain the required refurbished units for the prices Alta Power needed.

33.    GE/WattStock also persuaded Alta Power that its exclusive TRUEpackageTM OEM warranty was superior to anything offered in the market because GE would provide an end-to-end package warranty covering both the aeroderivative gas turbine and the electrical generation components. GE/WattStock further stated that other competitors could only warrant a portion of the package.

34.    During these meetings, GE and WattStock consistenyl described themselves as "partners." GE made it clear that the only way Alta Power could obtain the TRUEpackageTM equipment certification and warranty was by working with the GE and WattStock partnership.

35.    Specifically, GE refused to provide equipment certifications and warranties without WattStock.

36.    In addition to the pricing and warranties, GE and WattStock knew time was of the essence for Alta Power, as competitors were also attempting to enter the market. GE made it clear that delivery at the agreed upon pricing could occur within the time frame required by Alta Power's plans if Alta Power used the GE/WattStock TRUEpackageTM program.

37.    GE/WattStock emphasized that (1) GE had a proprietary global database of used LM6000 units including the operational and maintenance history on each, and (2) only GE and WattStock had access to this "proprietary" database. This "proprietary" data was a key selling point for Alta Power.

38.    GE/WattStock represented that GE and WattStock could efficiently locate used units, generate a detailed refurbishment scope, and cost estimate and streamline the acquisition, refurbishment, and delivery process all within Alta Power's required budget.

**D.    WattStock and Alta Power enter into a "Master Agreement."**

39.    In August of 2018, ProEnergy sent Alta Power a proposal for 3x LM6000 Turnkey EPC. ProEnergy's proposal satisfied Alta Power's technical, budgetary, and temporal requirements. Alta Power made GE aware that it was considering ProEnergy's offer, and that it would accept it if GE could not meet Alta Power's pricing requirements. GE knew this and badly wanted to ensure that Alta Power would not contract with ProEnergy.

40.    Through their discussions, GE and WattStock were keenly aware of the specific unit price requirements of Alta Power, and GE and WattStock assured Alta Power on multiple occasions that sufficient suitable units were available. GE also repeatedly promised they could and would make sure Alta Power could obtain the required units for at or below $10 million per refurbished LM6000 if Alta Power agreed to purchase GE TRUEPackages™, rather than from one of GE's competitors like ProEnergy.

ALTA POWER LLC'S FIRST AMENDED COMPLAINT AGAINST GE - PAGE 10

41.    GE also represented that it would "fully wrap"—that is, guarantee—WattStock's performance related to the TRUEPackages™. This caused Alta Power to believe that its involvement would insulate Alta Power from any concerns related to the financial viability of WattStock since GE is one of the largest companies in the world. GE also caused Alta Power to believe that WattStock had the financial resources to complete the necessary steps leading to GE's certification under the TRUEpackage™ OEM program.Based on GE and WattStock's representations concerning their relationship, capabilities, including (1) the benefits of the GE TRUEpackage™ program, (2) GE's assertion that it would fully guarantee WattStock's work related to the GE TRUEPackage™ program, (3)  the benefits from GE and WattStock "collaborating" as "partners;"  (4) the ready availability of used units that met Alta Power's project budget; (5) the ability to timely close purchases and refurbish units; and (6) the "benefits" of the warranty with respect to the overall economics of the project, Alta Power agreed to move forward with GE/WattStock for the acquisition of used GE aeroderivative gas turbines to effectuate Alta Power's unique strategy.

42.    In order to purchase the TRUEPackages™, GE directed and commanded Alta Power to contract directly with WattStock. More specifically, GE stated that in order to purchase a TRUEPackage™, Alta Power must contractually agree to allow WattStock (with GE standing behind it and guiding it) to negotiate the purchase price of the LM6000s for use in the TRUEPackage™with the prior owner and acquire the unit in WattStock's name for an agreed not to exceed price. GE/WattStock presented Alta Power with detailed total cost estimates for each unit showing that if each unit identified could

be acquired at or below the "not to exceed price," then the fully refurbished unit could be delivered within Alta Power's budgetary requirements.

43.    GE, WattStock, and Alta Power also agreed that in the event Alta Power paid any amounts prior to the units being acquired, those interim payments would be credited towards the purchase price Alta Power ultimately agreed to pay.

44.    On February 27, 2019 WattStock and Alta Power entered into a "Master Agreement" confirming the negotiations concerning how WattStock would be reimbursed for out-of-pocket expenses and as part of a negotiated purchase price after WattStock purchased and refurbished the used units.

45.    The Master Agreement contains an exclusivity and non-circumvention provision under which WattStock (and by extension, GE) agreed that neither WattStock nor GE would directly or indirectly cause another person to either attempt to or purchase a unit inspected on behalf of Alta Power (a service for which Alta Power paid).

**E.    GE and WattStock conceal termination fees, lie about their ability to provide the needed TRUEPackages for at or less than $10 million per TRUEPackage™.**

46.    In February 2019, WattStock Vice President Pete Watson travelled to Turkey to begin inspections and negotiations on used GE aeroderivative gas turbine units. This was done at Alta Power's expense pursuant to the Master Agreement.

47.    Several used GE aeroderivative units were available in Turkey because changes in Turkish governmental regulations made the units uneconomical in country. In March 2019, WattStock presented Alta Power price and purchase options for nine used GE units based in Turkey.

48.    What WattStock and GE did not tell Alta Power was that the presented prices of the units were not the true prices. All the units GE/WattStock persuaded Alta Power to spend substantial amounts of money on were burdened by significant hidden liabilities. Many of the potential units were significantly more expensive than represented because GE had Long Term Service Agreements ("LTSA") carrying hefty termination fees with the prior owners seeking to sell the used LM6000 aeroderivative gas turbine units. Units not burdened by LTSAs had other material undisclosed liabilities – all of which were driven by internal GE policies.

49.    These LTSAs generally required the prior owner pay GE millions of dollars to terminate. GE/WattStock failed to disclose the fact that the units GE and WattStock encouraged and caused Alta Power to target were burdened by LTSA's and associated termination fees that would materially impact Alta Power's ability to purchase the units for at or below $10 million per unit. In fact, the LTSA termination fees impact on the price of the targeted units were not disclosed until after (1) the units were targeted, (2) a purchase agreement was executed between the owners and WattStock, and (3) Alta Power paid WattStock millions of dollars in down payments associated with these purchase agreements.

50.    It was not until almost nine months after Alta Power had paid the first down payment that Alta Power learned that the LTSA termination fees could impact Alta Power's ability to acquire the targeted units for at or below Alta Power's budgetary requirements. In February 2020, one of the sellers of two units, a Turkish company called Nuh Cemento, began demanding reimbursement for the LTSA termination fees to be

paid GE in addition to the agreed upon purchase price. GE ultimately refused to waive the LTSA termination fee unless Alta Power entered into a multi-million dollar service agreement with GE. As a result, the project was burdened by expenses materially above Alta Power's project budgets.

51.    At all relevant points, GE knew that its LTSA contracts with Nuh Cemento required Nuh Cemento to pay GE millions of dollars before Nuh Cemento could sell Alta Power the Nuh Cemento units. GE also understood that unless it agreed to waive its contractual entitlement to these termination fees, the termination fees could and almost certainly would impact the total cost of these units to Alta Power, and that unless it agreed not to collect the termination fees, the cost of the Nuh Cemento units to Alta Power would exceed $10 million / unit. GE/WattStock were aware of the undisclosed termination fees before suggesting the Nuh Cemento units be targeted for acquisition. GE/WattStock knew adding the undisclosed termination fees would make the prices of those units higher than Alta Power's project budget. Utilizing a classic "bait and switch move," GE deliberately hid the existence of the termination fees and their potential impact on the price of the units from Alta Power until Alta Power had spent months and paid millions of dollars towards the acquisition of the units.GE then refused to waive its contractual right to the termination fees unless Alta Power would agree to execute an expensive and burdensome LTSA with GE, thereby preventing Alta Power from acquiring these units. But for GE's refusal to waive these undisclosed termination fees, Alta Power would have purchased these units and its business would have moved forward.

52.    Prior to learning of the true cost of these units due to the undisclosed associated liabilities, Alta Power, relying on GE and WattStock, moved throughout 2019 and into 2020 attempting to purchase the two Nuh Cemento units.

53.    WattStock, GE, and Alta Power identified an additional unit in Turkey owned by a Turkish company called Acarsoy. The same process repeated itself again.

54.    As with the Nuh Cemento units, GE failed to disclose that the Acarsoy unit was burdened with a multi-million-dollar LTSA termination fee, which was not included in the pricing presented to Alta Power. When GE refused to waive its right to collect the undisclosed termination fees, it doomed the transactions. But for this decision, Alta Power would have purchased this unit.

55.    Relying on GE and WattStock's representations concerning their ability and willingness to sell Alta Power the required TRUEPackages™ for at or less than $10 million per TRUEPackage™ unit, Alta Power paid $475,000 in down payments related to this unit, unaware of the true cost of the unit. Alta Power would never have done so had GE disclosed the liabilities associated with the unit which rendered it uneconomical for Alta Power's projects.

56.    GE also hid other material information from Alta Power.

57.    In May of 2019, GE and WattStock encouraged Alta Power to purchase a package from EthosEnergy.The "package" was essentially the housing for the aeroderivative gas turbine.

58.    GE and WattStock represented that Alta Power could obtain a gas turbine engine from the GE lease pool to marry with the EthosEnergy package and claimed a

similar housing was available in Panama and could also easily be married with a lease pool engine.

59.     GE andWattStock claimed these leased units with the purchased housings would lead to a significantly lower price for Alta Power.

60.     Based on these representations, Alta Power purchased the EthosEnergy package for $200,000.

61.     GE andWattStock also concealed that the EthosEnergy unit was in a dilapidated condition and was only suggested as a possibility so that GE andWattStock could increase their revenue stream for providing repairs. Furthermore, several months later when Alta Power inquired about the possibility of cost savings using the previously promised lease pool engines, WattStock and GE informed Alta Power that "that program was no longer being offered."

62.     Had GE/WattStock disclosed the true condition of the EthosEnergy unit or the unavailability of the lease pool, Alta Power would not have purchased the Ethos unit at any price. Furthermore, WattStock and/or GE still has possession of the EthosEnergy unit, despite having been paid for it.

63.     GE and WattStock convinced Alta Power to make a $300,000 down payment for a unit owned by a company in Turkey called Bosen. As with all other units, WattStock and GE represented that the delivered unit would be priced consistent with Alta Power's needs.

64.     At the time they convinced Alta Power to make this downpayment, both GE and WattStock knew that the Bosen units contained non-GE parts. They did not,

however, tell Alta Power that GE categorically refuse to service any LM6000 unit that contains any part that was not originally manufactured by GE, regardless of the non-GE part's condition, or that GE would not warrant (which is the most important aspect of the TRUEPackage™) the performance of a refurbished unit that contains non GE parts.

65.    Later, after Alta Power had made the $300,000 down payment, GE and WattStock informed Alta Power that GE would not warrant or service units containing non-GE components unless the non-GE components were first replaced—regardless of their condition.

66.    The Bosen unit contained non-GE components and as a result the "new" purchase price including the refurbishment work which was several million dollars higher than previously represented by GE/WattStock, and well above the promised $10 million total price. As a result, this unit was uneconomical for Alta's projects.

67.    By the fall of 2019, GE and WattStock continued to lead Alta Power to believe that the targeted units could be acquired consistent with WattStock and GE's earlier pricing guidance. Because of this, Alta Power continued to fund the potential acquisition of units.

68.    In October 2019, Alta Power sent WattStock $100,000 for potential use in extending an option to purchase units from Bosen. During WattStock's negotiations with Bosen, Alta Power ultimately decided not to go through and told WattStock to cease negotiations. WattStock complied and the parties never entered into an agreement extending the option period with Bosen.

69.     WattStock never sent Alta Power's $100,000 to Bosen since the negotiations were called off before the $100,000 was used.

70.     Alta Power requested the return of the $100,000. WattStock acknowledged the funds would be returned, and repeatedly promised to do so on multiple occasions during the fall and winter of 2019-2020.

**71.**     WattStock broke these promises. Instead, WattStock converted Alta Power's $100,000 and used it to cover serious cash flow issues, which GE had known about and hid from Alta Power for the entire time period relevant to this case.

72.     Despite all of the above, Alta Power was still committed to the development of its projects. Consistent with this and based on  WattStock's and GE's false representations, Alta Power paid WattStock over $200,000 for extensions to keep alive potential deals with Acarsoy and Nuh Cemento in the fall of 2019.

73.     At no time did GE or WattStock inform Alta Power that the true costs of these units were inconsistent with WattStock's and GE's representations.

74.     Consistent with this, Alta Power and WattStock entered a Limited Notice to Proceed Proposal ("LNTP") on December 23, 2019 for two separate units to be acquired from Nuh Cemento. The total amount of the LNTP was almost $20 million. This included the "not to exceed price" of $6.5 million for WattStock to purchase the units from Nuh Cemento that GE/WattStock told Alta Power will be sufficient to purchase the units, with the balance for transportation, refurbishment, and installation of the units. This price included GE/WattStock's profit margin for the project.

75.     GE and WattStock represented to Alta Power that GE needed to be paid $1,500,000 to secure the purchase of long-lead hardware, start engineering activities and deliver preliminary drawings related to a potential TRUEpackageTM project. The $1,500,000 was divided into two payments of $750,000.

76.     Alta Power paid $750,000 on December 24, 2019 and paid another $750,000 on January 13, 2020.

77.     In February 2020, Alta Power was informed for the first time that the owner of the two Nuh Cemento units would only sell the two units for the agreed not to exceed price of $6.5 million plus the cancellation of GE's LTSA termination fee of over $1.4 million. Despite its promises to Alta Power that it could and would ensure that Alta Power could obtain the required units at the necessary price points, GE refused to waive the seller's termination fees, thereby preventing Alta Power from purchasing the units.

78.     The impact of the cancellation fee materially increased project costs above the previous budget and made it economically impossible for Alta Power to move forward with the acquisition of this hardware.

79.     For the units being considered (as with the Bosen unit), the significant liabilities were not disclosed until after Alta Power made the final payment to GE under the LNTP. For each, GE chose not to disclose that the units were burdened by these fees (or that the fees could materially impact the price of the units to Alta Power) and refused to waive the termination fees even though doing so was inconsistent with GE and WattStock's promises and duties to Alta Power.

**F.** **GE refuses to make good on its promises, hangs Alta Power out to dry.**

80.    In the spring of 2020 WattStock informed Alta Power it was having financial issues. WattStock asked Alta Power to either provide a loan or acquire WattStock.

81.    During this time, Alta Power requested that GE step in and fulfill its commitment to Alta Power to assist in securing the units needed for Alta Power's project. GE refused.

82.    Alta Power was ready, willing, and able to go forward with the Nuh Cemento project with GE alone. GE refused to allow Alta to pay directly for the LNTP components, despite repeated requests by Alta Power due to concerns regarding WattStock's financial situation. And GE further refused to step in and take over for WattStock (despite contrary written representations) when Alta Power notified GE that WattStock was insolvent.

83.    Despite Alta Power's efforts and GE's prior representations, GE made it clear, once again, that it would only move forward with WattStock, thereby constructively cancelling the LNTP and the Nuh Cemento project and depriving Alta Power of the TRUEPackagesTM that GE and WattStock represented that they both could and would provide for at or below $10 million per TRUEPackage TM. As a result, Alta Power suffered more than one hundred million dollars of damages.

## V.    CAUSES OF ACTION

### Count I: RESPONDEAT SUPERIOR

84.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

85.     GE and WattStock represented to Alta Power that they were "partners" and that WattStock acted as GE's authorized service provider.

86.     Alta Power justifiably relied on these representations by GE and WattStock in agreeing to the Master Agreement and the LNTP.

87.     In fact, without the representations, Alta Power would have never entered any contracts with WattStock.

88.     Accordingly, an ostensible agency existed between WattStock and GE.

89.     GE is estopped from denying liability for WattStock's breaches and torts and/or GE and WattStock engaged in a joint enterprise for which joint and several liability exists.

90.     Despite the fig leaf boiler-plate language in the MOU between GE and WattStock, the language of the MOU shows GE controlled WattStock. Accordingly, the "no partnership or agency" provision is a sham or subterfuge designed to conceal the true legal status of GE/WattStock. Extrinsic evidence also shows actual control by GE over WattStock.

91.     GE is respondeat superior liable for the breaches and torts of WattStock.

## COUNT II: UNJUST ENRICHMENT (AGAINST GE)

92.     Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

93.     GE has been unjustly enriched in the amount of $1.5 million to the detriment of Alta Power.

94.     Alta Power demands restitution of all amounts GE has been justly enriched.

## COUNT III: FRAUD

95.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

96.    GE and WattStock intentionally misrepresented the nature of their relationship to  induce Alta Power to purchase GE TRUEPackages™ and contract with WattStock instead of acquiring the needed LM6000s from and/or contracting with a competitor like ProEnergy.

97.    GE falsey represented it would "stand behind" WattStock. However, when the time came to do so GE did not.

98.    GE intentionally misrepresented the benefits of the GE TRUEPackage™ Program, the pricing and acquisition costs associated with the TRUEPackage™ units, and the overall costs of the TRUEPackages™ marketed to Alta Power.

99.    GE/WattStock misrepresented the benefits of the TRUEpackageTM program.

100.    GE/WattStock represented that the program would enhance the ability to obtain financing when it did not.

101.    GE/WattStock represented that the program would be able to move quickly to service the narrow window Alta Power had for this unique strategy when in fact the GE/WattStock relationship created a bureaucracy that only slowed down projects.

102.    GE represented that the TRUEpackageTM program was of a superior quality when in fact it was not.

**APP.283**

103.    GE represented that units from the TRUEpackageTM program were competitively priced with alternative refurbished gas turbine solutions when in fact they were not.

104.    GE hid the existence of undisclosed liabilities on virtually every unit suggested using a classic bait and switch maneuver.

105.    GE misrepresentations were material and false.

106.    GE knew these representations were false when it made them, or at the very least, these representations were made recklessly and without knowledge of their truth.

107.    These representations were made with the intent that Alta Power act and rely on them.

108.    Alta Power relied on these representations and omissions to its detriment.

109.    GE representations and omissions were material and false.

110.    GE knew these representations and omissions were false (or created a false impression) when it made them, or at the very least, it made these representations recklessly and without knowledge of their truth.

111.    These representations and omissions were made with the intent that Alta Power act on them.

112.    Alta Power relied on the representations outlined above.

113.    GE's misrepresentations proximately caused Alta Power more than $100 million in damages.

## COUNT IV: NEGLIGENT MISREPRESENTATION

114.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

115.    Alternatively, each fraudulent misrepresentation made by GE was made negligently since GE did not exercise reasonable care or competence in obtaining or communicating the information.

116.    Alta Power has wasted at least $10 million based on GE/WattStock's negligent misrepresentations, and has lost more than $100 million in profits.

117.    Had GE not negligently misrepresented the true facts, Alta Power would have been able to successfully serve the niche market and has lost more than $100 million as a result of GE's fraudulent acts.

## COUNT V: CIVIL CONSPIRACY

118.    Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

119.    GE and WattStock conspired to accomplish an object or course of action, namely, to fraudulently induce Alta Power into contracting with WattStock (as opposed to another competitor like ProEnergy) related to the acquisition of the refurbished LM6000s Alta Power needed to carry out its business.

120.    To accomplish this, both GE and WattStock agreed to and did in fact intentionally misrepresent the nature of their relationship and virtually every aspect of GE's TRUEPackage™, including but not limited to the virtues of TRUEPackages™, their price, GE and WattStock's ability to timely deliver the required units, and the various

factors that might adversely impact their ability to follow through on their promises to Alta Power to induce Alta Power to agree to and spend money towards acquiring GE TRUEPackages™ instead of acquiring the needed refurbished units from a competitor like ProEnergy.

121.    GE and WattStock agreed to and did in fact accomplish this objective through the commission of numerous unlawful overt acts, including but not limited to by: (i) intentionally misrepresenting the benefits of the GE TRUEPackage™ Program, the pricing and acquisition costs associated with the TRUEPackage™ units, and the overall costs of the TRUEPackages™ marketed to Alta Power; (ii) falsely representing that they would be able to move quickly to service the narrow window Alta Power had for this unique strategy; (iii) falsely representing that the TRUEpackageTM program was of a superior quality when in fact it was not; (iv) falsely representing that units from the TRUEpackageTM program were competitively priced with alternative refurbished gas turbine solutions when in fact they were not; (v) hiding the existence of undisclosed liabilities on virtually every unit suggested using a classic bait and switch maneuver, and deliberately hid the fact that those undisclosed liabilities could (and would) materially increase the overall cost of the targeted units; (vi) falsely representing that GE would facilitate Alta Power's acquisition of the required units at the required price levels, but—after causing Alta Power to devote time and huge sums of money to attempting to purchase the two Nuh Cemento units and the Acorsoy units—caused those transactions to fail by refusing to waive the termination fees attached to the GE LTSAs attached to those units; (vii) falsely representing that GE would "stand behind" WattStock.

122.    Alta Power relied on these representations and ommissions to its detriment.

123.    Alta Power was damaged as a result of GE and WattStock's unlawful acts.

124.    Both GE and WattStock knew these representations and omissions were false (or created a false impression) when they made them, or at the very least, these representations were made recklessly and without knowledge of their truth.

125.    These representations and ommissions were made with the intent that Alta Power act on them.

126.    Alta Power relied on GE and WattStock's representations regarding their relationship, and these representations proximately caused Alta Power millions of dollars in damages.

## COUNT VI: TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

127.    Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

128.    GE knew there was a reasonable probability that Alta Power would have entered into a contractual relationship with ProEnergy.

129.    To prevent that from happening, GE fraudulently (i) intentionally misrepresenting the benefits of the GE TRUEPackage™ Program, the pricing and acquisition costs associated with the TRUEPackage™ units, and the overall costs of the TRUEPackages™ marketed to Alta Power; (ii) falsely representing that they would be able to move quickly to service the narrow window Alta Power had for this unique strategy; (iii) falsely representing that the TRUEpackage™ program was of a superior

quality when in fact it was not; (iv) falsely representing that units from the TRUEpackageTM program were competitively priced with alternative refurbished gas turbine solutions when in fact they were not; (v) hiding the existence of undisclosed liabilities on virtually every unit suggested using a classic bait and switch maneuver, and deliberately hid the fact that those undisclosed liabilities could (and would) materially increase the overall cost of the targeted units; (vi) falsely representing that GE would facilitate Alta Power's acquisition of the required units at the required price levels, but—after causing Alta Power to devote time and huge sums of money to attempting to purchase the two Nuh Cemento units and the Acorsoy units—caused those transactions to fail by refusing to waive the termination fees attached to the GE LTSAs attached to those units; (vii) falsely representing that GE would "stand behind" WattStock.

130.    GE undertook all of the acts described above with the conscious desire to prevent Alta Power from contracting with Pro Energy.

131.    GE's acts and omissions caused actual harm and damage to Alta Power. GE's acts and omissions caused Alta Power to lose more than one hundred million dollars in profit.

## VI.    JURY DEMAND

132.    Alta Power requests trial by jury on all contested issues of fact. The requisite jury fee has been paid.

## VII.    PRAYER

ACCORDINGLY, Alta Power prays that GE be cited to appear and answer and that upon a final trial of this matter, the Court enter a final judgment against GE awarding Alta Power the following relief:

a)  An award of the full amount of actual damages incurred by Alta Power and caused by the acts and omissions of GE;

b)  An award of equitable damages, as requested above;

c)  An award of exemplary damages;

d)  Reasonable and necessary attorneys' fees;

e)  Pre-judgment and post-judgment interest at the maximum rate allowed by law;

f)  Cost of court; andSuch other and further relief, general or special, at law or in equity, to which Alta Power may show itself to be justly entitled.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By: /s/ Jeb Golinkin
     Michael Cancienne
     State Bar No. 24055256
     Joseph W. ("Jeb") Golinkin II
     State Bar No. 24087596
     1980 Post Oak Blvd., Ste. 2300
     Houston, Texas 77056
     713.955.4028
     713.955.9644 Facsimile
     mcancienne@jlcfirm.com
     jgolinkin@jlcfirm.com

     **ATTORNEYS FOR PLAINTIFF ALTA POWER LLC**

## CERTIFICATE OF SERVICE

I hereby certified that a true and correct copy of the above pleading was served on all parties through the Court's electronic filing service on the 14th day of May, 2024.

By:    /s/ Jeb Golinkin
        Jeb Golinkin

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

WATTSTOCK LLC,

     *Plaintiff/Counter Defendant,*

v.

ALTA POWER LLC,                   Case No. 3:21-CV-03183-X

     *Defendant/Counter Plaintiff,*

v.

GENERAL ELECTRIC INTERNATIONAL
INC., d/b/a GE POWER SERVICES,

     *Third-Party Defendant.*

**ALTA POWER LLC'S ~~FIRST AMENDED ANSWER AND COUNTERCLAIM AND ORIGINAL~~ FIRST AMENDED ~~THIRD-PARTY PETITION~~COMPLAINT AGAINST GENERAL ELECTRIC INTERNATIONAL, INC.**

Alta Power LLC ("Alta Power") files this ~~First Amended Answer and Counterclaim and~~ First Amended~~Original~~ ~~Third-Party Petition~~ Complaint against ~~Counter-Defendant WattStock LLC ("WattStock") and Third-Party Defendant~~ General Electric International, Inc., d/b/a GE Power Services ("GE") and would respectfully show as follows:

### I.    SUMMARY OF ACTION

~~1.    This case is necessitated by repeated misrepresentation made by GE and WattStock to Alta Power concerning GE/WattStock's relationship, capabilities, and~~

~~program to entice Alta Power to use GE/WattStock as the source of used aeroderivative gas turbines.~~

~~2.~~1.    Alta Power was created to develop natural gas-fired power assets that would provide critical additional power capacity to the Texas energy grid when the grid is experiencing periods of high demand~~was overburdened~~. As part of this, Alta Power intended to purchase and place into service used aeroderivative gas turbines (essentially jet engines on skids powering a generator) that can quickly turn on and off to meet instances where power demand exceeds available power supply. During these periods of excess demand, power prices are highest.

~~3.~~2.    GE was eager to participate in the used gas turbine market, a segment in which it historically had no presence. GE, however, did not want to be involved in the work of actually acquiring and selling the used turbines. Instead, GE engaged former GE employees who started a new company named WattStock to act as its exclusive sales force and point of entry into the used gas turbine market.

~~4.~~3.    Starting in 2018, GE and WattStock persuaded Alta Power to purchase used refurbished GE aeroderivative gas turbines, marketing the units as both more reliable and cost competitive, similar to the "Certified Pre-Owned Mercedes Benz®" program. Critically, Alta Power relied on GE's and WattStock's representations regarding the nature of the ~~WattStock/GE~~GE's relationship with WattStock, the total acquisition cost of used units, and the benefits of GE's ~~"OEM certified program."~~ Aero TRUEPackage™ program. Ultimately, Alta Power agreed to ~~move forward with WattStock/GE.~~ use GE

TRUEPackages™ instead of a similar refurbished GE gas turbine product offered by one of GE's competitors.

4.     GE's and WattStock's representations were false and have caused Alta Power to miss opportunities in the marketplace. Instead of the benefits claimed by GE and WattStock, Alta Power put money into potential units that were never going to fit their budgetary requirements because the units were either (1) burdened by undisclosed liabilities related to GE's "Long Term Services Agreements," (2) were prohibitively expensive for refurbishment by GE, or (3) were not available as marketed. Simply put, the acquisition costs and the benefits lauded by GE and WattStock were false. Worse still, GE ultimately prevented Alta Power from acquiring the promised units by refusing to waive termination fees attached to the prospective units that they never disclosed in the first place.

5.     But for GE and WattStock's unlawful conduct, Alta Power would have obtained three or more  LM6000s and would have made millions in ~~pure~~ profits. Instead, GE and WattStock misappropriated millions of dollars of Alta Power's money.

~~5.     GE and WattStock's breaches of contract and tortious conduct caused Alta Power to lose more than one hundred million dollars of essential financing, profits related to its business, and millions in payments to GE and WattStock for undelivered equipment and phantom services. After investing millions, Alta Power has nothing to show for what it has paid to GE and WattStock.~~

ALTA POWER LLC'S ~~FIRST AMENDED~~ ~~ANSWER AND COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION~~ COMPLAINT AGAINST GE - PAGE 3

**APP.293**

## ~~II.~~    ~~DISCOVERY CONTROL PLAN~~

~~6.    Discovery is intended to be conducted under Level 3 of Texas Rule of Civil Procedure 190.~~

## II.    PARTIES

~~7.~~6.    Alta Power is the Defendant in this case originally filed by WattStock, the original Plaintiff and Counter-Defendant. Both Alta Power and WattStock have already appeared.

~~8.~~7.    Third-Party Defendant GE is a company incorporated under the laws of Delaware doing business in Texas and can be served with Citation through its registered agent in Texas, CT Corporation System, 1999 Bryan St., Ste 900, Dallas, TX 75201-3136.

## III.    VENUE AND JURISDICTION

8.    Jurisdiction in this Court is proper under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000. This Court also has core jurisdiction under 28 U.S.C. §§ 157 and 1334.

9.    ~~This Court has personal jurisdiction over WattStock related to Alta Power's claims as WattStock originally filed this case.~~ This Court has personal jurisdiction over GE because a substantial amount of the acts giving rise to Alta Power's causes of action arose in Texas.

~~10.    Venue is proper in Dallas County, Texas under Section 15.002 of the Texas Civil Practice & Remedies Code because all, or a substantial part of the events or omissions giving rise to the claims against WattStock and GE, occurred in Dallas County and WattStock's principal place of business is in Dallas County, Texas.~~

ALTA POWER LLC'S ~~FIRST AMENDED~~ ~~ANSWER AND COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION~~ COMPLAINT AGAINST GE - PAGE 4

APP.294

10.      Venue in this Court is proper under 28 U.S.C. §§ 1408, 1409, and 1452.

11.      As required by Rule 47(b) of the Texas Rules of Civil Procedure, Alta Power seeks monetary relief of more than $1,000,000. Alta Power also seeks pre-judgment and post judgment interest at the highest legal rate.

### IV.      GENERAL DENIAL

12.      Alta Power denies all the allegations set forth in WattStock's Original Petition and any subsequent amended petition and demands strict proof thereof as required by the laws of Texas.

### V.      AFFIRMATIVE DEFENSES

13.      Alta Power asserts the following affirmative defenses:

14.      WattStock's claims are barred because of WattStock's material breaches of the Master Agreement, the LNTP, and the Ethos Authorization; and

15.

16.      WattStock's claim for attorneys' fees fails for lack of presentment.

### VI.IV.    FACTUAL ALLEGATIONS

**A.    Alta Power's business develops a strategy for meeting peak energy demands.**

17.11.  Alta Power was established to provide additional capacity to an overloaded energy grid in a creative and profitable manner.

18.12.  The market for power in Texas has evolved from traditional gas and coal fired power plants to more renewable sources like wind and solar. In 2019, renewable energy sources accounted for about 11% of total U.S. energy consumption and about 17%

of electricity generation. Texas now meets approximately 30~~20~~% of its sizeable electricity

demand with wind power and approximately another 15% with solar.

~~19.~~13.  As electrical providers move towards renewable power production, there

are times when the energy grid has more demand than supply. Aeroderivative gas

turbine "peaker plants" have become imperative to meet this imbalance since these plants

turn on quickly—in less than 10 minutes.

~~20.~~14.  Pricing for this "peak demand" power is often at a premium and can be

sold under long-term contracts with investment grade counterparties. Alta Power

determined that peaker plants could help meet this demand, profitably for Alta Power if

Alta Power could acquire aeroderivative gas turbines at a competitive price and locate

them appropriately.

~~21.~~15.  Because of the high cost of new aeroderivative gas turbines, Alta Power's

strategy relied on acquiring used aeroderivative gas turbines, which was the only way to

make the projects work within the required budget.

~~22.~~16.  To successfully develop a peaker plant, Alta Power needed to~~Developing

natural gas-fired peaker projects is a complex process, including~~ (1) identif~~ying~~ying areas in

the grid where a peaker plant fits (considering gas supply, offtake pricing, and

interconnection feasibility); (2) navigat~~e~~ing the state and federal regulatory waters of the

electrical power market; and (3) ~~sourcing~~obtain used aeroderivative gas turbines that can

be purchased and refurbished within budget.~~; and (4) obtaining project financing.~~

23.17.  This complexity, along with relatively high entry costs, means that there were only a few companies competing with Alta Power. However, given the limited size of the market, being a first mover was critical.

24.18.  By April 2018, Alta Power had identified several potential project sites through an extensive vetting process based on prevailing market conditions. Through this work, Alta Power earned a head start on its competitors and found itself with a brief window during which it would be the first mover in this niche market.

25.19.  At this point Alta Power turned to identifying and purchasing surplus aeroderivative gas turbines units, which, once contractually secured, would allow it to obtain project financing.

**B.**    ~~GE and WattStock's Partnership~~ GE Aero TRUEPackage™.

26.20.  GE is one of the limited suppliers of aeroderivative gas turbines.

27.21.  GE historically has not had a presence in the sale of used aeroderivative gas turbines but recognized a need to be present in this market at some point prior to 2018. As such, GE partnered with WattStock, a group of former GE executives, agreed to work together to gain entry into this market. As part of this agreement, GE authorized and allowed WattStock to use its trademarks and other intellectual property to apparently create the impression that WattStock and GE were partners selling a GE product. WattStock marketed itself (along with GE) as a fully integrated locator, dealer, refurbisher, and servicer of used aeroderivative gas turbines. WattStock markets itself as a unique solution in the used aeroderivative gas turbines, and as the only authorized distributor of used GE aeroderivative gas turbines.

ALTA POWER LLC'S ~~FIRST AMENDED~~ ~~ANSWER AND COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION~~ COMPLAINT AGAINST GE - PAGE 7

APP.297

22. ~~However, b~~By early 2018, sales of GE's ~~gas powered~~new gas-powered turbines had fallen off a cliff because "decentralized renewable resources increase cost-competitive pressures." However, the increased reliance on renewables and wind energy had created a gap in the energy markets that companies like Alta Power could use refurbished LM6000s to very profitably exploit. GE's competitors, like ProEnergy, had recognized the potential market for refurbished LM6000 assets and had begun buying up and refurbishing previously owned LM6000 units in earnest. In so doing, ProEnergy and others were also increasingly winning contracts to service the GE units they were refurbishing and reselling.

23. Fearing it was being left behind, GE launched its Aero TRUEPackage™ product line, which GE described as the "only authorized OEM certified pre-owned package offering in the industry." According to GE's marketing materials, GE's TRUEPackage™ promised (1) OEM warranty and performance guarantees; (2) delivery in six months or less; (3) equipment selection and refurbishment plan driver by installed cost; and (4) OEM brand ~~certificatation~~certification can improve financing options and insurance premiums.

~~28.~~24. ~~In reality,~~ GE intended for, and held out WattStock to be, _its **exclusive partner**_ and representative in the sale of TRUEPackages™~~the de facto sales force in the used aeroderivative gas turbine market for GE. GE and WattStock work "hand-in-hand" as "partners" to provide~~ which both companies jointly marketed as the

ALTA POWER LLC'S ~~FIRST AMENDED~~ ~~ANSWER AND COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION~~ COMPLAINT AGAINST GE - PAGE 8

**APP.298**

"TRUEpackageTM" or Certified Turbine Power—CTPTM1 system, "[t]he only authorized OEM [original equipment manufacturer] certified preowned package offering in the industry."[2]

~~29.~~25.  GE and WattStock entered in a Memorandum of Understanding ("MOU") on June 26, 2018 that "outlines" their relationship. The MOU establishes that GE is in complete control, especially in the context of transactions related to aeroderivative gas turbines originally manufactured by GE.

26.    Consistent with their relationship, GE and WattStock held themselves out publicly and privately as "partners" both orally and in writing. GE described the TRUEPackage™ "process" as follows:



27.    GE applied for and owns a trademark for the word "TRUEPackage™" in the Construction and Repair Services  category. In its trademark application, GE

---

[1]    GE/WattStock uses the TRUEpackage™ descriptor on GE's Website and CTP™ on WattStock's website. See   https://www.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions  and https://www.WattStock.com/ctp.

[2]    https://www.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions.

informed the United States Patent and Trademark Office that "TRUEPackage™" refers to GE's practice of "refurbishing and upgrading of gas turbines power plants." GE attached a draft of the LNTP that it would eventually execute related to the sale of TRUEPackages™ to Alta Power with its trademark application.

30.28.  Since at least October of 2018, GE strictly required WattStock to refer only to "GE Aero TRUEPackage in marketing materials" related to the refurbishment and resale of used LM6000s because "TRUEpackage is the GE brand….not Certified Turbine Power:" and GE does not want to "confuse the market with different names."

**C.    GE directs Alta Power to WattStock**

31.29.  In 2018, Alta Power began to determine which used aeroderivative gas turbines would best suit its needs. Availability and total acquisition costs were key drivers in its decision on which aeroderivative gas turbines to select. Because the used aeroderivative gas turbines must be refurbished, acquisition costs necessarily include the costs associated with purchasing the units, the costs of refurbishment, and the costs associated with placing the unit at the location and into service.

32.30.  After sharing these considerations with GE and WattStock, and after meetings with GE, WattStock and others, Alta Power determined that used GE LM6000 aeroderivative turbine packages were best suited for Alta Power's strategy of tapping into the niche peaker plant market in Texas based on assurances from GE and WattStock.

33.31.  GE/WattStock were not the only companies that marketed used and refurbished GE LM6000s. Indeed, Alta Power met with several GE "certified" companies that refurbished used aeroderivative gas turbines. None, however, offered a fully OEM-

**APP.300**

certified and warranted end-to-end product like the TRUEpackage™, which GE/WattStock marketed as their "exclusive" service offering of being the "only authorized OEM certified preowned package offering in the industry."

~~34.~~ Alta Power had several joint meetings with both GE and WattStock personnel mainly at GE's Jacintoport facility where WattStock is co-located. ~~To protect Alta Power's confidential information concerning its unique strategy, the parties entered into a Confidentiality Agreement.~~

~~35.~~32.  During these meetings, Alta Power disclosed to GE/WattStock the detailed budgetary requirements of Alta Power's business model. Alta Power repeatedly emphasized the cost sensitivity of its projects; that is, the cost of the gas turbine units cannot exceed a certain price point if the project is to remain within budget and financeable. GE and WattStock repeatedly promised and reassured Alta that~~they would make sure~~ GE could provide obtain the required refurbished units ~~confirmed that used units could be obtained~~ for the prices Alta Power needed.

~~36.~~33.  GE/WattStock also persuaded Alta Power that its exclusive TRUEpackageTM OEM warranty was superior to anything offered in the market because GE would provide an end-to-end package warranty covering both the aeroderivative gas turbine and the electrical generation components. GE/WattStock further stated that other competitors could only warrant a portion of the package.

~~37.~~34.  During these meetings, GE and WattStock consistenyl described themselves as "partners." GE made it clear that the only way Alta Power could obtain the

ALTA POWER LLC'S ~~FIRST AMENDED~~ ~~ANSWER AND COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION~~ COMPLAINT AGAINST GE - PAGE 11

**APP.301**

TRUEpackageTM equipment certification and warranty was by working with the GE and WattStock partnership.

38.35.  Specifically, GE refused to provide equipment certifications and warranties without WattStock.

39.36.  In addition to the pricing and warranties, GE and WattStock knew time was of the essence for Alta Power, as competitors were also attempting to enter the market. GE made it clear that delivery at the agreed upon pricing could occur within the time frame required by Alta Power's plans if Alta Power used the GE/WattStock TRUEpackageTM program.

40.37.  GE/WattStock emphasized that (1) GE had a proprietary global database of used LM6000 units including the operational and maintenance history on each, and (2) only GE and WattStock had access to this "proprietary" database. This "proprietary" data was a key selling point for Alta Power.

41.38.  GE/WattStock represented that GE and WattStock could efficiently locate used units, generate a detailed refurbishment scope, and cost estimate and streamline the acquisition, refurbishment, and delivery process all within Alta Power's required budget.

**D.    WattStock and Alta Power enter into a "Master Agreement."**

39.    In August of 2018, ProEnergy sent Alta Power a proposal for 3x LM6000 Turnkey EPC. ProEnergy's proposal satisfied Alta Power's technical, budgetary, and temporal requirements. Alta Power made GE aware that it was considering ProEnergy's offer, and that it would accept it if GE could not meet Alta Power's pricing requirements.

GE knew this and badly wanted to ensure that Alta Power would not contract with ProEnergy.

42.    Through their discussions, GE and WattStock were keenly aware of the specific unit price requirements of Alta Power, and GE and WattStock assured Alta Power on multiple occasions that sufficient suitable units were available.

40.    GE also repeatedly promised they could and would make sure Alta Power could obtain the required units for at or below $10 million per refurbished LM6000 if Alta Power agreed to purchase GE TRUEPackages™, rather than from one of GE's competitors like ProEnergy.

43.    GE also represented that it would "fully wrap"—that is, guarantee—WattStock's performance related to the TRUEPackages™. This caused Alta Power to believe that its involvement would insulate Alta Power from any concerns related to the financial viability of WattStock since GE is one of the largest companies in the world. GE also caused Alta Power to believe that WattStock had the financial resources to complete the necessary steps leading to GE's certification under the TRUEpackageTM OEM program.

41.    Based on GE and WattStock's the representations concerning their relationship, capabilities, including (1) the benefits of the GE TRUEpackage™ program, (2) GE's assertion that it would fully guarantee WattStock's work related to the GE TRUEPackage™ program, (3) including, (1) the benefits from GE and WattStock "collaborating" as "partners;" (2) (4) the ready availability of used units that met Alta Power's project budget; (53) the ability to timely close purchases and refurbish units; and

(64) the "benefits" of the warranty with respect to the overall economics of the project, Alta Power agreed to move forward with GE/WattStock for the acquisition of used GE aeroderivative gas turbines to effectuate Alta Power's unique strategy.

44.42.  In order to purchase the TRUEPackages™, GE directed and commanded Alta Power to  began negotiating financial and contractual terms for the relationship in February 2019. At GE's insistence, Alta Power contracted directly with WattStock. More specifically, GE GE/WattStock stated that in order to purchase a TRUEPackage™, Alta Power must contractually agree to allowrequired that WattStock (with GE standing behind it and guiding it) to negotiate the purchase price of eachof the LM6000s for use in the TRUEPackage™ used GE aeroderivative unit with the prior owner and acquire the unit in WattStock's name for an agreed not to exceed price. GE/WattStock presented Alta Power with detailed total cost estimates for each unit showing that if each unit identified could be acquired at or below the "not to exceed price," then the fully refurbished unit could be delivered within Alta Power's budgetary requirements.

43.     The partiesGE, WattStock, and Alta Power also agreed that in the event Alta Power paid any amounts prior to the units being acquired, those interim payments would be credited towards the purchase price Alta Power ultimately agreed to pay.

45.44.  On February 27, 2019 WattStock and Alta Power entered into a "Master Agreement" confirming the negotiations concerning how WattStock would be reimbursed for out-of-pocket expenses and as part of a negotiated purchase price after WattStock purchased and refurbished the used units. At no point was WattStock to be

~~paid any mark-up on "down payments" made by Alta Power or on any out-of-pocket expenses for which Alta Power reimbursed WattStock.~~

~~46.    While not a named party to the Master Agreement, GE is an "affiliate" or "representative" of WattStock and, therefore, a party to the Master Agreement.~~

~~47.    In the Master Agreement, Alta Power and GE and WattStock agreed to a very strict confidentiality provision. GE/WattStock agreed to hold confidential information in "strict confidence" and agreed such information would "not be disclosed in any manner whatsoever."~~ The Master Agreement ~~also~~ contains an exclusivity and non-circumvention provision under which WattStock (and by extension, GE) agreed that neither WattStock nor GE would directly or indirectly cause another person to either attempt to or purchase a unit inspected on behalf of Alta Power (a service for which Alta Power paid).

~~48.    Additionally, the confidentiality provision required WattStock and GE not to use any information obtained for any other purpose other than the agreed "business purpose," including but not limited to, providing any product or service, or establishing a relationship that is competitive with or against the best interest of Alta Power.~~

~~49.~~45.  Under the "Master Agreement," the parties ~~also~~ agreed that Alta Power ~~would reimburse WattStock for specific out-of-pocket expenses incurred in arranging inspection and evaluation of the condition of used aeroderivative gas turbines, with prior written approval needed for expenditures more than $20,000.~~

**E.      GE and WattStock conceal termination fees, lie about their ability to provide the needed TRUE~~rue~~Pac~~k~~kages for at or less than $10 million per TRUEPackage™.**

**E.      ~~WattStock and GE's misrepresentations continue.~~**

~~50.    Fully cognizant of the pricing sensitivities of Alta Power's projects, GE/WattStock presented Alta Power with financial information for the acquisition of available units.~~

~~51.    The knowledge of the availability of units was largely driven by GE's data. The financial information related to the acquisition of units included WattStock's own estimates based on its "experience" and data from GE based on GE's own data and detailed refurbishment pricing models for each unit.~~

~~52.~~46.  In February 2019, WattStock Vice President Pete Watson~~, WattStock's Vice President of CTP Operations,~~ travelled to Turkey to begin inspections and negotiations on used GE aeroderivative gas turbine units. This was done at Alta Power's expense pursuant to the Master Agreement.

~~53.~~47.  Several used GE aeroderivative units were available in Turkey because changes in Turkish governmental regulations made the units uneconomical in country. In March 2019, WattStock presented Alta Power price and purchase options for nine used GE units based in Turkey.

~~54.~~48.  What WattStock and GE did not tell Alta Power was that the presented prices of the units were not the true prices. All the units GE/WattStock persuaded Alta Power to spend substantial amounts of money on were burdened by significant hidden liabilities. Many of the potential units were significantly more expensive than represented

ALTA POWER LLC'S ~~FIRST AMENDED~~ ~~ANSWER AND~~ ~~COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION~~ COMPLAINT AGAINST GE - PAGE 16

**APP.306**

because GE had Long Term Service Agreements ("LTSA") carrying hefty termination fees with the prior owners seeking to sell the used LM6000 aeroderivative gas turbine units. Units not burdened by LTSAs had other material undisclosed liabilities – all of which were driven by internal GE policies.

55.49.  These LTSAs generally required the prior owner pay GE millions of dollars to terminate. GE/WattStock failed to disclose ~~the existence of these LTSA financial burdens to Alta Power up front~~the fact that the units GE and WattStock encouraged and caused Alta Power to target were burdened by LTSA's and associated termination fees that would materially impact Alta Power's ability to purchase the units for at or below $10 million per unit. In fact, the LTSA termination fees impact on the price of the targeted units were not disclosed until after (1) the units were targeted, (2) a purchase agreement was executed between the owners and WattStock, and (3) Alta Power paid WattStock millions of dollars in down payments associated with these purchase agreements.

56.50.  It was not until almost nine months after Alta Power had paid the first down payment that Alta Power learned ~~of the existence of the~~that the LTSA termination fees could impact Alta Power's ability to ~~aquire~~acquire the targeted units for at or below Alta Power's budgetary requirements. In February 2020, one of the sellers of two units, a Turkish company called Nuh Cemento, began demanding reimbursement for the LTSA termination fees to be paid GE in addition to the agreed upon purchase price. GE ultimately refused to waive the LTSA termination fee unless Alta Power entered into a multi-million dollar service agreement with GE. As a result, the project was burdened by expenses materially above Alta Power's project budgets.

57.51.  At all relevant points, GE knew that its LTSA contracts with Nuh Cemento required Nuh Cemento to pay GE millions of dollars before Nuh Cemento could sell Alta Power the Nuh Cemento units. GE also understood that unless it agreed to waive its contractual entitlement to these termination fees, the termination fees could and almost certainly would impact the total cost of these units to Alta Power, and that unless it agreed not to collect the termination fees, the cost of the Nuh Cemento units to Alta Power would exceed $10 million / unit. GE/WattStock were aware of the undisclosed termination fees before suggesting the Nuh Cemento units be targeted for acquisition. GE/WattStock knew adding the undisclosed termination fees would make the prices of those units higher than Alta Power's project budget. Utilizing a classic "bait and switch move," GE/WattStock deliberately hid the existence of the termination fees and their potential impact on the price of the units from Alta Power until Alta Power had spent months and paid millions of dollars towards the acquisition of the units.in the hope Alta Power would have no choice but to pay them at the 11th hour after Alta Power's project financing had been secured and the projects were already well underwayGE then refused to waive its contractual right to the termination fees unless Alta Power would agree to execute an expensive and burdensome LTSA with GE, thereby preventing Alta Power from acquiring these units. But for GE's refusal to waive these undisclosed termination fees, Alta Power would have purchased these units and its business would have moved forward.

58.52.  Prior to learning of the true cost of these units due to the undisclosed associated liabilities, Alta Power, relying on GE and WattStock, moved throughout 2019 and into 2020 attempting to purchase the two Nuh Cemento units.

59.  ~~WattStock also improperly marked up Alta Power's down payment that would have never been made had Alta Power known the true price of the Nuh Cemento units. Per the terms of the Master Agreement, WattStock entered Equipment Purchase Agreements with Nuh Cemento. When WattStock sent an invoice to Alta Power for the $250,000 down payment, WattStock added a "mark-up" of $125,000. Alta Power refused to pay the "mark-up" since it was inconsistent with the Master Agreement. Recognizing it had no entitlement to these funds, WattStock did not reiterate its demand for payment until litigation between the parties became imminent.~~

60.53.  WattStock, GE, and Alta Power identified an additional unit in Turkey owned by a Turkish company called Acarsoy. The same process repeated itself again.

61.54.  As with the Nuh Cemento units, ~~WattStock/~~GE failed to disclose that the Acarsoy unit was burdened with a multi-million-dollar LTSA termination fee, which was not included in the pricing presented to Alta Power. When GE refused to waive its right to collect the undisclosed termination fees, it doomed the transactions. But for this decision, Alta Power would have purchased this unit.

62.55.  ~~Like with Nuh Cemento,~~ Relying on GE and WattStock's representations concerning their ability and willingness to sell Alta Power the required TRUEPackages™ for at or less than $10 million per TRUEPackage™ unit, Alta Power paid $475,000 in down

ALTA POWER LLC'S ~~FIRST AMENDED~~ ~~ANSWER AND COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION~~ COMPLAINT AGAINST GE - PAGE 19

APP.309

payments related to this unit, unaware of the true cost of the unit. Alta Power would never have done so had GE/WattStock disclosed the liabilities associated with the unit which rendered it uneconomical for Alta Power's projects.

63.    Once again, WattStock even attempted to mark up this down payment (as they did with every other payment from Alta Power) despite having no contractual basis to do so. Alta Power rebuffed these attempts, and WattStock recognized it had no basis for payments, and did not request the payments again until just before the filing of its lawsuit against Alta Power.

64.56.  In addition to units made uneconomical by LTSAs, WattStock alsGE also hid other material information from Alta Power. o marketed units that were uneconomical for other reasons.

65.57.  In May of 2019, GE and WattStock informed encouraged Alta Power of the existence of a package owned by EthosEnergy. WattStock suggested Alta Power to purchase athe package from EthosEnergy, claiming demand for the package was high. The "package" was essentially the housing for the aeroderivative gas turbine.

66.58.  GE and WattStock represented that Alta Power could obtain a gas turbine engine from the GE lease pool to marry with the EthosEnergy package and claimed a similar housing was available in Panama and could also easily be married with a lease pool engine.

67.59.  GE and/WattStock claimed these leased units with the purchased housings would lead to a significantly lower price for Alta Power.

68.60.  Based on these representations, Alta Power purchased the EthosEnergy package for $200,000.

69.    When WattStock sent an invoice for this purchase, it marked up the purchase price initially by $175,000 and then later by $115,000.

70.    Once again Alta Power refused to pay the mark-up, as there was no contractual basis for such a mark-up. Indeed, the contractual relationship between Alta Power and WattStock contemplated that this package would not be marked up.

71.61.  GE and/WattStock also did not discloseconcealed that the EthosEnergy unit was in a dilapidated condition and was only suggested as a possibility so that GE and/WattStock could increase their revenue stream for providing repairs. Furthermore, several months later when Alta Power inquired about the possibility of cost savings using the previously promised lease pool engines, WattStock and GE informed Alta Power that "that program was no longer being offered."

72.62.  Had GE/WattStock disclosed the true condition of the EthosEnergy unit or the unavailability of the lease pool, Alta Power would not have purchased the Ethos unit at any price. Furthermore, WattStock and/or GE still has possession of the EthosEnergy unit, despite having been paid for it.

63.    GE and WattStock convinced Alta Power to make a $300,000 down payment for a unit owned by a company in Turkey called Bosen. As with all other units, WattStock and GE represented that the delivered unit would be priced consistent with Alta Power's needs.

73.64. At the time they convicedconvinced Alta Power to make this downpayment, both GE and WattStock knew that the Bosen units contained non-GE parts. They did not, however, tell Alta Power that GE categorically refuse to service any LM6000 unit that contains any part that was not originally manufactured by GE, regardless of the non-GE part's condition, or that GE would not warrant (which is the most important aspect of the TRUEPackage™) the performance of a refurbished unit that contains non GE parts.

74.65. Alta Power put $300,000 dollars down for the purchase of the Bosen unit. Alta Power was Llater, after Alta Power had made the $300,000 down payment, GE and WattStock informed that Alta Power that GE/WattStock would not warrant or service units containing non-GE components unless the non-GE components were first replaced—regardless of their condition.

66. The Bosen unit contained non-GE components and as a result the "new" purchase price including the refurbishment work which was several million dollars higher than previously represented by GE/WattStock, and well above the promised $10 million total price. As a result, this unit was uneconomical for Alta's projects.

F. and the unit was uneconomical for Alta's projects.

75. WattStock scuttles Alta Power's efforts at financing.

76. Throughout 2019, Alta Power discussed potential financing options for its power project. Alta Power reached out to several sources of funding. In the summer of 2019, Alta Power identified its best source of funding for the purchase of the nine aeroderivative units: Deutsche Bank.

**APP.312**

77.    Alta Power engaged in negotiations with Deutsche Bank concerning financing for its unique peaker plant strategy. As part of its due diligence, Deutsche Bank requested a meeting with WattStock. WattStock met with Deutsche Bank and during these meetings, WattStock confirmed that GE and WattStock were "partners."

78.    Of course, Deutsche Bank would rely not solely on WattStock's representation that GE and WattStock were "partners." Accordingly, Deutsche Bank formally asked GE to provide appropriate assurances. On July 31, 2019, GE responded to this request in a letter confirming that if WattStock failed to meet its contractual obligations, GE would step in since GE and WattStock are partners in this venture. GE also confirmed that GE engineering will be overseeing WattStock's work and that GE has a "strong incentive" for the project to succeed.

79.    Sometime before financing was closed, WattStock disclosed to Ryan Castleman of Castleman Power Development LLC ("Castleman"), one of Alta Power's few competitors, that project financing from Deutsche Bank was imminent. Knowing the financing would decrease the available used units in the marketplace and would allow Alta Power's projects to come online first, Castleman predictably attempted to scuttle Alta Power's financing. Specifically, Castleman threatened to file a frivolous "trade secret" lawsuit against Alta Power to stop the financing.

80.    Alta Power was forced to disclose this frivolous claim to Deutsche Bank. Alta Power worked to quickly resolve the frivolous dispute, and ultimately had no choice but to pay Castleman an extortion fee to settle the frivolous claim. But the damage was already done. Castleman's strategy of causing delay to destroy financing worked.

81.    Deutsche Bank decided against providing financing to Alta Power, delaying Alta Power's ability to bring units into service.

G.    WattStock steals $100,000 from Alta Power to finance WattStock's operations.

82.    Despite the Deutsche Bank financing falling through, Alta Power remained committed to its unique peaker plant strategy and continued to explore other financing options in the fall of 2019.

83.67.  By the fall of 2019, GE and WattStock continued to lead Alta Power to believe that the targeted units could be acquired consistent with WattStock and GE's earlier pricing guidance. Because of this, Alta Power continued to fund the potential acquisition of units.

84.68.  In October 2019, Alta Power sent WattStock $100,000 for potential use in extending an option to purchase units from Bosen. During WattStock's negotiations with Bosen, Alta Power ultimately decided not to go through and told WattStock to cease negotiations. WattStock complied and the parties never entered into an agreement extending the option period with Bosen.

85.69.  WattStock never sent Alta Power's $100,000 to Bosen since the negotiations were called off before the $100,000 was used.

86.70.  Alta Power requested the return of the $100,000. WattStock acknowledged the funds would be returned, and repeatedly promised to do so on multiple occasions during the fall and winter of 2019-2020.

87.   WattStock broke these promises. Instead, WattStock converted Alta Power's $100,000 and used it to cover serious cash flow issues, which GE had known

about and hid from Alta Power for the entire time period relevant to this case.  ~~which~~
~~WattStock had previously failed to disclose to Alta Power and did not disclose until May~~
~~of 2020.~~

~~II.~~**71.**    ~~WattStock continues to fail to disclose the true costs of units.~~

~~88.~~72. Despite all of the above, ~~Despite the Deutsche Bank financing falling~~
~~through,~~ Alta Power was still committed to the development of its projects. Consistent
with this and based on  WattStock's and GE's ~~false representations~~ ~~that other buyers~~
~~were targeting the Turkish units~~, Alta Power paid WattStock over $200,000 for extensions
to keep alive potential deals with Acarsoy and Nuh Cemento in the fall of 2019.

~~89.~~73.  At no time did GE or WattStock inform Alta Power that the true costs of
these units were inconsistent with WattStock's and GE's representations.

~~90.    During the fall of 2019, Alta Power considered a variety of funding~~
~~structures, and decided to finance each project separately, rather than approaching~~
~~potential lenders with a portfolio of three projects.~~

~~91.~~74.  Consistent with this, Alta Power and WattStock entered a Limited Notice
to Proceed Proposal ("LNTP") on December 23, 2019 for two separate units to be acquired
from Nuh Cemento. The total amount of the LNTP was almost $20 million. This included
the "not to exceed price" of $6.5 million for WattStock to purchase the units from Nuh
Cemento that GE/WattStock told Alta Power will be sufficient to purchase the units, with
the balance for transportation, refurbishment, and installation of the units. This price
included GE/WattStock's profit margin for the project.

92.75.  GE and WattStock represented to Alta Power that GE needed to be paid $1,500,000 to secure the purchase of long-lead hardware, start engineering activities and deliver preliminary drawings related to a potential TRUEpackageTM project. The $1,500,000 was divided into two payments of $750,000.

93.76.  Alta Power paid $750,000 on December 24, 2019 and paid another $750,000 on January 13, 2020.

94.77.  In February 2020, Alta Power was informed for the first time that the owner of the two Nuh Cemento units would only sell the two units for the agreed not to exceed price of $6.5 million plus the cancellation of GE's LTSA termination fee of over $1.4 million. Despite its promises to Alta Power that it could and would ensure that Alta Power could obtain the required units at the necessary price points, GE refused to waive the seller's termination fees, thereby preventing Alta Power from purchasing the units.

95.78.  The impact of the cancellation fee materially increased project costs above the previous budget and impacted Alta Power's ability to obtain financing for the project. and made it economically impossible for Alta Power to move forward with the acquisition of this hardware.

96.79.  For the units being considered (as with the Bosen unit), the significant liabilities were not disclosed until after Alta Power made the final payment to GE under the LNTP. For each, GE chose not to disclose that the units were burdened by these fees (or that the fees could materially impact the price of the units to Alta Power) and refused to waive the termination fees even though doing so was inconsistent with GE and WattStock's promises and duties to Alta Power.

97.    ~~By March 2020, the global economy was in the grips of the COVID-19 crisis. This delay impacted the closing of Alta Power's project financing. Regardless, Alta Power remained financially committed to the project and was ready, willing, and able to go forward with the two Nuh Cemento units under the LNTP.~~

**F.    GE refuses to make good on its promises, hangs Alta Power out to dry.**

~~98.~~80.  In the spring of 2020 WattStock informed Alta Power it was having financial issues. WattStock asked Alta Power to either provide a loan or acquire WattStock.

~~99.~~81.  During this time, Alta Power requested that GE step in and fulfill its commitment to Alta Power to assist in securing the units needed for Alta Power's project. GE refused.

~~100.~~82.    Alta Power was ready, willing, and able to go forward with the Nuh Cemento project with GE alone. GE refused to allow Alta to pay directly for the LNTP components, despite repeated requests by Alta Power due to concerns regarding WattStock's financial situation. And GE further refused to step in and take over for WattStock (despite contrary written representations) when Alta Power notified GE that WattStock was insolvent.

~~101.~~83.    Despite Alta Power's efforts and GE's prior representations, GE made it clear, once again, that it would only move forward with WattStock, thereby constructively cancelling the LNTP and the Nuh Cemento project and depriving Alta Power of the TRUEPackagesTM that GE and WattStock represented that they both could and would provide for at or below $10 million per TRUEPackage TM. As a result, Alta Power suffered more than one hundred million dollars of damages.

ALTA POWER LLC'S ~~FIRST AMENDED~~ ~~ANSWER AND COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION~~ COMPLAINT AGAINST GE - PAGE 27

**APP.317**

~~102.    Consequently, Alta missed their opportunity to be a first mover in the highly competitive Texas peaking electricity market.~~

CAUSES OF ACTION

**V.**

**Count II~~:~~ RESPONDEAT SUPERIOR ~~(AGAINST GE)~~**

~~103.~~84.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

~~104.~~85.    GE and WattStock represented to Alta Power that they were "partners" and that WattStock acted as GE's authorized service provider.

~~105.~~86.    Alta Power justifiably relied on these representations by GE and WattStock in agreeing to the Master Agreement and the LNTP.

~~106.~~87.    In fact, without the representations, Alta Power would have never entered any contracts with WattStock.

~~107.~~88.    Accordingly, an ostensible agency existed between WattStock and GE.

~~108.~~89.    GE is estopped from denying liability for WattStock's breaches and torts and/or GE and WattStock engaged in a joint enterprise for which joint and several liability exists.

~~109.~~90.    Despite the fig leaf boiler-plate language in the MOU between GE and WattStock, the language of the MOU shows GE controlled WattStock. Accordingly, the "no partnership or agency" provision is a sham or subterfuge designed to conceal the

ALTA POWER LLC'S ~~FIRST AMENDED~~ ANSWER AND ~~COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION~~ COMPLAINT AGAINST GE - PAGE 28

APP.318

true legal status of GE/WattStock. Extrinsic evidence also shows actual control by GE over WattStock.

~~110.~~91.        GE is respondeat superior liable for the breaches and torts of WattStock.

## COUNT I~~V~~: UNJUST ENRICHMENT (AGAINST GE)

~~111.~~92.        Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

~~112.~~93.        GE has been unjustly enriched in the amount of $1.5 million to the detriment of Alta Power.

~~113.~~94.        Alta Power demands restitution of all amounts GE has been justly enriched.

## ~~COUNT V: CONVERSION (AGAINST WATTSTOCK)~~

~~114.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.~~

~~115.    In October 2019, Alta Power sent WattStock $100,000 to extend an option to purchase units from Bosen.~~

~~116.    Alta ultimately declined to extend the option and instructed WattStock to return the $100,000.~~

~~117.    Alta repeatedly demanded that WattStock return the $100,000 during the fall and winter of 2019-2020. WattStock refused (and continues to refuse) to return this money, and thereby assumed and exercised dominion and control over Alta's money in~~

~~an unlawful and unauthorized manner, to the exclusion of and inconsistent with Alta's~~

~~rights.~~

~~**COUNT VI: TEXAS THEFT LIABILITY ACT (AGAINST WATTSTOCK)**~~

~~118.    Alta Power incorporates each of the foregoing paragraphs by reference as~~
~~if fully set forth herein.~~

~~119.    Alta has a possessory right to the $100,000 it paid WattStock.~~

~~120.    WattStock misappropriated and enjoyed these monies knowing full well it~~
~~was not entitled to same.~~

~~121.    All of this was done without Alta's consent. WattStock intended to and did~~
~~in fact deprive Alta of these monies which led Alta to suffer significant financial damages~~
~~in an amount to be proven at trial, plus court costs and reasonable and necessary~~
~~attorney's fees as allowed by the TLA.~~

**COUNT I~~V~~VII: FRAUD ~~(AGAINST GE AND WATTSTOCK)~~**

~~122.~~95.        Alta Power incorporates each of the foregoing paragraphs by
reference as if fully set forth herein.

~~123.~~96.        GE and WattStock intentionally misrepresented the nature of their
relationship to  induce Alta Power to purchase GE TRUEPackages™ and contract with
WattStock instead of acquiring the needed LM6000s from and/or contracting with a
competitor like ProEnergy.~~induce Alta Power to contract with GE/WattStock.~~

~~124.~~97.        GE falsey represented it would "stand behind" WattStock. However,
when the time came to do so GE did not.

125.98.    Simply put, the pricing provided by GE and WattStock was intentionally misrepresented and did not include the true cost of acquisition of the units. Alta Power relied on these representations to its detriment. GE intentionally misrepresented the benefits of the GE TRUEPackage™ Program, the pricing and acquisition costs associated with the TRUEPackage™ units, and the overall costs of the TRUEPackages™ marketed to Alta Power.

126.    GE had the right under its MOU with WattStock to force WattStock to sell GE any gas turbine purchased pursuant to the TRUEpackageTM program. In effect, GE had the right to push WattStock aside and ensure that any deal was consummated.

127.    Yet, when WattStock became insolvent GE refused to "stand behind" WattStock and take the necessary steps to consummate the LNTP with Alta Power and Nuh Cemento.

128.99.    GE/WattStock misrepresented the benefits of the TRUEpackageTM program.

129.100.    GE/WattStock represented that the program would enhance the ability to obtain financing when it did not.

130.101.    GE/WattStock represented that the program would be able to move quickly to service the narrow window Alta Power had for this unique strategy when in fact the GE/WattStock relationship created a bureaucracy that only slowed down projects.

131.102.    GE/WattStock represented that the TRUEpackageTM program was of a superior quality when in fact it was not.

132.103.        GE/WattStock represented that units from the TRUEpackageTM program were competitively priced with alternative refurbished gas turbine solutions when in fact they were not.

133.104.        GE/WattStock hid the existence of undisclosed liabilities on virtually every unit suggested using a classic bait and switch maneuver.

134.105.        GE/WattStock's misrepresentations were material and false.

135.106.        Both GE and WattStockGE knew these representations were false when itthey made them, or at the very least, these representations were made recklessly and without knowledge of their truth.

136.107.        These representations were made with the intent that Alta Power act and rely on them.

108.    Alta Power relied on these representations and omissions to its detriment.

109.    GE representations and omissions were material and false.

110.    GE knew these representations and omissions were false (or created a false impression) when it made them, or at the very least, it made these representations recklessly and without knowledge of their truth.

111.    These representations and omissions were made with the intent that Alta Power act on them.

112.    Alta Power relied on the representations outlined above.

137.113.        GE's misrepresentations proximately caused Alta Power more than $100 million in damages.

## COUNT IV~~VIII~~: NEGLIGENT MISREPRESENTATION

~~138.~~114.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

~~139.~~115.    Alternatively, each fraudulent misrepresentation made by GE was made negligently since GE did not exercise reasonable care or competence in obtaining or communicating the information.

~~140.~~116.    Alta Power has wasted at least $10 million based on GE/WattStock's negligent misrepresentations, and has lost more than $100 million in profits.

117.    Had GE not negligently misrepresented the true facts, Alta Power would have been able to successfully serve the niche market and has lost more than $100 million as a result of GE's fraudulent acts.

### COUNT V: CIVIL CONSPIRACY

118.    Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

119.    GE and WattStock conspired to accomplish an object or course of action, namely, to fraudulently induce Alta Power into contracting with WattStock (as opposed to another competitor like ProEnergy) related to the acquisition of the refurbished LM6000s Alta Power needed to carry out its business.

120.    To accomplish this, both GE and WattStock agreed to and did in fact intentionally misrepresent the nature of their relationship and virtually every aspect of GE's TRUEPackage™, including but not limited to the virtues of TRUEPackages™, their price, GE and WattStock's ability to timely deliver the required units, and the various

factors that might adversely impact their ability to follow through on their promises to Alta Power to induce Alta Power to agree to and spend money towards acquiring GE TRUEPackages™ instead of acquiring the needed refurbished units from a competitor like ProEnergy.

121.    GE and WattStock agreed to and did in fact accomplish this objective through the commission of numerous unlawful overt acts, including but not limited to by: (i) intentionally misrepresenting the benefits of the GE TRUEPackage™ Program, the pricing and acquisition costs associated with the TRUEPackage™ units, and the overall costs of the TRUEPackages™ marketed to Alta Power; (ii) falsely representing that they would be able to move quickly to service the narrow window Alta Power had for this unique strategy; (iii) falsely representing that the TRUEpackageTM program was of a superior quality when in fact it was not; (iv) falsely representing that units from the TRUEpackageTM program were competitively priced with alternative refurbished gas turbine solutions when in fact they were not; (v) hiding the existence of undisclosed liabilities on virtually every unit suggested using a classic bait and switch maneuver, and deliberately hid the fact that those undisclosed liabilities could (and would) materially increase the overall cost of the targeted units; (vi) falsely representing that GE would facilitate Alta Power's acquisition of the required units at the required price levels, but—after causing Alta Power to devote time and huge sums of money to attempting to purchase the two Nuh Cemento units and the Acorsoy units—caused those transactions to fail by refusing to waive the termination fees attached to the GE LTSAs attached to those units; (vii) falsely representing that GE would "stand behind" WattStock.

122.     Alta Power relied on these representations and ommissions to its detriment.

123.     Alta Power was damaged as a result of GE and WattStock's unlawful acts.

124.     Both GE and WattStock knew these representations and omissions were false (or created a false impression) when they made them, or at the very least, these representations were made recklessly and without knowledge of their truth.

125.     These representations and ommissions were made with the intent that Alta Power act on them.

126.     Alta Power relied on GE and WattStock's representations regarding their relationship, and these representations proximately caused Alta Power millions of dollars in damages.

## COUNT VI: TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

127.     Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

128.     GE knew there was a reasonable probability that Alta Power would have entered into a contractual relationship with ProEnergy.

129.     To prevent that from happening, GE fraudulently (i) intentionally misrepresenting the benefits of the GE TRUEPackage™ Program, the pricing and acquisition costs associated with the TRUEPackage™ units, and the overall costs of the TRUEPackages™ marketed to Alta Power; (ii) falsely representing that they would be able to move quickly to service the narrow window Alta Power had for this unique strategy; (iii) falsely representing that the TRUEpackageTM program was of a superior

ALTA POWER LLC'S ~~FIRST AMENDED ANSWER AND~~ ~~COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION~~ COMPLAINT AGAINST GE - PAGE 35

**APP.325**

quality when in fact it was not; (iv) falsely representing that units from the TRUEpackageTM program were competitively priced with alternative refurbished gas turbine solutions when in fact they were not; (v) hiding the existence of undisclosed liabilities on virtually every unit suggested using a classic bait and switch maneuver, and deliberately hid the fact that those undisclosed liabilities could (and would) materially increase the overall cost of the targeted units; (vi) falsely representing that GE would facilitate Alta Power's acquisition of the required units at the required price levels, but—after causing Alta Power to devote time and huge sums of money to attempting to purchase the two Nuh Cemento units and the Acorsoy units—caused those transactions to fail by refusing to waive the termination fees attached to the GE LTSAs attached to those units; (vii) falsely representing that GE would "stand behind" WattStock.

130.    GE undertook all of the acts described above with the conscious desire to prevent Alta Power from contracting with Pro Energy.

131.    GE's acts and omissions caused actual harm and damage to Alta Power.

~~141.~~    GE's acts and omissions caused Alta Power to lose more than one hundred million dollars in profit.

## ~~VII.~~VI.    JURY DEMAND

~~142.~~132.    Alta Power requests trial by jury on all contested issues of fact. The requisite jury fee has been paid.

ALTA POWER LLC'S ~~FIRST AMENDED~~ ANSWER AND COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION COMPLAINT AGAINST GE - PAGE 36

APP.326

## ~~VIII.~~VII.    PRAYER

ACCORDINGLY, Alta Power prays that ~~WattStock and~~ GE be cited to appear and answer and that upon a final trial of this matter, the Court enter a final judgment against ~~WattStock and~~ GE awarding Alta Power the following relief:

a) An award of the full amount of actual damages incurred by Alta Power and caused by the acts and omissions of GE ~~and WattStock~~;

b) An award of equitable damages, as requested above;

c) An award of exemplary damages;

d) Reasonable and necessary attorneys' fees;

e) Pre-judgment and post-judgment interest at the maximum rate allowed by law;

~~f)~~  Cost of court; and

~~g)~~f)    Such other and further relief, general or special, at law or in equity, to which Alta Power may show itself to be justly entitled.

ALTA POWER LLC'S ~~FIRST AMENDED~~ ~~ANSWER AND COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION~~ COMPLAINT AGAINST GE - PAGE 37

APP.327

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By: /s/ Jeb Golinkin
    Michael Cancienne
    State Bar No. 24055256
    Joseph W. ("Jeb") Golinkin II
    State Bar No. 24087596
    1980 Post Oak Blvd., Ste. 2300
    Houston, Texas 77056
    713.955.4028
    713.955.9644 Facsimile
    mcancienne@jlcfirm.com
    jgolinkin@jlcfirm.com

**ATTORNEYS FOR PLAINTIFF ALTA POWER LLC**

**CERTIFICATE OF SERVICE**

    I hereby certified that a true and correct copy of the above pleading was served on all parties through the Court's electronic filing service on the 14th day of May, 2024.

By:    /s/ Jeb Golinkin
          Jeb Golinkin

# EXHIBIT AA

**APP.329**

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (Filed 06/04/24)    Page 335 of 453    PageID 741
Compared Over Alta's February 24, 2021 Original Third-Party Petition

CAUSE NO. DC-20-08331IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| WATTSTOCK LLC., | IN THE DISTRICT COURT OF |
| *Plaintiff/Counter Defendant,* | |
| v. | |
| ALTA POWER LLC, | |
| *Defendant, /Counter Plaintiff, and Third-Party Plaintiff,* | DALLAS COUNTY, TEXAS |
| v. | |
| WATTSTOCK LLC, | |
| *Counter-Defendant, and* | |
| GENERAL ELECTRIC INTERNATIONAL, INC., d/b/a GE POWER SERVICES, | 116ᵗʰ JUDICIAL DISTRICT |
| *Third-Party DefendantsDefendant..* | |
| | Case No. 3:21-CV-03183-X |

**ALTA POWER LLC'S FIRST AMENDED ~~ANSWER AND COUNTERCLAIM AND ORIGINAL THIRD-PARTY PETITION~~COMPLAINT AGAINST GENERAL ELECTRIC INTERNATIONAL, INC.**

Alta Power LLC ("Alta Power") files this First Amended ~~Answer and Counterclaim and Original Third-Party Petition against Counter-Defendant WattStock LLC ("WattStock") and Third-Party Defendant~~Complaint against General Electric International, Inc., d/b/a GE Power Services ("GE") and would respectfully show as follows:

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38    Filed 06/04/24    Page 336 of 453    PageID 742
Compared Over Alta's February 24, 2021 Original Third-Party Petition

## I.    SUMMARY OF ACTION

~~1.    This case is necessitated by repeated misrepresentation made by GE and WattStock to Alta Power concerning GE/WattStock's relationship, capabilities, and program to entice Alta Power to use GE/WattStock as the source of used aeroderivative gas turbines.~~

1.    ~~2.~~ Alta Power was created to develop <u>natural gas-fired</u> power assets that would provide <u>critical</u> additional power capacity to the Texas energy grid when the grid ~~was overburdened~~<u>is experiencing periods of high demand</u>. As part of this, Alta Power intended to purchase and place into service used aeroderivative gas turbines (essentially jet engines on skids<u> powering a generator</u>) that can quickly turn on and off to meet instances where power demand exceeds available power supply. During these periods of excess demand, power prices are highest.

2.    ~~3.~~ GE was eager to participate in the used gas turbine market, a segment in which it historically had no presence. GE, however, did not want to be involved in the work of actually acquiring and selling the used turbines. Instead, GE engaged former GE employees who started <u>a new company named</u> WattStock to act as its<u> exclusive</u> sales force and point of entry into the used gas turbine market.

3.    ~~4.~~ Starting in 2018, GE and WattStock persuaded Alta Power to purchase used<u> refurbished</u> GE aeroderivative gas turbines, marketing the units as both more reliable and cost competitive, similar to the "Certified Pre-Owned Mercedes Benz®" program. Critically, Alta Power relied on GE's and WattStock's representations regarding the nature of the ~~WattStock/~~<u>GE's</u> relationship<u> with WattStock</u>, the total acquisition cost of used units,

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X   Document 38 (as filed 05/04/24)   Page 337 of 453   PageID 743
Compared Over Alta's February 24, 2021 Original Third-Party Petition

and the benefits of GE's ~~"OEM certified~~Aero TRUEPackage$^{TM}$ program~~."~~ Ultimately, Alta Power agreed to ~~move forward with WattStock/GE~~use GE TRUEPackages$^{TM}$ instead of a similar refurbished GE gas turbine product offered by one of GE's competitors.

4.   ~~5.~~ GE's and WattStock's representations were false and have caused Alta Power to miss opportunities in the marketplace. Instead of the benefits claimed by GE and WattStock, Alta Power put money into potential units that were never going to fit their budgetary requirements because the units were either (1) burdened by undisclosed liabilities related to GE's "Long Term Services Agreements," (2) were prohibitively expensive for refurbishment by GE, or (3) were not available as marketed. Simply put, the acquisition costs and the benefits lauded by GE and WattStock were false. Worse still, GE ultimately prevented Alta Power from acquiring the promised units by refusing to waive termination fees attached to the prospective units that they never disclosed in the first place.

5.   ~~6.~~ But for GE and WattStock's ~~breaches of contract and tortious~~unlawful conduct ~~caused,~~ Alta Power ~~to lose more than one hundred million dollars of essential financing, profits related to its business,~~would have obtained three or more LM6000s and would have made millions in ~~payments to~~profits. Instead, GE and WattStock ~~for undelivered equipment and phantom services. After investing~~misappropriated millions~~,~~ of dollars of Alta Power ~~has nothing to show for what it has paid to GE and WattStock.~~

~~II.      DISCOVERY CONTROL PLAN~~

~~7.      Discovery is intended to be conducted under Level 3 of Texas Rule of Civil Procedure 190~~'s money.

II.   ~~III.~~ PARTIES

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (as filed 06/04/24)    Page 338 of 453    PageID 744
Compared Over Alta's February 24, 2021 Original Third-Party Petition

6.     8. Alta Power is the Defendant in this case originally filed by WattStock, the original Plaintiff and Counter-Defendant. Both Alta Power and WattStock have already appeared.

7.     9. Third-Party Defendant GE is a company incorporated under the laws of Delaware doing business in Texas and can be served with Citation through its registered agent in Texas, CT Corporation System, 1999 Bryan St., Ste 900, Dallas, TX 75201-3136.

### III.     IV. VENUE AND JURISDICTION

8.     10. Jurisdiction in this Court is proper under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000. This Court also has personalcore jurisdiction over WattStock related to Alta Power's claims as WattStock originally filed this caseunder 28 U.S.C. §§ 157 and 1334.

9.     This Court has personal jurisdiction over GE because a substantial amount of the acts giving rise to Alta Power's causes of action arose in Texas.

10.     11. Venue in this Court is proper in Dallas County, Texas under Section 15.002 of the Texas Civil Practice & Remedies Code because all, or a substantial part of the events or omissions giving rise to the claims against WattStock and GE, occurred in Dallas County and WattStock's principal place of business is in Dallas County, Texas.

12.     As required by Rule 47(b) of the Texas Rules of Civil Procedure, Alta Power seeks monetary relief of more than $1,000,000. Alta Power also seeks pre-judgment and post judgment interest at the highest legal rate.

### V.     GENERAL DENIAL

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38   Filed 06/04/24    Page 339 of 453    PageID 745
Compared Over Alta's February 24, 2021 Original Third-Party Petition

13.    Alta Power denies all the allegations set forth in WattStock's Original Petition and any subsequent amended petition and demands strict proof thereof as required by the laws of Texas.

### VI.    AFFIRMATIVE DEFENSES

14.    Alta Power asserts the following affirmative defenses:

a.    WattStock's claims are barred because of WattStock's material breaches of the Master Agreement, the LNTP, and the Ethos Authorization; and

b.    WattStock's claim for attorneys' fees fails for lack of presentment 28 U.S.C. §§ 1408, 1409, and 1452.

### IV.    VII. FACTUAL ALLEGATIONS

## A.    Alta Power develops a strategy for meeting peak energy demands's business.

11.    15. Alta Power was established to provide additional capacity to an overloaded energy grid in a creative and profitable manner.

12.    16. The market for power in Texas has evolved from traditional gas and coal fired power plants to more renewable sources like wind and solar. In 2019, renewable energy sources accounted for about 11% of total U.S. energy consumption and about 17% of electricity generation. Texas now meets 20approximately 30% of its sizeable electricity demand with wind power and approximately another 15% with solar.

13.    17. As electrical providers move towards renewable power production, there are times when the energy grid has more demand than supply. Aeroderivative gas turbine "peaker plants" have become imperative to meet this imbalance since these plants turn on quickly—in less than 10 minutes.

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X   Document 38 (Filed 06/04/24)   Page 340 of 453   PageID 746
Compared Over Alta's February 24, 2021 Original Third-Party Petition

14.   ~~18.~~ Pricing for this "peak demand" power is often at a premium and can be sold under long-term contracts with investment grade counterparties. Alta Power determined that peaker plants could help meet this demand, profitably for Alta Power if Alta Power could acquire aeroderivative gas turbines at a competitive price and locate them appropriately.

15.   ~~19.~~ Because of the high cost of new aeroderivative gas turbines, Alta Power's strategy relied on acquiring used aeroderivative gas turbines, which was the only way to make the projects work within the required budget.

16.   ~~20. Developing natural gas-fired~~ <u>To successfully develop a</u> peaker ~~projects is a complex process, including~~ <u>plant, Alta Power needed to</u> (1) ~~identifying~~ <u>identify</u> areas in the grid where a peaker plant fits (considering gas supply, offtake pricing, and interconnection feasibility); (2) ~~navigating~~ <u>navigate</u> the state and federal regulatory waters of the electrical power market; <u>and</u> (3) ~~sourcing~~ <u>obtain</u> used aeroderivative gas turbines that can be purchased and refurbished within budget~~; and (4) obtaining project financing~~.

17.   ~~21.~~ This complexity, along with relatively high entry costs, means that there were only a few companies competing with Alta Power. However, given the limited size of the market, being a first mover was critical.

18.   ~~22.~~ By April 2018, Alta Power had identified several potential project sites through an extensive vetting process based on prevailing market conditions. Through this work, Alta Power earned a head start on its competitors and found itself with a brief window during which it would be the first mover in this niche market.

19.   ~~23.~~ At this point Alta Power turned to identifying <u>and purchasing</u> surplus

aeroderivative gas turbines units, ~~which, once contractually secured, would allow it to obtain project financing~~.

**B.    GE ~~and WattStock's Partnership~~Aero TRUEPackage™.**

20.    ~~24.~~ GE is one of the limited suppliers of aeroderivative gas turbines.

21.    ~~25.~~ GE historically has not had a presence in the sale of used aeroderivative gas turbines but recognized a need to be present in this market at some point prior to 2018. As such, GE partnered with WattStock, a group of former GE executives. ~~WattStock marketed itself (along with GE) as a fully integrated locator, dealer, refurbisher, and servicer of used aeroderivative~~, agreed to work together to gain entry into this market. As part of this agreement, GE authorized and allowed WattStock to use its trademarks and other intellectual property to apparently create the impression that WattStock and GE were partners selling a GE product. ~~s.~~

22.    By early 2018, sales of GE's new gas-powered turbines. ~~WattStock markets itself as a unique solution in the used aeroderivative gas turbines,~~ had fallen off a cliff because "decentralized renewable resources increase cost-competitive pressures." However, the increased reliance on renewables and wind energy had created a gap in the energy markets that companies like Alta Power could use refurbished LM6000s to very profitably exploit. GE's competitors, like ProEnergy, had recognized the potential market for refurbished LM6000 assets and had begun buying up and refurbishing previously owned LM6000 units in earnest. In so doing, ProEnergy and others were also increasingly winning contracts to service the GE units they were refurbishing and reselling.

23.    Fearing it was being left behind, GE launched its Aero TRUEPackage™

product line, which GE described as the "only authorized ~~distributor of used GE aeroderivative gas turbines~~OEM certified pre-owned package offering in the industry." According to GE's marketing materials, GE's TRUEPackage™ promised (1) OEM warranty and performance guarantees; (2) delivery in six months or less; (3) equipment selection and refurbishment plan driver by installed cost; and (4) OEM brand certification can improve financing options and insurance premiums.

24.    ~~26. In reality,~~ GE intended for, and held out WattStock to be, ~~the *de facto* sales force in the used aeroderivative gas turbine market for GE. GE and WattStock work "hand-in- hand" as "partners" to provide the "TRUE~~PACKAGE™~~" or Certified Turbine Power CTP™ system,~~its exclusive partner and representative in the sale of TRUEPackages™which both companies jointly marketed as "[t]he only authorized OEM [original equipment manufacturer] certified preowned package offering in the industry."~~²~~¹

25.    ~~27.~~ GE and WattStock entered in a Memorandum of Understanding ("MOU") on June 26, 2018 that "outlines" their relationship. The MOU establishes that GE is in complete control, especially in the context of transactions related to aeroderivative gas turbines originally manufactured by GE.

26.    ~~28.~~ Consistent with their relationship, GE and WattStock held themselves out publicly and privately as "partners" both orally and in writing. GE described the TRUEPackage™ "process" as follows:

---

~~¹ GE/WattStock uses the TRUEpackage™ descriptor on GE's Website and CTP™ on WattStock' s website. *See* https://www.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions and https://www.WattStock.com/ctp.~~

²¹ https~~://www~~://www.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions~~.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions.~~

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 138   Filed 06/04/24    Page 343 of 453    PageID 749
Compared Over Alta's February 24, 2021 Original Third-Party Petition

[Image]

27.     GE applied for and owns a trademark for the word "TRUEPackage™" in the Construction and Repair Services category. In its trademark application, GE informed the United States Patent and Trademark Office that "TRUEPackage™" refers to GE's practice of "refurbishing and upgrading of gas turbines power plants." GE attached a draft of the LNTP that it would eventually execute related to the sale of TRUEPackagesTM to Alta Power with its trademark application.

28.     Since at least October of 2018, GE strictly required WattStock to refer only to "GE Aero TRUEPackage in marketing materials" related to the refurbishment and resale of used LM6000s because "TRUEpackage is the GE brand….not Certified Turbine Power:" and GE does not want to "confuse the market with different names."

**C.     GE directs Alta Power to WattStock**

29.     In 2018, Alta Power began to determine which used aeroderivative gas turbines would best suit its needs. Availability and total acquisition costs were key drivers in its decision on which aeroderivative gas turbines to select. Because the used aeroderivative gas turbines must be refurbished, acquisition costs necessarily include the costs associated with purchasing the units, the costs of refurbishment, and the costs associated with placing the unit at the location and into service.

30.     After sharing these considerations with GE and WattStock, and after meetings with GE, WattStock and others, Alta Power determined that used GE LM6000 aeroderivative turbine packages were best suited for Alta Power's strategy of tapping into the niche peaker plant market in Texas based on assurances from GE and WattStock.

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38 Filed 05/04/24    Page 344 of 453    PageID 750
Compared Over Alta's February 24, 2021 Original Third-Party Petition

31.     GE/WattStock were not the only companies that marketed used and refurbished GE LM6000s. Indeed, Alta Power met with several GE "certified" companies that refurbished used aeroderivative gas turbines. None, however, offered a fully OEM-certified and warranted end-to-end product like the TRUEpackage™, which GE/WattStock marketed as their "exclusive" service offering of being the "only authorized OEM certified preowned package offering in the industry."

32.     Alta Power had several _joint_ meetings with both GE and WattStock personnel mainly at GE's Jacintoport facility where WattStock is co-located. ~~To protect Alta Power's confidential information concerning its unique strategy, the parties entered into a Confidentiality Agreement.33.~~ During these meetings, Alta Power disclosed to GE/WattStock the detailed budgetary requirements of Alta Power's business model. Alta Power repeatedly emphasized the cost sensitivity of its projects; that is, the cost of the gas turbine units cannot exceed a certain price point if the project is to remain within budget and financeable. GE and WattStock repeatedly ~~confirmed that used~~promised and reassured Alta that GE could provide obtain the required refurbished units ~~could be obtained~~ for the prices Alta Power needed.

33.     ~~34.~~ GE/WattStock also persuaded Alta Power that its exclusive ~~TRUEpackage™~~TRUEpackageTM OEM warranty was superior to anything offered in the market because GE would provide an end-to-end package warranty covering both the aeroderivative gas turbine and the electrical generation components. GE/WattStock further stated that other competitors could only warrant a portion of the package.

34.     ~~35.~~ During these meetings, GE and WattStock _consistenyl_ described

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (as filed 06/04/24)    Page 345 of 453    PageID 751
Compared Over Alta's February 24, 2021 Original Third-Party Petition

themselves as "partners." GE made it clear that the only way Alta Power could obtain the TRUEpackage^TM equipment certification and warranty was by working with the GE and WattStock partnership.

35.    36. Specifically, GE refused to provide equipment certifications and warranties without WattStock.

36.    37. In addition to the pricing and warranties, GE and WattStock knew time was of the essence for Alta Power, as competitors were also attempting to enter the market. GE made it clear that delivery at the agreed upon pricing could occur within the time frame required by Alta Power's plans if Alta Power used the GE/WattStock TRUEpackage^TM program.

37.    38. GE/WattStock emphasized that (1) GE had a proprietary global database of used LM6000 units including the operational and maintenance history on each, and (2) only GE and WattStock had access to this "proprietary" database. This "proprietary" data was a key selling point for Alta Power.

38.    39. GE/WattStock represented that GE and WattStock could efficiently locate used units, generate a detailed refurbishment scope, and cost estimate and streamline the acquisition, refurbishment, and delivery process all within Alta Power's required budget.

**D.    WattStock and Alta Power enter into a "Master Agreement."**

39.    In August of 2018, ProEnergy sent Alta Power a proposal for 3x LM6000 Turnkey EPC. ProEnergy's proposal satisfied Alta Power's technical, budgetary, and temporal requirements. Alta Power made GE aware that it was considering ProEnergy's

offer, and that it would accept it if GE could not meet Alta Power's pricing requirements. GE knew this and badly wanted to ensure that Alta Power would not contract with ProEnergy.

40.    Through their discussions, GE and WattStock were keenly aware of the specific unit price requirements of Alta Power, and GE and WattStock assured Alta Power on multiple occasions that sufficient suitable units were available. GE also repeatedly promised they could and would make sure Alta Power could obtain the required units for at or below $10 million per refurbished LM6000 if Alta Power agreed to purchase GE TRUEPackagesTM, rather than from one of GE's competitors like ProEnergy.

41.    40. GE also represented that it would "fully wrap"—that is, guarantee— WattStock's performance related to the TRUEPackagesTM. This caused Alta Power to believe that its involvement would insulate Alta Power from any concerns related to the financial viability of WattStock since GE is one of the largest companies in the world. GE also caused Alta Power to believe that WattStock had the financial resources to complete the necessary steps leading to GE's certification under the TRUEpackage$^{TM}$ OEM program. Based on the GE and WattStock's representations concerning the benefits of the TRUEpackage$^{TM}$ program their relationship, capabilities, including, (1) the benefits of the GE TRUEpackage$^{TM}$ program, (2) GE's assertion that it would fully guarantee WattStock's work related to the GE TRUEPackage$^{TM}$ program, (3) the benefits from GE and WattStock "collaborating" as "partners;" (24) the ready availability of used units that met Alta Power's project budget; (35) the ability to timely close purchases and refurbish units; and (46) the "benefits" of the warranty with respect to the overall economics of the project,

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (tshded-test 05/04/24)    Page 347 of 453    PageID 753
Compared Over Alta's February 24, 2021 Original Third-Party Petition

Alta Power agreed to move forward with GE/WattStock for the acquisition of used GE aeroderivative gas turbines to effectuate Alta Power's unique strategy.

41.    ~~Through their discussions, GE and WattStock were keenly aware of the specific unit price requirements of Alta Power, and GE and WattStock assured Alta Power on multiple occasions that sufficient suitable units were available.~~

42.    ~~The parties began negotiating financial and contractual terms for the relationship in February 2019. At GE's insistence,~~In order to purchase the TRUEPackages™, GE directed and commanded Alta Power ~~contracted~~to contract directly with WattStock. More specifically, GE~~/WattStock required~~ stated that in order to purchase a TRUEPackage™, Alta Power must contractually agree to allow WattStock (with GE standing behind it and guiding it) to negotiate the purchase price of ~~each used GE aeroderivative unit~~the LM6000s for use in the TRUEPackage™ with the prior owner and acquire the unit in WattStock's name for an agreed not to exceed price. GE/WattStock presented Alta Power with detailed total cost estimates for each unit showing that if each unit identified could be acquired at or below the "not to exceed price," then the fully refurbished unit could be delivered within Alta Power's budgetary requirements.

43.    ~~The parties~~GE, WattStock, and Alta Power also agreed that in the event Alta Power paid any amounts prior to the units being acquired, those interim payments would be credited towards the purchase price Alta Power ultimately agreed to pay.

44.    ~~GE and WattStock caused Alta Power to believe that GE's involvement would insulate Alta Power from any concerns related to the financial viability of WattStock since GE is one of the largest companies in the world. GE and WattStock~~

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (138 Filed 05/04/24)    Page 348 of 453    PageID 754
Compared Over Alta's February 24, 2021 Original Third-Party Petition

~~caused Alta Power to believe that WattStock had the financial resources to pay for the units or complete the necessary steps leading to GE's certification under the TRUEpackage™ OEM program.~~

44. ~~45.~~On February 27, 2019 WattStock and Alta Power entered into a "Master Agreement" confirming the negotiations concerning how WattStock would be reimbursed for out- of-pocket expenses and as part of a negotiated purchase price after WattStock purchased and refurbished the used units. ~~At no point was WattStock to be paid any mark-up on "down payments" made by Alta Power or on any out-of-pocket expenses for which Alta Power reimbursed WattStock.~~

~~46.    While not a named party to the Master Agreement, GE is an "affiliate" or "representative" of WattStock and, therefore, a party to the Master Agreement.~~

45. ~~47. In the Master Agreement, Alta Power and GE and WattStock agreed to a very strict confidentiality provision. GE/WattStock agreed to hold confidential information in "strict confidence" and agreed such information would "not be disclosed in any manner whatsoever."~~The Master Agreement ~~also~~ contains an exclusivity and non-circumvention provision under which WattStock (and by extension, GE) agreed that neither WattStock nor GE would directly or indirectly cause another person to either attempt to or purchase a unit inspected on behalf of Alta Power (a service for which Alta Power paid).

~~48.    Additionally, the confidentiality provision required WattStock and GE not to use any information obtained for any other purpose other than the agreed~~

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (filed 06/04/24)    Page 349 of 453    PageID 755
Compared Over Alta's February 24, 2021 Original Third-Party Petition

~~"business purpose," including but not limited to, providing any product or service, or~~

~~establishing a relationship that is competitive with or against the best interest of Alta~~

~~Power.~~

**E.**    ~~49. Under the "Master Agreement," the parties also agreed that Alta Power would~~ ~~reimburse WattStock for specific out-of-pocket expenses incurred in arranging~~ ~~inspection and evaluation of the condition of used aeroderivative gas turbines,~~ ~~with prior written approval__GE and WattStock conceal termination fees, lie__ **about their ability to provide the needed TRUEPackages for** ~~expenditures~~ ~~more__at or less __than $~~20,000.~~

~~**E.**    **WattStock and GE's misrepresentations continue.**~~

~~50.    Fully cognizant of the pricing sensitivities of Alta Power's projects,~~

~~GE/WattStock presented Alta Power with financial information for the acquisition of~~

~~available units.~~

~~51.    The knowledge of the availability of units was largely driven by GE's data. The~~ ~~financial information related to the acquisition of units included WattStock's own~~ ~~estimates based on its "experience" and data from GE based on GE's own data~~ ~~and detailed refurbishment pricing models for each unit__10 million per__ **TRUEPackage™**.

46.    ~~52.~~ In February 2019, ~~Pete Watson,~~ WattStock~~'s__ Vice President ~~of CTP~~

~~Operations,__Pete Watson travelled to Turkey to begin inspections and negotiations on used

GE aeroderivative gas turbine units. This was done at Alta Power's expense pursuant to

the Master Agreement.

47.    ~~53.~~ Several used GE aeroderivative units were available in Turkey because

changes in Turkish governmental regulations made the units uneconomical in country. In

March 2019, WattStock presented Alta Power price and purchase options for nine used GE

units based in Turkey.

48.    ~~54.~~ What WattStock and GE did not tell Alta Power was that the presented

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38   Filed 06/04/24    Page 350 of 453    PageID 756
Compared Over Alta's February 24, 2021 Original Third-Party Petition

prices of the units were not the true prices. All the units GE/WattStock persuaded Alta Power to spend <u>substantial amounts of</u> money on were burdened by <u>significant</u> hidden liabilities. Many of the potential units were significantly more expensive than represented because GE had Long Term Service Agreements ("LTSA") carrying hefty termination fees with the prior owners seeking to sell the used LM6000 aeroderivative gas turbine units. Units not burdened by LTSAs had other material undisclosed liabilities – all of which were driven by internal GE policies.

<u>49.</u>    ~~55.~~ These LTSAs generally required the prior owner pay GE millions of dollars to terminate. GE/WattStock failed to disclose the ~~existence of these LTSA financial burdens to Alta Power up front~~<u>fact that the units GE and WattStock encouraged and caused Alta Power to target were burdened by LTSA's and associated termination fees that would materially impact Alta Power's ability to purchase the units for at or below $10 million per unit</u>. In fact, the LTSA termination fees <u>impact on the price of the targeted units</u> were not disclosed until after (1) the units were targeted, (2) a purchase agreement was executed between the owners and WattStock, and (3) Alta Power paid WattStock millions of dollars in down payments associated with these purchase agreements.

<u>50.</u>    ~~56.~~ It was not until almost nine months after Alta Power had paid the first down payment that Alta Power learned ~~of the existence of~~<u>that</u> the LTSA termination fees <u>could impact Alta Power's ability to acquire the targeted units for at or below Alta Power's budgetary requirements</u>. In February 2020, one of the sellers of two units, a Turkish company called Nuh Cemento, began demanding reimbursement for the LTSA termination fees to be paid GE in addition to the agreed upon purchase price. GE ultimately refused to

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38   (Filed 05/04/24)    Page 351 of 453    PageID 757
Compared Over Alta's February 24, 2021 Original Third-Party Petition

waive the LTSA termination fee unless Alta Power entered into a multi-million dollar service agreement with GE. As a result, the project was burdened by expenses materially above Alta Power's project budgets.

51. ~~57.~~ At all relevant points, GE knew that its LTSA contracts with Nuh Cemento required Nuh Cemento to pay GE millions of dollars before Nuh Cemento could sell Alta Power the Nuh Cemento units. GE also understood that unless it agreed to waive its contractual entitlement to these termination fees, the termination fees could and almost certainly would impact the total cost of these units to Alta Power, and that unless it agreed not to collect the termination fees, the cost of the Nuh Cemento units to Alta Power would exceed $10 million / unit. GE/WattStock were aware of the undisclosed termination fees before suggesting the Nuh Cemento units be targeted for acquisition. GE/WattStock knew adding the undisclosed termination fees would make the prices of those units higher than Alta Power's project budget. Utilizing a classic "bait and switch move," GE~~/WattStock~~ deliberately hid the existence of the termination fees ~~in the hope Alta Power would have no choice but to pay them at the 11th hour after~~and their potential impact on the price of the units from Alta Power until Alta Power~~'s project financing~~ had ~~been secured~~spent months and ~~the projects were already well underway~~paid millions of dollars towards the acquisition of the units.GE then refused to waive its contractual right to the termination fees unless Alta Power would agree to execute an expensive and burdensome LTSA with GE, thereby preventing Alta Power from acquiring these units. But for GE's refusal to waive these undisclosed termination fees, Alta Power would have purchased these units and its business would have moved forward.

52.  58. Prior to learning of the true cost of these units due to the undisclosed associated liabilities, Alta Power, relying on GE and WattStock, moved throughout 2019 and into 2020 attempting to purchase the two Nuh Cemento units.

~~59.    WattStock also improperly marked up Alta Power's down payment that would have never been made had Alta Power known the true price of the Nuh Cemento units. Per the terms of the Master Agreement, WattStock entered Equipment Purchase Agreements with Nuh Cemento. When WattStock sent an invoice to Alta Power for the $250,000 down payment, WattStock added a "mark-up" of $125,000. Alta Power refused to pay the "mark-up" since it was inconsistent with the Master Agreement. Recognizing it had no entitlement to these funds, WattStock did not reiterate its demand for payment until litigation between the parties became imminent.~~

53.  60. WattStock, GE, and Alta Power identified an additional unit in Turkey owned by a Turkish company called Acarsoy. The same process repeated itself again.

54.  61. As with the Nuh Cemento units, ~~WattStock/~~GE failed to disclose that the Acarsoy unit was burdened with a multi-million-dollar LTSA termination fee, which was not included in the pricing presented to Alta Power. When GE refused to waive its right to collect the undisclosed termination fees, it doomed the transactions. But for this decision, Alta Power would have purchased this unit.

55.  62. Like with Nuh Cemento Relying on GE and WattStock's representations concerning their ability and willingness to sell Alta Power the required TRUEPackages™ for at or less than $10 million per TRUEPackage™ unit, Alta Power paid $475,000 in down payments related to this unit, unaware of the true cost of the unit. Alta Power would never

have done so had GE/WattStock disclosed the liabilities associated with the unit which rendered it uneconomical for Alta Power's projects.

56.    63. Once again, WattStock even attempted to mark up this down payment (as they did with everyGE also hid other paymentmaterial information from Alta Power) despite having no contractual basis to do so. Alta Power rebuffed these attempts, and WattStock recognized it had no basis for payments, and did not request the payments again until just before the filing of its lawsuit against Alta Power.

64.    In addition to units made uneconomical by LTSAs, WattStock also marketed units that were uneconomical for other reasons.

57.    65. In May of 2019, GE and WattStock informedencouraged Alta Power of the existence ofto purchase a package owned by EthosEnergy. WattStock suggested Alta Power purchase the package from EthosEnergy, claiming demand for the package was high. The "package" was essentially the housing for the aeroderivative gas turbine.

58.    66. GE and WattStock represented that Alta Power could obtain a gas turbine engine from the GE lease pool to marry with the EthosEnergy package and claimed a similar housing was available in Panama and could also easily be married with a lease pool engine.

59.    67. GE/WattStock andWattStock claimed these leased units with the purchased housings would lead to a significantly lower price for Alta Power.

60.    68. Based on these representations, Alta Power purchased the EthosEnergy package for $200,000.

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X   Document 38   Filed 06/04/24   Page 354 of 453   PageID 760
Compared Over Alta's February 24, 2021 Original Third-Party Petition

69.    When WattStock sent an invoice for this purchase, it marked up the purchase price initially by $175,000 and then later by $115,000.

70.    Once again Alta Power refused to pay the mark-up, as there was no contractual basis for such a mark-up. Indeed, the contractual relationship between Alta Power and WattStock contemplated that this package would not be marked up.

61. 71. GE/ and WattStock also did not discloseconcealed that the EthosEnergy unit was in a dilapidated condition and was only suggested as a possibility so that GE/WattStock andWattStock could increase their revenue stream for providing repairs. Furthermore, several months later when Alta Power inquired about the possibility of cost savings using the previously promised lease pool engines, WattStock and GE informed Alta Power that "that program was no longer being offered."

62. 72. Had GE/WattStock disclosed the true condition of the EthosEnergy unit or the unavailability of the lease pool, Alta Power would not have purchased the Ethos unit at any price. Furthermore, WattStock and/or GE still has possession of the EthosEnergy unit, despite having been paid for it.

63. 73. GE and WattStock convinced Alta Power to make a $300,000 down payment for a unit owned by a company in Turkey called Bosen. As with all other units, WattStock and GE represented that the delivered unit would be priced consistent with Alta Power's needs.

64. 74. At the time they convinced Alta Power put $300,000 dollars down for the purchase of the Bosen unit. Alta Power was laterto make this downpayment, both GE and WattStock knew that the Bosen units contained non-GE parts. They did not, however,

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38    (Filed 06/04/24)    Page 355 of 453    PageID 761
Compared Over Alta's February 24, 2021 Original Third-Party Petition

tell Alta Power that GE categorically refuse to service any LM6000 unit that contains any part that was not originally manufactured by GE, regardless of the non-GE part's condition, or that GE would not warrant (which is the most important aspect of the TRUEPackage[TM]) the performance of a refurbished unit that contains non GE parts.

65.    Later, after Alta Power had made the $300,000 down payment, GE and WattStock informed Alta Power that GE/WattStock would not warrant or service units containing non-GE components unless the non-GE components were first replaced—regardless of their condition.

66.    75. The Bosen unit contained non-GE components and as a result the "new" purchase price including the refurbishment work which was several million dollars higher than previously represented by GE/WattStock, and well above the promised $10 million total price. As a result, this unit was uneconomical for Alta's projects.

F.    WattStock scuttles Alta Power's efforts at financing.

76.    Throughout 2019, Alta Power discussed potential financing options for its power project. Alta Power reached out to several sources of funding. In the summer of 2019, Alta Power identified its best source of funding for the purchase of the nine aeroderivative units: Deutsche Bank.

77.    Alta Power engaged in negotiations with Deutsche Bank concerning financing for its unique peaker plant strategy. As part of its due diligence, Deutsche Bank requested a meeting with WattStock. WattStock met with Deutsche Bank and during these meetings, WattStock confirmed that GE and WattStock were "partners."

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38    Filed 06/04/24    Page 356 of 453    PageID 762
Compared Over Alta's February 24, 2021 Original Third-Party Petition

78.    Of course, Deutsche Bank would rely not solely on WattStock's representation that GE and WattStock were "partners." Accordingly, Deutsche Bank formally asked GE to provide appropriate assurances. On July 31, 2019, GE responded to this request in a letter confirming that if WattStock failed to meet its contractual obligations, GE would step in since GE and WattStock are partners in this venture. GE also confirmed that GE engineering will be overseeing WattStock's work and that GE has a "strong incentive" for the project to succeed.

79.    Sometime before financing was closed, WattStock disclosed to Ryan Castleman of Castleman Power Development LLC ("Castleman"), one of Alta Power's few competitors, that project financing from Deutsche Bank was imminent. Knowing the financing would decrease the available used units in the marketplace and would allow Alta Power's projects to come online first, Castleman predictably attempted to scuttle Alta Power's financing. Specifically, Castleman threatened to file a frivolous "trade secret" lawsuit against Alta Power to stop the financing.

80.    Alta Power was forced to disclose this frivolous claim to Deutsche Bank. Alta Power worked to quickly resolve the frivolous dispute, and ultimately had no choice but to pay Castleman an extortion fee to settle the frivolous claim. But the damage was already done. Castleman's strategy of causing delay to destroy financing worked.

81.    Deutsche Bank decided against providing financing to Alta Power, delaying Alta Power's ability to bring units into service.

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X   Document 38 (tsfiled 06/04/24)   Page 357 of 453   PageID 763
Compared Over Alta's February 24, 2021 Original Third-Party Petition

**G.      ~~WattStock steals $100,000 from Alta Power to finance WattStock's~~
~~operations.~~**

~~82.      Despite the Deutsche Bank financing falling through, Alta Power~~
~~remained committed to its unique peaker plant strategy and continued to explore other~~
~~financing options in the fall of 2019.~~

<u>67.</u>      ~~83.~~ By the fall of 2019, GE and WattStock continued to lead Alta Power to
believe that the targeted units could be acquired consistent with WattStock and GE's earlier
pricing guidance. Because of this, Alta Power continued to fund the potential acquisition
of units.

<u>68.</u>      ~~84.~~ In October 2019, Alta Power sent WattStock $100,000 for potential use
in extending an option to purchase units from Bosen. During WattStock's negotiations with
Bosen, Alta Power ultimately decided not to go through and told WattStock to cease
negotiations. WattStock complied and the parties never entered into an agreement
extending the option period with Bosen.

<u>69.</u>      ~~85.~~ WattStock never sent Alta Power's $100,000 to Bosen since the
negotiations were called off before the $100,000 was used.

<u>70.</u>      ~~86.~~ Alta Power requested the return of the $100,000. WattStock
acknowledged the funds would be returned, and repeatedly promised to do so on multiple
occasions during the fall and winter of 2019-2020.

<u>71.</u>      ~~87.~~ WattStock broke these promises. Instead, WattStock converted Alta
Power's $100,000 and used it to cover serious cash flow issues, which ~~WattStock~~<u>GE</u> had
~~previously failed to disclose to~~<u>known about and hid from</u> Alta Power ~~and did not disclose~~
~~until May of 2020.~~

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (filed 06/04/24)    Page 358 of 453    PageID 764
Compared Over Alta's February 24, 2021 Original Third-Party Petition

**H.    ~~WattStock continues to fail to disclose the true costs of units~~**for the entire time period relevant to this case.

72.    ~~88.~~ Despite all of the ~~Deutsche Bank financing falling through~~above, Alta Power was still committed to the development of its projects. Consistent with this and based on  WattStock's and GE's false representations ~~that other buyers were targeting the Turkish units~~, Alta Power paid WattStock over $200,000 for extensions to keep alive potential deals with Acarsoy and Nuh Cemento in the fall of 2019.

73.    ~~89.~~ At no time did GE or WattStock inform Alta Power that the true costs of these units were inconsistent with WattStock's and GE's representations.

~~90.    During the fall of 2019, Alta Power considered a variety of funding structures, and decided to finance each project separately, rather than approaching potential lenders with a portfolio of three projects.~~

74.    ~~91.~~ Consistent with this, Alta Power and WattStock entered a Limited Notice to Proceed Proposal ("LNTP") on December 23, 2019 for two separate units to be acquired from Nuh Cemento. The total amount of the LNTP was almost $20 million. This included the "not to exceed price" of $6.5 million for WattStock to purchase the units from Nuh Cemento that GE/WattStock told Alta Power will be sufficient to purchase the units, with the balance for transportation, refurbishment, and installation of the units. This price included GE/WattStock's profit margin for the project.

75.    ~~92.~~ GE and WattStock represented to Alta Power that GE needed to be paid $1,500,000 to secure the purchase of long-lead hardware, start engineering activities and deliver preliminary drawings related to a potential TRUEpackage$^{TM}$ project. The

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (as filed 06/04/24)    Page 359 of 453    PageID 765
Compared Over Alta's February 24, 2021 Original Third-Party Petition

$1,500,000 was divided into two payments of $750,000.

76. ~~93.~~ Alta Power paid $750,000 on December 24, 2019 and paid another $750,000 on January 13, 2020.

77. ~~94.~~ In February 2020, Alta Power was informed for the first time that the owner of the two Nuh Cemento units would only sell the two units for the agreed not to exceed price of $6.5 million plus the cancellation of GE's LTSA termination fee of over $1.4 million. <u>Despite its promises to Alta Power that it could and would ensure that Alta Power could obtain the required units at the necessary price points, GE refused to waive the seller's termination fees, thereby preventing Alta Power from purchasing the units.</u>

78. ~~95.~~ The impact of the cancellation fee materially increased project costs above the previous budget and ~~impacted~~<u>made it economically impossible for</u> Alta Power~~'s ability~~ to ~~obtain financing for the project~~<u>move forward with the acquisition of this hardware</u>.

79. ~~96.~~ For the units being considered (as with the Bosen unit), the significant liabilities were not disclosed until after Alta Power made the final payment to GE under the LNTP.

~~97.    By March 2020, the global economy was in the grips of the COVID-19 crisis. This delay impacted the closing of Alta Power's project financing. Regardless, Alta Power remained financially committed~~ <u>For each, GE chose not to disclose that the units were burdened by these fees (or that the fees could materially impact the price of the units to Alta Power) and refused</u> to ~~waive~~ the ~~project and was ready, willing, and able to go forward with the two Nuh Cemento units under the LNTP~~<u>termination fees even though</u>

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X   Document 38   Filed 06/04/24   Page 360 of 453   PageID 766
Compared Over Alta's February 24, 2021 Original Third-Party Petition

doing so was inconsistent with GE and WattStock's promises and duties to Alta Power.

**F.      GE refuses to make good on its promises, hangs Alta Power out to dry.**

80.   ~~98.~~ In the spring of 2020 WattStock informed Alta Power it was having financial issues. WattStock asked Alta Power to either provide a loan or acquire WattStock.

81.   ~~99.~~ During this time, Alta Power requested that GE step in and fulfill its commitment to Alta Power to assist in securing the units needed for Alta Power's project. GE refused.

82.   ~~100.~~ Alta Power was ready, willing, and able to go forward with the Nuh Cemento project with GE alone. GE refused to allow Alta to pay directly for the LNTP components, despite repeated requests by Alta Power due to concerns regarding WattStock's financial situation. And GE further refused to step in and take over for WattStock (despite contrary written representations) when Alta Power notified GE that WattStock was insolvent.

~~101.   Alta Power also continued to negotiate with other sources of funding for the Project, including Riverstone and Macquarie.~~

83.   ~~102.~~ Despite Alta Power's ~~effort sand~~efforts and GE's prior representations, GE made it clear, once again, that it would only move forward with WattStock, thereby constructively cancelling the LNTP and the Nuh Cemento project~~.~~

~~103.   Consequently~~ and depriving Alta Power of the TRUEPackagesTM that GE and WattStock represented that they both could and would provide for at or below $10 million per TRUEPackage TM. As a result, Alta ~~missed their opportunity to be a first~~

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38    Filed 06/04/24    Page 361 of 453    PageID 767
Compared Over Alta's February 24, 2021 Original Third-Party Petition

~~mover in the highly competitive Texas peaking electricity market~~Power suffered more than one hundred million dollars of damages.

## V. ~~VIII.~~ CAUSES OF ACTION

### ~~COUNT~~Count I:  ~~DECLARATORY JUDGMENT (AGAINSTGE AND WATTSTOCK)~~RESPONDEAT SUPERIOR

84.  ~~104.~~ Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

~~105.    Alta Power seeks a declaratory judgment pursuant to Tex. Civ. Prac. & Rem. Code § 37.001 *et seq.* Alta Power requests the Court to declare that:~~

~~a.    No contractual agreement exists by which WattStock is entitled to "mark-ups" on goods or services.~~

~~b.    GE and WattStock are principal/agent or partners such that GE is responsible for WattStock's torts and breaches.~~

~~c.    As of May 20, 2020, WattStock was insolvent and Alta Power was entitled to terminate the Master Agreement, which excuses Alta Power of any further performance.~~

~~d.    As of May 20, 2020, WattStock was insolvent and Alta Power was entitled to terminate the December 23, 2019 LNTP.~~

~~e.    GE's refusal to go forward with the Nuh Cemento project once WattStock became insolvent was a breach of the LNTP requiring GE to refund money paid to WattStock/GE by Alta Power.~~

### ~~COUNT II:  RESPONDEAT SUPERIOR (AGAINST GE)~~

85.  ~~106. Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.~~ GE and WattStock represented to Alta Power that they were "partners" and that WattStock acted as GE's ~~Authorized Service Provider~~authorized service provider.

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X     Document 38 Filed 05/04/24     Page 362 of 453     PageID 768
Compared Over Alta's February 24, 2021 Original Third-Party Petition

86. ~~107.~~ Alta Power justifiably relied on these representations by GE and WattStock in agreeing to the Master Agreement and the LNTP.

87. ~~108.~~ In fact, without the representations, Alta Power would have never entered any contracts with WattStock.

88. ~~109.~~ Accordingly, an ostensible agency existed between WattStock and GE.

89. ~~110.~~ GE is estopped from denying liability for WattStock's breaches and torts and/or GE and WattStock engaged in a joint enterprise for which joint and several liability exists.

90. ~~111.~~ Despite the fig leaf boiler-plate language in the MOU between GE and WattStock, the language of the MOU shows GE controlled WattStock. Accordingly, the "no partnership or agency" provision is a sham or subterfuge designed to conceal the true legal status of GE/WattStock. Extrinsic evidence also shows actual control by GE over WattStock.

91. ~~112.~~ GE is respondeat superior liable for the breaches and torts of WattStock.

**COUNT ~~III:  BREACH OF CONTRACT (AGAINST WATTSTOCK)~~**

~~113.   Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.~~

~~114.   Alta Power and WattStock entered into the Master Agreement, which is and was a valid and enforceable contract. Alta has standing to sue for breach of the Master Agreement.~~

~~115.   Alta Power performed its obligations under the Master Agreement.~~

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38  Filed 06/04/24    Page 363 of 453    PageID 769
Compared Over Alta's February 24, 2021 Original Third-Party Petition

116.    WattStock breached the confidentiality provisions of the Master Agreement by disclosing confidential information about Alta Power and its financing to Castleman. WattStock's breach has proximately caused injury to Alta Power. Specifically, WattStock's breach caused Alta Power to lose project financing for its a unique strategy for developing power generation projects in the Texas market.

117.    Had WattStock not breached the confidentiality provisions, Alta Power would have closed financing with Deutsche Bank and been able to implement its unique strategy.

118.    As a direct result of WattStock's breaches, Alta Power has been severely damaged.

119.    Alta Power paid GE/WattStock $1.5 million related to the Nuh Cemento project for GE to acquire long-lead hardware, start engineering activities, and deliver preliminary drawings.

120.    The Master Agreement and LNTP were cancelled due to WattStock's insolvency.

121.    In addition to its liability under the theory of respondeat superior, GE is also vicariously liable for WattStock's breaches of the Master Agreement and LNTP. Consequently, GE must refund to Alta Power the $1.5 million under the contracts between the parties.

122.    To compensate it for the damages outlined above, Alta Power seeks unliquidated damages.

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38    (as Filed 06/04/24)    Page 364 of 453    PageID 770
Compared Over Alta's February 24, 2021 Original Third-Party Petition

123.    Pursuant to Texas Civil Practice and Remedies Code section 38, Alta Power is entitled to attorney's fees, costs, and expenses, due to WattStock's breach of the agreement.

### COUNT IVII:  UNJUST ENRICHMENT (AGAINST GE)

92.    124.  Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

93.    125.  GE has been unjustly enriched in the amount of $1.5 million to the detriment of Alta Power.

94.    126.  Alta Power demands restitution of all amounts GE has been justly enriched.

### COUNT V:  CONVERSION (AGAINST WATTSTOCK)

127.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

128.    In October 2019, Alta Power sent WattStock $100,000 to extend an option to purchase units from Bosen.

129.    Alta ultimately declined to extend the option and instructed WattStock to return the $100,000.

130.    Alta repeatedly demanded that WattStock return the $100,000 during the fall and winter of 2019-2020. WattStock refused (and continues to refuse) to return this money, and thereby assumed and exercised dominion and control over Alta's money in an unlawful and unauthorized manner, to the exclusion of and inconsistent with Alta's rights.

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38    Filed 05/04/24    Page 365 of 453    PageID 771
Compared Over Alta's February 24, 2021 Original Third-Party Petition

**COUNT VI:  TEXAS THEFT LIABILITY ACT (AGAINST WATTSTOCK)**

131.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

132.    Alta has a possessory right to the $100,000 it paid WattStock.

133.    WattStock misappropriated and enjoyed these monies knowing full well it was not entitled to same.

134.    All of this was done without Alta's consent. WattStock intended to and did in fact deprive Alta of these monies which led Alta to suffer significant financial damages in an amount to be proven at trial, plus court costs and reasonable and necessary attorney's fees as allowed by the TLA.

**COUNT VIIIII:  FRAUD (AGAINST GE AND WATTSTOCK)**

95.    135. Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

96.    136. GE and WattStock intentionally misrepresented the nature of their relationship to induce Alta Power to purchase GE TRUEPackages™ and contract with GE/WattStock instead of acquiring the needed LM6000s from and/or contracting with a competitor like ProEnergy.

97.    137. GE falsey represented it would "stand behind" WattStock. However, when the time came to do so GE did not.

98.    138. Simply putGE intentionally misrepresented the benefits of the GE TRUEPackage™ Program, the pricing provided by GE and WattStock was intentionally mispresented and did not include the true cost of acquisition of the units. Alta Power relied

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 138    Filed 05/04/24    Page 366 of 453    PageID 772
Compared Over Alta's February 24, 2021 Original Third-Party Petition

on these representations to its detriment.

139.    GE had the right under its MOU with WattStock to force WattStock to sell GE any gas turbine purchased pursuant to the TRUEPACKAGE™ program. In effect, GE had the right to push WattStock aside and ensure that any deal was consummated.

140.    Yet, when WattStock became insolvent GE refused to "stand behind" WattStock and take the necessary steps to consummate the LNTP with<u>acquisition costs associated with the TRUEPackage™ units, and the overall costs of the TRUEPackagesTM marketed to</u> Alta Power and Nuh Cemento.

141.

<u>99.</u>    GE/WattStock misrepresented the benefits of the TRUEpackage™ <u>misrepresented the benefits of the TRUEpackageTM</u> program.

<u>100.</u>    142. GE/WattStock represented that the program would enhance the ability to obtain financing when it did not.

<u>101.</u>    143. GE/WattStock represented that the program would be able to move quickly to service the narrow window Alta Power had for this unique strategy when in fact the GE/WattStock relationship created a bureaucracy that only slowed down projects.

<u>102.</u>    144.          GE/WattStock          represented          that          the TRUEpackage™<u>TRUEpackageTM</u> program was of a superior quality when in fact it was not.

<u>103.</u>    145.     GE/WattStock     represented     that     units     from     the TRUEpackage™<u>TRUEpackageTM</u> program were competitively priced with alternative refurbished gas turbine solutions when in fact they were not.

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38   (its added: Filed 06/04/24)    Page 367 of 453    PageID 773
Compared Over Alta's February 24, 2021 Original Third-Party Petition

104.    ~~146.~~ GE/~~WattStock~~ hid the existence of undisclosed liabilities on virtually every unit suggested using a classic bait and switch maneuver.

105.    ~~147.~~ GE/~~WattStock's~~ misrepresentations were material and false.

106.    ~~148. Both GE and WattStock~~GE knew these representations were false when ~~they~~it made them, or at the very least, these representations were made recklessly and without knowledge of their truth.

107.    ~~149.~~ These representations were made with the intent that Alta Power act and rely on them.

108.    ~~150.~~ Alta Power relied on ~~GE and WattStock's~~these representations ~~regarding~~and omissions to its detriment.

109.    GE representations and omissions were material and false.

110.    GE knew these representations and omissions were false (or created a false impression) when it made them, or at the very least, it made these representations recklessly and without knowledge of their ~~relationship~~truth.

111.    ~~151. GE~~These representations and ~~WattStock~~omissions were made with the intent that Alta Power act on them.

112.    Alta Power relied on the representations outlined above.

113.    GE's misrepresentations proximately caused Alta Power ~~injury well beyond the minimum jurisdictional limits of the Court.~~

~~152.    Alta Power has wasted at least~~more than $~~10~~100 million ~~based on GE/WattStock's misrepresentations.~~

~~153.    Had GE/WattStock not misrepresented the true facts, Alta Power would~~

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (as Filed 06/04/24)    Page 368 of 453    PageID 774
Compared Over Alta's February 24, 2021 Original Third-Party Petition

have been able to successfully serve the niche market and has lost significant revenue as a result in damages.

## COUNT ~~VIII~~IV:  NEGLIGENT MISREPRESENTATION ~~(AGAINST GE AND WATTSTOCK)~~

114.    ~~154.~~Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

115.    ~~155.~~Alternatively, each fraudulent misrepresentation made by GE ~~and WattStock were~~was made negligently since GE~~/WattStock~~ did not exercise reasonable care or competence in obtaining or communicating the information.

116.    ~~156.~~Alta Power has wasted at least $10 million based on GE/WattStock's negligent misrepresentations, and has lost more than $100 million in profits.

117.    ~~157.~~Had GE~~/WattStock~~ not negligently misrepresented the true facts, Alta Power would have been able to successfully serve the niche market and has lost ~~significant revenue~~more than $100 million as a result of GE's fraudulent acts.

## COUNT V:  CIVIL CONSPIRACY

118.    Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

119.    GE and WattStock conspired to accomplish an object or course of action, namely, to fraudulently induce Alta Power into contracting with WattStock (as opposed to another competitor like ProEnergy) related to the acquisition of the refurbished LM6000s Alta Power needed to carry out its business.

120.    To accomplish this, both GE and WattStock agreed to and did in fact intentionally misrepresent the nature of their relationship and virtually every aspect of GE's

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (sealed) Filed 05/04/24    Page 369 of 453    PageID 775
Compared Over Alta's February 24, 2021 Original Third-Party Petition

TRUEPackage$^{TM}$, including but not limited to the virtues of TRUEPackages$^{TM}$, their price, GE and WattStock's ability to timely deliver the required units, and the various factors that might adversely impact their ability to follow through on their promises to Alta Power to induce Alta Power to agree to and spend money towards acquiring GE TRUEPackages$^{TM}$ instead of acquiring the needed refurbished units from a competitor like ProEnergy.

121.    GE and WattStock agreed to and did in fact accomplish this objective through the commission of numerous unlawful overt acts, including but not limited to by: (i) intentionally misrepresenting the benefits of the GE TRUEPackage$^{TM}$ Program, the pricing and acquisition costs associated with the TRUEPackage$^{TM}$ units, and the overall costs of the TRUEPackages$^{TM}$ marketed to Alta Power; (ii) falsely representing that they would be able to move quickly to service the narrow window Alta Power had for this unique strategy; (iii) falsely representing that the TRUEpackageTM program was of a superior quality when in fact it was not; (iv) falsely representing that units from the TRUEpackageTM program were competitively priced with alternative refurbished gas turbine solutions when in fact they were not; (v) hiding the existence of undisclosed liabilities on virtually every unit suggested using a classic bait and switch maneuver, and deliberately hid the fact that those undisclosed liabilities could (and would) materially increase the overall cost of the targeted units; (vi) falsely representing that GE would facilitate Alta Power's acquisition of the required units at the required price levels, but— after causing Alta Power to devote time and huge sums of money to attempting to purchase the two Nuh Cemento units and the Acorsoy units—caused those transactions to fail by refusing to waive the termination fees attached to the GE LTSAs attached to those units;

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38   Filed 06/04/24    Page 370 of 453    PageID 776
Compared Over Alta's February 24, 2021 Original Third-Party Petition

(vii) falsely representing that GE would "stand behind" WattStock.

122.    Alta Power relied on these representations and ommissions to its detriment.

123.    Alta Power was damaged as a result of GE and WattStock's unlawful acts.

124.    Both GE and WattStock knew these representations and omissions were false (or created a false impression) when they made them, or at the very least, these representations were made recklessly and without knowledge of their truth.

125.    These representations and ommissions were made with the intent that Alta Power act on them.

126.    Alta Power relied on GE and WattStock's representations regarding their relationship, and these representations proximately caused Alta Power millions of dollars in damages.

## COUNT VI:  TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

127.    Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

128.    GE knew there was a reasonable probability that Alta Power would have entered into a contractual relationship with ProEnergy.

129.    To prevent that from happening, GE fraudulently (i) intentionally misrepresenting the benefits of the GE TRUEPackage$^{TM}$ Program, the pricing and acquisition costs associated with the TRUEPackage$^{TM}$ units, and the overall costs of the TRUEPackages$^{TM}$ marketed to Alta Power; (ii) falsely representing that they would be able to move quickly to service the narrow window Alta Power had for this unique strategy; (iii) falsely representing that the TRUEpackageTM program was of a superior quality when

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38  Filed 06/04/24    Page 371 of 453    PageID 777
Compared Over Alta's February 24, 2021 Original Third-Party Petition

in fact it was not; (iv) falsely representing that units from the TRUEpackageTM program were competitively priced with alternative refurbished gas turbine solutions when in fact they were not; (v) hiding the existence of undisclosed liabilities on virtually every unit suggested using a classic bait and switch maneuver, and deliberately hid the fact that those undisclosed liabilities could (and would) materially increase the overall cost of the targeted units; (vi) falsely representing that GE would facilitate Alta Power's acquisition of the required units at the required price levels, but— after causing Alta Power to devote time and huge sums of money to attempting to purchase the two Nuh Cemento units and the Acorsoy units—caused those transactions to fail by refusing to waive the termination fees attached to the GE LTSAs attached to those units; (vii) falsely representing that GE would "stand behind" WattStock.

130.    GE undertook all of the acts described above with the conscious desire to prevent Alta Power from contracting with Pro Energy.

131.    GE's acts and omissions caused actual harm and damage to Alta Power. GE's acts and omissions caused Alta Power to lose more than one hundred million dollars in profit.

## VI.    ~~IX.~~ JURY DEMAND

132.    ~~158.~~ Alta Power requests trial by jury on all contested issues of fact. The requisite jury fee has been paid.

## VII.    ~~X.~~ PRAYER

ACCORDINGLY, Alta Power prays that ~~WattStock and~~ GE be cited to appear and answer and that upon a final trial of this matter, the Court enter a final judgment

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (as filed 05/04/24)    Page 372 of 453    PageID 778
Compared Over Alta's February 24, 2021 Original Third-Party Petition

against ~~WattStock and~~ GE awarding Alta Power the following relief:

a)  An award of the full amount of actual damages incurred by Alta Power and caused by the acts and omissions of GE ~~and WattStock~~;

b)  An award of equitable damages, as requested above;

c)  An award of exemplary damages;

d)  Reasonable and necessary attorneys' fees;

e)  Pre-judgment and post-judgment interest at the maximum rate allowed by law;

f)  Cost of court; and ~~g)~~ Such other and further relief, general or special, at law or in equity, to which Alta Power may show itself to be justly entitled.

GE's Redline Showing Alta's May 10, 2024 Proposed Complaint
Case 3:23-cv-00270-X    Document 38    Filed 06/04/24    Page 373 of 453    PageID 779
Compared Over Alta's February 24, 2021 Original Third-Party Petition

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC


By:  /s/ ~~Michael Cancienne~~Jeb Golinkin
Michael Cancienne
State Bar No. 24055256
~~Kevin Jordan~~
~~State Bar No. 11014800~~
Joseph W. ("Jeb") Golinkin II
State Bar No. 24087596
1980 Post Oak Blvd., Ste. 2300
Houston, Texas 77056
713.955.4028
713.955.9644 Facsimile
mcancienne@jlcfirm.com
~~kjordan@jlcfirm.com~~
jgolinkin@jlcfirm.com

**ATTORNEYS FOR** ~~**DEFENDANT,**~~
~~**COUNTER-PLAINTIFF AND THIRD-**~~
~~**PARTY**~~ **PLAINTIFF ALTA**
**POWER LLC**


## CERTIFICATE OF SERVICE

I hereby certified that a true and correct copy of the above pleading was served on all parties through the Court's electronic filing service on the ~~24~~14th day of ~~February~~May, ~~2021~~2024.

By:  /s/ ~~Michael Cancienne~~
~~Michael Cancienne~~Jeb Golinkin
Jeb Gelonin

# EXHIBIT BB

| From: | Capoccia, Matt |
|---|---|
| Sent: | Tuesday, May 14, 2024 6:16 PM |
| To: | Jeb Golinkin |
| Cc: | LeGrand, Andrew; Sohn, Bryan; Michael Cancienne |
| Subject: | Re: Alta Power: Proposed Amended Complaint and Meet and Confer |

Jeb,

GE would be willing to not oppose Alta's amended complaint if Alta will agree to answer interrogatories and provide deposition testimony needed to remedy the prejudice of Alta substantively amending its theories four years into the life of the case.

First, Alta must agree that GE may serve 15 additional interrogatories. These are warranted not only because Alta has changed its theories in the middle of the case, but also because a review of the interrogatories to date reflects that Alta has only given five substantive answers to interrogatories.

Second, Alta's late-stage amendment, if allowed, would require additional deposition time with two Alta deponents, Mr. Laterza and Mr. West. As you know, a large portion of each deposition was spent exploring theories that Alta now seeks to drop from its case, regarding the Castleman dispute. And neither deposition accounted for the new claims Alta now seeks to add, long after each deponent testified. I would also note that we approached you in November 2022 and sought for you to amend at that time, but you refused – causing GE to continue to expend resources (and deposition time) on claims you knew to be groundless and now seek to abandon.

Best,

Matt

**Matt Capoccia**
GIBSON DUNN

Gibson, Dunn & Crutcher LLP
2001 Ross Avenue Suite 2100, Dallas, TX 75201
Tel +1 214.698.3249 • Fax +1 214.571.2987
MCapoccia@gibsondunn.com • www.gibsondunn.com

1

**APP.370**

On May 10, 2024, at 1:58 PM, Jeb Golinkin <jgolinkin@jlcfirm.com> wrote:


**[WARNING: External Email]**

Dear Andrew and Matt,

As you know, the deadline for the parties to amend their pleadings is **on Tuesday**. To that end, we have prepared an amended complaint, a copy of which is attached for your review. I have also attached a redline so you can see what has changed. Please let us know if you oppose our amendment, or whether we can amend with your consent.

Also, in response to Matt's previous email, we are available to talk **next Friday afternoon** to confer. Anytime after 1:30pm. Let us know what works best for you.

Thanks,

Jeb
--
**Joseph W. Golinkin II**
Partner| Jordan, Lynch & Cancienne PLLC
(o) 713-955-4019 | (c) 832-250-6567
1980 Post Oak Blvd., Suite 2300 Houston, Texas 77056
www.jlcfirm.com  |  Attorney Biography
<image001.png>

<Alta Power_Proposed Amended Complaint (clean).pdf>
<Alta Power_Proposed Amended Complaint (Redline).pdf>


**Matt Capoccia**
## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
2001 Ross Avenue Suite 2100, Dallas, TX 75201
Tel +1 214.698.3249 • Fax +1 214.571.2987
MCapoccia@gibsondunn.com • www.gibsondunn.com

**APP.371**

# EXHIBIT CC

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ALTA POWER LLC,

    *Plaintiff/ Counter-Defendant,*

v.

GENERAL ELECTRIC INTERNATIONAL
INC., d/b/a GE POWER SERVICES,

    *Defendant/ Counter-Plaintiff.*

Case No. 3:23-CV-0270-X

## ALTA POWER LLC'S FIRST AMENDED COMPLAINT AGAINST GENERAL ELECTRIC INTERNATIONAL, INC.

Alta Power LLC ("Alta Power") files this First Amended Complaint against General Electric International, Inc., d/b/a GE Power Services ("GE") and would respectfully show as follows:

### I.    SUMMARY OF ACTION

1. This case is necessitated by repeated misrepresentations made by GE and WattStock to Alta Power concerning their relationship, capabilities, and the GE TRUEPackage™ program to entice Alta Power to purchase refurbished LM6000 aeroderivative turbines from GE/WattStock.

2. Alta Power was created to develop natural gas-fired power assets that would provide critical additional power capacity to the Texas energy grid when the grid is experiencing periods of high demand. As part of this, Alta Power intended to buy and

place into service used aeroderivative gas turbines (essentially jet engines on skids powering a generator) that can quickly turn on and off to meet instances where power demand exceeds available power supply. During these periods of excess demand, power prices are highest.

3. To implement its business plan, Alta Power sought to buy fully refurbished GE LM6000 aeroderivative turbines. GE and WattStock LLC ("WattStock")—which was started by former GE employees, with offices within GE's own office space, to act as GE's exclusive sales force and point of entry into the used gas turbine market—persuaded Alta Power to buy these units from them instead of GE's biggest competitor by misleading Alta Power about the nature of GE and Wattstock's relationship, the pricing and availability of the required units, and the benefits of their products.

4. But for GE and WattStock's unlawful conduct, Alta Power would have obtained the required units and would have made many millions in profits. Instead, GE and WattStock misappropriated millions of dollars of Alta Power's money.

## II.     PARTIES

5. Alta Power is the Defendant in this case originally filed by WattStock, the original Plaintiff and Counter-Defendant. Alta Power has already appeared.

6. Third-Party Defendant GE is a company incorporated under the laws of Delaware doing business in Texas. GE has already appeared.

### III.     VENUE AND JURISDICTION

7.     Jurisdiction in this Court is proper under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000. This Court also has core jurisdiction under 28 U.S.C. §§ 157 and 1334.

8.     This Court has personal jurisdiction over GE because a substantial amount of the acts giving rise to Alta Power's causes of action arose in Texas.

9.     Venue in this Court is proper under 28 U.S.C. §§ 1408, 1409, and 1452.

### IV.     FACTUAL ALLEGATIONS

A.     **Alta Power's business.**

10.     Alta Power was established to provide additional capacity to an overloaded energy grid in a creative and profitable manner.

11.     The market for power in Texas has evolved from traditional gas and coal fired power plants to more renewable sources like wind and solar. In 2019, renewable energy sources accounted for about 11% of total U.S. energy consumption and about 17% of electricity generation. Texas now meets approximately 30% of its sizeable electricity demand with wind power and approximately another 15% with solar.

12.     As electrical providers move towards renewable power production, there are times when the energy grid has more demand than supply. Aeroderivative gas turbine "peaker plants" have become imperative to meet this imbalance since these plants turn on quickly — in less than 10 minutes.

13.     Pricing for this "peak demand" power is often at a premium and can be sold under long-term contracts with investment grade counterparties. Alta Power

determined that peaker plants could help meet this demand, profitably for Alta Power if Alta Power could acquire aeroderivative gas turbines at a competitive price and locate them appropriately.

14.     Because of the high cost of new aeroderivative gas turbines, Alta Power's strategy relied on acquiring used aeroderivative gas turbines, which was the only way to make the projects work within the required budget.

15.     To successfully develop a peaker plant, Alta Power needed to (1) identify areas in the grid where a peaker plant fits (considering gas supply, offtake pricing, and interconnection feasibility); (2) navigate the state and federal regulatory waters of the electrical power market; and (3) obtain used aeroderivative gas turbines that can be purchased and refurbished within budget.

16.     This complexity, along with high entry costs, means that there were only a few companies competing with Alta Power. But given the limited size of the market, being a first mover was critical.

17.     By April 2018, Alta Power had identified several potential project sites through an extensive vetting process based on prevailing market conditions. Through this work, Alta Power earned a head start on its competitors and found itself with a brief window during which it would be the first mover in this niche market.

**B.      GE Aero TRUEPackage™**

18.     GE is one of the limited suppliers of aeroderivative gas turbines. Traditionally, GE makes money selling new turbines, and (often) by servicing these turbines. However, by early 2018, sales of GE's new gas-powered turbines had fallen off

a cliff because decentralized renewable resources increase cost-competitive pressures. But the increased reliance on renewables and wind energy had created a gap in the energy markets that companies (like Alta Power) endeavored to exploit by creating peaker power plants using refurbished LM6000s.

19.     In 2016 and 2017, a GE competitor called ProEnergy recognized the need for refurbished aeroderivative turbines and began buying, refurbishing, and reselling used GE LM6000 units. By doing this, ProEnergy frequently also won contracts to service these units. In so doing, ProEnergy became a direct competitor with GE in the market for servicing aeroderivative turbines.

20.     In early 2018, GE sought to combat ProEnergy's increasing dominance of this marketplace by launching something it called the GE Aero TRUEPackage™, which it marketed as its own product. Consistent with this, GE applied for and owns a trademark for the word "TRUEPackage™" in the Construction and Repair Services category.

21.     However, GE did not undertake the refurbishment of used aeroderivative turbines alone. Instead, it partnered with a company called WattStock to acquire, refurbish, and resell used GE LM6000 aeroderivative turbines. WattStock was founded by former employees of GE, and was and remains co-located inside GE's Jacintoport facility in Houston, Texas.

22.     GE, however, did not allow WattStock to hold the refurbished products out as its own product. Instead, GE required WattStock to refer only to "GE Aero TRUEPackage™ in marketing materials" related to the refurbishment and resale of used LM6000s because, as a GE executive explained to WattStock in early 2018, "TRUEPackage

is the GE brand….not Certified Turbine Power" and it did not want to "confuse the market with different names." Thus, GE very deliberately created the public perception that TRUEPackage is a GE product, and that all TRUEPackages™ are GE products backed by GE, not WattStock.

**C.**  **GE persuades Alta Power to reject ProEnergy and instead choose TRUEPackage™.**

23.      In early 2018, Alta Power turned to procuring the turbines that would power its peaker plants. Alta Power determined that the best way to achieve its business goals was to acquire fully refurbished GE LM6000 turbines. The question then became whether to buy the needed refurbished LM6000s from the market leader, ProEnergy, or one of its competitors like GE/WattStock.

24.      Around the same time, Alta Power learned of GE's TRUEPackage™ offering. GE's marketing materials[1] promise a variety of advantages over competitors, including, but not limited to, a "one year OEM warranty and equipment performance guarantees," "delivery in eight months or less;" and "equipment selection and refurbishment plan driven by installed cost." GE also touted financing benefits of its product, claiming that its "OEM certification can improve financing options and insurance premiums." GE also claimed that GE's TRUEpackage™ was unique because GE—the turbines' original manufacturer—was the only company that could provide an end-to-end warranty and performance guarantee at a fixed price. Finally, GE represented

---

[1]      Including GE's own website: https://www.gevernova.com/gas-power/services/gas-turbines/aeroderivative/repowering-solutions.

that WattStock had access to its proprietary database that WattStock and GE would jointly use to identify available units.

25.    Based on these representations, Alta Power began discussions with GE and its partner WattStock about the possibility of buying the needed refurbished LM6000s from them instead of from GE's competitor, ProEnergy.

26.    During its discussions with both GE and WattStock, Alta Power repeatedly emphasized the cost sensitivity of its projects; that is, the cost of the gas turbine units could not exceed a certain price—around $10 million per fully refurbished LM6000—if the project were to remain within budget and financeable. In response, GE and WattStock reiterated all of the points made by their marketing materials, including that GE and WattStock are "partners" and that GE and WattStock would deliver the required units in "eight months or less." GE and WattStock also assured Alta Power that if Alta Power agreed to acquire GE TRUEPackages™ by contracting with WattStock, they could and would make up to nine GE TRUEPackages™ available for purchase by Alta Power for at or below $10 million per fully refurbished LM6000.

27.    Alta Power attended many in person meetings with GE where its representatives, including, but not limited to, Lance Herrington, Alex Babu, and James Canon made numerous false, misleading representations, including, but not limited to, the following: (1) misrepresenting the nature of its relationship with WattStock; (2) falsely represented that it could and/or would make up to nine GE TRUEPackages™ available for Alta Power to buy for at or below $10 million per GE TRUEPackage™; (3) misrepresenting the true pricing and availability of TRUEPackage™ units; (4) falsely

holding itself out as the lowest cost, most financeable solution in the marketplace; (5) falsely representing that GE would "stand behind" and/or "fully wrap" WattStock's work related to the delivery of the GE TRUEPackages™.

28.    For example, on or about June 6, 2018, Alta Power (represented by Matthew Laterza and Travis West) met with GE Global Sales and & Sales Operations Leader Lance Herrington (who created and was in charge of GE's TRUEPackage™ offering) along with other representatives of GE and WattStock for more than three hours at GE's Jacintoport facility (where WattStock is co-located).

29.    During this meeting, Alta Power briefed GE and WattStock at length on the detailed technical and budgetary requirements of Alta Power's business model and also disclosed its timing requirements, e.g., that it would need GE and WattStock to deliver the units consistent with the representations in GE's marketing materials (8 months). In response, GE (specifically, Lance Herrington) reiterated the supposed benefits of its "partnership" with WattStock and assured Alta Power that if it chose TruePackage™ instead of ProEnergy, GE could and would enable Alta Power to buy up to nine used GE LM6000s for at or below $10 million per used GE LM6000 unit and that they would (as represented in their marketing materials) deliver these fully refurbished TRUEPackages™ in "eight months or less" if Alta Power agreed to exclusively contract with WattStock to buy GE TRUEPackages™.

30.    GE also represented that if Alta Power would reject ProEnergy in favor of its TRUEPackage™ offering, GE would "fully wrap"(or stand behind) WattStock's work and obligations to Alta Power related to the sale and refurbishment of the used LM6000s.

31.     GE's internal correspondence confirms that GE understood the importance of Alta Power's pricing requirements. Indeed, the day after its first in-person meeting with Alta Power, GE's Lance Herrington emailed GE's Senior Sales Manager in charge of the Southwest and explained that he believed Alta Power was interested in doing a deal with GE, but that "pricing into their pro forma which is basically based on experience with Pro-Energy will be key."

32.     On or about August 29, 2018, ProEnergy sent Alta Power a proposal for under which ProEnergy offered to provide the necessary refurbished LM6000s to supply the necessary refurbished LM6000s for Alta Power's first peaker plant. ProEnergy's proposal satisfied Alta Power's technical, budgetary, and temporal requirements.

33.     Along the same lines, on December 18, 2018, Alta Power returned to GE for another lengthy meeting at GE's Houston facility with GE's Lance Herrington and others. During this meeting, Herrington again reiterated GE's supposed partnership with WattStock and represented that if Alta Power rejected ProEnergy's contract and instead contracted with WattStock, GE could and would enable Alta Power to buy up to nine used GE LM6000s for at or below $10 million per refurbished GE LM6000 unit.

34.     GE's internal emails again confirm that GE understood Alta Power's pricing requirements, and confirm that GE understood that unless it met these requirements, Alta Power would contract with ProEnergy. For example, internal notes from this meeting circulated internally by GE and WattStock the day after the meeting note Alta Power's "specific price targets that they need to hit" to move forward. Along the same lines, on December 20, 2018, GE's Herrington emailed his entire GE team and

observed that GE can "win [Alta Power's project] from ProE" "if we can hit the price targets they are looking for."

35.     GE and WattStock jointly determined that Alta Power ought to enter into a "Master Agreement" with WattStock, with GE standing behind it. Consistent with this, WattStock and GE began pushing Alta Power to sign a so called "Master Agreement" with WattStock. This proposal contained an exclusivity provision that Alta Power correctly observed "puts [Alta Power] out of business for twelve months" if GE and WattStock fail to deliver the promised units for at or less than $10 million per unit.

36.     On February 24, 2019, WattStock sent GE a copy of the "Master Agreement"[2] they wanted Alta Power to sign. Both WattStock and GE understood that if Alta Power signed the Master Agreement, Alta Power would not be able to buy refurbished LM6000s from ProEnergy, and certainly not in time obtain a first mover advantage.

37.     The next day, GE's Lance Herrington and Alex Babu took Alta Power's Matthew Laterza and Travis West to lunch at Frank's Americana in Houston. During that meeting, Herrington and Babu each reiterated each of the representations outlined above, including but not limited to (1) the nature of GE and WattStock's relationship ("partners"); (2) that GE and WattStock could and would satisfy Alta Power's pricing and

---

[2]     The Master Agreement generally provides that WattStock will locate suitable gas turbines for Alta, arrange inspections to evaluate their condition and refurbishment requirements, and negotiate the purchase price with the existing owners (with GE standing behind it). Despite its name, the Master Agreement is limited in scope, covering only the preliminary steps toward acquiring the turbines. The Master Agreement contemplated that the parties would enter subsequent "definitive" agreements that would also describe the scope, terms, and price for the purchase of any given turbine. One such agreement was the parties' December 2019 Limited Notice to Proceed.

timing requirements; and (3) that GE would "fully wrap" and stand behind WattStock's work if Alta Power agreed to exclusively contract to buy TRUEPackages™ by entering into an exclusive Master Agreement with its partner WattStock.

38. On February 27, 2019—just days after GE's lunch with Alta Power—in reliance on the representations outlined above, Alta Power executed a "Master Agreement."[3] The Master Agreement outlined how WattStock would be reimbursed for out-of-pocket expenses and as part of a negotiated purchase price after WattStock purchased and refurbished the used units. The Master Agreement also contained an exclusivity and non-circumvention provision under which WattStock (and by extension, GE) agreed that neither WattStock nor GE would directly or indirectly cause another person to either attempt to or purchase a unit inspected on behalf of Alta Power (a service for which Alta Power paid). Article 6 of the Master Agreement likewise prohibited Alta Power from directly or indirectly purchasing or securing the exclusive right to buy any used LM6000 units disclosed by WattStock to Alta Power for a period of at least one year following the termination of the Master Agreement.

39. Given the narrow window that Alta Power had to exploit its "first mover" advantage in the peaker unit market, the Master Agreement made Alta Power dependent on GE and WattStock to follow through on their promises.

---

[3]     Nothing in the Master Agreement contradicts any of GE's representations related to the pricing or availability of units or any of its other misrepresentations.

## D.     Unbeknownst to Alta Power, GE lied about its relationship with WattStock.

40.     Unbeknownst to Alta Power, GE and WattStock had lied about nearly everything of substance to prevent it from agreeing to do business with ProEnergy. For example, GE and WattStock repeatedly and consistently held themselves out as partners, and GE suggested that their partnership was the subject of a contract—"the Memorandum of Understanding"—that provided that GE would stand behind WattStock's work related to Alta Power. But that was not accurate. GE's internal emails show that GE knew this, too. For example, on April 22, 2019, Lance Herrington wrote one of his colleagues about GE's relationship with WattStock and stated that "we do not currently have any signed agreement between [GE and WattStock]" related to the Alta Power project. The next day, Herrington's colleague responded with a series of questions about the nature of GE's relationship with WattStock going forward, observing that "the MOU that was signed has zero commitment on the GE part."

41.     As of August 25, 2020—which is *after* all of the events giving rise to this case—GE's internal emails confirm that GE *still* did not have a formal contractual relationship with WattStock that outlines each "partner's" role in the marketing and sale of GE TRUEPackages™.

42.     Despite the above, GE and WattStock continued to hold themselves out as "partners." Indeed, on July 31, 2019, GE sent Alta Power a letter—on GE letterhead, signed by GE's Lance Herrington—to give Alta Power additional comfort on the GE-WattStock relationship and to address "how GE could respond in the event that WattStock becomes unable to meet its contractual obligations to Alta Power, LLC under

agreements between WattStock and Alta Power for WattStock to supply a minimum of 9 refurbished LM6000 units." The letter states that "GE is willing to warranty WattStock's work on this project"; that "GE already conducts oversight of all aspects of WattStock's work"; and that GE "track[s] progress daily" of WattStock's work related to the Alta Power projects. The letter also states that "should WattStock fail to meet its contractual obligations to Alta Power, GE would be in a position to assume responsibility to complete any outstanding work."

43.     GE's letter reinforced Alta Power's belief that GE and WattStock were partners, and Alta Power did not learn that these representations were false until after this litigation began.

44.     Had GE disclosed the truth about its relationship with WattStock, Alta Power would not have entered into the Master Agreement (or any other agreement) with WattStock, nor would it have wired WattStock a single dollar. Instead, it would have accepted ProEnergy's August 2018 offer.

**E.     Relying on GE and WattStock, Alta Power pays millions of dollars to acquire various used LM6000 units.**

45.     But GE and WattStock had not merely lied about the nature of their relationship. They also lied about the pricing and availability of used LM6000 units. As discussed, GE and WattStock repeatedly told Alta Power that if Alta Power executed the Master Agreement, they could make up to nine TRUEPackages™ available for purchase to Alta Power for at or below $10 million per unit. Unbeknownst to Alta Power, this was not true.

46.     In February 2019, WattStock Vice President Pete Watson travelled to Turkey to begin inspections and negotiations on used GE aeroderivative gas turbine units. This was done at Alta Power's expense, and in reliance on GE and WattStock's representations as described above.

47.     Several used GE aeroderivative units were available in Turkey because changes in Turkish governmental regulations made the units uneconomical in country. In March 2019, WattStock's Jay Manning and Pete Watson presented Alta Power price and purchase options for nine used GE units based in Turkey. These prices suggested that the prices of these units were at or below the $10 million per refurbished unit price that GE and WattStock promised Alta Power they would meet if Alta Power agreed to buy TRUEPackages™.

48.     On April 17, 2019, WattStock's representative (with GE's knowledge and consent) sent Alta Power letters of intent to buy six used LM6000 units from the following companies in Turkey: Zorlu, Acorsoy, Bosen, Ataer, Cerkezkoy, and Nuh Cemento. The price provided for each of these units would fall within Alta Power's budgetary requirements.

49.     Based on GE and WattStock's pricing representations, Alta Power made a series of payments to secure these units.

50.     On May 23, 2019, Alta Power paid $57,250 to inspect and test the Turkish units GE and WattStock represented satisfied Alta Power's budgetary requirements.

51.     On May 30, 2019, Alta Power paid $200,000 to buy (at GE and WattStock's recommendation) another unit called the "Ethos Unit." That same day, Alta Power made a down payment towards the Nuh Cemento unit identified by GE and WattStock.

52.     On May 31, 2019, Alta Power paid a $15,000 "escrow fee" related to the acquisition of the recommended units.

53.     On June 13, 2019, Alta Power made a $417,000 down payment on the Acarsoy unit identified by GE and WattStock.

54.     On July 2, 2019, Alta Power paid $300,000 as a down payment towards the Bosen unit identified by GE and WattStock.

55.     On July 24, 2019, Alta Power paid $50,000 to extend its option to buy the Acarsoy unit identified by GE and WattStock.

56.     On August 2, 2019, Alta Power paid another $50,000 to obtain another extension of its option to purchase the Acarsoy unit identified by GE and WattStock.

57.     On August 8, 2019, Alta Power paid $112,500 to extend its options to buy the Acarsoy and Nuh Cemento units identified by GE and WattStock.

58.     On October 1, 2019, Alta Power paid $100,000 to secure an extension of the Bosen unit identified by GE and WattStock.

59.     Both GE and WattStock encouraged Alta Power to make payments even though they knew that the units they had identified did not actually satisfy Alta Power's budgetary requirements because they were burdened by liabilities GE and WattStock did not fully disclose to Alta Power, and even though GE and WattStock knew their representations about the GE-WattStock relationship were false.

60.     For example, GE and WattStock knew that the Nuh Cemento unit was burdened by a Long-Term Service Agreement ("LTSA") between GE and Nuh Cemento that required Nuh Cemento to pay GE millions of dollars in the event that Nuh Cemento were to sell its unit to Alta Power. GE also understood that unless it agreed to waive its contractual entitlement to these termination fees from Nuh Cemento, the termination fees could and almost certainly would impact the total cost of these units to Alta Power, and that unless it agreed not to collect the termination fees from Nuh Cemento, the cost of the Nuh Cemento units to Alta Power would exceed $10 million per unit. GE and WattStock were aware of the termination fees before suggesting the Nuh Cemento units be targeted for acquisition. GE and WattStock knew adding the termination fees would make the prices of those units higher than Alta Power's project budget.

61.     Along the same lines, GE failed to disclose that the Acarsoy unit was also burdened with an LTSA with a termination fee that GE knew would, unless waived, bring the cost of acquiring and refurbishing the Acarsoy unit to Alta to more than $10 million.

62.     The deception took a slightly different form with regard to the Ethos unit. In May 2019, GE and WattStock encouraged Alta Power to buy a "package"—essentially, the housing for an aeroderivative gas turbine—from a company called EthosEnergy. In so doing, GE and WattStock represented that Alta Power could obtain a gas turbine engine from the GE lease pool to marry with the EthosEnergy package and claimed a similar housing was available in Panama and could also easily be married with a lease

pool engine, and also promised that these leased units with the purchased housings would lead to a significantly lower price for Alta Power.

63.     Unfortunately, GE and WattStock did not disclose that the Ethos unit was dilapidated and was only suggested as a possibility so that GE and WattStock could increase their revenue stream for providing repairs. Furthermore, several months later when Alta Power inquired about the possibility of cost savings using the promised lease pool engines, WattStock and GE informed Alta Power that "that program was no longer being offered."

64.     Finally, GE and WattStock encouraged Alta Power to buy the Bosen unit, but did not disclose that the Bosen unit contained parts manufactured by one of GE's competitors (Chromalloy), or that GE and WattStock would not refurbish or warrant the unit unless Alta Power paid to have *all* of the Chromalloy parts replaced with brand new GE parts first. At the time it made these recommendations, GE knew this and knew these repairs would take the cost of the Bosen unit beyond Alta Power's budgetary requirements. To make matters worse, GE and WattStock also encouraged Alta Power to pay $100,000 to extend its option to buy this unit. Alta Power obliged, relying on all of GE and WattStock's aforementioned representations, but WattStock simply pocketed this deposit.

**F.     GE dupes Alta Power into paying it $1.5 million.**

65.     Notwithstanding all of the problems above, GE (through Lance Herrington and Alex Babu) and WattStock (through Jay Manning and Pete Watson) continued to insist that they could deliver the promised units for at or below $10 million per

refurbished unit. As a result, Alta Power executed a Limited Notice to Proceed Proposal ("LNTP") with WattStock on December 23, 2019. The LNTP called for WattStock to acquire (on behalf of Alta Power) and for GE to refurbish and deliver two units. The total amount of the LNTP was almost $20 million. This included the "not to exceed price" of $6.5 million for WattStock to buy the units from Nuh Cemento that GE and WattStock told Alta Power could buy the units, with the balance for transportation, refurbishment, and installation of the units. This price included GE and WattStock's profit margin for the project.

66.     GE and WattStock represented to Alta Power that GE needed to be paid $1,500,000 to secure the purchase of long-lead hardware, start engineering activities and deliver preliminary drawings related to a potential TRUEpackageTM project. The $1,500,000 was divided into two payments of $750,000.

67.     Relying on GE and WattStock's representations, Alta Power paid $750,000 on December 24, 2019 and paid another $750,000 on January 13, 2020.

68.     In February 2020, Alta Power was informed for the first time that the owner of the two Nuh Cemento units would only sell the two units for the agreed not to exceed price of $6.5 million plus the cancellation of GE's LTSA termination fee of over $1.4 million. Despite its promises to Alta Power that it could and would ensure that Alta Power could obtain the required units at the necessary prices, GE declined to waive its right to collect its termination fees from Nuh Cemento to ensure that Alta Power could acquire the units consistent with GE's representations. Instead, GE attempted to extort Alta Power by offering to forgo the termination fees if Alta Power executed an oppressive

ALTA POWER LLC'S FIRST AMENDED COMPLAINT AGAINST GE - PAGE 18

Long Term Service Agreement in which it promised to pay GE outrageous sums to service the units GE had been promising for so long to provide for at or less than $10 million per unit.

69. The effect of the cancellation fee materially increased project costs above the previous budget and made it economically impossible for Alta Power to move forward with the acquisition of this hardware.

70. For the units being considered (as with the Bosen unit), the significant liabilities were not disclosed until *after* Alta Power made the final payment to GE under the LNTP. For each, GE chose not to disclose that the units were burdened by these fees (or that the fees could materially impact the price of the units to Alta Power) and refused to waive the termination fees even though doing so was inconsistent with GE and WattStock's promises and duties to Alta Power.

71. Alta Power would not have made *any* of the payments outlined above if GE and WattStock had disclosed the true cost of these units or the true nature of their relationship.

72. Indeed, if GE had been honest about the pricing and availability of units and its relationship with WattStock, Alta Power never would have entered into the Master Agreement (or any other agreement) with WattStock, nor would it have wired WattStock a single dollar. Instead, it would have accepted ProEnergy's August 2018 offer.

73. But for GE and WattStock's false representation that they could make up to nine GE TRUEPackages (e.g., a fully refurbished LM6000 backed by a GE warranty) available for purchase to Alta Power for $10 million or less per TRUEPackage, Alta Power

would not have signed the Master Agreement (or any other Agreement with WattStock) or wired a single dollar to WattStock. Instead, Alta Power would have accepted ProEnergy's August 2018 proposal.

**G.    By the time GE and WattStock's representations begin to crumble, Alta Power had lost its place in the market.**

74.    In the spring of 2020 WattStock informed Alta Power it was having financial issues. WattStock asked Alta Power to either provide a loan or acquire WattStock.

75.    Alta Power did not want to buy WattStock. Instead, it wanted the TRUEPackages™ GE and WattStock had promised to deliver for at or less than $10 million per fully refurbished LM6000. To that end, in July 2020, Alta Power contacted GE and proposed that Alta Power pay GE directly to deliver the TRUEPackages™. On August 5, 2020, GE's James Canon wrote back to Alta Power and refused because "delivering parts and services to Alta instead of WattStock would be considered a material breach [of GE's contract." Canon then stated that GE "is represented by GE Legal Counsel; therefore, Alta's Litigation Attorney's should not contact our business's sales & operations teams directly[.]"

76.    Internally, though, GE understood it had a problem. In an August 10, 2020 internal email, GE's Jim Canon commented that "it is like when your buddy [WattStock] borrows your car and has a wreck? Whose insurance gets the claim? He gets a ticket, but you are responsible for the damage…"

APP.392

## H.  GE and WattStock's acts and omissions caused Alta Power to lose tens of millions of dollars of profit.

77.     But for the representations, acts, and omissions outlined above, Alta Power would have contracted with ProEnergy, not WattStock, and would have made many millions of profits providing much needed capacity to the Texas energy grid. The scope of those profits depends on how many units Alta Power would have gotten online and when those units were plugged into the grid, but Alta Power will ultimately prove that GE and WattStock's acts and omissions caused Alta Power to lose up to (and potentially greater than) $320 million in profit.[4]

## V.     CAUSES OF ACTION

### Count I: VICARIOUS LIABILITY

78.     Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

79.     GE is vicariously liable for WattStock's tortious conduct, including for the damages caused by WattStock's (1) fraud; (2) fraudulent inducement; (3) negligent misrepresentation; (4) civil conspiracy; and (5) tortious interference with prospective contractual relations.

80.     GE represented to Alta Power WattStock was its "partner"; that GE and WattStock "worked hand in hand to provide the TRUEPackage™ program they created

---

[4]      The profits Alta Power would have made serving the market as described in its Second Amended Counterclaim. These profits range depending on the sites and configuration. Under a three-site, nine-unit configuration, Alta Power estimates it would have generated $140,000,000 to $320,000,000 in profits. Under a one-site, two-unit confirmation, Alta Power estimates it would have generated between $10,000,000 and $50,000,000 in profits. A one-site, three-unit configuration would have been within these two ranges.

together; and that WattStock acted as GE's authorized service provider for the sale of GE TRUEPackages™.

81.     Alta Power justifiably relied on these representations by GE and WattStock in agreeing to the Master Agreement and the LNTP.

82.     In fact, without the representations, Alta Power would have never entered any contracts with WattStock or paid WattStock any money.

83.     Accordingly, an ostensible agency/joint enterprise existed between WattStock and GE, particularly given that the factual details of GE and WattStock's financial relationship were within their exclusive possession at all points relevant to this lawsuit.

84.     As a result, GE is estopped from denying liability for WattStock's breaches and torts, including, but not limited to, WattStock's liability for (1) fraud; (2) fraudulent inducement; (3) negligent misrepresentation; (4) civil conspiracy; or (5) tortious interference with prospective contractual relations.

85.     Alternatively, GE and WattStock engaged in a joint enterprise for which joint and several liability exists. GE and WattStock entered into an express or implied agreement, for a common purpose, with a community of pecuniary interest in that purpose, and with equal right to voice direction of the enterprise giving an equal right of control.

## COUNT II: UNJUST ENRICHMENT (AGAINST GE)

86.     Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

87.     GE has been unjustly enriched in the amount of $1.5 million to the detriment of Alta Power.

88.     Alta Power demands restitution of all amounts GE has been justly enriched.

## COUNT III: FRAUD

89.     Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

90.     GE made numerous material misrepresentations to Alta Power, including but not limited to (1) misrepresenting the nature of its relationship with WattStock; (2) falsely represented that it could and/or would make up to nine GE TRUEPackages™ available for Alta Power to buy for at or below $10 million per GE TRUEPackage™; (3) misrepresenting the true pricing and availability of TRUEPackage™ units; (4) falsely holding itself out as the lowest cost, most financeable solution in the marketplace; (5) falsely representing that GE would "stand behind" and/or "fully wrap" WattStock's work related to the delivery of the GE TRUEPackages™.

91.     GE representations and omissions were material and false.

92.     GE knew these representations and omissions were false (or created a false impression) when it made them, or at the very least, it made these representations recklessly and without knowledge of their truth.

93.     These representations and omissions were made with the intent that Alta Power act on them.

94.     Alta Power detrimentally relied on the representations outlined above.

ALTA POWER LLC'S FIRST AMENDED COMPLAINT AGAINST GE - PAGE 23

95.     GE's misrepresentations proximately caused Alta Power more than $100 million in damages.

## COUNT IV: FRAUDULENT INDUCEMENT

96.     Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

97.     GE fraudulently induced Alta Power into executing the Master Agreement and LNTP by making numerous material misrepresentations to Alta Power. GE (1) misrepresented the nature of its relationship with WattStock; (2) falsely represented that it could and/or would make up to nine GE TRUEPackages™ available for Alta Power to buy for at or below $10 million per GE TRUEPackage™; (3) misrepresented the pricing and availability of units; (4) falsely held itself out as the lowest cost, most financeable solution in the marketplace; and (5) falsely represented that GE would "stand behind" and/or "fully wrap" WattStock's work related to the delivery of the GE TRUEPackages™.

98.     GE representations and omissions were material and false.

99.     GE knew these representations and omissions were false (or created a false impression) when it made them, or at the very least, it made these representations recklessly and without knowledge of their truth.

100.    These representations and omissions were made with the intent that Alta Power act on them.

101.    Alta Power detrimentally relied on the representations outlined above by agreeing to the Master Agreement and/or the LNTP with WattStock.

102.    GE's misrepresentations proximately caused Alta Power more than $100 million in damages.

## COUNT V: NEGLIGENT MISREPRESENTATION

103.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

104.    Alternatively, each fraudulent misrepresentation made by GE was made negligently since GE did not exercise reasonable care or competence in obtaining or communicating the information.

105.    Alta Power spent at least $10 million wasted dollars based on GE and WattStock's negligent misrepresentations and has lost more than $100 million in profits.

106.    Had GE and WattStock not negligently misrepresented the true facts, Alta Power would have been able to successfully serve the niche market and has lost more than $100 million as a result of GE and WattStock's fraudulent acts.

## COUNT VI: CIVIL CONSPIRACY

107.    Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

108.    GE and WattStock conspired to accomplish an object or course of action, namely, to defraud Alta Power and/or tortiously interfere with Alta Power's prospective contractual relations with ProEnergy.

109.    GE and WattStock agreed to and did in fact accomplish these objectives through the commission of numerous unlawful overt acts, including, but not limited to, by: (1) misrepresenting the nature of its relationship with WattStock; (2) falsely

represented that it could and/or would make up to nine GE TRUEPackages™ available for Alta Power to buy for at or below $10 million per GE TRUEPackage™; (3) misrepresenting the true pricing and availability of TRUEPackage™ units; (4) falsely holding itself out as the lowest cost, most financeable solution in the marketplace; (5) falsely representing that GE would "stand behind" and/or "fully wrap" WattStock's work related to the delivery of the GE TRUEPackages™.

110.    Alta Power relied on these representations and omissions to its detriment.

111.    Alta Power was damaged as a result of GE and WattStock's unlawful acts.

112.    Both GE and WattStock knew these representations and omissions were false (or created a false impression) when they made them, or at the very least, these representations were made recklessly and without knowledge of their truth.

113.    These representations and omissions were made with the intent that Alta Power act on them.

114.    Alta Power relied on GE and WattStock's representations about their relationship, and these representations proximately caused Alta Power millions of dollars in damages.

### COUNT VII: TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

115.    Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

116.    GE and WattStock knew there was a reasonable probability that Alta Power would have entered into a contractual relationship with ProEnergy.

117.    To prevent that from happening, GE made numerous fraudulent and/or false/ and or negligent material misrepresentations to Alta Power, including but not limited to (1) misrepresenting the nature of its relationship with WattStock; (2) falsely represented that it could and/or would make up to nine GE TRUEPackages™ available for Alta Power to purchase for at or below $10 million per GE TRUEPackage™; (3) misrepresenting the true pricing and availability of TRUEPackage™ units; (4) falsely holding itself out as the lowest cost, most financeable solution in the marketplace; (5) falsely representing that GE would "stand behind" and/or "fully wrap" WattStock's work related to the delivery of the GE TRUEPackages™.

118.    GE undertook all of the acts described above with the conscious desire to prevent Alta Power from contracting with Pro Energy.

119.    GE's acts and omissions caused actual harm and damage to Alta Power.

120.    GE's acts and omissions caused Alta Power to lose more than one hundred million dollars in profit.

## VI.    JURY DEMAND

**121.**    Alta Power requests trial by jury on all contested issues of fact. The requisite jury fee has been paid.

## VII.    PRAYER

ACCORDINGLY, Alta Power prays that GE be cited to appear and answer and that upon a final trial of this matter, the Court enter a final judgment against GE awarding Alta Power the following relief:

a) An award of the full amount of actual damages incurred by Alta Power and caused by the acts and omissions of GE and WattStock;

b) An award of equitable damages, as requested above;

c) An award of exemplary damages;

d) Reasonable and necessary attorneys' fees;

e) Pre-judgment and post-judgment interest at the maximum rate allowed by law;

f) Cost of court; and

g) Such other and further relief, general or special, at law or in equity, to which Alta Power may show itself to be justly entitled.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By: /s/ Jeb Golinkin
    Michael Cancienne
    State Bar No. 24055256
    Joseph W. ("Jeb") Golinkin II
    State Bar No. 24087596
    1980 Post Oak Blvd., Ste. 2300
    Houston, Texas 77056
    713.955.4028
    713.955.9644 Facsimile
    mcancienne@jlcfirm.com
    jgolinkin@jlcfirm.com

    BAKER BOTTS L.L.P.
    Jessica B. Pulliam
    State Bar. No. 24037309
    John Lawrence
    State Bar No. 24055825
    2001 Ross Avenue, Suite 900
    Dallas, TX 75201-2980
    Telephone: 214.953.6500
    jessica.pulliam@bakerbotts.com
    john.lawrence@bakerbotts.com

**ATTORNEYS FOR ALTA POWER LLC**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the above pleading was served on all counsel of record through the Court's electronic filing service on the 14th day of May, 2024.

By:     /s/ Jeb Golinkin
        Jeb Golinkin

# EXHIBIT DD

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| *WATTSTOCK LLC,* | |
| *Plaintiff/Counter Defendant,* | |
| *v.* | |
| ALTA POWER LLC, | |
| *Defendant/Counter* Plaintiff*/ Counter-Defendant*, | Case No. 3:~~21~~23-CV-~~03183~~ 0270-X |
| v. | |
| GENERAL ELECTRIC INTERNATIONAL INC., d/b/a GE POWER SERVICES, | |
| *Third-Party* Defendant*./ Counter-Plaintiff* | |

### ALTA POWER LLC'S FIRST AMENDED COMPLAINT AGAINST GENERAL ELECTRIC INTERNATIONAL, INC.

Alta Power LLC ("Alta Power") files this First Amended Complaint against General Electric International, Inc., d/b/a GE Power Services ("GE") and would respectfully show as follows:

### I.     SUMMARY OF ACTION

1.     This case is necessitated by repeated misrepresentations made by GE and WattStock to Alta Power concerning their relationship, capabilities, and the GE TRUEPackage™ program to entice Alta Power to purchase refurbished LM6000

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (ncluded Filed 05/04/24t)    Page 409 of 453    PageID 815
Compared Over Alta's May 10, 2024 Proposed Complaint

aeroderivative turbines from GE/ WattStock.

~~1~~2.    Alta Power was created to develop natural gas-fired power assets that would provide critical additional power capacity to the Texas energy grid when the grid is experiencing periods of high demand. As part of this, Alta Power intended to ~~purchase~~buy and place into service used aeroderivative gas turbines (essentially jet engines on skids powering a generator) that can quickly turn on and off to meet instances where power demand exceeds available power supply. During these periods of excess demand, power prices are highest.

~~2~~3.    ~~GE was eager to participate in the used gas turbine market, a segment in which it historically had no presence. GE, however, did not want to be involved in the work of actually acquiring and selling the used turbines. Instead, GE engaged~~To implement its business plan, Alta Power sought to buy fully refurbished GE LM6000 aeroderivative turbines. GE and WattStock LLC ("WattStock") — which was started by former GE employees ~~who started a new company named WattStock~~, with offices within GE's own office space, to act as ~~its~~GE's exclusive sales force and point of entry into the used gas turbine market~~.~~

— 3.    ~~Starting in 2018, GE and WattStock~~ persuaded Alta Power to ~~purchase used refurbished GE aeroderivative gas turbines, marketing the units as both more reliable and cost competitive, similar to the "Certified Pre-Owned Mercedes Benz®" program.  Critically, Alta Power relied on GE's and WattStock's representations regarding~~buy these units from them instead of GE's biggest competitor by misleading

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38   Filed 06/04/24    Page 410 of 453    PageID 816
Compared Over Alta's May 10, 2024 Proposed Complaint

Alta Power about the nature of ~~the GE's~~GE and Wattstock's relationship ~~with WattStock, the total acquisition cost of used~~, the pricing and availability of the required units, and the benefits of ~~GE's Aero TRUEPackage™ program.  Ultimately, Alta Power agreed to~~use GE ~~TRUEPackages™~~ instead of a similar refurbished GE gas turbine product offered by one of GE's competitors.~~their products.

~~4.      GE's and WattStock's representations were false and have caused Alta Power to miss opportunities in the marketplace.  Instead of the benefits claimed by GE and WattStock, Alta Power put money into potential units that were never going to fit their budgetary requirements because the units were either (1) burdened by undisclosed liabilities related to GE's "Long Term Services Agreements," (2) were prohibitively expensive for refurbishment by GE, or (3) were not available as marketed. Simply put, the acquisition costs and the benefits lauded by GE and WattStock were false.  Worse still, GE ultimately prevented Alta Power from acquiring the promised units by refusing to waive termination fees attached to the prospective units that they never disclosed in the first place.~~

5~~4~~.      But for GE and WattStock's unlawful conduct, Alta Power would have obtained ~~three or more LM6000s~~the required units and would have made many millions in profits. Instead, GE and WattStock misappropriated millions of dollars of Alta Power's money.

## II.      PARTIES

6~~5~~.      Alta Power is the Defendant in this case originally filed by WattStock, the

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38(as-filed 05/04/24)    Page 411 of 453    PageID 817
Compared Over Alta's May 10, 2024 Proposed Complaint

original Plaintiff and Counter-Defendant.  ~~Both~~ Alta Power ~~and WattStock have~~has already appeared.

7~~6~~. Third-Party Defendant GE is a company incorporated under the laws of Delaware doing business in Texas ~~and can be served with Citation through its registered agent in Texas, CT Corporation System, 1999 Bryan St., Ste 900, Dallas, TX 75201-3136.~~. GE has already appeared.

### III.    VENUE AND JURISDICTION

8~~7~~. Jurisdiction in this Court is proper under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000. This Court also has core jurisdiction under 28 U.S.C. §§ 157 and 1334.

9~~8~~. This Court has personal jurisdiction over GE because a substantial amount of the acts giving rise to Alta Power's causes of action arose in Texas.

10~~9~~. Venue in this Court is proper under 28 U.S.C. §§ 1408, 1409, and 1452.

### IV.    FACTUAL ALLEGATIONS

**A.    Alta Power's business.**

1~~1~~10. Alta Power was established to provide additional capacity to an overloaded energy grid in a creative and profitable manner.

1~~2~~11. The market for power in Texas has evolved from traditional gas and coal fired power plants to more renewable sources like wind and solar. In 2019, renewable energy sources accounted for about 11% of total U.S. energy consumption and about 17% of electricity generation. Texas now meets approximately 30% of its sizeable

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (as filed 06/04/24)    Page 412 of 453    PageID 818
Compared Over Alta's May 10, 2024 Proposed Complaint

electricity demand with wind power and approximately another 15% with solar.

13~~12~~.   As electrical providers move towards renewable power production, there are times when the energy grid has more demand than supply. Aeroderivative gas turbine "peaker plants" have become imperative to meet this imbalance since these plants turn on quickly — in less than 10 minutes.

14~~13~~.   Pricing for this "peak demand" power is often at a premium and can be sold under long-term contracts with investment grade counterparties. Alta Power determined that peaker plants could help meet this demand, profitably for Alta Power if Alta Power could acquire aeroderivative gas turbines at a competitive price and locate them appropriately.

15~~14~~.   Because of the high cost of new aeroderivative gas turbines, Alta Power's strategy relied on acquiring used aeroderivative gas turbines, which was the only way to make the projects work within the required budget.

16~~15~~.   To successfully develop a peaker plant, Alta Power needed to (1) identify areas in the grid where a peaker plant fits (considering gas supply, offtake pricing, and interconnection feasibility); (2) navigate the state and federal regulatory waters of the electrical power market; and (3) obtain used aeroderivative gas turbines that can be purchased and refurbished within budget.

17~~16~~.   This complexity, along with ~~relatively~~ high entry costs, means that there were only a few companies competing with Alta Power. ~~However,~~But given the limited size of the market, being a first mover was critical.

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 Filed 06/04/24    Page 413 of 453    PageID 819
Compared Over Alta's May 10, 2024 Proposed Complaint

1817.  By April 2018, Alta Power had identified several potential project sites through an extensive vetting process based on prevailing market conditions. Through this work, Alta Power earned a head start on its competitors and found itself with a brief window during which it would be the first mover in this niche market.

19.    At this point Alta Power turned to identifying and purchasing surplus aeroderivative gas turbines units.

**B.    GE Aero TRUEPackage™.**

2018.  GE is one of the limited suppliers of aeroderivative gas turbines.

Traditionally, GE makes money selling new turbines, and (often) by servicing these turbines. However, by 21.    GE historically has not had a presence in the sale of used aeroderivative gas turbines but recognized a need to be present in this market at some point prior to 2018.  As such, GE partnered with WattStock, a group of former GE executives, agreed to work together to gain entry into this market.  As part of this agreement, GE authorized and allowed WattStock to use its trademarks and other intellectual property to apparently create the impression that WattStock and GE were partners selling a GE product. s.

22.    By early 2018, sales of GE's new gas-powered turbines had fallen off a cliff because "decentralized renewable resources increase cost-competitive pressures." However, But the increased reliance on renewables and wind energy had created a gap in the energy markets that companies (like Alta Power could use) endeavored to exploit by creating peaker power plants using refurbished LM6000s to very profitably exploit.

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X   Document 38 (Filed 06/04/24)   Page 414 of 453   PageID 820
Compared Over Alta's May 10, 2024 Proposed Complaint

GE's competitors.

, like19.     In 2016 and 2017, a GE competitor called ProEnergy, had recognized the potential marketneed for refurbished LM6000 assets and had begun buying up andaeroderivative turbines and began buying, refurbishing previously owned, and reselling used GE LM6000 units in earnest. By doing this, ProEnergy frequently also won contracts to service these units. In so doing, ProEnergy and others were also increasingly winning contracts to service the GE units they were refurbishing and resellingbecame a direct competitor with GE in the market for servicing aeroderivative turbines.

23.     Fearing it was being left behind, GE launched its Aero TRUEPackage™ product line, which GE described as the "only authorized OEM certified pre-owned package offering in the industry." According to GE's marketing materials, GE's TRUEPackage™ promised (1) OEM warranty and performance guarantees; (2) delivery in six months or less; (3) equipment selection and refurbishment plan driver by installed cost; and (4) OEM brand certification can improve financing options and insurance premiums.

24.     GE intended for, and held out WattStock to be, its *exclusive partner* and representative in the sale of TRUEPackages™which both companies jointly marketed as "[t]he only authorized OEM [original equipment manufacturer] certified preowned package offering in the industry."[1]

---

[1] https://www.ge.com/power/services/aeroderivative-gas-turbines/repowering-solutions.

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 Filed 05/04/24    Page 415 of 453    PageID 821
Compared Over Alta's May 10, 2024 Proposed Complaint

25.    GE and WattStock entered in a Memorandum of Understanding ("MOU") on June 26, 2018 that "outlines" their relationship.  The MOU establishes that GE is in complete control, especially in the context of transactions related to aeroderivative gas turbines originally manufactured by GE.

26.    Consistent with their relationship, GE and WattStock held themselves out publicly and privately as "partners" both orally and in writing.  GE described the TRUEPackage™ "process" as follows:



27.    20.    In early 2018, GE sought to combat ProEnergy's increasing dominance of this marketplace by launching something it called the GE Aero TRUEPackage", which it marketed as its own product. Consistent with this, GE applied for and owns a trademark for the word "TRUEPackage™" in the Construction and Repair Services category.  In its trademark application, GE informed the United States Patent and Trademark Office that "TRUEPackage™" refers to GE's practice of "refurbishing and upgrading of gas turbines power plants." GE attached a draft of the

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (t 38) Filed 06/04/24    Page 416 of 453    PageID 822
Compared Over Alta's May 10, 2024 Proposed Complaint

LNTP that it would eventually execute related to the sale of TRUEPackages™ to Alta Power with its trademark application.

21.    However, GE did not undertake the refurbishment of used aeroderivative turbines alone. Instead, it partnered with a company called WattStock to acquire, refurbish, and resell used GE LM6000 aeroderivative turbines. WattStock was founded by former employees of GE, and was and remains co-located inside GE's Jacintoport facility in Houston, Texas.

28.    Since at least October of 2018, GE strictly22.    GE, however, did not allow WattStock to hold the refurbished products out as its own product. Instead, GE required WattStock to refer only to "GE Aero TRUEPackageTRUEPackage™ in marketing materials" related to the refurbishment and resale of used LM6000s because "TRUEpackage, as a GE executive explained to WattStock in early 2018, "TRUEPackage is the GE brand….not Certified Turbine Power." and GE doesit did not want to "confuse the market with different names."  Thus, GE very deliberately created the public perception that TRUEPackage is a GE product, and that all TRUEPackages™ are GE products backed by GE, not WattStock.

**C.    GE dire6tspersuades Alta Power to WattStockreject ProEnergy and instead choose TRUEPackage'.**

23.    In early 2018, Alta Power turned to procuring the turbines that would power its peaker plants. Alta Power determined that the best way to achieve its business goals was to acquire fully refurbished GE LM6000 turbines. The question then became whether to buy the needed refurbished LM6000s from the market leader,

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38   Filed 05/04/24    Page 417 of 453    PageID 823
Compared Over Alta's May 10, 2024 Proposed Complaint

ProEnergy, or one of its competitors like GE/WattStock.

24.    Around the same time, Alta Power learned of GE's TRUEPackage"
offering. GE's marketing materials[1] promise a variety of advantages over competitors,
including, but not limited to, a "one year OEM warranty and equipment performance
guarantees," "delivery in eight months or less;" and "equipment selection and
refurbishment plan driven by installed cost." GE also touted financing benefits of its
product, claiming that its "OEM certification can improve financing options and
insurance premiums." GE also claimed that GE's TRUEpackage™ was unique because
GE — the turbines' original manufacturer — was the only company that could provide
an end-to-end warranty and performance guarantee at a fixed price. Finally, GE
represented that WattStock had access to its proprietary database that WattStock and
GE would jointly use to identify available units.

25.    Based on these representations, Alta Power began discussions with GE
and its partner WattStock about the possibility of buying the needed refurbished
LM6000s from them instead of from GE's competitor, ProEnergy.

29.    In 2018, Alta Power began to determine which used aeroderivative gas
turbines would best suit its needs.  Availability and total acquisition costs were key
drivers in its decision on which aeroderivative gas turbines to select.  Because the used
aeroderivative gas turbines must be refurbished, acquisition costs necessarily include

---

[1] Including GE's own website:  https://www.gevernova.com/ gas-power/ services/ gas-turbines/ aeroderivative/repowering-solutions.

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38  (Filed 06/04/24)    Page 418 of 453    PageID 824
Compared Over Alta's May 10, 2024 Proposed Complaint

the costs associated with purchasing the units, the costs of refurbishment, and the costs associated with placing the unit at the location and into service.

30.    After sharing these considerations with GE and WattStock, and after meetings with GE, WattStock and others, Alta Power determined that used GE LM6000 aeroderivative turbine packages were best suited for Alta Power's strategy of tapping into the niche peaker plant market in Texas based on assurances from GE and WattStock.

31.    GE/WattStock were not the only companies that marketed used and refurbished GE LM6000s. Indeed, Alta Power met with several GE "certified" companies that refurbished used aeroderivative gas turbines. None, however, offered a fully OEM certified and warranted end-to-end product like the TRUEpackage™, which GE/WattStock marketed as their "exclusive" service offering of being the "only authorized OEM certified preowned package offering in the industry."

32.    Alta Power had several joint meetings 26.    During its discussions with both GE and WattStock personnel mainly at GE's Jacinto port facility where WattStock is co-located. During these meetings, Alta Power disclosed to GE/WattStock the detailed budgetary requirements of Alta Power's business model., Alta Power repeatedly emphasized the cost sensitivity of its projects; that is, the cost of the gas turbine units cannot could not exceed a certain price point — around $10 million per fully refurbished LM6000 — if the project is were to remain within budget and financeable. In response, GE and WattStock repeatedly promised and reassured Alta

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38    Filed 06/04/24    Page 419 of 453    PageID 825
Compared Over Alta's May 10, 2024 Proposed Complaint

that GE could provide obtain the required refurbished units for the prices Alta Power needed.

reiterated all of the points made by their marketing materials, including that GE and WattStock are "partners" and that GE and WattStock would deliver the required units in eight months or less." 33. GE/ and WattStock also persuadedassured Alta Power that its exclusive TRUEpackageTM OEM warranty was superior to anything offered in the market because GE would provide an end-to-end package warranty covering both the aeroderivative gas turbine and the electrical generation components. GE/WattStock further stated that other competitors could only warrant a portion of the package.if Alta Power agreed to acquire GE TRUEPackages™ by contracting with WattStock, they could and would make up to nine GE TRUEPackages™ available for purchase by Alta Power for at or below $10 million per fully refurbished LM6000.

27.    Alta Power attended many in person meetings with GE where its representatives, including, but not limited to, Lance Herrington, Alex Babu, and James Canon made numerous false, misleading representations, including, but not limited to, the following:  (1) misrepresenting the nature of its relationship with WattStock; (2) falsely represented that it could and/or would make up to nine GE TRUEPackages™ available for Alta Power to buy for at or below $10 million per GE TRUEPackage"; (3) misrepresenting the true pricing and availability of TRUEPackage' units; (4) falsely holding itself out as the lowest cost, most financeable solution in the marketplace; (5) falsely representing that GE would "stand behind" and/or "fully wrap" WattStock's

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (tsaided iled 06/04/24t)    Page 420 of 453    PageID 826
Compared Over Alta's May 10, 2024 Proposed Complaint

work related to the delivery of the GE TRUEPackages™.

28. For example, on or about June 6, 2018, Alta Power (represented by Matthew Laterza and Travis West) met with GE Global Sales and & Sales Operations Leader Lance Herrington (who created and was in charge of GE's TRUEPackage' offering) along with other representatives of GE and WattStock for more than three hours at GE's Jacintoport facility (where WattStock is co-located).

34. During these meetings, GE and WattStock consistenyl described themselves as "partners." GE made it clear that the only way Alta Power could obtain the TRUEpackageTM equipment certification and warranty was by working with the GE and WattStock partnership.

35. Specifically, GE refused to provide equipment certifications and warranties without WattStock.

36. In addition to the pricing and warranties, GE and WattStock knew time was of the essence for Alta Power, as competitors were also attempting to enter the market. GE made it clear that delivery at the agreed upon pricing could occur within the time frame required by Alta Power's plans if Alta Power used the GE/WattStock TRUEpackageTM program.29. During this meeting, Alta Power briefed GE and WattStock at length on the detailed technical and budgetary requirements of Alta Power's business model and also disclosed its timing requirements, e.g., that it would need GE and WattStock to deliver the units consistent with the representations in GE's marketing materials (8 months). In response, GE (specifically, Lance Herrington)

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (Filed 06/04/24)    Page 421 of 453    PageID 827
Compared Over Alta's May 10, 2024 Proposed Complaint

reiterated the supposed benefits of its "partnership" with WattStock and assured Alta Power that if it chose TruePackage™ instead of ProEnergy, GE could and would enable Alta Power to buy up to nine used GE LM6000s for at or below $10 million per used GE LM6000 unit and that they would (as represented in their marketing materials) deliver these fully refurbished TRUEPackages™ in "eight months or less" if Alta Power agreed to exclusively contract with WattStock to buy GE TRUEPackages™.

37.    GE/WattStock emphasized that (1) GE had a proprietary global database of used LM6000 units including the operational and maintenance history on each, and (2) only GE and WattStock had access to this "proprietary" database. This "proprietary" data was a key selling point for Alta Power.

38.    GE/WattStock represented that GE and WattStock could efficiently locate used units, generate a detailed refurbishment scope, and cost estimate and streamline the acquisition, refurbishment, and delivery process all within Alta Power's required budget.

30.    GE also represented that if Alta Power would reject ProEnergy in favor of its TRUEPackage™ offering, GE would "fully wrap" (or stand behind) WattStock's work and obligations to Alta Power related to the sale and refurbishment of the used LM6000s.

D.    WattStock and Alta Power enter into a "Master Agreement."31.    GE's internal correspondence confirms that GE understood the importance of Alta Power's pricing requirements. Indeed, the day after its first in-person meeting with Alta Power,

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38  Filed 05/04/24    Page 422 of 453    PageID 828
Compared Over Alta's May 10, 2024 Proposed Complaint

GE's Lance Herrington emailed GE's Senior Sales Manager in charge of the Southwest and explained that he believed Alta Power was interested in doing a deal with GE, but that "pricing into their pro forma which is basically based on experience with Pro-Energy will be key."

39. In32. On or about August of29, 2018, ProEnergy sent Alta Power a proposal for 3x LM6000 Turnkey EPCunder which ProEnergy offered to provide the necessary refurbished LM6000s to supply the necessary refurbished LM6000s for Alta Power's first peaker plant. ProEnergy's proposal satisfied Alta Power's technical, budgetary, and temporal requirements.  Alta Power made GE aware that it was considering ProEnergy's offer, and that it would accept it if GE could not meet Alta Power's pricing requirements.  GE knew this and badly wanted to ensure that Alta Power would not contract with ProEnergy.

40.  Through their discussions, GE and WattStock were keenly aware of the specific unit price requirements of Alta Power, and GE and WattStock assured Alta Power on multiple occasions that sufficient suitable units were available.  GE also repeatedly promised they33.  Along the same lines, on December 18, 2018, Alta Power returned to GE for another lengthy meeting at GE's Houston facility with GE's Lance Herrington and others. During this meeting, Herrington again reiterated GE's supposed partnership with WattStock and represented that if Alta Power rejected ProEnergy's contract and instead contracted with WattStock, GE could and would make sureenable Alta Power could obtain the required unitsto buy up to nine used GE

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (as filed 05/04/24)    Page 423 of 453    PageID 829
Compared Over Alta's May 10, 2024 Proposed Complaint

LM6000s for at or below $10 million per refurbished GE LM6000 if Alta Power agreed to purchase GE TRUEPackages™, rather than from one of GE's competitors like ProEnergyunit.

34.    GE's internal emails again confirm that GE understood that Alta Power's pricing requirements, and confirm that GE understood that unless it met these requirements, Alta Power would contract with ProEnergy. For example, internal notes from this meeting circulated internally by GE and WattStock the day after the meeting note Alta Power's "specific price targets that they need to hit" to move forward. Along the same lines, on December 20, 2018, GE's Herrington emailed his entire GE team and observed that GE can "win [Alta Power's project] from ProE" "if we can hit the price targets they are looking for."

41.    GE also represented that it would "fully wrap"—that is, guarantee—WattStock's performance related to the TRUEPackages™.  This caused Alta Power to believe that its involvement would insulate Alta Power from any concerns related to the financial viability of WattStock since GE is one of the largest companies in the world. GE also caused Alta Power to believe that WattStock had the financial resources to complete the necessary steps leading to GE's certification under the TRUEpackageTM OEM program.  Based on GE and WattStock's representations concerning their relationship, capabilities, including (1) the benefits of the GE TRUEpackage™ program, (2) GE's assertion that it would fully guarantee WattStock's work related to the GE TRUEPackage™ program, (3) the benefits from GE and WattStock "collaborating" as

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Compared Over Alta's May 10, 2024 Proposed Complaint

Case 3:23-cv-00270-X    Document 38  (1 of 30) Filed 06/04/24    Page 424 of 453    PageID 830

"partners;" (4) the ready availability of used units that met Alta Power's project budget; (5) the ability to timely close purchases and refurbish units; and (6) the "benefits" of the warranty with respect to the overall economics of the project, Alta Power agreed to move forward with GE/WattStock for the acquisition of used GE aeroderivative gas turbines to effectuate Alta Power's unique strategy.

42.    In order to purchase the TRUEPackages™, GE directed and commanded Alta Power to contract directly with WattStock.  More specifically, GE stated that in order to purchase a TRUEPackage™, Alta Power must contractually agree to allow WattStock (with GE standing behind it and guiding it) to negotiate the purchase price of the LM6000s for use in the TRUEPackage™ with the prior owner and acquire the unit in WattStock's name for an agreed not to exceed price.  GE/WattStock presented Alta Power with detailed total cost estimates for each unit showing that if each unit identified could be acquired at or below the "not to exceed price," then the fully refurbished unit could be delivered within Alta Power's budgetary requirements.

4335.   GE, WattStock, and Alta Power also agreed that in the event Alta Power paid any amounts prior to the units being acquired, those interim payments would be credited towards the purchase price Alta Power ultimately agreed to pay.  and WattStock jointly determined that Alta Power ought to enter into a "Master Agreement" with WattStock, with GE standing behind it. Consistent with this, WattStock and GE began pushing Alta Power to sign a so called "Master Agreement" with WattStock. This proposal contained an exclusivity provision that Alta Power

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38  Filed 06/04/24    Page 425 of 453    PageID 831
Compared Over Alta's May 10, 2024 Proposed Complaint

correctly observed "puts [Alta Power] out of business for twelve months" if GE and WattStock fail to deliver the promised units for at or less than $10 million per unit.

36.    On February 24, 2019, WattStock sent GE a copy of the "Master Agreement" [2] they wanted Alta Power to sign. Both WattStock and GE understood that if Alta Power signed the Master Agreement, Alta Power would not be able to buy refurbished LM6000s from ProEnergy, and certainly not in time obtain a first mover advantage.

37.    The next day, GE's Lance Herrington and Alex Babu took Alta Power's Matthew Laterza and Travis West to lunch at Frank's Americana in Houston. During that meeting, Herrington and Babu each reiterated each of the representations outlined above, including but not limited to (1) the nature of GE and WattStock's relationship ("partners"); (2) that GE and WattStock could and would satisfy Alta Power's pricing and timing requirements; and (3) that GE would "fully wrap" and stand behind WattStock's work if Alta Power agreed to exclusively contract to buy TRUEPackages™ by entering into an exclusive Master Agreement with its partner WattStock.

4438.    On February 27, 2019 WattStock and — just days after GE's lunch with Alta Power entered into — in reliance on the representations outlined above, Alta Power

---

[2] The Master Agreement generally provides that WattStock will locate suitable gas turbines for Alta, arrange inspections to evaluate their condition and refurbishment requirements, and negotiate the purchase price with the existing owners (with GE standing behind it). Despite its name, the Master Agreement is limited in scope, covering only the preliminary steps toward acquiring the turbines. The Master Agreement contemplated that the parties would enter subsequent "definitive" agreements that would also describe the scope, terms, and price for the purchase of any given turbine. One such agreement was the parties' December 2019 Limited Notice to Proceed.

executed a "Master Agreement." ~~confirming the negotiations concerning~~ [3] The Master Agreement outlined how WattStock would be reimbursed for out-of-pocket expenses and as part of a negotiated purchase price after WattStock purchased and refurbished the used units.

45. The Master Agreement ~~contains~~also contained an exclusivity and non-circumvention provision under which WattStock (and by extension, GE) agreed that neither WattStock nor GE would directly or indirectly cause another person to either attempt to or purchase a unit inspected on behalf of Alta Power (a service for which Alta Power paid). Article 6 of the Master Agreement likewise prohibited Alta Power from directly or indirectly purchasing or securing the exclusive right to buy any used LM6000 units disclosed by WattStock to Alta Power for a period of at least one year following the termination of the Master Agreement.

39. Given the narrow window that Alta Power had to exploit its "first mover" advantage in the peaker unit market, the Master Agreement made Alta Power dependent on GE and WattStock to follow through on their promises.

D.    Unbeknownst to Alta Power, GE lied about its relationship with WattStock.

40. Unbeknownst to Alta Power, GE and WattStock had lied about nearly everything of substance to prevent it from agreeing to do business with ProEnergy. For example, GE and WattStock repeatedly and consistently held themselves out as partners, and GE suggested that their partnership was the subject of a contract —"the

---

[3] Nothing in the Master Agreement contradicts any of GE's representations related to the pricing or availability of units or any of its other misrepresentations.

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38   (Included Filed 05/04/24)    Page 427 of 453    PageID 833
Compared Over Alta's May 10, 2024 Proposed Complaint

Memorandum of Understanding" — that provided that GE would stand behind WattStock's work related to Alta Power. But that was not accurate. GE's internal emails show that GE knew this, too. For example, on April 22, 2019, Lance Herrington wrote one of his colleagues about GE's relationship with WattStock and stated that "we do not currently have any signed agreement between [GE and WattStock]" related to the Alta Power project. The next day, Herrington's colleague responded with a series of questions about the nature of GE's relationship with WattStock going forward, observing that "the MOU that was signed has zero commitment on the GE part."

41.    As of August 25, 2020 — which is *after* all of the events giving rise to this case —GE's internal emails confirm that GE *still* did not have a formal contractual relationship with WattStock that outlines each "partner's" role in the marketing and sale of GE TRUEPackages™.

42.    Despite the above, GE and WattStock continued to hold themselves out as "partners." Indeed, on July 31, 2019, GE sent Alta Power a letter — on GE letterhead, signed by GE's Lance Herrington—to give Alta Power additional comfort on the GE-WattStock relationship and to address "how GE could respond in the event that WattStock becomes unable to meet its contractual obligations to Alta Power, LLC under agreements between WattStock and Alta Power for WattStock to supply a minimum of 9 refurbished LM6000 units." The letter states that "GE is willing to warranty WattStock's work on this project"; that "GE already conducts oversight of all aspects of WattStock's work"; and that GE "track[s] progress daily" of WattStock's work related to

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X   Document 38 (tsfiled 05/04/24) (text)   Page 428 of 453   PageID 834
Compared Over Alta's May 10, 2024 Proposed Complaint

the Alta Power projects. The letter also states that "should WattStock fail to meet its contractual obligations to Alta Power, GE would be in a position to assume responsibility to complete any outstanding work."

43.     GE's letter reinforced Alta Power's belief that GE and WattStock were partners, and Alta Power did not learn that these representations were false until after this litigation began.

44.     Had GE disclosed the truth about its relationship with WattStock, Alta Power would not have entered into the Master Agreement (or any other agreement) with WattStock, nor would it have wired WattStock a single dollar. Instead, it would have accepted ProEnergy's August 2018 offer.

**E.      Relying on GE and WattStock** ~~conceal termination fees, lie about their ability to provide the needed TRUEPackages for at or less than $10 million per TRUEPackage™~~**, Alta Power pays millions of dollars to acquire various used LM6000 units**.

45.     But GE and WattStock had not merely lied about the nature of their relationship. They also lied about the pricing and availability of used LM6000 units. As discussed, GE and WattStock repeatedly told Alta Power that if Alta Power executed the Master Agreement, they could make up to nine TRUEPackages™ available for purchase to Alta Power for at or below $10 million per unit. Unbeknownst to Alta Power, this was not true.

46.     In February 2019, WattStock Vice President Pete Watson travelled to Turkey to begin inspections and negotiations on used GE aeroderivative gas turbine units. This was done at Alta Power's expense ~~pursuant to the Master Agreement~~, and in

reliance on GE and WattStock's representations as described above.

47.    Several used GE aeroderivative units were available in Turkey because changes in Turkish governmental regulations made the units uneconomical in country. In March 2019, WattStockWattStock's Jay Manning and Pete Watson presented Alta Power price and purchase options for nine used GE units based in Turkey. These prices suggested that the prices of these units were at or below the $10 million per refurbished unit price that GE and WattStock promised Alta Power they would meet if Alta Power agreed to buy TRUEPackages™.

48.    What WattStock and GE did not tell Alta Power was that the presented prices of the units were not true prices.  All the units GE/WattStock persuaded Alta Power to spend substantial amounts of money on were burdened by significant hidden liabilities.  Many of the potential units were significantly more expensive than represented because GE had Long Term Service Agreements ("LTSA") carrying hefty termination fees with the prior owners seeking to sell the used LM6000 aeroderivative gas turbine units.  Units not burdened by LTSAs had other material undisclosed liabilities—all of which were driven by internal GE policies.

49.    These LTSAs generally required the prior owner pay GE millions of dollars to terminate.  GE/WattStock failed to disclose the fact that the units GE and WattStock encouraged and caused Alta Power to target were burdened by LTSA's and associated termination fees that would materially impact Alta Power's ability to purchase the units for at or below $10 million per unit.  In fact, the LTSA termination

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (Filed 06/04/24)    Page 430 of 453    PageID 836
Compared Over Alta's May 10, 2024 Proposed Complaint

fees impact on the price of the targeted units were not disclosed until after (1) the units were targeted, (2) a purchase agreement was executed between the owners and WattStock, and (3) Alta Power paid WattStock millions of dollars in down payments associated with these purchase agreements.

50.    It was not until almost nine months after Alta Power had paid the first down payment that Alta Power learned that the LTSA termination fees could impact Alta Power's ability to acquire the targeted units for at or below Alta Power's budgetary requirements.  In February 2020, one of the sellers of two units, a Turkish company called Nuh Cemento, began demanding reimbursement for the LTSA termination fees to be paid GE in addition to the agreed upon purchase price.  GE ultimately refused to waive the LTSA termination fee unless Alta Power entered into a multi-million dollar service agreement with GE.  As a result, the project was burdened by expenses materially above Alta Power's project budgets.

48.    On April 17, 2019, WattStock's representative (with GE's knowledge and consent) sent Alta Power letters of intent to buy six used LM6000 units from the following companies in Turkey:  Zorlu, Acorsoy, Bosen, Ataer, Cerkezkoy, and Nuh Cemento. The price provided for each of these units would fall within Alta Power's budgetary requirements.

49.    Based on GE and WattStock's pricing representations, Alta Power made a series of payments to secure these units.

50.    On May 23, 2019, Alta Power paid $57,250 to inspect and test the Turkish

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (as-filed 06/04/24)    Page 431 of 453    PageID 837
Compared Over Alta's May 10, 2024 Proposed Complaint

units GE and WattStock represented satisfied Alta Power's budgetary requirements.

51.     On May 30, 2019, Alta Power paid $200,000 to buy (at GE and WattStock's recommendation) another unit called the "Ethos Unit." That same day, Alta Power made a down payment towards the Nuh Cemento unit identified by GE and WattStock.

52.     On May 31, 2019, Alta Power paid a $15,000 "escrow fee" related to the acquisition of the recommended units.

53.     On June 13, 2019, Alta Power made a $417,000 down payment on the Acarsoy unit identified by GE and WattStock.

54.     On July 2, 2019, Alta Power paid $300,000 as a down payment towards the Bosen unit identified by GE and WattStock.

55.     On July 24, 2019, Alta Power paid $50,000 to extend its option to buy the Acarsoy unit identified by GE and WattStock.

56.     On August 2, 2019, Alta Power paid another $50,000 to obtain another extension of its option to purchase the Acarsoy unit identified by GE and WattStock.

57.     On August 8, 2019, Alta Power paid $112,500 to extend its options to buy the Acarsoy and Nuh Cemento units identified by GE and WattStock.

58.     On October 1, 2019, Alta Power paid $100,000 to secure an extension of the Bosen unit identified by GE and WattStock.

59.     Both GE and WattStock encouraged Alta Power to make payments even though they knew that the units they had identified did not actually satisfy Alta Power's budgetary requirements because they were burdened by liabilities GE and

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 Filed 06/04/24    Page 432 of 453    PageID 838
Compared Over Alta's May 10, 2024 Proposed Complaint

WattStock did not fully disclose to Alta Power, and even though GE and WattStock knew their representations about the GE-WattStock relationship were false.

51.    At all relevant points60.    For example, GE and WattStock knew that its LTSA contracts withthe Nuh Cemento unit was burdened by a Long-Term Service Agreement ("LTSA") between GE and Nuh Cemento that required Nuh Cemento to pay GE millions of dollars beforein the event that Nuh Cemento couldwere to sell its unit to Alta Power the Nuh Cemento units. GE also understood that unless it agreed to waive its contractual entitlement to these termination fees from Nuh Cemento, the termination fees could and almost certainly would impact the total cost of these units to Alta Power, and that unless it agreed not to collect the termination fees from Nuh Cemento, the cost of the Nuh Cemento units to Alta Power would exceed $10 million /per unit. GE/ and WattStock were aware of the undisclosed termination fees before suggesting the Nuh Cemento units be targeted for acquisition. GE/ and WattStock knew adding the undisclosed termination fees would make the prices of those units higher than Alta Power's project budget. Utilizing a classic "bait and switch move," GE deliberately hid the existence of the termination fees and their potential impact on the price of the units from Alta Power until Alta Power had spent months and paid millions of dollars towards the acquisition of the units.GE then refused to waive its contractual right to the termination fees unless Alta Power would agree to execute an expensive and burdensome LTSA with GE, thereby preventing Alta Power from acquiring these units.  But for GE's refusal to waive these undisclosed termination fees, Alta Power

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (Filed 05/04/24)    Page 433 of 453    PageID 839
Compared Over Alta's May 10, 2024 Proposed Complaint

would have purchased these units and its business would have moved forward.

52.    Prior to learning of the true cost of these units due to the undisclosed associated liabilities, Alta Power, relying on GE and WattStock, moved throughout 2019 and into 2020 attempting to purchase the two Nuh Cemento units.

53.    WattStock, GE, and Alta Power identified an additional unit in Turkey owned by a Turkish company called Acarsoy.  The same process repeated itself again.

5461.    As withAlong the Nuh Cemento unitssame lines, GE failed to disclose that the Acarsoy unit was also burdened with a multi-million-dollaran LTSA with a termination fee, which was not included in the pricing presented to Alta Power.  When GE refused to waive its right to collect the undisclosed termination fees, it doomed the transactions.  But for this decision, Alta Power would have purchased this unit. that GE knew would, unless waived, bring the cost of acquiring and refurbishing the Acarsoy unit to Alta to more than $10 million.

55.    Relying on GE and WattStock's representations concerning their ability and willingness to sell Alta Power the required TRUEPackages™ for at or less than $10 million per TRUEPackage™ unit, Alta Power paid $475,000 in down payments related to this unit, unaware of the true cost of the unit.  Alta Power would never have done so had GE disclosed the liabilities associated with the unit which rendered it uneconomical for Alta Power's projects.

56.    GE also hid other material information from Alta Power.

57.    62.    The deception took a slightly different form with regard to the

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (Filed 05/04/24)    Page 434 of 453    PageID 840
Compared Over Alta's May 10, 2024 Proposed Complaint

Ethos unit. In May of 2019, GE and WattStock encouraged Alta Power to purchase a package from EthosEnergy. Thebuy a "package" was — essentially, the housing for thean aederivative gas turbine.

— from a company called EthosEnergy. In so doing, 58.    GE and WattStock represented that Alta Power could obtain a gas turbine engine from the GE lease pool to marry with the EthosEnergy package and claimed a similar housing was available in Panama and could also easily be married with a lease pool engine.

, 59.    GE and WattStock claimedalso promised that these leased units with the purchased housings would lead to a significantly lower price for Alta Power.

60.    Based on these representations, Alta Power purchased the EthosEnergy package for $200,000.

6163.    Unfortunately, GE and WattStock also concealeddid not disclose that the EthosEnergyEthos unit was in a dilapidated condition and was only suggested as a possibility so that GE and WattStock could increase their revenue stream for providing repairs. Furthermore, several months later when Alta Power inquired about the possibility of cost savings using the previously promised lease pool engines, WattStock and GE informed Alta Power that "that program was no longer being offered."

62.    Had GE/WattStock disclosed the true condition of the EthosEnergy unit or the unavailability of the lease pool, Alta Power would not have purchased the Ethos unit at any price. Furthermore, WattStock and/or GE still has possession of the EthosEnergy unit, despite having been paid for it.

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38   Filed 06/04/24    Page 435 of 453    PageID 841
Compared Over Alta's May 10, 2024 Proposed Complaint

63.    GE and WattStock convinced Alta Power to make a $300,000 down payment for a unit owned by a company in Turkey called Bosen.  As with all other units, WattStock and GE represented that the delivered unit would be priced consistent with Alta Power's needs.

64.    At the time they convinced Finally, GE and WattStock encouraged Alta Power to make this downpayment, both GE and WattStock knew buy the Bosen unit, but did not disclose that the Bosen units unit contained non-GE parts.  They did not, however, tell Alta Power that GE categorically refuse to service any LM6000 unit that contains any part that was not originally manufactured by GE, regardless of the non-GE part's condition, or that GE would not warrant (which is the most important aspect of the TRUEPackage ™) the performance of a refurbished unit that contains non GE parts. manufactured by one of GE's competitors (Chromalloy), or that GE and WattStock would not refurbish or warrant the unit unless Alta Power paid to have _all_ of the Chromalloy parts replaced with brand new GE parts first. At the time it made these recommendations, GE knew this and knew these repairs would take the cost of the Bosen unit beyond Alta Power's budgetary requirements. To make matters worse, GE and WattStock also encouraged Alta Power to pay $100,000 to extend its option to buy this unit. Alta Power obliged, relying on all of GE and WattStock's aforementioned representations, but WattStock simply pocketed this deposit.

F.____GE dupes Alta Power into paying it $1.5 million.

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 Filed 06/04/24    Page 436 of 453    PageID 842
Compared Over Alta's May 10, 2024 Proposed Complaint

65.    Later, after Alta Power had made the $300,000 down payment, GE and WattStock informed Alta Power that GE would not warrant or service units containing non-GE components unless the non-GE components were first replaced—regardless of their condition.

66.    The Bosen unit contained non-GE components and as a result the "new" purchase price including the refurbishment work which was several million dollars higher than previously represented by GE/WattStock, and well above the promised $10 million total price.  As a result, this unit was uneconomical for Alta's projects.

67.    By the fall of 2019, GE and WattStock continued to lead Alta Power to believe that the targeted units could be acquired consistent with WattStock and GE's earlier pricing guidance.  Because of this, Alta Power continued to fund the potential acquisition of units.

68.    In October 2019, Alta Power sent WattStock $100,000 for potential use in extending an option to purchase units from Bosen.  During WattStock's negotiations with Bosen, Alta Power ultimately decided not to go through and told WattStock to cease negotiations.    WattStock complied and the parties never entered into an agreement extending the option period with Bosen.

69.    WattStock never sent Alta Power's $100,000 to Bosen since the negotiations were called off before the $100,000 was used.

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (as filed 06/04/24)    Page 437 of 453    PageID 843
Compared Over Alta's May 10, 2024 Proposed Complaint

70.    Alta Power requested the return of the $100,000. WattStock acknowledged the funds would be returned, and repeatedly promised to do so on multiple occasions during the fall and winter of 2019-2020.

71.    WattStock broke these promises. Instead, WattStock converted Alta Power's $100,000 and used it to cover serious cash flow issues, which GE had known about and hid from Alta Power for the entire time period relevant to this case.

72.    Despite all of the above, Alta Power was still committed to the development of its projects. Consistent with this and based on WattStock's and GE's false representations, Alta Power paid WattStock over $200,000 for extensions to keep alive potential deals with Acarsoy and Nuh Cemento in the fall of 2019.

73.    At no time did GE or WattStock inform Alta Power that the true costs of these units were inconsistent with WattStock's and GE's representations.

74.    Consistent with this65.    Notwithstanding all of the problems above, GE (through Lance Herrington and Alex Babu) and WattStock (through Jay Manning and Pete Watson) continued to insist that they could deliver the promised units for at or below $10 million per refurbished unit. As a result, Alta Power and WattStock enteredexecuted a Limited Notice to Proceed Proposal ("LNTP") with WattStock on December 23, 2019 for two separate units to be acquired from Nuh Cemento. . The LNTP called for WattStock to acquire (on behalf of Alta Power) and for GE to refurbish and deliver two units. The total amount of the LNTP was almost $20 million. This included the "not to exceed price" of $6.5 million for WattStock to purchasebuy the

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X   Document 38 (as filed 06/04/24)   Page 438 of 453   PageID 844
Compared Over Alta's May 10, 2024 Proposed Complaint

units from Nuh Cemento that GE/ and WattStock told Alta Power will be sufficient to purchasecould buy the units, with the balance for transportation, refurbishment, and installation of the units. This price included GE/ and WattStock's profit margin for the project.

7566. GE and WattStock represented to Alta Power that GE needed to be paid $1,500,000 to secure the purchase of long-lead hardware, start engineering activities and deliver preliminary drawings related to a potential TRUEpackageTM project. The $1,500,000 was divided into two payments of $750,000.

76. 67. Relying on GE and WattStock's representations, Alta Power paid $750,000 on December 24, 2019 and paid another $750,000 on January 13, 2020.

7768. In February 2020, Alta Power was informed for the first time that the owner of the two Nuh Cemento units would only sell the two units for the agreed not to exceed price of $6.5 million plus the cancellation of GE's LTSA termination fee of over $1.4 million. Despite its promises to Alta Power that it could and would ensure that Alta Power could obtain the required units at the necessary price pointsprices, GE refuseddeclined to waive the seller'sits right to collect its termination fees, thereby preventing Alta Power from purchasing the units. from Nuh Cemento to ensure that Alta Power could acquire the units consistent with GE's representations. Instead, GE attempted to extort Alta Power by offering to forgo the termination fees if Alta Power executed an oppressive Long Term Service Agreement in which it promised to pay GE outrageous sums to service the units GE had been promising for so long to provide for

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (Redacted Filed 05/04/24)    Page 439 of 453    PageID 845
Compared Over Alta's May 10, 2024 Proposed Complaint

at or less than $10 million per unit.

7869.   The impacteffect of the cancellation fee materially increased project costs above the previous budget and made it economically impossible for Alta Power to move forward with the acquisition of this hardware.

7970.   For the units being considered (as with the Bosen unit), the significant liabilities were not disclosed until *after* Alta Power made the final payment to GE under the LNTP. For each, GE chose not to disclose that the units were burdened by these fees (or that the fees could materially impact the price of the units to Alta Power) and refused to waive the termination fees even though doing so was inconsistent with GE and WattStock's promises and duties to Alta Power.

71.     Alta Power would not have made *any* of the payments outlined above if GE and WattStock had disclosed the true cost of these units or the true nature of their relationship.

72.     Indeed, if GE had been honest about the pricing and availability of units and its relationship with WattStock, Alta Power never would have entered into the Master Agreement (or any other agreement) with WattStock, nor would it have wired WattStock a single dollar. Instead, it would have accepted ProEnergy's August 2018 offer.

73.     But for GE and WattStock's false representation that they could make up to nine GE TRUEPackages (e.g., a fully refurbished LM6000 backed by a GE warranty) available for purchase to Alta Power for $10 million or less per TRUEPackage, Alta

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (tis 3a8led Fies 05/04/24)    Page 440 of 453    PageID 846
Compared Over Alta's May 10, 2024 Proposed Complaint

Power would not have signed the Master Agreement (or any other Agreement with WattStock) or wired a single dollar to WattStock. Instead, Alta Power would have accepted ProEnergy's August 2018 proposal.

FG.   **By the time** **GE** refuses to make good on its promises, hangsand WattStock's **representations begin to crumble,** **Alta Power** out to dryhad lost its place in the **market**.

8074.  In the spring of 2020 WattStock informed Alta Power it was having financial issues. WattStock asked Alta Power to either provide a loan or acquire WattStock.

81.    During this time, Alta Power requested that GE step in and fulfill its commitment to Alta Power to assist in securing the units needed for Alta Power's project.  GE refused.

8275.  Alta Power was ready, willing, and able to go forward with the Nuh Cemento project with GE alone.  GE refused to allow Alta to pay directly for the LNTP components, despite repeated requests by Alta Power due to concerns regarding WattStock's financial situation.   And GE further refused to step in and take over for WattStock (despite contrary written representations) when Alta Power notified GE that WattStock was insolvent.did not want to buy WattStock. Instead, it wanted the TRUEPackages" GE and WattStock had promised to deliver for at or less than $10 million per fully refurbished LM6000. To that end, in July 2020, Alta Power contacted GE and proposed that Alta Power pay GE directly to deliver the TRUEPackages'. On August 5, 2020, GE's James Canon wrote back to Alta Power and refused because

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 Filed 06/04/24    Page 441 of 453    PageID 847
Compared Over Alta's May 10, 2024 Proposed Complaint

"delivering parts and services to Alta instead of WattStock would be considered a material breach [of GE's contract." Canon then stated that GE "is represented by GE Legal Counsel; therefore, Alta's Litigation Attorney's should not contact our business's sales & operations teams directly[. "

83.    Despite Alta Power's efforts and GE's prior representations, GE made it clear, once again, that it would only move forward with WattStock, thereby constructively cancelling the LNTP and the Nuh Cemento project and depriving Alta Power of the TRUEPackagesTM that GE and WattStock represented that they both could and would provide for at or below $10 million per TRUEPackage TM. As a result, Alta Power suffered more than one hundred million dollars of damages.

76.    Internally, though, GE understood it had a problem. In an August 10, 2020 internal email, GE's Jim Canon commented that "it is like when your buddy [WattStock] borrows your car and has a wreck? Whose insurance gets the claim? He gets a ticket, but you are responsible for the damage…"

**H.    GE and WattStock's acts and omissions caused Alta Power to lose tens of millions of dollars of profit.**

77.    But for the representations, acts, and omissions outlined above, Alta Power would have contracted with ProEnergy, not WattStock, and would have made many millions of profits providing much needed capacity to the Texas energy grid. The scope of those profits depends on how many units Alta Power would have gotten online and when those units were plugged into the grid, but Alta Power will ultimately prove that GE and WattStock's acts and omissions caused Alta Power to lose up to (and

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X   Document 38 (11/4/24) Filed 06/04/24   Page 442 of 453   PageID 848
Compared Over Alta's May 10, 2024 Proposed Complaint

potentially greater than) $320 million in profit.[4]

## V.   CAUSES OF ACTION

### Count I: ~~RESPONDEAT SUPERIOR~~VICARIOUS LIABILITY

~~84~~78.  Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

79.   GE is vicariously liable for WattStock's tortious conduct, including for the damages caused by WattStock's (1) fraud; (2) fraudulent inducement; (3) negligent misrepresentation; (4) civil conspiracy; and (5) tortious interference with prospective contractual relations.

~~85~~80.  GE ~~and WattStock~~ represented to Alta Power ~~that they were "partners"~~WattStock was its "partner"; that GE and WattStock "worked hand in hand to provide the TRUEPackage' program they created together; and that WattStock acted as GE's authorized service provider for the sale of GE TRUEPackages'.

~~86~~81.  Alta Power justifiably relied on these representations by GE and WattStock in agreeing to the Master Agreement and the LNTP.

~~87~~82.  In fact, without the representations, Alta Power would have never entered any contracts with WattStock or paid WattStock any money.

~~88~~83.  Accordingly, an ostensible agency/joint enterprise existed between WattStock and GE, particularly given that the factual details of GE and WattStock's

---

[4] The profits Alta Power would have made serving the market as described in its Second Amended Counterclaim. These profits range depending on the sites and configuration. Under a three-site, nine-unit configuration, Alta Power estimates it would have generated $140,000,000 to $320,000,000 in profits. Under a one-site, two-unit confirmation, Alta Power estimates it would have generated between $10,000,000 and $50,000,000 in profits. A one-site, three-unit configuration would have been within these two ranges.

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (added Filed 05/04/24 )    Page 443 of 453    PageID 849
Compared Over Alta's May 10, 2024 Proposed Complaint

financial relationship were within their exclusive possession at all points relevant to this lawsuit.

84.    As a result, GE is estopped from denying liability for WattStock's breaches and torts, including, but not limited to, WattStock's liability for (1) fraud; (2) fraudulent inducement; (3) negligent misrepresentation; (4) civil conspiracy; or (5) tortious interference with prospective contractual relations.

89.    GE is estopped from denying liability for WattStock's breaches and torts and/or85.    Alternatively, GE and WattStock engaged in a joint enterprise for which joint and several liability exists. GE and WattStock entered into an express or implied agreement, for a common purpose, with a community of pecuniary interest in that purpose, and with equal right to voice direction of the enterprise giving an equal right of control.

90.    Despite the fig leaf boiler-plate language in the MOU between GE and WattStock, the language of the MOU shows GE controlled WattStock. Accordingly, the "no partnership or agency" provision is a sham or subterfuge designed to conceal the true legal status of GE/WattStock. Extrinsic evidence also shows actual control by GE over WattStock.

91.    GE is respondeat superior liable for the breaches and torts of WattStock.

## COUNT II:  UNJUST ENRICHMENT (AGAINST GE)

9286.  Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (Ex. 1) Filed 06/04/24    Page 444 of 453    PageID 850
Compared Over Alta's May 10, 2024 Proposed Complaint

9387.    GE has been unjustly enriched in the amount of $1.5 million to the detriment of Alta Power.

9488.    Alta Power demands restitution of all amounts GE has been justly enriched.

## COUNT III:  FRAUD

9589.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

90.    GE made numerous material misrepresentations to Alta Power, including but not limited to (1) misrepresenting the nature of its relationship with WattStock; (2) falsely represented that it could and/or would make up to nine GE TRUEPackages' available for Alta Power to buy for at or below $10 million per GE TRUEPackage'; (3) misrepresenting the true pricing and availability of TRUEPackage' units; (4) falsely holding itself out as the lowest cost, most financeable solution in the marketplace; (5) falsely representing that GE would "stand behind" and/or "fully wrap" WattStock's work related to the delivery of the GE TRUEPackages'.

96.    GE and WattStock intentionally misrepresented the nature of their relationship to induce Alta Power to purchase GE TRUEPackages™ and contract with WattStock instead of acquiring the needed LM6000s from and/or contracting with a competitor like ProEnergy.

97.    GE falsely represented it would "stand behind" WattStock.  However, when the time came to do so GE did not.

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (as-filed 05/14/24)    Page 445 of 453    PageID 851
Compared Over Alta's May 10, 2024 Proposed Complaint

98.    GE intentionally misrepresented the benefits of the GE TRUEPackage™ Program, the pricing and acquisition costs associated with the TRUEPackage™ units, and the overall costs of the TRUEPackages™ marketed to Alta Power.

99.    GE/WattStock misrepresented the benefits of the TRUEpackageTM program.

100.    GE/WattStock represented that the program would enhance the ability to obtain financing when it did not.

101.    GE/WattStock represented that the program would be able to move quickly to service the narrow window Alta Power had for this unique strategy when in fact the GE/WattStock relationship created a bureaucracy that only slowed down projects.

102.    GE represented that the TRUEpackageTM program was of a superior quality when in fact it was not.

103.    GE represented that units from the TRUEpackageTM program were competitively priced with alternative refurbished gas turbine solutions when in fact they were not.

104.    GE hid the existence of undisclosed liabilities on virtually every unit suggested using a classic bait and switch maneuver.

10591. GE misrepresentationsrepresentations and omissions were material and false.

10692. GE knew these representations and omissions were false (or created a

false impression) when it made them, or at the very least, it made these representations were made recklessly and without knowledge of their truth.

~~107~~93. These representations and omissions were made with the intent that Alta Power act and rely on them.

~~108~~94. Alta Power detrimentally relied on ~~these~~the representations ~~and omissions to its detriment~~outlined above.

95.    GE's misrepresentations proximately caused Alta Power more than $100 million in damages.

### COUNT IV: FRAUDULENT INDUCEMENT

96.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

97.    GE fraudulently induced Alta Power into executing the Master Agreement and LNTP by making numerous material misrepresentations to Alta Power. GE (1) misrepresented the nature of its relationship with WattStock; (2) falsely represented that it could and/or would make up to nine GE TRUEPackages' available for Alta Power to buy for at or below $10 million per GE TRUEPackage'; (3) misrepresented the pricing and availability of units; (4) falsely held itself out as the lowest cost, most financeable solution in the marketplace; and (5) falsely represented that GE would "stand behind" and/or "fully wrap" WattStock's work related to the delivery of the GE TRUEPackages'.

~~109~~98. GE representations and omissions were material and false.

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X   Document 38 (as-filed 05/04/24)   Page 447 of 453   PageID 853
Compared Over Alta's May 10, 2024 Proposed Complaint

11099. GE knew these representations and omissions were false (or created a false impression) when it made them, or at the very least, it made these representations recklessly and without knowledge of their truth.

111100. These representations and omissions were made with the intent that Alta Power act on them.

112101. Alta Power detrimentally relied on the representations outlined above by agreeing to the Master Agreement and/or the LNTP with WattStock.

113102. GE's misrepresentations proximately caused Alta Power more than $100 million in damages.

**COUNT IVV: NEGLIGENT MISREPRESENTATION**

114103. Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

115104. Alternatively, each fraudulent misrepresentation made by GE was made negligently since GE did not exercise reasonable care or competence in obtaining or communicating the information.

116105. Alta Power has wastedspent at least $10 million wasted dollars based on GE/ and WattStock's negligent misrepresentations, and has lost more than $100 million in profits.

117106. Had GE and WattStock not negligently misrepresented the true facts, Alta Power would have been able to successfully serve the niche market and has lost more than $100 million as a result of GE'sGE and WattStock's fraudulent acts.

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (as filed 05/04/24)    Page 448 of 453    PageID 854
Compared Over Alta's May 10, 2024 Proposed Complaint

## COUNT ~~V~~VI: CIVIL CONSPIRACY

~~118~~107.    Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

~~119~~108.    GE and WattStock conspired to accomplish an object or course of action, namely, to ~~fraudulently induce Alta Power into contracting with WattStock (as opposed to another competitor like ProEnergy) related to the acquisition of the refurbished LM6000s Alta Power needed to carry out its business.~~defraud Alta Power and/or tortiously interfere with Alta Power's prospective contractual relations with ProEnergy.

~~120.    To accomplish this, both GE and WattStock agreed to and did in fact intentionally misrepresent the nature of their relationship and virtually every aspect of GE's TRUEPackage™, including but not limited to the virtues of TRUEPackages™, their price, GE and WattStock's ability to timely deliver the required units, and the various factors that might adversely impact their ability to follow through on their promises to Alta Power to induce Alta Power to agree to and spend money towards acquiring GE TRUEPackages™ instead of acquiring the needed refurbished units from a competitor like ProEnergy.~~

~~121~~109.    GE and WattStock agreed to and did in fact accomplish ~~this objective~~these objectives through the commission of numerous unlawful overt acts, including, but not limited to, by: (~~i~~1) ~~intentionally~~ misrepresenting the ~~benefits of the GE TRUEPackage™ Program, the pricing and acquisition costs associated with the~~

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (as filed 05/04/24)    Page 449 of 453    PageID 855
Compared Over Alta's May 10, 2024 Proposed Complaint

TRUEPackage™ units, and the overall costs of the TRUEPackages™ marketed to Alta Power; (ii) falsely representing that they would be able to move quickly to service the narrow window Alta Power had for this unique strategy; (iii) falsely representing that the TRUEpackageTM program was of a superior quality when in fact it was not; (iv) falsely representing that units from the TRUEpackageTM program were competitively priced with alternative refurbished gas turbine solutions when in fact they were not; (v) hiding the existence of undisclosed liabilities on virtually every unit suggested using a classic bait and switch maneuver, and deliberately hid the fact that those undisclosed liabilities could (and would) materially increase the overall cost of the targeted units; (vi) falsely representing that GE would facilitate Alta Power's acquisition of the required units at the required price levels, but — after causing Alta Power to devote time and huge sums of money to attempting to purchase the two Nuh Cemento units and the Acorsoy units—caused those transactions to fail by refusing to waive the termination fees attached to the GE LTSAs attached to those units; (vii)nature of its relationship with WattStock; (2) falsely represented that it could and/or would make up to nine GE TRUEPackages" available for Alta Power to buy for at or below $10 million per GE TRUEPackage'; (3) misrepresenting the true pricing and availability of TRUEPackage' units; (4) falsely holding itself out as the lowest cost, most financeable solution in the marketplace; (5) falsely representing that GE would "stand behind" WattStockand/or "fully wrap" WattStock's work related to the delivery of the GE TRUEPackages'.

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (Filed 05/04/24)    Page 450 of 453    PageID 856
Compared Over Alta's May 10, 2024 Proposed Complaint

122110.    Alta Power relied on these representations and ~~ommissions~~omissions to its detriment.

123111.    Alta Power was damaged as a result of GE and WattStock's unlawful acts.

124112.    Both GE and WattStock knew these representations and omissions were false (or created a false impression) when they made them, or at the very least, these representations were made recklessly and without knowledge of their truth.

125113.    These representations and ~~ommissions~~omissions were made with the intent that Alta Power act on them.

126114.    Alta Power relied on GE and WattStock's representations ~~regarding~~about their relationship, and these representations proximately caused Alta Power millions of dollars in damages.

## COUNT ~~VI~~VII:  TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

127115.    Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

128116.    GE and WattStock knew there was a reasonable probability that Alta Power would have entered into a contractual relationship with ProEnergy.

129117.    To prevent that from happening, GE ~~fraudulently (i) intentionally misrepresenting the benefits of the GE TRUEPackage™ Program, the pricing and acquisition costs associated with the TRUEPackage™ units, and the overall costs of the TRUEPackages™ marketed to Alta Power; (ii) falsely representing that they would be~~

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38  Filed 05/04/24    Page 451 of 453    PageID 857
Compared Over Alta's May 10, 2024 Proposed Complaint

able to move quickly to service the narrow window Alta Power had for this unique strategy; (iii) falsely representing that the TRUEpackageTM program was of a superior quality when in fact it was not; (iv) falsely representing that units from the TRUEpackageTM program were competitively priced with alternative refurbished gas turbine solutions when in fact they were not; (v) hiding the existence of undisclosed liabilities on virtually every unit suggested using a classic bait and switch maneuver, and deliberately hid the fact that those undisclosed liabilities could (and would) materially increase the overall cost of the targeted units; (vi) falsely representing that GE would facilitate Alta Power's acquisition of the required units at the required price levels, but— after causing Alta Power to devote time and huge sums of money to attempting to purchase the two Nuh Cemento units and the Acorsoy units—caused those transactions to fail by refusing to waive the termination fees attached to the GE LTSAs attached to those units; (vii) made numerous fraudulent and/or false/ and or negligent material misrepresentations to Alta Power, including but not limited to (1) misrepresenting the nature of its relationship with WattStock; (2) falsely represented that it could and/or would make up to nine GE TRUEPackages" available for Alta Power to purchase for at or below $10 million per GE TRUEPackage"; (3) misrepresenting the true pricing and availability of TRUEPackage" units; (4) falsely holding itself out as the lowest cost, most financeable solution in the marketplace; (5) falsely representing that GE would "stand behind" WattStockand/or "fully wrap" WattStock's work related to the delivery of the GE TRUEPackages".

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 Filed 05/04/24    Page 452 of 453    PageID 858
Compared Over Alta's May 10, 2024 Proposed Complaint

130118.    GE undertook all of the acts described above with the conscious desire to prevent Alta Power from contracting with Pro Energy.

131119.    GE's acts and omissions caused actual harm and damage to Alta Power.

120.    GE's acts and omissions caused Alta Power to lose more than one hundred million dollars in profit.

## VI.    JURY DEMAND

132121.    Alta Power requests trial by jury on all contested issues of fact. The requisite jury fee has been paid.

## VII.    PRAYER

ACCORDINGLY, Alta Power prays that GE be cited to appear and answer and that upon a final trial of this matter, the Court enter a final judgment against GE awarding Alta Power the following relief:

   a)    An award of the full amount of actual damages incurred by Alta Power and caused by the acts and omissions of GE and WattStock;

   b)    An award of equitable damages, as requested above;

   c)    An award of exemplary damages;

   d)    Reasonable and necessary attorneys' fees;

   e)    Pre-judgment and post-judgment interest at the maximum rate allowed by law;

   f)    Cost of court; and

   g)    Such other and further relief, general or special, at law or in equity, to which Alta Power may show itself to be justly entitled.

GE's Redline Showing Alta's May 14, 2024 As-Filed Proposed Complaint
Case 3:23-cv-00270-X    Document 38 (added filed 05/04/24)    Page 453 of 453    PageID 859
Compared Over Alta's May 10, 2024 Proposed Complaint

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By:    /s/ Jeb Golinkin
Michael Cancienne
State Bar No. 24055256
Joseph W. ("Jeb") Golinkin II
State Bar No. 24087596
1980 Post Oak Blvd., Ste. 2300
Houston, Texas 77056
713.955.4028
713.955.9644 Facsimile
mcancienne@~~jlcfirm~~j1cfirm.com
jgolinkin@~~jlcfirm~~j1cfirm.com

BAKER BOTTS L.L.P.
Jessica B. Pulliam
State Bar. No. 24037309
John Lawrence
State Bar No. 24055825
2001 Ross Avenue, Suite 900
Dallas, TX 75201-2980
Telephone:  214.953.6500
jessica.pulliam@bakerbotts.com
john.lawrence@bakerbotts.com

**ATTORNEYS FOR ~~PLAINTIFF~~ ALTA
POWER LLC**

## CERTIFICATE OF SERVICE

I hereby ~~certified~~certify that a true and correct copy of the above pleading was served on all ~~parties~~counsel of record through the Court's electronic filing service on the 14th day of May, 2024.

By:    /s/ Jeb Golinkin
Jeb Golinkin