IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ALTA POWER LLC,

    *Plaintiff/ Counter-Defendant,*

v.

GENERAL ELECTRIC INTERNATIONAL INC., d/b/a GE POWER SERVICES,

    *Defendant/ Counter-Plaintiff.*

Case No. 3:23-CV-0270-X

## ALTA POWER LLC'S FIRST AMENDED COMPLAINT AGAINST GENERAL ELECTRIC INTERNATIONAL, INC.

Alta Power LLC ("Alta Power") files this First Amended Complaint against General Electric International, Inc., d/b/a GE Power Services ("GE") and would respectfully show as follows:

### I.    SUMMARY OF ACTION

1.    This case is necessitated by repeated misrepresentations made by GE and WattStock to Alta Power concerning their relationship, capabilities, and the GE TRUEPackage™ program to entice Alta Power to purchase refurbished LM6000 aeroderivative turbines from GE/WattStock.

2.    Alta Power was created to develop natural gas-fired power assets that would provide critical additional power capacity to the Texas energy grid when the grid is experiencing periods of high demand. As part of this, Alta Power intended to buy and

place into service used aeroderivative gas turbines (essentially jet engines on skids powering a generator) that can quickly turn on and off to meet instances where power demand exceeds available power supply. During these periods of excess demand, power prices are highest.

3.     To implement its business plan, Alta Power sought to buy fully refurbished GE LM6000 aeroderivative turbines. GE and WattStock LLC ("WattStock")—which was started by former GE employees, with offices within GE's own office space, to act as GE's exclusive sales force and point of entry into the used gas turbine market—persuaded Alta Power to buy these units from them instead of GE's biggest competitor by misleading Alta Power about the nature of GE and Wattstock's relationship, the pricing and availability of the required units, and the benefits of their products.

4.     But for GE and WattStock's unlawful conduct, Alta Power would have obtained the required units and would have made many millions in profits. Instead, GE and WattStock misappropriated millions of dollars of Alta Power's money.

## II.      PARTIES

5.     Alta Power is the Defendant in this case originally filed by WattStock, the original Plaintiff and Counter-Defendant. Alta Power has already appeared.

6.     Third-Party Defendant GE is a company incorporated under the laws of Delaware doing business in Texas. GE has already appeared.

### III.   VENUE AND JURISDICTION

7.   Jurisdiction in this Court is proper under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds $75,000. This Court also has core jurisdiction under 28 U.S.C. §§ 157 and 1334.

8.   This Court has personal jurisdiction over GE because a substantial amount of the acts giving rise to Alta Power's causes of action arose in Texas.

9.   Venue in this Court is proper under 28 U.S.C. §§ 1408, 1409, and 1452.

### IV.   FACTUAL ALLEGATIONS

A.   **Alta Power's business.**

10.   Alta Power was established to provide additional capacity to an overloaded energy grid in a creative and profitable manner.

11.   The market for power in Texas has evolved from traditional gas and coal fired power plants to more renewable sources like wind and solar. In 2019, renewable energy sources accounted for about 11% of total U.S. energy consumption and about 17% of electricity generation. Texas now meets approximately 30% of its sizeable electricity demand with wind power and approximately another 15% with solar.

12.   As electrical providers move towards renewable power production, there are times when the energy grid has more demand than supply. Aeroderivative gas turbine "peaker plants" have become imperative to meet this imbalance since these plants turn on quickly—in less than 10 minutes.

13.   Pricing for this "peak demand" power is often at a premium and can be sold under long-term contracts with investment grade counterparties. Alta Power

determined that peaker plants could help meet this demand, profitably for Alta Power if Alta Power could acquire aeroderivative gas turbines at a competitive price and locate them appropriately.

14.     Because of the high cost of new aeroderivative gas turbines, Alta Power's strategy relied on acquiring used aeroderivative gas turbines, which was the only way to make the projects work within the required budget.

15.     To successfully develop a peaker plant, Alta Power needed to (1) identify areas in the grid where a peaker plant fits (considering gas supply, offtake pricing, and interconnection feasibility); (2) navigate the state and federal regulatory waters of the electrical power market; and (3) obtain used aeroderivative gas turbines that can be purchased and refurbished within budget.

16.     This complexity, along with high entry costs, means that there were only a few companies competing with Alta Power. But given the limited size of the market, being a first mover was critical.

17.     By April 2018, Alta Power had identified several potential project sites through an extensive vetting process based on prevailing market conditions. Through this work, Alta Power earned a head start on its competitors and found itself with a brief window during which it would be the first mover in this niche market.

**B.     GE Aero TRUEPackage**™

18.     GE is one of the limited suppliers of aeroderivative gas turbines. Traditionally, GE makes money selling new turbines, and (often) by servicing these turbines. However, by early 2018, sales of GE's new gas-powered turbines had fallen off

a cliff because decentralized renewable resources increase cost-competitive pressures. But the increased reliance on renewables and wind energy had created a gap in the energy markets that companies (like Alta Power) endeavored to exploit by creating peaker power plants using refurbished LM6000s.

19.    In 2016 and 2017, a GE competitor called ProEnergy recognized the need for refurbished aeroderivative turbines and began buying, refurbishing, and reselling used GE LM6000 units. By doing this, ProEnergy frequently also won contracts to service these units. In so doing, ProEnergy became a direct competitor with GE in the market for servicing aeroderivative turbines.

20.    In early 2018, GE sought to combat ProEnergy's increasing dominance of this marketplace by launching something it called the GE Aero TRUEPackage™, which it marketed as its own product. Consistent with this, GE applied for and owns a trademark for the word "TRUEPackage™" in the Construction and Repair Services category.

21.    However, GE did not undertake the refurbishment of used aeroderivative turbines alone. Instead, it partnered with a company called WattStock to acquire, refurbish, and resell used GE LM6000 aeroderivative turbines. WattStock was founded by former employees of GE, and was and remains co-located inside GE's Jacintoport facility in Houston, Texas.

22.    GE, however, did not allow WattStock to hold the refurbished products out as its own product. Instead, GE required WattStock to refer only to "GE Aero TRUEPackage™ in marketing materials" related to the refurbishment and resale of used LM6000s because, as a GE executive explained to WattStock in early 2018, "TRUEPackage

is the GE brand….not Certified Turbine Power" and it did not want to "confuse the market with different names." Thus, GE very deliberately created the public perception that TRUEPackage is a GE product, and that all TRUEPackages™ are GE products backed by GE, not WattStock.

C.     **GE persuades Alta Power to reject ProEnergy and instead choose TRUEPackage™.**

23.     In early 2018, Alta Power turned to procuring the turbines that would power its peaker plants. Alta Power determined that the best way to achieve its business goals was to acquire fully refurbished GE LM6000 turbines. The question then became whether to buy the needed refurbished LM6000s from the market leader, ProEnergy, or one of its competitors like GE/WattStock.

24.     Around the same time, Alta Power learned of GE's TRUEPackage™ offering. GE's marketing materials[1] promise a variety of advantages over competitors, including, but not limited to, a "one year OEM warranty and equipment performance guarantees," "delivery in eight months or less;" and "equipment selection and refurbishment plan driven by installed cost." GE also touted financing benefits of its product, claiming that its "OEM certification can improve financing options and insurance premiums." GE also claimed that GE's TRUEpackage™ was unique because GE—the turbines' original manufacturer—was the only company that could provide an end-to-end warranty and performance guarantee at a fixed price. Finally, GE represented

---

[1]     Including GE's own website: https://www.gevernova.com/gas-power/services/gas-turbines/aeroderivative/repowering-solutions.

that WattStock had access to its proprietary database that WattStock and GE would jointly use to identify available units.

25.     Based on these representations, Alta Power began discussions with GE and its partner WattStock about the possibility of buying the needed refurbished LM6000s from them instead of from GE's competitor, ProEnergy.

26.     During its discussions with both GE and WattStock, Alta Power repeatedly emphasized the cost sensitivity of its projects; that is, the cost of the gas turbine units could not exceed a certain price—around $10 million per fully refurbished LM6000—if the project were to remain within budget and financeable. In response, GE and WattStock reiterated all of the points made by their marketing materials, including that GE and WattStock are "partners" and that GE and WattStock would deliver the required units in "eight months or less." GE and WattStock also assured Alta Power that if Alta Power agreed to acquire GE TRUEPackages™ by contracting with WattStock, they could and would make up to nine GE TRUEPackages™ available for purchase by Alta Power for at or below $10 million per fully refurbished LM6000.

27.     Alta Power attended many in person meetings with GE where its representatives, including, but not limited to, Lance Herrington, Alex Babu, and James Canon made numerous false, misleading representations, including, but not limited to, the following: (1) misrepresenting the nature of its relationship with WattStock; (2) falsely represented that it could and/or would make up to nine GE TRUEPackages™ available for Alta Power to buy for at or below $10 million per GE TRUEPackage™; (3) misrepresenting the true pricing and availability of TRUEPackage™ units; (4) falsely

holding itself out as the lowest cost, most financeable solution in the marketplace; (5) falsely representing that GE would "stand behind" and/or "fully wrap" WattStock's work related to the delivery of the GE TRUEPackages™.

28.     For example, on or about June 6, 2018, Alta Power (represented by Matthew Laterza and Travis West) met with GE Global Sales and & Sales Operations Leader Lance Herrington (who created and was in charge of GE's TRUEPackage™ offering) along with other representatives of GE and WattStock for more than three hours at GE's Jacintoport facility (where WattStock is co-located).

29.     During this meeting, Alta Power briefed GE and WattStock at length on the detailed technical and budgetary requirements of Alta Power's business model and also disclosed its timing requirements, e.g., that it would need GE and WattStock to deliver the units consistent with the representations in GE's marketing materials (8 months). In response, GE (specifically, Lance Herrington) reiterated the supposed benefits of its "partnership" with WattStock and assured Alta Power that if it chose TruePackage™ instead of ProEnergy, GE could and would enable Alta Power to buy up to nine used GE LM6000s for at or below $10 million per used GE LM6000 unit and that they would (as represented in their marketing materials) deliver these fully refurbished TRUEPackages™ in "eight months or less" if Alta Power agreed to exclusively contract with WattStock to buy GE TRUEPackages™.

30.     GE also represented that if Alta Power would reject ProEnergy in favor of its TRUEPackage™ offering, GE would "fully wrap"(or stand behind) WattStock's work and obligations to Alta Power related to the sale and refurbishment of the used LM6000s.

31.     GE's internal correspondence confirms that GE understood the importance of Alta Power's pricing requirements. Indeed, the day after its first in-person meeting with Alta Power, GE's Lance Herrington emailed GE's Senior Sales Manager in charge of the Southwest and explained that he believed Alta Power was interested in doing a deal with GE, but that "pricing into their pro forma which is basically based on experience with Pro-Energy will be key."

32.     On or about August 29, 2018, ProEnergy sent Alta Power a proposal for under which ProEnergy offered to provide the necessary refurbished LM6000s to supply the necessary refurbished LM6000s for Alta Power's first peaker plant. ProEnergy's proposal satisfied Alta Power's technical, budgetary, and temporal requirements.

33.     Along the same lines, on December 18, 2018, Alta Power returned to GE for another lengthy meeting at GE's Houston facility with GE's Lance Herrington and others. During this meeting, Herrington again reiterated GE's supposed partnership with WattStock and represented that if Alta Power rejected ProEnergy's contract and instead contracted with WattStock, GE could and would enable Alta Power to buy up to nine used GE LM6000s for at or below $10 million per refurbished GE LM6000 unit.

34.     GE's internal emails again confirm that GE understood Alta Power's pricing requirements, and confirm that GE understood that unless it met these requirements, Alta Power would contract with ProEnergy. For example, internal notes from this meeting circulated internally by GE and WattStock the day after the meeting note Alta Power's "specific price targets that they need to hit" to move forward. Along the same lines, on December 20, 2018, GE's Herrington emailed his entire GE team and

observed that GE can "win [Alta Power's project] from ProE" "if we can hit the price targets they are looking for."

35.     GE and WattStock jointly determined that Alta Power ought to enter into a "Master Agreement" with WattStock, with GE standing behind it. Consistent with this, WattStock and GE began pushing Alta Power to sign a so called "Master Agreement" with WattStock. This proposal contained an exclusivity provision that Alta Power correctly observed "puts [Alta Power] out of business for twelve months" if GE and WattStock fail to deliver the promised units for at or less than $10 million per unit.

36.     On February 24, 2019, WattStock sent GE a copy of the "Master Agreement"[2] they wanted Alta Power to sign. Both WattStock and GE understood that if Alta Power signed the Master Agreement, Alta Power would not be able to buy refurbished LM6000s from ProEnergy, and certainly not in time obtain a first mover advantage.

37.     The next day, GE's Lance Herrington and Alex Babu took Alta Power's Matthew Laterza and Travis West to lunch at Frank's Americana in Houston. During that meeting, Herrington and Babu each reiterated each of the representations outlined above, including but not limited to (1) the nature of GE and WattStock's relationship ("partners"); (2) that GE and WattStock could and would satisfy Alta Power's pricing and

---

[2]     The Master Agreement generally provides that WattStock will locate suitable gas turbines for Alta, arrange inspections to evaluate their condition and refurbishment requirements, and negotiate the purchase price with the existing owners (with GE standing behind it). Despite its name, the Master Agreement is limited in scope, covering only the preliminary steps toward acquiring the turbines. The Master Agreement contemplated that the parties would enter subsequent "definitive" agreements that would also describe the scope, terms, and price for the purchase of any given turbine. One such agreement was the parties' December 2019 Limited Notice to Proceed.

timing requirements; and (3) that GE would "fully wrap" and stand behind WattStock's work if Alta Power agreed to exclusively contract to buy TRUEPackages™ by entering into an exclusive Master Agreement with its partner WattStock.

38.     On February 27, 2019—just days after GE's lunch with Alta Power—in reliance on the representations outlined above, Alta Power executed a "Master Agreement."[3] The Master Agreement outlined how WattStock would be reimbursed for out-of-pocket expenses and as part of a negotiated purchase price after WattStock purchased and refurbished the used units. The Master Agreement also contained an exclusivity and non-circumvention provision under which WattStock (and by extension, GE) agreed that neither WattStock nor GE would directly or indirectly cause another person to either attempt to or purchase a unit inspected on behalf of Alta Power (a service for which Alta Power paid). Article 6 of the Master Agreement likewise prohibited Alta Power from directly or indirectly purchasing or securing the exclusive right to buy any used LM6000 units disclosed by WattStock to Alta Power for a period of at least one year following the termination of the Master Agreement.

39.     Given the narrow window that Alta Power had to exploit its "first mover" advantage in the peaker unit market, the Master Agreement made Alta Power dependent on GE and WattStock to follow through on their promises.

---

[3]     Nothing in the Master Agreement contradicts any of GE's representations related to the pricing or availability of units or any of its other misrepresentations.

**D.**     **Unbeknownst to Alta Power, GE lied about its relationship with WattStock.**

40.     Unbeknownst to Alta Power, GE and WattStock had lied about nearly everything of substance to prevent it from agreeing to do business with ProEnergy. For example, GE and WattStock repeatedly and consistently held themselves out as partners, and GE suggested that their partnership was the subject of a contract—"the Memorandum of Understanding"—that provided that GE would stand behind WattStock's work related to Alta Power. But that was not accurate. GE's internal emails show that GE knew this, too. For example, on April 22, 2019, Lance Herrington wrote one of his colleagues about GE's relationship with WattStock and stated that "we do not currently have any signed agreement between [GE and WattStock]" related to the Alta Power project. The next day, Herrington's colleague responded with a series of questions about the nature of GE's relationship with WattStock going forward, observing that "the MOU that was signed has zero commitment on the GE part."

41.     As of August 25, 2020—which is *after* all of the events giving rise to this case—GE's internal emails confirm that GE *still* did not have a formal contractual relationship with WattStock that outlines each "partner's" role in the marketing and sale of GE TRUEPackages™.

42.     Despite the above, GE and WattStock continued to hold themselves out as "partners." Indeed, on July 31, 2019, GE sent Alta Power a letter—on GE letterhead, signed by GE's Lance Herrington—to give Alta Power additional comfort on the GE-WattStock relationship and to address "how GE could respond in the event that WattStock becomes unable to meet its contractual obligations to Alta Power, LLC under

agreements between WattStock and Alta Power for WattStock to supply a minimum of 9 refurbished LM6000 units." The letter states that "GE is willing to warranty WattStock's work on this project"; that "GE already conducts oversight of all aspects of WattStock's work"; and that GE "track[s] progress daily" of WattStock's work related to the Alta Power projects. The letter also states that "should WattStock fail to meet its contractual obligations to Alta Power, GE would be in a position to assume responsibility to complete any outstanding work."

43.     GE's letter reinforced Alta Power's belief that GE and WattStock were partners, and Alta Power did not learn that these representations were false until after this litigation began.

44.     Had GE disclosed the truth about its relationship with WattStock, Alta Power would not have entered into the Master Agreement (or any other agreement) with WattStock, nor would it have wired WattStock a single dollar. Instead, it would have accepted ProEnergy's August 2018 offer.

**E.      Relying on GE and WattStock, Alta Power pays millions of dollars to acquire various used LM6000 units.**

45.     But GE and WattStock had not merely lied about the nature of their relationship. They also lied about the pricing and availability of used LM6000 units. As discussed, GE and WattStock repeatedly told Alta Power that if Alta Power executed the Master Agreement, they could make up to nine TRUEPackages™ available for purchase to Alta Power for at or below $10 million per unit. Unbeknownst to Alta Power, this was not true.

46.     In February 2019, WattStock Vice President Pete Watson travelled to Turkey to begin inspections and negotiations on used GE aeroderivative gas turbine units. This was done at Alta Power's expense, and in reliance on GE and WattStock's representations as described above.

47.     Several used GE aeroderivative units were available in Turkey because changes in Turkish governmental regulations made the units uneconomical in country. In March 2019, WattStock's Jay Manning and Pete Watson presented Alta Power price and purchase options for nine used GE units based in Turkey. These prices suggested that the prices of these units were at or below the $10 million per refurbished unit price that GE and WattStock promised Alta Power they would meet if Alta Power agreed to buy TRUEPackages™.

48.     On April 17, 2019, WattStock's representative (with GE's knowledge and consent) sent Alta Power letters of intent to buy six used LM6000 units from the following companies in Turkey: Zorlu, Acorsoy, Bosen, Ataer, Cerkezkoy, and Nuh Cemento. The price provided for each of these units would fall within Alta Power's budgetary requirements.

49.     Based on GE and WattStock's pricing representations, Alta Power made a series of payments to secure these units.

50.     On May 23, 2019, Alta Power paid $57,250 to inspect and test the Turkish units GE and WattStock represented satisfied Alta Power's budgetary requirements.

51.     On May 30, 2019, Alta Power paid $200,000 to buy (at GE and WattStock's recommendation) another unit called the "Ethos Unit." That same day, Alta Power made a down payment towards the Nuh Cemento unit identified by GE and WattStock.

52.     On May 31, 2019, Alta Power paid a $15,000 "escrow fee" related to the acquisition of the recommended units.

53.     On June 13, 2019, Alta Power made a $417,000 down payment on the Acarsoy unit identified by GE and WattStock.

54.     On July 2, 2019, Alta Power paid $300,000 as a down payment towards the Bosen unit identified by GE and WattStock.

55.     On July 24, 2019, Alta Power paid $50,000 to extend its option to buy the Acarsoy unit identified by GE and WattStock.

56.     On August 2, 2019, Alta Power paid another $50,000 to obtain another extension of its option to purchase the Acarsoy unit identified by GE and WattStock.

57.     On August 8, 2019, Alta Power paid $112,500 to extend its options to buy the Acarsoy and Nuh Cemento units identified by GE and WattStock.

58.     On October 1, 2019, Alta Power paid $100,000 to secure an extension of the Bosen unit identified by GE and WattStock.

59.     Both GE and WattStock encouraged Alta Power to make payments even though they knew that the units they had identified did not actually satisfy Alta Power's budgetary requirements because they were burdened by liabilities GE and WattStock did not fully disclose to Alta Power, and even though GE and WattStock knew their representations about the GE-WattStock relationship were false.

60.     For example, GE and WattStock knew that the Nuh Cemento unit was burdened by a Long-Term Service Agreement ("LTSA") between GE and Nuh Cemento that required Nuh Cemento to pay GE millions of dollars in the event that Nuh Cemento were to sell its unit to Alta Power. GE also understood that unless it agreed to waive its contractual entitlement to these termination fees from Nuh Cemento, the termination fees could and almost certainly would impact the total cost of these units to Alta Power, and that unless it agreed not to collect the termination fees from Nuh Cemento, the cost of the Nuh Cemento units to Alta Power would exceed $10 million per unit. GE and WattStock were aware of the termination fees before suggesting the Nuh Cemento units be targeted for acquisition. GE and WattStock knew adding the termination fees would make the prices of those units higher than Alta Power's project budget.

61.     Along the same lines, GE failed to disclose that the Acarsoy unit was also burdened with an LTSA with a termination fee that GE knew would, unless waived, bring the cost of acquiring and refurbishing the Acarsoy unit to Alta to more than $10 million.

62.     The deception took a slightly different form with regard to the Ethos unit. In May 2019, GE and WattStock encouraged Alta Power to buy a "package"—essentially, the housing for an aeroderivative gas turbine—from a company called EthosEnergy. In so doing, GE and WattStock represented that Alta Power could obtain a gas turbine engine from the GE lease pool to marry with the EthosEnergy package and claimed a similar housing was available in Panama and could also easily be married with a lease

pool engine, and also promised that these leased units with the purchased housings would lead to a significantly lower price for Alta Power.

63.     Unfortunately, GE and WattStock did not disclose that the Ethos unit was dilapidated and was only suggested as a possibility so that GE and WattStock could increase their revenue stream for providing repairs. Furthermore, several months later when Alta Power inquired about the possibility of cost savings using the promised lease pool engines, WattStock and GE informed Alta Power that "that program was no longer being offered."

64.     Finally, GE and WattStock encouraged Alta Power to buy the Bosen unit, but did not disclose that the Bosen unit contained parts manufactured by one of GE's competitors (Chromalloy), or that GE and WattStock would not refurbish or warrant the unit unless Alta Power paid to have *all* of the Chromalloy parts replaced with brand new GE parts first. At the time it made these recommendations, GE knew this and knew these repairs would take the cost of the Bosen unit beyond Alta Power's budgetary requirements. To make matters worse, GE and WattStock also encouraged Alta Power to pay $100,000 to extend its option to buy this unit. Alta Power obliged, relying on all of GE and WattStock's aforementioned representations, but WattStock simply pocketed this deposit.

**F.     GE dupes Alta Power into paying it $1.5 million.**

65.     Notwithstanding all of the problems above, GE (through Lance Herrington and Alex Babu) and WattStock (through Jay Manning and Pete Watson) continued to insist that they could deliver the promised units for at or below $10 million per

refurbished unit. As a result, Alta Power executed a Limited Notice to Proceed Proposal ("LNTP") with WattStock on December 23, 2019. The LNTP called for WattStock to acquire (on behalf of Alta Power) and for GE to refurbish and deliver two units. The total amount of the LNTP was almost $20 million. This included the "not to exceed price" of $6.5 million for WattStock to buy the units from Nuh Cemento that GE and WattStock told Alta Power could buy the units, with the balance for transportation, refurbishment, and installation of the units. This price included GE and WattStock's profit margin for the project.

66.    GE and WattStock represented to Alta Power that GE needed to be paid $1,500,000 to secure the purchase of long-lead hardware, start engineering activities and deliver preliminary drawings related to a potential TRUEpackageTM project. The $1,500,000 was divided into two payments of $750,000.

67.    Relying on GE and WattStock's representations, Alta Power paid $750,000 on December 24, 2019 and paid another $750,000 on January 13, 2020.

68.    In February 2020, Alta Power was informed for the first time that the owner of the two Nuh Cemento units would only sell the two units for the agreed not to exceed price of $6.5 million plus the cancellation of GE's LTSA termination fee of over $1.4 million. Despite its promises to Alta Power that it could and would ensure that Alta Power could obtain the required units at the necessary prices, GE declined to waive its right to collect its termination fees from Nuh Cemento to ensure that Alta Power could acquire the units consistent with GE's representations. Instead, GE attempted to extort Alta Power by offering to forgo the termination fees if Alta Power executed an oppressive

Long Term Service Agreement in which it promised to pay GE outrageous sums to service the units GE had been promising for so long to provide for at or less than $10 million per unit.

69.     The effect of the cancellation fee materially increased project costs above the previous budget and made it economically impossible for Alta Power to move forward with the acquisition of this hardware.

70.     For the units being considered (as with the Bosen unit), the significant liabilities were not disclosed until *after* Alta Power made the final payment to GE under the LNTP. For each, GE chose not to disclose that the units were burdened by these fees (or that the fees could materially impact the price of the units to Alta Power) and refused to waive the termination fees even though doing so was inconsistent with GE and WattStock's promises and duties to Alta Power.

71.     Alta Power would not have made *any* of the payments outlined above if GE and WattStock had disclosed the true cost of these units or the true nature of their relationship.

72.     Indeed, if GE had been honest about the pricing and availability of units and its relationship with WattStock, Alta Power never would have entered into the Master Agreement (or any other agreement) with WattStock, nor would it have wired WattStock a single dollar. Instead, it would have accepted ProEnergy's August 2018 offer.

73.     But for GE and WattStock's false representation that they could make up to nine GE TRUEPackages (e.g., a fully refurbished LM6000 backed by a GE warranty) available for purchase to Alta Power for $10 million or less per TRUEPackage, Alta Power

would not have signed the Master Agreement (or any other Agreement with WattStock) or wired a single dollar to WattStock. Instead, Alta Power would have accepted ProEnergy's August 2018 proposal.

**G.    By the time GE and WattStock's representations begin to crumble, Alta Power had lost its place in the market.**

74.    In the spring of 2020 WattStock informed Alta Power it was having financial issues. WattStock asked Alta Power to either provide a loan or acquire WattStock.

75.    Alta Power did not want to buy WattStock. Instead, it wanted the TRUEPackages™ GE and WattStock had promised to deliver for at or less than $10 million per fully refurbished LM6000. To that end, in July 2020, Alta Power contacted GE and proposed that Alta Power pay GE directly to deliver the TRUEPackages™. On August 5, 2020, GE's James Canon wrote back to Alta Power and refused because "delivering parts and services to Alta instead of WattStock would be considered a material breach [of GE's contract." Canon then stated that GE "is represented by GE Legal Counsel; therefore, Alta's Litigation Attorney's should not contact our business's sales & operations teams directly[.]"

76.    Internally, though, GE understood it had a problem. In an August 10, 2020 internal email, GE's Jim Canon commented that "it is like when your buddy [WattStock] borrows your car and has a wreck? Whose insurance gets the claim? He gets a ticket, but you are responsible for the damage…"

**H.   GE and WattStock's acts and omissions caused Alta Power to lose tens of millions of dollars of profit.**

77.     But for the representations, acts, and omissions outlined above, Alta Power would have contracted with ProEnergy, not WattStock, and would have made many millions of profits providing much needed capacity to the Texas energy grid. The scope of those profits depends on how many units Alta Power would have gotten online and when those units were plugged into the grid, but Alta Power will ultimately prove that GE and WattStock's acts and omissions caused Alta Power to lose up to (and potentially greater than) $320 million in profit.[4]

## V.   CAUSES OF ACTION

### Count I: VICARIOUS LIABILITY

78.     Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

79.     GE is vicariously liable for WattStock's tortious conduct, including for the damages caused by WattStock's (1) fraud; (2) fraudulent inducement; (3) negligent misrepresentation; (4) civil conspiracy; and (5) tortious interference with prospective contractual relations.

80.     GE represented to Alta Power WattStock was its "partner"; that GE and WattStock "worked hand in hand to provide the TRUEPackage™ program they created

---

[4]     The profits Alta Power would have made serving the market as described in its Second Amended Counterclaim. These profits range depending on the sites and configuration. Under a three-site, nine-unit configuration, Alta Power estimates it would have generated $140,000,000 to $320,000,000 in profits. Under a one-site, two-unit confirmation, Alta Power estimates it would have generated between $10,000,000 and $50,000,000 in profits. A one-site, three-unit configuration would have been within these two ranges.

together; and that WattStock acted as GE's authorized service provider for the sale of GE TRUEPackages™.

81.     Alta Power justifiably relied on these representations by GE and WattStock in agreeing to the Master Agreement and the LNTP.

82.     In fact, without the representations, Alta Power would have never entered any contracts with WattStock or paid WattStock any money.

83.     Accordingly, an ostensible agency/joint enterprise existed between WattStock and GE, particularly given that the factual details of GE and WattStock's financial relationship were within their exclusive possession at all points relevant to this lawsuit.

84.     As a result, GE is estopped from denying liability for WattStock's breaches and torts, including, but not limited to, WattStock's liability for (1) fraud; (2) fraudulent inducement; (3) negligent misrepresentation; (4) civil conspiracy; or (5) tortious interference with prospective contractual relations.

85.     Alternatively, GE and WattStock engaged in a joint enterprise for which joint and several liability exists. GE and WattStock entered into an express or implied agreement, for a common purpose, with a community of pecuniary interest in that purpose, and with equal right to voice direction of the enterprise giving an equal right of control.

### <u>COUNT II: UNJUST ENRICHMENT (AGAINST GE)</u>

86.     Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

87.     GE has been unjustly enriched in the amount of $1.5 million to the detriment of Alta Power.

88.     Alta Power demands restitution of all amounts GE has been justly enriched.

## COUNT III: FRAUD

89.     Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

90.     GE made numerous material misrepresentations to Alta Power, including but not limited to (1) misrepresenting the nature of its relationship with WattStock; (2) falsely represented that it could and/or would make up to nine GE TRUEPackages™ available for Alta Power to buy for at or below $10 million per GE TRUEPackage™; (3) misrepresenting the true pricing and availability of TRUEPackage™ units; (4) falsely holding itself out as the lowest cost, most financeable solution in the marketplace; (5) falsely representing that GE would "stand behind" and/or "fully wrap" WattStock's work related to the delivery of the GE TRUEPackages™.

91.     GE representations and omissions were material and false.

92.     GE knew these representations and omissions were false (or created a false impression) when it made them, or at the very least, it made these representations recklessly and without knowledge of their truth.

93.     These representations and omissions were made with the intent that Alta Power act on them.

94.     Alta Power detrimentally relied on the representations outlined above.

95.     GE's misrepresentations proximately caused Alta Power more than $100 million in damages.

## COUNT IV: FRAUDULENT INDUCEMENT

96.     Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

97.     GE fraudulently induced Alta Power into executing the Master Agreement and LNTP by making numerous material misrepresentations to Alta Power. GE (1) misrepresented the nature of its relationship with WattStock; (2) falsely represented that it could and/or would make up to nine GE TRUEPackages™ available for Alta Power to buy for at or below $10 million per GE TRUEPackage™; (3) misrepresented the pricing and availability of units; (4) falsely held itself out as the lowest cost, most financeable solution in the marketplace; and (5) falsely represented that GE would "stand behind" and/or "fully wrap" WattStock's work related to the delivery of the GE TRUEPackages™.

98.     GE representations and omissions were material and false.

99.     GE knew these representations and omissions were false (or created a false impression) when it made them, or at the very least, it made these representations recklessly and without knowledge of their truth.

100.    These representations and omissions were made with the intent that Alta Power act on them.

101.    Alta Power detrimentally relied on the representations outlined above by agreeing to the Master Agreement and/or the LNTP with WattStock.

102.    GE's misrepresentations proximately caused Alta Power more than $100 million in damages.

## COUNT V: NEGLIGENT MISREPRESENTATION

103.    Alta Power incorporates each of the foregoing paragraphs by reference as if fully set forth herein.

104.    Alternatively, each fraudulent misrepresentation made by GE was made negligently since GE did not exercise reasonable care or competence in obtaining or communicating the information.

105.    Alta Power spent at least $10 million wasted dollars based on GE and WattStock's negligent misrepresentations and has lost more than $100 million in profits.

106.    Had GE and WattStock not negligently misrepresented the true facts, Alta Power would have been able to successfully serve the niche market and has lost more than $100 million as a result of GE and WattStock's fraudulent acts.

## COUNT VI: CIVIL CONSPIRACY

107.    Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

108.    GE and WattStock conspired to accomplish an object or course of action, namely, to defraud Alta Power and/or tortiously interfere with Alta Power's prospective contractual relations with ProEnergy.

109.    GE and WattStock agreed to and did in fact accomplish these objectives through the commission of numerous unlawful overt acts, including, but not limited to, by: (1) misrepresenting the nature of its relationship with WattStock; (2) falsely

represented that it could and/or would make up to nine GE TRUEPackages™ available for Alta Power to buy for at or below $10 million per GE TRUEPackage™; (3) misrepresenting the true pricing and availability of TRUEPackage™ units; (4) falsely holding itself out as the lowest cost, most financeable solution in the marketplace; (5) falsely representing that GE would "stand behind" and/or "fully wrap" WattStock's work related to the delivery of the GE TRUEPackages™.

110.    Alta Power relied on these representations and omissions to its detriment.

111.    Alta Power was damaged as a result of GE and WattStock's unlawful acts.

112.    Both GE and WattStock knew these representations and omissions were false (or created a false impression) when they made them, or at the very least, these representations were made recklessly and without knowledge of their truth.

113.    These representations and omissions were made with the intent that Alta Power act on them.

114.    Alta Power relied on GE and WattStock's representations about their relationship, and these representations proximately caused Alta Power millions of dollars in damages.

## COUNT VII: TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

115.    Alta Power incorporates each of the foregoing paragraphs as if fully set forth herein.

116.    GE and WattStock knew there was a reasonable probability that Alta Power would have entered into a contractual relationship with ProEnergy.

117.    To prevent that from happening, GE made numerous fraudulent and/or false/ and or negligent material misrepresentations to Alta Power, including but not limited to (1) misrepresenting the nature of its relationship with WattStock; (2) falsely represented that it could and/or would make up to nine GE TRUEPackages™ available for Alta Power to purchase for at or below $10 million per GE TRUEPackage™; (3) misrepresenting the true pricing and availability of TRUEPackage™ units; (4) falsely holding itself out as the lowest cost, most financeable solution in the marketplace; (5) falsely representing that GE would "stand behind" and/or "fully wrap" WattStock's work related to the delivery of the GE TRUEPackages™.

118.    GE undertook all of the acts described above with the conscious desire to prevent Alta Power from contracting with Pro Energy.

119.    GE's acts and omissions caused actual harm and damage to Alta Power.

120.    GE's acts and omissions caused Alta Power to lose more than one hundred million dollars in profit.

## VI.    JURY DEMAND

**121.**    Alta Power requests trial by jury on all contested issues of fact. The requisite jury fee has been paid.

## VII.    PRAYER

ACCORDINGLY, Alta Power prays that GE be cited to appear and answer and that upon a final trial of this matter, the Court enter a final judgment against GE awarding Alta Power the following relief:

a) An award of the full amount of actual damages incurred by Alta Power and caused by the acts and omissions of GE and WattStock;

b) An award of equitable damages, as requested above;

c) An award of exemplary damages;

d) Reasonable and necessary attorneys' fees;

e) Pre-judgment and post-judgment interest at the maximum rate allowed by law;

f) Cost of court; and

g) Such other and further relief, general or special, at law or in equity, to which Alta Power may show itself to be justly entitled.

Respectfully submitted,

JORDAN, LYNCH & CANCIENNE PLLC

By: /s/ Jeb Golinkin
     Michael Cancienne
     State Bar No. 24055256
     Joseph W. ("Jeb") Golinkin II
     State Bar No. 24087596
     1980 Post Oak Blvd., Ste. 2300
     Houston, Texas 77056
     713.955.4028
     713.955.9644 Facsimile
     mcancienne@jlcfirm.com
     jgolinkin@jlcfirm.com

     BAKER BOTTS L.L.P.
     Jessica B. Pulliam
     State Bar. No. 24037309
     John Lawrence
     State Bar No. 24055825
     2001 Ross Avenue, Suite 900
     Dallas, TX 75201-2980
     Telephone: 214.953.6500
     jessica.pulliam@bakerbotts.com
     john.lawrence@bakerbotts.com

**ATTORNEYS FOR ALTA POWER LLC**

**<u>CERTIFICATE OF SERVICE</u>**

     I hereby certify that a true and correct copy of the above pleading was served on all counsel of record through the Court's electronic filing service on the 14th day of May, 2024.

By:      /s/ Jeb Golinkin
             Jeb Golinkin