IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ALTA POWER LLC, | § | |
| | § | |
| *Plaintiff/Counter-Defendant*, | § | |
| | § | |
| v. | § | |
| | § | CASE NO. 3:23-CV-270-X |
| GENERAL ELECTRIC INTERNATIONAL, | § | |
| INC., n/k/a GE VERNOVA | § | |
| INTERNATIONAL LLC, d/b/a GE POWER | § | |
| SERVICES, | § | |
| | § | |
| *Defendant/Counter-Plaintiff.* | | |

**GE VERNOVA INTERNATIONAL LLC'S BRIEF IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

Table of Authorities.................................................................................................iii

Introduction ........................................................................................................... 1

Factual Background ............................................................................................... 3

I.  Alta is founded in late 2017 to develop gas-fired "peaker" power plants. ........................ 3

II.  Alta learns about and pursues the TruePackage offering.................................... 5

III.  Alta and WattStock execute a "Master Agreement" in early 2019 and discuss and execute multiple follow-on agreements in 2019 and 2020......................................... 8

IV.  Alta and WattStock exchange over a dozen pricing proposals in 2018 and 2019—each exceeds $10 million per unit. ................................................................ 11

V.  Alta fails to secure financing—for reasons wholly unrelated to GE or WattStock. ................................................................................................. 16

   A.  Deutsche Bank decides not to finance Alta's project because Alta lacked sufficient equity and faced legal risk from Castleman............................................ 16

   B.  Starwood decides not to finance Alta's project because Alta lacked sufficient equity and the uncertainty created by COVID-19. ................................................. 19

VI.  Alta unilaterally terminates its contracts with WattStock, and WattStock sues to recover its losses. ................................................................................... 21

Legal Standard.................................................................................................... 23

Summary of the Argument .................................................................................. 24

Argument ............................................................................................................. 26

I.  Alta cannot recover lost profits as a matter of law........................................ 26

   A.  Alta's own contracts bar it from recovering consequential damages, including lost profits. ................................................................................. 27

   B.  Alta cannot recover its alleged lost profits as a matter of law because it cannot create a genuine fact dispute as to whether it lost *any* profits with reasonable certainty................................................................................ 28

      1.  Alta cannot raise a genuine fact dispute as to whether it could have secured the financing needed to build even a single peaker plant. ................................................................................. 31

      2.  Alta cannot raise a genuine fact dispute as to whether it could have had any plants built and fully operational by Winter Storm Uri in February 2021................................................................... 33

i

TABLE OF CONTENTS
(continued)

Page

    3.    Alta cannot raise a genuine fact dispute as to whether its plants would have operated continuously and without issue for the duration of Winter Storm Uri. .............................................. 34

    4.    Alta cannot raise a genuine fact dispute as to whether its HRCOs would have been in effect during Uri, causing Alta to lose millions. .......................................................................... 36

    C.    Alta cannot quantify the profits it allegedly lost with reasonable certainty ........... 37

II.    Alta cannot recover any damages (including out-of-pocket damages) because it cannot create a genuine fact dispute that its losses were caused by anything GE or WattStock did—instead of its own failure to secure financing. ......................... 39

III.    Alta's claims—which seek to enforce two alleged oral promises—are barred by the statute of frauds. ....................................................................................... 41

IV.    Alta's direct tort claims against GE fail as a matter of law. ........................................ 42

    A.    Alta cannot create a genuine fact dispute as to whether GE made any of the alleged promises on which Alta's case is premised. ............................................... 42

    B.    Alta cannot create a genuine fact dispute as to whether it reasonably relied on any of the alleged misrepresentations. .......................................................... 43

V.    Alta's attempt to hold GE vicariously liable for WattStock's alleged breach of contract and torts fails as a matter of law ....................................................................... 45

VI.    Alta's remaining derivative claim and theories of liability fail as a matter of law. .............................................................................................................................. 47

VII.  At minimum, Alta cannot recover punitive damages as a matter of law. ...................... 48

    A.    Alta is contractually barred from seeking punitive damages. ................................. 48

    B.    Alta cannot create a genuine fact dispute as to whether GE acted with malice or gross negligence or fraudulently ...................................................................... 49

VIII. The record conclusively establishes that Alta breached its covenant not to sue for consequential damages, including lost profits. ............................................................. 49

Conclusion ........................................................................................................................... 50

TABLE OF AUTHORITIES

Page(s)

## Cases

*Agar Corp., Inc. v. Electro Cirs. Int'l, LLC,*
 580 S.W.3d 136 (Tex. 2019) ........................................................................48

*Baylor Univ. v. Sonnichsen,*
 221 S.W.3d 632 (Tex. 2007) ....................................................................1, 42

*Blue Gordon, C.V. v. Quicksilver Jet Sales, Inc.,*
 444 F. App'x 1 (5th Cir. 2011) ....................................................................39

*Bombardier Aerospace Corp. v. SPEP Aircraft Hldgs., LLC,*
 572 S.W.3d 213 (Tex. 2019) ........................................................................27

*Burkhart Grob Luft Und Raumfahrt GmbH & Co. KG v. E–Sys., Inc.,*
 257 F.3d 461 (5th Cir. 2001) ........................................................................28

*Cantu v. Bernal,*
 No. 13-22-00489-CV, 2023 WL 8817846 (Tex. App.—Corpus Christi–
 Edinburg Dec. 21, 2023, no pet.) .................................................................47

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986) ......................................................................................23

*Christus Health v. Quality Infusion Care, Inc.,*
 359 S.W.3d 719 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ................48

*DeWolff, Boberg, & Assocs. Inc. v. Pethick,*
 No. 24-10375, -- F.4th --, 2025 WL 999124 (5th Cir. April 3, 2025)............23

*Diamond Servs. Corp. v. RLB Contracting, Inc.,*
 113 F.4th 430 (5th Cir. 2024) .......................................................................48

*Eagan v. Walgreen Co.,*
 No. 21-20352, 2022 WL 683636 (5th Cir. Mar. 8, 2022) ............................43

*Edds v. Mitchell,*
 184 S.W.2d 823 (Tex. 1945) ........................................................................49

*El Dorado Motors, Inc. v. Koch,*
 168 S.W.3d 360 (Tex. App.—Dallas 2005, no pet.) ...............................28, 37

*In re Fisher,*
 649 F.3d 401 (5th Cir. 2011) ........................................................................40

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,*
 960 S.W.2d 41 (Tex. 1998) ...............................................................39, 41, 50

*Gaines v. Kelly,*
 235 S.W.3d 179 (Tex. 2007) ........................................................................47

*In re Guardianship of Fortenberry,*
 261 S.W.3d 904 (Tex. App.—Dallas 2008, no pet.) ....................................47

*Haase v. Glazner,*
 62 S.W.3d 795 (Tex. 2001) ......................................................................1, 41

*Harris Cnty. v. MERSCORP Inc.,*
 791 F.3d 545 (5th Cir. 2015) ........................................................................47

*Hemphill v. State Farm Mut. Auto. Ins. Co.,*
 805 S.W.3d 535 (5th Cir. 2015) ...................................................................23

TABLE OF AUTHORITIES
(continued)

Page(s)

*HMC Hotel Prop. II LP v. Keystone–Texas Prop. Holding Corp.*,
   439 S.W.3d 910 (Tex. 2014) ................................................................24, 39

*Horizon Health Corp. v. Acadia Healthcare Co.*,
   520 S.W.3d 848 (Tex. 2017) ..........................................................28, 37, 39

*Jacked Up, LLC v. Sara Lee Corp.*,
   291 F. Supp. 3d 795 (N.D. Tex. 2018), *aff'd*,
   No. 3:11-cv-3296-L, 2018 WL 2064126 (N.D. Tex. May 2, 2018)......................39

*Lake v. Cravens*,
   488 S.W.3d 867 (Tex. App.—Fort Worth 2016, no pet.)................................32, 39

*Lee & Lee Int'l, Inc. v. Lee*,
   261 F. Supp. 2d 665 (N.D. Tex. 2003) .....................................................32

*Lost Maples Gen. Store, LLC v. Ascentium Cap., LLC*,
   No. 14-18-00215-CV, 2019 WL 1966671 (Tex. App.—Houston [14th Dist.]
   May 2, 2019, no pet.)........................................................................46

*Nix v. Major League Baseball*,
   62 F.4th 920 (5th Cir. 2023) ...............................................................47

*Smith Int'l, Inc. v. Egle Grp., LLC*,
   490 F.3d 380 (5th Cir. 2007) ...............................................................50

*St. Joseph Hosp. v. Wolff*,
   94 S.W.3d 513 (Tex. 2002) .................................................................46

*Sterner v. Marathon Oil Co.*,
   767 S.W.2d 686 (Tex. 1989) ...............................................................48

*Sw. Bell Tel. Co. v. DeLanney*,
   809 S.W.2d 493 (Tex. 1991) ...............................................................41

*Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*,
   877 S.W.2d 276 (Tex. 1994) .................................................1, 2, 24, 28, 37

*Tri v. J.T.T.*,
   162 S.W.3d 552 (Tex. 2005) ...............................................................48

*Watson v. CitiMortgage, Inc.*,
   No. 3:11-cv-2733, 2012 WL 381205 (E.D.Tex. Feb. 3, 2012) ...........................25

*In re Xerox Corp.*,
   555 S.W.3d 518 (Tex. 2018) ...............................................................46

**Statutes, Rules & Other Authorities**

Dan B. Dobbs & Caprice L. Roberts, *Law of Remedies* (3d ed. 2018) ...................27

Fed. R. Civ. P. 56 .............................................................................23

Tex. Bus. & Com. Code § 2.201 ................................................................41

Tex. Bus. & Com. Code § 26.01 ................................................................41

Tex. Civ. Prac. & Rem. Code § 41.003 .........................................................49

### INTRODUCTION

This is a breach case in search of a contract. Alta contends GE made, but failed to keep, two oral promises: (1) "to deliver at least nine TruePackage units for $10 million or less"; and (2) to "fulfill WattStock's obligations under any contractual relationship that WattStock had with Alta Power." App.36–37. But those alleged promises were never reduced to writing by anyone—much less a signed writing. So they are unenforceable under the statute of frauds—and Alta cannot use tort claims to recover the benefit of an unenforceable bargain. *See Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636–37 (Tex. 2007). And that is precisely what Alta seeks to do here—"to recover as damages the benefit of a bargain that cannot otherwise be enforced because it fails to comply with the Statute of Frauds." *Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex. 2001).

Statute of frauds aside, Alta's lost-profits claim fails as a matter of law both because Alta contractually waived any lost-profits claims, and because Alta has no evidence to establish "with reasonable certainty" that it lost any profits, much less quantify the profits allegedly lost. *See Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279–80 (Tex. 1994). Alta's alleged lost profits are "at best hopeful; in reality, they [are] little more than wishful." *Id.* at 280.

Alta, a startup company, never: (1) achieved commercial operations on the peaker-plant projects at issue in this case; (2) completed comparable projects for any gas-fired peaker plants; or (3) generated any revenue or profit. Indeed, despite approaching nearly 90 lenders, Alta never secured financing and never purchased even a single refurbished turbine, even though its lost-profits model requires Alta to prove that: (1) it would have secured financing; (2) its peaker plants would have achieved commercial operations before Winter Storm Uri; (3) the plants would have been able to run during Uri; (4) the power generated during Uri would not have been contractually owed to another party; and (5) Alta would have been able to make (and keep) the extraordinary

revenue it would have generated during Uri.  So its lost-profits claim fails as a matter of law.  *See Tex. Instruments*, 877 S.W.2d at 279–80 (the "mere hope for success of an untried enterprise, even when that hope is realistic, is not enough for the recovery of lost profits").

Damages issues aside, summary judgment should be granted for GE because Alta's claims fail on the merits in all events:

- Alta's fraud (Count III), fraudulent inducement (Count IV), and negligent misrepresentation (Count V) claims all fail as a matter of law because Alta cannot create a genuine dispute of material fact (1) that the alleged misrepresentations were ever made, and (2) that Alta reasonably relied on GE's alleged misstatements, as Alta's conduct and its contracts with WattStock conclusively establish that any reliance was unreasonable.

- Alta's vicarious-liability claims (Count I)—which seek to hold GE liable for WattStock's alleged "breaches and torts" under partnership by estoppel, joint enterprise, and ostensible agency theories—are barred by the Alta-WattStock contracts and fail in all events because Alta cannot establish the elements of any of those theories.

- Because its underlying claims fail, Alta's claim for tortious interference (Count VII) and its derivative theories of recovery—unjust enrichment (Count II) and civil conspiracy (Count VI)—fail, too.

- And, at minimum, Alta cannot recover punitive damages—both based on its contractual waivers and because it cannot prove fraud, malice, or gross negligence by clear and convincing evidence as a matter of law.

Finally, summary judgment should also be granted on GE's contract claim against Alta. Despite contractually agreeing not to sue WattStock or its subcontractors—including GE—for any incidental, indirect, or consequential damages, Alta did exactly that.  Because there are no genuine material fact disputes, summary judgment should be granted for GE on Alta's claims and on GE's contractual counterclaim.

**FACTUAL BACKGROUND**

**I.    Alta is founded in late 2017 to develop gas-fired "peaker" power plants.**

Alta Power, LLC was founded in late 2017 by Bill Phelps and Matthew Laterza.  App.86.
Travis West and Roy Hart joined shortly thereafter to help Alta develop gas-fired peaker plants in
Texas.  App.96–97.  Many gas-fired peaker plants use aeroderivative gas turbines (jet engines on
skids) designed to supply power when customer demand is at its greatest (or "peak").
Aeroderivative turbines are specially designed for rapid startup, flexibility, and efficiency at high-
power output levels, making them well suited for peaker plants.  To get from concept to
commercial operation, peaker-plant owners generally need a site for the plant, the gas turbines
(and other equipment), and an Engineering, Procurement, and Construction contractor ("EPC
contractor") to handle on-the-ground aspects of the project, including engineering for and
construction of the plant.  Most developers pursuing peaker-plant projects also need financing.

One way developers attract financing is by negotiating for "contracted revenues."  Some
of these arrangements convert the financial upside of a peaking (high demand) event into a steady
income stream by selling an option contract known as a heat rate call option ("HRCO"), which has
an exercise price tied to its seller's cost to generate electricity.  The buyer of a HRCO locks in the
right to purchase electricity at a pre-negotiated rate—a rate that will be below the market rate when
supply is short and demand is high.  In exchange, the seller receives a guaranteed monthly fee.

HRCOs are like insurance policies for electricity prices.  The buyer pays a monthly
premium to protect against spikes in electricity prices, while the seller collects premiums, hoping
the buyer's demand for electricity will never exceed the seller's capacity to produce it.  If that were
to happen, the seller would be forced to purchase energy on the open market—when electricity
prices are typically at their highest.  This was exactly Alta's plan—use HRCOs to trade most of

3

its upside potential (the ability to charge its customers high prices during a peak event) for a steady stream of income that Alta could use to repay the debt used to finance its plant.

Alta had never built a peaker plant before—and to this day it still hasn't. *See* App.119–20. Alta calls its peaker strategy "unique" and "creative" and alleges that, if successful, it would have been a "first mover" in the Texas peaker-plant market. App.56–57; App.87. But Travis West and Roy Hart had previously worked with Castleman Power—one of Alta's competitors—on projects in Texas that Castleman completed before Alta's foray into the space. *See* App.129 (Travis West testifying about when he left Castleman); App.6038 (Roy Hart confirming he began working for Castleman around 2017 or 2018). Castleman achieved commercial operations with Chamon, a Texas peaker-plant project, in 2017, App.7059, and Castleman had two additional peaker plants in Victoria, Texas. App.7062.

That Castleman was able to achieve commercial operations with Chamon and obtain financing for two additional plants doesn't tell the entire story. West, who was working with Castleman at the time, testified that Castleman's Texas projects nearly failed because of issues with its EPC contractor, ProEnergy. According to West, ProEnergy was "detrimental to the [Castleman] projects," App.124, and had a track record of falling "woefully behind" on projects. App.136.

Lenders also preferred, if not required, an original equipment manufacturer's involvement to finance a new project. When Castleman approached Deutsche Bank to finance its peaker plant, Deutsche Bank did not immediately accept. Instead, the bank required Castleman to ensure that the original equipment manufacturer ("OEM") of the turbines Castleman acquired, rather than ProEnergy, warranty (and service) the turbines. App.140, 142 (due to the "unreliability" of two

of Castleman's plants "during their first year of operation," "the lenders have requested a reliability guarantee").

Knowing that Alta was embarking on a peaker-plant project, ProEnergy sent Alta a proposal for its services in August 2018. App.144. ProEnergy proposed building a 3-turbine plant for $55.8 million. App.152. The proposal was valid for only 30 days, was subject to prior sale, and contained no specific price for the gas turbines. *Id.* But Alta knew that ProEnergy was already active in the turbine-powered peaker plant space—it "had developed a site on [its] own at the time," which would directly compete with Alta's proposed peaker plant. App.134. As it was a competitor, Alta chose not to use ProEnergy:

> Q.   Okay.  Why didn't you go with ProEnergy, then, if their numbers are cheaper?
>
> A.   We didn't -- we didn't go with ProEnergy because ProEnergy had developed a site on their own at the time, and they were a direct competitor.

App.134; *see also* App.137 ("Q. Is the reason that you did not go with ProEnergy that they were a direct competitor? A. That's correct.").

## II.    Alta learns about and pursues the TruePackage offering.

In May 2018, Alta learned about the TruePackage offering. *See* App.7037 (Alta requesting meeting with WattStock); App.38 (testifying about "nearly [] bi-weekly" meetings after May 3, 2018). TruePackage is a solution created by GE for developers and other potential end-users to purchase fully refurbished GE gas turbines with a GE warranty, resolving the above OEM problem Castleman faced.

GE and WattStock entered a Memorandum of Understanding ("MOU") in June 2017 for the TruePackage offering. App.247. The MOU did not "create any partnership, corporation, agency or fiduciary relationship" but instead "serve[d] as the framework for further discussions

and the negotiation and documentation of definitive agreements" concerning the "purchase, refurbish[ing], and resale" of GE turbines for the TruePackage offering. *Id.*; *see also* App.251; App.474; *cf.* App.253. The MOU was meant to "formalize[ ] [WattStock and GE's] collaboration" to provide OEM-warrantied refurbished equipment to companies "looking for an alternative" to expensive new equipment. *See* App.257–58.

Under the TruePackage program, either WattStock or GE could be the "lead," with the other party being the subcontractor to the "lead." GE could be "in the lead" on a TruePackage deal and have a direct contractual relationship with the end user if that end user requested it. (That was the structure of the IP Mansfield power-plant project that GE and WattStock worked on before the Alta opportunity.) Alternatively, WattStock could be in the lead—and GE would operate as one of WattStock's subcontractors—if WattStock was the source of the opportunity or the end user requested it. One benefit of WattStock being "in the lead" is that the end user could avoid paying the OEM "premium" that GE charges for its work on projects in which it is the lead. *See* App.260, 262–65.

TruePackage is cheaper than purchasing a new gas turbine. It enables the power-plant developer (in this case, by contracting with WattStock) to acquire "fully refurbished" used turbines for its project. Some end users have purchased TruePackages to supply power for their own internal company use (e.g., for backup or emergency generation). Alta, by contrast, wanted to use TruePackage to become an Independent Power Producer ("IPP"). It planned to offer energy both to contracted "offtakers" (parties that purchase HRCOs, allowing them to "call" on Alta's production for a specified number of hours each year)—and, to the extent it could, at market prices

in the Electric Reliability Council of Texas ("ERCOT") system.[1]  So, in May 2018, Alta contacted WattStock to discuss using TruePackage for its gas-fired peaker-plant project.

Alta and WattStock met for the first time in person to discuss the TruePackage offering on May 3, 2018.  App.274.  WattStock and GE disagree with Alta about whether anyone from GE attended that meeting, but according to Alta, representatives of WattStock and GE both said they would deliver "up to nine fully refurbished TruePackages for 10 million or less per unit" at that initial meeting—and at "every" nearly biweekly Alta-WattStock meeting that occurred from then until late February 2019.  App.274–75.  Alta also claims that WattStock and GE represented at that initial meeting—and again at nearly every subsequent meeting—that GE would "stand[ ] behind" or "fully wrap[ ]" WattStock's work and obligations under any contract between WattStock and Alta in the event of a WattStock default.  *Id.*; App.38.

In May 2018, Alta and WattStock also executed a nondisclosure agreement.  App.409.  GE was neither named in nor a signatory to that agreement.  Instead, in December 2018 (more than six months later), Alta and GE executed their own, separate nondisclosure agreement (the "GE-Alta NDA").  The GE-Alta NDA expressly limited each party's liability:

> 11.  In no event shall either Party be liable for loss of profit or revenues, loss of use, cost of capital, or for any special, consequential, incidental, indirect, punitive or exemplary damages, regardless of whether a claim is based in contract, warranty, indemnity, tort/extra-contractual liability (including negligence), strict liability or otherwise. Each Party acknowledges that money damages would not be a sufficient remedy for any breach of this Agreement. Accordingly, in the event of any such breach, in addition to any other remedies at law or in equity that a Party may have, it shall be entitled to equitable relief, including injunctive relief or specific performance, or both.

_____

[1]  In fact, Alta planned to give up nearly all its financial upside by agreeing to sell roughly 90% of its power through HRCOs, to generate the recurring premium payments any lender would have required to repay its loan.  App.280–83; *cf.* App.327 (Alta "[h]edg[ed] with a HRCO to secure financing").  Put simply, even if Alta had managed to make its peaker-power plant operational, Alta would have traded the potential financial "boom" of a peaking event for a steady stream of HRCO premiums.

App.416 (emphases added).

The GE-Alta NDA also expressly denied any reliance "upon any representation or expectation that the other Party will enter into any relationship or transaction" or any prior understandings not memorialized in the NDA. App.415–16. Instead, GE and Alta both mutually agreed that any future relationship or transaction would be "based upon another agreement in writing signed by the Parties." *Id.* GE and Alta never executed any other written agreements.

### III.    Alta and WattStock execute a "Master Agreement" in early 2019 and discuss and execute multiple follow-on agreements in 2019 and 2020.

On February 5, 2019, Alta and WattStock signed a "Term Sheet" to "facilitate discussions . . . aimed at arriving at a definitive agreement between them." App.420. GE was not a party or a signatory to the Term Sheet. App.420, 423. Three weeks later, Alta and WattStock executed their "Master Agreement," which largely mirrors the Term Sheet and outlines the relationship between Alta and WattStock. App.425, 436.

The Master Agreement outlined at least six steps to get from identifying surplus gas turbines to purchasing those turbines for Alta's project:

(1)    WattStock would provide Alta an initial list of turbines;

(2)    WattStock and Alta would jointly rank those turbines;

(3)    WattStock would inspect the turbines;

(4)    WattStock would provide Alta a not-to-exceed price for refurbishment of the turbines that would not include "any defects that were not reasonably identifiable" through an inspection;

(5)    WattStock and Alta would agree "in writing" on the terms for WattStock to try to purchase the turbines; and

(6)    WattStock would then negotiate with the owners of those turbines to try to purchase them on the terms approved by Alta.

App.99–101, 427–28.

The Master Agreement did not require Alta to buy any of the turbines WattStock identified. App.429. Instead, if Alta wanted to buy one of the turbines, it would have to execute a "definitive" agreement describing the "scope, terms, and price." App.428. Alta acknowledged that the price "may vary due to the variable condition of each asset and the variable scopes of refurbishment work." *Id*.

The Master Agreement also contained a mutual waiver of consequential damages and covenants not to sue under which Alta and WattStock agreed not to make "any claim" against each other or their "subcontractors" for any "***consequential damages*** arising out of or ***connected in any way to this agreement***"—including but "not limited to" "loss of profit" or "any other consequential damages" from "any cause of action":

> B. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, AND TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER PARTY, THEIR RESPECTIVE OFFICERS, DIRECTORS, PARTNERS, EMPLOYEES, REPRESENTATIVES, CONTRACTORS OR SUBCONTRACTORS SHALL BE LIABLE TO THE OTHER OR SHALL MAKE ANY CLAIM FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR CONNECTED IN ANY WAY TO THIS AGREEMENT. THIS MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES SHALL INCLUDE, BUT IS NOT LIMITED TO, LOSS OF USE, LOSS OF PROFIT, LOSS OF BUSINESS, LOSS OF INCOME, LOSS OF REPUTATION OR ANY OTHER CONSEQUENTIAL DAMAGES THAT EITHER PARTY MAY HAVE INCURRED FROM ANY CAUSE OF ACTION INCLUDING NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT AND BREACH OF STRICT OR IMPLIED WARRANTEE.

App.432 (emphases added). Alta and WattStock also agreed to cap each other's liability under the contract to $100,000 for "***any and all claims***, losses, costs, damages of ***any nature whatsoever*** or claims expenses from any cause or causes, including attorneys' fees and costs and expert-witness fees and costs." *Id*. (emphases added).

The Master Agreement was just the start. Alta and WattStock executed three additional contracts after their Master Agreement: (1) a purchase order or Limited Notice to Proceed ("LNTP") related to turbines owned by Turkish company Nuh Cimento in May 2019; (2) a Cancellation Fee Agreement on August 2019; and (3) a Limited Notice to Proceed on December

23, 2019 (the "December LNTP").  App.438, 456, 459.  And in February 2020, Alta and WattStock executed a First Amendment to the Master Agreement.  App.463.

GE was not a party to any of these contracts.  And none of them contained any language even remotely suggesting that GE and WattStock were in a partnership, agency relationship, joint venture, or enterprise together.  Nor was there any language suggesting that GE would satisfy WattStock's contractual obligations to Alta in the event WattStock defaulted.  There wasn't any language suggesting that GE (or WattStock for that matter) would sell Alta nine TruePackages for $10 million or less, either.

Instead, Alta expressly acknowledged in the August 2019 Cancellation Fee Agreement that GE was simply WattStock's subcontractor on Alta's proposed project.  That agreement made clear that Alta understood that "[i]mportant components of WattStock's work . . . will be ***subcontracted*** to GE."  App.456 (emphasis added).  Alta agreed to reimburse WattStock up to $750,000 for any fees that WattStock might owe GE if Alta failed to get financing for its project or otherwise failed to pay for the work WattStock subcontracted to GE.  *Id.*; App. 7046–49.

A few months later, on December 23, 2019, Alta and WattStock entered the December LNTP for a 1-site, 2-turbine peaker-plant configuration.  The December LNTP included two TruePackages for a purchase price of $19,583,426, which was "based upon" over half a dozen "assumptions," including:

(1)  a specific scope of work that expressly did not include power control modules ("PCMs") or switchgear (systems ensuring reliable power distribution and protecting equipment),

(2)  the purchase of "2 Nuh Cimento Units for a combined price of $8,125,000," and

(3)  project "financial closing no later than February 28, 2020."

App.440–42.

Section 22 of Exhibit A to the December LNTP contains an express limitation-of-liability provision, which waives consequential damages (including lost profits) and punitive and exemplary damages:



> 22.2. Consequential Damages.
>   22.2.1. The Seller shall not be liable for loss of profit or revenues, loss of product, loss of use of the Work or any associated equipment, interruption of business, cost of capital, cost of replacement equipment, downtime costs, increased operating costs, claims of the Buyer's customers for such damages, or for any special, consequential, incidental, indirect, punitive or exemplary damages.

App.449.  Section 34.1—labeled "Third-Party Beneficiaries"—makes clear that its "Limitation of Liability" provision benefits not only WattStock and Alta but also third parties.



> 34.1. Third-Party Beneficiaries.
>   34.1.1. Except as provided in the Article entitled "Limitation of Liability", these provisions are for the benefit of the Parties hereto and not for any other third party.

App.451.

Alta claims that it executed (or considered executing) its written agreements with WattStock only because of the oral representations about (1) the price of the TruePackages and (2) the relationship between GE and WattStock.  And although Alta claims that it believed WattStock and GE were in some type of legal partnership, agency relationship, joint venture, or enterprise such that GE was responsible if Alta failed to perform, in September 2018, Alta proposed—and sent WattStock—a written contract to establish an exclusive joint venture between Alta and WattStock to "market[ ] GE equipment," including gas turbines.  App.41.  And, in April 2020, Alta and WattStock had discussions about Alta *acquiring* WattStock.  App.466–67.  GE was not involved in any of those discussions.  App.42.

**IV.    Alta and WattStock exchange over a dozen pricing proposals in 2018 and 2019—each exceeds $10 million per unit.**

Alta insists that GE (and WattStock) orally promised to deliver up to nine TruePackages for $10 million or less per "unit"—and Alta defines "unit" to include not only the turbine, and the

generator, switchgear, and PCM, but also (a) transportation for the turbine, (b) dismantling, crating, and shipping, and (c) commissioning and installation of the TruePackages. App.274–75, 43.

But Alta cannot produce a single writing showing that GE or WattStock *agreed* to sell TruePackages subject to a $10 million cap. *See* App.469; *see also* App.259 (explaining GE never put a "formal" price on the Alta proposal); App.478 (explaining the potential variance in pricing depending on the final purchase). In fact, the opposite is true.

From May 2018 through early 2020, WattStock and Alta exchanged dozens of written pricing proposals and emails related to TruePackage pricing. App.482. In nearly every single one of them, the price for each TruePackage "unit" (as defined by Alta in this case) exceeded $10 million. *See* App.497, 533, 535, 544, 568, 602, 622, 627, 629–30, 632, 643, 659, 827; 910; *see also* App.40 (Alta's 30(b)(6) witness agreeing that Alta and WattStock exchanged several emails and proposals between July 2018 and December 2019 that included prices "greater than $10 million per TruePackage").

One representative example of the Alta-WattStock exchanges is particularly telling because it reflects Alta's own revisions to a pricing proposal. Notably, Alta did *not* reduce the price per unit to below this supposed $10-million-or-less price guarantee. On February 21, 2019—just days before Alta and WattStock executed their Master Agreement—Alta sent WattStock a revised equipment proposal, changing the scope of equipment that WattStock would furnish. App.952–87.

Alta's redline of the proposal made the price of three TruePackage "units" $31,177,500. App.964. But even that $10.4 million per unit price did not include transportation costs (which would be billed at "cost plus 15%"), taxes, or fees. *Id.* And, critically, it also made clear that the

price was "based on the purchase of nine [gas turbines] and equipment"—"[l]ower quantities may result in higher pricing." *Id.* So not only did the current price exceed $10 million per unit, but Alta knew that the price could still go up further. App.39.



App.964.

Ultimately, WattStock executed contracts or made arrangements with the owners of six turbines for Alta's project. *See* App.991–92, 1000, 1023, 1030, 1060, 1062. Alta made down payments on four of these turbines. *See* App.1092–93, 1095–96; *see also* App.1101 (spreadsheet showing Bosen downpayment).

As Alta's corporate representative admitted, "in nearly every month between July of 2018 and December of 2019, WattStock sent a pricing proposal to Alta above $10 million per unit." App.40. And some later proposals exchanged between WattStock and Alta included a new section 4.5 that made clear that if Alta "has not entered into a contract with WattStock for the second site and [gas turbines] 4 through 6 by June 1, 2019, the price for Units 1 through 3 shall increase by $583,733 each." App.568, 602; *see also* App.1103.

Over that same period, WattStock consistently told Alta about certain fees that the current owners might owe when the turbines are sold. Starting on February 8, 2019 (before the Master Agreement), WattStock noted that one of the turbines on its initial list would be subject to a "GE CSA termination fee." App.1105–06.

Termination fees are early cancellation fees the current turbine owners might have to pay for cancelling their turbine-related equipment service agreements—called Contractual Service Agreements ("CSA"), Long Term Service Agreements ("LTSA"), or Multiyear Agreements ("MYA")—early. App.1110–12. GE offers LTSAs on its turbines. These agreements transfer certain risks of operating a turbine "to counterparties best equipped to manage them." App.1124. And typically "what is sought in project finance is for the OEM," here GE, "to provide some kind of service, some kind of long term service agreement to make sure the thing that is being financed is working." *Id.*; App.1132 (a "service agreement with the OEM[ ] . . . is always beneficial" when evaluating a project because the OEM "know[s] their equipment . . . and [how to] service it the right way"). If a counterparty to a GE service agreement cancels that arrangement before the contract's expiration date—on the sale of the turbine covered, for example—GE may be entitled to termination fees.

Turbines Alta considered for its project from three Turkish owners were serviced under LTSAs whose cancellation would entitle GE to termination fees: "Acarsoy," "Ataer," and "Nuh Cimento." App.1151 (Acarsoy and Nuh termination fees stated on tracker); App.1153–54 (summary of Ataer termination fees). Alta claims that these termination fees would "materially increase[ ] project costs." *See* App.69. But the owner of the Ataer turbines never tried to pass the cost of any termination fee on to Alta. App.49 ($5.65 million purchase price was "free and clear" with no reference to termination fees). Alta's own documents and testimony show the total

termination fee sought by current owners for three of the units was $1.95 million—$500,000 for the Acarsoy turbine and $1.45 million total for the two Nuh Cimento turbines.  App.51, 1151.

But even that figure is both high and misleading.  As part of Alta and WattStock's arrangement with the Acarsoy owner, the termination fee was included in the purchase price, which would have been reduced by *any amount* that GE agreed to waive.  App.1003 (setting purchase price at $7,500,000 minus "an amount equal to the amount General Electric reduces Seller's payment of the Early Services Termination Fee, if any"); App.48.  As to the Nuh Cimento turbines, Alta claims it would have been forced to bear the full cost of the termination fee because Nuh Cimento would raise the price or otherwise pass it on.  But GE agreed to reduce the total termination fee that Nuh Cimento owed GE to $750,000 if Nuh Cimento delivered the turbines to Alta, and Alta entered an MYA with GE for those turbines.  App.7055–57.

In March 2019, WattStock began sending Alta monthly "tracker" documents to keep Alta apprised of WattStock's efforts to negotiate with the current owners of the used turbines.  These trackers provided additional information about the machines, including information on non-GE parts installed inside them, as well as LTSA termination or cancellation fees.  *See*, *e.g.*, App.1162. For example, in the very first tracker, and every tracker that followed, WattStock disclosed that two of the turbines (Bosen and Zorlu) had non-GE "Chromalloy" parts.  App.45, 1167.  By policy, GE does not warranty non-GE parts—and TruePackage included an OEM warranty (or a WattStock warranty backed by the OEM).  App.1112.  So, to use the Bosen or Zorlu turbines, WattStock would have to replace the non-GE "Chromalloy" parts.  App.1169, 1171, 1174–75, 1178.

Alta never pursued the Zorlu turbine.  App.1173–74, 46–47.  And, in March 2020, when Alta considered purchasing the Bosen unit to upsize from a 2-turbine plant to a 3-turbine plant,

WattStock estimated that the cost of purchasing the refurbished the Bosen turbine would be $11,334,526—bringing the total price for the three TruePackages to roughly $30,917,951. App.117; *see* App.1188 (listing "CTG Equipment Cost" as $30,917,951).

But Alta did not end up buying any turbines—or any other TruePackages for that matter. Nor could it have. That is because Alta's purchase of these TruePackages was contingent on it securing outside financing. But Alta could not secure financing. Although Alta contends that it could not get financing because of the LTSA termination fees and Chromalloy parts, discovery conclusively establishes that lenders refused to fund Alta's project for reasons that had nothing to do with GE or WattStock—and everything to do with Alta.

## V.    Alta fails to secure financing—for reasons wholly unrelated to GE or WattStock.

From early 2018 through the end of 2020, Alta sought financing from more than 88 lenders and investors for its peaker-plant project. App.113–14. No one was willing to invest in Alta. The two lenders that came the closest to lending to Alta were Deutsche Bank and Starwood. Deutsche Bank evaluated Alta's project and decided against investing in September 2019. *See* App.1125. Starwood evaluated Alta's project after Deutsche Bank and decided not to move forward in March and April 2020. App.1194–95, 1200.

### A.    Deutsche Bank decides not to finance Alta's project because Alta lacked sufficient equity and faced legal risk from Castleman.

Deutsche Bank and Alta signed an engagement letter around June 20, 2019. App.1202. The letter did "not constitute a commitment by [Deutsche Bank] to provide any financing." *Id.* Instead, it allowed Deutsche Bank to conduct due diligence on Alta's project to determine whether the project was something Deutsche Bank wanted to finance.

Deutsche Bank never committed to financing Alta's project. One reason why Deutsche Bank did not finance Alta's project was that Alta did not have sufficient equity in its project.

App.1122.  Deutsche Bank required Alta to contribute equity in the form of capital equal to at least 10% of its project's construction costs.  App.1121–22; App.1219 (setting "[m]inimum equity %" at 10% of construction costs).  For the 3-turbine, 3-site peaker plant configuration Alta proposed to Deutsche Bank, Alta would have to raise an additional $15 million in equity to meet Deutsche Bank's requirements.  *See* App.380 ("Given the $75.2 million in project costs for a single three-unit project in my revised scenario, this yields $15.1 million in missing funds if Deutsche Bank had been willing to lend 90% of the project costs for three projects . . .").

But Alta's lack of equity was not its only hurdle.  On August 16, 2019, Castleman sent Alta a cease-and-desist letter and threatened suit.  App.1221–23.  According to Castleman, Travis West and Roy Hart had both signed binding non-competes while they were working at Castleman—and not only did their work for Alta violate those agreements, but they had also stolen Castleman's trade secrets and shared them with Alta.  App.1221–22.

Roy Hart worked for Alta mostly behind the scenes as its "contract development consultant" during his non-compete period.  App.1230.  Mr. Hart provided on-going coaching and guidance to his wife, April Hart, who had taken over his role as Alta's development head.  App.1228–29 ("If there was anything related to power plant development that I did, he coached me.").  Indeed, at Mr. Hart's instruction, Mrs. Hart used a different name (April Henry) in her external communications during the non-compete period specifically "to make less obvious the relationship between" her and her husband.  App.1227.

Travis West apparently took critical confidential documents from Castleman—including the Independent Engineer's Report that comprehensively described the business plan for two of Castleman's power plants, a lender presentation, and other strategy documents—and provided them to Alta.  *See* App.1235, 1236, 1286, 1299, 1130; *see also* App.1316 (sending Alta

confidential document in same email as his Castleman non-compete). West also conducted extensive work for Alta's power plants in ERCOT. Although West has tried to argue that he did not violate his non-compete because he was helping Alta for "free," he was being paid by an entity also owned by Alta's Chief Executive Officer (Phelps) and Chief Financial Officer (Laterza). App.135.

Alta ultimately resolved Castleman's claims by agreeing to pay $400,000. App.115. But Deutsche Bank was unable to get comfortable with the terms of the settlement. App.1318, 1119. The Castleman dispute was one of the main factors in Deutsche Bank's decision not to finance Alta's project. App.1119–20; *see also* App.1320 (noting "that Deutsche Bank has had some concerns about the facts" of Alta's dispute with Castleman), App.88, App.1318 (letter from Bill Phelps, Alta's CEO, explaining that "financing was put on hold by Deutsche Bank").

As part of its due diligence, Deutsche Bank also asked Alta about the relationship between GE and WattStock. App. 7051–53. Deutsche Bank was specifically interested in whether GE would guarantee performance of the Master Agreement in the event WattStock defaulted. *Id*. GE sent a letter to Alta explaining that GE was a "subcontractor" to WattStock on Alta's project, and "GE would be in a position to assume responsibility to complete any outstanding work" for WattStock only "subject to several considerations," including but not limited to:

(1) the absence of any legal or access issues;

(2) GE and Alta agreeing on a revised scope of work, associated cost, and terms and conditions;

(3) GE's determination that no insurmountable engineering or manufacturing issues exist; and

(4) modifying and reassigning any applicable purchase or change orders to GE.

App.1327.

Alta sent that letter to Deutsche Bank.  Unsurprisingly, Deutsche Bank responded that the letter **did not constitute** "**an unconditional obligation** . . . **to step into WattStock's contract** in the event of a WattStock default."  App.7034 (emphasis added).  GE, WattStock, and Alta discussed other possible ways to convince Deutsche Bank to finance Alta's peaker project.  App.1331.  But the issue became moot after Deutsche Bank definitively decided against financing Alta's project in September 2019.  App.1125, 1333.

> **B.**    **Starwood decides not to finance Alta's project because Alta lacked sufficient equity and the uncertainty created by COVID-19.**

Alta then contacted Starwood.  App.116.  On November 7, 2019, Starwood provided some "high level terms" on an indicative term sheet that it would be willing to consider "subject to [its] full due diligence."  App.1337.  After further discussions, Starwood and Alta signed an engagement letter on January 31, 2020.  App.1133.  The engagement letter was not a commitment to lend.  Instead, like Deutsche Bank, Starwood issued the engagement letter so it could evaluate Alta's project and conduct due diligence on the opportunity.  App.1133–34.

Part of Starwood's diligence involved assessing and modeling the financials of Alta's business plan to determine whether it made sense for Starwood to lend.  Although Starwood did not have a "hard rule" about the amount of equity developers must bring to the table, "one of the reasons why Starwood didn't provide financing for Alta Power's project was because Alta didn't have sufficient equity for the project."  App.1134, 1139.

Alta tried, but failed, to raise additional equity.  Its own documents show that it had a greater than $7 million "equity gap."  App.1344.  To fill that gap, Alta told Starwood that it had preferred equity commitments from Casey (Alta's EPC contractor) and its parent company MasTec, as well as WattStock.  Alta told Starwood that Casey would invest $4 million and that WattStock also agreed to invest $4 million in its project.  App.1135–37.  But discovery has

conclusively established that both Casey and WattStock rejected Alta's request to invest $4 million in its projects.  App.1366–67, 1138, 477, 1369.

Alta's equity gap wasn't the only reason Starwood chose not to finance Alta's project—there was also the onset of COVID-19.  App.1141; *see also* App.1371.  In March 2020, while Starwood was considering Alta's project, the World Health Organization declared COVID-19 a global pandemic.  Shortly thereafter, Starwood adopted a moratorium on new investments and began reviewing its portfolio of existing holdings.  App.1373.  Starwood "is a real estate company," so COVID-19 "was a major impact on the business" and influenced Starwood's decision not to finance Alta's project.  App.1141.

Alta tries to blame GE and WattStock for its failure to get financing, alleging that the LTSA termination fees owed by the sellers of the turbines (at most $1.95 million) and Chromalloy parts (in the Bosen turbine) caused Alta's project costs to "move" from its initial projections in its hypothetical capital expenditure budget (or "pro forma CapEx"), which scared lenders away.  *See* App.89 (Laterza discussing moving costs caused "Starwood to go pencils down").

But discovery has shown that Alta's projections in fact changed because Alta changed EPC contractors midstream.  Alta developed its pro forma CapEx in reliance on a low-ball bid from International Turbine Services.  App.110–11.  In June 2019, Alta learned that International Turbine Services' "financials were horrendous," App.1375, and Alta would not be able to get financing if it used International Turbine Services as its EPC contractor.  App.1377, 112.

Based on a recommendation by Leidos, an independent engineer engaged to evaluate Alta's project, App.1123, Alta eventually switched to Casey Industries as its EPC contractor.  Casey was more experienced—and more expensive.  The switch caused Alta's capital expenditures

20

projections to increase by at least $6 million per site—still with no additional equity to plug this now-wider gap.  App.113; *see also* App.65–67.

## VI.    Alta unilaterally terminates its contracts with WattStock, and WattStock sues to recover its losses.

On June 1, 2020, having been rejected by Deutsche Bank and Starwood and with no other prospects for financing on the horizon (despite having approached 88 other lenders), *see*, *e.g.*, App.1455–56; *see also* App.1383–92, 1396, 1424–43 (Alta's presentations to lenders for financing), Alta terminated its agreements with WattStock, asserting that WattStock breached the Master Agreement and LNTPs.  *See* App.1380–81.

WattStock then sued Alta for the amounts it was owed under the Master Agreement and the LNTPs.  App.1461.  Alta countersued WattStock later that year, asserting tort and contract claims.  App.1542–47.  Notably absent from Alta's complaint was any reference to the oral promises that are now at the heart of Alta's case against GE—namely, that WattStock and GE orally agreed to provide nine TruePackages for $10 million or less and that GE was partners with WattStock—and thus GE would satisfy WattStock's contractual obligations in the event of a WattStock default.  *Id.*; App.95.

After the WattStock-Alta litigation began, Alta asked GE to enter into a contract directly with Alta related to its projects.  GE refused because it "ha[d] a contractual obligation to provide parts and services to WattStock" and thought contracting directly with Alta would breach that agreement.  App.1559.  Soon thereafter, Alta added GE to this case as a third-party defendant.  App.1562.  Alta alleged that GE was responsible for WattStock's alleged breach of contract and other acts and omissions on the theory that "GE is an 'affiliate' or 'representative' of WattStock and, therefore, a party to the Master Agreement."  *Id.*  Alta did not allege (or even remotely suggest) anything about the supposed $10-million-per-unit price guarantee.

21

In August 2021, WattStock filed for bankruptcy and subsequently removed this case to federal court. App.1590. Alta later dismissed its claims against WattStock with prejudice, and WattStock dismissed its claims against Alta. App.1596–97. GE then counterclaimed against Alta alleging that Alta breached the covenant not to sue in the Master Agreement. App.1620; *see also* App.1612. Although Alta, now focusing its claims on GE, nominally dropped its breach of contract claim, it alleges vicarious liability and civil conspiracy to make GE liable for WattStock's "breaches." App.75, 78. And Alta has centered its claims against GE on GE's alleged failed oral promises: (1) "to deliver at least nine TruePackage units for $10 million or less"; and (2) to "fulfill WattStock's obligations under any contractual relationship that WattStock had with Alta Power." App.36–37.

By the time Alta brought its suit against GE, Texas was recovering from Winter Storm Uri. Alta blames GE and WattStock for the $6.18 million in out-of-pocket money it allegedly poured into its unsuccessful peaker-plant project. App.1710. And Alta claims that, but for GE's and WattStock's alleged oral misrepresentations, it would have had its peaker plants up and running during Uri and made between $193.6 and $407.3 million from September 1, 2020, through January 31, 2025. App.1710.

Alta's expert, Quentin Mimms, offers four different lost-profits models: two assume that Alta would have secured units at $10 million per unit; the other two assume that Alta would have contracted with its competitor ProEnergy. *Id.* Mimms's lost-profits calculations vary based on the number of plants. *Id.* But *all* of his calculations assume—in contradiction to the record—that Alta would have obtained financing from a third-party lender, experienced little to no construction delays, and had its plants up and running without issue during Winter Storm Uri. *See* App.1729–40. These and other unsupported assumptions undergird the overwhelming majority of Mimms's

lost profits figures. Indeed, 73% to 81% of Mimms's projected lost profits (under all four of his models) are from a single month during Winter Storm Uri, when other, established plants were bankrupted by the storm. *See* App.5941.

**LEGAL STANDARD**

A court must grant summary judgment if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party can meet its summary judgment burden by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "Where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, which shifts to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *DeWolff, Boberg, & Assocs. Inc. v. Pethick*, No. 24-10375, -- F.4th --, 2025 WL 999124, at \*3 (5th Cir. April 3, 2025) (cleaned up).

To survive summary judgment, the nonmoving party cannot rely on mere allegations or denials—it must present affirmative evidence setting forth specific facts to demonstrate the existence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322 n.3. "The nonmovant cannot satisfy this burden merely by denying the allegations in the opponent's pleadings but can do so by tendering depositions, affidavits, and other competent evidence to buttress its claim." *Pethick*, 2025 WL 999124, at \*3. Put differently, "[s]ummary judgment cannot be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015).

23

### SUMMARY OF THE ARGUMENT

**I.**    Alta's request for consequential damages fails as a matter of law for two separate and independent reasons.   ***First***, **(A)** Alta is contractually barred from seeking consequential damages from WattStock and its subcontractors—including GE.   ***Second***, contracts aside, Alta's lost-profits claim is entirely speculative.   It never got financing, never built or operated a peaker plant, and never generated any revenue or profit.   Summary judgment is warranted because Alta cannot create a genuine fact dispute as to whether it **(B)** lost any profits or **(C)** can quantify the profits it allegedly lost—much less with the "reasonable certainty" required by Texas law.   *See Tex. Instruments*, 877 S.W.2d at 279–80.

**II.**    All of Alta's damages claims—for both lost profits and out-of-pocket expenses—separately fail, because it cannot create a genuine fact dispute as to whether GE caused those damages.   The record conclusively establishes that Alta's peaker-plant project failed because it was unable to secure financing and that Alta's inability to secure financing had nothing to do with GE (or WattStock).   Because Alta would've suffered the same alleged damages absent the alleged fraud, it cannot recover against GE.   *See HMC Hotel Prop. II LP v. Keystone–Texas Prop. Holding Corp.*, 439 S.W.3d 910, 913 (Tex. 2014) (no "but-for" causation when there is no evidence that the outcome would have been different).

**III.**    Alta's claims fail because each is barred by the statute of frauds.   Those claims rely on two alleged promises: (1) that WattStock (and GE) would sell Alta nine turbines for $10 million or less per turbine and (2) GE would perform WattStock's obligations if WattStock did not.   Despite entering several signed, written contracts with WattStock, and a separate contract with GE, Alta never reduced *these* two alleged promises to a signed writing—as the statute of frauds requires.

**IV**.   Statute of frauds aside, Alta's direct claims against GE fail on their merits.  Alta **(A)** cannot create a genuine fact dispute that GE ever made the promises Alta alleges it made.  And Alta **(B)** cannot show that it reasonably relied on any alleged misstatement as a matter of law.

**V.**   Alta's "claims" that seek to hold GE vicariously liable for WattStock's alleged conduct are barred by the Alta-WattStock contracts and fail as a matter of law because Alta cannot establish the elements of any of its theories of vicarious liability.

**VI.**   Alta's remaining derivative claim for tortious interference and its derivative theories of recovery for unjust enrichment and civil conspiracy fail too because Alta's underlying claims fail.  And Alta's unjust enrichment theory fails on the merits.

**VII.**   At minimum, Alta is not entitled to punitive damages because it **(A)** waived its right to seek those damages in its LNTP with WattStock and its non-disclosure agreement with GE. And Alta **(B)** cannot prove by clear and convincing evidence that GE acted with malice or gross negligence or fraudulently as statutorily required for Alta to be awarded punitive damages.

**VIII.**   Summary judgment is also warranted for GE on its contract claim against Alta. Alta cannot dispute that the Master Agreement bars it from "mak[ing] any claim" against WattStock or GE for consequential damages "arising out of or connected in any way to th[at] Agreement."

As a result, GE is entitled to summary judgment and the dismissal of Alta's ostensible tort claims, as well as summary judgment on GE's breach of contract claim.[2]  This Court should thus

---

[2]   GE is also entitled to summary judgment on its declaratory judgment counterclaims for the same reasons it is entitled to summary judgment on its breach of contract claim.  App.1625–31; *see generally Watson v. CitiMortgage, Inc.*, No. 3:11-cv-2733, 2012 WL 381205, at *9 (E.D. Tex. Feb. 3, 2012) (A declaratory judgment "is simply a form of relief based on an underlying claim").

grant summary judgment in GE's favor on all of Alta's claims and award GE all the relief to which it is entitled.

ARGUMENT

## I.    Alta cannot recover lost profits as a matter of law.

Alta seeks to recover between $193.6 and $407.3 million in lost profits under a variety of legal theories.  But Alta cannot recover lost profits under any legal theory for three separate and independent reasons.

*First*, Alta contractually waived its right to seek consequential damages—including lost profits—in not only its Master Agreement and both LNTPs it entered with WattStock, but also the NDA it entered directly with GE.

*Second*, Alta cannot create a genuine fact dispute that it lost *any* profits.  Alta's damages model rests on several highly improbable assumptions, none of which has any evidentiary support.  In particular, to earn any revenue (much less profit), Alta—a startup business with no operating history—would have needed to complete at least one peaker plant, on time and within budget.  And, even more importantly, it would have had to secure the financing needed to do so.

*Third*, Alta cannot create a genuine fact dispute as to whether it can quantify its lost profits with reasonable certainty.  Even assuming Alta could have secured financing and successfully built a plant, there is no evidence to show with reasonable certainty that it would have made up to $400 million in profits.  These astronomical figures assume that the plants would have been up and running before Uri, that they would have operated successfully throughout the storm, and that the option contracts Alta needed to even be considered for financing would not have caused Alta to lose millions during the storm.

A.     **Alta's own contracts bar it from recovering consequential damages, including lost profits.**

Alta entered three contracts with WattStock—the Master Agreement and two LNTPs—and one directly with GE (the GE-Alta NDA).  In each of these contracts, Alta waived its right to recover consequential damages, including lost profits.  This Court should hold that Alta cannot recover its lost profits as a matter of law.

Consider just the Master Agreement.  It expressly bars Alta from seeking "consequential damages," including "loss of profit," from not only WattStock but also its "partners" and its "contractors and subcontractors"—like GE.  App.432.[3]  Even though Alta denies knowing that GE was a subcontractor to WattStock on Alta's project (despite Alta's own documents showing that to be the case), Alta cannot elide its own allegations in this case that GE and WattStock were "partners."  App.58, 60; *see also* App.50.

Nor can Alta escape the NDA it signed with GE—the only contract between Alta and GE—which expressly waives claims for "loss of profits."  That should begin and end the inquiry because there is no dispute that Alta is contractually barred from seeking to recover "consequential damages"—including "loss of profit."  *See* App.432; App.449; App.459; App.416; *see also* Dan B. Dobbs & Caprice L. Roberts, *Law of Remedies* § 3.3(4) (3d ed. 2018) ("claim to lost income or profit is a claim for consequential damages").  This Court should hold that Alta's lost-profits claim is barred as a matter of law.

---

[3]  The waiver is enforceable—and that Alta alleges fraud and fraudulent inducement changes nothing.  *But see* App.6640 (Alta claiming that "fraud vitiates the damages waiver").  As the Texas Supreme Court has explained, not only are "[l]imitation-of-liability clauses . . . generally valid and enforceable," but that Court has "never held . . . that fraud vitiates a limitation-of-liability clause." *Bombardier Aerospace Corp. v. SPEP Aircraft Hldgs., LLC*, 572 S.W.3d 213, 231–33 (Tex. 2019). That's because Texas law requires courts to "respect and enforce terms of a contract that parties have freely and voluntarily entered."  *Id*.

**B.    Alta cannot recover its alleged lost profits as a matter of law because it cannot create a genuine fact dispute as to whether it lost *any* profits with reasonable certainty.**

Alta waived its right to seek lost profits.  But there's more.  Its lost-profits claim fails as a matter of law because it cannot provide evidence to raise a genuine material fact dispute that it lost *any* profits with reasonable certainty.  *El Dorado Motors, Inc. v. Koch*, 168 S.W.3d 360, 367–68 (Tex. App.—Dallas 2005, no pet.); *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 859–60 (Tex. 2017) (lost profits "can be recovered only when both the fact and amount of damages is proved with reasonable certainty"); *see also Burkhart Grob Luft Und Raumfahrt GmbH & Co. KG v. E–Sys., Inc.*, 257 F.3d 461, 467 (5th Cir. 2001).

For starters, Alta is a startup—an untried company pursuing a risky venture in a volatile market.  To this day, Alta has never broken ground on (much less completed) a single peaker plant—it has never earned any revenue or generated any profits from operating a plant.  App.120.  So it lacks any meaningful benchmark for measuring the success it alleges it would have had.  *See Tex. Instruments*, 877 S.W.2d at 278–81 ("The mere hope for success of an untried enterprise, even when that hope is realistic, is not enough for recovery of lost profits.").

If that weren't enough, Alta's lost-profits model relies on several unsupported—and unsupportable—assumptions.  The following are a few examples of the extraordinary leaps one must make to get to where Alta is trying to go.  It also highlights the indisputable facts that contradict Alta's self-serving claims.

| Lost-Profits Assumption | Facts that Contradict the Assumption | Evidence |
|---|---|---|
| Lender completes due diligence | No lender completed due diligence with Alta.<br><br>Alta must, but cannot, show that lenders would have approved the financial models Alta's expert Quentin Mimms | • App.377–82 |

| Lost-Profits Assumption | Facts that Contradict the Assumption | Evidence |
|---|---|---|
| | relies on after conducting due diligence, despite those models appearing to understate costs and overstate projected revenues. | |
| Alta secures financing | Alta could not convince any of the nearly 90 lenders to finance its project.<br><br>The two lenders that offered non-binding indicative terms, Deutsche Bank and Starwood, declined to finance Alta's project because of (1) Alta's undercapitalization; (2) Castleman's threat of litigation; and (3) COVID-19. | • App.317–19, 351, 354–62<br>• App.1121–22 (Deutsche Bank discussing low equity)<br>• App.102 (Phelps discussing low equity)<br>• App.1119, 1318 (Castleman-related litigation risk was a dealbreaker for Deutsche Bank)<br>• App.1140 (Starwood was concerned about COVID-19) |
| Alta experiences no construction delays | Construction delays are common for these types of projects.<br><br>COVID-19 added another layer of unaccounted for delays. | • App.6016 (noting that "73% of Texas construction contractors experienced project delays or disruptions due to COVID-19") |
| Oncor allows Alta's "interconnection" with the Texas power grid before February 2021 | Oncor's estimates for interconnection were months after February 2021. | • App.6018 (Oncor suggesting a commercial operation date of June 2021 in March 2020) |
| Alta achieves commercial operations before February 2021 | As early as December 2018, Alta projected it would not reach commercial operations until April 2021. | • App.6032 ((December spreadsheet setting April 1, 2021, as "max COD")<br>• App.6040 (confirming that "for the three Alta plants that [Roy Hart] [was] working on, the CODs [commercial operation dates] were May 2021")<br>• App.6044–45 (Laterza email to Macquarie noting a scheduled commercial operation date of May 2021, or, if Alta could not attract financing soon, September 2021) |

| Lost-Profits Assumption | Facts that Contradict the Assumption | Evidence |
|---|---|---|
| Alta has winterization equipment that is effective and performs flawlessly during Winter Storm Uri | Alta never planned to winterize its plants or add an anti-icing solution.<br><br>ProEnergy's offered packages did not meet the specifications that would have been required to weather Winter Storm Uri.<br><br>Even plants in significantly less extreme weather than the sites of Alta's hypothetical plants experienced outages. | • App.6019–23<br>• App.131–34<br>• App.475 (noting anti-icing was taken out of the proposal because it was "too expensive according to [Alta]") |
| Alta has natural gas during Winter Storm Uri | Alta planned to buy its gas on the spot market and store it at Trinity Gas Storage, which did not come online until January 2025. | • *See* App.6023<br>• App.118–19 |
| Alta continuously operates its plants during Uri | Most gas-fired power plants were unable to operate continuously during Winter Storm Uri and many suffered millions of dollars in losses. | • App.6023<br>• 5962–63, 5966–73 |
| Alta's HRCO contract does not take effect before or during Winter Storm Uri | The HRCO quotes that Alta received included start dates within 3 months of each plant's commercial operation date.<br><br>Alta's HRCO "offtaker," Uniper, provided Alta (and its potential lenders) an indicative term sheet showing the HRCO starting on October 1, 2020. | • App.5962–66, 5972–73 (listing gas-fired peaker plants with HRCOs that were forced to file for bankruptcy after the storm)<br>• App.6051<br>• App.6446–48 |
| Alta can service its debt obligations with additional equity infusions | Mimms admits that, under his models, "Alta would not have sufficient excess cash to pay the full interest amount due." He assumes that the shortfall would be covered through additional equity contributions. But Alta was unable to raise any outside equity for its project—despite misrepresenting to lenders that Casey and WattStock each agreed to provide $4 million in equity. | • App.326–37<br>• App.5964 (quoting App. 1739)<br>• App.1366<br>• App.1138<br>• App.477<br>• App.1369 |

Alone, any one of these unsupportable assumptions would be sufficient to justify granting summary judgment on Alta's lost-profits claim. Together they compel it.

**1.    Alta cannot raise a genuine fact dispute as to whether it could have secured the financing needed to build even a single peaker plant.**

A fundamental premise of Alta's damages model is that it would have built and operated at least one peaker plant.  To do this, Alta needed to secure at least $35 million in financing.  App.1706, 1724.  But the record conclusively establishes not only that Alta was unable to secure any financing, but also that its inability to do so had nothing to do with GE, WattStock, or the allegations in this suit.  Absent evidence it could have secured the financing to build even one peaker plant, Alta's lost-profits model is reduced to nothing but conjecture and wishful thinking.  Thus, Alta cannot create a genuine dispute of fact as to whether it could have secured financing to build a single peaker plant.

The record conclusively establishes that Alta's inability to secure financing—despite approaching nearly 90 different lenders—was driven by three factors: (1) its inadequate capitalization; (2) the risk of litigation from Castleman; and (3) the onset of COVID-19.  And Alta has no evidence that these same impediments would not have thwarted its ability to secure financing in either of its "but for" scenarios (in which WattStock delivered units at $10 million apiece or Alta contracted with ProEnergy instead).

*First*, Alta was inadequately capitalized.  Both Deutsche Bank and Starwood affirmed this was a reason why they declined to extend Alta financing.  *See* App.356–57 (citing App.6057–58; App.6318); App.102 (explaining that low amount of equity, including Alta's, was a common concern for senior lenders).  Banks were skeptical of Alta's ability to pay off the large loan amounts it sought quickly enough to justify the loan.  App.6341–43.  And Alta tried to raise additional equity but was unable—and it has provided no evidence to suggest that it would have had any more success if it had access to $10 million TruePackages or if it had contracted with ProEnergy instead.

**Second**, Alta faced meaningful litigation risk from Castleman, which gave lenders another reason to be wary of financing Alta's project. Indeed, even after Alta settled with Castleman, the dispute (coupled with Alta's lack of equity) caused Deutsche Bank to not extend financing. App.1119; *see also* App.1320 (noting "that Deutsche Bank has had some concerns about the facts" of Alta's dispute with Castleman); App.88; App.1318 (email from Bill Phelps, Alta's CEO, explaining that "financing was put on hold by Deutsche Bank").

**Third**, the onset of the COVID-19 pandemic also caused financing to dry up—especially in early 2020. As Starwood explained, in March 2020 it adopted a moratorium on new investments and began reviewing its portfolio of existing holdings—because COVID-19 was having "a major impact" on its business. App.1141; App.1373. Indeed, as Alta co-founder Matthew Laterza acknowledged, COVID-19 "derailed the project financing" for Alta's peaker project. App.6355.

None of these factors had anything to do with GE, WattStock, or the allegations in this case. And Alta has no evidence that any lender would have overlooked these issues in either of Alta's but-for worlds.

Alta's inability to secure financing (or explain how it would've secured financing to support its hypothetical lost-profits calculations) "can lead to only one conclusion: lost profits were not reasonably certain." *Lake v. Cravens*, 488 S.W.3d 867, 902–04 (Tex. App.—Fort Worth 2016, no pet.) (lost-profits model that required plaintiff to "secure millions and millions of dollars in financing at a time when the economy was struggling and uncertain and" where defendant "was inclined to push forward while demanding financing terms that were inconsistent with going rates" led "to only one conclusion: lost profits were not reasonably certain"); *see also Lee & Lee Int'l, Inc. v. Lee*, 261 F. Supp. 2d 665, 677–78 (N.D. Tex. 2003) (plaintiffs failed to prove $705,883.49 in lost profits because evidence was speculative).

      2.      **Alta cannot raise a genuine fact dispute as to whether it could have had any plants built and fully operational by Winter Storm Uri in February 2021.**

To arrive at its nine-figure lost-profits model, Alta must prove that its plants would have been completed and operational by February 2021. That's because the overwhelming majority of Alta's alleged "lost profits" would have been generated in a single month—February 2021. The reason? Winter Storm Uri. *See* App.1732 ("Alta would have benefitted significantly from revenues produced in February 2021 based on the high Real Time and Ancillary Services pricing during Winter Storm Uri."); App.121; *see also* App.5941 ("Although he does not provide further explanation of the impact of Winter Storm Uri on his lost profits estimation in his report, Mr. Mimms' exhibits and calculations indicate that between 73% to 81% of the total cash flow for his lost profits determination would have occurred in February 2021 during Winter Storm Uri."). But Alta cannot prove with reasonable certainty that it would have even had an operational plant by February 2021—much less that its plants would have been able to operate the entire duration without issue or that its HRCOs would not have turned its claimed windfall into an eight-figure loss instead.

The record evidence shows that—as early as December 2018—Alta was projecting that it would not reach commercial operations until April 2021, two months too late for Winter Storm Uri. App.6032; *see also* App.6040 (confirming that "for the three Alta plants that [Roy Hart] [was] working on, the CODs [commercial operation dates] were May 2021"); App.6045 (Laterza email to Macquarie noting a scheduled COD of May 2021, or, if Alta could not attract financing soon, September 2021).

Alta's damages calculation also assumes that it would have encountered no "construction delays or cost overruns," even though Alta's own commercial operation date had changed multiple times. App.5956–57 (citing App.6367). Alta does not account for "the risks and delays common

to these types of projects, such as labor availability, weather events, delays in completion of transmission facilities needed for backfeed, delays in receipt of owner-furnished equipment (OFE), and shipping delays of other equipment," while "minimiz[ing] the impact of the COVID-19 pandemic on construction projects." App.6014; *see also* App.6016 (noting that "73% of Texas construction contractors experienced project delays or disruptions due to COVID-19").

Moreover, Oncor, the transmission provider that would connect Alta's plants to the grid, provided "numerous estimates for interconnection completion that were months *after* February 2021." App.6014; *see also* App.6018–19 (citing App.6369, 6371–72, 6374, 6376, 6382, 6384) (Oncor suggesting a COD of June 2021 in March 2020).

**3. Alta cannot raise a genuine fact dispute as to whether its plants would have operated continuously and without issue for the duration of Winter Storm Uri.**

But securing financing and getting at least one plant operational before Winter Storm Uri were just the first steps. Alta's lost-profits model also assumes that—unlike the vast majority of gas-fired turbines in Texas—its plant would have been able to operate continuously and without issue for the duration of the storm. But that assumption, like the financing and project-completion assumptions, finds no support in the record.

Instead, what the record shows is widespread outages—68% of plants like Alta's proposed plant experienced an outage during the storm. App.5966–67 (citing ERCOT reports on capacity and outages during the storm).

Alta's lost-profits calculation relies on its hypothetical plants operating continuously during Winter Storm Uri, when it is common knowledge that most power plants were unable to do so. *See* App.5966; *cf*. App.6440. Of the 337 natural gas-fired units identified by ERCOT (including units like Alta intended to use), 209 experienced an outage during the storm. App.5967. The majority of gas-powered turbine plants suffered major outages during Uri. *Id.* ("[S]ixty-eight

percent of natural gas combustion turbines experienced an outage at some point during Winter Storm Uri. Most disruptions were not minor: of those combustion turbines that experienced outages, 89% saw reductions exceeding 50% of their rated capacity, and 87% saw reductions exceeding 90% of their rated capacity.").

Alta's expert says Alta would have been able to continue operating at full capacity because it would have winterized its plants. App.1713–14. "Effective winterization of gas turbine-based power plants involves implementing a range of measures," from insulating equipment to installing heat-tracing systems and anti-icing systems. App.6020. In Texas, winterization was, at best, a secondary consideration. *Id.* More, when companies like ProEnergy offered packages for plant owners for cold-weather operation, those packages were geared toward the estimated maximum and minimum operating temperatures in that State. App.6020–21. Uri far exceeded those estimates in Texas. *See* App.5932–33.

Nor is there evidence that Alta planned to take any of the steps that would have been required to sufficiently protect its plants from Uri before February 2021. App.6023. Instead, the record establishes that Alta did *not* plan to provide an anti-icing solution or exceed the (insufficient) ERCOT winterization minimum requirements prior to Uri. *See* App. 131–33; App.475 (noting anti-icing was taken out of the proposal because it was "too expensive according to [Alta]"); *see also* App.621 ("Scope of supply: delete inlet filter anti-icing").

Rather than identifying the winterization steps Alta would have taken that its competitors did not take, Alta relies on the performance of six turbines ProEnergy refurbished to operate for its own account. *See* App.6019. But its reliance is misplaced because the site where those turbines ran not only *did*, in fact, experience outages, App.6025, but also experienced "significantly less

extreme weather," "freezing conditions[,] and heavy snow," than the North Texas locations where Alta planned to construct its plants. App.6023.

> **4.    Alta cannot raise a genuine fact dispute as to whether its HRCOs would have been in effect during Uri, causing Alta to lose millions.**

Finally, for Alta to have made the lost profits it seeks in this case, even under its own damages model, it must show that its HRCOs would not have been in effect during Uri. That's because if Alta's HRCOs were in effect and called by the counterparty, Alta would have owed electricity to its counterparty and any economic benefit from the spike in electricity prices would have been for Alta's HRCO counterparty to realize. App.5966 (explaining that Alta "would not have realized any net profits during this time period under Mimms' approach" if Alta's HRCOs were in effect and called).

In particular, Alta would have been required to sell electricity to its HRCO counterparty at about $1,400/MWh, at most. App.5972–73. But if Alta could not generate sufficient electricity from its hypothetical plants to meet that demand (like many other gas-fired plants), Alta would have had to buy electricity at the $9,000/MWh market price, which lasted for four *days* during Uri. *Id.* So for every megawatt hour of electricity that a HRCO holder called during Uri, Alta would have lost some $7,600. *See* App.5937, 5972. At that rate, an outage lasting only a few hours would have caused Alta millions in losses; multiple days of outages would have caused tens or hundreds of millions of dollars in losses. App.5972.

Proving that it lost profits with reasonable certainty thus requires Alta to prove not only that it would have (1) obtained financing, (2) completed plant construction by February 2021, and (3) kept its plants running without issue during Uri, but also that its HRCO contracts would not have been in effect during Uri.

The HRCO quotes that Alta received foreclose that showing. They make clear that the HRCOs would have been in effect when the plants began operating or—at maximum—within three months of commercial operations. App.5963–64 (citing App.6645 (noting date inferred from metadata); App.6906 (noting date inferred from metadata)); *see also* App.6446. Alta's damages model has the first of its plants, for example, beginning operation in September 2020. If that assumption would have held true, then—even if Alta had been able to get its plant up and running and keep it running without issue throughout Uri—the net impact on Alta's bottom line, even assuming a HRCO start within *three* months of operation, would have been more than a *$15 million* loss, and not a nearly $200 million profit. App.5965.

\* \* \*

It is black-letter law that to be recoverable, lost profits must be proved with reasonable certainty. Lost profits "not susceptible of being established by proof to that degree of certainty which the law demands cannot be recovered as damages." *Horizon Health*, 520 S.W.3d at 860. Alta's lost-profits model stacks assumption on assumption on contingency—none of which is supported by the record.

Summary judgment is warranted on Alta's lost-profits claim because it cannot provide any evidence showing lost profits with reasonable certainty—and thus raising a genuine fact dispute— as to these damages. *El Dorado Motors*, 168 S.W.3d at 367–68; *see also Tex. Instruments*, 877 S.W.2d at 279 ("evidence to establish [lost] profits must not be uncertain or speculative" but "ascertained with a reasonable degree of certainty and exactness").

### C.    Alta cannot quantify the profits it allegedly lost with reasonable certainty.

Even if Alta could prove with reasonable certainty that it would have profited in its but-for world (it cannot), summary judgment still would be warranted because it cannot prove the *amount* of profits it allegedly lost with reasonable certainty.

*First*, even if Alta could prove that it would have secured financing, it cannot establish the likely terms of that financing—and therefore its cost of capital—with reasonable certainty. Even if one assumes that Alta could have secured financing at the LIBOR-plus-450 basis-points rate that Deutsche Bank and Starwood considered as part of their indicative "non-binding" terms before completing due diligence, App.6454; App.6497; *see also* App.1124, Alta's own model requires it to raise somewhere between $6 million and $37 million in additional equity. The record conclusively shows that Alta never raised anything close to that amount of additional equity—all Alta can do is speculate about how it might have done so in its hypothetical but-for world.

Those defects aside, Alta still does not even begin to grapple with its expert's concession that "Alta would have been unable to meet its debt service payments in the very first quarter they came due." App.5956 (citing App.1739). Far from helping quantify its lost profits with reasonable certainty, this evidence just underscores that Alta is dramatically underestimating the costs (and therefore inflating the profitability) of its failed project.

*Second*, Alta's lost-profits dollar amounts are unsupported by the evidence in the record. Both of Mimms's lost-profits models assume the validity of Alta's financial projections. *See* App.1729. Mimms then makes some adjustments and applies a backwards-looking analysis using assumptions—based largely on conversations with Alta's Matthew Laterza—that Alta would have (i) timely obtained favorable financing (from institutions that refused Alta financing), (ii) constructed its plants without any construction delays during the height of COVID-19 (despite delays being common), (iii) operated continuously during Uri (despite other plants failing), and (iv) been operating without the HRCO any lender (assuming Alta could have found one) would have required. *See* App.1729–32; App. 1737–38.

Mimms then reaches two lost-profits calculations which attribute 73% to 81% of Alta's profits to it operating continuously during Uri. *See* App.5941 (citing App.1772; App.1773–85; App.2372; App.2373–85; App.3278–79; App.3280–91; App.3847; App.3848–60). This conclusion is almost entirely based on the deposition testimony of Matthew Laterza about Alta benefitting significantly from operation during Uri. App.1732. Alta's say-so is not enough to establish lost profits. *Cf. Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 809 (N.D. Tex. 2018) (Horan, J.), *aff'd*, No. 3:11-cv-3296-L, 2018 WL 2064126, at *14 (N.D. Tex. May 2, 2018) (excluding expert who relied on party's pro forma and "made numerous assumptions that remain unexplained or unsupported by the record").

Where, as here, "the surrounding circumstances" make clear "that the profits are not reasonably certain, there is no evidence to support the lost profits award" and summary judgment is appropriate. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 50 n.3 (Tex. 1998); *see also Lake*, 488 S.W.3d at 902–03 ("But there is a glaring problem with this rosy [lost-profits] prediction: for it to have become a reality, numerous significant events *had* to have occurred, . . . and based on everything that we have reviewed in the entire record, the odds of those events happening were downright abysmal, leading us to the inescapable conclusion that Dr. Ruhter's opinion testimony on lost profits was entirely speculative.").

The Court should grant summary judgment and hold that Alta cannot recover lost profits as a matter of law.

## II.    Alta cannot recover any damages (including out-of-pocket damages) because it cannot create a genuine fact dispute that its losses were caused by anything GE or WattStock did—instead of its own failure to secure financing.

To recover damages on any of its claims against GE, Alta must show that GE's allegedly tortious conduct caused—or at least was a "substantial factor" in causing—Alta's damages. *HMC Hotel Props. II LP*, 439 S.W.3d at 913; *Horizon Health*, 520 S.W.3d at 864–65 (no lost profits

where no evidence connecting the calculation to the alleged cause); *see also*, *e.g.*, *Blue Gordon, C.V. v. Quicksilver Jet Sales, Inc.*, 444 F. App'x 1, 11 (5th Cir. 2011) (no causation where the cause of plaintiff's injuries "was its own failure to cure defaults under the Agreement, which had no causal connection to [defendant's] alleged misrepresentations").

Alta cannot make that showing—and summary judgment is warranted—because all of Alta's alleged injuries were caused by its inability to secure financing, which lead to the failure of its peaker-plant project. And the record conclusively establishes that Alta's inability to secure financing had nothing to do with GE, WattStock, or the allegations in this suit. Instead, as discussed above, three factors contributed to Alta's failure to secure financing.

*First*, it was woefully undercapitalized and could not secure additional equity investment. *Second*, it faced litigation risk from (and financial exposure to) Castleman, one of its direct competitors. And *third*, the onset of COVID-19 in March 2020 caused financing to dry up and lenders to become much more selective in their lending decisions.

These issues would have plagued Alta if WattStock had presented Alta with turbines within Alta's desired price range or if Alta had gone with ProEnergy instead. Either way, Alta would not have secured financing, its project would have failed, and it would have incurred the same out-of-pocket expenses. So Alta's claims for lost-profits and out-of-pocket damages both fail as a matter of law for lack of causation. *Cf. In re Fisher*, 649 F.3d 401, 404 (5th Cir. 2011) (plaintiff could not recover $1.9 million investment because evidence showed he would have invested the same money in the absence of the alleged misconduct).[4]

---

[4] Not only is Alta contractually barred from seeking its lost profits from WattStock—its total aggregate recovery from WattStock (and GE, as the third-party beneficiary) is capped at $100,000 under the Master Agreement, which limits "liability for *any and all claims*, losses, costs, damages *of any nature whatsoever* . . . including attorneys' fees and costs and expert-witness fees and costs" to "USD $100,000." App.432 (emphases added).

III.    **Alta's claims—which seek to enforce two alleged oral promises—are barred by the statute of frauds.**

Alta brought—but subsequently abandoned—a breach-of-contract claim against WattStock. Despite having at least three signed, written agreements with WattStock, and one with GE, Alta now seeks to enforce two oral promises GE allegedly made—neither of which was reduced to writing. Those alleged promises are that (1) WattStock (and GE) would provide up to nine turbines for less than $10 million each and (2) GE would "stand[] behind" WattStock and perform its contractual obligations if WattStock failed to deliver. App.36–37.

But the alleged promises here—involving the sale of goods over $500 and an agreement to answer for the default of another—are both governed by the statute of frauds and therefore must be memorialized in a signed writing to be enforceable. *See* Tex. Bus. & Com. Code §§ 2.201(a), 26.01; *see also Haase*, 62 S.W.3d at 799. Because neither was, Alta's claims that rely on these unenforceable promises fail as a matter of law.

1.    Texas's statute of frauds applies to (1) agreements for the sale of goods exceeding $500 and (2) agreements to "answer for the debt, default, or miscarriage of another person." Tex. Bus. & Com. Code §§ 2.201(a), 26.01. The former covers the alleged promise to deliver nine turbines for less than $10 million per unit; the latter the alleged promise to "stand[] behind" WattStock in the event it defaults.

2.    That Alta is pursuing fraud and a variety of other tort claims is of no moment. The Texas Supreme Court has made clear that a party cannot use artful pleading to evade the statute of frauds. *See, e.g.*, *Sonnichsen*, 221 S.W.3d at 636 ("[O]ur holdings . . . focus the legal treatment of claims on the true nature of disputes rather than allow artful pleading to morph contract claims into fraud causes of action to gain favorable redress under the law.") (citing *Haase*, 62 S.W.3d at 798–99; *Formosa Plastics*, 960 S.W.2d at 48; *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493,

494–95 (Tex. 1991)).  And that is precisely what Alta attempts to do here—use fraud and a variety of other tort theories to enforce oral promises that are unenforceable under the statute of frauds.

Because Alta's lost-profits request (under a plethora of legal theories) is nothing more than a thinly veiled attempt to enforce two alleged oral promises that are unenforceable under the statute of frauds, it is barred as a matter of law and summary judgment is warranted.

## IV.    Alta's direct tort claims against GE fail as a matter of law.

Alta's direct tort claims against GE also fail as a matter of law for at least two separate reasons.  ***First***, save for the self-serving testimony of Alta's own officers, Alta cannot create a genuine fact dispute as to whether anyone ever promised to provide turbines for less than $10 million apiece or that GE would perform WattStock's obligations if WattStock defaulted.  ***Second***, Alta cannot create a genuine fact dispute as to whether it reasonably relied on any of the alleged misstatements.

### A.    Alta cannot create a genuine fact dispute as to whether GE made any of the alleged promises on which Alta's case is premised.

Alta faces an insurmountable hurdle with its misrepresentation claims—it cannot raise a genuine dispute of material fact that the alleged misrepresentations were even made.  GE has consistently denied ever making the representations Alta claims induced Alta into choosing WattStock over ProEnergy.  And Alta has no evidence to refute GE's position other than ***self-serving, uncorroborated testimony from its own employees***.  In addition, the only signed, written agreements in this case do not mention the alleged oral promises that form the basis of Alta's case.

Not only were the promises not reduced to a *signed* writing, they were never reduced to any writing—by either party.  There's no email or other document from GE making the alleged promises.  And no one at Alta ever bothered to write down GE's alleged oral promises on which Alta now contends it staked its entire business.  *See* App.43; *see also* App.44 (Alta's corporate

representative confirming that neither the alleged promise to deliver packages at or below $10 million per unit nor the promise to stand behind WattStock's contractual obligations are "in a document signed or written by GE"); *see* App.98 (conceding there is no written contract that WattStock provided to Alta making a guarantee on price).

The only "evidence" that GE made the statements that are necessary for Alta's case is unsupported testimony by Alta employees. *See* App.98 (confirming there is nothing in correspondence from WattStock that guarantees $10 million or less per unit and claiming there "were verbal guarantees and there were verbal representations that were made").

Although all justifiable inferences are drawn in the non-movant's favor, it's well established that "a party's uncorroborated self-serving testimony cannot prevent summary judgment, particularly if the overwhelming documentary evidence supports the opposite scenario." *Eagan v. Walgreen Co.*, No. 21-20352, 2022 WL 683636, at *3 (5th Cir. Mar. 8, 2022). Because that's the case here—Alta's claims are supported solely by such "uncorroborated self-serving testimony," and "the overwhelming documentary evidence" (the signed, written contracts) "supports the opposite scenario"—summary judgment should be granted for GE.

### B.    Alta cannot create a genuine fact dispute as to whether it reasonably relied on any of the alleged misrepresentations.

Alta's own knowledge and conduct conclusively established that it did not actually, let alone reasonably, rely on any of the alleged misstatements, and thus it cannot create a genuine fact dispute to the contrary.

*First*, Alta was repeatedly faced with information showing that GE was not obligated to step in if WattStock failed to perform and that each unit would cost more than $10 million. None of the above contracts between Alta and WattStock listed GE as WattStock's partner or stated that GE was responsible for WattStock's performance. *See supra* Part III. Indeed, GE expressly

43

disclaimed that it would backstop WattStock. When GE sent its July 2019 letter stating in plain terms that GE was *not* obligated to "backstop" WattStock's obligations to Alta, Alta simply sent the letter on to Deutsche Bank. App.1326. It did not declare a breach of the oral promises GE allegedly made or express any unwillingness to continue doing business with WattStock or try to exit the Master Agreement (that it allegedly was induced into signing) because of that alleged misrepresentation. In fact, it *amended* the Master Agreement with WattStock many months later— without making any attempt to even include GE in the agreement, much less change the agreement to reflect any alleged understanding that GE would be responsible for WattStock's breach. App.463.

The same is true for the alleged oral promise to sell turbines for no more than $10 million per "unit." As noted above, for nearly two years, WattStock and Alta exchanged dozens of written pricing proposals and emails related to TruePackage pricing, in which the price for each TruePackage "unit" (as defined by Alta in this case) exceeded $10 million. *See supra* Part IV.B.

***Second***, Alta's own conduct demonstrates that any alleged reliance on GE's and WattStock's purported misrepresentations was unreasonable as a matter of law.

**1.** As noted above, when GE sent the above July 2019 letter to Alta to pass along to Deutsche Bank, which stated in plain terms that GE was *not* obligated to "backstop" WattStock's obligations to Alta, Alta did not react in any way indicating that it thought GE had breached any oral promise to fulfill WattStock's obligations.

And in the GE-Alta NDA, Alta similarly disclaimed reliance "upon any representation or expectation that the other Party will enter into any relationship or transaction" or any prior understandings not memorialized in the NDA. App.415–16. This also shows that Alta knew it could not rely on any extracontractual statements.

**2.**    In the December LNTP, Alta expressly disclaimed reliance on "any representation" "not contained in the Contract." App.451.  So Alta knew it could not rely on any alleged promises not reduced to writing in the LNTP.

And in its NDA with GE, Alta similarly disclaimed reliance "upon any representation or expectation that the other Party will enter into any relationship or transaction" or any prior understandings not memorialized in the NDA.  App.415.  This thus likewise shows Alta knew it could not rely on any extracontractual statements.

**3.**    When Alta approached WattStock for a loan in the fall of 2019, GE was not involved, or asked to be involved, in the loan discussions, as would be expected if GE was expected to back Alta's work.  *See* App.6515–16 (GE not included in email or draft term sheets); *see also* App.477 (discussing loan discussions and not mentioning GE).  Indeed, the draft term sheet required confidentiality between just Alta and WattStock, stating that it "shall not be revealed to any party that does not have a need to know the contents for the purpose of negotiating and approving a potential financing involving WattStock."  App.6516.  Alta has no evidence suggesting GE was ever told about or involved in these discussions (because it wasn't).  The same is true for the "exclusive joint venture" that Alta proposed to WattStock.  App.41–42.

\* \* \*

Alta's own documents and recorded actions thus show that it did not believe—much less reasonably rely on—any of GE's alleged misrepresentations.  Accordingly, Alta cannot raise a genuine issue of material fact on the issue, and GE is entitled to summary judgment.

**V.    Alta's attempt to hold GE vicariously liable for WattStock's alleged breach of contract and torts fails as a matter of law.**

Alta seeks to establish GE's liability for WattStock's alleged misconduct based on a smorgasbord of vicarious liability theories, including partnership by estoppel, joint enterprise, and

ostensible agency. Alta cannot raise a genuine fact dispute as to the elements of any of these claims, and thus GE is entitled to summary judgment.

It is a "fundamental tort-law principle" that GE is liable only for its own "injury-causing conduct" absent some special legal relationship with WattStock. *In re Xerox Corp.*, 555 S.W.3d 518, 523 & n.22 (Tex. 2018). No such special relationship exists, and Alta cannot raise a genuine dispute of fact otherwise. And, as noted above, Alta's own documents—including a proposed loan document between Alta and WattStock—show that Alta knew that GE was not responsible for WattStock's performance under its contracts with Alta, such that Alta cannot succeed on a partnership by estoppel theory. *See supra* Part I.A; *see also Lost Maples Gen. Store, LLC v. Ascentium Cap., LLC*, No. 14-18-00215-CV, 2019 WL 1966671, at *5–6 (Tex. App.—Houston [14th Dist.] May 2, 2019, no pet.) (no partnership by estoppel where the vendor agreement between the parties "clarif[ied] that the two companies are not agents of each other").

Alta likewise cannot rely on a joint-enterprise theory of liability because it cannot raise a genuine dispute of fact as to the existence of any: (1) common purpose and agreement between GE and WattStock to jointly locate and sell aeroderivative units to Alta; (2) common pecuniary interest among GE and WattStock in the sale of the units beyond the interest in a typical "supplier" relationship; or (3) "equal right of control" between GE and WattStock to locate and sell the turbines. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2002).

Alta's final vicarious liability theory—ostensible agency—fails because Alta cannot raise a genuine dispute of fact as to whether, after due diligence, it reasonably believed WattStock was GE's agent. The Alta-WattStock contracts and GE's contemporaneous communications made clear that WattStock was not GE's agent. In fact, Alta's own conduct—including its proposed loan agreement and joint venture with WattStock alone—confirm it knew that WattStock was not

46

in fact GE's agent and thus it was not reasonable for Alta to assume the contrary. *See supra* Part IV.B; *see also Gaines v. Kelly*, 235 S.W.3d 179, 182–83 (Tex. 2007) (no ostensible agency unless a "reasonably prudent person, using diligence and discretion to ascertain the agent's authority[,]" would "believe that the agent has the authority [it] purports to exercise").

## VI.    Alta's remaining derivative claim and theories of liability fail as a matter of law.

*First*, Alta's tortious interference claim fails because its underlying claims fail. To recover for tortious interference with a prospective business relations, a plaintiff must prove that "the defendant's conduct was independently tortious or unlawful," *Nix v. Major League Baseball*, 62 F.4th 920, 934 (5th Cir. 2023), and that it "prevented the relationship from occurring," *Cantu v. Bernal*, No. 13-22-00489-CV, 2023 WL 8817846, at *3 (Tex. App.—Corpus Christi–Edinburg Dec. 21, 2023, no pet.). But the only conduct on which Alta can rely are the above oral promises GE allegedly made. App.80. As Alta cannot create a genuine fact dispute as to whether GE made these alleged promises, its tortious interference claim likewise fails. *See Cantu*, 2023 WL 8817846, at *1.

*Second*, Alta's unjust enrichment "claim" for the $1.5 million Alta paid WattStock under the LNTP fails as a matter of law because unjust enrichment is a theory of recovery, not a standalone cause of action. *Harris Cnty. v. MERSCORP Inc*., 791 F.3d 545, 561 (5th Cir. 2015). Indeed, Alta itself has acknowledged as much. Both in its brief and at the hearing on GE's Rule 12(c) motion, Alta represented that its unjust enrichment claim was intended to allege a form of remedy recoverable under its fraud and negligent-misrepresentation theories. *See* App.6565; App.6616–17. Because those claims fail as a matter of law, *supra* at Parts III & IV, its unjust enrichment claim necessarily fails as well.

Moreover, it is black-letter law that "a party cannot recover under quantum meruit or unjust enrichment for services provided under a contract." *In re Guardianship of Fortenberry*, 261

S.W.3d 904, 916 (Tex. App.—Dallas 2008, no pet.).  Because the $1.5 million Alta paid WattStock was covered by the express terms of the LNTP with WattStock, Alta must seek recovery under that contract.  And that's true even though GE isn't a party to the LNTP.  *See Diamond Servs. Corp. v. RLB Contracting, Inc.*, 113 F.4th 430, 443 (5th Cir. 2024) ("express-contract bar" to unjust-enrichment recovery applies "when the plaintiff seeks recovery from a third party foreign to the original contract but who benefitted from its performance") (quoting *Christus Health v. Quality Infusion Care, Inc.*, 359 S.W.3d 719, 724 (Tex. App.—Houston [1st Dist.] 2011, no pet.)).  Thus, Alta's unjust enrichment claim also fails on its merits.

*Third*, Alta's civil conspiracy theory of liability also fails because Alta's underlying claims fail.  Texas law makes clear civil conspiracy is "a theory of derivative liability" that must be premised on an intentional tort, and not itself "an independent tort."  *Agar Corp., Inc. v. Electro Cirs. Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019); *see also Tri v. J.T.T.*, 162 S.W.3d 552, 557 (Tex. 2005) ("cannot be a civil conspiracy to be negligent").  Because Alta's fraud claims fail, its civil conspiracy theory of liability does, too.  As a result, GE is entitled to summary judgment.

## VII.   At minimum, Alta cannot recover punitive damages as a matter of law.

Even if Alta can drum up a dispute of fact on the merits (it cannot), Alta is still not entitled to punitive damages as a matter of law because **(A)** at least two of Alta's contracts bar Alta from seeking such damages, and **(B)** Alta cannot establish by clear and convincing evidence that GE acted fraudulently or with malice or gross negligence as statutorily required for an award of punitive damages.

### A.   Alta is contractually barred from seeking punitive damages.

Alta waived its right to seek punitive damages under § 22.2 of its December LNTP with WattStock, to which GE is a third-party beneficiary per § 17 of that agreement.  *See* App.448.  And

even if Alta's agreement with WattStock didn't bar punitive damages, paragraph 11 of Alta's non-disclosure agreement with GE does.  *See* App.416.

### B.     Alta cannot create a genuine fact dispute as to whether GE acted with malice or gross negligence or fraudulently.

To be entitled to punitive damages, Alta must "prove[ ] by clear and convincing evidence that the harm with respect to which [it] seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence."  Tex. Civ. Prac. & Rem. Code § 41.003(a).  Alta does not even allege malice or gross negligence, much less have clear and convincing evidence that GE acted with malice or gross negligence.  And, as discussed above, Alta cannot present *any* evidence that GE acted fraudulently or that Alta's harm was caused by any alleged fraud, let alone *clear and convincing* evidence.  *See supra* Part IV.

## VIII.  The record conclusively establishes that Alta breached its covenant not to sue for consequential damages, including lost profits.

In the Master Agreement, Alta contractually agreed that it would not "make any claim" for "consequential damages arising out of or connected in any way to th[at] agreement":

> B. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, AND TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER PARTY, THEIR RESPECTIVE OFFICERS, DIRECTORS, PARTNERS, EMPLOYEES, REPRESENTATIVES, CONTRACTORS OR SUBCONTRACTORS SHALL BE LIABLE TO THE OTHER OR SHALL MAKE ANY CLAIM FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR CONNECTED IN ANY WAY TO THIS AGREEMENT. THIS MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES SHALL INCLUDE, BUT IS NOT LIMITED TO, LOSS OF USE, LOSS OF PROFIT, LOSS OF BUSINESS, LOSS OF INCOME, LOSS OF REPUTATION OR ANY OTHER CONSEQUENTIAL DAMAGES THAT EITHER PARTY MAY HAVE INCURRED FROM ANY CAUSE OF ACTION INCLUDING NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT AND BREACH OF STRICT OR IMPLIED WARRANTEE.

App.432 (emphases added); *cf. Formosa Plastics*, 960 S.W.2d at 49 n.1.  Yet, that is precisely what Alta did by pursuing its claims against GE in this suit.

***First***, GE is a third-party beneficiary to the Master Agreement as the agreement confers a direct benefit to GE.  *See Edds v. Mitchell*, 184 S.W.2d 823, 829 (Tex. 1945).  As noted above, the Master Agreement explicitly protects WattStock's "subcontractor"—GE—from suits for

consequential damages.  App.432.  As a result, pursuant to the intent of the parties, GE may sue to enforce the limitations to suit in the contracts.

*Second*, Alta cannot raise a genuine dispute of material fact as to any element of GE's contract claim against it:  (1) there's a valid contract, (2) Alta breached that contract by suing GE for consequential damages arising out of or connected to the Master Agreement; and (3) Alta's breach caused GE damages (the costs of litigating Alta's contractually barred claim).  *See Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007).  The only issue remaining for trial then is the amount of GE's damages.

CONCLUSION

For these reasons, the Court should grant summary judgment for GE on Alta's claims against it and on GE's claims against Alta.


Dated: April 24, 2025                    Respectfully submitted,

 */s/ Andrew LeGrand*
John T. Cox III (Texas Bar No. 24003722)
Andrew LeGrand (Texas Bar No. 24070132)
Bradley G. Hubbard (Texas Bar No. 24090174)
Kathryn Cherry (Texas Bar No. 24114781)
Cristina Squiers (Texas Bar No. 24093764)
Matthew Capoccia (Texas Bar No. 24121526)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas  75201
Telephone:  (214) 698-3100
Facsimile: (214) 571-2900
*tcox@gibsondunn.com*
*alegrand@gibsondunn.com*
*bhubbard@gibsondunn.com*
*kcherry@gibsondunn.com*
*csquiers@gibsondunn.com*
*mcapoccia@gibsondunn.com*

COUNSEL FOR GE VERNOVA INTERNATIONAL LLC