IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

**ALTA POWER LLC,**
          *Plaintiff/Counter-Defendant,*

v.

**GENERAL ELECTRIC**                              Case No. 3:23-CV-270-X
**INTERNATIONAL, INC., n/k/a GE**
**VERNOVA INTERNATIONAL LLC,**
**d/b/a GE POWER SERVICES,**
          *Defendant/Counter-Plaintiff.*

**GE VERNOVA INTERNATIONAL LLC'S BRIEF IN SUPPORT OF ITS
MOTION TO EXCLUDE THE EXPERT OPINIONS AND TESTIMONIES OF
QUENTIN MIMMS AND WILLIAM MARS**

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................iii

Introduction .........................................................................................................1

Background ...........................................................................................................3

    I. Alta designated Quentin Mimms as its lost-profits expert. ......................3

    II. Alta designated William Mars as its "ProEnergy" expert......................10

Legal Standard.....................................................................................................12

Argument .............................................................................................................13

    I. This Court should exclude Mimms's lost-profits opinions because
    they are (1) based on models he didn't independently verify and (2)
    assumptions that are unsupportable or contradicted by undisputed
    evidence. ..............................................................................................13

    II. This Court should exclude Mars's ProEnergy opinions because
    they are mere *ipse dixit*. ......................................................................21

Conclusion ...........................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

### CASES

*Barnes v. Allstate Tex. Lloyds,*
No. 1:21-CV-00217, 2022 WL 16908239 (E.D. Tex. Sept. 26, 2022) .................... 21

*Collins v. Safeco Ins. Co. of Ind.,*
No. 3:18-CV-01788-X, 2020 WL 95488 (N.D. Tex. Jan. 8, 2020) ............... 2, 13, 21

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993) ......................................................................... 1, 12

*Diabetes Ctrs. of Am., Inc. v. Healthpia Am., Inc.,*
No. H-06-3457, 2008 WL 375505 (S.D. Tex. Feb. 11, 2008) ........................... 14, 16

*Gen. Elec. Co. v. Joiner,*
522 U.S. 136 (1997) ................................................................................... 2

*Guillory v. Domtar Indus. Inc.,*
95 F.3d 1320 (5th Cir. 1996) .................................................................. 13

*Jacked Up, L.L.C. v. Sara Lee Corp.,*
291 F. Supp. 3d 795 (N.D. Tex. 2018) ....................... 1, 12, 13, 14, 15, 16, 17, 21, 25

*Jacked Up, L.L.C. v. Sara Lee Corp.,*
807 F. App'x 344 (5th Cir. 2020) ............................................................ 13

*Johnson v. Arkema, Inc.,*
685 F.3d 452 (5th Cir. 2012) .................................................................. 12

*JRL Enters., Inc. v. Procorp Assocs., Inc.,*
No. 01-2893, 2003 WL 21284020 (E.D. La. June 3, 2003) .................................. 16

*Moore v. Int'l Paint, L.L.C.,*
547 F. App'x 513 (5th Cir. 2013) ............................................................ 13

### RULES

Fed. R. Evid. 702 ........................................................................................ 12

## INTRODUCTION

Alta Power seeks up to $407.3 million in lost profits based on the testimony of two experts: Quentin Mimms and William Mars. Their opinions are unreliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Mimms calculates lost profits using financial models that Alta developed to shop its business plan—a plan for gas-fired peaker plants that Alta was never able to develop, finance, or operationalize. Mimms did nothing to independently verify the reasonableness or validity of Alta's models—which Alta could not convince any of the over 88 lenders it approached to accept. He assumed Alta's models were sufficient based on Alta's say-so. Mimms's failure to independently assess the underlying bases of his calculations renders his opinions unreliable. *Jacked Up, L.L.C. v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 802 (N.D. Tex. 2018) (Horan, J.), *aff'd*, No. 3:11-cv-3296-L, 2018 WL 2064126 (N.D. Tex. May 2, 2018).

But that's not all. Mimms also relied on Alta's say-so (mainly, the undocumented statements of its Chief Financial Officer, Matthew Laterza) as support for a handful of assumptions that are unsupported or contradicted by the undisputable record evidence:

1. Mimms assumes Alta would have achieved financial close on its project in September 2019, but Alta was never able to overcome the "equity gap" that lenders identified as a reason for refusing to finance Alta's project.

2. Mimms assumes Alta would have had its plants online in September 2020, but the commercial operations dates that Alta proposed while seeking financing constantly shifted, and Mimms ignores the possibility of construction delays.

3. Mimms assumes that Alta's hypothetical plants would have been fully functional during Winter Storm Uri, but Alta's documents and testimony unequivocally show that it did not plan to winterize its equipment.

1

4. Mimms assumes that Alta's heat rate call option ("HRCO") contracts would not have become effective before June 2021, but the indicative term sheet he seemingly relies upon for this assumption, which Alta received from its HRCO counterparty, shows a start date of October 1, 2020.

Rule 702 empowers courts to refuse "to admit testimony based on indisputably wrong facts." *Collins v. Safeco Ins. Co. of Ind.*, No. 3:18-CV-01788-X, 2020 WL 95488, at *2–3 (N.D. Tex. Jan. 8, 2020) (Starr, J.). An expert is supposed to consider the facts, not change them. Mimms shouldn't be allowed to confuse the jury.

Mars should suffer the same fate—for a similar reason. Mars doubles down on the assumptions about Alta's commercial operations dates and plants functioning during Uri that are contradicted by the facts. Mars, like Mimms, should not be allowed to offer those opinions at trial. What's worse, Mars offers other opinions that are pure *ipse dixit*. For example, Mars claims that, in a hypothetical but-for world where Alta contracted with ProEnergy for its peaker-plant project, "Alta's total cost for nine ProEnergy Packages would have come to $167,477,514 or less" because "ProEnergy would have given Alta a volume discount." App.17. For the total price or the volume discount, Mars cites—nothing. He just makes it up. This Court has refused to admit expert "testimony 'that is connected to existing data only by the *ipse dixit* of the expert.'" *Collins*, 2020 WL 95488, at *2 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). It should do the same here.

Both Mimms and Mars offer expert opinions that do not satisfy Rule 702. This Court should exercise its gatekeeping function and exclude those opinions.

## BACKGROUND

This case arises from Alta's failed attempt to build peaker-power plants using aeroderivative gas turbines adapted from jet engines.  The crux of Alta's claims is that GE and WattStock (whom Alta voluntarily dismissed) orally promised, but did not deliver, "up to nine fully refurbished [aeroderivative packages] for $10 million or less" per unit, and that GE orally promised to "fulfill all of the obligations that WattStock owed to Alta" under a contract between WattStock and Alta.  App.27, 28. Alta alleges that had GE and WattStock delivered or not made these alleged oral promises, it would have made around $400 million in profits during Winter Storm Uri by generating power (using machines provided by either WattStock or, in a hypothetical but-for world, ProEnergy) and selling that power to the market at exorbitant rates.  App.1326; *see also* App.36 (testifying Alta would have been "on-line during Winter Storm Uri at roughly 120 hours at $9,000 a megawatt hour").

## I.    Alta designated Quentin Mimms as its lost-profits expert.

Alta designated Quentin Mimms as an expert "to analyze and provide opinions regarding financial damages sustained by Alta" from GE's and WattStock's alleged conduct.  App.1324.  Mimms offers three key opinions: (1) "Alta suffered lost profits damages ranging from $193.6 million to $370.0 million for the time period from September 1, 2020, through January 31, 2025"; (2) "[a]lternatively, Alta suffered [lost profits] damages of at least $208.9 million to $407.3 million" for the same time period; and (3) "Alta suffered reliance damages of at least $6.18 million from February 2018, through December 2020, as a result of invoice payments to WattStock, GE, and third parties for various items."  App.1326.

3

Mimms first opines that Alta "suffered lost profits damages ranging from $193.6 million to $370.0 million for the time period from September 1, 2020, through January 31, 2025," depending on the number of sites.  App.1343.  This range is based on "a model developed by Alta during discussions about project financing with various financial institutions."  App.1345.  Mimms then "applied market pricing during the period the plants would have been operational through January 31, 2025, to estimate what Alta would have earned" based on these models and his assumptions.  *Id.*  He concluded that Alta would have earned $193,568,651 with one site operating three turbines or $370,023,723 with three sites operating nine turbines (three per site). App.1356.  Much of these profits—between 73% to 81% of the total cash flow—are attributable to the plants' operations during Winter Storm Uri.  Mimms alternatively opines that had Alta contracted with competitor ProEnergy, Alta would have earned $208.9 million to $407.3 million for the same time period.  App.1360.  Under this alternative model, Mimms assumes that Alta would have chosen ProEnergy to fill WattStock's role *and* he does not account for ProEnergy experiencing any construction delays.  App.1357–58.

Mimms bases both of his lost-profits calculations on (at least) four assumptions that are unsupportable or otherwise contradicted by Alta's own documents and evidence in this case.

*First*, he assumes that Alta would have financially closed on its peaker-plant project in September 2019:

> 73. Based on discussions with Mr. Laterza, I have assumed that Alta, for both scenarios, would have closed financially on the project in September 2019, making the first draw down on the construction loan in October 2019. Additionally, Alta would have issued a notice to proceed and begun site preparations in October 2019. While Alta would have likely staggered the start of construction for each site, to simplify the model, I have chosen to front load

App.1353–54. Mimms offers no other explanation for why this would be a reasonable financial close date other than his undocumented discussions with Mr. Laterza. *Id.* Mimms ignores scores of evidence—including from the only lender that had then given any real consideration to Alta's projects, Deutsche Bank—showing that in September 2019, lenders had rejected Alta's projects as lacking sufficient equity and being vulnerable to a legal dispute with a competitor company, Castleman Power. *See* App.134–36; *see also* App.166 (testifying that Deutsche Bank wasn't comfortable with the Castleman issue).

Mimms's assumed September 2019 financial close date is critical because if Alta had not secured funding by this time in the hypothetical but-for world where GE and WattStock delivered on the alleged oral promises, Alta could not have constructed a plant and been up and running before Winter Storm Uri (accounting for 70–80% of Mimms's calculated lost profits). *See* App.107–138 (discussing Alta's difficulty in getting financing).

*Second*, based on the assumed September 2019 financial close date, Mimms also assumes that Alta would have completed construction of two plants and had them fully operational on September 1, 2020, with a third plant operational on May 1, 2021:

> models of September 1, 2020. According to the Leidos Independent Engineer's
> Report, both GoodAlta and Altajac were "planned to be built in parallel and all
> the key milestone dates are consistent between the two [s]chedules."[112] Based on
> this, I have modeled two peaker plants with a combined six turbines becoming
> operational on September 1, 2020, and the remaining peaker plant becoming
> operational on May 1, 2021.[113] I have assumed that the 1x3 peaker plant option
> would have been operational on September 1, 2020, but for any delays as a result
> of GE/WattStock's alleged bad acts.

App.1345–46.

Mimms ignores the risk of construction delays. He bases his opinion on Alta's own internal preliminary construction schedules for two of Alta's proposed sites (GoodAlta and Altajac), with the third site's May 2021 start date resting on Mimms's undocumented "conversations with Matthew Laterza about expected timing."[1] App.1345–46. Although GE's experts explain why it is unreasonable to assume no construction delays on a project like the one Alta considered, especially in light of the COVID-19 Pandemic, *see* App.209–10, Mimms assumes—without citation to any factual support—that Alta would not have suffered any construction delays. App.1345–46. As with the September 2019 financial-close date, any delay in construction or in achieving full operations could have caused Alta to miss its alleged windfall opportunity during Winter Storm Uri. App.209–10, 211–12; *see also* App.73–75 (discussing Alta's efforts to get financing).

*Third*, Mimms assumes that Alta's plants would have fully functioned during Winter Storm Uri in February 2021:

---

[1] Mimms did not include in his materials any actual statements by Mr. Laterza, notes reflecting Mimms's conversations with Laterza, or even summaries regarding the substance of those discussions.

> 55. I have not included Quick-Start Revenue or ECRS revenue in my lost profits
> analysis, this is due to Quick-Start Revenue being discontinued as a potential
> revenue stream by ERCOT, and ECRS revenue not becoming available until
> 2023.[123] Notably, Alta would have benefitted significantly from revenues
> produced in February 2021 based on the high Real Time and Ancillary Services
> pricing during Winter Storm Uri.[124]

App.1348.  For the turbines to be able to operate during extreme cold temperatures, like the ones experienced during Uri, they must have gas and be equipped with certain "winterization" equipment—and, even with that equipment, the machines might not be able to run (as was the case for most power plants in Texas during Uri).[2] *See* App.258–61.  Mimms does not offer any reason to assume that Alta would have had gas at its plants given the widespread shortages in Texas at the time.  App.261. And he assumes that Alta's plants would have been winterized and the winterized equipment would have performed flawlessly, App.1329–30, despite undisputed evidence showing that Alta rejected winterization options from both ProEnergy and WattStock.  App.279, 282; *see also* App.375 (WattStock employee testifying that anti-icing was taken out of the proposal because it was "too expensive according to [Alta]").

*Fourth*, Mimms assumes Alta's HRCOs would not have become effective until nine months after Alta's plants would have reached commercial operations—in other words, in Mimms's hypothetical but-for world, Alta would not have owed any power to its HRCO counterparty during Uri:[3]

---

[2] Operators of the plants must also have access to natural gas to run the gas-fired turbines.  *See* App.261.

[3] HRCOs are like insurance policies for electricity prices.  The buyer (Alta's counterparty) pays a monthly premium to protect against spikes in electricity prices,

> 56. Beginning June 1, 2021, for the first two plants and June 1, 2022, for the third
> plant, the main source of revenue for the following five years of operation comes
> from the HRCO contract which has two streams of embedded revenue.[125]  The
> first is the "HRCO Premium" which represents a fixed monthly payment based
> on a contractual dollars per kilowatt per month.[126]  According to the HRCO, Alta

App.1348–49; *see also* App.1338 (stating that, "[b]ased on discussions with Matthew Laterza," Mr. Mimms "underst[ood] that the [HRCO] would not have taken effect until June 2021 for the first two plants").  Whether Alta would have had a HRCO in place during Winter Storm Uri (February 2021) makes a massive difference:  With a HRCO in place and realistic assumptions about Alta's ability in fact to generate electricity (rather than buy it on the market to satisfy its HRCO), the $193 million profit in Mimms's model for a single site is in fact a $17 million loss.  App.229.

To assume that no HRCO would have been in effect during Winter Storm Uri, Mimms relies on Mr. Laterza's deposition testimony to conclude that all HRCOs would have taken effect in the June following *any* commercial operations date—a period as long as eleven months and, in the case of a September 2019 commercial

---

while the seller (here Alta) collects premiums, hoping the buyer's demand for electricity will never exceed the seller's capacity to produce it.  A HRCO counterparty's premium gives them the right to call on a company like Alta to produce power up to a maximum amount permitted under the contract, and if the company fails to produce the power, it must cover by purchasing an equivalent amount of electricity for its counterparty on the open market.  During an event where electricity prices spike as occurred in Winter Storm Uri, a HRCO can expose a company like Alta to massive losses from needing to pay market prices to cover.  *See* App.225–26.  Notably, Alta planned to commit 95% of its capacity at each plant to a HRCO.  App.84.

operations date, a nine-month period.[4]  *See* App.1339, 1348; *accord* App.212–13 (explaining that Mimms assumes Alta's HRCOs would start nine months or more after a plant's COD).  But this assumption is contrary to the record and to the evidence Mimms relies on elsewhere in his report.  For instance, *every* quote Alta received to sell a HRCO to a counterparty from 2019 to 2020 reflects that the HRCO would start within just a few months of Alta's plants commercial operations dates (compare "Target COD" and "Start" columns):

| | | | Alta's HRCO Quotes and HRCO Parameters | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | All reflect same Heat Rate, Min Runtime, Min Downtime, Max Starts/Day, Max Starts per Year | | | | | | | |
| Date | Author | Bates | Target COD | Start | Tenor | Hours | Hub | Volume | Gas Index | Price |
| 6/7/2018 | Alta (Citigroup) | Alta 0129138 | Oct. 31, 2019 | Nov. '19 | 5 | 4000 | North | 135.375 MW | HSC | N/A |
| 6/15/2018 | Citigroup | Alta 0126683 | Oct. 31, 2019 | Nov. '19 | 5 | 4000 | North | 135.375 MW | HSC | $3.47 |
| 6/29/2018 | Alta (Direct) | Alta 0120867 | Oct. 31, 2019 | Nov. '19 | 5 | N/A | North | 135.375 MW | HSC | N/A |
| 7/11/2018 | Direct Energy | Alta 0120867 | Oct. 31, 2019 | Nov. '19 | 5 | 4000 | North | 135.375 MW | HSC | $5.48 |
| 2/5/2019 | Direct Energy | Alta 0120834 | Q2 2020 | June '20 | 5 | N/A | South | 135.375 MW | HSC | $5.42 |
| 2/15/2019 | Alta (Tenaska) | Alta 0005295 | Q2 2020 | N/A | N/A | 4 | North | 135.375 MW | | N/A |
| 3/11/2019 | Alta (BP) | Alta 0084550 | Q2 2020 | June '20 | 5 | 4000 | North | 135.375 MW | TXOK + $0.30 | N/A |
| 3/12/2019 | Alta (Vitol) | Alta 0084912 | Q2 2020 | June '20 | 5 | 4000 | North | 135.375 MW | TXOK + $0.30 | N/A |
| 3/18/2019 | Alta (EDF) | Alta 0084567 | Q2 2020 | June '20 | 5 | 4000 | North | 135.375 MW | TXOK + $0.30 | N/A |
| 3/20/2019 | BP | Alta 0084550 | Q2 2020 | June '20 | 5 | 4000 | North | 135.375 MW | TXOK + $0.30 | $2.5-$3.0 |
| 5/17/2019 | Alta (Uniper) | Alta 0087814 | Q2 2020 | June '20 | 5 | 3600 | North | 135.375 MW | TXOK | N/A |
| 5/20/2019 | Alta (Hartree) | Alta 0004220 | Q2 2020 | June '20 | 5 | 3600 | North | 135.375 MW | TXOK | N/A |
| 5/30/2019 | Alta (Uniper) | Alta 0085620 | Q2 | June '20 | 5 | 3600 | North | 135.375 MW | TX OK | $5.25 |
| 6/17/2019 | Uniper | Alta 0085799 | Q2 2020 | June '20 | 5 | 3600 | North | 135.375 MW | TXOK | N/A |
| 6/20/2019 | Alta (Hartree) | Alta 0004166 | Q2 2020 | June '20 | 5 | 3600 | Houston | 135.375 MW | TXOK | N/A |
| 6/21/2019 | Alta (Hartree) | Alta 0004731 | Q2 2020 | Oct. '20 | 5 | 3600 | North | 135.375 MW | TXOK | N/A |
| 6/21/2019 | Alta (Uniper) | Alta 0129645 | Q2 2020 | Oct. '20 | 5 | 3600 | Houston | 135.375 MW | TXOK | N/A |
| 6/27/2019 | Uniper | Alta 0012645 | Q2 2020 | Oct. '20 | 5 | 3600 | Houston | 135.375 MW | TXOK | $4.13 |
| 7/3/2019 | Alta (DB) | Alta 0004452 | Q2 2020 | June '20 | 5 | 3600 | Houston | 135.375 MW | TXOK | $4.07 |
| 7/8/2019 | Alta (DB) | DBSI-GE-00001987 | Q2 2020 | June '20 | 5 | 3600 | Houston | 135.375 MW | TXOK | N/A |
| 7/8/2019 | Uniper | Alta 0085515 | Q2 2020 | Oct. '20 | 5 | 3600 | North | 135.375 MW | TXOK | N/A |
| 7/12/2019 | Alta (Direct) | Alta 0083583 | Q2 2020 | June '20 | 5 | 3600 | North | 135.375 MW | TXOK | N/A |
| 7/12/2019 | Alta (Direct) | Alta 0083583 | Q2 2020 | June '20 | 5 | 3600 | North | 135.375 MW | TXOK | N/A |
| 7/12/2019 | Direct Energy | Alta 0083583 | Q2 2020 | June '20 | 5 | 3600 | North | 135.375 MW | HSC | $3.58 |
| 7/12/2019 | Direct Energy | Alta 0083583 | Q2 2020 | June '20 | 5 | 3600 | South | 135.375 MW | HSC | $2.88 |
| 7/12/2019 | Uniper | Alta 0012645 | Q2 2020 | June '20 | 5.33 | 3600 | North | 135.375 MW | TXOK | $4.61 |
| 7/15/2019 | Direct Energy | Alta 0083583 | Q2 2020 | Oct. '20 | 5 | 3600 | North | 135.375 MW | TXOK | $3.99 |
| 7/15/2019 | Direct Energy | Alta 0083583 | Q2 2020 | Oct. '20 | 5 | 3600 | North | 135.375 MW | TXOK | $3.23 |
| 7/25/2019 | Alta (Constellation) | Alta 0071980 | Q2 2020 | June '20 | 5 | 3600 | North | 135.375 MW | TXOK + $0.30 | N/A |
| 7/29/2019 | Alta (Macquarie) | Alta 0012598 | Q2 2020 | Oct. '20 | 5 | 3600 | North | 135.375 MW | TXOK + $0.30 | N/A |
| 7/30/2019 | Alta (Goldman) | Alta 0085356 | Q2 2020 | June '20 | 5 | 3600 | North | 135.375 MW | TXOK + $0.30 | N/A |
| 7/30/2019 | Alta (Goldman) | Alta 0085355 | Q2 2020 | Oct. '20 | 5 | 3600 | North | 135.375 MW | TXOK + $0.30 | N/A |
| 7/31/2019 | Alta (Axpo) | Alta 0048237 | Q2 2020 | June '20 | 5 | 3600 | North | 135.375 MW | TXOK + $0.30 | N/A |

*See*, *e.g.*, App.379–80.  Likewise, all of Alta's models from the time Alta sought financing leading up to September 2019 reflect a short gap between COD and HRCO start date, App.383–91; *e.g.*, App.424, 480, 536.  Again, Mimms's primary support for

---

[4] It is not believable that Alta would have been able to go eleven months without this revenue source it needed for debt service, for which it had planned to contract 95% of its capacity.

9

the nine-month gap between COD and HRCO start is the self-serving deposition testimony of Mr. Laterza. App.1339, 1438; *accord* App.212–13 (noting greater than nine-month gap between HRCOs and COD).

What is more, evidence Mimms relies on directly contradicts his assumption that the HRCO start date would have been nine to eleven months after the commercial operations date. This includes the "Indicative Term Sheet" Alta received from a counterparty providing for an October 1, 2020 HRCO start date, which Mimms references in connection with his assumption that Alta's HRCOs would not have started until June 2021. *See* App.1339 (referencing the "'Indicative Term Sheet' from Uniper Global Commodities North America LLC ("Uniper") on July 8, 2019"); *see also* App.609–612.[5]

## II.    Alta designated William Mars as its "ProEnergy" expert.

Alta designated William Mars as a retained expert "to offer [an] expert opinion on ProEnergy's offerings and capabilities, . . . how long it would have taken ProEnergy to get those refurbished LM6000s connected to the ERCOT grid, and whether those units would have functioned during Winter Storm Uri." App.13.

First, Mars opines that winterization on a single three-unit configuration would have cost, at most, $400,000, and that "Alta's total cost for nine ProEnergy Packages would have come to $167,477,514 or less" because "ProEnergy would have given Alta a volume discount." App.17. Mars does not validate his estimates in any

---

[5] "Mimms also cites to 'Nomura_0000000210' as the basis for his HRCO parameters" but "the 'Nomura_0000000210' document relates to title insurance and does not refer to HRCO parameters or pricing." App.216.

10

way or even explain how ProEnergy would have calculated volume discounts, what the discount would have been, how common volume discounts were at the time, or the reasons or circumstances under which ProEnergy offered volume discounts.

Second, Mars opines that "for each of Alta's three unit peaking power sites, it would have taken ProEnergy between six (6) and ten (10) months from the start of construction of each of the three sites to deliver, install, and connect (to the power grid) each set of three ProEnergy Packages." App.18. Mars bases this opinion on "ProEnergy's real world performance on similar jobs during the period Alta intended to construct its plants." *Id.* Specifically, Mars provides a one-sentence summary of the timeline for a single ProEnergy project. App.18–19. He does not explain what makes Alta's proposed project similar to this other project or how similar it is, and cites only a ProEnergy marketing pamphlet and a short article about this other project in support of this opinion. *Id.*; *see also* App.19 n.11.

Third, Mars opines that "Alta's first three-unit peaker power plant would have achieved interconnection in the second quarter of 2020 and would have been synced and achieved commercial operation late in the third quarter of 2020"; "Alta's second three unit peaker power plant would have achieved interconnection in the third quarter of 2020, and would have been synced and achieved commercial operation in late in the fourth quarter of 2020"; and "Alta's third peaker power plant would have achieved interconnection in the second quarter of 2021 and would have been synced and achieved commercial operation in the third quarter of 2021." App.19. Here again, Mars fails to discuss any facts about Alta's proposed project or how his observations relate to it. He cites no record evidence in support of this opinion.

Finally, Mars opines that "if Alta had purchased ProEnergy Packages from ProEnergy, including the winterization option, those units would have run without interruption during Winter Storm Uri despite the incelement [sic] weather." App.19. This opinion, he says, is based on the fact that six turbines that were "substantively identical" to those that "Alta would have acquired from ProEnergy" ran for 141 hours during Winter Storm Uri. *Id.* But he leaves out how many "substantively identical" turbines ran *with* interruption during the 141 hours of extreme generation demand during Uri and where the various turbines were located. Mars does not attempt to explain what factors would affect the operation of such turbines during inclement weather and does not attempt to analyze any differences in the power plants. And if that weren't enough, the six turbines at the only plant he does identify, HO Clarke, were in a different geographical area with higher temperatures during Uri than Alta's proposed project sites and did, in fact, report outages during Uri. App.261–63.

## LEGAL STANDARD

The district court "'acts as a gatekeeper' to ensure that 'any and all scientific evidence admitted is not only relevant, but reliable.'" *Jacked Up*, 291 F. Supp. 3d at 800 (quoting *Daubert*, 509 U.S. at 589); *see* Fed. R. Evid. 702. A district court may "admit proffered expert testimony only if the proponent, who bears the burden of proof, demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *Jacked Up*, 291 F. Supp. 3d at 800.

Reliability "mandates that expert opinion be grounded in the methods and procedures of science and be more than unsupported speculation or subjective belief." *Jacked Up*, 291 F. Supp. 3d at 801 (quoting *Johnson v. Arkema, Inc.*, 685 F.3d 452,

12

459 (5th Cir. 2012)) (alteration accepted). "Expert evidence that is not reliable at each and every step is not admissible." *Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 F. App'x 344, 348 (5th Cir. 2020) (cleaned up).

A reliable opinion must, naturally, be based on reliable information. "[A]n opinion based on insufficient, erroneous information, fails the reliability standard." *Jacked Up*, 291 F. Supp. 3d at 802 (quoting *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013)). "In other words, this Court need not admit testimony 'that is connected to existing data only by the *ipse dixit* of the expert.'" *Collins*, 2020 WL 95488, at *2 (cleaned up). And it "does not need to admit testimony based on indisputably wrong facts." *Id.* (quoting *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996)).

The burden is on the proponent of the expert testimony to show that the expert's testimony is reliable. *Jacked Up*, 807 F. App'x at 348.

## ARGUMENT

### I. This Court should exclude Mimms's lost-profits opinions because they are based on (1) models he didn't independently verify and (2) assumptions that are unsupported—and often contradicted—by undisputed evidence.

Mimms's opinions on lost profits are unreliable as they rest on (1) Alta's internal financial models and "projections" that were never accepted or finalized by any of the more than 88 lenders Alta contacted about financing and (2) Mimms's unsupportable assumptions which are often contradicted by the record. Mimms's lost-profits opinions should thus be excluded. *See Jacked Up*, 291 F. Supp. 3d at 802.

13

"Revenue and profit forecasting must be based on objective facts or data." *Jacked Up*, 291 F. Supp. 3d at 802–03. An expert fails to support his report with facts or data "where . . . the expert fails to show any basis for believing someone else's projections." *Id.* at 803; *see also Diabetes Ctrs. of Am., Inc. v. Healthpia Am., Inc.*, No. H-06-3457, 2008 WL 375505, at *2 (S.D. Tex. Feb. 11, 2008) (excluding lost profits expert testimony where expert "conducted no independent research into whether the projected figures given to him . . . were valid, or even reasonable").

For example, in *Jacked Up*, the court excluded a lost-profits expert for improperly relying on one party's business pro forma and the expert's own assumptions about the company's future sales without presenting "evidence that [he] assessed the validity" of the pro forma and "establish[ing] a factual basis for [his] assumptions." 291 F. Supp. 3d at 809–10. There, Jacked Up sued Sara Lee for breaching a licensing agreement for Sara Lee to sell Jacked Up's products. *Id.* at 798. To prove its lost profits, Jacked Up designated a lost-profits expert who based his calculations off of a pro forma created by Sara Lee in advocating for the deal and on calculations from Jacked Up, and then made several assumptions to build out the projected profits. *Id.* at 803–04.

The court held that both reliance on the pro forma and the expert's assumptions failed *Daubert*'s reliability standard. First, the court held the lost-profits opinion should be excluded because Jacked Up failed to offer any "evidence suggesting that [its expert] conducted an independent determination of whether the . . . Pro Forma's projections were valid or reasonable." *Jacked Up*, 291 F. Supp. 3d at 805. This is because "a company's financial projections are not automatically

14

reliable, such that an expert may rely on the projections without further inquiry or explanation." *Id.* at 804. Second, the court held the opinions should be excluded because Jacked Up failed to explain the basis and reasonableness of its expert's assumptions, many of which "conflict with facts in the record[.]" *Id.*; *see also id.* at 807–08.

Mimms's opinions also improperly rely on Alta's self-interested models and on assumptions contradicted by the record, and thus they should likewise be excluded.

A.    **Mimms's calculations rely on Alta's models and say-so.**

Mimms based his lost-profits calculations "on a model developed by Alta during discussions about project financing with various financial institutions," which "incorporates development and operating costs." App.1345. Alta's financial models are not "automatically reliable," *Jacked Up*, 291 F. Supp. 3d at 804, especially given that Alta prepared these models to try to convince lenders to finance its project and not a single one of the more than 88 lenders Alta contacted accepted Alta's models as drafted or finalized *any* financial models at all. App.208–09; *see also* 291 F. Supp. 3d at 805 (noting similar pro forma was "best guess as to how a Jacked Up energy iced tea would perform in the marketplace" so that the business team could evaluate the deal).

Mimms said he "reviewed" and "incorporated updates" on the models, App.1345, but there is no basis to believe that the models provide even a reliable foundation for Mimms's opinions. And although Mimms claims he provided "update[s]" to Alta's model based on conversations he had with Alta's CFO Mr. Laterza, he did nothing to independently verify the validity or reasonableness of

15

Alta's model, even with his supposed updates. For example, one of Mimms's "updates" was to calculate lost profits based on an assumption that Alta would have only been able to bring online one plant with three turbines, instead of one plant with only two turbines, "[b]ased on conversations with Matthew Laterza, Alta's CFO . . . that Starwood agreed to finance the alternate" one-with-three plan. *Id.* But Starwood never agreed to finance Alta's one-plant-three-turbine plan. Instead, Starwood told Alta that it was "not going to be able to spend time" on Alta's project until Alta finalized its plans and "locked in" the "costs, [Letter of Credit] needs, equity, etc." App.614.

"[T]he Federal Rules of Evidence require an expert to do more than blindly accept numbers provided by any party in calculating lost profits." *Jacked Up*, 291 F. Supp. 3d at 803. Under *Jacked Up*, it was improper for Mimms to simply assume that Alta's model was accurate: He needed to conduct "an independent determination of whether [Alta's] projections were valid or reasonable." *Id.* at 805. This is especially important here because Mimms can point to "no actual revenue data" to support his lost-profits calculations—because Alta never developed any peaker plants, never obtained financing for its project, and never generated any revenue or profit. *See id.* at 804; *see also Diabetes Ctrs.*, 2008 WL 375505, at *2 (excluding expert who "conducted no independent research into whether the projected figures given to him by [the plaintiff] were valid, or even reasonable"); *JRL Enters., Inc. v. Procorp Assocs., Inc.*, No. 01-2893, 2003 WL 21284020, at *7 (E.D. La. June 3, 2003) (excluding lost-profits expert who failed to independently assess plaintiff's projections for accuracy or reliability). Thus, his lost-profits opinions should be excluded on this ground alone.

16

**B. Mimms's calculations are based on assumptions unsupported by the record.**

Mimms's lost-profits opinions are separately unreliable because they are based on unsupported—and often contradicted—assumptions. Like in *Jacked Up*, Mimms also bases his calculation on assumptions, but he "fails to explain the basis for several of [his] assumptions that are unsupported by or contradict the evidence at hand." *Jacked Up*, 291 F. Supp. 3d at 807.

***First***, Mimms assumes that Alta would have financially closed on its peaker-plant project in September 2019. App.1353–54. He offers no explanation for why this would be a reasonable financial close date other than reliance on discussions with Mr. Laterza. As noted above, Mimms assumes that Starwood agreed to finance Alta's plan of one peaker plant with three turbines solely based on conversations with Mr. Laterza.[6] But the term sheets were just drafts as Starwood never agreed to finance Alta, these draft sheets contemplated only two turbines, not three turbines, and again, when Alta asked Starwood to finance three turbines, it never agreed to do so. *See* App.616–24; *see also* App.207–08. The same is true for his assumption that Deutsche Bank would have funded Alta's project at all. App.1339 (citing App.626, 763); *see also* App.168 (describing term sheets as drafts and not binding).

Changes to this assumption could have significant impacts on the lost-profits quantification. On Alta's own case and documents, earlier financial close dates would have led to Alta building its plants before summer 2020 and having its HRCOs in

---

[6] And there is no evidence that Starwood would have financed Alta in September 2019. *See* App.207–08.

place shortly thereafter, which would have wiped out Alta during Winter Storm Uri (February 2021). *See generally* App.379. Later financial close dates would have meant that Alta's proposed units would not even have been constructed before Winter Storm Uri (February 2021). Since a majority of Mimms's lost-profits projection depends on assumed operation during Uri, having an operation date *after* Uri would upend Mimms's opinion.

**Second**, Mimms assumes operation dates for the first two plants in September 2020. Again, he does not provide a citation for this specific assumption. App.1345–46. Instead, the record shows that Alta's proposed operational dates were shifting throughout 2019 and 2020. *See* App.784. Mimms likewise does not provide a citation for his assumption that the third plant would be open by summer of 2020 and prior to the summer of 2021, instead citing only "discussions" and "conversations with Matthew Laterza." App.1338. As noted, these operation dates are critical to Mimms's final lost-profits numbers.

**Third**, Mimms assumes that the hypothetical plants would be fully functional during Winter Storm Uri. App.1348. Under his primary analysis, concerning TruePackage, he provides no explanation for any winterization investments that Alta would have made before Uri or actions Alta would have taken to keep the plants operational during the storm. Nor does he address the evidence in the record that Alta declined winterization measures. For example, Jay Manning from WattStock testified that Alta declined to include winterization measures because Alta thought it was too expensive. App.375. While Mimms assumes under his alternative lost-profits analysis that ProEnergy would have offered Alta winterization, his sole

18

support for this statement is one of Alta's other experts—William Mars. *See* App.1329–30. And for this point, Mars relies not on any documents in the record—because none exists—but on his say-so. App.19.

Moreover, Mimms does not explain why it was appropriate to rely on Mars's naked assertion, given that the written proposal that ProEnergy sent to Alta Power *did not include winterization equipment*.

| Mechanical Equipment/Materials | | | | |
|---|---|---|---|---|
| GE LM6000PC SPRINT Package | 3 | PES | PES | PES |
| Air Inlet | 3 | PES | PES | PES |
| Anti-Icing System                                 * | - | - | N/A | - |
| CDP Heating System | - | - | N/A | - |
| Evaporative Cooling System | - | - | N/A | - |
| Inlet Air Chilling System | - | - | N/A | - |

App.279. Nor does Mimms explain why it was reasonable to assume any such equipment would have performed flawlessly given the evidence that Alta declined winterization measures and real-world plants even *with* winterization measures still failed during Uri. App.258–59, 263, 265.

**Fourth**, Mimms assumes that Alta's HRCO contracts would not have taken effect until June 2021 for the first two plants. App.1339, 1348–49. In support, he mentions discussions with Mr. Laterza, but provides no documents related to those discussions. *Id.* Mimms also cites Mr. Laterza's deposition testimony that signing a HRCO starting prior to the summer provides little to no economic benefit relative to a HRCO starting June 1. *Id.* But Mimms does not provide any other documentary evidence that Alta would have forgone this additional HRCO revenue or would have been able to receive financing through this sort of structure. And the July 2019 HRCO term sheet shows the HRCO would start in October 2020, not June 2021.

19

**Indicative Term Sheet**
Pricing as of July 8th, 2019

| | |
|---|---|
| *Enabling Agreement:* | TBD (the "Master Agreement"). |
| *Type of Transaction:* | Physically settled Day Ahead Heat Rate Call Option |
| *Buyer:* | Uniper Global Commodities North America LLC ("Uniper") |
| *Seller:* | Alta Power LLC ("Alta") |
| *Contract Quantity:* | See Schedule A for MW per each exercised hour for Hours Ending ("HE") 1 through HE 24, Central Prevailing Time ("CPT") |
| *Product:* | Firm (LD) Energy. |
| *Option Period:* | October 1, 2020 – September 30, 2025 (All Months – 60 Months total) |
| *Delivery Point:* | ERCOT North 345 kV Hub, or its successor, as defined by ERCOT Protocols |

*See* App.216, App.609.  Mimms provides no additional or separate citations for the HRCO start dates under the alternative hypothetical under which Alta contracted with ProEnergy instead.

Corrections to this assumption, too, would upend Mimms's opinion, as operations under a HRCO during Uri would greatly reduce, and even invert, Mimms's calculation of lost profits.  In particular, Alta would have been required to sell electricity to its HRCO counterparty at about $1,400/MWh according to Mimms's models.  App.225–26 & n.110.  But if Alta could not generate sufficient electricity from its hypothetical plants to meet that demand (like many other gas-fired plants), Alta would have had to buy electricity at the $9,000/MWh market price, which lasted for four *days* during Uri.  *Id*.  So for every megawatt hour of electricity that a HRCO holder called during Uri, Alta would have lost some $7,600.  *See* App.226 (listing gas-fired peaker plants with HRCOs that filed for bankruptcy after the storm).

\*\*\*

20

In sum, Mimms assumes that each material date—financing close dates, plant operation dates, and HRCO start dates—favor Alta amassing monumental profits from Winter Storm Uri. Yet, like the excluded expert in *Jacked Up*, Mimms fails to explain why these assumptions are "reasonable based on the facts of this case." *See Jacked Up*, 291 F. Supp. 3d at 807. Indeed, the record, including documents that Mimms seemingly relies on, "make clear" that the exact opposite is true for each assumption: Alta would not have gotten financing, opened its plants, or been fully operational without the confines of its HRCOs during Uri. *Id.* at 808. Mimms's assumptions thus have no "factual basis," and only generate "speculative" opinions that fail *Daubert*'s strictures, requiring exclusion. *See id.* at 802, 807–08.

## II. This Court should exclude Mars's ProEnergy opinions because they are mere *ipse dixit*.

Mars's conclusory opinions similarly fail because an expert's "conclusory opinion that fails to explain the expert's methodology cannot satisfy Rule 26(a)(2)(B)." *Barnes v. Allstate Tex. Lloyds*, No. 1:21-CV-00217, 2022 WL 16908239, at *4 (E.D. Tex. Sept. 26, 2022) (opinion excluded as *ipse dixit* where report stated no more than the expert's credentials, his subjective opinion, and that he viewed the damage and file). "Neither Daubert nor the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." *Id.* Without providing his reasoning or analysis, Mars's opinion cannot be admitted.[7] *See Collins*, 2020 WL 95488, at *3.

---

[7] Mars's opinions about Alta's commercial operations dates and plants fully functioning during Uri should be excluded for the same reasons Mimms's opinions

Mars bases his opinions about Alta's total project cost and "volume discount" from ProEnergy in the hypothetical but-for world on ProEnergy's "historical[]" performance and his recollection of what he asserts are "similar" projects (though he specifies just one similar project). App.18–19.  At their core, therefore, Mars's opinions are based on the assertion that these specified and unspecified projects were in fact similar or relevant to Alta's peaker plant projects.  But Mars does not even characterize this as one of his opinions—he simply weaves in the word "similar" as a foregone conclusion.

The closest Mars comes to analyzing any actual facts of this case is when he asserts without explanation that six "substantively identical" turbines to those Alta "would have purchased" operated during Winter Storm Uri.  But he fails to explain this conclusion as well.

Mars previews that he has not analyzed the facts of this case in disclosing the information he relied on in forming his opinions.  When Mars describes what he considered, evidence from this case is conspicuously absent.  Mars states, "I spoke with Alta's Matt Laterza and Alta's counsel, and I reviewed ProEnergy's August 28, 2018 contract proposal and Alta's markup of the same.  I also reviewed Alta's Complaint and GE's Counterclaims and affirmative defenses, as well as certain publicly available materials that are expressly identified in this Report."  App.13.

While consideration of ProEnergy's proposal and conversations with Mr. Laterza might provide Mars with information on the project Alta hoped to construct,

---

fail:  They are unsupported and contradicted by the undisputed facts in the record. *See supra* Part I.

it does not provide factual connection to this case. Mars did not consider several facts in this case that directly undermine Mars's assumptions. Mars did not consider, for example, any of the evidence that Alta would not have received financing for ProEnergy to build three 3-turbine peaker plants. For example, even Alta's own experts acknowledge Alta's changing project plans over the course of its search for financing. App.1345 (noting models for three plants with nine total turbines, one plant with two total turbines, and one plant with three total turbines) (citing in part App.794, 1055, and discussions with Matthew Laterza); *see also, e.g.*, App.1184–1241 (Alta's presentations to lenders for financing). Instead, Mars simply assumes that Alta's original plan would have received financing, and he bases his timelines and cost opinions on the same, though any change in the number of turbines and the configuration of the plants could have material effects on ProEnergy's pricing and ability to complete the project on time and on budget. *See* App.1243, 1276 (proposals exchanged between WattStock and Alta showing the price of individual turbines could go up if fewer than expected turbines are purchased); *see also* 1310. Nor does Mars contend with ProEnergy's well-known issues with delivering reliably operational plants or the fact that Alta considered ProEnergy a competitor in the industry. App.1312, 1316. Both of these facts are relevant to the reasonableness of Mars's assumption that Alta would have chosen ProEnergy and that lenders would have financed the proposed project.

Mars also did not consider that choosing ProEnergy could have resulted in increased lender skepticism of the project, since lenders considered original equipment manufacturers, here GE, more reliable for projects utilizing refurbished

23

equipment than companies like ProEnergy that refurbished other companies' used equipment. *See* App.1312 ("[Castleman] is no longer getting any funding from Deutsche Bank unless the OEM is used[.]").

Finally, Mars's projection for the commercial operations dates of the three hypothetical peaker plants relies on Alta's plants each being completed on the same timeline as that of ProEnergy's HO Clarke Power Plant project, with just one month of leeway. App.18 (explaining his projection is based on ProEnergy's completion of the HO Clarke Power Plant in 38 weeks). But Mars does not explain or analyze any differences between the HO Clarke Power Plant project and Alta's three power plant projects. *See* App.261–66.

Mars fails to consider, for example, real-world industry and economic conditions that could affect construction timelines and costs. *See, e.g.*, App.252 (explaining the many risks and delays that are "common to these types of projects").

He likewise ignores the differences in location and associated weather conditions between Alta's proposed project sites and sites where ProEnergy actually constructed plants. *See* App.261–66, App.219–29. All of these facts undermine the validity of Mars's opinions, especially with regard to his opinion that two of Alta's peaker plants would have performed exactly as the HO Clarke plant performed.

Without Mars's analysis of any of these facts, or any explanation at all, his opinions that Alta's plants would have been constructed on the same schedule as the HO Clarke Power Plant project and would have operated the same number of hours during Winter Storm Uri as the HO Clarke Power Plant are textbook *ipse dixit*. The

24

same is true for his assertion of the terms on which ProEnergy would have contracted with Alta.

In short, Mars is not applying scientific modeling to predict outcomes based on stated input, and he is not using his expertise to assess the facts of this case. He is simply speculating that ProEnergy could have done what it proposed to do for a price and "volume discount" that has no support in the record. Mars's failure to consider *any* evidence beyond four versions of a single proposal and a list of turbines, as well as his failure to explain how his assumptions and expertise apply to the facts of this case, render his methodology impossible to discern or evaluate and his opinions unreliable. *See Jacked Up*, 291 F. Supp. 3d at 809–10.

## CONCLUSION

For these reasons, the Court should exclude the testimony of Quentin Mimms and William Mars under Federal Rule of Evidence 702.

Dated:  April 24, 2025                Respectfully submitted,


                                       /s/  Andrew LeGrand
                                       John T. Cox III (Tex. Bar No. 24003722)
                                       Andrew LeGrand (Tex. Bar No. 24070132)
                                       Matthew Capoccia (Tex. Bar No. 24121526)
                                       GIBSON, DUNN & CRUTCHER LLP
                                       2001 Ross Avenue, Suite 2100
                                       Dallas, TX  75201
                                       Tel:  214.698.3100
                                       *TCox@gibsondunn.com*
                                       *ALegrand@gibsondunn.com*
                                       *MCapoccia@gibsondunn.com*

                                       *Attorneys for General Electric International,*
                                       *Inc. n/k/a GE Vernova International LLC*