IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ALTA POWER LLC,

      *Plaintiff/ Counter-Defendant,*

v.

GENERAL ELECTRIC INTERNATIONAL
INC., d/b/a GE POWER SERVICES,

      *Defendant/ Counter-Plaintiff.*

Case No. 3:23-CV-0270-X

## BRIEF IN SUPPORT OF ALTA POWER LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

JORDAN, LYNCH & CANCIENNE PLLC
Michael Cancienne
Texas Bar No. 24055256
Joseph W. ("Jeb") Golinkin II
Texas Bar No. 24087596
1980 Post Oak Blvd., Ste. 2300
Houston, Texas 77056
Telephone: 713.955.4028
mcancienne@jlcfirm.com
jgolinkin@jlcfirm.com

BAKER BOTTS L.L.P.
John B. Lawrence
Texas Bar No. 24055825
Ariel House
Texas Bar No. 24122827
2001 Ross Avenue, Suite 900
Dallas, Texas 75201
Telephone: 214.953.6500
john.lawrence@bakerbotts.com
ariel.house@bakerbotts.com

*Counsel for Plaintiff Alta Power, LLC*

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ....................................................................................... 1

BACKGROUND ........................................................................................................... 4

I.      Alta's Business............................................................................................... 4

II.     The Master Agreement. ................................................................................. 5

III.    The Consequences of GE's Fraudulent Conduct. ......................................... 7

IV.     Relevant Procedural History.......................................................................... 8

V.      The Parties' Existing Claims, Counterclaims and Affirmative Defenses. .............. 9

LEGAL STANDARDS ................................................................................................. 11

DISCUSSION .............................................................................................................. 11

I.      GE's Counterclaims should be dismissed. ................................................... 11

        A.      GE is not an intended third-party beneficiary of the Master Agreement
                between Alta and WattStock. ............................................................. 12

                i       GE cannot establish that Alta and WattStock intended to waive
                        damages against GE at the time the Master Agreement was signed.
                        .................................................................................................. 13

                ii      GE cannot establish that Alta and WattStock entered into the
                        Master Agreement "directly for" GE's benefit. ............................... 16

        B.      GE's requests for declaratory relief must be dismissed because Section 9 of
                the Master Agreement does not limit the damages that Alta seeks for GE's
                intentional torts................................................................................... 17

                i       Alta did not waive damages for GE's intentional torts.................... 17

                ii      Section 9.1(A)'s damages cap *only* limits the liability of Alta and
                        WattStock. ............................................................................... 20

        C.      GE's Counterclaims for declaratory relief should also be dismissed because
                they are merely duplicative of GE's Affirmative Defenses......................... 21

        D.      The Court should grant summary judgment on GE's breach of contract
                counterclaim, which fails as a matter of law, and GE's related request for
                attorney's fees. ..................................................................................... 22

II.     Summary judgment is also warranted on GE's Affirmative Defense Nos. 1, 2, 12,
        13, 15, and 16................................................................................................ 23

        A.      Affirmative Defense Nos. 1, 2, and 16: The Master Agreement does not limit
                Alta's ability to recover consequential damages for GE's intentional torts,
                nor does it limit the amount of damages that Alta may recover from GE's
                fraudulent conduct. .............................................................................. 23

ii

B.    Affirmative Defense No. 12: The Economic Loss Rule does not apply to Alta's claims against GE because Alta and GE never entered into any contracts together. ........................................................................24

C.    Affirmative Defense No. 13: Alta's settlement with WattStock expressly disclaims any effect on Alta's pending claims against GE, and therefore does not in any way limit Alta's ability to recover from GE in this case...25

D.    Affirmative Defense No. 15: The statute of frauds does not apply to any of Alta's intentional tort claims against GE. ....................................................26

CONCLUSION ........................................................................................................26

# TABLE OF AUTHORITIES

## CASES

*AK FortySeven Recs., Ltd. Co. v. Bahamas Ministry of Tourism*
  No. 4:17-CV-3750, 2018 WL 8755881 (S.D. Tex. Sept. 28, 2018) ............................ 15, 16

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .......................................................................................................... 11

*Bowman v. CitiMortgage Inc.*,
  No. 3:14-CV-4036-B, 2015 WL 4867746 (N.D. Tex. Aug. 12, 2015) ............................. 24

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .......................................................................................................... 11

*Clark v. PFPP Ltd. P'ship*,
  455 S.W.3d 283 (Tex. App.—Dallas 2015, no pet.) ......................................................... 24

*Consumer Fin. Prot. Bureau v. FirstCash, Inc.*,
  No. 4:21-CV-01251-P, 2024 WL 4706904 (N.D. Tex. Nov. 7, 2024) .............................. 23

*Duradril, L.L.C. v. Dynomax Drilling Tools, Inc.*,
  516 S.W.3d 147 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ................................. 26

*First Bank v. Brumitt*,
  519 S.W.3d 95 (Tex. 2017) ............................................................ 2, 12, 13, 14, 16

*First Nat'l Bank of Luling v. Nugent*,
  384 S.W.2d 224 (Tex. App.—San Antonio 1964, writ ref'd n.r.e.) ............................... 17

*Forest Oil Corp. v. McAllen*,
  268 S.W.3d 51 (Tex. 2008) ............................................................................................... 25

*Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*,
  960 S.W.2d 41 (Tex. 1998) ............................................................................................... 25

*Great Lakes Ins., S.E. v. Gray Group Investments, L.L.C.*,
  76 F.4th 341 (5th Cir. 2023) ............................................................................................ 18

*Holloway v. Dekkers*,
  380 S.W.3d 315 (Tex. App.—Dallas 2012, no pet.) ........................................................ 26

*J.M. Davidson, Inc. v. Webster*,
  128 S.W.3d 223 (Tex. 2003) ............................................................................................. 19

*L&S Pro-Line, LLC v. Gagliano*,
   No. 09-21-00178-CV, 2024 WL 3218507 (Tex. App. June 28, 2024) .............................. 22

*Lesieur v. Fryar*,
   325 S.W.3d 242 (Tex. App.—San Antonio 2010, pet. denied) ....................................... 12

*Maddox v. Vantage Energy, LLC*,
   361 S.W.3d 752 (Tex. App.—Fort Worth 2012, pet. denied) ................... 2, 13, 15, 16, 22

*Marx v. Gen. Revenue Corp.*,
   568 U.S. 371 (2013) ........................................................................................................... 22

*Meeks v. Mendford Trucking & Oilfield Servs., LLC*,
   No. P:15-CV-00050-DC, 2018 WL 2410993 (W.D. Tex. Feb. 7, 2018) ........................... 23

*Meridian Sec. Ins. v. Morris*,
   No. 5:22-CV-151-RWS-JBB, 2023 WL 5313905 (E.D. Tex. Aug. 1, 2023) ...................... 21

*Mo. Pac. R.R. Co. v. Harbison-Fischer Mfg. Co.*,
   26 F.3d 531 (5th Cir. 1994) ........................................................................................... 2, 12

*Nextera Energy Mktg. LLC v. Shell Energy N. Am. (US) LP*,
   No. 4:21-CV-02280, 2023 WL 2541964 (S.D. Tex. Mar. 16, 2023) .................................. 21

*Ragas v. Tenn. Gas Pipeline Co.*,
   136 F.3d 455 (5th Cir. 1998) .............................................................................................. 11

*Resolution Trust Corp. v. Kemp*,
   951 F.2d 657 (5th Cir. 1992) ....................................................................................... 12, 14

*Sanijet Corp. v. Lexor Intern., Inc.*,
   No. CIV.A.3:06CV1258-B, 2008 WL 2201451 (N.D. Tex. May 15, 2008) ...................... 21

*Sw. Bell Tele. Co. v. DeLanney*,
   809 S.W.2d 493 (Tex. 1991) ............................................................................................... 24

*Tawes v. Barnes*,
   340 S.W.3d 419 (Tex. 2011) ............................................................................................... 15

*Texas v. Am. Tobacco Co.*,
   441 F. Supp. 3d 397 (E.D. Tex. 2020) ............................................................................... 19

*Wal-Mart Stores, Inc. v. Xerox State & Loc. Sols., Inc.*,
   663 S.W.3d 569 (Tex. 2023) ............................................................................................... 15

*Yumilicious Franchise, L.L.C. v. Barrie*,
   No. 3:13-CV-4841-L, 2015 WL 1856729 (N.D. Tex. Apr. 23, 2015) ................................ 24

**STATUTES**

Texas Civil Practice and Remedies Code § 38.001(8) ........................................................ 22

**FEDERAL RULES OF CIVIL PROCEDURE**

FED. R. CIV. P. 1 ................................................................................................................ 11

FED. R. CIV. P. 56(a) .......................................................................................................... 11

Alta Power LLC ("Alta") files this brief in support of its Motion for Partial Summary Judgment. For the reasons set forth below, the Court should dismiss all three of General Electric International Inc., d/b/a GE Power Services' ("GE") Counterclaims as well as GE's Affirmative Defense Nos. 1, 2, 12, 13, 15, and 16.

## SUMMARY OF ARGUMENT

Alta's efforts to provide critical additional capacity to the Texas energy grid were stymied when Alta unknowingly became the victim of a fraudulent scheme orchestrated by GE. Alta intended to purchase a particular model of refurbished aeroderivative gas turbines (GE's LM6000 model), and was considering options provided by GE and its "partner," WattStock, along with options from a competitor called ProEnergy. To prevent Alta from entering a deal with ProEnergy, and increase its own potential fees, GE lied to Alta about the true nature of its relationship with WattStock, the true pricing and availability of the technology, and whether GE would stand behind WattStock's work related to delivering those turbines, among other things. In fact, GE encouraged Alta to make payments on certain turbines, without telling Alta that those units were burdened by heavy termination fees, which *were to be paid to GE* and which GE then *refused to waive*, resulting in the true price being far beyond Alta's limited financial resources. Alta fell for GE's lies, and was then thwarted by GE from obtaining the necessary equipment for the agreed-upon prices. GE's deception proved catastrophic for Alta's business, and prevented Alta from making significant profits by providing Texans with much-needed electricity during periods of peak demand.

Alta initiated this litigation to hold GE accountable for its intentional torts (and vicariously for WattStock's torts), including fraud, fraudulent inducement, negligent misrepresentation, civil conspiracy, and tortious interference. In response, GE filed counterclaims against Alta, seeking declarations that Alta's damages against GE are limited by the Master Agreement between Alta and WattStock, and asserting that Alta breached that agreement.

**GE's Counterclaims.** GE's Counterclaims should be dismissed for the following three reasons. <u>First</u>, all three of GE's Counterclaims, and several of its Affirmative Defenses, require GE to meet a "heavy burden"[1] to overcome the "presumption against third-party beneficiary agreements."[2] But GE cannot meet its high burden to point to a "clear and unequivocal expression" of Alta's intent to waive damages against GE in the text of the Master Agreement.[3] There is nothing in the text of that Agreement to indicate that Alta and WattStock entered into the Master Agreement intending to directly benefit GE. Indeed, GE is not even mentioned anywhere in that contract.

GE points to Section 9.1(B), which limits consequential damages under certain circumstances against the Parties and various persons and entities, such as unspecified "contractors" and "subcontractors." GE then contends that it was Alta's "contractor" or "subcontractor" under the Master Agreement and therefore Alta's damages for GE's fraudulent conduct are barred. But the evidence confirms that GE was *not* WattStock's contractor at the time the Master Agreement was signed. GE and WattStock had no agreement of their own at that time, and in fact, GE's corporate representative admitted that GE did not have any obligations to WattStock pertaining to Alta until five months *after* the Master Agreement was signed.

In short, GE cannot show that it is an intended third-party beneficiary of the Master Agreement. It follows, therefore, that GE cannot obtain its requested declarations that the Master Agreement limits Alta's damages against GE (Counterclaims No. 1 and 2). Nor can GE prove that Alta breached that agreement by bringing claims against GE (Counterclaim No. 3), or obtain attorney's fees for that breach of contract claim.

<u>Second</u>, GE's requests for declaratory relief also fail because GE's interpretation is contradicted by the plain text of the Agreement. GE asserts that Alta's damages claims

---

[1] *Mo. Pac. R.R. Co. v. Harbison-Fischer Mfg. Co.*, 26 F.3d 531, 540 (5th Cir. 1994).
[2] *Maddox v. Vantage Energy, LLC*, 361 S.W.3d 752, 757 (Tex. App.—Fort Worth 2012, pet. denied).
[3] *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017).

are barred by Section 9.1(B), but GE cannot establish that provision was intended to limit damages for intentional torts. Instead, when Section 9.1 is construed as a whole, it is apparent that Alta and WattStock only intended to waive consequential damages for ordinary business claims, and not for intentional torts. That interpretation is consistent with the plain text of the agreement, and ensures that every provision is given effect. Additionally, GE cannot show that Section 9.1(A) — which by its plain terms applies *only* to Alta and WattStock — could limit the amount of Alta's damages against GE in this case. Section 9.1(A) exclusively references the "Parties," and makes clear that no other persons or entities are subject to that damages limitation.

Third, while either of those foregoing deficiencies is more than enough to dismiss GE's two requests for declaratory relief, those Counterclaims should also be dismissed because they are simply duplicative of GE's pending Affirmative Defenses. Federal courts frequently dismiss requests for declaratory relief where, as here, those requests simply repeat affirmative defenses or other issues already pending before the court.

**Affirmative Defenses.** In addition to dismissing GE's Counterclaims, the Court should also strike several of GE's Affirmative Defenses. Three of GE's Affirmative Defenses (Nos. 1, 2, and 16) are identical to its claims for declaratory relief and therefore fail for the same factual and legal reasons. The Court should also strike GE's previously rejected assertion that Alta's claims are barred by the economic-loss rule (No. 12), because there are no contracts between GE and Alta at all, much less any that cover the subject matter of GE's misrepresentations. And even if Alta's agreements with WattStock are somehow relevant, GE's misrepresentations predated any such agreements, and therefore the economic loss rule would be inapplicable.

Additionally, GE's contention that Alta's claims are "barred by waiver or release" because Alta settled its claims with WattStock (No. 13) is contradicted by the very language of that settlement, which confirms that it has no effect on Alta's pending claims

3

against GE. Finally, the Court should strike GE's attempt to invoke the Statute of Frauds (No. 15) because Alta has not alleged that GE breached a contract with Alta.

The Court should grant Alta's motion for partial summary judgment and dismiss GE's three Counterclaims for declaratory relief and breach of contract, as well as its claim for attorneys' fees, and strike GE's Affirmative Defense Nos. 1, 2, 12, 13, 15, and 16.

## BACKGROUND

### I.    Alta's Business.

Alta was founded to develop natural gas-fired power assets designed to provide critical additional capacity to the Texas energy grid during periods of peak demand. After extensive evaluation, Alta determined that a certain model of turbine generator—the LM6000, originally manufactured by GE—was ideal for its business model.

Until early 2018, GE had not actively marketed refurbished LM6000 units,[4] and a GE competitor—ProEnergy—emerged as the dominant seller of refurbished LM6000s.[5] Determined to reclaim market share, GE launched a new trademarked product—the GE Aero TRUEPackage™—which it claimed to offer "through a unique partnership" with a company called WattStock.[6]

Shortly after GE unveiled the TRUEPackage™, Alta separately began negotiations with both ProEnergy and GE/WattStock for the potential acquisition of LM6000 units.[7] In August 2018, ProEnergy offered to sell Alta up to nine fully refurbished LM6000 units at prices that aligned with Alta's budgetary requirements.[8] Meanwhile, GE's employees repeatedly emphasized GE's "partnership" with WattStock[9] and assured Alta that GE and WattStock could and would supply up to nine units for no more than $10 million per

---

[4] Ex. 1 (GE Tr.) at App. 5:6-17.

[5] *Id.* at App. 8:2-18; Ex. 2 (Herrington Tr.) at App. 19:20-22; Ex. 3 (Manning Tr.) at App. 25:17-24, 26:22-27:2.

[6] Ex. 23 (03/20/18 PPT) at App. 187, 189; Ex. 25 (5/4/18 Email From L. Herrington) at App. 204.

[7] Ex. 14 (Email from M. O'Neill) at App. 85.

[8] Ex. 12 (8/10/18 Email from T. West) at App. 77.; Ex. 5 (West Tr.) at App. 48:9-49:9.

[9] *See e.g.* Ex. 25 (5/4/18 Email From L. Herrington) at App. 204; Ex. 7 (5/10/18 Email from J. Canon) at App. 55; Ex. 9 (5/11/18 Email from L. Herrington) at App. 67; Ex. 11 (GE Letter to T. West) at App. 77; Ex. 13 (10/16/18 Email from M. Tremblay) at App. 82.

turbine if Alta chose GE TRUEPackage™ over ProEnergy.[10] GE further represented that it would stand behind and "fully wrap" WattStock's work on the TRUEPackages™, effectively guaranteeing their quality and performance.[11]

Alta, relying on GE's representations, agreed to buy its LM6000 units through GE's purported partnership with WattStock rather than from ProEnergy. When Alta informed GE of its decision to buy GE TRUEPackages™, GE directed Alta to contract with WattStock, which GE repeatedly described as its "partner" and "representative" for the TRUEPackage™ offering.[12] Relying on GE's representations, Alta executed the Master Agreement with WattStock on February 27, 2019.[13]

**II.     The Master Agreement.**

The Master Agreement sets forth the terms governing Alta and WattStock's initial agreement to identify specific turbine generators for Alta to purchase.[14] After specific units that met Alta's technological and budgetary needs were identified, Alta and WattStock agreed that they would then enter into "one or more definitive Equipment Purchase and Sale Agreement describing the scope, terms, and price under which Alta would purchase from WattStock each LM6000 Generator Set."[15] Alta and WattStock later entered into additional agreements to cover subsequent stages of the project, including the Limited Notice to Proceed.

Notably, the Master Agreement defines the contractual "Parties" to refer exclusively to Alta and WattStock.[16] GE is not named as a party to the Master Agreement, or otherwise named anywhere in the Master Agreement.[17]

---

[10] Ex. 4 (Laterza Tr.) at App. 35:7-38:17.
[11] Ex. 6 (Vol. 1 of Alta Tr.) at App. 52:17-22, 53:16-22; Ex. 4 (Laterza Tr.) at App. 45:12-18.
[12] Ex. 4 (Laterza Tr.) at App. 39:24-40:20, 41:13-42:4.
[13] Ex. 24 (Master Agreement) at App. 193.
[14] *Id*. at App. 193, 195-96 (Preamble, Article 2, "Identifying and Prioritizing LM6000 Generator Sets," & Article 3, "Securing Right to Purchase Units).
[15] *Id*. at App. 196, § 4.1.
[16] *Id*. at App. 193.
[17] *Id*. at App. 192-204, *generally*.

5

Additionally, the Master Agreement contains a limitation of liability provision, which GE incorrectly contends applies to Alta's claims against GE. Section 9.1(B) limits consequential damages "from any cause of action including negligence, strict liability, breach of contract and breach of strict or implied warrantee":

> Art. 9.1(B): "Notwithstanding any other provision of this Agreement, and to the fullest extent permitted by law, neither Party, their respective officers, directors, partners, employees, representatives, contractors or subcontractors shall be liable to the other or shall make any claim for any incidental, indirect or consequential damages arising out of or connected in any way to this Agreement. This mutual waiver of consequential damages shall include, but is not limited to, loss of use, loss of profit, loss of business, loss of income, loss of reputation or any other consequential damages that either Party may have incurred from any cause of action including negligence, strict liability, breach of contract and breach of strict or implied warrantee."[18]

And Section 9.1(A) imposes a damages cap of $100,000 on only the "the other Party's liability" (in Alta's case, WattStock) under that Agreement:

> Art. 9.1(A): "To the maximum extent permitted by law, each Party agrees to limit the other Party's liability for any and all claims, losses, costs, damages of any nature whatsoever or claims expenses from any cause or causes, including attorneys' fees and costs and expert-witness fees and costs, so that the total aggregate liability of a Party to the other shall not exceed the amount of USD $100,000. It is intended that this limitation shall apply to any and all liability or cause of action arising under this Agreement however alleged or arising, unless otherwise prohibited by law."[19]

At the time that Alta and WattStock signed the Master Agreement on February 27, 2019,[20] WattStock and GE did not have a written agreement setting out any subcontractual relationship.[21] In fact, GE did not begin to have any contractual obligations to WattStock until five months later, in July 2019.[22]

---

[18] *Id*. at 200.

[19] *Id*.

[20] *See e.g.* Ex. 18 (9/11/19 Email from A. Alston) at App. 103; Ex. 19 (App. 105).

[21] *See generally*, Ex. 24 (Master Agreement) at App. 192-204; Ex. 3 (Manning Tr.) at App. 32:14-16.

[22] Ex. 1 (GE Tr.) at App. 10:7-15, 11:3-8, 13:11-21, 14:18-15:15; *see also* Ex. 2 (Herrington Tr.) at App. 21:16-22:8. Indeed, GE's corporate representative testified GE was not a party to any written, executed contract

### III.    The Consequences of GE's Fraudulent Conduct.

By signing the Master Agreement, Alta became exclusively dependent on GE and WattStock to identify and provide the refurbished LM6000 turbines that were critical to Alta's business.[23] Unfortunately, although Alta had no reason to suspect at the time that GE's assurances were false, the contract between GE and WattStock actually disclaimed any partnership, and further added that GE had no obligations whatsoever relating to the GE TRUEPackage™ offering--facts which were concealed from Alta until this litigation.[24] Alta, unknowingly and irreversibly, found itself contractually dependent on an incompetent and insolvent counterparty—one with whom GE had no binding contractual relationship, let alone the "partnership" it had publicly touted.

The consequences of GE's deception were catastrophic. Rather than ensuring Alta could buy nine TRUEPackages™ for $10 million or less per unit, as GE had promised, GE systematically drove up Alta's costs beyond its budget by (1) imposing termination fees that it either never disclosed or had explicitly assured Alta would not be an issue; and (2) refusing to refurbish any LM6000 containing any competitor's parts, rendering many viable turbines unusable.

By early 2020, WattStock had run out of money and was unable to refund a deposit it acknowledged was owed to Alta. At that point, Alta turned to GE, asking it to honor the pre-Master Agreement commitment to step in and ensure the delivery of the TRUEPackages™. GE refused.

---

with WattStock *at all* related to *any* project (Alta or otherwise) until July 2019. Ex. 1 (GE Tr.) at App. 4:17-5:14.
[23] Ex. 3 (Manning Tr.) at App. 28:18-29:11, 30:22-31:15; Ex. 15 (2/4/19 Email from J. Manning) at App. 90.
[24] Ex. 22 (Memorandum of Understanding) at App. 181-182.

## IV.    Relevant Procedural History.

In February 2021, Alta sued GE in Dallas County District Court, bringing GE into a lawsuit pending between Alta and WattStock.[25] As it does now, Alta based its claims against GE based on a series of false and misleading representations from GE regarding the nature of its relationship with WattStock, the true pricing and availability of the TRUEPackage™ units, and backstopping WattStock's work on refurbishing and delivering the TRUEPackages™.[26]

In response, GE moved to dismiss Alta's claims under Rule 91(a) of the Texas Rules of Civil Procedure. GE argued Alta's claims for consequential damages should be dismissed because "Alta promised it would not press claims for consequential damages against WattStock's contractors and subcontractors—exactly what it attempts to do now against GE."[27] After a lengthy hearing, the State District Court denied GE's Motion to Dismiss in its entirety, rejecting GE's argument that Alta had waived consequential damages.[28]

In June 2021, GE filed its answer in state court and asserted (among other things) that Alta's claims are barred by Alta's Master Agreement with WattStock.[29]

In August 2021, WattStock filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas. WattStock then removed this case to the United States District Court for the Northern District of Texas, which referred the matter to the Bankruptcy Court under the standing order of reference.[30]

---

[25] BRECF 1-4 at 15. "BRECF" refers to the docket in the underlying bankruptcy proceedings in this case, styled *WattStock LLC v. Alta Power LLC*, 21-03083-sgj, In the United States Bankruptcy Court for the Northern District of Texas.
[26] BRECF 1-4 at 15.
[27] BRECF 1-4 at 74-76.
[28] *Id.* at 329.
[29] BRECF 1-4 at 375.
[30] BRECF 1.

Now in federal court, GE filed *another* Motion to Dismiss Alta's claims, this time under Rule 12(c) of the Federal Rules of Civil Procedure.[31] In it, GE yet again argued that "Section 9.1(B) bars Alta's claims for consequential damages" because "GE contracted with WattStock to sell parts, engineering, and related services for used aeroderivative gas turbines."[32] After another lengthy hearing, the Bankruptcy Court again rejected GE's Motion to Dismiss, including its assertion that Alta's consequential damages claims are barred as a matter of law.[33]

**V.     The Parties' Existing Claims, Counterclaims and Affirmative Defenses.**

In its First Amended Complaint, Alta asserts seven causes of action against GE: (1) Vicarious Liability; (2) Unjust Enrichment; (3) Fraud; (4) Fraudulent Inducement; (5) Negligent Misrepresentation; (6) Civil Conspiracy; and (7) Tortious Interference With Prospective Business Relations.[34]

Meanwhile, although GE is not even a party to the Master Agreement, GE asserts three Counterclaims under that agreement for declaratory relief and breach of contract. GE asks the Court to make two declarations regarding GE's rights under the Master Agreement: (1) first, that Section 9.1(B) of the Master Agreement bars Alta from bringing against GE any claim for incidental, indirect, or consequential damages arising from or connected with the Master Agreement,[35] and (2) second, if Alta is permitted to do so, GE is shielded by the $100,000 limitation of liability in Section 9.1(A) of the Master Agreement.[36] In its third Counterclaim, GE alleges that Alta breached the Master Agreement by bringing claims that are allegedly connected to that agreement against GE.[37]

---

[31] BRECF 31.
[32] *Id.* at 24.
[33] BRECF 47.
[34] ECF 54. "ECF" refers to the docket in this case.
[35] BRECF 128, ¶¶ 31-38.
[36] *Id.*, ¶¶ 39-48.
[37] *Id.*, ¶¶ 49-61.

Additionally, GE has asserted a variety of affirmative defenses. Like GE's Counterclaims, many of GE's Affirmative Defenses are also based on GE's mistaken attempts to invoke its alleged rights under the Master Agreement, which were never bargained for or intended by the parties to that contractf. For instance, GE's first Affirmative Defense proclaims that Alta's claims for "incidental, indirect, or consequential losses and for punitive or exemplary damages are barred by the limitations of liability contained within the contract documents relating to the transactions and occurrences described in the first Amended Complaint, including but not limited to Article 9 of the Master Agreement."[38] GE also contends that "Alta's claims for damages in excess of $100,000 are barred by Article 9 of the Master Agreement"[39] and that "Alta's claims are barred or waived by the contracts, to the extent they exist, between Alta and WattStock and/or Alta and GE."[40]

GE also doubles down on other arguments that Judge Jernigan considered and rejected when she denied GE's Motion to Dismiss. For example, GE again insists that "Alta's claims are barred by the economic-loss rule because Alta seeks to recover in tort for claims for which contracts—specifically, the Master Agreement and the Alta-WattStock Limited Notice to Proceed—cover the substance of the dispute and the loss is economic in nature."[41]

Finally, GE has added two previously unexplored affirmative defenses. GE now argues that "Alta's claims based on WattStock's actions are barred by waiver or release based on Alta's dismissal of its claims against WattStock with prejudice."[42] GE also claims that "Alta's claims are barred by the Statute of Frauds."[43]

---

[38] ECF 80 at 13, ¶1.

[39] *Id.* at 13, ¶2.

[40] *Id.* at 17, ¶16.

[41] *Id.* at 16, ¶12.

[42] *Id.* at 17, ¶13.

[43] *Id.* at 17, ¶15.

## LEGAL STANDARDS

Summary judgment is "integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting FED. R. CIV. P. 1). Summary judgment is appropriate where the pleadings and evidence show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The nonmovant party must "identify specific evidence in the record" and "articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citation omitted). If the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," the court must grant summary judgment. *Celotex*, 477 U.S. at 322–23.

## DISCUSSION

### I.    GE's Counterclaims should be dismissed.

GE's first two Counterclaims request that the Court make declarations regarding GE's rights under the Master Agreement, and in its third Counterclaim GE alleges that Alta breached the Master Agreement. But *GE is not a party* to that agreement. While GE attempts to argue that it falls within the extremely limited exception permitting a third-party beneficiary to enforce a contract's terms, GE comes nowhere close to meeting the difficult burden to establish third-party beneficiary status. And even if GE *could* establish that it has the right to enforce any provisions of the Master Agreement (which it does not), the contract's plain and unambiguous terms do not limit the damages that Alta seeks for GE's intentional torts.

A.   **GE is not an intended third-party beneficiary of the Master Agreement between Alta and WattStock.**

To begin with, all of GE's Counterclaims require GE to successfully establish that by signing the Master Agreement, Alta intended to and did in fact waive its rights to pursue damages against GE. While GE is not a party to the Master Agreement (nor even mentioned *anywhere* in that contract), GE points to Section 9.1(B)'s language indicating that "neither Party, their respective officers, directors, partners, employees, representatives, contractors or subcontractors shall be liable" for consequential damages under certain circumstances. GE incorrectly contends that it is an intended third-party beneficiary of this limitation on liability because GE was WattStock's "contractor" or "subcontractor."

"[B]efore a court construes a provision in the contract to determine whether it entitles the person or entity to relief, it must first determine whether the person or entity seeking to enforce the contract provision it is in fact a party or third-party beneficiary to the contract." *Lesieur v. Fryar*, 325 S.W.3d 242, 251–52 (Tex. App.—San Antonio 2010, pet. denied). "As a general rule, the benefits and burdens of a contract belong solely to the contracting parties[.]" *First Bank v. Brumitt*, 519 S.W.3d 95, 102 (Tex. 2017). A limited exception exists for a non-party who qualifies as a third-party beneficiary. *Id.* Courts strictly limit third-party beneficiary claims, holding that "a non-party to a contract has a heavy burden when it claims third-party beneficiary status." *Mo. Pac. R.R. Co. v. Harbison-Fischer Mfg. Co.*, 26 F.3d 531, 540 (5th Cir. 1994). To establish third-party beneficiary status, the non-party must meet the high burden of proving—based on the contract's text alone—that the contracting parties (1) intended to secure a benefit for the third party, and (2) entered into the contract directly for the third party's benefit. *First Bank*, 519 S.W.3d at 102 (citation omitted). And crucially, the parties must have intended to benefit the third party "at the time the parties entered into the contracts." *Resolution Trust Corp. v. Kemp*, 951 F.2d 657, 662 (5th Cir. 1992) (collecting cases) (emphasis in orig.).

"Texas courts have presumed that a party contracts only for its own benefit and have therefore maintained a presumption against third-party beneficiary agreements." *Maddox*, 361 S.W.3d at 757. "Consequently, a third-party beneficiary will not be recognized unless the intent to make him or her so is clearly written or evidenced in the contract." *Id.*; *see also First Bank*, 519 S.W.3d at 102 ("[t]he contract must contain 'a clear and unequivocal expression of the contracting parties' intent to directly benefit a third party'"). "[T]he fact that a person is directly affected by the parties' conduct, or that he 'may have a substantial interest' in a contract's enforcement, does not make him a third[-] party beneficiary." *Maddox*, 361 S.W.3d at 757 (citations omitted); *see also First Bank*, 519 S.W.3d at 102 (holding that it does not matter whether "the third party intended or expected to benefit from the contract").

For the reasons discussed below, GE cannot meet either part of the third-party beneficiary test. Accordingly, all of GE's Counterclaims must be dismissed.

### i    GE cannot establish that Alta and WattStock intended to waive damages against GE at the time the Master Agreement was signed.

Nothing in the Master Agreement supports a finding that Alta and WattStock intended to secure a benefit for GE (namely, waiving damages) at the time they entered into that contract.

To begin with, there is no dispute that GE is not a party to the Master Agreement.[44] "Party" and "Parties" are contractual terms that are defined in the very first paragraph to refer exclusively to Alta and WattStock.[45] Even GE admits that, other than Alta and WattStock, "[n]o other person or entity is a named Party or signatory to the [Master] [A]greement."[46] Moreover, GE is not mentioned *anywhere* in the Master Agreement.[47]

---

[44] Ex. 24 (Master Agreement) at App. 193.
[45] *Id.*
[46] BRECF 128, ¶ 14.
[47] *See generally*, Ex. 24 (Master Agreement) at App. 192-204.

GE points to the references in the Master Agreement to "contractors" and "subcontractors," and then contends that this is applicable here because GE was acting as WattStock's "contractor" or "subcontractor." That argument fails for both factual and legal reasons, as discussed below.

<u>First</u>, and most critically, this argument fails on factual grounds. GE's own witnesses acknowledge that GE was *not* WattStock's "contractor" or "subcontractor" when Alta executed the Master Agreement in February 2019.[48] Accordingly, the parties could not have intended to waive liability for claims against GE at the time they entered into the Master Agreement.

In *Stanton Holdings Inc. v. First Data Corp.*, the court granted summary judgment to the defendant because "[p]laintiffs [could not] prove they were an end user subscriber [the third-party beneficiary] *at the time the contract was signed*[.]" *Id.* (citing *Resolution Trust Corp. v. Kemp*, 951 F.2d 657, 662 (5th Cir. 1992)). Accordingly, the plaintiff could not meet its burden to prove that the contracting parties intended to make the contract for the plaintiff's benefit. *Id.* (citing *Kemp*, 951 F.2d at 662).

The same principle is dispositive here. GE was not WattStock's "contractor" or "subcontractor" when Alta executed the Master Agreement on February 27, 2019.[49] There is no dispute that GE did not have a contract with WattStock establishing a sub-contractual relationship at that time. For example, nearly a month after the Master Agreement was signed, the GE executive overseeing GE's relationship with WattStock informed a colleague that GE and WattStock "*do not currently have any signed agreement between us* [on the Alta project]."[50] Months later, when Alta inquired whether "a signed

---

[48] *Id.*; Ex. 3 (Manning Tr.) at App. 32:14-16.
[49] *See e.g.* Ex. 18 (9/11/19 Email from A. Alston) at App. 103; Ex. 19 (GE Letter to T. West) at App. 105.
[50] Ex. 16 (4/23/19 Email from M. Tremblay) at App. 94.

14

contract between GE and WattStock" would be executed for the project, GE responded affirmatively but admitted the agreement had not yet been finalized or signed.[51]

GE and WattStock's witnesses do not dispute this, either.[52] GE's own corporate representative admitted GE had no contractual obligations to WattStock related to Alta until July 2019 (five months after the Master Agreement was signed), and even then, GE still was not a "subcontractor" because Alta and WattStock would not execute the general contract (e.g. the contract under which GE professes to have been working as a subcontractor) until December 2019.[53] All of this evidence is fatal to GE's Counterclaims. *See Stanton Holdings*, 2006 WL 1343631, at *8.

<u>Second</u>, this argument also fails because the terms "contractors" and "subcontractors" are too broad to define a specific, discrete, and limited group. Under Texas law, the non-party claiming to be a third-party beneficiary "must be … sufficiently described or designated" in the contract itself. *Maddox*, 361 S.W.3d at 757. In other words, the contract must clearly define a specific, limited group to whom the parties owe the alleged obligations. *Wal-Mart Stores, Inc. v. Xerox State & Loc. Sols., Inc.*, 663 S.W.3d 569, 585–86 (Tex. 2023) (citations omitted). A loosely defined or amorphous group cannot satisfy this standard, as courts will not infer an "unmistakable" intent to benefit a non-party from vague language. *AK FortySeven Records, Ltd. Co. v. Bahamas Ministry of Tourism*, No. 4:17-CV-3750, 2018 WL 8755881, at *8 (S.D. Tex. Sept. 28, 2018)*; see also Tawes v. Barnes*, 340 S.W.3d 419, 428 (Tex. 2011) (rejecting third-party beneficiary status where the agreement failed to define a specific group to which obligations were owed).

---

[51] Ex. 17 (8/18/19 Email from J. Manning) at App. 100; *see also* Ex. 21 (8/25/20 Email from J. Manning) at App. 175.

[52] Ex. 1 (GE Tr.) at App. 6:17-7:14); Ex. 2 (Herrington Tr.) at App. 21:16-22:8; Ex. 3 (Manning Tr.) at App. 32:14-16.

[53] Ex. 1 (GE Tr.) at App. 10:7-15, 11:3-8, 13:11-21, 14:18-15:15; *see also* Ex. 2 (Herrington Tr.) at App. 21:16-22:8. Indeed, GE's corporate representative testified GE was not a party to any written, executed contract with WattStock *at all* related to *any* project (Alta or otherwise) until July 2019. Ex. 1 (GE Tr.) at App. 4:17-5:14.

15

Here, the list of WattStock's contractors and subcontractors could (and did) change over time, rendering the group undefined and fluctuating. Courts have consistently found similar contractual terms to be insufficient to establish third party beneficiary status. *See AK FortySeven Recs., Ltd. Co.*, 2018 WL 8755881, at *8 (rejecting third-party beneficiary status where "sponsors" were not defined in the contract and could change over time); *Maddox*, 361 S.W.3d at 758 (declining to recognize third-party-beneficiary-status to "nondiscrete" group—mineral-rights lessors—that would change when as parties executed leases). Accordingly, GE cannot establish that it was sufficiently described or identified in the Master Agreement's limitations on liability.

### ii     GE cannot establish that Alta and WattStock entered into the Master Agreement "directly for" GE's benefit.

There is no evidence to prove that Alta and WattStock entered into the Master Agreement "directly for [GE's] benefit." *First Bank*, 519 S.W.3d at 102. There is absolutely no language in the Master Agreement expressing a "clear and unequivocal expression" of Alta and WattStock's intent to waive damages claims against GE. *Maddox*, 361 S.W.3d at 757. And as discussed above, when the Master Agreement was signed in February 2019, GE and Wattstock did *not* have a sub-contractual relationship, nor was one contractually established until many months *after* the Master Agreement was signed. Accordingly, GE cannot establish that Alta and WattStock "directly" entered into the Master Agreement for GE's benefit and agreed to waive damages claims against GE.

For these reasons, summary judgment is warranted as to all of GE's Counterclaims, because GE cannot meet the high burden to establish that Alta and WattStock intended to directly benefit GE and entered into the Master Agreement for that purpose.

**B.  GE's requests for declaratory relief must be dismissed because Section 9 of the Master Agreement does not limit the damages that Alta seeks for GE's intentional torts.**

As a matter of law, GE cannot establish that the Master Agreement's damages limitations apply to GE. But even if GE could prove that it was an intended third-party beneficiary under that agreement, GE's contentions that (i) Alta waived all consequential damages for GE's intentional torts under Section 9.1(B), and (ii) Alta's damages are capped at $100,000 under Section 9.1(A), also fail for the additional reason that GE's interpretation is inconsistent with the plain text of that agreement.

**i    Alta did not waive damages for GE's intentional torts.**

GE seeks a declaration that Section 9.1(B) categorically bars Alta's claims for consequential damages based on GE's intentional torts—its fraud, fraudulent inducement, civil conspiracy, and tortious interference. As discussed below, the plain and unambiguous terms of that provision make clear that Alta did *not* agree to waive consequential damages for GE's intentional torts.

Texas courts have long recognized the maxim *expressio unius est exclusio alterius*— "the expression in a contract of one or more things of a class implies the exclusion of all not expressed, even though all would have been implied had none been expressed." *First Nat'l Bank of Luling v. Nugent*, 384 S.W.2d 224, 226 (Tex. App.—San Antonio 1964, writ ref'd n.r.e.). Here, Section 9.1(B) enumerates specific types of causes of action, all of which are contract-related or unintentional torts, which are covered by this damages limitation. This enumerated list necessarily implies the exclusion of other types of claims, including intentional torts like fraud and tortious interference with prospective business relations, which are notably absent from this list and analytically distinct from the enumerated claims:

THIS MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES, **SHALL INCLUDE BUT IS NOT LIMITED TO,** LOSS OF USE, LOSS OF PROFIT, LOSS OF BUSINESS, LOSS OF INCOME, LOSS OF REPUTATION OR ANY OTHER CONSEQUENTIAL DAMAGES THAT EITHER PARTY MAY HAVE INCURRED FROM **ANY CAUSE OF ACTION INCLUDING NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT, AND BREACH OF STRICT OR IMPLIED WARRANTEE.**[54]

This construction is buttressed by Section 9.1(B)'s disparate use of the phrases (i) "*including*" negligence, etc. and (ii) "*shall include but is not limited to*" loss of use, etc. Section 9.1(B) contains two "lists" that clarify its intended scope: (1) a list of different categories of consequential damages arising from (2) a list of different causes of action. Section 9.1(B) employs the phrase "shall include but is not limited to" earlier in the provision to tee up the (unlimited) categories of consequential damages that the provision waives, but only as to the following causes of action. Then when Section 9.1(B) enumerates the types of causes of action to which the waiver applies, it uses the more *limited* phrase "including," followed by a limited list of causes of action involving breaches of contracts and warranties, and unintentional torts. The phrases "including" and "shall include, but not limited to" must convey different meanings—otherwise "but not limited to" is mere surplusage. The parties chose to use distinct phrases, and that choice should be given effect. *See Great Lakes Ins., S.E. v. Gray Group Investments, L.L.C.*, 76 F.4th 341, 347 (5th Cir. 2023) ("The difference in verbiage is critical because under principles of contract interpretation, a word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning.") (cleaned up).

Lastly, Section 9.1(B)'s sister provision—Section 9.1(A)—confirms that the parties did not intend for Section 9.1(B)'s consequential damages waiver to encompass intentional torts such as fraud. Section 9.1(A)—a separate damages limitation—limits

---

[54] Ex. 24 (Master Agreement) at App. 200.

18

each party's liability for claims arising directly "under" the Master Agreement to $100,000:

> IT IS INTENDED THAT THIS LIMITATION [OF $100,000] SHALL APPLY TO **ANY AND ALL LIABILITY** OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT **HOWEVER ALLEGED OR ARISING**[.][55]

The fact that Section 9.1(A)'s $100,000 limitation applies to "any and all" causes of action "however alleged" under the Master Agreement reaffirms that the parties knew how to draft clauses that that covered *any* set of causes of action arising under that Agreement. Section 9.1(B), however, did *not* take a similar linguistic approach.[56]

Moreover, when both provisions are construed together, as they must be, it makes sense why each has a different scope. *See Texas v. Am. Tobacco Co.*, 441 F. Supp. 3d 397, 444 (E.D. Tex. 2020) ("Contracts must be construed in a manner that will 'harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.'") (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)).

Section 9.1(A) is *narrower* in the sense that it applies only to claims brought directly "under" the Master Agreement, but *broader* in the sense that it limits damages arising from "any and all" causes of action "however alleged" under the Master Agreement. This construction makes sense given that the Master Agreement covered a very limited scope of engagement to simply identify potential sources of equipment. Given that limited, preliminary scope, which was expressly intended to be followed by a more comprehensive agreement, it makes sense that the parties intended for damages for those causes of action directly "arising under" the Master Agreement to be limited to only $100,000.

By contrast, Section 9.1(B) is *broader* in scope in that it applies to claims for consequential damages "arising out of or connected" to the Master Agreement—not merely those claims arising directly under the Agreement. But Section 9.1(B) is also

---

[55] *Id.*
[56] *Id.* at Section 9.1(B).

*narrower* in the sense that "any and all" causes of action are not subject to this limitation—instead, claims like fraud and tortious interference are excluded. This, too, makes sense and reflects the Parties' intent *not* to waive damages for intentional torts, such as fraud and tortious interference, that broadly arise out of or are connected to the Master Agreement.

### ii    Section 9.1(A)'s damages cap *only* limits the liability of Alta and WattStock.

GE's second request for declaratory judgment asks the Court to declare that Section 9.1(A)'s damages cap of $100,000 applies to GE. Specifically, GE asks the Court to declare that "Alta cannot recover more than $100,000 from GE…" or, alternatively, to find that "GE's liability … is capped at $100,000."[57] But this limitation explicitly applies only to the *Parties* themselves. While Section 9.1(B) contains language establishing that the Parties, along with "their respective officers, directors, partners, employees, representatives, contractors or subcontractors," will not be liable for consequential damages under certain circumstances, Section 9.1(A) has no such language and instead is strictly limited to *only* Alta and WattStock[58]:

> TO THE MAXIMUM EXTENT PERMITTED BY LAW, **EACH PARTY AGREES TO LIMIT *THE OTHER PARTY'S* LIABILITY** FOR ANY AND ALL CLAIMS, LOSSES, COSTS, DAMAGES OF ANY NATURE WHATSOEVER OR CLAIMS EXPENSES FROM ANY CAUSE OR CAUSES, INCLUDING ATTORNEYS' FEES AND COSTS AND EXPERT WITNESS FEES AND COSTS, SO THE TOTAL AGGREGATE LIABILITY OF A PARTY TO THE OTHER SHALL NOT EXCUEED THE AMOUNT OF USD $100,000. IT IS INTENDED THAT THIS LIMITATION SHALL APPLY TO ANY AND ALL LIABILITY OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT HOWEVER ALLEGED OR ARISING, UNLESS OTHERWISE PROHIBITED BY LAW.[59]

---

[57] BRECF 128 ¶¶46-47.

[58] "Party" is a defined term in the Master Agreement. *Id.* at App. 193. The terms "Party" and "Parties" refer to "Alta Power LLC" and "WattStock LLC." *Id.*

[59] *Id.*

Because GE is not within the Master Agreement's definition of "Party," Section 9.1(A)'s damages cap does not apply to or limit Alta's ability to recover damages from GE.

**C.    GE's Counterclaims for declaratory relief should also be dismissed because they are merely duplicative of GE's Affirmative Defenses.**

Finally, the Court should dismiss GE's Counterclaims for declaratory relief because they are duplicative of GE's Affirmative Defenses.

Courts in the Fifth Circuit frequently dismiss requests for declaratory relief that simply repeat Affirmative Defenses or other issues already pending before the court. *See, e.g., Nextera Energy Mktg. LLC v. Shell Energy N. Am. (US) LP*, No. 4:21-CV-02280, 2023 WL 2541964, at *3 (S.D. Tex. Mar. 16, 2023) (dismissing counterclaim that was "simply a mirror image of [the defendant's] affirmative defenses"); *Sanijet Corp. v. Lexor Intern., Inc.*, No. CIV.A.3:06CV1258-B, 2008 WL 2201451, at *3 (N.D. Tex. May 15, 2008) (denying leave to add a counterclaim for declaratory judgment that would be "duplicative of the issues that will necessarily be resolved in connection with [defendant's] affirmative claims . . . and/or its proposed new affirmative defenses"); *Meridian Sec. Ins. v. Morris*, No. 5:22-CV-151-RWS-JBB, 2023 WL 5313905, at *3 (E.D. Tex. Aug. 1, 2023), *report and recommendation adopted*, No. 5:22-CV-151-RWS-JBB, 2023 WL 5309892 (E.D. Tex. Aug. 17, 2023) (collecting cases where declaratory judgment counterclaim was dismissed as redundant because they it would naturally be resolved by resolution of the party's affirmative claims and defenses).

Here, GE's first two Counterclaims seek declaratory judgments that (i) the Master Agreement prohibits Alta from recovering consequential damages from GE and (ii) Alta's damages are capped at $100,000.[60] Likewise, GE's first two Affirmative Defenses also assert that (i) "Alta's claims for damages for incidental, indirect, or consequential losses and for punitive or exemplary damages are barred by the limitations of liability …

---

[60] ECF 128 at ¶38, ¶¶ 47-48.

including but not limited to Article 9 of the Master Agreement" and (ii) "Alta's claims for damages in excess of $100,000 are barred by Article 9 of the Master Agreement."[61] Because these requests for declaratory relief are duplicative of GE's Affirmative Defenses, and would operate as a bar to Alta's claims on the merits, they do not add any new facts or issues and therefore should be dismissed.

### D.   The Court should grant summary judgment on GE's breach of contract counterclaim, which fails as a matter of law, and GE's related request for attorney's fees.

As set forth above, GE is not an intended third-party beneficiary under the Master Agreement, and thus GE cannot bring a claim against Alta related to Alta's alleged breach of that agreement. *See, e.g., Maddox*, 361 S.W.3d at 759 (concluding that appellants were not third-party beneficiaries and therefore "lack[ed] standing to sue to enforce" the agreement); s*ee also L&S Pro-Line, LLC v. Gagliano*, No. 09-21-00178-CV, 2024 WL 3218507, at *20 (Tex. App. June 28, 2024) (concluding that entity that was "merely an incidental beneficiary … did not have standing to assert a breach of contract claim"). Accordingly, summary judgment should be granted as to GE's third Counterclaim for breach of contract.

Additionally, the Court should also dismiss GE's request for attorneys' fees "pursuant to Texas Civil Practice and Remedies Code § 38.001(8) and any applicable contractual provisions or common law." Without a viable breach of contract claim, GE cannot seek fees under Section 38.001(8)—which requires a claim to be for "an oral or written contract."  Similarly, there are no "contractual provisions" on which GE may seek fees, and the common law squarely refutes such a request. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382 (2013) ("Under the "bedrock principle known as the 'American Rule,' each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise.") (cleaned up).

---

[61] ECF 80 at 14, ¶¶ 1-2.

As shown above, GE cannot show that Alta and WattStock entered into the Master Agreement intending to directly benefit GE with that contract. As a result, all of GE's Counterclaims should be dismissed.

## II. Summary judgment is also warranted on GE's Affirmative Defense Nos. 1, 2, 12, 13, 15, and 16.

Texas-based federal courts allow plaintiffs to seek a summary judgment on a defendant's affirmative defenses because it "enable[s] the district court to enter an order indicating that the defense is no longer in controversy' and is not limited to the pleadings like a motion to strike. *Meeks v. Mendford Trucking & Oilfield Servs., LLC*, No. P:15-CV-00050-DC, 2018 WL 2410993, at *3 (W.D. Tex. Feb. 7, 2018); *Consumer Fin. Prot. Bureau v. FirstCash, Inc.*, No. 4:21-CV-01251-P, 2024 WL 4706904, at *2 (N.D. Tex. Nov. 7, 2024). As set forth below, the Court should grant summary judgment on six of GE's Affirmative Defenses.

### A. Affirmative Defense Nos. 1, 2, and 16: The Master Agreement does not limit Alta's ability to recover consequential damages for GE's intentional torts, nor does it limit the amount of damages that Alta may recover from GE's fraudulent conduct.

The Court should dismiss GE's Affirmative Defense Nos 1, 2, and 16 because they are duplicative of GE's Counterclaims, and fail for all the same legal and factual reasons.

**Affirmative Defense Nos. 1 and 2.** As discussed above, GE's first two Counterclaims are duplicative of its first two Affirmative Defenses. The Court should strike both of these Affirmative Defenses for the reasons outlined in detail above—GE is not an intended third-party beneficiary under the Master Agreement, and the Master Agreement does not limit Alta's ability to recover consequential damages for GE's intentional torts.

**Affirmative Defense No. 16.** The Court should also grant summary judgment on GE's sixteenth Affirmative Defense, which contends that "Alta's claims are barred or waived by the contracts, to the extent they exist, between Alta and WattStock and/or Alta

and GE."[62] Again, the only contractual basis GE has ever identified for limiting Alta's available relief is Section 9.1 of the Master Agreement. Because that provision does not apply to Alta's claims against GE for the reasons discussed above, and because it is undisputed that Alta and GE have never executed a contract with one another, this defense must fail.

> **B.    Affirmative Defense No. 12: The Economic Loss Rule does not apply to Alta's claims against GE because Alta and GE never entered into any contracts together.**

As its twelfth Affirmative Defense, GE recycles its rejected assertion that "Alta's claims are barred by the economic loss rule because Alta seeks to recover in tort for claims for which contracts—specifically the Master Agreement and the Alta WattStock Limited Notice to Proceed—cover the substance of the dispute and the loss is economic in nature,"[63] this time in the form of an affirmative defense. Judge Jernigan already rejected this argument, and this Court should too.[64]

The economic loss rule "precludes recovery in tort when the loss is the subject matter of a contract between the parties." *Bowman v. CitiMortgage Inc.*, No. 3:14-CV-4036-B, 2015 WL 4867746, at *3 (N.D. Tex. Aug. 12, 2015) (citing *Sw. Bell Tele. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991); *Clark v. PFPP Ltd. P'ship*, 455 S.W.3d 283, 288 (Tex. App.—Dallas 2015, no pet.)). Here, however, there is no contract between GE and Alta. GE is not a party to the Master Agreement, and Alta never entered into a separate agreement directly with GE. Accordingly, the economic loss rule cannot bar Alta's claims against GE.

And even if Alta's agreements with WattStock somehow could extend to GE, most of GE's misrepresentations *predate* the Master Agreement. *See Yumilicious Franchise, L.L.C. v. Barrie*, No. 3:13-CV-4841-L, 2015 WL 1856729, at *7 n.8 (N.D. Tex. Apr. 23, 2015)

---

[62] ECF 80 at 16, ¶16.
[63] ECF 80 at 17, ¶12.
[64] BRECF 31 at 21-23; BRECF 47 (denying GE's Motion to Dismiss).

(holding the economic loss rule does not apply to fraud and negligent misrepresentation claims predating the parties' contract). That GE continued the fraud after the Master Agreement existed is of no moment. *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998) ("[T]he Supreme Court of Texas has repeatedly recognized that a fraud claim can be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed within a contract.").

Because there is no contract with GE and Alta that covers the subject matter of Alta's losses, the economic loss rule is inapplicable. The Court should therefore strike GE's twelfth Affirmative Defense.

C.   **Affirmative Defense No. 13: Alta's settlement with WattStock expressly disclaims any effect on Alta's pending claims against GE, and therefore does not in any way limit Alta's ability to recover from GE in this case.**

In its thirteenth Affirmative Defense, GE maintains that "Alta's claims based on WattStock's actions are barred by waiver or release based on Alta's dismissal of claims against WattStock with prejudice."[65]

However, Alta and WattStock's settlement expressly states that it "does not affect any claims, counterclaims, and causes of action between Alta and GE."[66] The Bankruptcy Court understood this, and that is why it only dismissed "all claims, counterclaims, and causes of action that could have been asserted by WattStock against Alta and by Alta against WattStock[.]"[67] *See also Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 58 (Tex. 2008) (Texas courts should uphold with equal force "contracts that reserve future claims" and "contracts that settle all claims"). As a result, GE is foreclosed from arguing Alta's settlement with WattStock somehow impacts its liability for the damages caused by its conspiracy with WattStock, and its thirteenth Affirmative Defense should be dismissed.

---

[65] ECF 80 at 17, ¶13.
[66] BRECF 96 at 1-2.
[67] BRECF 101.

25

**D.    Affirmative Defense No. 15: The statute of frauds does not apply to any of Alta's intentional tort claims against GE.**

Finally, GE insists that "Alta's claims are barred by the Statute of Frauds."[68] The Statute of Frauds would be relevant only if Alta were asserting a breach of contract claim against GE in this case, which it is not. *Holloway v. Dekkers*, 380 S.W.3d 315, 320 (Tex. App.—Dallas 2012, no pet.) ("The statute of frauds is an affirmative defense *in a breach of contract suit* and renders a contract that falls within its purview unenforceable.") (emphasis added); *Duradril, L.L.C. v. Dynomax Drilling Tools, Inc.*, 516 S.W.3d 147, 158 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (same). Because GE cannot prevail on this defense as a matter of law, the Court should strike this Affirmative Defense.

## CONCLUSION

Since this case began, GE has repeatedly argued that the Master Agreement—a contract that GE is not even a party to—limits Alta's ability to recover damages from GE. As two previous courts have already held, and as explained above, GE is mistaken. GE cannot establish it is a third-party beneficiary of the Master Agreement, or that any provision in that agreement limits the damages that Alta now seeks against GE. As a result, all three of GE's Counterclaims necessarily fail as a matter of law. Moreover, Alta is entitled to summary judgment with respect to GE's Affirmative Defense Nos. 1, 2, 12, 13, 15, and 16.

---

[68] ECF 80 at 17, ¶15.

Respectfully submitted,

By: *Jeb Golinkin*_____

**JORDAN, LYNCH & CANCIENNE PLLC**
Michael Cancienne
State Bar No. 24055256
Joseph W. ("Jeb") Golinkin II
State Bar No. 24087606
1980 Post Oak Blvd., Suite 2300
Houston, Texas 77056
Telephone: 713.955.4025
mcancienne@jlcfirm.com
jgolinkin@jlcfirm.com

**BAKER BOTTS L.L.P.**
John B. Lawrence
State Bar No. 24055825
Ariel House
Texas Bar No. 24122827
2001 Ross Avenue, Suite 900
Dallas, TX 75201-2980
Telephone: 214.953.6500
john.lawrence@bakerbotts.com
ariel.house@bakerbotts.com

**ATTORNEYS FOR ALTA POWER LLC**

27