IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ALTA POWER LLC, | § | |
| | § | |
| *Plaintiff/Counter-Defendant*, | § | |
| | § | |
| v. | § | |
| | § | CASE NO. 3:23-CV-270-X |
| GENERAL ELECTRIC INTERNATIONAL, | § | |
| INC., n/k/a GE VERNOVA | § | |
| INTERNATIONAL LLC, d/b/a GE POWER | § | |
| SERVICES, | § | |
| | § | |
| *Defendant/Counter-Plaintiff*. | | |

**GE VERNOVA INTERNATIONAL LLC'S RESPONSE IN OPPOSITION
TO ALTA'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

Table of Authorities ............................................................................................... ii

Introduction ............................................................................................................. 1

Background .............................................................................................................. 3

I.    The contracts among the parties:  The GE-WattStock MOU; the GE-Alta NDA; and the Alta-WattStock NDA, Master Agreement, and LNTPs. ......................... 3

II.   Unable to secure financing, Alta terminates its contracts with WattStock, WattStock then sues Alta to recover its losses, Alta counterclaims and adds GE as a third-party defendant, and GE counterclaims against Alta and asserts affirmative defenses ....................................................................................... 7

Legal Standard ........................................................................................................ 9

Summary of Argument ........................................................................................... 10

Argument ................................................................................................................ 11

I.    Alta's own contracts—which it breached by suing GE—bar it from recovering lost profits as a matter of law. ...................................................................... 11

     A.    The contractual waivers in the Alta-WattStock Master Agreement, the GE-Alta NDA, and the Alta-WattStock LNTPs separately and independently bar Alta's attempt to recover its alleged lost profits. .............................. 11

     B.    Alta breached the Master Agreement's covenant not to sue for consequential damages. ..................................................................... 18

II.   The statute of frauds separately and independently bars Alta from recovering lost profits ........................................................................................................ 18

III.  At minimum, Alta's recovery on its vicarious-liability theories is capped at $100,000 under the Master Agreement's plain language. ............................... 19

IV.  Alta isn't entitled to summary judgment on GE's other affirmative defenses either. ................................................................................................................ 20

     A.    The economic-loss rule bars Alta's negligent-misrepresentation claim. ............... 21

     B.    Alta can't hold GE vicariously liable for WattStock's alleged conduct after dismissing its direct claims against WattStock. ...................................... 22

Conclusion .............................................................................................................. 23

## TABLE OF AUTHORITIES

Page(s)

### Cases

*A&H Props. P'ship v. GPM Eng'g,*
2015 WL 9435974 (Tex. App.—Austin Dec. 23, 2015, no pet.)............................22

*Acad. of Skills & Knowledge, Inc. v. Charter Schs., USA, Inc.,*
260 S.W.3d 529 (Tex. App.—Tyler 2008, pet. denied)......................................21

*AK FortySeven Recs., Ltd. v. Bahamas Ministry of Tourism,*
2018 WL 8755881 (S.D. Tex. Sept. 28, 2018) ....................................................15

*Amerisure Ins. Co. v. Navigators Ins. Co.,*
611 F.3d 299 (5th Cir. 2010) ...............................................................................9

*Baylor Univ. v. Sonnichsen,*
221 S.W.3d 632 (Tex. 2007)....................................................................2, 11, 19

*Brandon v. Wells Fargo Bank, N.A.,*
2020 WL 2776714 (Tex. App.—Corpus Christi-Edinburg May 28, 2020, no pet.) ...................22

*ConocoPhillips Co. v. Graham,*
2012 WL 1059084 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, no pet.) .................13, 14

*In re E.C.R.,*
402 S.W.3d 239 (Tex. 2013)................................................................................17

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contrs.,*
960 S.W.2d 41 (Tex. 1998)..................................................................................19

*Haase v. Glazner,*
62 S.W.3d 795 (Tex. 2001)............................................................................11, 19

*Harris v. Houston Methodist Hosp.,*
2018 WL 3233329 (Tex. App.—Houston [1st Dist.] July 3, 2018, pet. denied)...........3, 11, 20

*Hometown 2006–1 1925 Valley View, L.L.C. v. Prime Income Asset Mgmt., L.L.C.,*
595 F. App'x 306 (5th Cir. 2014) ........................................................................17

*Ibe v. Jones,*
836 F.3d 516 (5th Cir. 2016) ..............................................................................21

*Jim Walter Homes, Inc. v. Reed,*
711 S.W.2d 617 (Tex. 1986)...........................................................................11, 21

*Maddox v. Vantage Energy, LLC,*
361 S.W.3d 752 (Tex. App.—Fort Worth 2012, pet. denied) ...............................15

*Mavuninu-Jean v. Reyes,*
2019 WL 5963886 (N.D. Tex. Nov. 13, 2019)....................................................23

*Miller v. Target Corp.,*
854 F. App'x 567 (5th Cir. 2021) .......................................................................22

*New Century Fin., Inc. v. Olympic Credit Fund, Inc.,*
487 F. App'x 912 (5th Cir. 2012) .......................................................................21

TABLE OF AUTHORITIES
(continued)

Page(s)

*Pratt-Shaw v. Pilgrim's Pride Corp.*,
    122 S.W.3d 825 (Tex. App.—Dallas 2003, pet. denied) ........................................14

*Resol. Tr. Corp. v. Kemp*,
    951 F.2d 657 (5th Cir. 1992) ........................................................................9

*Rodriguez v. Branch*,
    2022 WL 619537 (S.D. Tex. Feb. 23, 2022) ........................................................23

*Sharyland Water Supply Corp. v. City of Alton*,
    354 S.W.3d 407 (Tex. 2011)........................................................................22

*Sheline v. Dun & Bradstreet Corp.*,
    948 F.2d 174 (5th Cir. 1991) ........................................................................9

*St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*,
    78 F.3d 202 (5th Cir. 1996) ........................................................................17

*Stanton Holdings, Inc. v. First Data Corp.*,
    2006 WL 1343631 (N.D. Tex. May 16, 2006) ........................................................13

*Sterling Chems., Inc. v. Texaco Inc.*,
    259 S.W.3d 793 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)...................................22

*Sw. Bell Tel. Co. v. DeLanney*,
    809 S.W.2d 493 (Tex. 1991)........................................................................19, 21

*Tawes v. Barnes*,
    340 S.W.3d 419 (Tex. 2011)........................................................................15

*Temple EasTex, Inc. v. Old Orchard Creek Partners Ltd.*,
    848 S.W.2d 724 (Tex. App.—Dallas 1992, writ denied) ..............................................14

*Tex. Prop. & Cas. Ins. Guar. Ass'n v. Sw. Aggregates, Inc.*,
    982 S.W.2d 600 (Tex. App.—Austin 1998, no pet.) ................................................17

*Trebuchet Siege Corp. v. Pavecon Com. Concrete, Ltd.*,
    2014 WL 4071804 (Tex. App.—Dallas Aug. 19, 2014, no pet.)...........................................22

*United States v. Gonzales*,
    520 U.S. 1 (1997)................................................................................15

**Statutes & Rules**

Fed. R. Civ. P. 56....................................................................................9

Tex. Bus. & Com. Code § 2.201 ......................................................................2, 19

Tex. Bus. & Com. Code § 26.01 ......................................................................2, 19

Tex. Civ. Prac. & Rem. Code § 33.002 ...............................................................23

Tex. Civ. Prac. & Rem. Code § 33.004 ...............................................................23

TABLE OF AUTHORITIES
(continued)

Page(s)

**Other Authorities**

Bryan A. Garner & Antonin Scalia,
  *Reading Law* (2012)..............................................................................................2, 16

*Webster's Third New International Dictionary* (1976) .................................................16

iv

**INTRODUCTION**

Alta's motion makes clear that the parties agree the following issues are ripe for resolution at the summary-judgment stage because there are no material fact disputes: (1) whether Alta's request for lost profits is barred by its own contracts, the statute of frauds, or both; (2) whether Alta breached its covenant not to sue for lost profits by filing this suit against GE; and (3) whether, at minimum, Alta's recovery against GE is contractually limited to $100,000.

Applying well-settled law to the undisputed facts makes clear that summary judgment should be granted for GE on each of those issues.

***First***, Alta contractually waived its right to recover its alleged lost-profits damages—and it expressly agreed that it wouldn't bring "any claim" seeking those damages.

Alta and WattStock both expressly agreed in the Master Agreement to waive their right to recover consequential damages (including lost profits) using language that is both broad and unequivocal. The waiver applies not only to the parties (Alta and WattStock), but also to their "officers, directors, *partners*, employees, representatives, *contractors* or *subcontractors*." App.432 (emphases added).[1] Alta concedes (at 6–7, 15) that GE was a subcontractor for WattStock. And its theory of the case (at 1, 4–5, 7) turns on the allegation that it believed GE and WattStock were "partners." *See* App.50, 58, 60.

Alta's arguments (at 13–15) about when GE and WattStock signed their contracts, and the lack of a written subcontractor agreement, are irrelevant. It is clear from the plain language of the waiver itself that Alta and WattStock both intended to benefit third-party contractors like GE. Alta's attempt (at 17–20) to use a list of examples following the word "including" to narrow the scope of the waiver is inconsistent with both "good English usage" and "textualist decision–

---

[1] "App." refers to the appendix to GE's MSJ. ECF 97–101. "Resp.App." refers to the appendix to this response.

1

making."  Bryan A. Garner & Antonin Scalia, *Reading Law* 132–33 (2012) ("the word *including* itself means that the list is merely exemplary and not exhaustive").  And in all events, Alta's claim for lost profits is separately barred by the NDA it entered directly with GE, *see* App.416—a contract Alta doesn't bother to mention.

And Alta doesn't advance any independent arguments in response to GE's breach-of-contract claim.  Instead, it simply recycles its argument that GE isn't a third-party beneficiary under the Master Agreement—an argument that fails as a matter of law.

***Second***, the statute of frauds separately and independently bars Alta's recovery of lost profits.  Alta doesn't dispute that neither of the alleged promises at issue—to provide "nine units for no more than $10 million per turbine" and "effectively guarantee[ ]" WattStock's performance—was reduced to writing.  Nor does it dispute that both promises are governed by the statute of frauds.  *See* Tex. Bus. & Com. Code § 2.201(a) (goods over $500); Tex. Bus. & Com. Code § 26.01(a), (b)(2) (answer for another's default).

Alta's only argument (at 26)—that the statute of frauds "would be relevant only if Alta were asserting a breach of contract claim"—is flatly inconsistent with a mountain of Texas Supreme Court precedent.  Those cases make clear that the statute of frauds bars plaintiffs from using "artful pleading to morph contract claims into [tort] causes of action to gain favorable redress under the law."  *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007) (citing cases).

***Third***, at minimum, Alta cannot recover more than $100,000 in its attempt (at 1) "to hold GE accountable . . . vicariously for WattStock's torts."  The plain language of the Master Agreement limits Alta to recovering $100,000 from WattStock "for any and all claims, losses, costs, damages of any nature whatsoever" for "any and all liability or cause of action arising under" the Master Agreement.  App.432.  Alta doesn't dispute that it couldn't have recovered more than

$100,000 from WattStock. And it's black-letter law that Alta can't use secondary liability to recover from GE more than it could've recovered from WattStock. *Harris v. Houston Methodist Hosp.*, 2018 WL 3233329, at *5 (Tex. App.—Houston [1st Dist.] July 3, 2018, pet. denied) (no vicarious liability because no direct liability).

Because there aren't any material fact disputes about these issues—and because GE is right on the law—the Court should deny Alta's motion and grant summary judgment for GE on all the issues raised in Alta's motion for partial summary judgment.

## BACKGROUND

I.    **The contracts among the parties: The GE-WattStock MOU; the GE-Alta NDA; and the Alta-WattStock NDA, Master Agreement, and LNTPs.**

Alta was founded in late 2017 for the sole purpose of building peaker plants in Texas. Alta planned to power its peaker plants with used aeroderivative turbines manufactured by GE.

1.    In June 2017, GE and WattStock contracted to facilitate the TruePackage program—a solution for developers and other end users to purchase fully refurbished GE gas turbines with a manufacturer's warranty. App.247. That contract—the 2017 Memorandum of Understanding (MOU)—formalized the GE-WattStock "collaboration" and expressly provided that they weren't creating "any partnership, corporation, agency or fiduciary relationship." App.249, 250. At no point were GE and WattStock ever partners in the legal sense. Instead, for the Alta project, WattStock was the "lead" and used GE as a subcontractor for certain materials and work related to refurbishing the turbines. App.260, 262–65; *see also* GE MSJ (ECF 96) at 5–6 (discussing the various "lead" configurations under the TruePackage program).

GE's role as WattStock's subcontractor for the Alta project was further formalized through a July 2019 Limited Notice to Proceed between GE and WattStock. Resp.App.5–14.

3

**2.**     In early 2018, Alta learned about and began pursuing the TruePackage offering. Starting in May 2018 and continuing through December 2019, Alta and WattStock entered a series of contracts to facilitate Alta's purchase of TruePackage turbines through WattStock.

*First*, in May 2018 Alta and WattStock executed a nondisclosure agreement.  App.409. Several months later, Alta also signed a separate nondisclosure agreement with GE (the "GE-Alta NDA").  App.413.  The GE-Alta NDA contains an explicit consequential damages bar:

> 11.  In no event shall either Party be liable for loss of profit or revenues, loss of use, cost of capital, or for any special, consequential, incidental, indirect, punitive or exemplary damages, regardless of whether a claim is based in contract, warranty, indemnity, tort/extra-contractual liability (including negligence), strict liability or otherwise. Each Party acknowledges that money damages would not be a sufficient remedy for any breach of this Agreement.  Accordingly, in the event of any such breach, in addition to any other remedies at law or in equity that a Party may have, it shall be entitled to equitable relief, including injunctive relief or specific performance, or both.

App.416 (highlighting added).  It also provided that any further relationship or transaction between GE and Alta would be "based upon another agreement *in writing* signed by the Parties."  App.415 (emphasis added).

*Second*, in February 2019, Alta and WattStock executed their Master Agreement. App.425.  Section 9.1(B) of the Master Agreement contains a mutual waiver of consequential damages and a covenant not to sue:

> B.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, AND TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER PARTY, THEIR RESPECTIVE OFFICERS, DIRECTORS, PARTNERS, EMPLOYEES, REPRESENTATIVES, CONTRACTORS OR SUBCONTRACTORS SHALL BE LIABLE TO THE OTHER OR SHALL MAKE ANY CLAIM FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR CONNECTED IN ANY WAY TO THIS AGREEMENT. THIS MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES SHALL INCLUDE, BUT IS NOT LIMITED TO, LOSS OF USE, LOSS OF PROFIT, LOSS OF BUSINESS, LOSS OF INCOME, LOSS OF REPUTATION OR ANY OTHER CONSEQUENTIAL DAMAGES THAT EITHER PARTY MAY HAVE INCURRED FROM ANY CAUSE OF ACTION INCLUDING NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT AND BREACH OF STRICT OR IMPLIED WARRANTEE.

App.432 (highlighting added).  Both Alta and WattStock agreed not to make "***any claim***" against each other or "their respective officers, directors, ***partners***, employees, representatives, ***contractors or subcontractors***" for "***any*** incidental, indirect or ***consequential damages*** arising out of or connected in any way to this agreement."  App.432 (emphases added).  Section 9.1(B) continues that the "mutual waiver of consequential damages shall include but is not limited to . . . ***loss of profit*** . . . or ***any other consequential damages*** that either party may have incurred from ***any cause of action*** including negligence, strict liability, breach of contract and breach of strict or implied warrantee."  App.432 (emphases added).

Separately, Section 9.1(A) contains a cap on liability:

> **A. TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH PARTY AGREES TO LIMIT THE OTHER PARTY'S LIABILITY FOR ANY AND ALL CLAIMS, LOSSES, COSTS, DAMAGES OF ANY NATURE WHATSOEVER OR CLAIMS EXPENSES FROM ANY CAUSE OR CAUSES, INCLUDING ATTORNEYS' FEES AND COSTS AND EXPERT-WITNESS FEES AND COSTS, SO THAT THE TOTAL AGGREGATE LIABILITY OF A PARTY TO THE OTHER SHALL NOT EXCEED THE AMOUNT OF USD $100,000. IT IS INTENDED THAT THIS LIMITATION SHALL APPLY TO ANY AND ALL LIABILITY OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT HOWEVER ALLEGED OR ARISING, UNLESS OTHERWISE PROHIBITED BY LAW.**

App.432 (highlighting added).  It limits each party's aggregate liability to $100,000 for "***any and all claims***, losses, costs, damages of ***any nature whatsoever*** or claims expenses from any cause or causes, including attorneys' fees and costs and expert-witness fees and costs."  App.432 (emphases added).

And Section 3.3 of the Master Agreement requires WattStock and Alta to agree "in writing" to the terms on which WattStock would purchase and refurbish turbines for Alta.  App.428.

***Third***, Alta and WattStock then entered two limited notices to proceed for the purchase of specific turbines.

5

In May 2019, Alta and WattStock executed a Limited Notice to Proceed related to three turbines owned by Nuh Cimento (a Turkish company).  App.459.  Consistent with the Master Agreement, the May LNTP provides that WattStock is not "liable for any incidental or consequential damages, including lost profits":

> 4.  Neither Party is liable for any incidental or consequential damages, including lost profits, sales, marketing, or proposal efforts arising in relation to this LNTP.

App.459–60.

In December 2019, Alta and WattStock executed a second, more detailed Limited Notice to Proceed, under which WattStock would acquire, refurbish, and sell two Nuh Cimento turbines to Alta.  App.438.  Like the Master Agreement and the May LNTP, the December LNTP also contains a limitation-of-liability provision under which WattStock (the "Seller") "shall not be liable for loss of profit or revenues . . . or for any special, consequential, incidental, indirect, punitive or exemplary damages":

> 22.2. Consequential Damages.
>   22.2.1. The Seller shall not be liable for loss of profit or revenues, loss of product, loss of use of the Work or any associated equipment, interruption of business, cost of capital, cost of replacement equipment, downtime costs, increased operating costs, claims of the Buyer's customers for such damages, or for any special, consequential, incidental, indirect, punitive or exemplary damages.

App.449 (Ex. A § 22).  The December LNTP also expressly provides that the benefits of the "Limitation of Liability" provision extend to third parties, like GE.

> 34.1. Third-Party Beneficiaries.
>   34.1.1. Except as provided in the Article entitled "Limitation of Liability", these provisions are for the benefit of the Parties hereto and not for any other third party.

App.451 (Ex. A § 34) (highlighting added).  Finally, the December LNTP again reiterates the "in writing" requirement:  "Any oral or written representation, warranty, course of dealing, or trade usage not contained or referenced herein shall not be binding on either Party."  App.451 (Ex. A § 33).

*Fourth*, in February 2020—after repeatedly representing to third parties that GE was a "subcontractor" to WattStock on the Alta TruePackage project—Alta and WattStock amended the Master Agreement.  Resp.App.16–17, 28, 79; App.1326–28.  All three of the provisions discussed above—the consequential-damages bar, the $100,000 liability cap, and the written-terms requirement—remained unchanged.  Resp.App.16–17.

## II.    Unable to secure financing, Alta terminates its contracts with WattStock, WattStock then sues Alta to recover its losses, Alta counterclaims and adds GE as a third-party defendant, and GE counterclaims against Alta and asserts affirmative defenses.

Alta's peaker project ultimately failed for reasons entirely unrelated to WattStock or GE.  *See* GE MSJ at 16–21.  Unable to secure financing, Alta unilaterally terminated its contracts with WattStock in June 2020—only four months after amending the Master Agreement in February 2020.  *See* App.1380–81.

WattStock then sued Alta to recover payments Alta owed under the contracts; Alta later filed counterclaims against WattStock.  App.1461, 1542–47.  In February 2021, Alta pulled GE into its dispute with WattStock as a third-party defendant.  App.1562.

In January 2023, Alta and WattStock settled.  Alta dismissed its claims against WattStock with prejudice, and WattStock dropped its claims against Alta.  App.1596–97.

The next month, GE asserted three counterclaims against Alta, seeking:

(I)    a declaration that Alta is contractually barred from recovering consequential damages;

7

    (II)  a declaration that Alta is barred from recovering more than $100,000 from GE on its claims seeking to hold GE vicariously liable for WattStock's alleged conduct; and

    (III) damages for Alta's breach of the Master Agreement's covenant not to sue for consequential damages connected in any way to the Master Agreement.

*See* App.1625–31.

In May 2024, Alta filed its first amended complaint.  ECF 54.  And, in February 2025, GE filed its amended answer.  ECF 80.

At bottom, Alta now seeks to hold GE responsible for Alta's own failures to (1) obtain financing and (2) build its peaker plants.  Alta's claims against GE center on two oral promises that Alta insists (at 4–5) GE made but failed to fulfill:  that GE would (1) "deliver at least nine . . . TruePackage units for $10 million or less"; and (2) "fulfill WattStock's obligations under any contractual relationship that WattStock had with Alta."  App.36–37.  Alta claims that, but for these misrepresentations, it would've successfully built and operationalized its peaker plants in time to reap significant profits during 2021's Winter Storm Uri.  Alta seeks between $190 and $410 million in lost profits under that speculative theory.  App.1710.

Alta's motion for partial summary judgment targets GE's three counterclaims and several of its affirmative defenses.

GE's Counterclaim I and Counterclaim III invoke the Master Agreement's bar on consequential damages.  Specifically, Counterclaim I seeks a declaration that Section 9.1(B) bars Alta from seeking consequential damages from GE.  App.1625–27.  Counterclaim III seeks damages based on Alta's decision to sue GE for lost profits in breach of Section 9.1(B)'s covenant not to sue for consequential damages.  App.1628–31.

Counterclaim II invokes the $100,000 liability cap found in Section 9.1(A) of the Master Agreement.  App.1627–28.  GE seeks a declaration that its vicarious liability for WattStock's

conduct, if any, is capped at $100,000.  App.1627–28.  GE also sought a declaration that if Alta

prevailed on its argument that GE was "a party to the Master Agreement," App.1571 ¶ 46 ("GE is

an 'affiliate' or 'representative' of WattStock and, therefore, a party to the Master Agreement."),

then it should be estopped from arguing that GE isn't a party for purposes of Section 9.1(A)'s

$100,000 cap.  *See* App.1628 ¶ 48.[2]

    The affirmative defenses targeted by Alta's motion invoke:

- the consequential damages waivers in the Master Agreement and Alta's other contracts (Affirmative Defenses 1 and 16);

- Section 9.1(A)'s $100,000 cap on liability (Affirmative Defense 2);

- the economic-loss rule (Affirmative Defense 12);

- Alta's dismissal with prejudice of its claims against WattStock (Affirmative Defense 13); and

- the statute of frauds (Affirmative Defense 15).

*See* ECF 80 at 13–16.

## LEGAL STANDARD

    Summary judgment is warranted if "there is no genuine dispute as to any material fact,"

and the movant is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Resol. Tr.*

*Corp. v. Kemp*, 951 F.2d 657, 661 (5th Cir. 1992) ("When 'the only issue before the court is a pure

question of law . . . summary judgment is appropriate.' ") (quoting *Sheline v. Dun & Bradstreet*

*Corp.*, 948 F.2d 174, 176 (5th Cir. 1991)).  "A genuine issue of material fact exists when the

evidence is such that a reasonable jury could return a verdict for the non-moving party." *Amerisure*

*Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010).

---

[2]  Alta has since abandoned that argument, *see* Alta MSJ 21 ("Because GE is not within the Master Agreement's definition of 'Party,' Section 9.1(A)'s damages cap does not apply."); ECF 54 (Alta 1AC) (omitting this allegation), mooting GE's request.  But if Alta backtracks, the Court should hold that GE's total liability is capped at $100,000.

## SUMMARY OF ARGUMENT

I.      Alta's own contracts—which it breached by suing GE—bar it from recovering consequential damages.  **(A)** In the Master Agreement, Alta expressly waived its right to recover its lost profits not only from WattStock, but also from WattStock's partners, contractors, or subcontractors (Counterclaim I; Affirmative Defenses 1 and 16).  Alta's attempts to avoid the plain language of the agreement fall flat.  And Alta's lost-profits request is separately barred in all events by both the GE-Alta NDA and the Alta-WattStock LNTPs (Affirmative Defenses 1 and 16)—contracts Alta doesn't mention.

In addition to waiving its right to recover consequential damages, Alta also expressly agreed not to "make any claim" seeking them.  **(B)** Alta breached that agreement by suing GE for lost profits (Counterclaim III).  Alta's only response is regurgitating (at 22–23) its (incorrect) argument that GE isn't a third-party beneficiary of the Master Agreement.  So the parties agree:  if GE is a third-party beneficiary, and if the agreement means what it says—that it covers "any claim" for consequential damages (and not just claims for negligence, strict liability, breach of contract, and breach of warranty as Alta argues)—then GE is entitled to judgment as a matter of law on its breach of contract claim against Alta.

II.      The statute of frauds separately and independently bars Alta from recovering its alleged lost profits (Affirmative Defense 15).  Alta doesn't dispute that the alleged promises on which it relies (at 4–5)—that GE would (1) deliver "nine units for no more than $10 million per turbine" and (2) "effectively guarantee[ ]" WattStock's performance—weren't reduced to writing.  Nor does it dispute that those promises come within the statute of frauds.  Instead, Alta argues that the statute of frauds is irrelevant because it has dropped its contract claims.  But the Texas Supreme Court repeatedly has rejected that argument—plaintiffs can't "use a fraud claim essentially to

enforce a contract the Statute makes unenforceable." *Haase v. Glazner*, 62 S.W.3d 795, 799–800 (Tex. 2001); *see also Sonnichsen*, 221 S.W.3d at 636 (citing cases).

**III.**    At minimum, Alta's recovery on its vicarious-liability theories is capped at $100,000 under the Master Agreement's plain language (Counterclaim II; Affirmative Defense 3). Alta doesn't dispute that it couldn't have recovered more than $100,000 from WattStock. And it's black-letter law that Alta can't use secondary liability to recover from GE more than it could've recovered from WattStock. *See Harris*, 2018 WL 3233329, at *5.

**IV.**    Alta's remaining arguments about GE's affirmative defenses fare no better. **(A)** The economic-loss rule bars Alta's negligent-misrepresentation claim (Affirmative Defense 12). Alta's argument (at 3, 24–25)—that the rule doesn't apply because "there is no contract between GE and Alta"—ignores the GE-Alta NDA and is inconsistent with Fifth Circuit and Texas Supreme Court precedent in all events. *See*, *e.g.*, *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). And **(B)** Alta's argument about its settlement with WattStock (at 25) misses the forest for the trees. Despite dismissing with prejudice its claims against WattStock, Alta continues seeking to hold GE "vicariously" liable "for WattStock's torts." At minimum, now that WattStock has been dismissed, there's no dispute that GE can designate it as a responsible third party (Affirmative Defense 13).

**ARGUMENT**

**I.    Alta's own contracts—which it breached by suing GE—bar it from recovering lost profits as a matter of law.**

     **A.    The contractual waivers in the Alta-WattStock Master Agreement, the GE-Alta NDA, and the Alta-WattStock LNTPs separately and independently bar Alta's attempt to recover its alleged lost profits.**

Alta baldly asserts (at 24) that "Alta and GE have never executed a contract with one another." Not so. The record conclusively establishes that Alta and GE executed an NDA in

11

December 2018.  App.416.  The plain language of that NDA bars Alta from recovering its alleged

"loss of profit"—and that's true "regardless of whether [its] claim is based in contract, warranty,

indemnity, tort/extracontractual liability (including negligence), strict liability or otherwise":

> 11.  In no event shall either Party be liable for ==loss of profit== or revenues, loss of use, cost of capital, or for ==any special, consequential, incidental, indirect, punitive or exemplary damages,== regardless of whether a claim is based in contract, warranty, indemnity, tort/extra-contractual liability (including negligence), strict liability or otherwise. Each Party acknowledges that money damages would not be a sufficient remedy for any breach of this Agreement. Accordingly, in the event of any such breach, in addition to any other remedies at law or in equity that a Party may have, it shall be entitled to equitable relief, including injunctive relief or specific performance, or both.

App.416 (highlighting added).  That alone precludes Alta from recovering its alleged lost profits

as a matter of law—particularly given that GE and Alta are parties to the NDA, rendering Alta's

third-party beneficiary arguments (at 11–16) beside the point.  The two LNTPs between Alta and

WattStock, which also appear nowhere in Alta's MSJ, contain similar provisions and are also fatal

to Alta's arguments.[3]

Section 9.1(B) of the Master Agreement separately bars Alta from recovering lost profits.

As that provision makes clear, "neither party"—Alta and WattStock—nor "their respective

officers, directors, *partners*, employees, representatives, *contractors* or *subcontractors* shall be

liable" for any "consequential damages arising out of or connected in any way" with the Master

Agreement.  App.432 (emphases added).

Alta advances two arguments in its attempt to avoid the Master Agreement's plain language.

Neither withstands scrutiny.

---

[3]  The May LNTP says WattStock isn't "liable for any incidental or consequential damages, including lost profits."  App.459.  The December LNTP similarly says WattStock "shall not be liable for loss of profit or revenue . . . or for any special, consequential, incidental, punitive or exemplary damages."  App.449.  It also makes clear that that provision benefits third parties like GE.  App.451.

1.    Alta's suggestion (at 12–17) that GE can't enforce Alta's contractual waiver because it's not a third-party beneficiary strains credulity.  As the plain language makes clear, the waiver covers not only the parties, but also their partners, contractors, and subcontractors.  Alta's own claim is that GE and WattStock were "partners."  Alta MSJ 1, 4–5, 7; *see also* App.50, 58, 60; ECF 54 ¶ 21 (Alta's 1AC) (GE "*partnered* with a company called WattStock").  And Alta concedes (at 6–7, 15) that GE had "contractual obligations" to WattStock.[4]

Alta's lead argument (at 6, 14–15)—that "WattStock and GE did not have a *written agreement* setting out any subcontractual relationship" "*[a]t the time* Alta and WattStock signed the Master Agreement" (emphases added)—misses the mark.  First, the timing is irrelevant.  Nothing in the Master Agreement—or Texas law—restricts the group of relevant third parties (the "officers, directors, partners, employees, representatives, contractors or subcontractors") to people in those roles at the time the Master Agreement was signed.  *E.g.*, *ConocoPhillips Co. v. Graham*, 2012 WL 1059084, at *6 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, no pet.) (third party-beneficiaries can include categories of persons, "all of whom may not be known to the contracting parties *at the time of execution*") (emphasis added).[5]

---

[4]  The record shows Alta had no choice but to make that concession.  *See*, *e.g.*, Resp.App.16–17, 28, 79 (Alta designating GE as a "Major Subcontractor" while negotiating with WattStock); App.1326–28 (letter emailed by Alta CFO Matthew Laterza to Deutsche Bank identifying GE as "a subcontractor to WattStock"); App.456 (cancellation fee agreement, drafted and signed by Alta, acknowledging that "[i]mportant components of WattStock's work . . . will be subcontracted to GE").  All those are in addition to the 2017 GE-WattStock MOU and the July 2019 GE-Alta LNTP, which respectively formalized and confirmed GE's role as WattStock's subcontractor on Alta's TruePackage project.  App.247; Resp.App.5–14.

[5]  Alta's reliance (at 14) on *Stanton Holdings, Inc. v. First Data Corp.*, 2006 WL 1343631 (N.D. Tex. May 16, 2006), is misplaced.  There, the problem was that the plaintiff couldn't show it met the contractual definition of "end user" at any point while the contract was in effect.  *Id* at *8.  That the plaintiff had been an "end user" at some point *before* the contract was signed wasn't enough.  *Id*.

Second, the existence of a written agreement is equally irrelevant. As with the timing, nothing in the Master Agreement (or Texas law) requires the contractor or subcontractor relationship to be memorialized in writing.

And even if the timing mattered (it doesn't) or a written contract were required (it isn't), that wouldn't change anything. That's because, as Alta acknowledges (at 6, 15), at minimum GE and WattStock had a written contractual relationship by July 2019—seven months *before* Alta executed the First Amendment to the Master Agreement, which reaffirmed that the Master Agreement's consequential-damages waiver remained "in full force and effect." App.463 ("All provisions of the Original Agreement not explicitly amended or modified in this Amendment shall remain in full force and effect, and the Original Agreement, as modified by this Amendment, shall be binding upon . . . the parties").[6]

Alta's fallback argument (at 15–16) that the terms "contractor" and "subcontractor" are too broad and indeterminate to confer third-party beneficiary status fares no better. It's black-letter law that a party need not "be expressly identified by name in the agreement" to qualify as a third-party beneficiary. *ConocoPhillips*, 2012 WL 1059084, at *6. Indeed, they "may be identified in the agreement by class or category of persons." *Id.* Texas courts have held that the term "subcontractors" fits that bill. *See Temple EasTex, Inc. v. Old Orchard Creek Partners Ltd.*, 848 S.W.2d 724, 730 (Tex. App.—Dallas 1992, writ denied); *see also Pratt-Shaw v. Pilgrim's Pride Corp.*, 122 S.W.3d 825, 830 (Tex. App.—Dallas 2003, pet. denied) (applying *Temple EasTex* to a waiver covering "the Company" and its "clients").

---

[6] Alta's suggestion (at 7) that WattStock and GE "had no binding contractual relationship" is inconsistent with not only the undisputed record evidence, *see supra* note 4, but also the rest of its own MSJ. *See* Alta MSJ 6 & n.22 (conceding that GE began "to have . . . contractual obligations to WattStock . . . in July 2019"); Alta MSJ 15 (arguing that "GE still was not a 'subcontractor' . . . until December 2019").

None of Alta's cases (at 15–16) is to the contrary. Some involve contracts that didn't "refer[ ] to any third parties" whatsoever. *See*, *e.g.*, *AK FortySeven Recs., Ltd. v. Bahamas Ministry of Tourism*, 2018 WL 8755881, at *7 (S.D. Tex. Sept. 28, 2018). Others involved purported third-party beneficiaries that—unlike here—were "unidentifiable by membership in a specifically defined, discrete, limited group." *Maddox v. Vantage Energy, LLC*, 361 S.W.3d 752, 759 (Tex. App.—Fort Worth 2012, pet. denied); *see also Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011) (similar). Here, not only does the Master Agreement's waiver provision expressly refer to third parties, but GE fits into at least two of Section 9.1(B)'s specifically defined, discrete, limited groups: (1) "contractor" or "subcontractor," as the record conclusively establishes, *see supra* notes 4, 6, and accompanying text; and (2) "partner," under Alta's own theory of the case. *See* GE MSJ 27 (citing App.50, 58, 60).[7] So GE is a third-party beneficiary and can enforce the Master Agreement as a matter of law.

**2.** Alta's attempt (at 17–20) to exclude intentional torts from the scope of the Master Agreement's broad waiver language is equally unpersuasive. Its principal error is looking first to the canons of construction (at 17) before assessing the text to see whether its meaning is clear. And the text here is clear: the waiver covers "***any claim*** for ***any*** incidental, indirect or ***consequential damages*** arising out of or ***connected in any way***" to the Master Agreement. App.432 (emphases added); *see*, *e.g.*, *United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("Read

---

[7] Alta repeatedly has claimed that it intended to enter a relationship with both WattStock *and* GE for TruePackages. Resp.App.126–30 (Alta CFO Matthew Laterza) (agreeing that, because GE and WattStock "held themselves out as partners, at least Alta Power believed that GE would be responsible or obligated for any contracts between WattStock and Alta"); Resp.App.135 (Laterza, testifying as Alta's corporate representative) (agreeing that "it's Alta's contention that GE had all of the same rights and obligations as WattStock under [the December 2019] LNTP").

naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'") (quoting *Webster's Third New International Dictionary* 97 (1976)).

Alta's second error is relying (at 18) on a broad explanatory sentence to narrow the scope of the consequential-damages waiver.  Alta asks the Court to ignore Section 9.1(B)'s first sentence (which says the waiver covers "any claim" for consequential damages) and the first half of its second sentence (which is similarly broad), and instead to interpret the word "including" in the final clause of the second sentence as introducing an exclusive list.  That is, according to Alta, the list in blue below is exhaustive—and it effectively redefines the incredibly broad language in yellow ("any claim"; "any cause of action") to cover only claims for negligence, strict liability, breach of contract, and breach of warranty:

> B.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, AND TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER PARTY, THEIR RESPECTIVE OFFICERS, DIRECTORS, PARTNERS, EMPLOYEES, REPRESENTATIVES, CONTRACTORS OR SUBCONTRACTORS SHALL BE LIABLE TO THE OTHER OR SHALL MAKE ANY CLAIM FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR CONNECTED IN ANY WAY TO THIS AGREEMENT.  THIS MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES SHALL INCLUDE, BUT IS NOT LIMITED TO, LOSS OF USE, LOSS OF PROFIT, LOSS OF BUSINESS, LOSS OF INCOME, LOSS OF REPUTATION OR ANY OTHER CONSEQUENTIAL DAMAGES THAT EITHER PARTY MAY HAVE INCURRED FROM ANY CAUSE OF ACTION INCLUDING NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT AND BREACH OF STRICT OR IMPLIED WARRANTEE.

App.432 (highlighting added).

That argument is inconsistent with both "good English usage" and "textualist decision–making."  Garner & Scalia, *Reading Law* at 132–33.  As Scalia and Garner make clear, "the word *including* itself means that the list is merely exemplary and not exhaustive."  *Id*. ("the commonness of these belts-and-suspenders phrases"—like "*including but not limited to*"—"does not lessen the exemplariness of *include*").

16

Alta's argument is also inconsistent with both Fifth Circuit and Texas Supreme Court precedent. *Compare* Alta MSJ 17–18 (applying "*expressio unius*" to conclude that the "enumerated list" (above, in blue) "necessarily implies the exclusion of other types of claims"), *with St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 206 (5th Cir. 1996) ("we are not convinced that the rule of *expressio unius*" applies when "the challenged list . . . is prefaced by the word 'including' "), *Hometown 2006–1 1925 Valley View, L.L.C. v. Prime Income Asset Mgmt., L.L.C.*, 595 F. App'x 306, 311 (5th Cir. 2014) ("It is hornbook law that the use of the word *including* indicates that the specified list . . . is illustrative, not exclusive.") (alteration in original) (quoting *Tex. Prop. & Cas. Ins. Guar. Ass'n v. Sw. Aggregates, Inc.*, 982 S.W.2d 600, 608 (Tex. App.—Austin 1998, no pet.)), *and In re E.C.R.*, 402 S.W.3d 239, 246 n.6 (Tex. 2013) ("including" is broad, illustrative, and non-exhaustive) (citing sources).

**3.**     Finally, Alta's argument (at 21–22) that Counterclaim I is "merely duplicative" of Affirmative Defense 1 doesn't withstand scrutiny. Counterclaim I seeks a declaration that Master Agreement Section 9.1(B) bars Alta from seeking incidental, indirect, or consequential damages. App.1625–27. Affirmative Defense 1 is broader in two respects: (1) it covers all "contract documents"—not just the Master Agreement; and (2) it seeks to bar Alta from recovering not only incidental, indirect, and consequential damages, but also punitive and exemplary damages as well. ECF 80 (GE Am. Answer) at 13.

The Master Agreement's broad consequential-damages waiver means what it says: Alta can't recover its alleged lost profits from GE. Alta's motion should be denied, and summary judgment should be granted for GE.

**B.      Alta breached the Master Agreement's covenant not to sue for consequential damages.**

Section 9.1(B) expressly bars both parties from suing to recover consequential damages. *See* App.432 ("neither party . . . *shall make any claim* for any . . . consequential damages arising out of or connected in any way to this agreement") (emphasis added).  Alta breached that agreement by suing GE for lost profits.

So the only issues for the Court to resolve regarding GE's contract claim (Counterclaim III) are the same issues just addressed in Part I.A.1–2, namely:  (1) whether GE is a third-party beneficiary that can enforce the Master Agreement, and (2) whether "any claim" means "any claim," or whether Section 9.1(B) only covers the four claims enumerated in its final clause (in blue above)—those introduced by the word "including."  App.432.[8]

For the reasons laid out above, the Court should deny Alta's motion and grant summary judgment for GE on its contract claim.

**II.      The statute of frauds separately and independently bars Alta from recovering lost profits.**

Under the statute of frauds, Alta can't enforce an oral promise that statute requires to be written and signed.  But that is precisely what Alta seeks to do here—to use fraud and a variety of other tort and vicarious-liability theories to enforce oral promises that the statute of frauds makes unenforceable.  Alta's case turns on two alleged promises that it concedes (at 3–5) were never reduced to writing:  (1) that WattStock (and GE) "would supply up to nine units for no more than $10 million per turbine"; and (2) that GE "would stand behind and 'fully wrap'" WattStock's performance—"effectively guaranteeing" it.

---

[8]   Notably, Alta doesn't press the second argument with respect to GE's contract claim.  It relies (at 22) exclusively on the argument that "GE is not an intended third-party beneficiary."

Alta doesn't dispute that those promises are governed by the statute of frauds—the former because it involves the sale of goods for more than $500, *see* Tex. Bus. & Com. Code § 2.201(a), and the latter because it involves answering for the debt, default, or miscarriage of another.  Tex. Bus. & Com. Code § 26.01(b)(2).  Nor does Alta dispute that neither promise was reduced to a signed writing.  Instead, it argues (at 26) that the statute of frauds doesn't apply because Alta is no longer asserting a contract claim.

But that argument is squarely foreclosed by decades of Texas Supreme Court precedent, which makes clear that a plaintiff can't use a fraud claim (or any other theory) to enforce an oral promise that the statute of frauds renders unenforceable.  *See*, *e.g.*, *Sonnichsen*, 221 S.W.3d at 636 ("our holdings . . . focus the legal treatment of claims on the true nature of disputes rather than allow artful pleading to morph contract claims into fraud causes of action to gain favorable redress under the law") (citing *Haase*, 62 S.W.3d at 798–99, *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contrs.*, 960 S.W.2d 41, 48 (Tex. 1998), and *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494–95 (Tex. 1991)).

Because Alta's lost-profits request (under a smattering of different legal theories) is nothing more than a thinly veiled attempt to enforce two alleged oral promises that are unenforceable under the statute of frauds, it is barred as a matter of law and summary judgment should be granted for GE.

## III.    At minimum, Alta's recovery on its vicarious-liability theories is capped at $100,000 under the Master Agreement's plain language.

The plain language of Section 9.1(A) of the Master Agreement makes clear that Alta could've recovered no more than $100,000 from WattStock—a conclusion Alta doesn't dispute.

> **A.** TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH PARTY AGREES TO LIMIT THE OTHER PARTY'S LIABILITY FOR ==ANY AND ALL CLAIMS==, LOSSES, COSTS, DAMAGES ==OF ANY NATURE WHATSOEVER== OR CLAIMS EXPENSES ==FROM ANY CAUSE OR CAUSES==, INCLUDING ATTORNEYS' FEES AND COSTS AND EXPERT-WITNESS FEES AND COSTS, SO THAT THE TOTAL AGGREGATE LIABILITY OF A PARTY TO THE OTHER ==SHALL NOT EXCEED THE AMOUNT OF USD $100,000.== IT IS INTENDED THAT THIS LIMITATION SHALL APPLY TO ==ANY AND ALL LIABILITY OR CAUSE OF ACTION== ARISING UNDER THIS AGREEMENT ==HOWEVER ALLEGED OR ARISING==, UNLESS OTHERWISE PROHIBITED BY LAW.

App.432 (highlighting added).

Alta's argument (at 20–21) that Section 9.1(A) applies only to claims between it and WattStock fundamentally misapprehends GE's position. GE doesn't argue that Section 9.1(A) caps GE's direct liability. Instead, it argues that Section 9.1(A) caps how much Alta can recover by holding GE vicariously liable for WattStock's conduct.

No one disputes that Section 9.1(A) bars Alta from recovering more than $100,000 from WattStock directly. GE's argument is simply that Alta can't use vicarious liability to end-run that contractual limit. A party can't use secondary-liability theories to recover more than it could've recovered directly against the principal—and Alta identifies no cases to the contrary. *Harris*, 2018 WL 3233329, at *5 (no vicarious liability because no direct liability).

To the extent Alta is permitted to hold GE vicariously liable for WattStock's alleged conduct, Section 9.1(A) limits its recovery to the same $100,000 that Alta could've recovered from WattStock directly.

**IV.    Alta isn't entitled to summary judgment on GE's other affirmative defenses either.**

Alta spends six paragraphs at the end of its brief arguing (at 24–25) for summary judgment on GE's economic-loss and settlement affirmative defenses. Neither argument holds water. If anything, they confirm that the case is ripe for resolution and that summary judgment should be entered for GE.

### A.    The economic-loss rule bars Alta's negligent-misrepresentation claim.

The economic-loss rule "precludes recovery in tort when the loss complained of is the subject matter of a contract." *Ibe v. Jones*, 836 F.3d 516, 526 (5th Cir. 2016) (citing *DeLanney*, 809 S.W.2d at 494). That's because "it is not the nature of the damages sought, but the nature of the injury, here economic losses, that affects the applicability of the economic loss rule." *Acad. of Skills & Knowledge, Inc. v. Charter Schs., USA, Inc.*, 260 S.W.3d 529, 541 (Tex. App.—Tyler 2008, pet. denied); *see also Jim Walter Homes*, 711 S.W.2d at 618 ("When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone.").

So what matters for economic-loss purpose are (1) the source of the alleged duty and (2) the nature of the alleged injury. *Jim Walter Homes*, 711 S.W.2d at 618.

Here, although artfully pleaded in tort, the substance of Alta's negligent-misrepresentation claim sounds in contract. It turns on GE's alleged failure to deliver on two oral promises—that WattStock (and GE) would provide nine turbines for less than $10 million each and that GE would "stand behind" WattStock and perform its contractual obligations if WattStock didn't. *See* Alta MSJ 4–5. And Alta seeks to recover the alleged benefits it would've reaped under various contracts. Because Alta's "injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." *Jim Walter Homes*, 711 S.W.2d at 618; *see also New Century Fin., Inc. v. Olympic Credit Fund, Inc.*, 487 F. App'x 912, 915–16 (5th Cir. 2012) (negligent-misrepresentation claim barred because plaintiff didn't allege an injury distinct from that suffered under the contract and sought the same measure of damages).

Alta's only response (at 24–25)—that the economic-loss rule doesn't apply because "there is no contract between GE and Alta"—is wrong on the facts and wrong on the law. It ignores the GE-Alta NDA. *See supra* pp. 4, 11–12. And it runs headlong into a bevy of Texas precedent making clear that the economic-loss rule applies regardless of whether the parties are in privity of

contract. *See Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 419 (Tex. 2011); *see also Brandon v. Wells Fargo Bank, N.A.*, 2020 WL 2776714, at *14 n.4 (Tex. App.—Corpus Christi–Edinburg May 28, 2020, no pet.) ("The economic-loss rule, when applicable, not only bars claims against those in a direct contractual relationship but also precludes tort claims between parties who are not in contractual privity.") (citing cases); *A&H Props. P'ship v. GPM Eng'g*, 2015 WL 9435974, at *2 (Tex. App.—Austin Dec. 23, 2015, no pet.) (same); *Trebuchet Siege Corp. v. Pavecon Com. Concrete, Ltd.*, 2014 WL 4071804, at *6–7 (Tex. App.—Dallas Aug. 19, 2014, no pet.) (same).

Because Alta's negligent-misrepresentation claim seeks to recover losses covered by contracts, it's barred by the economic-loss rule as a matter of law. *See, e.g.*, *Sterling Chems., Inc. v. Texaco Inc.*, 259 S.W.3d 793, 797–800 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (affirming summary judgment for defendant on plaintiff's negligent-misrepresentation claim because the "lost profits and sales" plaintiff sought were "actually . . . the economic losses" covered by "its contract with [third party]"—a contract defendant allegedly induced plaintiff to enter).

### B. Alta can't hold GE vicariously liable for WattStock's alleged conduct after dismissing its direct claims against WattStock.

The Bankruptcy Court's order dismissing Alta's claims against WattStock with prejudice precludes Alta from holding GE vicariously liable for WattStock's alleged conduct. App.1596–97. It's black-letter law that vicarious liability is contingent on the wrongful conduct of another. *See, e.g.*, *Miller v. Target Corp.*, 854 F. App'x 567, 570 (5th Cir. 2021) (vicarious liability can't be pursued after underlying tort claim is dismissed). Because Alta dismissed its claims against WattStock with prejudice, Alta can't establish the facts necessary to hold GE vicariously liable for WattStock's alleged conduct.

22

At minimum, GE must be permitted to designate WattStock as a responsible third party, so the jury can accurately assign liability. Under Texas law, "a defendant who is sued in tort . . . may reduce his liability by a percentage of responsibility attributed to a responsible third party." *Mavuninu-Jean v. Reyes*, 2019 WL 5963886, at *1 (N.D. Tex. Nov. 13, 2019) (citing Tex. Civ. Prac. & Rem. Code § 33.002). "Section 33.004(a) of the Texas Civil Practice and Remedies Code allows a defendant to seek leave to designate a person as a responsible third party," *Rodriguez v. Branch*, 2022 WL 619537, at *1 (S.D. Tex. Feb. 23, 2022)—and that is precisely what GE intends to do. So Alta's settlement with (and dismissal of its claims against) WattStock is relevant to Alta's claims against GE and permits GE to ask the jury to apportion fault directly to WattStock.

## CONCLUSION

For these reasons, the Court should grant summary judgment for GE on all issues raised in Alta's motion for partial summary judgment.

Dated: May 15, 2025

Respectfully submitted,

 /s/ Andrew LeGrand
John T. Cox III (Texas Bar No. 24003722)
Andrew LeGrand (Texas Bar No. 24070132)
Bradley G. Hubbard (Texas Bar No. 24090174)
Cristina Squiers (Texas Bar No. 24093764)
Matthew Capoccia (Texas Bar No. 24121526)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2900
*tcox@gibsondunn.com*
*alegrand@gibsondunn.com*
*bhubbard@gibsondunn.com*
*csquiers@gibsondunn.com*
*mcapoccia@gibsondunn.com*

COUNSEL FOR GE VERNOVA INTERNATIONAL LLC

23

**CERTIFICATE OF SERVICE**

I certify that on May 15, 2025, a true and correct copy of the foregoing document has been

served on counsel of record pursuant to the Federal Rules of Civil Procedure.

/s/ *Andrew LeGrand*
Andrew LeGrand
