IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ALTA POWER LLC, | |
| *Plaintiff/ Counter-Defendant,* | |
| v. | Case No. 3:23-CV-0270-X |
| GENERAL ELECTRIC INTERNATIONAL INC., d/b/a GE POWER SERVICES, | |
| *Defendant/ Counter-Plaintiff.* | |

## ALTA POWER LLC'S RESPONS IN OPPOSITION TO GENERAL ELECTRIC INTERNATIONAL INC'S MOTION FOR SUMMARY JUDGMENT

JORDAN, LYNCH & CANCIENNE PLLC
Michael Cancienne
Texas Bar No. 24055256
Joseph W. ("Jeb") Golinkin II
Texas Bar No. 24087596
1980 Post Oak Blvd., Ste. 2300
Houston, Texas 77056
Telephone: 713.955.4028
mcancienne@jlcfirm.com
jgolinkin@jlcfirm.com

BAKER BOTTS L.L.P.
John B. Lawrence
Texas Bar No. 24055825
Ariel House
Texas Bar No. 24122827
2001 Ross Avenue, Suite 900
Dallas, Texas 75201
Telephone: 214.953.6500
john.lawrence@bakerbotts.com
ariel.house@bakerbotts.com

*Counsel for Plaintiff Alta Power, LLC*

# Table of Contents

SUMMARY OF ARGUMENT .................................................................................. 1

BACKGROUND ................................................................................................... 4

    I.       Alta's Business ......................................................................................... 4

    II.     The Conspiracy To Disrupt ProEnergy. ................................................. 5

    IV.   The Master Agreement ............................................................................ 9

    V.    Alta's Project Development. .................................................................. 11

    VI.   WattStock Collapses, GE Refuses To Act. ........................................... 12

    VII.  Alta's Lawsuit And Lost Profits Evidence. .......................................... 13

STANDARD OF REVIEW ................................................................................... 14

ARGUMENT ..................................................................................................... 14

    I.       Alta Did Not Waive Its Right To Recover Lost Profits. ....................... 14

    II.     Alta's Claims for Lost Profits Must Be Decided By A Jury ................. 18

        A.  Alta's business is not new, its venture is not untested, and peaker plants are not  risky. ............................................................................... 19

        B.  Alta's lost profits calculations are based on actual market data and reasonable assumptions that are supported by objective evidence in the record. ........................................................................................... 22

    III.   The Jury Must Decide Whether GE Was A Proximate Cause Of Alta's Injuries. 34

    IV.   The Statute of Frauds Does Not Bar Alta's Tort Claims. ..................... 35

    V.    A Mountain Of Documentary And Testimonial Evidence Supports Alta's Allegations Related To GE's Tortious Acts. ........................................ 37

        A.   A reasonable factfinder could conclude GE and/or WattStock knowingly made material misrepresentations to Alta. ...................... 37

    B.    Alta Justifiably Relied On GE's Misrepresentations. .......................... 43

    VI.   Alta Can Show GE Is Vicariously Liable For WattStock's Tortious Acts. ...... 44

        A.  GE and WattStock were a joint enterprise .......................................... 44

        B.  A reasonable fact finder could find WattStock was GE's ostensible agent. 47

    VI.   Alta's Derivative Liability Claims Also Survive. ................................. 49

    VII.  Alta Can Recover Punitive Damages. ................................................... 50

CONCLUSION .................................................................................................. 50

## TABLE OF AUTHORITIES

### Cases

*First v. AGCO Corp.*, No. 7:21-CV-0006-O, 2022 WL 22890627 (N.D. Tex. Mar. 10, 2022) ........................................................................................................... 34

*Mo. Pac. R.R. Co. v. Harbison-Fischer Mfg. Co.*, 26 F.3d 531 (5th Cir. 1994) ........................ 15

*Am. Akaushi Ass'n, Inc. v. Twinwood Cattle Co., Inc.*,
No., 14-21-00701-CV, 2025 WL 450750, at *33 .............................................................. 34

*Am. Heritage, Inc. v. Nevada Gold & Casino, Inc.*,
259 S.W.3d 816 (Tex. App. 2008) ................................................................. 19, 20

*Am. Midstream (Alabama Intrastate), LLC v. Rainbow Energy Mktg. Corp.*,
667 S.W.3d 837 (Tex. App. 2023) ................................................................. 19, 34

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................. 14

*Armstrong v. Curves Int'l, Inc.*,
No. 6:15-CV-294-RP, 2017 WL 894437, at *21 (W.D. Tex. Mar. 6, 2017) .................... 34

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*,
590 S.W.3d 471 (Tex. 2019) ...................................................................... 44

*Blase Indus. Corp. v. Anorad Corp.*,
442 F.3d 235 (5th Cir. 2006) ...................................................................... 19

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings LLC*,
572 S.W.3d 213 (Tex. 2019) ...................................................................... 16

*Cash Am. Pawn, LP v. Alonzo*,
No., 01-19-00801-CV, 2021 Tex. App. LEXIS 7583 (Tex. App.—Houston [1st Dist.] Sep. 14, 2021, no pet.) ........................................................................ 18

*Chevez v. Brinkerhoff*,
No., 05-13-00572-CV, 2014 WL 7246798 (Tex. App.—Dallas Dec. 22, 2014, no pet.) ........................................................................................................ 45

*Cory v. Stewart*,
103 F.4th 1067 (5th Cir. 2024) (per curiam) .................................................. 14

*Document Imaging, Inc. v. IPRO, Inc.*,
952 F. Supp. 462 (S.D. Tex. 1996) .............................................................. 22

*DSC Commc'ns Corp. v. Next Level Commc'ns*,
107 F.3d 322 (5th Cir. 1997) ...................................................................... 34

*Duke Energy Int'l, L.L.C. v. Napoli*,
748 F. Supp. 2d 656 (S.D. Tex. 2010) .......................................................... 46

*Eagle Rock Timber, Inc. v. Rock Hard Rental, LLC,*
    672 S.W.3d 438 (Tex. App.—San Antonio 2023) ........................................... 34

*Engle v. Dinehart,*
    213 F.3d 639 (5th Cir. 2000) ...................................................................... 47

*ERI Consulting Eng'rs, Inc. v. Swinnea,*
    318 S.W.3d 867 (Tex. 2010) ................................................................ 18, 32

*Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,*
    51 S.W.3d 573 (Tex. 2001) .................................................................. 15, 43

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,*
    960 S.W.2d 41 (Tex. 1998) .................................................................. 35, 37

*Grant Thornton LLP v. Prospect High Income Fund,*
    314 S.W.3d 913 (Tex. 2010) ....................................................................... 44

*Harrison v. Aztec Well Servicing Co.,*
    No. 1:20-CV-038-H, 2021 WL 6073164 (N.D. Tex. Dec. 23, 2021) ................. 45, 46, 47

*Holt Atherton Indus., Inc. v. Heine,*
    835 S.W.2d 80 (Tex. 1992) .................................................................. 18, 32

*Horizon Health Corp. v. Acadia Healthcare Co.,*
    520 S.W.3d 848 (Tex. 2017) ................................................................ 18, 20

*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
    623 F. Supp. 2d 798 (S.D. Tex. 2009) ........................................................... 35

*Lake v. Cravens,*
    488 S.W.3d 867 (Tex. App.—Fort Worth 2016, no pet.) ................................... 33

*Lewis v. Bank of Am. NA,*
    343 F.3d 540 (5th Cir. 2003) ....................................................................... 43

*Nat'l Screen Serv. Corp. v. Poster Exch., Inc.,*
    305 F.2d 647 (5th Cir. 1962) ....................................................................... 14

*Pace Corp. v. Jackson,*
    155 Tex. 179 (1955) .................................................................................. 21

*Prudential Ins. of Am. v. Jefferson Assocs., Ltd.,*
    896 S.W.2d 156 (Tex. 1995) ....................................................................... 16

*Resolution Trust Corp. v. Kemp,*
    951 F.2d 657 (5th Cir. 1992) ....................................................................... 15

*Seitz v. Envirotech Sys. Worldwide Inc,*
    2008 WL 656513, at *7 (S.D. Tex. Mar. 6, 2008) ........................... 34, 36, 39, 49

*Space Maker Designs, Inc. v. Weldon F. Stump & Co.,*
    2003 WL 21414726, at *1 (N.D. Tex. June 16, 2003) ..................................... 34

*Sparger v. Worley Hosp., Inc.*,
    547 S.W.2d 582 (Tex. 1977) ............................................................................ 46

*St. Joseph Hosp. v. Wolff*,
    94 S.W.3d 513 (Tex. 2002) ............................................................................. 45

*Sw. Battery Corp. v. Owen*,
    131 Tex. 423 (1938) ....................................................................................... 20

*Sw. Battery*,
    115 S.W.2d at 1099 ....................................................................................... 31

*Tex. Dep't of Transp. v. Able*,
    35 S.W.3d 608 (Tex. 2000) ............................................................................. 46

*Tex. Instruments v. Teletron Energy Mgmt.*,
    877 S.W.2d 276 (Tex. 1994) ....................................................... 18, 19, 20, 21

*Tompkins v. Cyr*,
    202 F.3d 770 (5th Cir. 2000) ......................................................................... 35

*Travis v. City of Mesquite*,
    830 S.W.2d 94 (Tex. 1992) ............................................................................. 35

*Tubacex, Inc. v. M/V Risan*,
    45 F.3d 951 (5th Cir. 1995) ........................................................................... 15

*United Healthcare Servs., Inc. v. Rossel*,
    No. 3:21-CV-1547-L-BT, 2024 WL 4451761 (N.D. Tex. July 23, 2024) ................. 35, 44

*United Healthcare Servs., Inc. v. Synergen Health LLC*,
    No. 3:20-CV-0301-X, 2023 WL 4186370 (N.D. Tex. June 26, 2023) ................. 35, 38, 44

*Wise Elec. Coop., Inc. v. Am. Hat Co.*,
    476 S.W.3d 671 (Tex. App.—Fort Worth 2015, no pet.) ................................................ 34

*Young v. Johnson*,
    No. SA: 19-CV-00270, 2020 WL 4194015 (W.D. Tex. July 21, 2020) ........................... 15

Alta Power LLC ("Alta") files this Response in Opposition to General Electric International Inc's ("GE") Motion for Summary Judgment (ECF 54).

## SUMMARY OF ARGUMENT

This case is necessitated by repeated misrepresentations made by GE and WattStock to Alta concerning their relationship, capabilities, and features of GE TRUEPackage refurbished aeroderivative turbines.

Alta was created to develop natural gas-fired power generation plants that would provide more power capacity to the Texas energy grid when the grid is experiencing periods of high demand. As part of this, Alta intended to buy and place into service used aeroderivative gas turbines that can quickly turn on and off to meet instances where power demand exceeds available power supply. During these periods of excess demand, power prices are highest.

To finance and build its project, Alta needed to obtain refurbished GE LM6000 aeroderivative turbines backed by a reputable warranty. GE's competitor, ProEnergy, offered to sell Alta up to nine such turbines for a price that fit Alta's budgetary requirements. Alta filed this lawsuit because GE fraudulently persuaded Alta to reject ProEnergy's offer and instead exclusively agree to use GE TRUEPackages, which GE marketed as its own bankable, GE warranted refurbished LM6000 package. In reality, TRUEPackage was not bankable and GE knew it. As a result, Alta could not complete its peaker plants and was forced to watch as its competitors made hundreds of millions executing Alta's business plan.

Despite this, GE now argues that Alta cannot recover lost profits caused by GE's tortious acts based on three agreements to which it is not a party, and because it claims Alta's lost profits are "too speculative" since (thanks to GE) Alta never completed construction of its peaker plants. GE also argues Alta has no evidence it committed any tortious conduct and that Alta cannot demonstrate that GE is vicariously liable for WattStock's conduct. In each instance, GE's arguments must be rejected.

*Alta waived nothing.* Without citing a single case or providing any discussion of evidence that supports its contentions, GE argues that the Master Agreement, the LNTP, and/or a Confidentiality Agreement involving a different GE entity somehow bar Alta's lost profits claim. Each of these assertions is facially incorrect. GE is not a party to or referenced in *any* of these documents. The Master Agreement and LNTP are between Alta and WattStock, *not* GE. GE tries to save itself by observing that it eventually became a "subcontractor" to GE on the Alta project. But GE admits it was *not* a subcontractor when Alta signed the Master Agreement *or* when GE committed the tortious acts that give rise to Alta's claims. GE's reliance on the LNTP fails for the same reasons, but also another: the waiver in the LNTP only applies to damages to physical property and personal injuries, neither of which is in issue here. Finally, the Confidentiality Agreement is irrelevant because (1) it was signed by GE Packaged Power LP, which is not a party here; and (2) it only applies to claims related to a product Alta never tried to buy from GE in the first place.

*Lost Profits.* GE's lost profits arguments are equally misguided. GE argues that Alta cannot prove its lost profits with reasonable certainty because Alta never closed financing and because Alta's claims are "speculative." Each of GE's arguments highlight the numerous genuine issues of material fact that make summary judgment improper. Between 2017 and 2020, ten different major lenders conducted meaningful diligence of Alta's projects and sent Alta term sheets outlining the terms of potential project financing for Alta's projects. In the same window, Alta's substantively identical competitors received hundreds of millions of dollars in capital to build their own peaker plants using the ProEnergy packages GE caused Alta to reject. Each of these facts is more than sufficient to create a fact question about whether Alta's projects would have been financed.

Alta's lost profits model also debunks GE's assertion that Alta's lost profits claim is "speculative." Alta's damages expert used objective, real-world evidence of what Alta's

actual costs and revenues would have been absent GE's misconduct, including the real-world price of the energy Alta would have been selling and the real-world price of the gas Alta would have used to produce it. GE tries to distract from this by questioning Alta's projected timelines, financial hedging strategies, and plant performance during Winter Storm Uri. GE's complaints about Alta's expert's assumptions—which are all grounded in substantial documentary evidence—go to the quantity of Alta's lost profits, *not* their existence. Indeed, Alta would have made $38 million per peaker plant during Uri *even if* the jury agrees with GE's contentions about the timing of Alta's HRCOs. Accordingly, Alta's lost profits claim must stand.

*Statute of Frauds.* GE next argues that Alta's fraud, fraudulent inducement, and tortious interference claims are barred by the Statute of Frauds. But GE does not even acknowledge (much less address) Alta's core allegation, which is that GE lied about its relationship with WattStock to create the false impression that TRUEPackage was a bankable product. GE's silence no accident: acknowledging the substance of Alta's allegations would quickly destroy GE's attempt to argue Alta was trying to "enforce a promise." Alta's allegations all support a single overriding claim: through a series of fraudulent acts and misrepresentations, GE caused Alta to execute a contract it never would have signed if GE had been honest about its relationship with WattStock, the features of TRUEPackage, or the price and availability of TRUEPackages. No court has *ever* concluded that such an allegation is subject to, much less barred by, a Statute of Frauds defense.

*Actionable Conduct.* GE also attempts to argue that Alta's claims are barred by the statute of frauds or that, alternately, Alta has no evidence of actionable conduct. But each of these arguments depends on a fiction, which is that Alta is somehow trying to enforce GE and/or WattStock's promises. Alta's Complaint explicitly refutes this assertion. Indeed, the whole point of Alta's claims against GE is that Alta would not and could not have ever signed the Master Agreement if GE had been honest about its relationship with

WattStock, the warranty that attached to TRUEPackage, the bankability of TRUEPackage, and/or the pricing or availability of units. Instead, Alta would have accepted ProEnergy's offer. Alta has reams of evidence to support each of these allegations, all of which are independently actionable. This same evidence also supports each element of Alta's vicarious liability theories against GE.

**BACKGROUND**

### I.    Alta's Business.

For decades, Texas' energy grid ("ERCOT") has relied on so called "peaker power plants"—which can start in less than 10 minutes—to supplement the ERCOT power supply during times of peak demand. During these periods, the price of power spikes and peakers are able to sell their power at a premium. Historically, there were not enough of these peaking events to make developing peaker power plants an attractive or financeable business. Beginning around 2015, though, this began to change.

Texas' rapid economic growth and corresponding surge in electricity demand, coupled with the Texas' increased reliance on renewable energy, the retirement of aging coal-fired plants, and delays in constructing baseload generation have combined to vastly increase the number of "peaking" events a year. These developments changed the economics of peaker plant development. With more peaking events came more opportunities for substantial profits. The volatility also increased demand for financial products that would allow large power consumers to hedge their exposure to ERCOT market volatility by purchasing options to buy power from peaker plants at a set price.

This latter development made peaker plant development both easier and more financially attractive. Previously, lenders were hesitant to extend project finance to peaker plant developers because, although such plants can earn substantial profits, they lacked the sort of consistent, predictable cashflow necessary to obtain project finance for large projects. The increased demand for Heat Rate Call Options ("HRCOs") solved this

4

problem: developers could now sell off a portion of their upside to generate the cashflow necessary to service their debt (thus making the projects financeable).

Enter Alta. In 2017, Alta aimed to profit from what it predicted would be a decade of increased volatility in EROCOT by building three peaker power plants in ERCOT's North Texas zone using GE's LM6000s, a natural gas powered aeroderivative turbine frequently used to power peakers. Newly manufactured LM6000s are extremely expensive, however, and their cost makes peaker development economically unattractive.[12]

## II.    The Conspiracy To Disrupt ProEnergy.

In 2016, ProEnergy found a solution to this problem: ProEnergy would buy a large numbers of used, out of service GE LM6000s, refurbish them to "like new," and sell them to peaker plant developers like Alta. In each instance, ProEnergy's customers were able to finance their purchase of ProEnergy's refurbished LM6000 and use those ProEnergy packages to build their peaker plants.[3] ProEnergy's success selling refurbished LM6000s also had a profitable side effect for ProEnergy: since ProEnergy was selling the LM6000 packages, it often also won the lucrative contracts to service those units.[4]

ProEnergy's success came at the expense of GE, the original equipment manufacturer of the LM6000.[5] Until ProEnergy's rise, GE had a virtual monopoly on the market for servicing LM6000s. ProEnergy's emergence threatened that market dominance and the profits that came with it, so GE launched its own certified, refurbished, (supposedly) GE warranted product to compete with ProEnergy in early 2018: TRUEPackage.[6]

---

[1] Ex. 115 at App. 1450.
[2] Ex. 107 at App. 1273.
[3] Ex. 192 at App. 5.
[4] Ex. 107 at App. 1271.
[5] Ex. 23 at App. 127;  Ex. 25 at App. 136; Ex. 40 at App. 231; Ex. 42 at App. 242; Ex. 44 at App. 259.
[6] *Id.*

The GE executive who created and ran the TRUEPackage product, Lance Herrington, testified that GE's primary reason for launching TRUEPackage was not to make money, but to cut off ProEnergy's oxygen by denying it customers and driving up the cost of the gray market units ProEnergy used to create its refurbished LM6000 packages.[7]

To achieve its goal of winning ProEnergy's prospective customers, GE understood that it was imperative that it create the impression that TRUEPackage was a "bankable" product.[8] That is, GE needed to convince its potential customers (like Alta) that choosing TRUEPackage over ProEnergy would not prevent them from obtaining the project financing they needed to build their peaker plants.[9] On its face, this should not have been an issue. GE is one of America's oldest and respected corporations and is the original manufacturer of the LM6000.[10] But there was one complication: GE did not own the used LM6000 units it would use to create the TRUEPackage and it had no interest in paying to create a stockpile of used units to refurbish and sell.[11] As a result, GE entered into what it repeatedly and consistently referred to as a "partnership" (both publicly and privately) with an unknown company called WattStock, which was run by a cabal of former GE employees.[12]

But WattStock's involvement complicated GE's ability to keep customers out of ProEnergy's hands because unlike GE, WattStock was not a credit worthy counterparty and had little relevant experience refurbishing LM6000s.[13] This should have been no issue because, as GE knew, GE's brand, history, and balance sheet were such that potential lenders would not hesitate to lend to projects that sourced their essential equipment so

---

[7] Ex. 107 at App. 1296-98; *see also* Ex. 25 at App. 136; Ex. 40 at App. 231.
[8] Ex. 106 at App. 1180-81; Ex. 15 at App. 87; Ex. 21 at App. 110.
[9] Ex. 106 at App. 1180.
[10] Ex. 103 at App. 1210.
[11] Ex. 62 at App. 468.
[12] Ex. 103 at App. 1215; Ex. 86 at App. 987; Ex. 58 at App. 346; Ex. 23 at App. 346.
[13] Ex. 106 at App. 1209-1214; Ex. 8 at App. 66; Ex. 9 at App. 68; Ex. 10 at App. 70.

long as GE was ultimately guaranteeing the delivery of that product.[14] To that end, the natural solution was for GE to enter into a contract with WattStock that outlined each company's respective rights and obligations related to the sale of GE TRUEPackages, with GE agreeing to oversee and ultimately guarantee the delivery of the product to the end customer in the event of a WattStock default.

But GE did not do this. Instead, it worked to persuade its potential customers that GE had a binding contract with WattStock under which GE stood behind all aspects of the TRUEPackage even though none of these things were true.[15] The foundational lie of GE's campaign of deception — and an important misrepresentation in this case — was GE's consistent and repeated representation that it was a party to a binding contract with WattStock under which GE ultimately stood behind and guaranteed the delivery of all GE TRUEPackages.[16] GE very carefully told potential customers curious about its relationship with WattStock that GE and WattStock had executed a "Memorandum of Understanding" with WattStock related to the sale of GE TRUEpackages, and told the same potential customers (including Alta) that the MOU was a binding contract.[17] This was a lie: the MOU explicitly states that it creates no binding obligations on either GE or WattStock related to TRUEPackage.[18]

GE also went out of its way to downplay WattStock's role in TRUEPackage to the marketplace. GE trademarked TRUEPackage and marketed TRUEPackage as a GE product, *not* a WattStock product.[19] GE also tightly "controlled the [TRUEPackage] brand,"[20] requiring WattStock to obtain its permission and approval before sharing marketing materials with third parties.[21]

---

[14] Ex. 106 at App. 1187, 1189, 1204; Ex. 107 at App. 1308.
[15] Ex. 70 at 644; Ex. 40 at App. 231; Ex. 46 at App. 266; Ex. 47 at App. 268.
[16] Ex. 115 at App. 1486-87, 1488, 1491-92.
[17] Ex. 103 at App. 1212:18-1213:9; Ex. 106 at App. 1183; Ex. 62 at App. 474; Ex. 71 at App. 644.
[18] Ex. 1 at App. 10-11.
[19] Ex. 103 at App. 1187-1191, 1233; Ex. 107 at App. 1308; Ex. 110 at App. 1368.
[20] Ex. 143; Ex. 107 at App. 1314.
[21] Ex. 110 at App. 1408; Ex. 220.

When GE did acknowledge WattStock's involvement in TRUEPackage, GE habitually described their relationship as a "partnership," thereby bolstering the impression that a binding contract governed GE and WattStock's respective rights and obligations with respect to the sale of TRUEPackages.[22] GE emphasized its cozy relationship with WattStock by emphasizing the fact that WattStock is "co-located" inside of GE's Houston facility.[23] GE also aggressively touted the financing benefits of using TRUEPackage, further creating the impression that GE *obviously* must be standing behind everything since WattStock was not experienced or credit worthy.[24]

GE acknowledges this, but insists it was simply using the "colloquial" meaning of the term "partnership."[25] That assertion defies logic and is contradicted by GE's own internal documents. For example, in a sales document, the GE salesperson in charge of pitching Alta specifically noted that GE's "strategy" for winning business from ProEnergy included "emphasiz[ing] GE's partnership with WattStock."[26] Indeed, WattStock's CEO conceded that without the GE meatball, WattStock would have had no hope of competing with ProEnergy.[27] GE was also acutely aware that WattStock was not a bankable counterparty, a fact underscored by GE's own internal correspondence showing that multiple GE executives wanted to stop doing business with WattStock altogether because WattStock did not have enough cash to support its ongoing operations.[28] GE, of course, hid this from the market and from Alta.

## III.    The Competition for Alta's Business.

In 2018, Alta began considering how to power its peaker plants. Though Alta briefly entertained purchasing "GE CF6-80C2 engines converted to operate in a GE power

---

[22] Ex. 207; Ex. 40 at App. 231; Ex. 41 at 174; Ex. 57 at App. 341-42; Ex. 86 at App. 987; Ex. 106 at App. 318-19.
[23] *See e.g.* Ex. 5 at App. 47; Ex. 6 at App. 56-58; Ex. 106 at App. 1187; Ex. 110 at App 1358.
[24] Ex. 106 at App. 1187-90, 1204.
[25] Ex. 106 at App. 1187-90, 1204, 1255-56.
[26] Ex. 44 at App. 259.
[27] Ex. 104 at App. 1156; Ex. 110 at 1368, 1389-90, 1408; Ex. 106 at App. 1407.
[28] Ex. 8 at App. 66; Ex. 9 at App. 68; Ex. 10 at App. 70; Ex. 11 at App. 76 ; Ex. 12 at App. 78.

generation package equipment" from GE, Alta rejected that idea and instead decided to use refurbished GE LM6000 aeroderivative turbines to power its peaker plants.[29] For Alta's purposes (or really any peaker developer's purposes), Alta did not simply need to buy refurbished LM6000s. Instead, Alta needed to purchase *bankable* refurbished LM6000s backed by a warranty issued by a reputable equipment manufacturer that satisfied its budgetary requirements.[30] From Alta's perspective, this left it with only two options: ProEnergy and GE TRUEPackage.

Alta met with both ProEnergy and GE/WattStock and shared its detailed budgetary requirements with both companies.[31] ProEnergy promptly offered to provide Alta not only the equipment it needed, but also EPC services for prices that were squarely within Alta's budget.[32] Alta shopped this offer to GE, which responded by aggressively encouraging Alta to reject ProEnegy's offer and instead commit to using GE TRUEPackages.[33]  Over the course of nearly a year, GE repeatedly touted the financing benefits of choosing TRUEPackage and told Alta that WattStock was GE's exclusive "partner" in the TRUEPackage program.[34] GE's also reiterated that there was a binding contract governing GE and WattStock's rights and responsibilities related to the GE TRUEPackage, and that as part of GE and WattStock's partnership, GE would stand behind WattStock's work on TRUEPackages.[35]

## IV.    The Master Agreement.

At the beginning of 2019, GE and WattStock collaborated to push Alta to enter into an exclusive contract with WattStock that would effectively make it impossible for Alta to obtain refurbished LM6000 aeroderivative turbines from ProEnergy or anyone else.

---

[29] Ex. 115 at App. 1470-71; Ex. 59 at App. 451.
[30] Ex. 63 at App. 477.
[31] Ex. 115 at App. 1474-75.; *see also* Ex. 17 at App. 95.
[32] Ex. 115 at App. 1478.
[33] Ex. 115 at App. 1484-85.
[34] Ex. 115 at App. 1484-85, 1487, 1489-92, 1509, 1512,
[35] Ex. 115 at App. 1486-88.

WattStock presented Alta with a proposal, the Master Agreement, which GE told Alta that Alta would have to sign to obtain GE TRUEPackages.[36] Under the Master Agreement, WattStock would secure refurbished units on Alta's behalf using Alta's money, and then GE and WattStock would turn those used LM6000s into warranted, fully refurbished GE TRUEPackages for a price that would be the subject of a different contract to be negotiated later. Most important from GE and WattStock's perspective, though, was persuading Alta to execute the Master Agreement since both GE and WattStock understood that the contract would make it impossible for Alta to obtain the refurbished LM6000s from ProEnergy or any other company other than GE and WattStock.[37] GE then used its proprietary database of LM6000s to identify every available refurbished LM6000 that satisfied Alta's requirements and provided that information to WattStock, which put all of the units on WattStock's "exclusivity list" that would set forth the units Alta would be obligated to acquire from WattStock or no one.[38] Together, GE and WattStock included 41 units on the "exclusivity list" that would eventually be incorporated into the Master Agreement.[39]

Having done the research necessary to ensure that the Master Agreement would comprehensively guarantee Alta could never do business with ProEnergy, GE took two of Alta's executives to lunch to close the deal.[40] During that lunch meeting, GE again emphasized that GE and WattStock were contractually bound to one another in a "partnership" under which GE was obligated to stand behind Alta everything WattStock does related to the TRUEPackage, and GE emphasized that it could and would meet Alta's budgetary requirements.[41] Persuaded, Alta agreed to choose TRUEPackage over ProEnergy. Two days after the lunch—on February 27, 2019—Alta executed the Master

[36] Ex. 115 at App. 1489-90; Ex. 86 at App. 987 (WS "has to be involved")
[37] Ex. 124 at App. 1671; Ex. 125 at App. 1673.
[38] Ex. 124 at App. 1671; Ex. 125 at App. 1673.
[39] Ex. 18 at App. 98.
[40] Ex. 27 at App. 144; Ex. 106 at App. 1245; Ex. 115 at App. 1500.
[41] Ex. 115 at App. 1500.

Agreement with WattStock. In so doing, both GE and WattStock understood that Alta had made itself dependent on GE for delivery of a bankable product that satisfied Alta's technical and budgetary requirements.[42]

## V.    Alta's Project Development.

Constructing a peaker power plant requires more than obtaining LM600s. To close financing and start construction, Alta also needed to secure numerous other contracts. Alta did exactly that. Alta successfully negotiated and obtained options to buy the land on which Alta intended to build its power plants; secured an EPC contractor to build Alta's power plants; negotiated an operations and maintenance agreement with contractor to run Alta's power plants for a fixed fee; entered into a "Base Contract for Sale and Purchase of Natural Gas" with United Energy Trading LLC; negotiated a firm gas supply transportation agreement to ensure the delivery of Alta's natural gas; secured firm natural gas transportation to all of its power plants; negotiated a gas supply agreement; and negotiated interconnection agreements with guaranteed "connected to the grid by" dates (2x in 2020, 1x in 2021); and obtained indicative HRCO terms to allow Alta to choose when it wanted to begin its hedges.[43] Alta also obtained all of the necessary permits (environmental and otherwise) necessary to construct Alta's power plants, conducted all of the necessary environmental and other studies required to move forward with construction, and undertook every other step necessary to construct a natural gas fired peaker.[44]

At the same time, Alta paid WattStock (and, indirectly, GE) $3,072,006 to inspect and secure for Alta the right to buy multiple units GE and WattStock told Alta met their budgetary requirements.[45] On most of these units, GE neglected to disclose the fact that it had the right to collect substantial termination fees from the seller in the event that the

---

[42] Ex 2 at App. 17.
[43] Ex. 127 at App. 1683-84; Ex. 115 at App. 1463-64.
[44] Id.
[45] Id. at Table 10.

owners chose to sell the units to Alta.[46] GE knew that this would cause the cost of the units Alta was targeting to materially increase well beyond Alta's budget.[47] Despite this, GE worked behind the scenes to ensure that the owners of these units understood that they would be on the hook for these termination fees if they sold the units, thereby directly causing the price of Alta's targeted units to go up.[48] This also had another equally pernicious effect: as GE knew, Alta needed a fixed price for the units it was going to buy to close its financing, yet GE and WattStock repeatedly failed to provide Alta fixed price proposals for the true costs of the units.[49] As a result, Alta had zero chance of closing on the financing it needed to build its peakers.[50]

## VI.    WattStock Collapses, GE Refuses To Act.

In Spring 2020, WattStock told Alta what GE had known all along: WattStock was insolvent.[51] Knowing how important moving forward with its peaker projects was to Alta, WattStock asked Alta to either provide a loan or acquire WattStock. In response, Alta proposed paying GE directly in July 2020 to deliver the turbines. On August 5, 2020, GE rejected this offer, claiming direct dealings with Alta would constitute a breach of GE's contract *with WattStock*.[52] Shortly thereafter, GE claimed it was represented by legal counsel and instructed Alta's attorneys not to contact GE's sales and operations teams directly.[53] Internally, however, GE recognized its liability problem. In an internal email dated August 10, 2020, GE likened GE's predicament with WattStock to "when your buddy borrows your car and has a wreck—he gets the ticket, but you are responsible for the damage."[54]

---

[46] Ex. 111 at App. 1417;
[47] Ex. 29 at app. 148; Ex. 19 at App. 101; Ex. 31 at App. 155.
[48] Ex. 31 at App. 156, 159; Ex. 29 at App. 148; Ex. 19 at App. 101.
[49] Ex. 111 at App. 1420-23; Ex. 31 at App. 169
[50] Ex. 37 at App. 205; Ex. 31 at App. 169; Ex. 111 at App. 1430.
[51] Ex. 8 at App. 66; Ex. 9 at App. 68; Ex. 10 at App. 70; Ex. 11 at App. 76 ; Ex. 12 at App. 78.
[52] *Id.*
[53] Ex. 104.
[54] Ex. 14 at App. 85.

## VII.    Alta's Lawsuit And Lost Profits Evidence.

In this lawsuit, Alta alleges GE caused it to lose millions in profits by, among other things, (1) misrepresenting the nature of its relationship with WattStock; (2) falsely represented that it could and/or would make up to nine GE TRUEPackages available for Alta Power to buy for at or below $10 million per GE TRUEPackage; (3) misrepresenting the true pricing and availability of TRUEPackage units; (4) falsely holding itself out as the lowest cost, most financeable solution in the marketplace; (5) falsely representing that GE would "stand behind" and/or "fully wrap" WattStock's work related to the delivery of the GE TRUEPackages.[55] Based on these allegations, Alta sued GE for (1) Vicarious Liability; (2) Unjust Enrichment; (3) Fraud; (4) Fraudulent Inducement; (5) Negligent Misrepresentation; (6) Civil Conspiracy; and (7) Tortious Interference With Prospective Business Relations.[56]

Based on the above, Alta seeks to recover the lost profits it would have made but for GE's tortious acts. To that end, Alta retained Quentin Mimms—who has provided lost profits testimony in more than 250 cases and is one of the most respected and experienced damages experts in the country—to evaluate opine on what Alta's lost profits would have been but for GE's tortious acts. Mimms used objective evidence of Alta's costs (in the form of execution version ready contracts and actual proposals from real lenders) and real-world gas and power prices to calculate what Alta's lost profits would have been if Alta had accepted ProEnergy's contract proposal.[57] Mimms documented his extensive work in a report that spans more than 4,000 pages including exhibits.[58]

---

[55] ECF 54 at ¶¶ 3, 27, 37, 45, 72
[56] *Id.* at ¶¶ 78-120.
[57] Ex. 54.
[58] GE App. 1705-5917.

## STANDARD OF REVIEW

Summary judgment is appropriate only if the evidence, viewed in the light most favorable to the nonmoving party (here, Alta), shows "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Defendants, as the moving parties, bear the "heavy" burden of showing the absence of a genuine issue of any material fact. *Nat'l Screen Serv. Corp. v. Poster Exch., Inc.*, 305 F.2d 647, 651 (5th Cir. 1962); *see Cory v. Stewart*, 103 F.4th 1067, 1079 (5th Cir. 2024) (per curiam). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In addition, the court "'resolve[s] factual controversies in favor of the nonmoving party.'" *Cory*, 103 F.4th at 1077-79. "As long as the nonmovant's evidence 'reasonably lead[s]' to the 'not implausible' conclusion that all the necessary legal elements are (or are not) met, summary judgement is improper." *Id.* at 1079. Accordingly, summary judgment should be granted "cautiously." *Nat'l Screen Serv.*, 305 F.2d at 651.

## ARGUMENT

GE's request for summary judgment must be denied because Alta (1) waived nothing; (2) can prove its lost profits using objective evidence with reasonable certainty; (3) can show GE made numerous material misrepresentations; (4) can prove it justifiably relied on those misrepresentations; and (5) can prove those misrepresentations were a proximate cause of Alta's injuries. Alta can also prove GE is vicariously liable for WattStock's tortious acts. For all of these reasons, the Court should deny GE's Motion for Summary Judgment in full.

### I.    Alta Did Not Waive Its Right To Recover Lost Profits.

Without citing a single case, GE begins its Motion by arguing that (1) the Master Agreement with WattStock; (2) the LNTP with WattStock; and (3) a confidentiality Agreement between "GE Packaged Power LP," which is *not* a party here, and Alta. In

14

each instance, GE is moving for summary judgment on an affirmative defense on which it owns the burden of proof. The Court "must" reject each of these arguments "regardless of [Alta's Response]" because GE cites no evidence that supports its arguments for any of these agreements. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995); *Young v. Johnson*, No. SA: 19-CV-00270, 2020 WL 4194015, at *3 (W.D. Tex. July 21, 2020) (denying motion because movant failed to cite "relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a genuine factual dispute."). That issue aside, none of these contracts impact Alta's ability to recover lost profits.

***Master Agreement.*** In just three sentences, GE argues that the Master Agreement bars Alta from seeking "consequential damages," including the "loss of profit" from WattStock, along with its "partners" and "'contractors and subcontractors'—like GE."[59] Because GE is not even a party to that agreement, GE bears the "heavy burden" to show that it qualifies as a third-party beneficiary under that contract. *Mo. Pac. R.R. Co. v. Harbison-Fischer Mfg. Co.*, 26 F.3d 531, 540 (5th Cir. 1994). This requires GE to prove, based on the contractual text alone, that Alta and WattStock (1) intended to secure a benefit for GE at the time they entered into the Master Agreement, and (2) entered into the contract directly for GE's benefit. *First Bank*, 519 S.W.3d at 102 (citation omitted); *see also Resolution Trust Corp. v. Kemp*, 951 F.2d 657, 662 (5th Cir. 1992) (collecting cases) (emphasis in orig.).

For the reasons explained in Alta's own Motion for Partial Summary Judgment, GE cannot establish either element and Alta (not GE) is entitled to summary judgment on this issue.[61] But GE does not even *try* to meet this burden in its own Motion for Summary Judgment nor could it because GE admits, it was not a "subcontractor" when Alta executed the Master Agreement or when GE engaged in the tortious acts that give

---

[59] ECF 96 at 27.

[60] ECF 111 at

[61] Ex. 106 at 340:3-8; 359:18-360:15. Alta incorporates the contents of its Brief in Support of Its Motion For Partial Summary Judgment (ECF 111) by reference.

rise to Alta's Complaint.[62] GE's argument also overlooks the text of the Master Agreement, which makes clear that Alta and WattStock did not intend to waive damages for intentional torts, such as fraud or tortious interference, that arise out of or are connected to the Master Agreement.[63]

Finally, even if GE could overcome the issues set forth above—and it cannot—its Motion for Summary Judgment still fails because fraud vitiates any alleged damages waiver. *See Prudential Ins. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995) ("A buyer is not bound by an agreement . . . that he is induced to make because of a fraudulent representation or concealment of information by the seller."). In *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings LLC*, the Court enforced a contractual punitive damages waiver despite the defendant's fraud. 572 S.W.3d 213, 232 (Tex. 2019). In doing so, the Court distinguished the punitive damages waiver and the "as is" clauses that it had previously explained were vitiated by fraud. *Id.* at 232−33. Because *Bombardier's* punitive damages waiver did not "limit actual damages," the plaintiff's proffered comparisons to the "as is" clauses discussed in Prudential were inapt. *Id.* By contrast, a consequential damages waiver here would limit Alta's actual damages. Thus, the Court cannot enforce any damages waiver until the jury considers Alta's fraud claim.

**LNTP.** GE also argues Alta's claim for lost profits is somehow barred by the LNTP. Once again, GE does not even try to satisfy its burden of demonstrating that it was an intended third-party beneficiary, and its LNTP argument suffers from all of the same problems that defeat its attempts to use the Master Agreement. But GE's attempt to invoke the LNTP is especially absurd because the waiver provision of the LNTP GE cites in support of its argument—the "General Indemnity Provision[64]—only applies to claims "for any physical injuries to third parties or physical damage to third-party property."[65]

---

[62] Alta's arguments related to this topic are fully set forth in detail in ECF 111 at 12-16.
[63] Alta's arguments related to this topic are fully set forth in detail in ECF 111 at 16-21.
[64] ECF 96 at 48.
[65] Ex. 3 at App. 25, Ex. A at Section 17.

This is not a personal injury lawsuit and Alta is not alleging any physical damages to anything so on its face, the LNTP is irrelevant to Alta's claims for lost profits. And again, Alta was fraudulently induced into executing the LNTP.

    ***Confidentiality Agreement.*** Finally, GE contends Alta waived its lost profits claim by executing a Confidentiality Agreement with "GE Packaged Power LP." [66] This assertion, however, cannot shield GE from liability for Alta's lost profits. The Confidentiality Agreement's limitation of liability clause expressly restricts its applicability to the defined "Parties," namely "GE Packaged Power LP" and "Alta Power, LLC."[67] Alta is not suing "GE Packaged Power LP," nor is GE itself designated as a "Party" under this Agreement. Thus, GE lacks any standing to enforce this contractual limitation against Alta.[68]

    Further, GE's reliance on the Confidentiality Agreement is fundamentally flawed because the Agreement explicitly limits its scope to discussions regarding "the possibility of entering into the design, development, sale, and purchase of GE CF6-80C2 engines converted to operate in a GE power generation package." [69] This litigation, by contrast, is entirely unrelated to the CF6-80C2 product line. Rather, Alta's claims specifically involve GE and WattStock's misrepresentations related to the sale of "GE TRUEPackage LM6000 Certified Turbine Packages." [70] Given GE's own admission that "a GE CF6-80C2 is not an LM6000," GE's attempt to invoke the Confidentiality Agreement's limitation of liability provision must fail and should be rejected. [71]

---

[66] ECF 96.
[67] Ex. 59 at App. 448, 450.The Agreement defines "Parties" as Alta an "GE Packaged Power LP."
[68] Alta's lawsuit is, and has always been, against "General Electric International, Inc." ECF 54.
[69] ECF 97 at App. 413.
[70] Ex. 3 at App. 26.
[71] Ex. 106 at App. 1270; *see also* App. 1162-63, 1195; Ex. 17 at App. 95; Ex. 116; Ex. 6 at App. 55; Ex. 15 at App. 86; Ex. 20 at App. 103.

## II.    Alta's Claims for Lost Profits Must Be Decided By A Jury.

GE next challenges Alta's lost profits claims because it claims Alta "cannot provide evidence to raise a genuine material fact dispute that it lost *any* profits with reasonable certainty" and cannot quantify its lost profits with reasonable certainty. [72] Neither claim withstands scrutiny.

Awards for lost profits must be established with reasonable certainty. "The requirement of 'reasonable certainty' in the proof of lost profits is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise." *Tex. Instruments v. Teletron Energy Mgmt.*, 877 S.W.2d 276, 279 (Tex. 1994). "Recovery for lost profits does not require that the loss be susceptible of exact calculation." *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 859 (Tex. 2017). "What constitutes reasonably certain evidence of lost profits is a fact intensive determination." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). "Opinions or estimates are competent evidence of lost profits if based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Cash Am. Pawn, LP v. Alonzo*, No. 01-19-00801-CV, 2021 Tex. App. LEXIS 7583, at *21 (Tex. App.—Houston [1st Dist.] Sep. 14, 2021, no pet.) (citing *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010)). In awarding lost profits, the ultimate question is whether, and what amount of, lost profits is "the natural and probable consequence of the act or omission complained of." *Horizon Health*, 520 S.W.3d at 860.

Here, the nature of Alta's business model makes Alta's lost profits calculable with a level of precision that far exceeds the Texas Supreme Court's "flexible" and "fact intensive" reasonable certainty requirement. Indeed, every input in Alta's damages model is based on objective, real world data supported by documentary evidence— execution ready contracts negotiated between Alta and its counterparties related to its business plan and other real world offers made to Alta by third parties related to Alta's

---

[72] ECF 96 at 28.

business plan.[73] The Court will also not have to guess about what Alta's sales would have been, or whether customers would have purchased Alta's product because Alta's damages rely on the actual, real world market price of Alta's product—electricity—for every fifteen-minute interval during the periods Alta would have been online.[74]

### A. Alta's business is not new, its venture is not untested, and peaker plants are not risky.

GE begins its assault on Alta's lost profits claim by arguing that Alta cannot recover lost profits because "Alta is a startup—an untried company pursuing a risky venture in a volatile market" and because "Alta has never broken ground on (much less completed) a single peaker plant."[75] This is wrong.

To survive summary judgment, Alta need only present evidence from which a jury could reasonably estimate the amount of Alta's loss. *Blase Indus. Corp. v. Anorad Corp.*, 442 F.3d 235, 238 (5th Cir. 2006). "The requirement of 'reasonable certainty' in the proof of lost profits is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise." *Tex. Instruments v. Teletron Energy Mgmt.*, 877 S.W.2d 276, 279 (Tex. 1994). "Opinions or estimates are competent evidence of lost profits if based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Am. Midstream (Alabama Intrastate), LLC v. Rainbow Energy Mktg. Corp.*, 667 S.W.3d 837, 865 (Tex. App. 2023), *review granted* (Oct. 18, 2024).

While GE incorrectly suggests the nascent nature of Alta's business is somehow dispositive, "[t]he mere fact that [the wrongful conduct affected] a new business with no prior history of profits … does not bar recovery under a lost profits measure as too speculative, uncertain, or remote." *Am. Heritage, Inc. v. Nevada Gold & Casino, Inc.*, 259 S.W.3d 816, 826 (Tex. App. 2008). Indeed, the Texas Supreme Court has made clear that "[t]he fact that a business is new is *but one consideration* in applying the 'reasonable

---

[73] Ex. 94 at App. 1035.
[74] *Id.*; *see also* Ex. 127 at App. 1678, ¶¶ 33-36.
[75] ECF 96 at 28.

certainty' test." *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 280 (Tex. 1994) (emphasis added). As the Supreme Court explained, "[w]hen there are firmer reasons to expect a business to yield a profit, the enterprise is not prohibited from recovering merely because it is new." *Id*. For example, *Sw. Battery Corp. v. Owen* involved lost profits for the sale of batteries that the defendant failed to supply. 131 Tex. 423, 427 (1938). The Texas Supreme Court reasoned that given the "dominant place" of the automobile industry, "[t]he selling of batteries used in automobiles is not an uncertain or speculative business." *Id*.

Accordingly, newly formed companies like Alta can, and often do, recover lost profits. This is so because under Texas law, a party can prove its lost profits in one of two ways: "a history of profitability or the actual existence of future contracts from which lost profits can be calculated with reasonable certainty." *Am. Heritage, Inc. v. Nevada Gold & Casino, Inc.*, 259 S.W.3d 816, 826 (Tex. App. 2008).

That is exactly what Alta has done here. Alta's damages expert, Quentin Mimms, calculated the revenue that Alta would have received under its proposed contracts with third parties, which included the HRCO Premium, HRCO revenues, excess power revenue, responsive reserve energy revenue, responsive reserve ancillary service revenue, merchant revenue, non-spinning revenue, and black start revenue.[76] Importantly, Mimms did not use projected pricing, but used the *actual, real-world ERCOT hourly market pricing*, as well as the *actual, real-world daily Texas-Oklahoma natural gas pricing*, over the assumed period of operation.[77] Accordingly, Alta's lost profits can be calculated with reasonable certainty based on the contractual terms and real-world pricing data. As a result, Alta's lost profits are nothing like the situations in which lost profits are found to be "dependent on uncertain and changing conditions." *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 860 (Tex. 2017) (internal quotations and

---

[76] *See, e.g.,* Ex. 94 at App. 1035.
[77] *Id.*

citation omitted). The jury can look back on the pricing data from the damages period and determine exactly how much Alta would have made based on those known circumstances. Indeed, the reason why Alta's lost profits figures are so high is because real-world data confirmed just how much money peaker plants like Alta's made during the extraordinary storm event of Winter Storm Uri in February 2021.[78]

The Texas Supreme Court has also explained that another relevant consideration when a business is "new or unestablished" is "the experience of the persons involved in the enterprise and the nature of the business activity, and the relevant market." *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 280 (Tex. 1994); *see also Pace Corp. v. Jackson*, 155 Tex. 179, 192 (1955) (a new business' claim for lost profits was bolstered by the fact that its owner had many years of experience in that industry). The four members of Alta's executive team had ample experience running energy companies and in fact, *they already had success building peaker plants in ERCOT using ProEnergy's refurbished LM6000 packages*:

### Alta Executive Team Experience

| Executive (Title) | Relevant Experience |
| --- | --- |
| William C. Phelps (Chief Executive Officer) | Prior to Alta, Mr. Phelps was a Co-founder, Executive Director and CFO of Coastal Energy before its sale to CEPSA (IPIC-Abu Dhabi) in January 2014 for $2.3 billion, which represented an 8x return for IPO investors. Before that, Mr. Phelps was the CFO of NuCoastal Thailand, and NuCoastal Power. Before that, Phelps served as a senior member of the Energy Investment Banking Group, and the Leveraged Finance Group, where he advised on numerous M&A and financing transactions in the energy industry. |
| Matthew E. Laterza (Chief Financial Officer) | Prior to Alta, Mr. Laterza was Vice President of Finance of Coastal Energy Company. During his tenure he was responsible for the Company's finance operations and the Company's business development group, including the Company's entrance into Malaysia and its sale to CEPSA. Mr. Laterza also served as Commercial Manager for NuCoastal Power. His early background includes energy equity research at Credit Suisse and working as an analyst for a hedge fund . |
| Travis West (Chief Operating Officer) | Before joining Alta, Mr. West spent over 25 years in the utility industry, with responsibilities including managing project execution; managing operations and maintenance; managing |

---

[78] Ex. 94 at App. 1035; Ex. 127 at App. 1678, ¶¶ 33-36.

| Executive (Title) | Relevant Experience |
|---|---|
|  | regulatory compliance (permitting); and developmental strategies. Mr. West was the Executive Vice President for Agilon Energy with responsibilities including full implementation of two (100MW) peaking facilities within ERCOT, and two other (100MW) peaking facilities fully developed using ProEnergy. |
| Roy J. Hart (Chief Development Officer) | Before joining Alta, Mr. Hart spent over 40 years in the power industry and deployed over 3,000 MW of generation. Mr. Hart developed 4 "fast-start" peaking plants (100MW each) in Texas. Before that, Mr. Hart ran NuCoastal Power, where he redeveloped a mothballed facility as a 300 MW facility. |

Because Alta's executives were experienced in every aspect of building a peaker power plant, the fact that GE prevented Alta from achieving profitability through its tortious acts cannot prevent Alta from recovering lost profits caused by that wrongful conduct. *See, e.g., Document Imaging, Inc. v. IPRO, Inc.*, 952 F. Supp. 462, 469 (S.D. Tex. 1996) (denying summary judgment on lost profits claim where plaintiff showed "relevant work experience" and was able to provide "a comparison with profits of other companies" that were comparable during the same period).

### B. Alta's lost profits calculations are based on actual market data and reasonable assumptions that are supported by objective evidence in the record.

GE argues that Alta's lost profits model relies on "unsupportable" assumptions that require "extraordinary leaps."[79] GE presents a highly misleading chart, which (according to GE) supposedly "highlights the indisputable facts that contradict Alta's self-serving claims."[80] But all GE manages to show is that certain assumptions are based on disputed facts, which will be for the jury to decide. As shown below, Mimms' assumptions are based on sufficient evidence, and there are plenty of triable issues for the jury.

| Supposed Assumption(s) | Response/ Description of Alta's Evidence | Appx. Cites |
|---|---|---|
| "Lender completes diligence" and "Alta secures financing" | Actual financing proposals provided by ten different major financial institutions; hundreds of millions of financing provided to Castleman and ProEnergy to build ERCOT peakers using | Ex. 49 at App. 284; Ex. 52 at App. 296; Ex. 64 at App. 480; Ex. 72 at App. 647; Ex. 73, App. 650; |

---

[79] ECF 96 at 28.
[80] ECF 96.

| Supposed Assumption(s) | Response/ Description of Alta's Evidence | Appx. Cites |
|---|---|---|
| | ProEnergy Packages; testimony of Alta's actual prospective lenders. | Ex. 74 at App. 654; Ex. 75 at App. 658; Ex. 76 at App. 701; Ex. 78 at App. 709; Ex. 79 at App. 719; Ex. 85 at App. 959; Ex. 93 at App. 1029; Ex. 94 at App. 1040; Ex. 95 at App. 1079; Ex. 96, Appx. 1109; Ex. 118 at App. 1593; Ex. 126 at App. 1677; Ex. 127 at App. 1678, ¶¶ 3-13. |
| "Alta experiences no construction delays" | Mimms does not assume Alta would not have experienced construction delays. In fact, one of Alta's construction experts testified that Casey's estimated construction timeline *builds in* construction delays into their construction estimate. In any event, ProEnergy offered Alta a "36 week construction cycle from notice to proceed (and receipt of applicable funding) until Commercial Operation Date (COD)" and further indicated that they could deliver even faster if Alta needed it expedited. That this timeline was reasonable and achievable is further supported by real life: ProEnergy built power plants in ERCOT using the ProEnergy packages Alta would have used but for GE's tortious acts in 38 weeks in 2020 and had Wattbridge's peakers running ahead of Covid. Alta's timeline is also supported by the contemporaneous construction schedule prepared for Alta and provided to Alta's engineer's lender when Alta was trying to close on its financing of its projects using TRUEPackages. | Ex. 58 at App. 358; Ex. 67 at App. 589; Ex. 88 at App. 998; Ex. 92 at App. 1014. |
| "Oncor allows Alta's 'interconnection' with the Texas power grid before February 2021." | Alta does not have to prove any of its peakers would have been interconnected to the power grid before Uri to prove that GE's tortious acts caused it to lose *some* profits. Additionally, Alta does not and has never argued that all three of its peaker plants would have been interconnected before Uri. Instead, Alta alleges that two of its three plants would have been online before Uri. Alta's damages expert, however, includes lost profits models that calculate Alta's profits even if it had only gotten one unit online before the Winter Storm. Still, Alta's interconnection timeline is supported by two interconnection agreements Alta negotiated with Oncor which | Ex. 83 at App. 888; Ex. 84 at App. 935; Ex. 127 at App. 1679, ¶ 31. |

23

| Supposed Assumption(s) | Response/ Description of Alta's Evidence | Appx. Cites |
|---|---|---|
| | provide guaranteed interconnection for Alta's GoodAlta and Altajac power plants in mid-2020. | |
| "Alta achieves commercial operations before February 2021" | Alta does not have to prove any of its peakers would have been interconnected to the power grid before Uri to prove that GE's tortious acts caused it to lose *some* profits. Additionally, Alta does not and has never argued that all three of its peaker plants would have been interconnected before Uri. Instead, Alta alleges that two of its three plants would have been online before Uri. Alta's damages expert, however, includes lost profits models that calculate Alta's profits even if it had only gotten one unit online before the Winter Storm.. Notwithstanding the above, Alta's COD timeline is supported by countless contemporaneous documents, including Alta's correspondence with lenders, Alta's lenders' own internal discussions about that Alta projects, Alta's interconnection agreements, and others. | Ex. 51 at App. 222; Ex. 58 at App. 350; Ex. 66 at App. 496: Ex. 83 at App. 888; Ex. 84 at App. 935; Ex. 92 at App. 1014. |
| "Alta has winterization equipment that is effective and performs flawlessly during Winter Storm Uri" and "Alta continuously operates during Winter Storm Uri" | Alta does not have to prove that it would have continuously operated during Uri to establish that GE's tortious acts caused it to lose profits. That said, Alta's witnesses uniformly testified they would have winterized their units to the extent that they did not come winterized, and the ProEnergy Packages Alta would have relied on but for GE's misrepresentations operated continuously and without incident throughout Uri. Also, the primary reason for plant failures during Uri was not (as GE suggests) that the peakers were not sufficiently winterized. Instead, most failures were caused by peaker plants inability to access natural gas. That would not have been an issue for Alta since it negotiated a firm natural gas agreement and Alta. Alta also can show with 100% certainty that its units would not have experienced any of the issues | Ex. 15 at App. 89; Ex. 53 at App. 312; Ex. 69 at App. 648.; Ex. 92 at App. 1023; Ex. 110 at App. 1400, 1403, 1409; Ex. 118 at App. 1596; Ex. 120 at App. 1608; Ex. 121 at App. 1621; Ex. 127 at App. 1679, ¶ 28. |
| "Alta's HRCO contract does not take effect before or during Winter Storm Uri" | Alta does not have to prove its hedges would not have started before the winter storm to show that GE's tortious acts caused Alta some lost profits. Alta would have made nearly $60 million during Uri even if its hedges were in place. Still, the timing of Alta's hedges are supported by numerous internal emails with third parties which reveal that Alta intended for its hedges to start in June of 2021, and are further supported by the testimony of Matt Laterza and Alta's prospective lenders, each of which testified that Alta needed to build in a meaningful gap between its projected COD and | Ex. 77 at App. 707; Ex. 80 at App. 856; Ex. 81 at App. 858; Ex. 82 at App. 860; Ex. 117 at App. 1583, 1586; Ex. 122 at App. 1646-47 Ex. 123 at App. 1688. |

| Supposed Assumption(s) | Response/ Description of Alta's Evidence | Appx. Cites |
|---|---|---|
| "Alta can service its debt obligations with additional equity infusions" | GE misrepresents the content of Alta's expert's report, however the record makes clear that Alta would have had access to any capital necessary to fund its equity needs, be it from mezzanine financing or from the massive wealth of its CEO and main investor. | Ex. 118 at App. 1592-94; Ex. 126. |

GE specifically challenges four assumptions, arguing there are no triable issues of fact as to (i) whether Alta ever would have received financing, (ii) whether Alta would have had its plants built and operational by Winter Storm Uri in February 2021, (iii) whether Alta's plants would have operated continuously throughout that winter storm, and (iv) whether the HRCOs would have already gone into effect by February 2021.[81] As discussed below, and similarly in Alta's concurrently-filed opposition to GE's motion to exclude Mimms' opinions, each of these assumptions has a factual basis in the record and therefore Alta's lost profits damages should be presented to the jury.

### 1.    *Alta would have received financing for its projects.*

GE argues "Alta cannot create a genuine dispute of fact as to whether it could have secured financing to build a single plant."[82] But there is plenty of evidence that Alta could and would have obtaining financing, but-for GE's wrongful misconduct.

Ten major lenders—Mitsubishi UFJ Financial Group ("MUFG"), CIT Group ("CIT"), Deutsche Bank ("DB"), Starwood Infrastructure Finance ("Starwood"), Apollo, ING Financial ("ING"), Macquarie, Energy Capital Partners ("ECP"), Investec, and Riverstone—sent Alta actionable term sheets between 2017 and 2020, including after Covid and after the Castleman dispute.[83] In each instance, Alta could have proceeded to executing a project financing transaction with those lenders.[84] These lenders did not make these proposals blindly, but after being provided access to and reviewing Alta's (1)

---

[81] ECF 96 at 31-37.

[82] ECF 96 at 31.

[83] Ex. 127 at App. 1679, ¶¶ 3-13; Ex. 61 at App. 457; Ex. 72 at App. 647; Ex. 73 at App. 650; Ex, 74 at App. 656; Ex .75 at App. 660; Ex. 76 at App. 702; Ex. 79 at App. 719; Ex. 93 at App. 1029; Ex. 95 at App. 1079; Ex. 96 at App. 1109; *see also* Ex. 122 at App. 1646-47; Ex. 123 at App. 1688.

[84] Ex. 127 at App. 1679, ¶¶ 3-13.

engineering drawings, (2) site control documentation, (3) draft agreements for natural gas supply and water supply, (4) draft engineering, procurement, and construction ("EPC") agreements, (5) a pro-forma financial projection for each project, and (6) copies of all permits that had been issued for each site.[85]

Real proposals from real lenders with real numbers to finance Alta's real projects is compelling evidence that Alta would have obtained whatever financing it needed to move forward with Alta's business, and by itself, these offers to finance Alta's projects subject to due diligence are more than sufficient to establish a fact question on this issue.

GE's assertions that Alta's projects were not financeable is also belied by the experiences of Alta's competitors during the same period. Between 2017 and 2020, Castleman and Wattbridge each received financing from major lenders to build peakers using ProEnergy Packages.[86] The only meaningful difference between Alta and these entities is that they used ProEnergy, while Alta relied on TRUEPackage.[87] If Alta had relied on ProEnergy, like Castleman and Wattbridge did—rather than being defrauded and thwarted by GE—Alta likely would have obtained financing as well.[88]

GE ignores Alta's objective evidence of its bankability and insists that the fact that Alta did not eventually receive financing from Deutsche Bank in 2019 or Starwood in 2020 somehow proves there is no genuine issue of material fact with respect to Alta's ability to obtain financing *from any lender* because (it claims) Alta's experience with these lenders somehow proves Alta was (1) "inadequately capitalized," (2) faced meaningful litigation risk from Castleman; and (3) Covid.

These arguments miss the mark and are not supported by evidence. Take GE's assertion that Alta cannot create a genuine issue of material fact with respect to its ability to access the capital it needed to build its peakers because "[b]oth Deutsche Bank and

---

[85] *Id.* at ¶ 3.
[86] Ex. 127 at App 1679, ¶13.
[87] *Id.*
[88] Ex. 122 at App. 1625-26; 61:2-8, 62:8-16.

Starwood affirmed [that Alta was inadequately capitalized] was a reason why they declined to extend Alta financing."[89] The evidence GE cites in support of this proposition does not even vaguely support GE's assertion that Alta's attempts to obtain financing were felled by the fact that it was somehow insufficiently capitalized.[90] But GE also fails to address why Alta's failure to obtain capital from these two lenders proves Alta could not get financing *from any lender* even though ten lenders tried to finance Alta's proposals.[91] GE's position also cannot be squared with the testimony obtained in this case from either Deutsche Bank or Starwood. Deutsche Bank's representative testified that he "didn't know" what sort of "equity gap" Deutsche Bank would have deemed acceptable on Alta's projects, and he also testified that Deutsche Bank had not done any diligence on Alta's ability to fund any such "gap" with its own cash.[92] Along the same lines, Starwood's representative testified that Starwood did not have "any minimum equity requirements for peaker plant projects or any other type of projects[.]"[93] Alta's Phelps also made clear that Alta had access to whatever equity it needed to close the alleged "equity gap" in the event that mezzanine financing was not provided, and that he was prepared to use his considerable personal resources if needed.[94] This evidence more than satisfies Alta's burden at this stage.

GE's second argument is even less plausible. According to GE, Alta could not obtain financing *from anyone* because "Alta faced meaningful litigation risk from Castleman, which gave lenders another reason to be weary of financing Alta's project."[95]

---

[89] ECF 96.

[90] The evidence GE cites—"App. 356-57 and App. 102"—in support of this proposition does not remotely support GE's bold claim.[90] "App 356-57" refers to a page in the report of one of GE's *paid experts*, and the corresponding citation to "App. 6057-58; App. 6318" refer to a model *prepared by Alta* and a draft term sheet. And "App. 102" refers to the testimony of Alta's CEO affirming a truism that too little equity can be a problem for lenders.

[91] Ex. 127 at App. 1680-81, ¶ 8.

[92] Ex. 122 at App. 1628.

[93] Ex. 123 at App. 1662.

[94] Ex. 118 at App. 1593-95; Ex. 126 at App. 1677, ¶ 2.

[95] ECF 96 at 32.

This assertion makes no sense. Alta settled its claims with Castleman in 2019 and executed a sweeping release that eradicated any risk of litigation.[96] If the Castleman dispute was categorically fatal to Alta's ability to secure financing, why did Starwood enter into an exclusive engagement to provide Alta financing *after* Alta executed the release even though it knew Castleman threatened litigation?[97] And what of Macquarie's post Castleman release offer to fund a portion of Alta's construction costs?[98] The Castleman dispute was not dispositive of *anything* related to financing.

Finally, and perhaps most bizarrely, GE argues the timing of Covid would somehow have prohibited Alta from obtaining the capital it needed to fund its projects. Again, Alta received proposals to finance its projects *after* Covid began, so Covid was not dispositive on this issue.[99] What's more, contemporaneous documents demonstrate both Deutsche Bank and even Starwood expected Alta's financing to close *before Covid started* and Alta would have done so but for GE's tortious acts.[100]

GE also points to Alta's inability to obtain financing to buy TRUEPackages and argues that this somehow proves Alta's projects were not financeable generally. GE does not seem to get it: Alta's projects were not financeable *because* Alta relied on GE TRUEPackage instead of ProEnergy. This reality is reflected in Deutsche Bank's rejection of GE's "comfort letter," which did not persuade Deutsche Bank that Alta's TRUEPackages were guaranteed by a credit worthy entity. Tellingly, neither GE or WattStock was surprised by Deutsche Bank's response. Instead, both focused on how to ensure that what they had done to Alta would "not trigger a GE reaction that will harm our relationship." More broadly, GE is missing the point: Alta would never have signed

---

[96] Ex. 90 at App. 1003.
[97] Ex. 127 at App. 1679, ¶¶ 8-9.
[98] Ex. 51 at App 293.
[99] Ex. 76 at App. 702;
[100] Ex. 66 at App. 515; Ex. 51 at App. 293; Ex. 52 at App. 296.

the Master Agreement if GE had been honest about its relationship with WattStock or its involvement in TRUEPackage.

Alta's dealings with Starwood would also have played out differently if Alta used ProEnergy instead of GE's TRUEPackage. Starwood stopped working with Alta because the cost of Alta's TRUEPackages kept changing, *not* (as GE suggests) because of Covid.[101] GE claims this was a product of Alta's supposed "reliance on a low ball bid from International Turbine Services,"[102] but this would not have been an issue if Alta had been working with ProEnergy since ProEnergy's offer was a firm fixed price proposal, including for EPC services.[103] As a result, Alta's EPC and equipment costs would have been known and fixed, and Starwood would not have had a reason to walk away.[104]

      2.    *Alta's expert's assumptions are firmly grounded in admissible evidence.*

GE argues that Alta cannot prove it lost any profits because it claims Alta's peaker plants would not have been online before Uri or, alternatively, that Alta would have lost money during Uri because Alta's peaker plants would have failed due to the cold weather, leaving it unable to fulfill its HRCOs. GE's arguments are baseless, but they also merely underscore the existence of numerous factual disputes that independently defeat GE's request for summary judgment.

GE first challenges Alta's ability to get any of its plants online before Uri because "the overwhelming majority of Alta's alleged lost profits would have been generated" during Winter Storm Uri.[105] GE's own argument is self-defeating: "most" profits is not all profits. Alta can also prove that two of its peaker plants would have been interconnected before February 2020.[106] This evidence includes, among other things, the

---

[101] Ex. 123 at App. 16667.
[102] ECF 96 at 20-21.
[103] Ex. 2007.
[104] *Id.*
[105] ECF 96.
[106] *See, e.g.*, Ex. 83 at App. 888; Ex. 84 at App. 935; Ex. 127 at App. 1679, ¶ 31. Alta has never claimed all three of its peaker plants would have been online by Uri. *See* Expert Report of Quentin Mimms.

testimony of two of Alta's experts (including one whose testimony is unchallenged) as well as a substantial quantity of evidence that Alta, its prospective lenders, the prospective lenders' engineers, the EPC contractor that Alta hired to build its plants using GE TRUEpackages, and even GE and WattStock fully expected at least two of Alta's peakers to be up and running before February 2021.[107]

GE's citation to Alta's internal documents showing projected commercial operations dates in mid-2021 is also deeply misleading. As GE's own expert acknowledged, the 2018 documents GE cites project mid-2021 COD dates because Alta had not yet persuaded its interconnection contractor, Oncor, to guarantee Alta interconnection in 2020. But, as GE's expert acknowledges, that changed in early 2019 when Oncor sent Alta an execution ready contract promising to interconnect Alta's power plants *on or before May 31, 2020. in 2020.*[108] Once Alta obtained this guarantee, Alta's contemporaneous documents and records show that it changed its expected commercial operations dates to "May 2020."[109] These dates only changed back to 2021 in 2020 after GE caused Alta's financing to fall through. But none of this would have been an issue if Alta had contracted with ProEnergy, since unlike GE and WattStock, ProEnergy was offering a firm, fixed turnkey price on an established, bankable product.[110]

GE also inexplicably argues that it is entitled to summary judgment because (1) Alta would not have been online before Uri to make hundreds of millions of dollars; (2) even if it had been online, Alta's peakers supposedly would have failed because of the weather; and (3) Alta would have lost millions of dollars because its HRCOs would have been in place if it was online for Uri *and* its plants would have failed. GE bases these contradictory assertions not on undisputed evidence, but the testimony of two of its

---

[107] *Id., see also* Ex. 92 at App. 1022-23; Ex. 67 at App. 588.
[108] Ex. 83 at App. 888; Ex. 84 at App. 935; Ex. 127 at App. 1679, ¶ 31.
[109] *Id.*
[110] Ex. 58 at App. 350.

retained experts. Alta has its own experts who rebut each and every word of GE's expert's testimony, and GE's own positions also conflict with Alta's internal documents *and* real life.[111] In 2020, ProEnergy delivered and installed the same ProEnergy Packages Alta would have purchased in just 36 weeks, those ProEnergy units ran continuously throughout Uri, and Alta would have had none of the gas supply problems that plagued other peakers throughout Texas.[112]

But all of this is, in some sense, besides the point. In every instance, GE's complaints about construction timelines and HRCO timelines merely impact the *quantity* of Alta's lost profits, not whether Alta can prove their existence. Since GE *admits* that Alta would have made some profits under some of the scenarios even it concedes are possible, the Court should deny GE's Motion. *Sw. Battery*, 115 S.W.2d at 1099 (noting that "uncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery.").

### 3.    *Alta can and has quantified its lost profits with reasonable certainty.*

In addition to claiming Alta has no evidence that it suffered any lost profits, GE also maintains that Alta "cannot establish the likely terms of that financing—and therefore the cost of capital—with reasonable certainty."[113] This is simply wrong. In Texas, "[o]pinions or estimates are competent evidence of lost profits if based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010); *Holt Atherton*, 835 S.W.2d at 84.

Here, Alta's damages expert reviewed objective, real world loan data in the form of (1) actual financing proposals made by real world lenders to finance Alta's projects; and (2) the terms of the loan received by Wattbridge in December 2019 to build its peaker

---

[111] Ex. 92 at App. 1022-23; Ex. 67 at App. 588.
[112] Ex. 53 at App. 312; Ex. 127 at App. 1687, ¶ 29.
[113] ECF 96.

plants; and (3) the April 2020 terms being discussed to finance Castleman's additional peakers.[114] Based on this real world, objective, relevant loan data, Alta's expert concluded that Alta "would have been able to finance the project for a rate of LIBOR plus a range of 325 to 450 basis points."[115] Mimms then used the high end of that range—Libor plus 450 basis points—in his model calculating Alta's lost profits.[116] Libor plus 450 basis points is the same rate offered to Alta by both Deutsche Bank *and* Starwood in 2019.[117] Since Alta's expert relied on objective evidence, GE's argument necessarily fails.

GE also accuses Alta of "failing to grapple with its expert's concession that Alta 'would have been unable to meet its debt service payments in the very first quarter they came due.'"[118] By using quotes, GE implies that Alta's expert said or wrote that "Alta would have been unable to meet its debt service payments in the very first quarter they came due." But GE is actually quoting *its own* damages expert, not Alta's! This disingenuous attempt to distort and mischaracterize the contents of Mimms' expert report is not competent summary judgment evidence, particularly since it is factually inaccurate.[119]

In reality, Alta's expert observes that in one out of his four damages models, he reduced Alta's final lost profits figure because, to be conservative, he assumed Alta would have had to start paying down the debt associated with all three of its peaker sites the minute its first peaker plant came online.[120] This would not have been an issue in real life—lenders understand the revenues of a single peaker probably will not immediately support the debt service on two additional not yet running peakers—but Alta's expert *did not want to assume anything he could not prove*, so he instead held it against Alta and

---

[114] Ex. 94 at App. 1054, ¶¶ 39-40.
[115] *Id.* at ¶ 41.
[116] *Id.*
[117] *Id.*
[118] ECF 96 at 38.
[119] *Id.* (citing Zahniser-Word's Expert Report).
[120] Ex. 94 at App. 1054, ¶ 39.

assumed Alta would have had to cover the difference in that first quarterly debt payment.[121] GE, of course, argues Alta would have been too poor to afford to finance the projects at all, this assumption is at odds with the evidence, which reveals that Alta would have had access to mezzanine finance and/or that Alta's wealthy CEO would and could have covered any "gap."[122]

Remarkably, GE does not merely misrepresent the evidentiary record. It also relies on cases that do not remotely support its position. For example, GE argues *Lake v. Cravens* proves Alta cannot prove its lost profits with reasonable certainty. But that case is obviously distinguishable. In that case, the Fort Worth Court of Appeals overturned a jury's lost profits award because the plaintiff's damages' expert "assumed Dr. Cravens and his business would secure millions and millions of dollars in financing at a time when the economy was struggling [2008] and uncertain and Dr. Cravens was inclined to push forward while demanding financing terms that were inconsistent with going rates, thus minimizing the number of, but increasing the collateral requirements expected by, potential lenders." *Lake v. Cravens*, 488 S.W.3d 867, 904 (Tex. App.—Fort Worth 2016, no pet.). But the plaintiff in that case *rejected* the only offer to provide debt financing it received because Cravens was *unwilling* to post additional collateral, and the Court also observed that the project's success was also contingent on two *additional loans* that Cravens had not even *tried* to obtain. *Id.* at 903. In other words, the plaintiff's expert assumed plaintiff could borrow money on terms that the plaintiff deemed acceptable even though zero lenders made any such offers, and the plaintiff rejected the lone proposal he received.

This case is, obviously, very different. Alta was seeking financing during a booming economy, and Alta's expert relied on financing terms that were actually provided to Alta subject to diligence that Alta *accepted*. It follows that there is an objective

---

[121] *Id., see also* App. 1069, ¶77.
[122] Ex. 118 at App. 1592-95; Ex. 126 at App. 1677, ¶ 2.

basis for not only believing that Alta's project was financeable, but that it was financeable at the specific rate Alta's damages expert used to calculate its damages. Given the availability of this *objective* evidence of what its financing costs would have been, Alta can and has calculated its damages using objective evidence with reasonable certainty. As such, GE's Motion must be denied. *First v. AGCO Corp.*, No. 7:21-CV-0006-O, 2022 WL 22890627, at *1 (N.D. Tex. Mar. 10, 2022) (denying motion for summary judgment re. lost profits caused by lost business opportunities because plaintiff "presented "admissible evidence regarding lost profits, specifically, witnesses able to testify about potential contracts and income."); *Am. Midstream (Alabama Intrastate), LLC v. Rainbow Energy Mktg. Corp.*, 667 S.W.3d 837, 869 (Tex. App.—Houston [1st Dist.] 2023, pet. granted) (plaintiff demonstrated lost profits with reasonable certainty where it "used objective facts and data regarding market performance," including performance under similar contracts and "the average price of gas during the period for which it missed the identified opportunities to supply additional gas to its customers."). [124]

### III.   The Jury Must Decide Whether GE Was A Proximate Cause Of Alta's Injuries.

In Section II of its Argument, GE argues (again) that Alta's claims fail because Alta has no evidence GE's "tortious conduct caused—or at least was a substantial factor in causing—Alta's damages" because "Alta's alleged injuries were caused by its inability to secure financing" and because "the record conclusively establishes that Alta's inability to secure financing had nothing to do with GE, WattStock, or the allegations in this suit." [125]

"Establishing causation requires facts sufficient for the fact-finder reasonably to infer that the defendant's acts were a substantial factor in bringing about the injury."

---

[123] *Id.*

[124] *See, e.g., DSC Commc'ns Corp. v. Next Level Commc'ns*, 107 F.3d 322, 330 (5th Cir. 1997); *Space Maker Designs, Inc. v. Weldon F. Stump & Co.*, 2003 WL 21414726, at *1 (N.D. Tex. June 16, 2003); *Eagle Rock Timber, Inc. v. Rock Hard Rental, LLC*, 672 S.W.3d 438, 451 (Tex. App.—San Antonio 2023); *Wise Elec. Coop., Inc. v. Am. Hat Co.*, 476 S.W.3d 671, 708 (Tex. App.—Fort Worth 2015, no pet.); *Twinwood Cattle Co., Inc.*, 2025 WL 450750, at *33–34; *Armstrong v. Curves Int'l, Inc.*, 2017 WL 894437, at *21 (W.D. Tex. Mar. 6, 2017); *Seitz v. Envirotech Sys. Worldwide Inc.*, 2008 WL 656513, at *7 (S.D. Tex. Mar. 6, 2008).

[125] ECF 96.

*Tompkins v. Cyr*, 202 F.3d 770, 782 (5th Cir. 2000). A plaintiff does not need direct evidence to satisfy causation. *Id.* "Circumstantial evidence and reasonable inferences therefrom are a sufficient basis for a finding of causation." *Id.* And in Texas, there "can be more than one proximate cause of an event." *Olson*, 980 S.W.2d at 893; *see also Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). "Whether something constitutes a proximate cause of an event is a question of fact particularly within the province of a jury." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 623 F. Supp. 2d 798, 812 (S.D. Tex. 2009). This Court can only grant summary judgment on this issue if "there is no material dispute about the evidence and the circumstances are such that reasonable minds could not come to a different conclusion." *Id.*

Alta comprehensively rebuts GE's contentions regarding financing above, and will not repeat those arguments here. The proposals made by potential lenders (both before and after Covid and Castleman release) and the financing extended to Alta's competitors that used ProEnergy instead of TRUEPackage each independently defeat GE's Motion, as does the considerable evidence that GE and WattStock's tortious acts absolutely interfered with Alta's ability to close with Deutsche Bank and Starwood. *United Healthcare Servs., Inc. v. Rossel*, No. 3:21-CV-1547-L-BT, 2024 WL 4451761, at *20 (N.D. Tex. July 23, 2024) (fact issue on causation precluded summary judgment); *United Healthcare Servs., Inc. v. Synergen Health LLC*, No. 3:20-CV-0301-X, 2023 WL 4186370, at *3 (N.D. Tex. June 26, 2023) (same). GE's Motion must therefore be denied

## IV.    The Statute of Frauds Does Not Bar Alta's Tort Claims.

In Section III of its Motion, GE observes that "Alta brought—but subsequently abandoned—a breach of contract claim against WattStock."[126] GE then goes on to argue that all of Alta's claims are no more than the same breach of contract case, and that Alta is really just "seeking to enforce" GE's promise that "WattStock and GE would provide

---

[126] ECF 96 at 41.

up to nine turbines for less than $10 million each" and that "GE would stand behind WattStock and perform its contractual obligations if WattStock failed to deliver."[127]

As explained in Alta's own Motion for Partial Summary Judgment (ECF 111)—the contents of which Alta incorporates by reference herein—GE's statute of frauds affirmative defense must be stricken because Alta is not alleging any breach of contract or anything remotely like one. Still, Alta will briefly address two glaring problems with GE's commentary about its statute of frauds argument.

First, although Alta did in fact assert a breach of contract claim against WattStock, that claim had *nothing* to do with the oral promises GE insists Alta is "seeking to enforce." Instead, Alta alleged WattStock breached the confidentiality provisions of the Master Agreement by disclosing its impending financing to its competitor, Castleman Power, and by stealing money Alta paid WattStock for engineering work it never received.[128] Alta has never, ever, alleged WattStock or anyone else breached a contract by failing to provide TRUEPackages in any of its lawsuits.

GE also brazenly misrepresents the substance of Alta's claims. According to GE, Alta is trying to "enforce" WattStock and GE's oral promises. But that simply is not accurate. Alta explicitly alleges it would not "have entered into the Master Agreement (or any other agreement) with WattStock, nor would it have wired WattStock a single dollar" if GE "had disclosed the truth about its relationship with WattStock"[129] or "if GE had been honest about the pricing and availability of units."[130] Alta reiterates this point in the final paragraph of the fact section of its Amended Complaint: "[b]ut for the representations, acts, and omissions outlined above, Alta would have contracted with ProEnergy, not WattStock, and would have made many millions of profits providing

---

[127] *Id.*
[128] GE App., Ex. 100; ECF 54.
[129] ECF 54, ¶ 44.
[130] *Id.*, ¶ 72.

much needed capacity to the Texas energy grid."[131] GE does not reference or discuss these allegations because it knows it cannot even plausibly argue that these allegations do not sound in or are not actionable as fraud, since each independently supports Alta's fraud allegations.

As for Alta's pricing allegations, Alta does not allege GE breached a contract by failing to deliver units at a specific price. Instead, Alta alleges GE *fraudulently induced* Alta to execute the Master Agreement by falsely representing the pricing and availability of the units even though GE "knew that the units they had identified did not actually satisfy Alta's budgetary requirements because they were burdened by liabilities GE and WattStock did not fully disclose to Alta."[132] The Texas Supreme Court has explicitly held that such promises can and do support claims for fraudulent inducement, which is exactly what Alta alleges here. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998) ("a fraud claim can be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed within a contract.").[133]

## V.    A Mountain Of Documentary And Testimonial Evidence Supports Alta's Allegations Related To GE's Tortious Acts.

GE next challenges Alta's ability to prove that GE and WattStock made actionable misrepresentations, that Alta justifiably relied on those misrepresentations, or that those representations were the proximate cause of some injury to Alta. GE is mistaken.

### A.    A reasonable factfinder could conclude GE and/or WattStock knowingly made material misrepresentations to Alta.

To prevail on its direct claims against GE, Alta must prove GE made one or more material misrepresentations that were false. *United Healthcare Servs., Inc. v. Synergen Health LLC*, No. 3:20-CV-0301-X, 2023 WL 4186370, at *2 (N.D. Tex. June 26, 2023). In its

---

[131] *Id.*, ¶ 77.
[132] *Id.*, ¶¶ 59, 97.
[133] Ex. 117 at App. 1578-79; Ex. 123 at App. 1655-56.

Complaint, Alta alleges GE and WattStock conspired to and did in fact make such misrepresentations by "(1) GE misrepresenting the nature of its relationship with WattStock; (2) falsely representing that it could and/or would make up to nine GE TRUEPackages available for Alta Power to buy for at or below $10 million per GE TRUEPackage; (3) misrepresenting the true pricing and availability of TRUEPackage units; (4) falsely holding [TRUEPackage] out as the lowest cost, most financeable solution in the marketplace; and (5) falsely representing that GE would 'stand behind' and/or 'fully wrap' WattStock's work related to the delivery of the GE TRUEPackages."[134]

GE ignores these allegations and instead argues that GE is entitled to summary judgment on Alta's claims because Alta cannot prove GE ever promised to sell Alta TRUEPackages for below a certain price or promised to stand behind WattStock in the event of a breach, or that Alta relied on these promises.[135] GE's failure to challenge Alta's ability to prove its *actual* allegations defeats GE's Motion. But Alta can also back up each of its allegations against GE, all of which are independently actionable.

### 1.    GE misrepresented the nature of its relationship with WattStock.

Above all, GE misrepresented the nature of its contractual relationship with WattStock to create the impression that TRUEPackage was bankable when that was not the case.[136] A few documents in particular vividly highlight GE and WattStock's fraud. For example, in February 2018, GE and WattStock received a request from a prospective lender to one of Alta's competitors, Castleman, which was choosing between ProEnergy and TRUEPackage. In a very revealing email exchange, WattStock's CEO contacted GE's Lance Herrington and explained that Castleman "needs 'proof' of our program with GE for the due diligence requested by the lender's engineer, *so I don't think a WattStock*

---

[134] ECF 54, ¶¶ 90, 97, 109, and 117.

[135] ECF 96 at 42.

[136] Ex. 117 at App. 1577-78; Ex. 106 at App. 1180-81, 1187, 1204, 1251-52; Ex. 115 at App. 1486-88, 1491-92; Ex. 70 at App. 644; Ex. 47 at App. 267; Ex. 86 at App. 987; Ex. 40 at App. 231; Ex. 44 at App. 259; Ex. 86 at App. 987; Ex. 2006; Ex. 62 at App. 463-44.

*presentation will suffice*."[137] After some discussion, Manning and Herrington rejected one employees suggestion that they provide copies of the MOU (since it was not binding) and instead said he just needed "a presentation on GE letterhead, which Herrington promptly provided.[138]

After additional discussion, the parties sent Ryan Castleman two documents to pass on to Castleman's lender: a "letter of confirmation from GE" and "a presentation which describes the program with GE ."[139] The letter—which was on GE letterhead—brags that (1) "GE Power Services executed a memorandum of understanding defining a strategic partnership" between GE and WattStock" and that "WattStock performs all labor under the direction of GE project and technology teams in accordance with GE standards."[140] GE admits both of these assertions are false, and these misrepresentations mirror the lies GE told Alta both before and after it executed the Master Agreement.[141]

The same is true of the PowerPoint presentation GE provided. That presentation repeats GE's misrepresentations about the MOU before falsely stating that "WattStock maintains singular rights to refurbish GE's LM gas turbine packages," that WattStock has "direct access to GE's intellectual property for maximized payback and optimal life value," and finally, that GE's TRUEPackage provides "increased access to project financing and lower insurance premiums."[142] Again, none of this was true.[143]

GE knew that its non-existent relationship with WattStock would make it impossible for Alta to obtain financing for its projects before Alta executed the Master Agreement,[144] but nevertheless went out of its way to affirmatively misrepresent the

---

[137] Ex. 62 at App. 463-44.
[138] Ex. 62 at App. 463.
[139] Ex. 47 at App. 268.
[140] *Id.*
[141] Ex. 106 at App. 1259-62; Ex. 47 at App. 268, 280; Ex. 70 at 644 at App. 644; Ex. 56 at App. 338; Ex. 57 at App. 342.
[142] Ex. 47 at App. 271; Ex. 5 at App. 50; Ex. 38 at App. 222; Ex. 7 at App. 64.
[143] Ex. 106 at App. 1259-62; Ex. 110 at App. 1374.
[144] Ex. 106 at App. 1259; 1264-65; *see also* Ex. 110 at App. 1374; Ex. 62 at App. 463.

nature of that relationship to Alta (and others) to persuade them to commit to GE TRUEPackage instead of ProEnergy.[145] In fact, a pre-Master Agreement internal sales document describes GE's "strategy" for persuading customers like Alta to choose TRUEPackage over ProEnergy was to "[e]mphasize GE's partnership to create engineered Refurbished scope to meet their needs for lost costs upfront on asset refurbishment."[146]

This is just the beginning. For years, GE and WattStock touted their "partnership" and referenced the "MOU" governing their relationship.[147] GE repeated these lies in countless meetings with Alta before Alta executed the Master Agreement.[148] Throughout this period, GE and WattStock knew that the MOU created zero binding obligations of any kind.[149] GE's own corporate representative admitted "there was not" "any sort of Master Agreement between GE and WattStock that in a binding fashion set out WattStock's and GE's rights and obligations to one another with respect to TRUEPackage opportunities."[150] GE also admits its references to the MOU were misleading: "GE understands there's a difference between a *Non-Binding* Memorandum of understanding and a Memorandum of Understanding."[151] This reality is reinforced by GE's public filings, where GE explicitly describes non-binding MOUs like the one at issue here as "Non-Binding Memorand[a] of Understanding.[152]

Together, all of this evidence and testimony highlights how GE and WattStock deliberately misrepresented their relationship to induce Alta to refuse ProEnergy's genuinely bankable option even though GE knew Alta's lender would eventually require

---

[145] *See e.g.* Ex. 46 at App. 266; Ex. 70 at 644; Ex. 60 at App. 454.
[146] Ex. 44 at App. 259; Ex. 106 at App.; 286:17-24.
[147] *E.g.*, Ex. 62 at App. 463; Ex. 60 at App. 454; Ex. 46 at App. 266; Ex. 86 at App. 987; Ex. 57 at App. 341; Ex. 100 at App. 1144; Ex. 101 at App. 1147; Ex. 56 at App. 338; Ex. 106 at App. 1255-56.
[148] Ex. 117 at App. 1576-77; Ex. 115 at App. 1484-85, 1487, 1491.
[149] Ex. 106 at App. 1251-53, 1267-1269; Ex. 107 at App. 1302, 1322-23.
[150] Ex. 106 at App. 1245.
[151] Ex. 106 at App. 1251-52.
[152] Ex. 45 at App. 264.

GE (since there was no actual contract setting forth GE's obligation to stand behind the WattStock "partnership") to either prove the existence of its partnership with WattStock or formally guarantee WattStock's work.[153] That is, of course, exactly what happened, and GE's failure to provide this assurance prevented Alta from obtaining the project finance to move forward.[154]

       2.     *GE misrepresented the nature of the TRUEPackage warranty.*

GE also repeatedly misrepresented the nature of TRUEPackage's warranty. In its marketing materials, GE repeatedly emphasized that all TRUEPackages are backed by "GE warranty and performance guarantee."[155] But GE admits that was *never* true.[156]

       3.     *GE misrepresented that TRUEPackage was "bankable."*

GE also told Alta and others that TRUEPackage "would be a more attractive solution" in the eyes of lenders, that GE's involvement would improve financing options and insurance premiums, and GE openly admits that it "marketed that the TRUEPackage offering would improve its customers financing options." [157] All the while, GE knew (but did not tell Alta) that WattStock "being the lead" would adversely impact the bankability of Alta's projects and also understood that, come closing time, all lenders would require GE to take the "lead" on Alta's projects to move forward.[158]

To make matters worse, throughout the period that GE was touting its "partnership" with WattStock and the GE warranty and performance guarantees that supposedly attached to all GE TRUEPackages, GE knew WattStock was essentially insolvent, and that its lack of experience or credit would doom Alta's projects unless GE could persuade Alta's lenders that GE would stand behind WattStock's work.[159] For

---

[153] Ex. 62 at App. 464.
[154] Ex. 63 at App. 477.
[155] *E.g.*, Ex. 56 at App. 338; Ex. 4 at App. 50; Ex. 57 at App. 342; Ex. 21 at App. 114.
[156] Ex. 106 at App. 1197-99; Ex. 110 at App. 1392.
[157] Ex. 106 at App. 1187, 1189; Ex. 106 at App. 1187, 1189; *see also* Ex. 5 at App. 50; Ex. 87 at App. 989.
[158] Ex. 106 at App. 1264.
[159] Ex. 8 at App. 66; Ex. 9 at App. 68; Ex. 10 at App. 70; Ex. 11 at App. 76 ; Ex. 12 at App. 78; Ex. 106 at App. 1210-14.

example, one GE executive sternly warned GE's TRUEPackage team that GE needed to "have a candid discussion with WattStock about whether they can sustain operations in the future."[160] Another GE executive internally described GE's relationship with WattStock as "a shitshow"[161] and "a very risky partnership" due to WattStock's incompetence and inability to sustain its operations.[162] Again, GE's internal documents prove it knew that WattStock's poor credit and lack of relevant experience rendered TRUEPackage unbankable.[163]

### 4.    GE misrepresented the "pricing and availability of the units."

Finally, Alta alleges that GE "misrepresented the pricing and availability of the units."[164] In its Motion, GE argues that this allegation is really some sort of breach of contract claim, but GE is missing the point. Before Alta exclusively committed itself to relying on GE TRUEPackages, Alta disclosed its detailed budgetary requirements to both GE and WattStock. In response, "GE and WattStock convey[ed]" that Alta's pricing was "achievable and appropriate" and that they could hit Alta's requirement that GE's TRUEPackages would not cost more than $10 million each.[165] The record demonstrates GE knew that this was not true since it also knew that it would enforce its right to collect termination fees, which would drive the price of these units far beyond Alta's budgetary requirements.[166]

* * *

Each of these misrepresentations is independently actionable, so GE's Motion must be denied.

---

[160] Ex. 30 at App. 152; Ex. 106 at App. 1222.
[161] Ex. 109 at App. 1348.
[162] Ex. 140; Ex. 10 at App. 70; Ex. 106 at App. 1218.
[163] Ex 38 at App. 222; Ex. 47 at App. 271; Ex. 106 at App. 1264.
[164] ECF 54
[165] Ex. 111 at App. 1422-23.
[166] Ex. 116 at App. at 234-236; Ex. 111 at App. 1417, 1422.

**B.      Alta Justifiably Relied On GE's Misrepresentations.**

GE next challenges Alta's ability to prove it "reasonably" relied on GE's representations that "GE was obligated to step in if WattStock failed to perform and that each unit would cost [no] more than $10 million."[167] As explained above, GE is misrepresenting the substance of Alta's allegations. And GE does not even challenge Alta's ability to prove it justifiably relied on all but one of GE's alleged misrepresentations. As a result, GE's Motion must fail.

But GE does not merely misrepresent Alta's factual allegations. It also misstates the law. GE argues Alta cannot "reasonably" rely on GE's representations regarding the pricing and availability of TRUEPackages, but Alta *does not have to show its reliance was "reasonable."* Instead, Alta must show that its reliance on one or more of GE's misrepresentations was "justifiable." *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001). "Justifiable" reliance is not the same standard as "reasonable" reliance. *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003) (The "'justifiable reliance' element of common law fraud does not require a plaintiff to demonstrate reasonableness."). Instead, justifiability focuses on a "fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances *at or before the time of the alleged fraud.*" *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (emphasis added). That is why the justifiability of a party's reliance "presents a question of fact for the jury to decide." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 497 (Tex. 2019). Since GE does not challenge Alta's ability to show that its reliance was "justified," GE cannot prevail.

GE's argument also fails on its own terms. GE argues Alta's reliance was not "reasonable" because GE claims GE's letter to Deutsche Bank should have put Alta on notice that GE would not backstop WattStock's work. GE is mistaken, but it would not matter even if that assertion were accurate since any analysis of the justifiability of Alta's

---

[167] ECF 96 at 43.

reliance focuses on Alta's "appreciation of facts and circumstances *at or before the time of the alleged fraud.*" *Grant Thornton*, 314 S.W.3d at 923 (emphasis added). The letter GE describes was not sent until months after Alta executed the Master Agreement, so the content of the comfort letter has zero impact on Alta's claims.

Finally, GE's arguments cannot be squared with this Court's decision in *United Healthcare v. Synergen.* In that case, this Court rejected the defendant's challenge to United's ability to prove it justifiably relied on the defendant's billing company even though the record demonstrated the United "was suspicious of ... Medicus in late 2014 and United Toxicology in August of 2015" but kept paying its claims anyway. *United Healthcare Servs., Inc. v. Synergen Health LLC*, No. 3:20-CV-0301-X, 2023 WL 4186370, at *3 (N.D. Tex. June 26, 2023) (Starr, J.) (denying summary judgment). GE points to no evidence that Alta was even suspicious, must less that they knew that GE's actionable representations were false. GE's Motion must therefore be denied. *Id; see also United Healthcare Servs., Inc. v. Rossel*, No. 3:21-CV-1547-L-BT, 2024 WL 4451761, at *19 (N.D. Tex. July 23, 2024) (denying summary judgment even though plaintiff kept paying claims after it was actually aware of allegations of billing fraud against the defendant). Accordingly, the Court should reject GE's Motion.

## VI.    Alta Can Show GE Is Vicariously Liable For WattStock's Tortious Acts.

GE also argues Alta cannot show that GE is vicariously liable for WattStock's tortious acts as the participant of an actionable joint enterprise and/or under an ostensible agency theory. As discussed below, GE is mistaken.

### A.  GE and WattStock were a joint enterprise.

To prove GE and WattStock were a joint enterprise, Alta must prove"(1) an agreement, express or implied, among the members of [a] group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members[,] and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex.

2002). When parties are engaged in a joint enterprise, the acts of one may be imputed to the other. *Chevez v. Brinkerhoff*, No. 05-13-00572-CV, 2014 WL 7246798, at *8 (Tex. App.—Dallas Dec. 22, 2014, no pet.). Alta has more than enough evidence to defeat GE's Motion with respect to this claim.

### 1.    *Agreement and common purpose.*

The MOU between WattStock and GE states that "WattStock and GE will **work together** to refurbish previously owned aero-derivative power units, including the LM6000 series units."[168] Though not binding, this agreement is certainly evidence that GE and WattStock worked towards a common purpose. GE and WattStock's witnesses conceded as much during their depositions, too.[169] When combined with GE's open acknowledgement that it held itself out to the world as WattStock's "partner" and actively marketed the fact that the two entities are co-located in the same office, this evidence creates a genuine issue of material fact issue on the first two elements. *See Harrison v. Aztec Well Servicing Co.*, No. 1:20-CV-038-H, 2021 WL 6073164, at *22 (N.D. Tex. Dec. 23, 2021) (fact issue existed in part because, despite "different bank accounts and incorporation documents," defendants "voluntarily elected to hold themselves out to the world as a family through marketing materials" and "share[d] an office").

### 2.    *Community of pecuniary interest.*

Alta also has sufficient evidence of a "community of pecuniary interest" between GE and WattStock to defeat GE's request for summary judgment. When evaluating this factor, courts focus on whether there are facts which suggest that the members of the alleged joint enterprise pooled efforts and monetary resources to achieve certain goals—reducing costs and achieving economic gain by approaching the project as a joint undertaking. *See Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 614 (Tex. 2000)." That was certainly true of GE and WattStock's relationship. GE and WattStock shared offices and

---

[168] Ex. 1 at App. 7; Ex. 6 at App. 56.
[169] Ex. 106 at App. 1183.

an address, and GE handled all of the marketing on both of their behalf at the same time WattStock refurbishment and unit acquisition (with GE's assistance).[170] This satisfies Alta's burden, and GE's Motion must be denied. *Harrison v. Aztec Well Servicing Co.*, No. 1:20-CV-038-H, 2021 WL 6073164, at *22 (N.D. Tex. Dec. 23, 2021) (denying summary judgment on joint enterprise claim where defendants jointly marketed themselves, shared services, shared offices, shared and address, and one party paid for certain advertisements on behalf of both companies).

        3.     *Equal right of control.*

"The right of control is ordinarily a question of fact." *Sparger v. Worley Hosp., Inc.*, 547 S.W.2d 582, 583 (Tex. 1977). "[T]he equal-right-to-control element means 'that each [participant] must have an authoritative voice or must have some voice and right to be heard.'" *Harrison*, 2021 WL 6073164, at *23 (internal citations and quotations omitted). The control inquiry is necessarily fact intensive. *Duke Energy Int'l, L.L.C. v. Napoli*, 748 F. Supp. 2d 656, 674 (S.D. Tex. 2010). That one participant exercises day-to-day control over operations does not negate the equal right of control element so long as both participants possess a "mutual right to control the direction and management of the enterprise." *Texas Dep't of Transp. v. Able*, 35 S.W.3d 608, 613 (Tex. 2000). "The critical inquiry in analyzing the equal-right-of-control element is whether the defendant charged with joint enterprise liability had the right to control the tortfeasor at the time of the tortious conduct." *Harrison*, 2021 WL 6073164, at *23.

GE's own documents prove it had control over WattStock's conduct related to TRUEPackage at all times relevant to this case. GE itself told Alta and others that GE "oversees all aspects of WattStock's work"[171] on TRUEPackages and WattStock's employees had to get GE's approval to circulate any marketing materials and WattStock needed to follow GE's internal rules and processes when working on GE

---

[170] Ex. 5 at App. 52; Ex. 7 at App. 62-64.
[171] Ex. 60 at App. 454.

TRUEPackages.[172] GE also repeatedly refused to allow WattStock to finalize agreements on Alta's behalf unless the transaction accounted for the termination fees GE was due under their contracts with the would *sellers* over WattStock's objection.[173] Together, this evidence is enough to create a genuine issue of material fact on this element. *Harrison*, 2021 WL 6073164, at *23 (denying summary judgment).

### B. A reasonable fact finder could find WattStock was GE's ostensible agent.

GE's also contests Alta's ability to prove an ostensible agency between GE and WattStock because GE argues that Alta "knew that WattStock was not GE's agent."[174] But GE does not cite a shred of evidence in its Motion to support this argument nor could it because it is not true.

To hold GE liable for WattStock's conduct under an ostensible agency theory, Alta must prove that "(1) [GE], by its conduct, (2) caused [Alta] to reasonably believe that [WattStock] was an agent of [GE], and (3) that [Alta] justifiably relied on the appearance of agency." *Engle v. Dinehart*, 213 F.3d 639 (5th Cir. 2000).

Here, the record unambiguously demonstrates that GE held TRUEPackage out as a GE product, and affirmatively represented that it oversaw all of WattStock's work related thereto.[175] In its first meeting with Atla, GE described WattStock as its "de-facto sales force" and made clear that WattStock was the "marketing arm and conduit through which GE was going to sell TRUEPackages."[176] This is consistent with GE's written representations to Alta and others that have been produced in this case. For example, in 2018, GE wrote to one of Alta's competitors and explained that "WattStock and GE work in collaboration throughout all phases of the project from the start of a sales opportunity, identification of equipment to be purchased, collaboration on level of refurbishment, and necessary upgrades to meet the end customer operational mission" and that "Wattstock

---

[172] Ex. 87 at App. 989; Ex. 26 at App. 139.
[173] Ex. 29 at App. 148; Ex. 31 at App. 156; Ex. 35 at App. 194; Ex. 37 at App. 204.
[174] ECF 96 at 46-47.
[175] Ex. 106 at App. 1191; Ex. 6 at App. 58.
[176] Ex. 115 at App. 1494-95.

LLC performs all labors under the direction of GE Project and Technology teams in accordance with GE standards."[177] Along the same lines, GE wrote to Alta—on GE letterhead—and stated that GE "oversees all aspects of WattStock's work."[178] In a different 2018 email, another GE employee explained "the rules are [WattStock] act[s] as a sales channel to help identify TRUEPackages[.']"[179] GE also held TRUEPackage--which GE trademarked under its own name without referencing WattStock[180]—out as a GE product and owned the trademark for TRUEPackage, and openly marketed the fact that WattStock officed in GE's Jancintoport facility.[181]

This is also consistent with the way GE described its relationship with WattStock internally, and in fact consistent with the reality of the GE-WattStock relationship. In his August 14, 2018 email to the rest of the GE's sales team launching TRUEPackage, GE's Herrington explained that "the rules are that [WattStock] acts as a sales channel to help identify TRUEPackage (that's the refurb brand name btw) opportunities and then brinf [GE] Aero Sales Manager."[182] Herrington continued to explain that WattStock "must follow [GE's] sales process  with 100% involvement from GE's sales manager" before concluding "[o]ne key thing, [WattStock] should always be in contact with [GE] when calling on [GE's] customers, and the GE sales manager should be involved whenever they feel they can/should be."[183]

Together, this evidence supports Alta's allegation that GE deliberately created the impression that WattStock was its agent, and everything it said and did both internally and externally confirmed as much. Alta's reliance on these representations was justified, too. As Alta's Matt Laterza explained, he did not think to question whether GE and

---

[177] Ex. 182 at App. 266;
[178] Ex. 60 at App. 454.
[179] Ex. 23 at App. 127.
[180] Ex. 106 at App. 1163.
[181] Ex. 106  at App. 1165-66; Ex. 5 at App. 47.
[182] Ex. 23 at App. 127.
[183] *Id.*

WattStock were lying about their relationship given that all of GE's representations occurred "at a GE facility and all the meetings [with WattStock and GE] are taking place at a GE facility where you check in with GE's security and walk around with a GE visitor's badge with the GE meatball on it, you know, you feel pretty comfortable."[184] This is more than enough to allow a jury to find an ostensible agency, so GE's Motion for Summary Judgment must be denied.

### VI.   Alta's Derivative Liability Claims Also Survive.

In its penultimate section, GE offers a variety of reasons it claims the Court should dismiss Alta's civil conspiracy and tortious interference claims. The most cogent of these arguments is GE's easily debunked assertion that Alta's derivative claims fail because Alta has no evidence that GE or WattStock committed any independently tortious conduct. As detailed above in this Response, Alta's fraud, fraudulent inducement, and negligent misrepresentation claims are all supported by ample evidence. Since Alta's underlying claims survive, so too must its civil conspiracy and tortious interference claims.

GE also nominally targets Alta's tortious interference claim because "the only conduct on which Alta can rely are the above oral promises GE allegedly made."[185] Again, GE misrepresents and ignores Alta's actual allegations, which are supported by substantial evidence. Since GE has not challenged the substance of Alta's allegations, the Court cannot accept GE's arguments and must deny its Motion. What is more, the evidence demonstrates that GE made numerous actionable misrepresentations.

Third, GE argues that the "express contract bar" prohibits Alta from recovering the $1.5 million of Alta's money GE stole under an unjust enrichment theory. GE does not point to any relevant contract that covers Alta's payments, which Alta would not

---

[184] Ex. 115 at App. 1493.
[185] ECF 96 at 47.

have made but for GE's misrepresentations. Accordingly, GE has not met its initial burden.

### VII.    Alta Can Recover Punitive Damages.

Finally, GE challenges Alta's ability to recover punitive damages because it argues that "Alta is contractually barred from seeking punitive damages" or, alternatively, because (2) "Alta cannot create a genuine fact dispute as to whether GE acted with malice or gross negligence or fraudulently."[186] Again, GE's arguments are facially absurd. Once again, GE has not come close to carrying its burden of demonstrating that it is a third-party beneficiary of the Master Agreement, and even if it could Alta's claims arise out of acts that took place *before* Alta executed the Master Agreement or became a "subcontractor" on the Alta projects. GE's suggestion that Alta has no evidence that GE acted fraudulently is equally ridiculous. In reality, and as Alta has outlined at length, the record is full of evidence of GE's fraudulent acts, and those same acts would require the Court to deny GE's Motion even GE could show it was a "subcontractor" when Alta signed the Master Agreement and/or when GE committed the tortious acts giving rise to Alta's claims here.

### CONCLUSION

Alta has substantial evidence to support every element of each of its claims against GE and WattStock. Accordingly, GE's Motion for Summary Judgment should be denied in full.

---

[186] ECF 96 at 49.