IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ALTA POWER LLC,

     *Plaintiff/ Counter-Defendant,*

v.

GENERAL ELECTRIC INTERNATIONAL
INC., d/b/a GE POWER SERVICES,

     *Defendant/ Counter-Plaintiff.*

Case No. 3:23-CV-0270-X

## ALTA POWER LLC'S APPENDIX IN SUPPORT OF ITS RESPONSE IN OPPOSITION TO GE'S MOTION FOR SUMMARY JUDGMENT

Alta Power LLC ("Alta") respectfully submits this Appendix in Support of Alta's Response in Opposition to GE's Motion for Summary Judgment.

| Exhibit | Description | App. Pages |
|---------|-------------|------------|
| 1. | Memorandum of Understanding - June 2017 | App. 0006–0011 |
| 2. | Master Agreement – February 2019 | App. 0012–0024 |
| 3. | WattStock Limited Notice To Proceed to Alta – December 2019 | App. 0025–0040 |
| 4. | YouTube - 2018 WTUI Conference | App. 0041–0045 |
| 5. | Aero TRUEPackage PowerPoint - March 2018 | App. 0046–0054 |
| 6. | 7/30/2019 Email from L. Herrington | App. 0055–0058 |
| 7. | 4/26/2019 Email from L. Herrington | App. 0059–0064 |
| 8. | 11/13/2019 Email from D. Hill | App. 0065–0066 |
| 9. | 5/31/2019 Email from D. Hill | App. 0067–0068 |
| 10. | 6/5/2019 Email from L. Herrington | App. 0069–0072 |
| 11. | 5/31/2019 Email from D. Hill | App. 0073–0076 |
| 12. | 6/19/2019 Email from M. Tremblay | App. 0077–0080 |
| 13. | 10/17/2019 Email from K. Cunningham | App. 0081–0083 |
| 14. | 8/10/2020 Email from G. Hall | App. 0084–0085 |
| 15. | 6/8/2018 Email from L. Herrington | App. 0086–0090 |
| 16. | 1/23/2019 Email from A. Babu | App. 0091–0093 |
| 17. | 12/19/2018 Email from L. Herrington | App. 0094–0096 |
| 18. | 1/25/2019 Email from J. Canon | App. 0097–0099 |
| 19. | 7/26/2019 Email from J. Manning | App. 0100–0102 |

| Exhibit | Description | App. Pages |
|---------|-------------|------------|
| 20. | 4/23/2019 Email from M. Tremblay | App. 0103–0108 |
| 21. | Aero TRUEPackage PowerPoint – February 2020 | App. 0109–0123 |
| 22. | 6/5/2018 Email from J. Manning | App. 0124–0125 |
| 23. | 8/14/2018 Email from L. Herrington | App. 0126–0129 |
| 24. | 10/16/2018 Email from M. Tremblay | App. 0130–0134 |
| 25. | 12/20/2018 Email from L. Herrington | App. 0135–0137 |
| 26. | 10/30/2018 Email from G. Fulmer | App. 0138-0142 |
| 27. | 2/25/2019 Meeting Invitation from A. Babu | App. 0143–0144 |
| 28. | 2/19/2019 Meeting Invitation from J. Canon | App. 0145–0146 |
| 29. | 3/13/2019 Email from L. Herrington | App. 0147–0150 |
| 30. | 6/5/2019 Email from L. Herrington | App. 0151–0154 |
| 31. | 8/5/2019 Email from N. Basegmez | App. 0155–0171 |
| 32. | 11/19/2019 Email from L. Herrington | App. 0172–0173 |
| 33. | 11/26/2019 Email from A. Babu | App. 0174–0177 |
| 34. | 2/13/2020 Email from L. Herrington | App. 0178–0193 |
| 35. | 3/17/2020 Email from L. Herrington | App. 0194–0201 |
| 36. | 3/19/2020 Email from J. Manning | App. 0202–0203 |
| 37. | 3/20/2020 Email from L. Herrington | App. 0204–0211 |
| 38. | Aero TRUEPackage PowerPoint – October 2019 | App. 0212–0224 |
| 39. | 5/10/2018 Email from J. Canon | App. 0225–0229 |
| 40. | 5/11/2018 Email from L. Herrington | App. 0230–0236 |
| 41. | 9/13/2018 Meeting Invitation from L. Herrington | App. 0237–0240 |
| 42. | 10/22/2018 Email from A. Babu | App. 0241–0250 |
| 43. | 1/24/2019 Email from J. Manning | App. 0251–0252 |
| 44. | 2/13/2019 Email from A. Babu | App. 0253–0259 |
| 45. | 2022 GE Annual Report | App. 0260–0264 |
| 46. | 2/28/2018 Letter to R. Castleman from L. Herrington | App. 0265–0266 |
| 47. | 2/28/2018 Email from J. Manning | App. 0267–0280 |
| 48. | 7/22/2019 Email from J. Presner | App. 0281–0282 |
| 49. | 4/17/2019 Email from J. Presner | App. 0283–0288 |
| 50. | 10/9/2019 Email from J. Pandolfi | App. 0289–0291 |
| 51. | 10/30/2019 Email from J. Pandolfi | App. 0292–0294 |
| 52. | 11/7/2019 Email from J. Pandolfi | App. 0295–0306 |
| 53. | Power Magazine | App. 0307–0320 |
| 54. | 5/30/2019 Email from M. Laterza | App. 0321–0323 |
| 55. | 7/2/2019 Email from M. Laterza | App. 0324–0330 |
| 56. | GE website | App. 0331–0339 |
| 57. | WattStock website | App. 0340–0344 |
| 58. | 8/29/2018 ProEnergy Proposal to Alta | App. 0345–0446 |
| 59. | Mutual Confidentiality Agreement December 2018 | App. 0447–0451 |
| 60. | 7/31/2019 Email from M. Laterza | App. 0452–0455 |

| Exhibit | Description | App. Pages |
|---------|-------------|------------|
| 61. | 9/3/2019 Email from M. Laterza | App. 0456–0461 |
| 62. | 2/28/2018 Email from L. Herrington | App. 0462–0475 |
| 63. | 8/14/2019 Email from J. Manning | App. 0476–0478 |
| 64. | 6/20/2019 Letter from Deutsche Bank to Alta | App. 0479–0492 |
| 65. | 3/5/2020 Email from W. Phelps | App. 0493–0494 |
| 66. | 9/5/2019 Email from M. Laterza | App. 0495–0587 |
| 67. | Expert Report of E. Rodriguez | App. 0588–0633 |
| 68. | List of Castleman Power Development Projects | App. 0634–0636 |
| 69. | ProEnergy Power Study | App. 0637–0638 |
| 70. | 9/4/2019 Email from M. Laterza | App. 0639–0642 |
| 71. | 7/29/2019 Email from A. Herr | App. 0643–0645 |
| 72. | 10/12/2019 Email from J. Chen | App. 0646–0648 |
| 73. | April 2019 Indicative Term Sheet from Deutsche Bank to Alta | App. 0649–0652 |
| 74. | 3/11/2019 Email from D. Venkatraman | App. 0653–0656 |
| 75. | 12/3/2019 Email from S. Stadlinger | App. 0657–0699 |
| 76. | 5/28/2020 Email from M. Laterza | App. 0700–0705 |
| 77. | 3/12/2020 Email from S. Jensen | App. 0706–0707 |
| 78. | 1/31/2020 Letter from Starwood Infrastructure Finance to Alta | App. 0708–0717 |
| 79. | 2019 Credit Agreement between Alta and Deutsche Bank | App. 0718–0854 |
| 80. | 3/3/2020 Email from E. Bergmann | App. 0855–0856 |
| 81. | 5/28/2020 Email from M. Laterza | App. 0857–0858 |
| 82. | ERCOT Heat Rate Call Option Term Sheet | App. 0859–0861 |
| 83. | ERCOT Standard Generation Interconnection Agreement – GoodAlta | App. 0862–0908 |
| 84. | ERCOT Standard Generation Interconnection Agreement – AltaJac | App. 0909–0955 |
| 85. | Castleman Energy Investor Presentation for Project Agilon - March 2019 | App. 0956–0985 |
| 86. | 3/6/2020 Email from A. Babu | App. 0986–0988 |
| 87. | 5/4/2018 Email from L. Herrington | App. 0989–0991 |
| 88. | Casey Industrial LM6000 Install Proposal Schedule for Goodlow, TX | App. 0992–0998 |
| 89. | List of Castleman Power Development Projects | App. 0999–1001 |
| 90. | Settlement Agreement | App. 1002–1009 |
| 91. | Declaration of T. West | App. 1010–1012 |
| 92. | Expert Report of W. Mars | App. 1013–1027 |
| 93. | 2020 Indicative Term Sheet from Macquarie Investments US Inc. to Alta | App. 1028–1034 |
| 94. | Expert Report of Q. Mimms | App. 1035–1077 |

| Exhibit | Description | App. Pages |
|---|---|---|
| 95. | November 2018 Indicative Financing Proposal from MUFG Bank, Ltd. and MUFG Securities Americas, Inc. to Alta | App. 1078–1107 |
| 96. | December 2018 Indicative Proposal from MUFG Bank, Ltd. and MUFG Securities Americas, Inc. to Alta | App. 1108–1112 |
| 97. | 1/22/2019 Email from M. Laterza | App. 1113–1118 |
| 98. | Fuel Management Services Agreement | App. 1119–1140 |
| 99. | 4/18/2019 Email from M. Manoucheri | App. 1141–1142 |
| 100. | 4/18/2019 Email from A. Babu | App. 1143–1145 |
| 101. | 4/18/2019 Email from TJ Higgins | App. 1146–1148 |
| 102. | 6/20/2019 Email from L. Herrington | App. 1149–1151 |
| 103. | 9/16/2019 Email from R. Farr | App. 1152–1154 |
| 104. | 1/9/2020 Email from A. Babu | App. 1155–1157 |
| 105. | 4/18/2019 Email from A. Babu | App. 1158–1160 |
| 106. | Deposition of GE 30(b)(6) Representative | App. 1161–1270 |
| 107. | Deposition of L. Herrington | App. 1271–1324 |
| 108. | Deposition of A. Babu Vol. 1 | App. 1325–1345 |
| 109. | Deposition of A. Babu Vol. 2 | App. 1346–1353 |
| 110. | Deposition of J. Manning | App. 1354–1410 |
| 111. | Deposition of P. Watson | App. 1411–1430 |
| 112. | Deposition of G. Hall | App. 1431–1436 |
| 113. | Deposition of A. Young | App. 1437–1440 |
| 114. | Deposition of C. Aranas | App. 1441–1445 |
| 115. | Deposition of M. Laterza Vol. 1 | App. 1446–1532 |
| 116. | Deposition of Alta 30(b)(6) Representative Vol. 1 | App. 1533–1567 |
| 117. | Deposition of M. Laterza Vol. 2 | App. 1568–1589 |
| 118. | Deposition of W. Phelps | App. 1590–1596 |
| 119. | Deposition of R. Hart | App. 1597–1605 |
| 120. | Deposition of T. West | App. 1606–1618 |
| 121. | Deposition of C. Gaset | App. 1619–1622 |
| 122. | Deposition of J. Presner | App. 1623–1652 |
| 123. | Deposition of J. Pandolfi | App. 1653–1669 |
| 124. | 2/5/2019 Email from J. Manning | App. 1670–1671 |
| 125. | 2/4/2019 Email from J. Manning | App. 1672–1675 |
| 126. | Declaration of W. Phelps | App. 1676–1677 |
| 127. | Declaration of M. Laterza | App. 1678-1691 |
| 128. | Alta Power Slide Deck | App. 1692 -1713 |
| 129. | Exhibit B to WattStock-Alta Master Agreement | App. 1714-1723 |
| 130. | 6/5/2018 Email from C. Yancy | App. 1724-176 |
| 131. | 12/20/2018 Email from J. Manning | App. 1727-1730 |

| Exhibit | Description | App. Pages |
|---------|-------------|------------|
| 132. | 4/10/2019 Proposal from WattStock to Alta for Jacksonville, Texas | App. 1731-1762 |

# Exhibit 1

Alta App.000006

**Memorandum of Understanding**

This Memorandum of Understanding (this "MOU") is by and between WattStock, LLC ("WS") and General Electric International, Inc., acting through its GE Power Services business ("GE").

**WHEREAS**, WS may purchase, refurbish and resale existing LM2500 and LM6000 Gas Turbines manufactured by GE or its affiliates and their associated packages (together, "LM Package(s)) (each such purchase, refurbishment and resale, a "Transaction"); and

**WHEREAS**, GE may assist WS in certain Transactions by (i) providing evaluations of the LM Package, (ii) purchasing the gas turbine(s) associated with a LM Package, (iii) providing a new or refurbished gas turbine for installation into a LM Package, iv) providing installation and commissioning supervision, and (iv) providing other parts and services for the upgrade of a LM Package, in each case, in accordance with the terms of a separately issued purchase order or purchase agreement.

**WHEREAS**, this MOU is not intended to bind either Party to sell any equipment, parts or services to the other but shall only be an expression of the parties' current understanding of the Transactions and to serve as the framework for further discussions and the negotiation and documentation of definitive agreements with respect to the Transaction.

NOW, THEREFORE, the parties agree as follows:

1) **Purchase Transactions Description; Scope of Responsibilities**

   a) WS may negotiate and purchase LM Packages regardless of whether such LM Packages have been placed into commercial operation.

   b) GE may support WS in such negotiations and purchases by providing evaluations of the gas turbines of an LM Package including, but not limited to, operational history and pedigree, borescope reports, past depot and other technical reports, and incident reports (to the extent such history and reports are available to GE), plus the then-current GE gas turbine acquisition price for the available turbine(s) (the "Evaluation"); provided that the provision of any such Evaluation shall not be deemed to be an offer to purchaser unless such offer is explicitly included therein.

   c) For any LM Package purchased by WS from a third-party owner, GE, at its sole option, may purchase the associated gas turbine(s) from WS, pursuant to terms and conditions to be set forth on Exhibit A, which may include mutually agreed modifications, and which shall be attached to or incorporated by reference in a purchase order or purchase agreement (a "GT Purchase Agreement"). The price of such associated gas turbine shall be as agreed upon by the Parties in the applicable GT Purchase Agreement. The Parties shall determine such price utilizing a pre-established pricing algorithm and/or matrix which would utilize some or all of the following: inbound engine configuration, age,

GE Confidential Information

EXHIBIT
Watson
1
1/12/21    aw

WATTSTOCK 000048
Alta App.000007

history of operation and maintenance, and current condition and such other factors as the parties may agree. For the avoidance of doubt, GE would not be obligated to purchase any such gas turbine that are included in any LM Package except gas turbines subject to an executed GT Purchase Agreement.

2) **Refurbish Transactions Description; Scope of Responsibilities**

a) When necessary to refurbish the LM Package or significant subassemblies (other than the gas turbine purchased by GE) at a location other than WS, WS may endeavor to utilize the GE Jacintoport facility pursuant to terms and conditions to be set forth in a separate agreement (a "Package Refurbishment Agreement").

b) WS shall endeavor to also give GE a right of first offer to perform any of the following parts and services on a LM Package, whether executed at GE's Jacintoport facility or otherwise:

   i) OEM-compliant control system upgrade or refurbishment, whether hardware and software or limited to software upgrade;

   ii) Fuel system conversion, such as from natural gas to dual fuel; and/or

   iii) Additional package equipment where GE may have existing inventory or supply chain advantages.

   Such services would be performed by GE pursuant to terms and conditions to be set forth in the Package Refurbishment Agreement or in such separate agreement as may be agreed by WS and GE.

c) GE may sell to WS and WS would re-sell any of the following as a function of customer value/market conditions and asset availability:

   i) a used full life gas turbine, meaning the gas turbine has been prudently maintained such that it is expected to achieve typical maintenance intervals, such as 25,000 hours before hot section refurbishment and 50,000 hours before major inspection, and potentially with value-added upgrades such as increased output or improved durability,

   ii) a used gas turbine with some estimate of remaining life but otherwise only nominally refurbished, referred to as partial life assets, or

   iii) a new gas turbine of required configuration.

   Purchase shall be pursuant to terms and conditions to be set forth on Exhibit B, which may include mutually agreed modifications, and which shall be attached to or incorporated by reference in a purchase order or purchase agreement (a "GT Sales Agreement").

d) Availability and final obligation of any of the above may be coordinated prior to WS entering into final end-contract with a customer to ensure on-time delivery of a



GE Confidential Information

WATTSTOCK 000049

Alta App.000008

Refurbished LM Package, with an expectation that final need for the gas turbine is normally at least 5 months from contract signature.

e) GE may also charge a separate test fee, necessary for performance guarantees if required by a customer, on engines not refurbished to full life intervals.

f) With respect to any gas turbine sold to WS for an LM Package in accordance with this MOU, GE may provide WS with a transferrable gas turbine warranty upon with delivery and title transfer to the customer. For a new or used full life gas turbine, such warranty would not be less than one year of operation or eighteen months from delivery, whichever comes first. For a partial life asset, GE would endeavor to supply an operational warranty of at least six months of such gas turbine operation. GE's standard warranty terms and conditions would also apply.

g) GE and WS would coordinate package refurbishment activity such that, where end-customer value warrants, GE would provide a full, transferrable package warranty in conjunction with the gas turbine. WS would compensate GE for assumption of the warranty risk on WS' package refurbishment scope as described in this Section subject to the terms and conditions of a signed purchase agreement for WS purchase of the gas turbine for identified resale to end customer.

h) Any warranty provided by GE on the gas turbine or any other parts of a refurbished LM Package is subject to proper installation and commissioning ("I&C"), and shall be conditioned upon GE's oversite of such I&C, to be defined and subject to terms and conditions to be negotiated. GE may offer additional I&C scope, as needed on a deal by deal basis.

i) In addition to any other payments to GE for gas turbines or other services to be provided by GE as described in the applicable signed agreement between the parties, WS would pay to GE a fee for each re-sold Refurbished LM Package, subject to the terms and conditions of a signed purchase agreement for WS purchase of the gas turbine for identified resale to end customer, for which GE would provide some or all of the following:

   i) Test-cell based gas turbine thermal performance guarantees, such as MW output, heat rate or both. The ability to translate used engine test cell performance plus refurbished package performance into a site guarantee would be evaluated if market conditions warrant.

   ii) Associated thermal performance degradation curves to establish customer economic expectations but not for guarantee. Note: GE would, in most circumstances, be willing to guarantee thermal performance degradation over time in some form of maintenance agreement negotiated separately from unit purpose.

   iii) Product reliability and availability experience, operational flexibility characteristics and other information to support marketing of the products as industry leading.

   iv) Reasonable marketing and other consultation to position the WS/GE collaboration as the preferred reseller and installer of Refurbished LM packages.

   v) Full Refurbished LM Package warranty as described above.

Page **3** of **20**

GE Confidential Information

WATTSTOCK 000050
Alta App.000009

3) **Service Agreements.** For each Refurbished LM Package quoted, GE would be permitted to offer, under a separate agreement, a service contract, at the end customer's option, that would include post-commissioning thermal and operational performance guarantees, life cycle cost risk transfer or other provisions. GE would have a right of first refusal to these opportunities if end customer requests or otherwise indicates interest in same from WS.

4) **Confidentiality**

The terms of the Mutual Nondisclosure Agreement dated 1 March 2017 between GE and WS (the "MNDA") are hereby incorporated herein by reference and shall continue in full force and effect until the termination of this MOU. This MOU shall constitute Confidential Information subject to such terms. Neither party nor any of its affiliates shall make or cause the making of any public statements with respect to this MOU without the prior written consent of the other party, except to the extent permitted under the terms of the MNDA.

5) **TERMINATION**

Either party may terminate this MOU at any time upon notice to the other party.

6) **Non-Binding; Disclaimer**

a) Except for Section 4 (Confidentiality) and Section 7 (Governing Law), each of which is intended to be binding, the parties agree that this MOU shall not constitute a legally binding or enforceable obligation or agreement on the part of either party. For the avoidance of doubt, neither party shall be obligated to purchase or sale any equipment, parts or services solely pursuant to this MOU.

b) The parties do not intend this MOU to create any partnership, corporation, agency or fiduciary relationship among them. Neither party shall have the right or power to bind the other party without the written consent of such other party.

c) Neither party shall have any liability to the other party for any failure to enter into any definitive agreements or documents, and either party may terminate any discussion, communication or negotiations with respect to a Transaction at any time for any reason or no reason at all.

d) THIS MOU AND THE INFORMATION CONTAINED HEREIN (THIS "INFORMATION") IS MADE AVAILABLE BY EACH PARTY TO THE OTHER AT NO CHARGE. THIS INFORMATION IS PROVIDED ON AN "AS IS" BASIS. EACH PARTY EXPRESSLY DISCLAIMS ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING BUT NOT

Page **4** of **20**



WATTSTOCK 000051
Alta App.000010

LIMITED TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

7)  **Governing Law**

This MOU shall be governed by and construed in accordance with the laws of the State of New York.

Signed                                                      Date

_Kevin_                                                  26 June 2017

Selma Kivran
General Manager – Aero Product Line
GE Power Services

_Jay Manning_                                          21 June 2017

Jay Manning
President
WattStock, LLC

Page **5** of **20**

WATTSTOCK 000052
Alta App.000011

# Exhibit 2

Alta App.000012

# MASTER AGREEMENT

This Master Agreement ("Agreement") is made and entered into as of the 27th day of February 2019 ("Effective Date") by and between Alta Power LLC, a Texas limited liability company ("Alta") with offices at 4605 Post Oak Place Dr. Suite 270, Houston, TX 77027, and WattStock LLC, a Texas limited liability company ("WattStock") with offices at Suite 850, 4040 North Central Expressway, Dallas, Texas 75204. Alta and WattStock are also each referred to herein as a "Party" and collectively as the "Parties".

WHEREAS, Alta is a power plant developer with a unique strategy for developing power generation projects in the Texas market using surplus combustion turbine packages; and

WHEREAS, WattStock is a supplier of power generation equipment and services, with extensive knowledge of the power equipment market; and

WHEREAS, Alta and WattStock seek to enter into an agreement or agreements to leverage each Party's unique skills to provide for an expedited and efficient means for (i) locating, evaluating, and pricing surplus combustion turbine generator assets available for purchase, (ii) purchasing and refurbishing of selected generator assets, and (iii) designing, constructing, and operating power generation plants in the Texas market ("Business Purpose").

NOW, THEREFORE, for and in consideration of the mutual covenants and promises and representations contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Alta and WattStock agree as follows:

## Article 1.    Definitions

Whenever used in this Agreement with initial capitalization, the following definitions shall be applicable:

**"Affiliate"** of a Party means any other person (natural person, corporation limited liability company, partnership, firm, association, or any other entity whether acting in an individual, fiduciary or other capacity) that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, the Party specified, including, without limitation such Party's owners, directors, officers, and employees.

**"Assets"** means major sub-components of an LM6000 Generator Set that may qualify for purchase for the Business Purpose including (i) generator set package with combustion turbine engine and electric generator, (ii) generator set package without combustion turbine engine and/or electric generator, (iii) combustion turbine engine only, (iv) electric generator only, and/or (v) such other equipment as the Parties may agree.

**"Business Day"** means a Day, other than a Saturday or Sunday or a legal or bank holiday, in the State of Texas.

**"Business Purpose"** has the meaning ascribed to it in the Preamble.



EXHIBIT
Watson
3
1/12/21    aw

1

Alta App.000013

"**Confidential Information**" means the existence and terms of this Agreement, the fact that discussions are taking place between the Parties concerning the Business Purpose, and any and all information related to the Business Purpose disclosed to a Receiving Party prior to, on or after the Effective Date by a Disclosing Party (whether written, oral, digital or visual) that has economic value and is not generally known to the public, or which would constitute a trade secret under the U.S. Uniform Trade Secrets Act and any oral, electronic or written communications thereof, including without limitation information concerning discoveries, developments, designs, improvements, inventions, formulas, software programs, processes, techniques, know-how, computer programs, program code, specifications, analyses, reports, drawings, sketches, models, samples, data, algorithms, trade secrets, models, samples, calculations, formulas, WattStock manufacturing specifications or methods, analytical or quality control methods, actual and projected sales information, cost, price and other financial information, information relating to actual or potential suppliers and customers. markets, marketing opportunities, business structure, assets, liabilities, budgets, operations and strategies or other technical or business information, together with any information developed or derived by Receiving Party from such disclosed information.

"**Day**" or "**day**" means a calendar day, unless otherwise specified.

"**Disclosing Party**" means a Party providing Confidential Information to the Receiving Party.

"**Effective Date**" has the meaning ascribed to it in the Preamble.

"**Equipment Purchase and Sale Agreement**" means a definitive agreement to be entered into by Alta and WattStock for the purchase by Alta from WattStock of an LM6000 Generator Set.

"**Exclusivity Period**" has the meaning ascribed to in Article 6.1.

"**Initial List of Assets**" has the meaning ascribed to in Article 2.1.

"**Inspection Conclusions and Estimates**" means any reports, condition assessments, analyses, recommendations, estimates to repair or refurbish, proposals, work scopes or other information prepared by WattStock or for WattStock by any WattStock subcontractor based upon Inspection Data.

"**Inspection Data**" means any information documenting the existing condition of the Asset including borescope photos, videos, operation and maintenance logs or other data obtained during the course of an Asset inspection but excluding any Inspection Conclusions and Estimates.

"**LM6000 Generator Set**" means a skid-mounted, GE aeroderivative combustion turbine power generation package refurbishment by WattStock.

2

**"Owner"** means the person or entity that owns or controls the right to sell an Asset. The term "Owner" may include third-party agents or brokers retained by the title holder of the Asset to find potential buyers.

**"Receiving Party"** means a Party to whom Disclosing Party provides Confidential Information.

**"Representatives"** of a Party means any attorneys, accountants, consultants, agents and advisors, as well as actual or prospective partners, joint venturers, co-owners, lenders, financing parties, underwriters, and equity investors.

**"Term"** has the meaning ascribed to it in Article 5.

### Article 2.    Identifying and Prioritizing LM6000 Generator Sets

2.1    Promptly following the Effective Date, WattStock will deliver to Alta as Confidential Information an initial list of Assets that WattStock believes may be available for purchase.  The initial list will include general information about the country of the Asset's last known location, its approximate age, and if available, price being asked by the Owner ("Initial List of Assets").

2.2    Within two (2) Business Days following Alta's receipt of the Initial List of Assets, Alta shall (i) advise WattStock in writing of any Asset on the Initial List of Assets that Alta has been in negotiations with the Owner to purchase such Asset within the last six (6) months, and (ii) provide WattStock with reasonable documentation demonstrating Alta's prior awareness of the Asset and Alta's efforts to purchase same. Alta and WattStock will jointly determine the best strategy to transition the purchase lead from Alta to WattStock.

2.3    The Parties shall jointly rank-order the Initial List of Assets with goal of developing a list of top target Assets sufficient, once refurbished, as required, by WattStock, to make up nine (9) LM6000 Generator Sets.

2.4    At any time during the Term of this Agreement, either Party may disclose to the other Party as Confidential Information additional Assets that were not on the Initial List of Assets. In such event, the Party receiving the disclosure information shall within two (2) Business Days following its receipt of the newly disclosed Asset, (i) advise the disclosing Party in writing that the receiving Party has been in negotiations with the Owner to purchase such Asset within the last six (6) months, and (ii) provide the disclosing Party with reasonable documentation demonstrating the receiving Party's prior awareness of the Asset and its efforts to purchase same. Alta and WattStock will jointly determine the best strategy to transition the purchase lead from Alta to WattStock.

### Article 3.    Securing Right to Purchase Units

3.1    With approval of Alta, WattStock will arrange with the Owner of an Asset an inspection to evaluate the condition and refurbishment requirements of such Asset. Alta understands and acknowledges that the types of Asset inspections that WattStock will be able to perform in the

Alta App.000015

field cannot identify all defects in an Asset, even with the benefit of borescope inspections of the internals of a combustion turbine engine. Alta will be responsible for reimbursing WattStock for WattStock's out-of-pocket expenses incurred in performing Asset inspections. Aggregate expenses in excess of $20,000 will require prior written Alta approval. WattStock shall provide Alta with a copy of the Inspection Data and WattStock may retain a copy of the Inspection Data. Any Inspection Conclusions and Estimates delivered by WattStock to Alta shall be WattStock Confidential Information.

3.2    Following inspection of Assets sufficient to make-up a generator package, WattStock will provide to Alta as Confidential Information a not-to-exceed price for an agreed upon scope of work to complete an LM6000 Generator Set. For the avoidance of doubt, the agreed upon scope of work for the LM6000 Generator Set will exclude any defects that are not reasonably identifiable through the field inspections performed by WattStock pursuant to Article 3.1.

3.3    Prior to WattStock securing from the Owner of an Asset the exclusive right to purchase same, WattStock and Alta would agree in writing on the terms, including the amount of any non-refundable payments Alta would agree upon in order that WattStock may secure the right to purchase the Asset.

3.4    WattStock would then enter into negotiations with the Owner of an Asset on purchase terms or a purchase option consistent with the terms approved by Alta. Commencing from the date that WattStock and Alta have agreed pursuant to Article 3.1 that WattStock should inspect an Asset and continuing through the first to occur of the date that (i) Alta rejects such Asset, (ii) Owner declines to grant WattStock an exclusive right to purchase such Asset, or (iii) is sixty (60) days following WattStock's latest proposal to the Owner of an Asset to grant WattStock an exclusive right to purchase such Asset (or such longer period as may be agreed by the Parties) and Owner still has not granted WattStock an exclusive right to purchase the Asset, WattStock agrees it shall not market such Asset to any third-parties.

### Article 4. Refurbishing of Assets for Alta

4.1    Alta and WattStock will enter into one or more definitive Equipment Purchase and Sale Agreement describing the scope, terms, and price under which Alta would purchase from WattStock each LM6000 Generator Set.

4.2    Alta acknowledges that the price for each LM6000 Generator Set may vary due to the variable conditions of each Asset and the variable scopes of refurbishment work that may be required for each Asset. Certain defects or conditions, including what is commonly referred to as "fallout", are not discoverable until the Asset is disassembled in a repair shop setting. To the extent such additional repairs are discovered, the Parties would agree to a change order to the Equipment Purchase and Sale Agreement, including price and schedule to perform the work.

4.3    All amounts paid by Alta to WattStock for payment to the Owner to secure the Asset (excluding reimbursement of WattStock expenses described in Article 3.1) shall be treated as payments toward the purchase price of the LM6000 Generator Set.

4

4.4     If Alta and WattStock are unable to reach agreement on an Equipment Purchase and Sale Agreement then the Parties will agree upon a plan for dealing with any Assets that were secured with the intent of incorporation into an LM6000 Generator Set.

4.5     Failure by the Parties to reach agreement on any one (1) Equipment Purchase and Sale Agreement shall not be grounds for terminating this Agreement.

### Article 5. Term

5.1     The term of this Agreement shall be twenty-four (24) months following the Effective Date, unless the Parties have agreed to an extension in writing or the Agreement has been earlier terminated pursuant to Article 11.

### Article 6. Exclusivity and Non-Circumvention

6.1     For any Assets that an Owner has granted WattStock an exclusive right to purchase during the Term of this Agreement, Alta will have an exclusive right to purchase an LM6000 Generator Set from WattStock utilizing such Asset for the period equal to WattStock's exclusivity ("Exclusivity Period").

6.2     Without derogation of any confidentially obligations pursuant to Article 7, during the Term of this Agreement and for a period of twelve (12) months following the expiration or termination of this Agreement for Assets that have been inspected pursuant to Article 3 of this Agreement or for a period of six (6) months for Assets that have not been inspected pursuant to Article 3 of this Agreement:

A.  Alta agrees that neither it, nor its agents, Representatives, or authorized assignees, will directly or indirectly (i) purchase or (ii) secure an exclusive right to purchase or (iii) cause another person or entity to purchase or secure an exclusive right to purchase an Asset (1) on the Initial Assets List or (2) otherwise disclosed by WattStock to Alta during the Term of this Agreement; and

B.  WattStock agrees that neither it, nor its agents, Representatives, or authorized assignees, will directly or indirectly (i) purchase or (ii) secure an exclusive right to purchase or (iii) cause another person or entity to purchase or secure an exclusive right to purchase an Asset disclosed by Alta to WattStock during the Term of this Agreement, except as otherwise provided in the Agreement.

C.  WattStock shall be free to purchase an Asset without any restrictions or further obligations to Alta with respect to such Asset in the following circumstances:

    i.  If Alta rejects an Asset for use in connection with the Business Purpose for any reason;

    ii.  If WattStock is unable to reach agreement with Owner on purchase terms or a purchase option consistent on the terms approved by Alta;

    iii.  If Alta and WattStock cannot agree on terms of an Equipment Purchase Sale Agreement.

5

**Article 7. Confidentiality**

7.1     The Parties agree that the WattStock Standard Mutual Nondisclosure Agreement that was entered by the Parties on or about May 8, 2018 is hereby superseded by this Agreement. Any Confidential Information disclosed pursuant to that prior Mutual Nondisclosure Agreement shall continue to be deemed Confidential Information protected against disclosure pursuant to this Article 7.

7.2     Confidential Information shall not be disclosed to any third party by Receiving Party or any of its Affiliates or Representatives, and shall not be used by Receiving Party or any of its Affiliates or Representatives for any purpose other than the Business Purpose, including but not limited to developing and/or providing any product or service or establishing any relationship that is competitive with or against the best interests of the Disclosing Party.  Confidential Information shall be held in strict confidence by the Receiving Party and shall not be disclosed in any manner whatsoever without the prior written consent of the Disclosing Party, except to those Affiliates or Representatives of the Receiving Party with a need to know the Confidential Information in connection with the Business Purpose. The Receiving Party shall inform any of its Affiliates or Representatives to whom Confidential Information is disclosed of the existence of the restrictions in this Article 7, and that the Confidential Information has been shared with the Receiving Party in strict confidence. The Receiving Party shall be responsible for any breach or threatened breach of this Article 7 by its Affiliates or Representatives or any third-party to whom its Affiliates or Representatives disclose Confidential Information. The Receiving Party and its Affiliates and Representatives shall protect the Confidential Information by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination or publication of the Confidential Information as the Receiving Party uses to protect its own confidential and proprietary information.

7.3     The Disclosing Party has reserved and shall retain all rights, title, and interest to the Confidential Information disclosed to the Receiving Party. No express or implied license or right is granted to Receiving Party with respect to any intellectual property or other proprietary rights of the Disclosing Party with respect to the Confidential Information. The Receiving Party shall not acquire any patent, copyright, trademark, or other intellectual property rights in such Confidential Information except for the limited right to use the Confidential Information for the specific purposes described herein. Any invention made or discovery based upon or arising from the Confidential Information is, and shall remain, the sole property of the Disclosing Party.

7.4     This Article 7 imposes no obligation upon the Receiving Party with respect to Confidential Information that: (i) is or becomes generally known or publicly available through no fault of the Receiving Party; (ii) was known to the Receiving Party on a non-confidential basis prior to disclosure by the Disclosing Party (iii) is lawfully obtained by the Receiving Party from a third-party under no obligation of confidentiality or (iv) is independently developed by or for the Receiving Party without use of the Confidential Information.

7.5     In the event that the Receiving Party is requested or required (by oral questions, interrogatories, requests for information, or by applicable legal or regulatory authority or by any

rule or regulation of any stock exchange or market or by any administrative or government body) to disclose any Confidential Information, the Receiving Party shall promptly notify the Disclosing Party in writing of such request or requirement prior to disclosure so that the Disclosing Party may seek an appropriate protective order and/or waive compliance with the terms of this Article 7, as applicable. The Parties shall cooperate with each other and their respective counsel in any Party's efforts to prevent such disclosure of Confidential Information. In the event that a protective order or other remedy is not obtained, by the time that the Receiving Party is required to disclose the Confidential Information, or the Disclosing Party waives compliance with the provisions hereof, the Receiving Party agrees to furnish only that portion of the Confidential Information that it reasonably determines, in consultation with its counsel, is legally required to be disclosed, and to exercise reasonable efforts to obtain assurance that confidential treatment will be accorded such Confidential Information after its disclosure.

7.6    At any time upon written request of the Disclosing Party, the Receiving Party shall promptly destroy (and supply written confirmation thereof to the Disclosing Party) all Confidential Information, including all copies, summaries, extracts and notes thereof, in possession of the Receiving Party or any of its Affiliates or Representatives.

7.7    Neither Party makes any representations or warranties, whether written or oral, statutory, express or implied. with respect to any information provided hereunder, including without limitation any warranty of accurateness, completeness, merchantability or fitness for a particular purpose. Neither the Disclosing Party nor any of its Affiliates or Representatives shall have any liability resulting from the use of the Confidential Information by the Receiving Party.

7.8    Notwithstanding any expiration or termination of this Agreement, all obligations of confidentiality and all restrictions on the use of Confidential Information under this Article 7 shall remain in effect for a period of three (3) years following the date of expiration or termination, and with respect to Confidential Information that constitutes a trade secret under applicable law, for as long as such information remains a trade secret.

7.9    The Parties hereto agree that money damages would not be a sufficient remedy for any breach of this Article 7 and that the Disclosing Party shall be entitled to injunctive or other equitable relief to remedy or prevent any breach or threatened breach of this Article 7. Such remedy shall not be the exclusive remedy for any breach of this Article 7 but shall be in addition to all other rights and remedies available at law or in equity.

### Article 8. Indemnification

8.1    Both Alta and WattStock agree to indemnify and hold one another harmless from and against any and all liability, loss, expense, attorneys' fees, or claims for physical injury to third-parties and/or physical damages to property of third-parties from or in any way connected to the performance of this Agreement, but only in proportion to and to the extent such liability, loss, expense, attorneys' fees, or claims for injury or damages are caused by or result from such indemnifying Party's negligence, willful misconduct or intentional acts.

7

## Article 9. Limitation of Liability

9.1    EXCEPTING ARTICLE 6 (EXCLUSIVITY AND NON-CIRCUMVENTION), ARTICLE 7 (CONFIDENTIALITY), AND 8 (INDEMNIFICATION):

A. **TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH PARTY AGREES TO LIMIT THE OTHER PARTY'S LIABILITY FOR ANY AND ALL CLAIMS, LOSSES, COSTS, DAMAGES OF ANY NATURE WHATSOEVER OR CLAIMS EXPENSES FROM ANY CAUSE OR CAUSES, INCLUDING ATTORNEYS' FEES AND COSTS AND EXPERT-WITNESS FEES AND COSTS, SO THAT THE TOTAL AGGREGATE LIABILITY OF A PARTY TO THE OTHER SHALL NOT EXCEED THE AMOUNT OF USD $100,000. IT IS INTENDED THAT THIS LIMITATION SHALL APPLY TO ANY AND ALL LIABILITY OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT HOWEVER ALLEGED OR ARISING, UNLESS OTHERWISE PROHIBITED BY LAW.**

B. **NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, AND TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER PARTY, THEIR RESPECTIVE OFFICERS, DIRECTORS, PARTNERS, EMPLOYEES, REPRESENTATIVES, CONTRACTORS OR SUBCONTRACTORS SHALL BE LIABLE TO THE OTHER OR SHALL MAKE ANY CLAIM FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR CONNECTED IN ANY WAY TO THIS AGREEMENT. THIS MUTUAL WAIVER OF CONSEQUENTIAL DAMAGES SHALL INCLUDE, BUT IS NOT LIMITED TO, LOSS OF USE, LOSS OF PROFIT, LOSS OF BUSINESS, LOSS OF INCOME, LOSS OF REPUTATION OR ANY OTHER CONSEQUENTIAL DAMAGES THAT EITHER PARTY MAY HAVE INCURRED FROM ANY CAUSE OF ACTION INCLUDING NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT AND BREACH OF STRICT OR IMPLIED WARRANTEE.**

## Article 10. Warranty Disclaimer

10.1    WattStock makes no warranty, express or implied, including regarding the condition of an Asset or title thereto. All warranties, if any, to be made by WattStock to Alta will be set forth in any executed Equipment Purchase and Sale Agreements.

## Article 11. Termination

11.1    Neither Party may terminate the Agreement for its convenience.

11.2    Alta may terminate the Agreement for cause in the event (i) of insolvency or bankruptcy of WattStock or (ii) a material breach of this Agreement by WattStock which WattStock fails to cure within thirty (30) days after notice thereof from Alta.

11.3    WattStock may terminate the Agreement for cause in the event (i) of insolvency or bankruptcy of Alta or (ii) a material breach of this Agreement by Alta which Alta fails to cure within thirty (30) days after notice thereof from WattStock.

11.5    Expiration or termination of this Agreement shall not terminate, modify or otherwise impact any Equipment Purchase and Sale Agreement in effect as of the effective date of

8

Alta App.000020

expiration or termination of this Agreement; provided, however, in the event of a bankruptcy by one Party, the non-filing Party shall have the right to terminate any or all pending Equipment Purchase and Sale Agreement(s) for cause.

### Article 12. Miscellaneous

12.1    The Agreement shall be governed by the laws of the state of Texas. Any disputes involving this Agreement will be adjudicated by any court of competent jurisdiction in Dallas, Texas.

12.2    Any notice or other formal communication to be given under this Agreement shall be in writing and signed by or on behalf of the Party giving it. All such communications will be deemed given: (a) at the time of delivery, if delivered to the appropriate address by hand or by internationally recognized overnight courier service (costs prepaid); (b) at the time of transmission, if sent by fax or email with confirmation of transmission by the transmitting equipment; or (c) at the time of receipt or rejection by the addressee, if sent by certified mail, return receipt requested, provided that, in each case, where the delivery, transmission, receipt or rejection occurs outside working hours, notice shall be deemed given at the start of working hours on the next business day. The mailing or delivery addresses, email addresses and fax numbers for the Parties for the purpose of this clause are:

**If to Alta:**

| | |
|---|---|
| COMPANY: | Alta Power LLC |
| ATTENTION: | Matthew Laterza |
| ADDRESS: | 4605 Post Oak Place Dr, Suite 270 |
| CITY: | Houston |
| STATE: | Texas |
| ZIP: | 77027 |
| EMAIL: | mlaterza@altapowerdev.com |
| Copy to: | twest@altapowerdev.com |

**If to WattStock:**

| | |
|---|---|
| COMPANY: | WattStock LLC |
| ATTENTION: | Jay Manning |
| ADDRESS: | Suite 850, 4040 North Central Expressway |
| CITY: | Dallas |
| STATE: | Texas |
| ZIP: | 75204 |
| EMAIL: | j.manning@wattstock.com |
| Copy to: | p.jenevein@wattstock.com |

12.3    Each Party hereto has been represented by counsel and participated in the drafting of this Agreement. This Agreement shall be construed as if drafted jointly by the Parties and no

9

Alta App.000021

presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

12.4    Each Party shall bear its own legal and other costs in connection with the negotiation and preparation of this Agreement and any subsequent definitive agreements contemplated hereby.

12.5    Each Party agrees to comply with all applicable laws during the performance of its obligations pursuant to this Agreement, including:

A. Fair Labor Standards Act of 1938, as amended;
B. Occupational Safety and Health Act of 1970, as amended;
C. anti-bribery and anti-corruption laws, including, as applicable, the United States Foreign Corrupt Practices Act and the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions dated 21 November 1997;
D. any applicable laws and regulations concerning the export or import of products or technology; and
E. applicable anti-money laundering, anti-terrorism and related laws of the United States and, when applicable, the country in which an Asset is located.

12.6    Each Party represents and covenants to the other that it will not directly or indirectly:

A. Offer, give, make, promise, pay or authorize the offering, giving, making, promising or payment of any money, gift, or anything of value to any government official, that is an officer or employee of any government, or any department, agency or instrumentality thereof, any public international organization, any person acting in an official capacity on behalf of such government, any candidate for or appointee to a political or government office, or any political party;
B. Knowingly engage in any transaction which involves:
    i.   Receiving, transferring, transporting, retaining, using, structuring, diverting, or hiding the proceeds of any criminal activity whatsoever, including drug trafficking, fraud, and bribery of any individual covered in 12.6.A above;
    ii.  Engaging, becoming involved in, financing, supporting financially or otherwise sponsoring, facilitating, or giving aid or comfort to any terrorist person, activity or organization; and
    iii. Employing, engaging in any transaction or otherwise conducting business with a "designated person," namely a person or entity that appears on any list issued by the United States or the United Nations with respect to money laundering, terrorism financing, drug trafficking, or economic or military embargoes.

12.7    This Agreement does not create any agency or employment relationship, partnership, joint venture or co-venture between Alta and WattStock. Neither Party is granted any express or implied right or authority to assume or to create any obligation on behalf of or in the name of the other Party. Each Party shall pay for all social security, federal income taxes, unemployment insurance, workmen's compensation insurance, pensions, annuities or other liabilities or taxes incurred by, or on behalf of, or for the benefit of such Party or any of its Representatives, agents

10

employees or servants who are not directly employed by the other Party, and arising out of the performance by the its obligations under this Agreement.

*[SIGNATURE PAGE FOLLOWS]*

11

Alta App.000023

IN WITNESS WHEREOF, the parties have executed this Master Agreement in duplicate originals effective as of the Effective Date.

WATTSTOCK LLC
By: _____
Printed Name: _____
Title: PRESIDENT

ALTA POWER LLC
By: _____
Printed Name: Matthew Laterza
Title: CFO

12

Alta App.000024

# Exhibit 3

Alta App.000025



# WATTSTOCK LLC LIMITED NOTICE TO PROCEED PROPOSAL

## TO

# ALTA POWER LLC

### FOR THE

### GOODLOW PEAK POWER SITE

### FOR

### TWO (2) TRUEPACKAGE™ LM6000 PC SPRINT GTG'S

### DECEMBER 23,, 2019

PREPARED BY: JAY C. MANNING
J.MANNING@WATTSTOCK.COM
713.248.4148

WATTSTOCK LIMITED NOTICE TO PROCEED PROPOSAL TO ALTA POWER

CONFIDENTIAL: NOT FOR DISTRIBUTION

Page 1 | 15



EXHIBIT
Watson
4
1/12/21    aw

026



December 23, 2019

Mr. William Phelps
Alta Power LLC
4605 Post Oak Place Dr., Suite 270
Houston, TX 77027

Subject: LM6000PC TRUEPackage Limited Notice to Proceed Proposal for the Goodlow Site

Dear Bill,

After numerous meetings and discussions between and among WattStock LLC, Alta LLC, and GE, we have prepared the following revised proposal. This Proposal is also sometimes referred to herein as Purchase Order.

All terms and conditions of our proposal are contained within our attached Proposal/Purchase Order.

Thank you for this opportunity to work with Alta, and please do not hesitate to call me if you have any questions.

Regards,

WattStock LLC

Jay C. Manning
**President**

Alta App.000027



## 1. Scope of LNTP Work and LNTP Pricing

| Description | Quantity | Delivery | Price ($) |
|---|---|---|---|
| Woodard Controls Upgrade Hardware | 2 | 2/28/2020 | 453,218 |
| Fin-Fan Lube Oil Cooler | 1 | 2/28/2020 | 188,415 |
| Internal Gas Vent Valve | 2 | 2/28/2020 | 12,495 |
| Generator Enclosure Design to modify from 50Hz Design | 1 | 2/28/2020 | 431,635 |
| Gas Turbine/Generator Coupling | 1 | 2/28/2020 | 90,452 |
| Generator Lube Oil (GLO) Skid | 2 | 2/28/2020 | 443,390 |
| Automatic Voltage Regulator - EX2100e (AVR) | 2 | 2/28/2020 | 44,855 |
| External Block & Bleed Gas Valves | 2 | 2/28/2020 | 69,113 |
| Approx. 1100 hours of Engineering Support for Engineering Drawings | 1 | 2/28/2020 | 149,858 |
| Woodward Acarsoy Cancellation Fee 1 NA | 1 | N/A | 48,213 |
| GE Acarsoy Engineering Labor Charge 1 NA | 1 | N/A | 32,609 |
| Supplier Non-Returnable/Cancellation/Restocking fee's* | TBD* | TBD | TBD |
| 20% WattStock Markup | | N/A | 491,063 |
| TOTAL (subject to maximum increase of $285,000 for items marked *) | | | 2,455,316 |

Notes to Above Table:

(i) Any Supplier materials related to the 3<sup>rd</sup> Acarsoy Unit have been cancelled. Those materials that are non-returnable, or subject to supplier cancellation/restocking fees, GE will invoice WattStock at cost plus 10%, and WattStock will in turn invoice Alta for the amount invoiced by GE without further markup. These fees are for items such as: Generator GLO, block valves, gas valves, AVR, etc.

(ii) Any reference to Acarsoy cancellation fees does not refer to any cancellation fees or liability that may be payable by WattStock if the Acarsoy PSA is terminated.

(iii) Note: The above price is in 2019 US Dollars, and does not include applicable sales, excise, value added, use or similar taxes.

## 2. LIST OF ENGINEERING ITEMS – Due within five (5) business days following project financial closing:

Preliminary Main Unit (General Arrangement)
Preliminary Anchor Bolt
Preliminary One-Line Diagram
Preliminary Foundation Loads
Air Filter (General Arrangement)
Sprint Skid (General Arrangement)
Water Injection (General Arrangement)
Aux Skid (General Arrangement)
Plan & Elevation (P&E) for TCP
Technical Specification for package motors and heaters



## 3. Changes

The LNTP Price shall be adjusted as necessary to take account of (a) Change Orders, or (b) other adjustments specifically provided for in this Proposal. Prices shall not change without the express written consent of Customer in a Change Order signed by both parties.

Changes to specifications, drawings, services or hardware will be evaluated by Seller for a Change in Scope to the Proposal. Seller will quote the changes and a Customer Change Order must be received before work is to proceed.

Storage Costs, additional travel, delays at work, unit restart delays and overtime work out of scope of the project will be subject to the Change Order process above and considered additional work and will be charged according to Seller's published rates at time of execution and in lieu of any pre-existing agreement. As of the date of this revision to the Proposal, no such additional work has occurred.

## 4. Compliance

Compliance and certifications are within current Seller's design practices and standards. The price presented here does not include compliance with any state or local codes unless expressly defined by Customer prior to sale.

## 5. Proposal Basis

Price quoted herein is valid for five (5) days.

Price quoted is per the Terms and Conditions stated herein.

Parts and Services are subject to prior sale.

Subject to Article 2 on this LNTP, delivery time of drawings shall be confirmed upon the execution of Equipment and Services Supply Agreement.

## 6. Commercial Items

Terms and Conditions

This Proposal is in accordance with WattStock Terms and Conditions attached hereto as Exhibit A. In the event of any conflict in the terms and conditions between this LNTP agreement and the WattStock Terms and Conditions, the terms and conditions of the proposal shall govern. Customer and Seller agree that in the event a firm ESA is executed for the TRUEPackages (i) all payments made under this LNTP shall be applied to the ESA Purchase Price**, (ii) all work performed under this LNTP will be deemed to have been work performed pursuant to the ESA, and (iii) the terms and conditions of this LNTP shall be replaced in their entirety by the terms and conditions of the ESA. Upon execution of this LNTP by both parties and receipt by WattStock of the first $750,000 payment referenced in Article 7, this LNTP will supersede the letter signed by Alta Power LLC on August 9, 2019 that the parties have commonly referred to as the "backstop letter".

**As of the date of this LNTP Proposal, the Purchase Price is $19,583,426, based upon the below listed assumptions:

- Scope of work described in Exhibit B attached to December 21, 2019 draft of Equipment Supply Agreement;
- Purchase of 2 Nuh Cemento Units for a combined price of $8,125,000;
- Project financial closing no later than February 28, 2020;
- Guaranteed substantial completion no sooner than 330 days following the project financial closing and effective date of the Equipment Supply Agreement;
- Site does not change;

Alta App.000029



- Schedule is not substantially different from 330 days following the project financial closing and effective date of the Equipment Supply Agreement;
- Lender due diligence changes;
- ESA changes from present version;
- ESA Purchase Price subject adjustment in accordance with final terms of the Equipment Supply Agreement, including for example, discovery of latent or concealed conditions which differ materially from those described in the borescope inspection reports.

## 7. Payment Terms & Schedule

| Milestone | Amount | Net Receipt of Invoice |
|---|---|---|
| 1. Upon LNTP Purchase Order Execution | $750,000 | 2 business Days |
| 2. Second Invoice | $750,000 | 5 days |
| 3. Invoice Issued January 28, 2019 Prior to Expected Parts Shipment (Cash received prior to releasing material for shipment) | $464,253 | 25 days |
| 4. Supplier Non-Returnable/Cancellation/Restocking Fees (if any) - to be invoiced no later than January 28, 2020 | TBD | 25 days |
| 5. Upon Financial Close of the Project | $491,063 | 2 days |

All payments will be made via wire transfer and, except as otherwise provided in the Milestone table above, are due no later than 30 days from receipt of Seller's invoice without any setoff (including, without limitation, setoff under other contracts with Seller or with WattStock LLC or its affiliates). These terms will take precedence over any conflicting payment terms referenced. Seller agrees to provide Buyer within two (2) business days following Seller's receipt of Buyer's wire transfer of funds paid to Seller pursuant to this LNTP a wire transfer confirmation showing that such payments made by Buyer to Seller (excluding the payment for Seller's 20% markup to be made upon closing of Buyer's financing for the project referenced in Milestone #5) have been remitted to General Electric Company.

## 8. Termination Schedule

In the event Buyer terminates the Purchase Order through no fault of Seller, or Seller terminates the Purchase Order for Buyer default, the Buyer shall be liable to Seller for the following termination amounts:

Alta App.000030



| Termination on or Before | Termination Amount Due (USD) |
|---|---|
| 8/16/2019 | 15% of Contract |
| 9/16/2019 | 30% of Contract |
| 10/25/2019 | 75% of Contract |
| 12/6/2019 | 100% of Contract |

Upon receipt of payment of all amounts due, (i) WS will deliver to Buyer all materials procured under this LNTP to which WattStock has received title from GE, and (ii) Buyer and Seller shall then have no further liability to the other under this LNTP.

## 9. Invoicing Methods

Unless mutually agreed otherwise, WattStock shall submit invoices to Customer by e-mail, and if Customer so requests then WattStock shall also provide to Customer a paper invoice by regular mail.

Alta App.000031



## 10.Submittal and Acceptance

This proposal submitted by:

Name:    Jay C. Manning

Title:    President

For:    WattStock LLC

Date:    July 19, 2019


This Proposal is accepted by Customer:

Name:

Title:    CFO

For:    Alta Power LLC

Alta App.000032



**EXHIBIT A – TERMS AND CONDITIONS OF SALE**

1. Scope of Supply

1.1. The Seller shall supply the Equipment and perform the associated Services as more fully described in the Proposal, subject to the terms and conditions as set forth in the Contract. The Equipment and Services are collectively referred to herein as the "Work".

2. Price

2.1. The Buyer shall pay to the Seller the Contract Price in consideration of the Work. The Contract Price is exclusive of sales, VAT or other taxes, which will be added at the time of invoicing, unless a tax exemption or resale certificate is provided. The Contract Price shall be adjusted as necessary to take account of (a) Change Orders, including those related to the exercise of any options that may be described in the Proposal, or (b) other adjustments provided for in the Contract.

3. Payments

3.1. Payment of the Contract Price shall be made via wire transfer in accordance with the Payment Schedule and the payment terms set forth in the Proposal..

3.2. Wire transfer instructions shall be provided on each invoice. Payments are due ten [10] days from Buyer's receipt of Seller's invoice. Late payments shall be subject to an interest charge equal to the lesser of (i) five percentage points (5%) in excess of the prime rate as published in the Wall Street Journal, at that time, compounded on a monthly basis or (ii) the maximum rate allowed by applicable law.

3.3. Seller may require that any or all payments by Buyer to Seller will be secured by an on-demand irrevocable standby letter of credit issued or confirmed by a United States or other bank acceptable to Seller on terms acceptable to Seller ("Payment Security"). If required by Seller, the Payment Security shall become operative and delivered to Seller within (30) thirty Days after the Effective Date, but in any event prior to Seller delivery of the Equipment to Buyer. All Payment Security shall provide for partial payments pro rata on partial deliveries and for the payment of any charges for storage, export shipment, price adjustments, cancellation, cancellation and termination, and all other payments due from Buyer under this Contract against Seller's invoice and certification of the charges and grounds for such payment. Buyer will increase the amount(s) and/or extend the validity period(s) and make appropriate modifications to any Payment Security within-ten (10) days of Seller's notification that such is necessary to provide for payments to become due.

4. Effect of Changes in Contract Price

4.1. If any adjustment results in an increase to the Contract Price, Buyer shall pay for the increase in accordance with the applicable Change Order and corresponding invoice submitted by Seller. If any adjustment results in a decrease in the Contract Price, payments previously made shall be retained by the Seller and will be applied to subsequent payments as they become due.

4.2. Seller shall not be responsible for back charges or field modifications performed by Buyer unless Seller authorizes such charges in writing prior to the incurrence thereof. Buyer specifically waives any right of set-off relating to such charges. Any claim or set-off for back charges

shall be accompanied by a copy of such written authorization. In no event shall Buyer offset any amounts due under the Contract by amounts that may be due Buyer from Seller or any of its Affiliates under this Contract or any other agreement, judgment or order.

5. Certain Buyer Obligations

5.1. In addition to the other Buyer obligations described in the Contract, Buyer shall be responsible for timely obtaining all permits required for owning, installing, operating and maintaining the Equipment, including environmental and use permits, all other licenses (including but not limited to export licenses, import licenses), exemptions, permits (including but not limited to foreign exchange permits and work permits), authorizations, approvals, local building and construction permits, and easements necessary for the construction and operation of the Facility, and shall be responsible for any additional costs, fees or fines arising from any delay or failure to obtain such permits, licenses, exemptions, authorizations or approvals, even though any such permits, licenses, exemptions, authorizations or approvals may be applied for by Seller.

5.2. Seller shall not be liable if any permits, licenses, exemptions, authorizations or approvals are delayed, denied, revoked, restricted or not renewed and Buyer shall not be relieved thereby of its obligations under this Contract, including paying Seller for the Equipment.

6. Delivery.

6.1. The Seller shall deliver the Equipment ExWorks (Incoterms 2010) ("Delivery").

7. Risk of Loss.

7.1. With respect to each item of Equipment, risk of loss shall pass to the Buyer upon the earliest of (i) Delivery, (ii) shipment to storage as provided hereinbelow, or (iii) passage of title to the Buyer pursuant to Contract.

8. Shipment to Storage.

8.1. If any part of the Equipment cannot be shipped to the Buyer when ready due to any cause not attributable to the Seller, the Seller may ship such Equipment to storage, such storage being in accordance with any technical specifications or other instructions provided by the Seller. Buyer shall make all reasonable efforts to inform Seller of the potential for this event to occur. If such Equipment is placed in storage, including storage at the Seller's facility, the following conditions shall apply: (i) title and risk of loss shall thereupon pass to the Buyer; (ii) any amounts otherwise payable to the Seller upon Delivery or shipment shall be payable upon presentation of the Seller's invoice(s); (iii) all expenses incurred by the Seller, such as for preparation for and placement into storage, handling, inspection, short-term preservation, storage, removal charges and any taxes shall be payable by the Buyer upon submission of the Seller's invoice(s); (iv) if the Contract includes Services, any such Services shall be subsequently changed to the rate prevailing at the time of actual use and Buyer shall pay the net increase; and (v) when conditions permit and upon payment of all amounts due hereunder, the Seller shall resume Delivery of the Equipment. Notwithstanding anything to the contrary contained herein, storage, and shipment to storage, and arranging for insurance once in storage is

WATTSTOCK LIMITED NOTICE TO PROCEED PROPOSAL TO ALTA POWER

CONFIDENTIAL: NOT FOR DISTRIBUTION

8.2. the sole and direct responsibility of the Buyer and the Seller shall not assume any liability associated therewith and Buyer shall indemnify, defend and hold Seller harmless for any damages, costs, expenses and fees, including reasonable attorneys' fees associated therewith. Any Seller invoicing or collection related to shipment is only a service provided to the Buyer and represents no direct or indirect responsibility associated with storage.

9. Observation and Inspection

9.1. Observation at the Site.

9.1.1. The Seller shall be afforded access during normal business hours to observe the Work in progress at the Site. The Seller may visit the Site at any time or times, or may maintain representatives to observe Buyer's or Buyer's contractors work, provided such activity and inspections do not unreasonably interfere with the Work.

9.2. Inspections and Tests at Seller's Facilities.

9.2.1. Upon the Buyer's request, the Buyer's inspector shall be provided reasonable access to the Seller's facilities during normal business hours to obtain information on production progress and make inspections.

9.2.2. Inspections and Tests at Suppliers' Facilities.

9.2.3. Subject to the conditions set forth in the foregoing paragraph, the Seller will make reasonable efforts to obtain for the Buyer's access to Seller's suppliers' facilities for the purposes described in the paragraph above if applicable.

10. Warranty

10.1. Warranty Period.

10.1.1. The Seller shall warrant the Equipment and the associated Services on the terms set forth in this Article for twelve (12) months following the date the Equipment is energized at the Site or eighteen (18) months following the date of Seller's Notice of Delivery/Readiness to Ship, whichever period shall first expire (the "Warranty Period"), unless otherwise stated in the Proposal. Equipment must be transported and stored in accordance with Seller's recommendations.

10.2. Warranty Coverage

10.3. The Seller warrants to the Buyer that during the Warranty Period (i) the Equipment to be delivered hereunder (A) shall meet the technical specifications outlined in the Proposal when operated in accordance with the Seller's or original manufacturer's written guidelines or operation instructions and, in the absence thereof, in accordance with generally accepted operation practices of the electric power producing industry, and (B) shall be free from defects in material, workmanship and title; and (ii) the Services shall be performed in a competent, diligent manner.

10.4. Remedy

10.4.1. If the Equipment delivered or Services performed hereunder do not meet the above warranties during the Warranty Period, the Buyer shall promptly notify the Seller in writing and make the Equipment available for correction. The Seller shall thereafter, as soon as is practicable, correct any warranty defect, at its option and expense, (i) by re-performing the defective Services, (ii) repairing the defective part of the Equipment, or (iii) by making available necessary

replacement parts at Seller's factory. Buyer shall, at Seller's option, return any defective part that is replaced by Seller at Buyer's expense to Seller's designated repair facility within thirty (30) Days from the date of written instruction by Seller. The Seller shall provide technical advisory Services reasonably necessary for any such repair of the Equipment, but the Seller shall not be responsible for (i) removal or replacement of structures or other parts of the facility and (ii) site labor or transportation of parts or components. The Buyer shall be responsible for the installation of any repaired or replacement part and for payment of any customs duties or similar levies, which may be assessed as a result of the shipment of any such replacement parts. If a defect in the Equipment or part thereof cannot be corrected by the Seller's reasonable efforts, the Parties will negotiate an equitable adjustment in price with respect to such Equipment or part thereof, however the adjustment in price shall be limited to the price of the respective equipment

10.5. Warranty on Remedial Work.

10.5.1. Any re-performed service or repaired or replacement part furnished under this warranty shall carry warranties on the same terms as set forth above, except that the applicable warranty period for the repair/replacement part or re-performed Service shall be for the longer of (a) the remainder of the original Warranty Period or (b) three (3) months from the date of such re-performance, repair or replacement. In any event the repair/replacement warranty period and the Seller's responsibilities set forth herein for such repaired or replacement part shall end no later than three (3) months after expiration of the original Warranty Period.

10.6. Exclusions.

10.6.1. The Seller does not warrant the Equipment or any repaired or replacement parts against normal wear and tear, including that due to environment or operation, or erosion, corrosion or material deposits from fluids. The warranties and remedies set forth herein are further conditioned upon (i) the proper storage, installation, operation, and maintenance of the Equipment in conformance with the operation instruction manuals (including revisions thereto) provided by the Seller and/or its subcontractors or suppliers, as applicable (including any required warranty preservation services in the event of long term storage) and (ii) repair or modification pursuant to the Seller's instructions or approval. The Buyer shall keep proper records of operation and maintenance during the Warranty Period and make such records available to Seller for reasonable review and inspection.

11. Exclusive Remedies and Warranties.

11.1. THE PRECEDING PARAGRAPHS SET FORTH THE SOLE AND EXCLUSIVE REMEDIES FOR ALL CLAIMS BASED ON FAILURE OF OR DEFECT IN THE EQUIPMENT AND SERVICES PROVIDED UNDER THE CONTRACT, WHETHER THE FAILURE OR DEFECT ARISES BEFORE OR DURING THE WARRANTY PERIOD AND WHETHER A CLAIM, HOWEVER INSTITUTED, IS BASED ON CONTRACT, INDEMNITY, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE. THE FOREGOING WARRANTIES ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER WARRANTIES AND GUARANTEES WHETHER WRITTEN, ORAL, IMPLIED

WATTSTOCK LIMITED NOTICE TO PROCEED PROPOSAL TO ALTA POWER

CONFIDENTIAL: NOT FOR DISTRIBUTION

Alta App.000034

OR STATUTORY.    NO IMPLIED STATUTORY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE SHALL APPLY

## 12. Taxes

### 12.1. Seller Taxes.

12.1.1. Unless otherwise specified in the Contract, the Seller shall be responsible for, and shall pay directly, all sales and use taxes imposed on Seller or its subcontractors and for which they are required to pay sales and use tax, (b) all personal property taxes imposed on Seller, (c) all franchise and income taxes imposed on Seller or its subcontractors, and (d) all payroll, unemployment, occupational, or employment compensation tax, social security tax, or similar tax, each as imposed on Seller or its subcontractors ("Seller Taxes"). If Buyer deducts or withholds Seller Taxes, the Buyer shall furnish within thirty (30) Days of the Seller's request official receipts from the appropriate governmental authority for each deducted or withheld Seller Taxes.

### 12.2. Buyer Taxes.

12.2.1. Equipment exported from the United States is presumed to be exempt from Buyer taxes levied with the United States. When requested by Seller, Buyer agrees to furnish without charge evidence of tax or duty exemption acceptable to the taxing or customer authorities. Furthermore, if Buyer arranges for export shipment, Buyer agrees to provide Seller without charge, an export bill of lading. The Buyer shall be responsible for, and shall pay directly when due and payable, (a) any sales or use taxes, duties, or dues directly imposed on Buyer with respect to the Work or Equipment (b) real and personal property taxes on the Site, Facility or any Equipment to which Owner holds title at the relevant time; and (c) income taxes directly imposed on Buyer ("Buyer Taxes"). All payments due and payable by the Buyer to the Seller hereunder shall be made in the full amount of the Contract Price, free and clear of all deductions and withholding, for Buyer Taxes. If the Buyer deducts or withholds Buyer Taxes from Seller payments, the Buyer shall pay additional amounts to the Seller to cause the amounts actually received by the Seller, net of deducted or withheld Buyer Taxes, to equal the full amount of the Contract Price, and shall provide to the Seller within thirty (30) Days of Seller's request, accurate official receipts from the appropriate governmental authority for deducted or withheld Buyer Taxes. If the Seller is required to pay Buyer Taxes, the Buyer shall, promptly upon presentation of the Seller's invoice for such Buyer Taxes, pay to the Seller in the Contract Currency an amount equal to the U.S. dollar of such Buyer Taxes

## 13. Invoices.

13.1. The Seller shall issue an official value-added, sales (or similar) tax invoice in addition to the Contract Price, in accordance with applicable laws

## 14. Duty Drawback.

14.1. All rights to drawback of customs duties paid by the Seller to the customs authorities of the country of manufacture of any Equipment belong to and shall remain with Seller. Buyer agrees to cooperate with Seller and to furnish such documents to Seller as may be necessary to obtain drawback.

## 15. Changes

### 15.1. Changes Resulting from Force Majeure, Changes in Codes, or Changes in Law.

15.1.1. If any change to the Codes and Standards, Ambient Site Conditions, Site Requirements or any Change in Law has a negative impact in the cost or time to perform the Work or requires a change to the Equipment or Services, the Seller shall be entitled to a Change Order that includes equitable adjustments to the Contract Price and to the Scheduled Delivery Date(s) and other provisions of the Contract that are impacted. If the Seller is entitled to a Change Order, the Seller shall submit to the Buyer a draft Change Order.

### 15.2. Buyer-Initiated Changes.

15.2.1. The Buyer shall have the right to request that the Seller consider changes to the Equipment or the Services, including modifications, alterations or additions. If the Buyer wishes to request such a change, the Buyer shall notify the Seller in writing. Within fifteen (15) Days after receipt of such notice (unless otherwise extended by mutual agreement), the Seller shall advise the Buyer of the feasibility of the requested change, and shall submit to the Buyer a draft Change Order, unless the matter requires further investigation and research in which case Seller will provide an estimate of the time frame in which Seller will be able to submit a detailed response to Buyer.

### 15.3. Seller-Initiated Changes.

15.3.1. If the Seller wishes to propose a change, or if the Seller is entitled to a Change Order pursuant to the provisions of this Contract, the Seller shall submit to the Buyer a draft Change Order.

### 15.4. Contents of Draft Change Order

15.4.1. Any draft Change Order shall include: (i) a technical description of the proposed change in such detail as the Buyer may reasonably require, (ii) a lump sum firm price adjustment (increase or decrease) in the Contract Price, if any, caused by the proposed change, (iii) all potential effect(s), if any, on the Scheduled Delivery Date(s), or any other schedule or date for performance by the Seller hereunder caused by the proposed change, and (iv) all potential effect(s), if any, on the Seller's ability to comply with any of its obligations hereunder, including the Seller's warranties and Performance Guarantees caused by the proposed change.

### 15.5. Process for Concluding Change Order.

15.5.1. The Buyer shall, within two (2) Days from the date of receipt of such information, either approve or disapprove the draft Change Order in writing or request additional time to consider the draft Change Order. If the Buyer approves the Change Order, the Buyer and the Seller shall then sign the Change Order that shall operate as an amendment to this Contract. Any delays resulting from a delay in this procedure are the sole responsibility of the Buyer.

### 15.6. Agreement Required.

15.6.1. Except for Change Orders to which the Seller is expressly entitled pursuant to this Contract, all changes under this contract shall be subject to mutual agreement, and no Change Order will be effective until signed by both Parties.

## 16. Excusable Delays

WATTSTOCK LIMITED NOTICE TO PROCEED PROPOSAL TO ALTA POWER

CONFIDENTIAL: NOT FOR DISTRIBUTION

Alta App.000035



16.1. The Seller shall not have any liability or be considered to be in breach or default of its obligations under this Contract to the extent that performance of such obligations is delayed or prevented, directly or indirectly, due to, but not limited to, the following:

16.1.1. causes beyond its reasonable control;

16.1.2. acts of God;

16.1.3. acts (or failures to act) of governmental authorities;

16.1.4. fires, severe weather conditions, floods earthquakes;

16.1.5. strikes or other labor disturbances;

16.1.6. war (declared or undeclared), terrorism, epidemics, civil unrest, riots;

16.1.7. delays or accidents in transportation or car or transporter shortages; or

16.1.8. delays in the prerequisite work of the Buyer, Buyer's other contractors or suppliers, or other acts (or omissions) of the Buyer, including but not limited to failure to promptly: (A) provide the Seller with information and approvals necessary to permit the Seller to proceed with work immediately and without interruption, or (B) comply with the terms of payment; or shipment to storage in accordance with the Contract.

16.2. The Seller shall notify the Buyer of any such excusable delay. Seller shall be entitled to a Change Order that includes equitable adjustments to the Contract Price and to the Scheduled Delivery Date(s) and other provisions of the Contract that are impacted.

17. General Indemnity

17.1. General Indemnity.

17.1.1. Each party (each an "Indemnifying Party") shall be liable to and indemnify the other party, its officers, employees, agents and subcontractors (each an "Indemnified Party") for any physical injuries to third parties or physical damage to third party property, and, at its expense, shall defend against and hold the Indemnified Party harmless from any claims raised by a third party arising in connection with the Contract, to the extent such physical damages are caused by the negligence of the Indemnifying Party or its officers, employees, agents or subcontractors and to the extent the Indemnified Party is liable to the third party under applicable law.

17.2. Concurrent Negligence.

17.2.1. If physical damage or injury is caused by the joint or concurrent negligence of the parties, their officers, employees, agents, or subcontractors, the parties shall bear the loss in proportion to their or their officers', employees', agents' or subcontractors' degree of negligence.

17.3. Notice.

17.3.1. The indemnities provided in this Article shall apply only if the party seeking indemnity gives the Indemnifying Party prompt notice of any claim and provides the Indemnifying Party all necessary information and assistance so that the Indemnifying Party may, at its option, defend or settle the claim.

17.4. "Third Parties" Defined.

17.4.1. "Third parties" under this Article do not include the Parties, the owner of the Site, their affiliates, agents, successors or assigns, any operation or maintenance contractor of the Parties or the owner of

the Site, or any entity (i) with an equity or security interest in any Party or the owner of the Site, or their assets or property, (ii) that seeks to claim any rights, power or privileges of one of the Parties or the owner of the Site, or (iii) that seeks to claim as a third party beneficiary of one of the Parties or the owner of the Site. No portion of the Equipment, the Facility, electricity, fuel or hydrocarbons is "third party property" for the purposes of this Article.

18. Insurance

18.1. Insurance for Injuries to Workers (Worker's Compensation).

18.1.1. During the term of this Contract, both Parties shall maintain the insurance for work-related injuries or disease of their own employees in such forms and amounts as may be required by laws that are applicable to each Party and its employees.

18.2. General Liability and Automobile Insurance

18.2.1. During the term of this Contract, each Party shall maintain the following insurance coverage at its own expense to protect its own interests: (i) Commercial General Liability or Public Liability insurance, in broad form, either per occurrence and effective for at least three years after the expiration of the Contract, that includes coverage for contractual liability, bodily injury and third party property damage, with a combined single limit of not less than U.S. $1,000,000 per occurrence and U.S. $1,000,000 in the aggregate annually, for primary and excess policies combined; and (ii) automobile liability insurance covering all owned, non-owned, and hired automobiles used by it in connection with the Work, if any, with a combined single limit of not less than U.S. $1,000,000 per occurrence, for primary and excess policies combined.

18.2.2. Each of the foregoing insurance policies shall not be cancelled or materially changed without thirty (30) Days' advance written notice to the other Party or, in the case of non-payment, ten (10) Days' advance written notice. Upon request, each Party shall deliver to the other Party certificates of insurance showing that the foregoing insurance is in full force and effect.

18.3. Failure to Maintain Insurance.

18.3.1. If at any time the Buyer fails to maintain insurance complying with the requirements of the Contract in full force and effect, (a) the Buyer shall be responsible for any resulting losses or costs sustained by the Seller and shall hold the Seller harmless from actions brought against the Seller as the result of the absence of the Buyer's required insurance, and (b) the Seller shall not be required but may elect to do any of the following: (i) immediately suspend all or a portion of the Work and be entitled to an equitable adjustment in the price, schedule and other terms of this Contract for the impact of the suspension, (ii) pay premiums or purchase alternate insurance at Buyer's expense or (iii) pursue such other remedies as may be allowed by law, equity, or the Contract.

19. Buyer's Risks.

19.1. In no event shall the Seller be responsible for Buyer's Risks. Buyer's Risks include damages and losses due to (i) war, hostilities, terrorism, rebellion, revolution, civil disturbances, nuclear radiation or similar occurrence, (ii) acts or omissions of the Buyer, (iii) natural perils (such as flood or earthquake) or other perils to the extent that peril is

WATTSTOCK LIMITED NOTICE TO PROCEED PROPOSAL TO ALTA POWER

CONFIDENTIAL: NOT FOR DISTRIBUTION



excluded from the ARBR/CAR policy coverage or the loss is in excess of the policy limits.

20. Suspension

20.1. Suspension by Buyer of Work at Site.

20.1.1. The Buyer shall have the right, at any time, to suspend Work at the Site upon written notice to the Seller. Any cost incurred by the Seller in accordance with any such suspension (including storage costs) shall be payable by the Buyer upon submission of the Seller's invoice(s). Performance of the Seller's obligations shall be extended for a period of time reasonably necessary to overcome the effects of such suspension.

20.2. Suspension by Buyer of Work in Seller's Facilities.

20.2.1. It is expressly agreed that the Buyer shall have no right to suspend Work of Seller on the Equipment before Delivery.

20.3. Suspension by Seller.

20.3.1. The Seller shall have the right to suspend all Work, including the delivery of any Equipment, upon the failure of the Buyer to make any payment when due. The Seller shall further have the right to suspend any shipment of the Equipment if all payments due prior to the applicable Scheduled Delivery Date have not been made. Any cost incurred by the Seller in accordance with any such suspension (including storage costs) shall be payable by the Buyer upon submission of the Seller's invoice(s). Performance of the Seller's obligations shall be extended for a period of time reasonably necessary to overcome the effects of such suspension, except that Seller's suspension shall not be deemed to extend the Warranty Period hereunder.

21. Termination for Cause

21.1. Grounds for Termination by Buyer.

21.1.1. The Buyer shall have the right to terminate the Contract for cause in the event that the Seller: (i) becomes insolvent, makes an assignment for the benefit of its creditors, has a receiver or trustee appointed for the benefit of its creditors, or files for protection from creditors under any bankruptcy or insolvency laws; (ii) substantially breaches and fails to comply or perform its material obligations hereunder (but only with respect to a material obligation for which this Contract does not provide exclusive remedies), (iii) notwithstanding satisfaction of all conditions precedent, Seller refuses to execute a loan agreement on terms substantially in accordance with the Loan Agreement Term Sheet attached to this LNTP, provided that: (A) the Buyer shall first have provided the Seller with written notice of the nature of such breach and of the Buyer's intention to terminate this Contract as a result of such breach, and (B) the Seller shall have failed within thirty (30) Days after receipt of such notice (or such extended period as is considered reasonable by the Parties) either (1) to commence to cure such breach and diligently thereafter to pursue such cure, or (2) to provide reasonable evidence that no such breach has occurred; or (iv) Seller's relationship with General Electric Company, or any of its affiliates, is terminated through no fault of the Buyer.

21.2. Remedy in the Event of Termination by Buyer.

21.2.1. If the Buyer terminates the Contract as provided above, the Buyer shall pay the Seller for that portion of the Contract Price allocable to the Equipment title transferred or Services performed prior to the termination. If the payments received by the Seller as of the date of such termination are in excess of such portion of the Contract Price, the Seller shall return the excess of such payments to the Buyer. In addition, the Seller shall pay to Buyer an amount equal to the difference between that portion of the Contract Price allocable to the terminated Work and such actual and reasonable amount paid by the Buyer to another vendor for equipment comparable to those terminated, subject to the limitation of liability set forth in Article 22.

21.3. Grounds for Termination by Seller.

21.3.1. The Seller shall have the right to terminate the Contract for cause in the event that the Buyer: (i) becomes insolvent, makes an assignment for the benefit of its creditors, has a receiver or trustee appointed for the benefit of its creditors, or files for protection from creditors under any bankruptcy or insolvency laws; or (ii) substantially breaches and fails to comply or perform its material obligations hereunder, including failure to comply with the requirement of the Contract, or fails to make any payment when due or to fulfill any payment conditions, including any payment security, as set forth in this Contract, provided: (A) that the Seller shall first have provided the Buyer with written notice of the nature of such failure and of the Seller's intention to terminate this Contract as a result of such failure, and (B) that the Buyer shall have failed within thirty (30) Days after receipt of such notice to correct such failure.

21.4. Remedy in the Event of Termination by Seller.

21.4.1. If the Seller terminates the Contract as provided above, the Buyer shall pay to the Seller the charges set forth in the Termination Schedule. In such event, Seller shall retain title to all Equipment not yet delivered to Buyer as of the effective date of termination.

22. Limitation of Liability

22.1. Limitation.

22.1.1. The total liability of the Seller for all claims arising out of or relating to the performance or breach of the Contract or use of any Equipment shall not exceed the portion of the Contract Price allocable to the portion of the Equipment giving rise to the claim. The Seller's liability shall terminate at the end of the Warranty Period for the Equipment giving rise to the claim. The Buyer may enforce a claim that accrued before that date by commencing an action, as applicable under the dispute resolution clause, before the expiration of the applicable statute of limitations or repose, but not later than ninety (90) Days after the expiry of the Warranty Period.

22.2. Consequential Damages.

22.2.1. The Seller shall not be liable for loss of profit or revenues, loss of product, loss of use of the Work or any associated equipment, interruption of business, cost of capital, cost of replacement equipment, downtime costs, increased operating costs, claims of the Buyer's customers for such damages, or for any special, consequential, incidental, indirect, punitive or exemplary damages.

23. Sale, Transfer, Assignment to Third Party.

WATTSTOCK LIMITED NOTICE TO PROCEED PROPOSAL TO ALTA POWER

CONFIDENTIAL: NOT FOR DISTRIBUTION

Alta App.000037



23.1. If the Buyer is supplying, transferring or assigning the Work to a third party, the Buyer shall require the third party to agree to be bound by this Article. If the Buyer does not obtain this agreement for the Seller's benefit, or if the agreement is found void or unenforceable, the Buyer shall indemnify, defend and hold the Seller, its Affiliates, subcontractors and suppliers of any tier, and their agents and employees, individually or collectively, harmless from and against any and all liability arising out of claims made by the third party in excess of the limitations and exclusions of this Article.

24. Gratuitous Advice.

24.1. The Seller shall not be liable for any advice or assistance that is not required under this Contract.

25. Limitations to Prevail.

25.1. The limitations and exclusions in the Contract shall apply regardless whether a claim is based in contract (including warranty or indemnity), tort (including negligence or strict liability), statute, equity or any other extra-contractual theory.

26. Limitation of Remedies; Overriding Effect.

26.1. The Buyer's and the Seller's rights, obligations and remedies arising out of or relating to the Work are limited to those rights, obligations and remedies described in the Contract. This Article shall prevail over any conflicting or inconsistent terms in the Contract, unless those terms further restrict the Seller's liability.

27. Export Control

27.1. Export Controls.

27.1.1. The Buyer hereby agrees that it shall not, except as said laws and regulations may expressly permit, make any disposition by way of transshipment, re-export, diversion or otherwise, of U.S. origin goods and technical data (including computer software), or the direct product thereof, supplied by the Seller hereunder. The obligations of the Parties to comply with all applicable export control laws and regulations shall survive any termination, or discharge of any other contract obligations.

27.2. Buyer to Keep Informed.

27.2.1. The Buyer undertakes to keep itself fully informed of, and to comply with, the export control laws and regulations of the respective Government and any amendments thereof.

28. Assignment

28.1. Eligible Assignees.

28.1.1. An Eligible Assignee is: (i) an Affiliate of the Buyer, or (ii) an engineering or construction contractor under contract with the Buyer for the installation of the Equipment, provided that the Eligible Assignee offers Seller satisfactory evidence of its ability (both financial and otherwise) to fulfill the obligations of Buyer hereunder; in either case provided that the Seller would not be penalized or become subject to additional requirements under any Law as a result of entering into contract with such person.

28.2. Buyer's Right to Assign to Eligible Assignees.

28.2.1. The Buyer may once assign its rights and delegate its obligations under the Contract to an Eligible Assignee, provided: (i) that the Buyer shall notify the Seller of its intent to assign no less than ten (10) Days prior to the execution of any such assignment; (ii) that Buyer

shall either (at Seller's option and election) (A) guarantee the obligations of the assignee by executing a guaranty in a form acceptable to Seller or (B) retain its obligations under any payment, indemnity and any bonus provisions of the Contract; (iii) that the first assignee may not further assign or delegate any rights or obligations hereunder except to the original Buyer; and (iv) that the Buyer shall in no event assign to its engineering or construction contractor the right to receive liquidated damages under the Contract.

28.3. Collateral Assignment.

28.3.1. The Buyer may also assign a collateral interest in this Contract to a lender who is not an Eligible Assignee as collateral security for a loan for the acquisition of the Equipment, provided however, that Buyer and Lender agree that any future assignment to the Lender shall occur only as the result of the exercise by Lender of its remedies under the loan agreements relative to a bankruptcy or liquidation of Buyer. Under no circumstances, however, shall a collateral assignment require Seller to deliver Equipment to Buyer or an assignee if Seller has not been fully paid for such Equipment.

28.4. All Other Assignments and Transfers by Buyer.

28.4.1. All other assignments or transfers by Buyer of any or all of its duties or rights under this Contract (by operation of law or otherwise) are subject to Seller's prior written consent. Further, Buyer agrees that, until Buyer receives title to the Equipment as set forth herein, Buyer shall not, directly or indirectly sell, offer to sell or otherwise broker the Equipment.

28.5. Seller's Right to Assign.

28.5.1. The Seller may assign its rights and delegate its obligations under this Contract to any Affiliate or subsidiary company. Seller may assign its rights and obligations to other parties with the prior written consent of Buyer. In the event of such assignment, the Seller's assignee will be responsible for the assigned Work and will invoice directly to and collect payments directly from the Buyer.

28.6. Conditions.

28.6.1. Any assignment shall be subject to all limitations of liability contained in this Contract. The Buyer may not assign this Contract except in accordance with this Article. Any purported assignment not in accordance with this Article shall be void and without effect.

29. Dispute Resolution

29.1. Referral to Senior Management.

29.1.1. Any and all controversies, disputes or differences between the Parties to the Contract, if not amicably settled by the Parties with thirty (30) Days following written notice of dispute, shall be referred to senior management of the Parties for resolution. In the event the dispute has not been resolved within forty-five (45) Days following referral to senior management, or such longer period as the Parties may mutually agree, then either Party may, upon ten (10) Days' notice to the other party, pursue their remedies at law.

30. Venue.

30.1. Any legal action or proceeding with respect to the Contract shall be brought in the United States District Court for the Southern District of Texas or, in a District Court of the State of Texas in Harris County. Each of the Parties hereby accepts and consents to, generally and

WATTSTOCK LIMITED NOTICE TO PROCEED PROPOSAL TO ALTA POWER

CONFIDENTIAL: NOT FOR DISTRIBUTION

Alta App.000038



unconditionally, the jurisdiction of the aforesaid courts and appellate courts from any appeal thereof. Each of the Parties irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such Party at the address first set forth in the this Contract. Each of the Parties hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Contract brought in the courts referred to above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

31. Governing Law

   31.1. The Contract, including but not limited to, the validity, performance and all matters relating to the interpretation and effect of this Contract and all further documents executed pursuant to it, shall be construed and interpreted in accordance with the laws of the State of Texas, excluding their conflict of law rules, provided that any provision of such law invalidating any provision of this Contract or modifying the intent of the Parties as expressed in the terms of this Contract shall not apply.

32. Effective Date

   32.1. The Contract shall become effective when it is signed by both Parties (the "Effective Date"), however, the Seller shall not be required to commence any Work associated with, connected to, or arising from, directly or indirectly, the Equipment or Services, until the Seller receives the initial payment described in the Proposal, together with any required Payment Security. Further, if the initial payment or required Payment Security is not timely received in accordance with the terms of this Contract (the "Delayed NTP"), in addition to Seller's right to terminate, the Seller shall have the right to adjust the Scheduled Delivery.

33. Entire Agreement

   33.1. The Contract represents the entire agreement between the Parties with respect to the Work, and supersedes in its entirety all prior

agreements concerning the subject matter hereof, and no modification, amendment, revision, waiver, or other change shall be binding on either Party unless consented to in writing by the Party's authorized representative. Any oral or written representation, warranty, course of dealing, or trade usage not contained or referenced herein shall not be binding on either Party. Each Party agrees that it has not relied on, or been induced by, any representations of the other Party not contained in the Contract.

34. Miscellaneous Provisions

   34.1. Third-Party Beneficiaries.

      34.1.1. Except as provided in the Article entitled "Limitation of Liability", these provisions are for the benefit of the Parties hereto and not for any other third party.

   34.2. Survival.

      34.2.1. All provisions or obligations contained in the Contract which by their nature or effect are required or intended to be observed, kept or performed after termination or expiration of this Contract shall survive and remain binding upon and for the benefit of the Parties, including, without limitation, the Articles with the following titles, which shall survive termination of this Contract: Taxes, Warranty, Patents, General Indemnity, Limitation of Liability, Proprietary Information, Dispute Resolution, Governing Law, Software License, Personal Data Protection, Export Control, Contract Documents, Entire Agreement and Miscellaneous Provisions.

   34.3. Non-Waiver.

      34.3.1. Waiver by either Party of any right under the Contract shall not be deemed a waiver by such Party of any other right hereunder.

   34.4. Invalidity.

      34.4.1. The invalidity in whole or in part of any part of the Contract shall not affect the validity of the remainder of this Contract.

35. Counterparts.

This Contract may be signed in any number of counterparts, each of which shall constitute one and the same instrument.

WattStock Limited Notice to Proceed Proposal to Alta Power

CONFIDENTIAL: NOT FOR DISTRIBUTION

Page 14 | 15



Alta App.000040

# Exhibit 4

Alta App.000041

GE's TruePackage Solution for Aeroderivatives | 2018 WTUI Conferenc...          https://www.youtube.com/watch?v=tKI16mMMVSM



#GEPower #PoweringForward

## GE's TruePackage Solution for Aeroderivatives | 2018 WTUI Conference | GE Power

1,797 views • Mar 21, 2018                        👍 7    👎 DISLIKE    ↗ SHARE    ≡+ SAVE    ···

 **GE Power**
37.1K subscribers                                                          **SUBSCRIBE**

Watch our aeroderivative product manager Lance Herrington's overview on how GE can purchase, refurbish and relocate pre-owned aero plants with the recently launched TruePackage solution. For more information: https://www.gepower.com/services/aero... #GEPower #PoweringForward

SHOW MORE

 **It All Starts With Power | GE Power**
GE Power
8.5K views • 1 year ago



 **When Disaster Struck, This Group Of Engineers Got An Argentinian Power Plant Online | GE Power**
GE Power
2K views • 10 months ago

Alta App.000042

GE's TruePackage Solution for Aeroderivatives | 2018 WTUI Conferenc...                    https://www.youtube.com/watch?v=tKJ16mMMVSM

    SIGN IN


2.7K views • 1 year ago


**Timelapse of the Arabelle Steam Turbine for Hinkley Point C | GE Power**
GE Power
16K views • 1 year ago


**The Hydrogen Economy | GE Power**
GE Power
5.1K views • 1 year ago


**HRSG FAQ: Learn More About Heat Recovery Steam Generator Services | GE Power | GE Power**
GE Power
1.1K views • 1 year ago


**Building Towards Zero | GE Gas Power**
GE Power
9.6K views • 1 year ago


**The Power of Yes in action | GE Power**
GE Power
1.4K views • 5 months ago


**Live Outage – GE and FieldCore Delivering Outage Transformation | GE Power**
GE Power
2.9K views • 7 months ago

**LM2500+HSPT Gas Turbine Power Plant**
Rose Pelrine
1.2K views • 3 years ago

**Future of Energy: A Decade of Action | GE Power**
GE Power
2K views • 1 year ago

**Embracing Diversity—The first FieldCore female-led outage in Saudi Arabia**

Alta App.000043

GE's TruePackage Solution for Aeroderivatives | 2018 WTUI Conferenc...          https://www.youtube.com/watch?v=tK116mMMVSM

  

≡  ▶ YouTube                              🔍  🎤              ⋮   ⊘ SIGN IN

**AMAZING Technology! From Yellow Line to skycam and Pylon Cam | NFL EXPLAINED Broadcast Innovations**
NFL Throwback
831K views • 4 weeks ago

**Moving To Net-Zero World with CCUS | GE Power**
GE Power
984 views • 5 months ago

**GE 9 FA gas turbine**
Mustafa Kaynak Adana transfer turizm
3.3K views • 3 years ago

**The story behind Track 4A and GE's FIRST 9HA.02 | GE Power**
GE Power
8.4K views • 1 year ago

**2022.10.02-Welcome**
Highland Presbyterian
44 views • 13 days ago

**TM2500 Gas Turbine Your affordable Power Solution**
Rose Pelrine
2.7K views • 4 years ago

**Kilnbridge: Hinkley Point C Cooling Water Inlet/Outlet Heads Construction**
Kilnbridge
23K views • 7 months ago

**Are you covered for what you think you are?**
Haendiges Insurance Solutions
6 views • 8 days ago

|  SHOW MORE  |

Alta App.000044

GE's TruePackage Solution for Aeroderivatives | 2018 WTUI Conferenc...          https://www.youtube.com/watch?v=tKI16mMMVSM

☰   ▶ YouTube                    🔍  🎤           ⋮   ⊛ SIGN IN

10/13/2022, 2:22 PM

Alta App.000045

# Exhibit 5

Alta App.000046





# Aero TRUEpackage

March 20, 2018
Lance Herrington

CONFIDENTIAL

Alta 0029260



EXHIBIT
25

Alta App.000047

GE Power

**© 2018, General Electric Company.**

GE Proprietary Information - The information contained in this document is General Electric Company (GE) proprietary information. It is the property of GE and shall not be used, disclosed to others or reproduced without the express written consent of GE, including, but without limitation, in the creation, manufacture, development, or derivation of any repairs, modifications, spare parts, or configuration changes or to obtain government or regulatory approval to do so, if consent is given for reproduction in whole or in part, this notice and the notice set forth on each page of this document shall appear in any such reproduction in whole or in part. The information contained in this document may also be controlled by the US export control laws. Unauthorized export or re-export is prohibited. This presentation and the information herein are provided for information purposes only and are subject to change without notice. NO REPRESENTATION OR WARRANTY IS MADE OR IMPLIED AS TO ITS COMPLETENESS, ACCURACY, OR FITNESS FOR ANY PARTICULAR PURPOSE.

All relative statements are with respect to GE technology unless otherwise noted.

© 2018 General Electric Company. Confidential information. All rights reserved.



CONFIDENTIAL

Alta 0029261

Alta App.000048

# Industry outlook



**Drivers**

**Operational flexibility**, lower installed and operating costs

**Challenges**

**Decentralized renewable resources** increase cost-competitive pressures

**Solutions**

- **Lower** life cycle costs with life extension technologies
- **Increase** revenue with peak power and ancillary services
- **Reduce** operating costs through improved turbine efficiency

© 2018 General Electric Company. Confidential information. All rights reserved.

CONFIDENTIAL

3

Alta 0029262

Alta App.000049

## Introducing TRUEpackage

**Refurbished gas turbine packages improved by OEM-engineered systems, components, upgrades and digital solutions**

- OEM warranty and performance guarantees
- Delivered in six months or less
- Equipment selection and refurbishment plan driven by installed cost
- OEM brand certification can improve financing options and insurance premiums



CONFIDENTIAL

© 2018 General Electric Company. Confidential information. All rights reserved.

Alta 0029263

Alta App.000050

# How it works



GE and WattStock collaborate to select best available equipment

GE overhauls gas turbine to meet operating profile

Work scope adapted to meet project economics

WattStock refurbishes package

Equipment certification and warranty management

CONFIDENTIAL

© 2018 General Electric Company. Confidential information. All rights reserved.

5

Alta 0029264

# Facilities



- GE and WattStock co-located in Houston, TX service center
- Access to port for ease of shipment and import/export of equipment
- Level 4 repair facility

- Recent $30 million investment to expand 50,000 sq. ft. and upgrade with latest repair technology
- State-of-the-art automated clean and fluorescent penetrant inspection lines
- Local parts warehouse

© 2018 General Electric Company. Confidential information. All rights reserved.

CONFIDENTIAL

Alta 0029265

Alta App.000052

# Rise to the challenge with GE solutions



## Output/Efficiency

- LM25/LM6 Repower
- OpFlex* Peak Performance
- OpFlex VIVG Schedule Optimization
- Steam Injection
- Compressor Fouling Mitigation (HFWW/Super Polish Blades)

## Availability

- Xtend
- Rad-Rad Combustor
- Core Software & Controls Upgrades
- Compressor Fouling Mitigation (HFWW/Super Polish Blades)
- Asset Performance Management

## Emissions

- DLE Conversion
- OpFlex Automapping
- Hybrid EGT
- OpFlex Auto $NO_x$ Blasting
- Water or Steam Injection for $NO_x$

## Flexibility

- Hybrid EGT
- OpFlex Fast Start
- Alternative/Dual Fuel Conversion
- Synchronous Condensing Upgrade
- LM25/LM6 Repower

* Trademark of General Electric Company

© 2018 General Electric Company Confidential information. All rights reserved.

CONFIDENTIAL

7

Alta 0029266

Alta App.000053



CONFIDENTIAL

Alta 0029267

Alta App.000054

# Exhibit 6

Alta App.000055

---

Message

---

| | |
|---|---|
| **From:** | Herrington, Lance R (GE Power) [lance.herrington@ge.com] |
| **Sent:** | 7/30/2019 11:59:21 AM |
| **To:** | Babu, Alex (GE Power) [alex.babu@ge.com]; Canon, James T (GE Power) [james.canon@ge.com]; Alston, Ashley (GE Power) [ashley.alston@ge.com] |
| **Subject:** | FW: GE Letter |
| **Attachments:** | GE TRUEpackage LM6000's and WattStock Refurbishment Services v1 for Alta Power.docx |

All

See attached. The lender is requiring some assurance from GE that we will be willing to step in on the Alta Project if WattStock contractually fails to be able to support it. I do not see anything generally wrong with draft letter that Dave Herberger developed, but let me know your thoughts.

Lance Herrington
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E: lance.herrington@ge.com
Linkedin. http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

**From:** Jay Manning <j.manning@wattstock.com>
**Date:** Monday, July 29, 2019 at 5:55 PM
**To:** Lance Herrington <lance.herrington@ge.com>
**Cc:** "Andrew F. Herr" <a.herr@wattstock.com>, "p.jenevein@wattstock.com" <p.jenevein@wattstock.com>, Pete Watson <p.watson@wattstock.com>
**Subject:** EXT: RE: GE Letter

Here is our rough draft.

**From:** Herrington, Lance R (GE Power) [mailto:lance.herrington@ge.com]
**Sent:** Monday, July 29, 2019 9:52 AM
**To:** j.manning@wattstock.com
**Cc:** Andrew F. Herr <a.herr@wattstock.com>; p.jenevein@wattstock.com; Pete Watson <p.watson@wattstock.com>
**Subject:** Re: GE Letter

Thank you, Jay. Yes, please develop a draft of the letter for review.

Lance Herrington
Global Sales Leader
Aero Conversions  Modifications  and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E. lance.herrington@ge.com
Linkedin. http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...



EXHIBIT
38

**From:** Jay Manning <j.manning@wattstock.com>
**Date:** Saturday, July 27, 2019 at 2:27 PM
**To:** Lance Herrington <lance.herrington@ge.com>
**Cc:** "Andrew F. Herr" <a.herr@wattstock.com>, "p.jenevein@wattstock.com" <p.jenevein@wattstock.com>,
Pete Watson <p.watson@wattstock.com>
**Subject:** EXT: GE Letter

Lance,
As we discussed, Deutsch Bank has asked if GE could write a letter if in the event WattStock defaults, GE will take over
the project assuming GE will get to recover any additional costs that it may take to finish the WattStock scope of work.
If you would like, Andy could come up with a draft as he is very familiar with what DB would like to see from GE.  Then
you can review and make changes and once agreed upon, submit to GE Management for approval.
We really need this ASAP, so I would like to get this process moving.
Thanks,
Jay

GE CONFIDENTIAL

Alta App.000057

DATE:
Alta Power LLC
4605 Post Oak Place Dr., Suite 270
Houston, TX  77027

Attention:  Mr. Matt Laterza

Subject: GE TRUEpackage LM6000's and WattStock Refurbishment Services

Dear Matt:

We understand that your lenders seek clarification regarding the GE-WattStock relationship,
and how GE could respond in the event that WattStock becomes unable to meet its contractual
obligations to Alta Power LLC under agreements between WattStock and Alta Power for
WattStock to supply a minimum of 9 refurbished LM6000 units.

WattStock and GE have entered into a Memorandum of Understanding that sets out how
WattStock and GE will work together to refurbish previously owned aero-derivative power
units, including the LM6000 series units.  In general, GE is committed to overhauling engines
and supplying engineering analysis and diagrams to ensure the entire unit is refurbished to GE-
specifications, and WattStock is committed to acquiring used units and refurbishing the
balance-of-plant.  By refurbishing units in this fashion, GE is able to warranty the completed
unit.  WattStock and GE have agreed that either party might act in the role of prime contractor,
depending on a variety of factors.  With regard to the Alta Power project, we jointly determined
that WattStock would take the lead, and GE will perform its engineering and engine overhaul
work as a subcontractor to WattStock.

Should WattStock fail to meet its contractual obligations to Alta Power, GE would be in a
position to assume responsibility to complete any outstanding work, subject to several
considerations.  For illustration and without limitation, those considerations would likely
include: (1) the absence of any legal or access issues; (2) GE and Alta being able to agree to a
revised scope of work and associated costs; and (3) GE's assessment that there are no
insurmountable engineering or manufacturing issues.

There are a number of reasons that GE is willing to warranty WattStock's work on this
project.  First, WattStock's operation is co-located next to our engine overhaul facility, GE will
be tracking project progress daily and could quickly assume work scope without
transportation.  Second, as part of our engineering services on this project we already conduct
oversight of all aspects of WattStock's work – we will be intimately acquainted with each unit
and its refurbishment program.  Third, as the leader in aero-derivative power plants, we have a
broad network suppliers that we expect to be able to call on to assist if need be.  Fourth – and
most importantly – GE has a strong incentive for this project to succeed.

# Exhibit 7

Alta App.000059

---

Message

| | |
|---|---|
| **From:** | Herrington, Lance R (GE Power) [lance.herrington@ge.com] |
| **Sent:** | 4/26/2019 11:09:57 AM |
| **To:** | Tremblay, Mike J (GE Power) [mike.tremblay@ge.com]; Hall, Gavin M (GE Power) [gavin.hall@ge.com]; Ayrado, Antonio (GE Power) [antonio.ayrado@ge.com]; j.manning@wattstock.com |
| **Subject:** | Re: Map GE /WattStock relationship |
| **Attachments:** | GE_WattStock TRUEpackage relationship overview.pptx |

Please see attached, I did this a while back before we had the MOU in place to describe the GE WattStock relationship and who does what.  Hope this helps...

**Lance Herrington**
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades..

---

**From:** mike.tremblay@ge.com
**When:** 10:30 AM - 11:30 AM April 26, 2019
**Subject:** Map GE /WattStock relationship
**Location:** Skype Meeting

In order to establish a meaningful Agreement between GE and Wattstock, we need to fully understand the engagement and who will do what

---

Join Skype Meeting
Trouble Joining? Try Skype Web App

Join by phone

Toll-free number: +1 (866) 799-9419,,65417631# (Dial-in Number)          English (United States)
Toll number:       +1 (860) 785-9628,,65417631# (Dial-in Number)          English (United States)
Find a local number

Conference ID: 65417631
Forgot your dial-in PIN? | Help | Legal

---

GE CONFIDENTIAL                                                                 GEALTA_0002881

Alta App.000060

EXHIBIT
62

# Aero "Certified Pre-Owned" Package Program



Program background / intent

Under the current market conditions, we are seeing a growing number of Aeroderivative Power Generation Packages being decommissioned, or the operating entity owning the asset seeks to sale the equipment to other investors, asset owners, and/or operators. In these circumstances the Aero Product Line seeks to work with the seller and buyer through the acquisition, refurbishment, upgrade, and redeployment of those assets to maximize the return on value to the new owner/operator, as well as, maintain a mutually beneficial service relationship with that owner/operator over the lifetime of the assets

Program structure

- Establish MOU and supplier agreement with outside firm for acquisition, holding, refurb/upgrade, and resell of used LM package equipment

- The intent of the MoU is to establish the working guidelines between GE and the outside firm regarding the identification of projects for the acquisition, refurbishment, upgrade and resell.

- The intent of the supplier agreement is to establish contractual relationship for the potential use of the Jacintoport facility to perform the physical refurb/upgrade work...with access to port to ease shipping as well as import/export of equipment as needed

- GE and the outside firm will work independently and/or collective to identify projects best suited for used and/or surplus Aeroderivative equipment. Examples of target projects for used and/or surplus equipment would be Cross Fleet / oOEM repower projects such as FT4/FT8 to LM repowers.

- When equipment is identified for purchase the outside firm will pursue the purchase of the equipment from the seller into their inventory. The Firm and GE will work together to determine best purchase price of equipment, with GE providing a proposal to them for the purchase of the LM Gas Turbine from the purchased packaged equipment.

- For the refurbishment of the LM package equipment, GE and The Firm will work together to identify the extent of the scope of work to be performed.

- In general, the firm will provide all labor and supervision to complete the agreed upon scope. GE will sale to the firm all parts, systems, required gas turbines, and engineering services required to complete the refurbishment scope. Additionally, GE and the firm will agree upon the scope of upgrades that will be required to maximize the value of the equipment to the buyer. GE will sale to the firm the agreed upon upgrade scope.

- GE and the firm will jointly work sales opportunities following the GE ITO R Process to ensure continuity of customer relationship with GE throughout the lifecycle of the project and post COD.

- Logistics / Transportation will be provided by the outside firm.

- The outside firm will provide I&C labor with GE provide TA Services

- Warranty will be provided in general for parts/labor provided for the refurbishment and upgrade scope following std terms. A full wrap warranty can additionally be provided

- Full performance guarantees will be provided by GE to the customer.



Presentation Title          Confidential. Not to be copied, distributed, or reproduced without prior approval.          [DateTime]    1

Alta App.000061

# Aero "Certified Pre-Owned" Package Program



### Division of Scope / Responsibility (WattStock as Commercial Lead)



**JOINT**



| GE | JOINT | WATTSTOCK |
|---|---|---|
| • Provide GT Buy-back price | • Combined GT/Package buyback price | • Identification of units for sale |
| • Buy back GT and place into asset mgmt inventory after WattStock purchase of GT/package | • Identify sales / project opportunities…pace through GE ITO R process | • Broker buyback |
| • Engineering services (sale to WattStock @ pre-agreed discount level) | • Identify scope of refurbishment required | • Hold purchased package in inventory |
| • Parts / Systems for refurb (sale to WattStock @ pre-agreed discount level) | • Identify scope of upgrades to maximize customer value based on operational mission profile | • Decommisioning of equipment at seller's site |
| • Parts / Systems for upgrades (sale to WattStock @ pre-agreed discount level) | • Identify best engine to meet customer operation mission profile (i.e. New, overhauled, or used servceable) | • Transportation & Logistics from seller site to refurb/upgrade site |
| • Sales Support / Account Mgmt | | • Supervision and labor for refurb / upgrade works |
| • Marketing | | • Lead commercial negotiation & sale with buyer |
| • TA Services for I&C | | • Transportation & Logistics from refurb/upgrade site to buyer site |
| • I&C "Red Flag Review" | | • I&C supervision & Labor |
| • Performance Guarantees | | |
| • Refurb / upgrade parts & services warranty | | |
| • Full wrap warranty (additional price) | | |
| • MYA Proposal | | |
| • Warranty management | | |

Presenation Title    Confidential. Not to be copied, distributed, or reproduced without prior approval.    [DateTime]    2

Alta App.000062

# Aero "Certified Pre-Owned" Package Program



### Division of Scope / Responsibility (GE as Commercial Lead)





| GE | JOINT | WattStock |
|---|---|---|
| • Provide GT Buy-back price<br>• Buy back GT and place into asset mgmt inventory after WattStock purchase of GT/package<br>• Engineering services (sale to WattStock @ pre-agreed discount level)<br>• Parts / Systems for refurb (issue to project for WattStock installation)<br>• Parts / Systems for upgrades (issue to project for WattStock installation)<br>• **Lead commercial negotiation & sale with buyer**<br>• Marketing<br>• TA Services for I&C<br>• I&C "Red Flag Review"<br>• Performance Guarantees<br>• Refurb / upgrade parts & services warranty<br>• Full wrap warranty (additional price)<br>• MYA Proposal<br>• Warranty management | • Combined GT/Package buyback price<br>• Identify sales / project opportunities...pace through GE ITO R process<br>• Identify scope of refurbishment required<br>• Identify scope of upgrades to maximize customer value based on operational mission profile<br>• Identify best engine to meet customer operation mission profile (ie. New, overhauled, or used serviceable) | • Identification of units for sale<br>• Broker buyback<br>• Hold purchased package in inventory<br>• **Sale to GE** - Decommissioning of equipment at seller's site<br>• **Sale to GE** - Transportation & Logistics from seller site to refurb/upgrade site<br>• **Sale to GE** - Supervision and labor for refurb / upgrade works<br>• **Support commercial negotiation & sale with buyer**<br>• **Sale of refurb/upgraded package to GE**<br>• **Sale to GE** - Transportation & Logistics from refurb/upgrade site to buyer site<br>• **Sale to GE** - I&C supervision & Labor |

| Presentation Title | Confidential. Not to be copied, distributed, or reproduced without prior approval. | [DateTime]  3 |

Alta App.000063

# Aero "Certified Pre-Owned" Package Program



Relational Benefits





- OEM "brand" on refurb unit…helps improve customer access to project financing, lower insurance premiums, and improve investor confidence.
- Engineering and Technology leadership
- Access to IP to maximize customer payback value and maintain optimal life cycle value
- Marketing
- TA Services for I&C
- I&C "Red Flag Review" process
- Performance Guarantees
- Refurb / upgrade parts & services warranty
- Full wrap warranty
- MYA Proposal
- Warranty management
- Long Term customer relationship and relationship management team / process

- Link to resell unit market and sellers
- Better buyback negotiation position as broker
- Deep relationships with owners and operators of LM equipment and Power Generation industry leaders
- Willingness to hold packages in inventory
- Tight linkage to potential projects / potential buyers focused only on "grey market" units due to project economics
- Resources with deep LM equipment knowledge

Presentation Title | Confidential. Not to be copied, distributed, or reproduced without prior approval. | [DateTime]   4

Alta App.000064

GE CONFIDENTIAL

# Exhibit 8

Alta App.000065

Message

| | |
|---|---|
| **From:** | Hill, Daniel D (GE Power) [daniel.hill@ge.com] |
| **Sent:** | 11/13/2019 9:25:50 AM |
| **To:** | Hall, Gavin M (GE Power) [gavin.hall@ge.com]; Hill, Daniel D (GE Power) [daniel.hill@ge.com] |
| **Subject:** | Conversation with Gavin Hall |

Hill, Daniel D (GE Power) 8:15 AM:

Morning: Question - Knowing WattStock will not have cash until they sign a deal with Alta..... do I hold the final milestone invoice for the LNTP or proceed with issuing. If we issue, it will be just another past due invoice in the realtrack metrics.

Gavin Hall 8:16 AM:

since we have stopped work, move the payment schedule out to reflect the current status

Hill, Daniel D (GE Power) 8:16 AM:

k

Gavin Hall 8:17 AM:

when is Alex saying they could close?

Gavin Hall 8:18 AM:

have you gone in a added explanation in the IOI? Last time I looked it was all 'green' and said waiting on PO

Gavin Hall 8:18 AM:

should be red on cash flow

Gavin Hall 8:18 AM:

should say stopped wirk

Hill, Daniel D (GE Power) 8:19 AM:

They are in a requoting process right now. Alta wants a price on 2 units... priced separately being each unit has a defferent prices depending on refurbishment needs. I'll ask Alex for a estimate.

Hill, Daniel D (GE Power) 8:19 AM:

I'll update IOI's

Gavin Hall 8:20 AM:

ok thanks

Gavin Hall 8:20 AM:

sending you something FYI o Halle

Gavin Hall 8:20 AM:

shaft tunnel cracked

GEALTA_0008114

EXHIBIT
63

Alta App.000066

# Exhibit 9

Alta App.000067



Message

| | |
|---|---|
| **From:** | Hill, Daniel D (GE Power) [daniel.hill@ge.com] |
| **Sent:** | 5/31/2019 4:21:58 PM |
| **To:** | j.manning@wattstock.com; Tremblay, Mike J (GE Power) [mike.tremblay@ge.com] |
| **CC:** | Herrington, Lance R (GE Power) [lance.herrington@ge.com]; Andrew F. Herr [a.herr@wattstock.com]; p.jenevein@wattstock.com; Pete Watson [p.watson@wattstock.com] |
| **Subject:** | Re: EXT: PAYMENT NO. 4 |

Mike, looking for assistance.  I'll give you a call shortly.

Daniel Hill
281-382-9630

On May 31, 2019, at 3:14 PM, "j.manning@wattstock.com" <j.manning@wattstock.com> wrote:

Guys, we are in a cash flow dilemma and need to pay the IEC/TTS invoice.  Is it possible to accelerate the payment and pay the early payment fee?  It is due to be paid June 29.  We would like it released now.
**We need this ASAP.**
Thanks,
Jay

<image003.png>
Jay C. Manning
16415 Jacintoport Blvd.
Houston, TX  77015
C:  713.248.4148
j.manning@wattstock.com www.wattstock.com
***************************************************************************

This e-mail is the property of WattStock LLC and/or its relevant affiliate and contains confidentia and privileged material for the sole use of the intended recipient(s).  Any review, use, distribution or disclosure by others is strictly prohibited.  If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender or reply to WattStock LLC at Webmaster@wattstock.com and delete all copies of the message.  This e-mail (and any attachments hereto) are not intended to be an offer (or an acceptance) and do not create or evidence a binding and enforceable contract between WattStock LLC (or any of its affiliates) and the intended recipient or any other party, and may not be relied on by anyone as the basis of a contract by estoppel or otherwise.  Thank you.

Alta App.000068

# Exhibit 10

Alta App.000069



Message

| | |
|---|---|
| **From:** | Herrington, Lance R (GE Power) [lance.herrington@ge.com] |
| **Sent:** | 6/5/2019 10:00:26 AM |
| **To:** | Tremblay, Mike J (GE Power) [mike.tremblay@ge.com]; Hill, Daniel D (GE Power) [daniel.hill@ge.com]; Hall, Gavin M (GE Power) [gavin.hall@ge.com] |
| **Subject:** | Re: CONFIDENTIAL |

Thank you for your note Mike. And I appreciate your concerns, very warranted to be sure. I agree that we should have a candid discussion with them. At the moment we are laser focused on getting IP Mansfield to commercial operation...I am going to schedule a 1-2 workout meeting after that with WattStock and GE to include Sales/Commercial, PMO, Engineering, Field Corp(?) to complete a IP after action review and lay out improvement plans going forward. That will probably occur here in Houston at Jacintoport. You are welcome to participate as well...

**Lance Herrington**
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754 | M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

**From:** "Tremblay, Mike J (GE Power)" <mike.tremblay@ge.com>
**Date:** Tuesday, June 4, 2019 at 6:34 AM
**To:** Daniel Hill <daniel.hill@ge.com>, Lance Herrington <lance.herrington@ge.com>, "Hall, Gavin M (GE Power)" <gavin.hall@ge.com>
**Subject:** CONFIDENTIAL

Guys –
I have to admit that this is very concerning. This isn't the first time that we have had to take extraordinary measures to pay Wattstock early so they can continue with work.

As you are aware, I'm in the process of developing a Supply Agreement with them; however I wouldn't be doing my job if I didn't escalate this as a valid concern. I realize we like this program; however it looks as though the program could expose us to significant risk, should they not improve their financial position.

I think we need to have a candid discussion with them on whether they can sustain operations in the future.

**Mike Tremblay**
Sourcing Leader
GE- Power Services – Global Repair Solutions
Office 864 254 4638
Mobile 603-817-9397
Mike.Tremblay@ge.com

Message and Content are **Confidential**

**From:** Hill, Daniel D (GE Power)
**Sent:** Monday, June 3, 2019 10:30 PM
**To:** Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>; Yagana, Satya (GE Power, Non-GE)
<satya.yagana@ge.com>; D, Naveen (GE Global Operations, consultant) <Naveen1.D@ge.com>; Fraz, Shariq (GE Power,
consultant) <Shariq.Fraz@ge.com>
**Cc:** Ramage, Demarra (GE Power) <Demarra.Ramage@ge.com>
**Subject:** Re: EXT: PAYMENT NO. 4

Mike,
 Curious of any progress or estimated payment date. Thanks.

Daniel Hill
281-382-9630

On Jun 3, 2019, at 9:02 AM, Hill, Daniel D (GE Power) <daniel.hill@ge.com> wrote:

Mike,
        See attached. Line 4 on the GE PO.


DDH



**From:** Tremblay, Mike J (GE Power)
**Sent:** Monday, June 3, 2019 6:05 AM
**To:** Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Yagana, Satya (GE Power, Non-GE) <satya.yagana@ge.com>; D,
Naveen (GE Global Operations, consultant) <Naveen1.D@ge.com>; Fraz, Shariq (GE Power, consultant)
<Shariq.Fraz@ge.com>
**Cc:** Ramage, Demarra (GE Power) <Demarra.Ramage@ge.com>
**Subject:** RE: EXT: PAYMENT NO. 4

Daniel
Can you provide the Wattstock PO/line number that was received and is waiting payment?

Satya – We will need to Modify the Terms for Wattstock to 3.5-30 Net 150 Tiers and then contact AP to pay immediately
with a discount for the above PO.

Mike

**From:** Hill, Daniel D (GE Power)
**Sent:** Friday, May 31, 2019 4:22 PM
**To:** j.manning@wattstock.com; Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Cc:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Andrew F. Herr <a.herr@wattstock.com>;
p.jenevein@wattstock.com; Pete Watson <p.watson@wattstock.com>
**Subject:** Re: EXT: PAYMENT NO. 4

Mike, looking for assistance.  I'll give you a call shortly.

Daniel Hill
281-382-9630

GEALTA_0007972

Alta App.000071

&lt;Payment Number 4 WattStock LLC Invoice GE-IP-006 Rev 1 August 9 2018 to GE PACKAGE POWER INC PURCHASE ORDER 425234752 dated 9 Aug 2018.pdf&gt;

&lt;425234752 WattStock Repower PO.pdf&gt;

GEALTA_0007973

Alta App.000072

# Exhibit 11

EXHIBIT
84

Message

| | |
|---|---|
| From: | Hill, Daniel D (GE Power) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4F3D1CEAC719423498E9AE72800FE328-HILL, DANIE] |
| Sent: | 5/31/2019 11:15:00 PM |
| To: | Pete Watson [p.watson@wattstock.com] |
| CC: | Jay Manning (j.manning@wattstock.com) [j.manning@wattstock.com]; Herrington, Lance R (GE Gas Power) [lance.herrington@ge.com]; Billy Tate [b.tate@wattstock.com] |
| Subject: | FW: IP Project --- Wendell needs to Complain |

Importance:    High

Pete,

      Please take the time to read the below.

       I'm not going to spend time repeating Wendell's comments below. They are clear. Wendell is a veteran field rep with countless packages under his belt. So, no need for me to add comments. But I will say, many of his same observations where noted during the Houston package build and package FAT testing were GE had to step up and hire FieldCore and other contactors to support package build and testing.... the same, has now followed into the field. GE should only have 2 reps onsite with very limited scope, taking alignment readings and QA/QC over I&C manuals sign offs. Instead, we have staffed (5 reps) to cover WattStock and their contractor to insure this package is running in 30days and to a quality standard GE is known for. Now we are questioning, if more labor is needed from GE/FieldCore. Looking for WattStock to step up and drive this project, internally and with your EPC contractor (IEC). At his time, WattStock seems to be stepping back and allowing IEC to fail or succeed at their leisure while GE/FieldCore teams are working at extraordinary levels for success.

Also, Tim is a great guy, very knowledgeable, and has a huge passion for success. I trust there are no repercussions on him because of this email. As Wendell mentioned, we need to get along and figure this out. Growing pains are never easy.

Regards,

DDH

From: Birdsall, Wendell J (FieldCore)
Sent: Friday, May 31, 2019 8:45 PM
To: Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Duncan, Alec (FieldCore) <Alec1.Duncan@ge.com>
Subject: IP Project --- Wendell needs to Complain
Importance: High

Daniel,

GE CONFIDENTIAL

I hate to pick a fight, but this <u>must</u> be done and I'm including the regional FS manager. Alec........let Daniel mull this letter over and perhaps the three of us can talk about this.

The major construction is up (except for silencer and final filter house panel).

**I need Brad Orr on days and am making this his last night shift!  NOT NEGOTIABLE.**

Yesterday, Tim was counseled by his company piers that he was not to work.  He was helping install GLO piping.  Tim was told to watch and observe.  Answer questions only when asked.  While this is what Tim said to me, I don't know the entire discussion he had with his team, but what is going on with this.

He did try to help with the exhaust (which shifted in transport as it was not secured) but I asked him to leave and not get in trouble with his company.

For the GLO piping, I have informed and asked where the check valves for the system are.  They are in the parts container and not installed.  We have to walk the system down, but again.....duplicate or unfinished work.

How come I can be out there busting it up all day but the company we hired can watch?

What happened to GE and WattStock kicking in and helping each other get through this?

You saw the action items from my last visit in Houston.  The package was to be complete.  We still have unsupported pipe and tube runs in the package.  There are hydraulic lines rubbing on gas lines.  Forget the touch up paint.

I understand there were parts issues.  These could have been caught last fall, but nobody did a parts inventory until January.  I understand there have been frequent design changes by GE and areas of support that other have taken on due to our long lead time.

I do not understand why we would build TLO or Hydraulic piping without simple U-bolts and brackets to support them.  Wattstock has brought no significant tools or material to clean this up.  But if I make a list of what I think we need..........they'll get it???

Wattstock hired Chan.  Chan hired TTS.

I'm responsible for sign-offs on this stuff.  Billy and Carlos are too, but when confronted with questions about package leveling or inconsistent readings after the foundation is set......seems to be "my call" or "they (assume TTS or Chans group) will just have to fix it".  I thought this cooperation was supposed to be better between the three of us.  It is not working for me.

I've taken a full day from trying to address alignment, to rough set the exhaust and test fit the collector for the sake of timeline, production, and test fit.  This is something I have to take back apart to proceed forward with Turbine and Generator alignment.

I have alignment concerns.  The generator is close to bolt bound.  The turbine is close to bolt bound.  I can make it smile...............but the steps taken in my opinion are too desperate for a first install.

I could go on but will end this here.  I am grateful to TTS as they have given me two great mechanics the last few days.

I've been tasked as lead and TA.
I've been tasked as labor.
I've been tasked for punch-list tracking.
I've been tasked with maintaining the IP Yellow Book and GE teams' daily safety sheets.
I've been tasked with oversight and mechanical sign-off for GE

I've been tasked with IP Yellow book and safety.
I've been tasked with updates for Construction manual progress. I haven't touched that since the 21st or 22nd. Chan asked today for an update.........you were on copy of my response.
I answer Customer questions, Wattstock worker questions, General worker questions.

You know I don't care to sit in an office all day, and I enjoy being hands-on, but I'm not in a middle ground where I feel I have the ability to maintain the oversight that has been assigned on such a broad scale while being such a high percentage of the workforce.

The workers that Wattstock brought were out there for two days unaware of the IP Yellow Book. They had no idea about JSA's and the need to sign on to a LOTO. I have corrected that. They are also electricians and a helper. GREAT GUYS! --- glad to have them here and they will be helpful.

I'm not convinced they have all the disciplines needed to complete the Turbine and Generator compartment and punch-list as it currently is. I've already mentioned materials and tools but it needs to be stated again. They do have an awesome tube bending kit...........so Kudos for that.

I'm tasked out Bud (s). Perhaps I don't understand my function and am not executing or managing my time effectively.

Forget about myself, I am concerned that we are so focused on timeline --- that we will have an extremely large punch-list. It's not just a pride in product issue, but I fear that follow up costs for GE Warranty and re-work could be large. Not so much on the equipment side, as I believe all will work well. From cosmetics, fire dump test, rusty metal, cleanliness and presentation, stairs...........I perceive that we could be tasked with some considerable re-work. I hope I am wrong.

IP Mansfield has already expressed bare metal and non-painted areas. I haven't established a full bead on their position other than their frame turbine alignment guru. We may get a break on their punch-list final but I just don't know right now. You know the painted stairs on the generator are a concern.

I love you both very much, but I just need to put this out from my perspective. I request that <u>we have no internal</u> family fighting. I would like to work the problems and go forward.

Wendell

**Wendell Birdsall**
Field Service Representative
FieldCore

M +1 315 708 2654
O +1 315 452 7210
F +1 315 452 7285
E wendell.birdsall@ge.com

**GE Proprietary:** The information in this document and all attachment(s) is confidential information of the General Electric Co and may be legally privileged  It is intended only for the use of the addressee(s) listed.  Any dissemination, distribution, or copying of this document or any of its attachment(s) without the prior written permission of the General Electric Co is strictly prohibited  If you have received this document or any of its attachment(s) in error  please immediately notify the sender by telephone at the number above and return the original document and any attachment(s) to GE at the address above.

Alta App.000076

# Exhibit 12

Alta App.000077



Message

**From:**      Tremblay, Mike J (GE Power) [mike.tremblay@ge.com]
**Sent:**      6/19/2019 9:31:10 AM
**To:**        Hill, Daniel D (GE Power) [daniel.hill@ge.com]
**CC:**        Herrington, Lance R (GE Power) [lance.herrington@ge.com]
**Subject:**   RE: EXT: Fwd: Lack of Payment Notice


Good to hear that the disaster was averted..

I hope Jay fully understands the problems that this could have cause and the ramifications.   If he wants to be a Supplier to GE, he has to have the capital to sustain operations.

Also I hope he understands that the ongoing result will be that any subsequent  payment will also be subject to discount, as their account is now with TPS (GE capital).


**From:** Hill, Daniel D (GE Power)
**Sent:** Tuesday, June 18, 2019 7:11 PM
**To:** Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Cc:** Guerra, Scott (GE Power) <scott.guerra@ge.com>; Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Subject:** Re: EXT: Fwd: Lack of Payment Notice

Thanks.  We are good now.

Daniel Hill
281-382-9630

On Jun 18, 2019, at 3:28 PM, Tremblay, Mike J (GE Power) <mike.tremblay@ge.com> wrote:

Thanks Scott.

Daniel – Did we get confirmation ?   Is the risk mitigated??

**From:** Guerra, Scott (GE Power)
**Sent:** Tuesday, June 18, 2019 1:S9 PM
**To:** Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Cc:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Subject:** RE: EXT: Fwd: Lack of Payment Notice

Payment document from Treasury attached.    Has the supplier confirmed if they received any funds?  Thanks.


**From:** Guerra, Scott (GE Power)
**Sent:** Monday, June 17, 2019 7:35 PM
**To:** Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Cc:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Subject:** RE: EXT: Fwd: Lack of Payment Notice

Treasury put through a same day manual payment as of 5PM today.    I do not a document to confirm yet.  We only have the email where Treasury states they approved/processed the manual payment.  Treasury was able to support a same day funds transfer.  It's possible if the supplier's bank was still open the funds transferred today.  I would expect the supplier to have the funds tomorrow morning.

Will keep everyone posted when we have something more formal from Treasury.

**From:** Hill, Daniel D (GE Power)
**Sent:** Monday, June 17, 2019 7:14 PM
**To:** Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Cc:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Guerra, Scott (GE Power) <scott.guerra@ge.com>
**Subject:** Re: EXT: Fwd: Lack of Payment Notice

Mike,

Any luck getting approval for wire transfer today? If so, do you have any type of document giving the bank OK to proceed?

Daniel Hill
281-382-9630

On Jun 17, 2019, at 12:55 PM, Tremblay, Mike J (GE Power) <mike.tremblay@ge.com> wrote:

Daniel

We are working to make the payment. However I'm told we will have payment confirmation but the funds may not actually hit their account for 2 days.    What will that do ?

**From:** Hill, Daniel D (GE Power)
**Sent:** Monday, June 17, 2019 1:45 PM
**To:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Subject:** Fwd: EXT: Fwd: Lack of Payment Notice

This is now critical. IP will be notified today.

Daniel Hill
281-382-9630

Begin forwarded message:

**From:** Chan Lam <clam@iec-corporation.com>
**Date:** June 17, 2019 at 12:38:25 PM CDT
**To:** Jay Manning <j.manning@wattstock.com>, Pete Watson <p.watson@wattstock.com>
**Cc:** Billy Tate <b.tate@wattstock.com>, "Hill, Daniel D (GE Power)" <daniel.hill@ge.com>, Eric Quintero <equintero@iec-corporation.com>
**Subject: EXT: Fwd: Lack of Payment Notice**

Jay and Pete,

Please see below.  When do you expect the wire transfer payment of invoice 13 and 14 to go through?

Thanks and regards,

Chan

<image001.gif>

**Chan Lam, P.E.**
**Senior Project Manager /**

**Principle Mechanical**
**IEC Corporation**
8795 Folsom Blvd. Suite 205
Sacramento, CA 95826
Mobile: 530.400.3020
Fax: 916.383.6010

Email: clam@iec-corporation.com
Website: www.iec-corporation.com

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender at IEC Corporation by reply email and destroy all copies of the original message.

---------- Forwarded message ---------
From: **Nathen Howard** <nhoward@ttsconstruction.com>
Date: Mon, Jun 17, 2019 at 8:01 AM
Subject: Lack of Payment Notice
To: Chan Lam <clam@iec-corporation.com>
Cc: Walter Hitch <whitch@ttsconstruction.com>, Lori Otterbeck <lotterbeck@ttsconstruction.com>

Chan,

Over the past couple of weeks, I know you have been trying to get some resolution from Wattstock - with the help of GE on the late payment(s). But our latest invoice for the 2nd construction payment has been over due since May 27th. Wattstock has over extended their credit with us (through IEC). As of right now, we are no longer going to perform additional work. We will continue the next couple of days supporting punch list and other needs for our already installed work, but no additional scope will be taken on until the lack of payment has been rectified.

Also note, we are looking at reducing/removing the nights shift as well as a further reduction in day shift. In addition, Wattstock had requested additional equipment support such as more UTV's and we will be taking them off rent after today due to lack of payment.

Lastly, to protect our claim rights and they are the Owner, we will notify IP-Internation Paper today of the above.

Regards,

Nathen Howard
TTS Construction Corporation

<image001.gif>

GE CONFIDENTIAL

GEALTA_0017429

Alta App.000080

# Exhibit 13

Alta App.000081


EXHIBIT
95

Message
_____

**From:**      Cunningham, Kevin (GE Power) [kevin1.cunningham@ge.com]
**Sent:**      10/17/2019 4:39:49 PM
**To:**        Hill, Daniel D (GE Power) [daniel.hill@ge.com]; Nair, Sindhu (Genpact, consultant) [sindhu.nair1@ge.com]; Bernu,
               Curtis (GE Power) [curtis.bernu@ge.com]; Mody, Amol (GE Power) [Amol.Mody@ge.com]; Babu, Alex (GE Power)
               [alex.babu@ge.com]; Currie, Lana (GE Power) [Lana.Currie@ge.com]
**CC:**        Hall, Gavin M (GE Power) [gavin.hall@ge.com]; Pinapati, Chandra Sekhar (GE Power, consultant)
               [ChandraSekhar.Pinapati@ge.com]; Utal, Harmeet (GE Power) [Harmeet.Utal@ge.com]; Luna, Jhona (GE Capital,
               consultant) [jhona.luna@ge.com]
**Subject:**   RE: Overdue invoices for WATTSTOCK LLC & GENCONN DEVON LLC

**Importance:**  High

Daniel,

Thanks for the update.  This is really serious as what your saying is Wattstock is either out of cash or chooses not to pay
us until the next deal with Aero/Alta closes. We can't work like this and then to your point about withholding, parts,
services, drawings, etc indefinitely.

Amol, Alex,
I see this impacting SC inductions of any Alta/Wattstock engines.  If we don't have the $1.9M Wattstock cash by then,
then inductions need to push until the $1.9M is collected. The contract proposals your drafting now probably need to
have CIA terms now.

Kevin



**From:** Hill, Daniel D (GE Power) <daniel.hill@ge.com>
**Sent:** Thursday, October 17, 2019 3:20 PM
**To:** Nair, Sindhu (Genpact, consultant) <sindhu.nair1@ge.com>; Bernu, Curtis (GE Power) <curtis.bernu@ge.com>
**Cc:** Hall, Gavin M (GE Power) <gavin.hall@ge.com>; Cunningham, Kevin (GE Power) <kevin1.cunningham@ge.com>;
Pinapati, Chandra Sekhar (GE Power, consultant) <ChandraSekhar.Pinapati@ge.com>; Utal, Harmeet (GE Power)
<Harmeet.Utal@ge.com>; Luna, Jhona (GE Capital, consultant) <jhona.luna@ge.com>
**Subject:** RE: Overdue invoices for WATTSTOCK LLC & GENCONN DEVON LLC

Sindhu,
        WattStock is having cashflow issues. I don't expect any payments this month. WattStock cash
is dependent in getting the full order from Alta Power. Sales teams are working weekly with
WattStock and believe the bank financing will be complete early November. GE will hold material
parts and engineering drawings until all payments are made.


DDH



**From:** Nair, Sindhu (Genpact, consultant) <sindhu.nair1@ge.com>
**Sent:** Thursday, October 17, 2019 3:12 PM
**To:** Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Bernu, Curtis (GE Power) <curtis.bernu@ge.com>
**Cc:** Hall, Gavin M (GE Power) <gavin.hall@ge.com>; Cunningham, Kevin (GE Power) <kevin1.cunningham@ge.com>;
Pinapati, Chandra Sekhar (GE Power, consultant) <ChandraSekhar.Pinapati@ge.com>; Utal, Harmeet (GE Power)

Alta App.000082

<Harmeet.Utal@ge.com>; Luna, Jhona (GE Capital, consultant) <jhona.luna@ge.com>
**Subject:** Overdue invoices for WATTSTOCK LLC & GENCONN DEVON LLC

Hello Daniel, Curtis,

File available in the box  https://ge.ent.box.com/folder/64622720419

Daniel- Please update us with the latest from Watt stock.  Donald Brunswick d.brunswick@wattstock.com has not
responded to my emails.



# Non Responsive Commercially Sensitive Information

Thank you,
Sindhu

**Sindhu Nair**
Accounts Receivable (A/R)Specialist
GE Industrial Power
Direct +905-858-5254
Main +905-858-5600
sindhu.nair1@ge.com
1919 Minnesota Court, Mississauga, ON L5N 0C9, Canada

GEALTA_0010230

Alta App.000083

# Exhibit 14

Alta App.000084



Message

**From:** Hall, Gavin M (GE Gas Power) [gavin.hall@ge.com]
**Sent:** 8/10/2020 3:41:29 PM
**To:** Hill, Daniel D (GE Gas Power) [daniel.hill@ge.com]
**Subject:** RE: WattStock - IP Project

The DOR could be interpreted a number of different ways.

Under BOP Mech Systems – SPRINT is listed...under testing/commish/start-up – 'GE&W' are listed – section 3.5 A on the DOR
Under site services - contractual responsibility was 'W&I' – section 6.5 C on the DOR

Not sure if it matters who actually did it - it matters who is responsible per the DOR.

If you believe 3.5 it was both GE & W...
If you believe 6.5 – it was WattStock and IEC...

It is like when you buddy borrows your car and has a wreck? Who's insurance gets the claim...?
He gets a ticket, but you are responsible for the damage...



**From:** Hill, Daniel D (GE Gas Power) <daniel.hill@ge.com>
**Sent:** Monday, August 10, 2020 3:11 PM
**To:** Hall, Gavin M (GE Gas Power) <gavin.hall@ge.com>
**Subject:** WattStock - IP Project

Gavin,

From today's call... you are correct. It was WS scope to install and commission the package. However, due to their WS lack of experience and deficiencies, GE was required to 'step-up' and keep the project on pace and with a quality standard. See my attached email as reference.

Internal contract between GE/WS... Clear WS has full commissioning – see section 1.13
Internal DOR between GE/WS – see section 6.1

In sum, GE was required to oversee this project from Day 1 with Wendell and Jairo required at j-Port for the conversation and testing activities.

**Daniel Hill**
**GE Energy**
CM&U Project Manager
c: 281-382-9630

# Exhibit 15

Alta App.000086

Message

| | |
|---|---|
| **From:** | Herrington, Lance R (GE Power) [/o=gemail/ou=first administrative group/cn=recipients/cn=2040135341@unknown] |
| **Sent:** | 6/8/2018 8:24:11 AM |
| **To:** | Janson, Mark A (GE Power) [mark.janson@ge.com]; Cunningham, Erik S (GE Power) [erik.cunningham@ge.com] |
| **Subject:** | RE: ALTA POWER ACTION ITEMS: |

Yes that was the plan.

Lance Herrington
Product Line Leader
Aero Conversions, Modifications, and Uprades (CM&U)

T+1 832 954 0754  |  M+1 832 412 9785

Start here to find the right upgrades...

**From:** Janson, Mark A (GE Power)
**Sent:** Friday, June 8, 2018 7:09 AM
**To:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Cunningham, Erik S (GE Power) <erik.cunningham@ge.com>
**Subject:** RE: ALTA POWER ACTION ITEMS:

Thanks lance,  I think it still needs to go through our process to provide a quote to WattStock

**From:** Herrington, Lance R (GE Power)
**Sent:** Thursday, June 07, 2018 6:06 PM
**To:** Janson, Mark A (GE Power) <Mark.Janson@ge.com>
**Subject:** RE: ALTA POWER ACTION ITEMS:

Sounds good Mark. Right now we would be quoting to WattStock since Alta Power approached them first, however, financing could change that where suddenly we have to be lead but we will see I guess when we get there.

Lance Herrington
Product Line Leader
Aero Conversions, Modifications, and Uprades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

Start here to find the right upgrades...

**From:** Janson, Mark A (GE Power)
**Sent:** Thursday, June 7, 2018 4:16 PM
**To:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>; Babu, Alex (GE Power) <alex.babu@ge.com>
**Cc:** Pete Watson <p.watson@wattstock.com>; Kenneth Stevens <k.stevens@wattstock.com>; Yancy, Clayton2 (GE Power) <clayton2.yancy@ge.com>; j.manning@wattstock.com; Cunningham, Erik S (GE Power) <erik.cunningham@ge.com>
**Subject:** RE: ALTA POWER ACTION ITEMS:

Lance

Since the package will ultimately land in the North region, I will lead for Aero Sales

mark

**From:** Herrington, Lance R (GE Power)
**Sent:** Thursday, June 07, 2018 4:34 PM
**To:** Janson, Mark A (GE Power) <Mark.Janson@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>; Babu, Alex (GE Power) <alex.babu@ge.com>
**Cc:** Pete Watson <p.watson@wattstock.com>; Kenneth Stevens <k.stevens@wattstock.com>; Yancy, Clayton2 (GE Power) <clayton2.yancy@ge.com>; <j.manning@wattstock.com>; Cunningham, Erik S (GE Power) <erik.cunningham@ge.com>
**Subject:** RE: ALTA POWER ACTION ITEMS:

Mark, Jim, Alex,

Not sure who the right Account Manager is for this one...Alta Power is based out of the south, but the units will be going into the PJM market...in any case I just wanted to give a summary on where we are.

• In the meeting this week we went through and developed a Division of Responsibility (DOR) matrix to refine scope and responsibility.

• They are looking to develop a 3 unit site design that can be replicated multiple times, 1st site will be somewhat near the Cleveland, OH area at a shutdown paper mill.

• They will be peaking operation only and looking for LM6000PC SAC SPRINT w/ Water Injection.

• They are interested in potentially using LM5000 packages converted to LM6PC especially if it can keep costs down some. They will need a statement from us saying that LM5000 packages converted to LM6 will provide the same performance as a "standard" LM6 package. They will need performance data by end of month, just one run at ISO condition.

• Seems like they really want to make the projects work with us, but pricing into their pro-forma which is basically based on experience with Pro-Energy will be key.

• This will be full turnkey, brown field installation, simple cycle, with SCRs, and 1 PCM for 3 units.

• Since they will be IPP in the PJM market, dual fuel is not required at the moment, so Gas only.

• Interested in 5-min start, and Peak Performance.

• They would like to talk to GE about financing, we need to provide a EFS contact to them as soon as we can.

• Lastly they are keenly interested in GE offering remote operations. These will be unmanned sites. Travis from Alta Power felt like "GE would be missing a great opportunity" if we do not offer remote ops and especially thought Jport was a much better location than "someplace in Missouri"... I think there is a strong hint there. Do we have a reference for remote ops?

• Next Steps:

o    Get performance info to them
o    Statement about LM5 converted package relative to LM6 package
o    GE EFS contact
o    Engage a EPC
o    Provide LM5000 GA's and SCR for layout

    o      Start working up some cost and proposal

That was my takeaways from the meeting this week.

Lance Herrington
Product Line Leader
Aero Uprades

T+1 832 954 0754  |  M+1 832 418 9788

Start here to find the right upgrades...

**From:** Yancy, Clayton2 (GE Power)
**Sent:** Wednesday, June 6, 2018 1:08 PM
**To:** j.manning@wattstock.com; Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Cc:** Babu, Alex (GE Power) <alex.babu@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>; Janson, Mark A (GE Power) <Mark.Janson@ge.com>; Pete Watson <p.watson@wattstock.com>; Kenneth Stevens <k.stevens@wattstock.com>
**Subject:** RE: ALTA POWER ACTION ITEMS:

Lance,

Will Alta need both papers? The papers are attached.

Jay,

I attached the DOR and drawings if needed.

**From:** j.manning@wattstock.com [mailto:j.manning@wattstock.com]
**Sent:** Wednesday, June 06, 2018 11:47 AM
**To:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Cc:** Yancy, Clayton2 (GE Power) <clayton2.yancy@ge.com>; Babu, Alex (GE Power) <alex.babu@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>; Janson, Mark A (GE Power) <Mark.Janson@ge.com>; Pete Watson <p.watson@wattstock.com>; Kenneth Stevens <k.stevens@wattstock.com>
**Subject:** EXT: ALTA POWER ACTION ITEMS:

GE:
1.      Revised DOR.
2.      Performance runs at full load ISO.
a.      Peak power boost performance runs.
b.      Statement that the LM5 to LM6 conversion will not affect performance.
3.      Site visit LM5 conversion.
a.      Did IEC work on one of the conversions?  If so, would be the right one to go to?
4.      White paper on Infinite Purge Credit.
5.      Pricing for anti-icing options.
6.      Pricing for use of portable CEMS.
7.      GA for the LM5000.
8.      GE Capital contact to Matt Laterza.

WattStock:
1.      Site layout with 3 units with SCR.
a.      PCM for three units.
b.      Aux skids with enclosure and roll up sides.
Let me know if I missed anything.

GE CONFIDENTIAL

GEALTA_0004124

Regards,

Jay
WattStock LLC
9225 Katy Fwy, Suite 310
Houston, TX 77024
C: 713.248.4148
j.manning@wattstock.com www.wattstock.com
This e-mail is the property of WattStock LLC and/or its relevant affiliate and contains confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender or reply to WattStock LLC at Webmaster@wattstock.com and delete all copies of the message. This e-mail (and any attachments hereto) are not intended to be an offer (or an acceptance) and do not create or evidence a binding and enforceable contract between WattStock LLC (or any of its affiliates) and the intended recipient or any other party, and may not be relied on by anyone as the basis of a contract by estoppel or otherwise. Thank you.

GE CONFIDENTIAL

# Exhibit 16

Alta App.000091



Message

| | |
|---|---|
| **From:** | Babu, Alex (GE Power) [alex.babu@ge.com] |
| **Sent:** | 1/23/2019 7:47:42 PM |
| **To:** | Currie, Lana (GE Power) [Lana.Currie@ge.com] |
| **CC:** | Canon, James T (GE Power) [james.canon@ge.com]; Leslie, David (GE Power) [David.Leslie@ge.com]; Herrington, Lance R (GE Power) [lance.herrington@ge.com] |
| **Subject:** | RE: Castleman Power - update? |

Lana,

Here is the quick high-level update on Castleman Power:

- Castleman has installed 4x Refurbished LM6000PC Packages in 2017 via ProEnergy in Texas, and is in process of installing another 4x Refurbished LM6000PC Packages via ProEnergy this year.  They have a potential to install another 12 units in Texas in the next 3 years, so we are aggressively going after this to win from ProEnergy.
- WattStock is the lead on this as they have the relationship with Castleman and brought up this opportunity to GE, so we are being a Sub to WattStock for this TruePacakge deal. (WattStock is our partner in the TruePackage program)
- We have heard that ProEnergy's performance has been very poor, and Castleman is looking at alternatives to proceed with his future plans.
- Our budgetary numbers have been higher than ProEnergy's numbers so they are trying to dwindle down our number which may be impossible to meet.
- Recently (within the last week) we have heard that Castleman is trying to pursue purchasing these old assets directly from those owners who have idle assets to sell, and are potentially trying to partner with MTU to refurbish the Gas Turbines and partner with another outfit to refurbish the packages. This would totally kick us out of the picture for any work.

WattStock is setting up a meeting next week with Castleman so we can try to get in front of this, and ill be in attendance to that meeting.  I don't have a high level of confidence in this happening as they are trying to find other avenues to get the most cheapest refurbished units and they are not being that honest with us.  Castleman is an Ex-GE Executive so I don't think he is very motivated in working with the OEM for these LM6000 packages.  This is what my gut is telling me.

Jim – any comments based on our chat with Wattstock today?

Alex

**From:** Currie, Lana (GE Power)
**Sent:** Wednesday, January 23, 2019 11:30 AM
**To:** Babu, Alex (GE Power) <alex.babu@ge.com>
**Cc:** Canon, James T (GE Power) <james.canon@ge.com>; Leslie, David (GE Power) <David.Leslie@ge.com>; Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Subject:** RE: Castleman Power - update?

HI Alex, thanks.
Unfortunately it's already in the plan as OP plan was built several months ago and it received a lot of visibility with team once loaded in Demantra.
We'll need to find a path to offset the CM risk if this one falls through. Please keep us updated.

**From:** Babu, Alex (GE Power)
**Sent:** Wednesday, January 23, 2019 10:56 AM
**To:** Currie, Lana (GE Power) <Lana.Currie@ge.com>

GE CONFIDENTIAL

GEALTA_0024491

Alta App.000092

**Cc:** Canon, James T (GE Power) <james.canon@ge.com>; Leslie, David (GE Power) <David.Leslie@ge.com>; Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Subject:** Re: Castleman Power - update?

I would say this is at a very high risk right now and don't put it in the plan.

I will send more details later on today when I'm in front of my laptop.

Alex Babu
GE Power Services
713-315-0946

On Jan 23, 2019, at 10:00 AM, Currie, Lana (GE Power) <Lana.Currie@ge.com> wrote:

Jim/Alex,
We're trying to better hone in on our risk/oppty for CM&U plan in 2019.  We have Castleman Power in the OP at 10M rev/25% CM.

Can you provide us with the latest?

# Exhibit 17

Alta App.000094

Message
_____

**From:**       Herrington, Lance R (GE Power) [lance.herrington@ge.com]
**Sent:**       12/19/2018 10:53:10 AM
**To:**         Babu, Alex (GE Power) [alex.babu@ge.com]; Jay Manning [j.manning@wattstock.com]
**CC:**         Canon, James T (GE Power) [james.canon@ge.com]
**Subject:**    Alta Power discussion 18 Dec 2018
**Attachments:**   Summary Low Scope cc.xlsx; Untitled attachment 00030.dat



Alex

I sat in a meeting with WattStock and Alta Power yesterday afternoon to discuss their projects. The main purpose of the call was to invite Doug Byrd Services GM of Engineering to present to them our findings on investigating the use of a CF6 engine in Power Generation application. The discussion was very good, and very effective at opening their eyes to the potential pitfalls and has them questioning what PE is telling them about the capabilities of a converted CF6 engine from a power output perspective. Essentially PE is telling them that they can get it to make 50MW and eventually 56MW, our engineering team has found that without major modifications (i.e. new VBV doors, structure, new LPC, new Combustor, new LPT, and new HPT, and more robust blades in the HPC)... the best we can get is ~32MW...so essentially they would have to convert the CF6 to a LM6000 Sprinted PC engine for 50MW and to a PG/PF+ to get 56MW....

Travis' reaction was interesting, he seemed really upset with what PE has been feeding him...

Alta is anxious for a quote from WattStock. I spent some time with Pete and Jay figuring out the best quote strategy to get to the price that Alta is looking for, which is essentially $9.2M per unit to include the GTG skid/auxiliaries for a LM6000PC SAC w/ NOx Water Injection and SPRINT. The following is what we came up with:

NOTE: The costing represents the target costing to make it work...

GE Supply:
For Hot End Drive LM6000 using LM5000 packages:
- Engine "prescriptive" overhaul, assuming the engine meets Patrick Georges qualifying engine standards for the Castleman project = $1.5M
- LM5 to LM6 conversion kit = $0.750
- Controls = $0.300
- Fuel System = $0.400
- Total Cost = $2.95M
- Total Price to WattStock at 20% CM = $3.69M per unit * 3 Units = $11M

For Cold End Drive LM6000 packages:
- Engine "prescriptive" overhaul, assuming the engine meets Patrick Georges qualifying engine standards for the Castleman project = $1.5M
- Controls = $0.300
- Fuel System = $0.400
- Total Cost = $2.2M
- Total Price to WattStock at 20% CM = $2.75M per unit * 6 Units = $16.5M

Total Price for 9 Units = $27.5M

The qualifying engine criteria is attached from Patrick as well as the assumed minimum overhaul scope and price to WattStock that Patrick worked up for Castleman. Jay understands that there is risk on that overhaul price based on the condition of the engine they supply for overhaul.

GE CONFIDENTIAL                                                   GEALTA_0000642

Alta App.000095

Alta also needs a Performance guarantee for the engines…

@Jay Manning – correct anything I got wrong or add whatever I missed please.


**Lance Herrington**
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington


Start here to find the right upgrades…

GEALTA_0000643

Alta App.000096

# Exhibit 18

Alta App.000097



Message

| | |
|---|---|
| **From:** | Canon, James T (GE Power) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=FDA2C9FF0E3E48A6BE3C05C5B886C024-CANON, JAME] |
| **Sent:** | 1/25/2019 6:04:12 PM |
| **To:** | Babu, Alex (GE Power) (alex.babu@ge.com) [alex.babu@ge.com]; Grahn, Rob J (GE Gas Power) [robJ.grahn@ge.com]; Janson, Mark A (GE Gas Power) [Mark.Janson@ge.com]; Whiteside, Albert (GE Power) (albert.whiteside@ge.com) [albert.whiteside@ge.com]; Wiley, Stanford T (GE Power & Water) (Stanford.Wiley@ge.com) [Stanford.Wiley@ge.com] |
| **CC:** | Herrington, Lance R (GE Power & Water) (lance.herrington@ge.com) [lance.herrington@ge.com]; Jay Manning (j.manning@wattstock.com) [j.manning@wattstock.com] |
| **Subject:** | FW: Alta Power: LM6000 SURPLUS Engines and Packages |

**Importance:** High

Guys,

Please see the note below from Jay. We need to locate as many stranded assets in North America as we can. Rob told me yesterday about some TransAlta units. We need the details on those. What else is out there?

Thanks,
Jim


**From:** j.manning@wattstock.com <j.manning@wattstock.com>
**Sent:** Thursday, January 24, 2019 6:40 AM
**To:** Canon, James T (GE Power) <james.canon@ge.com>
**Cc:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Pete Watson <p.watson@wattstock.com>; Rob McNGamee <r.mcnamee@wattstock.com>; Walter Sharpin <w.sharpin@wattstock.com>; Andrew F. Herr <a.herr@wattstock.com>
**Subject:** EXT: Alta Power: LM6000 SURPLUS Engines and Packages
**Importance:** High


Jim,

As we discussed yesterday, Alta is willing to pay our expenses to lock up nine LM6000 PC engines and packages. They would like for us to start right away.
Can you ask the NA sales team to give you a list of the known units available for sale? We need this ASAP.
Rob and I will be putting together the final list/report for Alta with your information.
In addition to the list for Alta, we need to prepare a list for other opportunities as well.
Attached is a list from Turkey.
Regards,
Jay C. Manning
WattStock LLC
16415 Jacintoport Blvd.
Houston, TX 77015
C: 713.248.4148
j.manning@wattstock.com www.wattstock.com



*************************************************************
This e-mail is the property of WattStock LLC and/or its relevant affiliate and contains confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If

you are not the intended recipient (or authorized to receive for the recipient), please contact the sender or reply to WattStock LLC at Webmaster@wattstock.com and delete all copies of the message.  This e-mail (and any attachments hereto) are not intended to be an offer (or an acceptance) and do not create or evidence a binding and enforceable contract between WattStock LLC (or any of its affiliates) and the intended recipient or any other party, and may not be relied on by anyone as the basis of a contract by estoppel or otherwise.  Thank you.

GEALTA_0001749

Alta App.000099

# Exhibit 19

Alta App.000100

Message
_____

**From:**      j.manning@wattstock.com [j.manning@wattstock.com]
**Sent:**      7/26/2019 7:41:17 PM
**To:**        Babu, Alex (GE Power) [alex.babu@ge.com]
**CC:**        Herrington, Lance R (GE Power) [lance.herrington@ge.com]; Pete Watson [p.watson@wattstock.com]
**Subject:**   RE: EXT: FW: ATAER


Yes, it affects the purchase price.

**From:** Babu, Alex (GE Power) [mailto:alex.babu@ge.com]
**Sent:** Thursday, July 25, 2019 10:34 PM
**To:** j.manning@wattstock.com
**Cc:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Pete Watson <p.watson@wattstock.com>
**Subject:** Re: EXT: FW: ATAER

Jay - per our last chat, does the termination fee affect the purchase price of the packages? If we can get them
to agree to sell WattStock the units and provide some sort of discount for the purchase so that GE to concede
the termination fee I believe we can work something out.

Lance - I know you have been involved with this more than I have with the international team so I'm not sure
their stance on the entire termination amount especially if they have it in their base case for the year.  What I
would envision is the following:

1) Ataer to provide a discount to the purchase price if GE concedes the entire or portion of the termination
fee.
2) Need an LOI or MOU from Alta Power stating they will sign up with GE for the MYA in which the termination
fees get transferred over to the new MYA, and if not that they will pay the termination fee on Ataer's behalf so
that we can purchase these units for their projects.

This is all contingent on our new GE organization agreement and the regions playing together.

Alex Babu
GE Power Services
713-315-0946

On Jul 25, 2019, at 7:09 PM, "j.manning@wattstock.com" <j.manning@wattstock.com> wrote:

Ataer is back on the table.  Need to know about the termination fee.  We need these units because Ethos is right
handed.
Jay


**From:** Abdullah Kurt [mailto:abdullah@pro-per.net]
**Sent:** Thursday, July 25, 2019 7:07 AM
**To:** Pete Watson <p.watson@wattstock.com>
**Cc:** j.manning@wattstock.com
**Subject:** ATAER

Pete,



GE CONFIDENTIAL                                                                      GEALTA_0011319

Alta App.000101

ATAER Plant manager just called me and invited me to the site early next week to talk one more time the price and the dismantling schedule. I will be there most probably on Tuesday. I will understand what they have in mind as Selling price for 2x packages. More importantly, they have 2 issues they need to solve:

- Production license: They have to terminate the production license before they allow us to dismantle the equipment. Speaking from experience, it usually takes 1 – 1 ½ months.
- GE termination fee from the MMP they signed back in 2016. I think it's $2.7M.

Will keep you updated.

Regards,
Apo

GE CONFIDENTIAL

# Exhibit 20

Alta App.000103

Message
_____

**From**: Tremblay, Mike J (GE Power) [mike.tremblay@ge.com]
**Sent**: 4/23/2019 7:14:31 AM
**To**: Herrington, Lance R (GE Power) [lance.herrington@ge.com]; Fulmer, Griffin (GE Power) [Griffin.Fulmer@ge.com]
**Subject**: RE: Master Service Agreement?

Lance

I'm working the MSA and based on the number of exceptions that Wattstock has taken, I need to revisit the scope of what they will provide.

What will Wattstock's engagement with GE be?

• Will GE buy material from Wattstock? If so, what?
• Wil GE contract Wattstock to perform any Services on GE / Customer material?  If so, What?
• Who will place PO's to Wattstock? (GE Gas, or the JV)

Also – The MOU that was signed has zero commitment on the GE part.   Is there any other Agreement that we have with Wattstock that I'm not aware of?

My advice is that if Wattstock plans to purchase used Packages and refurbish them with the intent of selling to GE (to resell), then I recommend GE have a straight "buy" agreement with them.

We may need to have a call.

Mike


**From:** Herrington, Lance R (GE Power)
**Sent:** Monday, April 22, 2019 11:20 AM
**To:** Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>; Marsh, Geoffrey (GE Power) <Geoffrey.Marsh@ge.com>; Fulmer, Griffin (GE Power) <Griffin.Fulmer@ge.com>
**Cc:** Hart, Joseph J (GE Power) <joseph.hart@ge.com>
**Subject:** Re: Master Service Agreement?

Mike

The "agreement" he is referring to is a specific project for Alta Power.  WattStock is the commercial lead and has a signed agreement with the end customer.  We are hoping to finalize this MSA as a bi-lateral agreement to use as the agreement between WS and GE for our scope of supply on that project.  We do not currently have any signed agreement between us on that project...

**Lance Herrington**
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...



GE CONFIDENTIAL

**From:** "Tremblay, Mike J (GE Power)" <mike.tremblay@ge.com>
**Date:** Saturday, April 20, 2019 at 6:49 AM
**To:** "Marsh, Geoffrey (GE Power)" <Geoffrey.Marsh@ge.com>, Derrell Fulmer <Griffin.Fulmer@ge.com>,
Lance Herrington <lance.herrington@ge.com>
**Cc:** "Hart, Joseph J (GE Power)" <joseph.hart@ge.com>
**Subject:** FW: Master Service Agreement?

Guys
Can you let me know if this arrangement will be incorporated into the JV or stay within GAS?

**Griffin –** Would you happen to have the original MOU for this?   What Wattstack sent is missing Exhibits.

**Lance –** I'm missing where there is any commitment or Agreement for Wattstack to purchase/ refurbish nine
Packages. Do we have a separate agreement ?   What he sent me (attached) doesn't provide that info.


**Mike Tremblay**
Sourcing Leader
GE- Power Services – Global Repair Solutions
Office  864 254 4638
Mobile 603-817-9397
Mike.Tremblay@ge.com


Message and Content are **Non-Public Information**




**From:** j.manning@wattstock.com <j.manning@wattstock.com>
**Sent:** Friday, April 19, 2019 1:56 PM
**To:** Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>; Herrington, Lance R (GE Power)
<lance.herrington@ge.com>
**Cc:** dave@sterlingintegrity.com; Andrew F. Herr <a.herr@wattstock.com>
**Subject:** EXT: RE: Master Service Agreement?

Mike, please find the attached MOU and Building Lease.  Insurance requirements are different, and the EHS
ComplyWorks docs also require different levels of insurance.
Below is the questions and response from our insurance broker.
Debra,
Please review the clause below for insurance requirements for a new agreement with GE.  We also have the lease
agreement which has insurance requirements also.  You have a copy of the lease agreement.  We are negotiating the
terms, so if you could help us understand what the differences are in each agreement that will be helpful.
Jay
*10.3     During the Term of this Agreement and for the Warranty Period, Supplier, shall at its own cost, obtain and keep
in force for the benefit of Supplier and Company all insurance/and or bonds required by law and the following insurance
to be issued by insurance carriers with a minimum rating in A.M. Best's of A:VIII or better with minimum limits as set
forth below:  Original lease required A-VII*
*(a)     Worker's Compensation Insurance with statutory limits and Employers Liability with a minimum limit of
$2,000,000 per accident, illness or disease;  Original lease required $1,000,000 which is what you have, This is requiring
$2,000,000 (which I'm not sure we can get)*

                                                                        GEALTA_0015244

(b)     Commercial General Liability including products and completed operations coverage, and cross liability coverage, with minimum limits for bodily injury and property damage on an occurrence basis of: $5,000,000 per occurrence; $5,000,000 aggregate. Original lease only required a combination of primary and excess limits of $3,000,000. This with the Excess (f) you would need a total of $10,000,000 in limits. You currently carry a total of $6,000,000.

(c)     Business Automobile Liability Insurance covering all vehicles used in connection with the work and covering Bodily Injury and Property Damage with a minimum combined single limit equal to: $2,000,000 per accident. You currently carry $1,000,000 limit

(d)     Professional Errors and Omissions Liability Insurance covering the activities of Supplier with a minimum limit equal to: $5,000,000 per claim. If written on a "claims-made" basis, the retroactive date must precede the date of this Agreement and continuity of cover must be maintained for three (3) years following termination or expiration of this Agreement. You currently do not have a E&O policy with us. Original lease did not require.

(e)     Property insurance on an All-Risk, replacement cost basis, covering Company's Equipment pursuant to Section 7.7. I don't' see this on the attached but you are carrying coverage on your equipment and contents.

(f)     Excess or Umbrella Liability Insurance, scheduling insurance under 10.3(a), (b) and (c) above as underlying, on an occurrence basis, with minimum limits of $5,000,000. You currently carry $5mil

10.4     Additional Insurance Requirements.

(a)     Company shall be named as additional insured under the policies of insurance set forth in subsections 10.3(b) (c) above for any and all purposes arising out of or connected to the Services. Same

(b)     It is the intent of both parties to this Agreement that all insurance purchased by Supplier in compliance with this Agreement, will be primary to any other insurance owned, secured, or in place by Company, which insurance shall not be called upon by Supplier's insurer to contribute in any way. Supplier shall secure endorsements to this effect from all insurers of such policies. Same

(c)     At Company's request, Supplier shall furnish Company with certificates of insurance and with copies of original endorsements effecting coverage required by this clause. The certificates and endorsements shall identify Company as an additional insured and shall be signed by a person authorized by that insurer to bind coverage on its behalf. Company reserves the right to require complete, certified copies of all required insurance policies, at any time. Same

(d)     All policies provided for herein shall expressly provide that such policies shall not be canceled, terminated or altered without sixty (60) days' prior written notice to Company. Original lease required 30 days.

(e)     All insurance specified in this section shall contain a waiver of subrogation in favor of the Company, its Affiliates and their respective employees, officers and directors for all losses and damages covered by the insurance required by this section. Same

(f)     Supplier shall also require from all of its subcontractors insurance with the same coverages and limits specified above for Supplier. Same

Next week is works for me.

Thanks for your help.

Jay

---

**From:** Tremblay, Mike J (GE Power) [mailto:mike.tremblay@ge.com]
**Sent:** Friday, April 19, 2019 12:02 PM
**To:** j.manning@wattstock.com; Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Cc:** dave@sterlingintegrity.com; Andrew F. Herr <a.herr@wattstock.com>
**Subject:** RE: Master Service Agreement?

Ok – I'm working redlines. Maybe we can connect later next week.

Can you send me a copy of the signed Agreement that you referenced? I want to be sure we are covering the scope with this MSA..

**Mike Tremblay**
Sourcing Leader
GE- Power Services – Global Repair Solutions

GE CONFIDENTIAL

Office  864 254 4638
Mobile 603-817-9397
Mike.Tremblay@ge.com

Message and Content are **Non-Public Information**

**From:** j.manning@wattstock.com <j.manning@wattstock.com>
**Sent:** Friday, April 19, 2019 12:21 PM
**To:** Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>; Herrington, Lance R (GE Power)
<lance.herrington@ge.com>
**Cc:** dave@sterlingintegrity.com; Andrew F. Herr <a.herr@wattstock.com>
**Subject:** EXT: RE: Master Service Agreement?

Mike, we have signed an agreement to supply nine TRUEpackage LM6000's subject to financial closure which is expected
July 1.  We are already purchasing surplus units for this project.  WattStock is the lead on this transaction.
We would like to get a bi-lateral agreement finalized before this project commences.
What is the status of legal help?
Have a great Easter weekend.
Jay

**From:** j.manning@wattstock.com
**Sent:** Wednesday, April 3, 2019 9:44 AM
**To:** 'Tremblay, Mike J (GE Power)' <mike.tremblay@ge.com>; Herrington, Lance R (GE Power)
<lance.herrington@ge.com>
**Cc:** 'dave@sterlingintegrity.com' <dave@sterlingintegrity.com>; Andy Herr (a.herr@wattstock.com)
<a.herr@wattstock.com>
**Subject:** RE: Master Service Agreement?

Mike,
I appreciate your comments that this is a boiler plate agreement that is executed with few if any changes for most
suppliers.  However, we have a different relationship with GE from most suppliers.
For example, we have executed two documents with GE that need to be understood and incorporated into this
document:  the MOU which describes our relationship, and the lease agreement for Jport which has insurance, EHS,
security, etc. requirements.
As you will see in our review attached, we have many changes that, in our opinion, reflect our understanding of the
relationship with GE and the documents we have already executed.
We are ready to discuss with you at your convenience.
Regards,
Jay C. Manning
WattStock LLC
16415 Jacintoport Blvd.
Houston, TX  77015
C:  713.248.4148
j.manning@wattstock.com www.wattstock.com



*******************************************************************************

This e-mail is the property of WattStock LLC and/or its relevant affiliate and contains confidential and privileged material for the sole use of the intended recipient(s).  Any review, use, distribution or disclosure by others is strictly prohibited.  If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender or reply to WattStock LLC at Webmaster@wattstock.com and delete all copies of the message.  This e-mail (and any attachments hereto) are not intended to be an offer (or an acceptance) and do not create or evidence a binding and enforceable contract between WattStock LLC (or any of its affiliates) and the intended recipient or any other party, and may not be relied on by anyone as the basis of a contract by estoppel or otherwise.  Thank you.

**From:** Tremblay, Mike J (GE Power) [mailto:mike.tremblay@ge.com]
**Sent:** Friday, March 22, 2019 8:55 AM
**To:** j.manning@wattstock.com; Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Subject:** Master Service Agreement?

Please find the draft Framework Agreement for us to complete.   I'll walk through the overall objective and how this will work for follow on jobs

**Mike Tremblay**
Sourcing Leader
GE- Power Services – Global Repair Solutions
Office  864 254 4638
Mobile 603-817-9397
Mike.Tremblay@ge.com

Message and Content are **Non-Public Information**

# Exhibit 21

Alta App.000109





# Aero TRUEpackage

Prepared by: Lance Herrington
Feb 2020



Alta App.000110

GE Power

**© 2018, General Electric Company.**

GE Proprietary Information - The information contained in this document is General Electric Company (GE) proprietary information. It is the property of GE and shall not be used, disclosed to others or reproduced without the express written consent of GE, including, but without limitation, in the creation, manufacture, development, or derivation of any repairs, modifications, spare parts, or configuration changes or to obtain government or regulatory approval to do so, if consent is given for reproduction in whole or in part, this notice and the notice set forth on each page of this document shall appear in any such reproduction in whole or in part. The information contained in this document may also be controlled by the US export control laws. Unauthorized export or re-export is prohibited. This presentation and the information herein are provided for information purposes only and are subject to change without notice. NO REPRESENTATION OR WARRANTY IS MADE OR IMPLIED AS TO ITS COMPLETENESS, ACCURACY, OR FITNESS FOR ANY PARTICULAR PURPOSE.



All relative statements are with respect to GE technology unless otherwise noted.

© 2018 General Electric Company. Confidential information. All rights reserved.

Alta App.000111

# A quick history...



### 2016

**Problem:**

1| rapidly changing power market conditions leaving Aero GT assets stranded

2| developers needed a way to move projects forward at a lower capital cost w/ reliable technology that was "bankable"

### 2017

1| GE an WattStock begin a collaboration and socialize a GE certified, "refurbished" package concept

2| GE & WattStock sign MOU and lease agreement for refurb at Jacintoport, Houston, TX facility

### 2018

GE TRUEpackage launched...

1| First project awarded..repowering a GE Frame 5 with Hot End Drive LM6000PF refurbished package

2| Project pipeline grows to over $200M with 28 units of potential volume

### 2019

1| First project goes into commercial operation...

- 1st Hot End Drive LM6000PF Package
- Achieved 34 day installation and commissioning cycle

2| Limited notice to proceed awarded multi-unit project up to 9 units...

### 2020

Installation & Commissioning of ~9 units planned before year end...



Edit Presentation Title in [Insert Tab > Header & Footer]  |  3 September 2024

3

© 2018 General Electric Company. Confidential information. All rights reserved.

Alta App.000112

## Market Drivers

- **Decentralized renewable resources** increase cost-competitive pressures on operators and project developers

- Changing power market demands creating stranded assets in Aero installed base...lowering Aero Service annuity.

- Financing challenges requiring low CAPEX and reliable OPEX solutions for development projects

Alta App.000113



Alta App.000114

## Advantages cont'd...



- GE and WattStock co-located in Houston, TX service center
- Access to port for ease of shipment and import/export of equipment
- Level 4 repair facility

- Recent $30M investment to expand 50,000 sq. ft. and upgrade with latest repair technology
- State-of-the-art automated clean and fluorescent penetrant inspection lines
- Local parts warehouse

© 2018 General Electric Company. Confidential information. All rights reserved.

6



Alta App.000116

# GE Solutions to optimize operations...

## Output/Efficiency
- LM25/LM6 Repower
- OpFlex* Peak Performance
- OpFlex VIVG Schedule Optimization
- Steam Injection
- Compressor Fouling Mitigation (HFWW/Super Polish Blades)

## Availability
- Xtend
- Rad-Rad Combustor
- Core Software & Controls Upgrades
- Compressor Fouling Mitigation (HFWW/Super Polish Blades)
- Asset Performance Management

## Emissions
- DLE Conversion
- OpFlex Automapping
- Hybrid EGT
- OpFlex Auto $NO_x$ Blasting
- Water or Steam Injection for $NO_x$

## Flexibility
- Hybrid EGT
- OpFlex Fast Start
- Alternative/Dual Fuel Conversion
- Synchronous Condensing Upgrade
- LM25/LM6 Repower



* Trademark of General Electric Company

© 2018 General Electric Company. Confidential information. All rights reserved.

8

Alta App.000117

# ISP Competitive Assessment



| Gas Turbine Model | P | R | S | U | M | C | Pk |
|---|---|---|---|---|---|---|---|
| LM6000 | | | | | | | |
| LM2500 | | | | | | | |
| LM2500+ | | | | | | | |
| RR Trent 60 | | | | | | | |
| P&W FT4 | | | | | | | |
| P&W FT8 | | | | | | | |
| RR RB211 | | | | | | | |

P = Parts  R = Repairs  S = Services  U = Upgrade  M = MYA  C= Controls  Pk = Packaging

Competitor claims and we've seen it | Competitor claims but we haven't seen it | Competitor makes no claim | No in-house competence, externally sourced

### Overall presence
Operations experience in over 40 countries worldwide, with 12 offices





Source: Company website, Public documents, W/L records, PS Marketing Data / Analysis

## Capabilities Overview

✓ Support LM2500 / LM2500+ / LM6000
✓ Primarily O&M Field Service , then  LTSA, Lease ,EPC and power plant relocations. Buys and resells Power plants , including LM packages.
✓ Most Successful Regions: Venezuela, USA
✓ AeroAdvantage service offering:
  • 90% GE LM2500 & LM6000 for overhauls and field services
  • 10% Pratt & Whitney FT8 specialty repairs and field services
  • Emergency Outage Maintenance, Borescope Inspections, Service Bulletin Compliance, Alignment Verification, Package Inspections & Maintenance, Rotable Hot Sections, Rotable Fuel Nozzles, Rotable Modules, Condition-based Overhauls, Turbine Removal & Installation, Component Replacement
✓ Remote Operations Center (ROC) in Sedalia, MO
✓ Probable partner: Chromalloy
✓ 23 refurbished units installed and commissioning since 2015

## Interesting Facts

✓ Acquired several LM6000 packages on the secondary market including 4 xLM6000 ( ex CSFPU) 2010, resold into Venezuela. Also repurchased 3xLM2500+ packages from Kuwait in 2010.
✓ Recently provided some L4 services, like HS refurbishment.
✓ Leadership prior work experience includes GE, P&W, Wood Group, Dresser Rand, Solar Turbines, Calpine, etc. 50% of the top executives have held positions within GE.
✓ Developing interconnect agreements in Ercot, possibly PJM and CAISO

## Win/Loss Summary ('17)

✓ 3 Loss according to NEX
✓ Total Lost Value; $1.8M

## Win/Loss Summary ('16)

✓ 2 Loss according to SFDC
✓ 1 Controls based loss; $1.7M Value
✓ Rockwell Controls channel
✓ 1 Core based loss; $2.1M value

© 2018 General Electric Company. Confidential information. All rights reserved.

9

Alta App.000118

# Market pricing assessment

## Market pricing targets...
- Peaker/Merchant Plant = **$450/kw**
- Industrial = **~$600/kw**

\* Ex. Based on 3xLM6PC SPRINT Dual Fuel, W.I. units. Full turnkey with BOP..

**Ex. Competitor market pricing and commercial structure...**

- Sole source provider
- Refurbished & OH'd engine
- Refurbished & OH'd generator
- Refurbished or New (wide-body) package
- BOP equipment (new/used)
- Package & Aux systems upgrades
- EPC / Civil Works

- Pricing ~ $486/kw (based on 3 unit site)

**Ex. GE market pricing and commercial structure...**

- Multiple providers
- GE
  - New or OH'd engine
  - Engineering services
  - Package & Aux system upgrades
- WattStock LLC
  - Refurbished & OH'd generator
  - Refurbished package
  - BOP equipment (new/used)
- EPC
  - Plant design / construction
  - BOP equipment (as necessary)

- Pricing (based on current active opportunity - 3xLM6PC SAC, Dual Fuel, Water Injected)
  - GE            $17M
  - WattStock      $18M
  - EPC           $38M
  - **Total        $73M  ($500/kw)**
  - Total with single source $78M ($534/kw)



© 2018 General Electric Company. Confidential information. All rights reserved.

10

Alta App.000119

# Aero TRUEpackage* Commercial Pipeline

*A trademark of the General Electric Company



**Orders Pipeline**
Opportunity Name (Unit Count×Rev$)

- Backlog(2)
- Oppty(3)
- Pipeline(16)

| Orders Pipeline | 2018 | 2019 | 2020 | 2021 | 2022 | Ttl |
|---|---|---|---|---|---|---|
| Won | $23.0 | $2.5 | $0.0 | $0.0 | $0.0 | $25.5 |
| Active | $0.0 | $18.0 | $18.0 | $0.0 | $0.0 | $36.0 |
| Pipeline | $0.0 | $75.0 | $191.8 | $21.0 | $0.0 | $287.8 |
| **Ttl** | **$23.0** | **$95.5** | **$209.8** | **$21.0** | **$0.0** | **$349.3** |

## Key opportunities currently pacing...
(New ID - Oppty Name,Exp. Order Date, Rev $)

1335991 - Alta Power - Site #1, 11/15/2019, $6.8M
1495633 - Alta Power - Site #2, 11/29/2019, $11.2M
1446479 - Middle River Power Crane, 02/28/2020, $18M

## Total Pipeline (Aero Services)

Sales **$349M**

CM **$84M**

| CM Pipeline | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| Backlog (1) | $0 | $3 | $1 | $0 | $0 |
| Opportunities (9) | $0 | $0 | $5 | $5 | $0 |
| Pipeline (25) | $0 | $0 | $17 | $49 | $5 |
| | $0 | $3 | $22 | $54 | $5 |

| Unit Count | | | | | |
|---|---|---|---|---|---|
| Backlog | 1 | 0 | 0 | 0 | 0 |
| Opportunities | 0 | 6 | 3 | 0 | 0 |
| Pipeline | 0 | 0 | 14 | 11 | 0 |
| | 1 | 6 | 17 | 11 | 0 |


■ Peaking/Merchant  ■ Industrial


3%
97%

11

© 2018 General Electric Company. Confidential information. All rights reserved.

Alta App.000120

# Execution / Manufacturing analysis



**Market pricing targets...**
- Peaker/Merchant Plant = **$450/kw**
- Industrial = **~$600/kw**

**Financial Analysis (based on 3-unit peaking plant in PJM ISO)**
($millions)

| 1| Refurb package / engine approach | |
|---|---|
| Package Buyback | $8.3 |
| Engine Buyback Value | $3.0 |
| Engine Repair | $3.2 |
| Package Refurb | $2.8 |
| Generator Refurb | $0.6 |
| Upgrades | $5.7 |
| Addtl Allocations | $2.0 |
| **Ttl Cost (3 pkgs)** | **$25.4** |
| CM % Tgt | 20% |
| **Price (3 pkgs)** | **$32.0** |
| **EPC Price** | **$36.0** |
| **Total Plant** | **$68.0** |
| **$/kw (150MW)** | **$453** |

| 2| New build package, OH'd engine approach | |
|---|---|
| Package Buyback | $8.3 |
| Engine Buyback Value | $3.0 |
| Engine Repair | $3.2 |
| Package build | $16.0 |
| Generator Refurb | n/a |
| Upgrades | n/a |
| Addtl Allocations | $4.0 |
| **Ttl Cost (3 pkgs)** | **$34.5** |
| CM % Tgt | 20% |
| **Price (3 pkgs)** | **$43.1** |
| **EPC Price** | **$36.0** |
| **Total Plant** | **$79.1** |
| **$/kw (150MW)** | **$527** |

| PROS | CONS |
|---|---|
| **With refurbished equipment...** | **With refurbished equipment...** |
| + Addtl service annuity (GE) | - Added complexity in execution (GE) |
| + Low CAPEX ($/kw) (Cust) | - Potential margin erosion from missed scope |
| + Potential for higher CM$ (GE) | - Supply chain limited by available assets |
| + Target refurb scope to match operational mission | |
| + Helps maintain market segment..competitive response | |
| + Protects the brand | |
| | |
| **With new package...** | **With new package...** |
| + Addtl service annuity | - Equipment costs more fixed |
| + Less complex commercial structure | - Initial CM would need to be lower to get closer to target $/kw |
| + Simpler execution model...better control of CM | - Supply chain limited by available assets |
| + Helps maintain market segment..competitive response | - Customers reluctant to sell only engines |
| + Lower CAPEX vs. complete new build | |



© 2018 General Electric Company. Confidential information. All rights reserved.

12

Alta App.000121

# Challenges / Next Steps

**Current challenges:**

1 | Market price competitiveness…$450/kw

2 | Customer turnkey scope
requirement…margin stacking

3 | Potential for refurb package and
engine supply constraint

**Next Steps:**

1 | Integrate new build opportunities into
pipeline (one product to market)

2 | Investigate advance buyback of
packages to inventory

3 | Analyze new build package w/ OH'd
engine & generator vs. refurb package

4 | Explore JV or SPE to improve financial
competitiveness

5 | Align on EPC costs and cost out efforts



13

© 2018 General Electric Company. Confidential information. All rights reserved.

Alta App.000122



Alta App.000123

# Exhibit 22

Alta App.000124

**Organizer:** j.manning@wattstock.com[j.manning@wattstock.com]
**From:** j.manning@wattstock.com[j.manning@wattstock.com]
**Attendees:** Travis West; Matthew Laterza; Herrington, Lance R (GE Power); Yancy, Clayton2 (GE Power) (clayton2.yancy@ge.com); Kenneth Stevens; Pete Watson; Cunningham, Erik S (GE Power)
**Location:** JPORT CONF ROOM (tbd)
**Importance:** Normal
**Subject:** ALTA POWER DIVISION OF RESPONSIBILITY MEETING
**Start Time:** Tue 6/5/2018 12:00:00 PM Central Standard Time
**End Time:** Tue 6/5/2018 3:00:00 PM Central Standard Time
**Required Attendees:** Travis West; Matthew Laterza; Herrington, Lance R (GE Power); Yancy, Clayton2 (GE Power) (clayton2.yancy@ge.com); Kenneth Stevens; Pete Watson
**Optional Attendees:** Cunningham, Erik S (GE Power)



Alta App.000125

Alta 0019587

# Exhibit 23

Alta App.000126

Message

| | |
|---|---|
| **From**: | Herrington, Lance R (GE Power) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=5CF91FC00E874B7484E7FFE17B9773B8-HERRINGTON,] |
| **Sent**: | 8/14/2018 9:17:32 AM |
| **To**: | Morton, Andrew (GE Power) [andrew1.morton@ge.com]; Chaaban, Ihab (GE Power) [ihab.chaaban@ge.com]; Huskey, Timothy R (GE Power) [timothy.huskey@ge.com]; Wilner, Katy (GE Power) [katy.wilner@ge.com]; Wood, Grant A (GE Power) [grant.wood@ge.com]; Remington, Ty (GE Power) [ty.remington@ge.com]; Bird, Joshua (GE Power) [joshua.bird@ge.com]; Agro, Thomas (GE Power) [thomas.agro@ge.com] |
| **Subject**: | RE: TRUEpackage |

On the TRUEpackage program we do not have sales credit sharing since WattStock has their own scope in the project, they make their margin and we make our margin on our scope.

- The rules are that they act as a sales channel to help identify TRUEpackage (that's the refurb package brand name btw) opportunities and then bring that opportunity to the appropriate PS Aero Sales Manager.
- We conduct an R0 to discuss the opportunity and commercial strategy and decide on who will take commercial lead.
- if the customer does not care and WattStock found the lead they will take point and we will quote the appropriate scope to them, i.e. engine, controls, fuel systems, engineering services, etc. to refurb the package.
- If customer prefers GE be in the lead then the roles reverse.
- We are open about the estimated costs and pricing approach to each project, we try to approach if as fair and equitable based on the scope and risk each party is taking.
- T&Cs, payment terms, LDs, and bonuses if applicable are back to back, they take as much risk as we do as appropriate
- they must follow our sales process with 100% engagement from the GE Sales Manager.
- During the refurb process our engineering team is involved to ensure all systems refurb'd and reinstalled according to design
- Any hardware under GE scope is purchased by GE and provided to WattStock for installation as part of their refurb costs
- Any hardware WattStock needs for the refurb, consumables, replacement etc, can be purchased through us at list minus discount, which is really based on the cost plus the project margin...if they want to purchase direct they must use our approved parts and vendors.
- WattStock provides the construction and erection services, but we must have I&C TAs on site and follow the I&C Tech Review process just like a new unit installation so we can warranty and provide performance guarantee on equipment.
- One key thing, they should always be in contact with us when calling on our customers, and the GE Sales Manager should be involved whenever they feel they can / should be.

Hope this helps.  TRUEpackage is different than how you guys might use WattStock, but we are considering a potential sales agreement with them specifically on Cross Fleet Repowering, especially in regions where we are light on PS Aero Sales Managers.  Though that could be something that you all could help us with and maybe we could establish a sales credit plan with you all instead....it keeps the credit within GE at least that way.

Lance Herrington
Global Sales Leader
Aero Conversions, Modifications, and Uprades (CM&U)

T:+1 832 954 0754  |  M:+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...


138

Alta App.000127

GEALTA_0026184

**From:** Morton, Andrew (GE Power)
**Sent:** Tuesday, August 14, 2018 8:00 AM
**To:** Chaaban, Ihab (GE Power) <ihab.chaaban@ge.com>; Huskey, Timothy R (GE Power) <timothy.huskey@ge.com>; Wilner, Katy (GE Power) <katy.wilner@ge.com>; Wood, Grant A (GE Power) <grant.wood@ge.com>; Remington, Ty (GE Power) <ty.remington@ge.com>; Bird, Joshua (GE Power) <joshua.bird@ge.com>; Agro, Thomas (GE Power) <thomas.agro@ge.com>
**Cc:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Subject:** RE: TRUEpackage

Lance – any details of the running rules, including sales credit sharing, would be good to know.  As I understand Wattstock has an order for 2xLM6 with International Paper in Louisiana.  And as Tim notes, they're wanting help with one of our big customers in FL where Services is trying to sell a retrofit.

Tks, Andrew

**Andrew Morton**
**Mobile  704-806-7134**
**Email     andrew1.morton@ge.com**


**From:** Chaaban, Ihab (GE Power)
**Sent:** Monday, August 13, 2018 6:36 PM
**To:** Huskey, Timothy R (GE Power) <timothy.huskey@ge.com>; Wilner, Katy (GE Power) <katy.wilner@ge.com>; Wood, Grant A (GE Power) <grant.wood@ge.com>; Remington, Ty (GE Power) <ty.remington@ge.com>; Bird, Joshua (GE Power) <joshua.bird@ge.com>; Agro, Thomas (GE Power) <thomas.agro@ge.com>
**Cc:** Morton, Andrew (GE Power) <andrew1.morton@ge.com>; Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Subject:** RE: TRUEpackage

Hi Tim,
I heard about it a while back and actually spoke to Lance (he's on copy) to get the update...This is more like a sales channel for GE Services on refurbished units where an NDA and MOU have taken place between GE Services and Wattstock that could develop into Terms and Conditions...There are rules of engagement as I understood from Lance as Wattstock would approach our customers with our knowledge. Jay Manning and a lot of his staff being X-GE employees is an advantage to keep opportunities within GE's reach when compared to ProEnergy and others in the Market Place...If there are any concerns , please share with Lance as he is the right contact to address any outstanding issues on that matter.

Best Regards

Ihab Chaaban, P Eng., MBA
Aero derivatves Global Commercial Development Director
GE Power - Gas Power Systems -  Cel + 1 281 460 2602


**From:** Huskey, Timothy R (GE Power)
**Sent:** Monday, August 13, 2018 2:09 PM
**To:** Wilner, Katy (GE Power) <katy.wilner@ge.com>; Wood, Grant A (GE Power) <grant.wood@ge.com>; Remington, Ty (GE Power) <ty.remington@ge.com>; Bird, Joshua (GE Power) <joshua.bird@ge.com>; Agro, Thomas (GE Power) <thomas.agro@ge.com>; Chaaban, Ihab (GE Power) <ihab.chaaban@ge.com>
**Cc:** Morton, Andrew (GE Power) <andrew1.morton@ge.com>
**Subject:** FW: TRUEpackage

Alta App.000128

GEALTA_0026185

Hi Ihab,
I was not aware of this relationship-or any running rules.
Do you know about the arrangement with Wattstock (Jay Manning-former GE) for refurbished Aero packages----they want to talk to one of our customers.
Thanks,
Tim

**From:** Morton, Andrew (GE Power)
**Sent:** Monday, August 13, 2018 3:32 PM
**To:** Huskey, Timothy R (GE Power) <timothy.huskey@ge.com>
**Subject:** FW: TRUEpackage

As discussed...

**From:** j.manning@wattstock.com <j.manning@wattstock.com>
**Sent:** Tuesday, August 07, 2018 3:42 PM
**To:** Morton, Andrew (GE Power) <andrew1.morton@ge.com>
**Cc:** Rob McNamee <r.mcnamee@wattstock.com>
**Subject:** EXT: TRUEpackage

Andrew, attached is a presentation that Lance gave at WTUI in March to announce our partnership. Rob is part of the WattStock sales team along with Walter Sharpin, CJ deMaaker, and Brendon Green.
I will give you a call tomorrow. What is a good time for you?
Regards,

Jay C. Manning
WattStock LLC
16415 Jacintoport Blvd.
Houston, TX 77015
C: 713.248.4148
j.manning@wattstock.com www.wattstock.com
**************************************************************************
This e-mail is the property of WattStock LLC and/or its relevant affiliate and contains confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender or reply to WattStock LLC at Webmaster@wattstock.com and delete all copies of the message. This e-mail (and any attachments hereto) are not intended to be an offer (or an acceptance) and do not create or evidence a binding and enforceable contract between WattStock LLC (or any of its affiliates) and the intended recipient or any other party, and may not be relied on by anyone as the basis of a contract by estoppel or otherwise. Thank you.

GE CONFIDENTIAL

# Exhibit 24

Alta App.000130

Message

**From:** Tremblay, Mike J (GE Power) [mike.tremblay@ge.com]
**Sent:** 10/16/2018 3:42:00 PM
**To:** Herrington, Lance R (GE Power) [lance.herrington@ge.com]; Babu, Alex (GE Power) [alex.babu@ge.com]; Hall, Gavin M (GE Power) [gavin.hall@ge.com]; Canon, James T (GE Power) [james.canon@ge.com]
**CC:** Hill, Daniel D (GE Power) [daniel.hill@ge.com]
**Subject:** RE: GE Power Insurance

OK –

However, to be fair... ==Sourcing's relationship with Wattstock has been more of a Shotgun wedding than a vendor== relationship.   They were added as a Supplier "after" they were selected for the IP job and on an emergency basis.   There was no bidding or negotiated terms from the Sourcing side.

I would agree to discuss (negotiate) a LT agreement but can't do it in the middle of an existing job, as that gives me (us) zero leverage).   We need to negotiate before we award the next job.

Wattstock (Jay) accepted the Purchase Order and should have been aware of the associated terms (as stated on the PO).   Other than Pay Terms, which were raised early on, I know of no specific exceptions.

As I view it now, I see this as a very risky partnership, as GE has all the commercial risk and Wattstock has little liability (as they propose).   We need to at last have them liable for the Services they perform, along with associated damages and warranties.  (my opinion)

I recommend we tread lightly through this job and then move forward with full disclosures prior to new work.


**Mike Tremblay**
Sourcing Leader
GE- Power Services – Global Repair Solutions
Office  864 254 4638
Mobile 603-817-9397
Mike.Tremblay@ge.com


Message and Content are **Non-Public Information**


**From:** Herrington, Lance R (GE Power)
**Sent:** Tuesday, October 16, 2018 3:32 PM
**To:** Babu, Alex (GE Power) <alex.babu@ge.com>; Hall, Gavin M (GE Power) <gavin.hall@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>; Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Cc:** Hill, Daniel D (GE Power) <daniel.hill@ge.com>
**Subject:** Re: GE Power Insurance

Nothing to add to this specific deal.

When we set wattstock up the idea was that they would be the commercial lead on TRUEpackage sales and we would be selling engines, upgrade kits, and engineering services to them.  IP changed that based on IP wanting to work through GE.  That is why we are feeling this pain.  For IP the idea was, that we would issue a PO with Long description and reference WattStock's proposal to us, and then they would go by GE's T&Cs except on LDs, and milestone payment schedule.

GEALTA_0006528
Alta App.000131

I agree that going forward we need master terms with WattStock if they are going to be sub to us, which means they need to be set up as a full supplier. @Tremblay, Mike J (GE Power) I can work with you and we talk about how we do that understanding that based on the scope(i.e. refurbed equipment & where they are getting some materials and engineering services from us) it might feel a little different than a standard supplier.

Lance Herrington
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

---

**From:** "Babu, Alex (GE Power)" <alex.babu@ge.com>
**Date:** Tuesday, October 16, 2018 at 2:05 PM
**To:** "Hall, Gavin M (GE Power)" <gavin.hall@ge.com>, James Canon <james.canon@ge.com>, Lance Herrington <lance.herrington@ge.com>
**Cc:** Daniel Hill <daniel.hill@ge.com>, "Tremblay, Mike J (GE Power)" <mike.tremblay@ge.com>
**Subject:** RE: GE Power Insurance

Lance or Jim – any comments on this based on your earlier conversations with Jay?  When we setup WattStock as a vendor, didn't they have to agree to GE's Terms & Conditions per our sourcing policies?

Like I have stated before, if Wattstock is going to be a working partner with us on TruePackage, then we have to establish a general set of Terms & Conditions for all projects moving forward globally.  Their terms to GE cannot be dependent on GE's terms with our end customers, otherwise every project we execute with them will be a painful process as we are going thru right now.

Alex

---

**From:** Hall, Gavin M (GE Power)
**Sent:** Tuesday, October 16, 2018 11:35 AM
**To:** Babu, Alex (GE Power) <alex.babu@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>; Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Cc:** Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Subject:** RE: GE Power Insurance

Internal only – Any ITO team comment on Jay's description of the 'agreement'?

---

**From:** j.manning@wattstock.com <j.manning@wattstock.com>
**Sent:** Tuesday, October 16, 2018 12:11 PM
**To:** Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Cc:** Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Hall, Gavin M (GE Power) <gavin.hall@ge.com>; Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Pete Watson <p.watson@wattstock.com>; Carsey Manning <c.manning@wattstock.com>
**Subject:** EXT: RE: GE Power Insurance

GEALTA_0006529

Alta App.000132

We never agreed to your standard terms and conditions.  My agreement with GE is that we will accept the same terms that GE accepted with IP.  The GE terms were never given to me for review.  Attached is a gap analysis of some of the main issues.

Our lease agreement calls for CGL and we have that in place.

I suggest we have a conference call to understand what was agreed to by GE during the negotiations.

Regards,
Jay C. Manning
WattStock LLC
16415 Jacintoport Blvd.
Houston, TX  77015
C:  713.248.4148
j.manning@wattstock.com www.wattstock.com
***********************************************************************

This e-mail is the property of WattStock LLC and/or its relevant affiliate and contains confidential and privileged material for the sole use of the intended recipient(s).  Any review, use, distribution or disclosure by others is strictly prohibited.  If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender or reply to WattStock LLC at Webmaster@wattstock.com and delete all copies of the message.  This e-mail (and any attachments hereto) are not intended to be an offer (or an acceptance) and do not create or evidence a binding and enforceable contract between WattStock LLC (or any of its affiliates) and the intended recipient or any other party, and may not be relied on by anyone as the basis of a contract by estoppel or otherwise.  Thank you.

**From:** Tremblay, Mike J (GE Power) [mailto:mike.tremblay@ge.com]
**Sent:** Monday, October 8, 2018 12:23 PM
**To:** j.manning@wattstock.com
**Cc:** Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Hall, Gavin M (GE Power) <gavin.hall@ge.com>
**Subject:** GE Power Insurance

Jay,
As a follow on to our earlier discussion on Insurance.

Per the Purchase Order Terms, (attached), GE requires all Suppliers to maintain a minimum of $5M USD of General Liability Insurance, as well as others listed.

Based on the conversation, I respectfully request the Certificate of Insurance, as required by section 12.2 of the attached.  This is typically obtained by contacting your insurance carrier.

I will also set up a brief call for later this week so that we can discuss further.

Alta App.000133

GE PACKAGED POWER, LLC.

| PURCHASE ORDER | | |
|---|---|---|
| PURCHASE ORDER NUMBER | ORDER NO. | PAGE |
| 8282943G2 | 1 | 1 of 3 |

GE POWER TERMS OF PURCHASE PT.C.A. U.S. APPLY TO THIS
ORDER. SEE STANDARD INSTRUCTIONS BELOW

| SHIP TO: | GE Power C/O Agility Houston Warehouse |
|---|---|
| | 2909 GREENS ROAD |
| | DOCK #85 |
| | HOUSTON TX   77032 |
| | UNITED STATES |

| BILL TO: | Please submit invoices to Suppliers Collaboration Portal (clean |
|---|---|
| | submit) using the following link or hard |
| | copy invoices will not be processed |
| | |
| | https://suppliers@abmexxxx.gs.energy.com/scp/collaction |
| | |
| | If unable to submit invoice electronically contact the |
| | E-way, see helpdesk at 866-770-1248 or |
| | sendcoka@ge.com |
| | for assistance |

**Mike Tremblay**
Sourcing Leader
GE- Power Services – Global Repair Solutions
Office  864 254 4638
Mobile 603-817-9397
Mike.Tremblay@ge.com

Message and Content are **Non-Public Information**

GEALTA_0006531

Alta App.000134

# Exhibit 25

Alta App.000135

Message

| | |
|---|---|
| **From:** | Herrington, Lance R (GE Power) [lance.herrington@ge.com] |
| **Sent:** | 12/20/2018 2:29:58 PM |
| **To:** | Fulmer, Griffin (GE Power) [griffin.fulmer@ge.com]; O'Neill, Martin Francis (GE Power) [martin.o'neill@ge.com]; Byrd, Doug (GE Power) [doug.byrd@ge.com]; Tyagi, Gaurav (GE Power) [gaurav.tyagi@ge.com]; Kaplan, Hannah (GE Power) [hannah.kaplan@ge.com]; Pipes, Michael D (GE Power) [michael.pipes@ge.com] |
| **Subject:** | Re: ProEnergy |

Thanks all for supporting the discussion with Martin today, I think we have done the proper due diligence and came to the right conclusion today.

@Derrell Fulmer and @Douglas Byrd particularly thanks for the work in putting pages together and helping tell the story.  Doug your discussion with Alta Power on Tuesday was significant and I think was compelling enough that if we can hit the price target they are looking for positions us to win that project from ProE.

My takeaways:

- Continue to focus on taking a leading position in the refurb market with TRUEpackage (Lance and team)
- Continue to monitor ProE activities (Competitive Intel Team)
- Finalize performance on the 2 spool configuration (Doug Byrd)
- Put together a sale against white paper for TRUEpackage  and ProE Pro-Certified/CF6 Hybrid (Lance, Griffin, Rob Cambell)

Lance Herrington
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...



**From:** Griffin.Fulmer@ge.com
**When:** 9:00 AM - 10:00 AM December 20, 2018
**Subject:** ProEnergy
**Location:** Skype Meeting

Purpose:  Summary of work that team is executing on ProEnergy response.  Booking an hour, hoping to need less.

→ Join Skype Meeting
Trouble Joining? Try Skype Web App

Join by phone

| | |
|---|---|
| Toll-free number: +1 (866) 799-9419,,85102049# (Dial-in Number) | English (United States) |
| Toll number:    +1 (860) 785-9628,,85102049# (Dial-in Number) | English (United States) |

Find a local number

Conference ID: 85102049
Forgot your dial-in PIN? | Help | Legal

GE CONFIDENTIAL

Alta App.000137

# Exhibit 26

Alta App.000138

---

Message

| | |
|---|---|
| **From:** | Fulmer, Griffin (GE Power) [Griffin.Fulmer@ge.com] |
| **Sent:** | 10/30/2018 11:03:42 AM |
| **To:** | j.manning@wattstock.com; Herrington, Lance R (GE Power) [lance.herrington@ge.com]; Walter Sharpin [w.sharpin@wattstock.com]; Rob McNamee [r.mcnamee@wattstock.com] |
| **Subject:** | RE: Latest GE approved TruePackage customer presentation |

There is no TRUEpackage logo. Just a brand name.

Griffin

**From:** j.manning@wattstock.com <j.manning@wattstock.com>
**Sent:** Tuesday, October 30, 2018 10:26 AM
**To:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Fulmer, Griffin (GE Power) <Griffin.Fulmer@ge.com>; Walter Sharpin <w.sharpin@wattstock.com>; Rob McNamee <r.mcnamee@wattstock.com>
**Subject:** EXT: RE: Latest GE approved TruePackage customer presentation

Ok, fair enough. Griffin, can you send the TRUEpackage logo in a format that we can use for marketing materials?
Thanks,
Jay

**From:** Herrington, Lance R (GE Power) [mailto:lance.herrington@ge.com]
**Sent:** Tuesday, October 30, 2018 8:17 AM
**To:** j.manning@wattstock.com; Fulmer, Griffin (GE Power) <Griffin.Fulmer@ge.com>; Walter Sharpin <w.sharpin@wattstock.com>
**Subject:** Re: Latest GE approved TruePackage customer presentation

==Understand Jay. But TRUEpackage is the GE brand....not Certified Turbine Power. We do not want to confuse the market with different names. CTP may be the business entity name you use to execute the GE TRUEpackage products, but we need to only use GE Aero TRUEpackage in market materials.==

Lance Herrington
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

**From:** Jay Manning <j.manning@wattstock.com>
**Date:** Tuesday, October 23, 2018 at 1:07 PM
**To:** Lance Herrington <lance.herrington@ge.com>, Derrell Fulmer <Griffin.Fulmer@ge.com>, Walter Sharpin <w.sharpin@wattstock.com>
**Subject:** EXT: RE: Latest GE approved TruePackage customer presentation

Lance, we have two businesses under the WattStock name: Certified Turbine Power (TRUEpackage) and Transformer Recovery Inventory Program (TRIP).

Jay

**From:** Herrington, Lance R (GE Power) [mailto:lance.herrington@ge.com]
**Sent:** Tuesday, October 23, 2018 12:26 PM
**To:** Fulmer, Griffin (GE Power) <Griffin.Fulmer@ge.com>; Walter Sharpin <w.sharpin@wattstock.com>;
j.manning@wattstock.com>
**Subject:** Re: Latest GE approved TruePackage customer presentation

Well I do not read much Spanish either. Looks like slide 3 is a new slide...Certified Turbine Power is not in our standard
TRUEpackage slides. The attached slides are the last approved slides...

**Lance Herrington**
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

**From:** Derrell Fulmer <Griffin.Fulmer@ge.com>
**Date:** Tuesday, October 23, 2018 at 9:26 AM
**To:** Walter Sharpin <w.sharpin@wattstock.com>, Jay Manning <j.manning@wattstock.com>, Lance Herrington
<lance.herrington@ge.com>
**Subject:** RE: Latest GE approved TruePackage customer presentation

Honestly, we have our Communications and Legal teams review almost everything in English. Then the region teams do
their own translations based on the original English versions that are approved. I can't say we need another approval for
this, as we typically wouldn't do that process again "in language".

Lance, do you have any concerns?

Griffin

**From:** Walter Sharpin <w.sharpin@wattstock.com>
**Sent:** Tuesday, October 23, 2018 10:21 AM
**To:** Fulmer, Griffin (GE Power) <Griffin.Fulmer@ge.com>; j.manning@wattstock.com; Herrington, Lance R (GE Power)
<lance.herrington@ge.com>
**Subject:** EXT: Re: Latest GE approved TruePackage customer presentation

Let's do this. I'll use it as is. I translated this myself so I'm pretty comfortable with what it says. I won't leave a copy with
the customer today, but he will likely want me to send it to him later. Please have it properly reviewed so that I can
forward it by email tomorrow as a follow up to my meeting. Can you do that?

Walter

**From:** "Fulmer, Griffin (GE Power)" <Griffin.Fulmer@ge.com>
**Date:** Tuesday, 23 October 2018 at 11:11
**To:** Walter Sharpin <w.sharpin@wattstock.com>, Jay Manning <j.manning@wattstock.com>, "Herrington,

GEALTA_0030042

Alta App.000140

Lance R (GE Power)" <lance.herrington@ge.com>
**Subject:** RE: Latest GE approved TruePackage customer presentation

I don't speak Spanish and cannot get this reviewed in the next 2 hours by someone who does. Did you just convert the English version into Spanish? Looks like the same pitch from before, so as long as your translations are good, it should fine.

Regards,
Griffin

**From:** Walter Sharpin <w.sharpin@wattstock.com>
**Sent:** Tuesday, October 23, 2018 9:42 AM
**To:** j.manning@wattstock.com; Fulmer, Griffin (GE Power) <Griffin.Fulmer@ge.com>; Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Subject:** EXT: Re: Latest GE approved TruePackage customer presentation

Griffin:

Do you think you can get it reviewed and approved by noon today? I have a meeting with a customer whose English is very bad this afternoon, and it would really help me to have this pitch in Spanish to tell our story.

Thanks

Walter

**From:** Jay Manning <j.manning@wattstock.com>
**Date:** Tuesday, 23 October 2018 at 08:26
**To:** "Fulmer, Griffin (GE Power)" <Griffin.Fulmer@ge.com>, "Lance Herrington - GE AERO SERVICES (lance.herrington@ge.com)" <lance.herrington@ge.com>
**Cc:** Walter Sharpin <w.sharpin@wattstock.com>
**Subject:** FW: Latest GE approved TruePackage customer presentation

Griffin,
Walter has several opportunities in Latin America. We really need to get this approved ASAP.
Thanks,
Jay C. Manning
WattStock LLC
16415 Jacintoport Blvd.
Houston, TX 77015
C: 713.248.4148
j.manning@wattstock.com www.wattstock.com
*********************************************************************

This e-mail is the property of WattStock LLC and/or its relevant affiliate and contains confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender or reply to WattStock LLC at Webmaster@wattstock.com and delete all copies of the message. This e-mail (and any attachments hereto) are not intended to be an offer (or an acceptance) and do not create or evidence a binding and enforceable contract between WattStock LLC (or any of its affiliates) and the intended recipient or any other party, and may not be relied on by anyone as the basis of a contract by estoppel or otherwise. Thank you.

**From:** Walter Sharpin
**Sent:** Monday, October 22, 2018 5:29 PM
**To:** j.manning@wattstock.com
**Subject:** Re: Latest GE approved TruePackage customer presentation

Jay:

I did it out of the latest version I had.

Can you run it by GE to see if they are OK with the translation so that I can send it out to customers?

Walter

**From:** Walter Sharpin <w.sharpin@wattstock.com>
**Date:** Monday, 22 October 2018 at 14:45
**To:** Jay Manning <j.manning@wattstock.com>
**Subject:** Latest GE approved TruePackage customer presentation

Jay

Can you send me the lasts GE approved pitch in pptx. ? I need to send a potential customer the pitch in Spanish and want to make sure the version I translate is the official GE blessed pitch.

Walter Roy Sharpin
Sales Director
Caribbean, Central and South America
WattStock LLC
C: +54 9 11 5757-2060
w.sharpin@wattstock.com www.wattstock.com

This e-mail is the property of WattStock LLC and/or its relevant affiliate and contains confidential and privileged material for the sole use of the intended recipient(s). Any review, use, distribution or disclosure by others is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender or reply to WattStock LLC at Webmaster@wattstock.com and delete all copies of the message. This e-mail (and any attachments hereto) are not intended to be an offer (or an acceptance) and do not create or evidence a binding and enforceable contract between WattStock LLC (or any of its affiliates) and the intended recipient or any other party, and may not be relied on by anyone as the basis of a contract by estoppel or otherwise. Thank you.

# Exhibit 27

Alta App.000143

**Organizer:** Babu, Alex (GE Power)[alex.babu@ge.com]
**From:** Babu, Alex (GE Power)[alex.babu@ge.com]
**Attendees:** Matthew Laterza; j.manning@wattstock.com; Travis West; Herrington, Lance R (GE Power)
**Location:** Frank's - 3736 Westheimer Rd, Houston, TX 77027
**Importance:** Normal
**Subject:** Lunch - Alta, WattStock, GE
**Start Time:** Mon 2/25/2019 12:00:00 PM Central Standard Time
**End Time:** Mon 2/25/2019 1:30:00 PM Central Standard Time
**Required Attendees:** Matthew Laterza; j.manning@wattstock.com; Travis West; Herrington, Lance R (GE Power)
**Attachment:** image001.jpg
**Attachment:** image002.jpg

All,
Placeholder for our lunch meeting. Please let me know if we need to reschedule date, time, or location. Thanks,
Alex

## Frank's Americana Revival & White Star Bar

Website    Directions    Save

 219 Google reviews

RESERVE A TABLE

Modern takes on regional American cooking are served in a retro setting at this upscale eatery
**Address:** 3736 Westheimer Rd · Houston · TX 77027
**Hours:** Open · Closes 9PM · See more hours
**Menu:** frankshouston.com
**Reservations:** frankshouston.com · opentable.com
**Phone:** (713) 572-8600



CONFIDENTIAL

# Exhibit 28

Appointment

| | |
|---|---|
| **From**: | Canon, James T (GE Power) [james.canon@ge.com] |
| **Sent**: | 2/19/2019 4:08:19 PM |
| **To**: | Babu, Alex (GE Power) [alex.babu@ge.com]; Herrington, Lance R (GE Power) [lance.herrington@ge.com]; Vegahernandez, Jose (GE Aviation, US) [jose.vegahernandez@ge.com]; Jay Manning (j.manning@wattstock.com) [j.manning@wattstock.com] |

| | |
|---|---|
| **Subject**: | Alta Power TruePackage - Partially Overhauled LM6000 Performance Guarantee |
| **Location**: | Skype Meeting; (866) 799-9419,,81853778# |

| | |
|---|---|
| **Start**: | 2/20/2019 3:00:00 AM |
| **End**: | 2/20/2019 3:30:00 AM |
| **Show Time As**: | Tentative |

| | |
|---|---|
| **Required Attendees**: | Alex Babu; Lance Herrington; Jose Vega Hernandez; Jay Manning |

Guys,

Let's talk about our strategy on this.    I'll ring Jose beforehand to bring him up to speed.

Rgds,
Jim

....................................................................................................................

## Join Skype Meeting

Trouble Joining? Try Skype Web App

## Join by phone

Toll-free number: +1    (Dial-in Number)          English (United States)
Toll number:        +1 (860) 785-9628,,81853778# (Dial-in Number)          English (United States)

Find a local number

Conference ID: 81853778

Forgot your dial-in PIN? | Help  | Legal

....................................................................................................................

GE CONFIDENTIAL                                                                      GEALTA_0008738

Alta App.000146

# Exhibit 29

Alta App.000147

Message
_____

**From:**     Herrington, Lance R (GE Power) [lance.herrington@ge.com]
**Sent:**     3/13/2019 10:48:35 AM
**To:**       Pete Watson [p.watson@wattstock.com]; j.manning@wattstock.com
**Subject:**  Re: Offer for Nuh Enerji Power Plant

I understand Pete, but the financial math still has to work.

Lance Herrington
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754 | M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...


**From:** Pete Watson <p.watson@wattstock.com>
**Date:** Wednesday, March 13, 2019 at 9:44 AM
**To:** Jay Manning <j.manning@wattstock.com>, Lance Herrington <lance.herrington@ge.com>
**Subject:** EXT: RE: Offer for Nuh Enerji Power Plant

Lance
As you well know the CSA agreement 1.4 penalty is a drop in the bucket compared to (9) engines repair/OH . Please remind who ever you have to that each and every one of the Turkey engines are important in order to fill the contract with ALTA.
Thanks

**From:** j.manning@wattstock.com <j.manning@wattstock.com>
**Sent:** Wednesday, March 13, 2019 9:35 AM
**To:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Cc:** Pete Watson <p.watson@wattstock.com>
**Subject:** RE: Offer for Nuh Enerji Power Plant



You have the ITO estimator for each package.  If you need me to resend it, let me know.
Jay

**From:** Herrington, Lance R (GE Power) [mailto:lance.herrington@ge.com]
**Sent:** Wednesday, March 13, 2019 9:07 AM
**To:** j.manning@wattstock.com
**Cc:** Pete Watson <p.watson@wattstock.com>
**Subject:** Re: Offer for Nuh Enerji Power Plant

Jay

I will have to have an internal discussion, but it might be hard to convince folks to right off the termination fees, unless I can show that the same level of revenue is replaced by other means.  So we will have to look at the ITO estimators once complete for these serial numbers, and the comparative revenue GE expects to make.

**Lance Herrington**
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T +1 832 954 0754 | M +1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

---

**From:** Jay Manning <j.manning@wattstock.com>
**Date:** Wednesday, March 13, 2019 at 8:21 AM
**To:** Lance Herrington <lance.herrington@ge.com>
**Cc:** Pete Watson <p.watson@wattstock.com>
**Subject:** EXT: FW: Offer for Nuh Enerji Power Plant

We need to discuss how to handle this.
Jay

**From:** Mehmet ÇETİNKAYA [mailto:mehmet.cetinkaya@nuhenerji.com.tr]
**Sent:** Wednesday, March 13, 2019 2:30 AM
**To:** Pete Watson <p.watson@wattstock.com>; j.manning@wattstock.com
**Cc:** Abdullah Kurt <abdullah@pro-per.net>
**Subject:** Offer for Nuh Enerji Power Plant

Dear Mr. Watson and Mr.Manning,

First of all, I would like to thank you for your interest in our power plant equipment and for above referred offer you had submitted to us. I did also received the quotation from Mr. Kurt for the remaining equipment not covered in your offer.

Now, there is an important subject we have to clarify before any further negotiation and I already explained it to Abdullah Bey yesterday. I assume he did also informed you about the following subject:

In the third quarter of year 2015,after cancelling all production licenses Nuh Energy owned, we had talked to GE about how to handle the CSA agreements we have on Gas Turbine Package -1,and by signing two "Termination and Release Agreement" s and two "Master Maintenance Program, MMP" s for off-shore (with GE Packaged Power Inc. GEPPİ) and for on-shore (with General Elektrik Ticaret ve Servis A.Ş.), we cancelled the CSA. Herewith attached I am sending you the copy of Article-4 of the mentioned MMP with GEPPİ. The on-shore MMP has exactly the same wording. The only difference is in Article 4.2.4 ,regarding the pricing of termination, which are 1.000.000,-USD for GEPPİ and 450.000,- USD for General Elektrik. If we agree to sell you the simple cycle equipment, we want to be released from the charges and since you are working together with GE, and assuming the renewed equipment will still be under GE's CSA at the final destination ,I assume you can easily manage this matter. Pls work on the subject matter and let us have yr confirmation on our wish. VERY IMPORTANT.

I had already informed our Chairman and CEO this morning in regards to prices received. A quick response from both of them was "too low". I am not the person who will decide on pricing; but they are. Assuming you may have still some margin in your pricing, I will dare to mention something about our company's expectation; which is higher than 9 Million USD NET for the complete CCPP sale.(meaning either >= 9+1,45 USD gross,or greater >9 Million USD together with a confirmation of being released from MMP's without any payment)

GEALTA_0007654

Alta App.000149

I will be waiting yr positive response for both of the mentioned subjects.

Best Regards,
Mehmet Çetinkaya

Yasal Uyarı : Bu elektronik posta işbu linki kullanarak ulaşabileceğiniz Koşul ve Şartlar dökümanına tabidir :
http://www.nuhenerji.com.tr/email-yasal-uyari

GE CONFIDENTIAL

# Exhibit 30

Alta App.000151

Message
_____

**From:**        Herrington, Lance R (GE Power) [lance.herrington@ge.com]
**Sent:**        6/5/2019 10:00:26 AM
**To:**          Tremblay, Mike J (GE Power) [mike.tremblay@ge.com]; Hill, Daniel D (GE Power) [daniel.hill@ge.com]; Hall, Gavin M (GE Power) [gavin.hall@ge.com]
**Subject:**     Re: CONFIDENTIAL


Thank you for your note Mike. And I appreciate your concerns, very warranted to be sure.  I agree that we should have a candid discussion with them. At the moment we are laser focused on getting IP Mansfield to commercial operation...I am going to schedule a 1-2 workout meeting after that with WattStock and GE to include Sales/Commercial, PMO, Engineering, Field Corp(?) to complete a IP after action review and lay out improvement plans going forward. That will probably occur here in Houston at Jacintoport.  You are welcome to participate as well...

**Lance Herrington**
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...



_____

**From:** "Tremblay, Mike J (GE Power)" <mike.tremblay@ge.com>
**Date:** Tuesday, June 4, 2019 at 6:34 AM
**To:** Daniel Hill <daniel.hill@ge.com>, Lance Herrington <lance.herrington@ge.com>, "Hall, Gavin M (GE Power)" <gavin.hall@ge.com>
**Subject:** CONFIDENTIAL

Guys –
I have to admit that this is very concerning.   This isn't the first time that we have had to take extraordinary measures to pay Wattstock early so they can continue with work.

As you are aware, I'm in the process of developing a Supply Agreement with them; however I wouldn't be doing my job if I didn't escalate this as a valid concern.  I realize we like this program; however it looks as though the program could expose us to significant risk, should they not improve their financial position.

I think we need to have a candid discussion with them on whether they can sustain operations in the future.


**Mike Tremblay**
Sourcing Leader
GE- Power Services – Global Repair Solutions
Office 864 254 4638
Mobile 603-817-9397
Mike.Tremblay@ge.com


Message and Content are **Confidential**

**From:** Hill, Daniel D (GE Power)
**Sent:** Monday, June 3, 2019 10:30 PM
**To:** Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>; Yagana, Satya (GE Power, Non-GE)
<satya.yagana@ge.com>; D, Naveen (GE Global Operations, consultant) <Naveen1.D@ge.com>; Fraz, Shariq (GE Power,
consultant) <Shariq.Fraz@ge.com>
**Cc:** Ramage, Demarra (GE Power) <Demarra.Ramage@ge.com>
**Subject:** Re: EXT: PAYMENT NO. 4

Mike,
 Curious of any progress or estimated payment date. Thanks.

Daniel Hill
281-382-9630

On Jun 3, 2019, at 9:02 AM, Hill, Daniel D (GE Power) <daniel.hill@ge.com> wrote:

Mike,
        See attached. Line 4 on the GE PO.


DDH



**From:** Tremblay, Mike J (GE Power)
**Sent:** Monday, June 3, 2019 6:05 AM
**To:** Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Yagana, Satya (GE Power, Non-GE) <satya.yagana@ge.com>; D,
Naveen (GE Global Operations, consultant) <Naveen1.D@ge.com>; Fraz, Shariq (GE Power, consultant)
<Shariq.Fraz@ge.com>
**Cc:** Ramage, Demarra (GE Power) <Demarra.Ramage@ge.com>
**Subject:** RE: EXT: PAYMENT NO. 4

Daniel
Can you provide the Wattstock PO/line number that was received and is waiting payment?

Satya – We will need to Modify the Terms for Wattstock to 3.5-30 Net 150 Tiers and then contact AP to pay immediately
with a discount for the above PO.

Mike

**From:** Hill, Daniel D (GE Power)
**Sent:** Friday, May 31, 2019 4:22 PM
**To:** j.manning@wattstock.com; Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Cc:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Andrew F. Herr <a.herr@wattstock.com>;
p.jenevein@wattstock.com; Pete Watson <p.watson@wattstock.com>
**Subject:** Re: EXT: PAYMENT NO. 4

Mike, looking for assistance.  I'll give you a call shortly.

Daniel Hill
281-382-9630

Alta App.000153

<Payment Number 4 WattStock LLC Invoice GE-IP-006 Rev 1 August 9 2018 to GE PACKAGE POWER INC PURCHASE ORDER 425234752 dated 9 Aug 2018.pdf>

<425234752 WattStock Repower PO.pdf>

# Exhibit 31

Alta App.000155

*152*

Message

**From:** Basegmez, Nilay (GE Power) [nilay.basegmez@ge.com]
**Sent:** 8/5/2019 8:18:12 AM
**To:** Herrington, Lance R (GE Power) [lance.herrington@ge.com]
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees---PLEASE ANSWER

Lance hi,
Do you have any update on your side?
If you have any solution or proposal to this issue with Ataer and Acarsoy, please let me know. I will be happy to present it to our leadership and set up a meeting with you after checking with them

Thanks
Nilay.

**From:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Sent:** Monday, July 22, 2019 5:30 PM
**To:** Basegmez, Nilay (GE Power) <Nilay.Basegmez@ge.com>
**Subject:** Re: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees---PLEASE ANSWER

Nilay

- On Arcasoy at this point they are not making it clear or known that they are including termination fees in the buyback price for the equipment.  So, at this time we should not offer any relief on termination related to the buyback.
- I will set-up a separate discussion with you on Ataer, we need to review the terms of the MMP because it sounds like if they are unable to run due to economic reasons then they do not have to pay the annual GE fee, BUT if they terminate they have a large termination fee which could be persuading them to NOT sale to avoid a heavy termination fee. Which impacts us on the NAM project potentially.

**Lance Herrington**
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754 | M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

**From:** "Basegmez, Nilay (GE Power)" <Nilay.Basegmez@ge.com>
**Date:** Monday, July 22, 2019 at 4:52 AM
**To:** Lance Herrington <lance.herrington@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees---PLEASE ANSWER

Lance hi,
Could you please clarify below? I would like to visit the customer this week after your response.

Thanks
Nilay

GE CONFIDENTIAL

**From:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Sent:** Thursday, July 18, 2019 5:51 PM
**To:** Basegmez, Nilay (GE Power) <Nilay.Basegmez@ge.com>
**Subject:** Re: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees---PLEASE ANSWER

Hi Nilay. Let me get back to on this.

Lance Herrington
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

---

**From:** "Basegmez, Nilay (GE Power)" <Nilay.Basegmez@ge.com>
**Date:** Thursday, July 18, 2019 at 7:49 AM
**To:** Lance Herrington <lance.herrington@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees---PLEASE ANSWER

Lance,
Just want to make sure I understand correctly.

Does that mean, Wattstock or indirectly GE NAM will cover termination fee with 500K reduction (2.3M – 0.5M = 1.8M) as part of the buyback deal?

Please clarify.
Thanks
Nilay

**From:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Sent:** Thursday, July 18, 2019 3:46 PM
**To:** Basegmez, Nilay (GE Power) <Nilay.Basegmez@ge.com>
**Subject:** Re: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees---PLEASE ANSWER

Nilay – For Acarsoy the bottom line is that in order to make the project financials work for the NAM deal, we need a $500k reduction in termination fee. Nothing new to add on Ataer yet.

Lance Herrington
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

GEALTA_0003589
Alta App.000157

**From:** "Basegmez, Nilay (GE Power)" <Nilay.Basegmez@ge.com>
**Date:** Thursday, July 18, 2019 at 2:46 AM
**To:** Lance Herrington <lance.herrington@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees---PLEASE ANSWER

Lance hi,
After our last conversation, have you contacted Wattstock? Any progress on the deal?

**From:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Sent:** Thursday, June 27, 2019 2:51 PM
**To:** Basegmez, Nilay (GE Power) <Nilay.Basegmez@ge.com>
**Cc:** Celdran, Fernando (GE Power) <fernando.celdran@ge.com>; Zarca, Jorge (GE Power) <jorge.zarca@ge.com>; Queune, Olivier (GE Power) <olivier.queune@ge.com>; Veronesi, Jacopo (GE Power) <jacopo.veronesi@ge.com>
**Subject:** Re: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees---PLEASE ANSWER

I will talk with WattStock today to see if they have heard anything new. Last update I heard was about the same board meeting for Ataer.

Sent from my iPhone

On Jun 27, 2019, at 6:34 AM, Basegmez, Nilay (GE Power) <Nilay.Basegmez@ge.com> wrote:

Hi All,
We have sent letter to both Ataer and Acarsoy as attached.
I received a call back from Ataer right after my email.
The general manager told me that they are in a very bad position financially and having difficulty to pay even salaries. He mentioned that there will be BOD meeting next week on July 3rd and the board will make a decision on the sale of their assets. He promised to give me a call after the board meeting.

Lance,
Do you have any update from your side?

Thanks
Nilay

**From:** Herrington, Lance R (GE Power)
**Sent:** Thursday, June 20, 2019 6:27 PM
**To:** Basegmez, Nilay (GE Power) <Nilay.Basegmez@ge.com>; Celdran, Fernando (GE Power) <fernando.celdran@ge.com>; Zarca, Jorge (GE Power) <jorge.zarca@ge.com>
**Cc:** Queune, Olivier (GE Power) <olivier.queune@ge.com>; Veronesi, Jacopo (GE Power) <jacopo.veronesi@ge.com>
**Subject:** Re: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees---PLEASE ANSWER

All

I talked with WattStock and their agent in Turkey yesterday.  The feedback I received on Ataer is that the buyback offer was not rejected yet. WattStock pulled their offer, but will be putting it back on the table this week.  The motion to sell the equipment is being presented to the Ataer general board (~400 members) for approval on June 25th, then the Ataer BOD can negotiate the sale if approved.

Lance Herrington
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

Alta App.000158

T+1 832 954 0754 | M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

---

**From:** "Basegmez, Nilay (GE Power)" <Nilay.Basegmez@ge.com>
**Date:** Wednesday, June 19, 2019 at 8:58 AM
**To:** Lance Herrington <lance.herrington@ge.com>, "Celdran, Fernando (GE Power)"
<fernando.celdran@ge.com>, "Zarca, Jorge (GE Power)" <jorge.zarca@ge.com>
**Cc:** Olivier Queune <olivier.queune@ge.com>, "Veronesi, Jacopo (GE Power)" <jacopo.veronesi@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees---PLEASE ANSWER

Dear All,
Thanks for joining with such short notice.

Below is the summary of what we have discussed:
-GE works with a 3rd party for buyback deal. Direct buyback costs higher to GE.
-Acarsoy buyback deal is still ongoing, but Ataer has already rejected.
-Acarsoy is asking to compensate the termination fee with the buyback price. Lance will get update from the 3rd party on the discussion.
-Nilay will send a letter to Acarsoy informing them about the termination fee.

with regards
Nilay

-----Original Appointment-----
**From:** Basegmez, Nilay (GE Power)
**Sent:** Wednesday, June 19, 2019 1:40 PM
**To:** Basegmez, Nilay (GE Power); Herrington, Lance R (GE Power); Celdran, Fernando (GE Power); Zarca, Jorge (GE Power)
**Cc:** Queune, Olivier (GE Power); Veronesi, Jacopo (GE Power)
**Subject:** Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees---PLEASE ANSWER
**When:** 19 June 2019 16:30-17:00 (UTC+03:00) Istanbul.
**Where:** Skype Meeting

Moving one hour later since Lance didn't respond to the invitation.


Lance hi,

Just to clarify for you, I am CSL of both customers. I never discussed any buyback price or negotiate termination fee with these customers. I haven't received such request directly from the customer.
We were first informed of this deal by your message. Our impression was that you are directly in contact with the customer and negotiating for the buyback price with them where termination fee came into discussion.

I spoke with both customers today and as I understand from them they have been approached by Woodstock who offered a buyback price. Ataer has already rejected the offer. Acarsoy is still in discussion with Woodstock.

I would like to set this meeting to understand how the deal is being led and which parties are involved.
If we will negotiate the termination fee with the customer, we need to understand the financials of the deal (buyback price, payment term etc.)

Kind regards
Nilay Basegmez
Customer Service Leader
GE Power, Power Services

M +90 539 6686051
nilay.basegmez@ge.com

Maslak Mah. Eski Buyukdere Cad.
Orjin Maslak İş Merkezi No: 27
Kat: 6-7 Sarıyer 34485 Istanbul
Turkey

## Join Skype Meeting

Trouble Joining? Try Skype Web App

### Join by phone

Toll number:     +902129003866,,19182972# (Dial-in Number)          Turkish (Turkey)
Find a local number

Conference ID: 19182972
Forgot your dial-in PIN? | Help | Legal

HAVING TROUBLE WITH SKYPE?
GE Employees and Contractors are encouraged to try the following:
- Use a Bluetooth or plug-in headset
- **Don't have a headset?** When joining from your computer, select 'Call me at' and enter your landline or mobile device number
- When joining from mobile, use 'call back' within the Skype for Business mobile app - click the ellipses button and choose 'call me back'
- If entering the meeting though SpeedTCON, choose the 'phone' option to call directly into the meeting using the conference line

---

**From:** Herrington, Lance R (GE Power)
**Sent:** Tuesday, June 18, 2019 7:55 PM
**To:** Celdran, Fernando (GE Power) <fernando.celdran@ge.com>; Basegmez, Nilay (GE Power)
<Nilay.Basegmez@ge.com>; Zarca, Jorge (GE Power) <jorge.zarca@ge.com>
**Cc:** Queune, Olivier (GE Power) <olivier.queune@ge.com>; Kozachenok, Marisa Jo (GE Power)
<Marisa.Kozachenok@ge.com>; Veronesi, Jacopo (GE Power) <jacopo.veronesi@ge.com>
**Subject:** Re: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees---PLEASE ANSWER

Fernando, et al,

The NAM deal team has received limited notice to proceed as of two weeks ago, the LNTP is focused on the down payments needed to secure the buyback of three units for site #1.  We are working on securing a PO for long lead items

before end of June and then Full Notice to Proceed 2nd week of July for all three sites, 9 units in total.  As of two weeks ago we were informed that phase two will now proceed before end of year for an additional two sites (i.e. 6 more units for a total of 15 units).  I am looking for an update from the deal team negotiating the buyback of the Acarsoy and the Ataer units to better understand if the customer is planning on impacting buyback price related to the GE termination fees...

Has the EUR region team talked with the customers regarding the CSA cancellation and their plans to pay the fees, they are not engaging with the team offering the buyback relative to their intent on the fees.

Lance Herrington
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

---

**From:** "Celdran, Fernando (GE Power)" <fernando.celdran@ge.com>
**Date:** Tuesday, June 18, 2019 at 11:03 AM
**To:** "Basegmez, Nilay (GE Power)" <Nilay.Basegmez@ge.com>, Lance Herrington <lance.herrington@ge.com>, "Zarca, Jorge (GE Power)" <jorge.zarca@ge.com>
**Cc:** Olivier Queune <olivier.queune@ge.com>, Marisa Kozachenok <Marisa.Kozachenok@ge.com>, "Veronesi, Jacopo (GE Power)" <jacopo.veronesi@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees---PLEASE ANSWER

Lance,
Sorry to say this but it is very disappointing.
We have reported these deals as opportunities for the Region but no answer about our request for information to update our Higher Management
Please I would appreciate to receive your feedback about the status of the negotiations and timeframe
Thanks
Fernando

**From:** Basegmez, Nilay (GE Power)
**Sent:** Tuesday, June 18, 2019 1:51 PM
**To:** Celdran, Fernando (GE Power) <fernando.celdran@ge.com>; Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Zarca, Jorge (GE Power) <jorge.zarca@ge.com>; Oguzer, Ozge (GE Power) <Ozge1.Oguzer@ge.com>; Veronesi, Jacopo (GE Power) <jacopo.veronesi@ge.com>; Ozgul, Burcu (GE Power) <Burcu.Ozgul@ge.com>
**Cc:** Cherifkanouni, Mehdi (GE Power) <mehdi.cherifkanouni@ge.com>; Queune, Olivier (GE Power) <olivier.queune@ge.com>; Okyar, Ibrahim kursad (GE Power) <kursad.Okyar@ge.com>; Gun, Ozgun (GE Power) <ozgun.gun@ge.com>; Kazan, Serkan (GE Power) <serkan.kazan@ge.com>; Haymanali, Reha (GE Power) <recep.haymanali@ge.com>; Mazzocco, Valeria (GE Power) <Valeria.Mazzocco@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Lance hi,
I tried to reach you via phone and email many times to discuss below issue.

Can you please update us all with a quick email on the deal?

GEALTA_0003593
Alta App.000161

Are Acarsoy and Ataer units still considered in this deal?

Thanks
Nilay

**From:** Celdran, Fernando (GE Power)
**Sent:** Wednesday, June 05, 2019 10:50 AM
**To:** Basegmez, Nilay (GE Power) <Nilay.Basegmez@ge.com>; Herrington, Lance R (GE Power)
<lance.herrington@ge.com>; Zarca, Jorge (GE Power) <jorge.zarca@ge.com>; Oguzer, Ozge (GE Power)
<Ozge1.Oguzer@ge.com>; Veronesi, Jacopo (GE Power) <jacopo.veronesi@ge.com>; Ozgul, Burcu (GE Power)
<Burcu.Ozgul@ge.com>
**Cc:** Cherifkanouni, Mehdi (GE Power) <mehdi.cherifkanouni@ge.com>; Queune, Olivier (GE Power)
<olivier.queune@ge.com>; Okyar, Ibrahim kursad (GE Power) <kursad.Okyar@ge.com>; Gun, Ozgun (GE Power)
<ozgun.gun@ge.com>; Kazan, Serkan (GE Power) <serkan.kazan@ge.com>; Haymanali, Reha (GE Power)
<recep.haymanali@ge.com>; Mazzocco, Valeria (GE Power) <Valeria.Mazzocco@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Hi Lance...any feedback please?
Thanks
Fernando

**From:** Basegmez, Nilay (GE Power)
**Sent:** Friday, May 31, 2019 2:21 PM
**To:** Celdran, Fernando (GE Power) <fernando.celdran@ge.com>; Herrington, Lance R (GE Power)
<lance.herrington@ge.com>; Zarca, Jorge (GE Power) <jorge.zarca@ge.com>; Oguzer, Ozge (GE Power)
<Ozge1.Oguzer@ge.com>; Veronesi, Jacopo (GE Power) <jacopo.veronesi@ge.com>; Ozgul, Burcu (GE Power)
<Burcu.Ozgul@ge.com>
**Cc:** Cherifkanouni, Mehdi (GE Power) <mehdi.cherifkanouni@ge.com>; Queune, Olivier (GE Power)
<olivier.queune@ge.com>; Okyar, Ibrahim kursad (GE Power) <kursad.Okyar@ge.com>; Gun, Ozgun (GE Power)
<ozgun.gun@ge.com>; Kazan, Serkan (GE Power) <serkan.kazan@ge.com>; Haymanali, Reha (GE Power)
<recep.haymanali@ge.com>; Mazzocco, Valeria (GE Power) <Valeria.Mazzocco@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Lance hi,
In order to go to approval for this deviation with the right information, can you please provide more detail on the
customer's position with regards to your buyback offer for both Ataer and Acarsoy?
Are they willing to pay the termination fee? As I understand from your earlier communication, they are asking the
termination fee on top of your buyback price to be able to pay termination to GE EU region. Is this still the case?

We need to understand customer's and GE's position better, so please provide any further detail you can.

Thanks
Nilay

**From:** Celdran, Fernando (GE Power)
**Sent:** Thursday, May 30, 2019 9:33 PM
**To:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Zarca, Jorge (GE Power) <jorge.zarca@ge.com>;
Oguzer, Ozge (GE Power) <Ozge1.Oguzer@ge.com>; Veronesi, Jacopo (GE Power) <jacopo.veronesi@ge.com>; Ozgul,
Burcu (GE Power) <Burcu.Ozgul@ge.com>
**Cc:** Basegmez, Nilay (GE Power) <Nilay.Basegmez@ge.com>; Cherifkanouni, Mehdi (GE Power)

GEALTA_0003594

Alta App.000162

<mehdi.cherifkanouni@ge.com>; Queune, Olivier (GE Power) <olivier.queune@ge.com>; Okyar, Ibrahim kursad (GE Power) <kursad.Okyar@ge.com>; Gun, Ozgun (GE Power) <ozgun.gun@ge.com>; Kazan, Serkan (GE Power) <serkan.kazan@ge.com>; Haymanali, Reha (GE Power) <recep.haymanali@ge.com>; Mazzocco, Valeria (GE Power) <Valeria.Mazzocco@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Lance,
We will review it tomorrow morning and let you know in our call
Is still Ataer interested in the GE offer for reallocation?
Thanks
Fernando

**From:** Herrington, Lance R (GE Power)
**Sent:** Thursday, May 30, 2019 7:50 PM
**To:** Zarca, Jorge (GE Power) <jorge.zarca@ge.com>; Oguzer, Ozge (GE Power) <Ozge1.Oguzer@ge.com>; Veronesi, Jacopo (GE Power) <jacopo.veronesi@ge.com>; Celdran, Fernando (GE Power) <fernando.celdran@ge.com>; Ozgul, Burcu (GE Power) <Burcu.Ozgul@ge.com>
**Cc:** Basegmez, Nilay (GE Power) <Nilay.Basegmez@ge.com>; Cherifkanouni, Mehdi (GE Power) <mehdi.cherifkanouni@ge.com>; Queune, Olivier (GE Power) <olivier.queune@ge.com>; Okyar, Ibrahim kursad (GE Power) <kursad.Okyar@ge.com>; Gun, Ozgun (GE Power) <ozgun.gun@ge.com>; Kazan, Serkan (GE Power) <serkan.kazan@ge.com>; Haymanali, Reha (GE Power) <recep.haymanali@ge.com>; Mazzocco, Valeria (GE Power) <Valeria.Mazzocco@ge.com>
**Subject:** Re: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

All

Just following up to see where we ended on this.  The team needs to finalize the best/final buyback offer to Acarsoy with the $500k termination fee reduction as a carrot.

**Lance Herrington**
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T +1 832 954 0754  |  M +1 832 418 9788

E: lance.herrington@ge.com
Linkedin: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

**From:** "Zarca, Jorge (GE Power)" <jorge.zarca@ge.com>
**Date:** Friday, May 24, 2019 at 4:08 AM
**To:** "Oguzer, Ozge (GE Power)" <Ozge1.Oguzer@ge.com>, "Veronesi, Jacopo (GE Power)" <jacopo.veronesi@ge.com>, "Celdran, Fernando (GE Power)" <fernando.celdran@ge.com>, "Ozgul, Burcu (GE Power)" <Burcu.Ozgul@ge.com>
**Cc:** Lance Herrington <lance.herrington@ge.com>, "Basegmez, Nilay (GE Power)" <Nilay.Basegmez@ge.com>, "Cherifkanouni, Mehdi (GE Power)" <mehdi.cherifkanouni@ge.com>, Olivier Queune <olivier.queune@ge.com>, "Okyar, Ibrahim kursad (GE Power)" <kursad.Okyar@ge.com>, "Gun, Ozgun (GE Power)" <ozgun.gun@ge.com>, "Kazan, Serkan (GE Power)" <serkan.kazan@ge.com>, "Haymanali, Reha (GE Power)" <recep.haymanali@ge.com>, "Mazzocco, Valeria (GE Power)" <Valeria.Mazzocco@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

++Burcu

**From:** Oguzer, Ozge (GE Power)
**Sent:** viernes, 24 de mayo de 2019 10:38
**To:** Veronesi, Jacopo (GE Power) <jacopo.veronesi@ge.com>; Zarca, Jorge (GE Power) <jorge.zarca@ge.com>; Celdran, Fernando (GE Power) <fernando.celdran@ge.com>
**Cc:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Basegmez, Nilay (GE Power) <Nilay.Basegmez@ge.com>; Cherifkanouni, Mehdi (GE Power) <mehdi.cherifkanouni@ge.com>; Queune, Olivier (GE Power) <olivier.queune@ge.com>; Okyar, Ibrahim kursad (GE Power) <kursad.Okyar@ge.com>; Gun, Ozgun (GE Power) <ozgun.gun@ge.com>; Kazan, Serkan (GE Power) <serkan.kazan@ge.com>; Haymanali, Reha (GE Power) <recep.haymanali@ge.com>; Mazzocco, Valeria (GE Power) <Valeria.Mazzocco@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Hi Jacobo,

I still think this decision tree is more related with CSA; Ataer has no ICAM model (as you know MMP offers some certain discount levels for certain scope of supply), so not sure how the "reset" concept applies here.
And after we amend the Termination Term, the MMP contract will end, will not continue.

PS: we dont know even Ataer can afford / or accept to pay the reduced termination amount; after $500K reduction we will still have considerable amount for termination. They have no cash even to rewind their generator.

Thanks

Regards
Ozge

**From:** Veronesi, Jacopo (GE Power)
**Sent:** Friday, May 24, 2019 11:22 AM
**To:** Zarca, Jorge (GE Power) <jorge.zarca@ge.com>; Oguzer, Ozge (GE Power) <Ozge1.Oguzer@ge.com>; Celdran, Fernando (GE Power) <fernando.celdran@ge.com>
**Cc:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Basegmez, Nilay (GE Power) <Nilay.Basegmez@ge.com>; Cherifkanouni, Mehdi (GE Power) <mehdi.cherifkanouni@ge.com>; Queune, Olivier (GE Power) <olivier.queune@ge.com>; Okyar, Ibrahim kursad (GE Power) <kursad.Okyar@ge.com>; Gun, Ozgun (GE Power) <ozgun.gun@ge.com>; Kazan, Serkan (GE Power) <serkan.kazan@ge.com>; Haymanali, Reha (GE Power) <recep.haymanali@ge.com>; Mazzocco, Valeria (GE Power) <Valeria.Mazzocco@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

HI Jorge,
No. I mean exactly that per policy we should follow the Commercial DoA process. Not a concession. Of course, reset accounting does not apply.
See below the decision tree.
Regards,
Jacopo


<image001.png><image002.png>

**From:** Zarca, Jorge (GE Power)
**Sent:** venerdì 24 maggio 2019 10:14
**To:** Oguzer, Ozge (GE Power) <Ozge1.Oguzer@ge.com>; Veronesi, Jacopo (GE Power) <jacopo.veronesi@ge.com>;

GEALTA_0003596
Alta App.000164

Celdran, Fernando (GE Power) <fernando.celdran@ge.com>
**Cc:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Basegmez, Nilay (GE Power)
<Nilay.Basegmez@ge.com>; Cherifkanouni, Mehdi (GE Power) <mehdi.cherifkanouni@ge.com>; Queune, Olivier (GE
Power) <olivier.queune@ge.com>; Okyar, Ibrahim kursad (GE Power) <kursad.Okyar@ge.com>; Gun, Ozgun (GE Power)
<ozgun.gun@ge.com>; Kazan, Serkan (GE Power) <serkan.kazan@ge.com>; Haymanali, Reha (GE Power)
<recep.haymanali@ge.com>; Mazzocco, Valeria (GE Power) <Valeria.Mazzocco@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Ozge,

I guess Jacopo refers that this means a concession to the current contract and need to go through the concession
approval process.

Regards
Jorge

**From:** Oguzer, Ozge (GE Power)
**Sent:** viernes, 24 de mayo de 2019 10:07
**To:** Veronesi, Jacopo (GE Power) <jacopo.veronesi@ge.com>; Celdran, Fernando (GE Power)
<fernando.celdran@ge.com>
**Cc:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Basegmez, Nilay (GE Power)
<Nilay.Basegmez@ge.com>; Cherifkanouni, Mehdi (GE Power) <mehdi.cherifkanouni@ge.com>; Queune, Olivier (GE
Power) <olivier.queune@ge.com>; Okyar, Ibrahim kursad (GE Power) <kursad.Okyar@ge.com>; Gun, Ozgun (GE Power)
<ozgun.gun@ge.com>; Kazan, Serkan (GE Power) <serkan.kazan@ge.com>; Haymanali, Reha (GE Power)
<recep.haymanali@ge.com>; Zarca, Jorge (GE Power) <jorge.zarca@ge.com>; Mazzocco, Valeria (GE Power)
<Valeria.Mazzocco@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Hi Jacopo,

Termination amount of an ongoing agreement is OTR decision, the approval levels mentioned in Risk DOA are for the
new CSA's, new agreements to be signed.
This is an ongoing agreement, it is OTR decision

Especially this agreement is MMP, i.e., there is no deferred balance, no incurred cost which we did not bill, even no
pastdues exist.

Thanks

Regards
Ozge

**From:** Veronesi, Jacopo (GE Power)
**Sent:** Friday, May 24, 2019 10:59 AM
**To:** Celdran, Fernando (GE Power) <fernando.celdran@ge.com>
**Cc:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Basegmez, Nilay (GE Power)
<Nilay.Basegmez@ge.com>; Cherifkanouni, Mehdi (GE Power) <mehdi.cherifkanouni@ge.com>; Queune, Olivier (GE
Power) <olivier.queune@ge.com>; Okyar, Ibrahim kursad (GE Power) <kursad.Okyar@ge.com>; Oguzer, Ozge (GE
Power) <Ozge1.Oguzer@ge.com>; Gun, Ozgun (GE Power) <ozgun.gun@ge.com>; Kazan, Serkan (GE Power)
<serkan.kazan@ge.com>; Haymanali, Reha (GE Power) <recep.haymanali@ge.com>; Zarca, Jorge (GE Power)

GE CONFIDENTIAL

<jorge.zarca@ge.com>; Mazzocco, Valeria (GE Power) <Valeria.Mazzocco@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Hi Fernando, Olivier,
As it is a T&C amendment, we should follow the standard commercial approval process to discount the Termination.
Regards,
Jacopo

**From:** Veronesi, Jacopo (GE Power)
**Sent:** venerdì 24 maggio 2019 08:44
**To:** Celdran, Fernando (GE Power) <fernando.celdran@ge.com>
**Cc:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Basegmez, Nilay (GE Power) <Nilay.Basegmez@ge.com>; Cherifkanouni, Mehdi (GE Power) <mehdi.cherifkanouni@ge.com>; Queune, Olivier (GE Power) <olivier.queune@ge.com>; Okyar, Ibrahim kursad (GE Power) <kursad.Okyar@ge.com>; Oguzer, Ozge (GE Power) <Ozge1.Oguzer@ge.com>; Gun, Ozgun (GE Power) <ozgun.gun@ge.com>; Kazan, Serkan (GE Power) <serkan.kazan@ge.com>; Haymanali, Reha (GE Power) <recep.haymanali@ge.com>; Zarca, Jorge (GE Power) <jorge.zarca@ge.com>; Mazzocco, Valeria (GE Power) <Valeria.Mazzocco@ge.com>
**Subject:** Re: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Hi Fernando and team,
I need to check what it will mean from an internal process standpoint this deviation and will let you know asap.
On the other hand, I think we should consider an internal mechanism where the region gets back this discount as the payments from the main relocation deal start flowing.
Regards,
Jacopo


On 24 May 2019, at 05:38, Celdran, Fernando (GE Power) <fernando.celdran@ge.com> wrote:

Lance
I am ok with the proposal.

Jacopo,
what do you think?

El 23 may 2019, a las 17:54, Herrington, Lance R (GE Power) <lance.herrington@ge.com> escribió:

All

After further discussion with the deal team in NAM, I propose the following...

Acarsoy – offer $500k reduction in termination fee. From what I have heard they have financial challenges and may struggle to pay the full termination fees as is and will have to add to the buyback price to help cover it.
Ataer – has not accepted the buyback offer and is going out for additional bids, offer similar $500k reduction in termination fee as part of a best and final offer as good will in the buyback option.

Thoughts?

Lance Herrington
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754 | M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

---

**From:** "Basegmez, Nilay (GE Power)" <Nilay.Basegmez@ge.com>
**Date:** Wednesday, May 22, 2019 at 5:43 AM
**To:** "Cherifkanouni, Mehdi (GE Power)" <mehdi.cherifkanouni@ge.com>, Lance Herrington <lance.herrington@ge.com>, "Celdran, Fernando (GE Power)" <fernando.celdran@ge.com>, Olivier Queune <olivier.queune@ge.com>, "Okyar, Ibrahim kursad (GE Power)" <kursad.Okyar@ge.com>, "Oguzer, Ozge (GE Power)" <Ozge1.Oguzer@ge.com>, "Gun, Ozgun (GE Power)" <ozgun.gun@ge.com>, "Kazan, Serkan (GE Power)" <serkan.kazan@ge.com>
**Cc:** "Haymanali, Reha (GE Power)" <recep.haymanali@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Mehdi,
Acarsoy is suspended and Ataer is an MMP contract.

**From:** Cherifkanouni, Mehdi (GE Power)
**Sent:** Wednesday, May 22, 2019 1:38 PM
**To:** Basegmez, Nilay (GE Power) <Nilay.Basegmez@ge.com>; Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Celdran, Fernando (GE Power) <fernando.celdran@ge.com>; Queune, Olivier (GE Power) <olivier.queune@ge.com>; Okyar, Ibrahim kursad (GE Power) <kursad.Okyar@ge.com>; Oguzer, Ozge (GE Power) <Ozge1.Oguzer@ge.com>; Gun, Ozgun (GE Power) <ozgun.gun@ge.com>; Kazan, Serkan (GE Power) <serkan.kazan@ge.com>
**Cc:** Haymanali, Reha (GE Power) <recep.haymanali@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Dear All,
Are we not having any costs with these customers ? I know the plants are not running but at minimum we incur CPM costs on a yearly basis.
Are the contracts under Suspend mode right now ? what is their status ?
Best regards
Mehdi

**From:** Basegmez, Nilay (GE Power)
**Sent:** Wednesday, May 22, 2019 10:49 AM
**To:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Celdran, Fernando (GE Power) <fernando.celdran@ge.com>; Queune, Olivier (GE Power) <olivier.queune@ge.com>; Okyar, Ibrahim kursad (GE Power) <kursad.Okyar@ge.com>; Oguzer, Ozge (GE Power) <Ozge1.Oguzer@ge.com>; Gun, Ozgun (GE Power) <ozgun.gun@ge.com>; Kazan, Serkan (GE Power) <serkan.kazan@ge.com>
**Cc:** Haymanali, Reha (GE Power) <recep.haymanali@ge.com>; Cherifkanouni, Mehdi (GE Power) <mehdi.cherifkanouni@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Lance, yes correct.

Thanks

GE CONFIDENTIAL

Nilay

**From:** Herrington, Lance R (GE Power)
**Sent:** Tuesday, May 21, 2019 5:28 PM
**To:** Basegmez, Nilay (GE Power) <Nilay.Basegmez@ge.com>; Celdran, Fernando (GE Power)
<fernando.celdran@ge.com>; Queune, Olivier (GE Power) <olivier.queune@ge.com>; Okyar, Ibrahim kursad (GE Power)
<kursad.Okyar@ge.com>; Oguzer, Ozge (GE Power) <Ozge1.Oguzer@ge.com>; Gun, Ozgun (GE Power)
<ozgun.gun@ge.com>; Kazan, Serkan (GE Power) <serkan.kazan@ge.com>
**Cc:** Haymanali, Reha (GE Power) <recep.haymanali@ge.com>; Cherifkanouni, Mehdi (GE Power)
<mehdi.cherifkanouni@ge.com>
**Subject:** Re: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Thank you Nilay.  Question, is the below at 100% margin?

**Lance Herrington**
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754 | M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...


**From:** "Basegmez, Nilay (GE Power)" <Nilay.Basegmez@ge.com>
**Date:** Tuesday, May 21, 2019 at 8:39 AM
**To:** Lance Herrington <lance.herrington@ge.com>, "Celdran, Fernando (GE Power)"
<fernando.celdran@ge.com>, Olivier Queune <olivier.queune@ge.com>, "Okyar, Ibrahim kursad (GE Power)"
<kursad.Okyar@ge.com>, "Oguzer, Ozge (GE Power)" <Ozge1.Oguzer@ge.com>, "Gun, Ozgun (GE Power)"
<ozgun.gun@ge.com>, "Kazan, Serkan (GE Power)" <serkan.kazan@ge.com>
**Cc:** "Haymanali, Reha (GE Power)" <recep.haymanali@ge.com>, "Cherifkanouni, Mehdi (GE Power)"
<mehdi.cherifkanouni@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Lance hi,
Following our meeting last week, Please see termination fee for Ataer and Acarsoy contract.

| Ataer | Termination Fee |
|---|---|
| Onshore | $ 500,000.00 |
| Offshore | $ 2,200,000.00 |
| Total | $ 2,700,000.00 |

Acarsoy termination fee calculation is as below:

| Acarsoy | Termination Fee |
|---|---|
| Onshore | $ 382,201.00 |
| Offshore | $ 1,933,519.00 |
| Total | $ 2,315,720.00 |

GEALTA_0003600
Alta App.000168

So, in total we have $5M termination fee right as per the contract.

Could you please let us know how you would like to proceed as we need to raise the issue to regional level for any settlement amount?

Kind regards
Nilay

-----Original Appointment-----
**From:** Herrington, Lance R (GE Power)
**Sent:** Tuesday, May 07, 2019 5:14 PM
**To:** Herrington, Lance R (GE Power); Basegmez, Nilay (GE Power); Celdran, Fernando (GE Power); Queune, Olivier (GE Power); Okyar, Ibrahim kursad (GE Power); Oguzer, Ozge (GE Power); Gun, Ozgun (GE Power); Kazan, Serkan (GE Power)
**Cc:** Haymanali, Reha (GE Power); Cherifkanouni, Mehdi (GE Power)
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees
**When:** 17 May 2019 08:00-09:00 (UTC-06:00) Central Time (US & Canada).
**Where:** Online Meeting

Re-scheduling as critical participants were unable to join.  We need to come to a conclusion quickly as this could impact financial close (scheduled for late June) of another deal worth ~$20M CM, please join or provide a delegate that has authority to make a decision. Thank you.

**From:** "Basegmez, Nilay (GE Power)" <Nilay.Basegmez@ge.com>
**Date:** Tuesday, May 7, 2019 at 6:58 AM
**To:** "Celdran, Fernando (GE Power)" <fernando.celdran@ge.com>, Lance Herrington <lance.herrington@ge.com>, Olivier Queune <olivier.queune@ge.com>, "Okyar, Ibrahim kursad (GE Power)" <kursad.Okyar@ge.com>
**Cc:** "Oguzer, Ozge (GE Power)" <Ozge1.Oguzer@ge.com>, "Gun, Ozgun (GE Power)" <ozgun.gun@ge.com>, "Kazan, Serkan (GE Power)" <serkan.kazan@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Hi All,
For Ataer contract, the customer has right to terminate due to economic reasons as you can see below.
For Acarsoy, we have right to issue $2.3M termination fee.

| Acarsoy | Termination Fee |
|---------|-----------------|
| Onshore | $ 382,201.00 |
| Offshore | $ 1,933,519.00 |
| Total | $ 2,315,720.00 |

<image001.png>

**From:** Celdran, Fernando (GE Power)
**Sent:** Monday, May 06, 2019 6:40 PM
**To:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Queune, Olivier (GE Power) <olivier.queune@ge.com>; Okyar, Ibrahim kursad (GE Power) <kursad.Okyar@ge.com>

Alta App.000169

**Cc:** Oguzer, Ozge (GE Power) <Ozge1.Oguzer@ge.com>; Gun, Ozgun (GE Power) <ozgun.gun@ge.com>; Basegmez, Nilay (GE Power) <Nilay.Basegmez@ge.com>; Kazan, Serkan (GE Power) <serkan.kazan@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Ok, lets have a discussion

**From:** Herrington, Lance R (GE Power)
**Sent:** Monday, May 6, 2019 5:37 PM
**To:** Celdran, Fernando (GE Power) <fernando.celdran@ge.com>; Queune, Olivier (GE Power) <olivier.queune@ge.com>; Okyar, Ibrahim kursad (GE Power) <kursad.Okyar@ge.com>
**Cc:** Oguzer, Ozge (GE Power) <Ozge1.Oguzer@ge.com>; Gun, Ozgun (GE Power) <ozgun.gun@ge.com>; Basegmez, Nilay (GE Power) <Nilay.Basegmez@ge.com>; Kazan, Serkan (GE Power) <serkan.kazan@ge.com>
**Subject:** Re: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

We should probably have a discussion to look at what it means to GE before just deciding. If the termination fees are not waived the customer will add it to the buyback so although the EUR region may get the fees, another region is going to pay for it, making it a net neutral at the Gas Power level potentially.

Lance Herrington
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

**From:** "Celdran, Fernando (GE Power)" <fernando.celdran@ge.com>
**Date:** Monday, May 6, 2019 at 10:34 AM
**To:** Olivier Queune <olivier.queune@ge.com>, Lance Herrington <lance.herrington@ge.com>, "Okyar, Ibrahim kursad (GE Power)" <kursad.Okyar@ge.com>
**Cc:** "Oguzer, Ozge (GE Power)" <Ozge1.Oguzer@ge.com>, "Gun, Ozgun (GE Power)" <ozgun.gun@ge.com>, "Basegmez, Nilay (GE Power)" <Nilay.Basegmez@ge.com>, "Kazan, Serkan (GE Power)" <serkan.kazan@ge.com>
**Subject:** RE: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Lance,
We cannot give up the termination fee.
Regards
Fernando

**From:** Queune, Olivier (GE Power)
**Sent:** Monday, May 6, 2019 3:57 PM
**To:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Okyar, Ibrahim kursad (GE Power) <kursad.Okyar@ge.com>
**Cc:** Oguzer, Ozge (GE Power) <Ozge1.Oguzer@ge.com>; Gun, Ozgun (GE Power) <ozgun.gun@ge.com>; Basegmez, Nilay (GE Power) <Nilay.Basegmez@ge.com>; Kazan, Serkan (GE Power) <serkan.kazan@ge.com>; Celdran, Fernando (GE Power) <fernando.celdran@ge.com>
**Subject:** Re: Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

GEALTA_0003602

Alta App.000170

Lance,
In CC are the people you need to keep in the loop.
One thing is for sure.. the region needs the termination fee.
OQ

---

**From:** "Herrington, Lance R (GE Power)" <lance.herrington@ge.com>
**Date:** Monday 6 May 2019 at 15:41
**To:** "Okyar, Ibrahim kursad (GE Power)" <kursad.Okyar@ge.com>, Olivier Queune <olivier.queune@ge.com>
**Subject:** Acarsoy ESN 191-716 and Ataer ESN 191-648 CSA Termination Fees

Gentlemen,

The NAM team is currently working on a multi-unit TRUEpackage opportunity that will utilize a number of packages/engines that are currently in Turkey.  Two of the units in the subject above currently have CSA termination fees, Acarsoy has a termination fee of $1.9M and the Ataer engine has a similar termination fee.  Currently the customers are asking for relief on the termination fees in exchange for a lower buyback price on the equipment, otherwise the buyback price will be higher.  Who should I talk with in the region to discuss how best to handle the termination fees?  We are trying to move quickly to achieve full notice to proceed in June and the unit buyback is critical.  Thank you.

**Lance Herrington**
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

<Acarsoy_termination_Letter_26JUN19.pdf>

<Ataer Termination Letter 26 JUN 2019.pdf>

# Exhibit 32

Alta App.000172

Message
_____

**From:**      Herrington, Lance R (GE Power) [lance.herrington@ge.com]
**Sent:**      11/19/2019 8:39:09 AM
**To:**        Babu, Alex (GE Power) [alex.babu@ge.com]
**Subject:**   Re: Strategy for Response to WattStock: [EXTERNAL] RE: EXT: RE: WattStock Alta LNTP Project


Jay is saying he needs an answer today in order to get a $750k payment this week.

**Lance Herrington**
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...


_____

**From:** Alex Babu <alex.babu@ge.com>
**Date:** Tuesday, November 19, 2019 at 7:38 AM
**To:** Lance Herrington <lance.herrington@ge.com>
**Subject:** Tentative: Strategy for Response to WattStock: [EXTERNAL] RE: EXT: RE: WattStock Alta LNTP Project

Lance – ill be with another customer this morning.  Can we have this meeting tomorrow instead when we are all together at Jport?

Alex



# Exhibit 33

Alta App.000174

Message

| From: | Babu, Alex (GE Power) [alex.babu@ge.com] |
|---|---|
| Sent: | 11/26/2019 10:55:00 PM |
| To: | Jay Manning [j.manning@wattstock.com]; Hill, Daniel D (GE Power) [daniel.hill@ge.com]; Aranas, Cherrylyn (GE Power) [cherrylyn.aranas@ge.com]; Herrington, Lance R (GE Power) [lance.herrington@ge.com] |
| CC: | Andrew Herr [a.herr@wattstock.com] |
| Subject: | RE: Alta Power - Site #1 DRAFT Proposal |

Jay – based on what the team has provided me, I don't know how to answer your question below. It's probably best to have a conference call early next week once everyone is back in the office to review further. Thoughts?

Can you elaborate below better or provide an example of what you mention below so that the team can look into this further as its very broad and we don't know where to start.

I believe Daniel already relayed this, but the LNTP had a flat 25% markup on everything due to the sensitivity of timing to get something out to Alta asap back then. Since then, on the final proposal/estimator we have varied the level of markup on various parts of the upgrade based on the value added from GE and the risk GE is taking on that portion of the upgrade. However the total blended markup is 25% as described earlier. I didn't realize we were going to get this detailed into the numbers at this stage, and if I knew then we would have kept everything at the standard 25% markup to keep it similar to the LNTP.

How far off are we on pricing that you are trying to reconcile below? I don't want to exercise the already limited/lean team if we are like $100k off, as I think that should be something we can figure out how to reconcile as part of the larger project. Maybe I am trying to oversimplify this but I want to ensure we are effectively using our time here especially at the end of the year when things are already chaotic for year-end closure.

Alex

**From:** Jay Manning <j.manning@wattstock.com>
**Sent:** Tuesday, November 26, 2019 10:18 AM
**To:** Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Aranas, Cherrylyn (GE Power) <cherrylyn.aranas@ge.com>; Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Babu, Alex (GE Power) <alex.babu@ge.com>
**Cc:** Andrew Herr <a.herr@wattstock.com>
**Subject:** EXT: RE: Alta Power - Site #1 DRAFT Proposal
**Importance:** High

Cherry, we cannot reconcile the numbers from the LNTP with the numbers from Alex's Sept 6 spdsht which split out the GE unit pricing. It looks like the quantities are wrong. And if the pricing has increased, we need to know which item has increased and why.
How fast can you do this? We are trying to reconcile this week so that we can get Alta to pay the $750k next week.
Call me if you have any questions.
Thanks,
Jay

**From:** Jay Manning
**Sent:** Wednesday, November 20, 2019 11:18 AM
**To:** 'Hill, Daniel D (GE Power)' <daniel.hill@ge.com>
**Subject:** RE: Alta Power - Site #1 DRAFT Proposal



Also, some of the quantities are hardwired and some refer to B3. These need to be reconciled for N1 and 2 only.

GE CONFIDENTIAL - ATTORNEYS EYES ONLY

**From:** Jay Manning
**Sent:** Wednesday, November 20, 2019 11:14 AM
**To:** 'Hill, Daniel D (GE Power)' <daniel.hill@ge.com>
**Subject:** FW: Alta Power - Site #1 DRAFT Proposal

**From:** Babu, Alex (GE Power) [mailto:alex.babu@ge.com]
**Sent:** Friday, September 6, 2019 1:51 PM
**To:** Jay Manning <j.manning@wattstock.com>; Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Cc:** Andrew Herr <a.herr@wattstock.com>; Pete Watson <p.watson@wattstock.com>
**Subject:** RE: Alta Power - Site #1 DRAFT Proposal

Jay,

Attached is the cost estimator broken down.

Nuh 1 = $2,726,739
Nuh 2 = $4,590,388
Soy = $2,475,831

Based on GE's pricing requirements we have various markups on different areas of the scope, however the overall
blended CM rate is 25% for this project.  Review and let me know if any questions. Thanks,

Alex

**From:** j.manning@wattstock.com <j.manning@wattstock.com>
**Sent:** Thursday, August 29, 2019 4:41 PM
**To:** Babu, Alex (GE Power) <alex.babu@ge.com>; Herrington, Lance R (GE Power) <lance.herrington@ge.com>
**Cc:** Andrew F. Herr <a.herr@wattstock.com>; Pete Watson <p.watson@wattstock.com>
**Subject:** EXT: RE: Alta Power - Site #1 DRAFT Proposal

Cost Estimator:  is it possible to break out your cost estimator per unit?  We have to track each unit individually in our
shop, and we can't do that just by dividing by 3.
Also, please confirm markup is 25% for everything in the estimator.
Thanks,
Jay

**From:** Babu, Alex (GE Power) [mailto:alex.babu@ge.com]
**Sent:** Friday, August 23, 2019 4:52 PM
**To:** j.manning@wattstock.com
**Cc:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>;
Alston, Ashley (GE Power) <ashley.alston@ge.com>; Aranas, Cherrylyn (GE Power) <cherrylyn.aranas@ge.com>; Hill,
Daniel D (GE Power) <daniel.hill@ge.com>
**Subject:** Alta Power - Site #1 DRAFT Proposal

Jay,

Sorry for the delay, but the team was able to finalize the DRAFT for Alta Site #1 this week.  Please review with your team
and advise if any immediate questions.  I think its important for us to meet together next week at JPort to go thru the
following:

1)    Walk thru Draft proposal to discuss/clarify any of GE's Scope to ensure we have captured everything needed.
2)    Walk thru of Estimator
3)    Need to understand the DOR between WS/Alta/GE/EPC so everyone is clear on Roles & Responsibilities.  Our Engineering team has some concern of PCM, Blackstart, 52U Breakers, etc. based on some initial feedback they are getting from the WS team that we haven't factored into this project.

Please note the details(Pricing, LDs, etc.) in the draft proposal haven't been officially approved by GE Leadership yet.  In order to minimize the amount of approval meetings, we wanted WS to review the draft first and ensure its acceptable before we proceed with formal approvals to give you the final proposal.

As of now, next Tues/Wed I will be out of office in customer meetings so anytime outside of that works.  Maybe we shoot for next Thursday morning to review/finalize this if the rest of the GE team is open then?

**Alex Babu**
Sales Manager, Power Services
GE Power

M +1 713 315 0946 | F  +1 713 583 2314
11330 Clay Rd, Suite 500 | Houston, TX 77041



# Exhibit 34

Message
_____

**From:** Herrington, Lance R (GE Gas Power) [lance.herrington@ge.com]
**Sent:** 2/13/2020 4:00:25 PM
**To:** Kozachenok, Marisa Jo (GE Gas Power) [Marisa.Kozachenok@ge.com]; Hall, Aaron C (GE Gas Power) [aaron.hall@ge.com]
**Subject:** Re: Regroup on True Package Strategy
**Attachments:** Aero TRUEpackage Intro Slides - (Siciu Discussion2).pptx


Marisa

Here is the slide deck I have come up with thus far.  More than a 4-blocker, but I was able to recycle a number of slides this way.

**Lance Herrington**
Global Sales Leader
Aero Conversions, Modifications, and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington


Start here to find the right upgrades...



- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**From:** Marisa.Kozachenok@ge.com
**When:** 2:00 PM - 2:30 PM February 13, 2020
**Subject:** Regroup on True Package Strategy
**Location:** Skype Meeting


..........................................................................

## Join Skype Meeting
Trouble Joining? Try Skype Web App

### Join by phone

Toll-free number: +1 (866) 799-9419,,745398160# (Dial-in Number)        English (United States)
Toll number:      +1 (860) 785-9628,,745398160# (Dial-in Number)        English (United States)
Find a local number

Conference ID: 745398160
Forgot your dial-in PIN? | Help | Legal

GE CONFIDENTIAL



Alta App.000181

GE Power

© 2018, General Electric Company.

GE Proprietary Information - The information contained in this document is General Electric Company (GE) proprietary information. It is the property of GE and shall not be used, disclosed to others or reproduced without the express written consent of GE, including, but without limitation, in the creation, manufacture, development, or derivation of any repairs, modifications, spare parts, or configuration changes or to obtain government or regulatory approval to do so, if consent is given for reproduction in whole or in part, this notice and the notice set forth on each page of this document shall appear in any such reproduction in whole or in part. The information contained in this document may also be controlled by the US export control laws. Unauthorized export or re-export is prohibited. This presentation and the information herein are provided for information purposes only and are subject to change without notice. NO REPRESENTATION OR WARRANTY IS MADE OR IMPLIED AS TO ITS COMPLETENESS, ACCURACY, OR FITNESS FOR ANY PARTICULAR PURPOSE





# A quick history...

**2016**

**Problem:**

1| rapidly changing power market conditions leaving Aero GT assets stranded

2| developers needed a way to move projects forward at a lower capital cost w/ reliable technology that was "bankable"

**2017**

1| GE an WattStock begin a collaboration and socialize a GE certified, "refurbished" package concept

2| GE & WattStock sign MOU and lease agreement for refurb at Jacintoport, Houston, TX facility

**2018**

**GE TRUEpackage launched...**

1| First project awarded..repowering a GE Frame 5 with Hot End Drive LM6000PF refurbished package

2| Project pipeline grows to over $200M with 28 units of potential volume

**2019**

1| First project goes into commercial operation...

- 1st Hot End Drive LM6000PF Package
- Achieved 34 day installation and commissioning cycle

2| Limited notice to proceed awarded multi-unit project up to 9 units. .

**2020**

Installation & Commissioning of ~9 units planned before year end..

Edit Presentation Title in [Insert Tab > Header & Footer] | [DateTime] 3

© 2018 General Electric Company. Confidential information. All rights reserved.

## Market Drivers

- Decentralized renewable resources increase cost-competitive pressures on operators and project developers

- Changing power market demands creating stranded assets in Aero installed base...lowering Aero Service annuity.

- Financing challenges requiring low CAPEX and reliable OPEX solutions for development projects

GE CONFIDENTIAL - ATTORNEYS EYES ONLY





Need info on square footage
Cranes

Alta App.000186







# ISP Competitive Assessment

### Overall presence

Operations experience in over 40 countries worldwide, with 12 offices

Source: Company website, Public documents, W/L records, PS Marketing Data / Analysis

## Capabilities Overview

- ✓ Support LM2500 / LM2500+ / LM6000
- ✓ Primarily O&M Field Service , then LTSA, Lease ,EPC and power plant relocations. Buys and resells Power plants , including LM packages.
- ✓ Most Successful Regions: Venezuela, USA
- ✓ AeroAdvantage service offering:
  - 90% GE LM2500 & LM6000 for overhauls and field services
  - 10% Pratt & Whitney FT8 specialty repairs and field services
  - Emergency Outage Maintenance, Borescope Inspections, Service Bulletin Compliance, Alignment Verification, Package Inspections & Maintenance, Rotable Hot Sections, Rotable Fuel Nozzles, Rotable Modules, Condition-based Overhauls, Turbine Removal & Installation, Component Replacement
- ✓ Remote Operations Center (ROC) in Sedalia, MO
- ✓ Probable partner Chromalloy
- ✓ 23 refurbished units installed and commissioning since 2015

## Interesting Facts

- ✓ Acquired several LM6000 packages on the secondary market including 4 xLM6000 ( ex CSFPU) 2010, resold into Venezuela. Also repurchased 3xLM2500+ packages from Kuwait in 2010.
- ✓ Recently provided some L4 services, like HS refurbishment.
- ✓ Leadership prior work experience includes GE, P&W, Wood Group, Dresser Rand, Solar Turbines, Calpine, etc. 50% of the top executives have held positions within GE.
- ✓ Developing interconnect agreements in Ercot, possibly PJM and CAISO

## Win/Loss Summary ('17)

- ✓ 3 Loss according to NEX
- ✓ Total Lost Value; $1.8M

## Win/Loss Summary ('16)

- ✓ 2 Loss according to SFDC
- ✓ 1 Controls based loss; $1.7M Value
- ✓ Rockwell Controls channel
- ✓ 1 Core based loss; $2.1M value

© 2018 General Electric Company. Confidential information. All rights reserved.

[DateTime] 9

## Market pricing assessment

**Market pricing targets…**
- Peaker/Merchant Plant ≈ **$450/kw**
- Industrial = **~$600/kw**

**Competitor market pricing and commercial structure…**

- Sole source provider
- Refurbished & OH'd engine
- Refurbished & OH'd generator
- Refurbished or New (wide-body) package
- BOP equipment (new/used)
- Package & Aux systems upgrades
- EPC / Civil Works

- Pricing - $486/kw (based on 3 unit site)

**GE market pricing and commercial structure…**

- Multiple providers
- GE
  - New or OH'd engine
  - Engineering services
  - Package & Aux system upgrades
- WattStock LLC
  - Refurbished & OH'd generator
  - Refurbished package
  - BOP equipment (new/used)
- EPC
  - Plant design / construction
  - BOP equipment (as necessary)

- Pricing (based on current active opportunity - 7 LM6PC SAC Dual Fuel Water Injected)
  - GE          $17M
  - WattStock    $18M
  - EPC          $38M
  - **Total      $73M  ($566/kw)**
  - Total with single source $78M ($534/kw)



© 2020 General Electric Company. Confidential Information. All rights reserved.

10

GE CONFIDENTIAL - ATTORNEYS EYES ONLY



**Aero TRUEpackage® Commercial Pipeline**

*A trademark of the General Electric Company

| Orders Pipeline | 2018 | 2019 | 2020 | 2021 | 2022 | YтI |
|---|---|---|---|---|---|---|
| Won | $23.0 | $2.5 | $0.0 | $0.0 | $0.0 | $25.5 |
| Active | $0.0 | $18.0 | $18.0 | $0.0 | $0.0 | $36.0 |
| Pipeline | $0.0 | $75.0 | $191.8 | $21.0 | $0.0 | $287.8 |
| YтI | $23.0 | $95.5 | $209.8 | $21.0 | $0.0 | $349.3 |

**Key opportunities currently pacing...**
(Title ID - Display Name, Eqp, Order Close, Rev $)
1335991 - Alta Power - Site #1, 11/15/2019, $6.8M
1495631 - Alta Power - Site #2, 11/29/2019, $11.2M
1446479 - Middle River Power Crane, 02/28/2020, $18M

**Total Pipeline (Aero Services)**

Sales **$349M**

CM **$84M**

| CM Pipeline | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| Backlog (1) | $0 | $3 | $1 | $0 | $0 |
| Opportunities (6) | $0 | $0 | $5 | $5 | $0 |
| Pipeline (23) | $0 | $0 | $17 | $49 | $5 |
| | $0 | $3 | $22 | $54 | $5 |

| Unit Count | | | | | |
|---|---|---|---|---|---|
| Backlog | 1 | 0 | 0 | 0 | 0 |
| Opportunities | 0 | 6 | 3 | 0 | 0 |
| Pipeline | 0 | 0 | 14 | 11 | 0 |
| | 1 | 6 | 17 | 11 | 0 |

© 2018 General Electric Company. Confidential information. All rights reserved.

11

GEALTA_0028245

Alta App.000191

## Challenges / Next Steps

**Current challenges:**

1 | Market price competitiveness...$450/kw

2 | Customer turnkey scope requirement...margin stacking

3 | Potential for refurb package and engine supply constraint

**Next Steps:**

1 | Integrate "new unit" opportunities into pipeline (one product to market)

2 | Investigate advance buyback of packages to inventory

3 | Analyze new build package w/ OH'd engine & generator vs. refurb package

4 | Explore JV or SPE to improve financial competitiveness

© 2005 General Electric Company. Confidential Information. All rights reserved.

Alta App.000192



GE CONFIDENTIAL - ATTORNEYS EYES ONLY

GEALTA_0028247

Alta App.000193

# Exhibit 35

Alta App.000194

Message
_____

**From:** Herrington, Lance R (GE Gas Power) [lance.herrington@ge.com]
**Sent:** 3/17/2020 12:58:04 PM
**To:** Talhaoui, Mohamed-Nabil (GE Gas Power) [mohamed-nabil.talhaoui@ge.com]; Barbero, Luis (GE Gas Power) [Luis.Barbero@ge.com]; Meseguer, Xavi (GE Gas Power) [Xavier.Meseguer@ge.com]; Celdran, Fernando (GE Gas Power) [fernando.celdran@ge.com]; Ozcan, Serdar (GE Gas Power) [Serdar.Ozcan@ge.com]; Queune, Olivier (GE Gas Power) [olivier.queune@ge.com]; Gun, Ozgun (GE Gas Power) [ozgun.gun@ge.com]; Zarca, Jorge (GE Gas Power) [jorge.zarca@ge.com]
**CC:** Babu, Alex (GE Gas Power) [alex.babu@ge.com]
**Subject:** Re: Nuh powerplant purchase


Nabil

I might add this termination fee for Nuh was not in your OP for the year, this is emergent.

**Lance Herrington**
Global Sales Leader
Aero Upgrades

T+1 832 418 9788 M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

---

**From:** Lance Herrington <lance.herrington@ge.com>
**Date:** Tuesday, March 17, 2020 at 11:53 AM
**To:** "Talhaoui, Mohamed-Nabil (GE Gas Power)" <mohamed-nabil.talhaoui@ge.com>, "Barbero, Luis (GE Gas Power)" <Luis.Barbero@ge.com>, "Meseguer, Xavi (GE Gas Power)" <Xavier.Meseguer@ge.com>, "Celdran, Fernando (GE Gas Power)" <fernando.celdran@ge.com>, "Ozcan, Serdar (GE Gas Power)" <Serdar.Ozcan@ge.com>, Olivier Queune <olivier.queune@ge.com>, "Gun, Ozgun (GE Gas Power)" <ozgun.gun@ge.com>, "Zarca, Jorge (GE Gas Power)" <jorge.zarca@ge.com>
**Cc:** Alex Babu <alex.babu@ge.com>
**Subject:** Re: Nuh powerplant purchase

Nabil / Luis

The units in question here is Nuh Cimento unit serial number 191-524 that is currently under an MMP agreement. The units were shut down a few years back and are not operating and have not had a PPA for sell of power since shutdown. Under the MMP if the customer terminates and sells the unit to a 3rd party then a termination fee of $1.45 (on-shore/off-shore) combined applies. There is a provision for termination for economic reasons which would eliminate the termination fees, but the team has determined that does not apply in this case. GE has no current costs or outstanding amounts concerning this unit, to my knowledge.

There is a TRUEpackage in the NAM region for two units with option for third on 1 site in Texas. The Alta Power Project. Alta is working with WattStock and GE for the purchase, refurb, GT Repair, and upgrade of this unit, plus Nuh Unit #2. This termination fee was added to the buyback price by Nuh Cimento to Alta Power 2 ½ weeks ago, and unfortunately $1.45M makes the economics no longer work for the Alta Project and could terminate that project. We are proposing not a full concession but a partial concession contingent upon final project closure with

WattStock/Alta. The TRUEpackage project CM for the Alta Power with the first two units will be over $3.5M USD. So we are proposing that for close of the TRUEpackage deal we would offer a termination fee concession of $750k.

Alta is also negotiating a CSA with Alex as well which would be at full margin...so we would propose that if they also sign the CSA we would offer an additional $250k concession.

The word from Alta is that if there is no relief on the termination fee the project looks like a No-Go which means GE would not get the termination fee OR the CM for the project OR the CM for the CSA.

Lance Herrington
Global Sales Leader
Aero Upgrades

T +1 832 418 9788 M +1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

---

**From:** "Talhaoui, Mohamed-Nabil (GE Gas Power)" <mohamed-nabil.talhaoui@ge.com>
**Date:** Tuesday, March 17, 2020 at 11:38 AM
**To:** "Barbero, Luis (GE Gas Power)" <Luis.Barbero@ge.com>, "Meseguer, Xavi (GE Gas Power)" <Xavier.Meseguer@ge.com>, "Celdran, Fernando (GE Gas Power)" <fernando.celdran@ge.com>, Lance Herrington <lance.herrington@ge.com>, "Ozcan, Serdar (GE Gas Power)" <Serdar.Ozcan@ge.com>, Olivier Queune <olivier.queune@ge.com>, "Gun, Ozgun (GE Gas Power)" <ozgun.gun@ge.com>, "Zarca, Jorge (GE Gas Power)" <jorge.zarca@ge.com>
**Cc:** Alex Babu <alex.babu@ge.com>
**Subject:** RE: Nuh powerplant purchase

Before getting into the DoA and how we can/should escalate the approval.
1/ Which deal is this ? I assume this is Acarsoy.
2/ What's the complete deal which is on the table ? How does it compare to the current negotiation with the customer ?
Regards,

M-Nabil Talhaoui
GE Power | Gas Power Europe

E mohamed-nabil.talhaoui@ge.com | T +41 58 506 5293 | M +41 79 772 2788
Brown Boveri Strasse 7, Konnex 7 | Baden, 5401 Switzerland

**From:** Barbero, Luis (GE Gas Power) <Luis.Barbero@ge.com>
**Sent:** Tuesday, March 17, 2020 5:32 PM
**To:** Meseguer, Xavi (GE Gas Power) <Xavier.Meseguer@ge.com>; Celdran, Fernando (GE Gas Power) <fernando.celdran@ge.com>; Herrington, Lance R (GE Gas Power) <lance.herrington@ge.com>; Ozcan, Serdar (GE Gas Power) <Serdar.Ozcan@ge.com>; Queune, Olivier (GE Gas Power) <olivier.queune@ge.com>; Gun, Ozgun (GE Gas Power) <ozgun.gun@ge.com>; Zarca, Jorge (GE Gas Power) <jorge.zarca@ge.com>
**Cc:** Babu, Alex (GE Gas Power) <alex.babu@ge.com>; Talhaoui, Mohamed-Nabil (GE Gas Power) <mohamed-nabil.talhaoui@ge.com>
**Subject:** RE: Nuh powerplant purchase

Hi,

Anyone let me know if I got it wrong.

GE CONFIDENTIAL - ATTORNEYS EYES ONLY

My understanding is that we could grant the customer a waive to the termination fee of 750k to 1M.
But on the other hand we'd be getting the unit(s) in exchange that to our purpose we think they can be of value and drive additional CM in another region.

To the extent that the customer to which we waive the termination is enabling to get to subsequent profit by giving to us assets worth >0, it could be that it is not a concession. Do we know what the internal inventory value is worth?

Please add/comment.
Thanks,
Luis

**From:** Meseguer, Xavi (GE Gas Power) <Xavier.Meseguer@ge.com>
**Sent:** martes, 17 de marzo de 2020 16:50
**To:** Celdran, Fernando (GE Gas Power) <fernando.celdran@ge.com>; Herrington, Lance R (GE Gas Power) <lance.herrington@ge.com>; Ozcan, Serdar (GE Gas Power) <Serdar.Ozcan@ge.com>; Queune, Olivier (GE Gas Power) <olivier.queune@ge.com>; Gun, Ozgun (GE Gas Power) <ozgun.gun@ge.com>; Zarca, Jorge (GE Gas Power) <jorge.zarca@ge.com>; Barbero, Luis (GE Gas Power) <Luis.Barbero@ge.com>
**Cc:** Babu, Alex (GE Gas Power) <alex.babu@ge.com>; Talhaoui, Mohamed-Nabil (GE Gas Power) <mohamed-nabil.talhaoui@ge.com>
**Subject:** RE: Nuh powerplant purchase

Please include Nabil tool as this is above my/Steve's approval level. thanks

**From:** Celdran, Fernando (GE Gas Power) <fernando.celdran@ge.com>
**Sent:** Tuesday, March 17, 2020 4:43 PM
**To:** Herrington, Lance R (GE Gas Power) <lance.herrington@ge.com>; Ozcan, Serdar (GE Gas Power) <Serdar.Ozcan@ge.com>; Queune, Olivier (GE Gas Power) <olivier.queune@ge.com>; Gun, Ozgun (GE Gas Power) <ozgun.gun@ge.com>; Zarca, Jorge (GE Gas Power) <jorge.zarca@ge.com>; Barbero, Luis (GE Gas Power) <Luis.Barbero@ge.com>
**Cc:** Babu, Alex (GE Gas Power) <alex.babu@ge.com>; Meseguer, Xavi (GE Gas Power) <Xavier.Meseguer@ge.com>
**Subject:** RE: Nuh powerplant purchase

Lance,
Lets discuss tomorrow but the concession level (>$700k) triggers a Higher Management approval

Luis,
Please could you advise?

Thanks
Fernando

**From:** Herrington, Lance R (GE Gas Power) <lance.herrington@ge.com>
**Sent:** Tuesday, March 17, 2020 3:02 PM
**To:** Ozcan, Serdar (GE Gas Power) <Serdar.Ozcan@ge.com>; Queune, Olivier (GE Gas Power) <olivier.queune@ge.com>; Celdran, Fernando (GE Gas Power) <fernando.celdran@ge.com>; Gun, Ozgun (GE Gas Power) <ozgun.gun@ge.com>; Zarca, Jorge (GE Gas Power) <jorge.zarca@ge.com>
**Cc:** Babu, Alex (GE Gas Power) <alex.babu@ge.com>
**Subject:** Re: Nuh powerplant purchase

All

GE CONFIDENTIAL - ATTORNEYS EYES ONLY

As we have discussed previously, this termination fee is going to be added onto the purchase of those units with the NAM TRUEpackage customer, effectively rendering the project not economically feasible. This effectively terminates the project in NAM and over $3.5M of CM for GE. I think we need to meet and discuss levels of concession based on Alta's 1) closure of the TRUEpackage deal w/o CSA $750k termination fee waived or 2) closure of TRUEpackage deal with CSA $1M termination fee waived. Also losing this project to GE puts it at risk for competition to gain these units and use them on other projects. I have added Alex Babu the NAM sales manager to this chain.

**Lance Herrington**
Global Sales Leader
Aero Upgrades

T+1 832 418 9788 M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

---

**From:** "Ozcan, Serdar (GE Gas Power)" <Serdar.Ozcan@ge.com>
**Date:** Tuesday, March 17, 2020 at 7:39 AM
**To:** Lance Herrington <lance.herrington@ge.com>, Olivier Queune <olivier.queune@ge.com>, "Celdran, Fernando (GE Gas Power)" <fernando.celdran@ge.com>, "Gun, Ozgun (GE Gas Power)" <ozgun.gun@ge.com>, "Zarca, Jorge (GE Gas Power)" <jorge.zarca@ge.com>
**Subject:** RE: Nuh powerplant purchase

$1M is for offshore, $450K is for onshore, total $1,45M.

Regards,
Serdar

**From:** Herrington, Lance R (GE Gas Power) <lance.herrington@ge.com>
**Sent:** Monday, March 16, 2020 5:18 PM
**To:** Ozcan, Serdar (GE Gas Power) <Serdar.Ozcan@ge.com>; Queune, Olivier (GE Gas Power) <olivier.queune@ge.com>; Celdran, Fernando (GE Gas Power) <fernando.celdran@ge.com>; Gun, Ozgun (GE Gas Power) <ozgun.gun@ge.com>; Zarca, Jorge (GE Gas Power) <jorge.zarca@ge.com>
**Subject:** Re: Nuh powerplant purchase

Based on this position, what will the termination amounts be? Considering the language used in the contracts:

GE CONFIDENTIAL - ATTORNEYS EYES ONLY

The "Termination Amount" in the event that Owner is the Defaulting Party is the greater of 1,000,000 USD per Covered Unit or as amount equal to (15%) percent of the sum of all prices paid by Owner to Contractor for Orders issued under this MMP. The Parties agree that the

The "Termination Amount" in the event that Owner is the Defaulting Party is the greater of 450,000 USD per Covered Unit or an amount equal to (15%) percent of the sum of all prices paid by Owner to Contractor for Orders issued under this MMP. The Parties agree that the

**Lance Herrington**
Global Sales Leader
Aero Upgrades

T+1 832 418 9788 M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

---

**From:** "Ozcan, Serdar (GE Gas Power)" <Serdar.Ozcan@ge.com>
**Date:** Wednesday, March 11, 2020 at 3:12 PM
**To:** Lance Herrington <lance.herrington@ge.com>, Olivier Queune <olivier.queune@ge.com>, "Celdran, Fernando (GE Gas Power)" <fernando.celdran@ge.com>, "Gun, Ozgun (GE Gas Power)" <ozgun.gun@ge.com>, "Zarca, Jorge (GE Gas Power)" <jorge.zarca@ge.com>
**Subject:** RE: Nuh powerplant purchase

Lance,

As yesterday we have received attached letter from customer and will be discussed on skype meeting by tomorrow.

Best regards,

GE CONFIDENTIAL - ATTORNEYS EYES ONLY

Serdar Ozcan

**From:** Herrington, Lance R (GE Gas Power) <lance.herrington@ge.com>
**Sent:** Wednesday, March 11, 2020 11:05 PM
**To:** Queune, Olivier (GE Gas Power) <olivier.queune@ge.com>; Celdran, Fernando (GE Gas Power) <fernando.celdran@ge.com>; Gun, Ozgun (GE Gas Power) <ozgun.gun@ge.com>; Zarca, Jorge (GE Gas Power) <jorge.zarca@ge.com>; Ozcan, Serdar (GE Gas Power) <Serdar.Ozcan@ge.com>
**Subject:** Re: Nuh powerplant purchase

Team – have we gotten to any answers yet on this matter?

**Lance Herrington**
Global Sales Leader
Aero Upgrades

T+1 832 418 9788 M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

---

**From:** olivier.queune@ge.com
**When:** 8:30 AM - 9:00 AM March 9, 2020
**Subject:** Nuh powerplant purchase
**Location:** Online Meeting

Lance,
I wanted to speak to you  about the purchase of Nuh power plant.
I hope you can make that call.
Thank you
oQ

Please forward to whoever needs to join.

..............................................................................................................

## Join online meeting

Trouble Joining? Try Skype Web App

## Join by Phone

+33 170995416,, 609921911#
Find a local number

Conference ID: 609921911

Forgot your dial-in PIN? | First online meeting? | Help | Legal

GE CONFIDENTIAL - ATTORNEYS EYES ONLY

GE CONFIDENTIAL - ATTORNEYS EYES ONLY

GEALTA_0007507

Alta App.000201

# Exhibit 36

Alta App.000202

**Message**

| | |
|---|---|
| **From**: | Jay Manning [j.manning@wattstock.com] |
| **Sent**: | 3/19/2020 1:11:07 PM |
| **To**: | Herrington, Lance R (GE Gas Power) [lance.herrington@ge.com] |
| **CC**: | Babu, Alex (GE Gas Power) [alex.babu@ge.com]; Pete Watson [p.watson@wattstock.com] |
| **Subject**: | EXT: Nuh Termination Fee |

Lance, just talked to Alex.  He says there is NO REDUCTION in the termination fee and that it is conditioned on Alta signing a CSA.   Nuh still has to pay GE 50%, and Alta has to pay GE 50%.  50+50 = 100%. That is no reduction/concession. Alta has made it clear that this will kill the deal.

Very disappointing.

Jay



# Exhibit 37

Alta App.000204

**To:**      Gun, Ozgun (GE Gas Power)[ozgun.gun@ge.com]
**Cc:**      Talhaoui, Mohamed-Nabil (GE Gas Power)[mohamed-nabil.talhaoui@ge.com]; Indermaur, Robin (GE Gas Power)[robin.indermaur@ge.com]; Babu, Alex (GE Gas Power)[alex.babu@ge.com]; Ozcan, Serdar (GE Gas Power)[Serdar.Ozcan@ge.com]; Queune, Olivier (GE Gas Power)[olivier.queune@ge.com]; Celdran, Fernando (GE Gas Power)[fernando.celdran@ge.com]; Zarca, Jorge (GE Gas Power)[jorge.zarca@ge.com]; Olivares, Javier (GE Gas Power)[javier.olivares@ge.com]; Meseguer, Xavi (GE Gas Power)[Xavier.Meseguer@ge.com]
**From:**    Herrington, Lance R (GE Gas Power)[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=5CF91FC00E874B7484E7FFE17B9773B8-HERRINGTON,]
**Sent:**    Fri 3/20/2020 1:20:53 PM (UTC-04:00)
**Subject:** Re: Nuh powerplant purchase

<mark>As discussed in the meeting, CAPEX is real challenge for the project, especially this close to financial close.</mark>  Alta has provided all final lending documents to the bank Friday a week ago, to add anything at this point will be a potential step backwards for the project financial close.  We are trying to do two things 1) offer a path to lower CAPEX and 2) incentivize a CSA deal.

**Lance Herrington**
Global Sales Leader
Aero Upgrades

T+1 832 418 9788 M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...



---

**From:** "Gun, Ozgun (GE Gas Power)" <ozgun.gun@ge.com>
**Date:** Friday, March 20, 2020 at 12:06 PM
**To:** Lance Herrington <lance.herrington@ge.com>
**Cc:** "Talhaoui, Mohamed-Nabil (GE Gas Power)" <mohamed-nabil.talhaoui@ge.com>, "Indermaur, Robin (GE Gas Power)" <robin.indermaur@ge.com>, Alex Babu <alex.babu@ge.com>, "Ozcan, Serdar (GE Gas Power)" <Serdar.Ozcan@ge.com>, Olivier Queune <olivier.queune@ge.com>, "Celdran, Fernando (GE Gas Power)" <fernando.celdran@ge.com>, "Zarca, Jorge (GE Gas Power)" <jorge.zarca@ge.com>, "Olivares, Javier (GE Gas Power)" <javier.olivares@ge.com>, "Meseguer, Xavi (GE Gas Power)" <Xavier.Meseguer@ge.com>
**Subject:** RE: Nuh powerplant purchase

Hi Lance,

I have few questions:

- Why can't Europe just provide concession of 700K from termination fee regardless of CSA signature or not?
- Why this 750K termination fee in case of CSA needs to be added on top of Americas CSA deal? Why this CSA termination fee can not captured in Europe region directly where we have contract in force with customer?
- What will be the benefit of having termination fee added on CSA price vs receiving term fee directly in region (as one GE)?

Thanks,
Ozgun

**From:** Herrington, Lance R (GE Gas Power) <lance.herrington@ge.com>
**Sent:** Friday, March 20, 2020 5:59 PM
**To:** Talhaoui, Mohamed-Nabil (GE Gas Power) <mohamed-nabil.talhaoui@ge.com>; Gun, Ozgun (GE Gas Power) <ozgun.gun@ge.com>; Indermaur, Robin (GE Gas Power) <robin.indermaur@ge.com>; Babu, Alex (GE Gas Power) <alex.babu@ge.com>; Ozcan, Serdar (GE Gas Power) <Serdar.Ozcan@ge.com>; Queune, Olivier (GE Gas Power) <olivier.queune@ge.com>; Celdran, Fernando (GE Gas Power) <fernando.celdran@ge.com>; Zarca, Jorge (GE Gas Power) <jorge.zarca@ge.com>; Olivares, Javier (GE Gas Power) <javier.olivares@ge.com>; Meseguer, Xavi (GE Gas Power) <Xavier.Meseguer@ge.com>

**Subject:** Re: Nuh powerplant purchase

I agree Nabil, we did agree on the $700k concession. For the remaining $750k if there is a mechanism and method to recover that back to Europe, maybe through finance doing an MJE across legal entities that would be ideal. I suggest we move forward with the termination concession as outlined while Ozgun works to find a way, if possible, to make that journal entry effectively and then the NAM finance team can plan the financials accordingly.

**Lance Herrington**
Global Sales Leader
Aero Upgrades

T+1 832 418 9788 M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

---

**From:** "Talhaoui, Mohamed-Nabil (GE Gas Power)" <mohamed-nabil.talhaoui@ge.com>
**Date:** Friday, March 20, 2020 at 7:50 AM
**To:** "Gun, Ozgun (GE Gas Power)" <ozgun.gun@ge.com>, "Indermaur, Robin (GE Gas Power)" <robin.indermaur@ge.com>, Alex Babu <alex.babu@ge.com>, Lance Herrington <lance.herrington@ge.com>, "Ozcan, Serdar (GE Gas Power)" <Serdar.Ozcan@ge.com>, Olivier Queune <olivier.queune@ge.com>, "Celdran, Fernando (GE Gas Power)" <fernando.celdran@ge.com>, "Zarca, Jorge (GE Gas Power)" <jorge.zarca@ge.com>, "Olivares, Javier (GE Gas Power)" <javier.olivares@ge.com>, "Meseguer, Xavi (GE Gas Power)" <Xavier.Meseguer@ge.com>
**Subject:** RE: Re: Nuh powerplant purchase

Hi Alex, Lance,
In the best case scenario for GE i.e. Upgrade + CSA, Europe with the transactions flowing as below will get 0$ from the termination fee. I did not have that understanding as I was focused only on the 700K$ concession.
I suppose there will be an MJE to ensure that 750K$ is flowing to Europe. Could you please link with the FP&A Team in the Americas region to see if that's the case ?
Regards,

**M-Nabil Talhaoui**
GE Power | Gas Power Europe

E mohamed-nabil.talhaoui@ge.com | T +41 58 506 5293 | M +41 79 772 2788
Brown Boveri Strasse 7, Konnex 7 | Baden, 5401 Switzerland

**From:** Gun, Ozgun (GE Gas Power) <ozgun.gun@ge.com>
**Sent:** Friday, March 20, 2020 12:54 PM
**To:** Indermaur, Robin (GE Gas Power) <robin.indermaur@ge.com>; Babu, Alex (GE Gas Power) <alex.babu@ge.com>; Herrington, Lance R (GE Gas Power) <lance.herrington@ge.com>; Ozcan, Serdar (GE Gas Power) <Serdar.Ozcan@ge.com>; Queune, Olivier (GE Gas Power) <olivier.queune@ge.com>; Celdran, Fernando (GE Gas Power) <fernando.celdran@ge.com>; Zarca, Jorge (GE Gas Power) <jorge.zarca@ge.com>; Olivares, Javier (GE Gas Power) <javier.olivares@ge.com>; Meseguer, Xavi (GE Gas Power) <Xavier.Meseguer@ge.com>; Talhaoui, Mohamed-Nabil (GE Gas Power) <mohamed-nabil.talhaoui@ge.com>
**Subject:** RE: Re: Nuh powerplant purchase

Hi Lance,

Can you please guide if the letter aligned with NDA w/ Americas team?

Thanks,
Ozgun

GEALTA_0016527

Alta App.000206

**From:** Indermaur, Robin (GE Gas Power) <robin.indermaur@ge.com>
**Sent:** Friday, March 20, 2020 11:42 AM
**To:** Babu, Alex (GE Gas Power) <alex.babu@ge.com>; Herrington, Lance R (GE Gas Power) <lance.herrington@ge.com>; Ozcan, Serdar (GE Gas Power) <Serdar.Ozcan@ge.com>; Queune, Olivier (GE Gas Power) <olivier.queune@ge.com>; Celdran, Fernando (GE Gas Power) <fernando.celdran@ge.com>; Gun, Ozgun (GE Gas Power) <ozgun.gun@ge.com>; Zarca, Jorge (GE Gas Power) <jorge.zarca@ge.com>; Olivares, Javier (GE Gas Power) <javier.olivares@ge.com>; Meseguer, Xavi (GE Gas Power) <Xavier.Meseguer@ge.com>; Talhaoui, Mohamed-Nabil (GE Gas Power) <mohamed-nabil.talhaoui@ge.com>
**Subject:** RE: Re: Nuh powerplant purchase

Hi all

# Privileged - Attorney/Client

Robin

**From:** Babu, Alex (GE Gas Power) <alex.babu@ge.com>
**Sent:** Thursday, 19 March 2020 20:37
**To:** Herrington, Lance R (GE Gas Power) <lance.herrington@ge.com>; Ozcan, Serdar (GE Gas Power) <Serdar.Ozcan@ge.com>; Queune, Olivier (GE Gas Power) <olivier.queune@ge.com>; Celdran, Fernando (GE Gas Power) <fernando.celdran@ge.com>; Gun, Ozgun (GE Gas Power) <ozgun.gun@ge.com>; Zarca, Jorge (GE Gas Power) <jorge.zarca@ge.com>; Olivares, Javier (GE Gas Power) <javier.olivares@ge.com>; Indermaur, Robin (GE Gas Power) <robin.indermaur@ge.com>; Meseguer, Xavi (GE Gas Power) <Xavier.Meseguer@ge.com>; Talhaoui, Mohamed-Nabil (GE Gas Power) <mohamed-nabil.talhaoui@ge.com>
**Subject:** RE: Re: Nuh powerplant purchase

# Privileged - Attorney/Client

Alex

**From:** Herrington, Lance R (GE Gas Power) <lance.herrington@ge.com>
**Sent:** Thursday, March 19, 2020 1:26 PM
**To:** Ozcan, Serdar (GE Gas Power) <Serdar.Ozcan@ge.com>; Queune, Olivier (GE Gas Power) <olivier.queune@ge.com>; Celdran, Fernando (GE Gas Power) <fernando.celdran@ge.com>; Gun, Ozgun (GE Gas Power) <ozgun.gun@ge.com>; Zarca, Jorge (GE Gas Power) <jorge.zarca@ge.com>; Babu, Alex (GE Gas Power) <alex.babu@ge.com>; Olivares, Javier (GE Gas Power) <javier.olivares@ge.com>; Indermaur, Robin (GE Gas Power) <robin.indermaur@ge.com>; Meseguer, Xavi (GE Gas Power) <Xavier.Meseguer@ge.com>; Talhaoui, Mohamed-Nabil (GE Gas Power) <mohamed-nabil.talhaoui@ge.com>
**Subject:** Re: Re: Nuh powerplant purchase

All

Just wanted to capture some notes to be sure we are all on the same page for how we will handle the termination fees for the NUH MMP. This is complex so I wanted to try to get it down in writing.

1. GE to NUH Cimento
   a. the termination for economic cause criteria does not apply in this case, since Nuh intends to sell to a 3rd party; therefore, both the on-shore and off-shore termination fees apply.
   b. GE will offer a reduction in the termination fee to $750k if in fact the unit in question is sold to Alta Power for the NAM project.
   c. If Alta Power signs a CSA with GE, then no termination fee is required to be paid to GE.

    d. If Alta does not sign a CSA with GE, then the termination fee of $750k will be paid to GE upon termination of the MMP.

2. GE to Alta Power

    a. GE is willing to reduce the termination fee for the GT serial number under MMP from $1.45M to $750K at close of the two unit project currently proposed.

    b. If Alta signs a CSA with GE, GE will include the $750k in the FFH rate of the CSA and not require payment of the termination fee at PO award.

    c. If Alta does not sign the CSA, the $750k termination amount will be paid to Nuh, and then Nuh will pay $750K to GE Europe upon termination of the MMP.

Lance Herrington
Global Sales Leader
Aero Upgrades

T+1 832 418 9788 M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

**From:** lance.herrington@ge.com
**When:** 10:00 AM - 10:30 AM March 18, 2020
**Subject:** Re: Nuh powerplant purchase
**Location:** Online Meeting

**From:** Lance Herrington <lance.herrington@ge.com>
**Date:** Tuesday, March 17, 2020 at 9:02 AM
**To:** "Ozcan, Serdar (GE Gas Power)" <Serdar.Ozcan@ge.com>, Olivier Queune <olivier.queune@ge.com>, "Celdran, Fernando (GE Gas Power)" <fernando.celdran@ge.com>, "Gun, Ozgun (GE Gas Power)" <ozgun.gun@ge.com>, "Zarca, Jorge (GE Gas Power)" <jorge.zarca@ge.com>
**Cc:** Alex Babu <alex.babu@ge.com>
**Subject:** Re: Nuh powerplant purchase

All

As we have discussed previously, this termination fee is going to be added onto the purchase of those units with the NAM TRUEpackage customer, effectively rendering the project not economically feasible. This effectively terminates the project in NAM and over AEO of CM for GE. I think we need to meet and discuss levels of concession based on Alta's 1) closure of the TRUEpackage deal w/o CSA $750k termination fee waived or 2) closure of TRUEpackage deal with CSA $1M termination fee waived. Also losing this project to GE puts it at risk for competition to gain these units and use them on other projects. I have added Alex Babu the NAM sales manager to this chain.

Lance Herrington
Global Sales Leader
Aero Upgrades

T+1 832 418 9788 M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

GE CONFIDENTIAL

**From:** "Ozcan, Serdar (GE Gas Power)" <Serdar.Ozcan@ge.com>
**Date:** Tuesday, March 17, 2020 at 7:39 AM
**To:** Lance Herrington <lance.herrington@ge.com>, Olivier Queune <olivier.queune@ge.com>, "Celdran, Fernando (GE Gas Power)" <fernando.celdran@ge.com>, "Gun, Ozgun (GE Gas Power)" <ozgun.gun@ge.com>, "Zarca, Jorge (GE Gas Power)" <jorge.zarca@ge.com>
**Subject:** RE: Nuh powerplant purchase

$1M is for offshore, $450K is for onshore, total $1,45M.

Regards,
Serdar

**From:** Herrington, Lance R (GE Gas Power) <lance.herrington@ge.com>
**Sent:** Monday, March 16, 2020 5:18 PM
**To:** Ozcan, Serdar (GE Gas Power) <Serdar.Ozcan@ge.com>; Queune, Olivier (GE Gas Power) <olivier.queune@ge.com>; Celdran, Fernando (GE Gas Power) <fernando.celdran@ge.com>; Gun, Ozgun (GE Gas Power) <ozgun.gun@ge.com>; Zarca, Jorge (GE Gas Power) <jorge.zarca@ge.com>
**Subject:** Re: Nuh powerplant purchase

Based on this position, what will the termination amounts be? Considering the language used in the contracts:





**Lance Herrington**
Global Sales Leader
Aero Upgrades

GE CONFIDENTIAL

T+1 832 418 9788 M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

---

**From:** "Ozcan, Serdar (GE Gas Power)" <Serdar.Ozcan@ge.com>
**Date:** Wednesday, March 11, 2020 at 3:12 PM
**To:** Lance Herrington <lance.herrington@ge.com>, Olivier Queune <olivier.queune@ge.com>, "Celdran, Fernando (GE Gas Power)" <fernando.celdran@ge.com>, "Gun, Ozgun (GE Gas Power)" <ozgun.gun@ge.com>, "Zarca, Jorge (GE Gas Power)" <jorge.zarca@ge.com>
**Subject:** RE: Nuh powerplant purchase

Lance,

As yesterday we have received attached letter from customer and will be discussed on skype meeting by tomorrow.

Best regards,
Serdar Ozcan

**From:** Herrington, Lance R (GE Gas Power) <lance.herrington@ge.com>
**Sent:** Wednesday, March 11, 2020 11:05 PM
**To:** Queune, Olivier (GE Gas Power) <olivier.queune@ge.com>; Celdran, Fernando (GE Gas Power) <fernando.celdran@ge.com>; Gun, Ozgun (GE Gas Power) <ozgun.gun@ge.com>; Zarca, Jorge (GE Gas Power) <jorge.zarca@ge.com>; Ozcan, Serdar (GE Gas Power) <Serdar.Ozcan@ge.com>
**Subject:** Re: Nuh powerplant purchase

Team – have we gotten to any answers yet on this matter?

**Lance Herrington**
Global Sales Leader
Aero Upgrades

T+1 832 418 9788 M+1 832 418 9788

E: lance.herrington@ge.com
LinkedIn: http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades...

---

**From:** olivier.queune@ge.com
**When:** 8:30 AM - 9:00 AM March 9, 2020
**Subject:** Nuh powerplant purchase
**Location:** Online Meeting

Lance,
I wanted to speak to you about the purchase of Nuh power plant.
I hope you can make that call.
Thank you
oQ

GE CONFIDENTIAL

GEALTA_0016531

Alta App.000210

Please forward to whoever needs to join.

........................................................................................................

## Join online meeting

Trouble Joining? <u>Try Skype Web App</u>

**Join by Phone**
+33 170995416,, 609921911#
<u>Find a local number</u>

Conference ID: 609921911

<u>Forgot your dial-in PIN?</u> | <u>First online meeting?</u> | <u>Help</u> | <u>Legal</u>



........................................................................................................


........................................................................................................

## Join online meeting

**Join by Phone**
+14692081502,,479998306# (Dial-in Number)      English (United States)
+18667999419,,479998306# (Dial-in Number)      English (United States)

<u>Find a local number</u>

Conference ID: 479998306

<u>Forgot your dial-in PIN?</u> | <u>Help</u> | <u>Legal</u>

........................................................................................................

GE CONFIDENTIAL

# Exhibit 38

Alta App.000212



# TRUEpackage*

* A trademark of the General Electric Company

Lance Herrington, Global Sales Leader – Aero Upgrades

October 2019



EXHIBIT

170

GE CONFIDENTIAL - ATTORNEYS EYES ONLY



Alta App.000214

GEALTA_0028838



GE CONFIDENTIAL - ATTORNEYS EYES ONLY

GEALTA_0028839



GE CONFIDENTIAL - ATTORNEYS EYES ONLY



GE CONFIDENTIAL - ATTORNEYS EYES ONLY

Alta App.000217

GEALTA_0028841



**Alta App.000218**

GEALTA_0028842



Add new unit repowers to list?



GE CONFIDENTIAL - ATTORNEYS EYES ONLY

GEALTA_0028844



Typical Contractual Structures
Option 1 (Preferred)
Limited to typical GE scope, CM ~18-20%
Lender
Fuel Supply
Offtaker
Financing & Security Agreements
Fuel Supply Agreements
PPA/Tolling Agreements
Customer
EPC
GE
Lowest GE Risk / Highest CM
Generally most costly to customer due to multiple mark-ups…more like typical upgrades projects
Option 2
Limited to typical GE scope, CM ~18-20%
Lender
Fuel Supply
Offtaker
Financing & Security Agreements
Fuel Supply Agreements
PPA/Tolling Agreements
Customer
EPC
GE
Shared Risk / CM similar to opt 1
Customer saves additional mark-up of GE content through EPC.
Customer takes on more risk.
Requires more collaboration among customer, EPC, and GE to ensure project success…need robust proj mgmt
Option 3
Scope incl. GE, BOP, Civil, CM ~10-12%
Lender
Fuel Supply
Offtaker
Financing & Security Agreements
Fuel Supply Agreements
PPA/Tolling Agreements
Customer
GE
EPC
Highest GE Risk / Lowest CM
GE takes risk on EPC performance to contract, risk of margin erosion if not managed well, low GE margins due to low mark-up on EPC price
Edit Presentation Title in [Insert Tab > Header & Footer] [DateTime]
Placeholder confidentiality disclosure. Edit or delete from master slide if not needed.
9

# Contract Considerations

Although price is first consideration with respect to meeting the customers payback hurdles…finance managers and lenders will look at other risk factors affecting "bankability" of a project

**What customer's finance mgrs / Lenders want…**

- A fixed completion date
- A fixed completion price
- No or limited technology risk
- Output guarantees
- Heat rate guarantees
- Liquidated damages for performance / schedule
- Large/No caps on liability
- Restrictions on the ability of the supplier to claim extensions of time and additional costs



**What GE will typically offer…**

- A scheduled shipment date for major equipment
- A fixed price for a fixed/defined scope . TDI services at Time & Material Rate, shipping at cost + 10%
- Limited technology risk based on proven technology
- Output guarantees
- Heat rate guarantees
- Liquidated damages (LDs) for performance / schedule
- LDs caps
  - Typically up to 10% of contract value for delays with a demonstrated impact on schedule
  - $ / kw LDs up to 10% of contract value for output
  - $ / mmbtu of Heat Rate up to 10% of contract value
  - Emissions are make rate guarantee w/cure period
  - Aggregate NTE 10% of contract value
- Clearly defined excusable delays and typical force majeure, etc.

 Edit Presentation Title In [Insert Tab > Header & Footer] [DateTime]    Placeholder confidentiality disclosure. Edit or delete from master slide if not needed.    10

GE CONFIDENTIAL - ATTORNEYS EYES ONLY

Alta App.000222

GEALTA_0028846

## Aero TRUEpackage* Commercial Pipeline

*A trademark of the General Electric Company



| Orders Pipeline | 2018 | 2019 | 2020 | 2021 | 2022 | TtI |
|---|---|---|---|---|---|---|
| Won | $23.0 | $2.5 | $0.0 | $0.0 | $0.0 | $25.5 |
| Active | $0.0 | $18.0 | $0.0 | $0.0 | $0.0 | $18.0 |
| Pipeline | $0.0 | $75.0 | $221.8 | $21.0 | $0.0 | $317.8 |
| TtI | $23.0 | $95.5 | $221.8 | $21.0 | $0.0 | $361.3 |

### Key opportunities currently pacing...
(Rev ID - Opptly Name,Exp. Order Date, Rev $)
1335991 - Alta Power - Site #1, 11/15/2019, $6.8M
1495633 - Alta Power - Site #2, 11/29/2019, $11.2M

| CM Pipeline | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| Backlog (1) | $0 | $3 | $1 | $0 | $0 |
| Opportunities (6) | $0 | $0 | $5 | $0 | $0 |
| Pipeline (28) | $0 | $0 | $17 | $57 | $5 |
|  | $0 | $3 | $22 | $57 | $5 |

### Unit Count

| | | | | | |
|---|---|---|---|---|---|
| Backlog | 1 | 0 | 0 | 0 | 0 |
| Opportunities | 0 | 6 | 0 | 0 | 0 |
| Pipeline | 0 | 0 | 17 | 11 | 0 |
|  | 1 | 6 | 17 | 11 | 0 |

Edit Presentation Title in [Insert Tab > Header & Footer]  [DateTime]

Placeholder confidentiality disclosure. Edit or delete from master slide if not needed.

11

Alta App.000223

GEALTA_0028847



GE CONFIDENTIAL - ATTORNEYS EYES ONLY

# Exhibit 39

Alta App.000225

EXHIBIT

171

Message

| | |
|---|---|
| **From:** | Canon, James T (GE Power) [james.canon@ge.com] |
| **Sent:** | 5/10/2018 3:36:30 PM |
| **To:** | Lydon, Christopher P (GE Power) [christopher.lydon@ge.com]; Herrington, Lance R (GE Power) [lance.herrington@ge.com]; Babu, Alex (GE Power) [alex.babu@ge.com]; Yancy, Clayton2 (GE Power) [clayton2.yancy@ge.com]; Hill, Daniel D (GE Power) [daniel.hill@ge.com]; Tremblay, Mike J (GE Power) [mike.tremblay@ge.com] |
| **Subject:** | RE: Deal at risk: IP Project Execution |

Guys — just to be clear.    Wattstock CAN get a bank guarantee.    ==The issue is the money that it will cost them to secure that guarantee.==    Wattstock is just as tight as us on margin for this project, at less than 10%.    If we want to pay for them to get a bank guarantee (~$17 – 18K), then I'm sure they would accept it.    For the same reason (margin), they can't afford the "early payment" discount that we like to force on our vendors if we pay "early."    Wattstock is more of a "partner" than a typical vendor.    We need to find a way to be back-to-back with them on a payment terms, so that when we get paid by IP we in turn pay Wattstock.

---

**From:** Lydon, Christopher P (GE Power)
**Sent:** Thursday, May 10, 2018 11:58 AM
**To:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>; Babu, Alex (GE Power) <alex.babu@ge.com>; Yancy, Clayton2 (GE Power) <clayton2.yancy@ge.com>; Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Subject:** RE: Deal at risk: IP Project Execution

That would be great, we just need a bit of flexibility on their end.    We all want it to happen.    Tough spot for all with the clock ticking...chris

*Chris Lydon*
PMO Director Aero
M:678-362-2378

---

**From:** Herrington, Lance R (GE Power)
**Sent:** Thursday, May 10, 2018 2:56 PM
**To:** Lydon, Christopher P (GE Power) <christopher.lydon@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>; Babu, Alex (GE Power) <alex.babu@ge.com>; Yancy, Clayton2 (GE Power) <clayton2.yancy@ge.com>; Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Subject:** RE: Deal at risk: IP Project Execution

Thanks Chris.    I spoke with Jay he is thinking ways WattStock can help to mitigate risk/concerns to us before the call.

**Lance Herrington**
Product Line Leader
Aero Conversions, Modifications, and Uprades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

Start here to find the right upgrades...

GEALTA_0045186

Alta App.000226

**From:** Lydon, Christopher P (GE Power)
**Sent:** Thursday, May 10, 2018 1:48 PM
**To:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>;
Babu, Alex (GE Power) <alex.babu@ge.com>; Yancy, Clayton2 (GE Power) <clayton2.yancy@ge.com>; Hill, Daniel D (GE
Power) <daniel.hill@ge.com>; Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Subject:** RE: Deal at risk: IP Project Execution

I think those are the types of options we should explore and have sourcing review and approve as we need their
concurrence.

We are lower risk as we pay 500k and IP has agreed to pay  us 700k so we are not out cash and we are positive.
We'll be slightly negative as for a few days as we have 14 day payment terms with WS and IP but we'll invoice a bit
later (Daniel should have invoice out to IP).

Most vendors we pay 90 days after work is completed so paying WS prior to services is a drastic difference in how we
typically operate, especially today.

Maybe taking title transfer would help that.

*Chris Lydon*
PMO Director Aero
M:678-362-2378

**From:** Herrington, Lance R (GE Power)
**Sent:** Thursday, May 10, 2018 2:39 PM
**To:** Lydon, Christopher P (GE Power) <christopher.lydon@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>;
Babu, Alex (GE Power) <alex.babu@ge.com>; Yancy, Clayton2 (GE Power) <clayton2.yancy@ge.com>; Hill, Daniel D (GE
Power) <daniel.hill@ge.com>; Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Subject:** RE: Deal at risk: IP Project Execution

What if we required title transfer of the LM5000 package to us after their purchase and removal from Greeley?    At
least then we would have a tangible piece of equipment.

Lance Herrington
Product Line Leader
Aero Conversions, Modifications, and Uprades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

Start here to find the right upgrades...

**From:** Lydon, Christopher P (GE Power)
**Sent:** Thursday, May 10, 2018 1:36 PM
**To:** Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>;
Babu, Alex (GE Power) <alex.babu@ge.com>; Yancy, Clayton2 (GE Power) <clayton2.yancy@ge.com>; Hill, Daniel D (GE
Power) <daniel.hill@ge.com>; Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Subject:** RE: Deal at risk: IP Project Execution

Alta App.000227

GEALTA_9045187

The risk, as I understand it, is if wattstock was to use the money for some other purpose or not fulfill their scope and / or was not financial sound (ie. Per the know your customer process) then we could be stuck in the deal and be in default with IP.   We effectively have not received any services for the 500k.

I too see the risk as low but these are the sourcing process that are laid out for us.

chris

*Chris Lydon*
PMO Director Aero
M:678-362-2378

_____

**From:** Herrington, Lance R (GE Power)
**Sent:** Thursday, May 10, 2018 2:21 PM
**To:** Lydon, Christopher P (GE Power) <christopher.lydon@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>; Babu, Alex (GE Power) <alex.babu@ge.com>; Yancy, Clayton2 (GE Power) <clayton2.yancy@ge.com>; Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Subject:** RE: Deal at risk: IP Project Execution

Chris – maybe it would help the team here to understand the why behind needing a bank guarantee or LOC, or tax statements?   What is the specific concern or risk to GE for issuing payment to WattStock without those securities?

Lance Herrington
Product Line Leader
Aero Conversions, Modifications, and Uprades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

Start here to find the right upgrades...

_____

**From:** Lydon, Christopher P (GE Power)
**Sent:** Thursday, May 10, 2018 1:09 PM
**To:** Canon, James T (GE Power) <james.canon@ge.com>; Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Babu, Alex (GE Power) <alex.babu@ge.com>; Yancy, Clayton2 (GE Power) <clayton2.yancy@ge.com>; Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Subject:** Deal at risk: IP Project Execution
**Importance:** High

Really need all the GE people on the deal.   This project is heading south quickly.

Wattstock has told us they can't get a bank guarantee or a LOC and they seem to be pushing back on tax statements and pushing GE to follow the existing contract.

GE's processes don't allow for advance payment without services so on this call with wattstock we'll need to see if we can find a path forward or if we are prepared to walk away from the deal.

Mike,   do we need anyone else in the Advance payment approval process on this call?

Chris

*Chris Lydon*
PMO Director Aero
M:678-362-2378

-----Original Appointment-----
**From:** Canon, James T (GE Power)
**Sent:** Wednesday, May 09, 2018 9:48 AM
**To:** Canon, James T (GE Power); Herrington, Lance R (GE Power); Babu, Alex (GE Power); Yancy, Clayton2 (GE Power); Hill, Daniel D (GE Power); j.manning@wattstock.com
**Cc:** Lydon, Christopher P (GE Power)
**Subject:** IP Project Execution
**When:** Thursday, May 10, 2018 2:00 PM-3:00 PM (UTC-08:00) Pacific Time (US & Canada).
**Where:** Skype Meeting; +1 (866) 799-9419,,,1307496


All – need to push to tomorrow to fit schedules.


All,

I talked with Richard at IP this morning about their concerns and expectations for the management of this project. Please see the attached email.    I'd like to go over these points tomorrow.

Rgds,
Jim

  << Message: EXT: Mansfield GTG    >>

→ Join Skype Meeting

Trouble Joining? Try Skype Web App

## Join by phone

Toll-free number: +1 (866) 799-9419, access code: 1307496 (Dial-in Number)          English (United States)
Toll number:        +1 (860) 785-9628, access code: 1307496 (Dial-in Number)          English (United States)

Find a local number

Conference ID: 1307496 (same as access code above)
Forgot your dial-in PIN? | Help | Legal

 GE-ALTA_0045189

# Exhibit 40

Alta App.000230

Message
_____

**From:**     Herrington, Lance R (GE Power) [lance.herrington@ge.com]
**Sent:**     5/11/2018 9:00:54 AM
**To:**        Tremblay, Mike J (GE Power) [mike.tremblay@ge.com]; Hill, Daniel D (GE Power) [daniel.hill@ge.com]; Mosher, Paul
              (GE Power) [paul.mosher@ge.com]; Lydon, Christopher P (GE Power) [christopher.lydon@ge.com]; Canon, James T
              (GE Power) [james.canon@ge.com]; Babu, Alex (GE Power) [alex.babu@ge.com]; Szalay, Ferenc (GE Power)
              [ferenc.szalay@ge.com]; Lopez-perez, Daniel (GE Power) [Daniel.Lopezperez@ge.com]; Lubert, Ann Marie (GE
              Power) [AnnMarieLubert@ge.com]; Kerkemeyer, Amanda (GE Power) [Amanda.Kerkemeyer@ge.com]
**Subject:**   RE: WattStock Advance Payment


All

I am afraid we will need to finalize something today, and get some checks to WattStock by Monday.  The unit that is
being purchased needs to start disassembly and be paid for by 5/15 or the owner incurs a $500k fine which will in turn
be passed on to GE, which will negatively impact already thin margins.  This is our launch Aero TRUEpackage project
that show the market that we are serious in this space and can perform like no other 3rd Party.  This is also very strategic
in that a 3rd party provider has successfully installed 22 refurb packages of ours without our involvement and have also
secured O&M contracts on those units effectively taking service annuity away from GE.

How I see the situation is...our end customer has paid us a $700k non-refundable down-payment to begin engineering,
schedule development, etc.  There is no risk of any breach of contract with our end customer, therefore,  no risk that GE
will not get paid by the end customer, who also has net 14 day terms on payment to GE.  WattStock is in the process of
finalizing (signature next week) a long term lease for Building G, and Building A2 at Jport to do the package refurb work
on this project and other opportunities that are being worked now, and is under a MOU establishing them as THE Aero
TRUEpackage partner....the MOU will most likely lead to a more exclusive arrangement as this program develops out
further this year.  They are in this as a partner with us.  There is no financial benefit for them to not perform on this
being the first project.  I see that there is little risk of failure to perform by WattStock.

**Lance Herrington**
Product Line Leader
Aero Conversions, Modifications, and Uprades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9786

Start here to find the right upgrades...

**From:** Tremblay, Mike J (GE Power)
**Sent:** Friday, May 11, 2018 6:27 AM
**To:** Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Mosher, Paul (GE Power) <paul.mosher@ge.com>; Lydon,
Christopher P (GE Power) <christopher.lydon@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>;
Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Babu, Alex (GE Power) <alex.babu@ge.com>; Szalay,
Ferenc (GE Power) <ferenc.szalay@ge.com>; Lopez-perez, Daniel (GE Power) <Daniel.Lopezperez@ge.com>; Lubert, Ann
Marie (GE Power) <AnnMarieLubert@ge.com>; Kerkemeyer, Amanda (GE Power) <Amanda.Kerkemeyer@ge.com>
**Subject:** RE: WattStock Advance Payment

Dan / All
Here is an alternate proposal.  I know Wattstock wants the entire amount at once but I can't understand why they need
it all in 10 days.

Proposal
Amend GE PO to Wattstock  to add below verbiage (yellow)

Line 1 – Disassembly, crating and cleanup of

Site  50% payable upon mobilization at site

**Line 2** Shipping non-permit and super loads
50% payable upon receipt of permits

**Line 3** Purchase LM5000 package less engine
Payable upon title transfer to GE

With Leadership concurrence, we can also apply for "Immediate Pay" of any of the invoices, once received in the system.

The above would provide Wattstock with immediate funding of $325k, while also allowing GE maintain ownership of some tangible goods.   The above would technically not require the Advance pay workflow.

Please provide feedback as to whether this would be feasible to both Wttstock and GE

**Mike Tremblay**
Sourcing Leader
GE- Power Services – Global Repair Solutions
Office  864 254 4638
Mobile 603-817-9397
Mike.Tremblay@ge.com

<center>Message and Content are **Non-Public Information**</center>

-----Original Appointment-----
**From:** Hill, Daniel D (GE Power)
**Sent:** Thursday, May 10, 2018 6:15 PM
**To:** Hill, Daniel D (GE Power); Tremblay, Mike J (GE Power); Mosher, Paul (GE Power); Lydon, Christopher P (GE Power); Canon, James T (GE Power); Herrington, Lance R (GE Power); Babu, Alex (GE Power); Szalay, Ferenc (GE Power); Lopez-perez, Daniel (GE Power); Lubert, Ann Marie (GE Power); Kerkemeyer, Amanda (GE Power)
**Subject:** WattStock Advance Payment
**When:** Friday, May 11, 2018 12:30 PM-1:00 PM (UTC-06:00) Central Time (US & Canada).
**Where:** Skype Meeting

Team,
        Let's meet to review the WattStock advance payment.

Update for 5/10/18:
Meeting between GE and our partner WattStock held today to discuss several project actions. Of interest to this meeting;

• 	GE requested WattStock to add title transfer terms to the contract. "Title Transfer of equipment to GE, ex-works site in Colorado. WattStock to retain transportation and insurance responsibility to GE

GEALTA 0045146

Alta App.000232

Jacintoport. ETA of TT is June 1st. Addition of these TT terms should mitigate advance payment risk for GE.
- WattStock noted it would cost @17~18k to for a bank guarantee or letter of credit. At this point, neither GE or WattStock has the margin to cover this cost so early in this project stage. GE/WattStock is using the 500k to secure equipment in Colorado to proceed with a @25mm contact with IP. IP PO estimated mid-July
- Noted, Agreed contract between International Paper and GE is for Engineering and Outage schedule only. No material deliverable are required under the contract/PO. Minimal to no risk for GE collecting 750K cash within the next 14days per PO terms.
- 500k advance payment to our partner, WattStock, will be covered with by the 750k advance from IP.
- 500K advance to WattStock due by Friday May 18th to keep the project on schedule and to minimize used equipment price escalation of @500k.

**FYI,... WattStock is a partner company with GE to purchase used LM units/equipment, restore and to resell as GE refurbished equipment. WattStock is in the process of signing a two year lease agreement deal for office and manufacturing space at the GE Jacintoport Facility.**


DDH



**From:** Quinney, Candis (GE Power)
**Sent:** Thursday, May 10, 2018 10:44 AM
**To:** Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>; Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Kerkemeyer, Amanda (GE Power) <Amanda.Kerkemeyer@ge.com>; Lubert, Ann Marie (GE Power) <AnnMarieLubert@ge.com>
**Cc:** Mosher, Paul (GE Power) <paul.mosher@ge.com>; Lydon, Christopher P (GE Power) <christopher.lydon@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>; Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Babu, Alex (GE Power) <alex.babu@ge.com>; Szalay, Ferenc (GE Power) <ferenc.szalay@ge.com>; Lopez-perez, Daniel (GE Power) <Daniel.Lopezperez@ge.com>
**Subject:** RE: GE Purchase Order 425230140 dated May 4, 2018 to WATTSTOCK LLC

Adding Ferenc and Danny to the discussion as the supplier advances approval from finance is being centralized and should go through Danny and Ferenc cc'd.

Thanks
Candis

**From:** Tremblay, Mike J (GE Power)
**Sent:** Thursday, May 10, 2018 11:15 AM
**To:** Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Quinney, Candis (GE Power) <Candis.Quinney@ge.com>; Kerkemeyer, Amanda (GE Power) <Amanda.Kerkemeyer@ge.com>; Lubert, Ann Marie (GE Power) <AnnMarieLubert@ge.com>
**Cc:** Mosher, Paul (GE Power) <paul.mosher@ge.com>; Lydon, Christopher P (GE Power) <christopher.lydon@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>; Herrington, Lance R (GE Power) <lance.herrington@ge.com>;

Alta App.000233    GEALTA_0045147

Babu, Alex (GE Power) <alex.babu@ge.com>
**Subject:** RE: GE Purchase Order 425230140 dated May 4, 2018 to WATTSTOCK LLC

Candis / Amanda
What are our options to provide an advance to a Supplier that cannot obtain a security?

Candis -this is the Supplier / deal that I provided the heads up to yesterday.   They need $.5M of funding to secure material and services to complete the Purchase Order.

**Mike Tremblay**
Sourcing Leader
GE- Power Services – Global Repair Solutions
Office  864 254 4638
Mobile 603-817-9397
Mike.Tremblay@ge.com

Message and Content are **Non-Public Information**

**From:** Hill, Daniel D (GE Power)
**Sent:** Thursday, May 10, 2018 10:51 AM
**To:** Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>
**Cc:** Mosher, Paul (GE Power) <paul.mosher@ge.com>; Lydon, Christopher P (GE Power) <christopher.lydon@ge.com>;
Canon, James T (GE Power) <james.canon@ge.com>; Herrington, Lance R (GE Power) <lance.herrington@ge.com>;
Babu, Alex (GE Power) <alex.babu@ge.com>
**Subject:** RE: GE Purchase Order 425230140 dated May 4, 2018 to WATTSTOCK LLC
**Importance:** High

Mike,
        From the attached response, it seems Wattstock is unable to provide a LOC or bank guarantee. What is our next step internally to get this advance payment approved, without having a LOC or BG?

DDH

**From:** Hill, Daniel D (GE Power)
**Sent:** Wednesday, May 9, 2018 4:19 PM
**To:** Tremblay, Mike J (GE Power) <mike.tremblay@ge.com>; Quinney, Candis (GE Power) <Candis.Quinney@ge.com>;
**Cc:** Mosher, Paul (GE Power) <paul.mosher@ge.com>; Lydon, Christopher P (GE Power) <christopher.lydon@ge.com>;
Lubert, Ann Marie (GE Power) <AnnMarieLubert@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>
**Subject:** RE: GE Purchase Order 425230140 dated May 4, 2018 to WATTSTOCK LLC

Team,
        In addition to the below advance payment to our sub-contractor, WattStoct.
• 	Our end customer, **International Paper**, has given GE an advance PO for 750K on 14day payment terms (see bullet 5 below).
• 	GE will issue the invoice tomorrow to collect the 750K from IP.

Alta App. 000234

GEALTA_0045148

- This 750k cash would then offset the 500k advance to WattStock for the pre-prelease purchase of 2ea de-commissioned LM5000 units and transportation from Colorado to the GE Jacintoport Facility.
- If packages are not removed from the Colorado site by June 1st, 2017, LD's apply.
- This is a 25mm opportunity for the CMU business.

**Pricing Summary from the International Paper/GE Contract.**

| Group Name | Total Cycle (weeks) | Price $USD |
|---|---|---|
| STANDARD SCOPE | | |
| Frame 5 to LM6000 Repower | 48 | $25,729,790* |
| OPTIONAL SCOPE | | |
| Option 1 – Super Polished Compressor Blades | | $421,300 |
| Option 2 – 60 Day Technical Advisory Continued Support | | $159,900 |
| Option 3 – Additional On-Site Training | | $75,000 |

*The above price is in 2019 US Dollars, and does not include applicable sales, excise, value added, use or similar taxes.*

## 4.2 Proposal Basis

1. The proposal and price quoted is valid until July 18, 2018.
2. Cycle time will be confirmed upon receipt of an order.
3. Price quoted is per the Terms and Conditions and Division of Responsibility (DOR) stated herein. The offering quoted price is based on the Scope of Supply in Section 2.
4. Parts and Services are subject to prior sale.
5. [*] Pricing assumes that Buyer has executed a Purchase Order for GE Proposal 1308058 R0 for Engineering and Schedule Support in the amount of $750,000 USD.

Thanks,

**Daniel Hill**
**GE Energy**
CM&U Project Manager
c: 281-382-9630

**From:** Tremblay, Mike J (GE Power)
**Sent:** Wednesday, May 9, 2018 3:51 PM
**To:** Quinney, Candis (GE Power) <Candis.Quinney@ge.com>
**Cc:** Mosher, Paul (GE Power) <paul.mosher@ge.com>; Hill, Daniel D (GE Power) <daniel.hill@ge.com>; Lydon, Christopher P (GE Power) <christopher.lydon@ge.com>; Lubert, Ann Marie (GE Power) <AnnMarieLubert@ge.com>
**Subject:** FW: GE Purchase Order 425230140 dated May 4, 2018 to WATTSTOCK LLC

Candis
Early heads up that we are in the process of initiating an Advanced Payment request for The Aero Services CM&U business to complete a re-power deal.

I have advised the Project team that we will need a Bank LOC, as well as some financial rating information from the Supplier.   They are in the process of attaining that and will complete the workflow accordingly.

Note this payment of $500k needs to be made to the Supplier within 12 days of today to avoid significant LD's.

Please take a look and elevate, as necessary to advise what other information / items will be needed.

**Mike Tremblay**
Sourcing Leader
GE- Power Services – Global Repair Solutions
Office  864 254 4638
Mobile 603-817-9397
Mike.Tremblay@ge.com

....................................................................

→ Join Skype Meeting

Trouble Joining? Try Skype Web App

### Join by phone

Toll-free number: +1 (866) 799-9419, access code: 8514309 (Dial-in Number)        English (United States)
Toll number:        +1 (469) 208-1502, access code: 8514309 (Dial-in Number)        English (United States)

Find a local number

Conference ID: 8514309 (same as access code above)
Forgot your dial-in PIN? | Help | Legal

HAVING TROUBLE WITH SKYPE?
GE Employees and Contractors are encouraged to try the following:
- Use a Bluetooth or plug-in headset
- **Don't have a headset?** When joining from your computer, select 'Call me at' and enter your landline or mobile device number
- When joining from mobile, use 'call back' within the Skype for Business mobile app - click the ellipses button and choose 'call me back'
- If entering the meeting though SpeedTCON, choose the 'phone' option to call directly into the meeting using the conference line

....................................................................

# Exhibit 41

Alta App.000237

Appointment

| | |
|---|---|
| **From**: | Herrington, Lance R (GE Power) [lance.herrington@ge.com] |
| **Sent**: | 9/13/2018 10:28:14 AM |
| **To**: | Janson, Mark A (GE Power) [Mark.Janson@ge.com]; Cunningham, Erik S (GE Power) [erik.cunningham@ge.com]; Aranas, Cherrylyn (GE Power) [cherrylyn.aranas@ge.com] |

| | |
|---|---|
| **Subject**: | Discuss Strategy Re: I discussed Controls for LS Power with Mark Spencer |
| **Location**: | Online Meeting |

| | |
|---|---|
| **Start**: | 9/14/2018 2:30:00 PM |
| **End**: | 9/14/2018 3:00:00 PM |
| **Show Time As**: | Tentative |

| | |
|---|---|
| **Recurrence**: | (none) |

| | |
|---|---|
| **Required Attendees**: | Janson, Mark A (GE Power); Cunningham, Erik S (GE Power); Aranas, Cherrylyn (GE Power) |

Mark – I would like to have a strategy discussion to determine the course of action prior to the call with LS Power.  I am very much interested in supporting what you think we need to do for your customer. I still want to get to the elements I talked to in my email below...but if you feel like this is an important GE account AND you feel that winning the controls is key, then let's do the right thing for GE and for the customer.  By the way I think winning on LS Power controls against Ethos is a key factor that we want to try to make happen. Similar to how we are trying to win against Pro E with TRUEpackage.

## Join online meeting

Trouble Joining? Try Skype Web App

## Join by Phone
+1 (866) 799-9419,, 59647148#
+1 (469) 208-1502,, 59647148#
Find a local number

Conference ID: 59647148

Forgot your dial-in PIN? | First online meeting? | Help | Legal





**From:** Mark Janson <Mark.Janson@ge.com>
**Date:** Thursday, September 13, 2018 at 9:21 AM
**To:** Lance Herrington <lance.herrington@ge.com>, James Canon <james.canon@ge.com>, "Kaplan, Hannah (GE Power)" <hannah.kaplan@ge.com>, Douglas Byrd <doug.byrd@ge.com>

Alta App.000238

**Cc:** Gaurav Tyagi <gaurav.tyagi@ge.com>, "Cunningham, Erik S (GE Power)" <erik.cunningham@ge.com>, "Aranas, Cherrylyn (GE Power)" <cherrylyn.aranas@ge.com>, "Munisteri, Anthony (GE Power)" <anthony.munisteri@ge.com>, Marc Devereaux <marc.devereaux@ge.com>, "Welsch, Michael(GE Power)" <Michael.Welsch@ge.com>, Derrell Fulmer <Griffin.Fulmer@ge.com>
**Subject:** RE: I discussed Controls for LS Power with Mark Spencer

Thanks all

Please let me know when ready to set up the call and who will be on

Thanks
mark

**From:** Herrington, Lance R (GE Power)
**Sent:** Tuesday, September 11, 2018 9:32 AM
**To:** Janson, Mark A (GE Power) <Mark.Janson@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>; Kaplan, Hannah (GE Power) <hannah.kaplan@ge.com>; Byrd, Doug (GE Power) <doug.byrd@ge.com>
**Cc:** Tyagi, Gaurav (GE Power) <gaurav.tyagi@ge.com>; Cunningham, Erik S (GE Power) <erik.cunningham@ge.com>; Aranas, Cherrylyn (GE Power) <cherrylyn.aranas@ge.com>; Munisteri, Anthony (GE Power) <anthony.munisteri@ge.com>; Devereaux, Marc (GE Power) <marc.devereaux@ge.com>; Welsch, Michael(GE Power) <Michael.Welsch@ge.com>; Fulmer, Griffin (GE Power) <Griffin.Fulmer@ge.com>
**Subject:** Re: I discussed Controls for LS Power with Mark Spencer

+Doug Byrd

Mark - thanks for the follow-up with LS Power, definitely seems like LS Power is far from partnering….

@Douglas Byrd – is there a way that we could put some information together that talks about the risks if peak performance is done wrong?  We probably need to be pretty specific without giving away the crown jewels, i.e. stall margin issues, hardware design limit issues because of speed, pressures, or cooling, etc.  I wouldn't focus so much on the life aspect as it seems they do not care as much about that.

Additionally, I am trying to remember if we did a disclosure on this function for patent or copy right?  Finally, I think we need to tie off with Frank Landgraff and the IP legal team…specifically I want to talk about Ethos control software including functions like SPRINT and a claim to EFS, and now a version of peak performance, those are very specific functions in the software beyond just GT fuel/air management that could not be duplicated through a textbook or "industry standard"….I think we need to find a path to a firm stand on protecting IP and the "me too" claims from 3rd party suppliers.

Lance Herrington
Global Sales Leader
Aero Conversions, Modifications  and Upgrades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

E  lance.herrington@ge.com
LinkedIn  http://www.linkedin.com/in/LanceRHerrington

Start here to find the right upgrades….

**Alta App.000239**

GEALTA_0022365

**From:** Mark Janson <Mark.Janson@ge.com>
**Date:** Monday, September 10, 2018 at 1:37 PM
**To:** Lance Herrington <lance.herrington@ge.com>, James Canon <james.canon@ge.com>, "Kaplan, Hannah (GE Power)" <hannah.kaplan@ge.com>
**Cc:** Gaurav Tyagi <gaurav.tyagi@ge.com>, "Cunningham, Erik S (GE Power)" <erik.cunningham@ge.com>, "Aranas, Cherrylyn (GE Power)" <cherrylyn.aranas@ge.com>, "Munisteri, Anthony (GE Power)" <anthony.munisteri@ge.com>, Marc Devereaux <marc.devereaux@ge.com>, "Welsch, Michael(GE Power)" <Michael.Welsch@ge.com>, Derrell Fulmer <Griffin.Fulmer@ge.com>
**Subject:** I discussed Controls for LS Power with Mark Spencer

All

Mark Spencer (LS Power employee) who is the Asset Manager for Wallingford


Highlights of Call
- Nate Chubet – Ethos Plant manager owns the budget  so there is no way LS Power will withhold the numbers from Nate.  I am not sure they would agree to withhold info ether as he said there is a fire wall in Ethos as in GE between Nate and Clark Weaver of Ethos Controls
- Doesn't think LS Power will look at anything but Price
- I can set up a call with Mark – **who from GE should be on the call?**
  - He believes they will be a bit skeptic of our info "as we have skin in the game"
  - He mentioned a recent Issue with BHGE at Ocean State Power ( 7EA) Mark Vie upgrade by BHGE that had issued but he didn't get into any details
- Peak Performance
  - He said the price of Power had to be greater than $300/MW-hr for them to bid PP into the market
    - He believes this would be 1/10 % of the time
  - He said he really is not that concerned with the affects to the engine as they will run 1 time per year for the capacity test and just collect capacity dollars
    - They would bid in the normal LM6000PC output into the market and but a large adder on 4-5 MWs provided by PP to prevent from being picked up
- He said we are so far apart, that the added value GE brings is not worth the price adder


Let me know who needs to be on the call with Mark and I will set it up.  I am suggesting Lance, Jim and Hannah at a minimum


mark

Alta App.000240

GEALTA_0022366

# Exhibit 42

Alta App.000241

**EXHIBIT**
175

Message

| | |
|---|---|
| **From:** | Babu, Alex (GE Power) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=19C0FB35ABEC48B5A753D432A19FD11B-BABU, ALEX] |
| **Sent:** | 10/22/2018 10:09:42 AM |
| **To:** | Dement, Christopher S (GE Power) [chris.dement@ge.com] |
| **CC:** | Doyle, Michael (GE Power) [michael.doyle@ge.com]; Watkins, Phillip (GE Power) [phillip.watkins@ge.com]; Janson, Mark A (GE Power) [Mark.Janson@ge.com] |
| **Subject:** | RE: Gray Review discussion |

Chris – here are my comments, let me know if this works…

Castleman Power
• New IPP in Texas installing refurbished LM6000 units as peakers. They have currently installed 8 units via ProEnergy, and we are aggressively going after them to sell our "TruePackage" Refurbished packages for their future projects.
• They are currently asking us to bid a 4x LM6000 Refurbished unit site which they are hoping to close financial funding sometime in 1Q 2019. Once that occurs, we expect to get into deep negotiations with the customer to sell our product.
o ProEnergy's price is dirt cheaper compared to ours, however the customer is not happy with ProEnergy's performance on the previous installation projects. They said "It has been a construction nightmare" dealing with them, which puts us at an advantage right now.
o ProEnergy also installs non-OEM controls on the refurbished units, and Castleman is interested in some of our new CM&U offerings (Peak Firing, 5 minute Fast Start, etc) which we have told we cannot install on non-OEM hardware. This also puts us at an advantage.
o We are trying to get creative on pricing/refurbish workscope to keep us competitive.
• Next meeting is scheduled in 2 weeks, and we are working on term sheets and contract language with them to be ready to aggressively bid this once they close financial funding.
• No immediate action required on this one, we are waiting on the end customer to get his permits and funding approved to move forward with this. If all goes well and we get selected, this will be a 2Q order.
• I believe this is a high probability based on the discussions we have been having with the customer.

Kinder Morgan
• Meeting scheduled with them on November 13th to discuss this item. One of their units will need a Major Overhaul in 2019, and we are targeting an engine exchange with them similar to what we did last year.
• Unfortunately things move very slow with Kinder Morgan's procurement department and their leadership for approvals. The 2017 deal started in 2014 and it took almost 3yrs of negotiating and moving it up their ladder to get the deal approved. Hoping this transaction goes smoother as they were very pleased with the 2017 engine exchange.
• No immediate action required on this one. I will get them a budgetary proposal by the end of this year and plan on sending a firm proposal sometime in 1Q of next year to hopefully get an order in 3Q. This is a waiting game from their side once we get the budgetary proposal out.
• I believe this is a high probability based on our past experiences with the customer, only risk is if this will drag along and get pushed to 2020 instead of 2019.

Signal Hill
• Budgetary proposal sent last month, and customer is reviewing the details trying to get next year's budget finalized. He stated outage will be most likely scheduled for 4Q 2019 unless something changes in their operational profile or budgeting cycle.
• We are trying to nail down a site visit next month with these guys to discuss strategy.
• They are very poor communicators but based on what I know they like working with the OEM for these type of major projects. I should know more about this later this year once I can get some time to sit down with the guy.

GEALTA_0052324
Alta App.000242

Sorry for the late response, I've been out of pocket for the past couple of days attending activities for a friend's wedding. I will have limited connectivity for the remainder of the day so please text me if you need anything additional, thanks!

Alex

**From:** Dement, Christopher S (GE Power)
**Sent:** Friday, October 19, 2018 3:00 PM
**To:** Babu, Alex (GE Power) <alex.babu@ge.com>
**Cc:** Doyle, Michael (GE Power) <michael.doyle@ge.com>; Watkins, Phillip (GE Power) <phillip.watkins@ge.com>
**Subject:** FW: Gray Review discussion

Alex,

Could you provide 3-4 bullets on the 3 Aero deals below (Castleman, Kinder, Signal Hill)? Status, Probability/barriers to closure, Where you need help? Sorry for the short notice but there's an Eric G review Monday afternoon so can you provide by Monday AM?

Thanks,
Chris

**From:** Macvaugh, Raegan (GE Power)
**Sent:** Friday, October 19, 2018 2:37 PM
**To:** Flynn, Patrick M (GE Power) <patrick1.flynn@ge.com>; Dement, Christopher S (GE Power) <chris.dement@ge.com>; Edmondson, Russell B (GE Power) <russell.edmondson@ge.com>; Van Dyne, Blair (GE Power) <Blair.Vandyne@ge.com>; Bartlett, Drew D (GE Power) <drew.bartlett@ge.com>
**Cc:** Abdalla, Mazin (GE Corporate) <Mazin1.Abdalla@ge.com>; Tung, Debby (GE Power) <debby.tung@ge.com>; Pantalone, John A (GE Power) <john.pantalone@ge.com>; Perales, Julio R (GE Power) <julio.perales@ge.com>
**Subject:** RE: Gray Review discussion

Team
As discussed on our 1:00 call. The flow outlined below is the approach we are taking. Also, below is an extract of the top 5 deals by Category. Good news/Bad News story.

Because the MYA Campaign bucket has opportunities that we will need background on in addition to the others we discussed. Another Adder is the Aero deals now showing. Need background.

Thanks,
Raegan.

GEALTA-0052325

Alta App.000243

| Category | Rank - Top | Opportun Account & Outage Date | Opportunity Name | Stage (NEX) | 2019 Total Opportun | 2019 Convertible Margin (in ! |
|---|---|---|---|---|---|---|
| MYA Campaigns | 1 | 1342593 Robert Da -- | Smith #1 - Seed Rotor Options | Active - Med. Probability | $10,000,000 | |
| MYA Campaigns | 2 | 1323932 Will Vasal -- | Dominion Possum Point AGP Inventory | Active - Low Probability | $5,000,000 | |
| MYA Campaigns | 3 | 1351936 Jason E Lo -- | Choctaw AGP Set | Active - Med. Probability | $0 | |
| TX Campaigns | 1 | 1277181 Ryan Obe -- | Martin 3 & 4 .05 Compressor/3SAR Upgrade | Active - High Probability | $60,000,000 | |
| TX Campaigns | 2 | 1240119 Robert Da 2020 Q3 | Smith 7&8 CC DLN2.6+ with AFS & Mk6e | Active - High Probability | $20,560,000 | |
| TX Campaigns | 3 | 1038706 Ryan Obe -- | Ft Myers Block 3 - Three Step Aged Turbine | Active - Med. Probability | $16,000,000 | |
| TX Campaigns | 4 | 1039200 Will Vasal 2020 Q4 | LS Power Doswell AGP Peaker 4019 - Upgr | Active - High Probability | $3,000,000 | |
| TX Rigor | 1 | 1360119 Robert G I -- | North Plant - 7FA.05 F2F Replacement | Active - High Probability | $50,000,000 | |
| TX Rigor | 2 | 1284445 Ryan Obe -- | Sanford 4&5 Emergency Peak Upgrade | Active - High Probability | $28,000,000 | |
| TX Rigor | 3 | 1284432 Ryan Obe -- | Ft Myers Block 2 Emergency Peak Upgrade | Active - High Probability | $16,000,000 | |
| TX Rigor | 4 | 1275159 Ryan Obe -- | Martin 3&4 ST Upgrades | Active - High Probability | $12,000,000 | |
| TX Rigor | 5 | 1156086 Thomas Li 2020 Q2 | 296840 Axiall Plaquemine EOL Options Spr | Active - Med. Probability | $9,896,249 | |
| Aero | 1 | 1247888 -- -- | Castleman Power Victoria Project - 2xLM6C | Active - High Probability | $10,000,000 | |
| Aero | 2 | 1171457 Creston D -- | APR - Gen-8 compliance with the Australia | Active - High Probability | $6,750,000 | |
| Aero | 3 | 1339339 Michael D -- | Kinder Morgan - LM6000PC Engine Exchang | Active - High Probability | $5,560,000 | |
| Aero | 4 | 1325595 Creston D -- | APR - TM2500 Hot Section parts (item #8) | Active - High Probability | $5,500,000 | |
| Aero | 5 | 1360752 Phillip Wo 2019 Q4 | Signal Hill - 691653 - Major Overhaul | Active - High Probability | $1,500,000 | |
| Digital | 1 | 1352783 Thomas Li -- | PD - Carville EO/DO/DBO | Active - Med. Probability | $250,000 | |

**From:** Macvaugh, Raegan (GE Power)
**Sent:** Thursday, October 18, 2018 10:05 PM
**To:** Flynn, Patrick M (GE Power) <patrick1.flynn@ge.com>; Dement, Christopher S (GE Power) <chris.dement@ge.com>; Edmondson, Russell B (GE Power) <russell.edmondson@ge.com>; Van Dyne, Blair (GE Power) <Blair.Vandyne@ge.com>; Bartlett, Drew D (GE Power) <drew.bartlett@ge.com>
**Cc:** Abdalla, Mazin (GE Corporate) (Mazin1.Abdalla@ge.com) <Mazin1.Abdalla@ge.com>; Tung, Debby (GE Power) <debby.tung@ge.com>; Pantalone, John A (GE Power) (john.pantalone@ge.com) <john.pantalone@ge.com>; Perales, Julio R (GE Power & Water) (julio.perales@ge.com) <julio.perales@ge.com>
**Subject:** RE: Gray Review discussion

Team,

During the preparation call today with RGM's, we discussed the proposed "Flow" utilizing Dashboard details during Monday's review. We can discuss tomorrow on our 'follow up' call (to be scheduled) …

"Flow" proposal
- Summary of Outage Count '18 Vs '19 "Screenshot below"   MMP & TX only*
- SII Orders Walk "Screenshot below"
- TX & MMP Summary by Sub Region "Screenshot below"
- Note Top 5 Deals summarized below the TX MMP Summary …. (Key Deals)

* Brief Entitlement Analysis shows that the "Mix" of Ups & Downs will yield an additional $308K Orders to offset the F Fleet Down turn.

## 2018 v 2019 Outage Count

|  |  | 1H'18 | 1H'19 | V% | 2H'18 | 2H'19 | V% | TY'18 | TY'19 | V% |
|---|---|---|---|---|---|---|---|---|---|---|
| Aero |  | 5 | 11 | ▲120% | 5 | 7 | ▲40% | 10 | 18 | ▲80% |
| Gas | Base Fleet | 13 | 11 | ▼-15% | 12 | 10 | ▼-17% | 24 | 21 | ▼-13% |
|  | E Fleet | 20 | 30 | ▲50% | 12 | 17 | ▲42% | 31 | 46 | ▲48% |
|  | F Fleet — CI | 4 | 2 | ▼-50% | 3 | 1 | ▼-67% | 7 | 3 | ▼-57% |
|  | F Fleet — HGP | 3 | 2 | ▼-33% | 8 | 8 | ○6% | 10 | 10 | ◉0% |
|  | F Fleet — MI | 13 | 11 | ▼-15% | 8 | 5 | ▼-38% | 21 | 16 | ▼-24% |
|  | F Fleet | 20 | 15 | ▼-25% | 19 | 14 | ▼-26% | 38 | 29 | ▼-24% |
|  | Gas Total | 53 | 56 | ▲6% | 43 | 41 | ▼-5% | 93 | 96 | ▲3% |
|  | Gas + Aero Total | 58 | 67 | ▲16% | 48 | 48 | ○0% | 103 | 114 | ▲11% |
| Steam | CC | 16 | 20 | ▲25% | 13 | 11 | -15% | 28 | 31 | ▲11% |

Legend: Closed Won | Active Commit | Active High Probability | Active Mod Probability | Active Low Probability | Prospect | MYA Cube

## NAM SII Waterfall (Orders)



| MYA Campaigns | TX Campaigns | TX Rigor | Digital | Aero | Flow Plug | MYA Cube | Total |
|---|---|---|---|---|---|---|---|
| $35M | $100M | $225M | $0M | $35M | $95M | $885M | $1,037M |

Total breakdown: $585M / $395M / $125M

|  | 2018 TX/MMP OEM Gas Outage Count (All Types) | 2019 TX/MMP OEM Gas Outage Count (All Types) | 2019 Total Opportunity Amount | Weighted Pipeline | 2018 Paced Orders (In the Base Case) | Paced Orders (In Base Case) ÷ Weighted Pipeline (%) | Paced Orders ÷ (In Base Case) ÷ Total Pipeline (%) | 2019 Flow (Mono) | 2018 Estimate (TBD) | 2019 Target | 2019 V% to Target | 2019 Convertible Sales (In Base Case) | 2019 Convertible Sales v Paced Orders % (In Base Case) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Grand Total | 523 | 289 | $3,388,392,319 | $3,666,373,225 | $836,638,786 | 34% | 26% | $183,000,000 | $407,000,000 | $387,000,000 | 110% | $565,603,201 | 64% |
| North America North | 505 | 87 | $912,854,195 | $280,923,780 | $243,754,508 | 84% | 22% | $88,000,000 | $281,000,000 | $281,000,000 | 107% | $349,599,528 | 48% |
| North America South | 518 | 176 | $1,530,485,499 | $621,968,317 | $417,884,573 | 67% | 28% | $15,000,000 | $0 | $498,000,000 | 510% | $206,061,172 | 52% |
| North America West | 105 | 26 | $757,302,623 | $578,248,749 | $349,231,408 | 142% | 32% | $80,000,000 | $226,000,000 | $222,000,000 | 512% | $204,009,760 | 82% |

Alta App.000245   GEALTA_0052327



Outage Mix – Simple "Entitlement" Calculation:
Outages show up 3% driven solely by E Fleet.  Brief Entitlement Analysis shows that the "Mix" of Ups & Downs will yield an additional $308K Orders to offset the F Fleet Down turn.

|  |  | ENTitlement | 19 Difference |  | 19 |
|---|---|---|---|---|---|
| 7F CI | 430K | $ 430,000 | -4 | $ | (1,720,000) |
| 7F HGP | 1.55M | $ 1,550,000 | 0 | $ | - |
| 7F MI | 2M | $ 2,000,000 | -5 | $ | (10,000,000) |
|  |  |  |  | $ | (11,720,000) |
|  |  |  |  |  |  |
| 7E CI | 232K | $ 232,000 | 4 | $ | 928,000 |
| 7E HGP | 970K | $ 970,000 | 5 | $ | 4,850,000 |
| 7E MI | 1.25M | $ 1,250,000 | 5 | $ | 6,250,000 |
|  |  |  |  | $ | 12,028,000 |
|  |  |  |  |  |  |
|  |  |  |  |  | 308,000 |

Thanks!
Raegan.


**From:** Macvaugh, Raegan (GE Power)
**Sent:** Thursday, October 18, 2018 7:35 AM
**To:** Flynn, Patrick M (GE Power) <patrick1.flynn@ge.com>; Dement, Christopher S (GE Power) <chris.dement@ge.com>; Edmondson, Russell B (GE Power) <russell.edmondson@ge.com>; Van Dyne, Blair (GE Power) <Blair.Vandyne@ge.com>; Bartlett, Drew D (GE Power) <drew.bartlett@ge.com>
**Cc:** Abdalla, Mazin (GE Corporate) (Mazin1.Abdalla@ge.com) <Mazin1.Abdalla@ge.com>; Tung, Debby (GE Power) <debby.tung@ge.com>; Pantalone, John A (GE Power) (john.pantalone@ge.com) <john.pantalone@ge.com>; Perales, Julio R (GE Power & Water ) (julio.perales@ge.com) <julio.perales@ge.com>
**Subject:** RE: Gray Review discussion

Team,

Clarification:
Confirmed with Pat – Need One Pager for TX Outages.
Attached is the One pager for TX Outages.... As a Template.
Correction on Dement:  "Debary" not yours.

Expectation on Coffee:
Clarify expectations
Revise list of deals if necessary

Additionally, I will reach out to Paula Dempsey on SW – to obtain additional supporting details of those deals.

Thanks.
Raegan

---

**From:** Macvaugh, Raegan (GE Power)
**Sent:** Wednesday, October 17, 2018 6:26 PM
**To:** Flynn, Patrick M (GE Power) <patrick1.flynn@ge.com>; Dement, Christopher S (GE Power) <chris.dement@ge.com>; Edmondson, Russell B (GE Power) <russell.edmondson@ge.com>; Van Dyne, Blair (GE Power) <Blair.Vandyne@ge.com>; Bartlett, Drew D (GE Power) <drew.bartlett@ge.com>
**Cc:** Abdalla, Mazin (GE Corporate) (Mazin1.Abdalla@ge.com) <Mazin1.Abdalla@ge.com>; Tung, Debby (GE Power) <debby.tung@ge.com>; Pantalone, John A (GE Power) (john.pantalone@ge.com) <john.pantalone@ge.com>; Perales, Julio R (GE Power & Water ) (julio.perales@ge.com) <julio.perales@ge.com>
**Subject:** RE: Gray Review discussion

Team,

Attached is an updated SII Walk (Orders) ...  I have reviewed it and made some suggestions regarding Key Deals by the Categories outlined below.

I believe we will need either a one pager or (previously created deal bible for the Key Deals. ).  I also believe a summary of Bullets would suffice for a Key TX Outage identified & Digital opportunities.
*Pat, please let me know if that will suffice....*

My assumption is that we will utilize the Tableau Dashboard for discussion, but will need the Deal Bible/1 Pager/or Bullets for Pat depending on the deal complexity....

As you can see by the "Highlighted" areas, we have Bibles or One pages we can update/repurpose.  I have attached a deck with those summaries included.

| Drew: | Blair: | Russ: | Chris: |
|---|---|---|---|
| FPL - RSA - TX Campaign | Axial Retran - 7EA's - TX** | Duke Smith DLN 2.0+ AFS** | Entergy Fleet Spare AGP Std** |
| FPL FT Fixes | Carville Cogen Optimizer - Digital | Dominion 7F 4 BG 2.0+ AFS | Duke Debary UR - Campaign |
| FPL Gulf Power – TX | KCP&L NE 78 Outages, TX | Duke Debary UR - Campaign | Entergy Ninemile - APM – OO Digital |
| FPL Non HW | WestLake CSA 7EA's & 7BS** | Duke Smith CC Buck DO & VLP - Digital | TX Outage? |
| Tx Outage? | TVA JCT X3 - 7EA ** | Tx Outage? | |
| | Shell Geismar 6B CSA | | |

We can review on Coffee and be sure to let me know if we are missing something.

Thanks!!

Raegan.

---

**From:** Flynn, Patrick M (GE Power)
**Sent:** Wednesday, October 17, 2018 1:48 PM
**To:** Macvaugh, Raegan (GE Power) <Raegan.Macvaugh@ge.com>
**Cc:** Dement, Christopher S (GE Power) <chris.dement@ge.com>; Edmondson, Russell B (GE Power)

GEALTA-0052329
Alta App.000247

<russell.edmondson@ge.com>; Van Dyne, Blair (GE Power) <Blair.Vandyne@ge.com>; Bartlett, Drew D (GE Power)
<drew.bartlett@ge.com>
**Subject:** Fwd: Gray Review discussion

Reagan
Please work with the team to pull together top 5 by category for each Sales director
Thanks
Pat

Sent from my iPhone

Begin forwarded message:

**From:** "Devereaux, Marc (GE Power)" <marc.devereaux@ge.com>
**Date:** October 17, 2018 at 1:07:10 PM EDT
**To:** "Flynn, Patrick M (GE Power)" <patrick1.flynn@ge.com>, "Wurster, Eric M (GE Power)" <eric.wurster@ge.com>,
"Johnston, Joseph P (GE Power)" <joseph.johnston@ge.com>, "Buttery, Kenneth L (GE Power)"
<kenneth.buttery@ge.com>
**Subject: Re: Gray Review discussion**

So for Monday;

RGMs agree on
Top 5;
- Tx deals
- campaigns
- AFS
- DO

What is format; ppt or Tableau ?

Regards,
Marc
508.561.4251

On Oct 17, 2018, at 7:14 AM, Buttery, Kenneth L (GE Power) <kenneth.buttery@ge.com> wrote:

All,

I spoke with Eric this morning about the review he had set up for next Monday. (this now
overlaps partially with Scotts)

I think it's very important we are all aligned on the intent of the call and subsequent content....
Based on the 4Q deep dive he had set up last week.

Eric wants to see our overall 2019 case and have us take him through our top ten deals by
region and our upgrades deals. I think this would align with what we want to share for 2019 as
well... I want to get away from PPT if we can, just use our NEX data for this deep dive.

Proposed:

GE CONFIDENTIAL

We can build a very simple top ten table in tableau (so we do not get into every deal) that will be based on your nex data that you can each talk to, each make sure that the information is correct in advance. Also, we can share the deal bibles or one-pagers for some of our upgrades which are already listed in Tableau today.

Summary:
1.    **TX Orders case** (tableau orders walk tab)
2.    **TX Top Ten deals by sub-region (maybe 5 orders and 5 CM)** (tableau top ten tab – to be created)
3.    **Upgrades** – (Tableau – supported by deal summaries for the deals you have them updated for)

Thoughts, I think it will be very powerful to use our tool based on NEX data for this.

Paolo I know is working a deck for the Scott review, with this new information as to what Eric wants to see, maybe we use the deck for Scott and NEX as proposed for Eric?=

Thanks,
Ken

**Ken Buttery**
Gas Power Systems & Power Services
Commercial Executive - Business Intelligence

T  +1 484 875 7065
M +1 315 569 8709

www.gepower.com

---

**From:** joseph.johnston@ge.com
**When:** 5:30 PM - 6:00 PM October 17, 2018
**Subject:** Gray Review discussion
**Location:** Skype Meeting

We currently have a meeting scheduled with Eric Gray next Monday for 3 hrs to discuss 2019. We discussed postponing that today but I think more discussion needed on the topic....

Appears to be availability here.....

→ Join Skype Meeting
Trouble Joining? Try Skype Web App

Join by phone

Toll-free number: +1 (866) 799-9419,,78375552# (Dial-in Number)          English (United States)

Alta App.000249

GEALTA_0052331

Toll number:    +1 (860) 785-9628,,78375552# (Dial-in Number)        English (United States)

Find a local number

Conference ID: 78375552

Forgot your dial-in PIN? | Help | Legal

GEALTA_0052332

Alta App.000250

# Exhibit 43

Alta App.000251

EXHIBIT

176

Message

| | |
|---|---|
| **From:** | j.manning@wattstock.com [j.manning@wattstock.com] |
| **Sent:** | 1/24/2019 9:40:11 AM |
| **To:** | Canon, James T (GE Power) [james.canon@ge.com] |
| **CC:** | Herrington, Lance R (GE Power) [lance.herrington@ge.com]; Pete Watson [p.watson@wattstock.com]; Rob McNamee [r.mcnamee@wattstock.com]; Walter Sharpin [w.sharpin@wattstock.com]; Andrew F. Herr [a.herr@wattstock.com] |
| **Subject:** | EXT: Alta Power: LM6000 SURPLUS Engines and Packages |
| **Attachments:** | image003.png; Aero Power Plants for sale_2019 V1.xlsx |

**Importance:**    High

Jim,

As we discussed yesterday, Alta is willing to pay our expenses to lock up nine LM6000 PC engines and packages. They would like for us to start right away.

Can you ask the NA sales team to give you a list of the known units available for sale?  We need this ASAP.

Rob and I will be putting together the final list/report for Alta with your information.

In addition to the list for Alta, we need to prepare a list for other opportunities as well.

Attached is a list from Turkey.

Regards,

Jay C. Manning

WattStock LLC

16415 Jacintoport Blvd.

Houston, TX  77015

C:  713.248.4148

j.manning@wattstock.com www.wattstock.com

*************************************************************************

This e-mail is the property of WattStock LLC and/or its relevant affiliate and contains confidential and privileged material for the sole use of the intended recipient(s).  Any review, use, distribution or disclosure by others is strictly prohibited.  If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender or reply to WattStock LLC at Webmaster@wattstock.com and delete all copies of the message.  This e-mail (and any attachments hereto) are not intended to be an offer (or an acceptance) and do not create or evidence a binding and enforceable contract between WattStock LLC (or any of its affiliates) and the intended recipient or any other party, and may not be relied on by anyone as the basis of a contract by estoppel or otherwise.  Thank you.

GE CONFIDENTIAL

# Exhibit 44

Alta App.000253

EXHIBIT
177

Message
_____

| | |
|---|---|
| **From:** | Babu, Alex (GE Power) [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=19C0FB35ABEC48B5A753D432A19FD11B-BABU, ALEX] |
| **Sent:** | 2/13/2019 3:46:40 PM |
| **To:** | Macvaugh, Raegan (GE Power) [Raegan.Macvaugh@ge.com] |
| **CC:** | Dement, Christopher S (GE Power & Water) [chris.dement@ge.com] |
| **Subject:** | RE: Need Pacing Comments updated ...for Ross |
| **Attachments:** | Aero_Deals.pptx |

Raegan – here you go, review and let me know if this hits all the right triggers 😊

Alex

**From:** Macvaugh, Raegan (GE Power)
**Sent:** Wednesday, February 13, 2019 12:08 PM
**To:** Babu, Alex (GE Power) <alex.babu@ge.com>; Doyle, Michael (GE Power) <michael.doyle@ge.com>; Rapagnani, Richard G (GE Power) <richard.rapagnani@ge.com>
**Subject:** RE: Need Pacing Comments updated ...for Ross

Examples...

Raegan

**From:** Babu, Alex (GE Power)
**Sent:** Wednesday, February 13, 2019 1:03 PM
**To:** Macvaugh, Raegan (GE Power) <Raegan.Macvaugh@ge.com>
**Subject:** RE: Need Pacing Comments updated ...for Ross

Is there a template for this one pager so I can fill in the relevant info?

**From:** Macvaugh, Raegan (GE Power)
**Sent:** Wednesday, February 13, 2019 12:01 PM
**To:** Doyle, Michael (GE Power) <michael.doyle@ge.com>; Babu, Alex (GE Power) <alex.babu@ge.com>; Rapagnani, Richard G (GE Power) <richard.rapagnani@ge.com>
**Cc:** Dement, Christopher S (GE Power) <chris.dement@ge.com>; Flynn, Patrick M (GE Power) <patrick1.flynn@ge.com>
**Subject:** RE: Need Pacing Comments updated ...for Ross
**Importance:** High

Thank you Very Much...

Pat has asked for a 1 Pager on each of the deals on the list in preparation for his meeting with Eric in the morning.. From Pat: <mark>Really strategy and deal closure plan</mark>...what is value for customer and closure plan.. one pagers would be good... not that many deals

Please send me your summary at your earliest.

Raegan.

**From:** Doyle, Michael (GE Power)
**Sent:** Wednesday, February 13, 2019 12:54 PM
**To:** Macvaugh, Raegan (GE Power) <Raegan.Macvaugh@ge.com>
**Subject:** RE: Need Pacing Comments updated ...for Ross

Mine was updated as well…

**From:** Macvaugh, Reagan (GE Power)
**Sent:** Wednesday, February 13, 2019 11:27 AM
**To:** Babu, Alex (GE Power) <alex.babu@ge.com>
**Cc:** Abdalla, Mazin (GE Corporate) <Mazin1.Abdalla@ge.com>; Rapagnani, Richard G (GE Power) <richard.rapagnani@ge.com>; Doyle, Michael (GE Power) <michael.doyle@ge.com>
**Subject:** RE: Need Pacing Comments updated …for Ross

Alex,

Thank You Very Much!!
Raegan

**From:** Babu, Alex (GE Power)
**Sent:** Wednesday, February 13, 2019 12:17 PM
**To:** Macvaugh, Reagan (GE Power) <Raegan.Macvaugh@ge.com>
**Cc:** Abdalla, Mazin (GE Corporate) <Mazin1.Abdalla@ge.com>
**Subject:** RE: Need Pacing Comments updated …for Ross

Comments inputted for Kinder & Castleman, let me know if anything further is required. Thanks!

Alex

**From:** Macvaugh, Reagan (GE Power)
**Sent:** Wednesday, February 13, 2019 10:37 AM
**To:** Doyle, Michael (GE Power) <michael.doyle@ge.com>; Rapagnani, Richard G (GE Power) <richard.rapagnani@ge.com>; Babu, Alex (GE Power) <alex.babu@ge.com>
**Cc:** Abdalla, Mazin (GE Corporate) <Mazin1.Abdalla@ge.com>
**Subject:** Need Pacing Comments updated …for Ross

Alex, Mike & Rich

We need your support to update the Pacing comments on the deals below… (by EOD today – for Ross discussion tomorrow)
Kinder Morgan/Castleman/Lyondell Basell

Per Dave Ross
"Pat, Marc and Joe.   Need your teams to add (and update real-time) bullets in NEX on each of these deals (risk and opportunity) to answer the Questions as if they were communicating to Strazik:

- Identify the critical milestones and actions that need to happen to close the deal by the EOD in system.
-clearly articulate the plan to address each (above) and
-the status on progress to closure.

With the above, we can articulate where we are, were we are going and path to get there.  All in the tool without a bunch of phone calls. "

Thanks!!

Raegan.

GEALTA_0052425



GEALTA_0052426

Alta App.000256

Alta App.000257



# Kinder Morgan – LM6000PC Engine Exchange

Acct Mgr. Alex Babu / Mike Doyle
REX ID: 1359339
Stage: Active High

**Plant Summary**

| ISO | Site Config | Market Structure | KPIs |
|---|---|---|---|
| ERCOT | LM6000PC - Cogen | Industrial Cogen, does not export to ERCOT | • O&M Costs<br>• Reduced Downtime<br>• Improved Availability |

**Financials**

- $6.4M for Overhauled LM6000PC Engine @[redacted]CM
- ($1M) for Buyback Value of Customer LM6000PC Engine
- Net Value of **$5.4M @[redacted]CM**

## Customer Value

- Shorter Outage duration. Gas Turbine Exchange is 3 days versus 90 days for a Gas Turbine Major Overhaul
- Better options for future repairs if non-OEM hardware is eliminated from fleet. i.e. More service providers can work on OEM hardware
- Reliability of having OEM hardware installed in their fleet.
- Wanting to build a more robust relationship with the

## VOC

- Liked GE's solution in 2017 for the Gas Turbine Exchange, would like something similar
- Would like to flush out all non-OEM hardware from fleet and get to GE hardware in all install base
- Kinder Morgan power generation assets have minimal budgets, need to get creative to ensure deals get completed

## Strategy

- Putting together similar pricing strategy as the 2017 Engine Exchange deal
- Packaged solution:
  - They are also interested in exchanging their non-OEM spare Hot Section hardware
  - Trying to work a combined deal to exchange the Engine and spare hot section with Overhauled OEM Hardware to flush out non-OEM material
- Provide special discounting for 2019 order to help motivate Kinder Morgan Purchasing to close order and convert this year

## Obstacles

- Kinder Morgan Purchasing Cycle is very slow. Previous deal took 3 years to close
- The pricing to exchange non-OEM hardware has about a $2M premium when compared to our standard hardware exchange price
- Potential ASP activity to provide similar solution for cheaper

## Next Steps

- RG internal strategy call for new packaged solution scheduled for 2/15
- Provide proposal to Kinder Morgan by 3/8
- Schedule meeting with Kinder Morgan Leadership to review options/solutions for 3Q closure and 4Q convertibility

GE Confidential – Internal Use Only. Not for Distribution 1

## Castleman Power – LM6000PC TRUEPackage

Acct Mgr: Alex Babu / Mike Doyle
TECH ID: 1247888
Stage: Active Medium

### Plant

| ISO | Site Config | Market Structure | KPIs |
|---|---|---|---|
| ERCOT | 4x LM6000PC Simple Cycle | ERCOT South Peakers | • O&M Costs<br>• Quick Installation<br>• Low Cost Assets w/ High Output & Heat Rate |

### Financials

• $10M @ OEM to provide the following:
  - 4x LM6000PC Modified Gas Turbine Overhaul
  - Engineering Support for TRUEPackage Upgrades
  - 4x OEM Control System, either MarkVIe or Woodward

### Customer Value

- Wants all four sites to have similar energy assets – LM6000PC Gas Turbines at standard operations
- Interested in keeping all upfront costs to a minimum on Assets, KPIs, etc.

### VOC

- Customer has installed 4x LM6000PC Refurbished units in 2017, and is currently installing 4 more LM6000PC Refurbished via ProEnergy
- Financial Close on March 1 for 800MWs of new generation online by 2021 (additional 16 units)

### Strategy

- ProEnergy install base is experiencing operability/reliability issues - continues to show the value of working with the OEM to alleviate some of these current issues
- Emphasize GE's partnership to create a engineered Refurbishment scope to meet their needs for least costs upfront on the asset refurbishment
- Emphasize GE's servicing support and the importance of OEM Control system to ensure future support of the assets

### Next Steps

- Prospecting meeting with team at TRUEPackage team to continue to work strategy
- Awaiting RFP retask which should be released in early March after financial close
- Provide updated proposal within 2 weeks of receiving RFP
- Continue frequent meetings with Castleman Leadership Team

### Obstacles

- Does not value the OEM - Have already worked with ProEnergy to install 8+ units over the past 3 years
- Ryan Castleman is an Ex-GE Exec, who has started Castleman Power 3rd in FFP in Texas, he is not very motivated to work with GE
- Castleman is looking to purchase surplus units on their own, and working with another contractor to perform the refurbishment, and uses to save on their onsite ... I am on extra resources to help oversee that
- Potential partnership with their an ABB-AMTUH to support GE Turbine Overhaul Twin scope
- GE TRUEPackage solution is currently 15% higher in price when compared to ProEnergy

GEALTA_0052428

Alta App.000259

# Exhibit 45

Alta App.000260

EXHIBIT
18 1

# 2022
# ANNUAL
# REPORT



Alta App.000261

# How GE Performed in 2022

*Dollars in millions; except per-share amounts*

**PURPOSE** We rise to the challenge of building a world that works

**CEO** H. Lawrence Culp, Jr.

**EMPLOYEES** ~172,000[1]

**GLOBAL OPERATIONS** ~170 countries

## Total Company

| GAAP | FY22 | FY21 | Y/Y REPORTED |
|---|---|---|---|
| Total Revenues | $76,555 | $74,196 | 3% |
| Profit | $1,412 | $(3,683) | F |
| Profit Margin | 1.8% | (5.0)% | 680 bps |
| Continuing EPS | $0.53 | $(3.25) | F |
| Net EPS | $(0.05) | $(6.16) | 99% |
| Cash from Operating Activities (CFOA) | $5,864 | $888 | F |
| Orders | $82,981 | $79,418 | 4% |
| Backlog | $478,228 | $428,121 | 12% |

| NON-GAAP[*] | FY22 | FY21 | Y/Y |
|---|---|---|---|
| Organic Revenues | $75,440 | $70,989 | 6% |
| Adjusted profit | $5,835 | $4,608 | 27% |
| Adjusted profit margin | 7.9% | 6.5% | 140 bps |
| Adjusted EPS | $2.62 | $1.71 | 53% |
| Free cash flow (FCF) | $4,758 | $1,889 | F |

## AEROSPACE

**MISSION** Providing customers with engines, components, avionics and systems for commercial, military and business & general aviation aircraft and a global service network to support these offerings
**UNITS** Commercial Engines and Services, Military, Systems & Other
**INSTALLED BASE** ~40,900 commercial aircraft engines[2] and ~26,100 military aircraft engines
**CEO** H. Lawrence Culp, Jr.
**EMPLOYEES** ~45,000

| | FY22 | FY21 | Y/Y REPORTED | Y/Y ORGANIC[*] |
|---|---|---|---|---|
| Revenues | $26,050 | $21,310 | 22% | 23% |
| Profit/Loss | $4,775 | $2,882 | 66% | 62% |
| Profit/Loss Margin | 18.3% | 13.5% | 480 bps | 440 bps |
| Segment FCF[*] | $4,890 | $4,315 | 13% | |
| Orders | $31,106 | $25,589 | 22% | 22% |
| Backlog | $352,627 | $303,441 | 16% | |

## RENEWABLE ENERGY

**MISSION** Making renewable power sources more affordable, reliable, and accessible for the benefit of people everywhere
**UNITS** Onshore Wind, Offshore Wind, Grid Solutions Equipment and Services, Hydro Solutions, Hybrids Solutions
**INSTALLED BASE** 400+ GW of renewable energy equipment
**CEO** Scott Strazik
**EMPLOYEES** ~36,000

| | FY22 | FY21 | Y/Y REPORTED | Y/Y ORGANIC[*] |
|---|---|---|---|---|
| Revenues | $12,977 | $15,697 | (17)% | (13)% |
| Profit/Loss | $(2,240) | $(795) | U | U |
| Profit/Loss Margin | (17.3)% | (5.1)% | (1,220) bps | (1,150) bps |
| Segment FCF[*] | $(2,040) | $(1,395) | (46)% | |
| Orders | $14,657 | $18,163 | (19)% | (17)% |
| Backlog | $32,830 | $31,511 | 4% | |

## POWER

**MISSION** Powering lives and making electricity more affordable, reliable, accessible, and more sustainable
**UNITS** Gas Power, Steam Power, Power Conversion, Nuclear & Other
**INSTALLED BASE** ~7,000 gas turbines
**CEO** Scott Strazik
**EMPLOYEES** ~32,000

| | FY22 | FY21 | Y/Y REPORTED | Y/Y ORGANIC[*] |
|---|---|---|---|---|
| Revenues | $16,262 | $16,903 | (4)% | 2% |
| Profit/Loss | $1,217 | $726 | 68% | 69% |
| Profit/Loss Margin | 7.5% | 4.3% | 320 bps | 300 bps |
| Segment FCF[*] | $1,850 | $929 | 99% | |
| Orders | $17,826 | $16,412 | 9% | 13% |
| Backlog | $74,307 | $74,270 | ~% | |

## HEALTHCARE[1]

**MISSION** Building a healthier future and creating a world where healthcare has no limits
**UNITS** Healthcare Systems, Pharmaceutical Diagnostics
**INSTALLED BASE** 4M+ installations; 2B+ patient exams per year
**CEO** Peter Arduini
**EMPLOYEES** ~49,000

| | FY22 | FY21 | Y/Y REPORTED | Y/Y ORGANIC[*] |
|---|---|---|---|---|
| Revenues | $18,461 | $17,725 | 4% | 7% |
| Profit/Loss | $2,705 | $2,966 | (9)% | (2)% |
| Profit/Loss Margin | 14.7% | 16.7% | (200) bps | (150) bps |
| Segment FCF[*] | $2,125 | $2,705 | (21)% | |
| Orders | $19,862 | $19,596 | 1% | 4% |
| Backlog | $18,926 | $19,205 | (1)% | |

---

*   Non-GAAP Financial Measure
1   On January 3, 2023, GE completed the planned separation of its healthcare business, launching GE HealthCare Technologies Inc. (GE HealthCare). As of December 31, 2022, GE had ~123,000 employees excluding GE HealthCare employees who are now part of the standalone company.

2   Including GE and its joint venture partners
U   Unfavorable
F   Favorable

Alta App.000262

# United States Securities and Exchange Commission

## WASHINGTON, D.C. 20549

## FORM 10-K

☑ Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
For the fiscal year ended December 31, 2022
Commission file number 001-00035



# GENERAL ELECTRIC COMPANY

(Exact name of registrant as specified in its charter)

| New York | 14-0689340 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| 5 Necco Street  Boston  MA | 02210 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

(Registrant's telephone number, including area code) (617) 443-3000

### Securities Registered Pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.01 per share | GE | New York Stock Exchange |
| 1.250% Notes due 2023 | GE 23E | New York Stock Exchange |
| 0.875% Notes due 2025 | GE 25 | New York Stock Exchange |
| 1.875% Notes due 2027 | GE 27E | New York Stock Exchange |
| 1.500% Notes due 2029 | GE 29 | New York Stock Exchange |
| 7 1/2% Guaranteed Subordinated Notes due 2035 | GE /35 | New York Stock Exchange |
| 2.125% Notes due 2037 | GE 37 | New York Stock Exchange |

### Securities Registered Pursuant to Section 12(g) of the Act:

(Title of class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | | |
|---|---|---|---|---|
| Large accelerated filer | ☑ | | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.☑

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☑

The aggregate market value of the outstanding common equity of the registrant not held by affiliates as of the last business day of the registrant's most recently completed second fiscal quarter was at least $68.8 billion. There were 1,089,286,553 shares of common stock with a par value of $0.01 outstanding at January 31, 2023.

### DOCUMENTS INCORPORATED BY REFERENCE

The definitive proxy statement relating to the registrant's Annual Meeting of Shareholders, to be held May 3, 2023, is incorporated by reference into Part III to the extent described therein.

**Competition & Regulation.** Worldwide competition for power generation products and services is intense. Demand for power generation is global, and as a result, is sensitive to the economic and political environments of each country in which we do business. Our products and services sold to end customers are often subject to many regulatory requirements and performance standards under different federal, state, foreign and energy industry standards. In addition, we are subject to market and other dynamics related to decarbonization, where it will remain important to lower greenhouse gas emissions for decades to come, which will likely depend in part on technologies that are not yet deployed or widely adopted today but may become more important over time (such as hydrogen-based power generation, carbon capture and sequestration technologies or small modular or other advanced nuclear power).

**Significant Trends & Developments.** During the year ended December 31, 2022, global gas power generation grew mid-single digits and GE gas turbine utilization grew low-single digits with strength in the U.S. Utilization of the fleet continues to follow growing gas power generation, capturing shortfalls from coal retirements, and resilient asset usage with a dynamic Europe environment with the Russia and Ukraine conflict and mild winter. Looking ahead, we anticipate H-class units to be commissioned into the serviceable installed base and the uncertain timing of deal closures due to financing and the complexities of working in emerging markets. Power has proactively managed the impact of inflationary pressure by deploying lean initiatives to drive cost productivity, partnering with our suppliers and adjusting the pricing of our products and services. We expect the impact of inflation will continue to be challenging and we will continue to take actions to manage. Although market factors related to the energy transition such as greater renewable energy penetration and the adoption of climate change-related policies continue to impact long-term demand (and related financing), we expect the gas market to remain stable over the next decade with gas generation continuing to grow low-single-digits. We believe gas will play a critical role in the energy transition. We remain focused on our underwriting discipline and risk management to ensure we are securing deals that meet our financial hurdles and we have high confidence to deliver for our customers.

In the first quarter of 2022, we signed a non-binding memorandum of understanding for GE Steam Power to sell a portion of its business to Électricité de France S.A. (EDF), which resulted in a reclassification of that business to held for sale. In the fourth quarter of 2022, we signed a binding agreement and expect to complete the sale, subject to regulatory approval, in the second half of 2023. In the second quarter of 2022, we announced that Gas Power intends to acquire Nexus Controls, a business specializing in aftermarket control system upgrades and controls field services. The deal, which is subject to customary closing conditions including regulatory approval and mandatory information and consultation processes with employees and their representatives, is expected to close in the second quarter of 2023.

We continue to invest in new product development, such as our Nuclear small modular reactors and our HA-Turbines, with over 1.6 million operating hours. Our fundamentals remain strong with approximately $69.0 billion in RPO, including 27 HA-Turbines, and a gas turbine installed base of approximately 7,000 units, including 78 HA-Turbines, which has nearly doubled since 2019, and approximately 1,800 units under long-term service agreements.

| Sales in units | 2022 | 2021 | 2020 |
|---|---|---|---|
| GE Gas Turbines | 101 | 62 | 71 |
| Heavy-Duty Gas Turbines(a) | 53 | 43 | 51 |
| HA-Turbines(b) | 11 | 13 | 21 |
| Aeroderivatives(a) | 48 | 19 | 20 |

(a) Heavy-Duty Gas Turbines and Aeroderivatives are subsets of GE Gas Turbines.
(b) HA-Turbines are a subset of Heavy-Duty Gas Turbines.

| RPO | | December 31, 2022 | | December 31, 2021 | | December 31, 2020 |
|---|---|---|---|---|---|---|
| Equipment | $ | 11,561 | $ | 12,169 | $ | 14,991 |
| Services | | 57,420 | | 56,569 | | 58,318 |
| **Total RPO** | $ | 68,981 | $ | 68,738 | $ | 73,308 |

| SEGMENT REVENUES AND PROFIT | | 2022 | | 2021 | | 2020 |
|---|---|---|---|---|---|---|
| Gas Power | $ | 12,072 | $ | 12,080 | $ | 12,655 |
| Steam Power | | 2,643 | | 3,241 | | 3,557 |
| Power Conversion, Nuclear and other | | 1,547 | | 1,582 | | 1,378 |
| **Total segment revenues** | $ | 16,262 | $ | 16,903 | $ | 17,589 |
| Equipment | $ | 4,737 | $ | 5,035 | $ | 6,707 |
| Services | | 11,526 | | 11,868 | | 10,883 |
| **Total segment revenues** | $ | 16,262 | $ | 16,903 | $ | 17,589 |
| **Segment profit (loss)** | $ | 1,217 | $ | 726 | $ | 274 |
| **Segment profit margin** | | 7.5 % | | 4.3 % | | 1.6 % |

**For the year ended December 31, 2022, segment revenues were down $0.6 billion (4%) and segment profit was up $0.5 billion (68%).**

RPO as of December 31, 2022 increased $0.2 billion from December 31, 2021, primarily driven by Gas Power services and equipment, partially offset by the continued wind down of the Steam Power new build coal business.

Alta App.000264

# Exhibit 46

Alta App.000265





GE Power

Lance Herrington
Global Product Leader
Aero Upgrades

Power Services

16415 Jacintoport Blvd
Houston, TX 77015

T +1 832 418 9788
www.lance.herrington@ge.com

Ryan Castleman
CEO
5850 San Felipe, Suite 650
Houston, TX  77057

February 28, 2018

Dear Mr. Castleman:

On June 26, 2017, GE Power, Power Services executed a memorandum of understanding (MOU), defining a strategic partnership with WattStock LLC.  This MOU outlines a working partnership with WattStock LLC for the location, acquisition, refurbishment & upgrade of used GE Aeroderivative Gas Turbine Packaged equipment, with the intent to redeploy these assets from a non-operational condition to operational condition.  Under the agreement WattStock and GE work in collaboration throughout all phases of the project from the start of a sales opportunity, identification of equipment to be purchased, collaboration on level of refurbishment, and necessary upgrades to meet the end customer operational mission.  Wattstock LLC performs all labors under the direction of GE Project and Technology teams in accordance with GE standards.  Prior to commercial operation, each unit in the GE Truepackage program will undergo a certification process and receive a GE Warranty and Performance Guarantee.

As the original equipment manufacturer, we believe this offers the highest level of quality and confidence in the long term reliability and producibility of the assets.

For any questions related to the GE Truepackage program and/or our strategic agreement with WattStock LLC, please contact me.

Regards,

Lance Herrington
Global Product Leader
Aero Upgrades

Appropriate Legal Entity

GEALTA_0044921

Alta App.000266

# Exhibit 47

Alta App.000267

Message

| | |
|---|---|
| **From:** | j.manning@wattstock.com [j.manning@wattstock.com] |
| **Sent:** | 2/28/2018 6:00:56 PM |
| **To:** | Herrington, Lance R (GE Power) [lance.herrington@ge.com]; Canon, James T (GE Power) [james.canon@ge.com]; Babu, Alex (GE Power) [alex.babu@ge.com] |
| **Subject:** | EXT: FW: GE Letter of Confirmation/Presentation |
| **Attachments:** | True Package Customer Presentation v4.pdf; Castleman Power GE WattStock Confirmation Letter.docx |



**From:** j.manning@wattstock.com
**Sent:** Wednesday, February 28, 2018 3:47 PM
**To:** 'ryan@castlemanpower.com' <ryan@castlemanpower.com>
**Cc:** Pete Watson <p.watson@wattstock.com>; Kenneth Stevens <k.stevens@wattstock.com>; 'raymond@castlemanpower.com' <raymond@castlemanpower.com>; Kenneth C Stevens - WattStock <k.stevens@wattstock.com>
**Subject:** GE Letter of Confirmation/Presentation

Ryan,

Attached please find a letter of confirmation from GE.  Please let me know if this is sufficient for your purposes.
Also, I have attached a presentation which describes the program with GE.
As always, just give me a call if you need anything else.
Regards,

Jay
WattStock LLC
9225 Katy Fwy, Suite 310
Houston, TX  77024
C:  713.248.4148
j.manning@wattstock.com www.wattstock.com

This e-mail is the property of WattStock LLC and/or its relevant affiliate and contains confidential and privileged material for the sole use of the intended recipient(s).  Any review, use, distribution or disclosure by others is strictly prohibited.  If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender or reply to WattStock LLC at Webmaster@wattstock.com and delete all copies of the message.  This e-mail (and any attachments hereto) are not intended to be an offer (or an acceptance) and do not create or evidence a binding and enforceable contract between WattStock LLC (or any of its affiliates) and the intended recipient or any other party, and may not be relied on by anyone as the basis of a contract by estoppel or otherwise.  Thank you.

Alta App.000268

GEALTA_0044909

# TRUEPACKAGE: THE ONLY CERTIFIED TURBINE PACKAGE (CTP)



Confidential - Not for Distribution



GE CONFIDENTIAL

Alta App.000269

GEMTA00044910

# What we do

WattStock's innovative services program, singular authorization to refurbish GE's LM gas turbine generator sets and extensive industry experience combine to deliver

- ✓ Reduced costs
- ✓ Mitigated risk
- ✓ Improved reliability
- ✓ Maximized performance






Alta App.009270
GEALTA_0044911

# Certified Turbine Package (CTP)
## With GE's TruePackage

- WattStock maintains singular rights to refurbish GE's LM gas turbine packages

- Latest upgrades and digital solutions engineered by GE

- Fully certified and subject to all GE warranty and performance guarantees

- Direct access to GE's Intellectual Property for maximized payback and optimal life cycle value

- Quick delivery – six months or less

- Increased access to project financing and lower insurance premiums

Alta App.000271

GEWATA10044912

# Position your plant for future success

## Sample upgrades available through CTP


### Output
Increase output by up to 27%;
Improve heat rate as
much as 13%


### Flexibility
Achieve part-load operation as
low as 10% load with emissions
compliance


### Emissions
Reduce emissions to as low as
5 ppm NOx


### Efficiency
Harness digital insights to drive
plant improvement


### Predictability
Asset performance Management
digital solutions can help save
$1billion over the next decade


### Reliability & Availability
Extend asset life up to
200,000 hours





GE CONFIDENTIAL

Alta App.009272
GEATL_0044913

# Position your plant for future success
## Sample upgrades available through CTP

## Output/Efficiency

- LM25/LM6 Repower
- OpFlex Peak Performance
- OpFlex VIVG Schedule Optimization
- Steam Injection
- Compressor Fouling Mitigation (HFWW/Super Polish Blades)

## Availability

- Xtend
- Rad-Rad Combustor
- Core Software & Controls Upgrades
- Compressor Fouling Mitigation (HFWW/Super Polish Blades)
- Asset Performance Management

## Emissions

- DLE Conversion
- OpFlex Automapping
- Hybrid EGT
- OpFlex Auto NOx Blasting
- Water or Steam Injection for NOx

## Flexibility

- Hybrid EGT
- OpFlex Fast Start
- Alternative/Dual Fuel Conversion
- Synchronous Condensing Upgrade
- LM25/LM6 Repower

GE CONFIDENTIAL

Alta App.000273

GEMS7A00044914

# TRUEPACKAGE Process

WattStock locates, purchases and disassembles surplus package



Package ships to WattStock
Turbine ships to GE



WattStock and GE collaborate to determine optimal refurb plan



6

Alta App.000274

GE-ALTA_0044915

# TRUEPACKAGE Process

WattStock refurbs package with GE engineering, parts & procedures



GE remanufactures turbine or pulls new from stock



GE inspects, static tests, and approves package for ship



7

Alta App.000275

GEM-TA-0044916

# TRUEPACKAGE Process

Turbine and package shipped to customer site



WattStock performs I&C, GE supervises and approves



Package tested to ensure performance guarantees



GE manages warranty, WattStock performs warranty work



8

# TRUEPACKAGE Certification Process

- Inspection checklist for the refurbishment of the surplus package

- Static tests: electrical powering of control systems and loops for point to point checks, sensor failure verifications, valve stroke and calibrations, motor bumps, etc.

- Acceptance testing in presence of GE representative to ensure proper operation and communication of all integrated systems

- Installation & Commissioning "Red Flag" Review





Alta App.000277

GEWS-TX-0044918

# WattStock Facility



- Co-located with GE's aeroderivative service center in Houston, TX
- Access to port for ease of shipment and import/export of equipment
- Level 4 repair facility
- Recent $30million investment to expand 50,000 sq ft and upgrade with latest repair technology
- State-of-the-art automated clean and fluorescent penetrant inspection lines
- Local parts warehouse



imagination at work



KNOWLEDGE. POWER. SECURITY.

Alta App.000278    GEALTA_0044919

# TRUEPACKAGE: THE ONLY CERTIFIED TURBINE PACKAGE

Contact:  Jay Manning

C: 713.248.4148

j.manning@wattstock.com



GE CONFIDENTIAL



Alta App.000279

OEMWTA0044920



GE Power

Lance Herrington
Global Product Leader
Aero Upgrades

Power Services
16415 Jacintoport Blvd
Houston, TX 77015

T +1 832 418 9788
www.lance.herrington@ge.com

Ryan Castleman
CEO
5850 San Felipe, Suite 650
Houston, TX  77057

February 28, 2018

Dear Mr. Castleman:

On June 26, 2017, GE Power, Power Services executed a memorandum of understanding (MOU), defining a strategic partnership with WattStock LLC. This MOU outlines a working partnership with WattStock LLC for the location, acquisition, refurbishment & upgrade of used GE Aeroderivative Gas Turbine Packaged equipment, with the intent to redeploy these assets from a non-operational condition to operational condition. Under the agreement WattStock and GE work in collaboration throughout all phases of the project from the start of a sales opportunity, identification of equipment to be purchased, collaboration on level of refurbishment, and necessary upgrades to meet the end customer operational mission. Wattstock LLC performs all labors under the direction of GE Project and Technology teams in accordance with GE standards. Prior to commercial operation, each unit in the GE Truepackage program will undergo a certification process and receive a GE Warranty and Performance Guarantee.

As the original equipment manufacturer, we believe this offers the highest level of quality and confidence in the long term reliability and producibility of the assets.

For any questions related to the GE Truepackage program and/or our strategic agreement with WattStock LLC, please contact me.

Regards,

Lance Herrington
Global Product Leader
Aero Upgrades

Appropriate Legal Entity

Alta App.000280

GEALTA_0044921

# Exhibit 48

Alta App.000281

**From:**    Joshua Presner [joshua.presner@db.com]
**Sent:**    7/22/2019 2:38:03 PM
**To:**    Matthew Laterza [mlaterza@altapowerdev.com]
**CC:**    Hadi Makkawi [hadi.makkawi@db.com]; Misha Yu [misha.yu@db.com]
**Subject:**    GE / Wattstock Entity

Matt,

This is probably another obvious one. But with respect to the GE / Wattstock counterparty with which the project companies will have privity, we'll need that to either be a creditworthy entity or guaranteed by one. Can you look into this?

Thanks,
Josh



**Joshua Presner**  Global Credit Trading  Transportation, Infrastructure & Energy
60 Wall Street, New York  +1 (212) 250 1903  joshua.presner@db.com

---
This communication may contain confidential and/or privileged information. If you are not the intended recipient (or have received this communication in error) please notify the sender immediately and destroy this communication. Any unauthorized copying, disclosure or distribution of the material in this communication is strictly forbidden.

Please refer to https://db.com/disclosures for additional EU corporate and regulatory disclosures.

Deutsche Bank does not render legal or tax advice, and the information contained in this communication should not be regarded as such.



EXHIBIT
200

# Exhibit 49

Alta App.000283

| From: | Joshua Presner [joshua.presner@db.com] |
|---|---|
| Sent: | 4/17/2019 2:05:46 PM |
| To: | Brent Canada [brent.canada@db.com] |
| Subject: | FW: Alta Power Proposal |
| Attachments: | Alta Power - Indicative Financing Terms (2019-04-17).pptx |



EXHIBIT
201

FYI

**From:** Joshua Presner
**Sent:** Wednesday, April 17, 2019 2:04 PM
**To:** Robin Cresswell <robin.cresswell@db.com>; Jeremy Eisman <jeremy.eisman@db.com>
**Subject:** RE: Alta Power Proposal

Also,

Side by side with a revised proposal based on advancing 95% loan-to-cost (per the client's actual ask). Let's discuss when you free up.

|  | 90% loan to cost (based on my email) (L+450) | 95% loan to cost (based on client ask) (L+600) |
|---|---|---|
| RoE(RWA) | 32% | 36% |
| RoE(B3) | 88% | 113% |
| RoE(A) | 83% | 107% |
| 2019 PnL | $2.6m | $2.7m |
| First Year PnL | $4.8m | $5.8m |
| Lifetime PnL | $20.2m | $28.0m |
| Rating | iBB (cons) / iBB+ (ops) | iBB- (cons) / iBB (ops) |
| LGD | 45% (cons) / 25% (ops) | 45% (cons) / 25% (ops) |
| LPs | 100 bps | 100 bps |
| Final Hold | $110m | $110m |
| Skim | 200 bps | 100 bps |
| Syndication Timing | 90 days from FC | 90 days from FC |

**From:** Joshua Presner
**Sent:** Wednesday, April 17, 2019 1:35 PM
**To:** Robin Cresswell <robin.cresswell@db.com>; Jeremy Eisman <jeremy.eisman@db.com>
**Subject:** Alta Power Proposal

Gents,

Please see attached and below for the proposed set of terms I'd like to go out with.

KPIs as follows (not including interest rate swaps):

| | |
|---|---|
| RoE(RWA) | 32% |
| RoE(B3) | 88% |
| RoE(A) | 83% |
| 2019 PnL | $2.6m |
| First Year PnL | $4.8m |
| Lifetime PnL | $20.2m |

Assumptions:

| | |
|---|---|
| Rating | iBB (cons) / iBB+ (ops) |
| LGD | 45% (cons) / 25% (ops) |
| LPs | 100 bps |
| Final Hold | $110m |
| Skim | 200 bps |
| Syndication Timing | 90 days from FC |



**Joshua Presner** | Global Credit Trading | Transportation, Infrastructure & Energy
60 Wall Street, New York | +1 (212) 250 1903 | joshua.presner@db.com

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Deutsche Bank
Corporate & Investment Bank





# Texas peaking power portfolio: indicative financing terms

April 2019

Deutsche Bank Securities Inc., a subsidiary of Deutsche Bank AG, conducts investment banking and securities activities in the United States.

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

Alta App.000286

DBSI-GE-00000158

# Disclaimer



Please note that the structure and terms set out in this indicative term sheet are indicative only, they do not constitute an offer or commitment of any kind to arrange or underwrite any form of financing and are subject to change for any reason whatsoever including market conditions as determined by Deutsche Bank. The proposed transaction and its terms are subject to due diligence, internal approvals (including management, credit, legal, et al) by Deutsche Bank and satisfactory documentation. The structure and the indicative terms set out in this indicative term sheet are confidential. This indicative term sheet is not intended to, and shall not, give rise to any legally binding obligations on the part of Deutsche Bank and/or its affiliates. The consummation of the proposed transaction by Deutsche Bank is expressly conditional on successful completion of KYC due diligence and adoption of all relevant entities to Deutsche Bank's satisfaction, including, without limitation, obtaining any relevant Anti Financial Crime compliance approval.

We are sending you this term sheet on the basis that you are a potential counterparty acting at arm's length. This term sheet is for discussion purposes only and is not intended to create any legally binding obligations between us. The type of transaction described in this document may not be suitable for you. For general information regarding the nature and risks of the transaction and types of financial instruments please go to www.globalmarkets.db.com/riskdisclosures. Please also take your own independent professional advice in order to assess if this type of transaction is appropriate for you given your circumstances and objectives. We are not acting as your financial, legal, tax or other adviser or in any fiduciary capacity, and this document does not constitute advice, or an offer (of any type), invitation to offer or recommendation, to you.

If after making your own assessment you independently decide you would like to pursue a specific transaction with us there will be separate offering or other legal documentation, the terms of which will (if agreed) supersede any indicative and summary terms contained in this document. We therefore do not accept any liability for any direct, consequential or other loss arising from reliance on this document.

Deutsche Bank AG ("Deutsche Bank") may maintain positions in the products referred to herein, or be engaged in other transactions involving these products and/or earn brokerage and fees etc.

Please note that: (a) we are making no representation as to the profitability of any financial instrument or economic measure. Assumptions, opinions and estimates expressed constitute our judgment as of the date of this material and are subject to change without notice. An investment in this type of transaction may result in the loss of your investment. Past performance is not indicative of future results; (b) there is likely to be little or no secondary market for this type of transaction; (c) we are dealing with you on a principal to principal basis and do not accept any responsibility for any dealings, including on-selling, between you and any third parties; (d) we make no representation as to the completeness or accuracy of the information contained in this document; and (e) you may not distribute this document, in whole or part, without our express written permission

You represent that you will comply with all applicable securities laws in force in any jurisdiction in which you purchase, offer, sell or deliver securities or possess or distribute transaction documentation and Deutsche Bank shall have no responsibility therefore. In particular, in relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (Directive 2003/71/EC) you represent that with effect from the date on which the Prospectus Directive is implemented in such Member State you will not make an offer of securities to the public in such Member State except during the 12 months following the publication of a prospectus approved in or passported into such Member State or at any time other than in circumstances which do not require the publication of a prospectus pursuant to Article 3 of the Prospectus Directive. Deutsche Bank is authorized under German Banking Law (competent authority: BaFin - Federal Financial Supervising Authority) and regulated by the Financial Services Authority for the conduct of UK business. Securities and investment banking activities in the United States are performed by Deutsche Bank Securities Inc., member NYSE, FINRA and SIPC, and its broker-dealer affiliates. Lending and other commercial banking activities in the United States are performed by Deutsche Bank AG, and its banking affiliates. © 2019 Deutsche Bank AG.

Deutsche Bank
Corporate & Investment Bank



## Indicative terms: 450 MW portfolio term takeout financing

| | |
|---|---|
| Sponsor | Alta Power, LLC |
| Borrower(s) | Goodalta Power Center LLC, Altajac Power Center LLC, Avocet Power Center LLC |
| Project(s) | Goodlow, Jacksonville, Lufkin |
| Mandated Lead Arranger, Structuring Bank, Hedging Bank | Deutsche Bank AG NY or any of its affiliates |
| Administrative / Collateral Agent | Deutsche Bank Trust Company Americas |
| Facilities | Senior secured construction-to term facility |
| Use of proceeds | Fund up to [90]% of construction costs on Goodlow, Jacksonville, Lufkin |
| Maturity | [5] years |
| Upfront fee / OID | [3.00]% |
| Margin | L+[4.50]% |
| Undrawn commitment fees | [40]% of applicable senior loan margin |
| Yield protection | Non call 2, callable at 101 at year 3, fully callable thereafter |
| Repayment | – Scheduled amortization: [5]% per annum<br>– Target balance cash sweeps: Set to reach a target debt balance of $[•]/kw at maturity<br>– Excess cash sweeps: [50]% of excess cash flow once the target debt balance has been reached |
| Interest rate hedging | [100]% of expected notional construction draw schedule, minimum of [75]% of base case amortization profile post-COD |
| Security | Senior secured on all assets of each project company and pledge of equity shares in each project company |
| Debt service reserve | [6] months, funded by cash or a letter of credit |
| Major maintenance reserve | To be determined based on due diligence |
| Outage insurance requirement | To be discussed |
| Minimum equity (%) | [10]% of construction costs |
| Covenants | Usual and customary |
| Conditions precedent | Usual and customary |
| Events of default | Usual and customary |

Deutsche Bank
Corporate & Investment Bank

1

CONFIDENTIAL INFORMATION SUBJECT TO PROTECTIVE ORDER

DBSI-SEC-00000160

# Exhibit 50

Alta App.000289

**To:**     Shan Jafri[SJafri@starwood.com]
**From:**   Josh Pandolfi[JPandolfi@starwood.com]
**Sent:**   Wed 10/9/2019 9:21:37 AM (UTC-04:00)
**Subject:** RE: Weekly Pipeline

Let's add the following:

Primary:

> ### Redacted - Not Responsive

- Alta Power – Lead, Power, TLA, Construction, Primary, 25%, <mark>end of Dec close</mark>, margin 450, 82, 82, construction financing for refurbished peakers in ERCOT

> # Redacted - Not Responsive

**\*Please note the new work # below**

**Josh Pandolfi**
Managing Director, Origination
**Starwood Infrastructure Finance**
(W) 203-487-8055 | (M) 203-312-4434



EXHIBIT
221

**From:** Shan Jafri
**Sent:** Tuesday, October 8, 2019 3:02 PM
**To:** Josh Pandolfi <JPandolfi@starwood.com>; Claudine Disario <CDisario@starwood.com>
**Subject:** Weekly Pipeline

Josh & Claudine,

Attached is the pipeline report as of 10/4/2019. Please let me know if you have any updates.

Thanks,

**Shan Jafri**
Starwood Property Trust
**Analyst**

301 Tresser Boulevard, 12th Floor
Stamford, CT  06901
Direct: 203-487-8061
Cell: 203-604-4610
sjafri@starwood.com



IMPORTANT: The information contained in this e-mail message is confidential
and is intended only for the named addressee(s). This message may be protected
by the attorney/client privilege. If the reader of this e-mail message is not
the intended recipient (or the individual responsible for the delivery of this

CONFIDENTIAL

SPT00001781

e-mail message to the intended recipient), please be advised that any re-use,
dissemination, distribution or copying of this e-mail message is prohibited.
If you have received this e-mail message in error, please reply to the sender
that you have received this e-mail message in error and then delete it.
Starwood Capital Group's privacy policy can be found at the following:
https://starwoodcapital.com/disclaimer/
Thank you.

CONFIDENTIAL

# Exhibit 51

Alta App.000292

Message

| | |
|---|---|
| **From:** | Josh Pandolfi [JPandolfi@starwood.com] |
| **Sent:** | 10/30/2019 2:09:02 PM |
| **To:** | Erich Bergmann [EBergmann@starwood.com] |
| **CC:** | Shan Jafri [SJafri@starwood.com] |
| **Subject:** | Re: Alta Power - Returns Inputs |

I'll call you now.  Let's assume we do the whole deal.  Everything else looks good

Josh Pandolfi
Managing Director, Origination
Starwood Infrastructure Finance
203-312-4434



On Oct 30, 2019, at 2:06 PM, Erich Bergmann <EBergmann@starwood.com> wrote:

Shan - See attached model and let me know if you have any questions.

Josh - please let me know if any of the assumptions below need to be adjusted.  Let's talk through the cash flow scenario we want to show when you have a second on the way home from the airport.  Right now I am assuming minimal merchant power revenue

Returns are as follows:
Total Loan Amount: $85MM
SIF Portion: $42.5MM
Tenor: Construction + 5 years
Close date: 12/31/2019
COD of both plants: 10/31/2020
First quarterly payment and sweep date: 3/31/2020
Maturity: 10/31/2025
Up-front Fee: 2.0%
Margin: L+400
Commitment Fee: 75bps
Construction Draw Schedule: $85MM over the first 10 months of 2020, assume pro-rata
Amort: 7.0% p.a.
Cash Sweep: See the model for the annual numbers.  For the annual cash sweep numbers, distribute the total through each of the four quarters with the following allocations: Q1 – 21%, Q2- 21%, Q3 – 37%, Q4 – 21%.

Let me know if you have any questions.

Best,
Erich

**Erich Bergmann**
Starwood Property Trust
**AVP, Starwood Infrastructure Finance**

**Please note my new contact information:**

301 Tresser Boulevard, 12th Floor
Stamford, CT  06901

203-487-8052 (direct)
475-214-4266 (cell)
ebergmann@starwood.com

<image002.png>

---

IMPORTANT: The information contained in this e-mail message is confidential
and is intended only for the named addressee(s). This message may be protected
by the attorney/client privilege. If the reader of this e-mail message is not
the intended recipient (or the individual responsible for the delivery of this
e-mail message to the intended recipient), please be advised that any re-use,
dissemination, distribution or copying of this e-mail message is prohibited.
If you have received this e-mail message in error, please reply to the sender
that you have received this e-mail message in error and then delete it.
Starwood Capital Group's privacy policy can be found at the following:
https://starwoodcapital.com/disclaimer/
Thank you.

<Alta Power Model - Phase 1 - 2 Plants - 10022019 w Merchant EGB v4.xlsx>

SP7601801801

# Exhibit 52

Alta App.000295

Message

| | |
|---|---|
| **From:** | Josh Pandolfi [JPandolfi@starwood.com] |
| **Sent:** | 11/7/2019 1:39:19 PM |
| **To:** | Matthew Laterza [mlaterza@altapowerdev.com] |
| **CC:** | Erich Bergmann [EBergmann@starwood.com]; Peter Tom [PTom@starwood.com] |
| **Subject:** | RE: ERCOT Peaker Project |
| **Attachments:** | Alta Power - SIF Terms - 11-7-19.pdf |

Matt, subject to our full due diligence, attached are some high level terms that we would seek to execute upon once you are able to raise the junior facilities/equity.  I'll be out of the office tomorrow, but happy to discuss early next week.

Josh

**\*Please note the new work # below**

**Josh Pandolfi**
Managing Director, Origination
**Starwood Infrastructure Finance**
(W) 203-487-8055| (M) 203-312-4434



**From:** Matthew Laterza [mailto:mlaterza@altapowerdev.com]
**Sent:** Wednesday, October 30, 2019 3:51 PM
**To:** Erich Bergmann <EBergmann@starwood.com>
**Cc:** Josh Pandolfi <JPandolfi@starwood.com>
**Subject:** RE: ERCOT Peaker Project

**EXTERNAL: Verify Sender/Links**

Erich,

Attached is the latest term sheet for the HRCO.  The pricing has not been updated.  Latest indicative bid is $5.37 / kW-mo.

The number of on-peak vs. off-peak hours is not limited contractually.  We based these assumptions in the model on a 5-year hourly backcast of DAM pricing vs. gas prices.

Hope this helps.

Matt

**From:** Erich Bergmann <EBergmann@starwood.com>
**Sent:** Wednesday, October 30, 2019 2:36 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Cc:** Josh Pandolfi <JPandolfi@starwood.com>
**Subject:** RE: ERCOT Peaker Project

Matt,

Alta App.000296

SPT00000433

Thanks for the response. We also had a few more HRCO related questions. Could you send us the Term Sheet for the HRCO if possible? We are trying to understand what is driving the number of on-peak and off-peak hours called under the HRCO, and whether that will be fixed in the contract or if it was modeled out?

We understand the remainder of on-peak hours in July/August are expected to bid into the responsive reserves (20%) and merchant energy (80%) markets and are therefore driving significant revenue, so wanted to better understand the dynamics of how much the HRCO could be called.

Thanks,
Erich

**From:** Matthew Laterza [mailto:mlaterza@altapowerdev.com]
**Sent:** Monday, October 28, 2019 6:58 PM
**To:** Erich Bergmann <EBergmann@starwood.com>; Josh Pandolfi <JPandolfi@starwood.com>
**Subject:** RE: ERCOT Peaker Project

EXTERNAL: Verify Sender/Links

Erich,

Thanks for sending this. I've gone back and read through our contracts and I can't find anything that would obligate us to compensate them for the SASM costs. Also, if you look at the chart a couple of pages later, there was only one instance where the price of replacement AS was at the 40x level. Most of the time the market is quite a bit more stable.

Let me know when you guys have more feedback.

Matt

**From:** Erich Bergmann <EBergmann@starwood.com>
**Sent:** Wednesday, October 23, 2019 10:50 AM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>; Josh Pandolfi <JPandolfi@starwood.com>
**Subject:** RE: ERCOT Peaker Project

Matt,
Thanks again for speaking with us. I was referencing the discussion on pg. 45 of the report (PDF pg. 83/181) which states that "QSEs without large resource portfolios are effectively precluded from participating in ancillary service markets because of the replacement risk faced in having to rely on a supplemental ancillary services market (SASM)."

If Tenaska as your QSE for example had to spend a lot of money to replace ancillaries which were not able to be provided by one of your plants due to a forced outage or some other circumstance, would they pass that cost back to the project? Let me know if that clarifies the question.

Best Regards,
Erich

**Erich Bergmann**
Starwood Property Trust
**AVP, Starwood Infrastructure Finance**

301 Tresser Boulevard, 12th Floor
Stamford, CT  06901
203-487-8052 (direct)

SPT00000434

Alta App.000297

475-214-4266  (cell)
**ebergmann@starwood.com**



STARWOOD
INFRASTRUCTURE FINANCE

**From:** Matthew Laterza [mailto:mlaterza@altapowerdev.com]
**Sent:** Wednesday, October 23, 2019 11:27 AM
**To:** Josh Pandolfi <JPandolfi@starwood.com>
**Cc:** Erich Bergmann <EBergmann@starwood.com>
**Subject:** RE: ERCOT Peaker Project

EXTERNAL: Verify Sender/Links

See attached slide.

**From:** Josh Pandolfi <JPandolfi@starwood.com>
**Sent:** Friday, October 18, 2019 1:40 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Cc:** Erich Bergmann <EBergmann@starwood.com>
**Subject:** RE: ERCOT Peaker Project

Matt, below are some questions.  Let me know if it's easier to have a call next week.  Thanks,

1. What are the forced and unforced outage rates assumed for each of the plants (Jacksonville and Goodlow)?  It doesn't look like anything is built into the model except for capacity and heat rate degradation?
2. HRCO Questions
    a. Can you confirm why the contract is sized at 127.5MW from May – September?  Is the goal to capture the real-time power prices with the available merchant capacity?  During the October-April period when 141MW are committed under the HRCO, nearly the entire capacity, how do you think about the risk of maintenance outages and unforced outages?
    b. What is the estimated basis differential between the HRCO settlement gas and power hubs vs. physical?
    c. What are the contract terms around maintenance or other outages?
3. What is your source for the ERCOT power strips and ancillary services strips?  Are the power strips estimated at the node or the hub?
4. With only ~3,000MW of responsive reserve per month on average and ~1,500MW of non-spin reserve per month on average (according to 2018 State of the Market Report), what is the strategy to successfully clear the market?  Can you provide some additional detail on your QSE's strategy?
5. How do you think about the risk presented by having to procure replacement ancillaries in the supplemental ancillary services market?

**\*Please note the new work # below**

**Josh Pandolfi**
Managing Director, Origination
**Starwood Infrastructure Finance**
(W) 203-487-8055| (M) 203-312-4434

Alta App.000298

**From:** Matthew Laterza [mailto:mlaterza@altapowerdev.com]
**Sent:** Friday, October 11, 2019 2:45 PM
**To:** Josh Pandolfi <JPandolfi@starwood.com>
**Subject:** RE: ERCOT Peaker Project

**EXTERNAL: Verify Sender/Links**

Josh,

Thanks for following up. I look forward to getting your feedback.

Matt

**From:** Josh Pandolfi <JPandolfi@starwood.com>
**Sent:** Friday, October 11, 2019 8:41 AM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Subject:** RE: ERCOT Peaker Project

Matt, sorry for the delay, we've had some fire drills over here. We're going through the model now. I should have some feedback early next week

**\*Please note the new work # below**

**Josh Pandolfi**
Managing Director, Origination
**Starwood Infrastructure Finance**
(W) 203-487-8055| (M) 203-312-4434

**From:** Matthew Laterza [mailto:mlaterza@altapowerdev.com]
**Sent:** Thursday, October 10, 2019 4:32 PM
**To:** Josh Pandolfi <JPandolfi@starwood.com>
**Subject:** RE: ERCOT Peaker Project

**EXTERNAL: Verify Sender/Links**

Josh,

Just left you a VM. Have you had a chance to think any further about senior for our projects?

Let me know if there's anything I can do to help as you evaluate.

Matt

**From:** Matthew Laterza
**Sent:** Wednesday, October 2, 2019 3:30 PM

CONFIDENTIAL

Alta App.000299

STWD00000436

**To:** Josh Pandolfi <JPandolfi@starwood.com>
**Subject:** RE: ERCOT Peaker Project

Josh,

Thanks for the time earlier. Attached is a model with the latest HRCO pricing and sized down for two plants.

Let me know if you have any questions or feedback.

Matt

**From:** Josh Pandolfi <JPandolfi@starwood.com>
**Sent:** Thursday, September 5, 2019 10:07 AM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Subject:** RE: ERCOT Peaker Project

Matt, just tried you, but it never went to vm. Try my cell when free.


**\*Please note the new work # below**

**Josh Pandolfi**
Managing Director, Origination
**Starwood Infrastructure Finance**
(W) 203-487-8055| (M) 203-312-4434


**From:** Matthew Laterza [mailto:mlaterza@altapowerdev.com]
**Sent:** Thursday, September 5, 2019 9:59 AM
**To:** Josh Pandolfi <JPandolfi@starwood.com>
**Subject:** Re: ERCOT Peaker Project

**EXTERNAL: Verify Sender/Links**

That works for me. You can call my office at 832-397-6039.


Thanks and look forward to speaking then.

Matt

**From:** Josh Pandolfi <JPandolfi@starwood.com>
**Sent:** Thursday, September 5, 2019 7:23 AM
**To:** Matthew Laterza
**Subject:** RE: ERCOT Peaker Project

Alta App.000300

Can I call you around 10 CT? I'm at a conference in Austin and have a break at that time. What's the best # to reach you?

**\*Please note the new work # below**

**Josh Pandolfi**
Managing Director, Origination
**Starwood Infrastructure Finance**
(W) 203-487-8055| (M) 203-312-4434

**From:** Matthew Laterza [mailto:mlaterza@altapowerdev.com]
**Sent:** Wednesday, September 4, 2019 10:54 PM
**To:** Josh Pandolfi <JPandolfi@starwood.com>
**Subject:** Re: ERCOT Peaker Project

**EXTERNAL: Verify Sender/Links**

Josh,

No, we are developing similar projects, but with some key differences:

1) LM6000s overhauled by GE with the same OEM warranty and output/performance guarantees as a new turbine and a long term service agreement with an OEM authorized service provider;

2) Casey Industrial as EPC contractor (they've done 18 LM6000s in the US, along with countless other types of gas turbines and recips);

3) Firm gas transportation agreements with multiple delivery and receipt points for gas optimization;

4) NAES as O&M contractor.

Alta App.000301

SRT00000438

These are quite a few other differences that I'd be happy to walk through with you on a call if there's interest on your part.

Matt

Get Outlook for iOS

_____

**From:** Josh Pandolfi <JPandolfi@starwood.com>
**Sent:** Wednesday, September 4, 2019 9:49:12 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Subject:** Re: ERCOT Peaker Project

Matt, are these the Castleman assets?

Josh Pandolfi
Managing Director, Origination
Starwood Infrastructure Finance
203-312-4434

On Sep 4, 2019, at 9:13 PM, Matthew Laterza <mlaterza@altapowerdev.com> wrote:

> **EXTERNAL: Verify Sender/Links**
>
> Patrick,
>
> Thanks for the intro. Moving you to BCC.
>
> Josh,
>
> As Patrick mentioned in his email we are looking for a debt solution for our ERCOT peaker projects. Let me know if this is something you might have interest in.
>
> Matt
>
> GetOutlook for iOS

CONFIDENTIAL

Alta App.000302

SPT00000439

**From:** Gimlett, Patrick <Patrick.Gimlett@alliancebernstein.com>

**Sent:** Wednesday, September 4, 2019 5:48:22 PM

**To:** Matthew Laterza <mlaterza@altapowerdev.com>

**Cc:** Josh Pandolfi <JPandolfi@starwood.com>

**Subject:** FW: ERCOT Peaker Project

Matt – It was nice to chat earlier. Copied to this email is Josh Pandolfi of Starwood. Josh specializes in the power finance world.

Josh – Per our quick conversation earlier, Matt is looking for debt capital solution. Below is a quick summary. I will leave to you two to coordinate if it might be a fit for Starwood.

Regards,

Pat


**Patrick Gimlett**

Managing Director | AB Private Credit Investors

T +1 832 366 2055    M +1 302 463 6364

Patrick.Gimlett@AllianceBernstein.com

1000 Louisiana St, Suite 3600

Houston, TX  77002

alliancebernstein.com/go/abpci | LinkedIn

**From:** Matthew Laterza <mlaterza@altapowerdev.com>

**Sent:** Wednesday, September 04, 2019 4:17 PM

**To:** Gimlett, Patrick <Patrick.Gimlett@alliancebernstein.com>

**Subject:** ERCOT Peaker Project

Patrick,

CONFIDENTIAL

SRT00300440

Thanks so much for taking the time to speak with me earlier.

We are developing three natural gas fired peaking power plants in ERCOT (150 MW each for a total of 450 MW). Below is a brief summary of the project highlights:

- Plants will use grey market equipment refurbished by the OEM (GE) with warranty, output and performance guarantees from the OEM
- Turnkey EPC costs of ~$400 / kW vs. ~$950 / kW for newbuilds
- Contracted cash flows from a 5 year offtake contract with an investment grade counterparty plus ancillary services revenue from ERCOT covering a majority of project costs
- Plants will be capable of <10 min start and black start capable enabling participation in full range of ancillary services markets
- Total project costs of ~$200MM

We were expecting to close our unitranche facility this week or next and had received lender's credit committee tentative approval, but our lead bank (who was underwriting the entire transaction) had some internal institutional issues arise recently and they are currently on hold pending some kind of resolution. They've given us permission to speak with other financing sources. We need to move quickly if we are going to make the summer 2020 run in ERCOT. We're fairly ready to close on our side as we have an independent engineering report being delivered tomorrow, fully baked White & Case credit docs, W&C fully reviewed all major contracts and is finalizing their legal diligence report, etc.

Again, thank you so much for your time and help. I'd definitely like to buy you lunch sometime for helping out.

Thanks,
Matt Laterza


.............................................................................

For further important information about AllianceBernstein please click here
http://www.alliancebernstein.com/disclaimer/email/disclaimer.html

CONFIDENTIAL

IMPORTANT: The information contained in this e-mail message is confidential
and is intended only for the named addressee(s). This message may be protected
by the attorney/client privilege. If the reader of this e-mail message is not
the intended recipient (or the individual responsible for the delivery of this
e-mail message to the intended recipient), please be advised that any re-use,
dissemination, distribution or copying of this e-mail message is prohibited.
If you have received this e-mail message in error, please reply to the sender
that you have received this e-mail message in error and then delete it.
Starwood Capital Group's privacy policy can be found at the following:
https://starwoodcapital.com/disclaimer/
Thank you.

SRT00600442

**Alta Power**
**Indicative Summary of Proposed Terms and Conditions**
**Senior Secured Credit Facilities**
**November 7, 2019**

*This Summary of Proposed Terms and Conditions ("Term Sheet") is for discussion purposes only, is non-binding and is only an outline of certain of the material terms of the proposed Senior Secured Credit Facilities and does not purport to summarize all of the provisions which would be contained in the Senior Secured Credit Facilities documentation. This Term Sheet is subject to change based upon, among other factors, due diligence, and does not constitute a direct or indirect commitment for financing or to consummate any transaction of any kind. This Term Sheet is confidential and may not be disclosed to third parties without Starwood's prior written approval.*

| | |
|---|---|
| Borrower: | TBD (Assumes construction of the Jacksonville and Goodlow plants at 150MW each) |
| Lead Arranger and Lending Entity: | SPT Infrastructure Finance, LLC and/or one or more of its affiliates ("**Starwood**") |
| Credit Facilities: | • Term Loan:  Up to $85,000,000 and not to exceed 65% of total project costs<br>• Revolver/LC Facility:  Up to $20,000,000 |
| Starwood Commitment: | Up to $105,000,000 |
| Amortization: | 5% p.a. |
| Cash Flow Sweep: | • 100% sweep to quarterly targets to get to $100/kW at maturity<br>• Excess cash flow sweep of 25% |
| Tenor: | Construction + 5 years |
| Interest Rate: | Libor + [4.00-4.50%], with 25bps step up after year 3.  Libor floor of 1.00% |
| Upfront Fee: | 2.50% |
| Arrangement Fee: | $250,000 |
| Commitment Fee: | 75 bps |
| Admin Agent Fee: | $50,000 p.a. |
| Call Protection: | 101 for 12 months |
| Distribution Conditions: | DSCR not less than 1.20:1.00 and other provisions TBD |
| Financial Covenant: | DSCR not less than 1.10:1.00 |
| Hedging Requirement: | Satisfactory energy margin hedges for a minimum term of 5-years at a price no less than $[5.40]/kW-month |

Alta App.000306

SPT00800443

# Exhibit 53

Alta App.000307


DEPOSITION
EXHIBIT
235





Energy Security

# A New Breed of Energy Security: HO Clarke Power Plant



*WattBridge, a relatively new independent power producer that evolved out of a non-OEM aeroderivative gas turbine solutions provider, completed its first power facility based on a standardized LM6000 plant design in January 2021, just weeks ahead of Winter Storm Uri. The design has been replicated in an expanding 2.3-GW fleet purpose-built to furnish the volatile Texas grid with crucial peaking power.*

Alta App.000308

## Get POWER Plant ID NOW for only 99¢

  ★ ★ ★ ★ ★

**JOIN NOW!**

Join the POWER community today and experience POWER Magazine like never before. With exclusive access to archived media, webinars, podcasts, and events, you'll gain valuable insights into the industry. Plus, with the brand-new POWER Plant ID data product, you'll be able to capture industry in a whole new light. And the best part? You can join now for only 99¢! Don't miss opportunity to expand your resources and connect with like-minded professionals in the community.

Electricity peaking plants, sometimes called peak-lopping plants, have existed since the inception of the interconnected grid, helping to balance the fluctuating power requirements of the electricity grid. As the energy transition has accelerated, bringing with it a massive influx of non-dispatchable variable generation from renewables, more emphasis has grown on the value of flexibility, from minute-to-minute, hour-to-hour, and season-to-season.

In 2018, that value became more critical within the Electric Reliability Council of Texas (ERCOT). The grid operator that serves 90% of Texas warned it was struggling to expand to the summer reserve margin. While the wholesale energy market had seen a proliferation of wind and solar resources—and even recently added a reliability risk desk to closely monitor and respond to wind and solar forecast errors, net load ramps, inertia levels, and ancillary service needs—its summer reserve margin had fallen dramatically to 11%, well below its target of 13.5%. ERCOT pointed to a spate of recent plant retirements, including major coal baseload generators, for the tight operating conditions.

PROENERGY, a Sedalia, Missouri–based integrated energy service solutions provider, sensed an opportunity. The company has painstakingly built its capabilities in power plant construction, equipment repair, overhaul services, outage response, and turnkey plant operation solutions since its founding in 2002 by President and CEO Jeff Canon. Today, PROENERGY employs more than 500 professionals, has a global experience footprint covering 40 countries, and specializes in services for the LM6000 and LM2500 platforms. Canon, an industry veteran, is specifically fluent in the capabilities of LM6000 aeroderivative gas turbines, owing to his deep experience at some of the nation's iconic power plants, including as plant manager at Pasco County Cogeneration Facility in Dade City, Florida. *POWER* recognized that facility as a Top Plant in 1994 for installing the world's first two GE LM6000 aeroderivative gas turbines.

Alta App.000309



## Enhancing Backup Power Safety and Reliability with the BPTM

 TESCO

**Read Case Study**

PG&E's Backup Power Transfer Meter enhances wildfire safety, enables seamless generat
supports grid resilience—providing thousands of California customers with safer, utility-m
backup power during outages.

LM6000PC technology, which now has the benefit of three decades of operational experience, is a quick-start, highly efficient technology that is ideally suited to support renewable balancing, Canon told POWER in September. Derived from GE's CF6-80C2 high bypass turbofan aircraft engine, the 46.1-MW simple-cycle, two-shaft turbine is still one of the most fuel-efficient in its size class.

# Sensing an Opportunity

In 2018, however, though cost and market conditions were optimal, a standardized LM6000 power plant package was not available. To fill the market gap, PROENERGY designed a fully engineered and standardized modular peaking plant that could be delivered turnkey and perform reliably with an absolute cost advantage. It rolled out the solution, "PowerFLX," in 2018, furnishing customers with a single source point—from inception through commercial operation—for building out PowerFLX plants. At the same time, it established a dedicated power generating company, WattBridge, to develop, own, and operate PowerFLX plants. PROENERGY tasked Mike Alvarado, a longtime power plant developer, with leading initial WattBridge opportunities in ERCOT.

Alta App.000310



*1. HO Clarke I has six LM6000PC units with a combined capacity of 288-MW. Courtesy: PROENERGY*

While WattBridge isn't "tied to a single technology," its mission is to accelerate a reduced carbon energy future. "We have the capabilities, resources, and technical expertise to deliver," Alvarado told POWER. The company's most lucrative draw as the transition accelerates and in a cutthroat market like ERCOT is "this really tremendous cost advantage that existed, born out of a pretty unique business model within PROENERGY," he said.

The PROENERGY cost advantage leverages a full integration, Canon explained. "Unlike a lot of independent power producers who don't build or operate their own plants, PROENERGY buys raw steel to build packages," he said. "We actually overhaul the engines ourselves. We have our own repair shops." PROENERGY, which is not an original equipment manufacturer (OEM), even repurposes machines. These turbines from Pasco, where Canon previously served as plant manager, were purchased by PROENERGY and placed in the WattBridge fleet.

The full integration also pans out to be a major plant development benefit, Alvarado said. "I think PROENERGY is arguably the expert in the world in this technology, both from an equipment standpoint, but also an operation and maintenance and [engineering, procurement, and construction (EPC)] standpoint," he said. The WattBridge underlying mission is to follow the market in a "reliable, cost-effective, and ultimately a responsible way," is also a big draw. Investors value responsibility, he noted, and the WattBridge gas power offering caters to energy security by bolstering "market requirements being born out of [renewable] intermittency."

## ⌐ ˋ8-Week Construction Timeframe

Alta App.000311

The unique model and its plant install price, which "is significantly less than our competition," provided a crucial opening in the summer of 2019, when ERCOT wholesale power prices spiked, signaling attractive conditions for new builds, Canon said. WattBridge quickly kicked off the development of its first plant, HO Clarke, a 288-MW peaker in Houston that would be equipped with six LM6000PC units, running at average heat rate of 9,725 Btu/kW. Canon said the primary motivation for PROENERGY to build the plant was to provide a physical "showplace for our product, looking at it as a fully integrated business." However, its economics are also sound, even while running at an 11.7% capacity factor in its first year, which has increased sharply in 2022. "From a market perspective, we have heat rate call options on the facility, so that underpins the economics," Canon said.

While the project achieved financial close in December 2019, it received its construction permit in March 2020. "That was the beginning of COVID [disruptions]," recalled Alvarado. "And effectively, what the City of Houston did was convert permitted operations to a remote situation. That slowed us down." Still, the company spearheaded construction in earnest, and by December 2020—within 38 weeks—it was ready for commissioning.

"That gives you a sense of the value of this business model," Alvarado said. "It's just a very compelling advantage that we have in the industry. Timelines in the industry are typically closer to 18 to 24 months if you are doing it in a more traditional procurement way."

## A Powerhouse During Winter Storm Uri

The plant's commercial operation in January 2021 came at a crucial time. In mid-February, Winter Storm Uri unleashed its deadly three-day, statewide freeze, disabling an average 34 GW of generation—nearly half of ERCOT's all-time winter peak. The newcomer plant remained steadfast on the grid, with all six units providing 141 hours of uninterrupted critical power supplies to public safety infrastructure during the storm's critical days. The plant's resilient, weatherized design and its ideal location—on well-established gas infrastructure with firm supply and transport—played an essential role in that achievement.

PROENERGY preparation and expertise was also pivotal, said Alvarado. "We are a fast-start peaker generating station, designed to run in exactly these types of situations," he said. "Our biggest challenge was keeping our crew fed and sheltered as local hotels closed down within the first 24 hours of the storm. In the end, the crew slept on the control room floor in shifts for five days straight. We are so thankful for their efforts," he recalled.

HO Clarke's significant reliability attributes laid the foundation for several sister plants in the Greater Houston area. In fall 2021, WattBridge brought online two more LM6000PCs as part of the 96-MW HO Clarke II project. WattBridge in late 2019 also kicked off development of the two-phase Topaz facility in Galveston County. The seven-unit 336-MW Topaz I began operating in July 2021, and the three-unit 144-MW Topaz II followed within weeks that summer.

Alta App.000312



### To the "Edge" and Beyond: How Advanced Automation Technologies Transform Power Industry Innovation

Sponsored by Emerson

**Register for this Emerson webinar!**

Join us for an insightful webinar as industry experts delve into the realm of advanced automation and discuss real world challenges and opportunities associated with delivering bottom line value from current and future technologies. Our esteemed panelists will provide a quick introduction provide some perspectives on automation and control technologies shaping and impactir areas of responsibility, setting the stage for an in-depth exploration of current and future evolving technology landscape can deliver value and sustainability to power generation as

In summer 2022, meanwhile, WattBridge put online the six-unit 288-MW Braes Bayou plant in Fort Bend County. The 288-MW Mark One nearby is currently in the commissioning phase, and the company plans to fully commission its next project, the 288-MW Brotman facility, in early 2023. Recently placed in the construction queue, meanwhile, is the 480-MW Remy Jade, a greenfield project.

According to Alvarado, another 1,696 MW is in advanced stages of development. "Overall, we've raised close to $1.75 billion—which is fairly unique in the gas and thermal space in the last few years, just in terms of the amount of capital raised and the number of assets funded, under construction, and coming to commercial operation," Alvarado said.

## Sustainability Is Paramount

Committed to accelerating a reduced carbon energy future, WattBridge is also developing utility-scale energy storage at several of the company's natural gas plants, said Alvarado. "That's something we've been thoughtful about when we look for locations: reaching a scale and size that that's meaningful, but also enables energy storage," he said. "The economics of it are a little bit challenging right now, but it's very much in our plans."

Alta App.000313

## POWER POINTS
### Winning Attributes

✔ HO Clarke pioneers a standardized LM6000 power plant design that has demonstrated reliability, affordability, resiliency, and sustainability attributes.

✔ Designed to support the energy transition, the plant sets new benchmarks for gas peaking power development and construction timeframes, costs, and emissions.

✔ Built in just 38 weeks, the plant provided critical power to the power-strapped Texas grid during Winter Storm Uri.

At the same time, PROENERGY has invested $12.3 million (and 10,000 hours of engineering) in a "string-test" facility—"a unique, plant-level facility that mirrors real-world operating conditions while free from the grid"—that became fully hydrogen-ready in February 2022. The facility, equipped with a 60-MW load bank system, serves as the PROENERGY "proving ground" to help expand LM6000PC and PD fuel flexibility and resilience.

The company's ultimate goal is to test aeroderivative package design enhancements and power-augmentation methods while assessing the limits of hydrogen fuel mixes. Tests, which begin in 2022, will start below "the established 30% hydrogen mix." The company plans to make incremental increases to a 50% mix, with a long-term goal of a 100% hydrogen burn.

Canon is hopeful tests will initiate the next evolution of the LM6000 platform. "By testing these engines with blended and, eventually, green hydrogen fuel, we will broaden the applications of this technology and strengthen its value within a low-carbon economy," he said.

—*Sonal Patel is a POWER senior associate editor (@sonalcpatel, @POWERmagazine).*

**SHARE this article**

#Technology   #ERCOT   #Peaking Power   #Wattbridge   #Hydrogen   #HO Clarke

#Engineering   #LM6000   #Aeroderivative   #Gas Turbine   #ProEnergy   #Texas

Alta App.000314

# Recommended



**GE Vernova Unveils 100% Hydrogen-Fueled Aeroderivative Gas Turbine Solution, Secures First Customer**



**New Aeroderivative Gas Turbine Offering Hits the Market**



**Stanton Energy Reliability Center Hybrid Supplies Power When Southern California Needs It Most**



**Hybrid Plant Provides a Cleaner Power Solution**

# More Energy Security News

**Nation's Power Operators Warn Congress of a Coming Reliability Shortfall**

Seven major U.S. grid operators have raised a unified alarm about an impending capacity crunch, warning that the pace and…

**Gas Power's Boom Sparks a Turbine Supply Crunch**

Gas power is experiencing a stunning resurgence, driven by soaring electricity demand. But as utilities scramble to secure new capacity,…

**Europe Risks Grid Crisis Without Immediate Action on Dispatchable Power, Group Warns**

Europe's ambitious push toward carbon neutrality is rapidly replacing fossil fuel–fired power generation with variable renewable resources (VRE), but this…

**.e Security Imperative for Data Centers in an Innovation-Driven World**

Alta App.000315

Data centers serve as the silent backbone of our daily lives, the epicenter of digital communication, corporate data, and countless…



Oct 3, 2022

**by Sonal Patel**

## ALSO IN THIS ISSUE

October 3, 2022

**O&M** | Oct 3, 2022

**Fun in the Sun: Cane Island Is a Central Florida Treasure**

 by **Aaron Larson**

**Gas** | Oct 3, 2022

**Innovation, Efficiency at Heart of CHP Plant Upgrade**

 by **Darrell Proctor**

**Hydrogen** | Oct 3, 2022

**Harnessing an H-Class for Hydrogen: Long Ridge Energy Terminal**

 by **Sonal Patel**

**Gas** | Oct 3, 2022

**Expansion Project Furthers Indonesia's Increase in Power Generation**

 by **Darrell Proctor**

**O&M** | Oct 3, 2022

**Rental Boilers Fill Process Steam Gaps During Crucial Production Periods**

 by **Aaron Larson**

**Gas** | Oct 3, 2022

**Europe Turns to LNG to Avert Energy Crisis**

 by **Darrell Proctor**

**Trends** | Oct 3, 2022

C       ower Plant Wastewater Be Valuable?

 by **Sonal Patel**

Alta App.000316

**History** | Oct 3, 2022

A Legacy of Quality Reporting: POWER Turns 140

 by **Aaron Larson**

**Trends** | Oct 3, 2022

The Big Picture: Power Plant Additions Over the Decades [Infographic]

 by **Sonal Patel**

**Marmaduke** | Oct 3, 2022

Marnie Surfaceblow—Standing Up for Safety: Maya Sounds the Alarm, but Will Anyone Listen?

 by **Una Nowling, PE**

## FOLLOW US

*POWER* is at the forefront of the global power market, providing in-depth news and insight on the end-to-end electricity system and the ongoing energy transition. We strive to be the "go-to" resource for power professionals, offering a wealth of information on innovative business practices, sound safety measures, useful productivity enhancements, and much more.

Alta App.000317

**FOLLOW US**

f    X    in

*POWER* is at the forefront of the global power market, providing in-depth news and insight on the end-
to-end electricity system and the ongoing energy transition. We strive to be the "go-to" resource for
power professionals, offering a wealth of information on innovative business practices, sound safety
measures, useful productivity enhancements, and much more.

Alta App.000318



**May 2025 POWER Magazine Preview**



## 📅 POWER Events



**Data Center POWER eXchange** (DPX) is the first forum to bring together utilities, data center operators, policymakers, and investors to tackle the critical energy challenges posed by the rapid expansion of AI, hyperscale data centers, and cloud computing. The future of data centers is unfolding at an unprecedented pace, and with it comes a massive surge in electricity consumption. If…

**Oct 28 — Oct 28, 2025**
Denver, CO

Visit our site

Alta App.000319

A New Breed of Energy Security: HO Clarke Power Plant

Alta App.000320

# Exhibit 54

Alta App.000321

**To:** Joshua Presner[joshua.presner@db.com]
**From:** Matthew Laterza[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8F6EED0B000C4F419C7E8DBD7C543FB2-MLATERZA_86]
**Sent:** Thur 5/30/2019 3:36:11 PM Central Standard Time
**Subject:** RE: Bios

No other key employees or owners. We have a few support personnel, but that's it.
Will get you more detailed CVs tomorrow.
Matt

**From:** Joshua Presner <joshua.presner@db.com>
**Sent:** Thursday, May 30, 2019 3:34 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Subject:** RE: Bios

Thanks Matt. That's helpful color. Any other key employees or owners or is it just the four of you?
I do actually think detailed CVs would be very helpful if you can get those over.

**From:** Matthew Laterza [mailto:mlaterza@altapowerdev.com]
**Sent:** Thursday, May 30, 2019 4:23 PM
**To:** Joshua Presner <joshua.presner@db.com>
**Subject:** Bios

Josh,
Apologies for the delay. We've been swamped this week and a couple of folks have been traveling. Below is what I have handy for bios. I can send you more detailed CVs by the weekend if you think necessary. Otherwise let me know if the below is sufficient.
We received some updated pricing on a 5 year HRCO for energy only priced at $5.25 / kw-mo. Up from the $4.50 last price. This would give us an incremental ~$20MM in EBITDA across the three plants for 5 years.
On another note, ERCOT just printed 9K real time.
Matt

**William C. Phelps – Chief Executive Officer**
Mr. Phelps was a Co-founder, Executive Director and Chief Financial Officer of Coastal Energy (TSX: CEN), which operated in Thailand and Malaysia before its sale to CEPSA (IPIC-Abu Dhabi) in January 2014 for $2.3 billion, which represented an 8x return for IPO investors over 7 years and a 56x return for its founding shareholder, Oscar Wyatt. Before that, Mr. Phelps was the Chief Financial Officer of NuCoastal Thailand, the predecessor of Coastal Energy, and NuCoastal Power. His early background in energy was working for Citi as a senior member of the Energy Investment Banking Group, and prior to that the Leveraged Finance Group, where he advised on numerous M&A and financing transactions in the energy industry.

**Matthew E. Laterza – Chief Financial Officer**
Mr. Laterza served as Vice President of Finance of Coastal Energy Company (TSX: CEN), which operated in Thailand and Malaysia before its sale to CEPSA (IPIC-Abu Dhabi) in January 2014 for $2.3 billion, which represented an 8x return for IPO investors over 7 years and a 56x return for its founding shareholder, Oscar Wyatt. During his tenure he was responsible for the Company's finance operations and the Company's business development group, including the Company's entrance into Malaysia and its sale to CEPSA. Mr. Laterza also served as Commercial Manager for NuCoastal Power. His early background includes energy equity research at Credit Suisse and working as an analyst for a hedge fund.

**Travis West – Chief Operating Officer**
Mr. West has spent over 25 years in the utility industry, with responsibilities including managing project execution (EPC); managing operations and maintenance; managing regulatory compliance (permitting); and developmental strategies. Most recently Mr. West was the Executive Vice President for Agilon Energy with responsibilities including full implementation of two (100MW) peaking facilities within ERCOT, and two other (100MW) peaking facilities fully developed – these facilities were constructed using a strategic mix of secondary market aero-derivative gas turbines and new/secondary market balance of plant equipment providing installed cost well below the current market.

**Roy J. Hart – Chief Development Officer**
Mr. Hart has spent over 40 years in the power industry and deployed over 3,000 MW of generation. Most recently Mr. Hart developed 4 "fast-start" peaking plants (100MW each) in Texas for Agilon Energy. Prior to that, Mr. Hart ran NuCoastal Power, a company owned by Oscar S. Wyatt, Jr. (Coastal Energy, Coastal Corp), where he redeveloped an existing mothballed facility as a 300 MW combined cycle facility. The company was sold to a major equity fund. Mr. Hart also spent 20 years at Coastal Corporation, lastly as Executive Vice President in the Coastal Power division. Mr. Hart also spent 5 years working for Kiewit Construction leading successful EPC bids for 2000 MW of projects throughout the southern USA.

—

This communication may contain confidential and/or privileged information. If you are not the intended recipient (or have received this communication in error) please notify the sender immediately and destroy this communication. Any unauthorized copying, disclosure or distribution of the material in this communication is strictly forbidden.

Please refer to https://db.com/disclosures for additional EU corporate and regulatory disclosures.

Deutsche Bank does not render legal or tax advice, and the information contained in this communication should not be regarded as such.

**EXHIBIT**
2003
10-15-22 PSA

Alta App.000322

Alta 0004059

Alta App.000323

# Exhibit 55

Alta App.000324

**To:** Joshua Presner[joshua.presner@db.com]
**Cc:** Robin Cresswell[robin.cresswell@db.com]; Daniel Jimenez[daniel.jimenez@db.com]; Hadi Makkawi[hadi.makkawi@db.com]; Jeremy Eisman[jeremy.eisman@db.com]
**From:** Matthew Laterza[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8F61EED0B000C4F419C7E8DBD7C543FB2-MLATERZA_86]
**Sent:** Tue 7/2/2019 2:22:22 PM Central Daylight Time
**Subject:** RE: Alta Power Update
**Attachment:** Resume - Phelps.pdf
**Attachment:** Resume - West.pdf
**Attachment:** Resume - Hart.pdf
**Attachment:** Resume - Laterza.pdf

Josh,
CVs attached.
Matt

**From:** Joshua Presner <joshua.presner@db.com>
**Sent:** Monday, July 1, 2019 10:21 AM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Cc:** Robin Cresswell <robin.cresswell@db.com>; Daniel Jimenez <daniel.jimenez@db.com>; Hadi Makkawi <hadi.makkawi@db.com>; Jeremy Eisman <jeremy.eisman@db.com>
**Subject:** RE: Alta Power Update
Hi Matt,
I hope you had a good weekend. A couple of things as we head into the week:
    1. We have asked for fee schedules and engagement letters from White & Case (and Baker Botts as their local Texas sub), ICF, Tateswood, and Moore McNeil. To keep things moving I'll send them each over individually as they come in.
    2. Could you send me the full names and birth dates for Roy and Travis? Looping in Dan as well as we will should get the full KYC process started this week.
    3. Could you shoot over the team's CVs this week? We are looking to schedule a follow-up call with a potential pref investor before the holiday.
    4. Do you have some time today to briefly chat on EPC status, process, and expected timing? I think we'll need to clear the EPC bankability analysis with counsel and the technical advisors as the first step in the execution process since many of the due diligence workstreams depend directly on resolution of this component.

I'm free any time after 2:30 ET.
Thanks,
Josh

**From:** Matthew Laterza [mailto:mlaterza@altapowerdev.com]
**Sent:** Thursday, June 06, 2019 7:45 PM
**To:** Joshua Presner <joshua.presner@db.com>
**Cc:** Robin Cresswell <robin.cresswell@db.com>
**Subject:** RE: Alta Power Update
Josh,
For me and Bill:
Matthew Edward Laterza
03/12/1984
3255 Las Palmas St. #652
Houston, TX 77027
3255 Las Palmas St. #553
Houston, TX 77027
William Clark Phelps
10/13/1971
3617 Inwood Dr.
Houston, TX 77019
Will get you Roy & Travis tomorrow.
Matt

**From:** Joshua Presner <joshua.presner@db.com>
**Sent:** Tuesday, June 4, 2019 2:16 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Cc:** Robin Cresswell <robin.cresswell@db.com>
**Subject:** RE: Alta Power Update
Matt,
Thanks. We'll get started on that. Also, we'd like to get moving on some of the preliminary KYC checks as they can be long lead-time items. Can you send over the following additional info on William, yourself, Roy and Travis?
    • DOB's
    • Middle names
    • Residence or previous addresses

Best,
Josh

**From:** Matthew Laterza [mailto:mlaterza@altapowerdev.com]
**Sent:** Monday, June 03, 2019 3:16 PM
**To:** Joshua Presner <joshua.presner@db.com>
**Cc:** Robin Cresswell <robin.cresswell@db.com>
**Subject:** Alta Power Update



EXHIBIT
2004
10-15-22 P9A

Alta App.000325
Alta 0006183

Josh,

Putting the CVs together now.

Latest model with updated HRCO prices attached.

Alta Power LLC is the Texas LLC. Registered office is 4605 Post Oak Place Dr. Ste 270 Houston, TX 77027.

Alta Power LLC is owned by Coronado Power LLC, a Delaware LLC. Registered address is 2035 Sunset Lake Rd., Suite B-2, Newark DE 19702

FYI – there is no relationship whatsoever to Coronado Power Ventures LLC (a Texas LLC). Just a coincidental similar name. We've filed the paperwork with the Delaware Secretary of State to change the name of this entity to Alta Power LLC as well. That should come through this week.

Also, can you guys get started on a draft mandate letter? We've got a couple of indications of interest on our side for the pref piece as well as whomever you guys are speaking with.

Thanks,

Matt

—

This communication may contain confidential and/or privileged information. If you are not the intended recipient (or have received this communication in error) please notify the sender immediately and destroy this communication. Any unauthorized copying, disclosure or distribution of the material in this communication is strictly forbidden.

Please refer to https://db.com/disclosures for additional EU corporate and regulatory disclosures.

Deutsche Bank does not render legal or tax advice, and the information contained in this communication should not be regarded as such.

—

This communication may contain confidential and/or privileged information. If you are not the intended recipient (or have received this communication in error) please notify the sender immediately and destroy this communication. Any unauthorized copying, disclosure or distribution of the material in this communication is strictly forbidden.

Please refer to https://db.com/disclosures for additional EU corporate and regulatory disclosures.

Deutsche Bank does not render legal or tax advice, and the information contained in this communication should not be regarded as such.

Alta App.000326

# William C. Phelps

Chief Executive Officer

4605 Post Oak Place Drive Suite 270
Houston, Texas 77027
**713-497-7575**
**wphelps@altapowerdev.com**

## EXPERIENCE

**Alta Power LLC,** Houston, TX — *Co-Founder & Chief Executive Officer*

2016 – PRESENT

Development of 450 MW of natural gas peaking plants in ERCOT.

**Hague & London Oil plc,** Houston, TX — *Co-Founder & Non-Executive Director*

2014 – PRESENT

Advised on acquisition of Dutch North Sea natural gas assets from Tullow
plc.

**Coastal Energy Company,** Houston, TX — *Co-Founder & Chief Financial Officer*

2005 – 2014

Independent exploration & production company with assets in Thailand &
Malaysia. Sold to CEPSA (Abu Dhabi – IPIC) in 2014 for $2.3 billion.

**NuCoastal Power,** Houston, TX — *Co-Founder & Chief Financial Officer*

2005 – 2009

Independent power producer that developed a 300MW natural gas fired
power plant in Victoria, TX. Acquired a portfolio of mothballed power
plants from Riverstone/Sempra.

**Citigroup,** New York, NY/Houston, TX— *Vice President*

1997 – 2005

Energy Investment Banking Group.

## EDUCATION

**London School of Economics,** London, UK — *M.Sc. Finance*

1997

**University of Texas,** Austin, TX — *B.A. Economics*

1994

Alta App.000327

Alta 0006185

# Travis G. West

Chief Operating Officer

4605 Post Oak Place Drive Suite 270
Houston, Texas 77027
**225-936-9602**
**twest@altapowerdev.com**

## EXPERIENCE

**Alta Power LLC,** Houston, TX — *Chief Operating Officer*

2018–PRESENT

Development of 450 MW of natural gas peaking plants in ERCOT.

**Castleman Power Development/Agilon Energy,** Houston, TX — *EVP Projects*

2014 – 2018

Developed 4 100MW gas fired peakers in ERCOT. Oversaw construction
of two of the plants to completion.

**STEP Combustion,** Baton Rouge, LA — *Sr. Project Manager*

2009–2014

Incorporating low NOx technology on fossil fired equipment.

**ACT/Fuel Tech,** Baton Rouge, LA — *Sr. Project Manager*

2003–2009

Project management of combustion solutions and NOx reduction
equipment.

**RJM Corp.** Baton Rouge, LA — *Regional Sales Manager*

2000–2014

Sales and installation/start-up oversight for the utility industry.

**Air & Combustion Services,** Baton Rouge, LA — *Manufacturer's Representative*

1997–2000

Provided combustion equipment to the refining and petrochemical
industries

**H.B. Zachry Co.,** Baton Rouge, LA — *Various Positions – Industrial Division*

1991–1997

1995 – 1997 Project Controls Engineering Manager – Monsanto Chemicals

1993 – 1995 Assistant Project Manager – OxyChem Chemicals

1991 – 1993 Project Safety Engineer – Phillips Petroleum

## EDUCATION

**Louisiana State University,** Baton Rouge, LA — *B.S. Industrial Engineering*

1991

Alta App.000328
Alta 0006186

# Roy J. Hart

Chief Development Officer

4605 Post Oak Place Drive Suite 270
Houston, Texas 77027
**832-434-5645**
**rhart@altapowerdev.com**

## EXPERIENCE

**Alta Power LLC,** Houston, TX — *Chief Development Officer*

JAN 2019 – PRESENT

Development of 450 MW of natural gas peaking plants in ERCOT.

**Roy J. Hart LLC,** Houston, TX — *President & CEO*

2009 – 2019

Development consulting.

Clients included:

Alta Power LLC – provided development consulting for 3 150MW gas fired peakers in ERCOT

Castleman Power Development/Agilon Energy – fully developed 4 100MW gas fired peakers in ERCOT

Calhoun County Port Authority – provided development consulting for a combined cycle natural gas plant

Choctaw Maiden - provided development consulting for a wind farm

**NuCoastal Power,** Houston, TX — *Chief Development Officer*

2004 – 2009

Independent power producer that developed a 300MW natural gas fired power plant in Victoria, TX. Acquired a portfolio of mothballed power plants from Riverstone/Sempra.

**Kiewit Corporation,** Houston, TX — *EPC Sales Manager*

2000 – 2004

Managed EPC sales to power sector.

**Coastal Corporation,** Houston, TX — *EVP Power*

1990 – 2000

Developed combined cycle gas plants, simple cycle gas plants and coal plants.

**Bechtel,** Houston, TX — *Sr. Project Manager*

1980 – 1990

Project manager for combined cycle gas plants, coal plants, and nuclear plants

**Central Electricity Generating Board,** London, UK — *Various Positions*

1965 – 1980

Operations & maintenance.

## EDUCATION

**London University,** London, UK — *Mechanical Engineering*

1965

Profession Engineer in the UK

Alta App.000329

Alta 0006187

# Matthew E. Laterza

Chief Financial Officer

4605 Post Oak Place Drive Suite 270
Houston, Texas 77027
**713-859-9770**
mlaterza@altapowerdev.com

## EXPERIENCE

**Alta Power LLC,** Houston, TX — *Co-Founder & Chief Financial Officer*
2016 – PRESENT
Development of 450 MW of natural gas peaking plants in ERCOT.

**Hague & London Oil plc,** Houston, TX — *Consultant*
2014 – 2016
Advised on acquisition of Dutch North Sea natural gas assets from Tullow plc.

**Coastal Energy Company,** Houston, TX — *VP Finance & Treasurer*
2008 – 2014
Independent exploration & production company with assets in Thailand & Malaysia. Sold to CEPSA (Abu Dhabi – IPIC) in 2014 for $2.3 billion.

**NuCoastal Power,** Houston, TX — *Commercial Director*
2008 – 2009
Independent power producer that developed a 300MW natural gas fired power plant in Victoria, TX. Acquired a portfolio of mothballed power plants from Riverstone/Sempra.

**Credit Suisse,** Houston, TX — *Analyst*
2007 – 2008
Equity research – oilfield services team.

**McDonald Capital Management,** Lubbock, TX — *Analyst*
2005 – 2006
Boutique alternative asset management firm.

## EDUCATION

**Texas Tech University,** Lubbock, TX — *B.B.A Finance & Economics*
2005

Alta App.000330

Alta 0006188

# Exhibit 56

Alta App.000331







GE Gas Power    PRODUCTS ⌄    SERVICES ⌄    RESOURCES ⌄    🔍    Sign In    Regions ⌄    CONTACT US

Repowering

# GE's aeroderivative gas turbine technology

Our proficiency in gas turbine replacement and flange-to-flange including plant integration) solutions for aeroderivative (aero), industrial, and heavy-duty gas turbines from different OEMs—including Siemens, Westinghouse, Pratt & Whitney or Rolls-Royce—will position your plant to be competitive in the future.

# Replacement gas turbines that fit into your infrastructure

Repowering is a beneficial solution for plant operators looking to reduce both upfront and operating costs, as well as emissions. Replacement gas turbines from GE allow your plant to achieve higher output and efficiency, which leads to lower $/MWh, and these newer gas turbines will help keep your plant more environmentally compliant.



### Technology competitiveness

Replacing older gas turbines with proven aeroderivative gas turbine technology offers significant efficiency benefits—whether you're running your unit as baseload in a CHP application or fluctuating between different loads. Repowering can also significantly improve plant output and emission profiles. Thanks to the modularity of aeros, we can get one to you in as few as three days (compared to 15 for a heavy-duty gas turbine) to maintain and support your hot gas path inspection outage.



### OEM fleet management support solutions around the globe

Our global network of Authorized Service Providers (ASPs) for overhaul services or upgrades gives you quick turnarounds, guarantees, and reliable service. GE also offers a full spectrum of training, ranging from transactional support on an ad-hoc basis to a full support agreement with guarantees.



### Aeroderivative gas turbine repowering experience

GE Gas Power supports an installed base of over 1,500 operating units in a variety of applications. With more than 11 non-GE turbine repowers (cross-fleet repowers) on Siemens, Pratt & Whitney, and Rolls Royce units, and 100+ repowers executed on our own fleet, you can benefit from decades of experience.



### Improved economics from repowering your gas turbine

With their origins from our fabled aviation technology, GE's aeroderivative gas turbine portfolio features highly flexible and mobile technologies for use in a wide variety of applications. Our aeros are trusted and proven the world over and have a wide range of characteristics that make them a great gas turbine core engine replacement for energy providers.

Alta App.000333



ge.com/gas-power/services/gas-turbines/aeroderivative/repowering-solutions

GE Gas Power

CONTACT US

# Repowering your turbine assets with aeroderivative technology

With their origins from our fabled aviation technology, GE's aeroderivative gas turbine portfolio features highly flexible and mobile technologies for use in a wide variety of applications. Our units are trusted and proven the world over and have a wide range of characteristics that make them a great choice for energy providers.

## Repower with LM2500 +

## Repower with LM6000 −

**Power range:**
45 – 55 MW

**Range of efficiency (simple cycle):**
>41%

**Hydrogen capability (% volume):**
5% (DLE), 30-35% (SAC)

**Emissions range:**
25 ppm NOx (SAC), 15–25ppm NOx (DLE)

**Battery storage solution available:**
LM6000 battery Hybrid EGT

**Operational flexibility:**
**- Start time/ramp up:**
5 min start capable to maximum power
**- Peak performance:**
Up to 5 MW

**Synchronous condenser:**
Clutched or clutchless

## Repower with LMS100 +

GE Gas Power ≡    CONTACT US

## Repowering Australia



    

Origin Energy's Quarantine Power Station worked with GE to keep businesses thriving

Get an inside look at Energy Australia's Hallett Power Station repower project

**Jamaica**

Renewed reliability at Jamaica's Bogue Power Station



Alta App.000335



Calculate your potential savings

**AERODERIVATIVE REPOWERS Value Calculator**

**GET A FREE ESTIMATE**
of the value you can
derive by repowering

Alta App.000336



## Your options—regardless of gas turbine type

GE's extensive experience in cross-fleet solutions means that whether you own a Siemens heavy-duty gas turbine or Rolls-Royce aeroderivative gas turbine engines, we will work with you to tailor the scope of the cross-fleet repower that suits your needs, maintaining as much of your existing infrastructure as possible—like balance of plant, switch gears, generator, etc.—to lower the cost.

Aero TruePackage

The only authorized OEM certified pre-owned package offering in the industry.

Offers used-refurbished replacement aeroderivative gas turbine packages improved by GE's engineered systems, components, upgrades and digital solutions

Alta App.000337





GE Gas Power

CONTACT US

Aero TruePackage

The only authorized OEM certified pre-owned package offering in the industry.

Offers used/refurbished replacement aeroderivative gas turbine packages improved by GE's engineered systems, components, upgrades and digital solutions.

**How TruePackage works:**

**Advantages:**

- ✓ 30% cost reduction compared with a new installation
- ✓ One-year OEM warranty and equipment performance guarantees
- ✓ Delivered in eight months or less
- ✓ Equipment selection and refurbishment plan driven by installed cost
- ✓ OEM certification can improve financing options and insurance premiums
- GE and WattStock co-located in Houston, TX service center

Ready to get started?

Contact us for more information on what repowering can do for you.

# Exhibit 57

Alta App.000340



HOME (/)
ABOUT
WHAT WE DO (/WHAT-WE-DO)
OUR TEAM (/OUR-TEAM)
CONTACT INFO (/CONTACT)
SERVICES
(/CTP)
HOW CTP WORKS (/HOW-
CTP-WORKS)
HOW TRIP WORKS (/HOW-
TRIP-WORKS)
ASSET SOURCING
SELL SIDE SERVICES (/ASSET-SOURCING)
ASSETS FOR SALE (/SALE)
CONTACT US (/CONTACT-US)

## Services

ASSET SOURCING (/CTP)

HOW CTP WORKS (/HOW-CTP-WORKS)

TRIP (/TRIP)

HOW TRIP WORKS (/HOW-TRIP-WORKS)

ASSET SOURCING (/EQUIPMENT-SALES)

SELL SIDE SERVICES (/ASSET-SOURCING)

ASSETS FOR SALE (/SALE)



# REPOWERING GAS TURBINE UNITS TO REDUCE CAPEX

With the rise of green energy – solar and wind in particular – grid operators and utility managers increasingly need efficient, fast-responding, flexible generation units to provide peak, backup, and voltage support.  Other backup/support technologies are evolving but are not currently cost effective.  Refurbished gas turbines offer a superior option for many applications by reducing capital cost while still delivering performance, reliability and efficiency similar to higher priced new equipment.



EXHIBIT
2006
10-15-22

Alta App.000341

## GAS TURBINES PLAY AN INCREASINGLY IMPORTANT ROLE IN GLOBAL ELECTRIC GRID OPERATIONS

Providing grid support for increased solar and wind generation drives a growing need for small gas turbines. Refurbished units from other suppliers typically cost considerably less than new gas turbine packages but currently face a number of issues, including the lack of OEM warranty and questions regarding infringement of OEM's intellectual property.

To address these issues, WattStock works hand-in-hand with a leading gas turbine OEM to provide refurbished turbine generator packages with OEM-backed warranty and guarantees, while preserving the cost advantages of refurbished units.

The WattStock Certified Turbine Power (CTP™) program offers significant advantages over other refurbished gas turbine options:

*Lower project cost, increased output, lower heat rate, and improved reliability – delivered in six months or less and fully covered by a major manufacturer's warranty and performance guarantees. That's the profile of a WattStock CTP aero-derivative gas turbine generator set refurbished leveraging state-of-the art OEM technology.*

As the only packager approved by our partner OEM to refurbish their gas turbine generator sets, WattStock offers access to the full suite of OEM-engineered components, upgrades, digital solutions, and intellectual property — maximizing payback and optimizing life cycle value. Our approach may also improve project financing profiles and lower business interruption insurance premiums.

SEE HOW CTP™ WORKS
(/HOW-CTP-WORKS)

SEE SOME EXAMPLE
CTP™ UPGRADES (/HOW-CTP-WORKS)

Alta App.000342

WATTSTOCK, 4040 NORTH CENTRAL EXPRESSWAY, DALLAS, TX, 75204, UNITED STATES  713-248-4148  INQUIRIES@WATTSTOCK.COM (MAILTO:INQUIRIES@WATTSTOCK.COM)

**CONTACT US (/CONTACT-US)**

**Headquarters:**

4040 North Central Expressway, Suite 850

Dallas, TX 75204

**Houston/Manufacturing Operations:**

16415 Jacintoport Blvd.

Houston, TX 77015

Alta App.000344

# Exhibit 58

Alta App.000345



# Alta Energy

Proposal for 3xLM6000 Turnkey EPC

**August 29, 2018**



www.proenergyservices.com

Proposal #1018-2127

This document is privileged and contains confidential information intended for use only by Alta Energy

Alta App.000346

0079769

# Table of Contents

**Overall Summary**

| | | |
|---|---|---|
| **1.0** | **Executive Summary** | **5** |
| **2.0** | **Brief Project Description** | **7** |
| **3.0** | **Commercial Summary** | **8** |
| 3.1 | Price | 8 |
| 3.2 | Payment Schedule | 8 |
| 3.3 | Validity | 8 |
| 3.4 | Delivery Schedule | 9 |
| 3.5 | Performance Guarantees | 9 |
| 3.6 | Contact Details for Follow-up | 9 |
| **4.0** | **Project Division of Responsibilities** | **10** |
| 4.1 | DOR and Scope Matrix | 10 |
| 4.2 | Interconnect Points | 14 |
| **5.0** | **Expected Performance & Design Conditions** | **15** |
| **6.0** | **Clarifications and Assumptions** | **17** |
| 6.1 | Clarifications | 17 |
| 6.2 | Assumptions | 17 |
| **7.0** | **General Arrangement Drawing / Site Layout** | **18** |
| **8.0** | **Major Generating Equipment Descriptions** | **19** |
| 8.1 | LM6000 Combustion Turbine Generator (CTG) Package | 19 |
| 8.1.1 | Air Inlet System | 19 |
| 8.2 | GT Exhaust System | 19 |
| 8.2.1 | Selective Catalytic Reduction (SCR) | 19 |
| 8.2.2 | Continuous Emission Monitoring System (CEMS) | 20 |
| 8.3 | Generator Step-Up Transformer | 20 |
| 8.4 | Auxiliary Systems | 20 |
| 8.4.1 | LP SPRINT Power Augmentation | 20 |
| 8.4.2 | Water Injection System | 21 |
| 8.4.3 | Lube Oil System | 21 |
| 8.4.4 | Electro-Hydraulic Start System | 21 |
| 8.4.5 | Oily Water Sump | 21 |
| 8.4.6 | Fire and Gas Protection System | 21 |
| **9.0** | **BOP Systems & Equipment Descriptions** | **22** |



**Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

Alta App.000347

Alta_0079770

| | | |
|---|---|---|
| 9.1 | Fuel Systems | 22 |
| 9.1.1 | Gas Fuel | 22 |
| 9.1.2 | Gas Compressor System | 22 |
| 9.2 | Water Systems | 22 |
| 9.2.1 | Raw Water Supply | 22 |
| 9.2.2 | Demineralized Water System | 23 |
| 9.2.3 | Service Water System | 23 |
| 9.2.4 | Water Wash | 23 |
| 9.2.5 | Emergency Shower and Eye Wash Stations | 24 |
| 9.3 | Instrument and Service Air Systems | 24 |
| 9.4 | Black Start Capability | 24 |
| **10.0** | **Electrical Systems Descriptions** | **25** |
| 10.1 | Substation – (Optional) | 25 |
| 10.2 | High Voltage System (138kV) | 25 |
| 10.3 | Medium Voltage System (4160V) | 25 |
| 10.4 | Low Voltage Systems (480V and 120/208V Systems) | 26 |
| 10.5 | Batteries / Chargers / UPS Systems | 26 |
| 10.6 | Power Distribution Center | 26 |
| **11.0** | **Control Systems** | **27** |
| 11.1 | Turbine Control System | 27 |
| 11.2 | Balance of Plant (BOP) Control Systems | 27 |
| 11.3 | Remote Operations (Optional) | 28 |
| **12.0** | **Project Services** | **29** |
| 12.1 | Engineering | 29 |
| 12.1.1 | Project Design Codes and Standards | 30 |
| 12.2 | Project Management | 31 |
| 12.2.1 | Project Management Team | 32 |
| 12.2.2 | Project Coordinator Meeting | 32 |
| 12.2.3 | Design Review Meeting/IFC Drawing Review | 32 |
| 12.3 | Commissioning | 33 |
| 12.4 | Operator Training | 33 |
| **13.0** | **Construction Services** | **34** |
| 13.1 | Civil / Structural Work | 34 |
| 13.1.1 | Site Work | 34 |
| 13.1.2 | Excavation and Backfill | 35 |
| 13.1.3 | Concrete / Foundations | 35 |



**Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000348 0079771

13.1.4    Roads and Parking _____ 35
13.2    Mechanical Work ............................................................................................ 35
13.2.1    On-site Transportation and Rigging _____ 35
13.2.2    Equipment Erection and Assembly _____ 36
13.2.3    Piping _____ 36
13.2.4    Steel (Racks, Supports, Ladders, Platforms) _____ 36
13.2.5    Tanks / Vessels _____ 36
13.3    Electrical Work .............................................................................................. 36
13.3.1    Wire and Cable _____ 37
13.3.2    Raceway _____ 37
13.3.3    Ground Grid _____ 37
13.3.4    Cathodic Protection _____ 37
13.3.5    Lightning Protection _____ 37
13.3.6    Site Lighting _____ 37
13.4    Instrumentation and Controls ...................................................................... 38
13.5    Commissioning ............................................................................................. 38
13.6    Safety Training ............................................................................................. 38
**14.0    Construction Schedule** _____ **40**
14.1    Level One Schedule ..................................................................................... 41
**15.0    Proposal Attachments** _____ **42**
**A.    Company Information** _____ **43**
**B.    Contracting Details** _____ **45**
**C.    Construction Execution Plan** _____ **47**
**D.    Experience List** _____ **52**
**E.    Performance Specifications and Test Procedures** _____ **53**
**F.    Equipment Refurbishment Procedures** _____ **77**
**G.    Commissioning** _____ **80**
**H.    QA/QC Program** _____ **85**
**I.    Safety Information** _____ **86**
**J.    Fuel Specification** _____ **87**
**K.    Water Specification** _____ **98**

ProEnergy    *Proprietary and Confidential*
*Alta Energy* • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000349


## 1.0    Executive Summary

ProEnergy Services, LLC ("ProEnergy") is pleased to provide Alta Energy ("Customer" or "Buyer") this proposal for a Turnkey EPC solution of three (3) Certified Refurbished LM6000PC Aeroderivative Combustion Turbine Packages. The "zero-hour" equipment offers identical performance and an identical maintenance cycle to the original guarantees provided by the OEM when the equipment was brand new. The project is fully backed by ProEnergy including performance guarantees, an extended warranty, and O&M Services.

ProEnergy is home to some of the most experienced and skilled professionals in the power industry. Our proven EPC track-record offers the following repeated advantages to our satisfied customers:

1.  The fastest delivery cycles



2.  The lowest installed and operating cost



**Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000350    0079773

These key differentiators makes ProEnergy the leading seller and installer of LM6000 gas turbines in the world today.

ProEnergy is pleased to be providing Alta Energy with the following systems in our turnkey EPC proposal:
- ❖ Turbine & Turbine Package
- ❖ Generator & Generator Package
- ❖ Balance of Plant Components
- ❖ GSU
- ❖ Instrument and Service Air
- ❖ Black-Start Capabilities
- ❖ Water Systems
  - ○ Demineralized Water
  - ○ Demineralized Water Tank
  - ○ Water Wash

Included in the above, ProEnergy will be providing the construction, start-up, and commissioning of the complete power plant.

We appreciate the opportunity to provide this proposal and look forward to meeting with your team to further discuss and clarify the scope of this offer.

Please feel free to contact me directly should you have any questions or points of clarification.

Sincerely,

Jeff Canon
President & CEO



CONFIDENTIAL

Alta App.000351
3001079774

**2.0**    <u>**Brief Project Description**</u>

ProEnergy will supply and install three (3) ProEnergy Certified LM6000PC GT operating in simple cycle mode to produce approximately 145 MW at a Net Heat Rate (LHV) of 8849 BTU/kWh of at ISO conditions; these conditions and performance models are listed in Section 5.0 Expected Performance & Design Conditions.

ProEnergy will connect to the required Balance of Plant (BOP) systems to support the reliable operation of the primary mover. This proposal provides for the turnkey supply of all engineering, construction, construction tools, equipment rental, project management, commissioning, and performance testing in accordance with ASME performance test codes, as described throughout. Any modifications to the major equipment associated with this proposal could have consequential impact on the overall design and construction of the project.

*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

7
www.proenergyservices.com

CONFIDENTIAL

Alta App.000352

0079775

## 3.0    Commercial Summary

The following is a summary of the key, high level commercial details in the offer.  Please refer to the Attachment "B Contracting Details" for the remainder of the terms of this offer.

3.1    Price

ProEnergy will perform the scope of work as described in this proposal for the following price:

| Description | Extended Price (USD) |
|---|---|
| **3xLM6000 Turnkey Engineering, Procurement, & Construction (EPC)** | **$55,825,838\*** |

The price for the Scope of Supply described in this proposal is USD which includes engineering, labor, equipment provided by ProEnergy, transportation, materials, installation and commissioning.

Pricing is contingent that ProEnergy LLC will be contracted/providing a 6 year O&M and LTSA.\*

3.2    Payment Schedule

The payment schedule will be negotiated and determined based on the required project schedule, once identified.  The payment terms will be divided in to two categories, Equipment and EPC, based on mutually agreed upon milestones.

| Milestone Payment Description | Percentage of Contract Price |
|---|---|
| **Milestone 1- Notice to Proceed** | **30%** |
| **Milestone 2- Purchase Orders or Similar Purchase Instruments for all Major Equipment** | **20%** |
| **Milestone 3- Civil Work- Foundation Poured for Major Equipment** | **14%** |
| **Milestone 4- Major Equipment Rough Set on Foundation** | **14%** |
| **Milestone 5- Assembly of Major Equipment** | **12%** |
| **Milestone 6- Substantial Completion** | **8%** |
| **Milestone 7- Final Completion** | **2%** |
| **Total** | **100%** |

3.3    Validity

This proposal shall be valid for thirty (30) days and subject to prior sale. However, the obligation to treat this proposal as confidential, and may not be shared with any third party without the prior written consent of ProEnergy, shall survive.

*ProEnergy* | *Proprietary and Confidential*
*Alta Energy • Proposal #1018-2127*

www.proenergyservices.com

CONFIDENTIAL

Alta App.000353

Alta 0079776

3.4    Delivery Schedule

ProEnergy will utilize the most efficient method of construction necessary. Subject to equipment availability, ProEnergy is pleased to offer a **36 week** construction cycle from notice to proceed (and receipt of applicable funding) until the Commercial Operation Date (COD). Upon request, ProEnergy can adjust this construction cycle as necessary to meet the Owners requirements. See Level-One schedule in Section 14.1.

3.5    Performance Guarantees

This proposal is based on the performance guarantees being provided. ProEnergy will provide performance guarantees as follows:

- Net output
- Heat rate
- Emissions
- Reliability (Based upon ProEnergy Operating the facility)

Please see Section 5.0 for ProEnergy Gas Turbine Expected Performance.

3.6    Contact Details for Follow-up

Please contact the following person(s) at ProEnergy for information regarding this proposal:

Jeff Canon, CEO and President
jcanon@proenergyservices.com
Office:          660.829.5100
Cell:            660.287.2819
Fax:             660.829.1160

Bill Mars, Senior Vice President Fast Track Solutions
bmars@proenergyservices.com
Office:          660.829.5100
Cell:            660.287.5327
Fax:             660.596.7590

Donald Traywick, Vice President of Business Development
dtraywick@proenergyservices.com
Office:          660.829.5100
Cell:            713.703.3594
Fax:             660.596.7590



**4.0**     **Project Division of Responsibilities**

4.1     DOR and Scope Matrix

| Description | Qty. | | Responsibility | |
|---|---|---|---|---|
| **General** | | | | |
| Power Plant Site with site survey. | 1 | - | Owner | - |
| Geotechnical Survey | 1 | - | Owner | - |
| Topographical Survey | 1 | - | Owner | - |
| Fuel gas pipeline to site boundary | 1 | - | Owner | - |
| Fuel Gas Supply | 1 | - | Owner | - |
| LF Fuel Supply | 1 | - | N/A | - |
| Raw Water Supply | 1 | - | Owner | - |
| Site permits if required (Environmental, etc.) | 1 | - | Owner | - |
| Construction permits (if required) | 1 | - | Owner | - |
| Substation | TBD | TBD | TBD | TBD |
| | | | | |
| **Mechanical Equipment/Materials** | | | | |
| GE LM6000PC SPRINT Package | 3 | PES | PES | PES |
| Air Inlet | 3 | PES | PES | PES |
| Anti-Icing System | - | - | N/A | - |
| CDP Heating System | - | - | N/A | - |
| Evaporative Cooling System | - | - | N/A | - |
| Inlet Air Chilling System | - | - | N/A | - |
| Simple Cycle Exhaust Stack (45') | - | - | N/A | - |
| SCR System with 65' Stack | 3 | PES | PES | PES |
| Ammonia Vaporizer | 3 | PES | PES | PES |
| CEMS | 3 | PES | PES | PES |
| OTSG | - | - | N/A | - |
| HRSG | - | - | N/A | - |
| STG | - | - | N/A | - |
| Turbophase | - | - | N/A | - |
| SPRINT Skid | 3 | PES | PES | PES |
| Water Injection Skid | 3 | PES | PES | PES |
| Lube Oil System | 3 | PES | PES | PES |
| Oily Water Sump | 1 | PES | PES | PES |

ProEnergy     *Proprietary and Confidential*     www.proenergyservices.com
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000355

| Description | Qty. | Responsibility | | |
|---|---|---|---|---|
| GT Fire Protection and Extinguishing System | 3 | PES | PES | PES |
| Gas Heater | - | - | N/A | - |
| Coalescing Filter | 3 | PES | PES | PES |
| Pressure Reducing Station | - | - | N/A | - |
| Natural Gas Safety Shut-off Valve | 3 | PES | PES | PES |
| Natural Gas Meters (at package) | 3 | PES | PES | PES |
| Natural Gas Detectors | 3 | PES | PES | PES |
| Gas Compression System | 1 | PES | PES | PES |
| Liquid Fuel Skid | - | - | N/A | - |
| Raw Water Forwarding Pumps | 2 | PES | PES | PES |
| 125GPM Demineralized Water Treatment System | 1 | PES | PES | PES |
| Water Wash Skid | 3 | PES | PES | PES |
| Emergency Eyewash/Safety Showers | 3 | PES | PES | PES |
| Air Compressor | 1 | PES | PES | PES |
| Air Dryer | 1 | PES | PES | PES |
| Blackstart Generator with Switchgear | 1 | PES | PES | PES |
| Natural Gas Piping from tie-in | 1 | PES | PES | PES |
| Liquid Fuel Piping from tie-in | - | - | N/A | - |
| Demineralized Water Piping from tie-in | 1 | PES | PES | PES |
| Raw Water Piping from tie-in | 1 | PES | PES | PES |
| Oily Water Sump Piping | 1 | PES | PES | PES |
| Air Piping from dryer | 1 | PES | PES | PES |
| Ammonia Piping from Tank | 1 | PES | PES | PES |
| Service Water System | - | - | N/A | - |
| Potable Water System | - | - | N/A | - |
| Fire Water System | - | - | N/A | - |
| Raw Water Tank | - | - | N/A | - |
| Wash Water Drain Tank | 3 | PES | PES | PES |
| 350,000 Gallon Demineralized Water Tank | 1 | PES | PES | PES |
| Ammonia Tank | 1 | PES | PES | PES |
| Liquid Fuel Tank | - | - | N/A | - |
| Fire Water Tank | - | - | N/A | - |
| | | | | |
| **Electrical** | | | | |
| Substation | 1 | PES | PES | PES |



*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000356  0079779

| Description | Qty. | Responsibility | | |
|---|---|---|---|---|
| Dead End Structure | 1 | PES | PES | PES |
| 138kV-13.8kV 45/60/75 MVA GSU | 3 | PES | PES | PES |
| GSU Protection Panel | 3 | PES | PES | PES |
| 108kV Polymer lightning Arrestors | 9 | PES | PES | PES |
| SF-6 Breaker | 3 | PES | PES | PES |
| | | | | |
| Power Distribution Center | 2 | PES | PES | PES |
| 13.8kV Generator Circuit Breaker | 3 | PES | PES | PES |
| Aux feeder breakers | 3 | PES | PES | PES |
| Auxiliary Transformer (13.8kV / 4160V) | 3 | PES | PES | PES |
| Auxiliary Transformer (13.8kV / 480V) | 3 | PES | PES | PES |
| New Transformer Oil | 3 | PES | PES | PES |
| Redundant SEL-700G Relays | 3 | PES | PES | PES |
| 4160V Switchgear | 3 | PES | PES | PES |
| 480V MCC – GT | 3 | PES | PES | PES |
| 480V MCC – BOP | 1 | PES | PES | PES |
| 480V Distribution Panel | 3 | PES | PES | PES |
| Utility Communication System | TBD | | | |
| Balance of plant (BOP) 480 V / 120 / 208 V Transformer, Distribution Panels, Lighting Panels | 3 | PES | PES | PES |
| Insulated Cable Bus from GT to Generator Breaker | 3 | PES | PES | PES |
| Insulated Cable Bus and Structural Steel to Connect the Generator Breaker to the GSU | 3 | PES | PES | PES |
| Insulated Cable Bus from  Generator Breaker to Aux Transformers | 3 | PES | PES | PES |
| Cabling within site boundary | 1 | PES | PES | PES |
| Raceway within site boundary | 1 | PES | PES | PES |
| LM6000 Plant Ground Grid | 1 | PES | PES | PES |
| Plant Instrumentation | 1 | PES | PES | PES |
| LM6000 Control System | 3 | PES | PES | PES |
| Plant BOP Control System | 1 | PES | PES | PES |
| 24V DC Battery | 2 | PES | PES | PES |
| 24V DC Battery Charger | 4 | PES | PES | PES |
| 125V Battery | 2 | PES | PES | PES |
| 125V Battery Charger | 4 | PES | PES | PES |
| Plant Cathodic Protection (if required) | 1 | PES | PES | PES |



*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000357

3030079780

| Description | Qty. | | Responsibility | |
|---|---|---|---|---|
| Communication System | - | - | N/A | - |
| Lightning Protection | 1 | PES | PES | PES |
| Freeze Protection | - | - | N/A | - |
| Remote Operations Capability -Optional | - | PES | PES | PES |
| | | | | |
| **Buildings** | | | | |
| Office and Control Room | - | - | N/A | - |
| Weather Enclosures | - | - | N/A | - |
| | | | | |
| **Civil / Structural** | | | | |
| Clear, Grub and Leveled Site | 1 | - | Owner | - |
| Site Prep and Grading | 1 | PES | PES | PES |
| Drainage | 1 | PES | PES | PES |
| Excavation/Backfill | 1 | PES | PES | PES |
| Engineered Soil | - | - | N/A | - |
| Concrete Foundations | 1 | PES | PES | PES |
| Pilings/Piers | - | - | N/A | - |
| Site Gravel (as required) | 1 | PES | PES | PES |
| Site Roads | - | - | N/A | - |
| Fencing | 1 | PES | PES | PES |
| Site Light Poles | 1 | PES | PES | PES |
| | | | | |
| **Engineering / PM** | | | | |
| Engineering and Project Management, Safety, QA/QC, subcontracting for civil, mechanical, electrical, instrumentation & plant control system | 1 | PES | PES | PES |
| Construction Power (480V) | 1 | - | Owner | - |
| Temporary Power Distribution | 1 | PES | PES | PES |
| Plant security during construction | 1 | - | Owner | - |
| Start up and commissioning spare parts | 1 | PES | PES | PES |
| Recommended BOP spare parts list | 1 | PES | PES | PES |
| Transportation of all Contractor Furnished Equipment | 1 | PES | PES | PES |
| Lubricants and Chemicals for GT Start Up & Commissioning | 1 | PES | PES | PES |
| Lubricants and Chemicals for BOP | 1 | PES | PES | PES |


CONFIDENTIAL

Alta App.000358    0079781

| Description | Qty. | Responsibility | | |
|---|---|---|---|---|
| Construction Offices, Storage, Temporary Facilities and Utilities | 1 | PES | PES | PES |
| Construction Tools and Equipment | 1 | PES | PES | PES |

4.2    Interconnect Points

| Interface | Description |
|---|---|
| Construction Electrical | Owner will provide 480V Power with 400 amps to a breaker Owner controls on the project site.  ProEnergy will tie into the breaker and distribute as necessary. |
| Construction Water | Supply is located on the project site with a connection point. |
| Electrical | Connection at the low side of Dead End Structure. Connections on the high side by Owner |
| Plant Waste Water | Waste Water Connection Point on Oily Water Sump. Owner to provide pump truck. |
| Plant Waste Oil | Waste Oil Connection Point on Oily Water Sump. Owner to provide pump truck. |
| Raw Water Supply | Raw Water tie-in located within 100' of package. Owner to provide a flange for Contractor to connect piping. |
| Natural Gas Supply | Natural Gas tie-in located within 100' of package. Owner to provide a flange for Contractor to connect piping. |
| Control System | At the station within the respective PDC.  Connections to other Controls Centers or interfaces with Utilities are not included. |

Preliminary Design Basis Documents that are the basis of this proposal are as follows:

- Project General Arrangement Section 7.0
- One-line Diagram Attachment 15.0
- Project Division of Responsibility Section 4.1

*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000359

ALTA-0079782

## 5.0    Expected Performance & Design Conditions

Design Conditions

|  | ISO |
|---|---|
| Fuel | Natural Gas (No H2S) |
| Site Elevation | 341 feet ASL |
| Ambient Air Temperature | $59^0F$ |
| Maximum Wind Velocity | 110 MPH |
| Relative Humidity | 60% |
| Seismic Zone | 0 |



GT PRO 27.0 ProEnergy

14.7 p
59.1
80 %RH
263.5 m
0 fl.elev.

1x GE LM6000PF
(Data-defined Model #330)

244.1 m

3 X GT

14.97 p
P44 T
860.3 M
25. ppm NOx

Net Power 145034 kW
LHV Net Heat Rate 6849 BTU/kWh
LHV Net Efficiency 33.96 %

71.25 %N2
12.57 %O2
5.371 %CO2
11.91 %H2O
0.8572 %Ar

49702 kW

14.55 p
59 T
283.5 m

2.974 m    4.125 m
Natural gas 5.972 m
LHV 427803 kBTU/h
7 T

263 T

Water 6.015 m

p[psia], T[F], M[lbs], Steam Properties, IFC-67
2121-08-28-2018 14:46:22  file=C:\Users\cjohnson\Documents\Thermoflow\MYFILE527\GTPRO-GTP

ProEnergy  **Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta 0079784

Alta App.000361

**6.0    Clarifications and Assumptions**

6.1    Clarifications

- Contractor will provide simple cycle testing, which will include heat rate, output, and emissions. This testing will confirm the base operating condition of the equipment. Instrumentation supplied with the equipment will be utilized to validate the performance parameters.
- The projected performance (Heat Rate and Net Output) presented in this proposal is based off the site conditions (e.g., Temperature, Relative Humidity, Elevation, etc.), gas analysis and pressures provided by the Owner.  Any variation in the Site Conditions will be accommodated through the use of correction curves, provided by PES.
- In order for ProEnergy to meet the Delivery Schedule in Section 3.4, the Owner must meet the following requirements:
  - Cash flow (payments must be made within 5/30 days of the invoiced milestone)
  - Timely receipt of key or missing information from the owner

6.2    Assumptions

The following assumptions have been made in the development of this proposal:

- Owner to provide access roads to the site suitable for transporting the major equipment.
- Owner to provide all local permits required to build the power plant and associated pipeline connections.
- The site is clean, flat and level, requiring minimal cut and fill to prepare for construction and has a soil bearing capacity of at least 3,000 psf.
- This proposal assumes that the site is clear and grubbed prior to Contractor mobilization.
- This proposal includes no allowance for pilings, piers, engineered soil, and removal of any subterranean obstacles, as indicated in the geotechnical report or soil surveys.
- Owner to provide an adequate supply of fuels to the property boundary in accordance with OEM specifications, as shown in the Attachment "Fuel Specification(s)" in this proposal.
- Natural Gas Supply will have sufficient volume to support the operation of the unit(s), and shall be at a pressure of 425psi.
- Owner will provide ProEnergy with a 6" flanged connection on the gas line, equipped with a manual valve, for ProEnergy's interconnection point.
- Owner to provide site survey and existing plant above and below ground drawings.
- Owner is responsible for the removal or disposal of any contaminated or hazardous wastes discovered on the site.
- ProEnergy is considered to be the OEM of the equipment and no additional OEM certifications, performance guarantees or warranties will be required. With using refurbished equipment, purchase specifications may not be available for Owner review.
- Pricing is contingent that ProEnergy LLC will be contracted/providing a 6 year O&M and LTSA.



7.0    General Arrangement Drawing / Site Layout



CONFIDENTIAL

Alta App.000363

ProEnergy | *Proprietary and Confidential*
Alta Energy • Proposal #1018-2127

www.proenergyservices.com

18

## 8.0    Major Generating Equipment Descriptions

### 8.1    LM6000 Combustion Turbine Generator (CTG) Package

ProEnergy will supply and install three (3) Certified LM6000PC model GT Package. Each GT Package is configured with a stationary combustion turbine generator, supporting systems, and associated auxiliary equipment. The GT Package will be equipped with the following required accessories to provide safe and reliable operation:

- Air inlet system complete enclosure with explosion-proof filtration system
- Weatherproof acoustic enclosure with explosion-proof lighting
- Generator Circuit Breaker equipped with synchronization capability
- Natural Gas Fuel system, including an electronically controlled fuel metering valve
- Two lube oil systems; one synthetic and one mineral
- Electro-hydraulic start system
- 24-volt DC non-gassing VRLA and battery chargers
- Generator protective relays
- Fire detection and protection system
- Turbine / Generator base plate

ProEnergy will furnish each GT Package with a direct air cooled 2-pole electric generator. The generator is equipped with brushless permanent magnet and excitation system. A two-pole synchronous design with NEMA and IEC Class F insulation is utilized. The generator is designed with two radial bearings and a thrust bearing to satisfy seismic requirements. The generator is furnished with an electronic voltage regulator system. The voltage regulator system will be rack mounted in the unit control panel and capable of maintaining generator output voltage within ± 0.5% during steady-state operating conditions.

ProEnergy will supply each GT Package with a weatherproof, acoustic enclosure. The gas turbine package enclosure will be assembled and mounted over the equipment prior to testing and shipment. The gas turbine compartment is fully ventilated with duplex belt driven fans. The generator compartment is fully ventilated with direct driven fans. Explosion-proof A.C. lighting is provided in both compartments. The enclosure provides average noise emission of 85 dB(A) measured at 3 feet (1.0 m) horizontal distance and at 5 feet (1.5 m) above grade in a free field condition, during full load steady state operation.

#### 8.1.1    Air Inlet System

ProEnergy will supply each GT Package with a modular, multi-stage filtration system consisting of inlet screens, a pre-filter and final barrier filter. All air for ventilation systems is filtered to the same level as turbine combustion air. Filtered air is silenced before entering the turbine plenum. The standard design arrangement optimizes the equipment layout and includes all interconnecting inlet ducting. Internal lighting of the filter house is provided to facilitate inspection and service. OSHA compliant platforms and ladders are included to service the inlet filter.

### 8.2    GT Exhaust System

Each GT Package is supplied with a circular, axial exhaust outlet with connection flange to facilitate in-line mounting of a Selective Catalytic Reduction (SCR).

#### 8.2.1    Selective Catalytic Reduction (SCR)

ProEnergy will design, supply, and install a complete SCR system to fulfill the requirements of the design emission limits for CO and NO$_x$. The SCR system includes:



*ProEnergy*  **Proprietary and Confidential**
**Alta Energy • Proposal #1018-2127**

19
www.proenergyservices.com

- Ammonia injection skid using electric vaporizers
- Ammonia storage and handling system
- High temperature catalyst for $NO_x$ and CO
- $NO_x$: design: 25 to 2.5 ppmvd @ 15% $O_2$
- CO: design: 125 to 4 ppmvd @ 15% $O_2$
- Ammonia slip: 10 ppmvd @ 15% $O_2$
- Catalyst will be designed for 1,000 operating hours per year for a maximum of five (5) years
- Less than 30 minutes to emissions compliance
- Standard Exhaust Stack is ten feet (10') in diameter and sixty five feet (65') tall
- Near-field Noise level is 85 dba (3 feet Horizontally and 5 feet above grade) – for one unit in operation at steady state.

ProEnergy will supply and install an Ammonia Storage and Unloading system (19% aqueous ammonia AQ19) for use in the SCR system which includes the storage tank, vaporizer, and any required pumps.

The storage tank is sized to hold approximately 12,000 gallons of Ammonia allowing for the delivery of two full tankers and 147 hours of continuous operation. The storage tank will be designed to meet a minimum 25 psig design working pressure in accordance with ASME Code for Unfired Pressure Vessels (Section VIII).

### 8.2.2  Continuous Emission Monitoring System (CEMS)

ProEnergy will supply and install a CEMS system on each exhaust stack. The system utilizes sampling technology, which has proven to be highly accurate and reliable. The CEMS will sample, analyze, and record gas flow rate, NOx, CO, and $CO_2$ concentration levels, and percentage of oxygen in the exhaust gas from the stack. The CEMS sensors will transmit the data to a data acquisition system (DAS) that will store the data and generate emission reports in accordance with permit requirements.

The system is provided in a walk-in shelter with a wall-mounted air conditioning unit. The system also consists of the necessary stack probes and sample lines.

### 8.3  Generator Step-Up Transformer

ProEnergy will supply each LM6000 GT package with a 45/60/75 MVA 13.8kV Delta x 138kV Wye Generator Step-Up Transformer as well as the required volume of new transformer oil. The Transformer will be set on a concrete foundation that includes a secondary oil containment reservoir to contain the transformer oil in the event of a leak or spill. The Generator Step-Up Transformer will be located greater than 60' from the GT Package to eliminate the requirement for a blast wall.

### 8.4  Auxiliary Systems

#### 8.4.1  LP SPRINT Power Augmentation

SPRINT® boosts engine performance using a spray intercooling design that increases the mass flow by cooling the air during the compression process. The system is based on an atomized water spray injected through spray nozzles placed at the inlet bellmouth. Water is atomized using high pressure air taken off of the compressor eighth stage bleed. The water flow rate is metered, using the appropriate engine control schedules and at the inlet bellmouth. Bellmouth portions on SPRINT® alternate operation based on turbine inlet temperature. Each unit requires 83 LPM (22 GPM) of demineralized water to the connection on the unit. Water supply must meet water specification in Attachment K.

ProEnergy

*Proprietary and Confidential*
Alta Energy • Proposal #1018-2127

20
www.proenergyservices.com

CONFIDENTIAL

Alta App.000365

### 8.4.2   Water Injection System

ProEnergy will supply a Water Injection System that serves to control the amount of nitrogen oxides (NOx) emitted by the gas turbine engine during normal operation. Demineralized water is injected into the combustor section of the gas turbine through the fuel nozzles on the engine.  Demineralized water from a customer source is pressurized by the water injection pump and plumbed into the main skid.
The Water Injection System contains the following major components. They are mounted on the water filter skid, water injection pump skid and main skid.

- Duplex low pressure filter upstream of pump skid
- Water injection pumps (Low Pressure)
- Flow transmitter
- Flow metering valve

### 8.4.3   Lube Oil System

ProEnergy will supply each GT Turbine Package with two separate lube oil systems: one synthetic for the gas turbine and one mineral for the generator.  The oil reservoirs and piping are all stainless steel, and the lube oil system valves have stainless steel trim.  Each lube oil system has duplex filters, duplex fin fan water coolers, and thermostatic-controlled electric heaters.  The oil reservoir and filters for each system are mounted on an auxiliary equipment module located next to the gas turbine baseplate.  The auxiliary equipment module provides simplified piping connections and reduces installation time and costs.

### 8.4.4   Electro-Hydraulic Start System

ProEnergy will supply each GT Turbine Package with an electric motor driven hydraulic pump assembly, filters, cooler and controls, mounted on the auxiliary equipment module.  A hydraulic motor is also mounted on the gas turbine accessory gearbox.  Hydraulic hoses are furnished to connect the auxiliary equipment module and the main baseplate.

### 8.4.5   Oily Water Sump

ProEnergy will supply and install an Oily Water Sump. The scope of work includes supply and installation of below ground piping and fittings to allow the package containment systems to be connected to the Oily Water Sump System. Containment systems to be connected are:

- GT Unit(s)
- Generator Step-Up Transformer(s)
- Auxiliary Transformer(s)

### 8.4.6   Fire and Gas Protection System

ProEnergy will supply the GT Package with an installed fire and gas protection system complete with optical flame detection, hydrocarbon sensing and thermal detectors, piping and nozzles in both the generator and gas turbine compartments.  The fire and gas detection system will be in accordance with NFPA requirements.   The fire protection system includes cylinders containing $CO_2$ mounted on a separate module.  All alarms and shutdowns are annunciated at the GT control panel.  An alarm sounds at the turbine if the gas detectors detect high gas levels, or if the system is preparing to release the $CO_2$. When activated, the package shuts down, and the primary $CO_2$ cylinders are discharged into the turbine and generator compartments via multiple nozzles, and the ventilation dampers automatically close.  After a time delay and if required, the slow extended discharged of $CO_2$ is released.



*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000366    0079789

## 9.0    BOP Systems & Equipment Descriptions

ProEnergy will design and install dedicated BOP equipment to support the GT as described in the following sections of this document. The design will include the necessary structural, mechanical, electrical, instrumentation, and control systems to support the major equipment.

The Balance of Plant scope of supply will include the following systems:

### 9.1    Fuel Systems

#### 9.1.1    Gas Fuel

ProEnergy will supply and install the required equipment to be able to operate the GT unit on Natural Gas. The system is anticipated to include:

- Coalescing filters
- Pressure regulating equipment
- Gas Safety Shut-Off Valve
- Gas Meters provided on the package
- Natural gas detectors

All necessary shutoff valves, piping and instruments between the fuel module connection and the engine are included. A 6" flanged connection on the gas line, equipped with a manual valve, for ProEnergy's interconnection point to be provided by the Owner. A minimum gas pressure of 350 PSIG, as measured downstream of a non-regulated meter set, will be provided by the Owner, if ProEnergy scope includes a Gas Compressor System. Otherwise, a minimum of 700 PSIG will be required. The gas fuel specification can be found in Attachment J.

#### 9.1.2    Gas Compressor System

ProEnergy will supply and install a gas compressor system consisting of 1 x 100% Gas Compressor to raise the pressure from 425psi to the required 675psi. The Compressor will be skid mounted and utilizes a compressor directly coupled to a horizontal induction electric motor. The system includes the following.

- Suction scrubber
- Coalescing filter
- Air-to-air gas inter-stage after cooler
- Control panel
- Interconnecting piping
- Wiring

### 9.2    Water Systems

#### 9.2.1    Raw Water Supply

ProEnergy will tie-into the water supply at the hosts raw water connection point. The system is anticipated to include the following.

- Raw water forwarding pump(s)

The Raw Water should meet the following water quality criteria.



*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000367

Alta/0079790

| Parameter | Value |
|---|---|
| pH | 6 - 10 |
| TDS | < 500 ppm |
| Total Hardness | < 200 ppm |
| Iron | < 0.3 ppm |
| Silica | < 30 ppm |
| Turbidity | < 1 NTU |
| TSS | 30 ppm |
| Temperature | 65 - 90 degrees F |
| Barium | < 1 ppm |
| Strontium | < 1 ppm |
| Free Chlorine | < .1 ppm |
| SDI | < 4.0 |

### 9.2.2   Demineralized Water System

ProEnergy has included a 125GPM Demineralized Water System complete with instrumentation and automatic valves.  This system is provided, installed, pre-piped and pre-wired, in a skid base design to minimize overall field installation requirements.   The following equipment is part of the standard demineralized water system:

- Two (2) sets of multimedia filters
- One (1) backwash pump
- Two (2) cartridge filters
- One (1) sodium sulphite chemical dosing tank and pump
- One (1) reverse osmosis pump
- One (1) reverse osmosis unit
- One (1) 350,000 gallon Welded Tank equipped with the required nozzles for inlet, outlet, and level transmitter. The tank(s) will be equipped with access ladder and platform.

The demineralized water specification can be found in Attachment K.

### 9.2.3   Service Water System

ProEnergy will supply and install a service water system off of the raw water supply line.  This system will be in place to support plant wash down and other water service needs.

### 9.2.4   Water Wash

ProEnergy will supply the GT Package with a turbine cleaning system, which allows customers to clean the compressor section of the turbine during off line operation. Portable skid connections are provided purified water at a maximum of 50 psig (345 kPag) and air at 100 – 120 psig (689 – 827 kPag).  Turbine water washes will be collected in a water wash drains tank.  The wastewater will be discharged to the owner's wastewater collection system.

ProEnergy

*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000368                    0079791

9.2.5    Emergency Shower and Eye Wash Stations

ProEnergy will install an emergency eyewash in accordance with ANSI Z358.1 adjacent to each ammonia vaporization skid and at the ammonia storage tank and ammonia unloading area.  Electric heat tracing and heaters will be provided as necessary to satisfy this requirement. 29CFR (Code of Federal Regulations) 1926.441 requires a shower and eye wash within 25 feet of battery rooms. For showers without integral potable water storage, supply piping will be stainless steel or HDPE.

9.3    Instrument and Service Air Systems

ProEnergy will supply and install a skid-mounted air compressor sufficiently sized for the air requirements of the gas turbine package and the auxiliary equipment.  The air compressor system is self-contained and includes a control and indicator panel, air dryer, coalescing pre-filters, particulate after-filters, and air receivers.

The instrument air system will provide dry, filtered air to pneumatic operators and devices.  Air from the service air system is dried, filtered, and pressure-regulated before delivery to the instrument air piping network. An instrument air header will be routed to locations within the facility equipment areas and within the water treatment facility where pneumatic operators and devices will be located.

The air compressor skid can provide service air to hose connections for general plant use.  Service air headers will be routed to hose connections located at various points throughout the facility.

9.4    Black Start Capability

ProEnergy will supply and install a diesel engine driven generator package to provide each gas turbine generator with 650kW start-up capability in the event of a loss of connection to the grid.  For black starts, the diesel generator provides AC power for the gas turbine generator hydraulic starter motor, GT package ventilation fan, and various accessories.  In addition to the diesel engine and generator, the black start system includes a breaker cubicle, distribution/control panel, paralleling Switchgear, and fuel tank.

ProEnergy  **Proprietary and Confidential
Alta Energy • Proposal #1018-2127**

CONFIDENTIAL

Alta App.000369
Alta-0079792

**10.0    Electrical Systems Descriptions**

10.1    Substation

10.2    High Voltage System (138kV)

ProEnergy will supply and install a high voltage system as follows:

- Supply and install a Generator Step-Up Transformer for each CTG.  Each Transformer is supplied with new transformer oil.  Details are called out in Section 3.1.4.
- The high-voltage side of the Generator Step-Up Transformer will be connected to a single-circuit, three phase, Dead-End Structure
- Supply and install New 2000 Amp 40kA SF-6 Gas Circuit Breaker per GSU Transformer.
- Supply and install New 2000 Amp Manual Disconnect Switch per GSU Transformer.
- The GSU Transformer will be placed at least 60ft away from the nearest building eliminating the need for blast/fire walls.
- Supply and install a 1500kVA 13.8kV Delta/480V Wye Auxiliary Transformer with kirk keyed switchgear from each unit.
- Supply and install 13.8kV Delta/4.16kV Wye Auxiliary Transformer for the Gas Compressor Supply and install three (3) Polymer 108kV 88MCOV Lighting Arrestors per Generator Step-Up Transformer.
- Supply and install a 750MCM 15kV XLPE insulated cable bus from each Generator to the respective ProEnergy supplied Generator Circuit Breaker, and from each Generator Breaker to the 13.8kV terminals on ProEnergy supplied Generator Step-Up Transformer.  ProEnergy assumes that the site layout will allow the GSU to be placed within 60ft of the turbine package.
- Supply and install a 750MCM 15kV XLPE insulated cable bus from each Generator Circuit Breaker to ProEnergy supplied Auxiliary Transformer.
- Supply and install redundant SEL-700G multifunction relays. Relays shall include the following protective functions:
  - 21 backup impedance
  - 24 volts/hertz
  - 32 Multi-step reverse power
  - 27TN/59N 100% stator ground fault
  - 46 Phase unbalance; 50/27 inadvertent energization
  - 50BF breaker failure (CTG)
  - 59 over voltage elements
  - 59N bus ground fault
  - 60 loss of potential detection
  - 78 out-of-step protection
  - 87 differential protection
  - In addition to protective functions, relay shall have extensive metering capability, oscillography, self-diagnostics, and communication capability
- Each SEL-700G will be provided a lockout relay for GT tripping and a lockout relay from generator tripping. Tripping, blocking, and initiate logic shall be consistent with Owner's operating requirements and coordinated with the electrical interconnection equipment protection.

10.3    Medium Voltage System (4160V)

ProEnergy will supply and install a medium voltage system as required to provide auxiliary power for plant operation as follows:

- Supply and install 4160V interconnection cable

**Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000370    0079793

- Supply and install 4160V starting switchgear for the Gas Compressor

10.4    Low Voltage Systems (480V and 120/208V Systems)

ProEnergy will supply and install a low voltage system as required to provide auxiliary power for plant operation as follows:

- Supply and install 480V GTMCC
- Supply and install 480V BOP Distribution Panel as required
- Supply and install 480V BOP MCC as required
- Supply and install feeder breakers to the 120/208 V system as required
- Supply and install cable tray / conduit with cabling from Transformers to MCC and from MCC to plant 480 V equipment and motors
- Supply and install conduit, trenches or cable trays mounted on utility racks

ProEnergy will supply and install a transformer and distribution panel as required with associated conduits, fittings and wire for the 120/208V System.

10.5    Batteries / Chargers / UPS Systems

ProEnergy will supply and install a station battery systems used to provide backup power for critical loads and control systems. For the fire system, a provided battery system includes a 24-volt DC non-gassing VRLA and battery chargers.

The battery chargers operate from a 230 volt, 60 Hz, 1-Phase power supply. The chargers will be static rectified type and sized to maintain the battery fully charged during "worst case" conditions, with a maximum recharge time of eight hours.

ProEnergy will supply and install an Uninterruptible Power Supply (UPS) supplying power to essential instrumentation, critical equipment load, and unit protection and safety systems. The UPS system will consist of 15kVA full-capacity inverter, (1) UPS AC panel, (1) 125VDC Panel which is redundant to control power.

ProEnergy will supply and install for the controls system, a 125VDC, 665 Ah, non-gassing VRLA battery system, 125VDC battery charger is fed 400V. (1) per unit, (2) per PDC and are redundant to each other. With an 80A load the 665Ah battery bank yields approximately 8 hrs. of run down time.

10.6    Power Distribution Center

ProEnergy will supply and install one Power Distribution Center per two (2) CTG's. The PDC Buildings will contain the following systems/equipment:

- Fire Protection Panel (FPP)
- BOP and CTG(s) 480V MCC
- DC Uninterruptible Power Supply (UPS) Systems
- Turbine Control Panels (TCP)
- Generator Relay Panels (GRP)
- Automatic Voltage Regulation Panels (AVR)
- Server and Network Cabinets
- GSU Transformer Relay Panel
- Lighting and HVAC Equipment (per industry standards)



- Room for the installation of utility communications system

**11.0     Control Systems**

11.1   Turbine Control System

ProEnergy will supply and install each GT Package with a Turbine Control System that utilizes the Allen Bradley ControLogixTM PLC processors in a simplex configuration for the turbine control platform with a simplex power supply configuration.  The Turbine Control System is designed to provide primary control and monitoring of the gas turbine, generator, and the associated packaged auxiliary systems.  In the context of safety, the Turbine Control System is the main control system and provides the first layer of protection for the gas turbine and generator.   The Allen Bradley ControLogixTM platform offers the following advantages.

- Open architecture following IEEE Programming standards
- Flexible scalability to integrate additional plant functionality
- Ease of integration with existing Allen Bradley PLCs
- Multiple communication options (Modbus serial, Modbus TCP, Ethernet IP, Fieldbus, DeviceNet, ControlNet, OPC)

The Turbine Control System is designed with the following control functionalities:

- Starting permissive
- Turbine startup sequencing
- Interface to Fuel Control
- Breaker interlock functions
- Alarm and shutdown functions
- Annunciation and turbine shutdown sequencing
- Cool down and emergency stop functions
- Slow roll function
- Speed ratio control
- Droop and Isochronous modes
- Acceleration control
- Exhaust gas temperature control
- Load control and combustion monitoring

11.2   Balance of Plant (BOP) Control Systems

ProEnergy will furnish GT Package with an integrated plant control system to manage the Balance of Plant equipment.  The integrated plant control system includes:

- Local and/or remote HMIs
  - One (1) Turbine Control HMI
  - One (1) BOP HMI
- Engineering workstation
- Network switches
- Simplex I/O Modules

Operating and monitoring HMIs supplied are Allen Bradley FactoryTalkTM View.  The FactoryTalkTM HMI offers a seamless integration with enhance communication between PLC, HMI, and remote stations.

HMI graphic development with documentation format and content will be in accordance to the project specific specifications or mutually agreed upon by Owner.

The integrated plant control system offers a common platform for interfaces to all of the BOP equipment operating in the plant. The common interface to equipment operator screens, process data, alarms, and events, trips, and trend data helps to increase the operator's productivity and operational awareness.

11.3    Remote Operations (Optional)

ProEnergy's Remote Operations Center (ROC) is designed to optimize operations, monitoring and diagnostic capabilities while reducing operating costs for utilities and power plant owners. Robust and secure connections allow for remote operations and monitoring to provide efficient control of the assets. The Center is supported by qualified and experienced operators who provide monitoring and controls 24/7/365.

Dedicated Engineers support every project and can immediately address and troubleshoot any problems that may occur. Remote operations is a particularly ideal option for peaking plants in cost competitive markets. Real-time monitoring and controls allows for even the most demanding start, stop, and ramping requirements.

Capabilities:
- 24/7 continuous monitoring of assets
- Remote operations of power generation assets
- Production reporting
- Scheduling and forecasting
- Emergency response support and notification
- Performance tracking with continuous improvement
- Engineering support
- ISO/Market interface
- KPI Metric tracking
- Diagnostic Root Cause Analysis
- Remote visualization for site security, weather and other critical activities
- Network monitoring
- NERC Compliance tracking and reporting
- Customized Services to meet the needs of each customer

Advantages:
- Substantial savings in labor costs
- Multiple sites at one center of control
- Full monitoring and diagnostics
- Predictive Analysis capabilities
- Remote troubleshooting
- On-site Engineers
- Ability to work across different asset lines such as GT, Wind or solar
- Improvement in asset availability & reliability
- Dispatching of services resources when market conditions demand response
- Identification of trends and system performance to improve budgeting and maintenance requirements
- Information Management - Data storage and archiving



**Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

28
www.proenergyservices.com

CONFIDENTIAL

Alta App.000373

Alta_0079796

## 12.0    Project Services

12.1    Engineering

ProEnergy will perform all design engineering work including, but not limited to, the following items:

- Prepare design documents, size equipment, generate drawings and specifications, and other supporting activities to the degree of detail required to fully and clearly define manufacturing and construction work requirements and minimize design engineering work in the field.
- Prepare calculations as required for design decisions, equipment and material selection, and preparation of Project construction drawings.
- Prepare system descriptions indicating equipment data, operating characteristics, functions, flow rates, and other process information for all Project systems.
- Prepare mechanical, electrical, and instrument equipment lists with summary descriptions, vendors, and pertinent data.
- Develop the detailed Site arrangement including provisions for locations of structures, equipment, and permanent access routes.
- Coordinate receipt of information and materials so that all phases of the Project are well coordinated.
- Prepare arrangement drawings for Owner's Review and finalize arrangement drawings for construction.
- Prepare Piping and Instrumentation Diagrams (P&ID's) for all Project Mechanical Systems.
- Prepare Electrical One-line drawings showing connection for all Project Electrical Loads.
- Provide all civil, electrical, instrument and control, mechanical, and structural construction drawings for the Project and supporting systems, including, but not limited to, the following:
  - o Site Grading and Drainage
  - o Site and Building Arrangements
  - o General Arrangements
  - o Piping and Instrumentation Diagrams (P&IDs)
  - o Equipment Location Plans and Elevations
  - o Access Roads, Curbs, Walkways, and Parking
  - o Site Fencing and Access
  - o Wastewater Sump and Discharge
  - o Foundations and Equipment Pads (excluding the Electrical Interconnection System exterior to Project Site)
  - o Ductbanks and Manholes
  - o Structural Steel, Platforms, and Stairs
  - o Architectural Plans, Elevations, and Details
  - o Waste Water Systems
  - o Above Grade Piping (2-1/2 inches and larger)
  - o Underground Utilities and Piping (all sizes)
  - o Pipe Supports (including hanger designs)
  - o Conduit, Cable, and Raceway
  - o Area Lighting
  - o Fire Protection Systems
  - o Electrical One-Lines and (Generator Voltage) Three - lines
  - o Electrical Power and Control Wiring
  - o Electrical Schematics and Connection Details
  - o Electrical Grounding Grid and Equipment Connection Details
  - o Lightning Protection
  - o Instrument Lists and Installation Details
  - o Technical Specifications for New Contractor Furnished Equipment

**ProEnergy**    **Proprietary and Confidential**
**Alta Energy • Proposal #1018-2127**

CONFIDENTIAL

Alta App.000374    0079797

- Arrange for and provide fully qualified technical representatives during erection, testing, and commissioning of the CTG.

All Architectural, Civil, Structural, Mechanical, Electrical, and Instrument and Control design documents that are issued for construction or procurement shall be prepared by or under the direct supervision of a registered professional engineer or architect according to the requirements in the state to which the Project is located. The design documents shall include, but are not limited to, all required purchase and construction specifications, arrangement drawings, elevations, structural drawings, civil drawings, foundation designs, P&ID's, equipment arrangements, piping layouts, pipe stress analysis, electrical three-line diagrams, and electrical one-line diagrams.

Upon completion of the Project, ProEnergy will provide an as-built technical engineering library including all engineering calculations and design documents as listed produced by ProEnergy that are updated to match all changes and updates recorded prior to Final Completion. The as-built technical library shall include one (1) hard copy and one (1) electronic copy, if available.

### 12.1.1 Project Design Codes and Standards

The following organization's standards and codes are applicable to design and construction practices for the project.

| Interface | Description |
|---|---|
| ACI | American Concrete Institute – Various Sections |
| CRSI | Concrete Reinforcing Steel Institute – Various Sections |
| AISC | American Institute of Steel Construction – Various sections |
| ASCE | American Society of Civil Engineers – Various Sections |
| AISI | American Iron and Steel Institute – Various Sections |
| IBC | International Building Code – Various Sections |
| SSPC | Steel Structures Painting Council – Various Sections |
| ASME | American Society for Mechanical Engineers – Various Sections |
| ASME B31.1 | Code for Power Piping |
| ASME Section IX | Boiler and Pressure Vessel Code – Welding and Brazing Qualifications |
| ASME Section VIII Div. I | Boiler and Pressure Vessel Code – Unfired Pressure Vessels |
| ANSI | American National Standards Institute – Various Sections |
| ASHRAE | American Society of Heating, Refrigeration, and Air Conditioning – Various Sections |
| ASTM | American Society for Testing Materials – Various Sections |
| MSS | Manufactures Standardization Society Standard Practices – Various Sections |
| AWWA | American Water Works Association – Various Sections |
| AGA | American Gas Association – Various Sections |
| API | American Petroleum Institute – Various Sections |
| AWS | American Welding Society – Various Sections |

ProEnergy

**Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000375

Alta_0079798

| Interface | Description |
|---|---|
| AWS A3/0 | Definitions of Welding Terminology |
| AWS B2.1-84 | Standard for Welding Procedure and Performance Qualification |
| AWS D1.1 | Code for Structural Welding |
| IEEE | Institute of Electronic and Electrical Engineers – Various Sections |
| NEC | National Electrical Code – Various Sections |
| NESC | National Electrical Safety Code – Various Sections |
| IES | Illuminating Engineering Society |
| NEMA | National Electrical Manufactures Association – Various Sections |
| NEMA AB1 | Molded Case Circuit Breakers |
| NEMA ICS1 | General Standards for Industrial Control and Systems |
| NEMA ICS2 | Industrial Control Devices, Control and Systems |
| NEMA ICS4 | Terminal Blocks for Industrial Use |
| NEMA ICS6 | Enclosures for Industrial Controls and Systems |
| NEMA MG1 | Motors and Generators |
| NEMA PE5 | Constant-Potential-Type Electric Utility (Semi-Conductor Static Converter) Battery Chargers |
| NEMA SG2 | High Voltage Fuses |
| NEMA WC2 | Rubber Insulated Wire and Cable for the Transmission and Distribution of Electrical Energy |
| ICEA | Insulated Cable Engineering Association – Various Sections |
| ISA | The Instrumentation, Systems, and Automation Society – Various Sections |
| ISA S5.1 | Instrumentation Symbols and Identification |
| NACE | The National Association of Corrosion Engineers – Various Sections |
| NACE RP018890 | Standard Recommended Practice: Discontinuity (Holiday) Testing of Protective Coatings |
| NFPA | National Fire Protection Association – Various Sections |
| NFPA70 | National Electric Code |
| NFPA No. 1 | Carbon Dioxide Extinguishing Systems |
| NFPA No. 37 | Stationary Combustion Engines and Gas Turbines |
| OSHA | Occupational Safety and Health Administration – Various Sections |
| OSHA CFR Title 29 | Occupational Safety and Health Administration |

Any project specific codes or insurance design requirements need to be noted at the start of the project, and may require a Change Order.

12.2    Project Management



**Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

31
www.proenergyservices.com

CONFIDENTIAL

Alta App.000376
PE0079799

ProEnergy will provide project management complete with construction management, quality control / quality assurance, scheduling, administration, warehousing, and expediting including regular monthly reporting of all disciplines.

ProEnergy will provide the following services during the site execution process:

- Construction offices
- Fenced storage and a lay-down area around the construction site during construction
- Sanitation facilities for ProEnergy's personnel during construction

### 12.2.1 Project Management Team

The following is a high level project management team typical for our project execution.



### 12.2.2 Project Coordinator Meeting

To be held at-site after project award, the project coordination (kick-off) meeting ensures the scope of the project is understood / agreed to including a detailed project time line/schedule review and clearly defined lines of communication are established. This will involve the Project Manager for the project from ProEnergy and whomever the Owner wishes to include in the project. At this point, project schedule, final scope definition and any further site requests can be discussed with the project team. As a starting point for the rest of the project, a high level of involvement from the site allows for a more successful and less disruptive project.

### 12.2.3 Design Review Meeting/IFC Drawing Review


*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

32
www.proenergyservices.com

CONFIDENTIAL

Alta App.000377

Alta_0079800

The Design Review Meeting allows the customer and ProEnergy to review the IFC design drawings and agree on the final system details prior to being released to Construction. At this point, the primary design drawings are sent to the customer for review and comment. Customer has five (5) business days to respond with comments to discuss and resolve final system details. Any deviations to the proposal or agreed upon scope may result in a Change Order. Once approved, the project will reach a "design freeze" milestone. Design changes post Design Review Meeting usually mandate a change order, as this disrupts production and impacts released drawings, documents, etc.

12.3    Commissioning

ProEnergy will provide the following Commissioning Services:

- Commissioning of the CTG
- Commissioning and testing of BOP associated systems
- Supply and install all lubricants, lube oils and chemicals for supplied equipment required for first fill and commissioning
- Supply, receive and store all commissioning spare parts associated with ProEnergy's scope of supply
- Provide Owner with recommended list of spare parts for the BOP equipment supplied by ProEnergy
- Operator and maintenance training for the GT package and BOP

12.4    Operator Training

ProEnergy has developed comprehensive hands-on training classes to provide customers the knowledge and ability to properly maintain their facility, operating with maximum availability and reliability. Included with the Project is one (1) week of Operator Training.

ProEnergy offers additional training in the following areas:

- Simple and/or Combined Cycle Plant Familiarization
- Specific Gas and Steam Turbine Technology
- Specific Balance of Plant (BOP) Equipment
- Plant Specific Operational Training
- Plant Specific Maintenance Training



*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

0079801

**13.0    Construction Services**

ProEnergy will carry out all construction and installation activities to achieve completion of the project. The work will be provided in a safe and reliable manner. Effective construction methods will be adopted to achieve the required commissioning schedule.

ProEnergy will furnish and maintain temporary construction facilities needed to support construction staff and labor force, delivery, unloading and storage of equipment and materials. The construction services include, but are not limited to the following:

- Owner to provide all permits required for construction.
- Owner to provide an area sufficient for the project site, construction facilities and staging, as well as a laydown yard.
- Temporary storage facilities at the project site for the proper unloading and storage of all project equipment and materials. If adequate facilities are not available, such material shall be stored at suitable offsite facilities (e.g., warehouses, storage yards, etc.).
- Owner to provide construction power
- Construction power distribution
- Temporary communication system
- Temporary lighting system
- Temporary roads
- Construction personnel and sanitary facilities (including construction offices)
- Temporary water distribution (potable and non-potable)
- Parking facilities to accommodate all construction work forces
- Owner to provide Site security
- Construction testing services (e.g. weld NDE, hydro-testing, megger testing, concrete strength and placement, compaction testing, steel testing etc.)
- Construction materials, such as equipment, tools, consumables, instruments, and all other items necessary for the construction and erection of the project. The supply of the construction equipment includes fuel, lubricants, spare parts, and any other elements or service required for operation and maintenance
- First aid services in conjunction with arrangement for offsite first aid transportation and treatment as necessary during the construction of the project

13.1    Civil / Structural Work

In summary, ProEnergy will provide the scope listed below:

- Minimal Site preparation
- Permanent site drainage
- Drainage during construction
- Wastewater collection sump
- All subgrade work and foundations
- All final grading
- Roads and paving (including construction laydown and parking)

13.1.1 Site Work

The Owner will provide a site that does not require any clearing or grubbing. ProEnergy will provide the Geotechnical Surveys and the Construction Surveys.



*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000379

Alta_0079802

ProEnergy will perform the final site prep and finished grading at the completion of the project. The finish grading will consist of graveled areas around the plant, substation and tanks.

ProEnergy will also perform the final site grading to meet the basic drainage plans, as well as provide the necessary erosion control. The final site drainage and erosion control is simple. The site will shed water and be diverted into a drainage ditch. Complex designs, including aqueducts and French drains, are not included in the standard design.

The site laydown area shall be cleaned and leveled upon completion of the construction activities.

### 13.1.2 Excavation and Backfill

ProEnergy will perform all the excavation and backfill required for the project construction. All excavated materials will be left on site.

Site dewatering, subterranean obstacles and engineered soil are excluded from the scope until the geotechnical survey has been performed and reviewed. Once completed, any cost impacts will be presented to the Owner for approval.

### 13.1.3 Concrete / Foundations

ProEnergy will design, supply and install all reinforced concrete foundations.

Pilings and piers are excluded from the scope until the geotechnical survey has been performed and reviewed. Once completed, this design can be finalized and any cost impacts will be presented to the Owner for approval.

### 13.1.4 Roads and Parking

The Owner will provide all access roads to the site.

ProEnergy has assumed that all site access roads are suitable to allow the safe transportation of all Contractor supplied equipment.

Laydown areas will be designed with consideration for concentrated loading due to handling of loads such as turbine or generator rotor removal.

Support structures will be adequate to resist all pipe and equipment anchor loading under all design conditions, including seismic.

Type and depth of foundation required will be based on the existing subsurface conditions and the geotechnical studies.

## 13.2   Mechanical Work

In general, ProEnergy will supply, install, and commission all major mechanical equipment, mechanical systems, and mechanical interfaces listed in Section 3 in order to have a complete and fully functional facility.

### 13.2.1 On-site Transportation and Rigging



**Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

35
www.proenergyservices.com

Alta App.000380

PEO 0079803

ProEnergy will supply all plant construction required equipment, including: cranes, forklifts, back-hoes, hydraulic lifts, welding machines, air compressors, generators, temporary lights, trucks, pick-ups, etc.

ProEnergy will be responsible for unloading all plant equipment delivered to site, providing all support equipment necessary to facilitate the installation of all the plant equipment.

### 13.2.2 Equipment Erection and Assembly

ProEnergy will provide all support equipment and manpower, as required, to install the GTand all associated auxiliary and BOP equipment.

### 13.2.3 Piping

ProEnergy will supply and install all piping systems as approved for construction and specification required for the plant operation. The piping systems will include heat tracing and insulation as required.

### 13.2.4 Steel (Racks, Supports, Ladders, Platforms)

ProEnergy will supply and install structural steel utility racks as required to support overhead piping and cable trays or bus.

### 13.2.5 Tanks / Vessels

ProEnergy will install and test all required vessels and tanks. Materials for major tanks will be as follows:

| Tank | |
|---|---|
| Wash Water Drains Tank | Fiberglass or plastic tank for each CTG. Each tank will have a capacity of 330 gallons. |
| Demineralized Water Storage Tank | The tank is to be welded and designed for atmospheric pressure with a capacity of 350,000 gallons. |
| Ammonia Storage Tank | Carbon steel tank with 21 day, 7-hour per day storage capacity (or 12,000 gallons minimum) will be provided to store 19% aqueous ammonia. |

Outside storage tanks will be designed for the complete range of ambient conditions expected.

Storage capacity will be based on a fluid level above tank draw-off connections to the invert of the tank overflow. The overflow line will be at least one size larger than the largest incoming line or combination of incoming lines that can simultaneously fill the tank.

Ladder, platform and walkway design will be provided for maintenance and access and in accordance with good safety practices.

Shop fabricated storage tanks will have permanent lifting lugs provided to facilitate installation and maintenance. Lifting lugs will be arranged to provide for an equal distribution of weight when lifting.

### 13.3 Electrical Work



ProEnergy's scope of work includes, but is not limited to, installation and testing of all the electrical equipment listed in Section 4 in order to have a complete and fully functional power generating facility.

### 13.3.1 Wire and Cable

ProEnergy will supply and install the necessary cable and wire as required to electrically connect between the terminals of the equipment defined in the scope of work above.

### 13.3.2 Raceway

ProEnergy will supply and install the necessary cable tray, conduit, cable trenches, wire ways, pull boxes, junction boxes, raceway accessories required to electrically connect between the terminals of the equipment defined in Section 4.

### 13.3.3 Ground Grid

ProEnergy will supply and install a plant ground grid with associated ground rods and connections to plant equipment in accordance with applicable codes and design requirements.

### 13.3.4 Cathodic Protection

ProEnergy will provide cathodic protection for outside tanks and underground metallic piping systems as required. Cathodic Protection will be furnished for wetted equipment as required based on the water quality and equipment materials. The Cathodic Protection system will be designed in accordance with National Association of Corrosion Engineers requirements and will be based on the results of soils resistivity testing.

### 13.3.5 Lightning Protection

ProEnergy will provide lightning protection as follows:

- Supply and install lightning protection on the GT Exhaust Stack
- Supply and install Lightning Arrestors on the GSU Transformer

### 13.3.6 Site Lighting

ProEnergy will supply and install four (4) area lighting poles with two (2) 400 watt metal halide floodlights on each pole sufficient to illuminate the GT and common area.



**Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000382

ALT2 0079805

13.4    Instrumentation and Controls

ProEnergy's scope of work includes, but is not limited to, installation, testing, and commissioning all instrumentation and controls systems specified herein and necessary for a complete, functional power generating facility. The instrument and controls provided will ensure the safe and efficient operation of the process over the complete range of operation conditions.

13.5    Commissioning

The ProEnergy project execution team will provide full commissioning services for the power generating facility. A team of commissioning specialists from ProEnergy and from major equipment vendors arrives at the job site when construction is nearing completion. The team checks each plant system carefully. After thorough operating checks, these specialists prepare the plant for performance testing and eventual turnover to the plant operators.

ProEnergy's commissioning team will develop the commissioning plan using proven processes and procedures, which includes the following:

- Develop a commissioning schedule
- Review the project safety plan
- Compile technical data
- Perform operability and commissioning review
- Develop systems commissioning boundaries
- Develop test standards
- Implement commissioning procedures
- Develop system turnover packages
- Walk down and develop system punch lists
- Systems verifications
- Support plan testing
- Provide for initial operations

13.6    Safety Training

ProEnergy will perform construction services with safety in mind. Safety requirements shall be met by adhering to all applicable state and federal laws, codes, and standards, best practices, and lessons learned from previous projects of a similar nature. Project design will consider insights for both constructability and facility operations and maintenance from major equipment providers and subcontractors to maximize access and preserve safety. ProEnergy's safety training program includes:

Level One (New Employee)

- Overview of EHS
- Fire Extinguisher Training
- Evacuation
- Hazardous Communication Program (HAZCOM)
- Reporting of ESH Incidents
- Blood-borne Awareness
- LOTO Affected
- General PPE



**Proprietary and Confidential**
**Alta Energy • Proposal #1018-2127**

CONFIDENTIAL

Alta App.000383

3063079806

Level Two (Field Service)

- Personal Protective Equipment (PPE)
- Hearing Protection/Conservation
- LOTO Authorized
- Ladders and Stairs
- Environmental / Emergency Response / Waste Management
- Scaffolding
- Safety Work Practices
- Fall Protection
- Compressed Gas / Welding and Burning
- Hot Work
- Overhead Cranes

Level Three (Specialized Training Requirements)

- Confined Space Entry
- Motorized Equipment
- Respiratory Protection
- CDL Drivers
- Cranes
- CPR / First Aid / Blood-borne

ProEnergy's EHS Training Requirements can be found in Attachment I.

**ProEnergy**

*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

39
www.proenergyservices.com

CONFIDENTIAL

Alta App.000384 0079807

**14.0**     **Construction Schedule**

A construction schedule will be prepared by ProEnergy to support the installation, and commissioning of the project. The construction schedule will define the manpower loading and classification of the supervisors provided, as well as showing all activities for the entire construction phase of the Project. See Level-One schedule in Section 14.1 below.

*ProEnergy* | *Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

Alta App.000385

14.1   Level One Schedule





Proprietary and Confidential
Alta Energy • Proposal #1018-2127

CONFIDENTIAL

Alta 0079809

Alta App.000386

**15.0**        **Proposal Attachments**

*ProEnergy* | ***Proprietary and Confidential***
***Alta Energy*** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL                    Alta App.000387

## A.  Company Information

### Introduction

ProEnergy is committed to serving the power industry with the idea that Quality, Safety and Customers come first.  Our business consistently maintains the highest level of quality and customer satisfaction.

We are ready and committed to make available all of our combined resources, expertise, and experience to ensure that the engineering, procurement and construction of this project are successfully completed. To that end, we have developed this proposal to address the challenges and issues of the project.  We wish to highlight the following key elements of our philosophical approach:

- Assigning a highly experienced team of professionals with experience in optimizing, engineering, designing, procuring materials and equipment, constructing, and commissioning power plants.

- Formally and systematically developing the scope, schedule, responsibility, quality and cost on a task-by-task basis to allocate responsibility and ensure the focus of all parties is on meeting or exceeding established project goals.

- Developing a Project Quality Plan to address the quality related goals.

- Implementing proven Project Management approaches to effect proactive control of scope, quality, cost, and schedule; reporting on progress; identifying deviations; forecasting trends; taking corrective actions when necessary; promoting communications; and coordinating the activities of all participants on the project.

- Providing a continuous involvement of the key management personnel to provide the oversight, commitment, experience and attention required to ensure successful project completion.

- Utilizing local subcontractors as integral team members in support of the project.  Our relationship with these organizations will take advantage of opportunities to benefit from local practices, infrastructure and experience with past projects in that region.

### Company Background

ProEnergy was founded in 2002 by CEO Jeff Canon. ProEnergy completed construction on its corporate office in Sedalia, Missouri in 2006. Since that time, the campus has undergone multiple expansions, currently sitting on 90-acres and featuring 900,000 square feet of state-of-the-art facilities and equipment. Today, we are still growing to meet the constantly changing demands of the energy industry. ProEnergy currently employs over 1,000 professionals with experience in over 40 countries. Our headquarters are based in Sedalia, MO USA with 10 locations worldwide.

## Who We Are

ProEnergy provides innovative service and equipment solutions to the energy industry worldwide.

ProEnergy is a leading third-party solutions provider for the Power Generation and Oil & Gas industries. We are responsible for the construction, management, operations, maintenance and repair services for energy generation facilities and equipment around the world.



**EPC**
*46+ Plants Built*

**Commissioning**
*6,700 MW Installed*

**Operations & Maintenance**
*8,000 MW Installed*

**Professional Services**
*25,000+ Placed*

**Plant Relocation**
*45+ Plants*

ProEnergy's centrally-located US campus provides a multitude of service and equipment solutions for our global customers. Our state-of-the-art facilities and campus design allow for a unique collaboration between our expert engineers and technicians. The result is optimum efficiency and quicker turnaround times. ProEnergy remains focused on customer satisfaction, driving to reduce costs, increase efficiency and provide real value. We remain dedicated to providing a level of service that exceeds our customer's expectations.

ProEnergy offers a multitude of service solutions to the Power Generation and Oil & Gas industries. We have a solution for every aspect of your plant's operation. ProEnergy's Core Solutions include:

- EPC Fast Track
- Overhauls
- Component Repairs
- High Voltage

- Staffing
- Field Services
- Controls Solutions
- Technical Services

- Operations and Maintenance
- Fabrication Services

CONFIDENTIAL

Alta App.000389

Alta-0079812

## B. **Contracting Details**

SUPPLEMENTAL TERMS FOR EPC SCOPE OF WORK

*Unless expressly modified or superseded by other terms set forth in PES's Proposal to which these Supplemental Terms are incorporated, the price, payment terms, schedule, and scope of work identified in PES's Proposal are contingent on the following terms being included in any resulting contract between PES and Client with respect to the subject matter of PES's Proposal:*

**TAXES:** No amount is included in the contract price for any excise, privilege, use, sales, VAT, stamp, or other foreign, federal, state or local taxes, customs fees and duties, or other government assessments. The contract price shall be increased to include any such taxes, fees, duties or assessments.

**PAYMENT:** Payment shall be in U.S. Dollars without offset, back charge, retention or withholding. In the event that payment is due on the occurrence of any milestone event, including the completion of any percentage of the work to be performed, and such occurrence is delayed by Client through no fault of PES, such payments shall be due when the event would have occurred had such delay not intervened. Invoices shall become due upon receipt. Payments made later than ten (10) days from Client's receipt of invoice shall be subject to a late penalty of one and one-half percent (1 ½%) per month. At the request of PES, Client agrees to issue an irrevocable letter of credit for the payment of the contract price on terms, and issued by a bank, reasonably acceptable to PES.

**CHANGES:** Changes in the scope of work shall only be permitted by written agreement of PES and Client.

**DELAYS:** The date(s) for completing the work is subject to adjustment for any delay resulting from: (i) Client's failure to furnish PES with any Client supplied components, data, shipping instructions, approved drawings or change orders as required, (ii) any changes to the scope of work made at Client request, (iii) Client's delay in paying an invoice, (iv) Client's convenience, (v) force majeure, or (vi) hazardous substances, underground obstructions, or other unforeseen conditions at the project site. In the event of any such delay, the schedule will be automatically extended for a period not less that the duration of the delay. Client shall pay PES any additional costs incurred by PES as a result of the delay.

**WARRANTY AND PERFORMANCE GURANTEES:** PES warrants its work from and against all defects in title, material, and workmanship and otherwise complies with the terms of any specifications set forth in the contract between PES and Client. The warranty term shall be for a period of twelve (12) months from Substantial Completion (as defined in the contract) or Client taking over and/or operating the equipment, whichever occurs first. Any repairs, replacements or reperfomance by PES to its work during the warranty period shall be warranted for the remainder of the original warranty term or 90 days, whichever is longer. All warranted reperfomance, repairs and replacements shall be made F.O.B. (Incoterms 2010) PES's (or its supplier's) facility unless otherwise agreed. The duties, liabilities and obligations of PES do not extend to any repairs, adjustments, alterations, replacements or maintenance that may be required as a result of normal wear and tear, normal degradation in the performance of the equipment or as a result of (a) improper repair or alteration by Client or other persons, (b) misuse, negligence or damage by Client or other persons, (c) excessive operation at peak capacity, frequent starting, type of fuel, detrimental air inlet conditions, or erosion, corrosion or material deposit of fluids. The warranty and remedies are further conditioned upon (i) the proper storage, installation, operation and maintenance of the equipment and conformance with the operation and instruction manuals provided by the suppliers and manufacturers and (ii) repair or modification pursuant to the instructions of the suppliers and manufacturers and as otherwise directed by PES. NO IMPLIED, STATUTORY, OR COMMON LAW WARRANTY OF ANY KIND, INCLUDING MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SHALL APPLY. No performance guarantees such as output, heat rate, emissions, noise, availability or capacity are provided by PES unless specifically provided for elsewhere in the provisions of PES's Proposal.

**CANCELLATION:** Should the contract be canceled by Client for any reason other than the termination for PES's material breach, Client shall pay PES for all costs and expenses incurred and commitments made, plus an amount equal to PES's expected profit or, at PES's option, PES may retain all amounts paid as of such cancellation date as liquidated damages.

**LANGUAGE, LAW AND VENUE:** The contract and all contract documents and communications will be in English. The contract will be interpreted according to the laws of the State of New York (notwithstanding its choice of laws). Any dispute between the parties shall be resolved in any federal or state court located in Missouri or Texas. PES and Client expressly exclude the application of the Convention on International Sale of Goods to the contract.

**FORCE MAJEURE:** PES shall not be responsible for any failure or delay in delivery/performance due to causes beyond its reasonable control, including but not limited to acts of God, fire, strike, flood or other severe weather conditions, military authority, government regulation or priority rating, embargoes, or shortages of raw equipment, components or labor. In the event of such delay, the schedule for completing the work shall be extended for a period of time equal to the time of such delay.

**CODES AND STANDARDS:** PES specifically takes exception to any requirement to conform to any unidentified state, county, municipal or other local codes or standards. PES will prepare comments and exceptions to the technical provisions of such codes or standards when accompanied by Client's written description of the applicable sections. The parties agree to comply with all laws and regulations applicable to its respective obligations under the contract.

**LIMITATION OF LIABILITY:** In no event shall PES be liable for any claim, expense, loss or damage (including attorney's fees) whether based in contract or tort, including the negligence of PES, in an amount in excess of 100% of the contract price and reduced to 10% of the contract price once Substantial Completion under the contract has been achieved. Under no circumstances shell PES be responsible for any incidental or consequential damages including, but not limited to loss of use, downtime, loss of profits or revenue.

**INDEMNITY:** PES and Client shall indemnify, defend and hold each other harmless from and against any and all liabilities, claims, demands, suits, losses, damages, costs and expenses (including reasonable attorney fees and court costs) for bodily injury to or death of any third person, or damage to or destruction of any property of third party, caused by any negligent act or omission on the part of the indemnifying party its

*ProEnergy*   **Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000390   ALG 0079813

officers, employees, contractors or agents, except to the extent such liabilities, claims, suits, losses, damages, costs and expenses result from any negligent or willful act or omission on the part of the indemnified party, its officers, employees, contractors or agents.

**INSURANCE:** Client shall be responsible for providing the Builders "All Risk" Insurance in a minimum amount equal to the full insurable value of the equipment and project and including any additional costs normally insured under such policy. The insurance shall include boiler and machinery coverage and be placed with, an insurer and on terms, reasonably acceptable to PES. The policy shall include PES as an additional insured with a waiver of subrogation.

www.proenergyservices.com

*ProEnergy* | **Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000391
Alta 0079814

## C. Construction Execution Plan

### 1.0    General Information

ProEnergy will execute this project based on industry standards, and our standard processes developed and tested through our experience in performing this type of work. Project management support will be provided from ProEnergy's headquarters in addition to an assigned Construction Manager at the project site.

The Management team at ProEnergy's home office will provide the project support functions required to assist the construction team. The support functions provided by the home office team include coordination and logistics, procurement and purchasing, documentation and procedure development, engineering and technical expertise, environmental health and safety, and quality control. The Project Manager will ensure that the construction team is receiving optimal support from these functions to maximize the effectiveness of the Construction Team.

The Construction Management Team at the site will:
- Manage, oversee, and direct the construction of the plant
- Provide direct management of manpower, material control, documentation control, planning, scheduling, and technical direction
- Provide direct feedback to the subcontractors selected for manpower planning, equipment & tool requirements, and consumables
- Collect the necessary data for proper documentation.

The Project Management Team at ProEnergy headquarters will support the on-site Construction Team with the following functions:

- Overall Project Management
- Procurement and purchasing services
- Quality Control / Quality Assurance
- Environmental Health and Safety
- Project Scheduling
- Engineering and technical support
- Coordination and logistics
- Human Resources
- Payroll and finance

A key element of an effective management program is the communication between all levels of the team. During the construction phase of the Project, communication is accomplished through regularly scheduled meetings. The agenda for these meetings typically include the following:

- Progress reports from those responsible for the various work tasks.
- Information concerning material deliveries for planning work.
- Information concerning quality issues and work plans.
- Information concerning design issues requiring resolution.
- Discussions and presentation of plans for the upcoming period.
- Development of action items and assignment of responsibility for resolution.
- Discussion of any special site activities such as heavy lifts, etc.
- Later in the project, commissioning plans will be presented at these meetings.

At the conclusion of the meeting, minutes of the meeting are developed and distributed to all project



**ProEnergy**    **Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

47
www.proenergyservices.com

participants. Attachments such as schedules, cost evaluations, and other documentation will be distributed as appropriate.

The Project Manager will be responsible for the day-to-day management of the project team and ensuring that the contract is fulfilled within the completion dates and to the satisfaction of the Customer. Additional personnel assigned to the project as well as subcontractors will report through these individuals to the Project Manager as shown on the personnel list below.

The ProEnergy Site Construction Manager will be the primary point of contact on the project. The core management team will set out all procedures and controls required for coordinating and routing documentation, design and engineering information, technical interfaces and correspondence as required ensuring the following:

- Planning and scheduling all project activities.
- Coordination of project activities.
- Coordination of project interfaces.
- Monitoring and reporting all project activities.
- Producing progress reports and schedules.
- Providing site Management and Coordination.
- Providing contract management.

Key ProEnergy Personnel typically include the following:



*Proprietary and Confidential*
*Alta Energy • Proposal #1018-2127*

CONFIDENTIAL

Alta App.000393

## 2.0   Project Management Team

The team members listed here are typical for our projects. Other team members of comparable capacities may be utilized.

Project Manager – Thomas Canon

 Thomas has over ten years of power plant experience encompassing an entire project life cycle, from construction, commissioning, operations and through maintenance. He has supported a variety of functions including mobilization, major overhauls, hot gas path inspections and repairs on gas turbines. Thomas spent three years managing an LM6000 power plant and also managed the turnkey EPC for 8 LM6000 plants in Venezuela.

The Project Manager's primary function is to ensure the project goals are being met. The Project Manager will monitor progress of the project and will ensure the project support functions are providing the necessary functions required by the Construction Team throughout the various stages of implementation from design through to completion. The Project Manager has complete responsibility for the EPC portion of the project's execution, from contract signing to final acceptance of the EPC scope of work, and will ensure the appropriate company resources are applied to the project to meet the goals set forth.

The Site Construction Manager will report directly to the Project Manager and will communicate any issues, support needs, technical concerns, project status, and man power needs on a daily basis.

Vice President of EHS & Quality – Fred Bartol

 Fred brings over 30 years of experience to his role as ProEnergy's Vice President of EHS & Quality. Fred is responsible for driving the environmental health and safety culture throughout ProEnergy's worldwide operations and initiating policies and programs to achieve the highest level of corporate responsibility possible. He has served as a Senior Safety and Health Compliance Officer for OSHA, an adjunct Professor of Occupational Safety, Health and Security at Penn State University and Director of Environmental, Health and Safety at Boehringer Ingelheim Chemicals, Inc. Fred earned his PhD in Occupational Health and Safety-Ergonomics from Drexel University in Philadelphia, PA.

## 3.0   Construction Management Team

ProEnergy will provide Construction Management Services to construct the facility and perform the commissioning of the modified plant. The Construction Management team will consist of project management engineering support, technical specialists, quality control, and supervision to perform the work. Documentation and material control will be the responsibility of ProEnergy.

The site staff will be composed of the key personnel defined below, adjusted to the specific needs of the project as it progresses.

Site Construction Manager

The Site Construction Manager is assigned to the site for construction, and commissioning phases of the project. His responsibilities include coordinating with the various team members on all aspects of the project effecting construction and commissioning. The Site Construction Manager's responsibility will also include forming a close working relationship with the Customer and any subcontractors selected

**ProEnergy**   *Proprietary and Confidential*
*Alta Energy • Proposal #1018-2127*

CONFIDENTIAL

Alta App.000394    0079817

to perform the work.

The Site Construction Manager is supported by a staff of individuals experienced in the mechanical/piping, electrical, and instrument and controls disciplines as needed. These individuals will provide rapid resolution of any questions, concerns, or problems that may arise during the project to ensure quality and adherence to schedule. Additionally, individuals experienced in QA/QC, Safety, and supervision of labor will complete the Construction Team to provide the required expertise in those areas.

The Site Construction Manager is responsible for the conduct of all construction related activities for the duration of the Project. The Project Manager is directly responsible for project work performance and accomplishment of the construction schedule and goals. Planning and scheduling of site work is vital to the success of any project. The Site Construction Manager forecasts labor manpower requirements, allocates manpower, equipment, and material, and administers the overall construction activities. For this task, he is supported by an experienced staff comprised of the following members.

Project Engineer

The Project Engineer is responsible for the engineering and design interfaces with the Site. The Project Engineer is also responsible for providing field engineering support to the construction supervisors and Site Construction Manager. The Project Engineer will ensure that all of the Latest IFC Drawings are in Document Control at Site and being used by the Superintendents in the Field, RFI's are tracked and processed, Red Line Drawings are updated and approved prior to implementation at Site, Field Routed / Installed material are shown on sketches in accordance with Engineering Specifications and Standards, and provide technical support to QA/QC on NCR's.

ProEnergy will support all site activities through our Engineering department. They will be responsible for providing technical services and creating the as-built construction documents. The overall project schedule will be developed and submitted to Owner for comments. The schedule will be adjusted and resubmitted as the final schedule that the project will be constructed from. ProEnergy will update the schedule on a weekly basis and provide details of any deviations of the original schedule in weekly reports to the Owner. The Project Schedule will be updated by a ProEnergy scheduler.

QA/QC Manager

The Quality Assurance/Quality Control (QA/QC) Manager is responsible for the Site Quality Assurance and Quality Control Program. All manuals and procedures for the Program are produced under his direction. He is also responsible for the direction and supervision of the Quality Control and Testing Program. The Quality Assurance/Quality Control Manager will be supported by the ProEnergy QA/QC Group.

Safety Manager

The Safety Manager is responsible for the Site Safety Program and ensures alignment between ProEnergy's and the Client's Safety Requirements for the Project. All Safety Policies and Procedures for the Safety Program are under Safety Manager's direction.

Specialists

Throughout the course of the construction activities, the Site Construction Manager will need assistance from specific specialists. These specialists will report to the Site Construction Manager and will take responsibilities for specific aspects of construction to ensure the installation is performed



correctly. Based on individual skills and job requirements, one person may cover multiple responsibilities. These specialists will typically include the following positions:

- Mechanical Technical Advisors – Our TA's will be responsible for centerline erection of turbines and generators.
- Civil Superintendent – Our Civil team is responsible for all civil works performed on site.
- Structural Superintendent – Our Structural team is responsible for the installation of the structural steel and buildings.
- Mechanical Superintendent – Our Mechanical team is responsible for the installation of mechanical equipment.
- Piping Superintendent – Our Piping team is responsible for the installation of piping.
- Electrical and Instrumentation Superintendent – Our Electrical and Instrumentation team is responsible for the entire electrical and instrumentation installation.
- Controls Technical Advisor – Our Controls TA is responsible for the development and installation of the control system.

## D. Experience List

| Client | Facility | Location | Job Description | Plant Configuration | Output | Completion |
|---|---|---|---|---|---|---|
| Agilon 2 | Victoria Port | Victoria, Texas | Turnkey EPC | 2 X GE LM6000 PC | 97 MW | 2018 |
|  | Victoria City | Victoria, Texas | Turnkey EPC | 2 X GE LM6000 PC | 97 MW | 2018 |
| CEPM (Consorcio Energetico Punta Cana - Macao) | Bavaro | Punta Cana, Dominican Republic | Turnkey EPC | 1 X GE LM2500 | 23 MW | 2018 |
| LS Power | Wallingford Energy II | Wallingford, Connecticut | Turnkey EPC of 2 X GE LM6000 PC | 7 X GE LM6000 PC | 322 MW | 2017 |
| Agilon | Chamon Power | Channelview, Texas | Turnkey EPC | 2 X GE LM6000 PC | 97 MW | 2017 |
|  | Port Comfort Power | Point Comfort, Texas | Turnkey EPC | 2 X GE LM6000 PC | 97 MW | 2017 |
| Centrales de la Costa Atlantica S.A | 9 de Julio | Mar Del Plata, Argentina | Turnkey EPC with Desalination Plant | 2 X GE LM6000 PC | 100 MW | 2017 |
| Prairie Power Inc. | Alsey Generating Station | Alsey, Illinois | Installation of 1 X GE LM6000; Boroscope Inspections, Overhaul Fuel Nozzles; Fuel Nozzle Changeout | 1 X GE LM6000; 2 X GE LM2500; 2 X Westinghouse 251B; 1 X Westinghouse 191B | 100 MW | 2017 |
| Graphic Packaging International Inc. | West Monroe Pulp & Paper Mill | West Monroe, Louisiana | Installation of a 1 X GE MS6001B | 5 X GE ST Steam Turbines; 1 X GE MS6001B | 63 MW | 2016 |
| Rockland Capital | Eagle Point Power Generation | West Deptford, New Jersey | Installation of a Siemens Steam Turbine | 2 X GE MS7001EA; 1 X Alstom ST Steam Turbine | 225 MW | 2016 |
| Nalcor Energy | Holyrood Thermal Generating Station | St. Johns, Newfoundland, Canada | Turnkey EPC; Fuel Conversion of Equipment | 1 X W501D5A; 3 X 150MW Steam Turbines | 120 MW | 2015 |
| PDVSA | Barinas | Barinas, Venezuela | Turnkey EPC; Refurbishment and Fuel Conversion of Equipment | 2 X P&W FT4 Twin Pac | 90 MW | 2015 |
|  | El Furrial | El Furrial, Venezuela | Turnkey EPC | 4 X RR Trent60 | 240 MW | 2014 |
|  | Morichal | Morichal, Venezuela | Turnkey EPC; Refurbishment and Fuel Conversion of Equipment | 2 X GE LM6000 PC | 100 MW | 2014 |
| CORPOELEC | La Raisa I | Charallave, Venezuela | Turnkey EPC; Refurbishment and Fuel Conversion of Equipment | 3 X P&W FT8-3 (Dual Fuel) | 150 MW | 2014 |
|  | La Raisa II | Charallave, Venezuela | Turnkey EPC; Refurbishment and Fuel Conversion of Equipment | 2 X GE LM6000PC/PD | 100 MW | 2014 |
|  | Guarenas I | Guarenas, Venezuela | Turnkey EPC; Refurbishment and Fuel Conversion of Equipment | 2 X GE LM2500+; 1 X GE LM6000 PC | 100 MW | 2013 |
|  | Guarenas II | Guarenas, Venezuela | Turnkey EPC; Refurbishment and Fuel Conversion of Equipment | 1 X GE LM6000 PC | 50 MW | 2013 |

**ProEnergy** *Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000397

**E.** <u>Performance Specifications and Test Procedures</u>

# Gas Turbine

# Performance Specifications
# &
# Test Procedure

*The information contained within this document is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, editing, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient, is prohibited*

# Table of Contents

| Section | Description | |
|---|---|---|
| 1 | INTRODUCTION | 4 |
| 1.1 | SCOPE | 4 |
| 1.2 | PERFORMANCE GUARANTEES | 4 |
| 1.3 | PARTIES TO THE TEST | 4 |
| 1.4 | BASE REFERENCE CONDITIONS | 5 |
| 1.5 | CODES AND CONSTANTS | 6 |
| 2 | TEST CONDUCT | 8 |
| 2.1 | OPERATING DISPOSITION | 8 |
| 2.2 | EQUIPMENT CLEANLINESS | 8 |
| 2.3 | STABILIZATION | 9 |
| 2.4 | TEST RUNS | 9 |
| 2.5 | DATA COLLECTION | 9 |
| 2.6 | SAMPLING | 10 |
| 2.7 | TEST DEVIATIONS | 10 |
| 3 | TEST MEASUREMENTS | 11 |
| 3.1 | PRIMARY MEASUREMENTS | 11 |
| 3.2 | SECONDARY MEASUREMENTS | 11 |
| 3.3 | EMISSIONS | 11 |
| 3.4 | CALIBRATION | 11 |
| 4 | CALCULATIONS | 12 |
| 4.1 | PERFORMANCE EQUATIONS | 12 |
| 4.2 | EQUIVALENT OPERATING HOURS | 13 |
| 4.3 | TEST TOLERANCE | 13 |
| 5 | UNCERTAINTY | 14 |
| 5.1 | INTRODUCTION | 14 |
| 5.2 | METHODOLOGY | 14 |
| 5.3 | POST-TEST ANALYSIS | 14 |
| 6 | TEST REPORTING | 16 |

ProEnergy

*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000399

Alta-0079822

## Table of Appendices

A.    TEST BOUNDARY DIAGRAM
B.    INSTRUMENT LIST
C.    TEST SCHEDULE
D.    DIVISION OF RESPONSIBILITY
E.    DEFINED                                                    TERMS

# 1 Introduction

This document provides instruction on performance testing and specifies the basis of the performance guarantees.

## 1.1 Scope

This document provides detailed instruction for performance testing the ProEnergy scope of supply. Instruction is provided for the test conduct, methodology, and calculations.

The Performance Test is conducted with the goal of determining:
- Final Corrected Output
- Final Corrected Heat Rate

Other performance tests are outside the scope of this Test Procedure.

## 1.2 Performance Guarantees

The purpose of testing is to determine the performance goals outlined in the Scope at Base Reference Conditions using the calculation methodology provided in Section 4.

Performance Guarantees
Final Corrected Output:      52,000 kW
Final Corrected Heat Rate:   8,650 BTU/kWh (LHV)

Emissions Limitations
NOx @ 15% O2:      25ppm CO @ 15% O2:      12ppm

Although the normal amount of O2 in air is 21%+-, emission calculations use a constant value of 15% O2 in air to calculate the ppm NOx and CO.

The CO value of 12ppm is this low only if a CO catalyst is used to reduce the emissions. If a CO catalyst is not used, the value will be expected to be greater.

## 1.3 Parties to the Test

The parties to the performance test are ProEnergy and the Purchaser. All other parties are considered test observers and do not have authority in agreements made at the time of performance testing.

Each party shall appoint one (1) representative that shall sign agreement of pre-test preparation, test clarifications, test deviations, and receipt of all documentation required prior to the parties leave site.

ProEnergy  |  *Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

ProEnergy shall appoint a Test Director to be in charge of all testing activities. Representatives for each Party to the Test shall be designated to observe the test, confirm that it was conducted in accordance with this Test Procedure, and, if necessary, shall have the authority to approve any test deviations. All test deviations will be made in writing following the performance testing. A division of responsibility matrix is provided in Appendix D to govern the roles and responsibilities of the Parties to the Test.

## 1.4    Base Reference Conditions

Testing may not be able to be performed at the conditions used to establish the performance guarantees. The measured performance test results will be corrected to the Base Reference Conditions in Table 1-1 in accordance with section 4. Testing shall be conducted at conditions as close to the Base Reference Conditions as practical. To ensure accuracy of the testing, no conditions may exceed the design limitations of the ProEnergy scope of supply, and testing conditions must be within those values listed in Table 1-2.

**Table 1-1:  Base Reference Conditions**

| Parameter | Reference Condition |
|---|---|
| Barometric Pressure | 14.7 psia |
| Site Dry Bulb Temperature | 80 Deg F |
| Site Relative Humidity | 60 % |
| Power Factor | 0.85 |
| Sprint Water Temperature | 65 Deg F |
| Generator Frequency | 60 Hz |
| Degradation | New and Clean |
| Fuel Gas Analysis | - |
| $CO_2$, mole percent | 1.5577 |
| $N_2$, mole percent | 0.3244 |
| $C_1$, mole percent | 96.3398 |
| $C_2$, mole percent | 1.4226 |
| $C_3$, mole percent | 0.2007 |
| $iC_4$, mole percent | 0.0477 |
| $nC_4$, mole percent | 0.0435 |
| $iC_5$, mole percent | 0.0182 |
| $nC_5$, mole percent | 0.0126 |
| $C_6$, mole percent | 0.0328 |
| Site Fuel Temperature | 50 Deg F |

**Table 1-2:  Maximum Permissible Deviations from Base Reference Conditions**

| Parameter | Maximum Deviation |
|---|---|
| Ambient Temperature | ±30 Deg F |
| Power Factor | 1.0 to 0.85 |

ProEnergy | **Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000402 0079825

| Generator Frequency | ±1 Hz |
| --- | --- |

Note, if conditions are outside the ranges specified above, an assessment will be conducted by ProEnergy to determine if the modeling methods provide sufficient accuracy for testing.

## 1.5    Codes and Constants

Testing will be conducted in general accordance with the following Test Codes.

### Table 1-3:  Applicable Test Codes

| Standard | Code | Date | Title |
| --- | --- | --- | --- |
| ANSI/ASME | PTC 19.1 | 2013 | Test Uncertainty |
| ANSI/ASME | PTC 19.2 | 2010 | Pressure Measurement Instruments and Apparatus Supplement |
| ANSI/ASME | PTC 19.3 | 2004 | Temperature Measurement Instruments and Apparatus |
| ANSI/ASME | PTC 19.5 | 2005 | Flow Measurements |

### Table 1-3 (Continued):  Applicable Test Codes

| Standard | Code | Date | Title |
| --- | --- | --- | --- |
| ANSI/ASME | PTC 22 | 2014 | Performance Test Code on Gas Turbines |
| ASTM | D1945 | 2003 | Standard Test Method for Analysis of Natural Gas by Gas Chromatography (Reaffirmed 2010 |
| ASTM | 3588 | 1998 | Standard Practice for Calculating Heat Value, Compressibility Factor, and Relative Density of Gaseous Fuels (Reaffirmed 2011) |
| AGA | Report No 8 | 1994 | American Gas Association's Compressibility Factor for Natural Gas and Related Hydrocarbon Gases, Transmission Measurement Committee Report no. 8 |
| GPA | 2145 | 2009 | Table of Physical Constants for Hydrocarbons and Other Compounds of Interest to the Natural Gas Industry |

Code-specific constants/conversion factors required for use in the determination of test results are as follows:

Energy calculations use the International Table BTU where 1 BTU = 1,055.056 joules. Steam Tables use ASME 1997 formulations.

Psychrometric calculations are based on the 2005 ASHRE Handbook.



## 2    TEST CONDUCT

### 2.1    Operating Disposition

Performance is based on operation of the equipment in the following disposition:

- Gas Turbines operated on their Base Load control system algorithms.    The following Control Modes are permissible for testing purposes:
    - o  T3
    - o  PS3
    - o  T48
- Sprint Water Injection shall be to the LP Compressor only.
- Inlet heating if applicable shall be out of service during testing.
- All systems shall be placed into automatic or normal operating modes.
    - o  In the event that abnormal operation is noted by any of the Parties to the Test, the Parties to the Test shall meet to determine if the abnormal operation effects the thermal performance of the supplied equipment. If there is no effect on thermal performance, the abnormality will be noted and the Performance Test will continue. If there is an effect on thermal performance, then the Parties to the Test shall come to resolution on either how to correct for the abnormal condition, or cancel the Test Run and continue testing once the condition has been returned to a normal operating status.

If the unit has inlet conditioning, for test runs where the ambient temperature is above 59F the inlet conditioning will be in service for all test runs. If the inlet conditioning cannot be placed in service due to ambient temperatures or commissioning schedule, then the performance test shall be conducted with the inlet conditioning out of service. For this case, the Base Reference Conditions for Site Dry Bulb Temperature and Site Relative Humidity shall be replaced by the design compressor inlet conditions which assumes inlet conditioning is operating at design performance.

### 2.2    Equipment Cleanliness

A water wash will be conducted on all units within 72 operating hours of the Performance Test if ambient conditions permit. All units must be operated for a total of 24 hours at Base Load after water washing prior to the Performance Test. Any modifications to the water washing schedule shall be at the discretion of the ProEnergy representative to determine compressor cleanliness.

New and Clean condition is assessed as Recoverable and Non-Recoverable degradation:
1. Non-Recoverable Degradation: 200 EOH is considered a standard commissioning cycle. EOH greater than 200 shall have a degradation correction applied to return the corrected results to a New and Clean condition.
2. Recoverable Degradation:  ProEnergy will conduct an inspection of equipment in their scope of supply. Based on that inspection, ProEnergy will determine the steps required to

*ProEnergy*

**Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000404

ALTA 0079827

remediate any fouling or degradation. Note, inlet air filters are considered a form of Recoverable Degradation, but will not be serviced prior to testing. Therefore, a correction for Filter House Differential Pressure will be applied to the corrected results.

## 2.3      Stabilization

Prior to commencement of Performance Testing the unit shall be operated in accordance with the Operating Disposition in Section 2.1 for a minimum of thirty minutes. In addition to the stabilization period, the following operational parameters shall be maintained:

### Table 2-2: Stability Criteria

| Parameter | Permissible Fluctuation During Any Test Run |
|---|---|
| Plant Power Output[1] | ±0.65% |
| Barometric Pressure[1] | ±0.16% |
| CTG Inlet Air Temperature[2] | ±1.3°F |
| Fuel Flow[1] | ±0.65% |
| Frequency[1] | ±0.33% |

1. Relative deviation of the Standard Deviation of the Population
2. Absolute deviation of the Standard Deviation of the Population
3. Stability shall be assessed in 30 minute increments.

## 2.4      Test Runs

Testing will be conducted in accordance with the following <u>Net Base Load Testing</u>
Number of Test Runs: 1
Duration of Test Runs: 30 minute

Calculated performance results will be conducted in accordance with Section 5.

In the event that stability is interrupted, the Test Director may restart a Test Run once Stability has been restored in accordance with Section 2.3.

In the event that performance levels do not meet the guaranteed levels, ProEnergy shall evaluate the equipment in their scope of supply for deficiencies and may take corrective action to resolve the performance. Testing will be conducted after any corrective action is taken to demonstrate satisfaction of the performance guarantees.

## 2.5      Data Collection

Data will be collected electronically using the ProEnergy HMI:

ProEnergy | **Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000405 0079828

Frequency of Electronic Data Collection: 1 measurement every 30 seconds.

Dead band and compression algorithms should be minimized to the extent possible for measurements listed in Appendix B.

Data will be consolidated at the end of the test and disseminated to each of the Representatives of the Parties to the Test at the completion of the test. Electronic data in the native format and copies of manual data will be provided at the completion of the test.

## 2.6      Sampling

Sampling will occur in accordance with the protocols provided in Appendix F.  Fuel Samples:
Number of Samples at each Collection: 2 (1 for analysis, 1 for Referee)
Sample Collection Periodicity: 1 set of Samples every 30 minutes Collection Starting Time: Beginning of test (Test Time = 0) Location: On the ProEnergy supplied fuel gas regulation skid

Samples will be shipped for Laboratory analysis in accordance with the codes specified in Section 1.5. Referee fuel gas samples will be held by ProEnergy for a maximum of 90 days after completion of performance testing at which time samples will be vented unless directed otherwise by the Parties to the Test.

## 2.7      Test Deviations

Portions of the Performance Testing may not be able to be completed in strict accordance with this Test Procedure. In order to facilitate Performance Testing, there may be deviations noted at the time of Performance Testing. Each of the Representatives to the Parties of the Test will be responsible to work with the other Representatives to the Parties of the Test to determine a prudent path forward and agree to the deviations in writing. These mutual agreements will be considered binding decisions that will supersede the direction in this Test Procedure.



# 3     Test Measurements

All measurements will utilize station instrumentation.

## 3.1     Primary Measurements

Primary measurements are those measurements that are used directly in the calculations. The instrument list provided in Appendix B provides the primary measurements, a description of the measurement, and the location of the measurement.

## 3.2     Secondary Measurements

Secondary measurements are those measurements that are not used directly in the calculations. They are used to validate primary measurements and may be used to replace primary measurements if agreed to by the Representatives of the Parties to the Test. Secondary measurements are also used for purposes of establishing stability and general supplemental information.

## 3.3     Emissions

Emissions are considered a secondary measurement to thermal performance testing and will be verified for compliance during performance testing to the extent possible by the station instruments supplied by ProEnergy.

## 3.4     Calibration

All instruments will be loop checked by the Commissioning agency. Calibration requirements for the purposes of the Performance Test are satisfied by the instrument manufacturer's certification of their accuracy classes which will serve as the systematic component of uncertainty. This section takes exception to Table 4-1.2.1-1 of PTC22-14

*ProEnergy* | *Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000407

Alta-0079830

## 4        Calculations

The calculation methodology will utilize a model based approach to ensure highest accuracy of the results possible. Model results will be provided by ProEnergy utilizing proprietary software used to develop the basis of performance. Note, summation notation is utilized to account for each of the generators provided in the ProEnergy scope of supply.

### 4.1      Performance Equations

Corrected Output

$$P_{Meas} = \mathbf{L}\, P_{Gen}$$

$P_{Meas}$  =   Total Measured Output, kW
$P_{Gen}$   =   Power measured at the generator terminals, kW

$$P_{corr} = P_{Meas} * \left(\frac{P_{BR}}{P_T}\right)$$

$P_{corr}$  =   Corrected Output at Base Reference Conditions, kW.
$P_{BR}$    =   Correction model predicted output at Base Reference Conditions, kW. $P_T$  =  Correction model predicted output at Test Conditions, kW.

Corrected Heat Rate

$$HR_{Meas} = \frac{Q_{meas}}{P_{Meas}}$$

$HR_{Meas}$ =   Measured Heat Rate, BTU/kWh (LHV).
$Q_{meas}$   =   Total Plant Heat Input to Gas Turbines, BTU/h (LHV).

$$Q_{meas} = \mathbf{L}\, M_{Fuel} * LHV$$

$M_{Fuel}$  =   Fuel flow into each respective Gas Turbine, lb/hr.
$LHV$   =   Lower Heating Value of the fuel, BTU/lb.

$$HR_{corr} = HR_{Meas} * \left(\frac{HR_{BR}}{HR_T}\right)$$

$HR_{corr}$ =   Corrected Heat Rate at Base Reference Conditions, BTU/kWh (LHV).

ProEnergy    *Proprietary and Confidential*    www.proenergyservices.com
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL                                                Alta App.000408    AE 0079831

HR$_{BR}$ = Correction model predicted heat rate at Base Reference Conditions, BTU/kWh (LHV).

HR$_T$ = Correction model predicted heat rate at Test Conditions, BTU/kWh (LHV).

## 4.2 Equivalent Operating Hours

EOH will be calculated in accordance with the following formula

$$EOH = (HRS) + (20 * ST) + (100 * TP)$$

EOH = Equivalent operating hours.
HRS = Operational hours of operation.
ST = Number of starts.
TP = Number of trips.

## 4.3 Test Tolerance

A Test Tolerance will be applied to the corrected test results that is equivalent to the Post-Test Uncertainty.

$$P_{Final} = P_{corr} * (1 + P_{unc})$$

P$_{Final}$ = Final Corrected Output, kW
P$_{unc}$ = Test tolerance equal to Post-Test Uncertainty. Note, this value is expressed as a decimal i.e. 0.3% = 0.003.

$$HR_{Final} = HR_{corr} * (1 - HR_{unc})$$

HR$_{Final}$ = Final Corrected Heat Rate, BTU/kWh (LHV)
HR$_{unc}$ = Test tolerance equal to Post-Test Uncertainty. Note, this value is expressed as a decimal i.e. 0.5% = 0.005.



*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000409

# 5        Uncertainty

## 5.1        Introduction

The objective of a pre-test uncertainty analysis is to demonstrate that the Performance Test is being designed in accordance with the uncertainty methodology outlined in ASME PTC 19.1- 2013. The post-test uncertainty analysis will be used as a quantitative assessment of the quality of the test and will also be used for determination of the test tolerance.

Analysis methods, assumptions, and findings for this analysis are presented in the following sections.

## 5.2        Methodology

The general formula for uncertainty is:

$$U_T = \sqrt{U_{Sys}^2 + U_{Rand}^2}$$

$U_T$        =  Total uncertainty

$U_{Sys}$        =  Systematic uncertainty, weighted for the sensitivity of the individual components considered in the uncertainty analysis.

$U_{Rand}$ =        Random uncertainty, weighted for the sensitivity of the individual components considered in the uncertainty analysis.

The following assumptions are made in development of the uncertainty analysis:
- Component systematic uncertainties are comprised of the instrument accuracy classes as indicated by the instrument supplier/manufacturer and the spatial variation effects that are measured.
- Component random uncertainties are entirely represented by the standard deviation of the data being analyzed.
- Pre-test random uncertainty is assumed in accordance with the experience of the Parties to the Test.
- Pre-test sensitivities are based on design values for all variables using the correction curves provided in this Test Procedure.

## 5.3        Post-Test Analysis

Post-test uncertainty will be conducted in the same manner as the pre-test analysis with the exception of the following:
- Sensitivities will be calculated at the as-tested conditions.
- Random uncertainty will be calculated from the data collected during the test.
- Spatial components of uncertainty will be calculated from the data collected during the test.

*ProEnergy*     **Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000410        0079833

# 6      Test Reporting

Following the performance test and once all sampling analysis has been received, the Test Report will be written which will include discussion of the following:

- Executive Summary
- Introduction
- Equipment Disposition
- Results Summary
- Instrumentation
- Conclusion

The following documentation will be attached directly to the Test Report:

- Test Procedure
- Summary of Test Data
- Detailed Calculations
- Post-Test Uncertainty Analysis
- Any Test Deviations if applicable

*ProEnergy* | **Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

66
www.proenergyservices.com

CONFIDENTIAL

Alta App.000411
Alta 1079834

# APPENDIX A

## Test Boundary Diagram

www.proenergyservices.com

*ProEnergy* | **Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000412

0079835

CONFIDENTIAL

ProEnergy
**Proprietary and Confidential**
Alta Energy • Proposal #1018-2127

Alta 0079836

Alta App.000413

# APPENDIX B

# Instrument List



*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

Alta App.000414    Alta 0079837

| Measurement | Measurement Classification | Location |
|---|---|---|
| Measured Output | Primary | Power measured at the generator terminals. |
| Power Factor | Primary | Power factor measured at the generator terminals. |
| Generator Frequency | Primary | Unit frequency at the generator terminals |
| Site Dry Bulb Temperature | Primary | Average of the temperature elements located in the filter house for each respective gas turbine. |
| Site Relative Humidity | Primary | Plant weather station relative humidity sensor. |
| Barometric Pressure | Primary | Plant weather station barometric pressure sensor. |
| Filterhouse Filter Differential Pressure | Primary | Unit differential pressure measured across the air filters in the filter house. |
| Sprint Water Temperature | Primary | Water temperature at the terminal point for sprint water injection. |
| Fuel Mass Flow | Primary | Unit fuel flow calculated in accordance with ASME PTC19.5. Calculation requires flow meter design information, gas pressure, gas temperature, and gas composition. |
| Fuel Gas Composition | Primary | Laboratory analysis of gas samples taken at the time of testing. |
| EOH | Primary | ProEnergy HMI calculation of operational activity. |
| Compressor Inlet Temperature | Secondary | Temperature Elements located at the compressor inlet for each respective gas turbine. |
| Control Mode | Secondary | ProEnergy HMI specified Control Mode for operation. |
| Emissions | Secondary | Station CEMS if available. |

# APPENDIX C

# Test Schedule



| Day 0 starts at completion of Tuning activities | 0 | 1 | 2 | 3 | 17 | 31 |
|---|---|---|---|---|---|---|
| Water Wash | ▓ | | | | | |
| Cure Period | | ▓ | | | | |
| ProEnergy Inspection | | | ▓ | | | |
| Performance Testing | | | ▓ | | | |
| Preliminary Results | | | | ▓ | | |
| Gas Analysis | | | | | ▓ | |
| Test Report | | | | | | ▓ |

*ProEnergy* | **Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000417

Alta 0079840

# APPENDIX D

## Division of Responsibility



| | Purchaser | ProEnergy |
|---|:---:|:---:|
| *General* | | |
| Ensure sufficient fuel within the design limits of the plant is available for testing and stabilization periods. | X | |
| Ensure there is sufficient dispatch capacity for the power generated during testing and stabilization periods. | X | |
| Operation of ProEnergy scope of supply. | | X |
| Perform equipment inspections and verify cleanliness. | | X |
| Collect and analyze fuel gas samples. | X | |
| *Equipment Supply / Installation / Monitoring* | | |
| Provide instrumentation manufacturers certification of accuracy (cut sheets) | | X |
| Provide data from specified station instrumentation over the test periods in electronic format at the completion of the test. | | X |
| *Administration* | | |
| Prepare and submit test reports. | | X |

*ProEnergy* | **Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000419

Alta 0079842

# APPENDIX E

# Defined Terms



*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000420
0079843

The following definitions are provided as a supplement to define the terms and acronyms used throughout this Test Procedure:

**Table J-1. Defined Terms**

| Term | Definition |
|---|---|
| AGA | American Gas Association |
| ANSI / ASME | American National Standards Institute / American Society of Mechanical Engineers |
| ASTM | American Society for Testing and Materials |
| Base Reference Conditions | Conditions used to serve as the basis for performance |
| Control Mode | The algorithms determined by the control system that govern operation and limitations of the Gas Turbine. |
| CEMS | Continuous emissions monitoring system. |
| EOH | Equivalent Operating Hours |
| GPA | Gas Processors Association |
| HMI | Human Machine Interface. The local control station at the Gas Turbine |
| Performance Test | A test conducted to assess thermal performance characteristics of equipment. |
| Purchaser | The company directly in contract with ProEnergy for supplied equipment and services. |
| Test Run | A period of time for which data is collected. The data over that time period is numerically averaged, and a single performance test result is calculated using the averaged data. |

*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000421

## F.  Equipment Refurbishment Procedures

### 1.0  Typical Engine Refurbishment

The overhaul/refurbishment process is typically based on the borescope inspection of each LM6000 CTG in conjunction with the total engine hours, the factored fired hours since the last repair and/or overhaul, and other applicable engine history. The following scope is planned for execution in order to return the engine to operations for this specific project.

General Engine Refurbishment Process:

1.  Receive CTG into Depot and Disassemble into Engine Modular Units
    - Incoming inspection and photograph of CTG arrival
    - Report of missing and damaged external hardware
    - Disassemble into Engine Modular Units, clean, and inspect as required
        - Low Pressure Compressor
        - High Pressure Compressor
        - Combustor Module
        - High Pressure Turbine
        - Low Pressure Turbine

2.  Condition Based Overhaul of Accessories and SB Implementation
    - Lube and Scavenge pump with applicable SB implementation
    - Hydraulic Control Unit, Variable Geometry pump, and Starter Motor
    - Engine actuators and implement applicable SB

3.  Condition Based Bearing Overhaul or Replacement with new including Associated Work and SB implementation
    - Disassembly of the Compressor Front Frame, Compressor Rear Frame, Turbine Rear Frame, Accessory Gear Box, and Inlet Gear Box
    - Overhaul or Replacement with new of all engine bearings
    - As required overhaul of cold end Teflon seals (# 1 bearing and # 3 bearing)
    - Inspect, clean and as required re-coat of Air Collector
    - Implement all applicable SB's
    - Reassembly with new consumables
    - Inspect and as required overhaul of #1 Bearing Stationary air seal or replacement with new condition

4.  Inlet Guide Vane (IGV), Low Pressure Compressor Rotor (LPCR), and Low Pressure Compressor Stator (LPCS) Repair
    - Condition based IGV disassembly, strip, and recoat
    - Condition based LPCR disassembly and disk/shaft overhaul
    - Condition based LPCS disassembly and stage 3 shroud overhaul
    - Labor and consumables to reassemble the IGV and LPC



**ProEnergy**

**Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

77
www.proenergyservices.com

CONFIDENTIAL

Alta App.000422

PE 0079845

5. Hot Section Overhaul

- Condition based overhaul of all airfoils, stage 1 and 2 blades and nozzles or Replacement with New Chromalloy Single Crystal Extended Life hardware
- Condition based Overhaul of HPT stage one and two shrouds or replacement with new or OH
- Applicable SB implementation

6. Overhaul of the Combustion Chamber
   - Condition based overhaul of Single-annular Combustor (SAC)

7. Clean, flow check and as needed overhaul of all 30 Fuel Nozzles
   - Clean, flow and recertify 30 Fuel Nozzles

8. HPC repair and SB implementation
   - As required Overhaul of HPC Rotor spools and Stator cases
   - As required Overhaul of all damaged blades and vanes or Replacement with new or Serviceable condition hardware
   - Applicable SB implementation

9. Assembly of the engine
   - Labor and consumables required to reassemble engine
   - Applicable SB implementation

10. As Required Acceptance Test of Completed Engine

### Typical SB Implementation for LM6000 Overhaul

| Service Bulletin No | Title | Compliance Category | Compliance Level | Issue Date | Module |
|---|---|---|---|---|---|
| 125 | Balance Piston Replacement | C | F/D | 25-Aug-99 | LPT |
| 128 | No. 4 Bearing Rotating Air, Seal Inspection | C | D | 12-Sep-07 | HPC |
| 148 | Introduction of Improved, No. 1 Bearing Stationary and Rotating Air/Oil Seals | C | F/D | 28-Jun-02 | LPC |
| 165 | Safety-Wire LPT Rotor, XNSD Electrical Connector | C | F | 15-Jan-02 | LPT |
| 172 | Introduction of Improved Inlet Gearbox Spanner Nut | C | D | 21-Aug-01 | IGB |
| 178 | Lube and Scavenge Oil Manifold Nipple Replacement | C | F | 30-Jan-02 | GTA |
| 181 | Variable Bypass Valve Actuating Ring Bolt Inspection and Re-torque | C | F | 25-Jul-02 | CFF |
| 202 | Acoustic Sensor (Pressure Transducer) Adapter Replacement | C | F | 18-Mar-04 | GTA |
| 203 | Stg 5 VSV Lever Arm Improvement - High Boss Stator | O | F/D | 12-Apr-04 | HPC |
| 212 | LPC Stg 3 Bushings Replacement | R | F | 2-Aug-04 | LPC |
| 213 | HPC Stator Stg 3-5 VSV Bushings Replacement | C | F | 4-Dec-06 | HPC |

ProEnergy  **Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000423
Alta 0079846

| Service Bulletin No. | Title | Compliance Category | Compliance Level | Issue Date | Module |
|---|---|---|---|---|---|
| 220 | Introduction of Inlet Gearbox Assembly PN 9185M71G31 | C | D | 17-Sep-07 | IGB |
| 229 | Stage 3 through 5 High Pressure Compressor Rotor Blades | C | F/D | 25-Jan-07 | HPC |
| 232 | PX 36 Sensor Electrical connection Relocation | R | F/D | 21-Sep-07 | GTA |
| 237 | VBV clevis bolt length increase | R | F/D | 4-Aug-04 | CFF |
| 239 | Improved LPT coupling Nut | C | F/D | 29-Jan-09 | LPT |
| 240 | Improved Forward Fan shaft Coupling Nut | C | F/D | Jan 29,2009 | LPC |

## G. __Commissioning__

This section describes ProEnergy's methodologies and approach to providing Commissioning Services.

### 1.0     __Phase I – Develop Commissioning Procedures and Documentation__

This phase represents the start of ProEnergy's activities on the project. After receiving notice to proceed, ProEnergy's first action will be to request project reference material to support execution of Phase I activities. Because this is an integrated project, the majority of the needed information will already be on hand. Requested project reference material will typically include:

- Equipment Lists
- Instrumentation Lists
- Piping and Instrumentation Diagrams (P&IDs)
- Electrical One-Line/Elementary Diagrams
- System/Control Design Descriptions
- Project Schedule
- Control Logic Diagrams
- Project Schedule
- Vendor Manuals

After receiving sufficient reference material to start work, ProEnergy's Manager of Commissioning Services will identify internal resources necessary to complete Phase I activities. The assembled ProEnergy team (Phase I) will then perform the tasks specified below. Please note that specified tasks may be performed in parallel, as best meets the needs of the project.

### 1.1     Develop Commissioning Plan

ProEnergy will develop a Commissioning Plan for commissioning of the project. This important document will provide administrative and management guidelines for moving the project from construction, through commissioning, into commercial operation. Commissioning Plan content will include (but not be limited to) the following:

- Introduction
- Purpose
- Scope of Commissioning Manual/Plan
- Jobsite Organization and Responsibilities
- Commissioning Activities
- Guidelines for Controlling Cost and Schedule
- Periodic Meeting Requirements
- Periodic Reporting Requirements
- Guidelines for Problem Resolution

After development, the Commissioning Plan will be submitted to the Owner for review and comment. After inclusion/resolution of Owner comments (if any), the Commissioning Plan will be issued and used by all project personnel associated with the commissioning effort. Periodic updates to the Commissioning Plan will be made as required.

### 1.2     Review Project Safety Plan

_**ProEnergy**_ | _**Proprietary and Confidential**_
_**Alta Energy • Proposal #1018-2127**_

CONFIDENTIAL

Alta App.000425

Alta 0079848

ProEnergy will review the project Safety Plan to determine its adequacy for use by the Commissioning team and to verify the project has established safety policies. Specific focus will be placed on ensuring the Safety Plan contains sufficient detail and direction with regard to:

- Equipment Isolation
- Lock-out/Tag-out
- Electrical Safety
- Confined Space Entry
- Hazardous Materials
- Spills
- Fire Prevention
- Emergency Response

After reviewing the Safety Plan, ProEnergy will provide any associated comments and/or recommendations to the Owner for its review, evaluation, and possible implementation.

### 1.3    Review and Compile Project Technical Data

ProEnergy will review the project reference material previously requested from the Owner. After review, reference material will be organized and catalogued to create a Technical Library for use during Commissioning. Updates to project reference material must be distributed to ProEnergy, as such updates are issued, to ensure the Technical Library is up to date and to avoid risks and delays arising from incomplete, inaccurate, or obsolete information. The Technical Library, with included updates, will be shipped to the work site at the time of Commissioning Manager mobilization.

### 1.4    Develop System Commissioning Boundaries

ProEnergy will assess and/or develop system boundaries to establish a logical approach to commissioning. The purpose of this task is to identify boundary and/or termination points for performance of system flushing, cleaning, operating tests, continuity tests, and system by system commissioning. Establishment of these boundaries also allows the Owner to focus completion efforts on the required system within these clear and concise boundaries.

After system commissioning boundaries are established, corresponding marked-up drawings and boundary descriptions will be utilized as the basis of the individual Turnover Packages. Two sets of the drawings will be developed, one will be maintained by ProEnergy's Manager of Commissioning Services for record purposes and backup, the second will be forwarded to Site with the Commissioning Manager and utilized in the Turnover Packages and Commissioning Schedule development.

### 1.5    Develop/Review Commissioning Schedule

ProEnergy will develop a detailed commissioning schedule for the project. The schedule will be based on system boundaries previously identified, and any milestone dates provided by the Owner. The schedule will be developed in Primavera P3 computer software to allow subsequent inclusion in the overall project or construction schedule, and to allow future updates as required. After development, the commissioning schedule will be delivered to the Owner electronically, in soft-copy form (computer software file).

### 1.6    Develop Component Test Standards

ProEnergy will develop test standards for new mechanical, electrical, and I&C system components installed at the Project. Format and content of the component test standards will be consistent with



*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000426 0079849

established ProEnergy corporate standards.  After development, the "Master" set of component test standards (with index) will be maintained by ProEnergy's Manager of Commissioning Services for subsequent handover to the Commissioning Manager.  A complete set of test standards associated with the equipment will be included in the Commissioning Plan Manual which will be delivered to the Owner in hard-copy form.

1.7    Develop System Commissioning Procedures

ProEnergy will develop commissioning procedures for each plant system as needed based on the scope of work, based on the boundaries previously identified. Each procedure will contain safety information, step-by-step checklists, and procedural text. The format of each procedure will be consistent with established ProEnergy corporate standards.

A complete set of Commissioning Procedures will be included in the Commissioning Plan Manual which will be delivered to the Owner in hard-copy form.

1.8    Develop System Turnover Packages

ProEnergy will develop turnover packages for each plant system. Format and content of each turnover package will be consistent with established ProEnergy corporate standards. After initial development, each turnover package will contain forms for recording system parameters during testing, commissioning, and starting up the associated system. The package will utilize the previously developed system boundaries as the basis of equipment associated with each system. As the plant moves through the commissioning process, forms included in each turnover package will be filled in with system data. After all commissioning activities are completed, the turnover packages will be finalized and delivered to the Owner.

After development, the "Master" set of turnover packages developed will be transmitted to (client) by ProEnergy's Manager of Commissioning Services, for subsequent implementation at the work site.

1.9    Perform Operability/Commissioning Review

As a final task for Phase I, ProEnergy will perform an Operability/Commissioning Review to determine:

- Potential safety issues based on adjusted plant design.
- System maintainability based on adjusted plant design.
- Ease of project/system/component commissioning.
- System boundary isolations.
- Operability of plant systems and controls.

Results of the Operability/Commissioning Review will be forwarded to the Owner.

**2.0    Phase II – Assemble and Mobilize the Site Team**

This phase represents the start of site mobilization for the ProEnergy commissioning team.  The following tasks will be completed during this phase.

2.1    Select ProEnergy Commissioning Manager

ProEnergy's Manager of Commissioning Services will select the Commissioning Manager for the project. The Commissioning Manager's resume will be submitted to the Owner for review and comment.



*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

82
www.proenergyservices.com

CONFIDENTIAL

Alta App.000427

Alta_0079850

2.2   Finalize Mobilization Schedule for the ProEnergy Site Team

After reviewing all Phase I documentation and evaluating the construction schedule (planned and actual), ProEnergy's Manager of Commissioning Services will review the proposed site mobilization schedule for members of the ProEnergy commissioning team. After internal review, the final mobilization schedule will be submitted to the Owner for review and comment.

2.3   Select ProEnergy Site Team Members

Supported by ProEnergy corporate staff, the Manager of Commissioning Services will identify and select ProEnergy personnel to serve on the commissioning team. Persons filling "Lead" positions will be selected first. After selection, resumes of ProEnergy team members will be forwarded to the Owner.

2.4   Identify Tools and Test Equipment

After reviewing Phase I documentation (including reference material), the ProEnergy Commissioning Manager will identify tools and test equipment necessary to support commissioning. This list of tools and test equipment will be made available to the Owner prior to site mobilization.

2.5   Calibrate Test Equipment

Any test equipment provided by ProEnergy will be calibrated before first use.

2.6   Mobilize ProEnergy Site Team

After completion of the above tasks, ProEnergy will begin mobilization of its commissioning team to site, in accordance with the mobilization schedule previously developed. ProEnergy will make the necessary travel arrangements.

## 3.0   Phase III – Commission the Plant

Major tasks to be completed in this phase include:

3.1   Develop Punch-List Structure and Priorities

The ProEnergy Commissioning Manager will develop a priority scheme for punch-listing plant systems and associated equipment affected. Established priorities will be used to indicate the impact of discrepancies and/or deficiencies associated with construction or operation of each system.

3.2   Walk Down and Punch-List Plant Systems

When a system is said to be mechanically and electrically complete by the construction organization, the assigned ProEnergy Engineer will perform a walk down to verify the system is ready for the start of commissioning. Observed construction deficiencies will be documented and prioritized on punch-lists. Any high priority punch-list items which would prevent the start of commissioning will be communicated to the construction organization for resolution. If/when there are no such items remaining, the system will be accepted by the commissioning team for the start of commissioning.

**ProEnergy**  *Proprietary and Confidential*
*Alta Energy* • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000428   0079851

3.3    Commission Plant Systems and Equipment

For each system, the assigned ProEnergy Engineer will commission the associated pieces of equipment, working in coordination with vendor representatives, the construction organization, and plant operations personnel. The Commissioning Engineer will then start the system, coordinating activities with the construction organization and/or plant operations personnel as required.

3.4    Support Plant Testing and Initial Operation

After commissioning of all plant systems have been completed, the team will work with designated operations personnel to perform integrated commissioning of the plant. During this time frame, ProEnergy team members will be available to advise plant operations personnel on proper sequence and methods of unit operations, including commissioning, normal operation, and shutdown. ProEnergy team members will also participate in responding to abnormal operating conditions (alarms, trips, etc.) and will assist in troubleshooting operational problems.

The ProEnergy commissioning team will continue to support integrated plant operation throughout performance and/or reliability tests to achieve commercial operation.

3.5    Resolve Punch-List Items

For each plant system, the assigned ProEnergy Commissioning Engineer will work with the construction organization and plant operations personnel to complete/resolve any remaining punch-list items within the commissioning team's scope of responsibility.

3.6    Finalize Commissioning Documentation

The ProEnergy Commissioning team will finalize all documentation not previously delivered to the Owner. Such documentation is expected to include as-built drawings and control logic red-lines. The ProEnergy Commissioning team will demobilize from the plant site after this task has been completed



*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

Alta App.000429

Alta-0079852

H. QA/QC Program

# Quality Control &
# ASSURANCE
CERTIFICATIONS



**Certifications & Codes**
- ISO 9001
- ASME S-Stamp
- ASME U-Stamp
- NBIC R-Stamp
- NBIC NB-Stamp
- AISC Sophisticated Paint Endorsement
- UL Certified
- HSB Registration Services
- API

**Safety Program Certifications**
- AVETTA
- PECS
- ISNetworld
- BROWZ
- CCS

**Welding Procedures**
- Shield Metal Arc Welding (SMAW)
- Gas Tungsten Arc Welding (GTAW)
- Gas Metal Arc Welding (GMAW)
- Flux Cored Arc Welding (FCAW)
- Laser Welding
- High Temperature Gas Tungsten Arc Welding
- Submerged Arc Welding (SAW)

**Fabrication & Installation**
- ASME B31.1 Power Piping
- ASME B31.3 Process Piping
- ASME B31.5 Refrigeration Piping
- ASME B31.8 Gas Transmission & Distribution Piping
- ASME B31.9 Building Services Piping
- ASME STS-1 Steel Stacks
- AWS D 17.1 Aerospace Welding & Manufacturing

ProEnergy is committed to serving the power industry with the idea that Quality and Customers come first. With exceptionally skilled professionals and a focus on continuous improvement, our business units consistently maintain the highest level of quality and customer satisfaction.

 **ProEnergy**   For more information call 660-833-0079 or visit us at proenergyservices.com

Alta App.000430

**I.** **Safety Information**



FOCUS ON
**SAFETY**



SAFETY IS A CORE VALUE
OF OUR BUSINESS

## PROENERGY **SAFETY BY THE NUMBERS**

| SAFETY STATISTICS | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | 2009 |
|---|---|---|---|---|---|---|---|---|---|
| + Experience Modification Rate (EMR) | 0.64 | 0.65 | 0.62 | 0.63 | 0.72 | 0.8 | 0.80 | 0.76 | 0.73 |
| + Fatalities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| + Number of Cases with Restrictions | 2 | 2 | 0 | 0 | 2 | 1 | 1 | 1 | 2 |
| + Number of Cases with DAW (Days Away From Work) | 1 | 1 | 1 | 0 | 2 | 0 | 2 | 2 | 3 |
| + OSHA DAFW | 0.13 | 0.12 | 0.14 | 0 | 0.32 | 0 | 0.18 | 0.25 | 0.41 |
|     National Bureau of Labor Statistics National Average | n/a | 0.9 | 0.9 | 1.0 | 1.0 | 1.0 | 1.1 | 1.1 | 1.1 |
| + OSHA DART (Days Away, Restricted or Transferred) Rate | 0.37 | 0.37 | 0.14 | 0 | 0.64 | 0.15 | 0.27 | 0.25 | 0.68 |
|     National Bureau of Labor Statistics National Average | n/a | 1.6 | 1.6 | 1.7 | 1.7 | 1.8 | 1.8 | 1.8 | 1.8 |
| + Work Hours | 1,643,778 | 1,615,214 | 1,641,516 | 1,194,505 | 1,246,194 | 1,342,597 | 2,211,696 | 1,930,957 | 1,461,632 |
| + Avg # of Employees | 632 | 624 | 617 | 548 | 518 | 675 | 886 | 625 | 500 |
| + Total # of Recordable Cases | 7 | 6 | 5 | 1 | 8 | 5 | 5 | 8 | 7 |
| + OSHA TRIR (Total Recordable Incident Rate) | 0.85 | 0.74 | 0.69 | 0.17 | 1.28 | 0.74 | 0.45 | 0.83 | - |
|     OSHA TRIR National Average | n/a | 2.9 | 3.0 | 3.2 | 3.3 | 3.4 | 3.5 | 3.5 | 3.6 |
| + OSHA Citation | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 |

 For more information call 660-829-5100 or visit us at proenergyservices.com

**Proprietary and Confidential**
Alta Energy • Proposal #1018-2127

86
www.proenergyservices.com

CONFIDENTIAL

Alta App.000431

Alta 0079854

**J.  Fuel Specification**

*MID-TD-0000-1*
*Revised, November 2001*

# Process Specification
# Fuel Gases For Combustion In AeroDerivative Gas Turbines

---

*These instructions do not purport to cover all details or variations in equipment or to provide for every possible contingency to be met  in connection with installation, operation or maintenance. Should further information be desired or should particular problems arise  which are not covered sufficiently for the purchaser's purposes the matter should be referred to the GE Company.*

(a)

(b)

(c)    **TABLE OF CONTENTS**

| | | |
|---|---|---|
| **1** | **GENERAL** | 1 |
| | | |
| **2** | **FUEL GAS CLASSIFICATION** | 3 |
| 2.1 | Natural and Liquefied Petroleum Gas (LPG) | 3 |
| 2.2 | Gasification Fuels | 3 |
| 2.3 | Process Gases | 4 |
| 2.4 | Refinery Gases | 5 |
| | | |
| **3** | **FUEL PROPERTIES** | 5 |
| 3.1 | Heating Values | 5 |
| 3.2 | Modified Wobbe Index Range | 5 |
| 3.3 | Superheat Requirement | 6 |
| 3.4 | Flammability Ratio | 6 |
| 3.5 | Gas Constituent Limits | 6 |
| 3.6 | Gas Fuel Supply Pressure | 6 |
| | | |
| **4** | **CONTAMINANTS** | 6 |
| 4.1 | Particulate | 7 |
| 4.2 | Liquids | 7 |
| 4.3 | Sulfur | 7 |
| | | |
| **Appendix 1** | **DEFINITIONS** | 9 |

**LIST OF TABLES**

| | | |
|---|---|---|
| Table 1. | Fuel Gas Usability | 1 |
| Table 2. | Test Methods for Gaseous Fuels | 2 |

## 1    GENERAL

AeroDerivative gas turbines have the ability to burn a wide range of gaseous fuels as shown in Table 1. These gases present a broad spectrum of properties due to both active and inert components. This specification is designed


**Proprietary and Confidential**
Alta Energy • Proposal #1018-2127

CONFIDENTIAL

Alta App.000433

Alta 0079856

to define guidelines that must be followed in order to burn these fuels in an efficient, trouble-free manner, while protecting the gas turbine and supporting hardware.

Table 2 identifies the acceptable test methods to be used in determining gas fuel properties.

| TABLE 1 FUEL GAS USABLILITY | | | | | | |
|---|---|---|---|---|---|---|
| Fuel Type | LHV Btu/SCF (kJ/NM³) | Wobbe Number | Major Components | Operational Comments | Applicability SAC | DLE |
| Pipeline Natural Gas | 850-1200 (33383-47128) | 45-60 | Methane | No Restrictions | Yes | Yes |
| Medium BTU Natural Gas | 400 - 850 (15709-33838) | 20-45 | Methane, Hydrocarbons (HC), carbon dioxide, Nitrogen | Requires > 700 BTU/scf (27492 kJ/NM³) for starting. May require modified fuel nozzles. Contact GE | Yes | No, See Note 8. |
| Liquefied Petroleum Gas (LPG) | 2300-3200 (90330-125676) | 70-75 | Propane, Butane | May require specific fuel nozzles. Contact GE | Yes | No |
| Gasification Gases - Air Blown | 150-200 (5891-7855) | 6-8 | Carbon monoxide, Hydrogen, HC, Nitrogen, Water Vapor | Contact GE | Yes | No |
| - Oxygen Blown | 200- 400 (7855-15709) | 8-20 | Carbon monoxide, Hydrogen, HC, Water Vapor | Contact GE | Yes | No |
| Process Gases | 300-1000 (11782-39274) | 15-50 | Methane, Hydrogen, Carbon monoxide, Carbon dioxide | Requires >700 BTU/scf (27492 kJ/NM³) for starting. Restricted transient operation. | Yes | See Note 8 |
| Refinery Gases | 1000-1300 (39274-51056) | 45-60 | Methane, Hydrogen, Carbon monoxide, Ethylene, Propylene, Butylene | No restrictions. Hydrogen content should be reviewed by GE. | Yes | See Note 8 |

(d)    **Notes:**

1.  When considering the use of alternate fuels, provide details of the fuel constituents, fuel temperature, and expected engine usage conditions and operating characteristics to GE for evaluation and recommendations.

2.  Values and limits apply at the inlet of the gas fuel control module.

3.  Heating value ranges shown are provided as guidelines. Specific fuel analysis must be furnished to GE for evaluation. The standard configured single annular combustor (SAC) gas turbines require a fuel with a LHV no less than of 6500 BTU/pound. The Dry Low Emissions (DLE) combustion system requires a minimum LHV of 18000 BTU/pound. (Reference Section 3.1)



*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000434    ALTA 0079857

4.  The quantity of sulfur in gas fuels is not limited by this specification. Experience has shown that oxidation/corrosion rates are not significantly affected by fuel sulfur levels up to 1.3% sulfur. Hot corrosion of hot gas path parts is affected by the presence of the specified trace metals. Sulfur levels shall be considered when addressing HRSG Corrosion, selective catalytic reduction (SCR) deposition, exhaust emissions, system material requirements, elemental sulfur deposition and iron sulfide. (Reference Section 4.3)

5.  The fuel gas supply shall be 100% free of liquids. Admission of liquids can result in combustion and/or hot gas path component damage. (Reference Section 3.3)

6.  Wobbe Number, or Modified Wobbe Number Index, is described in 3.2.

7.  Gases with Wobbe Number Index greater than 40 may be applicable for DLE. Contact GE.

8.  Process and refinery gases with <5% hydrogen content and low CO and CO2 content may be acceptable for DLE application. Contact GE.

NM$^3$ is at 0°C, 101.325kPa (sea level)

| TABLE 2 | |
|---|---|
| **TEST METHODS FOR GASEOUS FUELS** | |
| **PROPERTY** | **ASTM METHOD** |
| Gas Composition to C6+ | D1945 - Standard method for constituents of gases by gas chromatography |
| Heating Value | D3588 - Procedure for calculating calorific value and specific gravity of gaseous fuels |
| Specific Gravity | D3588 - Procedure for calculating calorific value and specific gravity of gaseous fuels |
| Compressibility Factor | D3588 - Procedure for calculating calorific value and specific gravity of gaseous fuels |
| Dew Point (see note 1) | D1142 - Water vapor content of gaseous fuels by measurement of dew point temperature |
| Sulfur | D1072 - Test for total sulfur in fuel gases  (see note 2) |
|  | D3246 - Test for total sulfur in fuel gases |
| Chemical Composition | D2650 - Standard method for chemical composition of gases by mass spectrography |

(c)  **Notes:**

1.  Hydrocarbon and water dew points shall be determined by direct dew point measurement (Chilled Mirror Device). If dew point cannot be measured, an extended gas analysis, which identifies hydrocarbon components from C1 through C14, shall be performed. This analysis must provide an accuracy of greater

than 10 ppmv. A standard gas analysis to C6+ is normally not acceptable for dew point calculation unless it is known that heavier hydrocarbons are not present, as is most often the case with liquefied natural gases.

2.  This test method will *not* detect the presence of condensable sulfur vapor. Specialized filtration



equipment is required to measure sulfur at concentrations present in vapor form. Contact GE for more information.

## 2  FUEL GAS CLASSIFICATION

### 2.1  Natural and Liquefied Petroleum Gas (LPG)

Natural gases are predominantly methane with much smaller quantities of the slightly heavier hydrocarbons such as ethane, propane and butane. Liquefied petroleum gas is propane and/or butane with traces of heavier hydrocarbons.

#### 2.1.1    Pipeline Natural Gas

Natural gases normally fall within the calorific heating value range of 850 to 1200 Btu/SCF (33383-47128 kJ/NM$^3$) (LHV). Actual calorific heating values are dependent on the percentages of hydrocarbons and inert gases contained in the gas.

#### 2.1.2    Medium BTU Natural Gas

Natural gases are found in and extracted from underground reservoirs. These "raw gases" may contain varying degrees of nitrogen, carbon dioxide, hydrogen sulfide, and contain contaminants such as salt water, sand and dirt. Processing by the gas supplier normally reduces and/or removes these constituents and contaminants prior to use in the gas turbine. A gas analysis must be performed to ensure that the fuel supply to the gas turbine meets the requirements of this specification.

#### 2.1.3    Liquefied Petroleum Gases

The heating values of Liquefied Petroleum Gases (LPGs) normally fall between 2300 and 3200 Btu/SCF (90330-125676 kJ/NM$^3$) (LHV). Based on their high commercial value, these fuels are normally utilized as a back–up fuel to the primary gas fuel for gas turbines. Since LPGs are normally stored in a liquid state, it is critical that the vaporization process and gas supply system maintains the fuel at a temperature above the minimum required superheat value. Fuel heating and heat tracing is required to ensure this.

### 2.2  Gasification Fuels

Other gases that may be utilized as gas turbine fuel are those formed by the gasification of coal, petroleum coke or heavy liquids. In general, the heating values of gasification fuel are substantially lower than other fuel gases. These lower heating value fuels require that the fuel nozzle gas flow passages be larger than those utilized for fuels of higher heating values.

Gasification fuels are produced by either an Oxygen Blown or Air Blown gasification process.

#### 2.2.1    Oxygen Blown Gasification

The heating values of gases produced by oxygen blown gasification fall in the range of 200 to 400 Btu/SCF (7855-15709 kJ/NM$^3$). The Hydrogen ($H_2$) content of these fuels is normally above 30% by volume and have $H_2$/CO mole ratio between 0.5 to 0.8. Oxygen blown gasification fuels are often mixed with steam for thermal NOx control, cycle efficiency improvement and/or power augmentation. When utilized, the steam is injected into the combustor by an independent passage. The current guideline for Hydrogen plus CO constituent is limited to 75% by volume for LM6000 and to 85% for the other AeroDerivative gas turbines. Due to high hydrogen content of these fuels, oxygen blown gasification fuels are normally not suitable for Dry Low Emissions (DLE) applications, for which the Hydrogen content is limited to 5% by volume.. The high flame speeds resulting from high hydrogen fuels can result in flashback or primary zone re–ignition on DLE pre–mixed combustion systems. Utilization of these fuels shall be reviewed by GE.

#### 2.2.2    Air Blown Gasification

ProEnergy    **Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000436    0079859

Gases produced by air blown gasification normally have heating values between 150 and 200 BTU/ SCF (5891-7855 kJ/NM$^3$) LHV. The Hydrogen (H$_2$) content of these fuels can range from 8% to 20% by volume and have a H$_2$/CO mole ratio 0.3 to 3:1. The use and treatment of these fuels are similar to that identified for oxygen blown gasification.

For Gasification fuels a significant part of the total turbine flow comes from the fuel. In addition, for oxygen blown fuels there is a diluent addition for NOx control. Careful integration of the gas turbine with the gasification plant is required to assure an operable system. Due to the low volumetric heating value of both oxygen an air blown gases. special fuel system and fuel nozzles are required.

## 2.3 Process Gases

Many chemical processes generate surplus gases that may be utilized as fuel for gas turbines. (i.e. tail or refinery gases). These gases often consisting of methane, hydrogen, carbon monoxide, and carbon dioxide that are normally byproducts of petrochemical processes. Due to the hydrogen and carbon monoxide content, these fuels have large rich to lean flammability limits. These types of fuels often require inerting and purging of the gas turbine gas fuel system upon unit shutdown or a transfer to a more conventional fuel. When process gas fuels have extreme flammability limits such that the fuel will auto ignite at turbine exhaust conditions, a more "conventional" start-up fuel, such as methane, is required.

Additional process gases utilized as gas turbine fuels are those which are byproducts of steel production. These are:

### 2.3.1 Blast Furnace Gases (BFGs)

Blast Furnace Gases (BFGs), alone, have heating values below minimal allowable limits. These gases must be blended with other fuel to raise the heating value to above the required limit. Coke Oven and/or Natural Gases or hydrocarbons such as propane or butane can be utilized to accomplish this.

### 2.3.2 Coke Oven Gases

Coke oven gases are high in H$_2$ and H$_4$C and may be used as fuel for single annular combustion (SAC) systems, but are not suitable for Dry Low Emissions (DLE) combustion applications. These fuels often contain trace amounts of heavy hydrocarbons, which when burned could lead to carbon buildup on the fuel nozzles. The heavy hydrocarbons must be "scrubbed" or removed from the fuel prior to delivery to the gas turbine.

### 2.3.3 COREX Gases

COREX gases are similar to oxygen blown gasified fuels, and may be treated as such. They are usually lower in H$_2$ content and have lower heating values than oxygen blown gasified fuels. Further combustion related guidelines could be found in Bureau of Mines Circulars 503 and 622.

### 2.3.4 Hydrogen

The presence of gaseous hydrogen in the fuel can present special problems due to the high flame speed and high temperatures associated with combustion, and the very wide flammability limits of this gas. Treatment of fuels containing hydrogen are separated into three categories, less than 5% by volume, 6% to 30% by volume and over 30%. If the hydrogen fuel content is 5% or less, no special precautions are necessary and starting on this fuel mixture can be permissible, assuming there are no other restrictive substances in the mix.

For fuels containing more than 5%, but 30% or less hydrogen, an alternative starting fuel may be required by local safety codes and a special exhaust system purge cycle is incorporated into the gas turbine start sequence to eliminate accumulated fuels from an aborted start. In addition, special high point venting is required for both the fuel gas and turbine compartments since the fuel constituents are normally lighter than air. The vents hold the compartment at a slight vacuum relative to local ambient. Special precautions must also be taken to completely seal the fuel delivery system from leaks. Consult the local authorities for specific local safety codes.

If the fuel contains more than 30% hydrogen, electrical devices used in the fuel gas and turbine compartments should be certified for use in Group B (explosive) atmospheres. Consult the local authorities for specific local safety codes.



*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127
92
www.proenergyservices.com
CONFIDENTIAL
Alta App.000437
Alta/0079860

(f)    **2.4 Refinery Gases**

Many hydrocarbon fuels contain olefin hydrocarbon compounds which have been thought to prohibit their use in aeroderivative gas turbines.

Fuel temperature is also a consideration in order to use standard fuel nozzles and to avoid the possibilities of fuel polymerization. Maximum fuel temperature of 125°F (52°C) is recommended. It may be possible to go as high as 190°F (88°C), but this may require non-standard fuel nozzle sizing and should be considered on a case by case basis. Please contact GE for assistance.

Because refinery gas fuels usually have significant higher hydrocarbon and olefin content the combustor flame temperatures are typically higher, resulting in higher than normal (high methane gas) NOx emissions. Contact GE for effect on emissions.

## 3    FUEL PROPERTIES

### 3.1 Heating Value

A fuel's heat of combustion, or heating value, is the amount of energy, expressed in Btu (British thermal unit), generated by the complete combustion, or oxidation, of a unit weight of fuel. The amount of heat generated by complete combustion is a constant for a given combination of combustible elements and compounds.

For most gaseous fuels, the heating value is determined by using a constant pressure, continuous type calorimeter. This is the industry standard. In these units, combustible substances are burned with oxygen under essentially constant pressure conditions. In all fuels that contain hydrogen, water vapor is a product of combustion, which impacts the heating value. In a bomb calorimeter, the products of combustion are cooled to the initial temperature and all of the water vapor formed during combustion is condensed. The result is the HHV, or higher heating value, which includes the heat of vaporization of water. The LHV, or lower heating value, assumes all products of combustion including water remain in the gaseous state, and the water heat of vaporization is not available.

### 3.2 Modified Wobbe Index Range

While gas turbines can operate with gases having a very wide range of heating values, the amount of variation that a single specific fuel system can accommodate is much less. Variation in heating value as it affects gas turbine operation is expressed in a term identified as modified Wobbe Index (Natural Gas, E. N. Tiratsoo, Scientific Press Ltd., Beaconsfield, England, 1972). This term is a measurement of volumetric energy and is calculated using the Lower Heating Value (LHV) of the fuel, specific gravity of the fuel with respect to air at ISO conditions, and the fuel temperature, as delivered to the gas turbine. The mathematical definition is as follows:

Modified Wobbe Index $= LHV/(SG_{gas} \times T)^{1/2}$

This is equivalent to:

Modified Wobbe Index $= LHV/[(MW_{gas}/28.96) \times T]^{1/2}$

Where:

LHV = Lower Heating Value of the Gas Fuel (Btu/scf) SGgas

= Specific Gravity of the Gas Fuel relative to Air MWgas =

Molecular Weight of the Gas Fuel

T          =    Absolute Temperature of the Gas Fuel (Rankine)

28.96    =    Molecular Weight of Dry Air

The allowable modified Wobbe Index range is established to ensure that required fuel nozzle pressure ratios be maintained during all combustion/turbine modes of operation. When multiple gas fuels are supplied and/or if variable fuel temperatures result in a Modified Wobbe Index that exceed the ±10% limitation, independent fuel



**Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

Alta App.000438    0079861

gas trains, which could include control valves, manifolds and fuel nozzles, may be required for standard combustion systems. For DLE applications the Wobbe Index range must be between 40 and 60. An accurate analysis of all gas fuels, along with fuel gas temperature profiles shall be submitted to GE for proper evaluation.

### 3.3 Superheat Requirement

The superheat requirement is established to ensure that the fuel gas supplied to the gas turbine is 100% free of liquids. Dependent on its constituents, gas entrained liquids could cause degradation of gas fuel nozzles, and for DLE applications, premixed flame flashbacks or re-ignitions. A minimum of 50°F (28°C) of superheat is required and is specified to provide enough margin to compensate for temperature reduction due to pressure drop across the gas fuel control valves.

### 3.4 Flammability Ratio

Fuel gases containing hydrogen and/or carbon monoxide will have a ratio of rich to lean flammability limits that is significantly larger than that of natural gas. Typically, gases with greater than 5% hydrogen by volume fall into this range and require a separate startup fuel. Consult the local authorities for specific local safety codes.

Fuel gases with large percentage of an inert gas such as nitrogen or carbon dioxide will have a ratio of rich–to–lean flammability limits less than that of pure natural gas. Flammability ratios of less than 2.2 to 1 as based on volume at ISO conditions (14.696 psia and 59°F (101.325 kPa and 15°C)), may experience problems maintaining stable combustion over the full operating range of the turbine.

### 3.5 Gas Constituent Limits

Gas constituents are not specifically limited except to the extent described in Fuel Gas Classification. These limitations are set forth to assure stable combustion through all gas turbine loads and modes of operation. Limitations are more stringent for DLE combustion systems where "premixed" combustion is utilized. A detailed gas analysis shall be furnished to GE for proper evaluation.

### 3.6 Gas Fuel Supply Pressure

Gas fuel supply pressure requirements are dependent on the gas turbine model and combustion design, the fuel gas analysis and unit specific site conditions. Minimum and maximum supply pressure requirements can be determined by GE for specific applications.

## 4   CONTAMINANTS

Dependent on the type of fuel gas, the geographical location and the forwarding means there is the potential for the "raw" gas supply to contain one or more of the following contaminants:

1. Tar, lamp black, coke
2. Water, salt water
3. Sand, clay
4. Rust
5. Iron sulfide
6. Scrubber oil or liquid
7. Compressor Lube oil
8. Naphthalene
9. Gas Hydrates

It is critical that the fuel gas is properly conditioned prior to being utilized as gas turbine fuel. This conditioning can be performed by a variety of methods. These include but are not limited to media filtration, inertial separation, coalescing and fuel heating. Trace metal, particulate and liquid contamination limits are given below. These limits are given in parts per million by weight (ppmw) corrected to the actual heating value of the fuel. It is critical that fuel gas conditioning equipment be designed and sized so that these limits are not exceeded.



*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000439

### 4.1 Particulate

Contamination limits for particulates are established to prevent fouling and excessive erosion of hot gas path parts, erosion and plugging of combustion fuel nozzles and erosion of the gas fuel system control valves. The utilization of gas filtration or inertial separation is required. The filtration level should be a beta ratio of 200 minimum (efficiency of 99.5%) at 5μ or less. The total particulate should not exceed 30 ppm by weight. GE requires the use of stainless steel piping downstream of this last level of filtration.

### 4.2 Liquids

No liquids are allowed in the gas turbine fuel gas supply. Liquids contained in the fuel can result in nuisance and/or hardware damaging conditions. These include rapid excursions in firing temperature and gas turbine load, primary zone re-ignition and flashback of premixed flames, and when liquids carry over past the combustion system, melting of hot gas path components. When liquids are identified in the gas supply, separation and heating is employed to achieve the required superheat level.

### 4.3 Sulfur

There is no specific limit on natural gas fuel sulfur content if the engine is used in an application where both the fuel and environment are free of alkali metals. There are several concerns relative to the levels of sulfur contained in the fuel gas supply. Many of these are not directly related to the gas turbine but to associated equipment and emissions requirements. These concerns include but are not limited to:

#### 4.3.1    Hot Gas Path Corrosion

Typically, use of sulfur bearing fuels will not be limited by concerns for corrosion in the turbine hot gas path unless alkali metals are present. Sodium, potassium and other alkali metals are not normally found in natural gas fuels, but are typically found to be introduced in the compressor inlet air in marine environments, as well as in certain adverse industrial environments. The total amount of sulfur and alkali metals from all sources shall be limited to form the equivalent of 0.6 ppm of alkali metal sulfates in the fuel. Unless sulfur levels are extremely low, alkali levels are usually limiting in determining hot corrosion of hot gas path materials. For low Btu gases, the fuel contribution of alkali metals at the turbine inlet is increased over that for natural gas and the alkali limit in the fuel is therefore decreased. The total amount of alkali metals [a] in gas fuels used with engines having marinized (corrosion-resistant) coatings on the high pressure turbine blading shall not exceed 0.2 ppm [b].

(g)    Sodium, potassium, and lithium. Experience has shown that sodium is by far the preponderant alkali metal, if any, found in gaseous fuels.

(h)    This limit assumes zero alkali metals in the inlet air or injected water or steam. When actual levels are above zero, the maximum allowable sodium content of the fuel must be reduced in accordance with the following relationship:

ppm sodium inlet air x Air/Fuel Ratio       = ppm sodium in water or steam  x
Water or Steam ratio                         =
Fuel

ppm sodium in fuel                           =

Total fuel equivalence for sodium from all       _____ sources not to exceed 0.2 ppm

#### 4.3.2    HRSG Corrosion

If heat recovery equipment is used, the concentration of sulfur in the fuel gas must be known so that the appropriate design for the equipment can be specified. Severe corrosion from condensed sulfuric acid results if a heat recovery steam generator (HRSG) has metal temperatures below the sulfuric acid dew point. Contact the HSRG supplier for additional information.

#### 4.3.3    Selective Catalytic Reduction (SCR) Deposition

Units utilizing ammonia injection downstream of the gas turbine for NOx control can experience the formation



**ProEnergy**  *Proprietary and Confidential*
*Alta Energy • Proposal #1018-2127*

www.proenergyservices.com

CONFIDENTIAL

Alta App.000440  0079863

of deposits containing ammonium sulfate and bisulfate on low temperature evaporator and economizer tubes. Such deposits are quite acidic and therefore corrosive. These deposits, and the corrosion that they cause, may also decrease HRSG performance and increase backpressure on the gas turbine. Deposition rates of ammonium sulfate and bisulfate are determined by the sulfur content of the fuel, ammonia content in the exhaust gas, tube temperature and boiler design. Fuels having sulfur levels above those used as odorants for natural gas should be reported to GE . In addition, the presence of minute quantities of chlorides in the inlet air may result in cracking of AISI 300 series stainless steels in the hot gas path. Contact the SCR supplier for additional information.

### 4.3.4    Exhaust Emissions

Sulfur burns mostly to sulfur dioxide, but 5% to 10% oxidizes to sulfur trioxide. The latter can result in sulfate formation, and may be counted as particulate matter in some jurisdictions. The remainder will be discharged as sulfur dioxide. To limit the discharge of acid gas, some localities may restrict the allowable concentration of sulfur in the fuel.

### 4.3.5    Elemental Sulfur Deposition

Solid elemental sulfur deposits can occur in gas fuel systems downstream of pressure reducing stations or gas control valves under certain conditions. These conditions may be present if the gas fuel contains elemental sulfur vapor, even when the concentration of the vapor is a few parts per billion by weight. Concentrations of this magnitude cannot be measured by commercially available instrumentation and deposition cannot therefore be anticipated based on a standard gas analysis. Should deposition take place, fuel heating will be required to maintain the sulfur in vapor phase and avoid deposition. A gas temperature of 130°F (54°C) or higher may be required at the inlet to the gas control valves to avoid deposition, depending on the sulfur vapor concentration. The sulfur vapor concentration can be measured by specialized filtering equipment. If required, GE can provide further information on this subject.

### (i)    APPENDIX 1 – DEFINITIONS

### (j)    *Dew Point*

This is the temperature at which the first liquid droplet will form as the gas temperature is reduced. Common liquids found in gas fuel are hydrocarbons, water and glycol. Each has a separate and measurable dew point. The dew point varies considerably with pressure and both temperature and pressure must be stated to properly define the gas property. Typically. the hydrocarbon dew point will peak in the 300 to 600 psia (2068 to 4137 kPa) range.

### (k)    *Dry Saturated Conditions*

The gas temperature is at, but not below or above, the dew point temperature. No free liquids are present

### (l)    Gas Hydrates

Gas hydrates are semi–solid materials that can cause deposits that plug instrumentation lines, control valves and filters. They are formed when free water combines with one or more of the C1 through C4 hydrocarbons. Typically the formation will take place downstream of a pressure reducing station where the temperature drop is sufficient to cause moisture condensation in a region of high turbulence. Because hydrates can cause major problems in the gas distribution network, the moisture content is usually controlled upstream at a dehydration process station.

### (m)    *Gas Hydrate Formation Line*

This is similar to the dew point line except the temperature variation with pressure is much less. The hydrate line is always below or at the moisture dew point line as free water must exist in order for hydrates to form. Maintaining 50°F of superheat above the moisture dew point will eliminate hydrate formation problems.

### (n)    *Glycol*

Glycol is not a natural constituent of natural gas but is introduced during the dehydration process. Various forms of glycol are used, diethylene and triethylene glycol being two most common. In some cases glycol is injected into the pipeline as a preservative. In most cases, glycol may only be a problem during commissioning of a new pipeline or if an upset has taken place at an upstream dehydration station.



**Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000441

Alta 0079864

(o)  **Superheat**

This is defined as the difference between the gas temperature minus the liquid dew point. The difference is always positive or zero. A negative value implies that the value is being measured at two differing states of pressure and temperature and is not valid. A measured gas temperature below the theoretical dew point means that the gas is in a wet saturated state with free liquids present.

(p)  **Saturation Line**

This is the same as the dew point line.

(q)  **Wet Saturated Conditions**

A point where a mixture consists of both vapor and liquids.

ProEnergy    **Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL                                                Alta App.000442  0079865

**K.  Water Specification**

MID-TD-0000-3
June 2004

# Requirements for Water and Steam Purity for Injection in Aero Derivative Gas Turbines

## 1.1  Scope

This document establishes the purity requirements for water for NOx suppression and SPRINT® injection into gas turbine engines and for Steam for injected into the gas turbine whether for NOx suppression or power augmentation.

## 1.2  Definitions

For the purpose of this specification, the following definitions shall apply:

NOx Suppression Water - Water introduced into the engine combustor for the purpose of suppressing the oxides of nitrogen (NOx) in the engine exhaust gases.

SPRINT® Water – Water introduced into the engine inlet or into the high pressure compressor inlet for purpose of power enhancement.

## 2.  Applicable Documents

## 2.1  American Society of Testing and Materials Publications.

ASTM D512  Standard Test Method for Chloride Ion in

Water ASTM D516   Standard Test Method for Sulfate

Ion in Water ASTM D859   Standard Test Method for

Silica in Water ASTM D1066 Standard Practice for

Sampling Steam

ASTM D1125 Standard Test Method for Electrical Conductivity and Resistivity of Water

ASTM D3370 Standard Practices for Sampling Water from closed Conduits

ASTM D4191 Standard Test Method for Sodium in Water by Atomic Absorbtion
      Spectography

ASTM D4192 Standard Test Method for Potassium in Water by Atomic Absorbtion
      Spectography

ASTM D5907 Standard Test Method for Filterable and Non-Filterable Matter in Water

ASTM D5464 Standard Test Method for pH of Water with Low Conductivity

 *ProEnergy*

*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000443

Alta 0079866

## 2.2    Environmental Protection Agency (EPA) Test Methods

EPA 160.3    Residue, Non-Filterable and Total Suspended

Solids EPA 150.1    pH Electrometric

EPA 120.1    Conductance, Specific Conductance at

25°C EPA 200.7    Metals & Trace Elements

EPA 325.3    Chloride, Titrimetric Mercuric

Nitrate EPA 375.4    Sulfate, Turbidimetric

## 3.    Water Requirements

## 3.1    Water Sampling Requirements

The sampling shall be in accordance with ASTM D3370. A minimum of one (1) gallon or four (4) liters shall be supplied.

## 3.2    Water Purity Requirements

The water shall meet the following requirements when tested in accordance with the designated test method:

|  | Limit | Test Method |
|---|---|---|
| Total Suspended Solids and Total Dissolved Solids, mg/L, max | 5 | ASTM D5907 or EPA 160.3 |
| pH | 6.0 - 8.0 | ASTM D5464 or EPA 150.1 |
| Conductivity, $\mu$S/cm at 25°C | < 1.0 | ASTM D1125 or EPA 120.1 |
| Sodium + potassium, ppm, max | See 3.3 | ASTM D4191 and D4192 or EPA 200.7 |
| Silica ($SiO_2$), mg/L, max. | 0.1 | ASTM D859 or EPA 200.7 |
| Chlorides, mg/L, max | 0.5 | ASTM D512 or EPA 325.3 |
| Sulfates, mg/L, max | 0.5 | ASTM D516 or EPA 375.4 |

*ProEnergy*    **Proprietary and Confidential**
**Alta Energy** • Proposal #1018-2127

www.proenergyservices.com

CONFIDENTIAL

Alta App.000444    ALTA 0079867

## 3.3 Sodium & Potassium Limits in Water or Steam

The maximum amount of NA + K allowed in the water or steam injected into the engine depends upon the total NA + K contamination from all sources; i.e., from the fuel, air, water and steam. The maximum Na + K allowed is determined from the equation:

**(ppmFuel) + (ppmAir)*A/F + (ppmWater)*W/F + (ppmSteam)*S/F = 0.2 ppm**

Where:

| | | |
|---|---|---|
| ppmFuel | = | Parts per million Na + K in fuel |
| ppmAir | = | Parts per million Na + K in Air |
| ppmWater | = | Parts per million Na + K in water |
| ppmSteam | = | Parts per million Na + K in steam |
| A/F | = | Air/Fuel Ratio (Wt. Basis) |
| W/F | = | Water/Fuel Ratio (Wt. Basis) |
| S/F | = | Steam/Fuel Ratio (Wt. Basis) |

## 3.4 Water Filtration Requirements

The water shall contain no particles larger than 20 microns absolute.

ProEnergy
*Proprietary and Confidential*
**Alta Energy** • Proposal #1018-2127

CONFIDENTIAL

Alta App.000445

## 4.1    Steam Requirements

## 4.2    Steam Purity

The Steam shall meet the following requirements when tested in accordance with the designated test method:

- Sodium + Potassium (Na +K) – See paragraph 3.3

- Total Conductivity (Cation + Anion)

    Normal:        <1.5 µS/cm (95% of operation time) Abnormal:    < 2.0 µS/cm (5% of operating time)

- Total Solids

The maximum total solids depends on the steam/fuel weight ratios at which the gas turbine is to operate in the specific application. The value is determined form the following figure. Contaminant size shall not exceed 250 microns. With the exception of silica, there is no differentiation between types of solids as long as other limitations of this section are met. Silica in the steam is limited to 20 ppb.



## 4.3    Steam Sampling

Steam samples should be taken in accordance with ASTM D1066.

![ProEnergy]

**Proprietary and Confidential**
Alta Energy • Proposal #1018-2127

www.proenergyservices.com
101

CONFIDENTIAL

Alta App.000446 0079869

# Exhibit 59

Alta App.000447

## MUTUAL CONFIDENTIALITY AGREEMENT

This Mutual Confidentiality Agreement (the "Agreement") is entered into and made effective as of 7 December 2018 by and between:

(1) GE Packaged Power LP ("GE"), a Delaware limited partnership having an office and place of business at 16415 Jacintoport Boulevard, Houston, TX 77015; and

(2) Alta Power LLC, a company organized under the laws of the State of Texas with an office located at 4605 Post Oak Place Dr. Suite 270, Houston, Texas, 77027 ("Company").

GE and Company shall be referred to individually as a "Party" and collectively as the "Parties", as context dictates.

**WHEREAS,** the Parties are interested in discussing and evaluating the possibility of entering into the design, development, sale and purchase of GE CF6-80C2 engines converted to operate in a GE power generation package equipment. (the "Purpose"); and

**WHEREAS,** the Parties anticipate that, in the course of discussions and evaluations concerning the Purpose, each Party may disclose to the other certain confidential or proprietary information; and

**WHEREAS,** the Parties wish to provide this understanding and agreement between them to establish restrictions on the handling of such information and to avoid unintended restrictions on future activities of the Parties;

**NOW, THEREFORE,** in consideration of the mutual promises and agreements contained in this Agreement, the mutual disclosure of Confidential Information (as defined below), and other good and valuable consideration, the Parties agree as follows:

1.  In this Agreement:

    a.  "**Affiliate**" with respect to a party means means an entity (including without limitation any individual, corporation, partnership, limited liability company, association or trust) controlling, controlled by or under common control with that party.

    b.  "**Confidential Information**" means any information disclosed (whether in writing, verbally (subject to the conditions specified in this item b. below) or by any other means and whether directly or indirectly) by the Party disclosing such information or by another person on behalf of such Party (the "**Disclosing Party**") to the Receiving Party or to another person on behalf of the Receiving Party in connection with the discussions and evaluations described above (including, without limitation, any information relating to the Disclosing Party's or its Affiliates' products, operations, methods, processes, plans or intentions, product information, drawings, specifications, technical descriptions, reports and other data, know-how, design rights, trade secrets, prices, market opportunities and



EXHIBIT

2009
10-15-22 PEA

Scanned with CamScanner

Alta App.000448

Alta 0069830

business affairs) and designated in writing by the Disclosing Party as "confidential" or "proprietary" at the time of disclosure. Draft contracts between the parties regarding the Purpose shall be Confidential Information subject to this Agreement. If the Disclosing Party has oral information which it considers to be confidential or proprietary, it shall so state before such information is disclosed and the Disclosing Party shall reduce the oral Confidential Information in writing within ten (10) days of such agreement, which writing shall specifically reference the date of disclosure and otherwise conform to the requirements of this paragraph (in particular, designate such information as "confidential" or "proprietary"), provided however that oral information concerning GE CF6-80C2 engines converted to operate in a GE power generation package equipment is deemed to be Confidential Information without the necessity of such a process.;

c. **"Receiving Party"** means the Party to this Agreement to whom the Confidential Information is disclosed.

2. The Receiving Party shall:

   a. treat such Confidential Information as confidential and use all reasonable care to prevent the disclosure of any portion of such Confidential Information to any third party, such care to be at least commensurate with the care exercised by GE (when GE is the Receiving Party), and Company (when it is the Receiving Party), for the protection of its own confidential information;

   b. use such Confidential Information only for the Purpose; and

   c. restrict access to such Confidential Information to only those officers, employees, lawyers and agents who require such Confidential Information for the Purpose, provided that, prior to disclosure of Confidential Information, such persons are advised of the confidential nature of Confidential Information, provided a copy of this Agreement and directed to abide by its terms].

3. The restrictions set forth above do not apply to any portion of the Confidential Information, which:

   a. is or becomes publicly known other than through breach of this Agreement;

   b. becomes rightfully known to a Party without confidentiality restrictions from a source other than a Party to this Agreement;

   c. is in possession of the Receiving Party prior to receipt under this Agreement or is independently developed by the Receiving Party (in each case, as shown by the Receiving Party's records), provided that the person or persons developing same have not had access to such Confidential Information received under this Agreement;

   d. must be disclosed pursuant to requirements of law or valid legal process, provided that the Receiving Party intending to make a disclosure in response to such requirements or

2

Scanned with CamScanner

Alta App.000449

Alta 0069831

CONFIDENTIAL

process shall notify the Disclosing Party in advance of any such disclosure and reasonably cooperate in attempts to maintain the confidentiality of such Confidential Information; or

e.    is approved for release, in writing, by the Disclosing Party.

4.    Upon request of the Disclosing Party, the Receiving Party will, as directed by such Party, (i) return to it all of such Party's Confidential Information and all documents and other material in its possession, custody or control that contain any part of Confidential Information received under this Agreement, or (ii) destroy (with a certification by the Receiving Party of such destruction) all documents and other material in its possession, custody or control which reflect or have been generated from any part of such Confidential Information, with the exception of one copy of the Confidential Information which may be retained exclusively for the purpose of documenting the disclosures made hereunder.

Furthermore, GE shall own exclusively all rights in ideas, inventions, works of authorship, strategies, plans and data created in or resulting from discussions between GE and Company, including but not limited to all patent rights, copyrights, moral rights, rights in proprietary information, database rights, trademark rights and other intellectual property rights, and Company will execute assignments as necessary to achieve that result.

5.    Nothing contained in this Agreement, or in Confidential Information exchanged hereunder, shall be construed as granting to either Party any right or license under any patent or copyright or to any know-how, nor shall this Agreement or the disclosure of Confidential Information hereunder impair the right of either Party to contest the scope, validity or alleged infringement of any patent, copyright or intellectual property rights.

6.    Neither the conduct of discussions or evaluations concerning the Purpose, nor this Agreement, nor the provision of Confidential Information shall diminish or restrict in any way the rights that each Party has to market, sell, license, or otherwise make available its products and services to any customer or third party.

7.    Except for the confidentiality restrictions set forth in this Agreement, the Parties agree that the discussions, evaluations, and disclosure contemplated by this Agreement shall not restrict either Party's right to take whatever future actions such Party unilaterally determines to be in its best interests, including the right to undertake similar discussions or evaluations or enter into agreements or relationships with other parties covering subjects related to the matters covered herein.

8.    Unless based upon another agreement in writing signed by the Parties, neither Party will rely upon any representation or expectation that the other Party will enter into any relationship or transaction, including without limitation, the Purpose. Neither Party accepts responsibility for or makes a representation or warranty, express or implied, with respect to the truth, accuracy or completeness of Confidential Information.

3

Scanned with CamScanner
Alta App.000450

CONFIDENTIAL

Alta 0069832

9.  As to any individual item of Confidential Information, the obligations set forth in this Agreement shall expire three years from the date of first disclosure of such item of Confidential Information.

10. This Agreement shall be governed by and constructed according to the laws of State of New York, U.S.A, without giving effect to any choice of law rules that would cause the application of laws of any other jurisdiction. The courts of State of New York, U.S.A shall have exclusive jurisdiction to settle any dispute arising from or connected with this Agreement.

11. In no event shall either Party be liable for loss of profit or revenues, loss of use, cost of capital, or for any special, consequential, incidental, indirect, punitive or exemplary damages, regardless of whether a claim is based in contract, warranty, indemnity, tort/extra-contractual liability (including negligence), strict liability or otherwise. Each Party acknowledges that money damages would not be a sufficient remedy for any breach of this Agreement. Accordingly, in the event of any such breach, in addition to any other remedies at law or in equity that a Party may have, it shall be entitled to equitable relief, including injunctive relief or specific performance, or both.

12. The Receiving Party represents and warrants that no technical data that it receives in conjunction with the Confidential Information, which is subject to the export control laws of the United States of America ("U.S."), shall be exported from the U.S. or re-exported from any other country without first complying with all export control laws and regulations of the U.S. Government, including the requirement for obtaining any export license, if applicable. The Receiving Party shall further comply with all other applicable export control laws and regulations.

13. The invalidity in whole or in part of any portion of this Agreement shall not affect the validity of the remainder of this Agreement. This Agreement constitutes the entire understanding of the Parties with respect to Confidential Information and supersedes all prior understandings and agreements with respect to Confidential Information. This Agreement shall not be amended or waived except by a written amendment or waiver signed by the Parties. No Party shall delegate or assign its duties or rights under this Agreement without the prior written consent of the other Party. The obligations and liabilities assumed in this Agreement by the Parties shall be binding upon each Party's respective successors and assigns

**IN WITNESS WHEREOF**, the Parties hereto, by their duly authorised representatives, have executed this Agreement as of the date set forth above.

GE Packaged Power LP

By: _____

Title: Global Sales Leader

Date: 12 Dec 2018

Alta Power LLC

By: _____

Title: CFO

Date: December 11, 2018

4

Scanned with CamScanner

Alta App.000451

Alta 0069833

CONFIDENTIAL

# Exhibit 60

Alta App.000452

To: Joshua Presner[joshua.presner@jb.com]
From: Matthew Laterza[O=EXCHANGELABS OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT) CN=RECIPIENTS CN=8F6EEDB0D00C4F419C7E5DBD7C543FB2-MLATERZA 86]
Sent: Wed 7/31/2019 12:57:59 PM Central Standard Time
Subject: FW: GE Letter
Attachment: GE TRUEpackage LM6000's WS Refurbishment Services v2 for Alta Power.pdf

---

From: Andrew F. Herr <a.herr@wattstock.com>
Sent: Wednesday, July 31, 2019 11:35 AM
To: Matthew Laterza <mlaterza@altapowerdev.com>
Subject: FW: GE Letter

Here's the note for DB – LMK what Josh thinks.

Andy

From: Herrington, Lance R (GE Power) <lance.herrington@ge.com>
Sent: Wednesday, July 31, 2019 10:34 AM
To: p.jenveen@wattstock.com; j.manning@wattstock.com
Cc: Andrew F. Herr <a.herr@wattstock.com>; Pete Watson <p.watson@wattstock.com>
Subject: Re: GE Letter

See attached...

**Lance Herrington**

**Andrew F. Herr**
Chief Operating Officer
Mobile: +1 972.963.0058

4040 North Central Expressway
Suite 850
Dallas, TX 75204

a.herr@wattstock.com www.wattstock.com
This e-mail message and any attachments are for the sole use of the intended recipient(s) and may contain confidential information. If you are not an intended recipient, or an intended recipient's authorized agent, you are hereby notified that any dissemination, distribution or copying of this e-mail message or any attachments is strictly prohibited. If you have received this message in error, please notify the sender by reply e-mail and delete this e-mail message and any attachments from your computer system.

EXHIBIT
2012
10-15-22  PEA

CONFIDENTIAL

Alta 0016166

Alta App.000453



GE Power

**Lance Herrington**
Global Sales Leader
Aero Upgrades

Power Services

16415 Jacintoport Blvd
Houston, TX 77015

T +1 832 418 9788
www.lance.herrington@ge.com

Matt Laterza
Alta Power LLC
4605 Post Oak Place Dr.
Suite 270
Houston, TX 77027

July 31, 2019

Subject: GE TRUEpackage LM6000's and WattStock Refurbishment Services

Dear Matt:

We understand that your lenders seek clarification regarding the GE-WattStock relationship, and how GE could respond in the event that WattStock becomes unable to meet its contractual obligations to Alta Power LLC under agreements between WattStock and Alta Power for WattStock to supply a minimum of 9 refurbished LM6000 units.

WattStock and GE have entered into a Memorandum of Understanding that sets out how WattStock and GE will work together to refurbish previously owned aero-derivative power units, including the LM6000 series units. In general, GE is committed to overhauling engines and supplying engineering analysis and diagrams to ensure the entire unit is refurbished to GE-specifications, and WattStock is committed to acquiring used units and refurbishing the balance-of-plant. By refurbishing units in this fashion, GE is able to warranty the completed unit. WattStock and GE have agreed that either party might act in the role of prime contractor, depending on a variety of factors. With regard to the Alta Power project, we jointly determined that WattStock would take the lead, and GE will perform its engineering and engine overhaul work as a subcontractor to WattStock.

Should WattStock fail to meet its contractual obligations to Alta Power, GE would be in a position to assume responsibility to complete any outstanding work, subject to several considerations. For illustration and without limitation, those considerations would likely include: (1) the absence of any legal or access issues; (2) GE and Alta being able to agree to a revised scope of work, associated cost, and terms and conditions, (3) GE's assessment that there are no insurmountable engineering or manufacturing issues, and (4) any applicable Purchase Orders or Change Orders should be modified and reassigned to GE.

There are a number of reasons that GE is willing to warranty WattStock's work on this project. First, WattStock's operation is co-located next to our engine overhaul facility. GE will be tracking project progress daily and could quickly assume work scope without transportation. Second, as part of our engineering services on this project we already conduct oversight of all aspects of WattStock's work – we will be intimately acquainted with each unit and its refurbishment program. Third, as the leader in aero-derivative power plants, we have a broad network suppliers that we expect to be able to call on to assist if need be. Fourth – and most importantly – GE has a strong incentive for this project to succeed.

CONFIDENTIAL

Alta 0016167

Alta App.000454

Closing,

Lance Herrington
Global Sales Leader
Aero Upgrades

cc

Alex Babu, GE
Jay Manning, WattStock LLC

CONFIDENTIAL

Alta 0016168

Alta App.000455

# Exhibit 61

Alta App.000456

To: Matthew Laterza[mlaterza@altapowerdev.com]
Cc: Jacqueline Berris[jberris@ecpartners.com]; Mahmud Riffat[mriffat@ecpartners.com]
From: Matt DeNichilo[mdenichilo@ecpartners.com]
Sent: Tue 9/3/2019 3:03:58 PM Central Daylight Time
Subject: RE: (EXTERNAL) > ERCOT Peaker Project

Matt,
As discussed, here are the indicative terms of the deal we'd be willing to pursue:
- $110mm ($245/kW and 5x debt/EBITDA) of unitranche debt
    - Sized to pay down to $100/kW by end of 5-year contracts in a base case (i.e. modeling no outages)
- L+800
- 2% OID
- 5-year tenor
- 100% CF Sweep

This would obviously necessitate a much larger pref / equity check. Give me a call at your convenience this afternoon and I can run you through a list of names you might also want to reach out to.
Best,
Matt DeNichilo
Energy Capital Partners
40 Beechwood Road
Summit, NJ 07901
Work: 973-671-6119
Mobile: 908-358-3160
Email: mdenichilo@ecpartners.com

**From:** Matthew Laterza <mlaterza@aitapowerdev.com>
**Sent:** Tuesday, September 03, 2019 1:45 PM
**To:** Matt DeNichilo <mdenichilo@ecpartners.com>
**Cc:** Jacqueline Berris <jberris@ecpartners.com>; Mahmud Riffat <mriffat@ecpartners.com>
**Subject:** Re: (EXTERNAL) > ERCOT Peaker Project
That will work.
Get Outlook for iOS

**From:** Matt DeNichilo <mdenichilo@ecpartners.com>
**Sent:** Tuesday, September 3, 2019 12:44:17 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Cc:** Jacqueline Berris <jberris@ecpartners.com>; Mahmud Riffat <mriffat@ecpartners.com>
**Subject:** RE: (EXTERNAL) > ERCOT Peaker Project
Thanks, I'll send out an invite for 3pm assuming that still works for you.
Best,
Matt DeNichilo
Energy Capital Partners
40 Beechwood Road
Summit, NJ 07901
Work: 973-671-6119
Mobile: 908-358-3160
Email: mdenichilo@ecpartners.com

**From:** Matthew Laterza <mlaterza@altapowerdev.com>
**Sent:** Tuesday, September 03, 2019 12:55 PM
**To:** Matt DeNichilo <mdenichilo@ecpartners.com>
**Cc:** Jacqueline Berris <jberris@ecpartners.com>; Mahmud Riffat <mriffat@ecpartners.com>
**Subject:** Re: (EXTERNAL) > ERCOT Peaker Project
Matt,
I have calls from 3:30 - 4:30ET and from 5:30 - 6:30ET today, but am otherwise open. Let me know what works on your end.
Matt
Get Outlook for iOS

**From:** Matt DeNichilo <mdenichilo@ecpartners.com>
**Sent:** Monday, September 2, 2019 12:16:01 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Cc:** Jacqueline Berris <jberris@ecpartners.com>; Mahmud Riffat <mriffat@ecpartners.com>
**Subject:** Re: (EXTERNAL) > ERCOT Peaker Project
Thanks Matt, we are having a discussion internally tomorrow morning and will get back to you tomorrow afternoon.
Best,
Matt
On Sep 2, 2019, at 12:58 PM, Matthew Laterza <mlaterza@altapowerdev.com> wrote:

> All,
>
> Just wanted to let you know that I'm around today if you want to catch up on anything.
>
> Matt

Alta App.000457

Alta 0020446

**From:** Matthew Laterza
**Sent:** Friday, August 30, 2019 4:52:02 PM
**To:** Matt DeNichilo <mdenichilo@ecpartners.com>; Jacqueline Berris <jberris@ecpartners.com>
**Cc:** Mahmud Riffat <mriffat@ecpartners.com>
**Subject:** RE: (EXTERNAL) > ERCOT Peaker Project
Matt,
Here's the latest model. We're still waiting on inputs from ICF on the following:
1. Quick start revenue (zero is being captured in this version)
2. ICF let me know that they have updated their ERCOT curves after the August events, so should have those next week as well

I'll be around all weekend if you want to catch up.
Thanks,
Matt

**From:** Matt DeNichilo <mdenichilo@ecpartners.com>
**Sent:** Thursday, August 29, 2019 2:38 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>; Jacqueline Berris <jberris@ecpartners.com>
**Cc:** Mahmud Riffat <mriffat@ecpartners.com>
**Subject:** RE: (EXTERNAL) > ERCOT Peaker Project
Thanks, can you also share the C&D letter for a discussion we will have with our internal counsel?
Best,
Matt DeNichilo
Energy Capital Partners
40 Beechwood Road
Summit, NJ 07901
Work: 973-671-6119
Mobile: 908-358-3160
Email: mdenichilo@ecpartners.com

**From:** Matthew Laterza <mlaterza@altapowerdev.com>
**Sent:** Thursday, August 29, 2019 3:32 PM
**To:** Jacqueline Berris <jberris@ecpartners.com>
**Cc:** Mahmud Riffat <mriffat@ecpartners.com>; Matt DeNichilo <mdenichilo@ecpartners.com>
**Subject:** RE: (EXTERNAL) > ERCOT Peaker Project
Thanks Jackie.
You all should be receiving VDR invitations shortly. It will come from ShareFile. Let me know if you don't see anything and I will resend.
Also, I've attached the latest turns of the Credit Agreement and term sheet. I'll forward the model and the Leidos report as soon as I have them in hand.
Thanks again for your time and let me know if you have any questions or there's anything I can help with to push this along.
Matt

**From:** Jacqueline Berris <jberris@ecpartners.com>
**Sent:** Thursday, August 29, 2019 1:55 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Cc:** Mahmud Riffat <mriffat@ecpartners.com>; Matt DeNichilo <mdenichilo@ecpartners.com>
**Subject:** RE: (EXTERNAL) > ERCOT Peaker Project
Matt,
As discussed – can you please add us three to the dataroom:
Matt DeNichilo mdenichilo@ecpartners.com
Mahmud Riffat mriffat@ecpartners.com
Jacqueline Berris jberris@ecpartners.com
Thanks,
Jackie
**Jacqueline Berris**
Energy Capital Partners
Phone +1 (973) 671-6082
Cell +1 (646) 400-1435
jberris@ecpartners.com

**From:** Matthew Laterza <mlaterza@altapowerdev.com>
**Sent:** Thursday, August 29, 2019 1:55 PM
**To:** Jacqueline Berris <jberris@ecpartners.com>; Matt DeNichilo <mdenichilo@ecpartners.com>
**Cc:** Mahmud Riffat <mriffat@ecpartners.com>
**Subject:** RE: (EXTERNAL) > ERCOT Peaker Project
That works for me.

**From:** Jacqueline Berris <jberris@ecpartners.com>
**Sent:** Thursday, August 29, 2019 12:54 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>; Matt DeNichilo <mdenichilo@ecpartners.com>
**Cc:** Mahmud Riffat <mriffat@ecpartners.com>
**Subject:** RE: (EXTERNAL) > ERCOT Peaker Project
Matt – would 2:30pm ET today work instead?
**Jacqueline Berris**
Energy Capital Partners
Phone +1 (973) 671-6082
Cell +1 (646) 400-1435
jberris@ecpartners.com

**From:** Matthew Laterza <mlaterza@altapowerdev.com>
**Sent:** Thursday, August 29, 2019 12:33 PM
**To:** Matt DeNichilo <mdenichilo@ecpartners.com>

Alta App.000458

Alta 0020447

Cc: Mahmud Riffat <mriffat@ecpartners.com>; Jacqueline Berris <jberris@ecpartners.com>
**Subject:** RE: (EXTERNAL) > ERCOT *Peaker Project*
Matt,
If you happen to have some time later today to connect let me know. We're trying to touch base with everyone today. If not, then tomorrow morning is fine.
Thanks,
Matt

---

**From:** Matt DeNichilo <mdenichilo@ecpartners.com>
**Sent:** Wednesday, August 28, 2019 4:35 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Cc:** Mahmud Riffat <mriffat@ecpartners.com>; Jacqueline Berris <jberris@ecpartners.com>
**Subject:** RE: (EXTERNAL) > ERCOT Peaker Project
Hey Matt,
Would you be able to speak at 11:30am on Friday?
Best,
Matt DeNichilo
Energy Capital Partners
40 Beechwood Road
Summit, NJ 07901
Work: 973-671-6119
Mobile: 908-358-3160
Email: mdenichilo@ecpartners.com

---

**From:** Matthew Laterza <mlaterza@altapowerdev.com>
**Sent:** Wednesday, August 28, 2019 5:02 PM
**To:** Matt DeNichilo <mdenichilo@ecpartners.com>
**Cc:** Mahmud Riffat <mriffat@ecpartners.com>; Jacqueline Berris <jberris@ecpartners.com>
**Subject:** RE: (EXTERNAL) > ERCOT Peaker Project
Hey guys,
Sorry for the delay in getting back with you. Do you have some time Friday to have a chat?
We've had a couple of developments on our end.
Thanks,
Matt

---

**From:** Matt DeNichilo <mdenichilo@ecpartners.com>
**Sent:** Friday, August 2, 2019 10:27 AM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Cc:** Mahmud Riffat <mriffat@ecpartners.com>; Jacqueline Berris <jberris@ecpartners.com>
**Subject:** RE: (EXTERNAL) > ERCOT Peaker Project
Hey Matt, we just caught up with Josh this morning. We are ready to dig in and do some modeling to figure out where we'd be able to help on a unitranche or mezzanine tranche. Will you be sending a model, or should we check with Josh? Happy to look at an NDA if there is one.
Best,
Matt DeNichilo
Energy Capital Partners
51 JFK Parkway, Suite 200
Short Hills, NJ 07078
Work: 973-671-6119
Mobile: 908-358-3160
Email: mdenichilo@ecpartners.com

---

**From:** Matthew Laterza <mlaterza@altapowerdev.com>
**Sent:** Friday, August 02, 2019 11:08 AM
**To:** Matt DeNichilo <mdenichilo@ecpartners.com>
**Cc:** Mahmud Riffat <mriffat@ecpartners.com>; Jacqueline Berris <jberris@ecpartners.com>
**Subject:** RE: (EXTERNAL) > ERCOT Peaker Project
Matt,
Thanks for following up. I believe you're speaking with Josh Presner at DB sometime tomorrow. He has our permission to share information about our projects with ECP.
If you'd like to have a brief introductory call ahead of that let me know.
Matt

---

**From:** Matt DeNichilo <mdenichilo@ecpartners.com>
**Sent:** Thursday, August 1, 2019 6:00 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Cc:** Mahmud Riffat <mriffat@ecpartners.com>; Jacqueline Berris <jberris@ecpartners.com>
**Subject:** RE: (EXTERNAL) > ERCOT Peaker Project
Hi Matt,
Thanks for the email, and pleasure to make your acquaintance. We would certainly be interested to learn more. We know ERCOT well given our ownership of Calpine and prior CCGT investments in the region.
Best,
Matt DeNichilo
Energy Capital Partners
51 JFK Parkway, Suite 200
Short Hills, NJ 07078
Work: 973-671-6119
Mobile: 908-358-3160
Email: mdenichilo@ecpartners.com

---

**From:** Matthew Laterza <mlaterza@altapowerdev.com>

CONFIDENTIAL

**Sent:** Wednesday, July 31, 2019 1:34 PM
**To:** Matt DeNichilo <mdenichilo@ecpartners.com>
**Subject:** (EXTERNAL) > ERCOT Peaker Project
Dear Matt,

We were given your contact information by JP Boudrias at Goldman. We are developing three natural gas fired peaking power plants in ERCOT (150 MW each for a total of 450 MW) and JP suggested that you might be interested in providing some mezzanine capital for this project. Below is a brief summary of the project highlights:

- Plants will use grey market equipment refurbished by the OEM with warranty, output and performance guarantees from the OEM
- Turnkey EPC costs of ~$400 / kW vs. ~$950 / kW for newbuilds
- Contracted cash flows from a 5 year offtake contract with an investment grade counterparty plus ancillary services revenue from ERCOT covering a majority of project costs
- Plants will be capable of <10 min start and black start capable enabling participation in full range of ancillary services markets
- Project generates ~22% unlevered returns
- ~$20-30MM of mezzanine capital required with a 5 year tenor

We are anticipating financial close on this project imminently (DB providing senior secured capital) with target commercial operations dates for all three plants in Q2 2020 to participate in the 2020 summer run.

If this is a project you would be interested in discussing further, please let us know and we will forward you the full slide deck. Thank you for your time.

Regards,
Matt Laterza
Matthew E. Laterza
Chief Financial Officer
Alta Power Ltd.
4605 Post Oak Place Dr. Suite 270
Houston, TX 77027
(o) 832.397.6939
(f) 832.356.5202
(m) 713.859.9770
(e) mlaterza@altapowerdev.com

**CONFIDENTIALITY NOTICE:** This message originates from Energy Capital Partners. This message and any attachments are solely for the use of the intended recipients. They may contain privileged and/or confidential information or other information protected from disclosure. If you are not an intended recipient, you are hereby notified that you received this email in error and that any review, dissemination, distribution or copying of this email and any attachment is strictly prohibited. If you have received this email in error, please contact the sender and delete the message and any attachment from your system.

**CONFIDENTIALITY NOTICE:** This message originates from Energy Capital Partners. This message and any attachments are solely for the use of the intended recipients. They may contain privileged and/or confidential information or other information protected from disclosure. If you are not an intended recipient, you are hereby notified that you received this email in error and that any review, dissemination, distribution or copying of this email and any attachment is strictly prohibited. If you have received this email in error, please contact the sender and delete the message and any attachment from your system.

**CONFIDENTIALITY NOTICE:** This message originates from Energy Capital Partners. This message and any attachments are solely for the use of the intended recipients. They may contain privileged and/or confidential information or other information protected from disclosure. If you are not an intended recipient, you are hereby notified that you received this email in error and that any review, dissemination, distribution or copying of this email and any attachment is strictly prohibited. If you have received this email in error, please contact the sender and delete the message and any attachment from your system.

**CONFIDENTIALITY NOTICE:** This message originates from Energy Capital Partners. This message and any attachments are solely for the use of the intended recipients. They may contain privileged and/or confidential information or other information protected from disclosure. If you are not an intended recipient, you are hereby notified that you received this email in error and that any review, dissemination, distribution or copying of this email and any attachment is strictly prohibited. If you have received this email in error, please contact the sender and delete the message and any attachment from your system.

**CONFIDENTIALITY NOTICE:** This message originates from Energy Capital Partners. This message and any attachments are solely for the use of the intended recipients. They may contain privileged and/or confidential information or other information protected from disclosure. If you are not an intended recipient, you are hereby notified that you received this email in error and that any review, dissemination, distribution or copying of this email and any attachment is strictly prohibited. If you have received this email in error, please contact the sender and delete the message and any attachment from your system.

CONFIDENTIAL

**CONFIDENTIALITY NOTICE:** This message originates from Energy Capital Partners. This message and any attachments are solely for the use of the intended recipients. They may contain privileged and/or confidential information or other information protected from disclosure. If you are not an intended recipient, you are hereby notified that you received this email in error and that any review, dissemination, distribution or copying of this email and any attachment is strictly prohibited. If you have received this email in error, please contact the sender and delete the message and any attachment from your system.

**CONFIDENTIALITY NOTICE:** This message originates from Energy Capital Partners. This message and any attachments are solely for the use of the intended recipients. They may contain privileged and/or confidential information or other information protected from disclosure. If you are not an intended recipient, you are hereby notified that you received this email in error and that any review, dissemination, distribution or copying of this email and any attachment is strictly prohibited. If you have received this email in error, please contact the sender and delete the message and any attachment from your system.

**CONFIDENTIALITY NOTICE:** This message originates from Energy Capital Partners. This message and any attachments are solely for the use of the intended recipients. They may contain privileged and/or confidential information or other information protected from disclosure. If you are not an intended recipient, you are hereby notified that you received this email in error and that any review, dissemination, distribution or copying of this email and any attachment is strictly prohibited. If you have received this email in error, please contact the sender and delete the message and any attachment from your system.

**CONFIDENTIALITY NOTICE:** This message originates from Energy Capital Partners. This message and any attachments are solely for the use of the intended recipients. They may contain privileged and/or confidential information or other information protected from disclosure. If you are not an intended recipient, you are hereby notified that you received this email in error and that any review, dissemination, distribution or copying of this email and any attachment is strictly prohibited. If you have received this email in error, please contact the sender and delete the message and any attachment from your system.

Alta App.000461

# Exhibit 62

Alta App.000462

Message

| | |
|---|---|
| **From:** | Herrington, Lance R (GE Power) [lance.herrington@ge.com] |
| **Sent:** | 2/28/2018 10:57:20 AM |
| **To:** | j.manning@wattstock.com; Kenneth Stevens [k.stevens@wattstock.com]; Pete Watson [p.watson@wattstock.com]; Canon, James T (GE Power) [james.canon@ge.com]; Babu, Alex (GE Power) [alex.babu@ge.com] |
| **CC:** | p.jenevein@wattstock.com; Andrew F. Herr [a.herr@wattstock.com]; Walter Sharpin [w.sharpin@wattstock.com] |
| **Subject:** | RE: castleman power estimator |
| **Attachments:** | Aero Truepackage Program Whitepaper 28Feb2018.pptx |

**Lance Herrington**
Product Line Leader
Aero Conversions, Modifications, and Uprades (CM&U)

T+1 832 954 0754  |  M+1 832 418 9788

Start here to find the right upgrades...

---

**From:** j.manning@wattstock.com [mailto:j.manning@wattstock.com]
**Sent:** Wednesday, February 28, 2018 9:38 AM
**To:** Kenneth Stevens <k.stevens@wattstock.com>; Pete Watson <p.watson@wattstock.com>; Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Canon, James T (GE Power) <james.canon@ge.com>; Babu, Alex (GE Power) <alex.babu@ge.com>
**Cc:** p.jenevein@wattstock.com; Andrew F. Herr <a.herr@wattstock.com>; Walter Sharpin <w.sharpin@wattstock.com>
**Subject:** EXT: RE: castleman power estimator

No, just need a presentation on GE letterhead.

---

**From:** Kenneth Stevens
**Sent:** Wednesday, February 28, 2018 8:42 AM
**To:** Pete Watson <p.watson@wattstock.com>; j.manning@wattstock.com; Herrington, Lance R (GE Power) <lance.herrington@ge.com>; Jim Canon <james.canon@ge.com>; Babu, Alex (GE Power) <alex.babu@ge.com>
**Cc:** p.jenevein@wattstock.com; Andrew F. Herr <a.herr@wattstock.com>; Walter Sharpin <w.sharpin@wattstock.com>
**Subject:** Re: castleman power estimator

Agree with Pete.   Give them plenty

Get Outlook for iOS

---

**From:** Pete Watson
**Sent:** Wednesday, February 28, 2018 9:26:59 AM
**To:** j.manning@wattstock.com; Herrington, Lance R (GE Power); Jim Canon; Babu, Alex (GE Power)
**Cc:** p.jenevein@wattstock.com; Andrew F. Herr; Walter Sharpin; Kenneth Stevens
**Subject:** Re: castleman power estimator

The MOU and The lease agreement, and  the working structure that Lance put together?

---

**From:** j.manning@wattstock.com
**Sent:** Wednesday, February 28, 2018 8:12:09 AM
**To:** Herrington, Lance R (GE Power); Jim Canon; Babu, Alex (GE Power)

Alta App.000463

**Cc:** p.jenevein@wattstock.com; Andrew F. Herr; Walter Sharpin; Pete Watson; Kenneth Stevens
**Subject:** RE: castleman power estimator

==Ryan called me this am.  He needs "proof" of our program with GE for the due diligence requested by the lender's engineer, so I don't think a WattStock presentation will suffice.==  The engineering firm is located in Denver.  Can't recall their name.

Lance, what do you have that we can send to him today?

Also, he is meeting with his team this am and will call me this afternoon.

Jay

---

**From:** j.manning@wattstock.com
**Sent:** Tuesday, February 27, 2018 1:21 PM
**To:** 'Herrington, Lance R (GE Power)' <lance.herrington@ge.com>; Jim Canon <james.canon@ge.com>; 'Babu, Alex (GE Power)' <alex.babu@ge.com>
**Cc:** Patrick Jenevein (p.jenevein@wattstock.com) <p.jenevein@wattstock.com>; Andrew F. Herr <a.herr@wattstock.com>; Walter Sharpin <w.sharpin@wattstock.com>; Pete Watson <p.watson@wattstock.com>; Kenneth C Stevens - WattStock <k.stevens@wattstock.com>
**Subject:** RE: castleman power estimator

I talked to Ryan again.  I told him that I needed to calm the troops down about if we are "going to get the deal".  His reply was that in his view without making a commitment "nothing has changed since the last time we talked".  I told him some people want me to pitch a tent in front of his office, and he laughed and said that the closing was very difficult, PruCap does not use electronic docs so everything had to be couriered back and forth and it took 4 days to finalize.  He said he has been inundated with docs since he returned from vacation after Christmas, and now he has to get his head around building two more power plants.

He is going to get together with his team this afternoon, go over the DOR and get back to me tomorrow.

I told him I was still working on the spreadsheet he asked for, but that the $13mm not to exceed number is what he should use.

Jay

---

**From:** j.manning@wattstock.com
**Sent:** Monday, February 26, 2018 8:11 PM
**To:** 'Herrington, Lance R (GE Power)' <lance.herrington@ge.com>; Pete Watson <p.watson@wattstock.com>; Jim Canon <james.canon@ge.com>; 'Babu, Alex (GE Power)' <alex.babu@ge.com>
**Cc:** Patrick Jenevein (p.jenevein@wattstock.com) <p.jenevein@wattstock.com>; Andrew F. Herr <a.herr@wattstock.com>; Walter Sharpin <w.sharpin@wattstock.com>
**Subject:** castleman power estimator
**Importance:** High

I talked briefly to Ryan at 530pm.  He asked for a spreadsheet showing cost of package and profit based on $16mm purchase price for the Ecuador units vs the $14mm we originally budgeted.  I have to send him something, so see tabs "Structure" and "DOR".  I gave him a not to exceed price of $13mm/package including the scope in the DOR. I need to get this to him ASAP tomorrow.

When can you discuss?

Jay
WattStock LLC
9225 Katy Fwy, Suite 310
Houston, TX  77024
C:  713.248.4148
j.manning@wattstock.com www.wattstock.com

Alta App.000464

GE CONFIDENTIAL

This e-mail is the property of WattStock LLC and/or its relevant affiliate and contains confidential and privileged material for the sole use of the intended recipient(s).  Any review, use, distribution or disclosure by others is strictly prohibited.  If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender or reply to WattStock LLC at Webmaster@wattstock.com and delete all copies of the message.  This e-mail (and any attachments hereto) are not intended to be an offer (or an acceptance) and do not create or evidence a binding and enforceable contract between WattStock LLC (or any of its affiliates) and the intended recipient or any other party, and may not be relied on by anyone as the basis of a contract by estoppel or otherwise.  Thank you.

Alta App.000465

GEALTA_0044924



**DRAFT**

# Aero Truepackage Program

[Date Time]

Confidential: Not to be copied, reproduced, or distributed without prior approval

Alta App.000466

# Aero "Certified Pre-Owned" Package Program



Program background / intent

Under the current market conditions, we are seeing a growing number of Aeroderivative Power Generation Packages being decommissioned, or the operating entity owning the asset seeks to sale the equipment to other investors, asset owners, and/or operators. In these circumstances the Aero Product Line seeks to work with the seller and buyer through the acquisition, refurbishment, upgrade, and redeployment of those assets to maximize the return on value to the new owner/operator, as well as, maintain a mutually beneficial service relationship with that owner/operator over the lifetime of the assets.

Program structure

- Establish MOU and supplier agreement with outside firm for acquisition, holding, refurb/upgrade, and resell of used LM package equipment.

- The intent of the MoU is to establish the working guidelines between GE and the outside firm regarding the identification of projects for the acquisition, refurbishment, upgrade and resell.

- The intent of the supplier agreement is to establish contractual relationship for the potential use of the Jacinto port facility to perform the physical refurb/upgrade work...with access to port to ease shipping as well as import/export of equipment as needed.

- GE and the outside firm will work independently and/or collective to identify projects best suited for used and/or surplus Aeroderivative equipment. Examples of target projects for used and/or surplus equipment would be Cross Fleet / oOEM repower projects such as FT4/FT8 to LM repowers.

- When equipment is identified for purchase the outside firm will pursue the purchase of the equipment from the seller into their inventory. The Firm and GE will work together to determine best purchase price of equipment, with GE providing a proposal to them for the purchase of the LM Gas Turbine from the purchased packaged equipment.

- For the refurbishment of the LM package equipment, GE and The Firm will work together to identify the extent of the scope of work to be performed.

- In general, the firm will provide all labor and supervision to complete the agreed upon scope. GE will sale to the firm all parts, systems, required gas turbines, and engineering services required to complete the refurbishment scope. Additionally, GE and the firm will agree upon the scope of upgrades that will be required to maximize the value of the equipment to the buyer. GE will sale to the firm the agreed upon upgrade scope.

- GE and the firm will jointly work sales opportunities following the GE ITO R Process to ensure continuity of customer relationship with GE throughout the lifecycle of the project and post COD.

- Logistics / Transportation will be provided by the outside firm.

- The outside firm will provide l&c labor with GE provide TA services

- Warranty will be provided in general for parts/labor provided for the refurbishment and upgrade scope following std terms. A full wrap warranty can additionally be provided

- Full performance guarantees will be provided by GE to the customer.



Alta App.000467

GE CONFIDENTIAL

GEALTA_0044926

# Aero "Certified Pre-Owned" Package Program



### Division of Scope / Responsibility (WattStock as Commercial Lead)

 

| GE | JOINT | WATTSTOCK |
|---|---|---|
| • Provide GT Buy-back price | • Combined GT/Package buyback price | • Identification of units for sale |
| • Buy back GT and place into asset mgmt inventory after WattStock purchase of GT/package | • Identify sales / project opportunities…pace through GE ITO R process | • Broker buyback |
| | | • Hold purchased package in inventory |
| • Engineering services (sale to WattStock @ pre-agreed discount level) | • Identify scope of refurbishment required | • Decommisioning of equipment at seller's site |
| • Parts / Systems for refurb (sale to WattStock @ pre-agreed discount level) | • Identify scope of upgrades to maximize customer value based on operational mission profile | • Transportation & Logistics from seller site to refurb/upgrade site |
| • Parts / Systems for upgrades (sale to WattStock @ pre-agreed discount level) | • Identify best engine to meet customer operation mission profile (i.e. New, overhauled, or used serviceable) | • Supervision and labor for refurb / upgrade works |
| • Sales Support / Account Mgmt | | • Lead commercial negotiation & sale with buyer |
| • Marketing | | • Transportation & Logistics from refurb/upgrade site to buyer site |
| • TA Services for I&C | | • I&C supervision & Labor |
| • I&C "Red Flag Review" | | |
| • Performance Guarantees | | |
| • Refurb / upgrade parts & services warranty | | |
| • Full wrap warranty (additional price) | | |
| • MYA Proposal | | |
| • Warranty management | | |

Alta App.000468

GE CONFIDENTIAL

GEALTA_0044927

# Aero "Certified Pre-Owned" Package Program



### Division of Scope / Responsibility (GE as Commercial Lead)

  

**JOINT**

| GE | JOINT | WattStock |
|---|---|---|
| • Provide GT Buy-back price | • Combined GT/Package buyback price | • Identification of units for sale |
| • Buy back GT and place into asset mgmt inventory after WattStock purchase of GT/package | • Identify sales / project opportunities…pace through GE ITO R process | • Broker buyback |
| • Engineering services (sale to WattStock @ pre-agreed discount level) | • Identify scope of refurbishment required | • Hold purchased package in inventory |
| • Parts / Systems for refurb (issue to project for WattStock installation) | • Identify scope of upgrades to maximize customer value based on operational mission profile | • Sale to GE - Decommissioning of equipment at seller's site |
| • Parts / Systems for upgrades (issue to project for WattStock installation) | • Identify best engine to meet customer operation mission profile (ie. New, overhauled, or used serviceable) | • Sale to GE - Transportation & Logistics from seller site to refurb/upgrade site |
| • **Lead commercial negotiation & sale with buyer** | | • Sale to GE - Supervision and labor for refurb / upgrade works |
| • Marketing | | • **Support commercial negotiation & sale with buyer** |
| • TA Services for I&C | | • **Sale of refurb/upgraded package to GE** |
| • I&C "Red Flag Review" | | • Sale to GE - Transportation & Logistics from refurb/upgrade site to buyer site |
| • Performance Guarantees | | • Sale to GE - I&C supervision & Labor |
| • Refurb / upgrade parts & services warranty | | |
| • Full wrap warranty (additional price) | | |
| • MYA Proposal | | |
| • Warranty management | | |

Presentation Title | Confidential. Not to be copied, distributed, or reproduced without prior approval. | [DateTime]    4

Alta App.000469

GEALTA_0044928



# Aero "Certified Pre-Owned" Package Program

DRAFT

## Outlook

Since program kick-off (2Q'17)

- ~$33M in active opportunities
- ~$140M in prospects
- Full volume of units for buyback unknown at this time
- Building pipeline view (Total aspirational SAS$ not known at this time)

Competitive Landscape (primaries):

ProEnergy
- Very active, ~6 units in last 18mos.
- Aggressively pursuing controls and GT Services

EthosEnergy
- Active, Low volume reseller.
- Aggressively pursuing controls and GT Services

THOMASSEN AMCOT
- Active, low volume reseller
- Primarily focused on equipment resell w/equity share

Axford
- Active, low volume reseller
- Primarily consulting to other resellers.

# Aero "Certified Pre-Owned" Package Program



### Relational Benefits





- OEM "brand" on refurb unit...helps improve customer access to project financing, lower insurance premiums, and improve investor confidence.
- Engineering and Technology leadership
- Access to IP to maximize customer payback value and maintain optimal life cycle value
- Marketing
- TA Services for I&C
- I&C "Red Flag Review" process
- Performance Guarantees
- Refurb / upgrade parts & services warranty
- Full wrap warranty
- MYA Proposal
- Warranty management
- Long Term customer relationship and relationship management team / process

- Link to resell unit market and sellers
- Better buyback negotiation position as broker
- Deep relationships with owners and operators of LM equipment and Power Generation industry leaders
- Willingness to hold packages in inventory
- Tight linkage to potential projects / potential buyers focused only on "grey market" units due to project economics
- Resources with deep LM equipment knowledge

Presentation Title | Confidential. Not to be copied, distributed, or reproduced without prior approval. | [DateTime]   6

Alta App.000471

GE CONFIDENTIAL

GEALTA_0044930

# Business overview



Co-founded in 2012 by Patrick Jenevein and Jay Manning to develop a transformer leasing business model and other interests in the power generation industry.

**JAY C. MANNING**, CEO is a former GE Sales Executive and VP of Stewart & Stevenson, primarily focusing on the sale of gas turbines and gas turbine services around the world

**PATRICK JENEVEIN**, WattStock Co-Founder is an IPP developer of gas fueled power plants, wind farms, and biomass applications for over 30 years. Patrick is the general partner in the second largest wind turbine blade manufacturing company in the world located in China. The Chinese company AVIC is the other partner in the blade manufacturing company. Patrick developed the first power project in China with a PPA.

**PETE WATSON**, WattStock "Aero CPO" Program Manager: Pete led the Stewart & Stevenson gas turbine services business for over 25 years until GE purchased the Gas Turbine Division of Stewart & Stevenson in 1998 Pete left GE in 2000 and has worked for TransCanada Turbines, Wood Group, ProEnergy and Chromalloy

## Services



Using new, adaptable designs for Large Power Transformers (LPTs), WattStock leverages an optimized pool of assets across different market applications and temporary demand spikes. This statistically scaled and continually flexible optimization strategy enables users and lessees to mitigate substantial and hard-to-manage risks in a cost competitive approach while also providing additional upside through improving insurance risk strategy and facilitating additional flexibility for end of plant life and early failure scenarios.

## Operating Environment



Large Power Transformers (LPTs) rank as one of the most critical at risk components of North America's aging electrical infrastructure. LPTs boost voltages of electricity to facilitate efficient transmission over long distances. As electricity nears end-use, transmission and distribution transformers reduce voltages to make electricity suitable for consumption.

## Approach

WattStock maintains a nationally distributed inventory of highly adaptable spare Large Power Transformers (LPTs) available to customers through subscription, lease or sale agreements.

WattStock's inventory programs, paired with proprietary failure prediction projections and flexible transformer designs, help transmission and power plant owners mitigate risks of failures, increase reliability and improve resiliency.



Presentation Title      Confidential. Not to be copied, distributed, or reproduced without prior approval.      [DateTime]   7

Alta App.000472

# Aero "Certified Pre-Owned" Package Program



## Internal Talking Points:

1. GE Power, Power Services - Aero Product Line has entered into a Memorandum of Understanding (MoU) with WattStocck LLC for the acquisition, refurbishment, upgrade, and resell of surplus and/or used GE LM Aeroderivative Power Generation Equipment.

2. The intent of the MoU is to establish working guidelines between GE and WattStock regarding the identification of projects for the acquisition, refurbishment, upgrade and resell of GE Aeroderivative Power Generation Packages.

3. GE and WattStock will work independently and/or collective to identify projects best suited for used and/or surplus Aeroderivative equipment. Examples of target projects for used and/or surplus equipment would be Cross Fleet repower projects such as GE Frame 5, Frame 6 to LM repowers. oOEM Repowers such as FT4/FT8 to LM repowers

4. When equipment is identified for purchase WattStock will pursue the purchase of the equipment from the seller into WattStock inventory. WattStock and GE will work together to determine best purchase price of equipment, with GE providing a proposal to WattStock for the purchase of the LM Gas Turbine from the purchased packaged equipment.

5. For the refurbishment of the LM package equipment, GE and WattStock will work together to identify the extent of the scope of work to be performed.

6. In general, WattStock will provide all labor and supervision to complete the agreed upon scope. GE will sale to WattStock all parts, systems, required gas turbines, and engineering services required to complete the refurbishment scope. Additionally, GE and WattStock will agree upon the scope of upgrades that will be required to maximize the value of the equipment to the buyer. GE will sale to WattStock the agreed upon upgrade scope.

7. In all cases once a project opportunity is identified as a candidate for repower with used and/or surplus equipment a joint RO call will be conducted between GE and WatGtock to determine commercial lead and quoting strategy. The GE Sales/Account Manager will open a SFDC opportunity for tracking / pacing purposes and will be involved regardless of commercial lead to help maintain the GE relationship with the end customer.

8. All sales opportunities will follow the standard GE ITO processes, tollgates, and necessary deal reviews related to the GE scope identified

9. Logistics & Transportation: In general WattStock will supply decommissioning and removal of purchased equipment, and will provide logistics and transportation of equipment to the location tc be used for refurbishment and upgrades. Additionally, WattStock will provide logistics and transportation to site of refurbished equipment.

10. Installation & Commissioning: In general, WattStock will supply I&C supervision, GE will quote TA Services.

11. Warranty & Performance Guarantees: GE will provide new engine warranty and performance guarantees. Standard warranty as well as terms and conditions will apply upon review of the scope.



Presentation file         Confidential, not to be copied, distributed, or reproduced without prior approval.         [DateTime]   8



Alta App.000473

GE CONFIDENTIAL

# Aero "Certified Pre-Owned" Package Program



**External Talking Points:**

1. GE remains committed to helping customers maximize the value of their Aeroderivative Gas Turbine Power Generation equipment. Whether that is through providing world class OEM service support, upgrading to address obsolescence, meet new regulatory needs, or to increase or create new revenue generating opportunities.
2. One of the goals of GE is to work with owners, operators, and asset managers to continue to keep LM Aeroderivative Power Generation units relevant and operating in the various power and industrial markets throughout the world.
3. Recently GE Power - Power Services and WattStock, LLC have developed a Memorandum of Understanding (MoU) establishing working guidelines around the acquisition, refurbishment, upgrade, and redeployment of surplus and/or used LM Power Generation units to meet the ever changing market needs, in a reliable and cost effective way
4. This MoU aims at utilizing surplus and/or used LM Power Generation units and developing fully warrantied, "Certified Pre-Owned", Power Generation packages with full performance guarantees from GE Power and WattStock LLC.
5. WattStock LLC can provide full turnkey project management and labor from decommissioning, equipment removal, refurbishment, relocation, and installation commissioning management.
6. As the original OEM of the LM power generation packages GE Power is in a unique position to provide fully engineered systems to address equipment obsolescence and to provide upgrades as well as digital solutions that maximize your return on investment at the lowest life cycle cost possible.



Presentation Title    Confidential. Not to be copied, distributed, or reproduced without prior approval.    [DateTime]    9

Alta App.000474



Alta App.000475

GEALTA_0044934

# Exhibit 63

Alta App.000476

Message

___

**From:**        j.manning@wattstock.com [j.manning@wattstock.com]
**Sent:**        8/14/2019 4:43:51 PM
**To:**          Herrington, Lance R (GE Power) [lance.herrington@ge.com]
**Subject:**     EXT: CONFIDENTIAL

Lance, DB did not accept the letter as it "does not offer the contractual protection we were seeking". See email string below.
Please think about how we may approach this differently and not trigger a GE reaction that will harm our relationship.
Call me when you have time to digest this.
Thanks,
Jay

**From:** Matthew Laterza [mailto:mlaterza@altapowerdev.com]
**Sent:** Tuesday, August 13, 2019 2:55 PM
**To:** j.manning@wattstock.com
**Subject:** Fwd: Project Atom - Wattstock Underwriting Requirements


Get Outlook for iOS

___

**From:** Joshua Presner <joshua.presner@db.com>
**Sent:** Tuesday, August 13, 2019 2:54:09 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Cc:** Jeremy Eisman <jeremy.eisman@db.com>; Hadi Makkawi <hadi.makkawi@db.com>; Peter Dagher <peter.dagher@db.com>
**Subject:** Project Atom - Wattstock Underwriting Requirements

Matt,

Thanks for taking the time to discuss the GE/Wattstock relationship. We appreciate the letter provided by GE to Alta Power dated July 31st 2019. Unfortunately however, this does not offer the contractual protection we were seeking. I've spoken with my internal management and several members of our investment committee. Candidly, we will only be able to proceed with this transaction if GE is subject to an unconditional obligation to step into Wattstock's contract in the event of a Wattstock default. We are not asking GE to guarantee Wattstock, but rather have a fixed-price obligation to complete the all of refurbishment and equipment delivery obligations should Wattstock default. We suspect that this is something Wattstock will need to address more generally as they seek to present themselves as a bankable counterparty.

From a bankability perspective, we (and the rest of the financing market) fundamentally care about three primary criteria: (1) the experience and track record of the counterparty, (2) the financial strength of that counterparty and (3) the strength of the underlying documentation. While we understand that the individuals within Wattstock may be capable and experienced, that fact in and of itself is not sufficient for bankability. Wattstock as a company lacks both an established track record and a creditworthy balance sheet. Even if we get comfortable with #3, we absolutely need the backing of a creditworthy entity with an institutional track record, which in this case is GE.

Additionally, we expect to see Wattstock warranties to Alta Power in line with that of new equipment. Regardless of whether or not there is a default, those warranties will need to effectively be 'pass-throughs.' In other words, they will need to match the warranties provided to Wattstock from GE and will need to be fully assignable to Alta Power.

Let me know if you have any questions.



2215

Alta App.000477

Thanks,
Josh



**Joshua Presner** | Global Credit Trading | Transportation, Infrastructure & Energy
60 Wall Street, New York | +1 (212) 250 1903 | joshua.presner@db.com

---

This communication may contain confidential and/or privileged information. If you are not the intended recipient (or have received this communication in error) please notify the sender immediately and destroy this communication. Any unauthorized copying, disclosure or distribution of the material in this communication is strictly forbidden.

Please refer to https://db.com/disclosures for additional EU corporate and regulatory disclosures.

Deutsche Bank does not render legal or tax advice, and the information contained in this communication should not be regarded as such.

Alta App.000478

# Exhibit 64

Alta App.000479



**Deutsche Bank**

Deutsche Bank Securities Inc.
60 Wall Street
New York, NY 10005

**PERSONAL AND CONFIDENTIAL**

Alta Power LLC
4605 Post Oak Place Dr., Suite 270
Houston, Texas 77027
Attention: William C. Phelps – CEO
　　　　　 Matthew E. Laterza – CFO



EXHIBIT

2303

June 20, 2019

Ladies and Gentlemen:

Pursuant to this engagement letter (this "**Engagement Letter**") Alta Power LLC (the "**Sponsor**") hereby engages Deutsche Bank Securities Inc. and/or one or more of its affiliates ("**DBSI**" or "**we**") to structure and arrange a senior secured credit facility (the "**Facility**"), to be provided to a bankruptcy-remote special purpose entity to be formed, owned and controlled by the Sponsor (the "**Company**"), to finance the development and construction of 450 MW of natural gas fired peaking power plants in the ERCOT region of Texas (the "**Project**").

Please note that this Engagement Letter does not constitute a commitment by DBSI to provide any financing (including the Facility) to the Company, nor does it constitute an offer to underwrite, sell or arrange securities, loans or commitments to provide loans or any financing of any kind, but is a framework upon which the documentation for the transactions described herein may be structured and is the basis for further discussion and negotiation of the terms as may be appropriate. This Engagement Letter does not present all of the terms, conditions, covenants, representations, warranties and other provisions, which will be contained in the definitive legal documentation for the transactions described hereby. Those matters that are not covered or made clear in this Engagement Letter are subject to mutual agreement of the parties. Any transaction will be subject to, among other things, satisfactory due diligence, final credit approval, documents, filings and opinions acceptable to counsel and the execution of mutually acceptable definitive documentation. Any commitment issued by DBSI will be made in writing and signed by two officers of DBSI following our satisfaction in form and scope with a due diligence review of the business and contemplated investments of the Sponsor and the Company (including any other holder of equity in the Company). receipt of internal approvals by DBSI as well as other matters as we deem appropriate.

1. **Engagement of DBSI**

   The Sponsor hereby engages DBSI exclusively to act as the structuring bank, sole bookrunner and mandated lead arranger in connection with providing and syndicating the Facility and placing 100% of the commitments for a debt financing or debt securities issuance for the Project on terms to be mutually agreed between the Company and DBSI (the "**Transactions**"). DBSI will perform the duties and exercise the authority customarily performed and exercised by it in the foregoing roles.

Alta App.000480

Alta 0003328

**2. Conditions**

DBSI's obligation to act in each role described herein is made on the terms of this Engagement Letter and is subject to, among other things, satisfaction of the following conditions:

(a)  compliance by the Sponsor with the terms of this Engagement Letter;

(b)  successful completion of know-your-customer due diligence and adoption of such by all relevant parties to DBSI's satisfaction, including without limitation obtaining any relevant anti-financial-crime compliance approval;

(c)  a financial structure and a security package being in place (including a comprehensive risk mitigation structure), in each case satisfactory to DBSI;

(d)  the outcome of financial, tax, environmental, regulatory, technical, legal, credit and insurance due diligence in relation to the Project and the Transactions being in all respects satisfactory to DBSI;

(e)  satisfactory legal documentation for the Project, including without limitation, revenue and commodity hedge agreements, construction agreements, equipment supply agreements, fuel supply and energy management agreements, development services agreements, management, operating or similar agreements, ownership and equity agreements, ERCOT agreements, real property agreements, insurance policies and all other material documents for the Project;

(f)  the receipt by DBSI of internal credit committee and other required approvals with respect to the Transactions; and

(g)  satisfactory legal documentation for the Transactions.

**3. Material Adverse Change**

The obligations of DBSI under this Engagement Letter are further subject to the absence, in its reasonable determination made in good faith, of any event or circumstance (including any material adverse change or the continuation of any circumstance) which, except as set forth in Section 3(a) below, occurs after the date hereof, and has materially adversely affected:

(a)  the business, condition (financial or otherwise), operations, assets or prospects of the Company since the date as at which Sponsor's or Company's latest financial statements (consolidated, if applicable) were prepared and delivered to DBSI prior to the date hereof;

(b)  the ability of the Sponsor to perform its obligations under this Engagement Letter; and

(c)  the economic or technical viability of the Project, the Transactions or any material part thereof.

**4. Syndication and Placement Assistance**

In consultation with the Sponsor, DBSI may use commercially reasonable efforts to syndicate the commitments for the Facility at any time either prior to or after the closing date of the Facility. In this regard:

(a)   DBSI will, with the cooperation of the Sponsor, the Company and their affiliates, manage with reasonable diligence and in a commercially reasonable manner all aspects of the syndication of the Facility, including timing, the selection of potential lenders, the acceptance and allocation of commitments to such lenders.

(b)   The Sponsor shall, and shall cause the Company to, provide assistance in the marketing relating to the syndication of the Facility as DBSI may reasonably request. Such assistance shall include:

   (i)    commercially reasonable efforts to ensure that syndication and placement efforts benefit from any existing lending relationship with banks or financial institutions;

   (ii)   direct contact between potential lenders under the Facility and senior management of the Sponsor and the Company;

   (iii)  relevant updates to diligence and credit materials;

   (iv)   attendance and presentations by senior management of the Sponsor and the Company at meetings with one or more banks or other financial institutions;

   (v)    support and provision of company information related to the marketing for the financing of the Transactions; and

   (vi)   satisfactory provision of all documentation required under applicable know-your-customer and anti-money laundering rules and regulations.

## 5.   Clear Market

To ensure an orderly and effective syndication of the Facility, during the period from the date of this Engagement Letter through the first to occur of (a) the termination of this Engagement Letter in accordance with Section 15 hereof and (b) the date that is 180 days following the financial closing of the Facility, the Sponsor shall not, and shall not permit any of its affiliates, announce, enter into discussions to raise, raise or attempt to raise any alternative financing in respect of debt financing in respect of power generation facilities in the United States, excluding any Other Financing. As used herein, the term **"Other Financing"** means any mezzanine or subordinated debt financing or any equity financing (including preferred equity interests, convertible notes or other equity securities of any kind).

## 6.   Information

The Sponsor will furnish, or cause to be furnished, to DBSI all financial and other information concerning the Project as DBSI deems appropriate in connection with the potential Transactions contemplated by this Engagement Letter and in that connection will provide DBSI with access to the officers, directors, employees, accountants, counsel and other representatives of the Sponsor and its affiliates (including the Company). The Sponsor acknowledges and confirms that DBSI (i) will rely on such information in connection with the potential Transactions contemplated by this Engagement Letter without assuming any responsibility for independent investigation or verification thereof, (ii) assumes no responsibility for the accuracy or completeness of such information or any other information regarding the Sponsor, any of its affiliates or the Project, and (iii) will not make any appraisal of any

assets of the Sponsor or its affiliates (including, for the avoidance of doubt, any assets that comprise the Project).

The Sponsor (on its behalf and on behalf of its affiliates) represents, warrants and covenants that (i) all information (the "**Company Information**") which has been or is hereafter made available to DBSI by or on behalf of the Sponsor or any of its affiliates or any of their representatives in connection with the Transactions contemplated hereby, taken as a whole, is and, in the case of Company Information made available after the date hereof, will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in light of the circumstances under which such statements are made at the time such statements were or are made after giving effect to any supplement thereto and (ii) the execution and delivery of this Engagement Letter and each other instrument to be delivered or contemplated to be executed and delivered by the Sponsor or any of its affiliates in connection herewith and the performance of the Sponsor's or any of its affiliates' obligations hereunder and thereunder does not and will not violate or conflict with any contract, agreement, undertaking or other document to which the Sponsor or any of its affiliates is a party or by which the Sponsor or any of its affiliates or their properties or assets are bound.

The Sponsor (on its behalf and on behalf of its affiliates) hereby further represents that (i) all historical financial data provided to DBSI will be prepared in accordance with generally accepted accounting principles and practices then in effect in the United States and will fairly present in all material respects the financial condition and operations of the entities and businesses covered thereby and (ii) any projections, financial or otherwise, provided to DBSI will be prepared in good faith with a reasonable basis at the time prepared for the assumptions and the conclusions reached therein and on a basis consistent with the historical financial data of the entities and businesses covered thereby (it being understood that such projections are subject to significant uncertainties and contingencies, many of which are beyond control of the Company or the Sponsor, actual results during the periods covered thereby may differ from the projected results, and that no assurance can be given that the projections will be realized). If at any time prior to the closing date of each Transaction any event in which the Sponsor or the Company are aware occurs, as a result of which the Company Information (as then supplemented or amended) would include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, the Sponsor will, and will cause the Company to, promptly notify DBSI of such event and the Sponsor shall, or shall cause the Company to, prepare a supplement or amendment to the Company Information which corrects such statement(s) or omission(s).

## 7. Matters Relating to Engagement

The Sponsor (on its behalf and on behalf of the Company) acknowledges that DBSI has been retained pursuant to this Engagement Letter solely in connection with the potential Transactions contemplated by this Engagement Letter. DBSI acknowledges that, except as set forth in this Engagement Letter and any other written agreement amongst DBSI, the Sponsor and the Company, neither Sponsor nor Company has any obligation to DBSI on any other matter or transaction. In pursuing the Transactions, DBSI shall act as an independent contractor, and any duties of DBSI arising out of its engagement hereunder shall be owed solely to the Company. In connection with any offering of securities, the Sponsor (on its behalf and on behalf of its affiliates, including the Company) acknowledges that DBSI is engaged in securities trading and brokerage activities, as well as the provision of investment banking and financial advisory services. In the ordinary course of trading and brokerage activities, DBSI and its affiliates may at any time hold long or short positions, and may trade or otherwise effect transactions, for their own account or the accounts of customers, in debt or equity securities of entities that may be involved in the transactions contemplated hereby.

The Sponsor (on its behalf and on behalf of its affiliates, including the Company) acknowledges and agrees that DBSI is not, and does not hold itself out to be, an advisor as to legal, tax or accounting matters in any jurisdiction. The Sponsor shall, and shall cause the Company to, consult with their own advisors concerning such matters and shall be responsible for making their own independent investigation and appraisal of the risks, benefits and suitability of the transactions contemplated by this Engagement Letter, and DBSI shall have no responsibility or liability to the Sponsor, the Company or any other party with respect thereto. The Sponsor (on its behalf and on behalf of its affiliates, including the Company) further acknowledges and agrees that:

(a)    DBSI has been engaged solely to act as a counterparty with respect to the Transactions and that no fiduciary, advisory or agency relationship between the Sponsor or any of its affiliates (including the Company), on the one hand, and DBSI, on the other hand, has been created in respect of any of the transactions contemplated by this Engagement Letter, irrespective of whether DBSI, or any of its affiliates, has advised or is advising the Sponsor or any of its affiliates (including the Company) on other matters;

(b)    the Sponsor and the Company have been advised that DBSI and its affiliates are engaged in a broad range of transactions which may involve interests that differ from those of the Sponsor and the Company and that DBSI has no obligation to disclose such interests and transactions to the Sponsor or the Company by virtue of any fiduciary, advisory or agency relationship; and

(c)    each of the Sponsor and the Company waives, to the fullest extent permitted by law, any claims it may have against DBSI for breach of fiduciary duty or alleged breach of fiduciary duty and agrees that DBSI shall have no liability (whether direct or indirect) to the Sponsor, the Company or any other party in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of the Sponsor or the Company, including stockholders, employees or creditors of the Sponsor or the Company.

## 8.   Use of Name

The Sponsor (on its behalf and on behalf of its affiliates, including the Company) agrees that any references to DBSI or any of its affiliates made in connection with the Transactions and any published references to DBSI, or any affiliate thereof, made in connection with the Transactions are subject to DBSI's prior written approval other than any such reference required to be disclosed in accordance with applicable laws and regulations. DBSI agrees that any references to Sponsor, Company or a parent company made in connection with the Transactions are subject to Sponsor's prior written approval other than any such reference required to be disclosed in accordance with applicable laws and regulations. Sponsor acknowledges that after consummation of the Transactions, DBSI may place advertisements in financial and other newspapers and periodicals or on a home page or similar place for dissemination of information on the Internet or worldwide web, and circulate similar promotional materials after the closing date of each of the Transactions, in the form of a "tombstone" listing the names of the Sponsor and the Company and the publicly disclosed Transaction details, all at the expense of DBSI.

## 9.   Additional Services

The Sponsor (on its behalf and on behalf of the Company) further understands and agrees that if DBSI is asked to act for the Sponsor or the Company in any other formal additional capacity relating to this engagement but not specifically addressed in this Engagement Letter, such activities shall constitute separate engagements and the terms of any such additional engagements will be embodied in one or more separate written agreements containing terms and conditions to be mutually agreed upon,

Alta-0003332

including, without limitation, appropriate indemnification provisions. The indemnity provisions in this Engagement Letter and such other written agreements shall remain in full force and effect regardless of any completion, modification or termination of this engagement.

## 10. Exclusivity

(a) The roles described in Section 1 hereof are exclusively assigned to DBSI. The Sponsor (on its behalf and on behalf of the Company) hereby agrees that during the Exclusivity Period, none of the Sponsor or the Company, nor the Sponsor's or the Company's affiliates or agents on their behalf, will directly or indirectly, (a) initiate, solicit, accept or enter into any mandate letter, memorandum of understanding or other agreement or arrangement, or furnish any information relating to, or conduct discussions or negotiations regarding, any inquiry, proposal or offer by any person other than DBSI or its affiliates for any debt financing for the Project or similar transaction, excluding any Other Financing (a "**Competing Proposal**"), (b) award any other titles or pay any other compensation in connection with the Transactions to any other person (except as expressly provided in this Engagement Letter), (c) offer, sell, contract to sell or otherwise dispose of any debt instruments that are structured as term financing that is either rated or unrated and secured by or representing a direct or indirect interest in all or any portion of the Project, other than in connection with any Other Financing, or (d) assist or cooperate with any other person not affiliated with DBSI to accomplish any of the foregoing, other than in connection with any Other Financing. Furthermore, the Sponsor agrees to immediately cease, and cause its affiliates to cease and refrain from, any existing discussions or negotiations (if any) with any parties not affiliated with DBSI conducted heretofore with respect to any such Competing Proposal. For purposes of this Engagement Letter, "**Exclusivity Period**" means the period commencing on the date of this Engagement Letter and ending on the termination of DBSI's engagement hereunder (pursuant to Section 15 hereof).

(b) The Sponsor (on its behalf and on behalf of the Company) hereby agrees that during the period commencing on the date of this Engagement Letter until the later of (i) 18 months from the closing date of the Facility or (ii) 90 days following the completion of the ERCOT Full Interconnection Studies for next 1000 MW of natural gas fired peaking power plants in ERCOT developed by the Sponsor or its affiliates (the "**Follow-On Projects,**" and the period of time described above in this Section 10(b), the "**Extended Exclusivity Period**"), except as otherwise provided herein, none of the Sponsor or the Company, nor the Sponsor's or the Company's affiliates or agents on their behalf, will directly or indirectly, (a) initiate, solicit, accept or enter into any mandate letter, memorandum of understanding or other agreement or arrangement, or furnish any information relating to, or conduct discussions or negotiations regarding the financing of, subsequent to the Project, the Follow-On Projects (other than in connection with any Other Financing), (b) award any other titles or pay any other compensation in connection with the financing of any Follow-On Projects to any other person (other than in connection with any Other Financing), or (c) assist or cooperate with any other person not affiliated with DBSI to accomplish any of the foregoing (other than in connection with any Other Financing). Furthermore, the Sponsor agrees to immediately cease, and cause its affiliates to cease and refrain from, any existing discussions or negotiations (if any) with any parties not affiliated with DBSI conducted heretofore with respect to any such Follow-On Projects financing proposals (other than in connection with any Other Financing). Notwithstanding the foregoing, if DBSI's proposed debt sizing or pricing terms (the "**Specified Financing Terms**") for any Follow-On Project are materially different from the Specified Financing Terms of the initial Facility, the Sponsor or the Company may initiate, solicit, accept or enter into any memorandum of understanding or other agreement or arrangement, or furnish any information relating to, or conduct discussions or negotiations regarding the financing of, subsequent to the Project, the Follow-On Projects; provided however, that DBSI shall have the right of first refusal to undertake any arrangement or placement on the same terms and conditions as those offered by any third party to the Sponsor or the Company with respect to any Follow-On Project (the "**ROFR**").

## 11. Fees and Expenses

As compensation to DBSI for its work in structuring and arranging the potential Transactions hereunder, the Sponsor agrees to pay, or cause the Company to pay, DBSI the fees and expenses set forth herein and as may be further documented in one or more fee letters to be entered into among DBSI, the Company and the Sponsor (the "**Fee Letter**").

The Sponsor will directly pay all of DBSI's documented third party expenses incurred in connection with its activities hereunder (including, without limitation, any potential syndication of the Facility and the fees and disbursements of its legal counsel and of any other advisors retained by DBSI), in each case resulting from or arising out of this engagement and whether or not any of the Transactions are consummated.

For the avoidance of doubt, DBSI shall direct its legal counsel and other advisors to directly bill the Sponsor, and the Sponsor shall be obligated to pay such documented fees and expenses. Additionally, the Sponsor shall be obligated to pay all documented third party fees, expenses and disbursements related to the Transactions (including fees, costs and expenses of the independent engineer, commercial advisor, insurance consultant and market consultant for DBSI and each other lender for the Transaction (collectively, the "**Technical Advisors**") and DBSI shall in no way be obligated to pay such fees, expenses and disbursements.

The Sponsor (on its behalf and on behalf of the Company) agrees that, once paid, the fees or any part thereof payable hereunder or under the Fee Letter shall not be refundable under any circumstances, regardless of whether the Transactions are consummated. All amounts payable hereunder shall be payable in U.S. Dollars (unless otherwise expressly provided herein) in New York. Each of the Sponsor and the Company agrees that any and all payments hereunder or under the Fee Letter shall (i) be made in immediately available funds, (ii) be made free and clear of any taxes and withholdings, and (iii) not be subject to counterclaim or set-off for, or be otherwise affected by any claim or dispute relating to, any other matter. Any payment, reimbursement, indemnification and other obligation of the Sponsor or the Company under this Engagement Letter shall be an obligation of the Company.

## 12. Indemnification

Since DBSI will be acting on behalf of the Sponsor and the Company in connection with its engagement hereunder, each of the Sponsor and the Company hereby agrees to the indemnification obligations set forth in Annex A hereto (the "**Indemnification Annex**"), providing for the indemnification by each of the Sponsor and the Company of DBSI and certain related persons and entities, which is incorporated herein and made part of this Engagement Letter.

## 13. Confidentiality

Each party hereto agrees that it will not and will cause its affiliates not to disclose this Engagement Letter, the contents hereof (including the Indemnification Annex) or the activities of either party pursuant hereto to any person without the prior written approval of the other party hereto, except that each such party may disclose this Engagement Letter and the contents hereof (a) to its affiliates, officers, employees, agents and legal advisors who are directly involved in the consideration of this matter (and then only on a confidential "need to know" basis), (b) as required by applicable law or compulsory legal process (in which case such party agrees to inform the other party, to the extent not prohibited from doing so, promptly thereof prior to any such disclosure), and (c) as requested by any governmental, regulatory or self-regulatory authority having appropriate jurisdiction (in which case

such party agrees to inform the other party, to the extent not prohibited from doing so, promptly thereof prior to any such disclosure).

## 14. Public Announcements

Public announcements by any party regarding the Transactions shall require the mutual written agreement of both parties and are otherwise subject to the terms set forth in <u>Section 8</u> of this Engagement Letter.

## 15. Termination; Survivability

The engagement of DBSI hereunder will be effective as of the date hereof and will terminate on the earlier of (a) the Extended Exclusivity Period, (b) the time at which the discussions and negotiations with respect to the Transactions have been terminated in writing by DBSI (provided, that the parties may extend the Term by mutual written agreement), (c) at any time DBSI provides notice to Sponsor that it does not expect to obtain internal credit approval for the Transactions for the Facility or any Follow-On Projects, or (d) at the option of the Sponsor and the Company after the closing of an initial Facility and prior to the end of the Extended Exclusivity Period, if the Specified Financing Terms for any Follow-On Project are materially different from the Specified Financing Terms of the initial Facility, <u>provided</u> the Sponsor or the Company have first approached DBSI with any ROFR and DBSI has declined to finance the applicable Follow-On Project pursuant to the terms and conditions set forth in such ROFR.

DBSI will be entitled to a fee of $4,950,000 (the **"Termination Fee"**) if (a) the Sponsor or the Company breaches its obligations set forth in <u>Section 10</u> hereof or (b) (i) this Engagement Letter is terminated by Sponsor for any reason other than a breach of the terms of this Engagement Letter by DBSI and (ii) at any time prior to the expiration of 12 months after any such termination, the Sponsor or the Company consummates any Transaction or any transaction substantially similar to the Transactions contemplated herein with another financial institution.

No termination of DBSI's engagement hereunder shall affect (i) each of the Sponsor's and the Company's obligation to reimburse DBSI for expenses as provided in <u>Section 11</u> hereof, (ii) each of the Sponsor's and the Company's indemnification obligations under the Indemnification Annex, or (iii) <u>Sections 8</u>, <u>12</u>, <u>13</u>, <u>14</u>, <u>15</u>, <u>17</u>, <u>19</u> and <u>20</u> hereof.

## 16. Scope of Agreement

Nothing in this Engagement Letter, expressed or implied, is intended to confer or does confer on any person or entity other than the parties hereto or their respective successors and assigns, and to the extent expressly set forth herein, the Indemnified Persons (as defined in the Indemnification Annex), any rights or remedies under or by reason of this Engagement Letter or as a result of DBSI's role hereunder. The Sponsor (on its behalf and on behalf of the Company) further agrees that neither DBSI nor any of its controlling persons, affiliates, directors, officers, employees or agents shall have any liability to the Sponsor or the Company for any losses, claims, damages, liabilities or expenses except to the extent that it shall be determined in a final non-appealable judgment by a court or arbitral tribunal of competent jurisdiction that any losses, claims, damages, liabilities or expenses incurred by the Sponsor or the Company resulted solely from the gross negligence or willful misconduct of DBSI or any of its affiliates, directors, officers, agents, employees or controlling persons in performing their roles under this Engagement Letter.

### 17. Enforceability

The invalidity or unenforceability of any provision of this Engagement Letter shall not affect the validity or enforceability of any other provisions of this Engagement Letter, which shall remain in full force and effect.

### 18. No Derivative Rights

The Sponsor (on its behalf and on behalf of the Company) acknowledges and agrees that DBSI has been engaged hereunder only by the Sponsor, for its behalf and on behalf of the Company, and that the Sponsor's and the Company's engagement of DBSI is not deemed to be on behalf of, and is not intended to confer rights upon, any shareholder or other direct or indirect owner or affiliate of the Sponsor or the Company, or any other person not a party hereto, as against any of DBSI or any of its affiliates or the respective directors, officers, employees, agents and representatives of DBSI or its affiliates. Unless otherwise expressly agreed, no one other than the Sponsor or the Company is authorized to rely on the Sponsor's or the Company's engagement of DBSI or any statements, advice, opinions or conduct of DBSI.

### 19. Governing Law and Submission to Jurisdiction

This Engagement Letter shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws (except for Sections 5-1401 and 5-1402 of the New York General Obligations Law). EACH PARTY HERETO IRREVOCABLY AGREES TO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS ENGAGEMENT LETTER OR DBSI'S ROLE HEREUNDER.

Each party hereto irrevocably and unconditionally submits to the exclusive jurisdiction of any state or federal court sitting in the County of New York over any suit, action or proceeding arising out of or relating to this Engagement Letter. Service of any process, summons, notice or document by registered mail addressed to either party shall be effective service of process against such person for any suit, action or proceeding brought in any such court. Each party hereto irrevocably and unconditionally waives any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any such court and any claim that any such suit, action or proceeding has been brought in an inconvenient forum. A final judgment in any such suit, action or proceeding brought in any such court may be enforced in any other courts to whose jurisdiction any party hereto is or may be subject, by suit upon judgment.

### 20. Miscellaneous

This Engagement Letter may not be assigned by the either party without the prior written consent of the other party (and any purported assignment without such consent will be null and void). This Engagement Letter (including the Indemnification Annex) may not be amended or any term or provision hereof waived or modified except by an instrument in writing signed by each of the parties hereto, and any term or provision hereof or thereof may be amended or waived only by a written agreement executed and delivered by all parties hereto.

This Engagement Letter may be executed in any number of counterparts, each of which when executed will be an original, and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of a signature page of this Engagement Letter by facsimile transmission or electronic transmission (in pdf format) will be effective as delivery of a manually executed counterpart

hereof. This Engagement Letter and the Indemnity Letter are the only agreements that have been entered into among the parties hereto with respect to the engagement described herein and set forth the entire understanding of the parties with respect thereto and supersede any prior written or oral agreements among the parties hereto with respect to the engagement described herein.

### 21. Patriot Act

DBSI hereby notifies the Sponsor that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001, as amended) (the **"PATRIOT Act"**), DBSI is required to obtain, verify and record information that identifies certain counterparties and their affiliates, which information includes the name, address, tax identification number and other information regarding them that will allow DBSI to identify such parties and their affiliates in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act.

*[Signature page immediately follows]*

Please confirm that the foregoing is in accordance with your understanding of this engagement by signing and returning to DBSI a copy of this Engagement Letter on or before the close of business on the date that is two business days after the date first written above, whereupon this Engagement Letter shall constitute a binding agreement as of the date first written above. We look forward to working with you on this matter.

DEUTSCHE BANK SECURITIES INC.

By: _____
Name: Jeremy Eisman
Title: Managing Director

By: _____
Name: Vilas Kuchinad
Title: Director

ACCEPTED AND AGREED:

Alta Power LLC

By: _____
Name: Matthew Lateiza
Title: CFO

Annex A

## Indemnification

In further consideration of the agreements contained in the Engagement Letter (the "**engagement**"), in the event that DBSI or any of its affiliates, the respective directors, officers, partners, agents or employees of DBSI or any of its affiliates, or any other person controlling DBSI (collectively, "**Indemnified Persons**") becomes involved in any capacity in any action, claim, suit, investigation or proceeding, actual or threatened, brought by or against any person, including stockholders of the Sponsor or the Company in connection with or as a result of the engagement or any matter referred to in the engagement, each of the Sponsor and the Company will reimburse such Indemnified Person for its reasonable and customary legal and other out-of-pocket and documented expenses (including without limitation the costs and expenses incurred in connection with investigating, preparing for and responding to third party subpoenas or enforcing the engagement) incurred in connection therewith as such expenses are invoiced to the Sponsor or the Company. Each of the Sponsor and the Company will also indemnify and hold harmless any Indemnified Person from and against, and each of the Sponsor and the Company agrees that no Indemnified Person shall have any liability to the Sponsor or the Company or their respective owners, parents, affiliates, security holders or creditors for, any losses, claims, damages or liabilities (including actions or proceedings in respect thereof) (collectively, "**Losses**") (A) related to or arising out of (i) the Sponsor's or the Company's actions or failures to act (including statements or omissions made or information provided by the Sponsor or the Company or their respective agents) or (ii) actions or failures to act by an Indemnified Person with the Sponsor's or the Company's consent or in reliance on the Sponsor's or the Company's actions or failures to act or (B) otherwise related to or arising out of the engagement or DBSI's performance thereof, except that this clause (B) shall not apply to any Losses (the "**Excluded Losses**") that are determined in a final non-appealable judgment by a court or arbitral tribunal of competent jurisdiction to have resulted solely from the willful misconduct or gross negligence of such Indemnified Person. If such indemnification is for any reason not available or insufficient to hold an Indemnified Person harmless, each of the Sponsor and the Company agrees to contribute to the Losses involved in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Sponsor or the Company, on the one hand, and by DBSI, on the other hand, with respect to the engagement or, if such allocation is determined in a final non-appealable judgment by a court or arbitral tribunal of competent jurisdiction to be unavailable, in such proportion as is appropriate to reflect other equitable considerations such as the relative fault of the Sponsor or the Company on the one hand and of DBSI on the other hand; provided, however, that the Indemnified Persons shall not be responsible for amounts which in the aggregate are in excess of the amount of all fees actually received by DBSI from the Sponsor or the Company in connection with the engagement. Relative benefits to the Sponsor or the Company, on the one hand, and DBSI, on the other hand, with respect to the engagement shall be deemed to be in the same proportion as (i) the total value paid or proposed to be paid or received or proposed to be received by the Sponsor or the Company or their respective security holders, as the case may be, pursuant to the transaction(s), whether or not consummated, contemplated by the engagement, bears to (ii) all fees actually received by DBSI in connection with the engagement.

Each of the Sponsor and the Company will not, without DBSI's prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding in respect of which indemnification may be sought hereunder (whether or not any Indemnified Person is a party thereto) unless such settlement, compromise, consent or termination includes a release of each Indemnified Person from any liabilities arising out of such action, claim, suit, investigation or proceeding. Each of the Sponsor and the Company will not permit any such settlement, compromise, consent or termination to include a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of an Indemnified Person, without such Indemnified Person's prior written consent. No Indemnified Person seeking indemnification, reimbursement or contribution under this

Alta 0003339

agreement will, without the Sponsor or the Company's prior written consent, settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate any action, claim, suit, investigation or proceeding referred to herein.

Each of the Sponsor and the Company agrees that neither DBSI nor any of its affiliates, directors, agents, employees or controlling persons shall have any liability to the Sponsor or the Company or any person asserting claims on behalf of or in right of the Sponsor or the Company in connection with or as a result of either the engagement or any matter referred to therein, including, without limitation, related services and activities prior to the date of the engagement, except to the extent that it shall be determined in a final non-appealable judgment by a court or arbitral tribunal of competent jurisdiction that any losses, claims, damages, liabilities or expenses incurred by the Sponsor or the Company resulted solely from the gross negligence or willful misconduct of DBSI or any of its affiliates, directors, agents, employees or controlling persons in performing their roles under the engagement. Each of the Sponsor's and the Company's obligations hereunder shall be in addition to any rights that any Indemnified Person may have at common law or otherwise. Each of the Sponsor and the Company acknowledges that in connection with the engagement DBSI is acting as an independent contractor and not in any other capacity with duties owing solely to the Company. This agreement and any other agreements relating to the engagement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws (except for Sections 5-1401 and 5-1402 of the New York General Obligations Law), applicable to contracts made and to be performed therein and, in connection therewith, the parties hereto consent to the exclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County or the United States District Court for the Southern District of New York and the respective appellate courts thereof. Notwithstanding the foregoing, solely for purposes of enforcing the Sponsor's or the Company's obligations hereunder, each of the Sponsor and the Company consents to personal jurisdiction, service and venue in any court proceeding in which any claim subject to this agreement is brought by or against any Indemnified Person. DBSI HEREBY AGREES, AND EACH OF THE SPONSOR AND THE COMPANY HEREBY AGREES ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS RESPECTIVE SECURITY HOLDERS, TO WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM, COUNTER-CLAIM OR ACTION ARISING OUT OF THE ENGAGEMENT OR DBSI'S PERFORMANCE THEREOF.

The provisions of this agreement shall apply to the engagement (including related activities prior to the date hereof) and any modification thereof and shall remain in full force and effect regardless of the completion or termination of the engagement. If any term, provision, covenant or restriction herein is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

Alta App.000492

# Exhibit 65

Alta App.000493

**To:** Robert Perkins[rperkins@altapowerdev.com]
**From:** William Phelps['O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=D246543C88FB4588BBB4A4C3E87A0C65-WPHELPS]
**Sent:** Thur 3/5/2020 8:48:56 AM Central Standard Time
**Subject:** Fwd: 150MW - Goodlow

Sent from my iPhone

Begin forwarded message:



> **From:** Josh Pandolfi <JPandolfi@starwood.com>
> **Date:** March 5, 2020 at 8:22:18 AM CST
> **To:** Matthew Laterza <mlaterza@altapowerdev.com>, Erich Bergmann <EBergmann@starwood.com>
> **Cc:** William Phelps <wphelps@altapowerdev.com>
> **Subject: RE: 150MW - Goodlow**

Matt, feel free to give me a call this morning, ==but we're not going to be able to spend time on this until everything is locked in (i.e. costs, LC needs, equity, etc.).==

**Josh Pandolfi**
Managing Director, Origination
Starwood Infrastructure Finance
(W) 203-487-8055 | (M) 203-312-4434

**From:** Matthew Laterza <mlaterza@altapowerdev.com>
**Sent:** Wednesday, March 4, 2020 11:41 PM
**To:** Josh Pandolfi <JPandolfi@starwood.com>; Erich Bergmann <EBergmann@starwood.com>
**Cc:** William Phelps <wphelps@altapowerdev.com>
**Subject:** 150MW - Goodlow
==EXTERNAL: Verify Sender/Links==
Josh & Erich,
Do you have some time Thursday morning to discuss upsizing the Goodlow project to 150MW?
We have always assumed that we would upsize the facility to add the third turbine sometime not long after closing on a 100MW financing - and have been working to refine the incremental project costs for that in parallel with the process for a 100MW configuration.
Running through the current numbers, the equity requirement for 100MW is almost the same as for 150MW due to economies of scale.
Furthermore, we have already identified and evaluated two potential LM6000 packages, either of which would be suitable for a third turbine option.
We don't want to materially delay closing, but if upsizing would not have a huge impact on timing we would like to discuss.
Let us know your availability.
Thanks,
Matt

IMPORTANT: The information contained in this e-mail message is confidential and is intended only for the named addressee(s). This message may be protected by the attorney/client privilege. If the reader of this e-mail message is not the intended recipient (or the individual responsible for the delivery of this e-mail message to the intended recipient), please be advised that any re-use, dissemination, distribution or copying of this e-mail message is prohibited. If you have received this e-mail message in error, please reply to the sender that you have received this e-mail message in error and then delete it. Starwood Capital Group's privacy policy can be found at the following: https://starwoodcapital.com/disclaimer/
Thank you.

**Alta App.000494** ALTA 0522308

# Exhibit 66

Alta App.000495

To: 'Josh Pandolfi'[JPandolfi@starwood.com]
From: Matthew Laterza[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8F6EED0B000C4E410C7E5DBD814 MLATERZA_86]
Sent: Thur 9/5/2019 10:48:49 AM Central Daylight Time
Subject: RE: ERCOT Peaker Project
Attachment: Alta Power 05302019.pdf
Attachment: 329599_Alta_Power_2_Peakers_IER_D1_20190830.pdf
Attachment: Alta Power Model - Phase I 09042019.xlsx

**EXHIBIT**
**2392**
PENGAD 800-631-6989

Josh,

Thanks for taking the time to speak this morning. As we discussed, attached are the model, slide deck, and draft IE report.

Let me know if you have any feedback or questions.

Thanks,
Matt

---

**From:** Josh Pandolfi <JPandolfi@starwood.com>
**Sent:** Thursday, September 5, 2019 10:07 AM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Subject:** RE: ERCOT Peaker Project

Matt, just tried you, but it never went to vm. Try my cell when free.

*Please note the new work # below

**Josh Pandolfi**
Managing Director, Origination
**Starwood Infrastructure Finance**
(W) 203-487-8055| (M) 203-312-4434

---

**From:** Matthew Laterza [mailto:mlaterza@altapowerdev.com]
**Sent:** Thursday, September 5, 2019 9:59 AM
**To:** Josh Pandolfi <JPandolfi@starwood.com>
**Subject:** Re: ERCOT Peaker Project

EXTERNAL: Verify Sender/Links

That works for me. You can call my office at 832-397-6039.

Thanks and look forward to speaking then.

Matt

---

**From:** Josh Pandolfi <JPandolfi@starwood.com>
**Sent:** Thursday, September 5, 2019 7:23 AM
**To:** Matthew Laterza
**Subject:** RE: ERCOT Peaker Project

Can I call you around 10 CT? I'm at a conference in Austin and have a break at that time. What's the best # to reach you?

*Please note the new work # below

**Josh Pandolfi**
Managing Director, Origination

**Starwood Infrastructure Finance**
(W) 203-487-8055| (M) 203-312-4434

---

**From:** Matthew Laterza [mailto:mlaterza@altapowerdev.com]
**Sent:** Wednesday, September 4, 2019 10:54 PM
**To:** Josh Pandolfi <JPandolfi@starwood.com>
**Subject:** Re: ERCOT Peaker Project

EXTERNAL: Verify Sender/Links

Josh,

No, we are developing similar projects, but with some key differences:

1) LM6000s overhauled by GE with the same OEM warranty and output/performance guarantees as a new turbine and a long term service agreement with an OEM authorized service provider;

2) Casey Industrial as EPC contractor (they've done 18 LM6000s in the US, along with countless other types of gas turbines and recips);

3) Firm gas transportation agreements with multiple delivery and receipt points for gas optimization;

4) NAES as O&M contractor.

These are quite a few other differences that I'd be happy to walk through with you on a call if there's interest on your part.

Matt

Get Outlook for iOS

---

**From:** Josh Pandolfi <JPandolfi@starwood.com>
**Sent:** Wednesday, September 4, 2019 9:49:12 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>

CONFIDENTIAL

Alta App.000496

Alta 00009904

**Subject:** Re: ERCOT Peaker Project

Matt, are these the Castleman assets?

Josh Pandolfi

Managing Director, Origination

Starwood Infrastructure Finance

203-312-4434

On Sep 4, 2019, at 9:13 PM, Matthew Laterza <mlaterza@altapowerdev.com> wrote:

**EXTERNAL: Verify Sender/Links**

Patrick,

Thanks for the intro. Moving you to BCC.

Josh,

As Patrick mentioned in his email we are looking for a debt solution for our ERCOT peaker projects. Let me know if this is something you might have interest in.

Matt

Get Outlook for iOS

---

**From:** Gimlett, Patrick <Patrick.Gimlett@alliancebernstein.com>

**Sent:** Wednesday, September 4, 2019 5:48:22 PM

**To:** Matthew Laterza <mlaterza@altapowerdev.com>

**Cc:** Josh Pandolfi <JPandolfi@starwood.com>

**Subject:** FW: ERCOT Peaker Project

Matt – It was nice to chat earlier. Copied to this email is Josh Pandolfi of Starwood. Josh specializes in the power finance world.

Josh – Per our quick conversation earlier, Matt is looking for debt capital solution. Below is a quick summary. I will leave you two to coordinate if it might be a fit for Starwood.

Regards,

Pat

**Patrick Gimlett**

Managing Director | AB Private Credit Investors

T +1 832 366 2055 M +1 302 463 6364

Patrick.Gimlett@AllianceBernstein.com

1000 Louisiana St, Suite 3600

Houston, TX 77002

alliancebernstein.com/go/abpci | LinkedIn

---

**From:** Matthew Laterza <mlaterza@altapowerdev.com>

**Sent:** Wednesday, September 04, 2019 4:17 PM

**To:** Gimlett, Patrick <Patrick.Gimlett@alliancebernstein.com>

**Subject:** ERCOT Peaker Project

Patrick,

Thanks so much for taking the time to speak with me earlier.

We are developing three natural gas fired peaking power plants in ERCOT (150 MW each for a total of 450 MW). Below is a brief summary of the project highlights:

- Plants will use grey market equipment refurbished by the OEM (GE) with warranty, output and performance guarantees from the OEM
- Turnkey EPC costs of ~$400 / kW vs. ~$950 / kW for newbuilds
- Contracted cash flows from a 5 year offtake contract with an investment grade counterparty plus ancillary services revenue from ERCOT covering a majority of project costs
- Plants will be capable of <10 min start and black start capable enabling participation in full range of ancillary services markets
- Total project costs of ~$200MM

We were expecting to close our unitranche facility this week or next and had received lender's credit committee tentative approval, but our lead bank (who was underwriting the entire transaction) had some internal institutional issues arise recently and they are currently on hold pending some kind of resolution. They've given us permission to speak with other financing sources. We need to move quickly if we are going to make the summer 2020 run in ERCOT. We're fairly ready to close on our side as we have an independent engineering report being delivered tomorrow, fully baked White & Case credit docs, W&C fully reviewed all major contracts and is finalizing their legal diligence report, etc.

Again, thank you so much for your time and help. I'd definitely like to buy you lunch sometime for helping out.

Thanks,

Matt Laterza

.............................................................

For further important information about AllianceBernstein please click here

http://www.alliancebernstein.com/disclaimer/email/disclaimer.html

IMPORTANT: The information contained in this e-mail message is confidential
and is intended only for the named addressee(s). This message may be protected
by the attorney/client privilege. If the reader of this e-mail message is not
the intended recipient (or the individual responsible for the delivery of this
e-mail message to the intended recipient), please be advised that any re-use,
dissemination, distribution or copying of this e-mail message is prohibited.
If you have received this e-mail message in error, please reply to the sender
that you have received this e-mail message in error and then delete it.
Starwood Capital Group's privacy policy can be found at the following:
https://starwoodcapital.com/disclaimer/
Thank you.



4605 Post Oak Place Dr. Suite 270, Houston, TX 77027

CONFIDENTIAL

Alta 0009907

Alta App.000499



# Executive Summary

➢ Development of natural gas fired peaking power plants in ERCOT (operator of the Texas power grid) to support continued expansion of renewable generation in Texas (~22% of total as of Dec 2018)

➢ Financial close for the first three sites is expected Q2 2019 (~$180MM total project cost) with commercial operations scheduled for Q2 2020 enabling participation in the 2020 summer run

➢ Each site will have 3 turbines totaling 150 MW of generation capacity

   ➢ Turnkey EPC costs of $58MM per plant (~$385 / kW vs. ~$950+ / kW for new build facilities)

   ➢ Construction costs reduced by more than 60% by utilizing refurbished (grey market) equipment overhauled by the OEM (GE) and having an OEM warranty, performance and output guarantee

   ➢ Plants will be quick start and black start capable enabling participation in all ancillary services

   ➢ Plants will be configured to install next generation battery storage technology

➢ Generation will be sold under an offtake agreement with an investment grade counterparty providing 5 years of contracted cash flow

➢ Other contracted revenue generated from and multi-year ancillary services agreements with ERCOT (Black Start) and other ancillary services (Quick Start, Non-Spin, Responsive Reserve)

CONFIDENTIAL



# Key Senior Management

**William C. Phelps – Chief Executive Officer**

Mr. Phelps was a Co-founder, Executive Director and Chief Financial Officer of Coastal Energy (TSX: CEN), which operated in Thailand and Malaysia before its sale to CEPSA (IPIC-Abu Dhabi) in January 2014 for $2.3 billion, which represented an 8x return for IPO investors over 7 years and a 56x return for its founding shareholder, Oscar Wyatt. Before that, Mr. Phelps was the Chief Financial Officer of NuCoastal Thailand, the predecessor of Coastal Energy, and NuCoastal Power. His early background in energy was working for Citi as a senior member of the Energy Investment Banking Group, and prior to that the Leveraged Finance Group, where he advised on numerous M&A and financing transactions in the energy industry.

**Matthew E. Laterza – Chief Financial Officer**

Mr. Laterza served as Vice President of Finance of Coastal Energy Company (TSX: CEN), which operated in Thailand and Malaysia before its sale to CEPSA (IPIC-Abu Dhabi) in January 2014 for $2.3 billion, which represented an 8x return for IPO investors over 7 years and a 56x return for its founding shareholder, Oscar Wyatt. During his tenure he was responsible for the Company's finance operations and the Company's business development group, including the Company's entrance into Malaysia and its sale to CEPSA. Mr. Laterza also served as Commercial Manager for NuCoastal Power. His early background includes energy equity research at Credit Suisse and working as an analyst for a hedge fund.

**Travis West – Chief Operating Officer**

Mr. West has spent over 25 years in the utility industry, with responsibilities including managing project execution (EPC); managing operations and maintenance; managing regulatory compliance (permitting); and developmental strategies. Most recently Mr. West was the Executive Vice President for Agilon Energy with responsibilities including full implementation of two (100MW) peaking facilities within ERCOT, and two other (100MW) peaking facilities fully developed – these facilities were constructed using a strategic mix of secondary market aero-derivative gas turbines and new/secondary market balance of plant equipment providing installed cost well below the current market.

**Roy J. Hart – Chief Development Officer**

Mr. Hart has spent over 40 years in the power industry and deployed over 3,000 MW of generation. Most recently Mr. Hart developed 4 "fast-start" peaking plants (100MW each) in Texas for a start-up power company. Prior to that, Mr. Hart ran NuCoastal Power, a company owned by Oscar S. Wyatt, Jr. (Coastal Energy, Coastal Corp), where he redeveloped an existing mothballed facility as a 300 MW combined cycle facility. The company was sold to a major equity fund. Mr. Hart also spent 20 years at Coastal Corporation, lastly as Executive Vice President in the Coastal Power division. Mr. Hart also spent 5 years working for Kiewit Construction leading successful EPC bids for 2000 MW of projects throughout the southern USA.



# Texas Power Market Opportunity

➢ Texas has been moving largely toward renewable (wind & solar) sources of energy and retiring aging thermal plants (coal & natural gas)

➢ Wind and solar are unpredictable and cannot be dispatched on demand because when they run is entirely dependent upon weather conditions

➢ As the generation mix has shifted toward renewable resources, which are inherently unpredictable, pricing volatility has increased significantly

➢ Currently in ERCOT, ~90% of all proposed generation projects are renewable resources, coupled with continued retirement of coal plants will further increase volatility in the market

> **This volatility is creating a substantial opportunity for reliable, fast response thermal assets (such as Alta's proposed projects) that can react to market events quickly (less than 10 minutes) and take advantage of price spikes**

CONFIDENTIAL



# Volatility is Directly Correlated with Growth in Renewable Generation



CONFIDENTIAL



# Renewables Becoming Larger Percentage of Installed Generation Base



Notes: (1) 2020 Installed Base figure assumes all planned 2019 additions commence commercial operations on schedule

CONFIDENTIAL

Alta 0009912

Alta App.000504



# Glut of Planned Renewable Generation Additions Will Increase Volatility



CONFIDENTIAL

Alta 0009913

Alta App.000505



# ERCOT Reserve Margins Are Expected to Remain Tight

➢ Reserve margins in ERCOT have been shrinking for the past several years due to retirement of coal and older steam plants

➢ The low amount of planned dispatchable generation installations coupled with continued load growth is resulting in low forecasted reserve margins for the foreseeable future

➢ Persistent low reserve margins will ensure that pricing remains volatile





## Sources of EBITDA

| Contracted Sources | Level of Certainty | % of EBITDA |
|---|---|---|
| Offtake Agreement – 5 Years w/ Investment Grade Counterparty | Contracted (100%) | 36% |
| Black Start – Contract Payment from ERCOT | Contracted (100%) | 3% |
| **Total Contracted EBITDA** | | **39%** |
| **Ancillary Services** | | **% of EBITDA** |
| Quick Start Capability Payment | High (80%)* | 5% |
| Non-Spinning Reserve Service | High (80%)* | 19% |
| Responsive Reserve Service | High (80%)* | 26% |
| **Total Ancillary Services EBITDA** | | **50%** |
| **Merchant Energy** | | **% of EBITDA** |
| Excess Energy Sales | Moderate (50%)* | 2% |
| Real Time Merchant | Moderate (50%)* | 9% |
| **Total Merchant EBITDA** | | 11% |

*Based on results of historical backcasted data*







**Project Costs Entirely Covered by Contracted Cash Flows and Ancillary Service Payments in Less Than 5 Years**

Alta 0009915

Alta App.000507



# Description of EBITDA Sources & Methodology

➢ Heat Rate Call Option (HRCO) - hedging product that is sold by the power plant to an offtaker specifying a fixed number of hours that the plant can be called to run by the offtake in exchange for a fixed annual capacity payment (expected to be between 1,300 – 1,400 hours)

➢ Black Start Service - an ancillary service provided by a facility able to start without support of the ERCOT transmission grid which receives a contracted annual payment

➢ Quick Start Resource – a facility that in its cold temperature state can come online within ten minutes of receiving ERCOT notice and receives a corresponding payment

➢ Responsive Reserve – an ancillary service provided by units that are online but operating at less than maximum output and are able to ramp to full output within 10 minutes

    ➢ For purposes of the pro-forma it is assumed that the plants will participate in responsive reserve during all on-peak hours in July & August of each year that are not anticipated to be exercised under the HRCO

➢ Non-Spinning Reserve Service – an ancillary service provided through use of the part of offline generation resources that can be synchronized and ramped to specified output level within 30 minutes and that can operate at a specified output level for at least one hour

    ➢ For purposes of the pro-forma it is assumed that any hours the plants are not operating under the HRCO or Responsive Reserve they will participate in the non-spinning reserve ancillary service

➢ Excess Power Sales – revenue earned from energy sales of the difference between energy delivered to settle the HRCO and actual plant output (e.g. HRCO volume is fixed at 135MW and when HRCO is exercised the plant generates 142MW of net output and the resulting 7MW differential is sold at prevailing real-time price)

CONFIDENTIAL



# NPRR 863 Implementation Will Enhance Value

➢ In February 2019 ERCOT adopted Nodal Protocol Revision 863 – Creation of a Contingency Reserve Ancillary Service

➢ Starting in 2022 ERCOT will be bifurcating the Non-Spinning Reserve Ancillary Service from only a 30 minute response service to a 30 minute service and a 10 minute service

➢ Any plant capable of reaching full output in less than 10 minutes (such as Alta's) will be eligible to participate in the Contingency Reserve Service instead of the traditional Non-Spinning Reserve Service

➢ While pricing is still uncertain, it is widely expected that due to the growing necessity in ERCOT for quick-start capable resources Contingency Reserve Service Pricing will be at a substantial premium to Non-Spinning Reserve Service pricing

CONFIDENTIAL



# Marketing
## Contracted

➢ 5 year offtake agreement with variable extension options with investment grade counterparty

➢ Offtake agreement will be day ahead and will be for approximately 1,300-1,400 hours per year

➢ Black Start ancillary service contract with ERCOT

## Ancillary Services & Merchant

➢ Remaining generation capacity (2,500 – 2,800 hours per year) will be available to cycle up and sell into periods of high ERCOT real-time pricing

    ➢ Plants are quick start capable (<10 mins) allowing the power to be sold into the initial pricing period of a spike in ERCOT real-time pricing

    ➢ <10 min start time makes these plants the fastest responding generation assets in ERCOT

➢ Our QSE will optimize our ancillary service offerings to maximize revenue – shown in pro forma as non-spin & responsive reserve revenue

    ➢ When Market conditions are not advantageous for real-time operations, each plant will participate in the appropriate ERCOT ancillary services to generate additional revenue

CONFIDENTIAL

Alta 0009918

Alta App.000510



# Project Model – 3 Plants

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total Revenue | | 46,564,256 | 79,598,842 | 88,823,362 | 85,193,048 | 87,636,451 | 37,579,515 |
| Variable Costs | | 11,986,961 | 22,782,115 | 25,113,451 | 26,216,177 | 27,018,090 | 10,783,997 |
| Fixed Costs | | 3,859,167 | 6,315,000 | 6,315,000 | 6,315,000 | 6,315,000 | 2,982,083 |
| Total Costs | | 15,846,128 | 29,097,115 | 31,428,451 | 32,531,177 | 33,333,090 | 13,766,081 |
| **EBITDA** | | **30,718,129** | **50,501,727** | **57,394,912** | **52,661,872** | **54,303,361** | **23,813,435** |
| Capital Investment | 89,887,500 | 89,887,500 | | | | | |
| Ending Debt Balance | 95,000,000 | 164,500,000 | 129,500,000 | 94,500,000 | 59,500,000 | 24,500,000 | 0 |
| Interest Expense    6.0% | 2,850,000 | 7,785,000 | 8,820,000 | 6,720,000 | 4,620,000 | 2,520,000 | 735,000 |
| Sale Proceeds @    $400   / kW | | | | | | | 180,000,000 |
| Total Cash Flow | 2,262,500 | 2,545,629 | 6,681,727 | 15,674,912 | 13,041,872 | 16,783,361 | 178,578,435 |
| Accumulated Cash | 2,262,500 | 4,808,129 | 11,489,855 | 27,164,767 | 40,206,639 | 56,989,999 | 235,568,434 |
| Debt / EBITDA | N/A | 5.4x | 2.6x | 1.6x | 1.1x | 0.5x | 0.0x |
| Interest Coverage | N/A | 3.9x | 5.7x | 8.5x | 11.4x | 21.5x | 32.4x |

*Notes:*
*(1) Shows only cash flow from operations over the 5 year life of the HRCO; excludes merchant cash flows*
*(2) Assumes debt amortizes beginning at commercial operations equally over 5 year tenor*

CONFIDENTIAL

Alta 0009919

Alta App.000511



## Sources & Uses of Cash – First Three Plants (3 x 150MW = 450MW Total)

| Sources | | Uses | |
|---|---|---|---|
| Senior Secured (75%): | $136.5MM | EPC Project Costs: | $174.0MM |
| Mezzanine + Equity: | $45.5MM | Development Costs: | $6.0MM |
| | | Overhead: | $2.0MM |
| Total: | $182.0MM | Total: | $182.0MM |

CONFIDENTIAL





Alta 0009921

Alta App.000513



## Schedule for First Set of Three 150 MW sites



Alta 0009922

Alta App.000514



## Proposed Site Locations



**Load Zone Legend**
- West
- North
- Houston
- South

**Goodlow**
Output: 150MW
Load Zone: North
COD: Mar 2020

**Jacksonville**
Output: 150MW
Load Zone: North
COD: Apr 2020

**Lufkin**
Output: 150MW
Load Zone: North
COD: May 2020

**Alice**
Output: 150MW
Load Zone: South
COD: Sep 2020

CONFIDENTIAL

Alta 0009923

Alta App.000515



## Site Backlog

- ➢ Goodlow
- ➢ Jacksonville
- ➢ Lufkin
- ➢ Alice
- ➢ Site #5 information not yet public
- ➢ Site #6 information not yet public
- ➢ Site #7 information not yet public
- ➢ Site #8 information not yet public
- ➢ Site #9 information not yet public

CONFIDENTIAL

Alta 0009924

Alta App.000516



# Appendix

CONFIDENTIAL



## Single Site Plant Parameters

➢ Nominal 150 MW output – 3 rebuilt LM6000 natural gas turbine generators

➢ Black start capable

➢ Quick start capability (hot standby compliant) 10 mins from cold start to full output

➢ Natural gas fuel, meets Texas Standard Air Permit requirement (6 weeks to obtain in both Attainment & Non-Attainment zones)

➢ Consumes ~1.3 mmcf of natural gas per hour

➢ Easily located due to small size as low as 4.5 acres

➢ Low noise (<85dB at 5 ft. from equipment, normal road noise equivalent at site boundary with 5 acre site)

➢ -$58 MM investment

➢ 25 year life span

CONFIDENTIAL



## Goodlow Plant

- ➢ Location: Goodlow, TX (Navarro County)
- ➢ Output: 150MW
- ➢ Load Zone: North
- ➢ COD Date: March 2020
- ➢ Gas Supplier: Energy Transfer
- ➢ Water Supplier: City of Kerens
- ➢ Wastewater Discharge: City of Corsicana

CONFIDENTIAL

Alta 0009927

Alta App.000519



## Jacksonville Plant

➢ Location: Jacksonville, TX (Cherokee County)

➢ Output: 150MW

➢ Load Zone: North

➢ COD Date: April 2020

➢ Gas Supplier: Enterprise

➢ Water Supplier: City of Jacksonville

➢ Wastewater Discharge: City of Jacksonville

CONFIDENTIAL

Alta 0009928

Alta App.000520



## Lufkin Plant

- ➤ Location: Lufkin, TX (Angelina County)
- ➤ Output: 150MW
- ➤ Load Zone: North
- ➤ COD Date: May 2020
- ➤ Gas Supplier: Gulf South
- ➤ Water Supplier: Well Water
- ➤ Wastewater Discharge: City of Lufkin

CONFIDENTIAL

Alta 0009929

Alta App.000521



# Technology is Modular to Accommodate Integration of Next Generation Energy Storage (Battery Back Up) Technology



➢ The GE LM6000 turbine can be paired with a lithium ion battery system to deliver next generation technology to the grid

➢ Provides contingency (spinning reserve) services without fuel burn between demand events

➢ Also enables delivery of high speed regulation reserve (automated generation control), primary frequency response, and voltage support services

➢ Zero fuel use and emissions between dispatches while continuing to deliver ancillary services

➢ Might qualify for tax credits

CONFIDENTIAL



## Alta Power Team Experience

➢ Team has 6 successful developments in Texas totaling 1000 MW

➢ Experienced power professionals with 50+ years of power development experience in Texas

➢ Individually 20+ power generation facilities developed and operational

➢ Team members have developed 4 similar projects using this development model, 2 of which became commercially operational in 2017

CONFIDENTIAL

Alta 0009931

Alta App.000523

# INDEPENDENT ENGINEER'S REPORT

# ALTA POWER PEAKERS GOODALTA AND ALTAJAC1 POWER CENTERS

# [FIRST DRAFT]

**Report Prepared for**

**Alta Power LLC**

**4605 Post Oak Place Drive, Suite 270**

**Houston, TX 77027**

**August [__], 2019**



Alta App.000524
ALTA0009934

THIS PAGE HAS BEEN LEFT BLANK INTENTIONALLY

CONFIDENTIAL

Alta App.000525

AMG-0009935



## Table of Contents

**Introduction** ........................................................................................................................... 1
**Project Participants** ................................................................................................................ 4
   Owner ......................................................................................................................................... 4
   EPC Contractor .......................................................................................................................... 4
   Gas Turbine Supplier/Refurbisher ............................................................................................ 4
   Emissions Reduction Unit Systems Supplier ............................................................................ 5
   Energy Manager and Qualified Scheduling Entity ..................................................................... 5
   Fuel Manager ............................................................................................................................. 6
   Operator ..................................................................................................................................... 6
   Summary .................................................................................................................................... 6
**The Project Sites** ..................................................................................................................... 7
   GOODALTA .............................................................................................................................. 7
      The Project Site .................................................................................................................... 7
      Site Conditions ..................................................................................................................... 7
      Subsurface Conditions ......................................................................................................... 7
      Site Arrangement ................................................................................................................. 9
      Access to Utilities ................................................................................................................ 9
   ALTAJAC1 ................................................................................................................................10
      The Project Site ...................................................................................................................10
      Site Conditions ....................................................................................................................10
      Subsurface Conditions ........................................................................................................10
      Site Arrangement ................................................................................................................12
      Access to Utilities ...............................................................................................................12
      Summary .............................................................................................................................12
**The Projects** ...........................................................................................................................13
   Civil and Structural ...................................................................................................................13
   Mechanical Equipment and Systems ........................................................................................14
      Cycle Description ................................................................................................................14
      Combustion Turbine ............................................................................................................15
      Emission Reduction Unit .....................................................................................................15
      Lube Oil Systems ................................................................................................................15
      Turbine/Generator Enclosure .............................................................................................15
      Compressed Air System .....................................................................................................16
      Natural Gas Compressors ...................................................................................................16
   Electrical and Control Systems .................................................................................................16
   Auxiliary/Station Service and Emergency Power .......................................................................16
   Control and Monitoring Systems ...............................................................................................17
   Black Start Generator ...............................................................................................................17
   Electrical Interconnect ..............................................................................................................17
      GOODALTA ........................................................................................................................17

ALTAJAC1 ............................................................................................................17
Balance of Plant Systems ........................................................................................18
  Water Supply and Treatment Systems ................................................................18
  Wastewater and Stormwater Systems .................................................................18
  Ammonia Supply ..................................................................................................19
Fuel Supply Systems and Agreements .....................................................................19
  Gas Interconnection .............................................................................................19
  Gas Transportation and Gas Supply ....................................................................19
Environmental Control Equipment .............................................................................21
**Construction of the Projects** .....................................................................................**21**
EPC Agreement and Equipment Supply Agreement .................................................22
  Scope of Supply ...................................................................................................22
  Price and Payment ...............................................................................................23
  Changes in Work ..................................................................................................23
  Commissioning, Completion, and Delay Liquidated Damages .............................24
  Warranty ...............................................................................................................25
  Performance Guarantees .....................................................................................26
  Emissions Guarantees .........................................................................................28
  Acceptance Testing Program ...............................................................................28
  Performance Liquidated Damages and the Performance Remedial Plan .............29
  Limitation of Liability ............................................................................................30
Electrical Interconnection Construction ....................................................................31
Summary ...................................................................................................................31
**Construction Cost and Schedule** .............................................................................**31**
Project Capital Costs ................................................................................................31
  Construction Cost .................................................................................................32
  Summary ..............................................................................................................33
  Other Project Costs ..............................................................................................33
  Financing Costs ...................................................................................................34
Construction Plan and Schedule ...............................................................................34
  Schedule Duration and Activities .........................................................................34
  Project Schedule Analysis ....................................................................................35
  Summary ..............................................................................................................35
**Technical Review of the Project** ...............................................................................**36**
GE LM6000 CT ..........................................................................................................36
  Background ...........................................................................................................36
  Operational Issues ...............................................................................................37
  LM6000 Refurbishment ........................................................................................38
  Summary ..............................................................................................................39
Estimated Useful Life of the Project ..........................................................................39
Projected Performance ..............................................................................................40



30470009937

Alta Power — GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page iii

Capacity and Heat Rate ...................................................................................40
Scheduled Outage Factor ...............................................................................41
Degradation ....................................................................................................42
Forced Outage ................................................................................................42
Availability .......................................................................................................42
Heat Rate Call Options ......................................................................................42
**Operations and Maintenance** .............................................................................**42**
Operating Agreements ........................................................................................42
Asset Management Agreement .......................................................................43
Energy Management Agreement .....................................................................44
Fuel Management Services Agreement ...........................................................44
Staffing ...............................................................................................................45
Operations and Maintenance Practices and Procedures ....................................45
Major Maintenance .............................................................................................46
Projected Non-Fuel Operating and Maintenance Cost .......................................46
Summary ............................................................................................................48
**Environmental Review of the Project** ................................................................**48**
Environmental Site Assessments .......................................................................48
ALTAJAC1 .......................................................................................................48
GOODATLA .....................................................................................................50
Status of Permits and Approvals ........................................................................51
Environmental Compliance .................................................................................54
**Principal Considerations and Assumptions** ...................................................**56**
**Conclusions** ........................................................................................................**57**

## List of Figures

Figure 1: Location of the Project Sites ...................................................................... 3
Figure 2: GOODALTA Site Layout ............................................................................ 9
Figure 3: ALTAJAC1 Site Layout ............................................................................12
Figure 4: Fuel Supply Plan Diagram ........................................................................21

## List of Tables

Table 1 Site-Specific Structural Design Criteria for Projects ....................................14
Table 2 Equipment Supply Performance Guarantees................................................27
Table 3 EPC Performance Guarantees ....................................................................27
Table 4 Guarantee Point Conditions for [Both EPC Agreements and] Equipment Supply
Agreements Performance Guarantees.......................................................................28



Table 5 Emissions Guarantees .................................................................................28
Table 6 Total Project Capital Costs ($000) ............................................................32
Table 7 Baseline Schedule Milestones....................................................................34
Table 8 Typical Performance Characteristics of the GE LM6000 .............................37
Table 9 Monthly Projects New and Clean Capacity and Heat Rate ...........................41
Table 10 GOODALTA Heat Balance New and Clean Capacity and Heat Rate .........41
Table 11 ALTAJAC1 Heat Balance New and Clean Capacity and Heat Rate...........41
Table 12 Projected 2021 Operating Costs ($000) ...................................................47
Table 13 Summary Status of Permits and Approvals ...............................................51

© 2019 Leidos Engineering, LLC
All Rights Reserved



THIS PAGE HAS BEEN LEFT BLANK INTENTIONALLY

0009940



# Introduction

Presented herein is the report (the "Report") that summarizes our review and analyses, as Independent Engineer, of the Goodalta Power Center ("GOODALTA") and the Altajac Power Center ("ALTAJAC1," and together with GOODALTA, the "Projects," and each a "Project) located in Texas. Each is a nominally rated 150 megawatt ("MW") capacity natural gas-fired peaking facility. GOODALTA and ALTAJAC1 are located in the Cities of Kerens and Jacksonville, respectively. GOODALTA will be owned by Goodalta Power Center, LLC ("Goodalta LLC") and ALTAJAC1 will be owned by Altajac Power Center, LLC ("Altajac LLC"). Goodalta LLC and Altajac LLC are owned by Alta Power LLC (the "Owner"). GOODALTA is located on an approximately 10-acre greenfield site (the "GOODALTA Site"), ALTAJAC1 is located on an approximately 20-acre greenfield site (the "ALTAJAC1 Site" together, the "Project Sites", and each a "Project Site"). A map showing the location of the Projects is presented in Figure 1. This Report is being prepared in connection with financing of the proposed Projects.

The Projects will each incorporate three refurbished LM6000 PC Sprint ("LM6000") aero-derivative combustion turbines ("CTs") and associated CT generators (together, the "CTGs") manufactured by General Electric ("GE"), each a "Unit". The CTs will be equipped with water injection for power augmentation and for abatement of the emission of oxides of nitrogen ("NOx"), and a selective catalytic reduction ("SCR") system for further reduction of NOx emissions. The Projects CTs also include inlet fogging to increase capacity during the summer months.

Engineering, procurement, and construction ("EPC") of the Projects, excluding supply of the CTGs and their related equipment and services, will be performed by Casey Industrial, Inc. ("Casey") pursuant to two separate but materially similar agreements between Casey and the Owner, a draft of which we received on [_____] and [_____] (the "EPC Agreements"). The Owner reported that the EPC Agreements are to be executed coincident with financial close. Casey's scope of services includes all design, equipment procurement, construction, commissioning, testing, development, delivery of operation and maintenance ("O&M") manuals, and training of the Owner's O&M staff.

The CTGs and associated power block and related equipment (the "Power Block Equipment") for each Project, together with certain services will be supplied under two separate but materially similar equipment supply agreements between WattStock LLC ("WattStock") and the Owner, a draft of which was dated [_____] and [_____] (the "Equipment Supply Agreements"). WattStock will also be responsible for refurbishment of the CTGs and certain related equipment supplied under the Equipment Supply Agreements.

Electrical interconnection of the Projects will be provided for under the terms of [_____].

The Projects will each sell electric energy and ancillary services (including black start and non-spinning reserve) into the Electric Reliability Council of Texas ("ERCOT") market. The variability of energy pricing will be hedged via a heat rate call option ("HRCO") for each Project. **[Draft HRCO term sheets have been provided by [_____] for each of the Projects. The Owner reported that one HRCO for each Project is to be executed after financial close on the debt financing.] [The Owner's pro forma model assumes energy generation equal to/in excess of that used as the baseline for the HRCO.]**

Natural gas is to be delivered to the GOODALTA Site by the Midcoast Pipelines (East Texas) L.P. ("Midcoast") and the Owner has negotiated an interconnection agreement dated **[September __, 2019]**

CONFIDENTIAL

Alta App.000531    Alta_0009941

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 2

with Midcoast. Natural gas will be delivered to the ALTAJAC1 Site by Enterprise Texas Pipeline LLC ("Enterprise") pipeline and the Owner has negotiated an interconnection agreement dated **[September __, 2019]** with Enterprise.

NAES Corporation ("NAES") is to operate and maintain the Projects under the terms of the O&M agreements. We reviewed a draft of the O&M Agreements dated **[_____]**.

**[Asset Management Agreement – to come.]**

The Projects are to enter into an Energy Management Agreement ("EMA") with Tenaska Power Services Co. ("Tenaska"") on terms negotiated. We reviewed a draft EMA titled *"Alta Power QSE and EMA Services 07.24.2019 Clean(1)"* received on August 23, 2019.

The Projects are to enter into a Fuel Management Services Agreement ("FMSA") with United Energy Trading, LLC ("UET") on terms negotiated. We reviewed a FMSA titled *"Alta – UET Services Agreement"* received on August 23, 2019.

We visited the Project Sites on March 19, 2019. During these visits, we made general field observations of the GOODALTA Site and the ALTAJAC1 Site. The general field observations were visual, above-ground examinations of selected areas which we deemed adequate to comment on the existing condition of the sites, but which were not in the level of detail necessary to reveal conditions with respect to geological or environmental conditions, the internal physical condition of any equipment, or the conformance with agreements, codes, permits, rules, or regulation of any party having jurisdiction with respect to the sites.

During the preparation of the Report, we have reviewed the various agreements required for the engineering, equipment supply, construction, and O&M of the Projects (the "Project Agreements"). These agreements set forth the obligations of each of the parties with respect to the EPC and operation of the Projects. As Independent Engineer, we have made no determination as to the validity and enforceability of these agreements; however, for the purpose of this Report, we have assumed the Project Agreements will be fully enforceable in accordance with their terms and that all parties will comply with the provisions of their respective agreements.

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 3

**Figure 1:** Location of the Project Sites



In addition, we have reviewed: (1) the proposed method of construction and operation of the Projects; (2) the projected levels of net output and net heat rate for the Projects; (3) the estimated cost of construction of the Projects as presented in the spreadsheet file provided by the Owner and titled *["[XX].xls]* (the "Pro Forma"); (4) the proposed construction schedule; (5) the status of environmental permits and approvals; (6) environmental site assessments ("ESAs") for the Projects; (7) the proposed conceptual design of the Projects; and (8) the technical inputs to the Owner's Pro Forma, including projected construction costs, fixed and variable non-fuel O&M expenses, and plant performance, as more fully discussed herein.

This Report has been prepared in accordance with a Master Professional Services Agreement dated March 1, 2019 between Leidos Engineering, LLC ("Leidos") and the Owner, and a Task Authorization dated March 1, 2019 between the same parties. The Report is solely for the information of and assistance to the Owner and should not be used for any other purpose or by any other party, except for those parties who have entered into a third-party use of work products agreement with Leidos. The Report has been developed based on the needs of the Owner and the level of information included reflects the knowledge of issues gained by the Owner through the course of our review. To the extent that any other readers of the Report have not been involved over the course of our review, the information contained herein could be misunderstood or incomplete.

Certain statements included in this Report constitute forward-looking statements. The achievement of certain results or other expectations contained in such forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause actual results, performance or achievements described in the Report to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements. We do not plan to issue any

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

Alta App.000533    Alta_0009943

updates or revisions to the forward-looking statements if or when changes to our expectations, or events, conditions or circumstances on which such statements are based, occur. No warranty, guarantee, or promise, express or implied, related to any future results, performance, or achievements associated with such forward-looking statements is provided.

# Project Participants

Those sponsors, contractors, vendors, and other major service providers responsible for the development, design, construction, and operation of the Projects are discussed below.

## Owner

**[To come]**

## EPC Contractor

Casey is a national self-perform contractor with experience in 46 states and has its corporate headquarters in Westminster, Colorado. Casey has been providing construction services since 1947. Since 2005, Casey has constructed 19 power projects of various technologies and includes the following projects: (1) the Exira Station, located near the community of Brayton, Iowa, is a natural gas simple-cycle GE LM6000 gas turbine plant that provides 140 MW of peaking power; (2) the installation of a natural gas simple-cycle GE LM6000 gas turbine into Jonesboro City Water & Light facility located Jonesboro, Arkansas; (3) the installation of a natural gas simple-cycle GE LM2500+ gas turbine at the City of Ames, Iowa peaking facility; and (4) the installation of a 22 MW Westinghouse diesel simple-cycle CT, transferred from a decommissioned plant in Borger, Texas, at XCEL ENERGY's Tucumcari, New Mexico peaking facility.

## Gas Turbine Supplier/Refurbisher

WattStock was formed in 2013 to provide risk mitigation and asset management of high-voltage equipment for power plant owners/operators. WattStock offers the Transformer Recovery Inventory Program ("TRIP") with a pool of regionally located large power transformers to provide a cost-effective approach to accelerate recovery from large power transformer outages.

In 2017, WattStock began its Certified Turbine Power ("CTP") program to offer refurbished LM6000 gas turbine packages optimized by GE, the original equipment manufacturer ("OEM"), engineered systems, components, upgrades, and digital solutions. The CTP provides a full OEM backed warranty and performance guarantees. WattStock is the only packager approved by GE to refurbish its CTG sets. WattStock's engineering, project management, procurement, operations, management and manufacturing teams are co-located with GE Aero's package engineering, service engineering, field core service technicians, and Level IV overhaul shop at the GE Jacintoport facility in Houston, Texas.

WattStock currently has completed one LM6000 PC refurbishment and installation to date. However, the WattStock team has been involved in 25 plus turbine refurbishments and installs when involved with companies such as Stewart & Stevenson as well as GE. WattStock works with GE personnel who have performed over 20 refurbishments and installations. WattStock and GE have an agreement that allows for GE to be subcontracted to WattStock and vice versa depending on the originator of the work.

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

## Emissions Reduction Unit Systems Supplier

SISU Energy & Environmental ("SISU") was formed in 2015 and is located in Tulsa, Oklahoma. SISU serves the heat recovery steam generator and simple cycle catalyst systems market. SISU offers inspection, technical and engineering services. This organization has been operating for approximately four years.

The SISU team is comprised of individuals who have a combined experience of more than 250 years in the design and manufacturing of heat recovery, structural steel, instrumentation and catalytic reduction systems. This team created and executed more than 100 CT catalyst systems, spanning a period of more than 25 years.

SISU reports that it is an approved supplier for the emissions reduction equipment for the following combustion turbine OEMs: (1) GE Power; (2) Solar Turbines (a Caterpillar Company); and (3) Siemens Dresser-Rand. Additionally, SISU is the preferred service provider for BASF CO Catalyst. SISU reports that it has Master Service Agreements, essentially meaning a pre-approved provider of services, with the following companies: (1) Conoco Phillips; (2) Southern California Edison Company; (3) Calpine; (4) New York Power Authority (NYPA); (5) El Paso Electric Company; (6) ONEOK; (7) City of Anaheim; (8) Exelon; (9) NRG; (10) Talen Energy; and (11) San Diego Gas & Electric.

SISU continues to support and evolve the CT catalyst system market, including service and design upgrades to meet newer and more stringent emissions requirements. The following customers have utilized SISU at their facilities: (1) Arizona Public Service (LM6000s); (2) BASF (multiple installations); (3) Black Hills Corporation (LMS100s and LM6000s); (4) Calpine (multiple installations); (5) City of Anaheim (LM6000s); (6) City of Riverside (LM6000s); (7) City of St. George (LM6000); (8) Conoco Phillips (technical support and maintenance for once through steam generators ("OTSGs")); (9) Cormetech (multiple installations); (10) CPS Energy (LMS100s); (11) DCO Energy (catalyst systems on landfill-fired Solar CTGs); (12) DGC Operations (LM6000s); (13) Eastern Kentucky Power (LMS100s); (14) El Paso Electric (LMS100s); (15) Exelon (technical and engineering support and maintenance for heat recovery steam generators ("HRSGs"); (16) Husky Energy (technical support and maintenance for OTSGs); (17) Hyperion Water Treatment Plant (technical support and maintenance for HRSGs); (18) Jacos (technical support and maintenance for OTSGs); (19) L.A. County Refrigeration & Cogen (repair/upgrade for CTG CO catalyst system); (20) Modesto Irrigation District (LM6000s – HRSG + emission reduction units ("ERUs")); (21) New York Power Authority (LM6000s); (22) NRG Energy (LM6000s – HRSG + ERUs); (23) West Valley Power (LM6000s); (24) Pacificorp (LM6000s); (25) Praxair (re-engineer and supply for LM2500 HRSG); (26) San Diego Gas & Electric (LM6000s); (27) Southern California Edison (LM6000s plus engineering consulting services for balance of fleet); (28) Talen Energy (LMS100s); (29) TransCanada Energy (LM6000s); (30) Tulsa Heaters Inc. (new steam system for Canadian Natural Resources Limited, CNRL, Plant); (31) University of Texas (LM2500 HRSG); and (32) Wellhead Electric Company (LM6000s) – as part of GE's Enhanced Gas Turbine Program.

SISU reports that the NOx catalyst manufacturing will occur in Cormetech's Raleigh-Durham facility. Ductwork and stacks will be fabricated in approved facilities in the Tulsa area. The ammonia flow control units (skid-mounted components) will be fabricated to SISU specifications in Texas. All components supplied by SISU for the Projects will be of domestic origin.

## Energy Manager and Qualified Scheduling Entity

")Tenaska is a Qualified Scheduling Entity ("QSE") and is the leading provider of energy management services to generation and demand-side customers in the United States ("U.S."), with more third-party-

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 6

owned generation under management than any other provider. Tenaska specializes in energy management, optimization and physical electric power marketing. Tenaska operates a 24-hour, 7-day-a-week trading floor, as well as a round-the-clock power plant operations desk. Tenaska is a Nebraska corporation and an indirect, wholly owned subsidiary of Tenaska Energy, Inc.

A QSE is a market participant that is qualified by the Electric Reliability Council of Texas ("ERCOT") for communication with ERCOT for Resource Entities and Load Serving Entities and for settling payments and charges with ERCOT.

## Fuel Manager

Founded in 2002, UET is a fully integrated energy marketing and logistics organization with operations throughout the continental U.S. and Canada. UET is a privately held, Denver-based oil and gas marketing and logistics company and a subsidiary of Bismarck-based United Energy Corporation, which holds power marketing, oil and gas producing, and retail gas companies in addition to UET. UET purchases, transports, and/or sells some 1.5 billion cubic feet ("bcf")/day of natural gas on over 80 pipelines and approximately 150,000 barrel ("bbl")/day of crude oil on over 20 pipelines and via over 1,000 rail cars throughout North America.

## Operator

NAES, a wholly-owned subsidiary of ITOCHU Corporation, is to provide O&M services for the Projects. Formed in 1980, NAES has a core business of O&M, but also possess an expanding presence in major maintenance services, field technical services, O&M support services, and regulatory and environmental compliance services. NAES reported that it currently has approximately 3,767 employees in more than 170 offices and plant sites.

As one of the largest third-party O&M providers in the world, NAES offers significant experience. NAES operates numerous plant technologies including industrial combustion and aeroderivative turbines (simple and combined cycle), reciprocating engines, coal- and oil-fired steam plants, district heating/cooling facilities and renewables: biomass, hydro, solar, wind, geothermal, landfill gas, and waste-to-energy.

## Summary

**[The Owner, through the experience of its management team, has previously demonstrated the capability to manage and develop natural gas-fired, simple-cycle facilities of similar size and technology as the Projects.**

**Based on our review, we are of the opinion that Casey has previously demonstrated the capability to design and construct natural gas-fired, simple-cycle facilities of similar size and technology as the Projects.**

**We are of the opinion that WattStock, through the experience of its/as [_____], has previously demonstrated the capability to refurbish LM6000 CTG sets.**

**We are of the opinion that SISU, through the experience of its/as [_____], has previously demonstration the capability to produce SCRs for CTGs similar to LM6000s.**

**We are of the opinion that NAES have previously demonstrated the capability to operate and maintain facilities of similar size and technology as the Projects.]**

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

# The Project Sites

In undertaking a review of the Projects, we: (1) visited the Project Sites; (2) reviewed the proposed design of the Projects; (3) reviewed certain reports regarding the condition of the Project Sites; (4) reviewed the EPC Agreements; and (5) reviewed certain other agreements for the Projects. A description of the Projects and the results of our review are set forth below.

## GOODALTA

### The Project Site

The GOODALTA Site is located approximately 180 miles southeast of Fort Worth, Texas, in Navarro County, Texas. We visited the GOODALTA Site with a representative of the Owner on March 19, 2019. While on site, we reviewed the proposed site layout and workspace, surrounding property, land use, site access, and proposed interconnection locations.

### Site Conditions

GOODALTA is to be constructed on an approximately rectangular 10-acre parcel, located at the southeast corner of County Road SE 3220 and County Road 3230 which the Owner has executed an option to purchase agreement which for a term of one year from the effective date of August 23, 2018. The Owner reported the option will be exercised on **[August 22, 2019] [Please provide status]** and the purchase and sale is required to be completed 30 days after the option is exercised. Navarro County Commissioners Court approved a change of the zoning of the GOODALTA Site from Agricultural Land Use to Industrial Land Use on May 13, 2019.

The GOODALTA Site is to be constructed the eastern side of the site with an existing 50-foot wide gas transmission right-of-way ("ROW") generally bisecting the site north to south and the interconnection substation to the west of GOODALTA. Two existing east to west electrical transmission line ROWs are south of the GOODALTA Site. No additional electrical or gas ROWs are required. The Owner reported that it will grant an easement to Oncor Electric Delivery Company LLC ("Oncor") to the substation and access to the substation. Natural gas will be supplied from the existing natural gas pipeline crossing the GOODALTA Site to a new metering station. Plant water will be supplied from the east from Richard Chamber Reservoir or **[an existing reservoir from the [CONFIRM]]** City of Goodlow water service on public ROW. The wastewater discharge **[canal]** is to the east.

The GOODALTA Site is generally flat with site elevations approximately 365 feet above mean sea level ("amsl"). Based on the Federal Emergency Management Agency ("FEMA") Flood Insurance Rate Map ("FIRM") Community Panel 48349C9450D effective June 5, 2012, the GOODALTA Site is in Flood Zone X, an area of minimal flood hazard.

The GOODALTA Site is east of Interstate 20 ("I-20") and south of I-45. Local access to the GOODALTA Site is from county roads to County Road SE 3230 on the eastern boundary.

### Subsurface Conditions

Subsurface investigations were performed at the GOODALTA Site during the period of April 6, 2019 to April 14, 2019 by Professional Service Industries, Inc. ("PS Industries") of Houston, Texas. Based on its subsurface investigation, PS Industries prepared the subsurface investigation report titled "*Geotechnical Engineering Report Goodlow Generation Facility Goodlow, Texas*" dated May 17, 2019 (the "GOODALTA Geotechnical Report").

The subsurface investigations included: (1) an exploration of soil, and groundwater by means of soil borings and one Refraction Microtremor ("ReMI") test, (2) laboratory tests to aid the classification of the soils and the selection of engineering parameters; and (3) preparation of the GOODALTA Geotechnical Report. The GOODALTA Geotechnical Report includes a summary of the field investigations, a boring location plan, boring logs and recommendations for design and construction. Results of the chemical analysis of the soils are included in the GOODALTA Geotechnical Report.

The subsurface investigation included 13 borings ranging in depth from 40 feet below ground surface ("bgs") to 75 feet bgs. Ground water was encountered in 3 borings, which were advanced using dry auger at depths ranging from 10 feet bgs to 20 feet bgs. The wet rotary method used in other borings precluded groundwater measurements in other borings. PS Industries recommends the EPC Contractor determine the groundwater elevations at the time of construction to determine impact on construction activities. The general subsurface profile at the GOODALTA Site consists of sandy lean clay, fat clay, lean clay, fat clay with sand, and sandy and fat clay, which is described as stiff to hard.

The near surface soils have a high potential for shrink and swell. PS Industries estimates the potential vertical rise of the soils in the range of 3 to 4 inches. To reduce to potential vertical rise to less than 1 inch, PS Industries recommends, installation of 4.5 feet of low plasticity structural fill be placed between the native soils and the final grade. The structural fill a minimum of 5 feet beyond the perimeter of the structure. PS Industries provided the following recommendation to control moisture and limit the potential for shrink and swell in soils: direct surface run-off away from slabs by slope subgrade; extending impervious surfaces to the edge of slabs and avoid excessive drying of soils around slabs.

To support the CTG, SCR ammonia storage tank, and ancillary structures, PS Industries recommended mat foundations bearing a minimum of 2 feet below finished grade and bearing on compacted structural fill or native soil as noted above, with a net allowable bearing pressure of 4,500 pounds per square foot for dead loads and transient live loads or 3,000 pounds per square foot for dead loads and sustained live loads.

PS Industries also provided axial capacities for drilled shaft foundation with 24-inch, 30-inch, and 36-inch diameters. The drilled shaft extending through the potentially expansive soils are subjected to vertical uplift loads and PS Industries recommends drilled shaft be checked for an uplift load of 20 units of thousands of pounds ("kips") times the diameter of the shaft. Additionally, PS Industries has provided soil parameters for designing the lateral capacity of piles based on the depth of the piles and the group action of the piles for the pile designer to utilize for final design.

The GOODALTA Geotechnical Report includes the dynamic properties which are used for the dynamic analysis of foundation of the soils to a depth of 70 feet bgs. The dynamic properties include the shear modulus, the mass density, the material damping ratio, and Poisson's Ratio are based on the ReMi testing preformed at the GOODALTA Site.

The results of laboratory chemical test data for resistivity, pH, chlorides, and the on-site soils are included in the GOODALTA Geotechnical Report and indicate that the soils are corrosive to extremely corrosive. PS Industries notes the limited testing may not provide a reliable indication of the corrosion potential of the on-site soils, however, based on their experience in the area, PS Industries recommends that buried metals in contact with the soils be protected from corrosion. The laboratory test data results for sulfate ion concentration of the on-site soils is negligible to moderate for sulfate exposure for use by the engineer of record in specifying concrete in contact with on-site soils.

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

The GOODALTA Geotechnical Report includes recommendations with respect to both the site classification and the spectral accelerations to be used for seismic design. Based on the provisions of the 2012 International Building Code ("IBC") ("2012 IBC") a Site Class equal to "D" (corresponding to a stiff soil profile) is applicable for the GOODALTA Site. The mapped spectral response accelerations of $S_S = 0.089$ times the acceleration of gravity ("g ") and $S_1 = 0.050g$ are estimated, which spectral acceleration values generally correspond to an area with a low level of seismic activity.

The GOODALTA Geotechnical Report also provides design recommendations for flexible and rigid pavement design, drainage, and site preparation.

**[Carey inspected the Project Site including the Owner provided geotechnical reports, with the exception of subsurface obstacles or archeological relics. Per the Draft EPC Agreement, Carey is allowed a change for unknown subsurface physical conditions which differ materially from the "Contract Documents". Pursuant to the Draft EPC Agreement, the risk of previously unknown hazardous wastes remains with the Owner.]**

## Site Arrangement

The GOODALTA Site is laid out as shown in Figure 2. The CTGs are to be located on the eastern portion of the GOODALTA Site, and the generator step-up ("GSU") transformers are to be located on the west of the CTs with the interconnection substation on the western side of the GOODALTA Site.

**Figure 2: GOODALTA Site Layout**

**[To come]**

## Access to Utilities

The access to utilities is discussed in the Electrical Interconnect and Balance of Plant Systems sections below.

# ALTAJAC1

## The Project Site

The ALTAJAC1 Site is located approximately 130 miles southeast of Fort Worth, Texas, in City of Jacksonville, Cherokee County, Texas. We visited the ALTAJAC1 Site with a representative of the Owner on March 19, 2019. While on site, we reviewed the proposed site layout and workspace, surrounding property, land use, site access, and proposed interconnection locations.

## Site Conditions

The Project is to be constructed on an approximately 20-acre parcel, which the Owner has executed an option to purchase agreement for a term of one year from the effective date of October 5, 2018. The Owner reported the option to purchase will be executed upon financial close. The ALTAJAC1 Site is generally two rectangular shapes, with the eastern rectangle horizontal and the western rectangle at an angle to the eastern rectangle. County Road 4102 is along the northern boundary of the western rectangle. The current use of the ALTAJAC1 Site is unoccupied, with the exception of a shipping container storage yard in the western portion of the site and 138 kilovolt ("kV") transmission ROW crossing the eastern portion of the site. Adjacent land uses include an active landfill, water wells and storage tanks, rural residential dwellings, and undeveloped land.

The Project is to be constructed in the central portion of the site with the Oncor substation to the east of the ALTAJAC1 facility and west of the existing transmission line ROW. The Owner reported it will grant an easement to Oncor for the substation and access to the substation. Natural gas will be supplied via an approximately 6,096-foot pipeline extension from the north by [_____]. Water and wastewater services for plant operation will be supplied by the City of Jacksonville. Connections to the existing systems will be by the City of Jacksonville.

The ALTAJAC1 Site generally slopes from the west to the east with rounded knolls and two drainage channels crossing the site. The Owner reported no facilities are planned in the vicinity of the existing drainage channels. The elevations range between approximately 680 feet amsl to 540 feet amsl. Based on FEMA FIRM Community Panel 4807300175D effective January 1, 2011, the ALTAJAC1 Site is in Flood Zone X, an area of minimal flood hazard.

The ALTAJAC1 Site is south of I-20. Local access to the ALTAJAC1 Site from State Highway 69, west of the ALTAJAC1 Site to County Road 4102 along the northern boundary of the site.

## Subsurface Conditions

Subsurface investigations were performed at the ALTAJAC1 Site during the period of June 3, 2019 to June 13, 2019 by PS Industries. Based on its subsurface investigation, PS Industries prepared the subsurface investigation report titled "*Geotechnical Engineering Report Jacksonville Generation Facility Jacksonville, Texas*" dated July 26, 2019 (the "ALTAJAC1 Geotechnical Report").

The subsurface investigations included: (1) an exploration of soil, and groundwater by means of soil borings and one ReMI test, (2) laboratory tests to aid the classification of the soils and the selection of engineering parameters; and (3) preparation of the ALTAJAC1 Geotechnical Report. The ALTAJAC1 Geotechnical Report includes a summary of the field investigations, a boring location plan, boring logs and recommendations for design and construction. Results of the chemical analysis of the soils are included in the ALTAJAC1 Geotechnical Report.

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

The subsurface investigation included 13 borings ranging in depth from 40 feet bgs to 75 feet bgs. Ground water was encountered in 9 borings, when drilling was advanced using dry auger for 10 feet to 25 feet of the bore after which wet rotary methods were used to the termination of the borings. The depth groundwater was encountered ranged from 8 feet bgs to 25 feet bgs. PS Industries recommends the EPC contractor determine the groundwater elevations at the time of construction to determine impact on construction activities. The general subsurface profile at the ALTAJAC1 Site consists of fat clay, fat clay with sand, lean clay, and sandy lean clay to a depth of 38 feet bgs, which are described as firm to hard. Between 38 feet bgs and 75 feet bgs, the subsurface profile is described as clayey sand, clayey gravel, poorly graded sand with silt, and silt sand which are described as dense to very dense.

The near surface soils have a high potential for shrink and swell. PS Industries estimates the potential vertical rise of the soils in the range of 5 to 6 inches. To reduce to potential vertical rise to less than 1 inch, PS Industries recommends installation of 6 feet of low plasticity structural fill be placed between the native soils and the final grade. The structural fill should extend a minimum of 5 feet beyond the perimeter of the structure. PS Industries provided the following recommendations to control moisture and limit the potential for shrink and swell in soils which include to direct surface run-off away from slabs by providing positive slope of the subgrade; extending impervious surfaces to the edge of slabs, and avoid excessive drying of soils around slabs.

To support the CTG, SCR ammonia storage tank, and ancillary structures, PS Industries recommended mat foundations bearing a minimum of 2 feet below finished grade and bearing on compacted structural fill or native soil as noted above, with a net allowable bearing pressure of 4,500 pounds per square foot for dead loads and transient live loads or 3,000 pounds per square foot for dead loads and sustained live loads.

PS Industries also provided axial capacities for drilled shaft foundations with 24-inch, 30-inch, and 36-inch diameters. The drilled shaft extending through the potentially expansive soils are subjected to vertical uplift loads and PS Industries recommends drilled shaft be checked for an uplift load of 42 kips times the diameter of the shaft. Additionally, PS Industries has provided soil parameters for designing the lateral capacity of piles based on the depth of the piles and the group action of the piles for the pile designer.

The ALTAJAC1 Geotechnical Report includes the dynamic properties which are used for the dynamic analysis of foundation of the soils to a depth of 50 feet bgs. The dynamic properties include the shear modulus, the mass density, the material damping ratio, and Poisson's Ratio are based on the ReMi testing preformed at the ALTAJAC1 Site.

The results of laboratory chemical test data for resistivity, pH, chlorides, and the on-site soils are included in the ALTAJAC1 Geotechnical Report and indicate that the soils are non-corrosive to moderately corrosive. PS Industries, notes the limited testing may not provide a reliable indicate of the corrosion potential of the on-site soils, however, based on their experience in the area, PS Industries recommends that buried metals in contact with the soils be protected from corrosion. The laboratory test data results for sulfate ion concentration of the on-site soils is negligible to moderate for sulfate exposure for use by the engineer of record in specifying concrete in contact with on-site soils.

The ALTAJAC1 Geotechnical Report includes recommendations with respect to both the site classification and the spectral accelerations to be used for seismic design. Based on the provisions of the 2012 IBC a Site Class equal to "D" (corresponding to a stiff soil profile) is applicable for the ALTAJAC1 Site. The mapped spectral response accelerations of $S_S = 0.101$ g and $S_1 = 0.055$ g are estimated, which spectral acceleration values generally correspond to an area with a low level of seismic activity.

The ALTAJAC1 Geotechnical Report also provides design recommendations for flexible and rigid pavement design, drainage, and site preparation.

**[Carey inspected the Project Site including the Owner provided geotechnical reports, with the exception of subsurface obstacles or archeological relics. Per the Draft EPC Agreement, Carey is allowed a change for unknown subsurface physical conditions which differ materially from the "Contract Documents." Pursuant to the Draft EPC Agreement, the risk of previously unknown hazardous wastes remains with the Owner.]**

## Site Arrangement

The ALTAJAC1 Site is laid out as shown in Figure 3. The CTGs are to be located on the eastern portion of the ALTAJAC1 Site, and the GSU transformers are to be located in the center of the site and west of the CTs and the interconnection substation west of the GSU transformers.

**Figure 3: ALTAJAC1 Site Layout**

**[To come]**

## Access to Utilities

The access to utilities is discussed in the Electrical Interconnect and Balance of Plant Systems sections below.

## Summary

**[Based on our review, provided that the EPC contractor follows recommendations in the Project Site-specific geotechnical reports regarding GOODALTA Site and ALTAJAC1 Site, the development, access, and subsurface conditions during design and construction we are of the opinion that GOODALTA and ALTAJAC1 should be suitable, from an infrastructure and geotechnical perspective, for construction, operation, and maintenance.]**

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

# The Projects

## Civil and Structural

The civil scope of work at the Project Sites to be performed under the EPC Agreements includes site preparation, rough grading and drainage, drainage during construction, subgrade preparation, final grading and drainage, and construction of roads and parking areas. The specified width of roads is 24 feet with a minimum load of HS-20 per the American Association of State Highway and Transportation Officials ("AASHTO"). The grading at the Projects is to be based on the general arrangement exhibit attached to the EPC Agreement for each Project. The site-specific subsurface investigation and geotechnical report also attached to the EPC Agreement for each Project includes recommendations for site preparation, subgrade preparation, civil construction, drainage, and pavement design.

The majority of the equipment to be installed at the Projects are mounted on skids. No site constructed buildings are planned at the Projects. The design of the foundations supporting the skid mounted equipment at the Projects will be based on the site specific subsurface investigation and geotechnical report, the site-specific environmental loading as specified in the 2010 edition of the American Society of Civil Engineers ("ASCE") Standard 7 "*Minimum Design Loads for Building and Other Structures,*" ("ASCE 7-2010") the equipment manufacturers' requirements and any requirement of the local authority having jurisdiction.

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

ALA00009953

Alta Power — GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 14

**Table 1**
**Site-Specific Structural Design Criteria for Projects**

|  | GOODALTA | ALTAJAC1 |
|---|---|---|
| [Risk Category [1] | III | III |
| Wind Speed – 3 Second Gust (mph [2]) | 120 | 120 |
| $S_s$ [3] | 0.09 | 0.10 |
| $S_1$ [3] | 0.05 | 0.05 |
| Site Class [2] | D | D |
| Seismic Design Category | B | B] |

1) Reference ASCE 7-2010 Table 1.5.1
2) See site-specific geotechnical report. Miles per hour ("mph").
3) Reference ASCE 7-2010 – based in Risk Category and response spectrum.

# Mechanical Equipment and Systems

## Cycle Description

The Projects are each designed to be a 150 MW nominal, natural gas-fired, simple-cycle electric generating plants consisting of three identical "1 x 0" power blocks. Each power block generally consists of a CT, generator, SCR, and GSU transformer. Each Project will generate electricity using three GE LM6000 PC SPRINT CTGs. The CT combustion air flows through an air inlet filter system and associated inlet ductwork. The air is then compressed to an approximately 2:1 compression ratio in the gas turbine low-pressure compressor ("LPC") section before entering the high-pressure compressor ("HPC"), where it is compressed to an approximately 15:1 compression ratio. Overall compression ratio is approximately 30:1, greatly aiding efficiency. The compressed air then flows to the CT combustor. High-pressure natural gas fuel is injected into the combustor section and ignited. The thermal energy produced by combustion is converted into mechanical energy in the turbine section of the unit; the high-pressure turbine ("HPT") drives the HPC while the low-pressure turbine ("LPT") drives the LPC and the generator. Power is transmitted from the LPT to the LPC via a shaft that runs through the hollow HPT and HPC assemblies. The generator is connected via a shaft to the LPC. Demineralized water is injected into the combustion zone in order to modulate combustion temperatures and reduce the formation of NOx to approximately 25 parts per million volume dry ("ppmvd"), corrected to 15 percent oxygen ("$O_2$"). Each CT will be equipped with GE's SPRay-INTercooled ("SPRINT") power boost technology to increase output from the plant during warm or hot ambient conditions. Demineralized, finely atomized water is injected into the compressor section of the engines, which reduces the heat of compression, leading to increased mass flow, and thus increased power output. Water may be introduced into either the LPC or HPC depending on ambient conditions and other factors. Hot flue gas exits the CTGs and enters the ERU. The proposed emissions limits will be met using an SCR process that will include NOx **[and carbon monoxide ("CO")]** catalysts as well as aqueous ammonia injection. Emissions will be monitored by a continuous emissions monitoring system ("CEMS") before exiting the stack. Stack NOx emissions will be controlled by a combination of water injection in the CTs and the SCR system. **[An oxidation (CO) catalyst will be installed in the SCR to limit CO emissions.]**

The design of the Projects is to provide for operating flexibility. Each CTG is designed to start and ramp up to full power in 10 minutes. This fast start capability will allow the Projects to qualify as Quick Start Generating Resources ("QSGR") and provide Responsive Reserve Service ("RRS"), allowing the Owner to readily adapt to changing conditions in the energy and ancillary services markets. Each CTG can also provide additional ancillary services, such as Regulation Service ("RGS"), Non-Spinning Reserve Service ("NSRS"), and "Voltage Support Service" **[this is not included in Pro Forma, please clarify]**.

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

The design of the Projects will allow for "black start" capability. Each Project will install a black start diesel generator that is capable of starting one CTG at a time. The Owner anticipates being selected to provide black start service ("BSS") at the first available ERCOT offering for BSS for the Projects in 2022. ERCOT request bids from "Generation Resource Entities" for the provision of BSS on or before June 1 of each year. Bids are evaluated based on certain evaluation criteria and contracted by December 31 for the following calendar year. ERCOT will ensure BSS are arranged, provided, and deployed as necessary to reenergize the ERCOT system following a total or partial system blackout.

## Combustion Turbine

The Projects will utilize GE LM6000 PC SPRINT CTs with water injection to mitigate the formation of $NO_x$ emissions during the combustion process. Each CT is a 3,600 revolutions per minute ("rpm"), 60 Hertz ("Hz") aeroderivative CT nominally rated at approximately 50 MW at standard conditions. Exhaust from each CT will be directed to the inlet of its respective ERU.

Each CT will also be equipped with an air inlet filter system to protect the CTs, generators, and equipment compartments from the effects of airborne dirt and foreign objects damage. The air inlet housing for each CT will be equipped with a three-stage inlet filtering system, which provides capture efficiency exceeding 99.9 percent of particles 5.0 microns and above. Further, CT compressor noise is to be reduced via a set of silencer baffles located in line with the inlet airflow.

Each CT is supplied with an electro-hydraulic start system that includes an electric motor driven hydraulic pump assembly, filters, cooler and controls, mounted on the auxiliary equipment module. A hydraulic motor is also mounted on the CT accessory gearbox.

## Emission Reduction Unit

Turbine exhaust hot flue gas exits the CT and enters the ERU. The ERU equipment will include a reactor chamber, catalyst modules, ammonia vaporization and injection system, monitoring equipment and sensors, exhaust stack with silencer.

Each ERU will use a Project aqueous ammonia storage and forwarding system, which consists of a 11,000-gallon ammonia storage tank, unloading skid and associated pumps, an aqueous ammonia forwarding skid containing 2x100 percent forwarding pumps, **[spill containment basin, and refilling station with a spill containment basin and sump]**. The 11,000-gallon ammonia storage tank provides over a month of continuous operation of all three ERUs at a Project.

## Lube Oil Systems

Each CTG is supplied with two separate lube oil systems: one synthetic for the gas turbine and one mineral for the generator. The lube oil reservoir, and filters are mounted on the auxiliary equipment module. The mineral lube coolers, reservoir and filters are located on the main skid baseplate. The lube oil coolers are fin-fan type. The fin-fan cooler is a simplex core fin-fan cooler complete with changeover valve mounted on a separate base plate with dual fans and is installed on a separate foundation. This cooler is suitable for operation up to an ambient temperature of 110 degrees Fahrenheit ("°F").

## Turbine/Generator Enclosure

Each CTG is supplied with weatherproof, acoustic enclosures. The enclosures are designed to achieve noise abatement to an average of 85 decibels A-weighted (sound pressure level) ("dB(A)") at 3 feet away

and 5 feet above grade during full load operations. Both CT and generator compartments are ventilated with redundant fans (one running, one standby). Explosion-proof lighting is provided in both compartments.

### Compressed Air System

Each Project will be provided with compressed air for instrument and service air via two 100 percent oil free rotary screw 200 cubic feet per minute ("CFM") air compressors, two 150 percent desiccant air dryers and one 400-gallon receiver tank, all mounted on separate skids.

### Natural Gas Compressors

GOODALTA is not being supplied with gas compression capability as MidCoast, the supplying pipeline, is committing to a minimum pipeline pressure of 700 pounds per square inch ("psi"). 700 psi exceeds GE's recommendation for the LM6000 gas supply pressure requirement of 675 psi. The Enterprise pipeline pressure is typically between 875 to 900 psi with a low of 750 psi.

## Electrical and Control Systems

The review of the electrical system is based on the *"Preliminary One-Line Sketch for the 3 Unit Configuration"* dated December 10, 2018. The drawing is for review only and not for design or construction.

The Projects are to include three simple-cycle units, each with a single generator coupled to the associated CT. Each generator is to be a synchronous, three phase, 60 Hz unit, air cooled with a nominal nameplate output rating of 50 MW megawatts ("MW"). The nominal Project output is to be 150 MW at 0.95 leading and 0.95 lagging power factor at the point of interconnection ("POI").

Each generator is to be connected to a generator circuit breaker and then to a GSU transformer. The line side terminals of each generator circuit breaker are to be tapped to feed one auxiliary transformer ("UAT"). The GSU transformers connected to the CTGs are to be outdoor, oil-filled, 13.8 kV to 138 kV units rated approximately 75 megavolt-amperes at 65 degrees Celsius ("°C") temperature rise with two stages of forced cooling in service. The high side of each GSU is connected to a 138 kV common bus through a disconnect switch. The common bus is connected to the interconnecting utility's POI substation through a 138 kV circuit breaker, a line disconnect switch, and a short 138 kV generation tie line.

Normal electrical power for start-up and general services is to be supplied by the two winding 13.8 kV to 480 volt ("V") UATs. Each UAT is to be an oil-filled, two winding design with a rating of 1,000 kilovolt-amperes ("kVA").

There is to be a 480 V system which is to include three 480 V buses each fed from one of the UATs, and bus tie circuit breakers to allow the busses to be supplied from multiple UATs. Each 480 V bus is to contain motor starters to supply three-phase motors and circuit breakers to feed other 480 V equipment and lower voltage systems.

There is to be a 13.8 kV/4,160 V step-down transformer that will supply a 4,160 V motor starting device as required to support the gas compression system.

## Auxiliary/Station Service and Emergency Power

The Owner reports that during start-up of the Project, auxiliary power is to be supplied from the grid at the Project's switchyard through the CTG GSU transformers. The Owner reports that critical auxiliary loads required to be operated in the interest of equipment and personnel safety during and following the loss of

normal auxiliary power to the Projects are to be fed from 24 V and 125 V-direct current ("DC") battery systems and uninterruptable power supply system ("UPS") associated with each unit. The battery system is to serve the emergency lube oil and seal oil pumps, switchgear, protective relay panels, and critical CT instrumentation associated with each unit. Owner reports each of the Projects is to have a station service transformer ("SST") located near the auxiliary control module and is to be served off the 480 V bus for 208 V-alternating current ("AC") and 120 V-AC facility loads. The SST is to be fed via an 800 ampere ("A") circuit breaker and is to be rated at 480 to 120 V-AC, 45 kVA. The fire protection system is to be provided by the CT supplier, and is to be powered via the 24 V battery system.

**[Please provide drawings.]**

## Control and Monitoring Systems

Both Projects are to be designed for automated operation, with each CTG to be dispatched independently by a distributed control system ("DCS"). The DCS is to be capable of executing supervisory control functions for the CTGs individually, through the GE control system of each generating unit.

Primary control, monitoring, alarming, and protection of each CTG is to be accomplished by a microprocessor-based control system located at each of the CTs, and furnished by GE that is to be either based on the GE Mk VIe or programmable logic controller ("PLC") with a local operator workstation for each unit in the PCM for supervisory control and monitoring.

**[Please provide drawings.]**

## Black Start Generator

Each Project includes black start capability, with one diesel-fired generator installed. Each generator is rated at 1,000 kVA at 480 V and is connected to two of the 480 V plant busses. The diesel generator circuit breakers are interlocked with the main circuit breakers coming from the UATs.

## Electrical Interconnect

### GOODALTA

GOODALTA is operated under the Standard Generation Interconnection Agreement ("SGIA") between Goodalta LLC and Oncore executed on [_____] and is the standard form of interconnection agreement used for generating facilities connecting to utilities within ERCOT.

**[To come]**

### ALTAJAC1

The Project is operated under the SGIA between the Altajac1 LLC and Oncor executed on [_____] and is the standard form of interconnection agreement used for generating facilities connecting to utilities within ERCOT.

**[To come]**

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

APP0009957

## Balance of Plant Systems

### Water Supply and Treatment Systems

City water will be supplied to an on-site reverse osmosis ("RO") water purification system **[provide details regarding RO system]**. The purified water is injected into the CT for $NO_X$ emission control as well as into the compressor for power augmentation via SPRINT. Reject water from the RO will be the only utility wastewater discharge. An 180,000-gallon demineralized water storage tank will be installed at each Project, which allows over 17 hours continuous operation of all three CTs at a Project.

For raw water, the Projects will use municipal water provided by: (1) Chatfield Water Supply ("Chatfield") for GOODALTA; and (2) the City of Jacksonville for ALTAJAC1.

We reviewed an agreement titled *"Draft Water Contract 07202019"* for GOODALTA to receive water from Chatfield. The following discussion is a summary of the contract. The term is to begin on the effective date and the initial term will remain in effect for 10 years. At the end of the term, the contract is set to automatically renew for three successive periods of 5 years unless either party notifies the other of its intent not to renew at least 180 days prior the end of the term.

Chatfield is to provide a scope of services pertaining to: (1) deliver potable treated water with purity standards of the State Department of Health and the Texas Commission on Environmental Quality ("TCEQ") of the State of Texas; (2) deliver 60,000,000 gallons of water; (3) install metering equipment and valves; (4) provide periodic inspections; and (5) provide any other duties as required.

The termination provisions of the FMSA by either party are typical for these type of agreements including default, false representation, bankruptcy, and failure to pay. There is no termination for convenience for either party.

We reviewed an agreement titled *"Water Purchase Contract"* for ALTAJAC1 to receive water from the City of Jacksonville. The following discussion is a summary of the contract. The term is to begin on the effective date and the initial term will remain in effect for 30 years.

The City of Jacksonville is to provide a scope of services pertaining to: (1) deliver potable treated water with purity standards of the State Department of Health and the TCEQ of the State of Texas; (2) provide 60,000,000 gallons of water; (3) accept 30,000,000 gallons of wastewater; (4) sell additional water above the 60,000,000 gallons limit at a rate of $2.85 per thousand gallons; (5) accept additional wastewater above the 30,000,000 gallons limit at a rate of $2.89 per thousand gallons; (6) provide engineering and construction of water main extension and wastewater main extension from current points of delivery and extend city-owned facilities to the property line; and (7) provide any other duties as required.

The termination provisions of the FMSA by either party are typical for these type of agreements including default, false representation, bankruptcy, and failure to pay. There is no termination for convenience for either party.

### Wastewater and Stormwater Systems

Reject water from the RO will be the only utility wastewater discharge. **[At each Project, oily wastewater is to be collected in containment systems connected to the CTs, and GSU and auxiliary transformers. The wastewater from each Project's containment drains on the site are to be collected and routed by gravity to the Project's oil/water separators.] [If RO is the only discharge,**

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

**please provide information on what is done with site drainage, stormwater, oily water treatment, etc.]**

GOODALTA is to dispose of wastewater to the Richland Chambers Reservoir per a permit filed with the TCEQ under the Texas Pollutant Discharge Elimination System ("TPDES") program. This permit will require water sampling and discharge monitoring. Wastewater discharges into pipe on the northwest corner of the Site. The pipe is routed within the ROW of SE 3200 Rd. (owned by Navarro County) and then discharges directly into Richland Chambers Reservoir approximately 0.5 miles west of the site. There is no sewage sludge disposal and the discharge is less than 5 MGD. Portable toilets will be utilized initially, with the possibility that a septic system will be installed at the facility in the future. If a septic system is installed, domestic sewage will be disposed of off-site through the use of a hauler.

ALTAJAC1 is to dispose of up to 30,000,000 gallons of wastewater under agreement to the city water municipality.

## Ammonia Supply

Aqueous ammonia at a nominal concentration of 19 percent will be procured locally, delivered to the Project Sites by truck and stored at each site in a storage tank with at least 11,000 gallons of capacity and secondary containment.

## Fuel Supply Systems and Agreements

The CTGs will be designed to burn natural gas only. Natural gas will be delivered to the GOODALTA Site by Midcoast. Natural gas will be delivered to the ALTAJAC1 Site by Enterprise. The supplying pipeline pressure is reported to be typically between 875 to 900 psi with a low of 750 psi. 700 psi exceeds GE's recommendation for the LM6000 gas supply pressure requirement of 675 psi.

The respective pipelines are to install metering and regulating equipment. A duplex gas filter-separator complete with an automatic liquid drain system will provided for each CT main unit fuel connection. Each CT is supplied with an electronically controlled fuel-metering valve. For full-load operation, the gaseous fuel must be supplied to the baseplate at 675 pounds per square inch gauge ("psig") **±[25]**.

## Gas Interconnection

The Owner has negotiated an interconnection agreement dated **[September __, 2019]** with Enterprise for ALTAJAC1. Under the terms of the agreement Enterprise is to construct pipeline interconnection and metering facilities designed to deliver a maximum gas flow of 1,250 MMscf per hour which is approximately equivalent to 30,810 million British thermal units ("MMBtu") per day. The Owner is to reimburse Enterprise for construction costs, as further discussed in the Capital Cost section of this Report.

The Owner has also negotiated an interconnection agreement dated **[September __, 2019]** with Midcoast for GOODALTA. Under the terms of the agreement Midcoast is to construct an **[8-inch]** diameter pipeline lateral and metering facilities designed to deliver a maximum gas flow of **[30,000 MMBtu per day]**. The Owner has agreed to pay Midcoast $1,000,000 as a contribution in aid of construction.

## Gas Transportation and Gas Supply

The Owner is implementing a fuel supply plan that includes firm transportation capacity on Enterprise and Midcoast, firm natural gas storage capacity at Trinity Gas Storage ("TGS"), and firm gas supply provided

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 20

by UET who will act as fuel manager for the Projects. The following provides a summary of each aspect of the fuel supply plan.

The Owner has negotiated a firm transportation agreement with Midcoast dated **[September __, 2019]**. The term of the agreement is ten years and the effective date of the agreement is the commencement of service on the Midcoast CJ Express pipeline expansion which is expected to occur in early 2021. The agreement provides 30,000 MMBtu per day of firm transportation capacity for delivery to the GOODALTA or to the interconnection of Midcoast and TETCO pipeline in the TETCO WLA zone. The primary receipt point under the agreement is TGS. The capacity reservation rate under the agreement is $0.15 per MMBtu per day or $1,642,500 annually. Prior to the commencement of service at TGS the commodity rate is $0.15 per MMBtu of gas delivered to GOODALTA. After commencement of service at TGS the commodity rate reduces to $0.05 per MMBtu of gas delivered to GOODALTA. All deliveries to GOODALTA also incur a 0.5 percent fuel retention rate. The commodity rate for gas delivered to TETCO is $0.10 per MMBtu with a 1 percent fuel retention rate. Under the terms of the agreement Midcoast guarantees a minimum pipeline operating pressure of **[___ psig]**. The guaranteed minimum pressure is still subject to force majeure in the event of mechanical or other failures on the pipeline system.

The Owner has negotiated a firm transportation agreement with Enterprise dated **[September __, 2019]**. The effective date of the agreement is April 1, 2020 with a primary term of five years and a one-time option to extend the agreement for an additional five years upon giving notice to Enterprise on or before March 31, 2024. From April 1, 2020 through June 30, 2020, the agreement provides 30,000 MMBtu per day of firm transportation capacity with 10,000 MMBtu per day for delivery to the Jacksonville Facility and 20,000 MMBtu per day for delivery to TGS. Commencing July 1, 2020 and ending March 31, 2025, the agreement provides 90,000 MMBtu per day of firm transportation capacity on Enterprise with 30,000 MMBtu per day for delivery at the Jacksonville Facility and 60,000 MMBtu per day for delivery at TGS. The primary receipt point under the agreement is the interconnection between Enterprise and Natural Gas Pipeline Company of America ("NGPL") at Beckville in Panola County, Texas. The capacity reservation rate under the agreement is $0.05 per MMBtu per day or $1,642,500 annually. The reservation rate escalates by $0.0025 per MMBtu annually beginning April 1, 2021. There is no commodity charge under the agreement but there is a 1 percent fuel retention rate on delivered volumes beginning July 1, 2020. Under the terms of the agreement Enterprise guarantees a minimum pipeline operating pressure of **[___ psig]**. The guaranteed minimum pressure is still subject to force majeure in the event of mechanical or other failures on the pipeline system.

The Owner has executed separate precedent agreements, one for each of the Projects, for natural gas storage service dated April 30, 2019 with TGS. In addition, the Owner has negotiated firm natural gas storage service agreements dated **[September __, 2019]** for each of the Projects. The term of the agreement commences on July 1, 2020 and ends June 30, 2030. The Project Sites will each hold a firm natural gas storage quantity of 1.5 Bcf. The maximum withdrawal capacity under the agreement is 30,000 MMBtu per day for each Project. The Maximum injection capacity under the agreement is 25,600 MMBtu per day for each Project. The allowable injection and withdrawal rates ratchet based on the level of gas in storage. The monthly storage reservation rate is $0.065 per MMBtu or $1,170,000 annually. The injection charge under the agreement is $0.015 per MMBtu with a 1.5 percent fuel retention rate.

The Owner has negotiated a **[draft]** FMSA with UET dated **[September __, 2019]**. The effective date of the agreement is **[April __, 2020]** with a primary term of three years and a two year extension option. Under the terms of the agreement UET will; sell firm gas supply to the Projects, manage pipeline nominations, manage pipeline imbalances, and optimize the value of the Owner's natural gas assets. UET will be the sole supplier of fuel to the Projects and the Owner will release its firm pipeline transportation and storage

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

capacity to UET who will manage and optimize the value of these assets. Pricing for day-ahead natural gas nominations is indexed to the Platts Gas Daily, NGPL, Texok zone plus $.30 per MMBtu. The energy management fee is $50,000 per month. UET is also entitled to optimization margin sharing. UET will receive 10 percent of the first $2 million of optimization margin and 50 percent of any optimized margin above $2 million as calculated on a cumulative annual basis.

Figure 4 is a diagram depicting how the various elements of the Owner's fuel supply plan work together to support the generation requirements of the Projects.

**Figure 4: Fuel Supply Plan Diagram**



## Environmental Control Equipment

Each CT will achieve its low NOx level of 25 parts per million ("ppm") at the CT exhaust with water injection. NOx emissions are further reduced in the ERUs that are to be equipped with an SCR system (with catalyst and ammonia injection grid) to further control NOx emissions **[and an oxidation catalyst system to control CO and VOC emissions]**. Each CT is to be equipped with inlet air filtration for particulate emissions control. CT noise is to be mitigated through the standard enclosure for this model CT. A CEMS is to be provided on the exhaust stack of each power block to determine air emissions rates of NOx and CO.

# Construction of the Projects

The Projects are to be constructed via two separate Equipment Supply Agreements and two separate EPC Agreements, one of each for each Project. In addition the electrical Interconnection will be constructed under the terms of the **[_____]**. The Equipment Supply Agreements are materially similar and EPC Agreements are materially similar. Unless otherwise noted, the discussion of the Equipment Supply

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 22

Agreements and EPC Agreements herein describes the common provisions of the draft execution versions of the corresponding contract.

The primary EPC of the Projects will be accomplished under the provisions of the respective Equipment Supply Agreement and EPC Agreement for each Project. Under each Equipment Supply Agreement, WattStock will engineer, design, and supply the Projects' major equipment, including the CTGs, which have been recovered from a decommissioned facility and refurbished. Under each EPC Agreement, Casey is to perform the site work, installation of the Power Block Equipment, supply and install certain other equipment and systems including SCR and stack, ammonia storage and feed system, fuel gas system **[please confirm if gas compressors will be installed at either or both sites]**, compressed air system, standby diesel generator, water treatment equipment and wastewater handling and storage system, construction of roads, grading, foundations, and **[buildings – please provide more detail]**, installation of interconnecting piping and wiring, and the EPC of the substation for each of the Projects. The EPC of the electrical interconnect for each Project will be performed by [_____].

## EPC Agreement and Equipment Supply Agreement

### Scope of Supply

Under the terms of the EPC Agreement for each Project, Casey is to design, engineer, and construct all of the work and provide services (except for Owner-supplied items and services), as necessary to achieve mechanical completion, substantial completion, and final completion (each as defined in such EPC Agreement), including: (1) the engineering, procurement, and construction of all Project equipment and systems, and the services required to complete such Project; (2) the required improvements to such Project Site including **[clearing and grubbing]** to allow for construction; **[(3) providing reasonable assistance to the Owner in procurement of any equipment not provided directly by Casey;]** (4) providing site management, equipment, and consumables necessary for the work except those items and services furnished by the Owner; (5) coordination with the Owner regarding activities at the Project Site and complying with the terms and conditions of the SGIAs **[and interconnection to all utilities]**[; (6) the commissioning, start-up, and testing of the Project; (7) supplying **[and storing]** all commissioning spare parts, **[and provide the Owner with a recommended list of spare parts for the Projects;]** and (8) providing documentation consisting of **[O&M manuals, training manuals,]** engineering calculations, as-built drawings, design specifications and data sheets, and warranty documents for plant equipment.

The Owner's obligations under the EPC Agreement for each Project include: (1) providing Project site access, and easements or other ROWs; (2) maintaining the Owner's permits and governmental authorizations; (3) providing access to utilities for construction electricity, construction water, telephone service, and start-up, commissioning, and testing fuel, and backfeed power required for commissioning and testing; **[and (5) providing site survey and geotechnical studies]**.

The Power Block Equipment for each Project to be supplied includes minor components and all appurtenant supporting equipment, first fill of consumables, **[control system software]**, **[spare parts]** and related services all as set forth in the technical specification under Appendix B to the corresponding Equipment Supply Agreement. The work to be performed is defined as the procurement, refurbishment (of used equipment), manufacture, fabrication, and supply (including transportation to the Project Site) of the Power Block Equipment and the **[special tools]**, technical assistance to the Owner or Casey for the unloading, assembly, erection, installation, and performance testing services provided under such EPC Agreement, and performance of WattStock warranty obligations, the provision of all licenses, management, and labor that is indicated in the Equipment Supply Agreement, or that are required in accordance with applicable laws with respect to work performed at the Project Site or under the Equipment Supply Agreement.

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 23

## Price and Payment

The "EPC Agreement Price" for each Project is to be a fixed separated-sum amount of $[_____]
for GOODALTA, and $[_____] for ALTAJAC1 as defined in the **[draft]** EPC Agreements.
Payments of the contract price for each Project are to be made in installments based upon completion of
each milestone as set forth in Exhibit H to such EPC Agreement. The Owner is permitted to withhold
10 percent retainage from each payment to be made to Casey. Casey will commence work under each
EPC Agreement upon issuance of a notice to proceed ("NTP"), which is to be provided by the Owner no
more than 2 business days after the date of financial closing, **[which has not yet been defined,]** but in no
case later than **[August 15, 2019 – this date has passed]**.

Upon achievement of mechanical completion for each Project, the retainage amount for such Project then
withheld will be reduced by 50 percent. Upon achievement of substantial completion for each Project the
withheld retainage shall then be released to Casey, less an amount equal to 200 percent of the value of the
associated punchlist, plus all amounts claimed as liquidated damages ("LDs") under such EPC Agreement
that have not yet been paid.

The "Equipment Supply Agreement Price," as total payment for the supply of the equipment, materials **[and
spare parts]** and for the performance of the services, is a fixed lump-sum price of $[_____] for
GOODALTA, and $[_____] for ALTAJAC1 and may be adjusted only as specified in such
Equipment Supply Agreement. The Equipment Supply Agreement Price includes an allowance of
$1,400,000 for each Project for transportation of the Power Block Equipment to each Project Site, which is
to be adjusted by change order upon determination of actual transportation costs incurred. Payment is to
be made as indicated in the payment schedule shown in Exhibit G to such Equipment Supply Agreement
and without setoff or retainage of any kind, as tied to milestones as indicated therein. Upon achievement
of Equipment Supply Substantial Completion for each Project, the then remaining associated Equipment
Supply Agreement Price is to be paid, less an amount equal to 150 percent of the value of the associated
final punchlist, **[and less all amounts claimed as LDs under such Equipment Supply Agreement that
have not yet been paid.]**

## Changes in Work

The Owner may submit a written request for change in scope to Casey via a change order process as
stipulated in the EPC Agreements. Casey may submit a change order request upon changes in law,
discovery of differing site conditions, or Owner-caused delay. Under the EPC Agreements, a force majeure
event allows for adjustment to the project schedule and guaranteed milestone completion dates, but not to
the corresponding EPC Agreement Price.

Under each Equipment Supply Agreement, the Owner has the right to submit a written request that
WattStock consider changes to the work, including modifications, alterations, or additions, or changes to
the project schedule. WattStock may submit a change order request upon if it wishes to or if it is entitled
to a change due to a force majeure event, changes in law, discovery of hazardous materials at the Project
Site, Owner breach of contract, or Owner-caused delay. Under the Equipment Supply Agreements, a force
majeure event allows for adjustment to the project schedule, guaranteed milestone completion dates, and
also the corresponding Equipment Supply Agreement Price. All changes under the Equipment Supply
Agreements shall be subject to mutual agreement between both the Owner and WattStock. However, if
any change is reasonably capable of being implemented by WattStock, but the parties are unable to agree
on the adjustment to the Equipment Supply Agreement Price or project schedule, then the Owner may
direct WattStock to proceed with such change, and the Equipment Supply Agreement Price is to be

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 24

adjusted based on documented direct costs plus 15 percent and the project schedule is to be adjusted for the resulting actual, substantiated delay.

## Commissioning, Completion, and Delay Liquidated Damages

Under the EPC Agreements, mechanical completion for each Project is deemed to occur when the Project: (1) is physically complete with regard to the work as provided in the scope **[except for the punchlist items]** and the essential equipment and balance of plant ("BOP") systems are ready for initial operation, adjustment, and testing; (2) all systems necessary for power generation have been checked to be in accordance with good industry practice; (3) **[turnover books]** have been completed to allow for start-up and testing and first fire testing to begin, and the Project is ready to receive backfeed through the GSU transformers; and the Owner and Casey have executed a "Certificate of Mechanical Completion" for such Project.

Under the EPC Agreements, the key events that need to occur prior to achieving substantial completion for a particular Project include: (1) mechanical completion has been achieved; (2) a performance test has been performed successfully demonstrating that the Project has successfully achieved the performance guarantees for **[stack NO$_X$, stack ammonia slip, SCR backpressure, and plant auxiliary load]** as stipulated in Appendix M of the EPC Agreements (the "EPC Performance Guarantees"); (3) the Project has been successfully interconnected and synchronized to the electrical grid; (4) all portions of the Project can be used for their intended purpose in accordance with the contract (except for items intended to be completed later and except for punchlist items) and applicable laws, the Project can be placed into commercial operation; (5) Casey has paid all undisputed performance guarantee LDs due to the Owner; and (6) Casey and the Owner have agreed to a punchlist. Should Casey not achieve substantial completion for each Project by the "Guaranteed Substantial Completion Date" of such Project, defined as [_____] for GOODALTA, and [_____] for ALTAJAC1, Casey is to be liable to pay delay LDs to the Owner in the amount of $5,000 per day of delay for days 1 through 5, $7,500 per day of delay for days 6 through 10, $10,000 per day of delay for days 11 through 15, $15,000 per day of delay for days 16 through 20, $25,000 per day of delay for days 21 through 30, $35,000 per day of delay for days 31 through 45, $50,000 per day of delay for days **[46]** through 90, or until the delay LD cap is achieved.

Under the EPC Agreements, the key events that need to occur prior to achieving final completion for a particular Project include: (1) substantial completion has occurred; (2) the Project is free of defects to the Owner's satisfaction; (3) proof of payment of all Project-related expenses has been provided, including submittal of required lien waivers; (4) **[the reliability test has been successfully completed – test and criteria are missing]**; (5) Casey has paid all undisputed delay LDs and performance LDs due to the Owner; (6) all punchlist items have been completed and accepted by the Owner; (7) the Owner has provide notification of confirmation that the above items have been satisfied.

Delivery of Power Block Equipment under each Equipment Supply Agreement is defined as the point at which the delivery of the major equipment of each Unit has occurred, and is guaranteed to occur by the dates specified **[missing stipulation of year]** in Exhibit D – Milestone Schedule. Major equipment includes **[installation hardware]** and essentially all three CTs, three generators, three baseplates, the **[control house – is this the power control module (PCM)?]**, and switchgear, for assembly and installation at the Project Site. If any of the specified components are not delivered on or before their guaranteed delivery dates, WattStock is subject to pay delivery delay LDs to the Owner as stipulated under Exhibit E-2, in the amount of $5,000 per **[major component per week of delay]**. **[Delivery of installation drawings does not appear to have a guaranteed milestone date or delay LDs associated, please confirm.]**

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

Turbine mechanical completion **[for each CT or all CTs]** under the Equipment Supply Agreements is defined as **[_____ under Exhibit J of the Equipment Supply Agreement - missing]**, and is guaranteed to occur by **[the dates specified - missing]** in **[Exhibit D – Milestone Schedule] ("the Turbine Mechanical Completion Guaranteed Dates")**. No LDs are assessed for late achievement of turbine mechanical completion.

Substantial completion under the Equipment Supply Agreements ("Equipment Supply Substantial Completion") is provided for **[on a per Unit basis or on a Project basis]** and is achieved when the following have been accomplished: (1) WattStock has achieved turbine mechanical completion so that the **[Unit or Project]** is **[ready to safely and reliably start-up and begin the commissioning process]**; (2) the performance tests have been completed to demonstrate that the **[Unit or Project]** has achieved **[at least the Minimum Power Block Guarantees, as defined below under the Performance Guarantees section]** while in compliance with the Project's permit limitations applicable to air emissions and noise; and (3) submittal of WattStock's **[installation and design manual and the O&M manual]**. If WattStock fails, due to its fault, to achieve substantial completion of a **[Project]**, prior to the Guaranteed Substantial Completion Date, it is subject to pay "Equipment Supply Substantial Completion Delay LDs" to the Owner as stipulated under Exhibit E-2, in the amount of $21,000 per day of delay, provided however, that such LDs payable shall be reduced by the LD amount incurred due to late equipment delivery LDs. Upon achievement of Equipment Supply Substantial Completion, WattStock is to submit a final punchlist for Owner's review and approval.

Subsequent to achievement of Equipment Supply Substantial Completion, the Owner may direct Casey to proceed with conducting the 72-hour reliability test.

Final completion under the Equipment Supply Agreements ("Equipment Supply Final Completion") is provided for on a Project basis and is achieved when the following have been accomplished: (1) **[Equipment Supply Substantial Completion has been achieved]**; (2) the final punchlist has been completed; (3) certain documentation required for Equipment Supply Final Completion have been submitted; (4) WattStock has removed all its tools, construction equipment, and debris has been removed from the Project Site; (5) the reliability test has been completed successfully; (6) WattStock has provided final lien waivers for it and its subcontractors; and (7) all work under the Equipment Supply Agreement have been completed.

## Warranty

For each Project, Casey warrants for a period of one year commencing on the Project's substantial completion date, that: (1) all EPC machinery, equipment, materials, systems, and supplies included in Casey's scope of work, except for Owner-supplied items, shall be free from defects in design, workmanship, and material, and will be new and unused at the time of their delivery to the Project Site, and spare parts shall be available **[for a certain undefined period following final completion]** for such Project for prices no greater than those stipulated in the corresponding EPC Agreement; (2) the work, including design, construction, and engineering, shall be performed in accordance with good industry practice, the scope in the EPC Agreement, and all applicable laws and permits. All corrective work is to have an extended warranty of one year from the date the corrective work is completed, but in no case later than two years after the date of substantial completion for such Project.

WattStock warrants to the Owner that during the warranty period: (1) the Power Block Equipment to be delivered will be free from defects in material, workmanship, and title; (2) designed and fit for the purpose of generating electric power when operated in accordance with the WattStock's operating instructions;

(3) conform with the Equipment Supply Agreement technical specifications; and (4) services shall be performed in a competent, diligent, good, and workmanlike manner in accordance with the Equipment Supply Agreement and applicable laws and permits.

WattStock will warrant the Power Block Equipment and its associated services from **[_____]** until the later of 12 months following date the turbine equipment is energized or 18 months after the **[first or last]** issuance of a WattStock notice of delivery of equipment to the Owner. WattStock has responsibility to repair or replace defective components and parts, or re-perform defective services, during the warranty term. The warranty period for components repaired or replaced or services provided under warranty shall be extended until the later of the expiration of the warranty period or 12 months after the completion of the repair. The WattStock warranty excludes damage due to wear and tear, improper storage or installation, and force majeure.

## Performance Guarantees

Power Block Equipment performance guarantees are provided for under the Equipment Supply Agreements Exhibit E as summarized in Table 2, and EPC performance guarantees are provided for under the EPC Agreements Appendix M as summarized in Table 3. The guaranteed point conditions on which the Equipment Supply Agreements **[and EPC Agreements]** performance guarantees are based as specified in Table 4. The minimum thermal performance for the Power Block Equipment include 95 percent of the Gross Power Block Output Guarantee (the "Minimum Gross Power Block Output Guarantee" and 105 percent of the Gross Power Block Heat Rate Guarantee (the "Maximum Gross Power Block Heat Rate Guarantee," together the "Minimum Power Block Guarantees").

ALTA0009966

**Table 2**
**Equipment Supply Performance Guarantees**

| Guarantee | Value |
|---|---|
| Gross Power Block Output (kW) [1] | 146,171 |
| Gross Power Block Heat Rate (Btu/kWh) (LHV) [1][2] | 8,839 |
| **[Near Field Noise, (dBA) [3] Average per CT] [4]** | [ ] |
| **[Far Field Noise, (dBA) Average per CT] [5]** | [ ] |
| Power Block Equipment NOx Emissions | See Table 5 |
| Power Block Equipment CO Emissions | See Table 5 |
| **[Start-up and Shutdown Air Emissions ]** | **[See Table 5]** |
| Minimum Gross Power Block Output Criteria (%) | 95 |
| Maximum Gross Power Block Heat Rate Criteria (%) | 105 |
| Reliability Guarantee (continuous hours of operation) | 72 |
| **[Transient Ramp Rate Guarantee (MW/minute per CT)** | [ ] |

1) Kilowatts ("kW"). Power measured at the Generator terminals, **[includes allowances for excitation power and net of WattStock auxiliary loads]**. Based on Table 3 reference conditions.
2) Based on Table 3 reference conditions. British thermal units per kilowatt-hour (lower heating value) ("Btu/kWh LHV").
3) **[Decibels A-weighted (sound pressure level) spatially averaged ("dBA").**
4) **Measured 3 feet in the horizontal plane and at an elevation of 5 feet above the CT operating level.**
5) **Measured no closer than 400 feet from the nearest point of the outdoor CT air inlet.]**

**Table 3**
**EPC Performance Guarantees**

| Guarantee | Value [1] |
|---|---|
| Unit Stack NOx | See Table 5 |
| Unit Stack Ammonia Slip | See Table54 |
| Unit SCR Back Pressure (in wc) [2] | **9.5** |
| Plant Auxiliary Load [3] | [ ] |
| Plant Reliability | [ ] |
| **[Plant Fast Start [4]]** | [ ] |

1) Based on and corrected to Table 5 reference conditions.
2) Inches of water column ("in wc").
3) As measured at the high voltage side of the 3 GSUs compared to that as measured at the 3 CTG terminals.
4) To demonstrate that the Project is able to achieve full load from a cold condition within 10 minutes and continue stable operation for an additional 20 minutes.

CONFIDENTIAL

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 28

**Table 4**
**Guarantee Point Conditions for [Both EPC Agreements and]**
**Equipment Supply Agreements Performance Guarantees**

| Condition | Value |
|---|---|
| Ambient Dry-Bulb Temperature (°F) | 59 |
| Ambient Relative Humidity (percent) | 60 |
| Ambient Barometric Pressure (psia) | [         ] |
| Inlet Loss (in wc) | 3.00 |
| Exhaust Loss (in wc) | 9.00 |
| Steady State Load | CTs at Baseload |
| Generator Power Factor | [         ] Lagging |
| Sprint Water Temperature (°F) | [         ] |
| Natural Gas Lower Heating Value (Btu/lb [1]) | [         ] |
| Equipment Condition | New and Clean |

1) Pounds ("lb").

## Emissions Guarantees

Casey and WattStock provide guarantees for emissions in their respective agreements, **[which meet the requirements as stated in the air permit]**. **[These guarantees are corrected to International Organization for Standardization ("ISO") operating conditions.]** Table 5 summarizes the emission guarantees, **[which are identical for the Projects]**.

**Table 5**
**Emissions Guarantees**

| Pollutant | Emission Limit |
|---|---|
| EPC NO$_X$ | 85% reduction [1] |
| EPC Ammonia Slip | 10 ppmvd at 15% O$_2$ |
| Power Block Equipment NO$_X$ | 25 ppmvd at 15% O$_2$ |
| Power Block Equipment CO | 21.12 pph at 15% O$_2$ |

(1) Efficiency of SCR as determined by measurement of stack NOx as compared to Power Block Equipment NO$_x$.

## Acceptance Testing Program

The purpose of the acceptance tests is to demonstrate each Project's ability to achieve its EPC Agreement Performance Guarantees **[and the Equipment Supply Agreement Performance Guarantees]** (collectively the "Performance Guarantees") necessary for each of the Projects to meet substantial completion under its respective contract. Under the corresponding EPC Agreement, Casey is to conduct performance testing with WattStock's and the Owner's support for each Project, including one 1-hour test run to collect data **[concurrently]** to prove each of the Performance Guarantees, except for the reliability guarantee which is to be tested over 72 hours. During performance testing all three CTs are to operate in unison. The procedures for conducting the acceptance tests are stipulated in Appendix M-1 of the EPC Agreement **[except for the reliability test which is in Appendix M]**. Performance test results for the **[EPC Agreement]** and the Equipment Supply Agreement will be corrected to Guarantee Point conditions in accordance with the American Society of Mechanical Engineers ("ASME") Performance Test Code ("PTC") 22, with **[major equipment manufacture's performance correction curves or thermal modeling correction factors]** to account for deviations from the guarantee conditions including ambient conditions.

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

According to the EPC Agreements and Equipment Supply Agreements, the following performance guarantees must be confirmed prior to achieving substantial completion for each Project: **[(1) 95 percent of the Gross Power Block Output Guarantee (the "Minimum Power Block Output Guarantee"); (2) 105 percent of the Gross Power Block Heat Rate Guarantee (the "Maximum Power Block Heat Rate Guarantee"); (3) Power Block NOₓ emissions; (4) stack NOₓ emissions; (5) Power Block CO emissions; (6) stack ammonia slip; (7) SCR back pressure; (8) plant auxiliary load; (9) near-field and far-field noise guarantees; (10) unit sound emissions (at property boundary); and (11) 10-minute fast start.]**

There are also "Demonstration Tests" called for under both the EPC Agreements and Equipment Supply Agreements that are to be used to demonstrate each Project's capability to operate as needed by the Owner.  **[_____]** of these demonstration tests are needed to confirm functional guarantees prior to substantial completion including:  (1) **[_____]** and (2) **[_____]**.

Acceptance testing will be conducted by Casey during times that are mutually agreeable to the Owner, Casey, **[and WattStock]**.  Testing of a Project may begin once mechanical completion has been achieved, all systems are capable of safe operation in accordance with the applicable EPC Agreement **[and the Equipment Supply Agreement]**, **[WattStock has completed its work (including commissioning and functional testing) such that such Project meets all the conditions needed to be considered "Ready for Operation," and WattStock has declared that it is ready to commence performance testing]**.  **[For the tests being conducted to verify Performance Guarantees, WattStock will be included in the development of the test procedures and witness the testing.  After substantial completion has occurred for a Project, WattStock shall be allowed reasonable access to such Project as may be required for the purpose of improving the performance, including the re-performance of any testing.]**

## Performance Liquidated Damages and the Performance Remedial Plan

The "Stack NOx Guarantee," "Stack Ammonia Slip Guarantee," and **[_____]** for each Project constitute "must-make" conditions of the EPC Agreement and therefore have no associated performance LDs assigned; Casey must do whatever is required to achieve such guarantees at its cost.  Until such time as these obligations have been met, Casey would risk paying delay LDs for failure to achieve substantial completion.  If Casey is unable to meet the Stack NOx Guarantee, Stack Ammonia Slip Guarantee, and **[_____]**, after **[____date_____]**, the Owner may terminate the EPC Agreement.

If the SCR back pressure test fails to demonstrate the required maximum backpressure of 9.5 in wc when corrected to the Guarantee Point, Casey is to pay to the Owner performance LDs as the Owner's exclusive remedy in the sum of $**[_____]** for every in wc by which the SCR backpressure is above the SCR "Back Pressure Guarantee."  Casey is not required to remediate the system after paying such performance LDs.

Under the EPC Agreements, if the "Plant Auxiliary Load" test fails to demonstrate the required maximum auxiliary power of **[_____]** kW when corrected to the "Guarantee Point," Casey is to pay to the Owner performance LDs as the Owner's exclusive remedy in the sum of $**[_____]** for every kW by which the auxiliary power is above the "Plant Auxiliary Load Guarantee."  Casey is not required to remediate the system after paying such performance LDs.

If Casey chooses, it can undertake repairs necessary and perform subsequent performance tests to achieve the EPC Agreement Performance Guarantees.  Alternatively, Casey can choose to pay performance LDs.

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

Under the Equipment Supply Agreements, the Minimum Power Block Output Guarantee, Maximum Power Block Heat Rate Guarantee, Power Block Equipment $NO_x$ Guarantee, Power Block Equipment CO Guarantee, and **[_____]** for each Project constitute "must-make" conditions and therefore have no associated performance liquidated damages assigned; WattStock must do whatever is required to achieve such guarantees at its cost. Until such time as these obligations have been met, WattStock would risk paying delay LDs for failure to achieve Equipment Supply Substantial Completion. If WattStock is unable to meet the Minimum Power Block Output Guarantee, Maximum Power Block Heat Rate Guarantee, Power Block Equipment $NO_x$ Guarantee, Power Block Equipment CO Guarantee and **[_____]**, after **[_____date_____]**, the **[Owner may terminate the Equipment Supply Agreement]**.

If the performance test demonstrates that the Power Block Equipment achieves the Minimum Gross Equipment Performance Guarantees but fails to demonstrate the Gross Equipment Performance Guarantees, WattStock has the option to make adjustments and retest or pay performance LDs as follows: $350 for each kW below the Gross Power Block Output Guarantee and $3,000 for each Btu/kWh, LHV basis, above the Gross Power Block Heat Rate Guarantee on a per Unit basis. No test tolerance is stipulated for the Equipment Supply Agreement.

## Limitation of Liability

Casey's aggregate liability delay and performance LDs, combined, shall not exceed 10 percent of the "Contract Price" for each Project. Except for Casey's obligations to indemnify for third-party claims and except for any claims arising out of Casey's gross negligence, willful misconduct, or fraud, the aggregate liability of Casey to the Owner pursuant to the EPC Agreement, shall not exceed 50 percent of the Contract Price per Project. Casey shall retain risk of loss of the EPC Agreement work until substantial completion under the EPC Agreement has been achieved, after which such risk of loss passes to the Owner. The EPC Agreement does not have provisions for the payment of either an early completion or performance bonus.

WattStock's total liability for all claims arising out of the use of any of the work or relating to the performance or breach of the Equipment Supply Agreement shall not exceed 100 percent of the Equipment Supply Agreement Price except for: **[(1) third-party indemnity obligations for bodily injury and third-party property damage; (2) claims arising out of the gross negligence or willful misconduct of WattStock; and (3) claims to the extent WattStock has received the proceeds of insurance with respect to such claims under the insurance policies required to be in effect and maintained. – these typical exceptions are unclear in the Equipment Supply Agreement.]**

WattStock's aggregate liability for Equipment Supply Agreement delivery delay LDs paid to the Owner is as follows: **[(1) for delay in delivery of installation drawings, LDs shall not exceed [_____] – this does not appear to be a guaranteed milestone but probably should be]**; and (2) for delay in the delivery of major components, LDs shall not exceed 5 percent per **[Unit Price – an undefined term]**. WattStock's liability limit for delay LDs associated with late achievement of substantial completion shall not exceed 5 percent of the Equipment Supply Agreement Price. WattStock's aggregate liability for all delay LDs shall not exceed 5 percent of the Equipment Supply Agreement Price. The performance LD cap under the Equipment Supply Agreement is **[5]** percent of the Equipment Supply Agreement Price, individually for output and heat rate, and **[10]** percent of the Equipment Supply Agreement Price collectively for all performance LDs. WattStock's aggregate liability for all LDs, including those for delay and performance, shall not exceed 10 percent of the Equipment Supply Agreement Price. WattStock shall retain risk of loss of the Power Block Equipment until delivery of such equipment to the Project Site has been achieved, after which such risk of loss passes to the Owner. The Equipment Supply Agreement does not have provisions for the payment of either an early completion or performance bonus. **[These limits of liability are**

CONFIDENTIAL

ALTA0009970

**comparable with those in other similar simple-cycle construction projects with which we are familiar.]**

## Electrical Interconnection Construction

GOODALTA and ALTAJAC1 is to be designed and constructed in accordance with the applicable requirements of the "ERCOT Operating Guides," "ERCOT Generation Interconnection Procedures," and any other ERCOT documents as related to the interconnection, operation, and transmission systems of the Projects. The Projects' equipment, which is part of, or affects, the electrical interconnection with Oncor conforms to the requirements of ERCOT Operating Guides and the North American Electric Reliability Standards.

## Summary

**[Based on our review, we are of the opinion that, in the aggregate, the various construction and equipment supply contracts provide for the equipment, materials, and services necessary to construct the Projects. The Owner has adequately provided the interconnections for the major off-site requirements, including fuel, electricity, water supply, and wastewater disposal.]**

# Construction Cost and Schedule

## Project Capital Costs

We have reviewed the overall construction cost estimate as provided by the Owner for each respective Project. The total project cost is summarized in Table 6 and is broken down into direct construction costs of $64,757,000 for GOODALTA and $65,294,000 for ALTAJAC1 (the "Direct Construction Costs"); indirect construction costs of $700,000 for GOODALTA, and $726,000 for ALTAJAC1 (the "Indirect Construction Costs"); contingency of $2,500,000 for GOODALTA and $2,500,000 for ALTAJAC1 (the "Contingency," and together with Direct and Indirect Construction Costs, the "Total Construction Cost"); other costs of $2,500,000 for GOODALATA and $2,225,000 for ALTAJAC1 (the "Other Project Costs"); and financing costs of **[$_____]** for GOODALTA **[$_____]** and for ALTAJAC1 (the "Financing Costs").

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

AG-10009971

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 32

**Table 6**
**Total Project Capital Costs ($000)** [1]

| Description | GOODALTA | ALTAJAC1 |
|---|---|---|
| Direct Construction Costs | | |
| CTG/PCM Equipment | 32,757 | 30,694 |
| EPC | 30,700 | 30,700 |
| Communications | 100 | 100 |
| Gas Metering and Water | 1,200 | 3,800 |
| Subtotal Direct Construction Costs | 64,757 | 65,294 |
| Indirect Construction Costs | | |
| O&M Mobilization | 300 | 326 |
| Spare Parts | 250 | 250 |
| Construction Power | 150 | 150 |
| Subtotal Indirect Construction Costs | 700 | 726 |
| Subtotal Construction Costs | 65,457 | 66,020 |
| Contingency | 2,500 | 2,500 |
| Total Construction Costs | 67,957 | 68,520 |
| Other Costs [2] | | |
| Development Costs | 2,125 | 1,850 |
| Owners Engineer | 150 | 150 |
| Insurance | 225 | 225 |
| Subtotal Other Costs | 2,500 | 2,225 |
| Financing Costs [2] | | |
| Admin/Commitment/Financing Fees | [    ] | [    ] |
| IDC [3] | [    ] | [    ] |
| Subtotal Financing Costs | [    ] | [    ] |
| Total Project Costs | [$70,457] | [$70,745] |

1) As estimated by Owner.
2) Not included in our comparative analysis of Total Construction Costs as these costs vary from project to project and are site specific.
3) Interest during construction ("IDC").

## Construction Cost

**Direct Construction Costs**

Direct Construction Costs are those costs that are directly related to the construction, commissioning, and start-up of physical facilities for the Projects and include construction of the Projects, site work, and interconnection upgrades.

The Owner developed its budgets for CTG/PCM equipment supply of **[$32,757,000]** for GOODALTA and **[$30,694,000]** for ALTAJAC1 based on its bid price and current negotiations with WattStock for the equipment that includes the CTGs and PCM. These budgets are based on WattStock identifying and purchasing the used CTGs, refurbishing them, and shipping the units to the project sites. The PCMs are based on quotes from vendors for new units.

The Owner developed its budgets for engineering, procurement, and construction of **[$30,700,000]** for GOODALTA and **[$30,700,000]** ALTAJAC1 and **[$30,700,000]** based on its EPC bid and current negotiations with Casey (the "EPC Contract Price"). Casey's scope of work includes: the engineering and design of all equipment required to complete the Projects, the procurement and transportation to both Project sites of all materials and BOP equipment; the assembly, installation, and construction of all

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

equipment and systems; the procurement and installation all software relating to the control of the Projects equipment and the management of the implementation of all software as necessary; and the commissioning, start-up, testing, and completion for both Projects. The Owner reports that the EPC Agreement will be executed on or prior to financial closing.

The Owner has estimated $100,000 for plant communications and supervisory control and data acquisition system for each Project.

The Owner developed its budget of **[$1,200,000]** for GOODALTA and **[$3,800,000]** for ALTAJAC1 for gas metering and water based on its estimates for water and sewer. These budgets are from the gas companies and city municipalities for water. The Owner informed us, these agreements have not been finalized.

The Owner stated all electrical upgrades including new substation, and transmission lines for GOODALTA and ALTAJAC1 will be paid for by AEP and will not be a cost to the Projects.

### Indirect Construction Costs

Indirect Construction Costs are costs that are required to support the construction of the Projects but are not directly concerned with the construction of the physical facilities. Indirect Construction Costs include construction power, spare parts, and O&M mobilization.

Indirect Construction Costs are budgeted at $700,000 for GOODALTA and $726,000 for ALTAJAC1. These costs include budgets for O&M mobilization, spare parts, and construction power. The Owner developed these budgets based on vendor pricing and its experience and actual costs on other simple-cycle projects. **[We note that there are no costs for the Owner for construction management and fuel costs during start-up which are indirect costs to the Projects.]**

### Contingency

The Owner has a Contingency budget of $2,500,000 for GOODALTA and $2,500,000 for ALTJAC1. This represents approximately 4 percent of the Direct Construction Costs. Currently the Owner has fixed price EPC bids with WattStock and Casey for the major equipment and EPC of the Facilities and draft lease agreements for gas and water interconnection. **[Once construction contracts and indirect costs are finalized we will opine on the accuracy of the contingency budget.]**

## Summary

**[Based on our review, we are of the opinion that the estimates which serve as the basis for the Total Construction Costs, including the Contingency, were developed in accordance with generally accepted engineering practices and methods of estimation. Further, the estimated Total Construction Costs of $67,957,000 for GOODALTA and $68,520,000 for ALTAJAC1 are comparable to the costs and contingencies of other simple-cycle facilities utilizing equipment of similar size and technology with which we are familiar and at similar stages of committed costs.]**

## Other Project Costs

Other Project Costs are estimated at $2,500,000 for GOODALTA and $2,225,000 for ALTAJAC1 for development costs, insurance, and Owner engineering services. We did not review the Other Project Costs budgeted by the Owner as these costs are outside our area of expertise.

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 34

## Financing Costs

Financing costs are estimated at [$_____] for GOODALTA and [$_____] for ALTAJAC1 and include costs associated with financing the Projects such as financing fees, commitment fees, deal closing costs, debt service reserve, and IDC. We did not review the Financing Costs budgeted by the Owner as these costs are outside our area of expertise.

## Construction Plan and Schedule

We have reviewed the preliminary schedules titled *"Alta Power LM60000 Install, Goodlow, Tx – Preliminary Proposal Schedule"* (the "GOODALTA Schedule") and **["Alta Power LM60000 Install, Jacksonville, Tx – Preliminary Proposal Schedule"]** (the "ALTAJAC1 Schedule") and together, (the "Schedules") and other information provided by the Owner. Both Projects are planned to be built in parallel and all the key milestone dates are consistent between the two Schedules. The Schedules depict only summary level activities for the planned execution of the work required for the Projects and commissioning and start-up activities. Therefore, our analysis is based on overall durations and does not include any float or critical path analysis through mechanical completion. The Schedules do not contain any milestones for interconnection activities, such as gas, water, or electrical interconnection facilities, but the Owner informed us based on communication and information provided by the utilities, all interconnection activities will be available by the start of commissioning. The key milestone dates of the Schedules for GOODALTA and **[ALTAJAC1]** are presented in Table 7.

**Table 7**
**Baseline Schedule Milestones**

| Key Event | Date GOODALTA | Date ALTAJAC1 |
|---|---|---|
| Full NTP | 09/09/2019 | |
| Begin Engineering | 09/09/2019 | |
| Begin Construction | 09/16/2019 | |
| CTG Unit 1 Delivery | 01/17/2020 | |
| CTG Unit 2 Delivery | 01/31/2020 | |
| CTG Unit 3 Delivery | 02/07/2020 | |
| Backfeed | 05/15/2020 | |
| Mechanical Completion Unit 1 | 05/19/2020 | |
| Mechanical Completion Unit 2 | 06/01/2020 | |
| Mechanical Completion Unit 3 | 06/15/2020 | |
| Facility Substantial Completion | 07/17/2020 | |
| Project Performance Acceptance | 08/18/2020 | |

## Schedule Duration and Activities

Full NTP is scheduled to be delivered to the EPC Contractor by the Owner on September 9, 2019 for GOODALTA and [_____] for ALTAJAC1. The Schedules have planned durations for the EPC of both the BOP and the CTGs, and the commissioning and start-up activities. The overall duration of construction for the Projects is approximately ten months starting with the start of engineering on September 9, 2019 for GOODALTA and ending with Facility Substantial Completion on July 17, 2020.

Once Full NTP is awarded detailed engineering and BOP equipment procurement is scheduled to start for GOODALTA. Also, at this time the Owner is to supply the GTG issue for construction drawings and the delivery schedule to the EPC Contractor to incorporate into the overall design and construction schedule.

CONFIDENTIAL

Alta App.000564
Alta0009974

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 35

Engineering is scheduled to be completed January 16, 2020 for GOODALTA, with the completion of electrical design. Current expectations are that all BOP equipment and material is to be on the Project site for GOODALTA by March 19, 2020 with the delivery of the main transformer. Delivery of "GTG 1," "GTG 2," and "GTG 3," by WattStock is scheduled for January 11, 2020, January 25, 2020, and February 7, 2020, respectively **[which aligns with WattStock's delivery schedule. It is our understanding, that WattStock has identified the CTGs and is in the process of procuring them for GOODALTA.]**

Construction is scheduled to commence on September 16, 2019 for GOODALTA. It is assumed that all construction permits to start construction will be received at this time. **[Need to confirm, no permitting activity on schedule**.] Grading and drainage are the first construction activities scheduled to occur at the site. Foundations for the CTGs and BOP equipment are scheduled to begin September 16, 2019 and be completed by March 10, 2020 for GOODALTA. All BOP construction that includes piping, electrical and instrumentation is scheduled to be completed at mechanical completion for each unit that includes the main transformer for GOODALTA.

Once the CTGs arrive at the GOODALTA Site each unit will be set on its foundation, followed by a three and one half-month installation period which includes all mechanical and electrical pre-commissioning activities. The CTGs are scheduled to be installed in parallel with a two week lag between each unit and completed for testing at mechanical completion for GOODALTA. Backfeed for commissioning is scheduled on May 15, 2020, but start commissioning and start-up activities with electrical generators (construction power) can begin prior to this date. Commissioning and turnover for all three units is scheduled to be completed by July 17, 2020 for GOODALTA, at which time Substantial Completion will be achieved.

## Project Schedule Analysis

The overall duration is approximately ten months from engineering release to substantial completion. We note that the Schedules provided by the EPC contractor includes start and completion dates for specific procurement, construction, and commissioning activities. The Schedules include summary tasks for construction activities including grading and drainage, foundations, above ground and underground piping, fuel gas piping, PCM building, underground locations, electrical cable tray and conduit, instrument and transformer and high-voltage construction. **[WattStock has identified the CTGs for the Projects, helping minimize procurement risk. They are scheduled to be procured in by October and approximately two months will be needed to refurbish them, therefore, a delivery date to the project sites is reasonable starting in January 2020. This needs to be confirmed by the Owner. Also the Owner need to confirm interconnection dates for water, electrical and gas.]**

## Summary

**[Based on our review, we are of the opinion that, barring unforeseen events that affect material delivery, equipment delivery, or construction that directly impact the Projects, the approximate 10-month schedule from the start of engineering on September 9, 2019 to facility substantial completion on July 17, 2020 for GOODALTA and the approximate [10]-month schedule from the start of engineering on [_____], 2019 to facility substantial completion on [_____], 2020 for ALTAJAC1 are achievable, and within the previously demonstrated capabilities of the EPC contractor using generally accepted construction and project management practices and adhering to a detailed work plan.]**

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

# Technical Review of the Project

## GE LM6000 CT

The development and operating history of the GE LM6000 utilized at the Projects are described herein to promote an understanding of the risks associated with the CTs. The summaries below for each version of the LM6000 present the development and characteristics of each technology and a description of problems incurred in such model and applicable predecessors for which the equipment manufacturer has provided solutions for implementation during the last three years, which may be applicable to these technologies and consequently may affect the LM6000PC Sprint™ (defined below) at the Projects.

### Background

The GE LM6000 CT design was based on a GE CF6-80C2 aircraft engine, which has in excess of 3,800 engines in service and has accrued over 200 million flight hours since its introduction in 1986. The LM6000 is considered mature, sound, and proven technology with over 1,200 units installed and in excess of 35 million fired hours accrued fleet-wide. GE reports that approximately 90 percent of the parts for the LM6000 are common to the CF6-80C2 CT design, which GE reports allows much of its CF6-80C2 experience to be applicable to the LM6000 product offerings.

The LM6000 design is a two-shaft, "direct drive," aero-derivative CT derived from the GE CF6-80C2, high-bypass, turbofan aircraft engine. The principal advantage of the LM6000 over earlier GE aero-derivative designs is that the nominal operating speed of the LPT section of the CF6-80C2 is approximately 3,600 rpm, which is coincident with the speed required to operate a 60 Hz electric generator. According to GE, this allows the LPT of the CF6-80C2 aircraft engine to be utilized for the LM6000 without the addition of a separate power turbine, which provides a cost savings over previous aero-derivative designs. The following discussion presents an overview of the technical development of the LM6000 and identifies the potential risks and risk mitigation strategies for that model. This is followed by a description of serial problems that the LM6000 fleet has experienced or that GE is in the process of correcting in the last three years, which have the potential to apply to the LM6000 and consequently affect the long-term operating characteristics of the CTs.

The first LM6000 PA Model was introduced to the market in 1991 and the LM6000 PC entered commercial operation in 1997.

The LM6000 was updated to include the Sprint Power Boost System ("Sprint™") in June 1998 as an up-rate of the LM6000 PC Model. The term Sprint™ refers to spray inter-cooling of the HPC section of the LM6000 with highly atomized water. The purposes of injecting atomized water into the HPC are to: (1) reduce the temperature of the air entering the compressor section, through a form of evaporative cooling, which results in denser air entering the CT (denser air creates more power, as power is proportional to mass flow through the engine), as well as resulting in a lower compressor discharge temperature; and (2) cool the compressor sections by providing a medium to transfer heat that is generated during the compression process, which increases compressor efficiency and lowers compressor discharge temperature. The lower compressor discharge temperature enables increases in rotational speed and firing temperatures, which subsequently result in additional power production and higher thermal efficiency. GE conducted field testing over an 18-month period prior to commercial release of the first Sprint unit, at which point GE became satisfied that admission of fine water mist for the Sprint would not compromise compressor or turbine section parts life.

CONFIDENTIAL

The LM6000 design capacity was up-rated to the LM6000 Enhanced Sprint™ in 2009.  The increased capacity of the Enhanced Sprint™ is derived by injecting highly atomized water into the inlet to the LPC as well as the inlet to the HPC, which further increases the air density and mass flow through the CT.  GE reports that the use of Enhanced Sprint™ injection in the LPC produces a greater thermodynamic benefit for a given amount of total water injection.  Thus GE reports, that by utilizing injection into both the LPC and HPC sections, the total water flow rate can be reduced while still achieving additional capacity, as compared to the Sprint™ performance.  GE further reports that when inlet icing becomes a concern (due to low ambient temperatures), a given project still maintains an ability to utilize the Sprint injection into the HPC, even though suspension of the LPC Sprint injection is required under such conditions.

The preceding information is intended to provide a chronology of the LM6000's development and improvements, including the inclusion of the Enhanced Sprint™ package.

The latest advancement to the LM6000 is the LM6000 PF and LM6000 PF Sprint™.  GE has improved the combustor section with an expanded gas premix system.  This includes additional gas manifolds with control valves and control software changes.  GE reports that these changes will allow the LM6000 PF to lower the $NO_X$ emission levels to 15 parts per million without changes to the turbo machinery.

Table 8 provides typical data for the LM6000 fleet as provided by GE.

### Table 8
### Typical Performance Characteristics of the GE LM6000 [1]

| LM6000 Model | Output (kW) [2] | Heat Rate (Btu/kWh-HHV) [3] | Exhaust Flow (lb/s) [4] | Exhaust Temperature (°F) |
|---|---|---|---|---|
| LM6000 PA (Gas) | 40,000 | 9,366 | 268 | 843 |
| LM6000 PC (Gas) | 43,315 | 9,092 | 277 | 845 |
| LM6000 PC (Oil) | 42,111 | 8,824 | 276 | 851 |
| LM6000 PC Sprint™ (Gas) | 46,327 | 9,098 | 287 | 847 |
| LM6000 PC Sprint™ (Oil) | 43,148 | 9,318 | 279 | 846 |
| LM6000 PD (Gas) | 42,227 | 9,145 | 275 | 841 |
| LM6000 PD (Oil) | 41,505 | 8,864 | 273 | 854 |
| LM6000 PD-Sprint (Gas) | 45,889 | 9,232 | 287 | 842 |
| LM6000 Enhanced Sprint (Gas) | 47,300 | 9,149 | 288 | 850 |
| LM6000 PF (Gas) | 42,227 | 9.145 | 275 | 841 |
| LM6000 PF-Sprint (Gas) | 47,300 | 9,149 | 288 | 850 |

1) Based on ISO conditions.
2) Based on ISO conditions.
3) Higher heating value ("HHV") approximated based on LHV provided.
4) Pounds per second ("lb/s").

## Operational Issues

As is typical with complex technology, there were a number of technical issues for which GE has designed, tested, and implemented remedies.  These remedies are communicated via service bulletins service bulletins for the LM6000 fleet, and GE has reported that most of the problems encountered have been relatively minor and have not resulted in outages of more than a few days due to the availability of lease engines and its prompt response to the problems.  GE has reported that they have identified five fleet programs for which service bulletins will be issued in the future that will address: (1) new HPC Stage 3 through Stage 5 blades and Stage 3 through Stage 9 vanes; (2) new Stage 5 LPT blades; (3) Stage 1 LPT

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 38

blades; (4) variable stage vane bushings; and (5) single annular combustor swirlers. The Facility utilizes the single annular combustors.

## LM6000 Refurbishment

The Projects are to utilize refurbished LM6000PC Sprint gas turbine packages supplied by WattStock. The refurbished gas turbine packages are optimized by GE-engineered systems, components, upgrades and digital solutions and are provided with a full GE warranty and performance guarantees.

WattStock and GE collaborate to select optimized equipment for project economics. GE overhauls the gas turbine portion of the gas turbine package and upgrades the controls to meet operating profile. The overhaul summary includes:

- Receipt, documentation, and disassembly of the LM6000PC into the LPC, HPC, combustor, HPT, and LPT;

- Conditioned based overhaul of lube and scavenging pump, hydraulic control unit, variable geometry pump, starter motor, engine actuators, and implementation of applicable service bulletins ("SBs");

- Conditioned based bearing overhaul or replacement after disassembly of compressor front and rear frames, turbine rear frame, and accessory and inlet gear box, replacement of Teflon seals, implementation of all applicable SBs, and reassembly;

- Inlet guide vane disassembly, strip and recoat, LPC rotor disassembly and disk/shaft overhaul, and LPC stator disassembly and Stage 3 overhaul, and reassembly of the same;

- Condition based overhaul of all airfoils, Stages 1 and 2 blades and nozzles, or replacement with new Chromalloy single crystal extended life hardware, and implementation of applicable SBs;

- Overhaul of combustion chamber and clean, flow check, and recertify fuel nozzles;

- Overhaul high-pressure rotor spools and stator cases, damaged blades and vanes or replace with new or serviceable components, and implement applicable SBs; and

- Reassemble the engine and apply applicable SBs.

The refurbished engine completes a test run tied to an actual generator in the test facility at the Factory. This testing includes including flushing, and verification of safety alarm and shutdown setpoints as well as starting the gas turbine and running to full power. Standard factory tests of the equipment will be performed to ensure conformance to carefully established quality assurance practices.

WattStock refurbishes the package including the generator. WattStock reports it uses a process to restore end of life generators to a full 30 year life. The process was developed by Pete Watson, now of WattStock, while working at Stewart & Stevenson. Prior to leaving factory, each refurbished turbine gets fitted to the refurbished package and a 400-point static and simulated testing is performed to confirm:

- Temperature element output and wiring

- Transmitter range, output and wiring

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

Alta App.000568
ALTA_0009978

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 39

- Solenoid operation

- Control valve torque motor, excitation and return signal

- Fire system continuity and device actuation

- System cleanliness

- Control system software loading and validation

GE is responsible for all the engineering and quality control under subcontract to WattStock

## Summary

Based on our review, we are of the opinion that the CT technology proposed for the Projects is a sound, proven method of power generation. Further, based on its operating experience to date, the CT is a sound, proven design. Additionally, WattStock is utilizing a refurbishment process that is consistent with industry standards and should result in refurbished CTs that perform consistent with other overhauled LM6000PC CTs. Lastly, if designed, constructed, operated, and maintained as currently proposed by the Owner, the EPC contractor, and the Operator, the Projects should be capable of passing the performance tests pursuant to the EPC Contract and meeting the requirements of the currently applicable environmental permits.

## Estimated Useful Life of the Project

There are many things that impact the technical useful life of a facility including: its design (assumed design life, quality and durability of specified equipment and materials, etc.); quality of construction; means and methods of operation (including consistency of operating regime with design assumptions); timely and appropriate renewals and replacements of facility components (including routine maintenance, major maintenance, and capital expenditures); and the quality of consumables such as fuel, water, and lubricants ("Estimated Useful Life Variables"). In the long term, even with Estimated Useful Life Variables properly considered and respective plans made, one should expect an increased risk of equipment failure and outages as a facility ages. This is particularly true for facilities that are operating beyond their original design life, or which have been subject to more strenuous operating environments (for example, more frequent cycling) than was considered in the original design assumptions.

It is common for modern simple-cycle power facilities to realize operating lives beyond their original design lives. In order to achieve this longevity, the plant operator must develop, implement, and maintain a diligent plant inspection and maintenance program that seeks to identify potential equipment issues as early as possible and to proactively address them before equipment failures cause collateral damage, resulting in equipment deratings, higher repair costs, and longer maintenance outages. Further, operations staff must be well trained in the proper operation and operating limitations of the equipment. Even with such prudent operating, inspection, and maintenance protocols in place, older equipment is still subject to unexpected failures, and it is generally advisable to budget for higher repair costs and higher forced outage rates as a facility ages.

Other factors that determine technical useful life involve the robustness of the design and how long the equipment can be maintained including considerations of services and part availability. Major equipment, such as the CT model for these Projects, is more of a consideration in this regard compared to minor equipment such as valves, piping, control systems, and pumps, which are more easily adapted to power

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 40

plants. Availability of maintenance providers is often driven by the number of operating units in the market to support those providers. Over 1,200 LM6000s are installed and operating, and the unit is still available for purchase through GE. Services, new parts, and refurbished parts are currently available through both GE and multiple third-party vendors. Including GE, we are aware of at least nine vendors able to fully support the LM6000, and a number of others that provide partial services. The robustness of the design and the size of the LM6000 market and associated service and part vendors support the useful life described below.

The Pro Forma provided by the Owner includes five years of routine maintenance expense. The Owner has reported that beyond year 5, they will **[make capital expenditures as necessary and perform major maintenance as required/use a MM reserve fund/etc./]** to achieve a useful life in excess of the term shown in the Pro Forma.

Provided that the Operator maintains a diligent plant operation, inspection, and maintenance program, including necessary capital expenditure and major maintenance, we are of the opinion that it may be possible for the Projects to achieve a useful life in excess of 20 years, although maintenance costs and forced outage rates may increase during the later years of each Project's life. We note that this review only addresses the potential for the Projects to realize the extended life while achieving expected performance, but does not consider economic variables.

## Projected Performance

We have reviewed the individual Project heat balances provided by the Owner. These heat balances were developed using Thermoflow's GT PRO software and inputs developed and incorporated by **[WattStock?]**. GT PRO is a standard industry software package and we consider its outputs as reliable. The heat balances show unit performance of the projects based on expected average monthly high dry bulb ambient temperature, actual elevation of each project, and with appropriate inlet and outlet pressure losses. They measure performance at the turbine generator terminals and then correct capacity and consequently heat rate by assuming capacity delivered to the revenue meter will be 2 percent lower resulting from supplying turbine auxiliaries, the ERU and GSU transformer losses. We consider this 2 percent assumption reasonable. We would prefer to see expected turbine auxiliary loads, ERU auxiliary loads and GSU design loss used.

We reviewed the performance guarantees of the draft Equipment Supply Agreement with WattStock and find them reasonable and consistent with the heat balances. Note that the performance guarantees are corrected to ISO conditions of 59°F, 60 percent relative humidity, and standard atmosphere (sea level). Additionally, the guarantees are referenced to the generator terminals.

### Capacity and Heat Rate

We have reviewed the turbine inputs used by the market consultant and which form the basis of the Pro Forma. These inputs are summarized in Table 9. Tables 10 and 11 summarize the heat balance outputs, for GOODALTA and ALTAJAC1, respectively, for comparison.

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 41

### Table 9
### Monthly Projects New and Clean Capacity and Heat Rate [1]

|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ambient Temp (°F) | 53 | 56 | 63 | 71 | 77 | 82 | 84 | 84 | 80 | 72 | 63 | 56 |
| Output (kW) | 50,213 | 49,678 | 48,656 | 47,333 | 46,274 | 45,305 | 44,986 | 45,075 | 45,790 | 47,128 | 48,715 | 49,750 |
| Heat Rate Btu/kWh) | 9,703 | 9,724 | 9,755 | 9,788 | 9,811 | 9,844 | 9,859 | 9,855 | 9,824 | 9,792 | 9,752 | 9,724 |

1) The output and heat rate values shown are on a per CT basis.

### Table 10
### GOODALTA Heat Balance New and Clean Capacity and Heat Rate [1][2]

|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ambient Temp (°F) [3] | 59 | 63 | 70 | 78 | 85 | 92 | 95 | 94 | 90 | 80 | 69 | 60 |
| Output (kW) | 48,894 | 48,185 | 46,953 | 45,514 | 44,123 | 41,883 | 40,718 | 41,109 | 42,641 | 45,124 | 47,128 | 48,716 |
| Heat Rate (Btu/kWh) | 9,644 | 9,658 | 9,685 | 9,720 | 9,772 | 9,856 | 9,908 | 9,890 | 9,826 | 9,736 | 9,681 | 9,647 |

1) The output and heat rate values shown are on a per CT basis.
2) GOODALTA's elevation is 365 feet above sea level.
3) Ambient temperature is the average high dry bulb temperature for the month. 60 percent relative humidity was assumed for each month.

### Table 11
### ALTAJAC1 Heat Balance New and Clean Capacity and Heat Rate [1][2]

|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ambient Temp (°F) [3] | 58 | 63 | 70 | 78 | 84 | 90 | 94 | 95 | 89 | 79 | 69 | 61 |
| Output (kW) | 48,523 | 47,656 | 46,437 | 45,016 | 43,840 | 42,248 | 40,747 | 40,358 | 42,552 | 44,820 | 46,611 | 48,006 |
| Heat Rate (Btu/kWh) | 9,640 | 9,660 | 9,686 | 9,723 | 9,764 | 9,826 | 9,886 | 9,906 | 9,815 | 9,729 | 9,682 | 9,653 |

1) The output and heat rate values shown are on a per CT basis.
2) ALTAJAC1's elevation is 650 feet above sea level.
3) Ambient temperature is the average high dry bulb temperature for the month. 60 percent relative humidity was assumed for each month.

**[It is our view that the heat balances better represent new and clean performance and should be utilized as inputs to the Pro Forma.]**

Within the Pro Forma, the Owner is projecting revenues from the following sources: (1) energy sales to support the HRCO; (2) non-spin reserve service; (3) responsive reserve service; (4) quick start service; and (5) black start service. The HRCO energy sales and the quick start energy represented in the Pro Forma assume operation of the CTs at full (maximum) output and use the capacity and heat rates of Table 9 after being corrected for degradation. The responsive reserve service assumes the CTs are dispatched to 80 percent of maximum output as they are being dispatched to provide frequency support. We reviewed the Pro Forma's correction for heat rate for operation at 80 percent part load and find it reasonable and consistent with other LM6000 PC Sprint correction curves. Additionally, the responsive reserve service capacity and heat rate are corrected for degradation. Non-spin reserve service and black start service do not require operation of the CT for purposes of the Pro Forma.

## Scheduled Outage Factor

A typical LM6000 peaking facility will utilize about 12 to 14 days of scheduled outage on a per annum basis. Due to the typical operating profile of these facilities, these outage periods will rarely impact revenue as they will be selected during periods of no to low market value. The Pro Forma does not attempt to

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 42

incorporate scheduled outage periods. We think this approach is reasonable for the expected hours of operation per year.

## Degradation

The performance of the CT degrades over time as a result of fouling, non-recoverable degradation (inclusive of the performance recovery predicted after the completion of major inspections, and other effects that make achieving guaranteed performance on a day-to-day basis difficult (the "Long-Term Effects"). The values assumed for the Long-Term Effects for output and heat rate for the term of the Pro Forma (through 2025) are 0.62 percent of new and clean capacity and 0.34 percent new and clean heat rate, respectively. These degradation rates are point values corresponding to 9,052 operating hours. **[We find these reasonable relative to similar facilities of similar technology we have reviewed.] [Actually slightly lower than we might expect – can WattStock provide a degradation curve?]**

Based on our review including consideration of Long-Term Effects, we are of the opinion that the Projects should be capable of achieving the values delineated in Table 9.

## Forced Outage

Forced outage events will occur randomly through the given period of analysis. Usually forced outage events are incorporated into the Pro Forma by assuming a forced outage rate probability to reduce expected capacity. The Pro Forma does not include a forced outage rate assumption. We would recommend 1 percent.

## Availability

Based on our review, we are of the opinion that each of the Projects should be capable of achieving a long-term average availability of 95.0 percent. There may be times when the actual forced outage rate and availability is above or below the values stipulated herein.

## Heat Rate Call Options

**[To come]**

# Operations and Maintenance

## Operating Agreements

NAES is to operate and maintain the Projects under the terms of the O&M Agreements during a mobilization, or transition phase, and operational phase on a reimbursable cost plus operating fee basis. Pursuant to the O&M Agreements, the mobilization phase is to begin upon a date determined as dictated within the NTP issued from GOODALTA and ALTAJAC1, as appropriate. The operational phase will begin on the takeover date and expire on December 31st following the seventh anniversary of the takeover date, with the option to extend the term for additional one-year periods unless either party notifies the other of its intent not to renew at least one year prior to the renewal date or at the end of the subsequent year during the extended term.

NAES is to provide routine O&M services to support continuous operations of the Projects. Appendix A of the O&M Agreements provides the scope of services during the mobilization phase as well as during the operational phase. The Owner indicated that during the mobilization phase, the services include: (1) recruit, hire, train, and establish payroll for qualified personnel; (2) review all project agreements;

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

(3) review and develop the operating budget; (4) provide recommendations on facility design and establish or procure an inventory of all strategic spare parts, components, and consumables; (5) evaluate and prepare safety, environmental, remote dispatch and the North American Electric Reliability Council ("NERC") programs; (6) prepare the O&M plan; (7) prepare the O&M manual; (8) develop and implement NAES's administrative programs; (9) evaluate the suitability of the information technology infrastructure; (10) develop format of progress reporting, routine communication, and extraordinary communication; (11) integrate site personnel into NAES's insurance program; (12) establish procedures for producing and historically compiling work orders for the preventative, predictive, and corrective maintenance of the Projects using a computerized maintenance and management system; (13) support the EPC Contractor with Facility startup and testing activities; and (14) provide any other duties as required.

The Owner indicated that during the operational phase, services include: (1) operate and manage the Projects in accordance with the O&M plan and manual; (2) maintain sufficient numbers of qualified personnel to perform the services; (3) develop and implement an ongoing training program for personnel; (4) perform or contract for all routine, preventative, and predictive maintenance including maintenance in accordance with the O&M plan; (5) manage, organize, and supervise contracted maintenance; (6) prepare and submit O&M budgets and progress reports; (7) develop and maintain a spare parts inventory; (8) cause adequate security to be provided; (9) implement and comply with the O&M manual; (10) assist GOODALTA and ALTAJAC1 in obtaining all permits, licenses, and other governmental consents, authorizations, or approvals required by applicable law to be maintained by NAES or any of its employees, to enable NAES to provide the O&M Agreement services; (11) conduct a community relations program; and (12) provide any other duties as required. In addition, NAES will operate the Projects in accordance with applicable ERCOT market rules, prudent operating and engineering standards, project documents, and all other applicable laws and regulations.

GOODALTA and ALTAJAC1 are to provide, respectively: (1) necessary information, services, and materials for NAES's use in performing the services; (2) utilities including gas, and as reported by the Owner electricity, water, wastewater, sewage, and telephone service; (3) government approvals other than those required to be obtained and maintained by NAES; and (4) transfer of care, custody, and control of the Projects to NAES, including access to the sites.

Pursuant to the O&M Agreements, GOODALTA and ALTAJAC1, respectively, are to reimburse NAES for all its approved costs associated with such service plus the following: (1) a fixed monthly operating fee of $10,000 during the mobilization period; (2) a fixed of $150,000 during the operational period; and (3) a fixed fee of $200,000 during the operational period for remote dispatch and remote thermal performance monitoring. Starting on January 1, 2020 and every year thereafter during the term, the operational fee is to be escalated by the United States Bureau of Labor Statistics Employment Cost Index for total compensation (the "ECI"). The applicable escalation factor is capped at 3.0 percent for any year.

The termination provisions of the O&M Agreement by either NAES or the Owner are typical for these type of agreements including default, false representation, bankruptcy, and failure to pay. There is no termination for convenience for either party.

NAES' limitation of liability under the O&M Agreement is the sum of the operational period fee payable in such year.

## Asset Management Agreement

**[To come]**

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 44

## Energy Management Agreement

As service provider, Tenaska's scope of services under the EMA encompasses general services, electric services, QSE services, fuel management services, sleeving procedures, and testing services. General service provisions require Tenaska to maintain sufficient personnel that are knowledgeable with ERCOT markets including black start service, ERCOT nodal protocols, and the operation of electric generation facilities within ERCOT. In addition, Tenaska is responsible for actives such as maintaining information technology, advising on how to fulfill reporting requirements, and collaborating with Alta Power to manage risks, optimize assets, and execute transaction strategies. The QSE services include but are not limited to: (1) dispatch and scheduling; (2) bid of all power of the Project into the ERCOT day-ahead market, and if not accepted, into the ERCOT real-time market; (3) assist with intra-day dispatch enhancement; (4) coordinate and bid all power-related testing of the Project; (5) communicate the daily schedules for power delivery into ERCOT; (6) provide compliance reports and support the telecommunication package; (7) notify ERCOT of scheduled and forced outages; (8) maintain QSE qualification with ERCOT; (9) provide other scheduling and optimization services; (10) resolve any disputes with ERCOT; and (11) provide any other duties as required.

The energy management services include but are not limited to: (1) optimize the marketing and sale of capacity, energy, and ancillary service from and pertaining to the customer resource; (2) provide fixed price and heat rate quotes for potential bilateral transactions; (3) provide replacement transaction services in the event of a shortfall in the customer resource capacity; (4) coordinate with ERCOT regarding testing and other performance-related requirements for the customer resource for the projects, including capacity ratings and emissions; and (5) provide other support services as required.

The EMA is to become effective on commercial operation and the initial term will remain in effect for five years. The term is then set to automatically renew and extend for successive one year periods unless either party notifies the other of its intent not to renew at least 120 days prior to the end of the EMA term. The initial term, renewal term, and extended term are collectively referred to as the term of the EMA.

Pursuant to the EMA, Alta is to reimburse Tenaska for all its approved costs associated with such services plus the following: (1) a one-time fee for establishing and configuring the telemetry and other communication equipment and software; (2) a support service fee of $9,500 for each service in Exhibit A provided; and (3) a monthly fixed fee of $7,500 and a gross margin share, as applicable. A schedule of gross margin shares is provided within the EMA. The gross margin shares are structured according to a percent of gross margin above defined dollar values.

Tenaska's limitation of liability for a single claim, or in aggregate, under the EMA is the sum of service fees payable in a three month period. The termination provisions of the O&M Agreement by either the Operator or the Owner are typical for these type of agreements including default, false representation, bankruptcy, and failure to pay. There is no termination for convenience for either party.

## Fuel Management Services Agreement

The Owner reported that the Projects will enter into a FMSA with UET on terms negotiated. We reviewed a FMSA titled *"Alta – UET Services Agreement"* received on August 23, 2019. The following discussion is a summary of the FMSA. The term of the FMSA is to begin on the effective date and the initial term will remain in effect for three years. The term is then set to automatically renew for a period of two years unless either party notifies the other of its intent not to renew at least 180 days prior to the end of the FMSA term.

As the FMSA manager, FMSA is to provide a scope of services pertaining to: (1) the Projects fuel supply strategy; (2) gas supply arrangements; (3) gas transportation agreements; and (4) fuel management. UET is to develop, update, and assist with the implementation of a fuel supply plan covering the acquisition, transportation, and delivery of all natural gas necessary for the Projects. Further, UET will assist the Owner in the negotiation of all natural gas supply agreements required for the supply of natural gas per the fuel supply plan. UET is also responsible to assist the Owner with negotiation of all necessary or appropriate gas transportation agreements and gas storage agreements. Subject to the Owner's direction, UET will act as the Owner's lead negotiator and handle the negotiations and drafting of the gas supply agreements, gas transportation agreements, gas storage agreements, and any other related agreements. At least annually, but not more than monthly, UET will review and provide Alta with guidance pertaining to the monitoring and administration of all gas supply agreements and gas transportation agreements, price risk management, and transportation-related considerations defined in the FMSA. UET is to also review and provide guidance on pipeline tariff filings to the Owner at least annually, but not more than quarterly.

The termination provisions of the FMSA by either party are typical for these type of agreements including default, false representation, bankruptcy, and failure to pay. There is no termination for convenience for either party. Either party may terminate the FMSA 15 days after written notice in the event the other party fails to perform its duties. Further, either party may terminate the FMSA by written notice if: (1) all or a material part of the Projects is destroyed or suffers damage in excess of $10,000,000 and is not rebuilt and in commercial operation within 24 months; (2) the Projects cannot be operated for a period of at least 18-consecutive months due to a force majeure event; (3) the Owner permanently shuts down the Projects; or (4) bankruptcy event of either party.

Pursuant to the FMSA, Alta is to reimburse UET for all its approved costs associated with the services plus the following: (1) a monthly fuel management fee of $50,000; and (2) an incentive "Optimization Margin" fee that includes but is not limited to savings generated by UET's ability to deliver gas supply for the Projects' fuel requirements at a price that is less than Gas Supply pricing as defined in the FMSA.

## Staffing

There will be two full-time O&M technicians at the site during the peak and off-peak seasons. During the peak period, the site staff will cover seven days per week for 12 hours per day. During the off-peak period, the site staff will work regular 40 hours per week. An O&M manager and administrative assistant will be shared between the Projects. Following the commissioning of the Projects, the Project Sites will share an on-site Environmental, Health and Safety ("EHS") coordinator.

## Operations and Maintenance Practices and Procedures

NAES is responsible for staffing plans, O&M procedures, administrative procedures, and operating plans.

**[O&M programs and procedures to be put in place at the Projects are still under commercial review and negotiation.]** We have assumed that NAES will develop typical O&M practices and procedures similar to those of other, primarily unmanned simple-cycle facilities.

The Owner is to follow GE recommendations for major maintenance. GE recommendations for major maintenance on the LM6000 CT include conducting semiannual borescope inspections, conducting hot section inspections every 25,000 operating hours, and conducting MIs every 50,000 operating hours. Both hot section inspections and major inspections ("MIs") are typically completed by removing the associated sections of the CTs and sending the equipment to a repair depot for inspection and repair as needed. Typically, facility owners perform hot sections at approximately 16,000 operating hours for CTs that use

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 46

water injection for NO$_X$ control. The Owner does not anticipate any major maintenance to be necessary during the term of the Pro Forma.

## Major Maintenance

No major maintenance is projected during the term of the Pro Forma. During this term of the Pro Forma, the Owner projects that each CTs will each accumulate approximately 9,052 operating hours.

Planned major maintenance work typically consists of (per unit):

- Borescope and Package Inspections – Performed semi-annually. Each "Borescope and Package Inspection" will consist of a borescope examination of the engine, and visual inspection of specified package components. In addition, as a part of every second Borescope and Package Inspection, a validation/calibration of control and instruments systems, and an annual generator inspection is conducted.

- Hot Section and Combustor Rotable Exchange – Performed as appropriate in light of the operation and condition of the unit during a scheduled outage; expected to be after approximately 25,000 fired hours of base load gas fuel operation. The existing hot section and combustor modules typically is removed, and refurbished replacement modules installed.

- Major Overhaul – Performed as appropriate in light of the operation and condition of the unit during a scheduled outage; expected to be at approximately 50,000 fired hours of baseload gas fuel operation. The gas turbine is typically removed from the plant site and taken to a Level 4 overhaul depot for performance of the overhaul work. Key features of this overhaul are: (1) complete tear down and inspection of engine, (2) rebuilding with new or serviceable refurbished parts as required, and (3) demonstration testing of functionality and performance in the test cell.

## Projected Non-Fuel Operating and Maintenance Cost

We reviewed the Pro Forma for "Non-Fuel Production Related O&M Costs" prepared by the Owner for the Projects. The estimated 2021 budget (for the first year of operation) for Non-Fuel Production Related O&M Costs are summarized in Table 12.

Non-Fuel Production Related O&M Costs include fixed routine O&M expenses, variable O&M expenses, major maintenance, and capital expenditures. Total non-fuel operating costs for 2021 are summarized in Table 12 and are in real (constant) dollars. The Owner did not assume any escalation for Operating Costs. Table 12 also includes "Owner and Other Operating Expenses," which fall outside of our expertise but are included for informational purposes.

329599_Alta_Power_3_Peakers_IER_D7_20190830.docx

**Table 12**
**Projected 2021 Operating Costs ($000) [1]**

|  | GOODALTA | ALTAJAC1 |
|---|---|---|
| Non-Fuel Production Related O&M Costs |  |  |
| Fixed O&M Costs |  |  |
| O&M Fee | 750 | 750 |
| Auxiliary Power | 20 | 20 |
| Communications | 20 | 20 |
| Environmental Compliance | 25 | 25 |
| Other OPEX | 100 | 100 |
| Total Fixed O&M Costs | 915 | 915 |
| Variable O&M |  |  |
| Consumables | 60 | 60 |
| Water | 224 | 224 |
| Total Variable O&M Costs | 284 | 284 |
| Total Generation | 240,017 | 239,993 |
| VOM Rate ($/MWh) [2] | 1.19 | 1.19 |
| Total Production-Related O&M Costs |  |  |
| Owner and Other Costs |  |  |
| Asset Management Fee | 250 | 250 |
| Energy Management Base Fee | 90 | 90 |
| Energy Management Incentive Fee | 250 | 250 |
| Fuel Management Fee | 75 | 75 |
| Insurance | 150 | 150 |
| Property Tax | 375 | 375 |
| Total Owner and Other Costs | 1,190 | 1,190 |
| Total Non-Fuel Operating Costs | 2,389 | 2,389 |

1) The Owner's estimated O&M expenses as provided in the Pro Forma.
2) This rate includes only those consumable expenses that vary directly with generation (ammonia and water) and excludes those that are not consumable or vary indirectly with generation (auxiliary power). Megawatt-hour ("MWh").

Fixed O&M expenses are production-related non-fuel O&M costs which do not vary significantly with electrical generation and typically include the following categories: materials and supplies, office overhead, back-up electricity, purchased power, and operating labor.

[We note there is no increase in fixed costs in year 2022 to reflect implementation of BSS. These would be incremental costs associated with testing, training, and likely significant increase to comply with additional NERC "Critical Infrastructure Program" costs.]

[The "Fuel Management Fee" in Table 12 is inconsistent with the FMSA. The FMSA includes a fee of $600,000 per annum ($50,000 per month) which would equate to $200,000 per Project. Plus the FMSA includes an incentive "Optimization Margin Fee."]

Variable O&M expenses are production-related non-fuel expenses, which vary in proportion to the electrical generation of the Projects and typically include the following categories: chemicals, ammonia, water, repairs and maintenance, parts, consumables, and supplies. The Pro Forma assumes a total water charge,

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 48

which includes purchase and treatment to demineralized quality, of $7.50 per 1,000 gallons. We did not verify this rate against municipal rates nor with RO installed (no details were provided for RO system) however, we feel this rate is reasonable. Additionally, the wastewater amount assumes a 20 percent rejection rate for the ROs. This rejection rate for an RO system is reasonable and we would expect actual performance to be better (lower than 20 percent). The Pro Forma assumes a wastewater discharge cost of $20 per 1,000 gallons. We were unable to verify this rate but generally feel this is a conservative cost. The Pro Forma assumes a consumables cost of $0.25 per MWh. The consumables will be mostly ammonia consumption for the SCR and we feel this rate is reasonable.

Major maintenance costs are those costs incurred in association with a scheduled facility outage, the timing of which typically varies with operating hours or plant starts. Types of major maintenance expenses include the following categories: scheduled major overhaul expenses for maintaining the CT, generator, major maintenance labor, spare parts costs, and SCR catalyst replacements. No major maintenance is projected during the five-year term of the Pro Forma.

## Summary

**[Based on our review, we are of the opinion that the staffing plan, organizational structure, and operating programs and procedures proposed for the Projects are consistent with generally accepted practices in the industry.]**

**[Based on our review, we are of the opinion that the methodology used by the Owner in preparing the estimate of the Non-Fuel Production Related O&M Costs for the Projects through the term of the Pro Forma is reasonable and the estimate of the Non-Fuel Production Related O&M Costs for the Projects through the term of the Pro Forma, including provision for major maintenance, is comparable to the costs of similar combined-cycle facilities with which we are familiar.]**

# Environmental Review of the Project

## Environmental Site Assessments

### ALTAJAC1

We have reviewed (1) the *"Phase I Environmental Site Assessment, 0.52 Miles East of the Intersection at County Road 4102 and State Highway 69, Jacksonville, Texas 75766"* dated March 25, 2019, prepared for the Owner by Environmental Resources Management Southwest, Inc. ("ERM"); and (2) ERM's June 28, 2019 letter report, *"Jacksonville Limited Phase II ESA Report"* regarding subsurface sampling at the ALTAJAC1 Site. According to ERM, the approximately 18.56-acre ALTAJAC1 Site is "a mixture of developed and undeveloped land. Approximately 1.4 acres of the southwestern corner of the "Subject Property" is cleared and used as a laydown area and for storage of roll-off containers." The adjoining property south of the ALTAJAC1 Site has been an active landfill since at least 1985. According to ERM, the Royal Oaks Landfill has historically utilized the southwestern corner of the ALTAJAC1 Site as a laydown and storage area for roll-off containers and empty trashcans since at least 2005. According to ERM's interview with a landfill representative, "Royal Oaks plans on creating new landfill cells in 2020 and 2023 that will be adjacent to the Subject Property on the southern border." Based on its review of groundwater monitoring data from the adjacent landfill, ERM concluded that arsenic detected in groundwater at the southern ALTAJAC1 Site boundary should be attributed to naturally-occurring conditions in the region. During its February 8, 2019 site visit, ERM observed the 18.56-acre ALTAJAC1 Site as undeveloped and "heavily vegetated" except for the 1.4-acre area in the southwestern corner used by the landfill operator for

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 49

storage of roll-off containers and trash cans. ERM also observed an electric transmission line traversing the property, and "various de minimis amounts of non-hazardous waste" including general trash and refuse. ERM observed no evidence of stained soils, hazardous waste, wells, or aboveground or underground storage tanks on the ALTAJAC1 Site. ERM concluded that its assessment did not identify any recognized environmental conditions in connection with the ALTAJAC1 Site. ERM's March 2019 Phase I ESA recommended that the Owner "consider conducting an independent evaluation of soil and groundwater on the subject property to gather baseline data prior to initiating development activities. Collection of this baseline data would serve as a risk mitigation strategy in the event that future releases from the landfill result in contamination of sediments or groundwater at the subject site."

Prior to any site development activities, ERM conducted soil and groundwater sampling during June 2019 to gather baseline data at the ALTAJAC1 Site. Soil was collected at five locations and groundwater was collected at three temporary monitor well locations (no visual evidence of contamination was observed in any samples). Samples were analyzed for volatile organic compounds ("VOCs"), polycyclic aromatic hydrocarbons ("PAHs"), total petroleum hydrocarbons ("TPH"), and metals. The laboratory analytical results were compared to the Tier 1 Protective Concentration Levels ("PCLs") of the Texas Risk Reduction Program ("TRRP") established TCEQ for residential and commercial/industrial sites. The metals analytical results were also compared to the Texas Specific Soil Background ("TSSB") levels. Analyses of soil and groundwater samples indicate that VOCs and PAHs were either not detected or were detected at concentrations less than their respective TRRP "Tier 1 Residential and Commercial/Industrial PCLs." Diesel range TPH and heavy oil range TPH were detected at only one soil sampling location, which exceeded TRRP "Tier 1 Residential PCLs." While ERM noted that "minor TPH impacts to soil may have occurred from historical activities at the Site," the "TPH concentrations did not exceed TRRP Tier 1 Commercial/Industrial PCLs from any surface soil, subsurface soil, or groundwater samples." ERM concluded that the "TPH exceedances do not pose a significant risk to human health." Elevated concentrations of certain metals (i.e., arsenic, lead, and selenium) were detected in the soil samples at all five sampling locations, and elevated arsenic (a naturally-occurring metal) was detected in two temporary well locations. Based on its analysis, ERM suggested that the elevated metals were "indicative of site-specific background conditions", and further concluded that the metals did not pose a significant risk to human health. ERM recommended "appropriate engineering/administrative controls (i.e., dust control measures and air monitoring) should be utilized in conjunction with personnel protective equipment to minimize exposure pathways of concern (e.g., inhalation, dermal contact, and ingestion) during site development activities." ERM concluded, "Assuming that appropriate measures are implemented to minimize exposure pathways of concern during construction and operation, the findings of this assessment should not preclude future development of the Site for commercial/industrial land use." **[Leidos requests that Alta Power describe the manner in which it intends to implement ERM's recommendations associated with site development activities regarding engineering controls and minimizing exposure pathways for construction workers.]**

**[Based on our review, we are of the opinion that the March 2019 Phase I ESA performed by ERM for the ALTAJAC1 Site was conducted in a manner consistent with industry standards, using comparable industry protocols for similar studies with which we are familiar. In our opinion, if dewatering of groundwater is required during construction, there is potential to encounter elevated concentrations of TPH or metals in the groundwater that may require special disposal.]**

**[Opinion withheld until resolution of the following issues:**

- **We note that the Phase I ESA for the ALTAJAC1 Site has exceeded the 180-day "Continued Viability" for a Phase I ESA as noted by Section 4.6 of ASTM E1527-13. It is Leidos'**

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

AltaJAC0009989

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 50

experience that lenders typically require that ESA issues be updated, such that current ESA reports are no older than six months old at the time of financial closing. Outdated ESA reports are also likely to be an issue for other lenders during syndication. Therefore, in anticipation of lender requirements, Leidos suggests that a Phase I ESA Update report be completed in accordance with ASTM E1527-13 standards.]

## GOODATLA

We have reviewed the "**[Draft]** Phase I Environmental Site Assessment, Southeast Corner of the Intersection at Southeast 3230 Road and Southeast 3220, Goodlow, Texas 75144" dated June 14, 2019, prepared for the Owner by ERM. According to ERM, "The Subject Property is comprised of approximately 10 acres of farmland and a wastewater discharge pipeline route located within the ROW of SE 3200 Road extending approximately 0.6 miles southwest toward Richland Chambers Reservoir from the western corner of the 10-acre parcel." During its March 21, 2019 site visit, ERM observed the 10-acre GOODALTA Site as vacant/agricultural land. ERM also observed overhead power transmission lines traversing the property from the southern corner to the northeastern side of the GOODALTA Site. ERM notes two gas pipelines are indicated as crossing the property parallel to each other from the northwest to the southeast sides of the GOODALTA Site according to the "Texas Railroad Commission" database. ERM observed no evidence of stained soils, hazardous waste, wells, or aboveground or underground storage tanks on the GOODALTA Site. ERM concluded that its assessment did not identify any recognized environmental conditions in connection with the GOODALTA Site.

**[Based on our review, we are of the opinion that the June 2019 Phase I ESA performed by ERM for the GOODALTA Site was conducted in a manner consistent with industry standards, using comparable industry protocols for similar studies with which we are familiar.]**

**[Opinion withheld until resolution of the following issues:**

- **We note the Phase I ESA provided for GOODALTA is marked "Draft" and not certified by the Environmental Professionals in Section 9.**

- **ERM did not indicate whether they interviewed or attempted to interview state or local government agency personnel regarding the GOODALTA Site. Notwithstanding the appearance of low risk associated with the Subject Property, Section 11.5.1 of ASTM E1527-13 states "A reasonable attempt shall be made to interview at least one staff member of …. state and/or local government agencies." Further, the absence of the interview or an explanation of why an interview was not conducted is a data gap. ASTM E1527-13 requires that data gaps be qualified as to whether the missing information impacted the ability of the Environmental Professional to identify recognized environmental conditions. ERM should supplement its report with the results of an interview with state or local agency personnel or comment on the significance of this data gap on the Environmental Professional's ability to identify recognized environmental conditions.**

- **We note that the Phase I ESA for the GOODALTA Site will expire on or about September 2, 2019 (the EDR report is dated March 6, 2019), and therefore will have exceeded the 180-day Continued Viability for a Phase I ESA as noted by Section 4.6 of ASTM E1527-13. It is Leidos' experience that lenders typically require that ESA issues be updated, such that current ESA reports are no older than six months old at the time of financial closing. Outdated ESA reports are also likely to be an issue for other lenders during syndication. Therefore, in anticipation of lender requirements, Leidos suggests that a Phase I ESA Update report be**

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

Alta App.000580
ALTA_0009990

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 51

**completed in accordance with ASTM E1527-13 standards unless the financing will close prior to this date.]**

## Status of Permits and Approvals

The Projects must be designed, constructed, and operated in compliance with applicable regulations, codes, standards, guidelines, policies, and laws.  Table 13 lists the summary status of environmental permits and approvals required from various federal, state, and local agencies before the Projects can be constructed and placed into commercial operation.  **[Based on our review, we are of the opinion that the Owner has identified and obtained the key environmental permits and approvals required from the various federal, state, and local agencies that are currently necessary to commence construction.  While there are certain minor or ministerial permits and approvals that have not yet been obtained and certain permits for operations that will be obtained post-closing, we are not aware of any technical circumstances that would prevent the issuance of these remaining permits and approvals.]**

Table 13
Summary Status of Permits and Approvals

| Permit/Approval | ALTAJAC1 | GOODALTA | Comments |
|---|---|---|---|
| **Federal** | | | |
| Aeronautical Obstruction Clearance, Determination of No Hazard to Air Navigation | The Owner indicates not required. | The Owner indicates not required. | As required by the Federal Aviation Administration to demonstrate no hazards to aviation if stack, buildings, or construction cranes exceed certain height thresholds or due to proximity to airports and/or military bases. |
| Threatened and Endangered ("T&E") Species Determination | Per the "Limited NEPA Analysis" memorandum dated 8/8/19 prepared by ERM ("ERM memo for Jacksonville"), no protected species are known or expected to occur at the ALTAJAC1 project area. | Per the "Limited NEPA Analysis" memorandum dated 8/8/19 prepared by ERM ("ERM memo for Goodlow"), no protected species are known or expected to occur at the GOODALTA project area. | Required to assess impacts of facility and linear facilities on local T&E species and other species of concern.  Desktop review only.  ERM memos recommend construction best management practices, contacting U.S. Fish and Wildlife Service if listed species are encountered, and avoidance of migratory birds and nests as a best practice. |
| Rivers and Harbors Act Section 10 Permit and Clean Water Act ("CWA") Section 404 Permit | Per the ERM memo for ALTAJAC1, no potentially jurisdictional waters of the U.S. or wetlands are expected to be impacted by the ALTAJAC1 project.  Desktop review only. | Per the ERM memo for GOODALTA, no potentially jurisdictional waters of the U.S. or wetlands are expected to be impacted by the GOODALTA project that would require permitting with the U.S. Army Corps of Engineers.  Field observations in March 2019. | Section 10 permit authorizes work in, on, or under a navigable water of the U.S., while the Section 404 permit authorizes discharge of dredge or fill material into wetlands and waters of the U.S.  ERM memos recommend construction best management practices. |
| Hazardous Waste Identification Number | To be obtained as required. | To be obtained as required. | Required for the use, management and disposal of material categorized as hazardous waste.  Disposal must follow manifest tracking system. |

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 52

**Table 13**
**Summary Status of Permits and Approvals**

| Permit/Approval | ALTAJAC1 | GOODALTA | Comments |
|---|---|---|---|
| Oil Spill Prevention Control and Countermeasure Plan | To be prepared, as required, prior to having oil above the threshold on site. | To be prepared, as required, prior to having oil above the threshold on site. | Required as per 40 CFR 112, Oil Pollution Prevention regulations, if a facility stores more than 1,320 gallons at the site (including electrical equipment, transformer oil). |
| **State** | | | |
| Air Quality Standard Permit, Electric Generating Units | Registration No. 156710 issued by the TCEQ on 5/21/19 for three 50 MW peaking turbines; expires 5/21/29. | Registration No. 157171 issued by the TCEQ on 6/13/19 for three 50 MW peaking turbines; expires 6/13/29. | Allows construction and operation of an air emission source. Sets forth emission limits, testing, monitoring, recordkeeping, and reporting requirements for the air emission sources. Construction must commence within 18 months of approval or request extension. Based on annual hours of operation of 3,600 per turbine, and 400 start-ups/shutdowns annually. Several ancillary activities to be covered under "Permits by Rule," requires on-site documentation be maintained. |
| Clean Air Act ("CAA") Title V Operating Permit | The Owner indicates the application is to be submitted to TCEQ after the start of construction. | The Owner indicates the application is to be submitted to TCEQ after the start of construction. | Required if site potential-to-emit is 100 tons per year ("TPY") or greater of a regulated pollutant or for certain federal requirements. Permits include all federally enforceable air quality requirements that apply to operations at a facility. |
| CAA Title IV Acid Rain Permit | The Owner indicates the application is to be submitted to TCEQ after the start of construction. | The Owner indicates the application is to be submitted to TCEQ after the start of construction. | As required for Acid Rain Program compliance. To be submitted 24 months prior to start of operations. Will be under Title V permit. |
| TPDES General Permit for Discharges of Stormwater Associated with Construction Activities | Notice of Intent to be submitted to TCEQ prior to start of construction (if greater than 5 acres ground disturbance) or small construction site notice to be posted (if less than 5 acres ground disturbance). | Notice of Intent to be submitted to TCEQ prior to start of construction (if greater than 5 acres ground disturbance) or small construction site notice to be posted (if less than 5 acres ground disturbance). | Required for stormwater management during construction. Requires the preparation of a Stormwater Pollution Prevention Plan ("SWPPP"). |
| TPDES General Permit for Discharges of Stormwater Associated with Industrial Activities | Not required based on TCEQ permit applicability. | Not required based on TCEQ permit applicability. | Generally required for stormwater management during operation and requires the preparation of SWPPP. |

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

Alta App.000582

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 53

**Table 13**
**Summary Status of Permits and Approvals**

| Permit/Approval | ALTAJAC1 | GOODALTA | Comments |
|---|---|---|---|
| TPDES Permit for Discharges of Process or Sanitary Water Associated with Industrial Activities | Not expected to be required, discharge is to the City of Jacksonville's publically-owned treatment works, design review by City. | Under review, application received by TCEQ 6/19/19 for discharge to Richland Chambers Reservoir. | Required if process or sanitary wastewater is to be discharged from the facility to surface waters. |
| CWA Section 401 Water Quality Certification | Not required if a Section 404 permit is not required. | Not required if a Section 404 permit is not required. | Section 401 of the CWA requires applicants for a federal license or permit that may result in discharge to waters of the U.S. obtain to verify the discharge will comply with applicable CWA and state water quality requirements. |
| National Historic Preservation Act Section 106 Consultation | Per the ERM memo for ALTAJAC1, Section 106 consultation is not expected to be required, and due to previous disturbances, ERM recommends cultural resource surveys are not necessary. | Per the ERM memo for GOODALTA, Section 106 consultation is not expected to be required, and due to previous disturbances, ERM recommends cultural resource surveys are not necessary and a Chance Finds Procedure should be developed prior to ground-breaking activities. | Required to identify and protect significant cultural and historical resources. Desktop review only. If cultural materials are found during construction, notify State Historic Preservation Office. |
| State-listed T&E Species Determination | Per the ERM memo for ALTAJAC1, no protected species are known or expected to occur at the ALTAJAC1 project. | Per the REM memo for GOODALTA, no protected species are known or expected to occur at the GOODALTA project. | To assess if state-listed species or their habitat would be adversely impacted by a project; desktop review only. State-listed species may only be handled by persons with a scientific collecting permit obtained through the Texas Parks and Wildlife Department. ERM memo recommends construction best management practices. |
| Highway Work Permit/Driveway/ Encroachment | **[Confirm a permit from the Texas Department of Transportation ("TXDOT") is not required.]** | **[Confirm a permit from the TXDOT is not required.]** | As required under state regulations for work in state highway ROW. |
| Aboveground Storage Tank Registration | To be obtained as required. | To be obtained as required | For aboveground tanks with capacity greater than 1,110 gallons containing petroleum products. |
| Solid Waste Registration | Registration required prior to operation. | Registration required prior to operation. | As required under state regulations. |

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

Alta App.000593
0009993

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 54

**Table 13**
**Summary Status of Permits and Approvals**

| Permit/Approval | ALTAJAC1 | GOODALTA | Comments |
|---|---|---|---|
| **Local** | | | |
| Zoning/Special Use Permit | The Owner indicates not required. | Zoning District Change from agricultural to industrial approved 3/7/19 by the Navarro County Planning and Zoning Commission. | As required under county codes and ordinances. |
| Floodplain Development Permit | Per the ERM memo for ALTAJAC1, in Zone X thus a permit is not anticipated. | Per the ERM memo for GOODALTA, in Zone X thus a permit is not anticipated. | As required under county floodplain ordinances for construction within floodplain; in conjunction with the FEMA. |
| Encroachment/Right-of-Way Permit | To be obtained as required for road crossing and/or driveway or work in county road ROW. | **[Provide for wastewater pipeline in county road ROW as referenced in TPDES application.]** | As required under county codes and ordinances. |
| Industrial Wastewater Discharge/ Pretreatment Approval | The Owner indicates design review by the City of Jacksonville, no pretreatment permit required. | Not applicable, permit to be issued by TCEQ. | As required under county codes and ordinances for wastewater sent to treatment works. |
| Various Permits (e.g., Building, Occupancy, Grading Permit) | To be obtained, as required. | To be obtained, as required. | Various construction and occupancy permits required for compliance with building codes and standards. If required, such permits are typically obtained by contractors once detailed design information becomes available. |

## Environmental Compliance

We note the following circumstances relative to compliance with permits and approvals and other regulatory requirements that could have an impact on future operations:

- The standard permit authorizations include pounds per hour and TPY emission limits for each turbine under normal operations and startup/shutdown for $NO_X$, carbon monoxide, volatile organic compounds, particulate matter ("PM") $PM_{10}/PM_{2.5}$, sulfur dioxide ("$SO_2$"), ammonia, and formaldehyde. The maximum emission rates tables do not include operational limits on hours, however, based on the application submittals, emissions are based on 3,600 operating hours and 400 startups/shutdowns per turbine. The Owner indicates the assumptions for calculating emissions (e.g., startups/shutdowns per year) are consistent with expected operation and based on information from the turbine provider. Emissions of $NO_X$ are to be controlled by SCR and demonstrated with continuous emissions monitoring systems.

- The Projects are subject to Title IV of the CAA Amendments of 1990 (Acid Rain Provisions) whereby each unit within a facility must possess $SO_2$ allowances to cover its emissions. As new facilities, the Projects will not be allocated any "Acid Rain" $SO_2$ allowances. A facility must hold allowances equal to its actual emissions during that year. The exact number of allowances to be

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

ALTA0009994

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 55

required in the future will depend on the utilization of the units. Because the Projects utilize natural gas fuel, the actual cost for purchasing allowances should be relatively small. Any shortfall must be purchased from the marketplace. If excess allowances are held, they can be sold into the marketplace.

- As a result of various legal proceedings, the U.S. Supreme Court on April 29, 2014 reversed a previous 2011 decision by the U.S. Court of Appeals for the District of Columbia Circuit (the "Court") staying the Cross States Air Pollution Rule ("CSAPR") and the USEPA filed a motion with the Court to lift the stay and toll the compliance deadlines by three years such that "Phase I" budgets applied in 2015 and 2016 and "Phase II" budgets apply in 2017 and beyond. On September 7, 2016, the USEPA finalized an update to the CSAPR ozone season program by issuing the CSAPR "Update Rule." This Update Rule would reduce air quality impacts to meet the 2008 ozone standard and also responds to the July 2015 remand of certain CSAPR budgets, including Texas, by the Court. In a final rule that was effective immediately and published on September 29, 2017, USEPA withdrew Texas from the annual $SO_2$ and $NO_X$ programs. Thus, Texas is now only subject to the ozone season $NO_X$ requirements, which begin on May 1 and end on September 30. As new units, CSAPR allowances for the Projects would be available through the new-unit set aside pool provided the allowance pool is not oversubscribed at the time the Projects begin operation.

- As a result of the April 2007 U.S. Supreme Court ruling indicating that greenhouse gas ("GHG") emissions meet the definition of "air pollutant" under the CAA, the USEPA developed certain rules to regulate GHG emissions. The *"Prevention of Significant Deterioration and Title V Greenhouse Gas Tailoring Rule,"* was adopted to phase in the major source applicability thresholds for GHGs under the federal prevention of significant deterioration ("PSD") pre-construction permitting program and the Title V operating permit program. Beginning January 2, 2011, sources that must already obtain New Source Review ("NSR") permits for other pollutants were required to include GHGs in their permits if they increase their emissions of carbon dioxide ("$CO_2$") equivalent by at least 75,000 TPY. On July 1, 2011, USEPA extended the requirements to new construction sources that emit at least 100,000 TPY of GHGs and existing sources that emit at least 100,000 TPY and increase their emissions by at least 75,000 TPY, even if they do not exceed thresholds for other pollutants. In addition, starting July 1, 2011, sources that emit at least 100,000 TPY of GHGs were also required to account for GHGs in their Title V operating permits. On November 10, 2010 and updated March 2011, USEPA issued its *"PSD and Title V Permitting Guidance for Greenhouse Gases"* ("GHG Guidance"). The GHG Guidance outlines USEPA's concepts for evaluating Best Available Control Technology ("BACT") for major sources of GHG emissions. In addition, the USEPA proposed on February 24, 2012 to keep the GHG permitting thresholds at current levels. On June 23, 2014, the Supreme Court issued its decision in "*Utility Air Regulator Group vs. EPA*" upholding the application of BACT for GHGs to sources already obtaining NSR permits for other pollutants. As the Projects have been granted an air permit authorization, it will not be subject to BACT requirements for GHG emissions unless future major modifications are made.

- On August 3, 2015, the USEPA issued the final *"Standards of Performance for GHG Emissions from New, Modified, and Reconstructed Stationary Sources: Electric Utility Generating Units."* In this rulemaking, the USEPA finalized GHG emissions standards from new fossil fuel-fired power plants under Section 111(b) of the CAA to 1,000 pounds of $CO_2$ per MWh gross for baseload natural gas-fired CTs or 120 pounds of $CO_2$ per MMBtu for non-base load natural gas-fired CTs, and 1,400 lb of $CO_2$ per MWh for coal-fired power plants. The registration submittals indicate the turbines are subject to a $CO_2$ emission standard and will meet the requirements.

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

- The final Clean Power Plan ("CPP") was issued on August 3, 2015 and published in the Federal Register on October 23, 2015, with the objective of reducing $CO_2$ emissions from the power sector. The CPP regulates fossil fuel-fired electric utility steam generating units ("EGUs"), which are generally boilers, and natural gas-fired combined-cycle generating units that were in operation or had commenced construction by January 18, 2014, under CAA Section 111(d). The CPP sets $CO_2$ emission goals for 47 mainland U.S. states. Under the CPP, each state has flexibility to meet its goal by 2030 through lowering the overall carbon intensity of the power sector in the state. The CPP allows states to design a program that makes the most sense for their particular situation. States can choose their mix of generation using different fuels, energy efficiency and demand-side management to meet the goals and their own needs. It allows them to work alone to develop individual plans or to work together with other states to develop multi-state plans. Final plans must be developed by September 6, 2016, or a two-year extension must be requested by that same date. Compliance periods begin January 1, 2022 with interim goals over an eight-year period. Final compliance is required in 2030. Although there are no emission limits for individual units under the CPP, Section 111(d) bases the state emission goals on performance rates of 1,305 pounds of $CO_2$ per MWh for EGUs and 771 lb of $CO_2$ per MWh for combined-cycle units. States, if choosing to comply with CPP requirements through a rate based approach, may impose these limits on individual units, while a mass based compliance approach could allow different options for meeting the state goal. On February 9, 2016, the U.S. Supreme Court stayed implementation of the CPP pending judicial review by the Court. Thus, until the litigation is settled and development of state plans, specific impacts to the Projects cannot be predicted.

- The CAA requires the USEPA to set National Ambient Air Quality Standards ("NAAQS") for pollutants considered harmful to public health and the environment. New one-hour standards were promulgated for $SO_2$ and $NO_X$ (expressed as "$NO_2$") in 2010; a new lower annual standard for particulate matter less than 2.5 microns in size was published in the Federal Register January 15, 2013 (announced December 14, 2012); and a new lower ozone standard was published in October 2015. The new $SO_2$, $NO_2$, and ozone standards are more restrictive than the previous standards as they offer a shorter time period over which to average emissions/impacts, or for the ozone standard, are simply a lower allowed ground-level concentration over the same averaging period. The Owner reports dispersion modeling was not required as part of the standard permit application. If a violation of any new standard were predicted by air quality modeling, or if the area around the Projects was determined to not meet the NAAQS, actions to reduce emissions could be required.

- Environmental regulations are continually changing and changes to existing regulations, as well as the promulgation of new regulations, can lead to increases in capital expenditures and O&M costs at both new and existing facilities. Many such regulations and potential changes have been discussed above. However, it is not possible to estimate the requirements and potential impacts of regulations that have not been promulgated, or even proposed, on the Projects.

## Principal Considerations and Assumptions

In the preparation of this Report and the opinions presented in this Report, we have made certain assumptions with respect to conditions which may exist or events which may occur in the future. While we believe these assumptions to be reasonable for the purpose of this Report, they are dependent upon future events, and actual conditions may differ from those assumed. In addition, we have used and relied upon certain information provided to us by others. While we believe the use of such information and assumptions

CONFIDENTIAL

Alta Power – GOODALTA and ALTAJAC1 Power Centers
Independent Engineer's Report
Page 57

to be reasonable for the purposes of this Report, we offer no other assurances with respect thereto, and some assumptions may vary significantly due to unanticipated events and circumstances. To the extent that actual future conditions differ from those assumed herein or provided to us by others, the actual results will vary from those projected herein. This Report summarizes our work up to the date of the Report. Thus, changed conditions occurring or becoming known after such date could affect the material presented to the extent of such changes.

The principal considerations and assumptions made by us and the principal information provided to us by others include the following:

1.  As Independent Engineer, we have made no determination as to the validity and enforceability of any contract, agreement, rule, or regulation applicable to the Projects. For the purposes of this Report, we have assumed that all contracts, agreements, rules, and regulations will be fully enforceable in accordance with the contractual terms. Moreover, it is assumed that all parties will comply with and fulfill the provisions of the contracts and agreements.

2.  **[The Facility will be designed and constructed in accordance with the EPC Contract and prudent industry standards, including the Independent Engineer's receipt and review of: (1) DEPCOM's structural calculations in support of increased pile length for piles located in high stormwater flow areas; and (2) GameChange's conformation of 24-foot design row spacing based on wind tunnel test(s).]**

3.  The Projects will be maintained in accordance with good engineering practices, all required renewals and replacements of equipment will be made in a timely manner, and the equipment will not be operated to cause it to exceed the design maximum ratings.

4.  Qualified and competent personnel will be employed who will properly operate and maintain the Projects in accordance with the equipment manufacturers' recommendations and generally accepted engineering practices, and will generally operate the Facility in a sound and businesslike manner.

5.  Inspections, overhauls, repairs, and modifications are planned for and conducted in accordance with equipment manufacturers' recommendations, and with special regard for the need to monitor certain operating parameters to identify early signs of potential problems.

6.  All licenses, permits and approvals necessary to construct and operate the Projects will be obtained on a timely basis and any changes in required licenses, permits or approvals will not result in changes in design, construction delays, reduced operation, or increased capital or operating costs of the Facility.

# Conclusions

Set forth below are the principal opinions we have reached regarding our review of the Facility. For a complete understanding of the estimates, assumptions, and calculations upon which these opinions are based, the Report should be read in its entirety. On the basis of our review and analyses of the Facility and the assumptions set forth in this Report, we are of the opinion that:

**[Conclusions to come in later draft.]**

1.

Respectfully submitted,
**LEIDOS ENGINEERING, LLC**

329599_Alta_Power_3_Peakers_IER_D1_20190830.docx

# Exhibit 67

Alta App.000588



Ex. 3

# Report of Findings

*Alta Power LLC v. General Electric International, Inc.*

*Case No. 3:23-CV-270-X*

*Prepared by:*



Eric Rodriguez, PE

February 25, 2025



EXHIBIT

2397

Alta App.000589

❊ **Secretariat**

# TABLE OF CONTENTS

I.     **INTRODUCTION** ................................................................................................... 3

    A.   Scope of Assignment ............................................................................................. 3
    B.   Methodology ....................................................................................................... 3
    C.   Qualifications and Experience ............................................................................. 4

II.    **EXECUTIVE SUMMARY** ........................................................................................ 6

III.   **DISCUSSION OF OBSERVATIONS AND FINDINGS** ................................................ 8

    A.   Alta's Project Definition was Sufficient for Bidding and Financing .................... 8
        1.   *Alta Appropriately Completed Site Selection, Geotechnical Investigation, and Environmental Site Assessment* ......................................................................................................... 8
        2.   *Alta developed Equipment/Technology Selection and Performance Requirements* ................... 11
        3.   *Alta Developed Preliminary Engineering Information* ............................................ 11
    B.   The Bidding Process Accounts for the Market Conditions ................................. 15
        1.   *The Bidding Process* ...................................................................................... 15
        2.   *A Lump Sum or Fixed Price Contract is Suitable for Well-Developed Projects* ............... 17
        3.   *Comparison of EPC Contractor Bids* .............................................................. 22
    C.   Casey's Proposal Schedule ................................................................................ 26
    D.   Casey's Historical Performance .......................................................................... 31

IV.   **SIGNATURE** ..................................................................................................... 35

**EXHIBIT 1: ERIC K. RODRIGUEZ, PE, CURRICULUM VITAE** ............................................ 36

Alta App.000590

# I.    Introduction

1. Secretariat Advisors, LLC (hereafter "Secretariat") prepared this Report of Findings (hereafter "Report") at the request of Jordan, Lynch & Cancienne, PLLC (hereafter "JL&C"), in relation to a lawsuit between Alta Power, LLC (hereafter "Alta") and General Electric International, Inc., d/b/a GE Power Services. Secretariat understands Alta sought to purchase refurbished LM6000 aeroderivative gas turbines from GE Power Services and WattStock LLC; for the purposes of this report, GE Power Services and WattStock are referred to together as "GE/WattStock". The dispute relates to the planned construction of three 150 MW peaking plants located in Texas (hereafter "Project" or "Facility"). Alta selected Casey Industrial (hereafter "Casey") as the engineering, procurement, and construction (hereafter "EPC") contractor.

## A.    Scope of Assignment

2. JL&C has retained Secretariat, and specifically Eric K. Rodriguez, PE, to perform an independent analysis of the development of the planned Project prior to Alta obtaining financing. Secretariat's scope relates specifically to the development of the engineering, procurement, and construction scope of the Project and does not extend to issues related to project financing or technology selection/acquisition. In completing this analysis, Mr. Rodriguez has developed opinions related to the definition of the work scope, bidding process, proposed construction costs, proposed schedule duration, and EPC contractor selection for the Project. All work performed by Secretariat for this assignment has been under the direct supervision of Mr. Rodriguez.

## B.    Methodology

3. Eric Rodriguez, PE, a Managing Director at Secretariat, has led Secretariat's work on this assignment. Secretariat has relied upon the review and analysis of documents produced throughout this litigation, as well as information and data sources commonly used by professionals engaged in analyses like that of Secretariat's assignment in this matter. The professionals performing the analyses related to the planning, bidding, and scheduling of the planned Project possess the requisite experience and credentials for such analyses and therefore have also relied on their education and professional training.

4. In addition to the above, Secretariat has also relied upon publications and recommended practices that are widely recognized and used within the engineering and construction

Alta App.000591



industries. Secretariat has tested Alta's actual performance of the work on the Project against this published data to determine whether Alta's work was carried out in a manner expected of a sophisticated and competent owner developing an EPC project. As such, Secretariat's findings are based not only on its knowledge and expertise related to EPC projects, but also industry-accepted published works. These published works are cited throughout this Report, as appropriate, and their applicability to the specific analysis being addressed is discussed.

5. Legal opinions are beyond the scope of this Report. Accordingly, observations and conclusions in this Report relating to the proposed EPC contract are based on the review and understanding of the contract from the perspective of an industry professional. In the construction industry, the contract between the parties is a principal source for determining the parties' respective obligations. Project professionals are routinely trained to review and understand contracts and to administer projects accordingly. It is important that such professionals engaged in capital projects possess a working knowledge of the fundamental rights and responsibilities under a contract.[1] Throughout the professional career of Mr. Rodriguez while engaged on active projects as well as matters in a dispute setting, he has routinely relied upon the terms and provisions in contracts to perform tasks like those to develop capital projects.

## C.    Qualifications and Experience

6. Mr. Rodriguez holds a Bachelor of Science in Civil Engineering (Structural Emphasis) from New Mexico State University and a Master's in Business Administration (Concentration in Corporate Finance) from The University of Texas at Austin. He is a licensed professional engineer in Texas, having held that license since 2004.

7. Mr. Rodriguez possesses over 20 years of experience providing professional services in the engineering and construction industry. As a practicing engineer, he has performed civil and structural engineering design and analysis on a variety of capital projects across multiple industry sectors, including industrial and commercial structures. He has also provided construction administration services throughout the construction phase and through project closeout.

---

[1] Construction Claims Deskbook, Brams, Lerner, 1996, §1.2.

8.  He has also provided consulting services on troubled active capital projects and on capital projects involved in litigation/arbitration. For engagements involving litigation/arbitration, Mr. Rodriguez performs forensic analyses related to engineering and construction management, engineering and construction defects, schedule delays, damages, standard of care, as well as other engineering- and construction-related issues. The size and complexity of the capital projects Mr. Rodriguez has been involved in ranges from several million dollars in total installed costs to multi-billion-dollar mega projects.

9.  Mr. Rodriguez has been designated as an expert and provided expert testimony at deposition and hearing in United States Bankruptcy Court, state courts, and arbitration proceedings (i.e., American Arbitration Association (AAA), International Chamber of Commerce (ICC), and private arbitration).

10. Mr. Rodriguez's Curriculum Vitae and prior testimony history is attached as Exhibit 1.

Alta App.000593

## II.   Executive Summary

11. Alta sought to construct three 150 MW peaking plants at separate sites within Texas (i.e., Goodlow, Jacksonville, and Lufkin). Secretariat has analyzed Alta's performance related to its development of the EPC scope for the Project, selection of the EPC contractor, and reasonableness of the proposed price and schedule. Secretariat's key observations and findings are summarized below:

   - The technology Alta chose for the project was a configuration of three refurbished GE LM6000 combustion turbine generators. The GM LM6000 is a proven and reliable technology that has been implemented in similar projects. As such, the technology chosen was suitable for the Project.

   - Alta obtained geotechnical investigations and environmental site assessments for the proposed project sites. The geotechnical investigations provided the information necessary to support the detailed engineering phase and the environmental site assessments did not reveal any conditions that would preclude the proposed sites. This demonstrated the proposed sites were suitable for the Project.

   - Alta developed preliminary engineering, which supported the bidding process. Alta received five fixed-price bids with minimal variance in the proposed pricing and schedule durations, which indicates the Project was well defined at the bidding stage.

   - The minimal pricing variance in five independently bids also indicates the proposed pricing was reasonable. Furthermore, because the bids included fixed prices, the selected EPC contractor—not Alta—would own the risk for cost overruns.

   - Similarly, the planned schedule durations included in the received bids indicated the schedule was reasonable. Furthermore, Casey, who Alta selected as the EPC contractor, proposed a ten-month schedule duration. Casey's proposed schedule duration was slightly longer than competing bids, indicating the ten-month schedule was achievable.

   - Casey has experience in delivering similar peaking plant projects, installing GE LM6000 equipment at other generation plants, and constructing a 140 MW

peaking plant utilizing the GE LM6000 technology. This indicates Casey was capable of delivering a successful project.

12. These issues are discussed in greater detail in the following sections of this Report.

❖ **Secretariat**    *Alta Power LLC v. General Electric International, Inc.*
*Case No. 3:23-CV-270-X*

## III.    Discussion of Observations and Findings

### A.    Alta's Project Definition was Sufficient for Bidding and Financing

13. Prior to engaging with Contractors, Alta performed initial front end project development work in order to define the scope of work. Alta's preliminary work included site selection, geotechnical investigations, environmental site assessments, equipment/technology selection, determining performance requirements, and developing preliminary engineering information. Alta's front end work is discussed in the following sections.

### 1.    Alta Appropriately Completed Site Selection, Geotechnical Investigation, and Environmental Site Assessment

14. Alta initially considered several locations in Texas to construct 150MW peaking plants. During the site selection process, Alta engaged Professional Service Industries, Inc. (hereafter PSI) to complete geotechnical investigations for the proposed GoodAlta and AltaJac1 locations.[2] The purpose of the geotechnical investigations was to evaluate the acceptable foundations for the proposed construction.[3] The geotechnical studies ultimately provided soil profiles, foundation and pavement recommendations, and civil and drainage considerations at each site to be utilized by the EPC contractor. Typically, this information is provided by an owner to the EPC contractor for consideration during design and construction.

15. Secretariat reviewed the geotechnical reports and determined the reports are consistent with typical industry practice and provided the necessary information to proceed with detailed engineering. The information presented in the geotechnical reports was based on subsurface explorations and laboratory testing of the native soils. The subsurface explorations were accomplished through borings up to 75 feet in depth. Furthermore, the proposed plot plans were utilized in selecting the specific boring locations, ensuring borings were performed at the proposed locations of foundations. This is important because it accounts for differences in the site stratigraphy at the most critical locations.

16. The geotechnical reports provided recommendations for site preparation, pavement design, and grading and drainage considerations. This information is necessary for the

---

[2] Alta 0102912, Geotechnical Services Report, Goodlow, TX, May 17, 2019, p. 4; Alta 0091895, Geotechnical Services Report, Jacksonville, TX, July 26, 2019, p. 4
[3] Alta 0102912, Geotechnical Services Report, Goodlow, TX, May 17, 2019, p. 5; Alta 0091895, Geotechnical Services Report, Jacksonville, TX, July 26, 2019, p. 5.

Alta App.000596

civil engineering design of the site. The geotechnical report also provided recommendations for shallow foundations and deep foundations. The shallow and deep foundation recommendations provide information for the structural engineering design of building and heavy equipment foundations. The geotechnical report also provided information on the seismic properties of the site, which is necessary for the structural engineering design of both foundations and superstructures. Lastly, the geotechnical report also addressed considerations that were relevant to construction activities.

17. The geotechnical reports exhibited the qualities of a thorough geotechnical investigation—consistent with my experience with typical geotechnical reports for projects such as this—necessary to support the detailed engineering phase of the Project.

18. On March 1, 2019, Alta entered into a Master Professional Services Agreement with Leidos Engineering, LLC (hereafter "Leidos") as well as a Task Authorization for "IE Review of Texas Peakers."[4] Under the Task Authorization, Leidos was to "review the principal aspects of the Project engineering design, environmental permits, and the technical provisions in the principal Project contracts, as provided by the Client, and to develop an independent engineer's report to support the Client's proposed financing of the Projects (the "Intended Purpose")."[5] An independent engineer is engaged by an owner or lender for its industry expertise. An independent engineer is to monitor and report on the financial and technical aspects of a project, and report on the progress of the work throughout its lifecycle. The independent engineer's duty is to the owner or lender, not the EPC contractor, or any other party. Therefore, the independent engineer is responsible for notifying the owner or lender of any concerns regarding the EPC contractor or other parties involved in the project. Leidos is well known in the industry for serving in this capacity.

19. Leidos prepared a draft Independent Engineer's Report dated August 2019 for the GoodAlta and AltaJac1 Projects (hereafter "IE Report"). Leidos's IE Report made the following statements regarding the geotechnical reports that Alta provided to Casey:[6]

> *Based on our review, provided that the EPC contractor follows recommendations in the Project Site-specific geotechnical reports regarding GOODALTA Site and ALTAJAC1 Site, the development, access, and subsurface conditions during*

---

[4] Alta 0074078, Master Professional Services Agreement, March 1, 2019; Alta 0077043, Task Authorization, March 1, 2019.
[5] Alta 0077043, Task Authorization, March 1, 2019.
[6] ARES-ALTAPOWER00000033, IE Report, August 2019, p. 12.

✦ Secretariat

> *design and construction we are of the opinion that GOODALTA and ALTAJACI*
> *should be suitable, from an infrastructure and geotechnical perspective, for*
> *construction, operation, and maintenance.*

20. Additionally, Alta acquired the Electric Generating Units Air Quality Standard Permit for the GoodAlta Project on June 13, 2019, the AltaJac1 Project on May 21, 2019, and the Avocet1 Project on July 30, 2019.[7] Alta then engaged ERM Worldwide Group Ltd (hereafter "ERM") to perform the Environmental Site Assessments and subsequently received final reports on both the GoodAlta and AltaJac1 Projects.[8]

21. Alta had also begun the process for acquiring all the other necessary permits.[9] Permits are required for construction projects to ensure that the facilities comply with applicable codes and standards. Leidos's IE Report made the following statements regarding Permits:[10]

> *Based on our review, we are of the opinion that the Owner has identified and*
> *obtained the key environmental permits and approvals required from the various*
> *federal, state, and local agencies that are currently necessary to commence*
> *construction. While there are certain minor or ministerial permits and approvals*
> *that have not yet been obtained and certain permits for operations that will be*
> *obtained post-closing, we are not aware of any technical circumstances that*
> *would prevent the issuance of these remaining permits and approvals.*

22. After Alta selected the project sites, it proceeded with the geotechnical investigations and environmental site assessments. The geotechnical investigations confirmed the sites were adequate for the Projects and provided sufficient information to support detailed engineering that was dependent on the soil properties and topography of the sites. The environmental site assessments did not reveal any environmental conditions that would prevent the Projects from being constructed at the selected sites. All of this demonstrates that the sites selected by Alta were viable for the Projects.

---

[7] Alta 0102803, Electric Generating Units Air Quality Standard Permit, June 13, 2019; Alta 0102808, Electric Generating Units Air Quality Standard Permit, May 21, 2019; NSI0001050, Electric Generating Units Air Quality Standard Permit, July 30, 2019.
[8] Alta 0064806, Final Goodlow NEPA Memo, August 8, 2019; Alta 0064852 Goodlow Phase I ESA, September 11, 2019; Alta 0066720, Jacksonville NEPA Memo, August 8, 2019; Alta 0111308, Jacksonville Phase I ESA, July 29, 2019.
[9] ARES-ALTAPOWER00000033, IE Report, August 2019, p. 51-54.
[10] ARES-ALTAPOWER00000033, IE Report, August 2019, p. 51.

Alta App.000598

## 2.    Alta developed Equipment/Technology Selection and Performance Requirements

23. Prior to soliciting EPC bids, owners need to establish the performance requirements and select any equipment or technology that they desire. These selections allow the EPC contractor to understand the technology and performance requirements that its design and construction must meet or exceed. On the Project, Alta informed the EPC bidders that it intended to utilize "three (3) refurbished GE LM6000 PC SPRINT (enhanced) CTG's operating in simple cycle mode" to construct the 150MW facilities.[11] Alta prepared an EPC Bid Request that detailed the assumptions, major equipment, balance of plant (hereafter "BOP") mechanical, BOP electrical, site work, plant civil and structural, and black start capabilities necessary to design and construct the Project.[12]

24. Leidos's IE Report made the following statements regarding the combustion turbine technology:[13]

> *Based on our review, we are of the opinion that the CT technology proposed for the Projects is a sound, proven method of power generation. Further, based on its operating experience to date, the CT is a sound, proven design.... Lastly, if designed, constructed, operated, and maintained as currently proposed by the Owner, the EPC contractor, and the Operator, the Projects should be capable of passing the performance tests pursuant to the EPC Contract and meeting the requirements of the currently applicable environmental permits.*

25. This combustion turbine technology is common in the industry, and as discussed later in this Report, has been installed in similar facilities. The GE LM6000 is a proven and reliable technology and an appropriate selection for the Project.

## 3.    Alta Developed Preliminary Engineering Information

26. While the EPC contractor was to "provide all engineering work for the site, including Gas & Water tie-ins, and Substation interconnecting points,"[14] Alta developed some preliminary engineering drawings to detail the planned layout of the Project. This is consistent with the typical process followed for EPC projects. Prior to the selection of an EPC contractor, some front-end engineering design, commonly referred to as FEED, is

---

[11] Alta 0003788, EPC Bid Request.
[12] Alta 0003788, EPC Bid Request.
[13] ARES-ALTAPOWER00000033, IE Report, August 2019, p. 39.
[14] Alta 0003788, EPC Bid Request.

⊕ **Secretariat**
*Alta Power LLC v. General Electric International, Inc.*
*Case No. 3:23-CV-270-X*

performed. After the EPC contractor is selected, the EPC contractor will perform what is commonly referred to as detailed engineering, which progresses the front-end engineering. The FEED package commonly serves as the basis for bidding an EPC project.

27. For the GoodAlta Project, Alta developed preliminary design documents, which included General Arrangement/Conceptual Layout, City Water Route, Lake Water Route, Wastewater Discharge Route, and one-line plans and drawings.[15] The following excerpt shows the GoodAlta Conceptual BOP Layout:[16]



---

[15] Alta 0003792, Goodlow Conceptual Layout, Rev. 2; Alta 0116231, Goodlow BOP Layout; Alta 0065974 Goodlow City Water Route; Alta 0065975, Goodlow Lake Water Route; Alta 0096784, Goodlow WWD route; Alta 0065383, Preliminary One-line Sketch, Rev. 0.
[16] Alta 0116231, Goodlow BOP Layout.

Alta App.000600

**Secretariat**

28. For the AltaJac1 Project, the Alta-developed preliminary design documents included General Arrangement/Conceptual Layout plans and drawings.[17] The following excerpt shows the AltaJac1 Conceptual Layout:[18]



29. For the Avocet1 Project, Alta developed General Arrangement/Conceptual Layout and Boundary plans and drawings.[19] The following excerpt shows the Avocet1 Conceptual Boundary:[20]

---

[17] Alta 0115867, Conceptual Layout in Simple Cycle – 3 X GE LM6000PC; Alta 0066217, Jacksonville BOP Layout; Alta 0029276, Jacksonville Conceptual Layout, Rev. 4.

[18] Alta 0029276, Jacksonville Conceptual Layout, Rev. 4.

[19] Alta 0003485, Lufkin Conceptual Layout; Alta 0063129, Site Plan General Arrangement-Sheet; Alta 0087999, Lufkin Conceptual Boundary.

[20] Alta 0003485, Lufkin Conceptual Layout.

Alta App.000601

**Secretariat**



30. The foregoing drawings demonstrate that Alta had begun to progress the design of the facilities so that Casey could begin the detailed design.

31. As previously stated, one function of the preliminary engineering, or FEED package, is to support the bidding process. There is no industry accepted standard for setting a required development for a FEED package. However, poorly developed FEED packages can often result in high uncertainty regarding the project price; such projects are often subject to cost growth during the project compared to the initial bid estimate. Furthermore, projects with poorly develop FEED packages often result in a "cost plus" contracting strategy with the EPC contractor where the owner assumes much, if not all, of the cost risk. However, as discussed later in this Report, Alta received five independent fixed-price bids from EPC contractors, which indicates the project was well defined.

32. In summary, Alta performed the front-end work that was necessary to execute EPC contracts and complete the development of the Project. Further, Leidos's IE Report made the following statement regarding Alta's experience on similar projects:[21]

---

[21] ARES-ALTAPOWER00000033, IE Report, August 2019, p. 6.

**❖ Secretariat**

> *The Owner, through the experience of its management team, has previously demonstrated the capability to manage and develop natural gas-fired, simple-cycle facilities of similar size and technology as the Projects.*

33. As noted above, there is no single requirement for how developed preliminary engineering must be before beginning the bidding process. Rather, the development of the preliminary engineering will vary between projects; however, the preliminary engineering should be able to support the bidding to ensure the owner receives reasonable bids. Considering Alta received multiple fixed price bids with minimal price variance, the preliminary engineering supported the bidding process and resulted in complete and reasonable bids,

## B.    The Bidding Process Accounts for the Market Conditions

### 1.    The Bidding Process

34. Selection of an EPC contractor is often accomplished through a bidding process in which an owner evaluates multiple candidates based on each candidate's ability to deliver the project. In general, the bidding process comprises multiple steps, from soliciting potential EPC contractors to contract signing and into project delivery.

35. Typically, the first step is the bid solicitation phase, where the owner invites potential candidates to submit a bid for consideration. Next, the bid submission phase occurs, where bidders provide information, such as cost estimates, planned schedules, and company qualifications related to the proposed project. The bid selection phase follows, where the owner evaluates the bids and selects the best-qualified candidate. During this phase, the owner may need to perform additional work to verify it is conducting an "apples-to-apples" comparison of the various bids and ensure the selection is based on comparable bids. For publicly funded projects, the owner is often required to select the lowest priced qualifying bid; however, for privately funded projects, the owner is free to base the selection on the factors it deems most important. After the owner selects the contractor, the parties will begin to form and negotiate the EPC contract. Typically, during this stage the parties select a contracting strategy.[22]

---

[22] The Construction Bidding Process Explained, Benarroche, Gray, December 10, 2024, https://www.procore.com/library/construction-bidding-process?msockid=3b6945112e8b6f0a141350362f2a6ebe.

36. Consistent with the bidding process described above, Alta issued an EPC Bid Request for multiple peaking power plants located within Texas. The EPC Bid Request specified each plant was to comprise three refurbished GE LM6000 PC SPRINT combustion turbine generators (hereafter "CTGs"). The EPC Bid Request further specified that the facilities would be simple cycle plants and that the proposals should include the turnkey supply of all construction, construction tools, equipment rental, project management, commissioning, start-up, and performance testing.[23]

37. Alta received bids from five different contractors: Casey, EDG Power (hereafter "EDG"), International Turbine Services (hereafter "ITS"), Lauren Engineers & Constructors (hereafter "Lauren"), and ProEnergy Services (hereafter "ProEnergy"). Ultimately, as discussed further later in this Report, Alta selected Casey as the EPC contractor.

38. As previously discussed, owners of privately funded projects are free to select a contractor based on the criteria most important to the owner. Depending on the circumstances surrounding the project, this can vary significantly from owner to owner. For instance, a proposed project may face certain time constraints, requiring the project to be delivered by a certain date; such schedule-driven projects are usually priced at a premium due to the compressed time schedule. Therefore, the owner would likely select the contractor with the best ability to deliver the project in a timely manner, with little to no consideration of the price. Conversely, certain owners may face budgetary constraints in financing the project; for these cost-driven projects, the proposed price usually becomes the primary, if not sole, factor in selecting a contractor. Other projects may be highly complex or "first-of-a-kind;" in such cases, the number of contractors capable of delivering the project may be limited, thus making the contractor's qualifications and/or project history the deciding factor. Other owners may value several factors and weigh those factors accordingly, and then select a contractor that best overall meets those key factors.

39. The Project Management Institute (hereafter "PMI") also discusses the bidding process in its Project Management Book of Knowledge (hereafter "PMBOK") Guide. PMI is a trade organization dedicated to the advancement of the project management profession and publishes standards and guidelines related to project management. One published

---

[23] Alta 0003788, EPC Bid Request.

**Secretariat**

standard is the PMBOK Guide. The PMBOK Guide "includes traditional practices that are widely applied as well as innovative practices that are emerging in the profession."[24]

40. The PMBOK Guide addresses the selection criteria commonly considered when evaluating proposals and states the selection may include, but is not limited to, the following:

- Capability and capacity;

- Product cost and life cycle cost;

- Delivery dates;

- Technical expertise and approach;

- Specific relevant experience;

- Adequacy of the proposed approach and work plan in responding to the SOW;

- Key staff's qualifications, availability, and competence;

- Financial stability of the firm;

- Management experience; and

- Suitability of the knowledge transfer program, including training."[25]

41. The above list is consistent with Secretariat's experience for key factors owners commonly consider when selecting an EPC contractor. Furthermore, as discussed within this Report, Casey's proposal satisfied many of the individual criterion listed above, thus indicating Alta had a reasonable expectation that Casey was capable of successfully delivering the Project.

2.    A Lump Sum or Fixed Price Contract is Suitable for Well-Developed Projects

42. Owners and contractors utilize different contracting strategies depending on the circumstances of the project and how the parties wish to allocate risk. For the bids Alta received, the bidding contractors submitted lump sum, or "fixed price,"[26] proposals for

---

[24] Project Management Institute – A Guide to the Project Management Body of Knowledge, Sixth Edition, §1.1, Overview and Purpose of this Guide.
[25] Project Management Institute – A Guide to the Project Management Body of Knowledge, Sixth Edition, §12.1.3. Independent Cost Estimates.
[26] Construction Law Handbook, Cushman, Myers, §11.06[A] Lump-Sum Contract.

Alta App.000605

✛ **Secretariat**

the work. After selecting Casey, Alta and Casey negotiated an executable "firm fixed price, turnkey" contract.[27]

43. The term "turnkey" in this context involved Casey being responsible for all work and services required in connection with the design, engineering, procurement, construction, startup, demonstration, commissioning, and testing of the Project.[28] However, the one exception to this was the procurement of the owner-supplied equipment (OSE); the OSE included the turbine equipment and turbine control building.[29] It is common to have some OSE on projects like this, including turnkey projects. Integration of the OSE into the overall plant would have still been within Casey's scope of work; as such, Casey would have provided a fully equipped facility ready for operation at the "turn of a key."

44. The lump sum contracting strategy places more risk upon the contractor and less risk upon the owner as compared to other common contracting strategies. Selection of a contracting strategy is important to the overall success of a project because by properly selecting a contracting strategy, the various project risks are owned by the party in the best position to manage those risks. Therefore, because a lump sum contract places more cost and schedule risk on the contractor, it is an appropriate strategy for the owner when the contractor is able to effectively manage those risks.

45. These issues related to contracting strategies are addressed by the Construction Industry Institute (hereafter "CII"), which is comprised of owner and contractor members and "brings global project industry leaders together to create and drive innovative tools and solutions through an academically based, disciplined approach."[30] CII published the CII Guide to Reimbursable Contracting Implementation Resource 20-2 in July 2011 (hereafter "CII Guide to Reimbursable Contracting"), which "aims to help decision makers develop an appropriate contracting strategy and, if a reimbursable strategy is chosen, it will help them understand how implementing a reimbursable contract differs from implementing a lump sum contract."[31] The CII Guide to Reimbursable Contracting provides a continuum of the risk associated with various contracting strategies, which

---

[27] Alta 0065169, Draft Contract for Engineering, Procurement and Construction Between GoodAlta Power Center LLC and Casey Industrial, Inc., 2019.
[28] Alta 0065169, Draft Contract for Engineering, Procurement and Construction Between GoodAlta Power Center LLC and Casey Industrial, Inc., 2019, Article 2.1.
[29] Alta 0065169, Draft Contract for Engineering, Procurement and Construction Between GoodAlta Power Center LLC and Casey Industrial, Inc., 2019, Article 5.4.
[30] About CII, https://www.construction-institute.org/about-cii.
[31] Construction Industry Institute Guide to Reimbursable Contracting, Implementation Resource 260-2, July 2011, p. 1.

**✦ Secretariat**
*Alta Power LLC v. General Electric International, Inc.*
*Case No. 3:23-CV-270-X*

indicates that the owner bears the least risk with lump sum contracting and most of the risk with cost reimbursable contracting. The following is an excerpt:[32]



**Figure 5.** Diagram of cost risk associated with major contract types

46. In the preceding graphic, "CPGMP" is an abbreviation for "Cost Plus Guaranteed Maximum Price," "CPFF" is an abbreviation for "Cost Plus Fixed Fee," and "CPPF" is an abbreviation for Cost Plus Percentage Fee." As addressed previously, Casey's proposal for the Project was a fixed price or lump sum, which places maximum risk upon Casey for cost escalation, as Casey's direct costs and its overhead and profit are fixed.

47. The industry acknowledges that lump sum/fixed fee pricing is commonly used when the scope has been developed to a high level of certainty. This is shown in the following excerpt:[33]

> ### 2.3.1. Lump Sum Contract
>
> In a lump sum contract, the contractor agrees to perform all the work stipulated in the contract by charging the owner a fixed sum of money. The contractor bears the risk of cost overruns, rather than the owner. ==This type of contract is suitable for a project in which the scope of work can be described with a high level of certainty at the time of contracting.== A lump sum contract may also include unit rates and reimbursable elements related to changes in the work.

---

[32] Construction Industry Institute Guide to Reimbursable Contracting, Implementation Resource 260-2, July 2011, p. 16.
[33] Construction Industry Institute Guide to Reimbursable Contracting, Implementation Resource 260-2, July 2011, p. 13.

Alta App.000607


48. This means that in lump sum/fixed fee pricing the scope and specifications are well-developed when pricing is determined. This is shown in the following excerpt:[34]

---

### 3.3.4. Contract Strategy Selection and Timing Issues

A key consideration in selection of the appropriate contracting strategy is the timing impact of the different strategies. <mark>A **lump sum contract** will require that the owner have relatively well-developed scope and specifications, meaning that the contracting process will necessarily be *later in the project cycle*.</mark> In addition, lump sum contracting will usually require substantially more time for the bidding process. This is true because the contractor is taking on substantial cost risk that often requires obtaining subcontractor bids for key portions of scope. Conversely, because a **reimbursable contract** does not require a firm scope and specifications, it can logically be entered into *earlier in the project cycle* than is possible with a lump sum contract. Further, it will generally require less time to bid than a lump sum contract would require, since the contractor's risk is limited to appropriately defining the cost reimbursement basis. To the extent that fixed elements of compensation are introduced—such as fixed fees or GMP—this advantage over the lump sum strategy is reduced.

---

49.  In terms of risk, the industry also recognizes that in a lump sum/fixed fee contract, cost and schedule risks are primarily assumed by the contractor.[35]

---

[34] Construction Industry Institute Guide to Reimbursable Contracting, Implementation Resource 260-2, July 2011, p. 18.
[35] Construction Industry Institute Guide to Reimbursable Contracting, Implementation Resource 260-2, July 2011, p. 1.

The alternative to reimbursable contracting is fixed price contracting, an approach in which contractors fix most aspects of the price when a bid is submitted. In fixed price contracting, payment is generally based on monthly inspections that verify which bid items have been completed. Because prices are fixed when the contract is awarded, the contractor does not need to provide evidence of actual costs. In a reimbursable contract, cost and schedule risks are primarily assumed by the owner, whereas in a fixed price contract (i.e., lump sum or unit price) cost and schedule risk are assumed primarily by the contractor. Such distinctions are addressed in this guide, along with numerous recommendations for achieving a successful outcome.

50. One common alternative to a lump sum proposal is a cost reimbursable proposal. Cost reimbursable pricing mechanisms include Cost Plus Guaranteed Maximum Price, Cost Plus Fixed Fee, and Cost Plus Percentage Fee. On a fully cost reimbursable construction contract, the contractor is compensated for its actual costs incurred plus a negotiated percentage mark-up to cover its overhead and profit. The owner bears most of the construction cost and schedule risk on a cost reimbursable contract. Payment under a cost reimbursable contract is directly dependent on the contractor's incurred costs, which also adjusts the amount of contractor overhead and profit on a percentage fee basis. Because the cost and schedule risks are mostly upon the owner, cost reimbursable contracts are often used when the contractor is in less control of its work scope, the owner has a high degree of control over the contractor, and the work scope has a high degree of uncertainty and volatility. As discussed in both the CII Guide to Reimbursable Contracting and the Construction Law Handbook, the Cost Plus Guaranteed Maximum Price does provide a maximum cost for the scope of work and the "contractor must absorb any costs above the Guaranteed Maximum Price," which results in the contractor accepting higher risk than other cost reimbursable options.[36]

51. The fact that Casey and several other contractors submitted a lump sum/fixed price proposal indicates that the Project did not have the foregoing attributes associated with cost reimbursable pricing, and the work scope had a high degree of certainty. A lump sum contracting strategy is advantageous to an owner in that it provides the owner price

---

[36] Construction Law Handbook, Cushman, Myers, §11.06[C] Guaranteed Maximum Price.

and schedule certainty. However, advantages also exist for a contractor under a lump sum contract. Because the contractor agrees to deliver the project at a predetermined price, the contractor can experience cost savings through increased efficiency in the project execution; these cost savings go to increase the contractor's profitability on the project. For a project with a well-defined scope and plan, these cost savings are more easily achievable. This further indicates the Project was well defined.

### 3.  Comparison of EPC Contractor Bids

52. As noted earlier, Alta approached several other contractors, in addition to Casey, to inquire about their abilities to provide EPC services on the Project. These contractors included ProEnergy, Lauren, EDG, Bibb Engineering, ITS, and PCL.[37]

53. Through this process, Alta received proposals for EPC services from Casey, ProEnergy, Lauren, EDG, and ITS. These contractors provided proposals for a single peaking plant with the understanding that, if awarded, the Project would be executed three times in three locations.

54. As previously discussed, Casey provided a proposal for a "(3) Unit LM6000 Project in Goodlow, TX."[38] Under the Casey EPC proposal, GE/WattStock was to supply certain OSE, including the GE LM6000 gas turbines. Casey would provide the remaining EPC services, including the installation of the OSE provided by GE/WattStock. Casey's EPC proposal was for a lump sum amount of $30,730,952, excluding the costs of the OSE. Casey's EPC proposal represented that it could complete the Project in ten months. Casey also provided its historical performance on other projects similar to the Project; this is discussed in detail later in this Report.

55. Alta and Casey continued to negotiate a contract based on Casey's proposal and included pricing on a "firm fixed price, turnkey basis."[39] According to Alta personnel, this draft contract was fully developed, and contract execution was pending upon the closing of the project financing. Secretariat understands that the Casey proposal for the Goodlow site would be duplicated at the Jacksonville and Lufkin sites, but Jacksonville may have required additional civil costs associated with drainage and grade leveling work.

---

[37] Travis West Deposition, April 20, 2023; Travis West Deposition Exhibit 2075; Lauren Engineers & Constructors, Inc. 6-21-19 EPC Pricing, June 21, 2019.
[38] Alta 0050323, Casey Estimate No. 19-035, July 9, 2019, p. 23.
[39] Alta 0065169, Draft Contract for Engineering, Procurement and Construction Between GoodAlta Power Center LLC and Casey Industrial, Inc., 2019.

Differences in the civil work and foundations between sites would be expected, as geotechnical conditions can vary between locations, even when those locations are within very close proximity of each other. These differences might include how storm water is removed from a site and to where it is directed, whether soil will need to be exported from or imported to the site, or how foundations are sized and reinforced. However, the expected cost differences associated with these issues would be minimal when compared to the overall project budget.

56. ProEnergy provided a "Turnkey EPC solution" proposal for one peaking plant.[40] At the time, locations were still being vetted by Alta.[41] Under the ProEnergy proposal, ProEnergy was to provide fully wrapped EPC Services. This included procurement of all the equipment, including the OSE excluded in the Casey EPC proposal. ProEnergy's EPC proposal was for a turnkey amount of $55,825,838.[42] Secretariat understands that this proposal amount was for a lump sum/fixed fee.[43] ProEnergy's EPC proposal represented that it could complete the Project in 36 weeks. ProEnergy's level 1 schedule is shown in the following excerpt: [44]



57. ProEnergy has performed EPC, installation, and refurbishment services on numerous power projects. ProEnergy's proposal listed 18 facilities where it had installed gas and steam turbine generators. Of these 18 facilities, 11 included GE LM6000 gas turbines.[45]

58. Lauren provided a proposal for one peaking plant, GoodAlta,[46] and stated that "if Lauren is awarded two or more plants, some redundant costs can be eliminated and we can offer a significant price reduction for the second and third plants."[47] Under the Lauren proposal, GE/WattStock was to supply certain OSE, including the GE LM6000 gas turbines. Lauren

---

[40] Alta 0080737 ProEnergy Proposal #1018-2127, August 29, 2018.
[41] Discussions with Alta Personnel.
[42] Alta 0080737 ProEnergy Proposal #1018-2127, August 29, 2018.
[43] Discussions with Alta Personnel.
[44] Alta 0080737 ProEnergy Proposal #1018-2127, August 29, 2018.
[45] Alta 0080737 ProEnergy Proposal #1018-2127, August 29, 2018.
[46] Discussions with Alta Personnel.
[47] Lauren Engineers & Constructors, Inc. 6-21-19 EPC Pricing, June 21, 2019.

would provide the remaining EPC services, including the installation of the OSE provided by GE/WattStock. Lauren's EPC proposal was for a lump sum amount of $31,300,000, excluding the costs of the OSE. Casey's EPC proposal represented that it could complete the Project from mobilization to demobilization in nine months.[48] Lauren has performed EPC, installation, and construction management services on several power projects. Lauren's website lists nine power generator facilities that it has previously completed. One of these projects included the installation of four GE LM6000 gas turbines.[49]

59. EDG provided an EPC quote for "each of the (3) East Texas Plants." Under EDG's quote, GE/WattStock was to supply certain OSE, including the GE LM6000 gas turbines. EDG would provide the remaining EPC services, including the installation of the OSE provided by GE/WattStock. EDG's quote was for an amount of $28,520,000 for each of the Projects. Secretariat understands that the parties understood that this was a lump sum/fixed price proposal.[50] EDG's quote included "Other Project Cost & Contingency" of $553,200, which is approximately 2% of EDG's Total EPC quote.[51] According to industry sources, the typical contingency on a construction project is about 5-10% of the total construction price.[52] EDG's use of a contingency amount that is less than 5% of the total construction price further demonstrates that the Project's scope was well-defined. EDG provides services in the power generation industry. EDG's websites states that it "creates energy packaged solutions" in the power generation industry.

60. ITS provided an EPC proposal for a project in Jacksonville, Texas. Under ITS's quote, GE/WattStock was to supply certain OSE, including the GE LM6000 gas turbines. ITS's quote was for a turnkey amount of $26,270,000.[53] Secretariat understands that the parties understood that this was a lump sum/fixed price proposal.[54] ITS provides several services in the energy and power generation industries. Specifically, ITS provides EPC,

---

[48] Lauren Engineers & Constructors, Inc. 6-21-19 EPC Pricing, June 21, 2019.
[49] Lauren Power Generation Capabilities, https://laurenec.com/POWER-GENERATION.html.
[50] Discussions with Alta Personnel.
[51] Travis West Exhibit 2083, Email from EDG to Alta, June 27, 2019.
[52] What is Construction Contingency?, Benarroche, December 10, 2024, https://www.procore.com/library/construction-contingency?msockid=3b6945112e8b6f0a141350362f2a6ebe; What is the Standard Construction Contingency Percentage? A Guide to Managing Project Risks and Budgets, Engineers & Architects of America, December 30, 2024, https://www.e-a-a.com/what-is-the-standard-construction-contingency-percentage/.
[53] Alta 0063152, International Turbine Services LLC Preliminary Technical Scope Document
[54] Discussions with Alta Personnel.

---

refurbishment, installation, and management services to the power generation industry.[55]

61. All the contractors submitted competitive pricing with no outliers, which resulted in an EPC cost variance of less than 10% between the bids. The following table compares the construction pricing of the different proposals.[56]

| Description | Casey | ProEnergy | Lauren | EDG | ITS |
|---|---|---|---|---|---|
| GoodAlta EPC Contractor | $ 30,730,952 | $ 55,825,838 | $ 31,300,000 | $ 28,520,000 | $ 26,370,000 |
| AltaJac1 EPC Contractor | $ 30,730,952 | $ 55,825,838 | $ 31,300,000 | $ 28,520,000 | $ 26,370,000 |
| Avocet EPC Contractor | $ 30,730,952 | $ 55,825,838 | $ 31,300,000 | $ 28,520,000 | $ 26,370,000 |
| **EPC Contractor Total** | **$ 92,192,856** | **$ 167,477,514** | **$ 93,900,000** | **$ 85,560,000** | **$ 79,110,000** |
| GE Goodlow OFE | $ 30,427,462 | $ - | $ 30,427,462 | $ 30,427,462 | $ 30,427,462 |
| GE AltaJac1 OFE | $ 30,427,462 | $ - | $ 30,427,462 | $ 30,427,462 | $ 30,427,462 |
| GE Avocet OFE | $ 28,539,814 | $ - | $ 28,539,814 | $ 28,539,814 | $ 28,539,814 |
| **GE OFE Total** | **$ 89,394,738** | **$ -** | **$ 89,394,738** | **$ 89,394,738** | **$ 89,394,738** |
| **Total Proposed Amounts** | **$ 181,587,594** | **$ 167,477,514** | **$ 183,294,738** | **$ 174,954,738** | **$ 168,504,738** |

62. According to the PMBOK Guide, "[s]ignificant differences in cost estimates can be an indication that the procurement SOW was deficient or ambiguous, or that the prospective sellers either misunderstood or failed to respond fully to the procurement SOW."[57] However, the close range of the lump sum proposals indicates that the scope of work was not deficient or ambiguous, and is a strong indicator that the owner-provided information was well defined.

63. Alta ultimately selected Casey as the EPC contractor for the Project and developed an executable contract based on Casey's proposal. The sufficiency and quality of Casey's EPC estimate is further supported by Leidos, the Independent Engineer. Leidos's IE Report stated the following:[58]

> *Based on our review, we are of the opinion that the estimates which serve as the basis for the Total Construction Costs, including the Contingency, were*

---

[55] ITS Our Services, http://its.llc/services.php.

[56] Alta 0050323, Casey Estimate No. 19-035, July 9, 2019, p. 23; Alta 0080737 ProEnergy Proposal #1018-2127, August 29, 2018; Lauren Engineers & Constructors, Inc. 6-21-19 EPC Pricing, June 21, 2019; Travis West Exhibit 2083, Email from EDG to Alta, June 27, 2019; Alta 0063152, International Turbine Services LLC Preliminary Technical Scope Document; Alta 0004495, Draft WattStock Proposal for GE TRUEPackage LM6000 Certified Turbine Package for Alta Power Company Goodlow, Texas Site, April 10, 2019; Alta 0004526, Draft WattStock Proposal for GE TRUEPackage LM6000 Certified Turbine Package for Alta Power Company Jacksonville, Texas Site, April 10, 2019; Alta 0004461, Draft WattStock Proposal for GE TRUEPackage LM6000 Certified Turbine Package for Alta Power Company Lufkin, Texas Site, April 10, 2019.

[57] Project Management Institute – A Guide to the Project Management Body of Knowledge, Sixth Edition, §12.1.3.7 Independent Cost Estimates.

[58] ARES-ALTAPOWER00000033, Leidos Independent Engineer's Report, First Draft, p. 33

> *developed in accordance with generally accepted engineering practices and methods of estimation. Further, the estimated Total Construction Costs of $67,957,000 for GOODALTA and $68,520,000 for ALTAJACI are comparable to the costs and contingencies of other simple-cycle facilities utilizing equipment of similar size and technology with which we are familiar and at similar stages of committed costs.*

64. Additionally, Casey's ten-month schedule was the longest of the three contractors that provided EPC proposals. The Casey schedule is discussed in more detail in the following section.

65. Based on the foregoing, Casey's proposal provided a reasonable estimate of the cost and schedule and was consistent with the other EPC contractors who provided independent bids. Furthermore, multiple proposal estimates with minimal variance and developed independently of each other indicates the scope of work was clearly defined and the proposed prices were reasonable for the scope of work.

## C.    Casey's Proposal Schedule

66. In addition to the project estimate, many of the bids also contained planned project schedules or planned durations, which are also important components of the bid. While the direct construction costs (e.g., installed materials, construction labor, equipment) are a function of the scope, major costs such as general conditions costs are a function of the project duration. As noted in Calculating Construction Damages, "[n]ormal jobsite overhead, also referred to as general conditions items, includes many costs that increase as a result of extended time of a project;" examples of such costs include project managers, superintendents, secretarial and clerical works, timekeepers, office trailers, storage trailers, office equipment, office supplies, temporary electricity, temporary water, temporary sewer, telephone costs, sanitary facilities, and trucks and automobiles.[59] Therefore, the accuracy of the project estimate is tied to the accuracy of the project schedule. This is because "[g]eneral conditions costs are typically viewed as being primarily time-related. In other words, their incurrence and growth are directly impacted by the project's duration."[60] Further, according to AACE Recommended Practice 27R-03,

---

[59] Calculating Construction Damages, Third Edition, Schwartzkopf, §6.02 Jobsite Overhead Defined.
[60] Proving and Pricing Construction Claims, Third Edition, Cushman, Carter, Gorman, Coppi, §2.23 General Conditions Costs.

Alta App.000614

✤ **Secretariat**

the "cost estimate class and the schedule class are both defined by the primary characteristic: the degree of project definition."[61]

67. AACE is the Association for the Advancement of Cost Engineering. AACE publishes Recommended Practices related to the field of cost engineering, which includes estimation, cost control, project management, and planning and scheduling, among other specific practices. "AACE's Body of Knowledge is developed, refined, and deployed by industry professionals worldwide."[62]

68. As previously discussed, Casey's EPC proposal represented that it could complete the Project in ten months. Casey's Preliminary Proposal had the longest proposed duration from the EPC Contractors that provided durations for the work in their proposals. The milestones in Casey's Preliminary Proposal Schedule are shown in the following excerpt:[63]



69. Within the construction industry, project schedules are developed to varying levels of detail depending on the objective and purpose of the schedule. To normalize the level of detail in a given schedule, construction professionals refer to individual schedule breakdowns or rollups as a Level X schedule, where X is a numeric value that generally describes the amount of detail contained in the schedule. AACE Recommended Practice 37R-06 addresses the numeric method for classifying different schedule levels and defines these various schedule levels. The following excerpt describes each of the numeric schedule levels:[64]

---

[61] AACE RP27R-03, Schedule Classification System, November 12, 2010, p. 5.
[62] About AACE, https://web.aacei.org/about.
[63] Alta 0050323, Casey Estimate No. 19-035, July 9, 2019, p. 23.
[64] AACE RP37R-06, Schedule Levels of Detail – As Applied in Engineering, Procurement and Construction, March 20, 2010, p 2-3.

**Level 0:** This is the total project and in effect is a single bar spanning the project time from start to finish. Functionally there is very little practical application for a schedule that is only a single bar other than to represent an element of a project or program time line. Level zero schedules normally will include the project or program major milestones and bars indicating key scope.

**Level 1:** This represents the schedule for the project by its major components. For example, a schedule for a process plant may be divided into process area, storage and handling area, services, site areas, and utilities. A Level 1 schedule is normally displayed as a Gantt or bar chart and may include key milestones.

To differentiate between program and project schedules: a Level 1 of a program schedule, for example, would be a combination of Level 0 schedules for each component project This would give program schedules at least one more level than the most detailed project schedule that constitutes the overall program.

**Level 2:** Each schedule component is further subdivided for Level 2. For example, utility systems are further subdivided into water, electrical, gas, storm drainage and sanitary systems, etc. In most cases Level 2 schedules can only be shown as a bar chart although key constraints may also be displayed. Milestones are normally included.

**Level 3:** The first level that a meaningful critical path network can be displayed and the CPM schedule can be used to monitor and manage (control) the overall project work. Level 3 is a good level for the overall project control schedule since it is neither too summarized nor too detailed.

**Levels 4-X:** The level of schedule subdivision continues to whatever is appropriate detail for the user. When operating at more detailed levels, the planners generally work with segments of the total schedule. Often the project "rolling schedule" includes a "look-ahead" period of time (30–180 days) and a "look-back" at recent completed work periods.

70. In addition to the above shown descriptions for the various schedule levels, AACE Recommended Practice 37R-06 also provides the guidelines for each schedule level. Below are the specific guidelines for a Level 2 and Level 3 schedule:[65]

---

[65] AACE RP37R-06, Schedule Levels of Detail – As Applied in Engineering, Procurement and Construction, March 20, 2010, p 3.

Alta App.000616

**Secretariat**

- **Level 2:** Level 2 schedules are generally prepared to communicate the integration of work throughout the life cycle of a project. Level 2 schedules may reflect, at a high level, interfaces between key deliverables and project participants (contractors) required to complete the identified deliverables. Typically presented in Gantt (bar chart) format and rarely in CPM network format Level 2 schedules provide high-level information that assist in the project decision-making process (re-prioritization and criticality of project deliverables). Level 2 schedules assist in identifying project areas and deliverables that require actions and/ or course correction. Audiences for this type of schedule include, but are not limited to general managers, sponsors, and program or project managers.

- **Level 3:** Level 3 schedules are generally prepared to communicate the execution of the deliverables for each of the contracting parties. The schedule should reflect the interfaces between key workgroups, disciplines, or crafts involved in the execution of the stage. Typically presented in Gantt or CPM network format, and is generally the output of CPM scheduling software. Level 3 schedules provide enough detail to identify critical activities. Level 3 schedules assist the team in identifying activities that could potentially affect the outcome of a stage or phase of work, allowing for mitigation and course correction in short course. Audiences for this type of schedule include, but are not limited to program or project managers, CMs or owner's representatives, superintendents, and general foremen.

71. The schedule Casey included in its proposal qualified as a Level 2 schedule—at a minimum—and likely qualified as a Level 3 schedule. In order to determine whether the schedule qualified as a Level 3 schedule, Casey's native Primavera schedule would need to be analyzed to assess whether there is additional information available that is not visible in the PDF schedule included in the proposal. The native Primavera file was not available for Secretariat's review.

72. Key information that would be visible in the native Primavera file but not in the PDF output would include inputs such as logic ties and resource loading. Logic ties are the relationships between specific work activities. For instance, predecessor and successor work would be tied together in the software, showing the successor work only being able to begin after the predecessor work is completed. This is key information for calculating the critical path of the project. Resource loading provides information such as available manpower or required quantities to be installed associated with specific work activities. This information goes to the planned durations of specific activities and can also influence the critical path of the project.

73. The following tables show the requirement for Level 2 and Level 3 schedules and which guidelines were met by Casey's proposal schedule:[66]

---

[66] AACE RP37R-06, Schedule Levels of Detail – As Applied in Engineering, Procurement and Construction, March 20, 2010, p 2-3.

| Level 2 Schedule Requirement | Requirement Met |
|---|---|
| May reflect, at a high level, interfaces between key deliverables and project participants (contractors) required to complete the identified deliverables | x |
| Typically presented in Gantt (bar chart) format | x |
| Provide high-level information that assist in the project decision-making process | x |
| assist in identifying project areas and deliverables that require actions and/ or course correction. | x |

| Level 3 Schedule Requirement | Requirement Met |
|---|---|
| Reflect the interfaces between key workgroups, disciplines, or crafts involved in the execution of the stage. | x |
| Typically presented in Gantt or CPM network format | x |
| Generally the output of CPM scheduling software | x |
| Provide enough detail to identify critical activities. | Likely with Primavera .xer file |
| Assist the team in identifying activities that could potentially affect the outcome of a stage or phase of work, allowing for mitigation and course correction in short course. | Likely with Primavera .xer file |

74. A Level 2 schedule is typically prepared for personnel including "general managers, sponsors, and program or project managers," and a Level 3 schedule is typically prepared for personnel including program or project managers, CMs or owner's representatives, superintendents, and general foremen."[67] Based on the foregoing, the Casey proposal schedule was sufficiently developed to support its planned work sequence and its cost estimate provided in its fixed price proposal, and the detail of the proposal schedule is consistent with the expectation for a schedule during the bidding phase of a project to provide a reasonable estimate of the overall project duration.

75. The level of development of Casey's proposed schedule is further supported by Leidos, the Independent Engineer. Leidos's draft IE Report stated the following:[68]

---

[67] AACE RP37R-06, Schedule Levels of Detail – As Applied in Engineering, Procurement and Construction, March 20, 2010, p 2-3.
[68] ARES-ALTAPOWER00000033, Leidos Independent Engineer's Report, First Draft, p. 35.

> *Based on our review, we are of the opinion that, barring unforeseen events that*
> *affect material delivery, equipment delivery, or construction that directly impact*
> *the Projects, the approximate 10-month schedule from the start of engineering*
> *on September 9, 2019 to facility substantial completion on July 17, 2020 for*
> *GOODALTA and the approximate [10]-month schedule from the start of*
> *engineering on [___], 2019 to facility substantial completion on [___], 2020 for*
> *ALTAJA1I are achievable, and within the previously demonstrated capabilities of*
> *the EPC contractor using generally accepted construction and project*
> *management practices and adhering to a detailed work plan.*

76. During the planned execution of the Project, an issue that impacted nearly every industry
    worldwide was COVID, which began impacting the Texas area in March 2020. However,
    Navarro County, TX; Cherokee County, TX; and Angelina County, TX all declared
    construction and/or energy personnel to be essential workers, and therefore, the Project
    could have continued to progress.[69] Many projects did progress during this time.

77. Further, The Associated General Contractors of America (hereafter "AGC") conducted a
    study and found that more than a quarter of Texas construction projects reported that
    they experienced no delays or disruptions from COVID.[70] Based on the foregoing and
    considering Casey's proposal schedule was the longest from the EPC proposals, it is
    reasonable to expect Casey could have delivered the Project within the proposed 10-
    month schedule timeframe.

## D.    Casey's Historical Performance

78. Casey had demonstrated through its historical performance that it could successfully
    perform the construction services for peaking plants. According to Casey's EPC proposal,
    Casey had installed at least two peaking plants. This is shown in the following excerpts:[71]

---

[69] Navarro County issues "Stay Home, Stay Safe Order," March 24, 2020, https://www.corsicanadailysun.com/covid-19/navarro-county-issues-stay-home-stay-safe-order/article_dcbfc752-6e03-11ea-b5d8-eb20c398a391.html; Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilince in COVID-19 Response, March 28, 2020, https://www.co.cherokee.tx.us/ips/cms/othercountyoffices/emc-docs/CISA_Guidance_on_the_Essential_Critical_Infrastructure_Workforce_Version_2.0_Updated.pdf; Amended Emergency Regulations and Stay Home – Stay Safe Order by the County Judge of Angelina County, April 1, 2020, https://www.angelinacounty.net/files/pdf/order0402.pdf.
[70] AGC Coronavirus Survey Texas Results (Feb 19- Mar 4, 2021), March 2021.
[71] Alta 0050323, Casey Estimate No. 19-035, July 9, 2019, p. 23.

⊕**Secretariat**



**BASIN ELECTRIC POWER CO-OP**
**Location:** Williston, ND
**Scope of Work:** Construction of a peaking power plant comprised of (12) Wärtsilä 20V34SG natural gas engine generators.
**Duration:** 2015-2016



**SOUTH TEXAS ELECTRIC CO-OP**
**Location:** Edinburg, TX
**Scope of Work:** Greenfield construction of a peaking power plant comprised of (12) Wärtsilä 50SG natural gas engine generators.
**Duration:** 2014-2016

79. Casey had also demonstrated through its historical performance and the experience of its key personnel that it could successfully install GE LM6000 gas turbines. In total, Casey and its personnel had installed at least 18 GE LM6000 gas turbines. This is shown in the following excerpt:[72]

---

[72] Alta 0050323, Casey Estimate No. 19-035, July 9, 2019, p. 23.

Alta App.000620

✠ **Secretariat**

*Alta Power LLC v. General Electric International, Inc.*
*Case No. 3:23-CV-270-X*

## Equipment Installation Experience

| | Caterpillar G20CM34 | GE 6B | GE 7EA | GE 7FA | GE LM2500+ | GE LM6000 | GE LMS100 | GE Jenbacher J624 | Pratt & Whitney FT8-3 Swiftpac | Wartsila 50SG | Wartsila W20V34SG | Westinghouse W-251 | Westinghouse 501F |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Aeroderivative Gas Turbines** | | | | 1 | 18 | 1 | | | | | | | |
| **Heavy Duty Gas Turbines** | | 4 | 10 | 15 | | | | | 2 | | | 1 | 16 |
| **Reciprocating Engines** | 12 | | | | | | | 1 | | 17 | 72 | | |

Note  Heavy Duty and Aeroderivative Gas Turbine installation experience includes both Casey,Industrial and Key Personnel experience

80. The following list of projects are examples of Casey's experience installing GE LM6000 gas turbines.[73]



**WESTERN MINNESOTA MUNICIPAL POWER AGENCY**
Location: Brayton, IA
Scope of Work: Mechanical installation of a simple-cycle GE LM6000 gas turbine.
Duration: 2006-2007



**JONESBORO CITY WATER & LIGHT**
Location: Jonesboro, AR
Scope of Work: Mechanical installation of a simple-cycle GE LM6000 gas turbine.
Duration: 2005

---

[73] Alta 0050323, Casey Estimate No. 19-035, July 9, 2019, p. 22.

Alta App.000621

81. Lastly, Casey had successfully constructed at least one Project that was both a peaking plant and utilized GE LM6000 gas turbines. The Exira Station is a 140MW facility that utilizes three GE LM6000 gas turbines in Iowa.[74] Casey constructed Unit 3 of the Exira Station that expanded the facility's power generation by 47MW. Unit 3 began commercial operations in March 2007. This is shown in the following excerpt:[75]

---

## Exira Station, Unit 3

**Scope:**            **LM6000 Expansion**
**Client:**           **Western Minnesota Municipal Public Agency**
**Location:**         **Brayton, IA**
**Delivery Method:**  **General Contractor**

---

Casey Industrial expanded this existing gas-fired peaking plant, operated by Missouri River Energy Services, by providing electrical and mechanical installation of a 47 MW simple-cycle GE LM6000 combustion turbine. This installation increased plant capacity to 60 MW. Casey self-performed all machinery foundations, structural steel, electrical, and mechanical work.

---

82. Leidos's IE Report also examined the historical performance and capabilities of Casey and made the following statement:[76]

> *Based on our review, we are of the opinion that Casey has previously demonstrated the capability to design and construct natural gas-fired, simple-cycle facilities of similar size and technology as the Projects.*

83. Based on the foregoing, Casey and its personnel had both the capabilities and experience necessary to successfully engineer, procure, and construct the Project in accordance with its proposal.

---

[74] Exira Station Project Description, https://s3.amazonaws.com/com-mrenergy-cdn/general-uploads/Exira-Fact-Sheet.pdf.
[75] Exira Station, Unit 3, https://www.caseyind.com/projects/exira-station-unit-3/.
[76] ARES-ALTAPOWER00000033, IE Report, August 2019, p. 6.

✤ **Secretariat**

## IV.  Signature

84.    The observations and findings contained in this Report are based on information reviewed to date. As such, Secretariat reserves the right to amend or supplement this Report as new information is made available.

85.    I confirm that the opinions I have expressed represent my true and complete professional opinions and are within are areas of my professional expertise. I also confirm that I have not entered into any arrangement where the amount or payment of fees is in any way dependent on the outcome of this case; professional services fees were billed at the following hourly rates:

- Managing Director      $485
- Director      $450
- Associate Director      $425
- Manager      $395
- Senior Associate      $350
- Associate      $295
- Project Assistant      $240

**Eric Rodriguez, PE**
Managing Director
Secretariat Advisors, LLC
February 25, 2025

Alta App.000623

❀ Secretariat

# Exhibit 1: Eric K. Rodriguez, PE, Curriculum Vitae



# Eric K. Rodriguez, PE
## Managing Director

### Current Position

Eric Rodriguez is a Managing Director at Secretariat based in Houston. He has more than 20 years of experience in the engineering and construction industries and specializes in providing independent expert services on engineering- and construction-related matters to owners, developers, contractors, design professionals, and sureties.

### Professional Experience

Eric Rodriguez is a licensed Professional Engineer with over 20 years of experience providing engineering, construction, and advisory services. Mr. Rodriguez has performed civil and structural engineering design on new and rehabilitated projects and conducted forensic failure analyses. He has also assisted on issues regarding troubled projects/project turnarounds, contract negotiations, change management, and project management.

His experience includes capital projects in the commercial, industrial, oil & gas, chemical processing, transportation, infrastructure, educational, institutional, healthcare, entertainment, hospitality, and residential sectors in the US and abroad. The scale of the projects Mr. Rodriguez has been involved with range from approximately $1MM USD to mega projects in excess of $4B USD.

Mr. Rodriguez has served as an independent expert in State courts as well as AAA and ICC arbitrations. The topics Mr. Rodriguez has testified to include construction costs and damages; civil, structural, and building envelope defects; engineering project management; construction management; standard of care; labor productivity; and schedule delay, acceleration, and compression.

**Contact Details**

Direct:    +1.972.365.4314
erodriguez@secretariat-intl.com

**Professional History**

- Secretariat Advisors, LLC
- SOCOTEC Advisory, LLC
- Interface Consulting International, Inc.
- Huitt-Zollars, Inc.

**Education**

- MBA, The University of Texas at Austin, McCombs School of Business
- BS, Civil Engineering, Structural, New Mexico State University

**Accreditations**

- Professional Engineer (PE)

�֍ Secretariat

Alta App.000625

Eric K. Rodriguez, PE

**Representative Engagements**

**Commercial**

- Anritsu Tech Center
- Children's Learning Adventure Childcare Center – Pearland & Cinco Ranch
- Clarewood Properties Warehouse
- ExxonMobil Corporate Campus C1 Projects
- Harwood International Phase VI
- Lockheed Martin Fort Worth Facilities
- Storage Solutions Fort Worth Facility
- The Promenade
- Westgate Retail Center
- Yum! Brands Restaurants

**Cultural / Entertainment / Sports**

- Allen ISD Eagle Stadium
- Larimer County Arena & Livestock Pavilion at The Ranch
- Northwest High School Athletic Complex
- Shoshone-Bannock Tribes Casino Expansion Phase II
- Texas Rangers Ballpark

**Educational**

- Carrizo Springs CISD Carrizo Springs Junior High
- Houston ISD Food Services Building
- Houston ISD School at St. George Place
- Rio Grande City ISD Grulla High School
- Southern Methodist University Broadcast Center
- Texas Christian University Campus Commons
- Texas Christian University Mary Couts Burnett Library



Secretariat

Alta App.000626

- Texas Christian University Wiggins Hall

- University of New Mexico Lobo Center

**Healthcare**

- University Health System Hospital Tower Superstructure

- USACE Tinker Air Force Base Medical and Dental Clinic

- UT Southwestern Medical Center William P. Clements Jr. University Hospital Tower III

**Hospitality**

- Fairmont Austin

- Hotel Paso Del Norte

- Hyatt House

- Katy Lakes RV Park

- Shoshone-Bannock Tribes Casino

**Industrial / Petrochemical**

- Alcoa Lake Charles Carbon Plant

- Archer Daniels Midland Boiler ID Fan

- El Dorado, AR Ammonia Plant

- Enterprise PDH Project

- Gulf Coast Hydrogen SMR Construction

- Lockheed Martin Boiler Room Modifications

- Wacker Polysilicon Plant (Poly 11)

- W.R. Grace Catalyst Plant

**Infrastructure / Transportation**

- Austin WWTP No. 4

- Battle Creek Diversion Project

- Bissonnet Roadway Reconstruction

- Blue Creek Ranch Runway



Secretariat

Alta App.000627

- Bronx-Whitestone Bridge

- Capitol Metro Transportation Authority

- City of Dallas Northwest Service Center

- Classen-Steubing Oversized Sewer Main

- Dallas Love Field Parking Garage A Rehabilitation

- Dallas Love Field Parking Garage B

- Dallas Love Field Pedestrian Concourse and Skybridge

- Falcon Point Master Planned Community

- Fort Polk Airfield Runway

- Margaret Hunt Hill Bridge

- ND Highway 1804

- Questa Water Treatment Plant

- Toronto Union Station

- Trophy Club MUD No. 1 WWTP

- UDOT SR-189

- Waco Transit Authority

- Woodlands, Texas Waterline

### Institutional / Government

- Guam Museum and Chamorro Educational Facility

- Hidalgo County Judge Mario E. Ramirez, Jr., Juvenile Justice Center

- Kirtland Air Force Base Feasibility Study

- Lackland Air Force Base Dormitory

- Lee County Courthouse

- Red River Army Depot

### Manufacturing

- Benteler Steel Tube Manufacturing Facility


Alta App.000628

Eric K. Rodriguez, PE

- Dresser-Rand Repair Facilities

- Gerdau Monroe Steel Mill Manufacturing Plant

- Weyerhaeuser Millport Lumber Facility Upgrades

**Marine**
- ATP Cheviot Tension Leg Platform

- Chevron Big Foot Offshore Platform

- Diamond Offshore Ocean Yatzy Platform Brazil

- ExxonMobil Grand Isle 18A Platform Allision

- Great Lakes Dredging and Dock Vessel

- Long Beach Fire Boat

- Marine Well Containment System Modular Capture Vessels Topside Modules

- Walter Coelacanth Field Platform at Ewing Bank Block 834

**Mixed-Use**
- CityCentre One

- The Yards Parcel O

**Multi-Family**
- 2727 Kirby Condominiums

- Catalyst Houston

- CCNAS/CCAD Housing

- Cherry Orchard Apartments

- Post Apartment Homes

- The Falls at Legend Trail

- Venue Museum District Luxury Apartments

- Wheatley Courts

**Oil & Gas**
- Calcasieu Pass LNG


Alta App.000629

Eric K. Rodriguez, PE

- Corpus Christi EF90 Terminal

- Eagle Ford Central Processing Facilities – McCarty Ranch & Neu Wassenberg Ranch

- Elba LNG

- Grey Ranch Natural Gas Plant

- Hess Hawkeye Compressor Station

- Holly-Tulsa East and West Plant Refineries

- Juniper GTL Brownfield Plant

- Keystone Station Flue Gas Desulfurization

- Linde US Canadian Valley Processing Plant

- Midmar and Fasken Gas Processing Plant

- NatGasoline Methanol Production Plant

- Petroecuador Esmeraldas Refinery

- Petroecuador Pacific Refinery

- Sonatrach Menzel Ledjmet East Plant

- Tesoro Anacortes Refinery

- Valero Aruba Refinery

- Valero Energy Port Arthur Refinery SGRU

## Pipeline

- Austin Chalk Pipeline

- Chevron Australia Potable Water & Sewage Pipelines

- Dakota Gas Carbon Dioxide Pipeline

- Phillips 66 Sweeny Midstream Pipelines

- REX Seneca Lateral Pipeline

- Risberg Pipeline

- Rockies Express Pipeline



Alta App.000630

Eric K. Rodriguez, PE

- The Chesapeake and Access Pipeline Projects

- Trans Alaska Pipeline System

**Power / Energy**

- Channelview Cogeneration Plant

- Duke Edwardsport Integrated Gasification Combined Cycle (IGCC) Station

- GENA Termo Colon Power Plant

- Huntsman Substation HC-1

- Kemper County Energy Facility

- Nikiski Power Generation Plant Combined Cycle Conversion

- Point Comfort Power Plant

- Victoria City Power

- Victoria Port Power

- Victoria Port Power 2



**Testimony Experience**

**Food Tech, Inc. v. Cacique Foods, LLC and Loop 335 South Georgia Street Ventures, LLC**
- Case No. 01-23-003-2035
- American Arbitration Association
- Deposition – February 2025

**DD&B Construction, Inc. v. C. Dock Framing, II, Inc.**
- Cause No. 2022CI07821
- District Court 131st Judicial District, Bexar County, Texas
- Deposition – October 2024

**EPT Montecillo Town Center Apartments, LLC v. EMJ Corporation, n/k/a EMJ Construction, LLC, Western Surety Company, 5G Studio Atlanta, LLC, 5G Studio Collaborative, LLC, James Viviano, Michael Voegtle, and Steve Maxwell**
- Private Arbitration
- Deposition – September 2024, Hearing – October 2024

**In Re: 1001 WL, LLC, Debtor**
- Case No. 24-10119-smr
- United States Bankruptcy Court Western District of Texas Austin Division
- Deposition – August 2024, Trial – August 2024

**Harrison Tobin v. Sam Engineering and Testing, LP**
- Cause No. 23-7843-431
- District Court 431st Judicial District Denton County, Texas
- Deposition – July 2024

**Brad Richards v. Clegg Services, Ltd.**
- Case No. 01-23-0002-0469
- American Arbitration Association
- Deposition – May 2024, Hearing – June 2024

**Belfiore Condominium Owners Association, Inc. v. Ludlow & Associates Construction, LLC & Belfiore Developers, LLC**
- Case No. 01-23-0000-8663
- American Arbitration Association
- Deposition – February 2024

**Cummings Electrical, LP v. Austin Commercial, LP, and Austin Commercial, Inc.**
- Case No. 01-22-0002-8942
- American Arbitration Association
- Deposition – October 2023, Hearing - December 2023

**Kiewit Louisiana Co. v. Venture Global Calcasieu Pass, LLC**
- Case No. 26416/PDP
- ICC International Court of Arbitration
- Hearing – April 2023



Alta App.000632

Eric K. Rodriguez, PE

**Burton Construction Co., Inc. v. Ranger Specialized Glass, Inc. and 4 Seasons Waterproofing, Inc.**
- Case No. 01-20-0010-9596
- American Arbitration Association
- Hearing – November 2022

**Manchester Austin, LLC d/b/a Manchester Austin Hotel, LLC and Manchester Texas Financial Group, LLC v. Hunt Construction Group, Inc. v. Bergelectric Corp, et al**
- Case No. 01-19-0001-0301
- American Arbitration Association
- Deposition – July 2021, Hearing – March 2022

**Ray D. Moreno v. Visser Ranch, Inc., et. al.**
- Case No. VCU254522
- Tulare County Superior Court
- Depositions – May 2015, June 2021

**Via Bayou, Inc. v. North Houston Trucking, et. al.**
- Cause No. 2016-45691
- District Court of Harris County, Texas, 269th Judicial District
- Deposition – November 2017, Trial – May 2019

**Blue Creek Real Properties, LLC v. Gadberry Construction Company, Inc.**
- Cause No. CV48950-A
- District Court 329th Judicial District, Wharton County, Texas
- Deposition – May 2019

**CLA Pearland, LLC v. Morcon Construction Company and CEI Engineering Associates, Inc.**
- Case No 01-16-000-0780
- American Arbitration Association
- Deposition – November 2018



# Exhibit 68

Alta App.000634

 (https://castlemanpower.com) 

# Agilon Energy Projects

**Upon completion of development, Castleman Power Development finances its power projects under an affiliate entity Agilon Energy**

### Port Comfort Power

**Status:** Developed and Constructed
**Location:** Calhoun County, Texas
**Capacity:** 100 MW
**Technology:** Aero derivative quick start
**Commercial Operation:** 2017

### Chamon Power

**Status:** Developed and Constructed
**Location:** Houston, Texas
**Capacity:** 100 MW
**Technology:** Aero derivative quick start
**Commercial Operation:** 2017

### Victoria Port Power

**Status:** Developed, Constructed, and Operating
**Location:** Victoria County, Texas
**Capacity:** 100 MW
**Technology:** Aero derivative quick start
**Commercial Operation:** 2019

### Victoria City Power

**Status:** Developed, Constructed, and Operating
**Location:** Victoria County, Texas
**Capacity:** 100 MW
**Technology:** Aero derivative quick start
**Commercial Operation:** 2020

### SJRR Power

**Status:** Developed, Constructed, and Operating
**Location:** Houston, Texas
**Capacity:** 100 MW
**Technology:** Aero derivative quick start
**Commercial Operation:** 2022

### Victoria Port Power 2

**Status:** Developed, Constructed, and Operating
**Location:** Harris County, Texas
**Capacity:** 100 MW
**Technology:** Aero derivative quick start
**Commercial Operation:** 2022



EXHIBIT
2398

Alta App.000635


© 2025 Castleman Power Development, LLC. All Rights Reserved.

# Exhibit 69

Alta App.000637

POWERSTUDY

PROENERGY



The PowerFLX concept—the first standardized, modular LM6000 power plant design—enabled PROENERGY to deliver HO Clarke Generating Station approximately 2 months earlier than anticipated and run for nearly 6 days during a historic severe weather event.

EPC SERVICES

LM6000PC

Houston, Texas, U.S.

# STANDARDIZATION CUTS EPC TIME BY 50%, READIES WATTBRIDGE TO SUPPORT ERCOT DURING URI

Independent power producer (IPP) WattBridge developed its first facility, HO Clarke Generating Station, to respond to peak demand periods in the Electric Reliability Council of Texas (ERCOT) grid. Based on the exclusive PowerFLX LM6000 concept, the plant features eight LM6000PC engines to generate 384 MW.

## CHALLENGE

In 2018, ERCOT warned operators that the reserve margin fell below its target against a backdrop of legacy plant retirements as well as wind and solar developments. To address the ongoing lack of power resources, WattBridge developed HO Clarke Generating Station with construction kicking off in Houston, Texas, at the onset of COVID-19 pandemic and its associated supply chain disruptions.

## SOLUTION

PROENERGY fully designed, engineered, and executed a standardized plant in two phases: Phase I with six units and Phase II with two units.

Starting with Phase I of the project, the engineers leveraged the PowerFLX concept to eliminate variability regarding equipment designs, power distribution centers, and spacing to route piping and cabling. They quickly completed drawings, wrote specifications, and ordered equipment. Obtaining the required permits took less than 1 week.

Concurrent with final engineering, the construction team prefabricated components and laid out the site. Completing foundations took 9 weeks and setting major equipment took 17 weeks, or 31 and 43 weeks faster than EPC averages, respectively.

PROENERGY serviced Phase I engines at its Level-IV depot on its Sedalia, Missouri, campus to assure reliable performance.

Within 38 weeks, PROENERGY had commissioned the first six units, which coincided with the coming of Winter Storm Uri, a severe arctic front.

The new plant operated for 141 hours without interruption from the time the ERCOT market reflected an extreme generation need until the time it revoked its emergency order.

## VALUE

PROENERGY provided WattBridge a single source point—from inception through commercial operation—to mitigate logistical complexities and complete the Phase I build before the unprecedented storm in just 12 months. By comparison, a typical EPC project takes approximately 24 months.

The turnkey power-generation solution fulfilled all requirements of the EPC project—including everything from the engines, to the packages, to the balance-of-plant systems—for performance reliability.

The accelerated delivery reduced typical EPC timeframes by approximately 50%, which enabled the plant to provide critical power to 200,000 homes despite ERCOT losing nearly half its capacity.

**STREAMLINED**

**1 SOURCE**
from inception to commercial operation

**INCLUSIVE**

**100% TURNKEY**
solution complete with balance of plant

**EXPEDITED**

**50% REDUCTION**
in 24-month EPC timeframe

Alta App.000638

# Exhibit 70

Alta App.000639

| | |
|---|---|
| **From**: | Matthew Laterza [mlaterza@altapowerdev.com] |
| **Sent**: | 9/4/2019 10:54:20 PM |
| **To**: | Josh Pandolfi [JPandolfi@starwood.com] |
| **Subject**: | Re: ERCOT Peaker Project |

**EXTERNAL: Verify Sender/Links**

Josh,

No, we are developing similar projects, but with some key differences:

1) LM6000s overhauled by GE with the same OEM warranty and output/performance guarantees as a new turbine and a long term service agreement with an OEM authorized service provider;

2) Casey Industrial as EPC contractor (they've done 18 LM6000s in the US, along with countless other types of gas turbines and recips);

3) Firm gas transportation agreements with multiple delivery and receipt points for gas optimization;

4) NAES as O&M contractor.

These are quite a few other differences that I'd be happy to walk through with you on a call if there's interest on your part.

Matt


Get Outlook for iOS

---

**From:** Josh Pandolfi <JPandolfi@starwood.com>
**Sent:** Wednesday, September 4, 2019 9:49:12 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Subject:** Re: ERCOT Peaker Project

Matt, are these the Castleman assets?

Josh Pandolfi
Managing Director, Origination
Starwood Infrastructure Finance
203-312-4434

On Sep 4, 2019, at 9:13 PM, Matthew Laterza <mlaterza@altapowerdev.com> wrote:

> **EXTERNAL: Verify Sender/Links**
>
> Patrick,
>
> Thanks for the intro. Moving you to BCC.
>
> Josh,

CONFIDENTIAL

As Patrick mentioned in his email we are looking for a debt solution for our ERCOT peaker projects. Let me know if this is something you might have interest in.

Matt

Get Outlook for iOS

---

**From:** Gimlett, Patrick <Patrick.Gimlett@alliancebernstein.com>
**Sent:** Wednesday, September 4, 2019 5:48:22 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Cc:** Josh Pandolfi <JPandolfi@starwood.com>
**Subject:** FW: ERCOT Peaker Project

Matt – It was nice to chat earlier. Copied to this email is Josh Pandolfi of Starwood. Josh specializes in the power finance world.

Josh – Per our quick conversation earlier, Matt is looking for debt capital solution. Below is a quick summary. I will leave to you two to coordinate if it might be a fit for Starwood.

Regards,
Pat

**Patrick Gimlett**
Managing Director | AB Private Credit Investors

T +1 832 366 2055  M +1 302 463 6364
Patrick.Gimlett@AllianceBernstein.com

1000 Louisiana St, Suite 3600
Houston, TX  77002

alliancebernstein.com/go/abpci  |  LinkedIn

---

**From:** Matthew Laterza <mlaterza@altapowerdev.com>
**Sent:** Wednesday, September 04, 2019 4:17 PM
**To:** Gimlett, Patrick <Patrick.Gimlett@alliancebernstein.com>
**Subject:** ERCOT Peaker Project

Patrick,

Thanks so much for taking the time to speak with me earlier.

We are developing three natural gas fired peaking power plants in ERCOT (150 MW each for a total of 450 MW). Below is a brief summary of the project highlights:

- Plants will use grey market equipment refurbished by the OEM (GE) with warranty, output and performance guarantees from the OEM
- Turnkey EPC costs of ~$400 / kW vs. ~$950 / kW for newbuilds
- Contracted cash flows from a 5 year offtake contract with an investment grade counterparty plus ancillary services revenue from ERCOT covering a majority of project costs

Alta App.000641

SPT00000007

- Plants will be capable of <10 min start and black start capable enabling participation in full range of ancillary services markets
- Total project costs of ~$200MM

We were expecting to close our unitranche facility this week or next and had received lender's credit committee tentative approval, but our lead bank (who was underwriting the entire transaction) had some internal institutional issues arise recently and they are currently on hold pending some kind of resolution. They've given us permission to speak with other financing sources. We need to move quickly if we are going to make the summer 2020 run in ERCOT. We're fairly ready to close on our side as we have an independent engineering report being delivered tomorrow, fully baked White & Case credit docs, W&C fully reviewed all major contracts and is finalizing their legal diligence report, etc.

Again, thank you so much for your time and help. I'd definitely like to buy you lunch sometime for helping out.

Thanks,
Matt Laterza


..............................................................

For further important information about AllianceBernstein please click here
http://www.alliancebernstein.com/disclaimer/email/disclaimer.html

---

IMPORTANT: The information contained in this e-mail message is confidential
and is intended only for the named addressee(s). This message may be protected
by the attorney/client privilege. If the reader of this e-mail message is not
the intended recipient (or the individual responsible for the delivery of this
e-mail message to the intended recipient), please be advised that any re-use,
dissemination, distribution or copying of this e-mail message is prohibited.
If you have received this e-mail message in error, please reply to the sender
that you have received this e-mail message in error and then delete it.
Starwood Capital Group's privacy policy can be found at the following:
https://starwoodcapital.com/disclaimer/
Thank you.

Alta App.000642

SPT00000008

# Exhibit 71

Alta App.000643

| From: | Andrew Herr |
|---|---|
| Sent: | Monday, July 29, 2019 11:09 AM CDT |
| To: | Jay Manning (j.manning@wattstock.com); Patrick Jenevein (p.jenevein@wattstock.com) |
| Subject: | GE Backstopping Letter |

Jay/Patrick:

Here is a rough cut at a letter that might do the trick. The problem is to convey GE's willingness to CONSIDER stepping into our shoes without contractually binding them to do so. My strategy is to make a sandwich of the matter – boilerplate summary of the GE WattStock MOU on top, and a list of the reasons that GE would be willing to backstop us on the bottom. The meat is a little thin, but that's what we have to work with . . .

Andy

* * * * * * * * *



TO: Alta Power

Dear Matt:

We understand that your lenders seek clarification regarding the GE-WattStock relationship, and how GE would respond in the event that WattStock becomes unable to meet it's contractual obligations to Alta Power LLC under agreements between WattStock and Alta Power for WattStock to supply a minimum of 6 refurbished LM6000 units.

WattStock and GE have entered into a Memorandum of Understanding that sets out how WattStock and GE will work together to refurbish previously owned aero-derivative power units, including the LM6000 series units. In general, GE is committed to overhauling engines and supplying engineering analysis and diagrams to ensure the entire unit is refurbished to GE-specifications, and WattStock is committed to acquiring used units and refurbishing the balance-of-plant. By refurbishing units in this fashion, GE is able to warranty the completed unit. WattStock and GE have agreed that either party might act in the role of prime contractor, depending on a variety of factors. With regard to the Alta Power project, we jointly determined that WattStock would take the lead, and GE will perform its engineering and engine overhaul work as a subcontractor to WattStock.

Should WattStock fail to meet its contractual obligations to Alta Power, GE is willing to assume responsibility to complete any outstanding work, subject to several considerations. Among those considerations are the absence of any legal or access issues; GE and Alta being able to agree to a revised scope of work and associated costs; and GE's assessment that there are no insurmountable engineering or manufacturing issues.

Alta App.000644    WATTSTOCK_006381

There are a number of reasons that GE is willing to consider "backstopping" WattStock on this project. First, WattStock's operation is co-located next to our engine overhaul facility, we can quickly assume work scope without transportation. Second, as part of our engineering services on this project we will conduct close oversight of all aspects of WattStock's work – we will be intimately acquainted with each unit and its refurbishment program. Third, as the leader in aero-derivative power plants, we have a broad network suppliers that we should be able to call on to assist if need be. Fourth – and most importantly – GE has a strong incentive for this project to succeed.

Please let me know if you have any questions.

Lance Harrington



**Andrew F. Herr**
Chief Operating Officer
*Mobile: +1 972.963.0058*

*4040 North Central Expressway*
*Suite 850*
*Dallas, TX 75204*

*a.herr@wattstock.com www.wattstock.com*

*This e-mail message and any attachments are for the sole use of the intended recipient(s) and may contain confidential information. If you are not an intended recipient, or an intended recipient's authorized agent, you are hereby notified that any dissemination, distribution or copying of this e-mail message or any attachments is strictly prohibited. If you have received this message in error, please notify the sender by reply e-mail and delete this e-mail message and any attachments from your computer system.*

Alta App. 000645    WATTSTOCK_006382

# Exhibit 72

Alta App.000646

**To:** William Phelps[wphelps@altapowerdev.com]; Matthew Laterza[mlaterza@altapowerdev.com]
**Cc:** Rajesh Jegadeesh[rjegadeesh@apollo.com]; Geoffrey Strong[gstrong@apollo.com]
**From:** Jerry Chen[jerrychen@apollo.com]
**Sent:** Sat 10/12/2019 4:29:24 PM Central Daylight Time
**Subject:** RE: [External] FW: Report & Dispatch Model Status
**Attachment:** Alta Power Term Sheet 201910.pdf

Bill / Matt,

Please see attached a summary term sheet for a $40mm 2L term loan investment. We are happy to discuss at your convenience.

Thanks,
Jerry
w: (917) 472-4127 | m: (917) 655-2903

**From:** Rajesh Jegadeesh <rjegadeesh@apollo.com>
**Sent:** Friday, October 11, 2019 4:58 PM
**To:** 'William Phelps' <wphelps@altapowerdev.com>; Matthew Laterza <mlaterza@altapowerdev.com>
**Cc:** Jerry Chen <jerrychen@apollo.com>
**Subject:** RE: [External] FW: Report & Dispatch Model Status

Thank you guys -- we will revert once we connect with Geoff. Helpful to hear

**From:** William Phelps <wphelps@altapowerdev.com>
**Sent:** Friday, October 11, 2019 4:45 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Cc:** Rajesh Jegadeesh <rjegadeesh@apollo.com>; Jerry Chen <jerrychen@apollo.com>
**Subject:** Re: [External] FW: Report & Dispatch Model Status

Hartree/Oaktree

> On Oct 11, 2019, at 2:35 PM, Matthew Laterza <mlaterza@altapowerdev.com> wrote:
>
>
> Rajesh & Jerry,
> It sounds like we have another ~$5MM of equity coming in, mostly from Hartree. This would reduce the potential balloon for you guys at the end of 5 years by almost $20 / kW.
> Matt

**From:** Rajesh Jegadeesh <rjegadeesh@apollo.com>
**Sent:** Thursday, October 10, 2019 5:20 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>; Jerry Chen <jerrychen@apollo.com>
**Cc:** William Phelps <wphelps@altapowerdev.com>
**Subject:** RE: [External] FW: Report & Dispatch Model Status

Thank you Matt. Does this use market forward curves or ICF's fundamental view? Thank you

**From:** Matthew Laterza <mlaterza@altapowerdev.com>
**Sent:** Thursday, October 10, 2019 5:42 PM
**To:** Rajesh Jegadeesh <rjegadeesh@apollo.com>; Jerry Chen <jerrychen@apollo.com>
**Cc:** William Phelps <wphelps@altapowerdev.com>
**Subject:** [External] FW: Report & Dispatch Model Status

Rajesh & Jerry,

I just received the attached dispatch model from ICF. This version does not assume a HRCO is in place; however, it shows that running as a pure merchant plant and providing non-spin and responsive reserve as we've previously discussed, each plant would be expected to generate approximately $101MM in EBITDA over the 2020 – 2025 timeframe.

Happy to set up a call with you guys and ICF as soon as possible to go through this.

Matt

This email and any files transmitted with it are confidential and intended solely for the person or entity to whom they are addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you have received this email in error please contact the sender and delete the material from any computer. Apollo Global Management, Inc.

This email and any files transmitted with it are confidential and intended solely for the person or entity to whom they are addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you have received this email in error please contact the sender and delete the material from any computer. Apollo Global Management, Inc.

CONFIDENTIAL

Alta 0017500

# Transaction Overview

## Net Source of Funds

| ($ in millions) | Rate | Tenor | $ |
|---|---|---|---|
| Senior Debt | [5.25% (L+275)] | [5 years] | $[40] |
| 2L Debt | 14% | 5.5 years | 40 |
| Equity | | | 55 |
| **Total Project Cost** | | | **$135** |

Note: Amounts are net of fees.

## Summary Term Sheet

| Key Term | Summary |
|---|---|
| Funded Debt | • $40mm 2nd Lien Term Loan |
| Issue Price | • 97.0 |
| Tenor | • 5.5-year maturity |
| Interest Rate | • 14% paid quarterly |
| Warrants | • 10% penny warrants |
| Payment Priority | • 100% excess cash flow sweep after senior debt service<br>• No incremental senior debt incurrence |
| Call Protection | • NC3 / 114 / 107 / Par |
| Covenants | • Customary financial and maintenance covenants |


APOLLO

Alta App.000648

1

Alta 0017501

# Exhibit 73

Alta App.000649



**Deutsche Bank**
Corporate & Investment Bank



# Texas peaking power portfolio: indicative financing terms

April 2019

Deutsche Bank Securities Inc., a subsidiary of Deutsche Bank AG, conducts investment banking and securities activities in the United States.

Alta App.000650

CONFIDENTIAL

Alta 0028566

# Disclaimer



*Please note that the structure and terms set out in this indicative term sheet are indicative only; they do not constitute an offer or commitment of any kind to arrange or underwrite any form of financing and are subject to change for any reason whatsoever including market conditions as determined by Deutsche Bank. The proposed transaction and its terms are subject to due diligence, internal approvals (including management, credit, legal, et al) by Deutsche Bank and satisfactory documentation. The structure and the indicative terms set out in this indicative term sheet are confidential. This indicative term sheet is not intended to, and shall not, give rise to any legally binding obligations on the part of Deutsche Bank and/or its affiliates. The consummation of the proposed transaction by Deutsche Bank is expressly conditional on successful completion of KYC due diligence and adoption of all relevant entities to Deutsche Bank's satisfaction, including, without limitation, obtaining any relevant Anti Financial Crime compliance approval.*

*We are sending you this term sheet on the basis that you are a potential counterparty acting at arm's length. This term sheet is for discussion purposes only and is not intended to create any legally binding obligations between us. The type of transaction described in this document may not be suitable for you. For general information regarding the nature and risks of the transaction and types of financial instruments please go to www.globalmarkets.db.com/riskdisclosures. Please also take your own independent professional advice in order to assess if this type of transaction is appropriate for you given your circumstances and objectives. We are not acting as your financial, legal, tax or other adviser or in any fiduciary capacity, and this document does not constitute advice, or an offer (of any type), invitation to offer or recommendation, to you.*

*If after making your own assessment you independently decide you would like to pursue a specific transaction with us there will be separate offering or other legal documentation, the terms of which will (if agreed) supersede any indicative and summary terms contained in this document. We therefore do not accept any liability for any direct, consequential or other loss arising from reliance on this document.*

*Deutsche Bank AG ("**Deutsche Bank**") may maintain positions in the products referred to herein, or be engaged in other transactions involving these products and/or earn brokerage and fees etc.*

*Please note that: (a) we are making no representation as to the profitability of any financial instrument or economic measure. Assumptions, opinions and estimates expressed constitute our judgment as of the date of this material and are subject to change without notice. An investment in this type of transaction may result in the loss of your investment. Past performance is not indicative of future results; (b) there is likely to be little or no secondary market for this type of transaction; (c) we are dealing with you on a principal to principal basis and do not accept any responsibility for any dealings, including on-selling, between you and any third parties; (d) we make no representation as to the completeness or accuracy of the information contained in this document; and (e) you may not distribute this document, in whole or part, without our express written permission.*

*You represent that you will comply with all applicable securities laws in force in any jurisdiction in which you purchase, offer, sell or deliver securities or possess or distribute transaction documentation and Deutsche Bank shall have no responsibility therefore. In particular, in relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (Directive 2003/71/EC) you represent that with effect from the date on which the Prospectus Directive is implemented in such Member State you will not make an offer of securities to the public in such Member State except during the 12 months following the publication of a prospectus approved in or passported into such Member State or at any time other than in circumstances which do not require the publication of a prospectus pursuant to Article 3 of the Prospectus Directive. Deutsche Bank is authorized under German Banking Law (competent authority: BaFin - Federal Financial Supervising Authority) and regulated by the Financial Services Authority for the conduct of UK business. Securities and investment banking activities in the United States are performed by Deutsche Bank Securities Inc., member NYSE, FINRA and SIPC, and its broker-dealer affiliates. Lending and other commercial banking activities in the United States are performed by Deutsche Bank AG, and its banking affiliates. © 2019 Deutsche Bank AG.*

Deutsche Bank
Corporate & Investment Bank

Alta App.000651

Alta 0028567

# Indicative terms: 450 MW portfolio term financing



| | |
|---|---|
| Sponsor | Alta Power, LLC |
| Borrower(s) | Goodalta Power Center LLC, Altajac Power Center LLC, Avocet Power Center LLC |
| Project(s) | Goodlow, Jacksonville, Lufkin |
| Mandated Lead Arranger, Sole Underwriter, Structuring Bank, Hedging Bank | Deutsche Bank AG NY or any of its affiliates |
| Administrative / Collateral Agent | Deutsche Bank Trust Company Americas |
| Facilities | Senior secured construction-to-term facility |
| Use of proceeds | Fund up to [90]% of construction costs on Goodlow, Jacksonville, Lufkin |
| Maturity | [5] years |
| Upfront fee / OID | [1.00]% |
| Structuring fee | [2.00]% |
| Margin | L+[4.50]% |
| Undrawn commitment fees | [40]% of applicable senior loan margin |
| Yield protection | Non call 2, callable at 101 at year 3, fully callable thereafter |
| Repayment | – Scheduled amortization: [5]% per annum<br>– Target balance cash sweeps: [100]% sweep set to reach a target debt balance of $[●]/kw at maturity<br>– Excess cash sweeps: [50]% of excess cash flow once the target debt balance has been reached |
| Interest rate hedging | [100]% of expected notional construction draw schedule, minimum of [75]% of base case amortization profile post-COD |
| Security | Senior secured on all assets of each project company and pledge of equity shares in each project company |
| Debt service reserve | [6] months, funded by cash or a letter of credit |
| Major maintenance reserve | To be determined based on due diligence |
| Outage insurance requirement | To be discussed |
| Minimum equity (%) | [10]% of construction costs |
| Covenants | Usual and customary |
| Conditions precedent | Usual and customary |
| Events of default | Usual and customary |

CONFIDENTIAL

Alta App.000652

Alta 0028568

# Exhibit 74

Alta App.000653

**To:** Matthew Laterza[mlaterza@altapowerdev.com]
**Cc:** Crowley, Sarah[Sarah.Crowley@cit.com]; Miller, Daniel[Daniel.Miller@cit.com]; Hilliard, Tyler[Tyler.Hilliard@cit.com]
**From:** Venkatraman, Drew[Drew.Venkatraman@cit.com]
**Sent:** Mon 3/11/2019 8:38:08 PM Central Standard Time
**Subject:** Alta Power Peaker Proposal
**Attachment:** Alta Power Model vCIT1.xlsx
**Attachment:** Alta Power Peakers High Level Modeling Assumptions.pdf

Matt,

Attached please find our High Level Modeling Assumptions for the ERCOT Peaker Portfolio we have been discussing. We have also attached our working model for your review. We have run the attached past senior management but would still need to have additional conversations with our credit team following further diligence (prior to signing a mandate letter or term sheet). The attached will also be subject to a market screen.

In addition to what is outlined in the High Level Modeling Assumptions, CIT notes we would like to better understand the portfolio in more detail including a review of the following:

☐ EPC Contracts;

☐ EPC provider including their creditworthiness or potential for bonding to be required during construction;

☐ The LTSA with GE as well as any warranties provided;

☐ Capital costs and structure (in conjunction with the IE's review);

☐ Backcast and forward projections (for both merchant energy and ancillary) in conjunction with the Market Consultant;

☐ The Ancillary Market constructs in ERCOT particularly around certainty of these cashflows; and

☐ HRCO construct, provider (and review of their creditworthiness), and a review on basis (the last to be determined in conjunction with the Market Consultant;

We look forward to discussing our proposal as well as the portfolio at greater length over the next few days.

Drew



**Drew Venkatraman**
Vice President, Energy
(310) 449-2298
CIT Bank, N.A.
2450 Broadway, Suite 400
Santa Monica, CA 90404
www.cit.com

This email message and any accompanying materials may contain proprietary, privileged and confidential information of CIT Group Inc. or its subsidiaries or affiliates (collectively, "CIT"), and are intended solely for the recipient(s) named above. If you are not the intended recipient of this communication, any use, disclosure, printing, copying or distribution, or reliance on the contents, of this communication is strictly prohibited. CIT disclaims any liability for the review, retransmission, dissemination or other use of, or the taking of any action in reliance upon, this communication by persons other than the intended recipient(s). If you have received this communication in error, please reply to the sender advising of the error in transmission, and immediately delete and destroy the communication and any accompanying materials. To the extent permitted by applicable law, CIT and others may inspect, review, monitor, analyze, copy, record and retain any communications sent from or received at this email address.

Alta App.000654

Alta 0030728

**DOCUMENT PRODUCED IN NATIVE FORMAT**

Alta App.000655

CONFIDENTIAL

Alta 0030729



# Alta Power Peaker Financing - High Level Modeling Assumptions

*The High-Level Modeling Assumptions are solely an indication of economic terms which CIT Bank, N.A. believes are available based on current market conditions and are subject to due diligence, legal documentation, a market screen, and credit approval.*

| Project Overview and Assumptions | |
|---|---|
| Sponsor | Alta Power |
| Portfolio Capacity | 450 MW |
| Projects | 3 Projects, 150MW each |
| Contract Term | 5 years w/ Creditworthy HRCO provider |
| Refurbisher | General Electric |
| LTSA Provider | General Electric |
| BOP Contractor | International Turbine Services |
| IE & Market Consultant | Leidos |

| Credit Facilities Summary ($MM): | CIT Proposal |
|---|---|
| CL/TL | $[98.0] |
| DSR LC | [13.0] |
| Hedge LC | TBD |
| Major Maintenance LC | TBD* |
| **Total Facilities** | **$[111.0]** |

| CIT Proposed Underwrite | $[111.0] |
|---|---|

| | |
|---|---|
| Debt Sizing Cashflow Credit | Up to [100]% credit to cashflow streams sized based upon DSCRs below |
| Contracted Cashflow Sizing DSCR | [1.30]x |
| Ancillary Cashflow Sizing DSCR | [2.00]x |
| Merchant Cashflow Sizing DSCR | [2.00]x |
| Merchant Energy Credit | [100]% of backcasted energy margin** |
| Backcast Energy EBITDA Assumption | $[2.0]MM** |
| Debt Sizing Amortization | C + 5 years |
| Tenor | C + 5 years |
| Minimum Equity Requirement | 30% of total Capital Cost |
| Funding Priority | Equity First |
| DSR Sizing | 6 months; to be satisfied by LC |
| Annual Agency / Depositary Fee | $[25]k / $[25]k |
| Commitment Fee | [0.750]% |
| Hedging Requirement | [75]% of amortization schedule |
| Credit Spread | [20]bps above mid-market |
| Distribution Test | 1.20x DSCR |

| | |
|---|---|
| TL and LCs Upfront Fee | [2.250]% |
| Structuring Fee | $[750]k |
| Pricing Margin (construction) | L + [3.000]% |
| Pricing Margin (term years 1-3) | L + [3.000]% |
| Pricing Margin (term years 4-5) | L + [3.250]% |

\* Sizing of the Major Maintenance LC (if needed) to be determined in conjunction with the IE

\*\* The amount of Merchant Energy assumed in the Debt Sizing Case will be subject to a review of the backcast with the Market Consultant and a market screen

Alta App.000656

Alta 0030730

# Exhibit 75

Alta App.000657

**To:** Matthew Laterza[mlaterza@altapowerdev.com]
**Cc:** William Phelps[wphelps@altapowerdev.com]; O'Neil, Andrew[Andrew.ONeil@ING.COM]; Wellock, Sven[Sven.Wellock@ing.com]; Bell, C. (Christopher)[Christopher.Bell@ing.com]

**From:** Stadlinger, Stefan[Stefan.Stadlinger@ING.COM]
**Sent:** Tue 12/3/2019 8:42:05 AM Central Standard Time
**Subject:** RE: ING/Alta
**Attachment:** Project Goodlow - ING Term Sheet.docx
**Attachment:** Project Goodlow - ING Term Sheet.pdf

Hi Matt,
Please find attached an indicative term sheet from ING.
Happy to discuss further if you have any questions.
Regards,


**Stefan Stadlinger**
Energy - Utilities, Power & Renewables
T +1 646 424 6264
E stefan.stadlinger@ing.com

**From:** Wellock, Sven <Sven.Wellock@ing.com>
**Sent:** Monday, December 2, 2019 3:03 PM
**To:** 'Matthew Laterza' <mlaterza@altapowerdev.com>; Bell, C. (Christopher) <Christopher.Bell@ing.com>; Stadlinger, Stefan <Stefan.Stadlinger@ING.COM>
**Cc:** William Phelps <wphelps@altapowerdev.com>; O'Neil, Andrew <Andrew.ONeil@ING.COM>
**Subject:** RE: ING/Alta

Matt,
Yes, indeed we spoke with DB which was very helpful. Our greenlight committee endorsed the transaction and we are working with legal to complete the internal review of the term sheet before we can send it out.
We hope to send it tonight or tomorrow.
Thanks for your patience.
Sven

**Sven Wellock, CFA**
Managing Director
Co-Lead of Energy - Utilities, Power & Renewables
ING Capital LLC
1133 Avenue of the Americas
New York, NY 10036
T: +1 646 424 7204, F: +1 646 424 6440
E: Sven.Wellock@ing.com
www.ing.com

**From:** Matthew Laterza [mailto:mlaterza@altapowerdev.com]
**Sent:** Monday, December 02, 2019 12:24 PM
**To:** Bell, C. (Christopher); Wellock, Sven; Stadlinger, Stefan
**Cc:** William Phelps
**Subject:** RE: ING/Alta

Sven/Chris/Stefan,
I hope you guys had a good holiday. I heard that you were able to speak with DB at the beginning of last week. I just wanted to check in and see how things were looking on the term sheet.
Thanks,
Matt

**From:** Bell, C. (Christopher) <Christopher.Bell@ing.com>
**Sent:** Friday, November 22, 2019 7:16 AM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>; Wellock, Sven <Sven.Wellock@ing.com>; Stadlinger, Stefan <Stefan.Stadlinger@ING.COM>
**Cc:** William Phelps <wphelps@altapowerdev.com>
**Subject:** RE: ING/Alta

Hi Matt,
I just circulated an invite. I assume we'll call you at your direct line. Let me know if that works.
Chris

**From:** Matthew Laterza <mlaterza@altapowerdev.com>
**Sent:** Thursday, November 21, 2019 6:57 PM
**To:** Wellock, Sven <Sven.Wellock@ing.com>; Bell, C. (Christopher) <Christopher.Bell@ing.com>; Stadlinger, Stefan <Stefan.Stadlinger@ING.COM>
**Cc:** William Phelps <wphelps@altapowerdev.com>
**Subject:** Re: ING/Alta

Sven,
Let's plan on speaking at 10:30AM ET tomorrow then.
Thanks,
Matt

**From:** Wellock, Sven <Sven.Wellock@ing.com>
**Sent:** Thursday, November 21, 2019 5:54:12 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>; Bell, C. (Christopher) <Christopher.Bell@ing.com>; Stadlinger, Stefan <Stefan.Stadlinger@ING.COM>
**Cc:** William Phelps <wphelps@altapowerdev.com>
**Subject:** RE: ING/Alta

Matt,
I presume you mean tomorrow morning. Yes, I am available tomorrow until 11:30am.

Alta App.000658

Please let me know what time works best for you.

Thanks,

Sven

Sent with BlackBerry Work
(www.blackberry.com)

**From:** Matthew Laterza <mlaterza@altapowerdev.com>
**Date:** Thursday, Nov 21, 2019, 5:34 PM
**To:** Wellock, Sven <Sven.Wellock@ing.com>, Bell, C. (Christopher) <Christopher.Bell@ing.com>, Stadlinger, Stefan <Stefan.Stadlinger@ING.COM>
**Cc:** William Phelps <wphelps@altapowerdev.com>
**Subject:** ING/Alta

Sven,

Do you have time to have a follow up call Friday morning?

We would like to give you some feedback following our call yesterday. Also, we'd like to discuss you going to greenlight committee as soon as possible because we have a potential lender that is interested in providing bridge financing, but they would need a term sheet from ING on the takeout to move forward.

Thanks,

Matt

----------------------------------------------------------------

The information in this Internet e-mail is confidential and may be legally privileged. It is intended solely for the addressee(s). Access to this Internet e-mail by anyone else is unauthorized. All e-mail sent to and from the ING corporate e-mail system is subject to archiving, monitoring and/or review by ING personnel.

If you are not the intended recipient of this e-mail, any disclosure, copying, or distribution of it is prohibited and may be unlawful. If you have received this e-mail in error, please notify the sender and immediately and permanently delete it and destroy any copies of it that were printed out. When addressed to our clients any opinions or advice contained in this Internet e-mail is subject to the terms and conditions expressed in any applicable governing ING terms of business or client engagement letter.

----------------------------------------------------------------

----------------------------------------------------------------

The information in this Internet e-mail is confidential and may be legally privileged. It is intended solely for the addressee(s). Access to this Internet e-mail by anyone else is unauthorized. All e-mail sent to and from the ING corporate e-mail system is subject to archiving, monitoring and/or review by ING personnel.

If you are not the intended recipient of this e-mail, any disclosure, copying, or distribution of it is prohibited and may be unlawful. If you have received this e-mail in error, please notify the sender and immediately and permanently delete it and destroy any copies of it that were printed out. When addressed to our clients any opinions or advice contained in this Internet e-mail is subject to the terms and conditions expressed in any applicable governing ING terms of business or client engagement letter.

----------------------------------------------------------------

----------------------------------------------------------------

The information in this Internet e-mail is confidential and may be legally privileged. It is intended solely for the addressee(s). Access to this Internet e-mail by anyone else is unauthorized. All e-mail sent to and from the ING corporate e-mail system is subject to archiving, monitoring and/or review by ING personnel.
If you are not the intended recipient of this e-mail, any disclosure, copying, or distribution of it is prohibited and may be unlawful. If you have received this e-mail in error, please notify the sender and immediately and permanently delete it and destroy any copies of it that were printed out. When addressed to our clients any opinions or advice contained in this Internet e-mail is subject to the terms and conditions expressed in any applicable governing ING terms of business or client engagement letter.

----------------------------------------------------------------

Alta App.000659

Alta 0031867

# PROJECT GOODLOW

*This summary of principal financing terms and conditions (this "**Term Sheet**") outlines the material terms and conditions that will govern the Facilities (as defined below). For the purposes hereof, the term "**Loan Documents**" shall mean the definitive loan documentation with respect to the Facilities on the terms and conditions set forth herein and otherwise mutually acceptable to the parties, including, without limitation, one or more credit agreements, guarantees, security agreements, intercreditor agreements, pledge agreements, and other related definitive documents. This Term Sheet is not a commitment by the lenders, any issuing bank or any of their respective affiliates to provide, arrange, purchase or underwrite the Facilities described herein or an agreement to deliver such a commitment. Any such commitment will be issued only in writing and will be subject to appropriate documentation. This Term Sheet shall not be considered exhaustive as to the terms and conditions which govern the Facilities and is subject, in all respects, to the final terms and conditions set forth in the executed Loan Documents. This Term Sheet is confidential and may not be disclosed to third parties (other than to employees and professional advisors of Alta Power LLC (and its affiliates) on a need-to-know basis and as may be required by law, regulation, court order or subpoena) without ING Capital LLC's written consent.*

## 150 MW Term Financing

$[54.6] million Term Loan Facility
$[29.3] million Letter of Credit Facility

### Summary of Principal Terms and Conditions

| | |
|---|---|
| **Project Company:** | A [Texas][1] limited liability company (the "***Project Company***") will be the owner of the Project (as defined below). |
| **Project Holdco:** | A Texas limited liability company ("***Project Holdco***") has been formed to be the direct owner of the Project Company. |
| **Project Holdco Pledgor:** | A Texas limited liability company ("***Project Holdco Pledgor***") has been formed to be the direct owner of Project Holdco. |
| **Borrower:** | Project Holdco (the "***Borrower***"). |
| **Pledgor:** | Project Holdco Pledgor (the "***Pledgor***"). |
| **Loan Parties:** | The Project Company, the Borrower and the Pledgor (the "***Loan Parties***"). |
| **Sponsor:** | Alta Power LLC, a Delaware limited liability company (the "***Sponsor***") will be the majority direct or indirect owner of Project Holdco Pledgor. |

---

[1] NTD: We would expect SPVs to be Delaware entities.

1

Alta App.000660

Alta 0031868

| | |
|---|---|
| **Project:** | Goodlow, a 150MW gas-fired peaker ("***Goodlow***") |
| **Lenders:** | The Term Lenders (defined below) and the lenders under the Letter of Credit Facility (the "LC Lenders," and, collectively with the Term Lenders, the "***Lenders***", and together with the Administrative Agent, Collateral Agent and the Issuing Banks, the "***Lender Parties***"). |
| **Sole Bookrunner and Coordinating Lead Arranger:** | ING Capital LLC ("ING") |
| **Term Lenders:** | ING and a syndicate of banks, financial institutions and other entities (other than Disqualified Institutions (to be defined in the Loan Documents)) approved by the Loan Parties with commitments in respect of the Term Facility (collectively, the "***Term Lenders***"). |
| **ING Commitment and Final Hold:** | Up to $50 million of the Facilities (defined below) |
| **Hedging Bank:** | ING (or one of its affiliates) and one or more other Term Lenders (if any) agreeing to act in such capacity and acceptable to the Borrower (each, a "***Hedging Bank***"). |
| **Issuing Banks:** | One or more LC Lenders (if any) agreeing to act in such capacity and acceptable to the Borrower (each, an "***Issuing Bank***"). |
| **Administrative Agent:** | [TBD] ("***Agent Bank***") will act as the sole and exclusive administrative agent (in such capacity, the "***Administrative Agent***") for the Lenders. |
| **Collateral Agent:** | [TBD] will act as the sole and exclusive collateral agent (in such capacity, the "***Collateral Agent***") for the secured parties. |
| **Depositary Bank:** | [TBD] will act as the sole and exclusive depositary bank (in such capacity, the "***Depositary Bank***"). |
| **Facilities:** | Up to $[83.9] million of first lien senior secured financing consisting of the following facilities (together, the "***Facilities***"): |

      (i)    a term loan facility (the "***Term Facility***," and the loans thereunder, the "***Term Loans***") in an aggregate principal amount of $[54.6] million; and

      (ii)   a letter of credit facility (the "***LC Facility***" and the loans thereunder, the "***LC Loans***", and together with the Term Loans, the "***Loans***") in an aggregate principal amount of up to $[29.3] million.

| | |
|---|---|
| **Purpose:** | Proceeds of the Term Loans will be used to (i) fund construction, development, financing costs in compliance with the construction budget for the Term Facility Availability Period (defined below), (ii) [refinance in full $[●] million of existing senior debt], and (iii) pay the fees and expenses |

2

Alta App.000661

Alta 0031869

incurred in connection with the Facilities (collectively, the "***Transaction Costs***").

On the Closing Date, letters of credit issued under the LC Facility ("***Letters of Credit***") shall be provided as collateral under the interconnect agreements and energy hedge agreements for Project Company, in each case as required thereunder for the period prior to the commercial operation date ("***COD***"). From and after COD, Letters of Credit shall be made available to fund the DSR Account (defined below).[2] Proceeds of the LC Loans will be used for the repayment of any unreimbursed drawings on Letters of Credit.

**Interest Rate Protection:**

Interest rate protection agreements shall be entered into on the Closing Date with any Hedging Bank or, on an unsecured and subordinated basis, with any other commercial bank or affiliate thereof whose long-term unsecured debt at the time such agreement is entered into (taking into account any parent or other affiliate guaranty) is rated at least A- by Standard & Poor's, a division of the McGraw-Hill Companies, Inc. ("***S&P***"), A- by Fitch Ratings Inc. ("***Fitch***") or A3 by Moody's Investors Service, Inc. ("***Moody's***"), to cover at least 80% of the outstanding principal balance of the Term Loans for the expected amortization profile thereof, in each case to be set forth in a financial model to be agreed between the Borrower and ING; provided that at no time shall interest rate swap hedging exceed 105% of (A) during the Term Facility Availability Period, the sum of the outstanding principal balance of the Term Loans and the unutilized Term Loan commitments then in effect and (B) thereafter, the outstanding principal balance of the Term Loans, in each case for the expected amortization profile. The interest rate protection agreements shall include customary provisions for breakage costs, gross up for withholding, compensation for increased costs and compliance with capital adequacy and other regulatory restrictions. Such interest rate protection agreements will terminate at maturity, acceleration, repayment, or involuntary removal of a Hedging Bank (or its affiliate) as a Lender.

**Final Maturity Date:**

Each of the Term Facility and the LC Facility will mature [six] years from the Closing Date (the "***Final Maturity Date***").

**Letters of Credit:[3]**

The LC Facility may be made available for the issuance of Letters of Credit by the Issuing Bank; <u>provided</u> that in no event shall the Issuing Bank be obligated to issue Letters of Credit in an aggregate amount in excess of its commitment to act as the Issuing Bank as of the Closing Date.

No Letter of Credit will have an expiration date later than the earlier of (x) 12 months after its date of issuance or such longer period as may be agreed by the Issuing Bank and (y) the date that is five business days prior to the Final

---

[2] NTD: ING will size the LC facility such that, during construction, it is sufficient to satisfy LGIA and hedge LC obligations. At COD, when such obligations are returned, capacity under the LC facility will be available to satisfy DSR requirements. The DSR Account does not need to be funded prior to COD but Sponsor will also be prohibited from making any distributions during this period. If Sponsor wants the flexibility to make distributions prior to COD, the DSR Account is required to be funded with cash or a letter of credit issued by an entity acceptable to the CLAs for the account of the Sponsor and in respect of which none of the Loan Parties has any reimbursement obligations.

[3] **Note to Draft**: Energy hedge provider security in the form of a pari passu capped first lien.

Alta App.000662

CONFIDENTIAL

Alta 0031870

Maturity Date; <u>provided</u> that any Letter of Credit will be subject to customary evergreen provisions providing for renewal thereof, on terms and conditions to be agreed, for additional periods of up to 12 months or such longer period as maybe agreed by the Issuing Bank (which in no event shall extend beyond the date referred to in clause (y) above).

Drawings under any Letter of Credit shall be reimbursed by the Loan Parties within one business day. To the extent that the Loan Parties do not reimburse the applicable Issuing Bank, so long as no event of default has occurred and is continuing and so long as the LC Loans have not become due and payable, the Loan Parties may elect to convert any unpaid drawings into LC Loans to the extent available under the LC Facility.

Any amounts drawn under any Letter of Credit may be reinstated upon repayment of the applicable reimbursement obligation (including by means of a borrowing if there are otherwise available commitments under the LC Facility) and/or LC Loan and the satisfaction of each of the conditions set forth in "Conditions to all Loan Borrowings and Letter of Credit Issuances after the Closing Date."

If any Lender under the LC Facility becomes a defaulting Lender, then the LC Loan exposure of such defaulting Lender will automatically be reallocated among the non-defaulting Lenders under the LC Facility *pro rata* in accordance with their commitments under the LC Facility up to an amount such that the credit exposure of such non-defaulting Lender does not exceed its commitments under the LC Facility. In the event that such reallocation does not fully cover the exposure of such defaulting Lender, the Issuing Bank may require the Loan Parties to cash collateralize such "uncovered" exposure in respect of each outstanding Letter of Credit and will have no obligation to issue new Letters of Credit, or to extend, renew or amend existing Letters of Credit to the extent Letter of Credit exposure would exceed the commitments of the non-defaulting Lenders under the LC Facility, unless such "uncovered" exposure is cash collateralized.

**Availability:**

Multiple drawings but not more than one per month of the Term Facility may be made starting on the date on which the conditions set forth in the Loan Documents have been satisfied (the "***Closing Date***") based on a draw schedule in Annex II (such period referred to herein as the "***Term Facility Availability Period***"). Once prepaid or repaid, Term Loans may not be reborrowed.

Letters of Credit may be issued, renewed, extended or amended from time to time on and after the Closing Date until the date that is five business days prior to the Final Maturity Date.

**Facility Amortization:**

The Term Loan will be payable (a) in quarterly amounts on the last business day of each quarter following the date of Closing, (b) pursuant to the Excess Cash Flow Sweep described below and (c) with a balloon payment at maturity, as set forth in the scheduled amortization schedule attached hereto as Annex III.

Alta App.000663

Alta 0031871

| | |
|---|---|
| **Excess Cash Flow Sweep:** | On each quarterly payment date, at level (vii) of the Account Waterfall (described below), up to 100% of excess cash shall be swept and applied to prepay the principal amount of the Term Loans as set forth in the scheduled amortization schedule attached hereto (the "***Target Debt Balance***"). |
| | The Target Debt Balance shall be adjusted following mandatory prepayments from the proceeds of asset sales, performance liquidated damages or casualty or condemnation events, in each case, as further described in the in the Loan Documents. |
| **Interest and Fees:** | As set forth on <u>Annex I</u> hereto. |
| **Mandatory Prepayments:** | The Loans will be prepaid in an amount equal to: |

(i) 100% of the net cash proceeds from the sale or other disposition of all or any part of any Project, excluding customary exceptions to be mutually agreed to under the Loan Documents;

(ii) 100% of the net cash proceeds received by any Loan Party from the issuance of debt or equity after the Closing Date other than any debt permitted under the Loan Documents to be incurred by a Loan Party;

(iii) 100% of the net cash proceeds of insurance (other than business interruption insurance) and condemnation proceeds received and paid on account of any casualty or condemnation event, in each case, in respect of any Loan Party that are in excess of certain thresholds to be agreed, other than net cash proceeds that are, subject to the satisfaction of customary conditions, used (or committed to be used) to rebuild, repair or replace the affected asset within [6] months (or such longer period as may be required to rebuild, repair or replace the affected asset if consented to by the Administrative Agent acting at the direction of the Lenders in consultation with the Engineering Consultant following receipt of such net cash proceeds, subject to other customary conditions to be mutually agreed;

(iv) 100% of the net cash proceeds of performance liquidated damages received and paid under applicable Material Project Documents, in each case, in respect of any Loan Party that are in excess of certain thresholds to be agreed, other than net cash proceeds that are required to be applied by such Loan Party to pay damages owed under any other Material Project Document as a result of the same events that caused such performance liquidated damages to be due;100% of the net cash proceeds of termination payments received and paid under commodity agreements, in each case, in respect of any Loan Party that are in excess of certain thresholds to be agreed; and

(v) 100% of the net cash proceeds of termination payments received and paid under commodity agreements, in each case, in respect of any Loan Party that are in excess of certain thresholds to be agreed; and

(vi) 100% of funds trapped in the distribution account for four consecutive quarters due to a failure to meet the Distribution

Alta App.000664

CONFIDENTIAL

Alta 0031872

Conditions (as defined below).

All mandatory prepayments will be applied without penalty or premium (except for swap and LIBOR breakage costs owed to any Lender Party), first, to prepay the Term Loans in inverse order of maturity, second, to prepay LC Loans (without a corresponding reduction in the commitments in respect thereof) and third, to cash collateralize outstanding Letters of Credit in a manner to be agreed.

**Optional Prepayments:** Optional prepayments of the Term Loans are permitted in whole or in part (in minimum amounts and multiples to be agreed), at any time and from time to time, with prior notice but without premium or penalty (except for LIBOR and swap breakage costs and including accrued and unpaid interest.

Optional prepayments shall be applied *pro rata* against the outstanding principal amount of the Term Loans.

**Account Waterfall:** On or prior to the Closing Date, the Loan Parties will each establish a revenue account (the "***Revenue Account***") and other customary project accounts with the Depositary Bank, which shall be pledged as Collateral. All revenues and other amounts received by the Loan Parties (other than any amounts which are otherwise required to make mandatory prepayments of the Term Loans or the proceeds of any permitted indebtedness other than the Facilities, which shall be applied in accordance with the applicable provisions of the Loan Documents) will be deposited into the Revenue Account or other applicable project account under the depositary agreement and applied to the other project accounts in accordance with following priorities:

(i)    construction expenses in respect of Goodlow (prior to completion thereof) (subject to limitations to be agreed);

(ii)    operations and maintenance expenses, administrative management expenses (subject to limitations as agreed) and necessary maintenance capital expenditure expenses in respect of Goodlow (after completion thereof) in excess of amounts available in the MMR Account;

(iii)    administrative fees, costs and expenses due in connection with the Facilities or due to counterparties with respect to any permitted commodity/energy hedge or power sales agreement;

(iv)    interest expense due in connection with the Facilities, ordinary course payments to counterparties with respect to any permitted commodity/energy hedge or power sales agreement, ordinary course interest rate swap settlements and Letter of Credit fees;

(v)    scheduled required principal due in connection with the Term Facility, interest rate swap settlement termination payments, and certain similar amounts due to counterparties with respect to any permitted commodity/energy hedge or power sales agreement;

(vi)    cash sweep to pay any outstanding LC Loans and any unreimbursed drawings on Letter of Credit;

6

Alta App.000665

CONFIDENTIAL

Alta 0031873

|  | (vii) | an Excess Cash Flow sweep on and after the Closing Date under the circumstances described under the heading "Excess Cash Flow Sweep" above; |
|---|---|---|
|  | (viii) | funding of the DSR Account up to the DSR Requirement (as such terms are defined below); |
|  | (ix) | funding of the MMR Account up to the MMR Requirement (as such terms are defined below); and |
|  | (x) | to the distribution account. |

**DSR Account:**

On or prior to the Closing Date, the Loan Parties will establish a debt service reserve account (the "***DSR Account***"), which will be funded upon Closing with the proceeds of an equity contribution from the Sponsor or one or more Acceptable Non-Recourse Letters of Credit (as defined below) and, from and after completion of Goodlow with the issuance of a Letter of Credit to the extent available to be issued in accordance with the terms of the Loan Documents or otherwise with the proceeds of an equity contribution from the Sponsor or one or more Acceptable Non-Recourse Letters of Credit (as defined below) and maintained until maturity of the Term Loans, in an amount equal to the following six months of scheduled amortization payments of principal in respect of the Term Loans (except with regard to the principal payment due at maturity), interest (taking into account any payments projected to be made or received by the Loan Parties under any interest rate protection agreements) and fees (such amount, the "***DSR Requirement***").

To the extent that the DSR Account is funded with a letter of credit other than a Letter of Credit, such letter of credit shall be issued by an institution rated at least A3 by Moody's, A- by Fitch and/or A- by S&P- (provided that such entity satisfies at least two of the aforementioned ratings) and in respect of which no Borrower or Pledgor is liable for (and none of its or their assets are pledged in support of) any drawings thereon (each, an "***Acceptable Non-Recourse Letter of Credit***").

[After Closing, the DSR Account shall be funded in accordance with the account waterfall.]

**Major Maintenance Reserve Requirement:**

On or prior to the Closing Date, the Loan Parties will establish a major maintenance reserve account (the "***MMR Account***"), which will be funded on a schedule to be agreed in consultation with the Engineering Consultant prior to the Closing Date (such amount, the "***MMR Requirement***"), either with cash or the posting of one or more Acceptable Non-Recourse Letters of Credit.[4]

**Collateral:**

The Facilities and, subject to the execution of an intercreditor agreement in form and substance reasonably satisfactory to Administrative Agent and

---

[4] NTD: TBD and subject to review of the Engineer Consultant using analyses customary for refurbished technologies of this type, taking into account any long-term service agreements entered into by the Loan Parties with reserved amounts available to cover major maintenance and other servicing besides ordinary opex.

7

Alta App.000666

Alta 0031874

Collateral Agent and to a cap to be agreed (as described below), any first-lien energy hedging agreement, will be secured by perfected first-priority (subject to permitted liens to be agreed) pledges of all equity interests in each Loan Party, and perfected first-priority (subject to permitted liens to be agreed) security interests in and mortgages on all tangible and intangible assets of each Loan Party, including, but not limited to accounts receivable, deposit and securities accounts (including the DSR Account), revenues of the Project, guarantees, warranties or indemnities, inventory, equipment, intercompany debt, insurance policies, investment property, intellectual property, real property, cash and proceeds of the foregoing) of the Loan Parties or relating to any Project, wherever located, now or hereafter owned other than Excluded Assets (to be defined customarily in the Loan Documents) (collectively, the "***Collateral***").

All such security interests will be created pursuant to usual and customary documentation and, on the Closing Date, such security interests shall become perfected (or arrangements for the perfection thereof reasonably satisfactory to the Administrative Agent shall have been made).

The Loan Parties' obligations with respect to the Term Facility, the LC Facility and the above-described first-lien energy and interest rate hedging as required, will rank *pari passu* with one another in accordance with a customary intercreditor agreement, subject, in the case of the first lien secured energy hedging, to a certain maximum aggregate first lien amount of $[●] and customary voting limitations to be set forth under such intercreditor agreement.

|  |  |
|---|---|
| **Material Project Documents:** | The following project agreements (including, except as set forth below, any amendment, modification or replacement of the same) shall constitute the "***Material Project Documents***": |

    (i) energy hedge, gas supply, water supply, engineering and construction, equipment purchase and warranty, land lease, land purchase, asset management, energy management, operations and maintenance, and interconnect agreements [5] and

    (ii) each additional project document (i) that is a replacement of the above documents or (ii) that would reasonably be expected to require annual payments by any Loan Party in excess of certain annual or aggregate monetary thresholds or the loss of which could reasonably be expected to have a Material Adverse Effect (as defined below).

|  |  |
|---|---|
| **Conditions to Closing Date:** | Usual and customary conditions precedent to the Closing Date for transactions of this kind, including the following: required interest rate hedging; representations and warranties true and correct; payoff and lien release documentation in respect of the existing financing documents being replaced (if required); executed Loan Documents (including an intercreditor agreement) as applicable; an initial base case financial model demonstrating credit metrics to be agreed; an annual operating budget; construction budget |

---

[5]   **Note to Draft**: Subject to due diligence

8

Alta App.000667

Alta 0031875

and schedule; full funding of Sponsor equity in respect of construction costs for Goodlow (and issuance of an Acceptable Non-Recourse Letter of Credit in respect of the portion thereof not funded in cash, to be drawn on a pro rata basis with Term Loan disbursements) in an amount to be mutually agreed and reflecting the agreed construction budget (including contingency) for Goodlow; all required permits and approvals obtained; insurance, including flood insurance (if required); delivery of notices to proceed (as applicable); solvency certificates; all required "know your customer," sanctions risk assessment, anti-money laundering and other information reasonably requested by Lenders; payment of all fees and expenses in connection with the Loan Documents; notice of borrowing; customary legal opinions, good standing certificates, incumbency certificates, resolutions and organizational documents; customary third party Engineering Consultant, Power Market Consultant and Insurance Consultant reports with reasonably appropriate and customary reliance letters; a reasonably satisfactory Phase I ESA, with reasonably appropriate and customary bring-down documentation and reliance letters; customary UCC lien, tax, litigation and judgment searches; perfection of security interest over Collateral; ALTA survey and paid policy from a title insurance company; mortgage; SNDAs, if applicable; a funds flow memorandum and letter of direction; a reasonably satisfactory risk management policy; all Material Project Documents and hedge contracts reasonably satisfactory to Lenders and consents to collateral assignment with the counterparties thereto; customary financial statements from Loan Parties; no default or event of default has occurred and is continuing; and other customary conditions precedents, if any, as reasonably determined necessary pending due diligence.

| | |
|---|---|
| **Conditions to all Loan Borrowings and Letter of Credit Issuances after the Closing Date:** | The several obligations of the Lenders to fund the Loans and issue Letters of Credit under the Facilities on and after the Closing Date will be subject to satisfaction or waiver of conditions precedent as are usual and customary for construction and operating financings of this kind and as reasonably determined necessary pending due diligence, including representations and warranties true and correct; no default or event of default has occurred and is continuing; delivery of borrowing or issuance notice, as applicable; and, with respect to Term Loans, invoicing and validation by Engineering Consultant of achievement of all milestones under the applicable Material Project Documents that will be funded with the requested Term Loans. |
| **Conditions to Project Completion:** | Project completion will be subject to satisfaction or waiver of conditions precedent as are usual and customary for project completion of projects and financings of this kind and as reasonably determined necessary pending due diligence. |
| **Representations and Warranties:** | Usual and customary representations and warranties (subject to materiality qualifiers, etc. to be agreed), including the following: no Material Adverse Effect (as defined below); organization, good standing, existence and compliance with law; power and authority; authorization, execution, delivery and enforceability of the Loan Documents and Material Project Documents; no violation of organizational documents, law or contractual obligations and no imposition of liens (other than permitted liens); no pending or threatened litigation; no default or abandonment; indebtedness (including guarantees); |

9

Alta App.000668

Alta 0031876

title and ownership of property and adequacy of assets; intellectual property; taxes; compliance with government approvals and permits and applicable law; regulatory status; federal reserve regulations; project documents; availability of utility services and infrastructure necessary for the development, construction and operation of the Project; labor matters; ERISA; Investment Company Act and other regulations, including energy regulatory; capitalization and subsidiaries; use of proceeds; environmental matters; financial statements; accuracy of information, etc.; security documents and the creation, perfection and first priority of security interests; solvency; senior indebtedness; flood hazard properties; required insurance; Regulation T, Regulation U and Regulation X; Patriot Act; anti-money laundering laws, anti-corruption laws, anti-terrorism laws and sanctions; federal taxpayer identification number; no accounts other than accounts permitted to exist under the Loan Documents; easements; maintenance of collateral accounts; compliance with flood requirements; no broker's fees; and no other business.

Pledgor will provide representations and warranties, under its equity pledge agreement, with respect to certain limited and customary matters as of the Closing Date.

"***Material Adverse Effect***" shall mean, for purposes of the Loan Documents, a material adverse effect on (a) the business, operations, properties, assets or financial condition of the Loan Parties (taken as a whole), (b) the ability of the Loan Parties to fully and timely perform their respective material obligations under the Loan Documents, (c) the legality, validity, binding effect or enforceability against each Loan Party of the Loan Documents to which it is a party or (d) the rights and remedies available to, or conferred upon, the secured parties under any Loan Document.

| | |
|---|---|
| **Affirmative Covenants:** | Usual and customary affirmative covenants (subject to materiality qualifiers, etc. to be agreed), including the following: payment of obligations and taxes; maintenance of existence and compliance with contractual obligations and requirements of law; performance and enforcement of Material Project Documents; maintenance of title, property and insurance; inspection of property, books and records, and discussions; auditors; compliance with environmental laws; approval of and compliance with construction budget and annual operating budget; construct and maintain the Project in accordance with the Loan Documents and the Material Project Documents; interest rate protection; preservation of, perfection and first priority of collateral; further assurances and additional collateral (including compliance with flood requirements); final title policies and surveys in respect of the Project; maintenance of collateral accounts; maintenance of federal and state energy regulatory authority and/or status; separateness (including appointment of an independent manager); deposit of revenues, net cash proceeds, insurance and condemnation proceeds, etc., in accordance with the Loan Documents; maintain material government approvals and permits; delivery of account control agreements over local accounts; insurance events and restoration plans; use of proceeds; "know your customer"; and compliance with sanctions, anti-money laundering laws, anti-corruption laws and anti-terrorism laws. |

10

Alta App.000669

Alta 0031877

Reporting:  delivery of (1) audited annual consolidated financial statements and unaudited quarterly consolidated financial statements and related certificates, (2) monthly construction reports, monthly operating reports and annual operating plan and budget (as applicable), each in forms to be agreed, and (3) notices relating to certain material events to be agreed; and (if requested) quarterly lender meetings.

Pledgor will agree, under its equity pledge agreement, to certain limited and customary affirmative covenants.

**Negative Covenants:**

Usual and customary negative covenants (subject to materiality qualifiers, etc. to be agreed), including the following:

Capital expenditures (other than mandatory capital expenditures, capital expenditures reimbursed by a third-party, capital expenditures funded with voluntary capital contributions of affiliates of Pledgor (other than the Loan Parties) or otherwise funded in accordance with the account waterfall); construction budget contingencies; construction and operating budget compliance; indebtedness (including guarantees and other contingent liabilities); liens (except for customary permitted liens, which shall include customary pari-passu and subordinated liens on cash, accounts receivable and other accounts securing obligations under permitted hedging agreements, energy management agreements, futures market clearing agreements or otherwise for the benefit of ISOs, RTOs and other parties, in each case subject to caps to be agreed and the execution of customary intercreditor agreements); fundamental changes; engaging in business other than development, construction and operation of the Project; asset sales and dispositions of property; restricted payments (subject to exceptions for distributions among Loan Parties); investments, advances and loans; transactions with affiliates; sale and leaseback transactions; hedging agreements (other than entry into, or the unwinding or modification of, permitted commodity/energy hedge agreements and required interest rate hedges); changes in fiscal periods and accounting policies; negative pledge clauses; no restriction on subsidiary distributions to Loan Parties; lines of business; partnerships and formation of subsidiaries, etc.; maintenance of accounts; tax elections;[6] ERISA; organizational documents; terminations or assignments of, amendments to, waivers or consents, and entry into Material Project Documents or, prior to project completion, change order in respect of construction contracts; restrictions on acquisition of material real property without delivery of an environmental report and satisfaction of flood requirements; Pledgor to not conduct material business other than as a passive holding company; anti-terrorism laws, anti-money laundering laws, anti-bribery laws and laws related to sanctioned persons; no approving the results of any performance test (or similar) in conjunction with project completion without confirmation by the Engineering Consultant; and margin stock.

Pledgor will agree, under its equity pledge agreements, to certain limited and

---

[6] **Note to Draft**: Each Loan Party shall be a "pass through" entity for US federal income tax purposes.

11

Alta App.000670

Alta 0031878

customary negative covenants.

| | |
|---|---|
| **Financial Covenants:** | The Borrower shall not permit the Debt Service Coverage Ratio (to be defined in the Loan Documents) for any period of four consecutive fiscal quarters ending on any quarterly measurement date to be below 1.05:1.00. |

**Distribution Conditions:**   The Loan Parties may make distributions to Pledgor or any affiliate thereof upon satisfaction of the following conditions (collectively, the "***Distribution Conditions***"):

     (i)     no default or event of default under the Loan Documents shall have occurred and be continuing or would result from such distribution;

     (ii)     each DSR Account shall be funded in satisfaction of the DSR Requirement;

     (iii)     all drawn amounts of Letters of Credit shall have been reimbursed;

     (iv)     no LC Loans are outstanding;

     (v)     the outstanding principal balance of the Term Loans does not exceed the then-applicable Target Debt Balance;

     (vi)     substantial project completion (as defined in the EPC Contract) has occurred; and

     (vii)     delivery by the Loan Parties of an officer's certificate certifying that the Debt Service Coverage Ratio (to be defined in the Loan Documents) for the period of four consecutive fiscal quarters, or such shorter period as has elapsed since the Closing Date, of the Loan Parties most recently ended was at least 1.20:1.00; and

     (viii)     the Minimum Energy Hedging Requirement is then satisfied.

The "***Minimum Energy Hedging Requirement***" means that at least 90%[7] of the aggregate nameplate capacity of the Project is subject to energy hedging agreements with counterparties satisfying to-be-agreed creditworthiness requirements and with a weighted average hedge price across all such energy hedging agreements that causes (a) Debt Service Coverage Ratio for quarterly period in the scheduled amortization profile to be at least 1.00:1.00 and (b) generates sufficient revenue to allow prepayments pursuant to the Excess Cash Flow Sweep such that the outstanding principal balance of the Term Loans does not exceed the Target Debt Balance as of any quarterly payment date, in each case calculated on a pro forma basis by updating the Closing Date base case financial model to reflect such energy hedge agreements.

**Events of Default:**   Events of default will include the following (subject to materiality qualifiers,

---

[7] NTD: To be discussed in further detail based on current hedging proposal.

Alta App.000671

CONFIDENTIAL

Alta 0031879

etc. to be agreed): nonpayment of obligations under Loan Documents; breach of representations and covenants; cross-payment default and cross-acceleration to certain other debt (including any interest rate hedging agreement); bankruptcy and insolvency events with respect to a Loan Party or Pledgor; ERISA events; judgments; invalidity or imperfection of first-priority lien on a material portion of the Collateral; Change of Control (as defined below); invalidity of Loan Documents; termination (and related customary events) under a Material Project Document that is not replaced; loss of permits or regulatory status; failure to achieve project completion (to be defined customarily) by a date certain to be agreed; activities of Pledgor (other than holding company activities); voluntary abandonment;; and cross-payment default and cross-acceleration under certain Material Project Documents.

| | |
|---|---|
| **Change of Control:** | A "***Change of Control***" means the consummation of any transaction or series of related transactions the result of which is that any one or more of the following shall occur: (a) the Designated Holders (as defined below), in the aggregate, shall fail to own directly or indirectly more than 50% of the economic and voting stock of Pledgor (on a fully diluted basis); (b) the Designated Holders, in the aggregate, shall fail to have the power, directly or indirectly, to direct the management of Pledgor, or Pledgor shall fail to have such power in respect of the Loan Parties; or (c) at any time, Pledgor shall fail to own directly 100% of the economic and voting stock of the Loan Parties (on a fully diluted basis). |

"***Designated Holders***" means (a) the Sponsor and (b) following completion of the Project, any Qualified Owner (as defined below).

"***Qualified Owner***" means any person that (a) has, or is a direct or indirect subsidiary of a person, or comprises a fund or account or other investment vehicle managed or controlled by a person, that has, or has its obligations in respect of its direct or indirect ownership interests in the Loan Parties guaranteed by a person that has, in each case, a tangible net worth (or assets under management) of at least $300 million or is a majority owned subsidiary of such person, (b) is a Qualified Operator (as defined below), has an affiliate that is a Qualified Operator or has contracted or caused the Loan Parties to contract or maintain in effect a contract for the operation of the Project by a Qualified Operator, and (c) prior to such person becoming an owner, directly or indirectly, of outstanding stock in Pledgor (other than as a result of any acquisition or transfer of any limited partnership or similar non-managing direct or indirect interest in any Designated Holder), has complied with all applicable "know your customer" and anti-money laundering requirements of the Lenders, consistently applied.

"***Qualified Operator***" means a person, including Sponsor, that is (or is a subsidiary of) a person that owns a controlling interest in or manages (or has owned or has managed over at least two years continuously in the past seven years) a Comparable Project (in each case, either directly or through management of controlling investments in persons who are engaged in constructing, owning and operating a Comparable Project).

"***Comparable Project***" means one or more natural gas- or distillate fuel oil-fired electric generating facilities located in the United States that are of a

13

CONFIDENTIAL

size, in aggregate, substantially similar to or greater than 300 MW, of which at least 66-2/3% shall be in the ERCOT market.

**Materiality, Etc.:**

The representations and warranties, affirmative and negative covenants and events of default described above will contain customary materiality qualifications, exceptions, dollar thresholds, baskets and cure periods to be agreed, provided that equity cure rights shall not be exercisable more than twice in any 12-month period or four times in the aggregate.

**Assignments; Participations:**

Each Lender may assign all or a portion of its loans and commitments under one or more of the Facilities to other Lenders, their affiliates, any central bank or Federal Reserve Bank (collectively, "***Permitted Assignees***").

All assignments will require the consent of the Administrative Agent and the Loan Parties, such consent not to be unreasonably withheld, conditioned or delayed; provided that no consent of the Loan Parties shall be required (a) if such assignment is made to a Permitted Assignee who is not a Disqualified Lender (to be defined in the Loan Documents) or (b) if an event of default has occurred and is continuing. The Loan Parties' consent shall be deemed given if the Loan Parties have not responded within ten business days of a request for such consent.

The Lenders will be permitted to sell participations in loans and commitments without restriction; provided, however, that (i) such Lender's obligations under the credit agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties and the Lender Parties shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under the credit agreement.

Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision thereof; provided that such agreement may provide that such Lender will not, without the consent of the participant, agree to any amendment, modification or waiver that (a) requires the consent of each Lender directly affected thereby and (b) directly affects such participant.

**Yield Protection, Taxes, Indemnification and Expense Reimbursement:**

The Loan Documents will contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, capital adequacy, liquidity, and other requirements of law (including but not limited to provisions relating to Dodd-Frank and Basel III) and from the imposition of or changes in certain withholding or other taxes, (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a LIBOR borrowings on a day other than the last day of an interest period with respect thereto and (c) for withholding tax gross-up, indemnification and expense reimbursement.

**Amendments and Waivers:**

Consent of Lenders holding at least a majority of funded and unfunded commitments under the Facilities will be required for amendments, waivers and consents of or under the Loan Documents, with consent of (i) a majority

14

Alta App.000673

CONFIDENTIAL

Alta 0031881

of each class of Lenders or (ii) all affected Lenders, in each case required for those amendments, waivers and consents that customarily require consent of (A) a majority of each class of Lenders or (B) all affected Lenders, respectively.    Issuing Banks and the Administrative Agent shall have customary voting rights.  Certain customary matters will require the unanimous consent of the Lenders.

**Lender Replacement Rights:**    The Loan Parties will have the right to remove a Lender that (i) is a "defaulting lender" (to be defined in the Loan Documents), (ii) requests payment of certain increased costs or indemnified taxes, (iii) does not agree to an amendment, waiver or consent that requires unanimous Lender approval and is approved by Lenders holding at least a majority of funded and unfunded commitments under the Facilities or (iv) provides a notice to the Loan Parties that such Lender requests a conversion of Adjusted LIBOR Loans to Base Rate Loans, unless in connection with the permanent discontinuance of LIBOR.  If the Loan Parties exercise such right, the Loan Parties shall remove Lenders at par by (x) paying all outstanding principal and interest owed to such Lender, and removing the Lender as a secured hedge provider, or (y) paying all outstanding interest owed to such Lender and arranging for another Lender or permitted assignee to take an assignment of all outstanding principal obligations and commitments of such Lender, and removing the Lender as a secured hedge provider.

**Defaulting Lender:**    The Loan Documents will contain customary provisions with respect to "defaulting lenders," including, without limitation, voting restrictions on, and ability of the Loan Parties to withhold fees and interest from and, as described under the heading "Lender Replacement Rights" above, remove, any "defaulting lender."

**Governing Law:**    The State of New York, except as to real estate and certain other collateral documents required to be governed by Texas law.  Each party to the Loan Documents will waive the right to trial by jury and will consent to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, the City of New York.

**Counsel to the Pledgor and the Borrower:**    [ ]

**Counsel to the Lead Lender and Hedging Bank:**    Mayer Brown LLP

**Engineering Consultant:**    [Leidos]

**Power Market Consultant:**    [ICF International]

**Insurance Consultant:**    [Moore McNeil]

**Environmental Consultant:**    [ERM]

15

Alta App.000674

Alta 0031882

<div align="right">
<u>Annex I</u> to

Term Sheet
</div>

| | |
|---|---|
| **Interest Rates:** | The interest rates under the Facilities will, at the option of the Loan Parties, be (i) Adjusted LIBOR <u>plus</u> the Applicable Adjusted LIBOR Margin (as defined below) or (ii) ABR <u>plus</u> the Applicable ABR Margin (as defined below). |

The Loan Parties may elect interest periods of 3 months for borrowings of Adjusted LIBOR (as defined below).

Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days with respect to Loans bearing interest with reference to Adjusted LIBOR (or 365 or 366 days, as the case may be, in the case of ABR loans based on the Administrative Agent's prime rate).

"***Adjusted LIBOR***" shall mean the London Interbank Offered Rate for corresponding deposits of U.S. dollars, adjusted for maximum statutory reserve requirements (if any) and, in any event, not to be less than 1.00%.

The Loan Documents will contain Adjusted LIBOR fallback language consistent with the amendment approach from form language proposed by the Alternative Reference Rates Committee for syndicated loans and, in any event, not to be less than 1.00%.

"***ABR***" is the Alternative Base Rate, which means, for any day, a fluctuating rate *per annum* equal to the highest (and, in any event, not to be less than 2.00%) of (i) the Federal Funds Effective Rate plus 0.50%, (ii) the average rate of interest in effect for such day as publicly announced from time to time by the Administrative Agent as its "prime rate", and (iii) Adjusted LIBOR for an interest period of one month plus 1.00%. The "***prime rate***" is the rate set by the Administrative Agent based upon various factors including its costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by the Administrative Agent shall take effect at the opening of business on the day specified in the public announcement of such change.

"***Federal Funds Effective Rate***" means, for any day, the rate *per annum* (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published on the

<div align="right">
Alta App.000675
</div>

CONFIDENTIAL

<div align="right">
Alta 0031883
</div>

next succeeding business day by the Federal Reserve Bank of New York; *provided* that, (a) if the day for which such rate is to be determined is not a business day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding business day as so published on the next succeeding business day and (b) if such rate is not so published for any day that is a business day, the Federal Funds Effective Rate for such day shall be the average of the quotations for such day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by the Administrative Agent.

| | |
|---|---|
| **Pricing:** | *"**Applicable ABR Margin**"* shall be 2.50% increasing by (x) 25 basis points upon each of the third and sixth anniversaries of the Closing Date and (y) [__] basis points at any point that the Minimum Energy Hedging Requirement is not satisfied. |
| | "***Applicable Adjusted LIBOR Margin**"* shall be 3.50% increasing by (x) 25 basis points upon each of the third and sixth anniversaries of the Closing Date and (y) [__] basis points at any point that the Minimum Energy Hedging Requirement is not satisfied. |
| | "***Drawn Fees**"* shall be equal to the Applicable Adjusted LIBOR Margin |
| | "***Swap Credit Margin**"* shall be 0.20%. |
| **Payments:** | Interest on the Loans bearing interest at Adjusted LIBOR shall be paid in arrears on the last day of the relevant interest period (*provided* that interest shall be paid no less frequently than quarterly), subject to the modified business day convention. Interest on the Loans bearing interest at ABR shall be paid on each March 31, June 30, September 30 and December 31 (each, a "***Payment Date**"*) commencing March 31, 2020. |
| | The Drawn Fees on the notional stated amount of issued Letters of Credit shall be paid on each Payment Date commencing at least one full calendar quarter after the Closing Date. |
| | The Swap Credit Margin on the notional amount of interest rate hedges by the Hedging Bank shall be applied on each Payment Date. |
| **Upfront Fees:** | 2.50% of the Facilities, due and payable on the Closing Date. |

2

Alta App.000676

Alta 0031884

| | |
|---|---|
| **Commitment Fees**: | An amount per annum equal to 0.75% on the average daily undrawn portion of the commitments in respect of the Term Facility and Letters of Credit, payable to the Lenders under the Term Facility and Letters of Credit (other than defaulting Lenders) quarterly in arrears on the signing date of the Loan Documents and upon the termination of the commitments, calculated based on the number of days elapsed in a 360-day year. |
| **Coordinated Lead Arranger Fee:** | $[500,000], due and payable on the Closing Date |

3

Alta App.000677

CONFIDENTIAL

Alta 0031885

Annex II to the Term Sheet

**Term Facility Draw Schedule**

[]

4

Alta App.000678

CONFIDENTIAL

Alta 0031886

Annex III to the Term Sheet

**Mandatory Amortization and Target Debt Balance Schedule[8]**

| Start Date | End Date | Amortization ($ 000s) | Target Debt Balance ($ 000s) |
|---|---|---|---|

---

[8] TBD based on final model and closing date.

5

Alta App.000679

Alta 0031887

## **PROJECT GOODLOW**

*This summary of principal financing terms and conditions (this "**Term Sheet**") outlines the material terms and conditions that will govern the Facilities (as defined below). For the purposes hereof, the term "**Loan Documents**" shall mean the definitive loan documentation with respect to the Facilities on the terms and conditions set forth herein and otherwise mutually acceptable to the parties, including, without limitation, one or more credit agreements, guarantees, security agreements, intercreditor agreements, pledge agreements, and other related definitive documents. This Term Sheet is not a commitment by the lenders, any issuing bank or any of their respective affiliates to provide, arrange, purchase or underwrite the Facilities described herein or an agreement to deliver such a commitment. Any such commitment will be issued only in writing and will be subject to appropriate documentation. This Term Sheet shall not be considered exhaustive as to the terms and conditions which govern the Facilities and is subject, in all respects, to the final terms and conditions set forth in the executed Loan Documents. This Term Sheet is confidential and may not be disclosed to third parties (other than to employees and professional advisors of Alta Power LLC (and its affiliates) on a need-to-know basis and as may be required by law, regulation, court order or subpoena) without ING Capital LLC's written consent.*

### **150 MW Term Financing**

$[54.6] million Term Loan Facility
$[29.3] million Letter of Credit Facility

<u>Summary of Principal Terms and Conditions</u>

| | |
|---|---|
| **Project Company:** | A [Texas][1] limited liability company (the "**Project Company**") will be the owner of the Project (as defined below). |
| **Project Holdco:** | A Texas limited liability company ("**Project Holdco**") has been formed to be the direct owner of the Project Company. |
| **Project Holdco Pledgor:** | A Texas limited liability company ("**Project Holdco Pledgor**") has been formed to be the direct owner of Project Holdco. |
| **Borrower:** | Project Holdco (the "**Borrower**"). |
| **Pledgor:** | Project Holdco Pledgor (the "**Pledgor**"). |
| **Loan Parties:** | The Project Company, the Borrower and the Pledgor (the "**Loan Parties**"). |
| **Sponsor:** | Alta Power LLC, a Delaware limited liability company (the "**Sponsor**") will be the majority direct or indirect owner of Project Holdco Pledgor. |

---

[1] NTD: We would expect SPVs to be Delaware entities.

1

Alta App.000680

CONFIDENTIAL

Alta 0031888

| | |
|---|---|
| **Project:** | Goodlow, a 150MW gas-fired peaker ("***Goodlow***") |
| **Lenders:** | The Term Lenders (defined below) and the lenders under the Letter of Credit Facility (the "LC Lenders," and, collectively with the Term Lenders, the "***Lenders***", and together with the Administrative Agent, Collateral Agent and the Issuing Banks, the "***Lender Parties***"). |
| **Sole Bookrunner and Coordinating Lead Arranger:** | ING Capital LLC ("ING") |
| **Term Lenders:** | ING and a syndicate of banks, financial institutions and other entities (other than Disqualified Institutions (to be defined in the Loan Documents)) approved by the Loan Parties with commitments in respect of the Term Facility (collectively, the "***Term Lenders***"). |
| **ING Commitment and Final Hold:** | Up to $50 million of the Facilities (defined below) |
| **Hedging Bank:** | ING (or one of its affiliates) and one or more other Term Lenders (if any) agreeing to act in such capacity and acceptable to the Borrower (each, a "***Hedging Bank***"). |
| **Issuing Banks:** | One or more LC Lenders (if any) agreeing to act in such capacity and acceptable to the Borrower (each, an "***Issuing Bank***"). |
| **Administrative Agent:** | [TBD] ("***Agent Bank***") will act as the sole and exclusive administrative agent (in such capacity, the "***Administrative Agent***") for the Lenders. |
| **Collateral Agent:** | [TBD] will act as the sole and exclusive collateral agent (in such capacity, the "***Collateral Agent***") for the secured parties. |
| **Depositary Bank:** | [TBD] will act as the sole and exclusive depositary bank (in such capacity, the "***Depositary Bank***"). |
| **Facilities:** | Up to $[83.9] million of first lien senior secured financing consisting of the following facilities (together, the "***Facilities***"): |

    (i)    a term loan facility (the "***Term Facility***," and the loans thereunder, the "***Term Loans***") in an aggregate principal amount of $[54.6] million; and

    (ii)    a letter of credit facility (the "***LC Facility***" and the loans thereunder, the "***LC Loans***", and together with the Term Loans, the "***Loans***") in an aggregate principal amount of up to $[29.3] million.

| | |
|---|---|
| **Purpose:** | Proceeds of the Term Loans will be used to (i) fund construction, development, financing costs in compliance with the construction budget for the Term Facility Availability Period (defined below), (ii) [refinance in full $[●] million of existing senior debt], and (iii) pay the fees and expenses |

2

Alta App.000681

Alta 0031889

incurred in connection with the Facilities (collectively, the "***Transaction Costs***").

On the Closing Date, letters of credit issued under the LC Facility ("***Letters of Credit***") shall be provided as collateral under the interconnect agreements and energy hedge agreements for Project Company, in each case as required thereunder for the period prior to the commercial operation date ("***COD***"). From and after COD, Letters of Credit shall be made available to fund the DSR Account (defined below).[2] Proceeds of the LC Loans will be used for the repayment of any unreimbursed drawings on Letters of Credit.

**Interest Rate Protection:**    Interest rate protection agreements shall be entered into on the Closing Date with any Hedging Bank or, on an unsecured and subordinated basis, with any other commercial bank or affiliate thereof whose long-term unsecured debt at the time such agreement is entered into (taking into account any parent or other affiliate guaranty) is rated at least A- by Standard & Poor's, a division of the McGraw-Hill Companies, Inc. ("***S&P***"), A- by Fitch Ratings Inc. ("***Fitch***") or A3 by Moody's Investors Service, Inc. ("***Moody's***"), to cover at least 80% of the outstanding principal balance of the Term Loans for the expected amortization profile thereof, in each case to be set forth in a financial model to be agreed between the Borrower and ING; provided that at no time shall interest rate swap hedging exceed 105% of (A) during the Term Facility Availability Period, the sum of the outstanding principal balance of the Term Loans and the unutilized Term Loan commitments then in effect and (B) thereafter, the outstanding principal balance of the Term Loans, in each case for the expected amortization profile. The interest rate protection agreements shall include customary provisions for breakage costs, gross up for withholding, compensation for increased costs and compliance with capital adequacy and other regulatory restrictions. Such interest rate protection agreements will terminate at maturity, acceleration, repayment, or involuntary removal of a Hedging Bank (or its affiliate) as a Lender.

**Final Maturity Date:**    Each of the Term Facility and the LC Facility will mature [six] years from the Closing Date (the "***Final Maturity Date***").

**Letters of Credit:**[3]    The LC Facility may be made available for the issuance of Letters of Credit by the Issuing Bank; <u>provided</u> that in no event shall the Issuing Bank be obligated to issue Letters of Credit in an aggregate amount in excess of its commitment to act as the Issuing Bank as of the Closing Date.

No Letter of Credit will have an expiration date later than the earlier of (x) 12 months after its date of issuance or such longer period as may be agreed by the Issuing Bank and (y) the date that is five business days prior to the Final

---

[2] NTD: ING will size the LC facility such that, during construction, it is sufficient to satisfy LGIA and hedge LC obligations. At COD, when such obligations are returned, capacity under the LC facility will be available to satisfy DSR requirements. The DSR Account does not need to be funded prior to COD but Sponsor will also be prohibited from making any distributions during this period. If Sponsor wants the flexibility to make distributions prior to COD, the DSR Account is required to be funded with cash or a letter of credit issued by an entity acceptable to the CLAs for the account of the Sponsor and in respect of which none of the Loan Parties has any reimbursement obligations.

[3]    **Note to Draft**: Energy hedge provider security in the form of a pari passu capped first lien.

Alta App.000682

Maturity Date; provided that any Letter of Credit will be subject to customary evergreen provisions providing for renewal thereof, on terms and conditions to be agreed, for additional periods of up to 12 months or such longer period as maybe agreed by the Issuing Bank (which in no event shall extend beyond the date referred to in clause (y) above).

Drawings under any Letter of Credit shall be reimbursed by the Loan Parties within one business day. To the extent that the Loan Parties do not reimburse the applicable Issuing Bank, so long as no event of default has occurred and is continuing and so long as the LC Loans have not become due and payable, the Loan Parties may elect to convert any unpaid drawings into LC Loans to the extent available under the LC Facility.

Any amounts drawn under any Letter of Credit may be reinstated upon repayment of the applicable reimbursement obligation (including by means of a borrowing if there are otherwise available commitments under the LC Facility) and/or LC Loan and the satisfaction of each of the conditions set forth in "Conditions to all Loan Borrowings and Letter of Credit Issuances after the Closing Date."

If any Lender under the LC Facility becomes a defaulting Lender, then the LC Loan exposure of such defaulting Lender will automatically be reallocated among the non-defaulting Lenders under the LC Facility *pro rata* in accordance with their commitments under the LC Facility up to an amount such that the credit exposure of such non-defaulting Lender does not exceed its commitments under the LC Facility. In the event that such reallocation does not fully cover the exposure of such defaulting Lender, the Issuing Bank may require the Loan Parties to cash collateralize such "uncovered" exposure in respect of each outstanding Letter of Credit and will have no obligation to issue new Letters of Credit, or to extend, renew or amend existing Letters of Credit to the extent Letter of Credit exposure would exceed the commitments of the non-defaulting Lenders under the LC Facility, unless such "uncovered" exposure is cash collateralized.

**Availability:**                   Multiple drawings but not more than one per month of the Term Facility may be made starting on the date on which the conditions set forth in the Loan Documents have been satisfied (the "***Closing Date***") based on a draw schedule in Annex II (such period referred to herein as the "***Term Facility Availability Period***"). Once prepaid or repaid, Term Loans may not be reborrowed.

Letters of Credit may be issued, renewed, extended or amended from time to time on and after the Closing Date until the date that is five business days prior to the Final Maturity Date.

**Facility Amortization:**          The Term Loan will be payable (a) in quarterly amounts on the last business day of each quarter following the date of Closing, (b) pursuant to the Excess Cash Flow Sweep described below and (c) with a balloon payment at maturity, as set forth in the scheduled amortization schedule attached hereto as Annex III.

4

Alta App.000683

Alta 0031891

| | |
|---|---|
| **Excess Cash Flow Sweep:** | On each quarterly payment date, at level (vii) of the Account Waterfall (described below), up to 100% of excess cash shall be swept and applied to prepay the principal amount of the Term Loans as set forth in the scheduled amortization schedule attached hereto (the "***Target Debt Balance***"). |
| | The Target Debt Balance shall be adjusted following mandatory prepayments from the proceeds of asset sales, performance liquidated damages or casualty or condemnation events, in each case, as further described in the in the Loan Documents. |
| **Interest and Fees:** | As set forth on <u>Annex I</u> hereto. |
| **Mandatory Prepayments:** | The Loans will be prepaid in an amount equal to: |

(i) 100% of the net cash proceeds from the sale or other disposition of all or any part of any Project, excluding customary exceptions to be mutually agreed to under the Loan Documents;

(ii) 100% of the net cash proceeds received by any Loan Party from the issuance of debt or equity after the Closing Date other than any debt permitted under the Loan Documents to be incurred by a Loan Party;

(iii) 100% of the net cash proceeds of insurance (other than business interruption insurance) and condemnation proceeds received and paid on account of any casualty or condemnation event, in each case, in respect of any Loan Party that are in excess of certain thresholds to be agreed, other than net cash proceeds that are, subject to the satisfaction of customary conditions, used (or committed to be used) to rebuild, repair or replace the affected asset within [6] months (or such longer period as may be required to rebuild, repair or replace the affected asset if consented to by the Administrative Agent acting at the direction of the Lenders in consultation with the Engineering Consultant following receipt of such net cash proceeds, subject to other customary conditions to be mutually agreed;

(iv) 100% of the net cash proceeds of performance liquidated damages received and paid under applicable Material Project Documents, in each case, in respect of any Loan Party that are in excess of certain thresholds to be agreed, other than net cash proceeds that are required to be applied by such Loan Party to pay damages owed under any other Material Project Document as a result of the same events that caused such performance liquidated damages to be due;100% of the net cash proceeds of termination payments received and paid under commodity agreements, in each case, in respect of any Loan Party that are in excess of certain thresholds to be agreed; and

(v) 100% of the net cash proceeds of termination payments received and paid under commodity agreements, in each case, in respect of any Loan Party that are in excess of certain thresholds to be agreed; and

(vi) 100% of funds trapped in the distribution account for four consecutive quarters due to a failure to meet the Distribution

Alta App.000684

CONFIDENTIAL

Alta 0031892

Conditions (as defined below).

All mandatory prepayments will be applied without penalty or premium (except for swap and LIBOR breakage costs owed to any Lender Party), <u>first</u>, to prepay the Term Loans in inverse order of maturity, <u>second</u>, to prepay LC Loans (without a corresponding reduction in the commitments in respect thereof) and <u>third,</u> to cash collateralize outstanding Letters of Credit in a manner to be agreed.

**Optional Prepayments:**

Optional prepayments of the Term Loans are permitted in whole or in part (in minimum amounts and multiples to be agreed), at any time and from time to time, with prior notice but without premium or penalty (except for LIBOR and swap breakage costs and including accrued and unpaid interest.

Optional prepayments shall be applied *pro rata* against the outstanding principal amount of the Term Loans.

**Account Waterfall:**

On or prior to the Closing Date, the Loan Parties will each establish a revenue account (the "***Revenue Account***") and other customary project accounts with the Depositary Bank, which shall be pledged as Collateral. All revenues and other amounts received by the Loan Parties (other than any amounts which are otherwise required to make mandatory prepayments of the Term Loans or the proceeds of any permitted indebtedness other than the Facilities, which shall be applied in accordance with the applicable provisions of the Loan Documents) will be deposited into the Revenue Account or other applicable project account under the depositary agreement and applied to the other project accounts in accordance with following priorities:

(i)    construction expenses in respect of Goodlow (prior to completion thereof) (subject to limitations to be agreed);

(ii)    operations and maintenance expenses, administrative management expenses (subject to limitations as agreed) and necessary maintenance capital expenditure expenses in respect of Goodlow (after completion thereof) in excess of amounts available in the MMR Account;

(iii)    administrative fees, costs and expenses due in connection with the Facilities or due to counterparties with respect to any permitted commodity/energy hedge or power sales agreement;

(iv)    interest expense due in connection with the Facilities, ordinary course payments to counterparties with respect to any permitted commodity/energy hedge or power sales agreement, ordinary course interest rate swap settlements and Letter of Credit fees;

(v)    scheduled required principal due in connection with the Term Facility, interest rate swap settlement termination payments, and certain similar amounts due to counterparties with respect to any permitted commodity/energy hedge or power sales agreement;

(vi)    cash sweep to pay any outstanding LC Loans and any unreimbursed drawings on Letter of Credit;

6

Alta App.000685

Alta 0031893

|  | (vii) | an Excess Cash Flow sweep on and after the Closing Date under the circumstances described under the heading "Excess Cash Flow Sweep" above; |
|  | (viii) | funding of the DSR Account up to the DSR Requirement (as such terms are defined below); |
|  | (ix) | funding of the MMR Account up to the MMR Requirement (as such terms are defined below); and |
|  | (x) | to the distribution account. |

**DSR Account:** On or prior to the Closing Date, the Loan Parties will establish a debt service reserve account (the "***DSR Account***"), which will be funded upon Closing with the proceeds of an equity contribution from the Sponsor or one or more Acceptable Non-Recourse Letters of Credit (as defined below) and, from and after completion of Goodlow with the issuance of a Letter of Credit to the extent available to be issued in accordance with the terms of the Loan Documents or otherwise with the proceeds of an equity contribution from the Sponsor or one or more Acceptable Non-Recourse Letters of Credit (as defined below) and maintained until maturity of the Term Loans, in an amount equal to the following six months of scheduled amortization payments of principal in respect of the Term Loans (except with regard to the principal payment due at maturity), interest (taking into account any payments projected to be made or received by the Loan Parties under any interest rate protection agreements) and fees (such amount, the "***DSR Requirement***").

To the extent that the DSR Account is funded with a letter of credit other than a Letter of Credit, such letter of credit shall be issued by an institution rated at least A3 by Moody's, A- by Fitch and/or A- by S&P- (underline provided that such entity satisfies at least two of the aforementioned ratings) and in respect of which no Borrower or Pledgor is liable for (and none of its or their assets are pledged in support of) any drawings thereon (each, an "***Acceptable Non-Recourse Letter of Credit***").

[After Closing, the DSR Account shall be funded in accordance with the account waterfall.]

**Major Maintenance Reserve Requirement:** On or prior to the Closing Date, the Loan Parties will establish a major maintenance reserve account (the "***MMR Account***"), which will be funded on a schedule to be agreed in consultation with the Engineering Consultant prior to the Closing Date (such amount, the "***MMR Requirement***"), either with cash or the posting of one or more Acceptable Non-Recourse Letters of Credit.[4]

**Collateral:** The Facilities and, subject to the execution of an intercreditor agreement in form and substance reasonably satisfactory to Administrative Agent and

---

[4] NTD: TBD and subject to review of the Engineer Consultant using analyses customary for refurbished technologies of this type, taking into account any long-term service agreements entered into by the Loan Parties with reserved amounts available to cover major maintenance and other servicing besides ordinary opex.

Alta App.000686

CONFIDENTIAL

Alta 0031894

Collateral Agent and to a cap to be agreed (as described below), any first-lien energy hedging agreement, will be secured by perfected first-priority (subject to permitted liens to be agreed) pledges of all equity interests in each Loan Party, and perfected first-priority (subject to permitted liens to be agreed) security interests in and mortgages on all tangible and intangible assets of each Loan Party, including, but not limited to accounts receivable, deposit and securities accounts (including the DSR Account), revenues of the Project, guarantees, warranties or indemnities, inventory, equipment, intercompany debt, insurance policies, investment property, intellectual property, real property, cash and proceeds of the foregoing) of the Loan Parties or relating to any Project, wherever located, now or hereafter owned other than Excluded Assets (to be defined customarily in the Loan Documents) (collectively, the "*Collateral*").

All such security interests will be created pursuant to usual and customary documentation and, on the Closing Date, such security interests shall have become perfected (or arrangements for the perfection thereof reasonably satisfactory to the Administrative Agent shall have been made).

The Loan Parties' obligations with respect to the Term Facility, the LC Facility and the above-described first-lien energy and interest rate hedging as required, will rank *pari passu* with one another in accordance with a customary intercreditor agreement, subject, in the case of the first lien secured energy hedging, to a certain maximum aggregate first lien amount of $[●] and customary voting limitations to be set forth under such intercreditor agreement.

**Material Project Documents:**    The following project agreements (including, except as set forth below, any amendment, modification or replacement of the same) shall constitute the "*Material Project Documents*":

    (i) energy hedge, gas supply, water supply, engineering and construction, equipment purchase and warranty, land lease, land purchase, asset management, energy management, operations and maintenance, and interconnect agreements [5] and

    (ii) each additional project document (i) that is a replacement of the above documents or (ii) that would reasonably be expected to require annual payments by any Loan Party in excess of certain annual or aggregate monetary thresholds or the loss of which could reasonably be expected to have a Material Adverse Effect (as defined below).

**Conditions to Closing Date:**    Usual and customary conditions precedent to the Closing Date for transactions of this kind, including the following: required interest rate hedging; representations and warranties true and correct; payoff and lien release documentation in respect of the existing financing documents being replaced (if required); executed Loan Documents (including an intercreditor agreement) as applicable; an initial base case financial model demonstrating credit metrics to be agreed; an annual operating budget; construction budget

---

[5] **Note to Draft**: Subject to due diligence

8

Alta App.000687

Alta 0031895

and schedule; full funding of Sponsor equity in respect of construction costs for Goodlow (and issuance of an Acceptable Non-Recourse Letter of Credit in respect of the portion thereof not funded in cash, to be drawn on a pro rata basis with Term Loan disbursements) in an amount to be mutually agreed and reflecting the agreed construction budget (including contingency) for Goodlow; all required permits and approvals obtained; insurance, including flood insurance (if required); delivery of notices to proceed (as applicable); solvency certificates; all required "know your customer," sanctions risk assessment, anti-money laundering and other information reasonably requested by Lenders; payment of all fees and expenses in connection with the Loan Documents; notice of borrowing; customary legal opinions, good standing certificates, incumbency certificates, resolutions and organizational documents; customary third party Engineering Consultant, Power Market Consultant and Insurance Consultant reports with reasonably appropriate and customary reliance letters; a reasonably satisfactory Phase I ESA, with reasonably appropriate and customary bring-down documentation and reliance letters; customary UCC lien, tax, litigation and judgment searches; perfection of security interest over Collateral; ALTA survey and paid policy from a title insurance company; mortgage; SNDAs, if applicable; a funds flow memorandum and letter of direction; a reasonably satisfactory risk management policy; all Material Project Documents and hedge contracts reasonably satisfactory to Lenders and consents to collateral assignment with the counterparties thereto; customary financial statements from Loan Parties; no default or event of default has occurred and is continuing; and other customary conditions precedents, if any, as reasonably determined necessary pending due diligence.

|  |  |
|---|---|
| **Conditions to all Loan Borrowings and Letter of Credit Issuances after the Closing Date:** | The several obligations of the Lenders to fund the Loans and issue Letters of Credit under the Facilities on and after the Closing Date will be subject to satisfaction or waiver of conditions precedent as are usual and customary for construction and operating financings of this kind and as reasonably determined necessary pending due diligence, including representations and warranties true and correct; no default or event of default has occurred and is continuing; delivery of borrowing or issuance notice, as applicable; and, with respect to Term Loans, invoicing and validation by Engineering Consultant of achievement of all milestones under the applicable Material Project Documents that will be funded with the requested Term Loans. |
| **Conditions to Project Completion:** | Project completion will be subject to satisfaction or waiver of conditions precedent as are usual and customary for project completion of projects and financings of this kind and as reasonably determined necessary pending due diligence. |
| **Representations and Warranties:** | Usual and customary representations and warranties (subject to materiality qualifiers, etc. to be agreed), including the following: no Material Adverse Effect (as defined below); organization, good standing, existence and compliance with law; power and authority; authorization, execution, delivery and enforceability of the Loan Documents and Material Project Documents; no violation of organizational documents, law or contractual obligations and no imposition of liens (other than permitted liens); no pending or threatened litigation; no default or abandonment; indebtedness (including guarantees); |

9

Alta App.000688

Alta 0031896

title and ownership of property and adequacy of assets; intellectual property; taxes; compliance with government approvals and permits and applicable law; regulatory status; federal reserve regulations; project documents; availability of utility services and infrastructure necessary for the development, construction and operation of the Project; labor matters; ERISA; Investment Company Act and other regulations, including energy regulatory; capitalization and subsidiaries; use of proceeds; environmental matters; financial statements; accuracy of information, etc.; security documents and the creation, perfection and first priority of security interests; solvency; senior indebtedness; flood hazard properties; required insurance; Regulation T, Regulation U and Regulation X; Patriot Act; anti-money laundering laws, anti-corruption laws, anti-terrorism laws and sanctions; federal taxpayer identification number; no accounts other than accounts permitted to exist under the Loan Documents; easements; maintenance of collateral accounts; compliance with flood requirements; no broker's fees; and no other business.

Pledgor will provide representations and warranties, under its equity pledge agreement, with respect to certain limited and customary matters as of the Closing Date.

"*Material Adverse Effect*" shall mean, for purposes of the Loan Documents, a material adverse effect on (a) the business, operations, properties, assets or financial condition of the Loan Parties (taken as a whole), (b) the ability of the Loan Parties to fully and timely perform their respective material obligations under the Loan Documents, (c) the legality, validity, binding effect or enforceability against each Loan Party of the Loan Documents to which it is a party or (d) the rights and remedies available to, or conferred upon, the secured parties under any Loan Document.

|                          |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                    |
| ------------------------ | -------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| **Affirmative Covenants:** | Usual and customary affirmative covenants (subject to materiality qualifiers, etc. to be agreed), including the following: payment of obligations and taxes; maintenance of existence and compliance with contractual obligations and requirements of law; performance and enforcement of Material Project Documents; maintenance of title, property and insurance; inspection of property, books and records, and discussions; auditors; compliance with environmental laws; approval of and compliance with construction budget and annual operating budget; construct and maintain the Project in accordance with the Loan Documents and the Material Project Documents; interest rate protection; preservation of, perfection and first priority of collateral; further assurances and additional collateral (including compliance with flood requirements); final title policies and surveys in respect of the Project; maintenance of collateral accounts; maintenance of federal and state energy regulatory authority and/or status; separateness (including appointment of an independent manager); deposit of revenues, net cash proceeds, insurance and condemnation proceeds, etc., in accordance with the Loan Documents; maintain material government approvals and permits; delivery of account control agreements over local accounts; insurance events and restoration plans; use of proceeds; "know your customer"; and compliance with sanctions, anti-money laundering laws, anti-corruption laws and anti-terrorism laws. |

10

Alta App.000689

Alta 0031897

Reporting:  delivery of (1) audited annual consolidated financial statements and unaudited quarterly consolidated financial statements and related certificates, (2) monthly construction reports, monthly operating reports and annual operating plan and budget (as applicable), each in forms to be agreed, and (3) notices relating to certain material events to be agreed; and (if requested) quarterly lender meetings.

Pledgor will agree, under its equity pledge agreement, to certain limited and customary affirmative covenants.

**Negative Covenants:**

Usual and customary negative covenants (subject to materiality qualifiers, etc. to be agreed), including the following:

Capital expenditures (other than mandatory capital expenditures, capital expenditures reimbursed by a third-party, capital expenditures funded with voluntary capital contributions of affiliates of Pledgor (other than the Loan Parties) or otherwise funded in accordance with the account waterfall); construction budget contingencies; construction and operating budget compliance; indebtedness (including guarantees and other contingent liabilities); liens (except for customary permitted liens, which shall include customary pari-passu and subordinated liens on cash, accounts receivable and other accounts securing obligations under permitted hedging agreements, energy management agreements, futures market clearing agreements or otherwise for the benefit of ISOs, RTOs and other parties, in each case subject to caps to be agreed and the execution of customary intercreditor agreements); fundamental changes; engaging in business other than development, construction and operation of the Project; asset sales and dispositions of property; restricted payments (subject to exceptions for distributions among Loan Parties); investments, advances and loans; transactions with affiliates; sale and leaseback transactions; hedging agreements (other than entry into, or the unwinding or modification of, permitted commodity/energy hedge agreements and required interest rate hedges); changes in fiscal periods and accounting policies; negative pledge clauses; no restriction on subsidiary distributions to Loan Parties; lines of business; partnerships and formation of subsidiaries, etc.; maintenance of accounts; tax elections;[6] ERISA; organizational documents; terminations or assignments of, amendments to, waivers or consents, and entry into Material Project Documents or, prior to project completion, change order in respect of construction contracts; restrictions on acquisition of material real property without delivery of an environmental report and satisfaction of flood requirements; Pledgor to not conduct material business other than as a passive holding company; anti-terrorism laws, anti-money laundering laws, anti-bribery laws and laws related to sanctioned persons; no approving the results of any performance test (or similar) in conjunction with project completion without confirmation by the Engineering Consultant; and margin stock.

Pledgor will agree, under its equity pledge agreements, to certain limited and

---

[6]   **Note to Draft**: Each Loan Party shall be a "pass through" entity for US federal income tax purposes.

11

CONFIDENTIAL

customary negative covenants.

**Financial Covenants:**    The Borrower shall not permit the Debt Service Coverage Ratio (to be defined in the Loan Documents) for any period of four consecutive fiscal quarters ending on any quarterly measurement date to be below 1.05:1.00.

**Distribution Conditions:**    The Loan Parties may make distributions to Pledgor or any affiliate thereof upon satisfaction of the following conditions (collectively, the "***Distribution Conditions***"):

(i)    no default or event of default under the Loan Documents shall have occurred and be continuing or would result from such distribution;

(ii)    each DSR Account shall be funded in satisfaction of the DSR Requirement;

(iii)    all drawn amounts of Letters of Credit shall have been reimbursed;

(iv)    no LC Loans are outstanding;

(v)    the outstanding principal balance of the Term Loans does not exceed the then-applicable Target Debt Balance;

(vi)    substantial project completion (as defined in the EPC Contract) has occurred; and

(vii)    delivery by the Loan Parties of an officer's certificate certifying that the Debt Service Coverage Ratio (to be defined in the Loan Documents) for the period of four consecutive fiscal quarters, or such shorter period as has elapsed since the Closing Date, of the Loan Parties most recently ended was at least 1.20:1.00; and

(viii)    the Minimum Energy Hedging Requirement is then satisfied.

The "***Minimum Energy Hedging Requirement***" means that at least 90%[7] of the aggregate nameplate capacity of the Project is subject to energy hedging agreements with counterparties satisfying to-be-agreed creditworthiness requirements and with a weighted average hedge price across all such energy hedging agreements that causes (a) Debt Service Coverage Ratio for quarterly period in the scheduled amortization profile to be at least 1.00:1.00 and (b) generates sufficient revenue to allow prepayments pursuant to the Excess Cash Flow Sweep such that the outstanding principal balance of the Term Loans does not exceed the Target Debt Balance as of any quarterly payment date, in each case calculated on a pro forma basis by updating the Closing Date base case financial model to reflect such energy hedge agreements.

**Events of Default:**    Events of default will include the following (subject to materiality qualifiers,

---

[7] NTD: To be discussed in further detail based on current hedging proposal.

Alta App.000691

CONFIDENTIAL

Alta 0031899

etc. to be agreed): nonpayment of obligations under Loan Documents; breach of representations and covenants; cross-payment default and cross-acceleration to certain other debt (including any interest rate hedging agreement); bankruptcy and insolvency events with respect to a Loan Party or Pledgor; ERISA events; judgments; invalidity or imperfection of first-priority lien on a material portion of the Collateral; Change of Control (as defined below); invalidity of Loan Documents; termination (and related customary events) under a Material Project Document that is not replaced; loss of permits or regulatory status; failure to achieve project completion (to be defined customarily) by a date certain to be agreed; activities of Pledgor (other than holding company activities); voluntary abandonment;; and cross-payment default and cross-acceleration under certain Material Project Documents.

**Change of Control:**        A "***Change of Control***" means the consummation of any transaction or series of related transactions the result of which is that any one or more of the following shall occur: (a) the Designated Holders (as defined below), in the aggregate, shall fail to own directly or indirectly more than 50% of the economic and voting stock of Pledgor (on a fully diluted basis); (b) the Designated Holders, in the aggregate, shall fail to have the power, directly or indirectly, to direct the management of Pledgor, or Pledgor shall fail to have such power in respect of the Loan Parties; or (c) at any time, Pledgor shall fail to own directly 100% of the economic and voting stock of the Loan Parties (on a fully diluted basis).

"***Designated Holders***" means (a) the Sponsor and (b) following completion of the Project, any Qualified Owner (as defined below).

"***Qualified Owner***" means any person that (a) has, or is a direct or indirect subsidiary of a person, or comprises a fund or account or other investment vehicle managed or controlled by a person, that has, or has its obligations in respect of its direct or indirect ownership interests in the Loan Parties guaranteed by a person that has, in each case, a tangible net worth (or assets under management) of at least $300 million or is a majority owned subsidiary of such person, (b) is a Qualified Operator (as defined below), has an affiliate that is a Qualified Operator or has contracted or caused the Loan Parties to contract or maintain in effect a contract for the operation of the Project by a Qualified Operator, and (c) prior to such person becoming an owner, directly or indirectly, of outstanding stock in Pledgor (other than as a result of any acquisition or transfer of any limited partnership or similar non-managing direct or indirect interest in any Designated Holder), has complied with all applicable "know your customer" and anti-money laundering requirements of the Lenders, consistently applied.

"***Qualified Operator***" means a person, including Sponsor, that is (or is a subsidiary of) a person that owns a controlling interest in or manages (or has owned or has managed over at least two years continuously in the past seven years) a Comparable Project (in each case, either directly or through management of controlling investments in persons who are engaged in constructing, owning and operating a Comparable Project).

"***Comparable Project***" means one or more natural gas- or distillate fuel oil-fired electric generating facilities located in the United States that are of a

13

CONFIDENTIAL

Alta App.000692

Alta 0031900

size, in aggregate, substantially similar to or greater than 300 MW, of which at least 66-2/3% shall be in the ERCOT market.

| | |
|---|---|
| **Materiality, Etc.:** | The representations and warranties, affirmative and negative covenants and events of default described above will contain customary materiality qualifications, exceptions, dollar thresholds, baskets and cure periods to be agreed, provided that equity cure rights shall not be exercisable more than twice in any 12-month period or four times in the aggregate. |
| **Assignments; Participations:** | Each Lender may assign all or a portion of its loans and commitments under one or more of the Facilities to other Lenders, their affiliates, any central bank or Federal Reserve Bank (collectively, "***Permitted Assignees***"). |
| | All assignments will require the consent of the Administrative Agent and the Loan Parties, such consent not to be unreasonably withheld, conditioned or delayed; <u>provided</u> that no consent of the Loan Parties shall be required (a) if such assignment is made to a Permitted Assignee who is not a Disqualified Lender (to be defined in the Loan Documents) or (b) if an event of default has occurred and is continuing. The Loan Parties' consent shall be deemed given if the Loan Parties have not responded within ten business days of a request for such consent. |
| | The Lenders will be permitted to sell participations in loans and commitments without restriction; <u>provided</u>, <u>however</u>, that (i) such Lender's obligations under the credit agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties and the Lender Parties shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under the credit agreement. |
| | Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision thereof; <u>provided</u> that such agreement may provide that such Lender will not, without the consent of the participant, agree to any amendment, modification or waiver that (a) requires the consent of each Lender directly affected thereby and (b) directly affects such participant. |
| **Yield Protection, Taxes, Indemnification and Expense Reimbursement:** | The Loan Documents will contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, capital adequacy, liquidity, and other requirements of law (including but not limited to provisions relating to Dodd-Frank and Basel III) and from the imposition of or changes in certain withholding or other taxes, (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a LIBOR borrowings on a day other than the last day of an interest period with respect thereto and (c) for withholding tax gross-up, indemnification and expense reimbursement. |
| **Amendments and Waivers:** | Consent of Lenders holding at least a majority of funded and unfunded commitments under the Facilities will be required for amendments, waivers and consents of or under the Loan Documents, with consent of (i) a majority |

14

Alta App.000693

Alta 0031901

of each class of Lenders or (ii) all affected Lenders, in each case required for those amendments, waivers and consents that customarily require consent of (A) a majority of each class of Lenders or (B) all affected Lenders, respectively.   Issuing Banks and the Administrative Agent shall have customary voting rights.  Certain customary matters will require the unanimous consent of the Lenders.

**Lender Replacement Rights:**   The Loan Parties will have the right to remove a Lender that (i) is a "defaulting lender" (to be defined in the Loan Documents), (ii) requests payment of certain increased costs or indemnified taxes, (iii) does not agree to an amendment, waiver or consent that requires unanimous Lender approval and is approved by Lenders holding at least a majority of funded and unfunded commitments under the Facilities or (iv) provides a notice to the Loan Parties that such Lender requests a conversion of Adjusted LIBOR Loans to Base Rate Loans, unless in connection with the permanent discontinuance of LIBOR.  If the Loan Parties exercise such right, the Loan Parties shall remove Lenders at par by (x) paying all outstanding principal and interest owed to such Lender, and removing the Lender as a secured hedge provider, or (y) paying all outstanding interest owed to such Lender and arranging for another Lender or permitted assignee to take an assignment of all outstanding principal obligations and commitments of such Lender, and removing the Lender as a secured hedge provider.

**Defaulting Lender:**   The Loan Documents will contain customary provisions with respect to "defaulting lenders," including, without limitation, voting restrictions on, and ability of the Loan Parties to withhold fees and interest from and, as described under the heading "Lender Replacement Rights" above, remove, any "defaulting lender."

**Governing Law:**   The State of New York, except as to real estate and certain other collateral documents required to be governed by Texas law.  Each party to the Loan Documents will waive the right to trial by jury and will consent to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, the City of New York.

**Counsel to the Pledgor and the Borrower:**   [ ]

**Counsel to the Lead Lender and Hedging Bank:**   Mayer Brown LLP

**Engineering Consultant:**   [Leidos]

**Power Market Consultant:**   [ICF International]

**Insurance Consultant:**   [Moore McNeil]

**Environmental Consultant:**   [ERM]

15

Alta App.000694

Alta 0031902

<div align="right">
<u>Annex I</u> to

Term Sheet
</div>

**Interest Rates:**                    The interest rates under the Facilities will, at the option
                                       of the Loan Parties, be (i) Adjusted LIBOR <u>plus</u> the
                                       Applicable Adjusted LIBOR Margin (as defined below)
                                       or (ii) ABR <u>plus</u> the Applicable ABR Margin (as defined
                                       below).

                                       The Loan Parties may elect interest periods of 3 months
                                       for borrowings of Adjusted LIBOR (as defined below).

                                       Calculation of interest shall be on the basis of the actual
                                       days elapsed in a year of 360 days with respect to Loans
                                       bearing interest with reference to Adjusted LIBOR (or
                                       365 or 366 days, as the case may be, in the case of ABR
                                       loans based on the Administrative Agent's prime rate).

                                       "***Adjusted LIBOR***" shall mean the London Interbank
                                       Offered Rate for corresponding deposits of U.S. dollars,
                                       adjusted for maximum statutory reserve requirements (if
                                       any) and, in any event, not to be less than 1.00%.

                                       The Loan Documents will contain Adjusted LIBOR
                                       fallback language consistent with the amendment
                                       approach from form language proposed by the
                                       Alternative Reference Rates Committee for syndicated
                                       loans and, in any event, not to be less than 1.00%.

                                       "***ABR***" is the Alternative Base Rate, which means, for
                                       any day, a fluctuating rate *per annum* equal to the
                                       highest (and, in any event, not to be less than 2.00%) of
                                       (i) the Federal Funds Effective Rate plus 0.50%, (ii) the
                                       average rate of interest in effect for such day as publicly
                                       announced from time to time by the Administrative
                                       Agent as its "prime rate", and (iii) Adjusted LIBOR for
                                       an interest period of one month plus 1.00%. The "***prime
                                       rate***" is the rate set by the Administrative Agent based
                                       upon various factors including its costs and desired
                                       return, general economic conditions and other factors,
                                       and is used as a reference point for pricing some loans,
                                       which may be priced at, above, or below such announced
                                       rate. Any change in such rate announced by the
                                       Administrative Agent shall take effect at the opening of
                                       business on the day specified in the public
                                       announcement of such change.

                                       "***Federal Funds Effective Rate***" means, for any day, the
                                       rate *per annum* (rounded upwards, if necessary, to the
                                       nearest 1/100 of 1%) equal to the weighted average of
                                       the rates on overnight federal funds transactions with
                                       members of the Federal Reserve System arranged by
                                       federal funds brokers on such day, as published on the

AMERICAS 98071552

<div align="right">
Alta App.000695
</div>

<div align="right">
Alta 0031903
</div>

next succeeding business day by the Federal Reserve Bank of New York; *provided* that, (a) if the day for which such rate is to be determined is not a business day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding business day as so published on the next succeeding business day and (b) if such rate is not so published for any day that is a business day, the Federal Funds Effective Rate for such day shall be the average of the quotations for such day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by the Administrative Agent.

| | |
|---|---|
| **Pricing:** | *"**Applicable ABR Margin**"* shall be 2.50% increasing by (x) 25 basis points upon each of the third and sixth anniversaries of the Closing Date and (y) [__] basis points at any point that the Minimum Energy Hedging Requirement is not satisfied. |
| | "***Applicable Adjusted LIBOR Margin***" shall be 3.50% increasing by (x) 25 basis points upon each of the third and sixth anniversaries of the Closing Date and (y) [__] basis points at any point that the Minimum Energy Hedging Requirement is not satisfied. |
| | "***Drawn Fees***" shall be equal to the Applicable Adjusted LIBOR Margin |
| | "***Swap Credit Margin***" shall be 0.20%. |
| **Payments:** | Interest on the Loans bearing interest at Adjusted LIBOR shall be paid in arrears on the last day of the relevant interest period (*provided* that interest shall be paid no less frequently than quarterly), subject to the modified business day convention. Interest on the Loans bearing interest at ABR shall be paid on each March 31, June 30, September 30 and December 31 (each, a "***Payment Date***") commencing March 31, 2020. |
| | The Drawn Fees on the notional stated amount of issued Letters of Credit shall be paid on each Payment Date commencing at least one full calendar quarter after the Closing Date. |
| | The Swap Credit Margin on the notional amount of interest rate hedges by the Hedging Bank shall be applied on each Payment Date. |
| **Upfront Fees:** | 2.50% of the Facilities, due and payable on the Closing Date. |

2

Alta App.000696

**Commitment Fees**: An amount per annum equal to 0.75% on the average daily undrawn portion of the commitments in respect of the Term Facility and Letters of Credit, payable to the Lenders under the Term Facility and Letters of Credit (other than defaulting Lenders) quarterly in arrears on the signing date of the Loan Documents and upon the termination of the commitments, calculated based on the number of days elapsed in a 360-day year.

**Coordinated Lead Arranger Fee:** $[500,000], due and payable on the Closing Date

Alta App.000697

CONFIDENTIAL

Alta 0031905

Annex II to the Term Sheet

**Term Facility Draw Schedule**

[]

4

Alta App.000698

CONFIDENTIAL

Alta 0031906

Annex III to the Term Sheet

**Mandatory Amortization and Target Debt Balance Schedule[8]**

| Start Date | End Date | Amortization ($ 000s) | Target Debt Balance ($ 000s) |
|---|---|---|---|
| | | | |

---

[8] TBD based on final model and closing date.

5

Alta App.000699

Alta 0031907

# Exhibit 76

Alta App.000700

**To:** William Phelps[wphelps@altapowerdev.com]; Robert Perkins[rperkins@altapowerdev.com]
**From:** Matthew Laterza[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=8F6EED0B000C4F419C7E8DBD7C543FB2-MLATERZA_86]
**Sent:** Thur 5/28/2020 3:17:57 PM Central Daylight Time
**Subject:** FW: Alta term sheet
**Attachment:** Alta Financing Proposal_v2020 05 28.pdf

---

**From:** Hughes, Walt <WHughes@riverstonecredit.com>
**Sent:** Thursday, May 28, 2020 3:13 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Cc:** Flannery, Daniel <dflannery@riverstonecredit.com>
**Subject:** Alta term sheet

Matt,

As discussed attached please find our financing proposal for Alta. Let's discuss after you've had a chance to review.

Thanks,

Walt

Walt Hughes
Vice President
Riverstone Credit Partners, L.P.
Office: 713-357-1395
Mobile: 713-235-0429
WHughes@riverstonecredit.com
*CONFIDENTIALITY NOTICE:*

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

CONFIDENTIALITY NOTICE:

The information contained in this transmission is intended only for the person or entity to which it is addressed and may contain confidential, trade secret and/or privileged material. If you are not the intended recipient of this information, do not review, retransmit, disclose, disseminate, use, or take any action in reliance upon, this information. If you received this transmission in error, please contact the sender and destroy all printed copies and delete the material from all computers. The information included in this email does not constitute and will not give rise to any legally binding obligation nor may it be relied upon as the basis for a contract by estoppel or otherwise.

Alta App.000701



# Project Peak
## Summary Indicative Terms

## May 2020

*Terms are for discussion purposes only and do not represent a firm offer; any firm offer would be subject to numerous conditions, including, but not limited to, the completion of due diligence and approval by the Investment Committee of Riverstone Credit Partners*

1

CONFIDENTIAL

Alta App.000702

Alta 0038587

# Summary Indicative Terms

RIVER STONE

| | |
|---|---|
| **Borrower** | > Alta Power LLC (the "Borrower") |
| **Guarantors** | > The Borrower and all subsidiaries of the Borrower |
| **Credit Facility** | > $70 million delayed-draw term loan facility (the "Term Loan") |
| **Use of Proceeds** | > $50 million to fund construction of a 150 MW natural gas fired peaking power plant in Goodlow, TX (the "Project") and to pay transaction fees and expenses<br>> $20 million to collateralize LCs |
| **Security** | > First priority lien on all assets of the Borrower and Guarantors, including all current and subsequently developed or acquired assets and collateral assignment of all material contracts and construction accounts<br>> Perfected pledge of stock of the Borrower and Guarantors (including other project subsidiaries) |
| **Availability** | > $50 million available at Close, subject to at least $[17.5] million of cash equity invested into the Project [1]<br>  – Construction draw schedule to be agreed<br>  – Any unutilized Term Loan will terminate upon the expiration of the DD Period<br>> $20 million undrawn to provide LC collateral for the substation, gas pipeline, and physical heat rate call option (the "HRCO")<br>  – ~$18 million will terminate upon expiration of DD Period; the remaining ~$2 million for gas pipeline will terminate 6 months post DD Period |
| **Tenor** | > 3-year<br>> Delayed-Draw Period (the "DD Period") of the earlier of (a) 12 months after closing and (b) achievement of commercial operations |
| **Drawn Margin** | > L+ 900 bps |
| **Undrawn Margin** | > L+ 550 bps |
| **LIBOR Floor** | > 2.0% |
| **OID / Upfront Fee** | > 97.5 on funded amounts at close / 2.5% on unfunded amounts at close |
| **Optional Prepayment** | > Prepayable in whole or in parts at any time subject to the Prepayment Premium plus accrued interest |
| **Prepayment Premium** | > Months 0-12: Par<br>> Months 13-18: 101<br>> Months 19-24: 103<br>> Months 25-36: 106 |
| **Mandatory Prepayments** | > 100% of the proceeds from the sale of any debt, asset sales, or insurance and condemnation received by the Borrower and the Guarantors<br>> 100% of payments of liquidated damages under the construction contracts and termination payments in respect of material project contracts<br>> 100% quarterly Excess Cash Flow Sweep post-expiration of the DD Period<br>> 100% if a Change of Control occurs<br>> All Mandatory Prepayments are subject to the Prepayment Premium plus any accrued interest |

(1)   Provides credit to $8 million invested to-date in Goodlow, TX Project. Assumes ~$97.5 million of total uses (~$69 million of plant costs, $20 million LC requirement, ~$8 million of 1-year interest, fees, and expenses)

CONFIDENTIAL

Alta App.000703<br>Alta 0038588

# Summary Indicative Terms (cont'd)

**RIVER STONE**

| | |
|---|---|
| **Maintenance Reserve Account** | > At 1 month prior to commercial operations, the Borrower will maintain a maintenance reserve account in an amount to be agreed in consultation with the Engineering Consultant |
| **Financial Covenants** | > Minimum Fixed Charge Coverage Ratio of 2.0x tested quarterly with the first full quarter after expected project completion<br>– Defined as (i) the greater of (a) LTM and (b) LQA EBITDA divided by (ii) the sum of (x) Interest Expense and (y) Maintenance Capex |
| **Negative Covenants** | > Strict prohibition on any senior, pari passu, or junior debt and lien incurrence at the Borrower or Guarantors<br>– Carve-out for post-completion, capped HRCO first lien, last-out security interest and subject to an ICA acceptable to RCP<br>> Limitations on any RPs or dividends for the Borrower<br>> Permitted investments to be agreed<br>> Usual & customary restrictions on affiliated and related party transactions<br>> No approving the results of any performance test (or similar) in conjunction with project completion without confirmation by the Engineering Consultant |
| **Affirmative Covenants** | > Usual & customary for facilities of this type, including, but not limited to:<br>– Monthly update calls with management, construction reports, and operating reports<br>– Annual budget submitted at Closing and for each fiscal year thereafter<br>– Outage insurance<br>– Compliance with construction budget and schedule, limitations on construction budget and schedule amendments, sufficiency of funds, target commercial operation date, and no unfunded cost overruns |
| **Detachable Equity Warrants** | > The Borrower shall grant the Lenders Detachable Equity Warrants of 2.5% of the common equity, determined on a fully-diluted basis<br>> Detachable Equity Warrants shall have anti-dilution provisions, put and call rights and other customary mechanics to be agreed |
| **Reps & Warranties** | > Usual & customary for facilities of this type |
| **Events of Default** | > Usual & customary for facilities of this type, including but not limited to:<br>– Failure to achieve commercial operations of all portions of the Project by a date to be agreed<br>– Termination of HRCO contract |
| **Expenses** | > All reasonable out-of-pocket expenses of the Lender will be reimbursed by the Borrower, including but not limited to legal and due diligence expenses |
| **Work Fee** | > $100,000 deposited into an account upon execution of the Indemnification & Expense Reimbursement Letter and netted from OID at Closing |

Alta App.000704

CONFIDENTIAL    Alta 0038589

# Summary Indicative Terms (cont'd)



| | |
|---|---|
| **Conditions to Closing** | > Including but not limited to:<br>  – Execution of Indemnity and Expense Reimbursement Letter<br>  – Completion of due diligence<br>  – Approval by Riverstone Credit Partners, L.P. Investment Committee<br>  – Delivery of third party Engineering Consultant report, ERCOT power market study, and insurance opinion [1]<br>  – Delivery of operating budget, construction budget, and construction schedule<br>  – Execution of Material Project Documents on terms acceptable to Lenders with consents to collateral assignment<br>  – Execution of HRCO contract with creditworthy counterparties and on other terms acceptable to Lenders including right-way basis risk<br>  – Execution of Intercreditor Agreement with HRCO counterparty on terms acceptable to Lenders<br>  – Execution of HoldCo Preferred investment on terms acceptable to Lenders (PIK, maturity > 3 years, etc.)<br>  – Funding of at least $[17.5] million of cash equity into construction account with disbursement mechanics and other terms acceptable to Lenders [2]<br>  – Reimbursement of expenses<br>  – Execution and delivery of the Term Loan documentation |
| **Comparable Project ROFR** | > Lenders shall hold a Right of First Refusal to participate as a first lien lender in future natural gas-fired generating facilities developed by Alta Power LLC (Delaware) or its management team |
| **Administrative Agent** | > Riverstone Credit Management LLC |
| **Lenders** | > RCP and affiliates |
| **RCP Commitment** | > 100% |
| **Admin Fee** | > $100,000 per annum |
| **Lenders Counsel** | > White & Case LLP |
| **Governing Law** | > New York |
| **Closing** | > Mid July 2020 |

[1]    RCP can utilize work already completed / underway
[2]    Includes any cash equity invested to-date, subject to satisfactory evidence provided to Lenders

Alta App.000705

Alta 0038590

# Exhibit 77

Alta App.000706

**To:** Greg Rudolph[Greg.Rudolph@directenergy.com]; Matthew Laterza[mlaterza@altapowerdev.com]
**From:** Stephen Jensen[Stephen.Jensen@directenergy.com]
**Sent:** Thur 3/12/2020 1:15:35 PM Central Daylight Time
**Subject:** RE: EXT HRCO Quotes

---

Indicative bids as of 3/11/20 COB ($ / Kw-month, denominator is 135.375 MW)
5 Years starting Jun 2021 $4.71
5 Years starting Oct 2021 $3.94
7 Years starting Jun 2021 $4.00
7 Years starting Oct 2021 $3.30
**From:** Greg Rudolph
**Sent:** Tuesday, March 10, 2020 9:18 PM
**To:** Matthew Laterza <mlaterza@altapowerdev.com>
**Cc:** Stephen Jensen <Stephen.Jensen@directenergy.com>
**Subject:** Re: EXT HRCO Quotes
Stephen,
Can you please provide quotes for Matthew on the following HRCOs?
Regards,

Greg Rudolph
Direct Energy
greg.rudolph@directenergy.com
*Office: 713-877-5709*
Mobile: 713-828-8950

On Mar 10, 2020, at 5:48 PM, Matthew Laterza <mlaterza@altapowerdev.com> wrote:

Hey Greg,
I was wondering if you could give us some refreshed HRCO bids for 150MW for the following:
5 Years starting Jun 2021
5 Years starting Oct 2021
7 Years starting Jun 2021
7 Years starting Oct 2021
Here are the parameters so you don't have to go searching for them.
Power Delivery: ERCOT North Hub
Gas Delivery: NGPL TexOk
Heat Rate: 9.8 MMBtu/MWh
VOM: $0.75/MWh, no escalator
Start Gas: 27 MMBtu per unit per start
Fuel Adder: $0.00/MMBtu
Volume: 42.5MW x 3 units; total of 127.5 MW (May – Sep); 47 MW x 3 units; total of 141 MW (Oct – Apr)
Min Runtime: 30 minutes
Min Downtime: 2 hours
Max Starts/Day: 2 per day
Max Starts/Year: 400 per day (rolling 12-month period)
Max Hours/Year: 3,600 hours (rolling 12-month period)
Thanks,
Matt

---

The information contained in or attached to this email is intended only for the use of the individual or entity to which it is addressed. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are not authorised to and must not disclose, copy, distribute, or retain this message or any part of it. It may contain information which is confidential and/or covered by legal professional or other privilege under applicable law.

The views expressed in this email are not necessarily the views of Centrica plc or its subsidiaries, and the company, its directors, officers or employees make no representation or accept any liability for its accuracy or completeness unless expressly stated to the contrary.

Additional regulatory disclosures may be found here: https://www.centrica.com/privacy-cookies-and-legal-disclaimer#email

PH Jones is a trading name of British Gas Social Housing Limited. British Gas Social Housing Limited (company no: 01026007), British Gas Trading Limited (company no: 03078711), British Gas Services Limited (company no: 3141243), British Gas Insurance Limited (company no: 06608316), British Gas New Heating Limited (company no: 06723244), British Gas Services (Commercial) Limited (company no: 07385984) and Centrica Energy (Trading) Limited (company no: 02877397) are all wholly owned subsidiaries of Centrica plc (company no: 3033654). Each company is registered in England and Wales with a registered office at Millstream, Maidenhead Road, Windsor, Berkshire SL4 5GD.

British Gas Insurance Limited is authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority. British Gas Services Limited and Centrica Energy (Trading) Limited are authorised and regulated by the Financial Conduct Authority. British Gas Trading Limited is an appointed representative of British Gas Services Limited which is authorised and regulated by the Financial Conduct Authority.

Alta App.000707

Alta 0057494

# Exhibit 78

Alta App.000708



301 Tresser Boulevard
12th Floor
Stamford, CT 06901

January 31, 2020

Alta Power
4605 Post Oak Place Dr.
Houston, TX 77027
Attn: Matthew Laterza

Re:    Construction Financing for GoodAlta – Engagement Letter

Ladies and Gentlemen:

Alta Power ("*AP*" or "*you*") has advised SPT Infrastructure Finance, LLC ("*SIF*") that AP desires to obtain senior secured credit facilities of up to $[55,000,000] (the "*Credit Facilities*") as further described in the summary of indicative terms and conditions attached hereto as Exhibit A (the "*Initial Term Sheet*"). The Credit Facilities are intended to be used (i) to construct the GoodAlta power plant, an approximately 100MW simple-cycle, gas-fired power generation project located in Goodlow, TX and (ii) to pay related transaction fees and expenses. Capitalized terms used herein but not defined have the meaning assigned to such terms in the Initial Term Sheet.

1.    **Titles and Roles**.  You hereby appoint SIF to act, and SIF hereby agrees to act, as mandated lead arranger and bookrunner for the Credit Facilities (the "*MLA*"), in each case, upon the terms and subject to the conditions set forth or referred to in this engagement letter (including the Initial Term Sheet and other annexes hereto, this "*Engagement Letter*"). Such appointment is in each case subject to the terms and the conditions set forth or referred to in this Engagement Letter. The MLA will perform the duties and exercise the authority customarily performed and exercised by it in such roles. You agree that no other agents, co-agents or arrangers will be appointed, no other titles will be awarded, and no compensation (other than as expressly contemplated by this Engagement Letter) will be paid in connection with the Credit Facilities unless you and we shall so agree.

**It is expressly understood and agreed that this Engagement Letter does not constitute any commitment or offer, expressed or implied, on the part of the MLA or any of its affiliates to provide or obtain (or commit to provide or obtain) any financing, provide, underwrite or purchase any loans, letters of credit, hedging arrangements or other financial support to you, or otherwise participate in any transaction. Any understanding regarding any such commitment would be subject to satisfactory completion of due diligence and receipt of required credit and other internal approvals by the MLA, and would be set forth in a commitment letter or definitive documentation satisfactory to the MLA and you including the terms and conditions of the Credit Facilities. The engagement of SIF hereunder relates only to the transactions contemplated by this Engagement Letter and does not constitute an engagement of SIF or any affiliate with respect to any matter of any kind.**

2.    **Information**.  You hereby represent and warrant that (a) all information other than (x) the financial projections for the Project (the "*Projections*") (including any Projections included in budgets and

**Alta App.000709**

GoodAlta Engagement Letter
January 31, 2020

unaudited pro forma financial statements), (y) any reports prepared by third party consultants (other than information provided by you or your representatives in connection with such reports), and (z) information of a general economic or general industry nature that has been or will be made available to the MLA by or on behalf of you or any of your affiliates or representatives in connection with the transactions contemplated hereby (the "*Information*"), is and will be, when furnished, complete and correct in all material respects, when taken as a whole, and does not and will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein, taken as a whole, not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements thereto) and (b) the Projections that have been or will be made available to the MLA by or on behalf of you or any of your affiliates or representatives have been or will be prepared in good faith based upon assumptions that are believed by you to be reasonable at the time made and at the time the related Projections are made available to the MLA (it being acknowledged by the MLA that the Projections are as to future events and are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ significantly from the projected results and such differences may be material). You agree that if at any time prior to the closing date of the Credit Facilities (the "*Closing Date*"), you become aware that any of the representations in the preceding sentence would be incorrect, in any material respect, if the Information and Projections were being furnished, and such representations were being made, at such time, then you will promptly inform us thereof and supplement the Information and the Projections so that such representations will be correct, in all material respects, under those circumstances. In arranging and structuring the Credit Facilities, you acknowledge and agree that we will be entitled to use and rely on the Information and the Projections without responsibility for independent verification thereof.

    3.   **Fees and Expenses**. As consideration for the MLA's agreement to perform the services described herein, you hereby agree to pay or cause to be paid the nonrefundable fees set forth in the Initial Term Sheet to the MLA at the times and in the manner specified therein. You hereby agree that such fees shall be fully earned upon becoming due and payable, shall be in addition to any other fees and expenses otherwise payable pursuant to this Engagement Letter, shall be paid without setoff or counterclaim, and that, once paid, shall not be refundable (in whole or part) for any reason whatsoever or creditable against any other fee payable in connection with the transactions contemplated hereby.

    You agree to pay or cause to be paid to the MLA a fee equal to $250,000 (the "*Alternate Transaction Fee*") in the event that at any time prior to the first anniversary of the date hereof, you, any of the companies referenced in the first paragraph of this Engagement Letter, or any of your respective affiliates proceeds with any fixed or floating rate debt financing in the commercial bank market, the institutional loan market or any similar debt market, other than the Credit Facilities, of which all or any portion of the proceeds thereof, in each case, are utilized to finance the Project, with any institution, person, or entity other than the MLA (the "*Alternate Transaction*"); *provided* that the Alternate Transaction Fee shall not be payable to us if (i) (A) we are provided with a bona fide offer to participate in the same role and with the same share of economics (on either a dollar basis or a percentage basis), in each case, as provided in this Engagement Letter and the Initial Term Sheet and (B) the terms of the Alternate Transaction are substantially similar to those set forth in the Engagement Letter and the Initial Term Sheet or (ii) we terminate this Engagement Letter. The Alternate Transaction Fee shall be paid at the time of the consummation of such Alternate Transaction. This paragraph shall survive termination of this Engagement Letter.

    You agree to pay or reimburse the MLA on demand for its reasonable and documented out-of-pocket costs and expenses (including the reasonable and documented out-of-pocket fees and disbursements of (i) one transaction counsel, plus if required one local counsel to the MLA in each applicable jurisdiction and (ii) other third party consultants engaged by us), arising in connection with the Credit Facilities and the preparation, negotiation, execution and delivery of this Engagement Letter, the definitive documentation for the Credit Facilities and any security arrangements in connection therewith.

Alta App.000710

CONFIDENTIAL

Alta 0058415

GoodAlta Engagement Letter
January 31, 2020

You shall be obligated to make such payments or reimbursements regardless of whether any transaction is consummated or any commitment to participate in a transaction is provided.

4A. **Right of First Refusal**. If within the two-year period commencing on the date hereof Alta Power or any controlled affiliate (collectively, "AP") seeks to raise financing for a natural gas-fired power generation plant located in or selling power or other services to ERCOT (each, a "Project") it shall first comply with the following provisions. AP will submit to SIF all proposed terms (including term sheets, proposal letters, LOIs) received from potential financing sources ("Proposed Lenders") for a Project and allow SIF ten (10) business days (the "Review Period") to indicate its willingness to provide financing substantially on such terms. If at the end of the Review Period SIF has failed to respond or has declined to provide such financing, AP may negotiate and close with a Proposed Lender a financing for such Project on such terms declined (or not responded to) by SIF or on terms more favorable to the applicable Project(s). If such financing with a Proposed Lender does not close within [6] months of the end of the Review Period and AP begins a new process for financing the Project, it must again comply with the foregoing provisions.

5. **Confidentiality**. This Engagement Letter and the Initial Term Sheet constitute Confidential Information as defined in that certain Confidentiality Agreement dated as of January 31, 2020 between you and SIF.

6. **PATRIOT Act. The MLA hereby notifies you that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "*Patriot Act*"), it and its affiliates are required to obtain, verify and record information that identifies you and your subsidiaries and any guarantor, which information includes the name, address, tax identification number and other information regarding you and your subsidiaries and any guarantor that will allow the MLA to identify you and your subsidiaries and the guarantor in accordance with the Patriot Act and any other applicable "know your customer" and anti-money laundering rules and regulations. This notice is given in accordance with the requirements of the Patriot Act and is effective for the MLA and its affiliates.**

7. **Indemnification**. You agree to indemnify and hold harmless the MLA and its affiliates and each of their respective affiliates, directors, officers, employees, agents, advisors and other representatives (each, an "*Indemnified Party*") from and against any and all claims, damages, losses, liabilities and reasonable and documented out-of-pocket expenses that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with, any investigation, litigation or proceeding or preparation of a defense in connection therewith) any matter referred to in this Engagement Letter, the enforcement of any of the Indemnified Parties' respective rights and remedies hereunder or any use made or proposed to be made with the proceeds thereof or any other aspect of the transactions contemplated hereby, and to reimburse each Indemnified Party upon demand for any documented out-of-pocket legal fees, disbursements and other charges of one transaction counsel, plus if required one local counsel to the MLA in each applicable jurisdiction, or other expenses incurred in connection with investigating or defending any of the foregoing, *provided* that you will not have to indemnify any Indemnified Party for any claim, damage, loss, liability or out-of-pocket expense (i) that is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct in performing the services the subject of this Engagement Letter, or (ii) arising out of any claim, action, suit, inquiry, litigation, investigation or proceeding that does not involve an act or omission or misrepresentation by it or on its behalf, and that is brought by an Indemnified Party against any other Indemnified Party (other than any claim, actions, suits, inquiries, litigation, investigation or proceeding against any Indemnified Party in its capacity or in fulfilling its role as an agent, mandated lead arranger or joint bookrunner under the Credit

3

CONFIDENTIAL

Alta App.000711

Alta 0058416

GoodAlta Engagement Letter
January 31, 2020

Facilities). In the case of an investigation, litigation or proceeding to which the indemnity in this Paragraph 6 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by you or any of your subsidiaries or affiliates or any of their respective equity holders or creditors (each, a "*Related Party*") and whether or not any aspect of the transactions contemplated hereby are consummated. You also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you, any Related Party or any of your or their respective subsidiaries, affiliates equity holders or creditors arising out of, related to or in connection with any aspect of the transactions contemplated hereby, unless such Indemnified Party is grossly negligent or engages in willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable judgment). None of any Indemnified Party, you or any Related Party shall be liable for any indirect, incidental, special, punitive or consequential damages (including, without limitation, loss of profit or business interruptions, however the same may be caused) arising out of or in connection with its activities related to or arising from this Engagement Letter, the Credit Facilities or the other transactions contemplated hereby. None of any Indemnified Party, you or any Related Party shall be liable for any damages arising from the use by others of information or other materials obtained through telephonic, email, internet or other electronic telecommunications or other information transmission systems, other than for direct or actual damages resulting from the gross negligence or willful misconduct of such person as determined by a final and non-appealable judgment of a court of competent jurisdiction.

If, for any reason the foregoing indemnification is unavailable to an Indemnified Party or insufficient to hold it harmless, you will contribute to the amount paid or payable by such Indemnified Party as a result of such claim, damage, loss, liability or expense in such proportion as is appropriate to reflect the relative economic interests of (i) you and your affiliates on the one hand, and (ii) the MLA on the other hand in the matters contemplated by this Engagement Letter as well as the relative fault of (i) you and your affiliates, and (ii) the MLA with respect to such claim, damage, loss, liability or expense and any other relevant equitable considerations. Your reimbursement, indemnity and contribution obligations under this section will be in addition to any liability you may otherwise have and will be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of you and any Indemnified Party.

8. **Other Services**. You hereby acknowledge that the MLA may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. We will not use confidential information obtained from you by virtue of the transactions contemplated by this Engagement Letter or our other relationships with you in connection with the performance by us of services for, or other uses on behalf of, other companies, and we will not furnish any such information to other companies. You also acknowledge that we have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, any confidential information obtained by us from other companies.

In connection with all aspects of each transaction contemplated by this Engagement Letter, you acknowledge and agree that: (a) (i) the arranging and other services described herein regarding the Credit Facilities are arm's-length commercial transactions between you and your affiliates, on the one hand, and the MLA, on the other hand, (ii) the MLA has not provided you with any legal, accounting, regulatory or tax advice, and you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, and (iii) you are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby; (b) (i) the MLA has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (ii) the MLA has no obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein; and (c) the MLA and its affiliates may be engaged in a broad range of transactions that involve interests that differ from yours and

4

Alta App.000712

CONFIDENTIAL

Alta 0058417

GoodAlta Engagement Letter
January 31, 2020

those of your affiliates, and the MLA has no obligation to disclose any of such interests to you or your affiliates. To the fullest extent permitted by law, you hereby waive and release any claims that you may have against the MLA with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated by this Engagement Letter.

9. **Miscellaneous**.

(a)    This Engagement Letter shall not be assignable by you without the prior written consent of the MLA (and any purported assignment without such consent shall be null and void), this Engagement Letter shall not be assignable by the MLA without your prior written consent (and any purported assignment without such consent shall be null and void), and this Engagement Letter is intended to be solely for the benefit of the parties hereto (and the Indemnified Parties) and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto (and the Indemnified Parties); *provided, however*, that the MLA may in its sole discretion assign its rights and obligations hereunder to its affiliates.

(b)    This Engagement Letter may not be amended or any term or provision hereof waived or otherwise modified except by an instrument in writing signed by all the parties hereto.

(c)    This Engagement Letter may be executed in any number of counterparts, each of which when executed shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Engagement Letter by facsimile transmission, PDF or other electronic means shall be effective as delivery of a manually executed counterpart hereof.

(d)    This Engagement Letter (including the Initial Term Sheet) is the only agreement that has been entered into among the parties hereto and thereto with respect to the Credit Facilities, and such agreement sets forth the entire understanding of all such parties with respect to the Credit Facilities and other transactions contemplated hereby and thereby and supersedes any prior written or oral agreements among the parties hereto and thereto with respect to the Credit Facilities.

(e)    This Engagement Letter and any claim or dispute arising out of or in connection herewith and/or the services provided hereunder shall be governed by the laws of the State of New York without regard to principles thereof requiring the application of different laws. **The parties hereto agree to waive absolutely, unconditionally and irrevocably any right to trial by jury in any action or proceeding arising out of or in connection with this Engagement Letter and/or the services provided hereunder or for the enforcement of any rights hereunder**. You and the MLA hereby irrevocably (i) submit to the exclusive jurisdiction of any New York State or Federal court sitting in New York County, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Engagement Letter and/or the services provided hereunder, (ii) agree that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court, (iii) waive, to the fullest extent legally permitted, the defense of an inconvenient forum to the maintenance of such action or proceeding, (iv) consent to the service of all process in any such action or proceeding by the mailing of copies of such process to you by certified United States mail, return receipt requested, at your address specified above or in any other manner permitted by law and (v) agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner permitted by law.

(f)    None of this Engagement Letter (including the Initial Term Sheet) nor any of its terms or substance (the "*Letter Information*") shall be disclosed, directly or indirectly, by you to any other person except that you shall be permitted to disclose the Letter Information (i) to any potential equity investor in you or the Project or additional sponsor of the Project and any of their respective affiliates, subsidiaries, officers, directors, employees, and advisors, as well as any of your affiliates and your and their respective subsidiaries, officers, directors, employees, and advisors, in each case as need to know such Letter

5

Alta App.000713

Alta 0058418

GoodAlta Engagement Letter
January 31, 2020

Information in connection with its evaluation of its participation in the financing or participation in the Project or the transactions contemplated hereby, but only to the extent the same has agreed to keep such Letter Information confidential; (ii) to the extent required by applicable laws and regulations or by any subpoena or similar legal process (provided that you use your commercially reasonable efforts to seek confidential treatment of such Letter Information and you notify the MLA of such disclosure as soon as reasonably practicable); (iii) to the extent such Letter Information (A) becomes publicly available other than as a result of a breach of this Engagement Letter or (B) becomes available to you on a non-confidential basis from a source other than the MLA, or your or their respective representatives; (v) to the extent the MLA shall have consented to such disclosure in writing (such consent not to be unreasonably withheld, conditioned or delayed); and (vi) to the extent necessary for the protection or enforcement of your rights hereunder or under the definitive documentation for the Credit Facilities. Notwithstanding anything herein to the contrary, this Paragraph 8(g) shall remain in full force and effect until the first to occur of (1) the second anniversary of this Engagement Letter and (2) the Closing Date.

(g)    It is understood that the MLA may at any time upon 10 days' prior written notice terminate its services hereunder without liability or continuing obligation to you; *provided* that the waivers of conflict of interest and fiduciary duty, indemnification and expense reimbursement provisions of this Engagement Letter will remain operative regardless of any such termination. You may terminate this Engagement Letter and the MLA's services hereunder in your sole discretion upon 10 days' prior written notice to the MLA, provided that the waivers of conflict of interest and fiduciary duty, indemnification, fees, Alternate Transaction Fees and expense reimbursement provisions of this Engagement Letter will remain operative regardless of any such termination. This Engagement Letter shall otherwise terminate on the earlier to occur of (i) the Closing Date and (ii) one year from the date first set forth above. Paragraphs 3, 4, 6, 7, 8(a), 8(b), 8(c), 8(d), 8(e), and 8(f) (subject to the terms thereof) of this Engagement Letter shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Engagement Letter; *provided*, that your indemnification and reimbursement obligations under this Engagement Letter shall automatically terminate and be superseded by the indemnification and reimbursement provisions of the definitive documentation for the Credit Facilities upon the effective date of such documentation to the extent such provisions indemnify and reimburse an Indemnified Party for the matters referred to in Paragraph 6.

*[SIGNATURES PAGES FOLLOW]*

6

Alta App.000714

CONFIDENTIAL

Alta 0058419

Should you have any questions, please call Josh Pandolfi at (203) 487-8055. The undersigned is pleased to have the opportunity to assist you with this important financing.

Very truly yours,

**SPT INFRASTRUCTURE FINANCE, LLC**

By: _____
Name:
Title:      Haig Najarian
            Authorized Signatory

ACKNOWLEDGED AND AGREED:

**ALTA POWER LLC**

By: _____
Name: Matthew Laterza
Title: CFO

[Signature Page    Engagement Letter]

**Alta App.000715**

Alta 0058420

**EXHIBIT A**
**to Engagement Letter**

[Initial Term Sheet]

CONFIDENTIAL

Alta 0058421

**Alta Power**
**Indicative Summary of Proposed Terms and Conditions**
**Senior Secured Credit Facilities**
**January 30, 2020**

*This Summary of Proposed Terms and Conditions ("Term Sheet") is for discussion purposes only, is non-binding and is only an outline of certain of the material terms of the proposed Senior Secured Credit Facilities and does not purport to summarize all of the provisions which would be contained in the Senior Secured Credit Facilities documentation. This Term Sheet is subject to change based upon, among other factors, due diligence, and does not constitute a direct or indirect commitment for financing or to consummate any transaction of any kind. This Term Sheet is confidential and may not be disclosed to third parties without Starwood's prior written approval.*

| | |
|---|---|
| Borrower: | A Texas limited liability company that has been formed to be the direct owner of the GoodAlta power plant with an approximate nameplate capacity of 100MW |
| Lead Arranger and Lending Entity: | SPT Infrastructure Finance, LLC and/or one or more of its affiliates ("**Starwood**") |
| Credit Facilities: | • Term Loan: Up to $[35 <s>32</s>,000,000] and not to exceed 70% of total project costs<br>• Revolver/LC Facility: Up to $[20 <s>8</s>,000,000] |
| Starwood Commitment: | Up to $40,000,000 |
| Amortization: | 5% p.a. |
| Quarterly Cash Flow Sweep: | • 100% sweep to annual targets to get to $100/kW at maturity<br>• Excess cash flow sweep of 25% after reaching targets |
| Tenor: | Construction + 5 years |
| Interest Rate: | Libor + 4.50%, with 25bps step up after year 3. Libor floor of 1.00% |
| Upfront Fee: | 2.50% |
| Arrangement Fee: | $250,000 |
| Commitment Fee: | 75 bps |
| Admin Agent Fee | $50,000 p.a. |
| Call Protection: | 101 for 12 months |
| Distribution Conditions: | DSCR not less than 1.20:1.00 and other provisions TBD |
| Financial Covenant: | DSCR not less than 1.10:1.00 |
| Hedging Requirement: | Satisfactory energy margin hedges for a minimum term of 5-years at a price no less than $5.40/kW-month |

Alta App.000717

Alta 0058422

# Exhibit 79

Alta App.000718

# WHITE & CASE

Dated [●], 2019

# Credit Agreement[1]

among

## Alta Power LLC
as Borrower,

## The Lenders and Issuing Banks Party Hereto From Time To Time,

### Deutsche Bank Trust Company Americas,
as Administrative Agent,

and

### Deutsche Bank Trust Company Americas,
as Collateral Agent and as Depositary Bank

———————

$[●]

———————

### Deutsche Bank Securities Inc.
as Mandated Lead Arranger and Structuring Bank

---

[1] **Note to Draft**: Draft subject to ongoing due diligence and review by experts including tax, regulatory, ERISA, environmental, real estate and derivatives.

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020-1095

## Table of Contents

Page

ARTICLE I DEFINITIONS ..................................................................................................... 1
    Section 1.01.    Certain Defined Terms............................................................................ 1
    Section 1.02.    Terms Generally ................................................................................... 38
    Section 1.03.    Accounting Terms................................................................................ 39
    Section 1.04.    Divisions .............................................................................................. 39

ARTICLE II THE CREDITS................................................................................................. 39
    Section 2.01.    Term Loan Facility .............................................................................. 39
    Section 2.02.    Letters of Credit................................................................................... 41
    Section 2.03.    Loans and Borrowings ......................................................................... 44
    Section 2.04.    Funding of Borrowings ........................................................................ 44
    Section 2.05.    Interest Elections................................................................................. 45
    Section 2.06.    Termination and Reduction of the Commitments................................ 46
    Section 2.07.    Repayment of Loans; Evidence of Debt .............................................. 47
    Section 2.08.    Prepayment of Loans ........................................................................... 48
    Section 2.09.    Fees...................................................................................................... 51
    Section 2.10.    Interest ................................................................................................. 52
    Section 2.11.    Alternate Rate of Interest..................................................................... 53
    Section 2.12.    Increased Costs .................................................................................... 53
    Section 2.13.    Break Funding Payments ..................................................................... 55
    Section 2.14.    Taxes.................................................................................................... 55
    Section 2.15.    Payments Generally; Pro Rata Treatment; Sharing of Set-offs ........... 57
    Section 2.16.    Mitigation Obligations; Replacement of Lenders................................ 59
    Section 2.17.    Defaulting Lenders .............................................................................. 60
    Section 2.18.    Acknowledgement and Consent to Bail-In of EEA Financial Institutions .......... 60
    Section 2.19.    Successor LIBOR ................................................................................ 61

ARTICLE III REPRESENTATIONS AND WARRANTIES ............................................... 62
    Section 3.01.    Due Organization, Etc.......................................................................... 62
    Section 3.02.    Limited Liability Company Power, Etc ............................................... 62
    Section 3.03.    No Conflict ........................................................................................... 62
    Section 3.04.    Title...................................................................................................... 62
    Section 3.05.    Approvals, Etc ...................................................................................... 63
    Section 3.06.    No Default, Abandonment ................................................................... 64
    Section 3.07.    Litigation, Etc ...................................................................................... 64
    Section 3.08.    Compliance with Laws and Obligations.............................................. 64
    Section 3.09.    Environmental Laws............................................................................. 64
    Section 3.10.    Project Documents............................................................................... 65
    Section 3.11.    Material Adverse Effect........................................................................ 66
    Section 3.12.    Regulations T, U and X ....................................................................... 66
    Section 3.13.    Information .......................................................................................... 66
    Section 3.14.    Pari Passu ............................................................................................ 66
    Section 3.15.    Investment Company; Energy Regulatory Status ................................ 66
    Section 3.16.    Patriot Act, Sanctions and Related Matters ........................................ 67
    Section 3.17.    Security Documents............................................................................. 68
    Section 3.18.    ERISA.................................................................................................. 69
    Section 3.19.    Labor Matters...................................................................................... 69
    Section 3.20.    Single-Purpose Entity ......................................................................... 70

Alta App.000720

Alta 0063364

Section 3.21.    Members; Membership Interests and Related Matters ......................................... 70
Section 3.22.    Deposit Accounts and Securities Accounts ......................................................... 70
Section 3.23.    Solvency ............................................................................................................. 70
Section 3.24.    Taxes ................................................................................................................... 70
Section 3.25.    Financial Statements .......................................................................................... 70
Section 3.26.    Intellectual Property ........................................................................................... 70
Section 3.27.    Indebtedness ....................................................................................................... 71
Section 3.28.    Use of Proceeds .................................................................................................. 71
Section 3.29.    Insurance ............................................................................................................. 71
Section 3.30.    No Other Subsidiaries ......................................................................................... 71
Section 3.31.    Beneficial Ownership ......................................................................................... 71
Section 3.32.    Debt Service Reserve Account ............................................................................ 71
Section 3.33.    Major Maintenance Reserve Account ................................................................. 71

ARTICLE IV CONDITIONS ...................................................................................................... 71
Section 4.01.    Conditions Precedent to Closing Date ............................................................... 71
Section 4.02.    Conditions Precedent to Term Loans and to Issuance of Each Letter of Credit .. 77
Section 4.03.    Conversion Date ................................................................................................. 79

ARTICLE V AFFIRMATIVE COVENANTS .............................................................................. 81
Section 5.01.    Limited Liability Company Existence; Etc. ........................................................ 81
Section 5.02.    Conduct of Business ........................................................................................... 82
Section 5.03.    Compliance with Laws and Obligations .............................................................. 82
Section 5.04.    Governmental Approvals ..................................................................................... 82
Section 5.05.    Maintenance of Title ........................................................................................... 83
Section 5.06.    Maintenance of Property; Insurance .................................................................... 83
Section 5.07.    Keeping of Books ................................................................................................ 83
Section 5.08.    Access to Records; Inspection Rights ................................................................. 83
Section 5.09.    Payment of Taxes, Etc ........................................................................................ 85
Section 5.10.    Information and Reporting Requirements ............................................................ 85
Section 5.11.    Notices ................................................................................................................ 87
Section 5.12.    Use of Proceeds .................................................................................................. 88
Section 5.13.    Security ............................................................................................................... 89
Section 5.14.    Further Assurances .............................................................................................. 89
Section 5.15.    Auditors .............................................................................................................. 89
Section 5.16.    Permitted Interest Rate Hedges .......................................................................... 90
Section 5.17.    Project Revenues ................................................................................................ 90
Section 5.18.    Insurance Proceeds and Condemnation Proceeds ............................................... 90
Section 5.19.    Construction Budget ........................................................................................... 91
Section 5.20.    Operating Budget ................................................................................................ 91
Section 5.21.    Surveys and Title Policies ................................................................................... 93
Section 5.22.    Permitted Commodity Hedges ............................................................................ 93
Section 5.23.    Intercreditor Requirements ................................................................................. 93
Section 5.24.    Compliance with Money Laundering, Anti-Terrorism and Sanctions ................ 93
Section 5.25.    Sanctions ............................................................................................................ 94
Section 5.26.    Material Contracts ............................................................................................... 94
Section 5.27.    Separateness ........................................................................................................ 94
Section 5.28.    Target Debt Balance Adjustment ........................................................................ 95
Section 5.29.    Title Event Proceeds ........................................................................................... 95
Section 5.30.    Construction of the Projects ................................................................................ 96
Section 5.31.    Operation of the Projects .................................................................................... 96
Section 5.32.    Replacement Required Critical Equipment and Spare Parts ................................ 96

Alta App.000721

Alta 0063365

ARTICLE VI NEGATIVE COVENANTS ............................................................................. 96
   Section 6.01.      Fundamental Changes ....................................................................... 96
   Section 6.02.      Subsidiaries ....................................................................................... 97
   Section 6.03.      Indebtedness; Guarantees ................................................................. 97
   Section 6.04.      Liens, Etc .......................................................................................... 97
   Section 6.05.      Investments, Advances, Loans ......................................................... 97
   Section 6.06.      Business Activities ............................................................................ 97
   Section 6.07.      Restricted Payments ......................................................................... 97
   Section 6.08.      Asset Dispositions ............................................................................ 98
   Section 6.09.      Accounting Changes ......................................................................... 98
   Section 6.10.      Change Orders; Project Documents Amendments; Reserved Discretions .......... 98
   Section 6.11.      Transactions with Affiliates ............................................................. 99
   Section 6.12.      Accounts ......................................................................................... 100
   Section 6.13.      Acceptance ..................................................................................... 100
   Section 6.14.      Hedging Agreements ...................................................................... 100
   Section 6.15.      Tax Status ....................................................................................... 100
   Section 6.16.      Sanctions ........................................................................................ 100
   Section 6.17.      Capital Expenditures ...................................................................... 101
   Section 6.18.      Sales and Leasebacks ..................................................................... 101
   Section 6.19.      Acquired Real Property .................................................................. 101
   Section 6.20.      Employees ....................................................................................... 101
   Section 6.21.      Regulations T, U and X ................................................................. 101
   Section 6.22.      Debt Service Coverage Ratio; Right to Cure. ................................ 102
   Section 6.23.      Construction Budget ....................................................................... 102
   Section 6.24.      Operating Budget ........................................................................... 102
   Section 6.25.      Burdensome Agreements ................................................................ 102
   Section 6.26.      Equity Contributions ...................................................................... 103

ARTICLE VII EVENTS OF DEFAULT ........................................................................... 103
   Section 7.01.      Events of Default ........................................................................... 103
   Section 7.02.      Remedies ........................................................................................ 107

ARTICLE VIII THE AGENTS .......................................................................................... 108
   Section 8.01.      Appointment ................................................................................... 108
   Section 8.02.      Other Business ................................................................................ 108
   Section 8.03.      Duties and Obligations ................................................................... 108
   Section 8.04.      Reliance .......................................................................................... 108
   Section 8.05.      Sub-Agents ..................................................................................... 109
   Section 8.06.      Resignation ..................................................................................... 109
   Section 8.07.      Lender Acknowledgments .............................................................. 109
   Section 8.08.      Withholding Taxes ......................................................................... 110
   Section 8.09.      No Discretion .................................................................................. 110
   Section 8.10.      Force Majeure ................................................................................ 110
   Section 8.11.      Authorization ................................................................................. 110

ARTICLE IX MISCELLANEOUS ..................................................................................... 111
   Section 9.01.      Notices ............................................................................................ 111
   Section 9.02.      Waivers; Amendments ................................................................... 113
   Section 9.03.      Expenses; Indemnity; etc ............................................................... 114
   Section 9.04.      Successors and Assigns .................................................................. 116
   Section 9.05.      Survival .......................................................................................... 119
   Section 9.06.      Counterparts; Integration; Effectiveness ....................................... 119

Alta App.000722

Alta 0063366

Section 9.07.    Severability ........................................................................................ 119
Section 9.08.    Right of Setoff ................................................................................... 119
Section 9.09.    Governing Law; Jurisdiction; Etc ..................................................... 120
Section 9.10.    Headings ............................................................................................ 121
Section 9.11.    Confidentiality .................................................................................. 121
Section 9.12.    No Third Party Beneficiaries ............................................................ 122
Section 9.13.    Reinstatement .................................................................................... 122
Section 9.14.    Patriot Act ......................................................................................... 122
Section 9.15.    Scope of Liability .............................................................................. 122
Section 9.16.    Limitation on Liability ...................................................................... 123
Section 9.17.    Certain ERISA Matters. .................................................................... 123

Alta App.000723

Alta 0063367

| APPENDIX A | - | Insurance Program |
|---|---|---|
| EXHIBIT A | - | Form of Assignment and Assumption |
| EXHIBIT B | - | Form of Note |
| EXHIBIT C-1 | - | Form of Borrowing Request |
| EXHIBIT C-2 | - | Form of Notice of Issuance |
| EXHIBIT C-3 | - | Form of Conversion Request |
| EXHIBIT C-4 | - | Form of COD Notice |
| EXHIBIT D | - | Form of Closing Date Officer's Certificate |
| EXHIBIT E-1 | - | Form of Closing Date Legal Opinion (Porter Hedges LLP, New York Counsel to Loan Parties) |
| EXHIBIT E-2 | - | Form of Closing Date Legal Opinion (Porter Hedges LLP, Texas Counsel to Loan Parties) |
| EXHIBIT E-3 | - | Form of Closing Date Legal Opinion ([●], Counsel to Sponsor) |
| EXHIBIT F | - | Form of Construction Report |
| EXHIBIT G | - | Form of Major Maintenance Reserve Requirement Certificate |
| EXHIBIT H | - | Form of Operating Report |
| EXHIBIT I | - | Form of Construction Drawdown Certificate |
| EXHIBIT J-1 | - | Form of Drawdown Certificate of Independent Engineer |
| EXHIBIT J-2 | - | Form of Drawdown Certificate of Technical Consultant |
| EXHIBIT K | - | Form of Physical Facilities and Performance Certificate |
| EXHIBIT L | - | Form of Legal Matters Certificate |
| EXHIBIT M-1 | - | Form of Closing Date Independent Engineer Reliance Letter |
| EXHIBIT M-2 | - | Form of Closing Date Insurance Advisor Reliance Letter |
| EXHIBIT M-3 | - | Form of Closing Date Market Consultant Reliance Letter |
| EXHIBIT M-4 | - | Form of Closing Date Environmental Consultant Reliance Letter |
| EXHIBIT M-5 | - | Form of Closing Date Technical Consultant Reliance Letter |
| EXHIBIT N | - | Form of Consent to Assignment |
| EXHIBIT O | - | Form of Acceptable Letter of Credit |
| EXHIBIT P | - | Base Case Projections |
| EXHIBIT Q-1 | - | Closing Date Construction Budget |
| EXHIBIT Q-2 | - | Pro Forma Operating Budget |
| EXHIBIT R | - | Construction Schedule |
| EXHIBIT S | - | Form of Interest Election Request |
| EXHIBIT T-1 | - | Form of GIA Letter of Credit |
| EXHIBIT T-2 | - | Form of Offtake Letter of Credit |
| | | |
| SCHEDULE I | - | Commitments |
| SCHEDULE II | - | ALTA Survey Project Site Description |
| SCHEDULE III | - | Disqualified Lenders |
| SCHEDULE 2.10 | - | Term Loan Amortization Schedules |
| SCHEDULE 3.01 | - | Entity Identification Numbers |
| SCHEDULE 3.04(a) | - | Real Property |
| SCHEDULE 3.05 | - | Governmental Approvals |

Alta App.000724

Alta 0063368

SCHEDULE 5.19          -          CB Approval Thresholds
SCHEDULE 5.20          -          OB Approval Thresholds
SCHEDULE 6.10(f)       -          Reserved Discretions

Alta App.000725

Alta 0063369

This CREDIT AGREEMENT (this "Agreement") dated as of [●], 2019, is among ALTA POWER LLC (the "Borrower"), a limited liability company organized under the laws of the State of Texas, THE LENDERS AND ISSUING BANKS PARTY HERETO FROM TIME TO TIME, DEUTSCHE BANK TRUST COMPANY AMERICAS, a New York banking corporation, as the Administrative Agent, DEUTSCHE BANK TRUST COMPANY AMERICAS, a New York banking corporation, as the Collateral Agent and as the Depositary Bank and DEUTSCHE BANK SECURITIES INC., as the Mandated Lead Arranger and structuring bank (in such capacity, the "Mandated Lead Arranger").

WHEREAS, the Borrower wishes to fund ownership, development, construction, operation and maintenance of a (a) 150 megawatt gas-fired peaking power plant to be constructed in Kerens, Texas (the "Goodalta Project") and owned by Goodalta Power Center LLC, a Texas limited liability company ("Goodalta"), (b) 150 megawatt gas-fired peaking power plant to be constructed in Jacksonville, Texas (the "Altajac Project") and owned by Altajac Power Center LLC, a Texas limited liability company ("Altajac"), and (c) 150 megawatt gas-fired peaking power plant to be constructed in Lufkin, Texas (the "Avocet Project") and owned by Avocet Power Center LLC, a Texas limited liability company ("Avocet");

WHEREAS, in connection therewith, the Borrower has requested that the Lenders extend credit to the Borrower in an aggregate principal or face amount (as applicable) not exceeding $[●] at any one time outstanding, comprised of (a) a Term Loan facility in an aggregate principal amount of $[●], and (b) a Letter of Credit facility in an aggregate principal amount of $[●]; and

WHEREAS, the Lenders are prepared to extend the credit referred to in the preceding clause upon the terms and conditions hereof, and, accordingly, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01.    Certain Defined Terms. As used in this Agreement, the following terms shall have the following meanings:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans constituting such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Auditor" means Deloitte, Ernst & Young, KPMG, PricewaterhouseCoopers or such other regionally or nationally recognized independent public accountants as are selected by the Borrower and reasonably acceptable to the Administrative Agent.

"Acceptable Bank" means any United States commercial bank(s) or financial institution(s) or a United States branch or subsidiary of a foreign commercial bank(s) or financial institution(s) having, or guaranteed or confirmed by an entity having, a long-term unsecured senior debt rating of at least A3 or better by Moody's, A- or better by Fitch and/or A- or better by S&P (provided it satisfies at least two of the aforementioned ratings).

"Acceptable Letter of Credit" means an irrevocable letter of credit, substantially in the form of Exhibit O or otherwise in a form reasonably acceptable to the Collateral Agent, issued by an Acceptable Letter of Credit Issuer in favor of the Collateral Agent (for the benefit of the Secured Credit Agreement Parties), in respect of which no Loan Party is liable for (and none of their assets are pledged in support of) any drawings thereon, that has a stated maturity date that is not earlier than (x) twelve months after the date of issuance of such letter of credit (subject to automatic annual extensions, if agreed by the Acceptable

Alta App.000726

Alta 0063370

Letter of Credit Issuer) and (y) five Business Days prior to the Final Maturity Date, and which letter of credit and all related documentation are satisfactory to the Administrative Agent, acting reasonably. Any such letter of credit must be drawable if (i) it is not renewed or replaced at least fifteen days prior to its stated maturity date or (ii) the issuer of the Acceptable Letter of Credit no longer has a credit rating of at least Baa3 or better by Moody's, BBB- or better by Fitch and/or BBB- or better by S&P (satisfying at least two of the aforementioned ratings) and a replacement letter of credit has not been obtained from an Acceptable Letter of Credit Issuer within the earlier of (x) thirty days after such downgrade and (y) fifteen days prior to the stated maturity date. For the avoidance of doubt and without limiting the provisions of Sections 6.03 and 6.04, the Borrower acknowledges and agrees that, except in the case of any Letter of Credit, it shall not be the account party in respect of any letter of credit, and that any letter of credit (other than any Letter of Credit) shall not otherwise constitute Indebtedness of the Borrower or be secured by a Lien on any of the property of the Borrower or any of the Loan Parties.

"Acceptable Letter of Credit Issuer" means any United States commercial bank(s) or financial institution(s) or a United States branch or subsidiary of a foreign commercial bank(s) or financial institution(s) having, or guaranteed or confirmed by an entity having, a long-term unsecured senior debt rating of at least Baa3 or better by Moody's, BBB- or better by Fitch and/or BBB- or better by S&P (provided it satisfies at least two of the aforementioned ratings).

"Acceptable Vendor" means, (a) with respect to any Capital Expenditures similar in scope to those provided under any Material Project Document, the Project Party in respect thereof, (b) [●][2], or (c) such other vendors as are selected by the Borrower and reasonably acceptable to the Administrative Agent (in consultation with the Independent Engineer and the Technical Consultant).

"Accounts" has the meaning assigned to such term in the Depositary Agreement.

"Accounts Withdrawal Certificate" has the meaning assigned to such term in the Depositary Agreement.

"Additional Equity Contributions" means any Equity Contributions, other than the Closing Date Equity Contribution.

"Additional Material Project Document" means any agreement relating to the Projects entered into by one or more Borrower Parties subsequent to the Closing Date (a) that is a replacement of any Material Project Document entered into in accordance with the terms of this Agreement, (b) that is a Permitted Commodity Hedge that is permitted or required to be entered into pursuant to Section 5.22 or (c)(i) pursuant to which Borrower reasonably expects such Borrower Parties to have obligations in excess of $[●][3] in the aggregate with respect to any one contract or (ii) the loss of which could reasonably be expected to have a Material Adverse Effect.

"Adjusted LIBO Rate" means, for any Interest Period for any LIBOR Borrowing, an interest rate per annum (rounded upwards, if necessary, to the next 1/100th of 1.00%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate for such Interest Period.

"Administrative Agent" means Deutsche Bank Trust Company Americas, in its capacity as administrative agent for the Lenders hereunder, and any successor thereto appointed pursuant to Article VIII.

"Administrative Questionnaire" means a questionnaire, in a form supplied by the Administrative Agent, completed by a Lender.

---

[2]    **Note to Draft**: Under review by Independent Engineer and Technical Consultant.
[3]    **Note to Draft**: Subject to further DB review.

Alta App.000727

Alta 0063371

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified, and when used with respect to the Borrower, shall also mean the Pledgor.

"Agents" means, collectively, the Administrative Agent, the Collateral Agent and the Depositary Bank.

"Agreement" has the meaning assigned to such term in the preamble.

"Altajac" has the meaning assigned to such term in the recitals hereto.

"Altajac Operating Agreement" means the Limited Liability Company Agreement of Altajac Power Center LLC, dated as of [●], by the Borrower.

"Altajac Project" has the meaning assigned to such term in the recitals hereto.

"Alternate Base Rate" means, for any day (or if such day is not a Business Day, on the immediately preceding Business Day), a rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1.00%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the sum of (i) the Federal Funds Effective Rate in effect for such day *plus* (ii) 0.50% and (c) the three month LIBO Rate *plus* 1.00%; provided, that the Alternate Base Rate shall not be less than 2.00%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or LIBO Rate, as the case may be.

"Anti-Terrorism Laws" means any of the following: (a) the Anti-Terrorism Order; (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations); (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations); (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations); (e) the PATRIOT Act; and (f) any regulations promulgated pursuant thereto.

"Anti-Terrorism Order" means Section 1 of Executive Order 13224 of September 24, 2001, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism.

"Applicable Accounting Requirements" means generally accepted accounting principles, as in effect from time to time in the United States.

"Applicable Law" means, with respect to any Person, property or matter, any of the following applicable thereto: any constitution, statute, law, regulation, ordinance, rule, judgment, , order, decree, Governmental Approval, authorization, approval, concession, grant, franchise, license, agreement with,, binding requirement or restriction of,or any similar form of binding decision of any Governmental Authority, ERCOT or any other applicable independent system operator or regional transmission organization, having the force of law, whether in effect as of the Closing Date or thereafter and in each case as amended (including any of the foregoing pertaining to land use or zoning restrictions).

"Applicable Margin" means, with respect to any ABR Loan or LIBOR Loan, the applicable rate per annum determined pursuant to the interest grid set forth below:

| Loans | |
|---|---|
| LIBOR | ABR |
| 4.50% | 3.50% |

Alta App.000728

Alta 0063372

"Applicable Percentage" means, with respect to any Lender and in respect of any Class, the percentage of the total Commitments of such Class represented by such Lender's Commitment of such Class. If any Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the applicable Commitments most recently in effect, giving effect to any assignments having taken effect as of such time.

"Approved Affiliate Contracts" has the meaning assigned to such term in Section 6.11.

"Asset Management Agreements" means (a) [●], (b) [●], (c) [●] and (d) [●].

"Asset Manager" means Alta Power Development Services LLC, a Texas limited liability company.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and acknowledged by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"Authorized Officer" means, with respect to any Person, any executive officer or Financial Officer of such Person, any Person that has been duly authorized as an authorized signatory (or similar designation) of such Person in respect of the applicable matter or issue in question, or of any member of such Person responsible for the administration or supervision of the obligations of such Person in respect of this Agreement and/or any other Transaction Document.

"Availability Period" means the GIA Letter of Credit Availability Period, the Offtake Letter of Credit Availability Period and/or the Term Loan Availability Period (as the context requires).

"Avocet" has the meaning assigned to such term in the recitals hereto.

"Avocet Operating Agreement" means the Limited Liability Company Agreement of Avocet Power Center LLC, dated as of [●], by the Borrower.

"Avocet Project" has the meaning assigned to such term in the recitals hereto.

"BaFin" means the German Federal Financial Supervisory Authority.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Base Case Projections" means the financial model forecasting the revenues and expenditures of the Projects for time periods, and based upon assumptions and methodology agreed upon by the Borrower and the Mandated Lead Arranger on the Closing Date (including the terms of the Offtake Agreements and the report of the Market Consultant delivered pursuant to Section 4.01(j)), as attached as Exhibit P.

"BCBS" has the meaning assigned to such term in Section 2.12(a)(iii).

"Beneficial Ownership Certification" has the meaning assigned to such term in Section 4.01(cc).

Alta App.000729

Alta 0063373

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning assigned to such term in the preamble.

"Borrower Flood Notice" has the meaning assigned to such term in Section 4.01(w)(ii).

"Borrower Operating Agreement" means the Limited Liability Company Agreement of Alta Power LLC, dated as of [●], by the Pledgor.

"Borrower Party" or "Borrower Parties" means the Borrower and each Subsidiary Guarantor.

"Borrower Party Operating Agreements" means, collectively, the Borrower Operating Agreement, the Altajac Operating Agreement, the Avocet Operating Agreement and the Goodalta Operating Agreement.

"Borrowing" means (a) all ABR Loans of the same Class made, converted or continued on the same date or (b) all LIBOR Loans of the same Class which have the same Interest Period (as the context requires).

"Borrowing Request" means a request by the Borrower for a Borrowing of Term Loans in accordance with Section 2.01.

"Business Day" means any day (a) that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed, and (b) if such day relates to a borrowing of, a payment or prepayment of principal of or interest on, a continuation or conversion of or into, or the Interest Period for, a LIBOR Borrowing, or to a notice by the Borrower with respect to any such borrowing, payment, prepayment, continuation, conversion, or Interest Period, that is also a day on which dealings in Dollar deposits are carried out in the London interbank market.

"Capital Expenditures" means expenditures to acquire or construct fixed assets, plant and equipment (including renewals, improvements and replacements) computed in accordance with Applicable Accounting Requirements.

"Cash Flow Available for Debt Service" means, for any period, with reference to the Borrower Parties' financial statements for such period, (a) Project Revenues (other than the proceeds of Additional Equity Contributions and liquidated damages received under any Project Document other than from Project Document Claims) collected for such period, *less* (b) Operating and Maintenance Expenses paid during such period, *less* (c) Major Maintenance Expenses and Capital Expenditures (to the extent not already counted as Operating and Maintenance Expenses) paid during such period.

"CB Approval Threshold" means each threshold set forth on Schedule 5.19 under the heading "*CB Approval Threshold*".[4]

---

[4] **Note to Draft**: To include certain matters that require consent of the Lenders, Administrative Agent, or Independent Engineer (e.g., reductions / reallocations to contingency, reallocations of cost savings from fixed price line items). Additionally, to be separated if the Projects have different conditions.

Alta App.000730

Alta 0063374

"Change in Law" means (a) the adoption of any law, rule or regulation after the Closing Date, (b) any change in any law, rule or regulation or in the interpretation or replacement thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender or any Issuing Bank (or, for purposes of Section 2.12(b), by any lending office of such Lender or by the Lender's or such Issuing Bank's holding company, if any) with any written request, guideline or directive (whether or not having the force of law, but if not having the force of law then being one with which the relevant party would customarily comply) of any Governmental Authority made or issued after the Closing Date.

"Change of Control" means the consummation of any transaction or series of related transactions the result of which is that any one or more of the following shall occur: (a) the Designated Holders, in the aggregate, shall fail to own directly or indirectly more than 50% of the economic and voting stock of Pledgor (on a fully diluted basis); (b) the Designated Holders, in the aggregate, shall fail to have the power, directly or indirectly, to direct the management of Pledgor, or Pledgor shall fail to have such power in respect of the Borrower, or the Borrower shall fail to have such power in respect of the Subsidiary Guarantors; (c) at any time, Pledgor shall fail to own directly 100% of the economic and voting stock of the Borrower (on a fully diluted basis); (d) at any time, the Borrower shall fail to own directly 100% of the economic and voting stock of each Subsidiary Guarantor (on a fully diluted basis); or (e) a Disqualified Owner shall become a direct or indirect owner of any voting or economic interest in any Loan Party.

"Change Order" means any change order, variation, equitable adjustment, claim or similar provisions under the Construction Contracts that has the effect of increasing the price or extending the time for performance thereunder.

"Class", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans constituting such Borrowing, are Term Loans; when used in reference to any Commitment, refers to whether such Commitment is a Term Loan Commitment; when used in reference to any Letter of Credit, refers to whether such Letter of Credit is a GIA Letter of Credit or an Offtake Letter of Credit; when used in reference to any Letter of Credit Exposure, refers to whether such Letter of Credit Exposure is a GIA Letter of Credit Exposure or an Offtake Letter of Credit Exposure.

"Closing Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"Closing Date Equity Contribution" means an Equity Contribution in the amount of $[●] to be made on or prior to the Closing Date.

"COD" means [that, with respect to each of the Altajac Project, the Avocet Project and the Goodalta Project, (a) "Substantial Completion" has occurred under the relevant Construction Contract, (b) the conditions to "[●]" as specified in the relevant Generation Interconnection Agreement have been satisfied, (c) the Borrower shall have certified in writing to the Administrative Agent that the relevant Project is capable of dispatching energy to ERCOT and eligible to receive payment for energy and (d) the Major Maintenance Reserve Account shall be fully funded with cash in an amount at least equal to the portion of the Required Major Maintenance Reserve Amount applicable to such Project.][5]

"COD Deadline" means (a) with respect to the Altajac Project, [●], (b) with respect to the Avocet Project, [●] and (c) with respect to the Goodalta Project, [●] (as the context requires).

"COD Notice" means a notice by the Borrower in accordance with Section 2.01(f).

"Code" means the U.S. Internal Revenue Code of 1986.

---

[5]    **Note to Draft**: Under review pending due diligence.

Alta App.000731

Alta 0063375

"Collateral" means any and all Liens of (or for the benefit of) the Secured Parties intended to be constituted from time to time by or pursuant to, or evidenced by, the Security Documents and, as applicable, all corresponding assets (including real property, personal property and fixtures) encumbered by such Liens.

"Collateral Agent" means Deutsche Bank Trust Company Americas, in its capacity as collateral agent for the Secured Parties under the Security Documents, and any successor thereto appointed pursuant to Article VI of the Intercreditor Agreement.

"Commitment" means, (a) with respect to any Term Loan Lender, the Term Loan Commitments of such Term Loan Lender, and (b) with respect to any Issuing Bank, its Issuing Commitment.

"Commodity Hedge Termination Proceeds Account" has the meaning assigned to such term in the Depositary Agreement.

"Commodity Hedge Termination Payment" means any amount payable by any Borrower Party in connection with an early termination (whether as a result of the occurrence of an event of default or other termination event) of any Permitted Commodity Hedge in accordance with the terms thereof; provided, that for the avoidance of doubt, "Commodity Hedge Termination Payments" shall not include any Ordinary Course Commodity Hedge Settlement Payments due under any such Permitted Commodity Hedge except any Ordinary Course Commodity Hedge Settlement Payments due as part of such termination payment.

"Comparable Project" means one or more natural gas- or distillate fuel oil-fired electric generating facilities located in the United States that are of a size, in aggregate, substantially similar to or greater than [450 MW], [225 MW] of which shall be in the ERCOT market.

"Condemnation" means any taking, seizure, confiscation, requisition, exercise of rights of eminent domain, public improvement, inverse condemnation, condemnation or similar action of or proceeding by any Governmental Authority relating to the Projects unless such taking, seizure, confiscation, requisition, exercise of rights of eminent domain, public improvement, inverse condemnation, condemnation or similar action or proceeding is diligently contested in good faith by the Borrower Parties and during the period of such contest, the enforcement of any contested item is effectively stayed.

"Condemnation Proceeds" means all amounts and proceeds (including instruments) received in respect of an Event of Taking.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consents to Assignment" means each Consent to Assignment executed by a Project Party and one or more Borrower Parties (as the context requires) and required to be delivered on the Closing Date pursuant to Section 4.01(b), and each Consent to Assignment substantially in the form of Exhibit N entered into by one or more Borrower Parties (as the context requires) with a Project Party pursuant to Section 6.10(d) and in connection with any Material Project Document entered into following the Closing Date.

"Construction Account" has the meaning assigned to such term in the Depositary Agreement.

"Construction Budget" means the construction budget attached as Exhibit Q, as may be modified from time to time in accordance with the terms hereof.

Alta App.000732

Alta 0063376

"Construction Contract" means, (a) with respect to the Altajac Project, [●], (b) with respect to the Avocet Project, [●] and (c) with respect to the Goodalta, [●].[6]

"Construction Drawdown Certificate" means a certificate substantially in the form of Exhibit I.

"Construction Report" means a report in substantially the form of Exhibit F.

"Construction Schedule" means the construction schedule attached as Exhibit R, as may be modified from time to time in accordance with the terms hereof.

"Contractor" means, (a) with respect to the Altajac Project, [●], (b) with respect to the Avocet Project, [●] and (c) with respect to the Goodalta Project, [●].

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Conversion Date" has the meaning assigned to such term in Section 4.03.

"Conversion Deadline" means [●].

"Conversion Request" means a request by the Borrower for a Borrowing of Term Loans in accordance with Section 2.01(e).

"Debt Service" means, for any period, the sum, computed without duplication, of the following: (a) all scheduled amounts payable by the Borrower in respect of principal of the obligations under this Agreement during such period (excluding any mandatory prepayment of such obligations and any bullet payment due at the Final Maturity Date); plus (b) all amounts payable by the Borrower in respect of Interest Expense for such period; plus (c) all net payments payable by the Borrower pursuant to Permitted Interest Rate Hedges during such period (less any net payments received by the Borrower during such period pursuant to Permitted Interest Rate Hedges) plus (d) all letter of credit fees and loan fees payable to the Agents (in their capacities as Agents), the Issuing Banks and the Lenders under the Financing Documents or the Depositary Bank under the Depositary Agreement.

"Debt Service Coverage Ratio" or "DSCR" means, for any period, the ratio of (a) Cash Flow Available for Debt Service for such period to (b) Debt Service for such period.

"Debt Service Reserve Account" has the meaning assigned to such term in the Depositary Agreement.

"Debt Service Reserve Required Amount" means the amount (as set forth in the applicable Accounts Withdrawal Certificate delivered pursuant to Section [3.03(b)] of the Depositary Agreement) that is equal to the estimated amount of Debt Service scheduled to be due during the six-month period commencing on the day after such date.

"Default" means any event or condition that, with the giving of notice, lapse of time or upon declaration or determination being made (or any combination thereof) would constitute an Event of Default.

"Defaulting Lender" means any Lender with respect to which a Lender Default is in effect.

---

[6]    **Note to Draft**: Subject to due diligence and input from the Independent Engineer and the Technical Consultant.

Alta App.000733

Alta 0063377

"Deposit Accounts" means a "deposit account" as that term is defined in Section 9-102(a) of the UCC.

"Depositary Agreement" means the Depositary Agreement, dated as of the Closing Date, among the Borrower, the Subsidiary Guarantors and the Agents.

"Depositary Bank" means Deutsche Bank Trust Company Americas, in its capacity as depositary bank under the Depositary Agreement, and any successor thereto appointed pursuant to Section [4.07] of the Depositary Agreement.

"Designated Equity Contribution" has the meaning assigned to such term in Section 6.22(b).

["Designated Holders" means (a) the Sponsor and (b) any Qualified Owner; provided, that prior to the completion of the Projects, the Sponsor shall continue to exercise operational control over the Projects.][7]

"Development" means development, acquisition, ownership, financing, occupation, construction, equipping, testing, alteration, reconstruction, repair, operation, maintenance and use of each Project, including the production and sale of electricity from such Project.

"Disbursement Date" has the meaning assigned to such term in Section 2.02(f).

"Disposition" has the meaning assigned to such term in Section 2.08(b)(iv).

"Disqualified Lender" means the institutions set forth on Schedule III.

"Disqualified Owner" means any Person that, as of the date it first becomes a direct owner of membership interests in the Borrower: (i) is, or is an Affiliate of a Person that is, described by or designated in any Sanctions List or in the Anti-Terrorism Order or owned or controlled by such a Person; (ii) is, or is an Affiliate of a Person that is, in violation of the Sanctions or Anti-Terrorism Laws; or (iii) has, or is an Affiliate of a Person that has, been convicted of money laundering (under 18 U.S.C. Sections 1956 or 1957), which conviction has not been overturned; provided, that a Person shall not be a Disqualified Owner if: (x) prior to the date that the Person first becomes a direct owner of membership interests in the Borrower the Borrower provides the Secured Credit Agreement Parties with all documentation and other written information required under applicable "know your customer" and anti-money laundering rules, regulations and requirements (including the PATRIOT Act) in respect of such Person; and (y) as of the date the Person first becomes a direct owner of the membership interests in the Borrower, such Person has certified to the Administrative Agent that none of the criteria set forth in the foregoing clauses (i) to (iii) in this definition are applicable to such Person. For the avoidance of doubt, each Person that is a parent company of the Borrower on the Closing Date, and each wholly owned direct or indirect subsidiary thereof, shall not be a Disqualified Owner.

"Distribution Account" has the meaning assigned to such term in the Depositary Agreement.

"Dollars" or "$" refers to the lawful currency of the United States of America.

"DSCR Calculation Period" means, in respect of a Quarterly Date after the Conversion Date, (a) for a Quarterly Date at the end of the first, second, or third full calendar quarter after the Conversion Date, the period beginning on the Conversion Date and ending on such Quarterly Date and (b)

---

[7]    **Note to Draft**: Subject to syndication.

Alta App.000734

Alta 0063378

for any subsequent Quarterly Date not specified in clause (a), the twelve month period ending on such Quarterly Date.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Energy Management Agreement" means [●].[8]

"Environmental Claim" means any written notice, claim, action, suit, judgment, demand, order, or consent agreement, or any proceeding, arising under any Environmental Law or any Governmental Approval required under any Environmental Law or alleging injury or threat to human health, safety, or the environment, including for damages, enforcement, investigatory costs, costs of response, removal, remediation, contribution, indemnification, cost recovery, injunctive relief, attorneys' fees, damages to the environment, natural resources, or other property, fines, third-party claims, remedial or other actions, or penalties arising out of, based on or resulting from (a) the Release or threatened Release into the environment of any Hazardous Substance or (b) any condition forming the basis of any liability under Environmental Law, or violation of any Environmental Law or any Governmental Approval required under any Environmental Law applicable to any Project.

"Environmental Consultant" means [ERM] or any successor consultant appointed by the Administrative Agent and, so long as no Default or Event of Default has occurred and is continuing, reasonably acceptable to the Borrower.

"Environmental Law" means any and all Applicable Laws relating to pollution, safety or the protection of human health, natural resources (including any protected species) or the environment or the use, handling, transportation, treatment, storage, disposal or Release into the environment of, or exposure to, any Hazardous Substance, including the Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. Sections 9601 *et seq.*) ("CERCLA"), the Resource Conservation and Recovery Act (42 U.S.C. Sections 6901 *et seq.*), the Clean Air Act (42 U.S.C. Sections 7401 *et seq.*), the Rivers and Harbors Act of 1899 (33 U.S.C. § 403), Title 14 Code of Federal Regulations, Federal Aviation Administration Regulations (Navigation Hazards), Safe Drinking Water Act (42 U.S.C. Section 300f *et seq.*), National Environmental Policy Act (42 U.S.C. Sections 4321 *et seq.*), Oil Pollution Act of 1990 (33 U.S.C. Section 2701 *et seq.),* Pollution Prevention Act of 1990 (42 U.S.C. Section 13101 *et seq.*), Endangered Species Act (16 U.S.C. Sections 1531 *et seq.*), Protection of Migratory Game and Insectivorous Birds Act (16 U.S.C. Sections 701 *et seq.*), Bald and Golden Eagle Protection Act (16 U.S.C. Sections 668 *et seq.*), Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. Sections 1101 *et seq.*), the Clean Water Act (33 U.S.C. Sections 1251 *et seq.*), the Hazardous Materials Transportation Act (49 U.S.C. Sections 1801 *et seq.*), and the Toxic Substances Control Act (15

---

[8]    **Note to Draft**: Borrower to confirm that there will be only one Energy Management Agreement.

Alta App.000735

Alta 0063379

U.S.C. Sections 2601 *et seq.*) and the regulations promulgated pursuant to any of the foregoing and similar or applicable state and local statutes and regulations, all as may be amended from time to time.

"Equity Contribution" means a cash capital contribution by the Sponsor to the Borrower (through the Pledgor) or to the Subsidiary Guarantors (through the Pledgor and the Borrower).

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, or any warrants, options or other rights to acquire such interests.

"ERCOT" means (a) the Electric Reliability Council of Texas or a successor entity or (b) the power region, served by the electrical grid wholly within the State of Texas, for which the Electric Reliability Council of Texas, Inc. or a successor entity certified by the PUCT, is the independent system operator.

"ERCOT Nodal Protocols" shall mean the document adopted by ERCOT, including any attachments or exhibits referenced in that document, as amended from time to time, that contains the scheduling, operating, planning, reliability, and settlement policies, rules, guidelines, procedures, standards, and criteria of ERCOT.

"ERCOT Resource Asset Registration Form" shall mean the ERCOT Resource Asset Registration Form (RARF) to be prepared by each resource entity in ERCOT in accordance with Section 16 of the ERCOT Nodal Protocols.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any Person, trade or business that, together with the Borrower, is or was treated as a single employer under Section 414(b), (c), (m) or (o) of the Code or Section 4001(b) of ERISA.

"ERISA Event" means: (a) a Reportable Event with respect to a Pension Plan; (b) the failure by the Borrower or any ERISA Affiliate to meet all applicable requirements under the Pension Funding Rules or the filing of an application for the waiver of the minimum funding standards under the Pension Funding Rules; (c) the incurrence by the Borrower or any ERISA Affiliate of any liability under Section 4063 or 4064 of ERISA due to the termination of a Pension Plan or a cessation of operations with respect to a Pension Plan which is treated as a withdrawal under Section 4062(e) of ERISA; (d) a complete or partial withdrawal (within the meaning of Section 4203 and 4205 of ERISA) by the Borrower or any ERISA Affiliate from a Multiemployer Plan or receipt of notification that a Multiemployer Plan is "insolvent" (within the meaning of Sections 4241 and 4245 of ERISA); (e) the filing of a notice of intent to terminate a Pension Plan under, or the treatment of a Pension Plan amendment as a termination under, Section 4041 of ERISA; (f) the institution by the PBGC of proceedings to terminate a Pension Plan; (g) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (h) the determination that any Pension Plan is in "at-risk status" (within the meaning of Section 430 of the Code or Section 303 of ERISA) or that a Multiemployer Plan is in "endangered status", "seriously endangered" or "critical status" (within the meaning of Section 432 of the Code or Section 305 of ERISA); (i) the imposition or incurrence of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; (j) the imposition of any liability on the Borrower or any ERISA Affiliate pursuant to Section 4069 of ERISA by reason of Section 4212(c) of ERISA; (k) the imposition of a Lien upon the Borrower pursuant to Section 436(f) or Section 430(k) of the Code or Section 303(k) of ERISA; or (l) the making of an amendment to a Pension Plan that could result in the posting of bond or security under Section 436(f)(1) of the Code.

Alta App.000736

Alta 0063380

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Abandonment" means (a) the written announcement by any Borrower Party of a decision to abandon or indefinitely defer, or the abandonment of, the construction or completion or operation of all or any material part of any Project for any reason or (b) the total suspension for more than ninety consecutive days or abandonment of the Development of any Project; provided, that any suspension or delay in construction, completion or operation of a Project caused by a force majeure event or a forced or scheduled outage of a Project shall not constitute an "Event of Abandonment" so long as, to the extent feasible during such force majeure event or outage, the Borrower Parties are diligently attempting to restart the construction, operation or completion, as the case may be, of such Project.

"Event of Damage" means any event of damage, destruction or casualty (other than an Event of Taking) relating to all or any part of a Project or the Project Assets.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Event of Taking" means the occurrence of any of the following events carried out by any Governmental Authority: (a) any Condemnation, nationalization, seizure, compulsory acquisition or expropriation of all or any portion of (i) the Project Assets, (ii) the business operations of a Borrower Party or (iii) the Equity Interests in a Borrower Party; (b) any intervention in, or assumption of custody or control of, all or any portion of (i) the Project Assets, (ii) the business operations of a Borrower Party or (iii) the Equity Interests in a Borrower Party; or (c) any action for the dissolution or disestablishment of a Borrower Party.

"EWG" means "exempt wholesale generator" as defined in Section 1262(6) of PUHCA and the implementing regulations of FERC at 18 C.F.R. Part 366 and Section 31.002(7) of PURA.

"Excess Cash Flow" has the meaning assigned to such term in the Depositary Agreement.

"Excluded Commodity Account Amount" shall mean, as of any date of determination:

(a)    [with respect to Short Term Permitted Commodity Accounts, an aggregate amount not to exceed (i) $[●] plus (ii) the amount of any Additional Equity Contributions that the Borrower has notified the Administrative Agent are specified to be used (at the time so contributed) as cash collateral to be held in Short Term Permitted Commodity Accounts; and]

(b)    with respect to other Excluded Commodity Accounts, an aggregate amount not to exceed the amount of any Additional Equity Contributions that the Borrower has notified the Administrative Agent is specified to be used (at the time so contributed) as cash collateral in other Excluded Commodity Accounts.

[9]"Excluded Commodity Accounts" shall mean any securities account or deposit account maintained by any Borrower Party and any related cash or Permitted Investments on deposit therein, or credited thereto, which are pledged to secure any Borrower Party's obligations under [(a) any Other Permitted Commodity Hedge or (b)] any exchange (including the Intercontinental Exchange) to support the purchase of fuel and sale of power generated by the Projects in the ordinary course of business and for non-speculative purposes; provided, that [(x) the aggregate amount on deposit in Short Term Permitted Commodity Accounts, or credited thereto, shall at no time exceed the Excluded Commodity Account Amount at such time as specified in clause (a) of the definition thereof and (y)] the aggregate amount on

---

[9]    **Note to Draft**: Alta and DB to discuss advisors.

Alta App.000737

Alta 0063381

deposit in other Excluded Commodity Accounts, or credited thereto, shall at no time exceed the Excluded Commodity Account Amount at such time as specified in clause (b) of the definition thereof.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Agent, Lender or Issuing Bank or required to be withheld or deducted from a payment to an Agent, Lender or Issuing Bank, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Agent, Lender or Issuing Bank being organized under the laws of, or having its principal office or, in the case of any Agent, Lender or Issuing Bank, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of an Agent, Lender or Issuing Bank, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Agent, Lender or Issuing Bank with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Agent, Lender or Issuing Bank acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.16) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.14, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Agent, Lender or Issuing Bank's failure to comply with Section 2.14(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"FATCA" means Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1.00%) of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York (provided, that if the day for which such rate is to be determined is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day), or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1.00%) of the quotations for such day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Fee Letters" means (a) that Commitment Letter, dated as of [●] between the Borrower and the Mandated Lead Arranger, (b) [●].

"FERC" means the Federal Energy Regulatory Commission and any successor entity performing similar functions.

"Final Maturity Date" means the earlier of (a) unless the Conversion Date shall have occurred, the Conversion Deadline and (b) the sixth anniversary of the Closing Date.

"Financial Officer" means, for any Person, the chief financial officer, principal accounting officer, treasurer, assistant treasurer, controller, assistant controller or similar accounting or financial principal of such Person or of any member of such Person responsible for the financial or accounting functions of such Person.

Alta App.000738

Alta 0063382

"Financing Documents" means this Agreement, each Note, the Security Documents, the Fee Letters, each GIA Letter of Credit, each Offtake Letter of Credit, the Permitted Interest Rate Hedges and the Intercreditor Agreement and any other agreement, letter agreement or similar document entered into by or for the benefit of the Administrative Agent, the Collateral Agent or any other Secured Credit Agreement Party, on one hand, and a Loan Party or one or more Affiliates of a Loan Party, on the other hand, in connection with the transactions expressly contemplated by this Agreement.

"FINRA" mean the Financial Industry Regulatory Authority, Inc.

"Fiscal Year" means, with respect to any Person, the fiscal year of such Person.

"Flood Laws" means the National Flood Insurance Reform Act of 1994, as amended and related legislation.

"Fitch" means Fitch Ratings, Ltd. or any successor to the ratings agency business thereof.

"FPA" means the Federal Power Act, as amended, and FERC's regulations thereunder.

"Generation Interconnection Agreements" means [●].

"Generation Interconnection Construction Agreements" means [●].

"GIA Issuing Bank" means (a) [●]; and (a) any other Lender designated as a GIA Issuing Bank pursuant to Section 2.02(i), in each case in its capacity as an issuer of GIA Letters of Credit hereunder, and its successors in such capacity which in the case of clause (b) shall have, or be guaranteed or confirmed by an entity having, a long-term unsecured senior debt rating in accordance with the requirements set forth in the Generation Interconnection Agreements.

"GIA Letter of Credit" means any letter of credit issued by any GIA Issuing Bank to [●], as beneficiary, pursuant to a Generation Interconnection Agreement and substantially in the form of Exhibit T-1.

"GIA Letter of Credit Availability Period" means the period from and including the Closing Date to the GIA Letter of Credit Maturity Date.

"GIA Letter of Credit Disbursement" means a payment made by any GIA Issuing Bank pursuant to a GIA Letter of Credit.

"GIA Letter of Credit Exposure" means, with respect to a GIA Issuing Bank, at any time, the sum of (a) the aggregate undrawn amount of any GIA Letter of Credit at such time issued by such GIA Issuing Bank and (b) the aggregate amount of all GIA Letter of Credit Disbursements of such GIA Issuing Bank that have not yet been reimbursed by or on behalf of the Borrower at such time.

"GIA Letter of Credit Maturity Date" means the earlier of (a) twelve months after the date of issuance of such letter of credit (subject to automatic annual extensions, if agreed by the applicable GIA Issuing Bank), (b) the Conversion Date and (c) the date that is five Business Days prior to the Conversion Deadline.

"Goodalta" has the meaning assigned to such term in the recitals hereto.

"Goodalta Operating Agreement" means the Limited Liability Company Agreement of Goodalta Power Center LLC, dated as of [●], by the Borrower.

"Goodalta Project" has the meaning assigned to such term in the recitals hereto.

Alta App.000739

Alta 0063383

"Governmental Approval" means any authorization, approval, consent, waiver, license, registration, ruling, permit, tariff, certification, exemption, franchise, or concession of or by any Governmental Authority.

"Governmental Authority" means any federal, state, regional or local governmental or quasi-governmental department, commission, board, bureau, authority, agency, court, instrumentality or judicial or regulatory body or entity, in any such case, whether foreign or domestic, and in each case, exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including, for the avoidance of doubt, any central bank (including the European Central Bank), FINRA, BaFin, BCBS, FERC, ERCOT, the North American Electric Reliability Corporation, TRE, or the IMM.

"Hazardous Substances" means any hazardous or toxic substances, chemicals, materials or wastes defined, listed, classified or regulated as such in or under any Environmental Law, including: (a) any petroleum, petroleum products (including gasoline, crude oil or any fraction thereof), petroleum breakdown products, flammable explosives, radioactive materials, , radon gas and polychlorinated biphenyls; and (b) any conditions, chemicals, materials or substances designated, classified, regulated, defined as or included in the definition of "hazardous", "toxic", "hazardous substances", "hazardous wastes", "hazardous materials", "extremely hazardous wastes", "restricted hazardous wastes", "toxic substances", "toxic pollutants", "contaminants", or "pollutants" or words of similar import, under any applicable Environmental Law.

"Hedging Agreement" means any agreement with respect to any spot, swap, forward, future or option or derivative transaction or similar agreement (including take-or-pay contracts, long term fixed price off take contracts and contracts for the sale of power on either a financial or physical basis) involving, or settled by reference to, one or more rates, currencies, commodities, equities or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions, including, without limitation, Permitted Interest Rate Hedges and Permitted Commodity Hedges.

"IMM" means the independent market monitor for the ERCOT market as selected by the PUCT pursuant to Section 39.1515 of PURA.

"Impairment" means, with respect to any Transaction Document or any Governmental Approval by any Governmental Authority, the rescission, termination, cancellation, repeal or invalidity thereof. The verb "Impair" shall have a correlative meaning.

"Indebtedness" means, as to any Person at any time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with Applicable Accounting Requirements: (a) all obligations of such Person for or in respect of borrowed money; (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments; (c) all obligations of such Person for representing the balance deferred and unpaid of the purchase price of any property or services; (d) all obligations of such Person that are or should be reflected on such Person's balance sheet as capital lease obligations; (e) obligations of such Person under any Hedging Agreement; (f) reimbursement obligations (contingent or otherwise) pursuant to any performance bonds; (g) whether or not so included as liabilities in accordance with Applicable Accounting Requirements, Indebtedness of others described in clauses (a) through (f) above secured by (or for which the holder thereof has an existing right, contingent or otherwise, to be secured by) a Lien on the property of such Person, whether or not the respective Indebtedness so secured has been assumed by such Person; and (h) all guarantees of such Person in respect of any of the foregoing. The amount of any obligation under any Hedging Agreement of any Person on any date shall be deemed to be the net termination value determined as of such date for which

Alta App.000740

Alta 0063384

such Person would be liable thereunder (assuming, for the purposes hereof, that such Hedging Agreement was closed-out or terminated as of such date).

"Indemnified Party" has the meaning assigned to such term in Section 9.03(b).

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Financing Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Independent Engineer" means Leidos Engineering, LLC or any successor consultant appointed by the Administrative Agent and, so long as no Default or Event of Default has occurred and is continuing, reasonably acceptable to the Borrower.

"Information" has the meaning assigned to such term in Section 9.11.

"Insolvency or Liquidation Proceeding" means:

(a)    any case commenced by or against any Borrower Party under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, any other proceeding for the reorganization, recapitalization or adjustment or marshalling of the assets or liabilities of such Borrower Party, any receivership or assignment for the benefit of creditors relating to such Borrower Party or any similar case or proceeding relative to such Borrower Party or any of its creditors, as such, in each case whether or not voluntary;

(b)    any liquidation, dissolution, marshalling of assets or liabilities or other winding up of or relating to such Borrower Party, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(c)    any other proceeding of any type or nature in which substantially all claims of creditors of such Borrower Party are determined and any payment or distribution is or may be made on account of such claims.

"Insurance Advisor" means Moore-McNeil, LLC, or another nationally recognized insurance advisor selected by the Administrative Agent, and, so long as no Event of Default has occurred and is continuing, reasonably acceptable to the Borrower.

"Insurance Proceeds" means insurance proceeds or other compensation, awards, damages and other payments or relief (exclusive, in each case, of the proceeds of liability insurance, delay in start-up insurance, forced outage insurance and business interruption insurance and other payments for interruption of operations) with respect to any Event of Damage.

"Insurance Program" means the insurance program described in Appendix A of this Agreement.

"Insurance/Condemnation, Title Event and Disposition Proceeds Account" has the meaning assigned to such term in the Depositary Agreement.

"Intercreditor Agreement" means the Collateral Agency and Intercreditor Agreement, dated as of the Closing Date, among the Borrower, the Administrative Agent, the Collateral Agent and each other Person that becomes a party thereto in accordance with its terms.

"Interest Election Request" means a request by the Borrower to convert or continue a Borrowing in accordance with Section 2.05(a).

Alta App.000741

Alta 0063385

"Interest Expense" means, for any period, the sum, computed without duplication, of the following: (a) all interest in respect of the obligations under this Agreement accrued during such period; *plus* (b) the net amounts payable (or receivable) under the Permitted Interest Rate Hedges (other than termination or unwind payments thereunder) accrued during such period whether or not paid or received during such period.

"Interest Payment Date" means (a) with respect to any ABR Loan, each Quarterly Date and the Term Loan Maturity Date for such ABR Loan and (b) with respect to any LIBOR Loan, the last day of each Interest Period therefor; provided, that notwithstanding the foregoing and notwithstanding any Interest Period election by the Borrower, the first Interest Payment Date to occur following the Conversion Date shall be the Quarterly Date occurring in the first full quarter following the Conversion Date.

"Interest Period" means, for any LIBOR Loan or Borrowing, the period commencing on the date of such Loan or Borrowing and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is three months thereafter; provided, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day, (b) any Interest Period which would otherwise end after the Term Loan Maturity Date shall end on the Term Loan Maturity Date, (c) each Interest Period shall have a duration of at least five Business Days, (d) any Interest Period which begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period and (e) the initial Interest Period selected by Borrower for LIBOR Loans on the Closing Date shall, subject to Section 2.05(a), if required, be an irregular Interest Period ending on the next Quarterly Date, at the option of the Borrower. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes hereof, the date of a Loan initially shall be the date on which such Loan is made and thereafter shall be the effective date of the most recent conversion or continuation of such Loan, and the date of a Borrowing comprising Loans that have been converted or continued shall be the effective date of the most recent conversion or continuation of such Loans.

"Interest Rate Hedge Termination Payment" means any amount payable by the Borrower in connection with an early termination (whether as a result of the occurrence of an event of default or other termination event) of any Permitted Interest Rate Hedge in accordance with the terms thereof and this Agreement; provided, that, for the avoidance of doubt, "Interest Rate Hedge Termination Payments" shall not include any Ordinary Course Interest Rate Hedge Settlement Payments due under any such Permitted Interest Rate Hedge except any Ordinary Course Interest Rate Hedge Settlement Payments due as part of such termination payment.

"Issue" means, with respect to any Letter of Credit, to issue, extend the expiration date of (whether automatically or otherwise), increase the face amount of, or reduce or eliminate any scheduled decrease in the face amount of, such Letter of Credit, or to cause any Person to do any of the foregoing. The terms "Issued" and "Issuance" have correlative meanings.

"Issuing Commitment" means, for each Issuing Bank with respect to a Class of Letters of Credit, the commitment to Issue Letters of Credit of such Class in accordance with the terms of this Agreement, expressed as such Issuing Bank's maximum Letter of Credit Exposure for such Class at any time, as such commitment may be (a) reduced in connection with a replacement of an Issuing Bank pursuant to an agreement described in Section 2.02(g), (b) increased in connection with the designation of an additional Issuing Bank pursuant to an agreement described in Section 2.02(i) or (c) reduced or increased from time to time pursuant to assignments by or to such Issuing Bank pursuant to Section 9.04. The initial amount of each Issuing Bank's Issuing Commitment for each Class of Letter of Credit is set forth on Schedule I, or in the Assignment and Assumption pursuant to which such Issuing Bank shall have assumed

Alta App.000742

Alta 0063386

its Issuing Commitment, as applicable. In addition, the total Issuing Commitments of all Issuing Banks with respect to each Class of Letters of Credit shall not at any time exceed (a) for GIA Letters of Credit, $[9,000,000] and (b) for Offtake Letters of Credit, $[30,000,000].

"Issuing Bank" means each GIA Issuing Bank and/or each Offtake Issuing Bank (as the context requires) including any additional Issuing Bank designated by the Borrower pursuant to Section 2.02(i).

"Lender Default" means (a) the refusal or failure by any Lender to make available its portion of any Borrowing within two days following the date on which such portion is required to be paid hereunder, (b) a Lender having notified in writing the Administrative Agent and the Borrower that it does not intend to comply with its obligations under Section 2.04 (unless in each case specified in clause (a) or (b), such Lender provides written notice to the Borrower and the Administrative Agent that states that such refusal, failure or intended action is the result of such Lender's good faith determination that, to the extent applicable to such Borrowing or funding, one or more conditions precedent set forth in Section 4.01 or Section 4.02, as applicable, have not been satisfied for the applicable Borrowing or funding (each which condition precedent, together with any applicable Default and Event of Default, shall be specifically identified in such written notice)), (c) the Administrative Agent having received notification that a Lender or its direct or indirect parent company is the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, intervenor or sequestrator or the like has been appointed for such Lender or its direct or indirect parent company other than by way of an Undisclosed Administration or (d) a Lender becomes the subject of a Bail-In Action.

"Lenders" means the Persons listed on Schedule I and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"Letter of Credit" means each of the GIA Letter of Credit and/or the Offtake Letter of Credit issued pursuant to this Agreement (as the context requires).

"Letter of Credit Disbursement" means a GIA Letter of Credit Disbursement and/or an Offtake Letter of Credit Disbursement (as the context requires).

"Letter of Credit Exposure" means, with respect to any Issuing Bank of a Letter of Credit at any time, its GIA Letter of Credit Exposure or Offtake Letter of Credit Exposure (as the context requires) at such time.

"Letter of Credit Exposure Fee" has the meaning assigned to such term in Section 2.09(b).

"Letter of Credit Maturity Date" means the GIA Letter of Credit Maturity Date or the Offtake Letter of Credit Maturity Date (as the context requires).

"LIBO Rate" means, with respect to any LIBOR Borrowing for any Interest Period: (a) the ICE Benchmark Administration Limited Interest Settlement Rate for deposits in Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period appearing on the display designated as the Reuters LIBOR01 page (or on any successor or substitute page or service providing quotations of interest rates applicable to dollar deposits in the London interbank market comparable to those currently provided on such page, as determined by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; (b) if the rate referenced in clause (a) above does not appear on such page[, the rate (rounded to the same number of decimal places as the two relevant LIBOR Screen Rates) which results from interpolating on a linear basis between:  (i) the applicable LIBOR Screen Rate for the longest period (for which that LIBOR Screen Rate is available) which is less than the Interest Period of that LIBOR Borrowing and (ii)

Alta App.000743

Alta 0063387

the applicable LIBOR Screen Rate for the shortest period (for which the LIBOR Screen Rate is available) which exceeds the Interest Period for that LIBOR Borrowing][10], determined as of approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period); or (c) if the rates referenced in the clauses (a) and (b) above are not available, the rate per annum determined by the Administrative Agent as the rate of interest (rounded upward to the next 1/100 of 1.00%) at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the LIBOR Borrowing being made, continued or converted and with a term equivalent to such Interest Period would be offered by major banks of international repute reasonably satisfactory to the Administrative Agent in the offshore Dollar market at their request at approximately 11:00 a.m., London time, two Business Days prior to the first day of such Interest Period. At no time shall the LIBO Rate be less than 1.00%.

"LIBOR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans constituting such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"LIBOR Screen Rate" means the quote on the Reuters LIBOR01 page (or on any successor or substitute page or service providing quotations of interest rates applicable to dollar deposits in the London interbank market comparable to those currently provided on such page, as determined by the Administrative Agent from time to time).

"LIBOR Successor Rate" has the meaning assigned to such term in Section 2.19(a).

"LIBOR Successor Rate Conforming Changes" means, with respect to any proposed LIBOR Successor Rate, any conforming changes to the definition of Adjusted LIBO Rate, LIBO Rate, Interest Period, timing and frequency of determining rates and making payments of interest and other administrative matters as may be appropriate, in the discretion of the Administrative Agent, to reflect the adoption of such LIBOR Successor Rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines that adoption of any portion of such market practice is not administratively feasible or that no market practice for the administration of such LIBOR Successor Rate exists, in such other manner of administration as the Administrative Agent determines in consultation with the Borrower).

"Lien" means, with respect to any property of any Person, any mortgage, lien, pledge, charge, lease, easement, servitude, security interest or encumbrance of any kind in respect of such property of such Person. A Person shall be deemed to own subject to a Lien any property that it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement (other than an operating lease) relating to such property.

"Loan Party" or "Loan Parties" means the Borrower, the Subsidiary Guarantors and the Pledgor.

"Loan to Project Cost Ratio" shall mean, at any date of determination, the ratio (expressed as a percentage) of (a) the aggregate principal amount of the Term Loans outstanding on such date (taking into account any proposed Term Loans to be made on such date) and (b) the aggregate amount of all Project Costs paid by the Borrower Parties on or prior to such date (taking into account any Project Costs to be paid on or immediately after such date in respect of all Projects).

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"[LTSA][Critical Equipment Pooling Agreement]" means [●].

---

[10]   **Note to Draft**: Subject to further DB review.

Alta App.000744

Alta 0063388

"Major Maintenance Expenses" has the meaning assigned to such term in the Depositary Agreement.

"Major Maintenance Reserve Account" has the meaning assigned to such term in the Depositary Agreement.

"Major Maintenance Reserve Requirement Certificate" means a certificate substantially in the form of Exhibit G.

"Mandated Lead Arranger" means Deutsche Bank Securities Inc.

"Market Consultant" means ICF International, Inc. or any successor consultant appointed by the Administrative Agent and, so long as no Default or Event of Default has occurred and is continuing, reasonably acceptable to the Borrower.

"Material Adverse Effect" means a material adverse effect on (a) the business, operations, properties, assets or condition (financial or otherwise) of the Loan Parties (taken as a whole), (b) the ability of any Loan Party to fully and timely perform its material obligations under the Financing Documents, (v) the legality, validity, binding effect or enforceability against each Loan Party of the Financing Documents to which it is a party, or (d) the rights and remedies available to, or conferred upon, the secured parties under any Financing Document.

["Material Gas Storage, Supply and Transportation Agreements" means [●].][11]

"Material Project Documents" means, from and after the execution thereof:

(a)      (i) the Construction Contracts, (ii) the Offtake Agreements, (iii) the Generation Interconnection Agreements, (iv) the Generation Interconnection Construction Agreements, (v) the O&M Agreements, (vi) the [LTSA][Critical Equipment Pooling Agreement][12], (vii) the Asset Management Agreement, (viii) the Pipeline Interconnection Agreements, (ix) the Energy Management Agreement, (x) the Borrower Operating Agreement, (xi) the Altajac Operating Agreement, (xii) the Avocet Operating Agreement, (xiii) the Goodalta Operating Agreement, (xiv) the Material Gas Storage, Supply and Transportation Agreements, (xv) the Material Real Property Agreements, (xvi) the QSE Services Agreements, (xvii) the Standard Form Market Participant Agreements and (xviii) the Turbine Supply Agreements;

(b)      each Additional Material Project Document; and

(c)      any replacement of any of the foregoing.[13]

"Material Project Parties" means each party (other than any Loan Party) to a Material Project Document and each guarantor in respect of any such party's obligations under such Material Project Document.

["Material Real Property Agreements" means [●].][14]

"Monthly Date" means the last Business Day of each calendar month, the first of which shall be the first such day after the Closing Date.

---

[11]    **Note to Draft**: Subject to due diligence.
[12]    **Note to Draft**: Alta to explain what equipment will be provided pursuant to this GE pooling agreement.
[13]    **Note to Draft**: Additional documents to be added pending due diligence.
[14]    **Note to Draft**: Subject to due diligence.

Alta App.000745

Alta 0063389

"<u>Moody's</u>" means Moody's Investors Service, Inc., or any successor to the rating agency business thereof.

"<u>Mortgage (Altajac)</u>" means that Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing, dated as of the Closing Date, by Altajac in favor of the Collateral Agent for the benefit of the Secured Parties.

"<u>Mortgage (Avocet)</u>" means that Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing, dated as of the Closing Date, by Avocet in favor of the Collateral Agent for the benefit of the Secured Parties.

"<u>Mortgage (Goodalta)</u>" means that Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing, dated as of the Closing Date, by Goodalta in favor of the Collateral Agent for the benefit of the Secured Parties.

"<u>Mortgages</u>" means the Mortgage (Altajac), the Mortgage (Avocet) and the Mortgage (Goodalta).

"<u>Multiemployer Plan</u>" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which Borrower or any ERISA Affiliate makes or is obligated to make contributions.

"<u>Net Available Amount</u>" means:

(a)    in the case of any Project Document Claim, the aggregate amount received by the Borrower Parties in respect of such Project Document Claim that is not being used to pay corresponding damages due and payable in connection with any penalty, buyback obligations or related costs, and net of reasonable costs and expenses incurred by the Borrower Parties in connection with the enforcement, negotiation, consummation, settlement, proceedings, administration or other activity related to the receipt or collection of such amount (including reasonable legal and accounting fees and expenses paid or payable as a result thereof);

(b)    in the case of any Termination Payment, the aggregate amount received by the Borrower Parties in respect of such Termination Payment, net of reasonable costs and expenses incurred by the Borrower Parties in connection with the enforcement, negotiation, consummation, settlement, proceedings, administration or other activity related to the receipt or collection of such amount (including reasonable legal and accounting fees and expenses paid or payable as a result thereof);

(c)    in the case of any Disposition, the aggregate amount received by the Borrower Parties in respect of such Disposition, net of reasonable costs and expenses incurred by the Borrower Parties in connection with the enforcement, negotiation, consummation, settlement, proceedings, administration or other activity related to such Disposition (including reasonable legal and accounting fees and expenses paid or payable as a result thereof) and net of any Taxes payable in connection with such Disposition;

(d)    in the case of any Insurance Proceeds, the aggregate amount received by the Borrower Parties in respect of such Insurance Proceeds, net of reasonable costs and expenses incurred by the Borrower Parties in connection with the enforcement, negotiation, consummation, settlement, proceedings, administration or other activity related to the receipt or collection of such amount (including reasonable legal and accounting fees and expenses paid or payable as a result thereof);

(e)    in the case of any Condemnation Proceeds, the aggregate amount received by the Borrower Parties in respect of such Condemnation Proceeds, net of reasonable costs and expenses incurred by the Borrower Parties in connection with the enforcement, negotiation, consummation, settlement, proceedings, administration or other activity related to the receipt or collection of such amount (including reasonable legal and accounting fees and expenses paid or payable as a result thereof); and

Alta App.000746

Alta 0063390

(f)       in the case of any Title Event Proceeds, the aggregate amount received by the Borrower Parties in respect of such Title Event Proceeds, net of reasonable costs and expenses incurred by the Borrower Parties in connection with the enforcement, negotiation, consummation, settlement, proceedings, administration or other activity related to the receipt or collection of such amount (including reasonable legal and accounting fees and expenses paid or payable as a result thereof).

"NFIP" has the meaning assigned to such term in Section 4.01(w)(ii).

"Non-Consenting Lender" has the meaning assigned to such term in Section 2.16(b)(ii).

"Non-Defaulting Lender" means, at any time, any Lender that is not a Defaulting Lender.

"Non-Recourse Persons" has the meaning assigned to such term in Section 9.15.

"Note" has the meaning assigned to such term in Section 2.07(d)(ii).

"Notice of Issuance" means a request by the Borrower for an Issuance of Letters of Credit in accordance with Section 2.02.

"Notice to Proceed" means [●].

"NPL" means the National Priorities List under CERCLA.

"O&M Agreements" means (a) [●], (b) [●] and (c) [●].

"OB Approval Threshold" means each threshold set forth on Schedule 5.20 under the heading "*OB Approval Threshold*" [15].

"Obligations" means all obligations and liabilities of any Loan Party arising under or in connection with a Financing Document, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter arising, in respect of: (a) the principal of and interest on all Loans; (b) Reimbursement Obligations; (c) all amounts payable under any Permitted Interest Rate Hedge; (d) fees payable under any Financing Document; (e) all other amounts payable by a Loan Party to any Agent, any Issuing Bank or any Lender pursuant to any Financing Document, including any premium, reimbursements, damages, expenses, fees, costs, charges, disbursements, indemnities and other liabilities (including all fees, charges, expenses and disbursements of counsel to any Agent, any Issuing Bank or any Lender) due and payable to any Agent, any Issuing Bank or any Lender and including interest that would accrue on any of the foregoing during the pendency of any bankruptcy or related proceeding with respect to a Loan Party; and (f) the performance and observance of all of the covenants and agreements made by the Loan Party for the benefit of the Secured Credit Agreement Parties under and in connection with any Financing Document.

"Officer's Certificate" means a certificate signed by an Authorized Officer of the applicable Loan Party.

"Offtake Agreements" mean [●].

"Offtake Counterparty" means [●], or any other counterparty to an Offtake Agreement, and any guarantor or any other party providing credit support in respect of such counterparty's obligations under the Offtake Agreements.

---

[15]    **Note to Draft**: To include certain matters that require consent of the Lenders, Administrative Agent, or Independent Engineer (e.g., increases to Operating and Maintenance Expenses above a certain threshold, decreases to aggregate forecasted revenues and free cash flows).

Alta App.000747

Alta 0063391

"Offtake Issuing Bank" means (a) [●] and (b) any other Lender designated as an Offtake Issuing Bank pursuant to Section 2.02(i), in each case in its capacity as an issuer of Offtake Letters of Credit hereunder, and its successors in such capacity which in the case of clause (b) shall have, or be guaranteed or confirmed by an entity having, a long-term unsecured senior debt rating in accordance with the requirements set forth in the Offtake Agreements.

"Offtake Letter of Credit" means any letter of credit issued by any Offtake Issuing Bank to [●], as beneficiary, pursuant to an Offtake Agreement and substantially in the form of Exhibit T-2.

"Offtake Letter of Credit Availability Period" means the period from and including the Closing Date to the Offtake Letter of Credit Maturity Date.

"Offtake Letter of Credit Disbursement" means a payment made by any Offtake Issuing Bank pursuant to an Offtake Letter of Credit.

"Offtake Letter of Credit Exposure" means, with respect to an Offtake Issuing Bank, at any time, the sum of (a) the aggregate undrawn amount of any Offtake Letter of Credit at such time issued by such Offtake Issuing Bank and (b) the aggregate amount of all Offtake Letter of Credit Disbursements of such Offtake Issuing Bank that have not yet been reimbursed by or on behalf of the Borrower at such time.

"Offtake Letter of Credit Maturity Date" means the earlier of (a) twelve months after the date of issuance of such letter of credit (subject to automatic annual extensions, if agreed by the applicable Offtake Issuing Bank), (b) the Conversion Date and (c) the date that is five Business Days prior to the Conversion Deadline.

"Operating and Maintenance Expenses" means, for any period, the sum, computed without duplication, of the following: (a) expenses for operating each Project and maintaining each Project in good repair and operating condition payable during such period, including fees and costs payable under the [Asset Management Agreements and] the O&M Agreements, input supply and transportation costs, costs to procure consumables, spare parts (including Required Critical Equipment and Spare Parts and any replacement thereof required pursuant to Section 5.32), equipment, materials, utilities, repair and maintenance services and capital expenditures and general and administrative expenses of the Borrower Parties; plus (b) insurance costs under the Insurance Program and any additional insurance maintained by the Loan Parties in the ordinary course of business and in each case payable during such period (including any applicable interest charges, if any); plus (c) applicable sales, excise and franchise Taxes (if any) payable or reimbursable by the Borrower Parties during such period; plus (d) property Taxes payable by the Borrower Parties during such period; plus (e) any other Taxes (if any) payable by the Borrower Parties during such period; plus (f) costs and fees attendant to the obtaining and maintaining in effect the Governmental Approvals (including costs associated with obtaining emission offset credits) payable during such period; plus (g) legal, accounting and other professional fees attendant to any of the foregoing items payable during such period; plus (h) any fees and expenses of the Secured Parties during such period not included in Debt Service; plus (i) expenses to keep the Collateral free and clear of all Liens (other than Permitted Encumbrances); plus (j) Ordinary Course Commodity Hedge Settlement Payments payable by any Borrower Party in respect of any Permitted Commodity Hedge that is not a Secured Commodity Hedge; plus (k) all other cash expenses payable by the Borrower in the ordinary course of business.

"Operating Budget" means a budget covering a Fiscal Year of the Borrower Parties (or in the case of the initial Operating Budget, covering the period from the Closing Date to the end of the first full Fiscal Year of the Borrower occurring after the Fiscal Year in which the Closing Date occurs) detailed by month, prepared by the Borrower and submitted in accordance with Section 4.01(l)(ii) and/or Section 5.20, covering (a) Operating and Maintenance Expenses and Debt Service expected to be incurred by the Borrower Parties and (b) Project Revenues expected to be received by the Borrower Parties in each case during the relevant fiscal year of the Borrower Parties to which such budget applies.

Alta App.000748

Alta 0063392

"Operating Model" means the operating model prepared by the Operating Model Auditor forecasting the revenues and expenditures of each Project and other matters required to be delivered pursuant to the Operating Reports, in each case for time periods, and based upon assumptions and methodology, agreed upon by the Borrower and the Administrative Agent on or prior to the Conversion Date.

"Operating Model Auditor" means an Acceptable Auditor or such other regionally or nationally recognized model auditor as are selected by the Borrower and reasonably acceptable to the Administrative Agent.

"Operating Reports" has the meaning assigned to such term in Section 5.10(b).

"Operating Year" means each calendar year (or portion thereof) occurring after the first Project reaches COD and through the Final Maturity Date.

"Operations Auditor" means Leidos Engineering, LLC or any successor consultant appointed by the by the Administrative Agent and, so long as no Default or Event of Default has occurred and is continuing, reasonably acceptable to the Borrower.

"Ordinary Course Commodity Hedge Settlement Payments" means all regularly scheduled payments due under any Permitted Commodity Hedge from time to time, calculated in accordance with the terms of such Permitted Commodity Hedge, but excluding, for the avoidance of doubt, any Commodity Hedge Termination Payments due and payable under such Permitted Commodity Hedge.

"Ordinary Course Interest Rate Hedge Settlement Payments" means all regularly scheduled payments due under any Permitted Interest Rate Hedge from time to time, calculated in accordance with the terms of such Permitted Interest Rate Hedge, but excluding, for the avoidance of doubt, any Interest Rate Hedge Termination Payments due and payable under such Permitted Interest Rate Hedge.

"Other Connection Taxes" means, with respect to any Agent, Lender or Issuing Bank, Taxes imposed as a result of a present or former connection between such Agent, Lender or Issuing Bank and the jurisdiction imposing such Tax (other than connections arising from such Agent, Lender or Issuing Bank having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Financing Document, or sold or assigned an interest in any Loan or Financing Document).

"Other Permitted Commodity Hedge" has the meaning assigned to such term in the Intercreditor Agreement.

"Other Taxes" means any and all present or future stamp, court, documentary, intangible, recording, filing or similar Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made under any Financing Document or from the execution, delivery, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Financing Document. For the avoidance of doubt, "Other Taxes" shall not include any Excluded Taxes.

"Part A Approvals" has the meaning assigned to such term in Section 3.05(a).

"Part B Approvals" has the meaning assigned to such term in Section 3.05(b).

"Participant" has the meaning assigned to such term in Section 9.04(e).

"Participant Register" has the meaning assigned to such term in Section 9.04(e).

Alta App.000749

Alta 0063393

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L.107-56, signed into law October 26, 2001.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Act" means the Pension Protection Act of 2006.

"Pension Funding Rules" means the rules of the Code and ERISA regarding minimum funding standards and minimum required contributions (including any installment payment thereof) to Pension Plans and Multiemployer Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" means any "employee pension benefit plan" (as defined in Section 3(2) of ERISA, other than a Multiemployer Plan) that is maintained or is contributed to by the Borrower or any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 or 430 of the Code or Section 302 or 303 of ERISA.

"Performance Guarantee" means [●][16].

"Permitted Assignee" means any Lenders, Affiliate of a Lender, central bank, Federal Reserve Bank, bank, financial institution, fund or other entity that is not a Disqualified Lender.

"Permitted Cash Credit Support" means cash (a) permitted to be provided by a Borrower Party, in an amount not less than that required by Applicable Law or a Project Document (as applicable), to satisfy collateral, credit support or similar requirements or obligations of a Borrower Party in accordance with requirements of Applicable Law or a Project Document (as applicable), (b) deposited in an escrow account established pursuant to an escrow agreement in form and substance reasonably acceptable to the Administrative Agent and (c) funded by the Borrower with (i) amounts withdrawn from the Distribution Account in accordance with Section 6.07 and Section [3.03(h)(i)] of the Depositary Agreement or (ii) Additional Equity Contributions.

"Permitted Commodity Hedge" means, individually or collectively, as the context may require, Offtake Agreements and any Other Permitted Commodity Hedges.

"Permitted Encumbrances" means, collectively, the following:

(a)    Liens in favor of carriers, warehousemen, mechanics, materialmen and repairment arising in the ordinary course of business or incidental to the Development or any restoration, in each case, (i) that are in respect of obligations that are not yet delinquent for a period of longer than thirty days and do not individually or in the aggregate materially detract from the value of any Project, materially impair the Development or the use of any Project or constitute a material risk of loss or forfeiture of any material portion of any Project or any Project Site or that are associated with the institution of legal proceedings and (ii) that are being contested in good faith and that are adequately bonded or in respect of which adequate reserves are in place in form and substance reasonably acceptable to the Administrative Agent;

(b)    Liens created pursuant to this Agreement and the Security Documents;

---

[16]    **Note to Draft**: To include emissions guarantees and such other performance guarantees as determined in performance of due diligence.

Alta App.000750

Alta 0063394

(c)     Liens created against personal property only and not any real property assets in connection with Indebtedness permitted under clause (c) of the definition of Permitted Indebtedness, in an amount not to exceed $[●]¹⁷, at any one time, or extensions, renewals or replacement of any of the foregoing for the same or a lesser amount; provided, that such Liens attach only to the equipment or other property purchased or leased using such Indebtedness and the cost of such equipment or other property has not been funded as part of any Loan disbursed hereunder;

(d)     the exceptions to coverage set forth on Schedule B to each Title Policy and such state of facts as shown on each Survey at the Closing Date;

(e)     pledges or deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds, letters of intent, purchase orders and other obligations of a like nature incurred in the ordinary course of business;

(f)     judgment Liens in existence for less than sixty days after the entry thereof or with respect to which execution has been stayed or the payment of which is covered in full (subject to a customary deductible) by adequate reserves, bonds or other security reasonably acceptable to the Administrative Agent or by insurance maintained with responsible insurance companies and that do not otherwise result in an Event of Default under Section 7.01(h);

(g)     Liens for Taxes, assessments or other governmental charges or levies not at the time delinquent or to the extent being contested and reserved against as provided under Section 5.09;

(h)     Liens that are common law or statutory rights of set-off or bankers' or similar liens upon deposits of cash or investments in favor of banks or other financial institutions;

(i)     rights reserved for or vested in any municipality or Governmental Authority to control or regulate the use of a Project Site or to use a Project Site in any manner, including zoning and land use regulations;

(j)     extensions, renewals and replacements of any of the foregoing or following Liens to the extent and for so long as the Indebtedness or other obligations secured thereby remain outstanding;

(k)     Liens on the Collateral supporting a Borrower Party's obligations under a Permitted Commodity Hedge [(other than an Other Permitted Commodity Hedge secured by a Short Term Permitted Commodity Account)] so long as (i) no such Lien is prior or superior to the Liens created pursuant to the Security Documents and (ii) if a Lien is *pari passu* in priority with the Liens created pursuant to the Security Documents, the Permitted Commodity Hedge is a "Security Document" in accordance with all of the requirements, conditions and procedures specified in the Intercreditor Agreement;

(l)     to the extent constituting Liens, the terms and conditions of any Real Property Documents;

(m)     Liens not otherwise permitted hereunder so long as the aggregate outstanding principal amount of the obligations secured thereby does not exceed $[●]¹⁸ at any one time;

(n)     Liens purported to be evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business; and

---

¹⁷   **Note to Draft**: Subject to further DB review.

¹⁸   **Note to Draft**: Subject to further DB review.

Alta App.000751

Alta 0063395

(o)      (i) Liens encumbering, to the extent pledged to an energy manager or fuel supplier, no more than [sixty] [*PH Note: Confirm*] days of accounts receivable (and accounts of any such energy manager or fuel supplier, as the case may be, into which the proceeds of such accounts receivable are deposited) owed by ERCOT or any other Person to the Borrower Parties for the purchase of electric energy and other related products or services, (ii) to the extent applicable, Liens in favor of ERCOT pursuant to ERCOT Nodal Protocols on (A) any segregated QSE account for a Project (as described in the QSE Services Agreement) or any similar receipts account in respect of ERCOT held by the QSE for the account of the Borrower Parties and (B) all amounts held therein and (iii) margin, clearing, cash collateral or similar accounts with or on behalf of brokers, credit clearing organizations, independent system operators, regional transmission organizations, pipelines, state agencies, federal agencies, futures contract brokers, exchanges related to the trading of energy (including the Intercontinental Exchange), customers, trading counterparties, or any other parties or issuers of surety bonds and any proceeds thereof in an aggregate amount not to exceed $[●][19] at any time.

"Permitted Equity Contributions" means:

(a)      the Closing Date Equity Contribution;

(b)      [Additional Equity Contributions that the Borrower has notified the Administrative Agent are specified to be used (at the time so contributed) as cash collateral to be held in Short Term Permitted Commodity Accounts];

(c)      Additional Equity Contributions to be funded for the purposes of Permitted Cash Credit Support;

(d)      Additional Equity Contributions permitted under Section 6.17;

(e)      Additional Equity Contributions permitted under Section 6.22; and

(f)      Additional Equity Contributions permitted under Section 7.01(s).

"Permitted Indebtedness" means, collectively, with respect to the Borrower Parties:

(a)      the obligations under this Agreement;

(b)      Indebtedness in respect of Permitted Interest Rate Hedges and Permitted Commodity Hedges incurred in the ordinary course of business and not for speculative purposes;

(c)      unsecured Indebtedness for the deferred purchase price of property or services incurred in the ordinary course of business and incurred in connection with the Development; provided, that (i) such Indebtedness is (A) not more than sixty days past due or (B) being contested in good faith and by appropriate proceedings and in respect of which adequate reserves are in place in accordance with Applicable Accounting Requirements and (ii) such Indebtedness does not at any time exceed $[●][20] in the aggregate;

(d)      trade or other similar Indebtedness incurred in the ordinary course of business (but not for borrowed money) and (i) not more than sixty days past due or (ii) being contested in good faith and by appropriate proceedings and in respect of which adequate reserves are in place in accordance with Applicable Accounting Requirements;

---

[19]    **Note to Draft**: Subject to further DB review.

[20]    **Note to Draft**: Subject to further DB review.

Alta App.000752

Alta 0063396

(e)       Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services in the ordinary course of business; provided, that such is extinguished within ten Business Days of its incurrence

(f)       Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds, financial assurances and completion guarantees and similar obligations in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations, in the ordinary course of business in an aggregate amount not to exceed $[●][21];

(g)       contingent obligations resulting from (i) the endorsement of negotiable instruments received in the ordinary course of its business and (ii) indemnities provided under the Transaction Documents and other Project Documents;

(h)       without duplication of the items in clause (f) above, obligations under any Project Document incurred in the ordinary course of business (including any guarantees made pursuant to the Project Documents) and only to the extent such amounts are (i) not overdue by more than sixty days or (ii) being contested in good faith and by appropriate proceedings and in respect of which adequate reserves are in place in accordance with Applicable Accounting Requirements;

(i)       commercial premium finance agreements in customary form entered into with insurers or their Affiliates solely to finance premiums of insurance; and

(j)       other unsecured Indebtedness in an amount not to exceed $[_____].

"Permitted Interest Rate Hedge" has the meaning assigned to such term in the Intercreditor Agreement.

"Permitted Interest Rate Hedge Provider" has the meaning assigned to such term in the Intercreditor Agreement.

"Permitted Investments" means: (a) marketable direct obligations of the United States of America that mature within one year; (b) marketable obligations directly and fully guaranteed as to interest and principal by the United States of America that mature within one year; (c) demand deposits with the Collateral Agent, the Depositary Bank and any Issuing Bank, and time deposits, certificates of deposit and banker's acceptances issued by an Acceptable Bank; (d) commercial paper or tax-exempt obligations given one of the three highest ratings by S&P or Moody's and (e) cash. In no event shall any cash be invested in any obligation, certificate of deposit, acceptance, commercial paper or instrument which by its terms matures more than thirty days after the date of investment, unless the Collateral Agent, the Depositary Bank or any Issuing Bank or an Acceptable Bank shall have agreed to repurchase such obligation, certificate of deposit, acceptance, commercial paper or instrument at its purchase price plus earned interest within no more than 180 days after its purchase hereunder. With respect to any rating requirement set forth above, if the relevant issuer is rated by either S&P or Moody's, but not both, then only the rating of such rating agency shall be utilized for the purpose of this definition.

"Permitted Letter of Credit Uses" means: (a) for the GIA Letter(s) of Credit, to support the Subsidiary Guarantors' credit support obligations under the Generation Interconnection Agreements and (b) for the Offtake Letter(s) of Credit, to support the Subsidiary Guarantors' credit support obligations under the Offtake Agreements.

---

[21]    **Note to Draft**: Subject to further DB review.

Alta App.000753

Alta 0063397

"Permitted Local Accounts" has the meaning assigned to such term in the Depositary Agreement.

"Permitted Title Encumbrance" means items (c), (d), (f) and (i) of the definition of Permitted Encumbrances.

"Person" means any natural person, corporation, business trust, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"PGC" means a "power generation company" as that term is defined in Section 31.002(10) of PURA.

"Pipeline Interconnection Agreements" means [●].

"Plan" means any "employee benefit plan" within the meaning of Section 3(3) of ERISA maintained or established for employees of the Borrower or any Subsidiary, or any such plan to which the Borrower or any Subsidiary is required to contribute on behalf of any of its employees or with respect to which Borrower has or may have any liability.

"Pledge Agreement" means the Pledge Agreement, dated as of the Closing Date, among the Pledgor, the Borrower and the Collateral Agent.

"Pledged Collateral" has the meaning given to such term in the Pledge Agreement.

"Pledgor" means Alta Power North I Intermediate HoldCo LLC, a Texas limited liability company.

"Pledgor Operating Agreement" mean the Limited Liability Company Agreement of Alta Power North I Intermediate HoldCo LLC, dated as of [●], by Alta Power North I Holdings LLC.

"Prepayment Account" has the meaning assigned to such term in the Depositary Agreement.

"Prime Rate" means the rate of interest per annum determined from time to time by the Administrative Agent as its prime rate in effect at its principal office in New York City and notified to the Borrower.

"Pro Rata Outstandings" means, of any Lender and Issuing Banks at any time, (a) in the case of the Term Loans, the outstanding principal amount of the Term Loans owing to such Lender and (b) in the case of any Class of Letters of Credit, the amount of the Issuing Bank's total outstanding Letter of Credit Exposure of such Class.

"Project" means each of the Altajac Project, the Avocet Project and/or the Goodalta Project.

"Project Assets" means all Property, rights and assets of any Borrower Party, whether real or personal and whether tangible or intangible, including the Projects, the Project Sites, the Equity Interests in the Subsidiary Guarantors held by the Borrower, the Part A Approvals, the Part B Approvals and the Project Documents.

"Project Costs" means all costs, fees, Taxes and expenses incurred or payable by any Borrower Party in connection with the ownership, development, construction, financing and completion of the Projects as contemplated by the then-applicable Construction Budget (including the contingency allowance identified in the Construction Budget), the Construction Schedule and the Project Documents, including the costs incurred in connection with design, engineering, procurement, construction, testing,

Alta App.000754

Alta 0063398

commissioning, equipping, assembly, inspection, start-up and financing of the Projects (including development costs and fees and costs related to Permitted Commodity Hedges), the Operating and Maintenance Expenses arising prior to the Conversion Date (other than Operating and Maintenance Expenses relating to a Project arising after such Project has achieved COD), Debt Service and other fees owing to the Secured Parties arising prior to the Conversion Date, the funding of the Debt Service Reserve Account and the Major Maintenance Reserve Account in accordance with this Agreement, and other finance costs incurred and payable by the Borrower Parties in connection with the Projects on or prior to the Conversion Date.[22]

"<u>Project Document Claim</u>" means any payment under the [Construction Contracts, the Turbine Supply Agreements, [LTSA][Critical Equipment Pooling Agreement] and O&M Agreements] in respect of liquidated damages for performance or performance guarantees, but excluding all delay related liquidated damages.

"<u>Project Documents</u>" means the Material Project Documents to which a Borrower Party is a party and each other contract or agreement (including Additional Material Project Documents) entered into by a Borrower Party in the ordinary course of its business (other than any Financing Document).

"<u>Project Party</u>" means each Person (other than a Borrower Party) from time to time party to any Project Document.

"<u>Project Revenues</u>" means, for any period, all cash revenues (without duplication) received by a Borrower Party during such period, including from: (a) the sale of goods and services during such period; (b) all interest earned with respect to such period on Permitted Investments held in the Accounts; (c) the proceeds of any delay in start-up insurance, forced outage insurance or business interruption insurance and other payments received for interruption of operations or damage to a Project during such period and all delay related liquidated damages received during such period or other liability insurance proceeds; (d) the proceeds of any Additional Equity Contributions; (e) payments received under any Permitted Commodity Hedge (not including any Commodity Hedge Termination Payments); (f) liquidated damages received under any Project Document other than from Project Document Claims; (g) Ordinary Course Interest Rate Hedge Settlement Payments and Ordinary Course Commodity Hedge Settlement Payments received by a Borrower Party; and (h) all other income or revenue, however earned or received, by any Borrower Party during such period (including any Tax refunds) that is not required to be deposited in an Account other than the Revenue Account in accordance with the Financing Documents, but excluding Insurance Proceeds (other than as described in <u>clause (c)</u> above), Condemnation Proceeds, Project Document Claims, proceeds of any Disposition exceeding $[●][23], and Loan proceeds.

"<u>Project Site</u>" means each site upon which the applicable Project is or will be installed, together with any fixtures or civil works constructed thereon and any other easements, licenses and other real property rights and interests of the Borrower Parties required for the installation and operation of such Project.

"<u>Property</u>" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"<u>Prudent Industry Practices</u>" means any of the practices, methods and acts engaged in or approved by a significant portion of the independent gas-fired power generation industry in the United

---

[22] **Note to Draft**: Operating and Maintenance Expenses relating to a Project arising after COD will not be Project Costs, but will be permitted to be paid from the Construction Account prior to the Conversion Date to the extent that such are sufficiently offset by deposits into the Construction Account from revenues under the Permitted Commodity Hedges or from merchant energy and ancillary services sales in the ERCOT market.

[23] **Note to Draft**: Subject to further DB review.

Alta App.000755

Alta 0063399

States during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, sound engineering practices, reliability, safety and expedition. For the avoidance of doubt, "Prudent Industry Practices" is not intended to be limited to the optimum practice, method or act to the exclusion of all others, but rather to be acceptable principles, methods and acts generally accepted in the United States, having due regard for, among other things, the preservation of manufacturers' warranties and operating instructions, the requirements or guidance of Governmental Authorities, applicable laws, applicable interconnection operating guidelines and rules, transmission provider rules and the requirements of insurers.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"PUCT" means the Public Utility Commission of Texas.

"PUHCA" means the Public Utility Holding Company Act of 2005, as amended, and FERC's regulations thereunder.

"PURA" means the Texas Public Utility Regulatory Act, set forth in the Tex. Util. Code Ann. § 11.001, *et seq.*, and the rules and regulations promulgated thereunder.

"QSE" means the party or parties named as the qualified scheduling entity in the applicable QSE Services Agreement.

"QSE Services Agreements" means, collectively, (a) the [●], with an effective date of [●], by and between [●] (b) [●], and (c) [●].

["Qualified Operator" means a person that is (or is a subsidiary of) a person that owns a controlling interest in or manages (or has owned or has managed over at least three years continuously in the past five years) a Comparable Project (in each case, either directly or through management of controlling investments in persons who are engaged in constructing, owning and operating a Comparable Project).][24]

["Qualified Owner" means any person that (a) has, or is a direct or indirect subsidiary of a person, or comprises a fund or account or other investment vehicle managed or controlled by a person, that has, or has its obligations in respect of its direct or indirect ownership interests in the Borrower Parties guaranteed by a person that has, in each case, a tangible net worth (or assets under management) of at least [$500,000,000][25] or is a majority owned subsidiary of such person, (b) is a Qualified Operator, has an affiliate that is a Qualified Operator or has contracted or caused the Borrower Parties to contract or maintain in effect a contract for the operation of each Project by a Qualified Operator and (c) prior to such person becoming an owner, directly or indirectly, of outstanding stock in Pledgor (other than as a result of any acquisition or transfer of any limited partnership or similar non-managing direct or indirect interest in any Designated Holder), has complied with all applicable "know your customer" and anti-money laundering requirements of the Lenders, consistently applied.][26]

"Quarterly Dates" means the last Business Day of March, June, September and December of each year, the first of which shall be the first such day after the Closing Date.

"Real Property Documents" means each deed, lease agreement, easement agreement, license or other document or agreement pursuant to which any Borrower Party holds a real property interest

---

[24]  **Note to Draft**: Subject to syndication.

[25]  **Note to Draft**: Subject to further DB review

[26]  **Note to Draft**: Subject to syndication.

Alta App.000756

Alta 0063400

or a license to use real property, in each case in any portion of any Project Site, all as more particularly listed and described on Schedule 3.04(a).

"Register" has the meaning assigned to such term in Section 9.04(c).

"Reimbursement Obligation" has the meaning assigned to such term in Section 2.02(e)(i).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" means any disposing, discharging, injecting, spilling, leaking, leaching, dumping, pumping, pouring, emitting, escaping, emptying, seeping, or placing, into or upon any land or water or air, or otherwise entering into, on or migrating through the environment.

"Remaining Excess Cash Flow" has the meaning assigned to such term in Section 2.08(b)(i)(A).

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA.

"Required Capital Expenditures" means all Capital Expenditures that are payable by a Borrower Party and reasonably necessary to permit the Borrower Parties to (a) operate or maintain the Projects in accordance with Prudent Industry Practices or (b) comply with Applicable Law.

"Required Critical Equipment and Spare Parts" means [●][27].

"Required Lenders" means, at any time, Lenders and Issuing Banks having unused Commitments and Pro Rata Outstandings representing more than 50% of the sum of the total unused Commitments and Pro Rata Outstandings at such time. The "Required Lenders" of a particular Class of Loans means Lenders having unused Commitments and Pro Rata Outstandings of such Class representing more than 50% of the total unused Commitments and Pro Rata Outstandings of such Class at such time. The unused Commitments and Pro Rata Outstandings of any Defaulting Lender shall be treated in this definition of "Required Lenders" pursuant to Section 2.17(b). For the avoidance of doubt, the term "Commitments" as used in this definition refers to the Lenders' aggregate Commitments, whether drawn or undrawn, as of the applicable date of determination. The unused Commitments and Pro Rata Outstandings of any Lender that is also a Secured Commodity Hedge Provider (as defined in the Intercreditor Agreement) shall be disregarded in determining whether the Required Lenders consent to a proposed increase in the Commodity Hedge Cap (as defined in the Intercreditor Agreement).

"Required Major Maintenance Reserve Amount" has the meaning assigned to such term in the Depositary Agreement.[28]

"Reserved Discretions" means the right of a Borrower Party to give or withhold consent, exercise options or take or decline to take other action under any of the provisions of the Material Project Documents described in Schedule 6.10(f).

"Restricted Payment" means:

(a)     all distributions by the Borrower Parties (in cash, property or obligations) on, or other payments or distributions on the account of, or the setting apart of money for a sinking or other

---

[27]   **Note to Draft**: To include back-up turbines and other spare parts as determined in consultation with the Independent Engineer and the Technical Consultant in performance of due diligence.

[28]   **Note to Draft**: To be separated into MMR portions per Project.

Alta App.000757

Alta 0063401

analogous fund for, or the purchase, redemption, retirement or other acquisition by any Borrower Party of, any portion of any membership interest in such Borrower Party;

(b)    all payments (in cash, property or obligations) of principal of, interest on and other amounts with respect to, or other payments on account of, or the setting apart of money for a sinking or other analogous fund for, or the purchase, redemption, retirement or other acquisition by any Borrower Party of, any Indebtedness owed to any Person other than such Borrower Party; and

(c)    any payment in respect of taxes based on or measured by the net income or receipts of any Borrower Party or any of their Affiliates.

For the avoidance of doubt, "Restricted Payments" does not include payments by any Borrower Party to any Affiliate of the Borrower Party pursuant to any Approved Affiliate Contract.

"Revenue Account" has the meaning assigned to such term in the Depositary Agreement.

"Risk Management Policy" [has the meaning assigned to such term in the Asset Management Agreement].[29]

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor to the rating agency business thereof.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (which, at the time of this Agreement, includes Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions List, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person that is otherwise the subject or target of Sanctions.

"Sanctions" means all economic or financial sanctions or trade embargoes administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control, the U.S. Department of State, or other U.S. federal Governmental Authorities, or the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom.

"Sanctions List" means any blocked persons list, designated nationals list, denied persons list, entity list, debarred party list, unverified list, sanctions list or other list of Persons with whom United States Persons may not conduct business, including any list published and maintained by the Office of Foreign Assets Control of the United States Department of Treasury, the United States Department of Commerce, or the United States Department of State, or the United Nations Security Council, the European Union or any European Union member state.

"Sanctions Violation" has the meaning assigned to such term in Section 5.24(e).

"Scheduled Conversion Date" means [●].

"Scheduled Principal Repayments" has the meaning assigned to such term in Section 2.07

"Scheduled Unavailability Date" has the meaning assigned to such term in Section 2.19(a).

---

[29]    **Note to Draft**: Technical Consultant to review.

Alta App.000758

Alta 0063402

"Secured Commodity Hedge" has the meaning assigned to such term in the Intercreditor Agreement.

"Secured Credit Agreement Parties" means (a) the Administrative Agent, the Collateral Agent and the Depositary Bank and (b) the Issuing Banks and the Lenders.

"Secured Interest Rate Hedge" has the meaning assigned to such term in the Intercreditor Agreement.

"Secured Interest Rate Hedge Provider" has the meaning assigned to such term in the Intercreditor Agreement.

"Secured Parties" has the meaning assigned to such term in the Intercreditor Agreement.

"Securities Account" means a "securities account" as that term is defined in Section 8-501 of the UCC.

"Security and Guaranty Agreement" means the Security and Guaranty Agreement, dated as of the Closing Date, among the Borrower Parties and the Collateral Agent.

"Security Documents" means

(a)    the Mortgage (Altajac), the Mortgage (Avocet), the Mortgage (Goodalta), the Security and Guaranty Agreement, the Pledge Agreement, the Depositary Agreement and the Consents to Assignment; and

(b)    any blocked or account control agreement in respect of any Permitted Local Account with any local bank, all UCC financing statements required by any Security Document and any other security agreement or instrument to be executed or filed pursuant hereto or any Security Document.

"SEMS" means the Superfund Enterprise Management System maintained by the U.S. Environmental Protection Agency.

["Short Term Permitted Commodity Accounts" shall mean any Excluded Commodity Account securing a Borrower Party's obligations under any [Other] Permitted Commodity Hedge with a tenor of less than nine months or with any exchange (including the Intercontinental Exchange) in connection with the purchase of fuel and sale of power generated by a Project in the ordinary course of business and for non-speculative purposes for a period of less than nine months, which in either case is not secured by any Liens on the Collateral or any Letter of Credit.][30]

"Solvent" means, with respect to any Person on a particular date, the condition that on such date (a) the fair value of the assets of such Person, at a fair valuation, is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair saleable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its existing debts as they become absolute and matured and (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature. "Solvency" has the meaning correlative thereto. For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Applicable Accounting Requirements).

---

[30]    **Note to Draft**: Alta and DB to discuss commodity hedging activities, including appropriate advisors.

Alta App.000759

Alta 0063403

"Sponsor" means Alta Power North I Holdings LLC, a Texas limited liability company.

"Standard Form Market Participant Agreements" means, collectively, [(a) the Standard Form Market Participant Agreement, with an effective date of June 24, 2019, by and between Altajac Power Center LLC and ERCOT, (b) the Standard Form Market Participant Agreement, with an effective date of June 24, 2019, by and between Avocet Power Center LLC and ERCOT and (c) the Standard Form Market Participant Agreement, with an effective date of June 24, 2019, by and between Goodalta Power Center LLC and ERCOT][31].

"Statutory Reserve Rate" means, for any Interest Period for any LIBOR Borrowing, a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the arithmetic mean, taken over each day in such Interest Period, of the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board for eurocurrency funding (referred to as "LIBOR liabilities" in Regulation D of the Board as of the Closing Date). Such reserve percentages shall include those imposed pursuant to such Regulation D. LIBOR Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subject Party" means (a) each Loan Party, (b) prior to the Conversion Date, each counterparty to a Construction Contract or a Turbine Supply Agreement and (c) any Offtake Counterparty.

"Subsidiary" means, for any Person, any corporation, limited liability company, partnership or other entity of which at least a majority of the Equity Interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions of such corporation, limited liability company, partnership or other entity (irrespective of whether or not at the time the Equity Interests of any other class or classes of such corporation, limited liability company, partnership or other entity shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by such Person or one or more Subsidiaries of such Person. For the purpose of this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and "controlled" shall have a meaning correlative thereto.

"Subsidiary Guarantors" means each of Altajac, Avocet and Goodalta.

"Survey" means each a survey of those certain real property and/or license interests of any Borrower Party in those portions of the Project Sites listed on Schedule II, dated no earlier than thirty days prior to the Closing Date, prepared by a land surveyor duly licensed and registered in the State of Texas in substantial compliance with the minimum detail requirements of ALTA and in form, scope and substance sufficient to cause all standard survey and related exceptions to be deleted from each Title Policy and to issue the endorsements of a type reasonably acceptable to the Administrative Agent and otherwise reasonably satisfactory to the Title Company and the Administrative Agent, and certified to the Title Company and the Collateral Agent by a form of certification reasonably acceptable to Administrative Agent.

"Target Debt Balance" means, for each Quarterly Date set forth below, the target Term Loan balance set forth opposite such Quarterly Date:

---

[31]    **Note to Draft**: Sponsor to provide.

Alta App.000760

Alta 0063404

| Quarterly Date | Target Debt Balance |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

provided, that (a) upon the occurrence of a TDB Prepayment Adjustment Event, each Target Debt Balance shall be reduced by an amount equal to the product of (a) such then applicable Target Debt Balance multiplied by (b) a fraction, the numerator of which is (x) the aggregate principal amount of all prepayments of Term Loans pursuant to Section 2.08(b)(iv), Section 2.08(b)(v), Section 2.08(b)(vi), Section 2.08(b)(vii), Section 2.08(b)(viii) or Section 2.08(b)(ix) being made on such date and (y) the denominator of which is the aggregate principal amount of Term Loans outstanding immediately prior to giving effect to such prepayments and (b) upon the occurrence of a TDB Commodity Hedge Clearing Price Adjustment Event, [●][32].

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings (including backup withholding), levied, collected, withheld or assessed by any Governmental Authority and all interest, penalties or other additions to tax with respect thereto.

"TDB Commodity Hedge Clearing Price Adjustment Event" means [●][33].

"TDB Prepayment Adjustment Event" means, as of any date of determination, a prepayment of Term Loans pursuant to clauses (iv), (v), (vi), (vii), (viii) or (ix) of Section 2.08(b) as of such date.

"Technical Consultant" means Tateswood Energy or any successor consultant appointed by the Administrative Agent and, so long as no Default or Event of Default has occurred and is continuing, reasonably acceptable to the Borrower.

"Term Loan" refers to a Loan made by the Lenders pursuant to Section 2.01(a)(i).

"Term Loan Availability Period" means the period from and including the Closing Date to (and including) the date that is [●][34] following the Closing Date.

"Term Loan Commitment" means, with respect to each Term Loan Lender, the commitment, if any, of such Term Loan Lender to make Term Loans hereunder, expressed as an amount representing the maximum aggregate principal amount of the Term Loans to be made by such Term Loan Lender hereunder, as such commitment may be (a) reduced from time to time pursuant to Section 2.06 and (b) reduced or increased from time to time pursuant to assignments by or to such Term Loan Lender pursuant to Section 9.04. The initial amount of each Term Loan Lender's Term Loan Commitment is set forth on Schedule I, or in the Assignment and Assumption pursuant to which such Term Loan Lender shall

---

[32]    **Note to Draft**: Subject to DB review.

[33]    **Note to Draft**: Subject to DB review.

[34]    **Note to Draft**: Subject to further DB review.

Alta App.000761

Alta 0063405

have assumed its Term Loan Commitment, as applicable. The initial aggregate amount of all of the Term Loan Lenders' Term Loan Commitments is up to $[●].

"Term Loan Lender" means a Lender with a Term Loan Commitment or an outstanding Term Loan.

"Term Loan Maturity Date" means the sixth anniversary of the Closing Date.

"Term Loan Principal Payment Date" means each Quarterly Date after the Conversion Date and prior to and including the Term Loan Maturity Date, beginning with the Quarterly Date at the end of the first full calendar quarter after the Conversion Date.

"Termination Date" means the date on which (a) the Commitments have expired or been terminated, (b) the principal of and interest on each Loan and all fees payable hereunder shall have been paid in full and all Letters of Credit shall have expired or terminated and all Letter of Credit Disbursements shall have been reimbursed (unless the total outstanding amount of the Letter of Credit Exposure related thereto has been cash collateralized in the manner contemplated by Section 2.02(h) in an amount equal to 102.5% of the Letter of Credit Exposure as of such date or a backstop letter of credit reasonably satisfactory to the applicable Issuing Bank is in place) and (c) all obligations to any Secured Party with respect to any Permitted Interest Rate Hedge shall have been paid in full or otherwise satisfied or discharged in full.

"Termination Payment" means any termination payment paid for the benefit of a Borrower Party under a Permitted Interest Rate Hedge or a Project Document.

"Title Company" means [●].

"Title Event" means the existence of any defect of title or Lien on any Property of the Borrower Parties (other than Permitted Encumbrances) that entitles the Borrower Parties or the Collateral Agent to make a claim under the Title Policies issued in the favor of the Borrower Parties or such Collateral Agent.

"Title Event Proceeds" means, with respect to any Title Event, the amounts and proceeds payable to the Borrower Parties or the Collateral Agent in respect of such Title Event, including proceeds of Title Policies.

"Title Policy" or "Title Policies" means (a) in respect of the Altajac Project, the [●], dated as of [●], originally issued by the Title Company in the amount of $[●], (b) in respect of the Avocet Project, the [●], dated as of [●], originally issued by the Title Company in the amount of $[●] and (c) in respect of the Goodalta Project, the [●], dated as of [●], originally issued by the Title Company in the amount of $[●], in each case, as such title policy has been endorsed to date, showing fee, leasehold, easement and/or license interests to each Project Site vested in one or more Borrower Parties pursuant to the Real Property Documents, insuring the validity and priority of the Lien in favor of the Collateral Agent for the benefit of the Secured Parties created by the Mortgages, subject only to Permitted Title Encumbrances and such exceptions approved by Administrative Agent, and excluding any general exceptions for mechanics' liens and containing such endorsements and affirmative assurances as the Administrative Agent shall require and which are reasonably obtainable from the Title Company in the State of Texas.

"Total Loss" means a total Condemnation, the complete destruction of any Project or substantially all of the Project Assets of a Project or the destruction of any Project or substantially all of the Project Assets of a Project irretrievably beyond repair.

"Transaction Document" means each of the Financing Documents and the Material Project Documents.

Alta App.000762

Alta 0063406

"<u>TRE</u>" means the Texas Reliability Entity, Inc.

"<u>Turbine Supply Agreements</u>" means [●].

"<u>Type</u>", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans constituting such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

"<u>Undisclosed Administration</u>" means, in relation to a Lender or its direct or indirect parent company, the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator under or based on the law in the country where such Lender or parent company is subject to home jurisdiction supervision if Applicable Law requires that such appointment is not to be publicly disclosed.

"<u>United States</u>", or "<u>U.S.</u>", means the United States of America.

"<u>Work</u>" [has the respective meanings provided in the Construction Contracts.][35]

"<u>Write-Down and Conversion Powers</u>" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02.    <u>Terms Generally</u>. Except as otherwise expressly provided, the following rules of interpretation shall apply to this Agreement and the other Financing Documents:

(a)    the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined;

(b)    whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(c)    the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(d)    the word "will" shall be construed to have the same meaning and effect as the word "shall";

(e)    unless the context requires otherwise, any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or therein) and shall include any appendices, schedules, exhibits, clarification letters, side letters and disclosure letters executed in connection therewith;

(f)    any reference herein to any Person shall be construed to include such Person's successors and assigns to the extent permitted under the Financing Documents and, in the case of any Governmental Authority, any Person succeeding to its functions and capacities;

---

[35]    **Note to Draft**: To be confirmed upon receipt of final Construction Contracts.

Alta App.000763

Alta 0063407

(g)    any reference to any Applicable Law in any of the Financing Documents shall include all references to such Applicable Law as amended from time to time;

(h)    the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof;

(i)    the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights; and

(j)    all references herein to Articles, Sections, Appendices, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Appendices, Exhibits and Schedules to, this Agreement.

Section 1.03.    Accounting Terms. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with Applicable Accounting Requirements; provided, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change in the Applicable Accounting Requirements occurring after the Closing Date or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such change in the Applicable Accounting Requirements or in the application thereof, then such provision shall be interpreted on the basis of the Applicable Accounting Requirements as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

Section 1.04.    Divisions. For all purposes under the Financing Documents, in connection with any division or plan of division under Delaware or Texas law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person; and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

ARTICLE II

THE CREDITS

Section 2.01.    Term Loan Facility.

(a)    Term Loans.

(i)    Subject to the terms and conditions set forth herein, each Term Loan Lender, severally, but not jointly, agrees to make one or more Term Loans in Dollars to the Borrower from time to time during the Term Loan Availability Period, but not more than once in any month [(or up to twice in any month if approved by the Term Loan Lenders acting reasonably upon a written request of the Borrower delivered at least ten Business Days prior to the date of the proposed Borrowing)][36], in an aggregate principal amount that will not result in such Term Loan Lender's Term Loans exceeding its Term Loan Commitment.

---

[36]    **Note to Draft**: Subject to syndication.

Alta App.000764

Alta 0063408

(ii)      Amounts prepaid or repaid in respect of Term Loans may not be reborrowed.

(b)      <u>Notice of Term Loan Borrowing</u>. To request a Borrowing of Term Loans, the Borrower shall deliver an irrevocable written Borrowing Request in the form of <u>Exhibit C-1</u> signed by the Borrower to the Administrative Agent (i) in the case of a LIBOR Borrowing, not later than 11:00 a.m., New York City time, three Business Days before the date of the proposed Borrowing or (ii) in the case of an ABR Borrowing, not later than 11:00 a.m., New York City time, one Business Day before the date of the proposed Borrowing. Each such irrevocable written Borrowing Request by the Borrower shall specify the following information:

(i)      the aggregate amount of the Borrowing of Term Loans requested by the Borrower;

(ii)      the date of such Borrowing of Term Loans, which shall be a Business Day;

(iii)      whether such Borrowing of Term Loans is to be an ABR Borrowing or a LIBOR Borrowing; and

(iv)      in the case of a LIBOR Borrowing, the Interest Period therefor, which shall be a period contemplated by the definition of the term "Interest Period."

(c)      <u>Notice by the Administrative Agent to the Lenders</u>. Promptly following receipt of a Borrowing Request in accordance with this <u>Section 2.01</u>, the Administrative Agent shall advise each Term Loan Lender of the details thereof and of the amount of such Lender's Term Loans to be made as part of the requested Borrowing.

(d)      <u>Failure to Elect</u>. If no election as to the Type of a Borrowing of Term Loans is specified, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period is specified with respect to any requested LIBOR Borrowing, then the requested Borrowing shall be made as a LIBOR Borrowing with an Interest Period ending on the third Monthly Date occurring thereafter.

(e)      <u>Notice of Conversion; Conversion Date Term Loans</u>. To request the occurrence of the Conversion Date, the Borrower shall deliver an irrevocable written Conversion Request in the form of <u>Exhibit C-3</u> signed by the Borrower to the Administrative Agent not later than 11:00 a.m., New York City time, one Business Day before the proposed Conversion Date. Unless the Debt Service Reserve Account shall have been funded (either with cash or an Acceptable Letter of Credit or a combination thereof) in an amount equal to the Debt Service Reserve Required Amount, then, subject to the requirements of <u>Section 2.01(b)</u>, the Borrower shall, together with such Conversion Request, request Term Loans (to be funded on the proposed Conversion Date) in an amount equal to the portion of the Debt Service Reserve Required Amount. The Borrower shall not request Term Loans to fund the Debt Service Reserve Account except on the proposed Conversion Date.

(f)      <u>Notice of COD; COD Term Loans</u>. Prior to the occurrence of COD for any Project, the Borrower shall deliver an irrevocable written COD Notice in the form of <u>Exhibit C-4</u> signed by the Borrower to the Administrative Agent not later than 11:00 a.m., New York City time, one Business Day before the date of the proposed COD. Unless the Major Maintenance Reserve Account shall have been funded with cash in an amount equal to the portion of the Required Major Maintenance Reserve Amount applicable to such Project, then, subject to the requirements of <u>Section 2.01(b)</u>, the Borrower shall, together with such COD Notice, request Term Loans (to be funded on the proposed COD) in an amount equal to the portion of the Required Major Maintenance Reserve Amount applicable to such Project. The Borrower shall

Alta App.000765

Alta 0063409

not request Term Loans to fund the portion of the Required Major Maintenance Reserve Amount applicable to any Project except on the proposed COD for such Project.

      (g)      Notice by the Administrative Agent to the Lenders. Promptly following receipt of a Conversion Request or a COD Notice in accordance with Section 2.01(e) or Section 2.01(f), as applicable, the Administrative Agent shall advise each Term Loan Lender of the details thereof.

      Section 2.02.      Letters of Credit.[37]

      (a)      Letters of Credit. Subject to the terms and conditions set forth herein, the Borrower may request:

            (i)      any GIA Issuing Bank to Issue a GIA Letter of Credit at any time and from time to time during the GIA Letter of Credit Availability Period; and

            (ii)      any Offtake Issuing Bank to Issue an Offtake Letter of Credit at any time and from time to time during the Offtake Letter of Credit Availability Period.

      (b)      Notice of Issuance, Amendment, Renewal or Extension. To request the Issuance of a Letter of Credit of any Class, the Borrower shall hand deliver (or transmit by electronic communication, if arrangements for doing so have been approved by the applicable Issuing Bank) to an Issuing Bank of such Class selected by it and the Administrative Agent (not less than five Business Days prior to the requested date of Issuance) a Notice of Issuance in the form of Exhibit C-2 requesting the Issuance of a Letter of Credit of such Class, and specifying the date of Issuance (which shall be a Business Day and shall comply with this Section 2.02), the date on which such Letter of Credit is to expire (which shall comply with Section 2.02(d)), the amount of such Letter of Credit and such other information as shall be reasonably necessary to prepare or Issue such Letter of Credit; provided, that no such Notice of Issuance shall be required in respect of an automatic extension of the expiry date of any Letter of Credit pursuant to the terms and conditions of such Letter of Credit. Subject to a final expiration date as specified in clause (d) of this Section 2.02, each Letter of Credit shall provide for the automatic extension of the expiry date thereof unless the applicable Issuing Bank gives notice in accordance with the Letter of Credit that such expiry date shall not be extended, and such Issuing Bank shall give such notice to the Borrower and the Administrative Agent if requested to do so by the Borrower or the Administrative Agent in a notice given not more than sixty days, but not less than 45 days, prior to the current expiry date of such Letter of Credit; provided, that, unless all of the Lenders of the applicable Class agree, if any Letter of Credit is outstanding on the last day of the applicable Availability Period, the applicable Issuing Bank shall thereafter give such notice in accordance with the terms of such Letter of Credit. If requested by the applicable Issuing Bank, the Borrower also shall submit a letter of credit application on such Issuing Bank's standard form in connection with any request for a Letter of Credit. In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, any Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.

      (c)      Limitations on Amounts and Uses. A Letter of Credit of any Class shall be Issued only if (and upon Issuance of such Letter of Credit, the Borrower shall be deemed to represent and warrant that), after giving effect to such Issuance, the Issuing Banks' Letter of Credit Exposure for such Class shall not exceed its Issuing Commitment for such Class. Each Letter of Credit shall be Issued only for Permitted Letter of Credit Uses.

      (d)      Expiration Date. Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) the date twelve months after the date of the issuance of such Letter of Credit

---

[37]    **Note to Draft**: Provisions allowing syndication of LC commitments to be included.

Alta App.000766

Alta 0063410

(or, in the case of any renewal or extension thereof, twelve months after the then-current expiration date of such Letter of Credit), (i) the applicable Letter of Credit Maturity Date and (i) five Business Days prior to the Final Maturity Date.

        (e)    <u>Reimbursement Obligations Absolute</u>.

        (i)    If any Issuing Bank shall make any Letter of Credit Disbursement in respect of any applicable Letter of Credit, the Borrower shall reimburse such Letter of Credit Disbursement to the applicable Issuing Bank for its own account no later than (A) in the case of any GIA Letter of Credit Disbursement, the third Business Day and (B) in the case of any Offtake Letter of Credit Disbursement, the third Business Day, in each case, after such Letter of Credit Disbursement in an amount equal to the full amount of such Letter of Credit Disbursement *plus* accrued interest thereon from the Disbursement Date to the date of repayment of the Letter of Credit Disbursement at the rate of interest that would apply to an ABR Loan in accordance with <u>Section 2.10</u> (each, a "<u>Reimbursement Obligation</u>"), which obligation shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of such Letter of Credit, or any term or provision therein, (ii) any draft or other document presented under such Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the applicable Issuing Bank under such Letter of Credit against presentation of a draft or other document that does not comply strictly with the terms of such Letter of Credit, and (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this <u>Section 2.02(e)</u>, constitute a legal or equitable discharge of the obligations of the Borrower hereunder.

        (ii)    Neither the Administrative Agent, the Lenders nor any Issuing Bank, nor any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit by any applicable Issuing Bank or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the applicable Issuing Bank; provided, that after paying in full its obligation to reimburse Letter of Credit Disbursements as provided in this <u>Section 2.02(e)</u>, the foregoing shall not be construed to excuse any Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by such Issuing Bank's gross negligence or willful misconduct as determined in a non-appealable judgment by a court of competent jurisdiction when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. In furtherance of the foregoing, the parties hereto expressly agree that, in the absence of gross negligence or willful misconduct as determined in a non-appealable judgment by a court of competent jurisdiction on the part of an Issuing Bank:

        (A)    such Issuing Bank may accept documents that appear on their face to be in substantial compliance with the terms of an applicable Letter of Credit without responsibility for further investigation, regardless of any notice or information to the contrary, and may make payment upon presentation of documents that appear on their face to be in substantial compliance with the terms of such Letter of Credit;

Alta App.000767

Alta 0063411

(B)     such Issuing Bank shall have the right, in its sole discretion, to decline to accept such documents and to decline to make such payment if such documents are not in strict compliance with the terms of such Letter of Credit; and

(C)     clauses (A) and (B) above shall establish the standard of care to be exercised by an Issuing Bank when determining whether drafts and other documents presented under an applicable Letter of Credit comply with the terms thereof (and the parties hereto hereby waive, to the extent permitted by Applicable Law, any standard of care inconsistent with the foregoing).

(f)     Disbursement Procedures. An Issuing Bank for any applicable Letter of Credit shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for an applicable Letter of Credit Disbursement under such Letter of Credit. Such Issuing Bank shall promptly after such examination notify the Administrative Agent and the Borrower by electronic communication of such demand for such Letter of Credit Disbursement and whether such Issuing Bank has made or will make such Letter of Credit Disbursement thereunder and the date (the "Disbursement Date") of such Letter of Credit Disbursement; provided, that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse (without duplication) such Issuing Bank with respect to any such Letter of Credit Disbursement.

(g)     Replacement of an Issuing Bank. Any Issuing Bank of Letters of Credit may be replaced at any time by written agreement between the Borrower and the Administrative Agent. The Administrative Agent shall notify the Lenders of any such replacement of any Issuing Bank of Letters of Credit. At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 2.09(b). From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of the replaced Issuing Bank under this Agreement with respect to Letters of Credit to be issued by it thereafter and (ii) applicable references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank of Letters of Credit, or to such successor and all previous Issuing Banks of Letters of Credit, as the context shall require. After the replacement of an Issuing Bank of Letters of Credit hereunder, the replaced Issuing Bank of Letters of Credit shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

(h)     Cash Collateralization. If (i) the maturity of the Loans has been accelerated upon the occurrence of an Event of Default or (ii) an Event of Default shall occur and be continuing and the Borrower receives notice from the Administrative Agent that the Required Lenders of any Class of Letters of Credit demand the deposit of cash collateral pursuant to this paragraph, the Borrower shall immediately deposit into an account established and maintained on the books and records of the Collateral Agent, which account shall be a Securities Account in the name of the Collateral Agent and for the benefit of the Lenders of the applicable Class, an amount in cash equal to 102.5% of the aggregate amount of all Letter of Credit Exposure of such Class as of such date (or any applicable amount required by Section 2.08) plus any accrued and unpaid interest thereon; provided, that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower described in clause (e) or (f) of Section 7.01. Any deposit made pursuant to this Section 2.02(h) shall be held by the Collateral Agent as collateral for the Letter of Credit Exposure of the applicable Class under this Agreement and shall in the case of a Letter of Credit Disbursement in respect of any Letter of Credit of such Class be applied to the payment of the Borrower's obligations in respect of the Loans arising as a result of such Letter of Credit Disbursement, so long as an Event of Default exists. For this purpose the Borrower hereby grants a security interest to the Collateral Agent for the benefit of the Issuing Banks of Letters of Credit of

Alta App.000768

Alta 0063412

the applicable Class and the Lenders of the applicable Class in such collateral account and any "financial assets" (as defined in the UCC) or other Property held therein. [*PH Note: what is the mechanism to release cash collateral when the Event of Default is no longer continuing?*]

    (i) <u>Additional Issuing Banks</u>. From time to time, the Borrower may by notice to the Administrative Agent designate other Lenders (in addition to the "<u>Issuing Banks</u>" named in the relevant definitions thereof) that agree (in their sole discretion) to act in such capacity and are reasonably satisfactory to the Administrative Agent as Issuing Banks of Letters of Credit (which, for the avoidance of doubt, shall meet the credit requirements set forth in <u>clause (b)</u> of the definition of "GIA Issuing Bank" or "Offtake Issuing Bank", as applicable). Such designation shall be set forth in a written agreement among the Borrower, the Administrative Agent, the existing Issuing Banks of the applicable Class and such additional Issuing Banks of Letters of Credit. The Administrative Agent shall notify the Lenders of any such designation. From and after the effective date of any such designation, (i) each additional Issuing Bank of Letters of Credit shall have all the rights and obligations of an Issuing Bank of Letters of Credit under this Agreement and (ii) references herein to the term "<u>Issuing Bank</u>" shall be deemed to refer to such additional Issuing Bank of Letters of Credit.

    Section 2.03. <u>Loans and Borrowings</u>.

    (a) <u>Obligations of Lenders</u>. Each Loan shall be made as part of a Borrowing consisting of Loans of the same Class and Type made by the applicable Lenders ratably in accordance with their respective Commitments of the applicable Class. The failure of any Lender to make any Loan required to be made by it) shall not relieve any other Lender of its obligations hereunder; <u>provided</u>, that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans) as required.

    (b) <u>Type of Loans</u>. Subject to <u>Section 2.11</u>, each Borrowing shall be constituted entirely of ABR Loans or of LIBOR Loans as the Borrower may request in accordance herewith. Each Lender at its option may make any LIBOR Loan by causing any domestic or foreign branch or Affiliate of such Lender to make or hold such Loan at such Lender's applicable lending office; <u>provided</u>, that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

    (c) <u>Minimum Amounts; Limitation on Number of Borrowings</u>. Each Borrowing shall be in an aggregate amount of $1,000,000 or a larger multiple of $100,000, and the final Borrowing of the Term Loans, subject to <u>Section 5.12</u>, may be in an amount up to the then-remaining applicable Term Loan Commitment. Borrowings of more than one Class may be outstanding at the same time; <u>provided</u>, that there shall not at any time be more than a total of six LIBOR Borrowings outstanding.

    Section 2.04. <u>Funding of Borrowings</u>.

    (a) <u>Funding by Lenders</u>. Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 12:00 noon, New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, for deposit into the Construction Account.

    (b) <u>Presumption by the Administrative Agent</u>. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with <u>paragraph (a)</u> of this <u>Section 2.04</u> and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable

Alta App.000769

Alta 0063413

Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand (without duplication) such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the Federal Funds Effective Rate or (ii) in the case of the Borrower, the interest rate applicable to the Type of Loan made. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.

Section 2.05.    Interest Elections.

(a)    Elections by the Borrower. Except as otherwise expressly provided herein, the Loans constituting each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a LIBOR Borrowing, shall have a three month Interest Period. Thereafter, the Borrower may elect to convert such Borrowing to a Borrowing of a different Type or to continue such Borrowing as a Borrowing of the same Type and, in the case of a LIBOR Borrowing, may elect the Interest Period therefor pursuant to this clause (a), all as provided in this Section 2.05. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing. No Interest Period beginning prior to the Conversion Date may extend beyond the Conversion Deadline.

(b)    Notice of Elections. To make an election pursuant to this Section 2.05(b), the Borrower shall notify the Administrative Agent of such election by electronic communication by the time that a Borrowing Request would be required under Section 2.01, if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such electronic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or electronic communication to the Administrative Agent of a written Interest Election Request in the form of Exhibit S (to the extent such election was not originally in the form of Exhibit S).

(c)    Content of Interest Election Requests. Each electronically communicated Interest Election Request shall specify the following information:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified in clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a LIBOR Borrowing; and

(iv)    if the resulting Borrowing is a LIBOR Borrowing, the Interest Period therefor after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

(d)    Notice by the Administrative Agent to the Lenders. Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each applicable Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    Events of Default. If the Borrower fails to deliver a timely and complete Interest Election Request with respect to a LIBOR Borrowing prior to the end of the Interest Period therefor (or if any Interest Election Request made by the Borrower requests a LIBOR Borrowing but does not specify an

Alta App.000770

Alta 0063414

Interest Period therefor), then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period, such Borrowing shall be converted to a LIBOR Borrowing with a three-month Interest Period. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing, (i) no outstanding Borrowing may be converted to or continued as a LIBOR Borrowing and (ii) unless repaid, each LIBOR Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period therefor.

Section 2.06.    Termination and Reduction of the Commitments.

(a)    Scheduled Termination. Unless previously terminated, (i) the Term Loan Commitments shall terminate on the last day of the Term Loan Availability Period, (ii) the Issuing Commitments with respect to the GIA Letters of Credit shall terminate on the GIA Letter of Credit Maturity Date, and (iii) the Issuing Commitments with respect to the Offtake Letters of Credit shall terminate of the Offtake Letter of Credit Maturity Date.

(b)    Voluntary Termination or Reduction. The Borrower may at any time terminate, or from time to time reduce, the Commitments of any Class; provided, that:

(i)    each partial reduction of the Commitments of any Class pursuant to this Section 2.06(b) shall be in an amount that is [$1,000,000] or an integral multiple of [$100,000] in excess thereof (or, if less, the remaining amount of such Commitments), except in the case of any reduction of the Commitments in connection with a reduction in the amount of any performance security required to be maintained pursuant to the terms and conditions of any Project Document, in which case the Commitments in respect of the applicable Class may be reduced by the amount of such reduction, regardless if such amount is less than [$1,000,000] or an integral multiple of [$100,000] in excess thereof;

(ii)    the Borrower shall not voluntarily terminate or reduce the GIA Letter of Credit Issuing Commitments if, the Borrower has not demonstrated to the reasonable satisfaction of the Administrative Agent (acting in consultation with the Independent Engineer and the Technical Consultant) that (A) the reduced portion of the GIA Letter of Credit Issuing Commitments is not and will not be required under the Generation Interconnection Agreements and (B) no Default or Event of Default would occur as a result of such termination or reduction;

(iii)    the Borrower shall not voluntarily terminate or reduce the Offtake Letter of Credit Issuing Commitments if, the Borrower has not demonstrated to the reasonable satisfaction of the Administrative Agent (acting in consultation with the Independent Engineer and the Technical Consultant) that (A) the reduced portion of the Offtake Letter of Credit Issuing Commitments is not and will not be required under the Offtake Agreements and (B) no Default or Event of Default would occur as a result of such termination or reduction;

(iv)    the Borrower shall not voluntarily terminate or reduce the Term Loan Commitments if, after giving effect thereto, the Borrower has not demonstrated to the reasonable satisfaction of the Administrative Agent (in consultation with the Independent Engineer and the Technical Consultant) that (A) the funds under the cancelled Term Loan Commitments are not necessary to achieve the Conversion Date by the Conversion Deadline and (B) no Default or Event of Default would occur as a result of such termination or reduction; and

(v)    notwithstanding the other provisions of this Section 2.06, the Borrower shall be permitted to voluntarily terminate or reduce the GIA Letter of Credit Issuing Commitments and the Offtake Letter of Credit Issuing Commitments to the extent that (A) the applicable Issuing Bank fails to meet the credit requirements under the applicable Project Document or Financing

Alta App.000771

Alta 0063415

Document, as applicable, in respect of which the applicable Letter of Credit was, or was intended to be, issued, and (B) replacement credit support meeting the requirements of the applicable Project Document or Financing Document is provided.

(c)    Notice of Voluntary Termination or Reduction. The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Commitments of any Class under paragraph (b) of this Section 2.06 at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this Section 2.06(c) shall be irrevocable.

(d)    Effect of Termination or Reduction. Any termination or reduction of the Commitments of any Class shall be permanent. Each reduction of the Commitments of any Class shall be made ratably among the Lenders in accordance with their respective Commitments of such Class.

Section 2.07.    Repayment of Loans; Evidence of Debt.

(a)    Repayment. The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the Term Loan Lenders on each applicable Term Loan Principal Payment Date set forth on Schedule 2.10 the aggregate principal amount of Term Loans set forth opposite such Term Loan Principal Payment Date on Schedule 2.10, which shall be, for each such Term Loan Principal Payment Date, in an aggregate amount of 1.25% of the total principal amount of Term Loans outstanding on the Conversion Date (after giving effect to the Term Loans made on such date) (subject to adjustment pursuant to paragraph (b) of this Section 2.07)) ("Scheduled Principal Repayments"). To the extent not previously paid, all Term Loans shall be due and payable on the Term Loan Maturity Date.

(b)    Adjustment to Amortization Schedule. If the initial aggregate amount of the Term Loan Commitments exceeds the aggregate principal amount of Term Loans that are outstanding on the Conversion Date (after giving effect to any Borrowing that occurs on the Conversion Date), then the Scheduled Principal Repayments shall be reduced ratably by an aggregate amount equal to such excess.

(c)    Manner of Payment. Prior to any repayment of any Borrowings of any Class hereunder, the Borrower shall select the Borrowing or Borrowings of the applicable Class to be paid and shall notify the Administrative Agent by electronic transmission of such selection not later than 11:00 a.m., New York City time, (i) in the case of an ABR Borrowing, one Business Day before the scheduled date of such payment and (ii) in the case of a LIBOR Borrowing, three Business Days before the scheduled date of such payment. If the Borrower fails to make a timely selection of the Borrowing or Borrowings to be repaid or prepaid, such payment shall be applied, *first*, to pay any outstanding ABR Borrowings of the applicable Class and, *second*, to other Borrowings of such Class in the order of the remaining duration of their respective Interest Periods (the Borrowing with the shortest remaining Interest Period to be repaid first). Each repayment of a Borrowing shall be applied ratably to the Loans included in such Borrowing.

(d)    Evidence of Debt.

(i)    Each Lender may maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder. In the case of a Lender that does not request, pursuant to clause (ii) below, execution and delivery of a Note evidencing the Loans made by such Lender to the Borrower, such account or accounts shall, to the extent not inconsistent with the notations made by the Administrative Agent in the Register, be prima facie evidence of such Indebtedness of the Borrower absent manifest error; provided, that the failure of any Lender to maintain such account

Alta App.000772

Alta 0063416

or accounts or any error in any such account shall not limit or otherwise affect any repayment obligations of the Borrower hereunder.

(ii)    The Borrower shall, upon the request to the Administrative Agent by any Lender, execute and deliver to such Lender, as applicable, a promissory note (a "Note") substantially in the form of Exhibit B payable to such Lender in an amount equal to such Lender's Loans evidencing the Loans made by such Lender. The Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Notes (or on any continuation of such grid), which notations, if made, shall evidence, inter alia, the date of, the outstanding principal amount of, and the interest rate and Interest Period applicable to the Loans evidenced thereby. Such notations shall, to the extent not inconsistent with the notations made by the Administrative Agent in the Register, be prima facie evidence of the applicable Indebtedness of the Borrower absent manifest error; provided, that the failure of any Lender to make any such notations or any error in any such notations shall not limit or otherwise affect any obligations of the Borrower. A Note and the obligation evidenced thereby may be assigned or otherwise transferred in whole or in part only in accordance with Section 9.04(b).

Section 2.08.    Prepayment of Loans.

(a)    Optional Prepayments. There shall be no optional prepayments prior to the second anniversary of the Closing Date; however, the Borrower shall have the right at any time and from time to time on or after the second anniversary of the Closing Date to prepay any Borrowing of Term Loans in whole or in part, without premium or penalty (other than any amounts payable under Section 2.13), subject to the requirements of this Section 2.08(a). In the event that the Borrower prepays any Term Loans, the Borrower shall pay to the Administrative Agent, for the ratable account of each of the applicable Lenders, the accrued interest to the date of such prepayment on the aggregate principal amount of the Term Loans so prepaid, and in the case of any prepayment prior to the third anniversary of the Closing Date, a prepayment premium of 1.00% of the aggregate principal amount of the Term Loans so prepaid. Each partial prepayment of any Borrowing under this Section 2.08(a) shall be in an aggregate amount at least equal to $1,000,000 and an integral multiple of $100,000 in excess thereof (or such lesser amount as may be necessary to prepay the aggregate principal amount then outstanding with respect to such Borrowing). Prepayments pursuant to this Section 2.08(a) shall be applied to the outstanding Term Loans in inverse order of maturity. Upon the Borrower's prior written request, a prepayment may be applied to prepay outstanding ABR Borrowings of Term Loans before any other Borrowings of such Class so long as such application does not affect the right any Lender would otherwise have to receive *pro rata* prepayments of the Loans or Class of Loans, as applicable, held by such Lender.

(b)    Mandatory Prepayments.[38]

(i)    Subject to Section 2.08(c), from and after the Conversion Date, the Borrower shall on each Quarterly Date (beginning with the Quarterly Date at the end of the first full fiscal quarter after the Conversion Date), prepay the Term Loans with Excess Cash Flow as of such Quarterly Date as follows:

(A)    first, prepay the outstanding principal amount of the Term Loans, with Excess Cash Flow in an amount equal to the lesser of (1) the amount necessary to cause the outstanding principal amount of the Term Loans to equal the Target Debt Balance as of such Quarterly Date and (2) 100% of the amount of Excess Cash Flow (any Excess Cash Flow remaining as of such Quarterly Date after giving effect to the prepayment in this clause (1) is referred to as "Remaining Excess Cash Flow"); and

---

[38]    **Note to Draft**: Amounts for mandatory prepayment are segregated through deposit in the Prepayment Account.

Alta App.000773

Alta 0063417

(B)    second, prepay the outstanding principal amount of the Term Loans with Remaining Excess Cash Flow in an amount equal to 50% of Remaining Excess Cash Flow as of such Quarterly Date.

(ii)    The Borrower shall apply, as and when required pursuant to Section 3.03(h)(ii) of the Depositary Agreement, ratably to the mandatory prepayment of Loans then outstanding, and, in accordance with Section 2.08(e), any termination payments (including any Interest Rate Hedge Termination Payments) in respect of any Permitted Interest Rate Hedges payable as a result of any such prepayment, pursuant to Section 2.08(c), together with accrued interest thereon and any amount required by Section 2.13 (if applicable), an amount equal to the amount on deposit in the Distribution Account in accordance with Section [3.03(h)(ii)] of the Depositary Agreement.

(iii)    Promptly upon receipt (but in any event within five Business Days of receipt), the Borrower shall apply 100% of the cash proceeds received by the Borrower Parties from the incurrence or issuance of any Indebtedness that is not permitted to be incurred or issued pursuant to Section 6.03 to prepayment of the Loans then outstanding, and, in accordance with Section 2.08(e), any termination payments (including any Interest Rate Hedge Termination Payments) in respect of any Permitted Interest Rate Hedges due and payable as a result of any such prepayment, pursuant to Section 2.08(c).

(iv)    Promptly upon receipt (but in any event within five Business Days of receipt) by the Borrower Parties of the proceeds of any conveyance, sale, lease, transfer or other disposal of Project Assets permitted pursuant to Section 6.08 (other than Section 6.08(a) and Section 6.08(d)) (a "Disposition") exceeding $[●]³⁹, in the aggregate, the Borrower shall prepay the Loans then outstanding, and, in accordance with Section 2.08(e), any termination payments (including any Interest Rate Hedge Termination Payments) in respect of any Permitted Interest Rate Hedges due and payable as a result of any such prepayment, pursuant to Section 2.08(c) in an amount equal to 100% of the Net Available Amount of such proceeds; provided, that the Borrower shall not be required to make such payments pursuant to this clause (iv) to the extent that the Borrower applies the same to make Capital Expenditures or to otherwise reinvest the same in Project Assets which are necessary or useful for the business of any Project, in each case pursuant to a transaction not prohibited hereunder, and the Net Available Amount so retained is so applied or reinvested, or committed to be so applied or reinvested, within 180 days of such Disposition, and any uninvested or unreinvested portion of such Net Available Amount shall be promptly applied pursuant to Section 2.08(c).

(v)    With respect to any Event of Damage or Event of Taking or the occurrence of a Total Loss for any Project, the Borrower shall prepay the Loans then outstanding in accordance with and to the extent required by Section 5.18.

(vi)    Promptly upon receipt (but in any event within five Business Days of receipt) by the Borrower Parties (or the Collateral Agent on behalf of the Borrower Parties) of the proceeds of any Project Document Claim, the Borrower shall prepay the Loans then outstanding, and, in accordance with Section 2.08(e), any termination payments (including any Interest Rate Hedge Termination Payments) in respect of any Permitted Interest Rate Hedges due and payable as a result of any such prepayment, pursuant to Section 2.08(c) in an aggregate amount equal to 100% of the Net Available Amount of such Project Document Claim.

---

³⁹    **Note to Draft**: Subject to further DB review.

Alta App.000774

Alta 0063418

(vii)    Promptly following the receipt (but in any event within five Business Days of receipt) by any Borrower Party of the proceeds of any (A) any Termination Payment received pursuant to any other Project Document and (B) Termination Payment exceeding $[●][40] received pursuant to and following the termination of any Other Permitted Commodity Hedge that is not a Material Project Document, the Borrower shall prepay the Loans then outstanding, and, in accordance with Section 2.08(e), any termination payments (including any Interest Rate Hedge Termination Payments) in respect of any Permitted Interest Rate Hedges due and payable as a result of any such prepayment, pursuant to Section 2.08(c) in an aggregate amount equal to 100% of the Net Available Amount of such Termination Payment; provided, that, with respect to any Termination Payment exceeding $[●][41] received by a Borrower Party pursuant to and following the termination of any Other Permitted Commodity Hedge that is not a Material Project Document, the Borrower shall deposit such Termination Payment in the Commodity Hedge Termination Proceeds Account and may use such funds to replace such Other Permitted Commodity Hedge with a replacement agreement substantially similar to or on terms more economically favorable to the applicable Borrower Party than the Other Permitted Commodity Hedge it replaces and substantially similar to or more favorable non-economic terms (taken as a whole) than the Other Permitted Commodity Hedge it replaces; provided, further, that if the applicable Borrower Party has not entered into such a replacement contract with respect to such Other Permitted Commodity Hedge within ninety days after its receipt of the proceeds of such Termination Payment, the Borrower shall prepay the Loans then outstanding, and, in accordance with Section 2.08(e), any termination payments (including any Interest Rate Hedge Termination Payments) in respect of any Permitted Interest Rate Hedges due and payable as a result of any such prepayment, pursuant to Section 2.08(c) in an aggregate amount equal to 100% of the Net Available Amount of such Termination Payment.

(viii)    With respect to any Title Event for any Project, the Borrower shall prepay the Loans then outstanding, and, in accordance with Section 2.08(e), any termination payments (including any Interest Rate Hedge Termination Payments) in respect of any Permitted Interest Rate Hedges due and payable as a result of any such prepayment, pursuant to Section 2.08(c) in accordance with and to the extent required by Section 5.29.

(ix)    Promptly upon receipt (but in any event within five Business Days of receipt), the Borrower shall apply 100% of the cash proceeds received by any Borrower Party from the any Equity Contribution that is not permitted to be issued pursuant to Section 6.26 to prepayment of the Loans then outstanding, and, in accordance with Section 2.08(e), any termination payments (including any Interest Rate Hedge Termination Payments) in respect of any Permitted Interest Rate Hedges due and payable as a result of any such prepayment, pursuant to Section 2.08(c).

Within five Business Days after any mandatory prepayment pursuant to this Section 2.08 that constitutes a TDB Adjustment Event, the Borrower shall deliver to Administrative Agent a proposed revised schedule of Target Debt Balance amounts implementing the adjustment described in the proviso of the definition of "Target Debt Balance" together with reasonably detailed supporting calculations therefor, which revised schedule, once approved by the Administrative Agent (such approval not to be unreasonably withheld or delayed), shall be deemed to replace the existing schedule of Target Debt Balance amounts set forth in the definition thereof for all purposes under this Agreement.

(c)    Priorities. Each prepayment made pursuant to Section 2.08(b) shall be applied ratably first, on a pro rata basis, to (i) prepay the Term Loans in inverse order of maturity and (ii) pay any

---

[40]    **Note to Draft**: Subject to further DB review.

[41]    **Note to Draft**: Subject to further DB review.

Alta App.000775

Alta 0063419

termination payments (including any Interest Rate Hedge Termination Payments) payable in respect of the termination (either in whole or in part) of any Permitted Interest Rate Hedges in connection with such prepayment of the Term Loans; and second, to cash collateralize any Letters of Credit then outstanding and undrawn in an amount in cash equal to 102.5% of the aggregate amount of all Letter of Credit Exposure as of such date, to be applied consistent with Section 2.02(h).

        (d)    Notices, Etc. The Borrower shall notify the Administrative Agent (with a copy to each affected Permitted Interest Rate Hedge Provider) by electronic transmission of any prepayment hereunder including, without limitation, under Section 2.08(a) and Section 2.08(b)), not later than 11:00 a.m., New York City time, one Business Day before the date of prepayment of any ABR Loans and three Business Days before the date of prepayment of any LIBOR Loans. Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment. Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the relevant Lenders of the contents thereof. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.10 and any amount required by Section 2.13 and shall be applied in the manner specified in Section 2.07(c).

        (e)    Permitted Interest Rate Hedges. Any prepayment of Term Loans made pursuant to this Section 2.08 shall be made simultaneously with (i) the early termination of Permitted Interest Rate Hedges to the extent that the aggregate notional amount under all such Permitted Interest Rate Hedges would exceed the aggregate principal amount of the Term Loans outstanding after giving effect to such prepayment and (ii) payment by the Borrower of any amount payable by the Borrower under any such Permitted Interest Rate Hedge as a result of such early termination, in each case in the manner set forth in Section [3.03(b)(iv)] of the Depositary Agreement. Any such early termination of Permitted Interest Rate Hedges shall be on a pro rata basis among all of the Permitted Interest Rate Hedges, according to the notional amounts then outstanding under each such Permitted Interest Rate Hedge.

        Section 2.09.    Fees.

        (a)    Commitment Fee. The Borrower agrees to pay to the Administrative Agent for account of each Lender having Term Loan Commitments a commitment fee, which shall accrue at a rate per annum equal to [1.80%][42] on the average daily unused amount of each such Commitment of such Lender during the period from and including the Closing Date to but excluding the earlier of (i) the date each such Commitment terminates (or if such Commitment is canceled or expired prior to such date, on the date of such cancellation or expiration) and (ii) Conversion Date. All commitment fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). For purposes of computing commitment fees with respect to the Commitments, a Lender's Commitment shall be deemed to be used to the extent of such Lender's outstanding Loans. Accrued commitment fees shall be due and payable on each Quarterly Date. Defaulting Lenders shall not be entitled to any commitment fees in respect of periods during which they are Defaulting Lenders.

        (b)    Letter of Credit Fees. The Borrower agrees to pay (i) to the Administrative Agent for account of each Issuing Bank a fee with respect to its Letter of Credit Exposure (a "Letter of Credit Exposure Fee") which shall accrue at a rate per annum equal to the Applicable Margin applicable to interest on LIBOR Loans, on the average daily amount of such Issuing Bank Letter of Credit Exposure (excluding any portion thereof attributable to unreimbursed Letter of Credit Disbursements) during the period from and including the Closing Date to but excluding (A) in the case of the GIA Issuing Bank, the GIA Letter of

---

[42]   **Note to Draft**: 40% of the LIBOR Applicable Margin.

Alta App.000776

Alta 0063420

Credit Maturity Date and (B) in the case of the Offtake Issuing Bank, the Offtake Letter of Credit Maturity Date and (ii) in the case of an amendment of a Letter of Credit, to the Issuing Bank of such Letter of Credit such Issuing Bank's customary and reasonable amendment fees and costs. Letter of Credit fees payable pursuant to clause (i) above shall be due and payable on the Quarterly Date occurring in the first full quarter following the Closing Date; provided, further, that any Letter of Credit fees payable pursuant to clause (i) above accruing after the GIA Letter of Credit Maturity Date or the Offtake Letter of Credit Maturity Date, as applicable, shall be payable on demand. All Letter of Credit fees payable pursuant to clause (i) above shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)    Mandated Lead Arranger and Agent Fees. The Borrower agrees to pay to the Administrative Agent, for its own account, and to the Collateral Agent, the Depositary Bank and the Mandated Lead Arranger the fees payable in the amounts and at the times separately agreed upon in the Fee Letters or the Depositary Agreement, as applicable.

(d)    Payment of Fees. All fees payable hereunder shall be paid on the dates due, in Dollars and immediately available funds, to the Administrative Agent (or to the applicable Issuing Bank, in the case of fees payable to it) for distribution, in the case of commitment fees and Letter of Credit Exposure Fees, to the Lenders entitled thereto. Fees paid shall not be refundable under any circumstances absent manifest error.

Section 2.10.    Interest.

(a)    ABR Loans. The Loans constituting each ABR Borrowing shall bear interest at a rate per annum equal to the Alternate Base Rate *plus* the Applicable Margin.

(b)    LIBOR Loans. The Loans constituting each LIBOR Borrowing shall bear interest for the applicable Interest Period at a rate per annum equal to the Adjusted LIBO Rate for such Interest Period for such Borrowing *plus* the Applicable Margin.

(c)    Default Interest. Notwithstanding the foregoing, if any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration, by mandatory prepayment or otherwise, such overdue amount shall bear interest, after as well as before judgment, (i) in the case of overdue principal of any Loan, at a rate per annum equal to 2.00% *plus* the rate that would otherwise be applicable to such amount pursuant to this Agreement or, (ii) in the case of any other amount, 2.00% *plus* the rate applicable to ABR Loans as provided in clause (a) of this Section 2.10.

(d)    Payment of Interest. Accrued interest on each Loan of any Class shall be payable in arrears on each Interest Payment Date for such Loan; provided, that (i) interest accrued pursuant to clause (c) of this Section 2.10 shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, (iii) in the event of any conversion of a LIBOR Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion and (iv) interest accrued pursuant to clause (a) of this Section 2.10 shall be first payable on the Interest Payment Date occurring in the first full quarter following the Closing Date.

(e)    Post-Petition Interest. Interest hereunder shall be due and payable in accordance with the terms hereof, before and after judgment, regardless of whether an Insolvency or Liquidation Proceeding exists in respect of any Borrower Party, and, to the fullest extent permitted by law, the Lenders shall be entitled to receive post-petition interest during the pendency of an Insolvency or Liquidation Proceeding.

(f)     Computation. All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The computation of interest shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.11.     Alternate Rate of Interest.

(a)     If prior to the commencement of the Interest Period for any LIBOR Borrowing:

(i)     the Administrative Agent determines (which determination shall be conclusive absent manifest error) that by reason of circumstances affecting the London interbank market adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(ii)     such Borrowing is of a particular Class of Loans, the Administrative Agent is advised by the Required Lenders of such Class that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their respective Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give written notice thereof to the Borrower and the Lenders as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or the continuation of any Borrowing as, a LIBOR Borrowing shall be ineffective and such Borrowing (unless prepaid) shall be continued as, or converted to, an ABR Borrowing on the last day of the Interest Period applicable thereto, and (ii) if any Borrowing Request requests a LIBOR Borrowing, such Borrowing shall be made as an ABR Borrowing.

(b)     In addition, if any Lender reasonably determines that the introduction of, or any change in or in the interpretation of, any Applicable Law after the Closing Date shall make it unlawful, or any Governmental Authority shall assert that it is unlawful, for any Lender or its applicable lending office to make LIBOR Loans or to continue to fund or maintain LIBOR Loans, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligations of such Lender to make or continue LIBOR Loans or to convert ABR Borrowings to LIBOR Borrowings, as the case may be, shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), convert all such LIBOR Borrowings of such Lender to ABR Borrowings, on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBOR Borrowings to such day, or immediately, if such Lender may not lawfully continue to maintain such Loans. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

Section 2.12.     Increased Costs.

(a)     Increased Costs Generally. If, after the Closing Date, any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit or similar requirement (except any such reserve requirement reflected in the Adjusted LIBO Rate) against assets of, deposits with or for account of, or credit extended by, any Lender or any Issuing Bank;

(ii)     subject any Lender or any Issuing Bank to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its Loans, loan principal, Letters of Credit,

Alta App.000778

Alta 0063422

Commitments, or other Obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on any Lender or any Issuing Bank any other condition not otherwise contemplated hereunder affecting this Agreement or LIBOR Loans made by such Lender or any Letter of Credit or participation therein, and the result of any of the foregoing shall be to increase the cost to such Lenders of making or maintaining any LIBOR Loan (or of maintaining its obligation to make any such Loan) to the Borrower or to increase the cost to such Lender or such Issuing Bank of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender or such Issuing Bank hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or such Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or such Issuing Bank, as the case may be, for such additional costs actually incurred or reduction suffered. For purposes of this Agreement, (A) the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub.L. 111-203 (signed into law July 21, 2010)) and all requests, rules, guidelines or directives in connection therewith and (B) all requests, rules, guidelines or directives concerning capital adequacy in connection with the implementation of the proposals (referred to as Basel III) on capital and liquidity of the Basel Committee on Bank Supervision (the "<u>BCBS</u>") issued in December 2009 and related publications and guidance (including the additions to and refinements of the proposals published by the BCBS in July 2010), shall be deemed to have been introduced or adopted, as applicable, after the Closing Date, regardless of the actual date such request, rule, guideline or directive actually goes into effect.

(b)     <u>Capital Requirements</u>. If, after the Closing Date, any Lender or any Issuing Bank reasonably determines that any Change in Law regarding capital requirements or (pursuant to the BCBS) liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or such Issuing Bank's capital or on the capital of such Lender's or such Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by such Issuing Bank, to a level below that which such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or such Issuing Bank's policies and the policies of such Lender's or such Issuing Bank's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender or such Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company for any such reduction actually incurred or suffered.

(c)     <u>Certificates from Lenders</u>. A certificate of a Lender or an Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or such Issuing Bank or its holding company, as the case may be, as specified in <u>clause (a)</u> or <u>(b)</u> of this <u>Section 2.12</u> shall be delivered to the Borrower (with a copy to the Administrative Agent) and shall be conclusive absent manifest error. The Borrower shall pay such Lender or such Issuing Bank, as the case may be, the amount shown as due on any such certificate within thirty days after receipt thereof.

(d)     <u>Delay in Requests</u>. Promptly after any Lender or any Issuing Bank has determined that it will make a request for increased compensation pursuant to this <u>Section 2.12</u>, such Lender or Issuing Bank shall notify the Borrower thereof. Failure or delay on the part of any Lender or any Issuing Bank to demand compensation pursuant to this <u>Section 2.12</u> shall not constitute a waiver of such Lender's or such Issuing Bank's right to demand such compensation; <u>provided</u>, that the Borrower shall not be required to compensate a Lender or an Issuing Bank pursuant to this <u>Section 2.12</u> for any increased costs or reductions incurred more than ninety days prior to the date that such Lender or such Issuing Bank, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or such Issuing Bank's intention to claim compensation therefor; <u>provided</u>, <u>further</u>, that, if the

Alta App.000779

Alta 0063423

Change in Law giving rise to such increased costs or reductions is retroactive, then the ninety day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.13. <u>Break Funding Payments</u>. In the event of (a) the payment of any principal of any LIBOR Loan other than on the last day of an Interest Period therefor (including as a result of an Event of Default), (b) the conversion of any LIBOR Loan other than on the last day of an Interest Period therefor, (c) the failure to borrow, convert, continue or prepay any LIBOR Loan on the date specified in any notice delivered pursuant hereto (other than in connection with any LIBOR Borrowing that is not made pursuant to <u>Section 2.04</u> due to circumstances set forth in <u>Section 2.11</u>) or (d) the assignment as a result of a request by the Borrower pursuant to <u>Section 2.16(b)</u> of any LIBOR Loan other than on the last day of an Interest Period therefor, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event (but excluding any anticipated profits). In the case of a LIBOR Loan, the loss to any Lender attributable to any such event shall be deemed to include an amount reasonably determined by such Lender to be equal to the excess, if any, of (i) the amount of interest that such Lender would pay for a deposit equal to the principal amount of such Loan for the period from the date of such payment, conversion, failure or assignment to the last day of the then current Interest Period for such Loan (or, in the case of a failure to borrow, convert or continue a LIBOR Loan, the duration of the Interest Period that would have resulted from such borrowing, conversion or continuation) if the interest rate payable on such deposit were equal to the Adjusted LIBO Rate for such Interest Period, over (ii) the amount of interest that such Lender would earn on such principal amount for such period if such Lender were to invest such principal amount for such period at the interest rate that would be bid by such Lender (or an affiliate of such Lender) for deposits in Dollars from other banks in the eurocurrency market at the commencement of such period. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this <u>Section 2.13</u> shall be delivered to the Administrative Agent, and the Administrative Agent shall promptly provide such certificate to the Borrower, and such certificate shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within thirty days after receipt thereof. Notwithstanding the foregoing, unless an Event of Default shall have occurred and be continuing, and except with regard to any voluntary prepayments hereunder or the events described in <u>Section 2.12(a)</u> and <u>(b)</u>, each Lender shall, unless otherwise requested by Borrower, use reasonable efforts to minimize any such break funding payments by, among other things, not applying mandatory prepayments until the last day of an Interest Period so long as such Lender, in its sole discretion, does not determine that such efforts would be disadvantageous to such Lender.

Section 2.14. <u>Taxes</u>.

(a) <u>Payments Free of Taxes</u>. For purposes of this <u>Section 2.14</u>, the term "Applicable Law" includes FATCA. Any and all payments by or on account of any obligation of any Loan Party under any Financing Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law. If any Applicable Law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Agent, Lender or Issuing Bank receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b) <u>Payment of Other Taxes</u>. In addition, the Borrower shall timely pay or cause to be paid any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

Alta App.000780

Alta 0063424

(c)     Indemnification. The Borrower shall indemnify or cause to be indemnified the Administrative Agent, the Collateral Agent, the Depositary Bank, each Lender and each Issuing Bank, within thirty days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.14 but without duplication of any amounts paid or indemnified under Section 2.14(a)) payable or paid by the Administrative Agent, the Collateral Agent, the Depositary Bank, such Lender or such Issuing Bank, as the case may be, and any penalties, interest and reasonable out-of-pocket expenses arising therefrom or with respect thereto (other than any penalties, interest and out-of-pocket expenses resulting solely from the gross negligence or willful misconduct of such Person), whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. The amount of such payment or liability and the denomination thereof as set forth in a certificate delivered to the Borrower by the Collateral Agent, the Depositary Bank, a Lender or an Issuing Bank or by the Administrative Agent on its own behalf or on behalf of the Collateral Agent, the Depositary Bank, a Lender or an Issuing Bank, shall be conclusive absent manifest error.

(d)     Evidence of Payments. As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section 2.14, the Borrower shall deliver or cause to be delivered to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment satisfactory to the Administrative Agent, acting reasonably.

(e)     Forms. Any Lender, Agent and each Issuing Bank that is entitled to an exemption from or reduction of withholding Tax with respect to payments under this Agreement or other Financing Document shall deliver to the Borrower, to the extent such Lender, Agent or Issuing Bank is legally able (with a copy to the Administrative Agent), (i) on or before the date it becomes a party hereto, (ii) thereafter when reasonably requested by the Borrower or the Administrative Agent and (iii) promptly upon the expiration, obsolescence or invalidity of any previously delivered forms, (A) such properly completed and executed documentation prescribed by Applicable Law as will permit such payments to be made without withholding or at a reduced rate and (B) IRS Form W-8BEN, W-8BEN-E, W-8ECI or W-9, as applicable (or, in each case, any successor form and, in each case, attached to an IRS Form W-8IMY if required), and, in the case of a person claiming an exemption under the "portfolio interest exemption," a statement certifying (1) that it is not a 10% shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of the Borrower, (2) that it is not a controlled foreign corporation related to the Borrower (within the meaning of Section 864(d)(4) of the Code) and (3) that it is not a "bank" as such term is used in Section 881(c)(3)(A) of the Code; provided, that the completion and execution of such documentation (other than such documentation set forth in clause (b) of this Section 2.14(e) or in Section 2.14(g)) shall not be required if in the good faith judgment of the Lender, Agent, or Issuing Bank such completion or execution would subject such Lender or Issuing Bank to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender, Agent, or Issuing Bank. Whenever a change in circumstances of a Lender, Agent or Issuing Bank would modify or render invalid any claimed exemption or reduction, the relevant Lender, Agent or Issuing Bank shall promptly notify the Borrower and the Administrative Agent. Notwithstanding anything herein to the contrary, a Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code shall provide a duly completed and executed IRS Form W-9 at the times prescribed by Applicable Law.

(f)     If the Administrative Agent, the Collateral Agent, the Depositary Bank, any Lender or any Issuing Bank determines, in such Person's sole discretion, exercised in good faith, that it has received a refund of any Indemnified Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.14, it shall pay over such refund to the Borrower, net of all of its out-of-pocket expenses (including Taxes that would not have been imposed but for such refund) and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that the Borrower, upon the request of the

Alta App.000781

Alta 0063425

Administrative Agent, the Collateral Agent, the Depositary Bank, any Lender or any Issuing Bank, as the case may be, agrees to repay as soon as reasonably practicable the amount paid over to the Borrower (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent, the Collateral Agent, the Depositary Bank, any Lender or any Issuing Bank, as the case may be, in the event the Administrative Agent, the Collateral Agent, the Depositary Bank, any Lender or any Issuing Bank, as the case may be, is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this clause (f), in no event will the Administrative Agent, the Collateral Agent, the Depositary Bank, any Lender or any Issuing Bank be required to pay any amount to a Loan Party pursuant to this clause (f) the payment of which would place such Administrative Agent, Collateral Agent, the Depositary Bank, any Lender or any Issuing Bank in a less favorable net after-Tax position than would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.

(g)     If a payment made to a Lender under any Financing Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)     This Section 2.14 shall not be construed to require the Administrative Agent, Collateral Agent, the Depositary Bank, any Lender or any Issuing Bank to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(i)     Each party's obligations under this Section 2.14 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Financing Document.

Section 2.15.     Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)     Payments by the Borrower. Unless otherwise specified, the Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of Letter of Credit Disbursements, or under Section 2.12, 2.13 or 2.14, or otherwise) or under any other Financing Document (except to the extent otherwise provided therein) prior to 2:00 p.m., New York City time, on the date when due, in immediately available funds, without set-off or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent by wire transfer to the following account: payment instructions: [Bank Name: [●]; Address: [●]; ABA Number: [●]; Account Name: [●]; Account No. [●]; Reference: [●]][43]; except as otherwise expressly provided in the relevant Financing Document and except payments to be made directly to any Issuing Bank as expressly provided herein and payments pursuant to

---

[43]    **Note to Draft**: DBTCA to provide.

Alta App.000782

Alta 0063426

Sections 2.13, 2.14 and 9.03, which shall be made directly to the Persons entitled thereto, in each case subject to the terms of the Depositary Agreement. The Administrative Agent shall distribute any such payments received by it for account of any other Person to the appropriate recipient promptly following receipt thereof. If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All amounts owing under this Agreement or under any other Financing Document are payable in Dollars.

(b)    Application of Insufficient Payments. If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed Letter of Credit Disbursements, interest and fees then due hereunder, such funds shall be applied, in each case pro rata among the relevant Lenders according to the amounts of their respective Commitments, (i) first, to pay interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties and (ii) second, to pay principal and unreimbursed Letter of Credit Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed Letter of Credit Disbursements then due to such parties.

(c)    Pro Rata Treatment. Except to the extent otherwise provided herein: (i) each Borrowing of a particular Class shall be made from the relevant Lenders, each payment of a commitment fee under Section 2.09(a) in respect of Commitments of a particular Class shall be made for account of the relevant Lenders, and each termination or reduction of the amount of the Commitments of a particular Class under Section 2.06 shall be applied to the respective Commitments of such Class of the relevant Lenders, pro rata among the relevant Lenders according to the amounts of their respective Commitments of such Class; (ii) each Borrowing of any Class shall be allocated pro rata among the relevant Lenders according to the amounts of their respective Commitments of such Class (in the case of the making of Loans) or their respective Loans of such Class that are to be included in such Borrowing (in the case of conversions and continuations of Loans); (iii) each payment or prepayment of principal of Loans by the Borrower shall be made for account of the relevant Lenders pro rata in accordance with the respective unpaid principal amounts of the Loans of such Class held by them; and (iv) each payment of interest on Loans by the Borrower shall be made for account of the relevant Lenders pro rata in accordance with the amounts of interest on such Loans then due and payable to the respective Lenders.

(d)    Sharing of Payments by Lenders. If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or participations in Letter of Credit Disbursements resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and participations in Letter of Credit Disbursements and accrued interest thereon then due than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans and participations in Letter of Credit Disbursements of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders pro rata in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and participations in Letter of Credit Disbursements; provided, that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in Letter of Credit Disbursements to any assignee or participant, other than to the Borrower or any Affiliate thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such

Alta App.000783

Alta 0063427

participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(e)     Presumptions of Payment. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for account of the Lenders or any Issuing Bank hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or such Issuing Bank, as the case may be, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders or each applicable Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or such Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(f)     Certain Deductions by the Administrative Agent. If any Lender shall fail to make any payment required to be made by it pursuant to 2.04(b), 2.15(e) or 9.03(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.16.     Mitigation Obligations; Replacement of Lenders.

(a)     Designation of a Different Lending Office. If any Lender requests compensation under Section 2.12, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for account of any Lender pursuant to Section 2.14, then such Lender shall, if requested by the Borrower, use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or Section 2.14, as the case may be, in the future and (ii) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material respect. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     Replacement of Lenders.

(i)     If any Lender requests compensation under Section 2.12, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for account of any Lender pursuant to Section 2.14, or if any Lender is a Defaulting Lender or if any Lender requests a conversion of LIBOR Loans to ABR Loans, then the Borrower may terminate the Commitment of such Lender, and (A) in the case of a Lender (other than the Issuing Bank), repay all Obligations of the Borrower owing to such Lender relating to the Loans and participations held by such Lender as of such termination date, (B) in the case of the Issuing Bank, repay all Obligations of the Borrower owing to the Issuing Bank relating to the Loans and participations held by the Issuing Bank as of such termination date and cancel (or backstop on terms satisfactory to the Issuing Bank in its reasonable discretion) any Letters of Credit issued by it and (C) in the case of a Lender that is a party to a Permitted Interest Rate Hedge repay all Obligations of the Borrower owing to such Lender under the Permitted Interest Rate Hedge.

(ii)     If any Lender (such Lender, a "Non-Consenting Lender") has failed to consent to a proposed amendment, waiver, discharge or termination which pursuant to the terms of

Alta App.000784

Alta 0063428

Section 9.02 requires the consent of all of the Lenders affected and with respect to which the Required Lenders shall have granted their consent, then the Borrower shall have the right to (unless such Non-Consenting Lender grants such consent) terminate the Commitment of such Lender, and (A) in the case of a Lender (other than the Issuing Bank), repay all Obligations of the Borrower owing to such Lender relating to the Loans and participations held by such Lender as of such termination date, (B) in the case of the Issuing Bank, repay all Obligations of the Borrower owing to the Issuing Bank relating to the Loans and participations held by the Issuing Bank as of such termination date and cancel (or backstop on terms satisfactory to the Issuing Bank in its reasonable discretion) any Letters of Credit issued by it and (C) in the case of a Lender that is a party to a Permitted Interest Rate Hedge repay all Obligations of the Borrower owing to such Lender under the Permitted Interest Rate Hedge.

(iii)    Any Lender that has been replaced as a Lender pursuant to clause (i) or (ii) of this Section 2.16(b), and that is party to a Permitted Interest Rate Hedge shall use commercially reasonable efforts to promptly novate, assign and delegate, without recourse, all its interests, rights and obligations under such Permitted Interest Rate Hedge to the assignee replacing it as a Lender pursuant to this Section 2.16(b), to an Affiliate thereof or to another Lender or Affiliate thereof, which, in each case, shall be a Permitted Interest Rate Hedge Provider.

Section 2.17.    Defaulting Lenders. Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender, to the extent permitted by Applicable Law:

(a)    Fees shall cease to accrue on the unused portion of the Commitment of such Defaulting Lender pursuant to Section 2.09(a).

(b)    The unused Commitments and Pro Rata Outstandings of such Defaulting Lender shall not be included in determining whether the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver requiring Required Lender approval pursuant to Section 9.02).

(c)    Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of a Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) shall be applied at such time or times as may be determined by the Administrative Agent as follows: (i) *first*, to the payment of any amounts owing by such Defaulting Lender to the Agents under the Financing Documents; (ii) *second*, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to the applicable Issuing Bank; (iii) *third*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement; (iv) *fourth*, if so determined by the Administrative Agent or requested by an Issuing Bank, held in such account as cash collateral for future funding obligations of such Defaulting Lender in respect of any existing or future participating interest in any Letter of Credit; (v) *fifth*, to the payment of any amounts owing to the Lenders or the applicable Issuing Banks as a result of any then final and non-appealable judgment of a court of competent jurisdiction obtained by any Lender or an applicable Issuing Bank against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; (vi) *sixth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any then final and non-appealable judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and (vii) *seventh*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction (provided, that with respect to this clause (vii), if such payment is a prepayment of the principal amount of any Loans in respect of which a Defaulting Lender has funded its participation obligations, such payment shall be applied solely to prepay the Loans of, and Reimbursement Obligations

Alta App.000785

Alta 0063429

owed to, all Non-Defaulting Lenders pro rata prior to being applied to the prepayment of any Loans, Reimbursement Obligations owed to such Defaulting Lender).

        Section 2.18.    <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in this Agreement, any other Financing Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under this Agreement or any other Financing Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

        (i)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

        (ii)    the effects of any Bail-In Action on any such liability, including, if applicable: (A) a reduction in full or in part or cancellation of any such liability; (B) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Financing Document; or (C) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

        Section 2.19.    <u>Successor LIBOR</u>.

        (a)    Notwithstanding anything to the contrary in this Agreement or any other Financing Document (including <u>Section 9.02</u> hereof), if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Borrower or the Required Lenders notify the Administrative Agent (with, in the case of the Required Lenders, a copy to Borrower) that the Borrower or the Required Lenders (as applicable) have determined, that:

        (i)    adequate and reasonable means do not exist for ascertaining LIBO Rate for any requested Interest Period because the LIBOR Screen Rate is not available or published on a current basis and such circumstances are unlikely to be temporary,

        (ii)    the administrator of the LIBOR Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which LIBO Rate or the LIBOR Screen Rate shall no longer be made available, or used for determining the interest rate of loans (such specific date, the "<u>Scheduled Unavailability Date</u>"), or

        (iii)    syndicated loans currently being executed, or that include language similar to that contained in this <u>Section 2.19</u>, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace LIBO Rate,

        then, reasonably promptly after such determination by the Administrative Agent or receipt by the Administrative Agent of such notice, as applicable, the Administrative Agent and the Borrower may amend this Agreement to replace LIBO Rate with an alternate benchmark rate (including any mathematical or other adjustments to the benchmark (if any) incorporated therein), giving due consideration to any evolving or then existing convention for similar Dollar denominated syndicated credit facilities for such alternative benchmarks (any such proposed rate, a "<u>LIBOR Successor Rate</u>"), together with any proposed LIBOR Successor Rate Conforming Changes and any such amendment shall become effective at 5:00 p.m. (New York time) on the fifth Business Day after the Administrative Agent shall have posted such proposed

Alta App.000786

Alta 0063430

amendment to all Lenders and the Borrower unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders do not accept such amendment.

(b)     If no LIBOR Successor Rate has been determined and the circumstances under clause (a) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, (i) the obligation of the Lenders to make or maintain LIBOR Loans shall be suspended (to the extent of the affected LIBOR Loans or Interest Periods) and (ii) the LIBO Rate component shall no longer be utilized in determining the Alternate Base Rate. Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of LIBOR Loans (to the extent of the affected LIBOR Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of ABR Loans (subject to clause (ii) of the immediately preceding sentence) in the amount specified therein.

(c)     Notwithstanding anything else herein, any definition of LIBOR Successor Rate shall provide that in no event shall such LIBOR Successor Rate be less than zero for purposes of this Agreement.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

The Borrower makes the representations and warranties contained in this Article III to each Agent, the Issuing Banks and the Lenders. Unless a representation and warranty is expressly made solely as of a specific date, each such representation and warranty shall be deemed made as of the Closing Date, the date of any Borrowing, the date of each issuance of a Letter of Credit, and the Conversion Date.

Section 3.01.     Due Organization, Etc. Each Loan Party is a limited liability company duly organized, validly existing and in good standing under the laws of Texas. Each Loan Party has all requisite limited liability company power and authority to own or lease and operate its respective properties and to carry on its respective business as now conducted and as proposed to be conducted and each Loan Party is duly qualified to do business and is in good standing in each jurisdiction where necessary in light of its business as now conducted and as proposed to be conducted under the Transaction Documents to which it is party, except where failure to so qualify would not reasonably be expected to have a Material Adverse Effect. The tax identification number of each Loan Party is set forth on Schedule 3.01 (or as otherwise notified to the Administrative Agent) and the organizational identification number of each Loan Party in its jurisdiction of organization is set forth on Schedule 3.01 (or as otherwise notified to the Administrative Agent).

Section 3.02.     Limited Liability Company Power, Etc. Each Loan Party has full limited liability company power and authority to enter into, deliver and perform its respective obligations under each of the Transaction Documents to which it is a party and to consummate each of the transactions contemplated herein and therein, and has taken all necessary limited liability company action to authorize the execution, delivery and performance by it of each of the Transaction Documents to which it is a party. Each Transaction Document to which a Loan Party is party has been duly executed and delivered by the Loan Party party thereto and is in full force and effect and constitutes a legal, valid and binding obligation of the Loan Party party thereto, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited (a) by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other similar laws affecting creditors' rights generally and (b) by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Alta App.000787

Alta 0063431

Section 3.03.    No Conflict. The execution, delivery and performance by each Loan Party of each of the Transaction Documents to which it is a party, as well as the consummation of the transactions contemplated herein and therein, do not and will not (a) violate its certificate of formation or Borrower Party Operating Agreement or Pledgor Operating Agreement, as applicable, (b) violate or result in a breach of, or constitute a default under, any indenture, loan agreement, mortgage or other instrument or agreement to which any Loan Party is a party or by which it is bound or to which any Loan Party's Property or assets are subject, except to the extent that any such conflict, breach or default could not reasonably be expected to have a Material Adverse Effect, (c) conflict with or result in a breach of, or constitute a default under, any Applicable Law, except to the extent that any such conflict, breach or default could not reasonably be expected to have a Material Adverse Effect or (d) result in the creation or imposition of any Lien (other than a Permitted Encumbrance) upon any of a Loan Party's Property or assets, now owned or hereafter acquired.

Section 3.04.    Title.

(a)    At all times on and after the Closing Date, each Borrower Party has good record, marketable and indefeasible and insurable title in fee simple to, or a valid and insurable leasehold or easement interest in (as applicable), all real property, including all rights of way, comprising the relevant Project Site pursuant to the Real Property Documents (a true, correct and complete list of which are attached as Schedule 3.04(a)), and such interests are sufficient to build, construct and operate the relevant Project in accordance with the Transaction Documents, in each case free and clear of all Liens other than any Permitted Title Encumbrances; provided, that following the Closing Date, the term "Project Site" as used in this Section 3.04 shall not include (i) any interests of a Borrower Party which are transferred or disposed of in accordance with Section 6.08 or (ii) any temporary real property interest, temporary license, or other temporary occupancy or use rights, of a Borrower Party in any access, construction laydown or other area that has expired.

(b)    At all times on and after the Closing Date, each Borrower Party has good, legal and valid title or otherwise has the right to use all material equipment and material personal Property, tangible or intangible, which is used in the day to day operations of the business of such Borrower Party and which is necessary to conduct the business of the Borrower Party in accordance in all material respects with Applicable Law and Governmental Approvals, and under the Transaction Documents.

(c)    No Project includes improved real property that is or will be located in an area that has been identified by the Director of the Federal Emergency Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968, as amended, other than properties for which evidence of flood insurance policies in an amount required by and otherwise in compliance with applicable Flood Laws has been delivered pursuant to Section 4.01(w) and such policies are in full force and effect.

(d)    Each of the Projects, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components are in good condition, order and repair in all material respects. There exists no structural or other material defects or damages in the Projects or improvements located thereon, whether latent or otherwise, and the Borrower Parties have not received notice from any insurance company or bonding company of any defects or inadequacies in any Project or any improvements thereon, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

Alta App.000788

Alta 0063432

(e)     Each Borrower Party has rights of access to public ways and each is served by water, sewer, sanitary sewer and storm drain facilities adequate to service the relevant Project for its intended use. All utility services, including, without limitation, gas, water, sewage, electrical and telephone, necessary for the development and occupancy of each Project and any improvements located thereon are available at or within the boundaries of the respective Project Site, or the Borrower Parties have taken all steps necessary to assure that all such services will be available upon completion of the improvements. All roads necessary for the use of each of the Projects for their current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities.

Section 3.05.    Approvals, Etc.

(a)     Schedule 3.05 [44] constitutes a complete and accurate list of all material Governmental Approvals required on the part of or on behalf of the Loan Parties for the Development and for the Loan Parties' execution, delivery, and performance of the Transaction Documents to which it is a party. As of the Closing Date, the Governmental Approvals set forth in Part A of Schedule 3.05 (the "Part A Approvals") have been duly obtained, are in full force and effect, are not subject to any pending appeals, are final and, except as noted on Part A of Schedule 3.05, the administrative and judicial periods to appeal such Governmental Approvals have expired and constituted all material Governmental Approvals that were required to be obtained as of the Closing Date for each Loan Parties' execution, delivery, and performance of the Transaction Documents to which it is a party and for the Development in light of the status of the Development at such time.

(b)     All material Governmental Approvals required on the part of or on behalf of the Loan Parties for the Development but not required to be obtained on or prior to the Closing Date in light of the status of the Development at such time, including information as to the filing of applications and the status thereof, are set forth in Part B of Schedule 3.05 (the "Part B Approvals"). To the knowledge of the Borrower (after due inquiry, including with the Loan Parties and the Sponsor), there exists no impediment that could reasonably be expected to prevent the Part B Approvals from being obtained in due course, without adverse conditions or requirements and prior to the time the same is required to be obtained.

Section 3.06.    No Default, Abandonment, Damage, Taking or Title Events. No (i) Default or Event of Default, (ii) Event of Abandonment or (iii) Event of Damage, Event of Taking or Title Event has occurred and is continuing, other than (in the case of clause (iii) and as of any date when this representation and warranty is made after the Closing Date) any Event of Damage, Event of Taking or Title Event the proceeds of which are to be applied pursuant to Section 5.18 or Section 5.29.

Section 3.07.    Litigation, Etc. Except as set forth on Schedule 3.07[45], there are no actions, suits, proceedings, investigations or similar actions pending or, to the knowledge of the Loan Parites, threatened (in writing) against any Loan Party or any of the Project Assets, that (as of any date when this representation and warranty is made after the Closing Date) has had or could reasonably be expected to have a Material Adverse Effect. To the Borrower's knowledge (after due inquiry, including with the Loan Parties and the Sponsor), there are no complaints or investigation proceedings, public or non-public, pending with the FERC, the PUCT, ERCOT or IMM seeking abrogation or modification, or otherwise investigating the terms, of a contract for the sale of power and/or capacity by any Loan Party that could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

Section 3.08.    Compliance with Laws and Obligations. Each Loan Party is in compliance with all Applicable Laws, regulations and orders of any Governmental Authority applicable to it or its Property and all indentures, agreements and other material instruments binding upon it or its Property,

---

[44]   **Note to Draft**: Subject to Lender review of schedule when available.

[45]   **Note to Draft**: Subject to Lender review of schedule when available.

Alta App.000789

Alta 0063433

except where the failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 3.09.    Environmental Laws.  [*PH Note: Confirm if any items should be scheduled to make this rep.*] (a) Each Borrower Party, all operations of each Borrower Party, and all Project Assets are in compliance in all material respects with all applicable Environmental Laws, including any Governmental Approvals required under any Environmental Laws, all material past noncompliance with such Environmental Laws and Governmental Approvals has been resolved, and, to the the Borrower Party's knowledge, no circumstances exist that could reasonably be expected to (i) form the basis of an Environmental Claim against any Borrower Party, Agent or Lender party that could have a Material Adverse Effect or (ii) cause any of the Project Assets to be subject to any restrictions on ownership, occupancy, use or transferability under any applicable Environmental Law that could reasonably be expected to have a Material Adverse Effect, (b) each Borrower Party has obtained and maintains in full force and effect all Governmental Approvals required under Environmental Laws for the Development of the Projects and all Project Assets (including any Governmental Approvals required to be obtained on behalf of each Borrower Party) except where the failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, and there are no actions or proceedings pending, or to the knowledge of the Borrower (after due inquiry, including with the Loan Parties and the Sponsor), threatened in writing, that reasonably would be expected to result in the repeal, revocation, termination, enjoinment, withdrawal, cancellation, or material modification or restriction of any such Governmental Approvals, or the imposition of material new limitations or conditions under such Governmental Approvals, (c) there are no pending or, to the knowledge of the Borrower (after due inquiry, including with the Loan Parties and the Sponsor), any unresolved past or threatened in writing Environmental Claims against the Project Assets or any Borrower Party that could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (d) to the knowledge of the Borrower (after due inquiry, including with the Loan Parties and the Sponsor), Hazardous Substances have not at any time been used or Released at, on, under, or from the Projects or the Project Sites, other than in material compliance at all times with all applicable Environmental Laws in effect at the time of such use or Release or in a manner that could not reasonably be expected to have a Material Adverse Effect, (e) no Borrower Party is undertaking, or has completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened Release of Hazardous Substances at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law, except to the extent as could not reasonably be expected to have a Material Adverse Effect, (f) to the knowledge of the Borrower, no Hazardous Substances generated, used, treated, handled or stored at, or transported to or from, any property currently owned or operated by any Borrower Party have been disposed of by the Borrower in a manner that could reasonably expected to result in a Material Adverse Effect [*PH Note: Confirm no exceedances at either site would be a potential MAE*], (g) none of the properties currently owned or operated by any Borrower Party is listed or, to the Borrower Parties' knowledge, proposed for listing on the NPL or on the SEMS or any analogous foreign, state or local list or is adjacent to any such property, (h) [to the Knowledge of the Borrower, no underground or above ground storage tanks or surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Substances are being or have been treated, stored or disposed of on any property currently owned or operated by any Borrower Party could reasonably be expected to have a Material Adverse Effect][*PH Note: Confirm accuracy of rep – there may be historical pits associated with oil and gas activities at the Jacksonville site –confirm wouldn't rise to MAE level*], (i) to the knowledge of the Borrower, there is no asbestos or asbestos-containing material on any property currently owned or operated by any Borrower Party in material violation of applicable Environmental Laws and (j) to the Knowledge of the Borrower, Hazardous Substances have not been Released, discharged or disposed of by the Borrower or any Borrower Party on any property currently owned or operated by any Borrower Party, in each case which could reasonably be expected to result in a Material Adverse Effect. As of the Closing Date, there have been no material environmental investigations, studies, audits, reviews or other analyses conducted

Alta App.000790

Alta 0063434

by, in the possession of a Borrower Party [or to a Borrower Party's knowledge, otherwise conducted,][*PH Note: Confirm*] in each case, in relation to the Projects which have not been provided to the Lenders. This Section 3.09 contains the sole representations and warranties of the Borrower regarding environmental matters.

Section 3.10.    Project Documents.

(a)    True and complete copies of all Material Project Documents and Additional Material Project Documents, and any amendments thereto, in each case, in effect on the date this representation is made, have been provided by the Borrower to the Administrative Agent. As of the Closing Date, each of the Material Project Documents is valid, binding and in full force and effect and no material defaults by any Borrower Party or, to the Borrower's knowledge (after due inquiry, including with the Loan Parties and the Sponsor), the Material Project Parties have occurred and are continuing thereunder.

(b)    There are no material services, materials or rights required for the Development of any Project in accordance with the Transaction Documents other than those available under the Project Documents or that can reasonably be expected to be commercially available at the Project Sites on commercially reasonably terms at or before the time when such material services, materials and rights are needed.

(c)    As of any date after the Closing Date, no event has occurred and is continuing under any Material Project Document that has resulted in the cancellation or termination by any Material Project Party of its performance, or the excuse of any Material Project Party from liability for any material non-performance, under any Material Project Document to which any Borrower Party is a party in accordance with the terms thereof, in each case, to the extent that the applicable Material Project Document has not been replaced or is in the process of being replaced in the manner and within the applicable time period specified in Section 7.01(o).

Section 3.11.    Material Adverse Effect. No Material Adverse Effect has occurred and is continuing.

Section 3.12.    Regulations T, U and X. None of the Borrower Parties is engaged principally, or as one its important activities, in the business of extending credit for the purpose, whether immediate, incidental or ultimate, of buying or carrying any "margin stock" (as defined in Regulation U of the Board of Governors (12 C.F.R. 221)) or to extend credit to others for such purpose and no part of the proceeds of the Loans will be used, whether immediate, incidental or ultimate, for the purpose of (a) buying or carrying any margin stock within the meaning of Regulation U of the Board of Governors (12 C.F.R. 221) or to extend credit to others for such purpose or (b) buying or carrying or trading in any security under such circumstances as to involve a Borrower Party in a violation of Regulation X of the Board of Governors (12 C.F.R. 224) or to involve any broker or dealer in a violation of Regulation T of the Board of Governors (12 C.F.R. 220).

Section 3.13.    Information.

(a)    All written information concerning the Loan Parties and the Projects provided by or on behalf of the Borrower to the Mandated Lead Arranger, as updated and supplemented as of the Closing Date and taken as a whole, is complete and correct in all material respects as of the Closing Date and, as of the Closing Date, does not contain any untrue statement of a material fact or omit to state any material fact necessary to make such information not misleading in light of the circumstances under which furnished.

(b)    The Base Case Projections were prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time furnished to the Agents and the Lenders, it being understood that such Base Case Projections are not to be viewed as facts and are subject to uncertainties

Alta App.000791

Alta 0063435

and contingencies, many of which are beyond the control of the Borrower, that no assurance can be given that the Base Case Projections will be realized, that actual results may differ and such differences may be material.

Section 3.14.    Pari Passu. The Loan Parties' obligations under this Agreement and the other Financing Documents rank and will rank at least *pari passu* in priority of payment and in all other respects with all other present or future unsecured and secured Indebtedness of the Loan Parties.

Section 3.15.    Investment Company; Energy Regulatory Status. [*PH Note: Confirm*]

(a)    None of the Loan Parties is an "investment company" or company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940 or an "investment adviser" within the meaning of the Investment Company Act of 1940.

(b)    No Borrower Party is, and none will, as of the date on which any Subsidiary Guarantor first produces, sells or delivers any energy, capacity or ancillary services from any Project, including test energy, become subject to or not otherwise exempt from (i) regulation as a "public utility" under the FPA or (ii) regulation under PUHCA except with respect to maintaining its status as an EWG.

(c)    No Loan Party is subject to regulation as a "public utility" under the FPA.

(d)    No Loan Party is a "holding company" under the FPA.

(e)    Each Subsidiary Guarantor has filed, or will file, with FERC a self-certification notice of its status as an EWG and pursuant to FERC's regulations its self-certification is, or shall be, in full force and effect as of the date each Subsidiary Guarantor first sells any energy, capacity or ancillary services from any Project, including test energy. At such point, each Subsidiary Guarantor will be an EWG under PUHCA and FERC's regulations thereunder.

(f)    Except as may be required as the result of the exercise of remedies under the Financing Documents, no consent, approval, authorization, order, filing, registration or qualification by or with FERC, the PUCT or any other state or federal Governmental Authority with jurisdiction over the energy sales, gas purchases or financing arrangements of the Borrower Parties is required for the execution and delivery of the Financing Documents, the consummation of the transactions contemplated by the Financing Documents or the performance of obligations under the Financing Documents.

(g)    Except as may result from the exercise of remedies under the Financing Documents, none of the Administrative Agent, the Collateral Agent, the Depositary Bank, the Lenders or any Issuing Bank, solely by virtue of the execution, delivery and performance of or its consummation of the Financing Documents, or the transactions contemplated by the Transaction Documents, shall be or become subject to regulation under, or otherwise not exempt from, (i) regulation under PUHCA, (ii) regulation as a "public utility" or "holding company" under the FPA or (iii) subject to regulation as a "public utility," "electric utility," "electric corporation," "holding company" or similar term under Texas laws or regulations.

(h)    None of the [Borrower Parties][*PH Note: Confirm*] is or will, as a result of the production, sale or delivery of any energy, capacity or ancillary services from any Project, including test energy, be or become subject to or not otherwise exempt from, regulation as a "public utility," "electric utility," "electric corporation," "holding company" or similar term under Texas laws or regulations.

(i)    Either (i) each of the Subsidiary Guarantors have executed and are in compliance with the Generation Interconnection Agreements, the Standard Form Market Participant Agreements and the ERCOT Resource Asset Registration Forms submitted to ERCOT for their respective Projects or (ii) no event or condition exists, and the Borrower shall, and shall ensure that each other Borrower Party shall,

Alta App.000792

Alta 0063436

operate each Project so that no event or condition will exist, that would reasonably be expected to prevent the Borrower Party from executing and complying with, prior to generating any electricity, the Generation Interconnection Agreements, the Standard Form Market Participant Agreements and the ERCOT Resource Asset Registration Forms for their respective Projects and the Borrower shall and shall ensure that each other Borrower Party does so prior to the time its respective Project starts generating electricity. The Borrower is not a public utility under state laws and is not subject to state laws or regulations respecting rates.

(j)     To the Borrower's knowledge (after due inquiry, including with the Loan Parties and the Sponsor), there are no complaints or investigation proceedings, public or non-public, pending with the FERC, the PUCT, ERCOT or IMM seeking abrogation or modification, or otherwise investigating the terms, of a contract for the sale of power and/or capacity by any Borrower Party that could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. [*PH Note: Confirm status of self-certification and if 60 day period has run.*]

Section 3.16.     Patriot Act, Sanctions and Related Matters.

(a)     No part of the use of the proceeds of the Loan will be used, directly or indirectly by any Borrower Party, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, or for the purpose of financing or facilitating any activity in violation of the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 or any other applicable anti-bribery or anti-corruption law.

(b)     Neither the Borrower Parties nor any of their respective Subsidiaries (collectively, the "Group") nor, any director, officer, or employee thereof, nor to the Group's knowledge, any, agent, affiliate or representative of the Group, is a Sanctioned Person.

(c)     The Group and their respective directors, officers, and employees, and, to the knowledge of each Borrower Party, the agents of the Borrower Parties and their Subsidiaries, are in compliance with all applicable Sanctions. Each Borrower Party represents and covenants that it will not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person (i) to fund or facilitate any activities or business of or with any Sanctioned Person or in any Sanctioned Country or (ii) in any other manner that will result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as underwriter, advisor, investor or otherwise). Each Borrower Party and their subsidiaries have instituted and maintain policies and procedures designed to ensure continued compliance with applicable Sanctions [*PH Note: Confirm procedures enacted*].

(d)     The operations of the Borrower Parties are and have been conducted at all times in compliance, in all material respects, with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1977, as amended by the PATRIOT Act, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any U.S. Governmental Authority (collectively, the "Money Laundering Laws") and no action, suit or proceeding by or before any court or Governmental Authority or any arbitrator involving the Borrower Parties with respect to the Money Laundering Laws is pending or, to the knowledge of the Borrower (after due inquiry, including with the Loan Parties and the Sponsor), threatened.

(e)     No Borrower Party, nor their Affiliates, directors or officers, nor, to their knowledge, any agent or representative of any Borrower Party, or any affiliate of them, has taken or will take any action in furtherance of an offer, payment, promise to pay, or authorization or approval of the payment or giving of money, property, gifts or anything else of value, directly or indirectly, to any person while knowing that all or some portion of the money or value will be offered, given or promised to anyone

Alta App.000793

Alta 0063437

to improperly influence official action, to obtain or retain business or otherwise to secure any improper advantage in each case in violation of any applicable law (including, without limitation, the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar applicable legislation in other jurisdictions).

(f)    The Borrower Parties and their Affiliates have conducted their businesses in compliance with applicable anti-corruption laws (including, without limitation, the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar applicable legislation in other jurisdictions) and have instituted and maintained, and will continue to maintain, policies and procedures reasonably designed to promote and achieve compliance with such laws and with the representations and warranties contained herein.

Section 3.17.    <u>Security Documents</u>. The Security Documents that have been delivered on or prior to the date this representation is made are effective to create, in favor of the Collateral Agent for the benefit of the Secured Parties, a legal, valid and enforceable Lien on and security interest in all of the Collateral purported to be covered thereby, and all necessary recordings and filings have been made (or arrangements satisfactory to the Administrative Agent to make any necessary recordings or filings on or immediately following the Closing Date, have been made) in all necessary public offices, and all other necessary and appropriate action has been taken, so that the security interest created by each Security Document is a perfected Lien on and security interest in all right, title and interest of the Loan Parties in the Collateral purported to be covered thereby (including delivery to the Collateral Agent of the certificates evidencing all of the Equity Interests in the Borrower Parties), prior and superior to all other Liens other than Permitted Title Encumbrances. The descriptions of the Collateral set forth in each Security Document are true, complete, and correct in all material respects and are adequate for the purpose of creating, attaching and perfecting the Liens in the Collateral granted or purported to be granted in favor of the Collateral Agent for the benefit of the applicable Secured Credit Agreement Parties under the Security Documents.

Section 3.18.    <u>ERISA</u>.

(a)    Except as could not reasonably be expected to result in material liability to a Borrower Party, each Plan is in compliance with the applicable provisions of ERISA, the Code and other Federal or state laws.

(b)    Each Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from Federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service, and, to the knowledge of the Borrower (after due inquiry, including with the Loan Parties and the Sponsor), nothing has occurred that would cause the loss of such tax-qualified status.

(c)    There are no pending or, to the knowledge of the Borrower (after due inquiry, including with the Loan Parties and the Sponsor), threatened or contemplated claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that, either individually or in the aggregate, could reasonably be expected to result in material liability to a Borrower Party. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that, either individually or in the aggregate, has had or could reasonably be expected to result in material liability to a Borrower Party.

(d)    No ERISA Event has occurred, and the Borrower is not aware (after due inquiry, including with the Loan Parties and the Sponsor) of any fact, event or circumstance that, either individually or in the aggregate, could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan.

Alta App.000794

Alta 0063438

(e)     The present value of all accrued benefits under each Pension Plan (based on those assumptions used to fund such Pension Plan) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Pension Plan allocable to such accrued benefits by a material amount. As of the most recent valuation date for each Multiemployer Plan, the potential liability of the Borrower Parties or any ERISA Affiliate for a complete withdrawal from such Multiemployer Plan (within the meaning of Section 4203 or Section 4205 of ERISA), when aggregated with such potential liability for a complete withdrawal from all Multiemployer Plans, is zero.

Section 3.19.    Labor Matters.

(a)     No strike, lockout or other labor dispute in connection with any Project, the business or the Properties of any Borrower Party exists or, to the actual knowledge of the Borrower (after due inquiry, including with the Loan Parties and the Sponsor), is threatened, that could reasonably be expected to result in material liability to a Borrower Party.

(b)     None of the Borrower Parties have any employees or former employees.

Section 3.20.    Single-Purpose Entity. The Borrower Parties have not conducted, and are not conducting, any business other than the Development and the performance of their obligations under the Financing Documents and the Project Documents to which they are a party and, in each case, activities related and incidental thereto.

Section 3.21.    Members; Membership Interests and Related Matters.

(a)     The only member of the Borrower is the Pledgor. The only member of the Subsidiary Guarantors is the Borrower. The Collateral includes all of the Equity Interests in the Borrower and the Subsidiary Guarantors.

(b)     All of the membership interests in each Borrower Party have been duly authorized and validly issued in accordance with the applicable Borrower Party Operating Agreement. None of the Borrower Parties has outstanding any securities convertible into or exchangeable for any of its membership interests in or any rights to subscribe for or to purchase, or any warrants or options for the purchase of, or any agreements providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to any such membership interests (except as expressly provided for herein or in the Security Documents, the Borrower Operating Agreement).

Section 3.22.    Deposit Accounts and Securities Accounts. Other than the accounts permitted to exist under the Depositary Agreement or as otherwise permitted under the Financing Documents (including [Excluded Commodity Accounts] and escrow accounts holding Permitted Cash Credit Support), the Borrower Parties have no Deposit Accounts or Securities Accounts.

Section 3.23.    Solvency. The Loan Parties are, taken as a whole, before and after giving effect to the transactions contemplated hereby on the Closing Date, Solvent.

Section 3.24.    Taxes. Each Borrower Party is a pass-through or disregarded entity for federal income tax purposes, and neither the execution and delivery of this Agreement nor the consummation of any of the transactions contemplated hereby shall affect such status. Each Borrower Party has filed, or caused to be filed, all Federal and all material state, local or other Tax returns required to be filed, and has paid, or caused to be paid, all material Taxes, fees, charges and assessments that are due, other than Taxes, fees, charges and assessments not at the time delinquent or being contested and reserved against in accordance with Section 5.09. To the knowledge of the Borrower (after due inquiry, including with the Loan Parties and the Sponsor), there is no action, suit, proceeding, investigation, audit or claim now pending by any Governmental Authority regarding any Taxes relating to a Borrower Party, except

Alta App.000795

Alta 0063439

after the Closing Date, such action, suit, proceeding, investigation, audit or claim that could not reasonably be expected to have a Material Adverse Effect.

Section 3.25.     Financial Statements. The financial statements in respect of each Loan Party delivered pursuant to Section 4.01(e) and 5.10 are true and correct and fairly present in all material respects the financial condition of the Person to whom they relate as of the date thereof. Such financial statements have been prepared in accordance with Applicable Accounting Requirements consistently applied, subject to normal year-end adjustments and lack of footnotes. There are no material liabilities, direct or contingent, of any Loan Party, except as has been disclosed in the financial statements delivered pursuant to Section 4.01(e) or 5.10 or pursuant to the Financing Documents.

Section 3.26.     Intellectual Property. Each Borrower Party owns, or has adequate licenses or other valid rights to use, all patents, trademarks, service marks, trade names, copyrights, franchises, formulas, licenses, other intellectual property and other rights with respect thereto (and has obtained assignment of all licenses and other rights of whatsoever nature), in each case, necessary for the Projects and the operation of its business as currently contemplated without any conflict with the rights of others, other than any failure to so own or to have that could not reasonably be expected to have a Material Adverse Effect. No product, process, method, substance, part or other material produced, practiced, or employed or presently contemplated to be produced by, practiced by, or employed by a Project infringes or will infringe any patent, trademark, service mark, trade name, copyright, franchise, formula, license or other intellectual property right of any third party in a manner or to an extent that could reasonably be expected to have a Material Adverse Effect.

Section 3.27.     Indebtedness. No Borrower Party has any outstanding Indebtedness or other material liabilities except Permitted Indebtedness.

Section 3.28.     Use of Proceeds. All proceeds of the Term Loans have been used solely in accordance with Section 5.12.

Section 3.29.     Insurance. All insurance policies required to be maintained by the Borrower Parties under Section 5.06(c) and Section 5.18 and represented by insurance policies or binders provided to the Administrative Agent pursuant to Section 4.01(g) or Section 4.01(w)(iv), as applicable, have been obtained and are in full force and effect, all premiums due thereon have been paid. None of the Borrower Parties has received any notice from any insurer that any insurance policy has ceased to be in full force and effect or claiming that the insurer's liability under any such insurance policy can be reduced or avoided.

Section 3.30.     No Other Subsidiaries. The Subsidiary Guarantors have no Subsidiaries, and the Borrower has no Subsidiaries other than the Subsidiary Guarantors.

Section 3.31.     Beneficial Ownership. As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

Section 3.32.     Debt Service Reserve Account. At all times on and after the Conversion Date, the Debt Service Reserve Account has been fully funded (either with cash or through an Acceptable Letter of Credit or a combination thereof) in an amount at least equal to the applicable Debt Service Reserve Required Amount.

Section 3.33.     Major Maintenance Reserve Account. At all times on and after the COD with respect to any Project, the Major Maintenance Reserve Account has been fully funded with cash in an amount at least equal to the portion of the Required Major Maintenance Reserve Amount applicable to such Project.

Alta App.000796

Alta 0063440

ARTICLE IV

CONDITIONS[46]

Section 4.01.    Conditions Precedent to Closing Date.  The effectiveness of this Agreement and the occurrence of the Closing Date are subject to the receipt by the Administrative Agent of each of the following documents and/or the satisfaction of the conditions precedent set forth below (as the context requires), each of which shall be reasonably satisfactory in form and substance to the Administrative Agent and each Lender (unless waived in accordance with Section 9.02):

(a)    Execution of Transaction Documents and Undertaking Letters.  This Agreement, all other Transaction Documents intended to be in effect as of the Closing Date, shall have been duly executed and delivered by the Persons intended to be parties thereto and shall be in full force and effect.

(b)    Security Documents.  The Collateral Agent shall have received evidence reasonably satisfactory to the Lenders and the Administrative Agent that the security interests in and to the Collateral intended to be created under the Security Documents shall have been created in favor of the Collateral Agent for the benefit of the Secured Parties and are fully registered (if applicable), perfected and in full force and effect (including the filing of UCC-1 financing statements) or arrangements satisfactory to the Administrative Agent to make any necessary recordings or filings on or immediately following the Closing Date have been made, and duly executed copies of the Consents to Assignment from each Material Project Party, executed as of the Closing Date, shall have been delivered to the Administrative Agent.

(c)    Corporate Documents.  The following documents, each certified as indicated below:

(i)    a copy of the certificate of incorporation, certificate of formation, charter or other organizational documents[47], together with any amendments thereto, of each Loan Party as of the Closing Date certified by the Secretary of State of its jurisdiction of organization and a certificate as to the good standing of and payment of franchise Taxes (or comparable evidence in the relevant jurisdiction) by each such Loan Party, in each case dated no more than thirty days prior to the Closing Date; and

(ii)    a certificate of an Authorized Officer of each Loan Party as of the Closing Date, dated as of the Closing Date, certifying:

(A)    that attached to such certificate is a true and complete copy of its by-laws, limited liability company agreement, operating agreement or other governing document of such Person, as applicable;

(B)    attached to such certificate is a true and complete copy of resolutions (which resolutions may be "standing" resolutions) duly adopted by the board of directors, member(s), partner(s) or other authorized governing body of such Person, authorizing the execution, delivery and performance of each of the Financing Documents to which such Person is a party, and that such resolutions have not been modified, rescinded or amended and are in full force and effect;

---

[46]    **Note to Draft**: Conditions under review pending completion of due diligence.

[47]    **Note to Draft**: As further detailed in Section 5.27, the organizational document of each Loan Party will be required to include customary separateness provisions and provide for the appointment of an independent manager/director.  Comments to this effect have been shared by W&C to PH.

Alta App.000797

Alta 0063441

(C)    that the certificate or articles of incorporation, certificate of formation, charter or other organizational documents (as the case may be) of such Person has not been amended since the date of the certification furnished pursuant to clause (i) above; and

(D)    as to the incumbency and specimen signature of each officer, member or director (as applicable) of such Person executing the Financing Documents to which such Person is a party.

(d)    Company Certificates. An Officer's Certificate substantially in the form of Exhibit D from the Borrower.

(e)    Financial Statements. Copies of the unaudited financial statements of the Borrower Parties (on a consolidated basis) for the fiscal quarter ended [June 30, 2019][48], accompanied by a certificate from an Financial Officer of the Borrower certifying that such financial statements were prepared in accordance with Applicable Accounting Requirements consistently applied and reflect fairly the financial condition of the Borrower Parties as at the date of such statements.

(f)    Opinion of Counsel to the Loan Parties. Favorable opinions of (i) Porter Hedges LLP, special New York counsel to the Loan Parties, substantially in the form of Exhibit E-1 hereto, (ii) Porter Hedges LLP, special Texas counsel to the Loan Parties, substantially in the form of Exhibit E-2 hereto and (iii) [●], special counsel to the Sponsor, substantially in the form of Exhibit E-3 hereto.

(g)    Insurance and Report of Insurance Advisor.

(i)    The Borrower Parties shall have obtained the insurance described in the Insurance Program to the extent required as of the Closing Date, and such insurance shall be in full force and effect, and the Borrower shall have furnished the Administrative Agent with certificates signed by the insurer or an agent authorized to bind the insurer, together with loss payee endorsements in favor of the Collateral Agent, evidencing such insurance required pursuant to the Insurance Program, identifying insurers, the type of insurance, the insurance limits and the policy terms, and stating that such insurance (A) is, in each case, in full force and effect and (B) complies with Section 5.06 and that all premiums then due and payable on such insurance have been paid.

(ii)    The Administrative Agent shall have received a final favorable report of the Insurance Advisor, which shall be dated as of a recent date, along with a reliance letter of the Insurance Advisor in the form of Exhibit M-2.

(h)    Report of Independent Engineer. A final report of the Independent Engineer favorably reviewing (i) the technical feasibility of each Project and the environmental compliance and environmental risks relating to such Project, (ii) the reasonableness and consistency of the Construction Budget, the Construction Schedule, the Construction Contracts, the Turbine Supply Agreements and related subcontracts and the assumptions related to the costs and operating performance of each Project, (iii) the reasonableness of the assumptions underlying the Base Case Projections and (iv) the gas transmission assessment of each Project, including applicable analysis, which shall be dated as of a recent date, together with a reliance letter of the Independent Engineer in the form of Exhibit M-1.

(i)    [Report of Technical Consultant. A final report of the Technical Consultant favorably reviewing [●], which shall be dated as of a recent date, together with a reliance letter of the Independent Engineer in the form of Exhibit M-5.][49]

---

[48]    **Note to Draft**: Alta to confirm what financial statements will be available at closing.

[49]    **Note to Draft**: Under DB review.

Alta App.000798

Alta 0063442

(j)    Market Report. The Administrative Agent shall have received a final report from the Market Consultant favorably reviewing (i) the reasonableness of the assumptions underlying the Base Case Projections and (ii) such other matters reasonably satisfactory to the Administrative Agent, which shall be dated as of a recent date, along with a reliance letter of the Market Consultant in the form of Exhibit M-3.

(k)    Title. All documents necessary to establish that each Borrower Party has entered into or obtained all necessary real estate fee ownership interests, licenses, easements, rights of way, access rights, utility and other services required for the then-current stage of Development (including the Project Sites), including any instruments or memoranda thereof to be duly recorded with all required Governmental Authorities in accordance with applicable law.

(l)    Budgets.

(i)    A construction budget (as attached as Exhibit Q-1), which shall be consistent in all material respects with the Project Documents and the Base Case Projections, together with a certificate of an Authorized Officer of the Borrower stating that such budget was prepared in good faith by the Borrower and is based upon assumptions which the Borrower considers to be reasonable.

(ii)    A pro forma Operating Budget (as attached as Exhibit Q-2), which shall be consistent in all material respects with the Project Documents and the Base Case Projections, together with a certificate of an Authorized Officer of the Borrower stating that such budget was prepared in good faith by the Borrower and is based upon assumptions which the Borrower considers to be reasonable.

(m)    Construction Schedule. A construction schedule (as attached as Exhibit R), which shall be consistent in all material respects with the Project Documents and the Base Case Projections, together with a certificate of an Authorized Officer of the Borrower stating that such schedule was prepared in good faith by the Borrower and is based upon assumptions which the Borrower considers to be reasonable.

(n)    Title Insurance and Survey.

(i)    Each Title Policy in effect as of the Closing Date, and copies of all recorded documents listed as exceptions to title or otherwise referred to therein, together with evidence that all title insurance premiums and expenses, filing, recordation, subscription and inscription fees and all recording and other similar fees, and all recording, stamp and other Taxes and other expenses related to the issuance of each Title Policy and such filings, registrations and recordings necessary for the consummation of the transactions contemplated by this Agreement and the other Financing Documents have been paid in full by or on behalf of Borrower or will be paid with the proceeds of the Loans extended on the Closing Date;

(ii)    the Survey; and

(iii)    Each of the Projects is comprised of one or more parcels which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of the applicable Project. The Borrower Parties shall have furnished to Administrative Agent copies of, or other evidence satisfactory to Administrative Agent establishing that Borrower Parties have obtained, all consents, licenses, permits and approvals (including zoning and land use approvals) from any and all Governmental Authorities having jurisdiction over Borrower Parties and the Projects.

Alta App.000799

Alta 0063443

(o)    <u>Establishment of Accounts</u>. Each of the Accounts shall have been established pursuant to the Depositary Agreement.

(p)    <u>Lien Searches</u>. Results of a recent search of all effective UCC financing statements and fixture filings and all judgment, litigation and Tax lien filings which have been made with respect to any personal or mixed property of the Loan Parties, together with copies of all such filings disclosed by such search, and UCC termination statements for filing in all applicable jurisdictions as may be necessary to terminate any effective UCC financing statements or fixture filings disclosed in such search (other than any such financing statements or fixture filings in respect of Permitted Title Encumbrances).

(q)    <u>Governmental Approvals</u>. The Borrower shall have delivered true and complete copies of each Part A Approval. Except as set forth on Part A of <u>Schedule 3.05</u>, the applicable Loan Party shall have duly obtained or been assigned and there shall be in full force and effect in the name of the applicable Loan Party or other appropriate permit holder, and not subject to any current legal proceeding or to any unsatisfied condition that could reasonably be expected to allow material modification or revocation of, and all applicable appeal periods shall have expired with respect to, the Part A Approvals.

(r)    <u>Filings</u>. All filings, registrations, recordings and other actions required to be taken as of the Closing Date (including filing UCC-1 financing statements), and all filing, recordation, subscription, inscription, notarization and other similar fees and all recording, stamp and other Taxes and expenses related to such filings, registrations and recordings (including expenses and premiums of the Title Company in connection with each Title Policy) required to be paid, for the consummation of the transactions contemplated by the Transaction Documents shall have been taken and paid, respectively (to the extent that the obligation to make payment then exists), by the Loan Parties.

(s)    <u>Base Case Projections</u>. The Base Case Projections, together with a certificate of an Authorized Officer of the Borrower stating that such projections and supporting documents were prepared in good faith by the Borrower and are based upon assumptions which the Borrower considers to be reasonable.

(t)    <u>Fees and Expenses</u>. The Borrower shall have confirmed that it has paid or has arranged for payment of all fees and expenses of any Lender, the Mandated Lead Arranger, the Agents, and any Issuing Bank, then due and payable by the Borrower pursuant to the Financing Documents.

(u)    <u>Notice to Proceed</u>. A copy of the Notice to Proceed under each applicable Construction Contract, which shall have been delivered to the relevant Contractor under and in accordance with such Construction Contract. [*PH Note: Confirm*]

(v)    [<u>Construction Contract LC POA</u>. A power of attorney in form and substance reasonably satisfactory to the Administrative Agent shall have been delivered to the Administrative Agent in respect of each Construction Contract Letter of Credit][50].

(w)    <u>Compliance with Flood Laws</u>. With respect to each Project Site, the following:

(i)    A completed "life of loan" Federal Emergency Management Agency Standard Flood Hazard Determination;

(ii)    If any improvement to such Project Site is located in a special flood hazard area, a notification thereof to the Borrower from the Administrative Agent (the "<u>Borrower Flood Notice</u>"), and (if applicable) the Borrower Flood Notice shall contain a notification to the Borrower

---

[50]    **Note to Draft**: Subject to due diligence and finalization of the Construction Contracts.

Alta App.000800

Alta 0063444

that flood insurance coverage under the National Flood Insurance Program ("NFIP") is not available because the community does not participate in the NFIP;

(iii)    Documentation evidencing the Borrower's receipt of the Borrower Flood Notice (e.g., countersigned Borrower Flood Notice, return receipt of certified U.S. Mail, or overnight delivery); and

(iv)    If the Borrower Flood Notice is required to be given and flood insurance is available in the community in which the relevant Project Site is located, a copy of one of the following: the flood insurance policy, the Borrower's application for a flood insurance policy plus proof of premium payment, a declaration page confirming that flood insurance has been provided as a separate policy or within the property insurance program for each Project, or such other evidence of flood insurance satisfactory to the Administrative Agent and the Lenders. To the extent that any improvement to a Project Site is located in a special flood hazard area, such flood insurance arranged by the Borrower shall be in an amount at least equivalent to the amount available under the NFIP.

(x)    Environmental Deliverables. The Administrative Agent shall have received:

(i)    an environmental report for each Project Site in form and substance satisfactory to the Administrative Agent, from an environmental consulting firm acceptable to the Administrative Agent, as to any hazards, costs or liabilities under Environmental Laws to which any Project Site, or the Borrower Parties may be subject, the amount and nature of which and the Borrower's plans with respect to which shall be acceptable to the Administrative Agent, together with evidence, in form and substance satisfactory to the Administrative Agent, that all applicable Environmental Laws shall have been complied with. To the extent any such report or any other information that may become available to the Administrative Agent shall disclose any hazards, costs or liabilities under Environmental Laws or otherwise that the Administrative Agent deems material, the Administrative Agent shall be satisfied that the Borrower has made adequate provision for such hazards, costs or liabilities, and

(ii)    a report from the Environmental Consultant along with a reliance letter of the Environmental Consultant in the Exhibit M-4.

(y)    Funds Flow Memorandum. The Administrative Agent shall have received a memorandum setting forth the flow of funds on the Closing Date and a related letter of direction, in form and substance satisfactory to the Administrative Agent.

(z)    Solvency Certificate. The Administrative Agent shall have received a Solvency Certificate in substantially the form of Exhibit G (the "Solvency Certificate"), attesting to the Solvency of the Loan Parties, on a consolidated basis, after giving effect to the transactions contemplated herein, signed by a Financial Officer of the Borrower.

(aa)    Risk Management Policy. The Administrative Agent shall have received a Risk Management Policy adopted by each Borrower Party, in form and substance satisfactory to the Administrative Agent.

(bb)    Know Your Customer Documentation. The Administrative Agent shall have received all such documentation and information in form, scope and substance reasonably satisfactory to the Lenders and Agents as requested by the Lenders and Agents necessary to carry out all necessary "know your customer" or similar requirements with respect to each Loan Party and the Sponsor and other information required by bank regulatory authorities, including those reasonably required to ensure

Alta App.000801

Alta 0063445

compliance with the Patriot Act and applicable foreign assets control and anti-money laundering regulations in such Lender's or Agent's jurisdiction.

(cc)    Beneficial Ownership Certification. To the extent that Borrower qualifies as a "legal entity customer" under 31 C.F.R. § 1010.230, the Administrative Agent shall have received a certification regarding its beneficial ownership as required by such regulation (the "Beneficial Ownership Certification").

(dd)    Representations and Warranties; No Default or Event of Default. (i) The representations and warranties of each Loan Party as of the Closing Date set forth in each Financing Document shall be true and correct on and as of the Closing Date (or, if any such representation or warranty is expressly stated to have been made as of a specific prior date, such representation or warranty was true and correct as of such specific prior date), both at the time of and immediately after giving effect to the Closing Date and (ii) at the time of and immediately after giving effect to the Closing Date, no Default or Event of Default shall have occurred and be continuing.

(ee)    [Additional CPs to be added pursuant to due diligence]

Section 4.02.    Conditions Precedent to Term Loans and to Issuance of Each Letter of Credit. The obligation of each Lender to make any Term Loan pursuant to a Borrowing, and of each Issuing Bank to Issue any Letter of Credit, is subject to the receipt by the Administrative Agent of each of the following documents, and the satisfaction of the conditions precedent set forth below, each of which shall be reasonably satisfactory in form and substance to the Administrative Agent, each applicable Lender and each applicable Issuing Bank (if applicable) (unless waived in accordance with Section 9.02):

(a)    Loan Borrowing Request or Notice of Issuance. Delivery of (i) in the case of Term Loans, a Borrowing Request to the Administrative Agent in accordance with Section 2.01(b) or (ii) in the case of Letters of Credit, delivery of a Notice of Issuance to the Administrative Agent in accordance with Section 2.02(b).

(b)    Representations and Warranties; No Default or Event of Default. (i) The representations and warranties of each Loan Party set forth in each Financing Document shall be true and correct in all material respects on and as of the date of such Borrowing or Issuance (or, if any such representation or warranty is expressly stated to have been made as of a specific prior date, such representation or warranty was true and correct in all material respects as of such specific prior date), both immediately prior to the proposed Borrowing or Issuance and after giving effect to such Borrowing or Issuance, and (ii) at the time of and immediately after giving effect to such Borrowing or Issuance, no Default or Event of Default shall have occurred and be continuing; provided, that a representation or warranty that is qualified by materiality, Material Adverse Effect or similar phrase shall be true and correct in all respects.

(c)    Closing Date Equity Contribution. Solely in the case of the initial Borrowing or Issuance, the Borrower shall have received the Closing Date Equity Contribution.[51]

(d)    Construction Drawdown Certificate; Construction Report; Independent Engineer Certificate. In the case of a Borrowing of Term Loans, delivery of a Construction Drawdown Certificate[52] dated not less than five Business Days prior to the date of the proposed Borrowing (or, with respect to the

---

[51]    **Note to Draft**: Structured as a sign and close, the Closing Date Equity Contribution will be required at the date of signing / closing, and will be required upfront; sizing to be the greater of (a) 10% of projected Project Costs (plus contingency) and (b) projected Project Costs (plus contingency) less Term Loan Commitments.

[52]    **Note to Draft**: Construction Drawdown Certificates to include detailed requirements relating to milestones, testing, and related matters.

Alta App.000802

Alta 0063446

Borrowing of Term Loans on the Closing Date so long as such Borrowing is elected by the Borrower to be an ABR Borrowing on the Closing Date, not less than one Business Day prior to the Closing Date) in the form of <u>Exhibit I</u>, certified by an Authorized Officer of the Borrower with required attachments thereto, including a Construction Report and description of Project Costs incurred to date (and a calculation of Loan to Project Cost Ratio, together with supporting evidence in a form reasonably acceptable to the Administrative Agent (in consultation with the Independent Engineer and Technical Consultant)), together with [(i)] a certificate of the Independent Engineer in the form of <u>Exhibit J-1</u> dated the date of the related Construction Drawdown Certificate [and (ii) a certificate of the Technical Consultant in the form of <u>Exhibit J-2</u> dated the date of the related Construction Drawdown Certificate, in each case][53] certifying (A) that the progress of construction of each Project is in all material respects in accordance with the Construction Budget and Construction Schedule and applicable requirements of the Construction Contracts, (B) COD for each Project is reasonably likely to be achieved by the relevant COD Deadline, (C) the Conversion Date is reasonably likely to be achieved by the Conversion Deadline, (D) that the utilization of previous Borrowings is consistent with the requirements therefor set forth in the Financing Documents, (E) that the Project Costs set forth in the Borrower's calculation of Loan to Project Cost Ratio are consistent with the evidence provided in support thereof, (F) that the amounts on deposit in the Construction Account attributable to revenues from Projects that have achieved COD (taking into account 45 days of projected Operating and Maintenance Expenses for Projects that have achieved COD) would be insufficient to fund the Project Costs for which the Term Loans have been requested and (G) that there are sufficient committed funds available to the Borrower from amounts in the Construction Account and Term Loans proposed to be drawn, and the allocation of such funds among each of the Projects (including taking into account 45 days of projected Operating and Maintenance Expenses for the Projects that have achieved COD) is sufficient to, (1) to achieve COD for each Project on or before the relevant COD Deadline, (2) to achieve the Conversion Date on or before the Conversion Deadline, and (3) to fund (I) the Debt Service Reserve Account in an amount at least equal to the applicable Debt Service Reserve Required Amount on the Conversion Date, and (II) the Major Maintenance Reserve Account in an amount at least equal to the applicable Required Major Maintenance Reserve Amount for each Project upon COD for each such Project.

(e)    <u>Lien Releases; Title Policy Endorsements</u>.

(i)    Solely in the case of a Borrowing of Term Loans, in accordance with the applicable provisions and requirements of the Construction Contracts, (A) copies of duly executed waivers of liens executed by the relevant Contractors with a contract value in excess of $250,000 in respect of all work completed as of the date of their current invoices (other than work in progress) and (B) evidence that the relevant Contractors have received duly executed waivers of liens in respect of all work completed as of the date of their current invoices (other than work in progress) from each of its subcontractors party to a subcontract with a contract value in excess of $250,000 in the aggregate; and

(ii)    Other than in the case of any Borrowings which are advanced on the Closing Date, endorsement(s) to the Title Policies dated not earlier than one Business Day prior to the date of the requested Borrowing (as applicable): (A) re-dating the Title Policies as of the date of such endorsement(s); (B) setting forth no additional exceptions (including survey exceptions) to the Title Policies other than Permitted Title Encumbrances; and (C) otherwise in form and substance satisfactory to the Administrative Agent, acting reasonably, together with evidence of payment (or anticipated payment with a portion of such Term Loan proceeds) of all title insurance premiums and expenses, all filing, recording and similar fees and any other items required by the Title Company to issue such endorsement(s). [**PH Note: Discuss down date required with each draw**]

---

[53]    **Note to Draft**: Under DB review.

Alta App.000803

Alta 0063447